**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERMONT NATIONAL TELEPHONE CO., <br><br> Plaintiff <br><br> v. <br><br> NORTHSTAR WIRELESS, L.L.C., *et al.*, <br><br> Defendants | Civil Action No. 15-728 (CKK) |

**MEMORANDUM OPINION AND ORDER**
(December 12, 2017)

Relator Vermont National Telephone Company brings this action under the False Claims Act ("FCA"), 31 U.S.C. § 3730, alleging that Defendants deprived the United States of approximately $3.3 billion through misconduct during an auction of wireless spectrum licenses conducted by the Federal Communications Commission ("FCC") between November 13, 2014, and January 29, 2015 (the "Auction"), in which Relator also participated. Relator alleges that the Defendants engaged in "a massive fraud" designed to obtain "bidding credits to which they were not entitled," Rel.'s Opp'n to Defs.' Mot. to Temporarily Stay Case Pending Related Appeal and Request for Expedited Consideration, ECF No. 48, at 1, credits which the FCC awarded them through its "designated entity" program. That program defines "designated entities" as either "small businesses" or "very small businesses" that are entitled to bidding credits based on "their average annual gross revenues during the preceding three years." Defs.' Mot. to Temporarily Stay Case Pending Related Appeal and Request for Expedited Consideration, ECF No. 41, at 3. A qualifying "very small business" is eligible for a 25% credit. *Id*.

Two months prior to the Auction, Defendants Northstar Wireless, L.L.C. ("Northstar") and SNR Wireless LicenseCo, L.L.C. ("SNR") filed "short-form" applications to participate in the Auction as designated entities. *Id*. at 2-3; Compl. ¶ 76. Relator's Complaint alleges that Northstar

1

and SNR falsely represented to the FCC that they qualified as "very small businesses" and were thereby entitled to a 25% bid credit, even though the two entities were in fact controlled by Defendant DISH Network Corporation, "a Fortune 250 corporation with annual revenues of $14 billion and a market capitalization of over $32 billion." Rel.'s Opp'n to Defs.' Mot. to Temporarily Stay Case Pending Related Appeal and Request for Expedited Consideration, ECF No. 48, at 2. Relator also alleges that Defendants engaged in a "complex bidding scheme . . . to create the appearance of intense competition in order to scare off legitimate bidders." *Id*.

Northstar and SNR ultimately secured 345 wireless spectrum licenses during the Auction, for a gross bid amount of $13.3 billion; but because they participated as designated entities entitled to a 25% bid discount, Northstar and SNR were only obligated to pay $10 billion. *Id*. at 3. Subsequently, Northstar and SNR filed "long-form" applications to obtain the wireless spectrum licenses they had won in the Auction. Defs.' Mot. to Temporarily Stay Case Pending Related Appeal, ECF No. 41, at 3-4. Relator and seven other parties filed petitions with the FCC to deny those applications shortly thereafter. *Id*. at 4. While its petition was pending before the FCC, Relator filed this *qui tam* action, in which the United States has declined to intervene. *See* The United States' Notice of Election to Decline Intervention, ECF No. 17.

On August 18, 2015, the FCC issued a Memorandum Opinion and Order, which concluded that "DISH is . . . a controlling entity of, or affiliated with [SNR and Northstar] . . . and therefore neither SNR nor Northstar is eligible for very small business bidding credits." FCC Order ¶ 49.[1] The FCC, however, expressly declined to hold that Northstar and SNR had been disingenuous in

---

[1] *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands*, Mem. Op. and Order, File Nos. 0006670613, 0006670667, FCC 15-104 (rel. Aug. 18, 2015) ("FCC Order"), filed in *SNR Wireless LicenseCo, LLC v. F.C.C.*, No. 15-1330 (D.C. Cir.), Document 1579390 (Oct. 22, 2015).

their applications. *Id*. ¶ 9 ("[B]ased on the record before us, we find that [SNR's and Northstar's] disclosure of their agreements and of the existence of their bidding arrangements was sufficient to comply with the disclosure obligations of our rules, and we further find that their bidding activity did not violate the previous FCC rules that governed [the] Auction . . . ."), ¶ 131 ("The fact that the Commission, upon review of the Agreements, concludes that, as a legal matter, the facts disclosed show that DISH controlled the applicants does not compel a finding that the applicants lacked candor."), ¶ 132 ("Based on the record before us, we find no substantial and material question of fact as to whether SNR and Northstar have shown a lack of truthfulness or reliability in their dealings with the Commission."). As a result of the FCC's decision, "Northstar and SNR paid the full auction price to the FCC for spectrum licenses they retained; agreed to the re-auction of licenses they did not retain; and will reimburse the government if those licenses sell for lower prices than their full Auction . . . prices." Defs.' Reply in Supp. of Mot. to Temporarily Stay Case Pending Related Appeal, ECF No. 50, at 4.

Northstar and SNR appealed the FCC order to the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit"). *SNR Wireless LicenseCo, LLC, et al. v. F.C.C.*, 868 F.3d 1021 (D.C. Cir. 2017). On March 2, 2017, the Court stayed the proceedings in the present action pending the issuance of the D.C. Circuit's opinion regarding the appeal of the FCC Order. Mem. Op. and Order, ECF No. 53, at 7. The Court determined that the resolution of the appeal before the D.C. Circuit was likely to have a considerable impact on the next stage of the proceedings in the present action, because it could shed light on whether the FCC properly denied Northstar's and SNR's application for bidding credits, and in what amount the Defendants benefitted from receiving those credits. *Id*. at 6.

On August 29, 2017, the D.C. Circuit rendered a decision which concluded that the FCC "reasonably interpreted and applied" FCC precedent "when it determined that DISH had *de facto* control over SNR and Northstar." *SNR Wireless LicenseCo, LLC*, 868 F.3d at 1030. The D.C. Circuit thus "affirm[ed] the Commission's decision that the petitioners are required to pay full price for the spectrum licenses they won in [the] Auction." *Id*. However, the D.C. Circuit also held that "[b]ecause the FCC did not give clear notice" that it would deny Defendants an opportunity to modify their agreements with DISH, "an opportunity for petitioner to renegotiate their agreements with DISH provides the appropriate remedy here." *Id*. at 1046. The D.C. Circuit thus remanded the matter to the FCC.

In light of that remand, Defendants filed the pending [54] Motion to Extend the Court-Ordered Stay Pending Further Administrative Proceedings ("Motion to Extend Stay"), which requests a stay of this case until the conclusion of administrative proceedings before the FCC. Defs.' Mot. to Extend Court-Ordered Stay Pending Further Administrative Proceedings, ECF No. 54, at 7. Relators subsequently filed the [55] Motion to Set Deadlines for Response to the Complaint and Briefing Schedule ("Motion to Set Deadlines"), opposing a continued stay. Having reviewed the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' [54] Motion to Extend Stay and **DENIES** Relator's [55] Motion to Set Deadlines. While Defendants did not specify a sunset for

---

[2] The Court's consideration has focused on the following documents:
- Compl., ECF No. 1;
- Defs.' Mot. to Extend Court-Ordered Stay Pending Further Administrative Proceedings, ECF No. 54;
- Rel.'s Opp'n to Defs.' Mot. to Extend Stay and in Supp. of Rel.'s Mot. to Set Deadlines for Resp. to Compl. and Briefing Schedule, ECF No. 56; and
- Defs.' Reply Mem. in Supp. of Mot. to Extend Court-Ordered Stay, and Mem. in Opp'n to VTel's Mot. to Set Deadlines, ECF No. 57.

this stay aside from the resolution of the FCC proceedings, the Court understands them to seek an extension of at least ninety days from the October 13, 2017, deadline for the parties to request *en banc* review of the D.C. Circuit decision.[3] *See* Defs.' Reply Mem. in Supp. of Mot. to Extend Court-Ordered Stay, and Mem. in Opp'n to VTel's Mot. to Set Deadlines, ECF No. 57, at 7. This Court finds it appropriate to key the ninety-day period instead from the issuance of the D.C. Circuit's mandate on October 24, 2017. Accordingly, this matter shall be **STAYED** until **JANUARY 22, 2018**, or until resolution of the proceedings before the FCC, whichever is earlier. If the FCC proceedings are not resolved by January 22, 2018, the parties shall file a Joint Status Report on **JANUARY 22, 2018**, as further instructed herein.

## I. LEGAL STANDARD

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n.6 (1998) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936)) (internal quotation marks omitted); *see also Clinton v. Jones*, 520 U.S. 681, 707 (1997). A party requesting a stay of proceedings "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*, 299 U.S. at 255.

## II. DISCUSSION

The Court's determination of whether a stay is warranted "is inextricably intertwined with the nature of the specific case." *Wrenn v. District of Columbia*, 179 F. Supp. 3d 135, 137 (D.D.C.

---

[3] The Court's review of the D.C. Circuit docket indicates that no party sought *en banc* review.

2016) (Kollar-Kotelly, J.). Accordingly, Defendants must show "that a stay is proper in this case, at the present time," given the circumstances specific to this matter. *Id*. In the present case, the stay inquiry reduces to the following two questions: (i) What effect, if any, will the completion of the FCC proceedings have on the proceedings before this Court?; and (ii) How, if at all, will Relator be burdened if a stay is granted, and how, if at all, will Defendants be burdened if a stay is denied?

Defendants represent that, following the FCC Order, they "paid the full auction price to the FCC for spectrum licenses they retained; agreed to the re-auction of licenses they did not retain; and will reimburse the government if those licenses sell for lower prices than their full Auction . . . prices." Defs.' Reply in Supp. of Mot. to Temporarily Stay Case Pending Related Appeal, ECF No. 50, at 4. As recounted above, the D.C. Circuit has ordered the FCC "to give petitioners an opportunity to seek to negotiate a cure for the *de facto* control the FCC found that DISH exercises over them." *SNR Wireless LicenseCo, LLC*, 868 F.3d at 1025. Consequently, one of the following two scenarios will occur. *First*, after re-auctioning of licenses that Defendants did not retain, Defendants will pay the United States the difference between the bid and re-auction prices. *Or second*, the FCC proceedings will result in a restructuring of the agreements between DISH and the defendants, curing the *de facto* control the FCC found, and Defendants will be able to purchase the licenses at the original Auction price. *See SNR Wireless LicenseCo, LLC*, 868 F.3d at 1046 (finding that opportunity-to-cure remedy was consistent with FCC precedent where it gave "small companies a chance to modify their contractual agreements with large investors, in an effort to give the small companies enough independence to satisfy the FCC" such that they would qualify for bidding credits). Relator insists that regardless of whether Defendants pay the government back, damages will still be present because the reverse false claim occurred when Northstar allegedly underpaid for the bidding contracts, an act that would be unaffected by subsequent

6

contractual renegotiations between Northstar and DISH. *See United States v. Newman*, No. 1:16-cv-01169-CKK, 2017 WL 3575848, at *9 (D.D.C. Aug. 17, 2017) ("[A] reverse false claim is any fraudulent conduct that results in no payment to the government when a payment is obligated.") (quoting *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 78 (D.D.C. 2014)) (internal quotation marks omitted). This is an issue for another day. The important point, for purposes of the stay, is that in either scenario, Defendants will have paid in full the amount that they were properly required to pay for the licenses. Consequently, the FCC proceedings are unlikely to have any effect on the amount of money *remaining due to the government*. Consequently, from a factual standpoint, the amount of money that the government has been deprived of is settled. In Defendants' view, the government has been paid in full. In Relator's view, because the original $3.3 billion in bidding credits must be trebled, substantial damages remain even if Defendants pay in full. The ossification of this factual issue counsels in favor of denying a further stay.

Nonetheless, other prudential factors do counsel in favor of waiting for the FCC proceedings to unfurl. To the extent the FCC decides that Defendants *can* cure, and to the extent this means *they could have cured had they been given the opportunity to do so*, and to the extent the FCC was *required to provide this opportunity*, Defendants may be in a stronger litigating position on a motion to dismiss with respect to liability and damages. Further guidance from the FCC on these issues would also be of assistance to the Court in ruling on a motion to dismiss. The benefit of this guidance, however, is not without its temporal limits. Relator asserts that a further stay "inevitably will prejudice Relator's presentation of its case" and result in "a material and irreparable financial loss on both the United States and Relator." Rel.'s Opp'n to Defs.' Mot. to Extend Stay and in Supp. of Rel.'s Mot. to Set Deadlines for Resp. to Compl. and Briefing Schedule, ECF No. 56, at 11-12. As before, because Relator's position assumes a fully favorable

7

outcome at such an early stage in the proceedings, the burdens Relator may suffer from a further stay remain highly speculative, although certainly not non-existent. Conversely, Defendants suggest that the administrative proceedings before the FCC could "substantially impact the nature of this matter" and "the outcome of the FCC proceedings could provide additional grounds to dismiss this matter altogether." Defs.' Mot. to Extend Court-Ordered Stay Pending Further Administrative Proceedings, ECF No. 54, at 6-7. The Court agrees that denying a stay of proceedings in this action before the FCC proceedings are completed could prejudice Defendants in crafting a motion to dismiss, and if the FCC proceedings are completed subsequent to the filing of the parties' responsive pleadings, the parties may seek to amend their pleadings and engage in supplemental motion practice, which would strain judicial resources. Nonetheless, the longer this case remains stayed, the less the benefit of delay outweighs the burden on Relator. Consequently, the uncertainty surrounding the length of the administrative proceedings counsels against granting an indefinite stay pending the conclusion of those proceedings.

Rather, the Court shall adopt an alternative suggested by Defendants. Defendants' Reply Memorandum alternatively suggested an intermediate remedy, namely, that the parties provide the court with a status update every 90 days after the deadline for which the parties have to seek *en banc* review of the D.C. Circuit's opinion. Defs.' Reply Mem. in Supp. of Mot. to Extend Court-Ordered Stay, and Mem. in Opp'n to VTel's Mot. to Set Deadlines, ECF No. 57, at 7. As discussed above, this matter shall be stayed for an additional 90 days from the issuance of the D.C. Circuit mandate, until January 22, 2018, or until the FCC proceedings conclude, whichever is earlier. If the FCC proceedings remain ongoing, the parties shall file a Joint Status Report on January 22, 2018, updating the Court on the status of those proceedings, and when they are likely to conclude. At that time, Defendants may request a further stay of proceedings for 90 days, but their position

must be justified in terms of the likelihood of FCC proceedings concluding in the near future, and of those proceedings having a substantial impact on the motion practice in this case. Absent substantial justification, the Court is disinclined to further delay this matter.

### III. CONCLUSION

For all of the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' [54] Motion to Extend Stay and **DENIES** Relator's [55] Motion to Set Deadlines. This matter shall be **STAYED** until **JANUARY 22, 2018**.

**SO ORDERED.**

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge