**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERMONT NATIONAL TELEPHONE CO., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 15-00728(CKK) |
| NORTHSTAR WIRELESS, L.L.C. *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**RELATOR'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Bert W. Rein (D.C. Bar # 067215)
brein@wileyrein.com
Bennett L. Ross (D.C. Bar # 978122)
bross@wileyrein.com
Stephen J. Obermeier (D.C. Bar # 979667)
sobermeier@wileyrein.com
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Phone: (202) 719-7000
Facsimile: (202) 719-7049

*Attorneys for Relator Vermont National Telephone Company*

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 4

I.      THE FCC SPECTRUM AUCTION PROCESS ............................................... 4

II.     AUCTION 97 ........................................................................................ 6

     A.    Relator's Participation in Auction 97 and Discovery of Defendants' Fraud .......... 6

     B.    Defendants' Fraud In Connection With Auction 97 ............................................. 7

         1.    Pre-Auction Activities ............................................................................. 7

         2.    Defendants' Conduct During Auction 97 ................................................ 8

         3.    Defendants' Post-Auction Conduct ........................................................ 9

III.    POST-AUCTION PROCEEDINGS TO DETERMINE OWNERSHIP OF SPECTRUM ............ 10

STANDARDS OF REVIEW .............................................................................. 13

I.      DISMISSAL FOR FAILURE TO STATE A CLAIM ........................................ 13

II.     DISMISSAL FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY .......... 13

ARGUMENT ................................................................................................. 14

I.      RELATOR HAS ADEQUATELY ALLEGED THAT DEFENDANTS VIOLATED THE FCA ............ 14

     A.    The Submission of False Statements in an FCC Auction Application to Obtain Bidding Credits Gives Rise to an FCA Claim. ................................................... 14

     B.    Like the Government in *Newman* and the Relator in *Gabelli*, Relator Here has Adequately Alleged an Affirmative Claim Under the FCA. ............................... 16

         1.    Relator Has Adequately Pleaded Falsity. ............................................. 16

         2.    Relator Has Adequately Pleaded Scienter. ........................................... 20

     C.    Relator Has Sufficiently Pleaded an FCA Conspiracy. ...................................... 23

         1.    Relator Alleges that Defendants Acted In Concert to Defraud the FCC. .. 23

         2.    Relator Alleges Multiple Overt Acts by Defendants. .............................. 24

         3.    The Intra-Corporate Conspiracy Doctrine Does Not Apply. ................... 25

     D.    Relator Also has Sufficiently Pled a "Reverse False Claim." .............................. 25

     E.    Relator's Complaint Satisfies Rule 9(b) As to All Defendants. .......................... 29

i

II.      THIS CASE IS NOT FORECLOSED BY THE PUBLIC DISCLOSURE BAR......................................33

         A.      Neither the Fraud nor its Essential Elements Were Publicly Disclosed. ..............33

         B.      Relator's Allegations Are Not Substantially Similar to the Alleged Public
                 Disclosures. ........................................................................................................36

         C.      In Any Event, Relator Is An Original Source.......................................................37

III.     THIS CASE IS NOT FORECLOSED BY THE GOVERNMENT ACTION BAR..................................41

CONCLUSION ..................................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banneker Ventures, LLC v. Graham*,
   225 F. Supp. 3d 1 (D.D.C. 2016) ......................................................................23

*United States ex rel. Costner v. URS Consultants, Inc.*,
   153 F.3d 667 (8th Cir. 1998) ...........................................................................41

*United States ex rel. Doe v. Staples, Inc.*,
   773 F.3d 83 (D.C. Cir. 2014) ...........................................................................39

*Foundation for Fair Contracting, Ltd. v. G & M Eastern Contracting*,
   259 F. Supp. 2d 329 (D.N.J. 2003) ..................................................................42

*United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*,
   680 F.3d 933 (7th Cir. 2012) ...........................................................................36

*Hagood v. Sonoma Cnty. Water Agency*,
   81 F.3d 1465 (9th Cir. 1996) ...........................................................................19

*United States ex rel. Harris v. Bernad*,
   275 F. Supp. 2d 1 (D.D.C. 2003) ......................................................................30

*United States ex rel. Heath v. AT&T, Inc.*,
   791 F.3d 112 (D.C. Cir. 2015) ....................................................................29, 31

*United States ex rel. Heath v. Wisconsin Bell, Inc.*,
   760 F.3d 688 (7th Cir. 2014) ...........................................................................39

*Hicks v. D.C.*,
   183 F. Supp. 3d 159 (D.D.C. 2016) ............................................................13, 26

*United States ex rel. Int'l Bhd. of Elec. Workers, Local Union No. 98 v. Farfield Co.*,
   No. CIV.A. 09-4230, 2013 WL 3327505 (E.D. Pa. July 2, 2013).........................41

*United States ex rel. Jonson v. Shell Oil Co.*,
   26 F. Supp. 2d 923 (E.D. Tex. 1998) ................................................................42

*United States ex rel. Lamers v. City of Green Bay*,
   168 F.3d 1013 (7th Cir. 1999) .........................................................................19

*United States ex rel. Mateski v. Raytheon Co.*,
   816 F.3d 565 (9th Cir. 2016) ......................................................................36, 37

*United States ex rel. McDermott v. Genetech, Inc.*,
No. 05-147-P-C, 2006 WL 3741920 (D. Me. Dec. 14, 2006) ...............................................44

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
608 F.3d 871 (D.C. Cir. 2010) ...................................................................................... 23, 24

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2016) .................................................................................................40

*Mpoy v. Rhee*,
758 F.3d 285 (D.C. Cir. 2014) ..............................................................................................38

*United States ex rel. Oliver v. Philip Morris USA, Inc.*,
101 F. Supp. 3d 111 (D.D.C. 2015) ................................................................................ 35, 39

*Pencheng Si v. Laogai Research Foundation*,
71 F. Supp. 3d 73 (D.D.C. 2014) ..........................................................................................25

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
116 F. Supp. 3d 1326 (S.D. Fla. 2015) ..................................................................................19

*United States ex rel. Purcell v. MWI Corp.*,
807 F.3d 281 (D.C. Cir. 2015) ..............................................................................................21

*Rawlings v. District of Columbia*,
820 F. Supp. 2d 92 (D.D.C. 2011) ........................................................................................25

*United States ex rel. Riedel v. Boston Heart Diagnostics Corp.*,
332 F. Supp. 3d 48 (D.D.C. Sept. 12, 2018) .........................................................................13

*RKO Gen., Inc. v. FCC*,
670 F.2d 215 (D.C. Cir. 1981) ..............................................................................................43

*United States ex rel. S. Prawer & Co. v. Fleet Bank of Me.*,
24 F.3d 320 (1st Cir. 1994)............................................................................ 41, 42, 43, 44

*United States ex rel. Schagrin v. LDR Indus., LLC*,
No. 14 C 9125, 2018 WL 6064699 (N.D. Ill. Nov. 20, 2018)...............................................44

*United States ex rel. Scott v. Pac. Architects and Engineers (PAE), Inc.*,
270 F. Supp. 3d 146 (D.D.C. 2017) ................................................................................. 13, 29

*United States ex rel. Scutellaro v. Capitol Supply, Inc.*,
No. CV 10-1094, 2017 WL 1422364 (D.D.C. Apr. 19, 2017) .......................................*passim*

*United States ex rel. Settlemire v. District of Columbia*,
198 F.3d 913 (D.C. Cir. 1999) ..............................................................................................35

*United States ex rel. Shea v. Cellco P'ship*,
   863 F.3d 923 (D.C. Cir. 2017) ........................................................ 33, 37, 39, 40

*Slate v. Pub. Def. Serv. for the D.C.*,
   31 F. Supp. 3d 277 (D.D.C. 2014) ................................................................38

*SNR Wireless LicenseCo, LLC v. FCC*,
   868 F.3d 1021 (D.C. Cir. 2017) ..................................................................12

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) ...............................................................33, 41

*Swierkiewicz v. Sorema, N.A.*,
   534 U.S. 506 (2002) ....................................................................................26

*United States ex rel. Taylor v. Gabelli*,
   345 F. Supp. 2d 313 (S.D.N.Y. 2004) ..................................................*passim*

*United States ex rel. Taylor v. Gabelli*,
   345 F. Supp. 2d 340 (S.D.N.Y. 2004) ....................................................3, 22

*United States ex rel. Tran v. Computer Scis. Corp.*,
   53 F. Supp. 3d 104 (D.D.C. 2014) ................................................................23

*United States v. Allergan, Inc.*,
   No. 17-1014, 2018 WL 3949031 (3rd Cir. Aug. 16, 2018)................................21

*United States v. Dynamic Visions, Inc.*,
   216 F. Supp. 3d 1 (D.D.C. 2016) ................................................................17

*United States v. DynCorp Int'l, LLC*,
   253 F. Supp. 3d 89 (D.D.C. 2017) ................................................................16

*United States v. Medtronic, Inc.*,
   327 F. Supp. 3d 831 (E.D. Pa. 2018)...........................................................40

*United States v. Newman*,
   No. CV 16-1169, 2017 WL 3575848 (D.D.C. Aug. 17, 2017) ....................*passim*

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008) ................................................................19

*United States ex rel. Yannacopoulos v. General Dynamics*,
   652 F.3d 818 (7th Cir. 2011) ................................................................19

## Statutes

31 U.S.C. § 3729(b)(3) ................................................................................... 26, 27

31 U.S.C. § 3730(e)(3) ..................................................................................... *passim*

31 U.S.C. § 3730(e)(4)(A) .......................................................................................33

31 U.S.C. § 3730(e)(4)(B) ................................................................. 3, 4, 38, 39

## Other Authorities

47 C.F.R. § 1.2104(g)(2) ................................................................................ *passim*

47 C.F.R. § 1.2108(d) ..............................................................................................43

47 C.F.R. § 1.2109(a) ...................................................................... 5, 9, 27, 28

65 Fed. Reg. 52323-01, 52334 (Aug. 29, 2000) ......................................................27

*Application of Baker Creek Communications, L.P.*, Memorandum Opinion and
    Order, 13 FCC Rcd 18709 (1998) ....................................................................22

*Licenses, 70 Bidders Qualified to Participate in Auction 97*, Public Notice, 29
    FCC Rcd 13465 (Oct. 30, 2014) ......................................................................27

*Licenses Closes, Winning Bidders Announced for Auction 97*, Public Notice, 30
    FCC Rcd 630 (Jan. 30, 2015) ................................................... 9, 10, 27, 28

*Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New
    Licenses in the 1695-1710 MHz and 1755-1780 MHz and 2155-2180 MHz Bands*,
    Memorandum Opinion and Order, 30 FCC Rcd 8887 (Aug. 18, 2015) ......................... *passim*

*Wireless Telecommunications Bureau Announces That Applications for AWS-3
    Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz
    Bands Are Accepted for Filing*, Public Notice, 30 FCC Rcd 3795 (Apr. 29,
    2015) ..........................................................................................................10

## INTRODUCTION

Defendants' motion to dismiss should be denied.[1] The motion weaves a self-serving story of Defendants' actions that is both contradicted by the well-pleaded allegations of the Complaint and entirely false. As Defendants tell it, Northstar and SNR were two, small independent business entities that needed financing from DISH to gain access to spectrum licenses in the Federal Communication Commission's ("FCC") Auction 97 that they intended to use to operate wireless networks. According to Defendants, Northstar and SNR disclosed everything about their relationship with DISH to the FCC, but innocently stepped over a vague regulatory line defining *de facto* control in granting investor safeguards to DISH – a line that, once crossed, led the FCC to find that Northstar and SNR were ineligible for the 25 percent bidding credits.

But the facts alleged by Relator Vermont National Telephone Company ("Relator") are far different, and when the facts are construed in Relator's favor, they easily state a claim under the False Claims Act ("FCA"). As pleaded in the Complaint, the DISH Entities engineered a scheme to defraud the Government by acquiring spectrum licenses for DISH at a 25 percent discount to which DISH was not entitled. Northstar and SNR were created, financed, and controlled by DISH to act as its agents in Auction 97; to obtain at heavily discounted prices nationwide spectrum licenses that would be turned over to DISH; to adhere to a bidding strategy engineered by DISH to obtain the licenses that DISH coveted; and to maintain the pretense of independence throughout

---

[1]   Defendants include Northstar Wireless, L.L.C. ("Northstar Wireless"), Northstar Spectrum, L.L.C. ("Northstar Spectrum"), and Northstar Manager, L.L.C. ("Northstar Manager") (together, "Northstar"); Doyon, Limited ("Doyon"); Miranda Wright ("Wright"); Allen M. Todd ("Todd"); SNR Wireless LicenseCo, L.L.C. ("SNR Wireless"), SNR Wireless HoldCo, L.L.C. ("SNR HoldCo"), and SNR Management, L.L.C. ("SNR Management") (together, "SNR"); Atelum L.L.C. ("Atelum"); John Muleta ("Muleta"); American AWS-3 Wireless I L.L.C. ("American I"); American AWS-3 Wireless II L.L.C. ("American II"); American AWS-3 Wireless III L.L.C. ("American III"); DISH Wireless Holding L.L.C. ("DISH Holding"), DISH Network Corporation ("DISH"), Charles W. Ergen, and Cantey M. Ergen (the "Ergens") (collectively, "DISH Entities").

the regulatory process by not disclosing their agency relationship and knowingly and falsely certifying that they were not controlled by DISH. By fraudulently misrepresenting and failing to disclose their true relationship with DISH, Northstar and SNR successfully claimed – and used – 25 percent bidding credits in meeting their obligation to pay for the licenses for which they were the high bidders in Auction 97. And in so doing, they deprived the United States of $3.3 billion in auction payments the Government should have received on March 2, 2015. These facts satisfy the required elements of a claim under the FCA and require denial of Defendants' motion to dismiss.

Significantly, this is not the first case in which courts have addressed the fraudulent acquisition and use of bidding credits in an FCC auction. In *United States v. Newman*, No. CV 16-1169 (CKK), 2017 WL 3575848 (D.D.C. Aug. 17, 2017), this Court denied a motion to dismiss an FCA complaint arising from Mrs. Newman's acquisition of a "new entrant bidding credit" by dissembling her spouse's controlling involvement in the bidding entity. Similarly, in *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313 (S.D.N.Y. 2004), the court denied motions to dismiss a relator's FCA complaint alleging that the defendants fraudulently acquired bidding credits by not disclosing Mr. Gabelli's disqualifying control. Here, Defendants' motion to dismiss Relator's Complaint should fare no better. Indeed, that Defendants only cite *Newman* once and make no attempt to distinguish either *Newman* or *Gabelli* is telling.

Nor can Defendants take comfort in the FCC's *Bidding Credit Order*.[2] That the FCC may have failed to find a "lack of candor" in Northstar's and SNR's applications for bidding credits does not negate scienter under the FCA. As the *Gabelli* court explained, "[f]or purposes of the FCA, 'knowing' and 'knowingly' do not require proof of a 'specific intent' to defraud" as required

---

[2]     *See Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz and 1755-1780 MHz and 2155-2180 MHz Bands*, Memorandum Opinion and Order, 30 FCC Rcd 8887, ¶ 30 (Aug. 18, 2015) ("*Bidding Credit Order*").

under the FCC's candor rules. 345 F. Supp. 2d at 352. And more importantly, the FCC expressly assumed that Defendants had "made full and truthful disclosures" to the FCC. *See* Dkt. 65 at 3; *Bidding Credit Order* ¶ 21 n.69. Relator has expressly alleged otherwise here, and Relator's claims – whether characterized as standard FCA allegations or reverse FCA allegations – satisfy Rules 8 and 9(b).

This case also should not be dismissed under the public disclosure bar. Foremost, neither the allegation of fraud at issue in this case nor its essential elements were publicly disclosed in a single source prior to Relator asserting its claims. Specifically, none of the alleged public disclosures on which Defendants rely identified that Defendants had violated the FCA by fraudulently seeking bidding credits to which they were not entitled by propping up Northstar and SNR to represent themselves as independent, very small entities to the FCC when, in fact, they were agents of DISH; in fact, none raised even a general allegation that Defendants had committed *fraud*. And for that same reason, Relator's allegations are not "substantially similar" to any of the alleged public disclosures identified by Defendants as required under the public disclosure bar. Indeed, none of the alleged public disclosures comes close to describing Defendants' fraud at the level of specificity contained in the Complaint.

Moreover, even if the Court were to conclude that the public disclosure bar was applicable as a threshold matter, the Complaint should not be dismissed because Relator has plausibly pleaded that it is an original source under the FCA. Relator "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" prior to any public disclosure of Defendants' fraud in Auction 97. 31 U.S.C. § 3730(e)(4)(B). In addition, Relator has adequately alleged that it "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to

the Government before filing an action under this section." *Id.* Specifically, Relator has alleged that it possesses "independent knowledge" of the information on which its claims are based by its participation in Auction 97 and subsequent investigation of Defendants' bidding behavior, which could only be explained by the exercise of central, coordinated control to the benefit of a single entity: DISH. Relator also has plausibly alleged that it has materially added to the alleged public disclosures because its independent investigation revealed that Defendants had engaged in a knowing scheme to defraud the Government in violation of the FCA.

Finally, this case is not foreclosed by the so-called "government action bar." The proceeding in which the FCC denied the bidding credits does not constitute an "administrative civil money penalty proceeding" under 31 U.S.C. § 3730(e)(3) because: (1) the FCC did not impose a fraud penalty against Defendants in that proceeding; (2) Northstar and SNR were the only Defendants that were even parties to that proceeding; and (3) the FCC could not lawfully have sought to penalize Northstar and SNR in that proceeding. The sole purpose of the FCC proceeding was to determine Northstar's and SNR's regulatory eligibility for bidding credits, not to penalize Defendants for fraud, which renders Section 3730(e)(3) inapplicable.

## BACKGROUND

### I.   THE FCC SPECTRUM AUCTION PROCESS

The right to use specific frequencies to provide wireless communications services is a highly valuable, publicly-owned asset that is managed and controlled by the FCC. Dkt. 1 ("Compl.") ¶ 42. Since 1993, Congress has authorized the FCC to use competitive bidding in public auctions in allocating this highly-valuable asset among competing applicants. *Id.* The FCC divides the spectrum into blocks based on frequency and geography. *Id.*

Consistent with Congress's directive to promote economic opportunity and competition and to "disseminat[e] [wireless] licenses among a wide variety of applicants, including small

businesses, rural telephone companies, and businesses owned by members of minority groups and women," *id.* ¶ 45, the FCC established a system to award eligible DE bidding credits (*i.e.*, discounts) against the gross amounts of their winning bids in a spectrum auction. *See id.* ¶¶ 45-55. Under the FCC's rules, a "very small business" (*i.e.*, a business with less than $15 million in gross revenues for the past three years) is eligible to receive bidding credits equal to 25 percent of its gross winning bids. *Id.* ¶¶ 47-48.

Spectrum auctions involve a two-step process. Step One is the auction itself, where winning auction bidders obtain the exclusive right to pursue a license to use a particular block or set of blocks of spectrum. *Id.* As a prerequisite to participating in the auction, an entity must submit a Short-Form application, or FCC Form 175, in which it makes certain disclosures and certifications to the FCC under penalty of perjury regarding its legal, technical, and financial qualifications to participate in FCC spectrum auctions, including whether its attributable revenues qualify the entity for "designated entity" ("DE") bidding credits. *Id.* ¶¶ 43, 57-58. Winning bidders are under a contractual and regulatory obligation to then pay the full amount of their winning bids by a date certain. *Id.* ¶ 73; *see also* 47 C.F.R. § 1.2104(g)(2); *id.* § 1.2109(a). Under Step Two, the winning bidder must submit a Long-Form application, or FCC Form 601, in which, *inter alia*, it must again demonstrate its eligibility to claim license bidding credits as a DE. Compl. ¶¶ 69-70. Based on the Long-Form application, the FCC determines whether the winning bidder satisfies all regulatory requirements to hold the spectrum licenses. *Id.* ¶¶ 69-73.

Importantly, to ensure that a small business legitimately qualifies for bidding credits (*i.e.*, that it is not merely being used as a stalking horse for a larger enterprise), the FCC requires an entity seeking "designated entity" status to identify in its Short-Form and Long-Form applications not only its own gross revenues, but also the gross revenues of its affiliates, its controlling interests,

the affiliates of its controlling interests, and entities with which it had an attributable material relationship for the preceding three years. *Id.* ¶ 48; *see also id.* ¶ 54 (defining "affiliate"); *id.* ¶ 50-52 (defining "controlling interest"); *id.* ¶ 55 (defining "attributable material relationship"). Moreover, federal "anti-trafficking" and "unjust enrichment" restrictions prevent winning bidders from earning speculative profits through post-auction resale of discounted licenses for a five-year period. *Id.* ¶ 74. These restrictions are in place to prevent bidders from circumventing congressional policy in favor of promoting small businesses by acquiring licenses at a discount and then turning over control of those licenses to large entities like DISH that are not eligible for bidding discounts. *Id.*

## II.   AUCTION 97

### A.   Relator's Participation in Auction 97 and Discovery of Defendants' Fraud

Relator is a small, family-owned company that provides telephone service to rural Vermonters on a network that has been in operation since 1890. *Id.* ¶ 8-9. Relator's wholly-owned subsidiary, VTel Wireless, Inc. ("VTel"), provides 4G LTE wireless service throughout Vermont.

In response to the FCC's May 19, 2014 public notice announcing the auction of licenses in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Advanced Wireless Service bands (collectively, "AWS-3" bands), which was designated as Auction 97, *see Bidding Credit Order* ¶ 11, VTel properly registered and participated as a "small business" entitled to a 15 percent bidding credit on any spectrum licenses it obtained. Compl. ¶¶ 8, 10. Unlike Northstar and SNR, however, VTel is a true small business that was eligible to claim small business bidding credits under FCC rules. *Id.* ¶ 10.

Despite being precisely the type of company Congress and the FCC intended to promote by offering designated entity bidding credits, VTel did not obtain any spectrum in Auction 97. *Id.* ¶ 11. This was due, in part, to Defendants' fraudulent conduct during the action, which succeeded

in causing VTel, and others to drop out from bidding in response to the false impression of high demand. *Id.* ¶¶ 11, 87.  Based on VTel's experience in Auction 97, Relator requested its counsel to investigate Defendants' conduct, which included consulting a recognized expert in FCC bidding and game theory, who concluded that the observed behavior of Defendants in Auction 97 could only be explained if control was exercised by a single entity for its own benefit.  *Id.* ¶ 104.

**B.     Defendants' Fraud In Connection With Auction 97**

      1.     <u>Pre-Auction Activities</u>

The DISH Entities conceived the idea of a fraudulent discount scheme and coordinated with Muleta and Doyon to form two sham DEs – Northstar and SNR – that would bid for spectrum on DISH's behalf at a 25 percent discount.  Together, the DISH Entities, Muleta, and Doyon formed Northstar and SNR just *days* before the start of the Auction 97.  Compl. ¶¶ 5, 15, 23; *Bidding Credit Order* ¶¶ 14, 17.  And although DISH created a complex chain of *de jure* controls to create the illusion of independence, Northstar and SNR were fronts existing only on paper to benefit DISH – a Fortune 250 corporation with average annual revenues in excess of $13 billion that could not on its own obtain the bidding credits. Compl. ¶ 5; *Bidding Credit Order* ¶ 4.

As part of the scheme, the DISH Entities also created a third entity, American I, as a wholly-owned, indirect DISH subsidiary to participate in the auction. Compl. ¶¶ 31-36. Its purpose was not to win any licenses but rather to permit DISH to organize and participate in a bid coordination agreement with Northstar, SNR, and American I (collectively, "DISH Bidding Defendants") through which DISH could dictate continuously the entities' bidding activities in Auction 97 in real time. *Id.* ¶¶ 89-90, 103.

The DISH Bidding Defendants filed Short-Form applications on September 12, 2014. *Id.* ¶ 76. Northstar and SNR both falsely certified in their applications that they qualified as "very small businesses" under FCC rules. *Id.* ¶ 77. Defendants Wright and Todd made the false

certifications on behalf of Northstar, and Defendant Muleta made the false certifications on behalf of SNR. *Id.* ¶¶ 78-79, 111-113. These certifications were false because, as Defendants well knew, Northstar and SNR were not independent decision-makers, but instead functioned as DISH's agents to further DISH's business interests pursuant to agreements and understandings that Northstar and SNR failed to disclose to the FCC. *Id.* ¶¶ 114-117. Northstar and SNR fraudulently failed to include and attribute the revenue of DISH, which would have disqualified Northstar and SNR from obtaining bidding credits. *Id.* ¶ 114.

2.    <u>Defendants' Conduct During Auction 97</u>

Before the commencement of bidding, pursuant to the rules of Auction 97, DISH funded Northstar to purchase $508 million worth of bidding units to be used during the auction, and SNR to purchase $412 million worth of units. The total bidding units purchased by Northstar and SNR allowed them both to bid for spectrum nationwide. *Id.* ¶ 64.

Auction 97 commenced on November 13, 2014. *Id.* ¶ 2. During the auction, in furtherance of its plan to defraud the Government, DISH implemented and directed a complex bidding scheme whereby the DISH Bidding Defendants submitted overlapping and anonymous bids to create the appearance of intense competition to scare off legitimate bidders. *Id.* ¶ 87. Once the DISH Bidding Defendants were able to eliminate competitors for the spectrum they sought, DISH's subsidiary American I – which was not eligible for the bidding credits – dropped out of the bidding and "handed off" the spectrum to Northstar and SNR, which claimed eligibility for the credits. *Id.* ¶ 88. Moreover, when American I stopped bidding, the competitive bidding between Northstar and SNR stopped. *Id.* ¶ 90. That is, when Northstar and SNR were competing against other active bidders, *i.e.,* DISH's competitors, they typically increased their bids; however, after DISH was successful in pushing out its competitors, Northstar and SNR would generally stop bidding against each other. *Id.*

8

Further evidencing their unity with DISH, Northstar and SNR bid in a manner that benefitted DISH but was inconsistent with their future operation of independent wireless networks. *Id.* ¶ 92. Tellingly, although both entities finished the auction with spectrum scattered across the country in no discernible pattern such that they had no viable network from their individual perspectives, taken together, they were able to obtain near nationwide coverage of AWS-3 spectrum. *Id.* This, of course, was the precise result sought by DISH. *Id.*

### 3.   Defendants' Post-Auction Conduct

The auction concluded on January 29, 2015. *Id.* ¶ 93. While DISH's subsidiary American I – which would have had to pay full price for any wireless licenses acquired during the AWS-3 auction – did not win a single license, Northstar and SNR, created just days before the start of the auction, won more than 700 licenses (of the 1,614 wireless licenses the FCC auctioned) for which they bid approximately $13.3 billion.  *Id.* ¶ 94; *Bidding Credit Order* ¶ 3.

After the close of the auction, on February 13, 2015, Northstar and SNR made down payments totaling 20 percent of the discounted bid amounts and submitted their FCC Form 601 Long-Form applications, which required Northstar and SNR to verify the information previously submitted in their Short-Form Applications. Compl. ¶¶ 69-72. As was the case with their Short-Form Applications, Northstar's and SNR's Long-Form applications included numerous fraudulent statements and omissions and false certifications. *Id.* ¶¶ 85, 95-96, 110.

FCC regulations and the rules governing Auction 97 obligated Northstar and SNR to pay $13.3 billion to the FCC on or before March 2, 2015, which represented the full amount of their winning bids.  *See* 47 C.F.R. § 1.2104(g)(2) ("A bidder assumes a *binding obligation* to pay its full bid amount upon acceptance of the winning bid at the close of an auction") (emphasis added); 47 C.F.R. § 1.2109(a); *Winning Bidder Notice*, ¶ 8 (establishing March 2, 2015 as "the final

payment deadline for Auction 97 . . .").[3] Because of their fraudulently-obtained DE credits, Northstar and SNR only paid approximately $10 billion for the licenses won at auction, depriving the Government of $3.3 billion to which it was entitled on March 2, 2015. *Id.* ¶¶ 73, 94-96.

## III.   POST-AUCTION PROCEEDINGS TO DETERMINE OWNERSHIP OF SPECTRUM

On April 29, 2015, the FCC accepted Northstar's and SNR's Long-Form Applications for filing "upon initial review," giving other parties until May 11, 2015 to file petitions to deny the applications.[4] VTel filed a petition to deny, challenging Northstar's and SNR's eligibility for bidding credits, and VTel's filing was only one of two petitions to deny that the FCC accepted because the other filers lacked standing.  *Bidding Credit Order* ¶¶ 30, 38.

In its August 18, 2015 *Bidding Credit Order*, the FCC found that Northstar and SNR were not "very small businesses" eligible for the approximately $3.3 billion in bidding credits they had claimed because, based on the administrative record only, Northstar and SNR were under the *de facto* control of DISH.  *See id.* ¶¶ 4-9.  The FCC agreed with VTel that the contractual commitments between Northstar, SNR, and DISH went far beyond what the FCC had previously approved as passive investor protections and instead gave DISH control of Northstar and SNR.  *Id.* ¶¶ 59-68.  These commitments effectively precluded Northstar and SNR from engaging in any business activity without DISH's prior agreement and from seeking financial assistance from any source other than DISH.  *Id.* ¶¶ 84-99.  Most importantly, they saddled Northstar and SNR with

---

[3]     *Auction of Advanced Wireless Services (AWS-3) Licenses Closes, Winning Bidders Announced for Auction 97*, Public Notice, 30 FCC Rcd 630 (Jan. 30, 2015) ("*Winning Bidder Notice*").

[4]     *Wireless Telecommunications Bureau Announces That Applications for AWS-3 Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands Are Accepted for Filing*, Public Notice, 30 FCC Rcd 3795 (Apr. 29, 2015).

debt repayment obligations that could only be satisfied by selling their spectrum licenses to DISH under a pre-set "put" arrangement. *Id.* ¶ 105.

The FCC declined VTel's request that the agency look behind Northstar's and SNR's certifications of independence and designate their applications for hearing. *Id.* ¶ 145. Rather, the FCC concluded that while "the facts disclosed show that DISH controlled [Northstar and SNR]" this "does not compel a finding that the applicants lacked candor." *Id.* ¶ 131. The FCC's conclusion expressly presumed, however, that Northstar and SNR had provided the agency "copies and/or summaries of all oral and written arrangements between [Northstar and SNR] and DISH that would bear on their eligibility [for bidding credits]." *Id.* ¶ 21 n.69.

Based on its finding, the FCC determined that Northstar and SNR were required to pay the full amount of their winning bids. *Id.* ¶¶ 152, 154. The FCC ordered Northstar and SNR to either pay the $3.3 billion they owed for the licenses acquired during Auction 97 or provide irrevocable letters of credit in the amount of $3.3 billion. *Id.* ¶¶ 153, 155.

Rather than comply with the FCC's order, however, Northstar and SNR selectively defaulted on $3.3 billion of the licenses they won in Auction 97.[5] By doing so, Northstar and SNR were subject to default payments of $333,919,350 and $181,635,840, respectively, and, after the licenses on which they selectively defaulted are reauctioned, will be responsible for an additional payment equal to fifteen percent of Northstar's and SNR's bids, or the subsequent winning bids, whichever is less.[6] DISH guaranteed payment to the FCC of the default payments that Northstar

---

[5]    Letter from Roger C. Sherman, Chief, Wireless Telecommunications Bureau, FCC, to Mark F. Dever, Counsel, Northstar Wireless LLC, DA 15-1108 (Oct. 1, 2015) ("Dever Letter"); Letter from Roger C. Sherman, Chief, Wireless Telecommunications Bureau, FCC, to Ari Q. Fitzgerald, SNR Wireless LicenseCo, LLC, DA 15-1109 (Oct. 1, 2015) ("Fitzgerald Letter").
[6]    Dever Letter at 2-3 (citing 47 C.F.R. § 1.2104(g)(2)); Fitzgerald Letter at 2-3 (same).

and SNR will owe when the licenses on which they defaulted are re-auctioned, which is further evidence that Northstar and SNR functioned as agents of DISH.[7]

Following their selective default, SNR and Northstar challenged the *Bidding Credit Order* on a number of procedural and substantive grounds before the Court of Appeals for the D.C. Circuit. The D.C. Circuit ultimately rejected Defendants' position, holding that the FCC "reasonably interpreted and applied" its precedent "when it determined that DISH had *de facto* control over SNR and Northstar." *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1030 (D.C. Cir. 2017), *cert. denied sub nom. SNR Wireless LicenseCo v. FCC*, 138 S. Ct. 2674 (2018). Thus, the Court of Appeals affirmed "the Commission's decision that the petitioners are required to pay full price for the spectrum licenses they won" at auction.  868 F.3d at 1030.

While affirming the FCC's decision that Northstar and SNR were under DISH's *de facto* control and not entitled to bidding credits, the D.C. Circuit remanded the matter to the FCC to give Northstar and SNR "an opportunity to seek to negotiate a cure for the *de facto* control the FCC found that DISH exercises over them." *SNR Wireless LicenseCo*, 868 F.3d at 1025. Notably, the D.C. Circuit did not direct the FCC "to permit a cure" – a choice that, according to the Court of Appeals, "lies with the FCC . . . ." *Id.* at 1046.  Although the FCC's remand proceedings remain pending, Defendants' attempts to "cure" DISH's *de facto* control over SNR and Northstar cannot obscure the extensive evidence establishing that Northstar and SNR are sham companies "that lack any real plan or potential to build wireless service" and exist solely for DISH "to obtain bidding credits."  *SNR Wireless LicenseCo*, 868 F.3d at 1045.

---

[7]     Dever Letter at 4; Fitzgerald Letter at 4.

## STANDARDS OF REVIEW

### I.     DISMISSAL FOR FAILURE TO STATE A CLAIM

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual allegations that, if accepted as true, 'state a claim to relief that is plausible on its face.'" *Hicks v. D.C.*, 183 F. Supp. 3d 159, 164 (D.D.C. 2016). The Court "must treat the complaint's factual allegations as true [and] must grant [the] plaintiff the benefit of all reasonable inferences from the facts alleged." *United States ex rel. Riedel v. Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 64 (D.D.C. Sept. 12, 2018). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hicks*, 183 F. Supp. 3d at 164.

### II.    DISMISSAL FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY

Fraud claims – including claims under the FCA – are subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(b). To meet that standard, "[t]he D.C. Circuit has required plaintiffs to 'state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud,' and to 'identify individuals allegedly involved in the fraud.'" *United States ex rel. Scott v. Pac. Architects and Engineers (PAE), Inc.*, 270 F. Supp. 3d 146, 152 (D.D.C. 2017). "Put more colloquially, an FCA plaintiff must identify the 'who, what, when, where, and how of the alleged fraud.'" *Id.*

Rule 9(b), however, "does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations." *Id.* "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* As this Court has explained, "the point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *Id.* at 152-53.

**ARGUMENT**

I.   **RELATOR HAS ADEQUATELY ALLEGED THAT DEFENDANTS VIOLATED THE FCA.**

Relator's Complaint alleges that Defendants engaged in a conspiracy to defraud the United States of $3.3 billion by having Northstar and SNR fraudulently misrepresent their relationship with DISH, fail to disclose they were acting as agents of DISH, and falsely certify their eligibility for bidding credits as "very small businesses." *See* Compl. ¶¶ 2-6, 97-116. In *Newman* and *Gabelli*, this Court and the Southern District of New York, respectively, held that this type of fraud to obtain bidding credits states a claim under the FCA. Based on the framework in *Newman* and *Gabelli*—decisions that Defendants largely ignore and make no attempt to distinguish—Relator has sufficiently pleaded all elements of an FCA claim against each Defendant.

   A.   **The Submission of False Statements in an FCC Auction Application to Obtain Bidding Credits Gives Rise to an FCA Claim.**

The fraud alleged here by Relator is not new, although it has never been attempted on the scale perpetrated by Defendants. Although Defendants make only a passing reference to *Newman* and no mention of *Gabelli*, those cases alleged frauds nearly identical to the fraud alleged here. And in both cases, the allegations were sufficient to withstand motions to dismiss.

*Newman* was decided by this Court just last year. There, Mrs. Newman applied, on behalf of a newly-formed defendant broadcasting company, for woman-owned bidding credits in an FCC auction for radio licenses. *See Newman*, 2017 WL 3575848, at *3. The Government alleged, among other things, that contrary to the defendants' certification that "no other entity or person had an interest in [the new company] that would vitiate the defendants' eligibility for designated entity status and a new entrant bidding credit," "in reality," Mrs. Newman's husband "had substantial involvement with [the new company]," and "the Defendants' representations to the

contrary were made to avoid [the husband], who already owned multiple radio stations in the area and accordingly would not have qualified for the new entrant bidding credit himself[.]" *Id.*

This Court denied the defendants' motion to dismiss the complaint. The Court first rejected the defendants' argument that the complaint failed to satisfy Rule 9(b) because the Government "clearly allege[d]" that the husband was "impermissibly involved" at the time the auction applications were submitted. *Id.* at *7. It then rejected the defendants' argument that the Government had failed to plead scienter because the defendants' certifications were based on a reasonable interpretation of the FCC's regulations. The Court held that such an argument "is incapable of resolution at the pleading stage." *Id.* at *8.

Similarly, *Gabelli* involved the creation of sham designated entities to obtain small business bidding credits in an FCC spectrum auction. More specifically, the relator, "[a]n attorney specializing in federal administrative and telecommunications law," 345 F. Supp. 2d at 317 n.1, alleged that the defendants "created several dozen companies to bid on licenses and/or to serve as owners of these bidders" which "were purportedly established for the purpose of acquiring federally discounted licenses as investments to be later sold for profit in the after-market, and not for the legitimate objective of developing or offering spectrum services under the acquired licenses, or to operate actual business operations." *Id.* at 321-22. To effectuate the scheme, the defendants "prepared and submitted the legal documents necessary to incorporate these corporations under Delaware law," and then "helped to prepare and file the short and long-form applications on which the sham bidders made numerous fraudulent statements and omissions to the FCC." *Id.* at 322. Among other things, the applications falsely "certified that the applicants were qualified to participate in the restricted-eligibility auctions and to receive the federal

discounts for small businesses" and "knowingly failed to attribute the assets and revenues of [defendants], which exercised *de facto* control over the bidders." *Id.*

Based on these allegations, the Southern District of New York denied the defendants' motion to dismiss relator's affirmative FCA claims. The *Gabelli* court rejected the argument, nearly identical to that raised by Defendants here, that the relator had failed to allege a false statement because the allegations amounted to "a disagreement with defendants' 'legal determination … as to the issue of *de facto* control…'" and the defendants had made all required disclosures in their FCC applications. *Id.* at 336-37. And the court also rejected the defendants' Rule 9(b) arguments, explaining that "[t]his is not a situation where only a general scheme of fraud was alleged that *might* have resulted in the submission of false claims" because "the fraudulent scheme was the submission of the claims themselves." *Id.* at 339 (emphasis in original).

   **B.   Like the Government in *Newman* and the Relator in *Gabelli*, Relator Here has Adequately Alleged an Affirmative Claim Under the FCA.**

Under *Newman* and *Gabelli*, Relator's Complaint states an affirmative FCA claim. To state an affirmative claim under the FCA, a relator must plead that "(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false.'" *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 98 (D.D.C. 2017) (citation omitted). Defendants do not contest the existence of a "claim," and Relator has adequately pleaded both falsity and scienter, which requires that Defendants' motion be denied.

   **1.   Relator Has Adequately Pleaded Falsity.**

As this Court explained in *Newman*, "[t]here are two overarching ways [that a plaintiff] may demonstrate falsity." *See Newman*, 2017 WL 3575848, at *8. "The first is factual falsity: '[i]n the paradigmatic case, a claim is false because it involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *Id.* In

other words, a claim may be false because the "claimant submits information that is untrue on its face." *Id.* at *8. "The second way a claim may be false is if it falsely certifies compliance with an applicable statute, regulation or contract." *United States v. Dynamic Visions, Inc.*, 216 F. Supp. 3d 1, 14 (D.D.C. 2016).

Defendants' contention that Relator has failed to plead falsity is based on their mischaracterization of Relator's allegations, attempting to bifurcate the Complaint into a "bidding-credits" theory and a "secret agreement" theory. Dkt. 70 at 29-34. Relator, in fact, alleges a single theory of factual falsity that plainly satisfies Rules 8 and 9(b). As explained above, the Complaint alleges that DISH created and financed Northstar and SNR to be its agents in Auction 97, and that Northstar and SNR fraudulently misrepresented their relationship with DISH and failed to disclose that they were acting as DISH's agents. *See* Compl. ¶¶ 2-6, 97-116. The applications Northstar and SNR submitted to the FCC were intended to disguise this reality by purporting to fully disclose Defendants' relationships. *Id.* ¶¶ 5-6, 115-116. But because the applications did not disclose that Northstar and SNR had agreed to act on DISH's behalf to further DISH's interests, the statements and certifications in Northstar's and SNR's applications that they were independent small businesses eligible for 25 percent bidding credits were factually false. *See* Compl. ¶¶ 3, 76-80, 115. That is, Northstar's and SNR's certifications were "untrue on [their] face." *Newman*, 2017 WL 3575848, at *8.

These allegations are more than enough to state a claim for factual falsity. Indeed, Relator's allegations are directly analogous to those in *Newman*, in which this Court found that the Government raised "distinct allegations of factual falsity: that is, the allegations that Defendants made factually false statements about [Ms. Newman's and her husband's] involvement in each other's media interests." *Id.* And Relator's Complaint likewise is directly analogous to the

allegations in *Gabelli*, in which the court specifically rejected the argument raised by Defendants here, *i.e.*, that the defendants "made all required disclosures of objective facts" in their auction applications. *Id.* at 336. According to the *Gabelli* court, an allegation "that defendant bidders falsely certified (or caused/conspired with others to falsely certify) that they were small or very small businesses, entitled to federal discounts … is a false or fraudulent statement sufficient to sustain a claim under the Act." *Id.* at 337. This case is no different.

Relator's allegations of factual falsity also satisfy Rule 9(b). As the Complaint outlines, the entire fraudulent scheme was engineered to guarantee the award of spectrum licenses by entities controlled by DISH, to be paid for by DISH (and for DISH's benefit) at a heavily discounted price. According to the Complaint, this scheme was not disclosed to the FCC. It took an expert analysis of the results of Auction 97 – after an investigation by Relator – to demonstrate that "the observed behavior of [DISH] could not be explained as the product of an agreement among independent entities, but could have arisen only if a single person or entity as controlling all three bidders." Compl. ¶ 104.

In particular, DISH's subsidiary, American I—which would have paid full price for any spectrum—*won no licenses*, while Northstar and SNR won nationwide spectrum valued at $13.3 billion. *Id.* ¶ 105. Individually, Northstar and SNR won licenses scattered across the United States with no discernible pattern for purposes of establishing an independent network, but together, their spectrum provides valuable nationwide wireless coverage for DISH. *Id.* ¶ 106. As Relator alleges, "[n]o rational entity would independently take such actions unless it had confidence that it would control any licenses issued to the sham entities." *Id.* ¶ 105. Thus, far from being merely "consistent" with its theory of liability, *see* Dkt. 70 at 35, Defendants' behavior can *only* be

explained by Northstar and SNR acting as agents of DISH contrary to their statements and certifications to the FCC otherwise. At the complaint stage, this is plainly sufficient.

Indeed, Relator's allegations here are even more detailed and specific than the allegations that withstood a motion to dismiss in *Newman*. There, with respect to the defendants' pre-auction behavior, the Government alleged only that: (1) "contrary to the certification made on [the new company's] Form 301, [the husband] was involved in [the new company] *during and before the application phase*;" (2) "the construction permit application" submitted by the company as part of its auction application,  "was submitted by or through [Cesta Newman] so that [the husband] could avoid paying the full value of the license;" and (3) "*from the application phase (or before)* through a period when [the new radio station] was on the air, [the husband] exercised control over [the bidding company]." *Id.* at *7 (emphases in original). This Court held that more specific allegations regarding the application process were not required to satisfy Rule 9(b). *See id.* The Court should reach the same conclusion here.

Finally, to the extent aspects of the Complaint could be characterized as alleging a legal falsity, Relator has still stated a claim. As an initial mater, nearly all the cases cited by Defendants in support of their legal falsity argument were resolved on summary judgment, not a motion to dismiss.[8] The lone exception—*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008)—is distinguishable because it involved a claim that the defendant had failed to provide sufficient maintenance under a government contract, which the Fourth Circuit held was not a false statement under the FCA. Furthermore, the FCC determined in the *Bidding*

---

[8]     *See United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818 (7th Cir. 2011); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999); *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465 (9th Cir. 1996); *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1326 (S.D. Fla. 2015).

*Credit Order*—and the D.C. Circuit agreed—that DISH controlled Northstar and SNR, even without the benefit of evidence of Defendants' fraud. Thus, Northstar's and SNR's statements and certifications to the contrary were objectively false. *See Gabelli*, 345 F. Supp. 2d at 337 (allegation "that defendant bidders falsely certified (or caused/conspired with others to falsely certify) that they were small or very small businesses[] entitled to federal discounts" qualified as "a false or fraudulent statement sufficient to sustain a claim under the [FCA]"). And regardless, Defendants' very argument was rejected in *Gabelli*. There, the relator alleged, like Relator here, that "defendants deliberately violated FCC regulations by concealing relevant financial relationships and falsely certifying that they were eligible for federal monies." The *Gabelli* court held that "[a]t th[at] early stage in the proceedings, these allegations are sufficient to satisfy the false or fraudulent statement element of FCA claims." *Id.* at 336-37. Defendants have not offered any reason for this Court to reach a contrary result here.

2.     Relator Has Adequately Pleaded Scienter.

Relator also has sufficiently pleaded scienter. While, as Defendants contend, the FCA does not reach "an innocent, good faith mistake," Dkt. 70 at 31 (citations omitted), the Complaint alleges no such thing. Again, Relator expressly alleges that Defendants "knew" their representations to the FCC were false because the entire purpose of their scheme was to create Northstar and SNR as sham entities that functioned as agents for DISH to obtain spectrum for DISH at discounts to which DISH was not entitled. *See Compl.* ¶¶ 2-5, 110-117; *see also Gabelli*, 345 F. Supp. 2d at 336-37 ("Accepting the factual allegations contained in the Complaint as true, defendants *deliberately* violated FCC regulations by concealing relevant financial relationships and falsely certifying that they were eligible for federal monies.").

Defendants' only response is that there can be no scienter because their statements and certifications were based on a reasonable interpretation of the FCC's "*de facto* control" standard,

which they claim is "ambiguous." Dkt. 70 at 31-34. But this argument is simply not relevant to

Relators allegations about factual falsity.  As this Court explained in *Newman*, under *United States*

*ex rel. Purcell v. MWI Corp.*, 807 F.3d 281 (D.C. Cir. 2015), "knowing falsity [was] incapable of

resolution at the pleading stage," because the Government alleged, like Relator here, that

"Defendant *knew* her claims and statements were false." *Newman*, 2017 WL 3575848, at *8.

(emphasis in original). Moreover, the Court concluded that even if it "were able to accept as true

the statements of defense counsel that Defendant in fact held a particular understanding of the

regulation, and the Court were to agree that her interpretation was reasonable, the complaint would

still not fail as a matter of law at the pleading stage because a defendant's reasonable interpretation

of a regulation is but one factor that affects whether Defendant made a knowingly false claim." *Id.*

And even with respect to legal falsity, a defendant's claim that it lacked scienter based on an

objectively reasonable interpretation of government regulations cannot be decided at the motion

to dismiss stage. *See Newman*, 2017 WL 3575848, at *8.  The Court's reasoning, which applies

equally here, is fatal to Defendants' scienter arguments.[9]

Instead of addressing *Newman*, Defendants point to *United States v. Allergan, Inc.*, No. 17-

1014, 2018 WL 3949031 (3rd Cir. Aug. 16, 2018), an unpublished decision in which the Third

Circuit affirmed the dismissal of claims that the defendants knowingly violated the FCA.

According to the Third Circuit, an ambiguous statute "susceptible to multiple interpretations" and

scattershot guidance" from the government that acknowledged "significant confusion" precluded

a "knowing" violation. *Id.* *11-19. But that nonbinding decision contradicts *Newman*. And in any

event, in contrast to *Allergan*, the FCC here has provided explicit guidance on how it interpreted

---

[9]      Defendants rely heavily on *Purcell*.  Dkt. 70 at 31-32.  However, such reliance is misplaced
because the D.C. Circuit found that the government had failed to establish that the defendant
knowingly made a false claim *after a jury trial*, not at the pleading stage.

*de facto* control. *See Bidding Credit Order* ¶ 50 n.190. Indeed, the relevant FCC guidance and precedent foreclosed use of the scheme employed by DISH, and Defendants' arguments otherwise are frivolous.[10] Thus, Defendants cannot claim that they made an "innocent mistake" because they reasonably interpreted "*de facto* control" to permit the types of investor protections that the FCC specifically warned would result in *de facto* control.

Finally, to the extent Defendants suggest that there can be no scienter because the FCC failed to find a "lack of candor" in the *Bidding Credit Order*, the *Gabelli* court rejected this very same argument as a matter of law. As the *Gabelli* court explained in denying the defendants' motion to certify certain questions to the FCC, "'lack of candor,' which requires an 'intent to deceive,' [under the FCC's regulations] is not an element of the [defendants' FCA] claims[.]" *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 340, 352 (S.D.N.Y. 2004). Indeed, "[f]or purposes of the FCA, 'knowing' and 'knowingly' do not require proof of a 'specific intent' to defraud.'" *Id.* Moreover, the *Bidding Credit Order* was predicated solely on the information Northstar and SNR disclosed to the FCC, *id.* ¶ 9 n.69, and thus the FCC's "lack of candor" finding has nothing to do with Relator's allegations here, which are based on Defendants' misrepresentations and lack of truthful disclosures. *See also* Dkt. 65 at 3 (Government Statement of Interest noting that the FCC expressly assumed – contrary to the facts alleged here – that Defendants "made full and truthful disclosures" to the agency).

---

[10]     *Compare* Dkt. 70 at 33 ("[T]here are no clarifying rules or formal guidance documents on the meaning of *de facto* control in this context."), *with Application of Baker Creek Communications, L.P.*, Memorandum Opinion and Order, 13 FCC Rcd 18709, ¶ 9 (1998) ("[i]nvestor protection provisions may confer actual control upon the minority owner where they give it the power to dominate the management of corporate affairs"); *see also Bidding Credit Order* ¶ 70 ("We agree with VTel that the circumstances presented here are similar to those presented in *Baker Creek*, in which Hyperion, ostensibly a non-controlling investor, was found to possess an impermissible level of control over the daily operations of Baker Creek contrary to the Commission's DE rules").

### C.     Relator Has Sufficiently Pleaded an FCA Conspiracy.

Relator also has alleged that Defendants conspired to defraud the FCC. To state a cause of action for conspiracy under the FCA, a relator must allege (1) that an agreement existed to have false or fraudulent claims allowed or paid to the government, (2) that each alleged member of the conspiracy joined that agreement, and (3) that "one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy." *See, e.g.*, *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010). Relator has properly alleged a conspiracy under the FCA, including an agreement and numerous overt acts, and the intra-corporate conspiracy doctrine does not prohibit a conspiracy between the numerous legally distinct entities named as Defendants here.

### 1.     Relator Alleges that Defendants Acted In Concert to Defraud the FCC.

Relator need not allege that "an express or formal agreement was entered into in order to establish that the parties were in agreement for the purpose of a[n FCA] conspiracy claim." *See United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 132-135 (D.D.C. 2014). Allegations of "concerted action" can be sufficient to allege an agreement between defendants. *See Banneker Ventures, LLC v. Graham*, 225 F. Supp. 3d 1, 15 (D.D.C. 2016).

As Relator has already described in detail, the Complaint here alleges that the Defendants acted in concert to defraud the FCC out of business credits to which Defendants were not entitled. Specifically, the Complaint alleges that Defendants engaged in a "scheme orchestrated by" DISH to "form [Northstar and SNR as] sham DEs" and "create the illusion" that Northstar and SNR were under the control of minority interests when in fact they were agents of DISH. *See* Compl. ¶¶ 3-4, 87, 91 (alleging that because DISH was ultimately in control of Northstar and SNR, it "benefited regardless of which of them ultimately were high bidders"); *id.* ¶ 97 (alleging that Defendants executed a "fraudulent bidding scheme"); *id.* ¶¶ 101-103 ("The DISH-Controlling Defendants

sought to disguise that the behavior of Northstar Wireless, SNR Wireless, and American I was conceived and directed by a single controlling interest for the purposes of obtaining a 25 percent discount to which they were not lawfully entitled."). After Auction 97 was announced and mere days before it commenced, DISH created Northstar, SNR, and American I in an attempt to fraudulently secure discounted spectrum. *Id.* ¶ 98.

The Complaint further alleges improper "concerted action" between the Defendants during Auction 97. That is, Relator alleges that DISH financed the scheme in order "to orchestrate the accumulation of nationwide AWS-3 spectrum." *Id.* ¶ 86. Then, Defendants engaged in a coordinated "strategy of joint bidding." *Id.* ¶¶ 6, 87 ("Defendants implemented a strategy of overlapping bids."); *id.* ¶ 89 (DISH "orchestrated a hand off strategy."). But Northstar and SNR were not, as they represented to the FCC, independent entities bidding in their own interests, but rather "fronts existing only on paper. Defendants intentionally created a complex chain of *de jure* controls to hide *de facto* control by the DISH-Controlling Defendants and to create the illusion that the Northstar Wireless and SNR Wireless bidders were under the control of minority equity interests." *Id.* ¶ 5. These allegations plainly suffice to demonstrate an agreement to defraud the FCC.

### 2.    Relator Alleges Multiple Overt Acts by Defendants.

Relator also has adequately pleaded that each of the Defendants "knowingly committed one or more overt acts in furtherance of the object of the conspiracy." *See, e.g.*, *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010). The Complaint alleges generally that the Defendants "took substantial steps in furtherance of the conspiracy, *inter alia*, by making fraudulent representations, by preparing fraudulent records and by failing to disclose material facts to the United States Government." Compl. ¶ 130. More specifically, it alleges that DISH, through its owners, Charles and Cantey Ergen, conspired with Muleta and

Doyon to create Northstar and SNR as sham designated entities. *See id.* ¶¶ 3-6, 37. Defendants Wright, Todd, and Muleta, on behalf of Northstar and SNR, fraudulently certified in the entities' Short and Long Form applications, *see id.* ¶¶ 78-80, 85, that they were entitled to "very small business" bidding credits. *See, e.g., id.* ¶ 80. And American I, Northstar (through American II), and SNR (through American III) actively participated in the AWS-3 spectrum auction, submitting hundreds of bids—over 77 days and 341 rounds of bidding—pursuant to their undisclosed agreements to win spectrum for DISH. *See* ¶¶ 86-95. In other words, each defendant is alleged to have participated in the conspiracy.

### 3. The Intra-Corporate Conspiracy Doctrine Does Not Apply.

Defendants' intra-corporate conspiracy doctrine argument is a red herring. *See* Dkt. 70 at 39-40. That doctrine only negates conspiracies that "are considered to be those of a single legal actor, negating the multiplicity of actors necessary to conspiracy." *See Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 103-104 (D.D.C. 2011); *Pencheng Si v. Laogai Research Foundation*, 71 F. Supp. 3d 73, 98 (D.D.C. 2014) ("There is no conspiracy if the conspiratorial conduct challenged is *essentially* a single act by a single corporation"). And here, the Complaint clearly alleges a "multiplicity of actors." Indeed, DISH and Defendants Muleta and Doyon—all legally distinct—conspired to create multiple shell entities to act as agents of DISH to carry out the scheme. In fact, in arguing that Defendants are not legally distinct, Defendants effectively admit that SNR and Northstar were controlled by DISH. *See* Dkt. 70 at 39-40.

### D. Relator Also has Sufficiently Pled a "Reverse False Claim."

Relator's allegations also can be characterized as a so-called "reverse false claim" because Northstar and SNR were obligated to pay $13.3 billion to the FCC for the licenses for which they were the winning bidder, but paid less than $10 billion by the deadline, which resulted in $3.3 billion in lost revenue to the Government. Compl. ¶¶ 3-4, 118-121. And under this theory,

Defendants' argument that Relator "fails to adequately plead any 'obligation' that triggers reverse-false claims liability" is meritless.  Dkt. 70 at 36.

"A reverse false claim is any fraudulent conduct that 'results in no payment to the government when a payment is obligated.'" *Newman*, 2017 WL 3575848, at *9 (citation omitted); *Hicks*, 183 F. Supp. 3d at 160.  The FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). As Defendants concede, the Complaint expressly alleges an obligation, asserting that "[f]inal payment of winning bids in Auction 97 was due March 2, 2015." Dkt. 70 at 37 (citing Compl. ¶ 73); *see also* Compl. ¶ 2 ("Successful bidders were required to tender payments to vest exclusive access rights on or before March 2, 2015"). Nothing more is required. *See, e.g.*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002) (the statement required by F.R.C.P. 8(b) "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests") (quoting *Conley v. Gibson*, 355 U.S. 41 (1957)).

Equally without merit is Defendants' insistence that "no statute, regulation, contract, or any type of relationship impos[ed] an 'established duty' on Northstar or SNR to pay any money to the FCC …." Dkt. 70 at 37. On the contrary, FCC regulations and the rules governing Auction 97 expressly imposed on Northstar and SNR a clear duty to pay to the government the full amount of their winning bids when their winning bids were accepted. Specifically, Section 1.2104(g)(2) provides that "[a] bidder assumes a *binding obligation* to pay its full bid amount upon acceptance of the winning bid at the close of an auction." 47 C.F.R. § 1.2104(g)(2) (emphasis added). Indeed, the FCC cautioned qualified bidders at the inception of Auction 97 to select "bid amounts carefully

because *each bidder assumes a binding obligation to pay the full bid amount*, even if the bid was mistakenly or erroneously made."[11]

In adopting the language of Section 1.2104(g)(2), the agency explained that its "principal function … is to establish that the *close of the auction creates a binding contractual obligation by the high bidder to pay the auction price for the license*." 65 Fed. Reg. 52323-01, 52334 (Aug. 29, 2000) (emphases added). The FCC imposed a binding obligation on the winning bidder so that the bidder could not simply walk away from paying the bid amount; otherwise, as the FCC explained, the government is harmed (in addition to the non-receipt of funds). *Id.* at 52335 (noting that a winning bidder who "defaults after the auction" means that "a new spectrum license must be auctioned," which involves "time and expense" and "results in a delay in provision of service to the public").[12]

Not only did SNR and Northstar have a binding obligation under the FCC's rules and regulations to pay the full amount of their winning bids at the close of Auction 97, they also were required to satisfy that obligation by March 2, 2015. Section 1.2109(a) of the FCC's rules provides that, "[u]nless otherwise specified by public notice, auction winners are required to pay the balance of their winning bids in a lump sum within ten (10) business days following the release of a public notice establishing the payment deadline." 47 C.F.R. § 1.2109(a).  The FCC's *Winning Bidder Notice* established March 2, 2015 as "the final payment deadline for Auction 97 …." *Winning Bidder Notice* ¶ 8.

---

[11]     *Auction of Advanced Wireless Services (AWS-3) Licenses, 70 Bidders Qualified to Participate in Auction 97*, Public Notice, 29 FCC Rcd 13465, ¶ 25 (Oct. 30, 2014) (emphasis added).

[12]     The 2000 Federal Register notice describing Section 1.2104(g)(2) describes the duty to pay upon acceptance of a winning bid as a "binding contractual obligation."   Whether the duty is contractual or imposed as a fee by regulation, however, it is equally an "obligation" under the definition provided by 31 U.S.C. § 3729(b)(3).

There was nothing "provisional" or "contingent" about SNR's and Northstar's obligation to pay the full amount of their winning bids by March 2, 2015.  Dkt. 70 at 37. The FCC made this clear in its Public Notice that "[f]ull and timely payment of winning bids" was required by the date established in accordance with Section 1.2109(a), which was March 2, 2015. *Winning Bidder Notice* ¶ 8. In short, both the amount of SNR's and Northstar's obligation ($13.3 billion) and the date certain for their performing that obligation (March 2, 2015) were established by the FCC, even though they had yet to be awarded any licenses.[13]

Attempting to avoid the plain language of the FCC's rules and regulations creating the obligation they anxiously seek to disavow, Defendants mistakenly point to snippets from the *Bidding Credit Order*.   However, the language in question addressed whether the defaulted licenses for which Northstar and SNR were the winning bidder should be re-auctioned because of their misconduct – an issue not before this Court. *Bidding Credit Order* ¶ 137. Furthermore, as explained above, Defendants' reliance upon the *Bidding Credit Order* is misplaced because it was predicated on Defendants having "made full and truthful disclosures" to the FCC, Dkt. 65, which Relator has alleged was not the case.

Finally, Defendants' citation to *Newman* is a red herring. There, this Court analyzed the Government's *post-auction* reverse FCA theory based on subsequent FCC submissions representing that Ms. Newman's husband was not involved with her new company. *Newman*, 2017 WL 3575848, at *2-3, 7.   By contrast, Relator here has not alleged that Defendants failed to

---

[13]     Relator's Complaint alleges that Defendants were required to pay a specified sum by a date certain, which readily distinguishes the cases cited by Defendants that relate to contingent penalties for regulatory noncompliance.  Dkt. 70 at 37 (citing *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008) ("unassessed potential penalty for regulatory noncompliance does not constitute an obligation that gives rise to a viable FCA claim"); *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 285 F. Supp. 3d 44, 50-54 (D.D.C. 2017) (same)).

"return" the value of the bidding credits they claimed in Auction 97 or had an "established duty" to do so. Dkt. 70 at 38-39.  Rather, Relator's theory, which is fully and adequately pleaded in the Complaint, is that Northstar and SNR fraudulently decreased their obligation to pay $13.3 billion on March 3, 2015 by paying only approximately $10 billion as a consequence of their fraudulent claim to DE bidding credits. Relator's allegations in this regard are materially indistinguishable from the Government's *pre-auction* false claims and false certification allegations in *Newman*, which this Court declined to dismiss.[14]

### E.    Relator's Complaint Satisfies Rule 9(b) As to All Defendants.

Defendants' arguments that Relator failed to satisfy Rule 9(b) also fails. The D.C. Circuit has made clear that Fed. R. Civ. P. 9(b) is satisfied when there is sufficient substance to allegations to afford the defendant the opportunity to respond and prepare for the judicial process. *See United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015). As an initial matter, as set forth *supra*, the Complaint has adequately alleged a conspiracy against all of the Defendants. And in any event, separate and apart from the conspiracy, the Complaint details the key participants in the fraudulent scheme and specifically identifies the "who, what, where, when, and how" of the scheme to apprise each of the defendants of how they fit into the fraud.  *See Scott*, 270 F. Supp. 3d at 152.

In *Gabelli*, the court rejected the same Rule 9(b) argument raised by Defendants here. There, the defendants argued that the relator had "indiscriminately group[ed] defendants together 'into one wrongdoing monolith, without specifying the alleged wrongdoing of each Defendant.'"

---

[14]    In *Gabelli*, the Southern District of New York dismissed the relator's reverse FCA claims as redundant of the affirmative claims. *See Gabelli*, 345 F. Supp. 2d at 338-39.  And in *Newman*, this Court characterized the Government's pre-auction FCA theory as an affirmative FCA claim. *See Newman,* 2017 WL 3575848 at *7-8.  To be clear, Relator here is not seeking to recover under both theories, but rather contends only that its claims can be characterized as either affirmative claims or reverse claims.

*Gabelli*, 345 F. Supp. 2d at 339. Applying the same Rule 9(b) standard applied in this Court, the

*Gabelli* court concluded:

> The "who" are the successful bidders and those defendants connected to them (as owners; related, predecessor, or successor entities; officers; or []related entities) who presented (or caused or conspired to present) the false records or claims.   The "what" is the false certifications of eligibility for federal monies submitted in connection with auction applications.   The "where" and "when" is the place/time where/when these claims and records were filed.   The "how" is addressed by those allegations relating to defendant bidders' certification and submission of false records/claims of small business status and eligibility for federal bidding credits.

*Id.* at 340. This is precisely the case here.

Defendants are left pointing to immaterial aspects of the allegations – such as the number of paragraphs in which a defendant is cited.  But as in *Gabelli*, that is beside the point. A relator need not point out every single aspect of an individual's participation in a fraudulent scheme – doing so is of course impossible. *See id.* at 339-40 (explaining that "Rule 9 may be relaxed where the fraudulent scheme is so complex that offering detailed accounts of each individual's role in the fraud is virtually impossible"); *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 8 (D.D.C. 2003) ("In cases where the complaint alleges complex or extensive fraud schemes, courts often relax the Rule 9(b) standard."). Defendants' mischaracterization that specific individuals have no "connection" to the fraud is completely belied by the Complaint's allegations. Specific defendants are named precisely because they played critical roles in the overall scheme.

**Allen Todd and Miranda Wright**. Both Todd and Wright were critical actors in the fraudulent scheme. Indeed, they were the individuals who personally certified and submitted for Northstar the very false and misleading certifications on which this case turns (and ultimately on behalf of DISH, which controlled Northstar). *See* Compl. ¶¶ 7, 20, 78, 80. These allegations put them squarely at the heart of the FCA violation, and their individual actions, plus the submission of the false certifications, qualify as the detailed "who, what, where, when, and how" of the false

statements on September 12, 2014, central to the overall scheme. *See e.g.*, *Gabelli*, 345 F. Supp. 2d at 339-40; *Heath*, 791 F.3d at 123-124. It is simply not credible to claim as Defendants do that Todd and Wright have no notice of the fraud allegations made against them.

**John Muleta**. The same analysis holds true for Muleta – a critical actor who made false certifications for SNR – on behalf of DISH, the ultimate controlling entity. Compl. ¶¶ 79, 113-14. Significantly, not only did Muleta knowingly make false representations to the FCC, but the Complaint also reveals how the DISH-Controlling Entities approached Muleta and Doyon to create SNR and Northstar as sham DEs just days before the auction. *See id.* ¶ 98. The very fact that Muleta himself submitted false certifications to the FCC and failed to disclose the true nature of SNR's ownership/status to FCC, as well as his participation in a scheme to win "very small business" credits, similarly puts him at the center of the False Claims Act violation and sufficiently satisfies the "who, what, where, when, how" standard of Rule 9. *See, e.g.*, *Gabelli*, 345 F. Supp. 2d at 339-40; *Heath*, 791 F.3d at 123-124.

**The Ergens**. The Ergens, too, played an integral role in the fraudulent scheme. The Complaint makes clear that the overarching scheme was to create sham entities controlled by DISH, specifically for the benefit of DISH. *See, e.g.*, Compl. ¶ 92 ("[Defendants] were able to obtain near nationwide coverage of AWS-3 spectrum. This benefited their single controlling entity, the DISH-Controlling Defendants."). And DISH is controlled by the Ergens. *Id.* ¶¶ 14, 37.

The Complaint therefore spells out exactly how the Ergens benefited from the alleged scheme, as majority stakeholders in the entire enterprise. Moreover, the complaint also plainly makes clear that Charles Ergen himself participated directly in the scheme, insofar as he was an "authorized bidder" for American I, *id.* ¶ 32, which was an integral part of DISH's bidding scheme and perpetration of the overall fraud. *Id.* ¶¶ 91-109. Given these material allegations, the Ergens

have more than sufficient notice as to the fraud alleged against them. FRCP 9(b) is satisfied. *See, e.g.*, *Newman*, 2017 WL 3575848, at *6-7 (allegations detailing both the false statements and the purpose of the false statements sufficient to satisfy Rule 9(b)).[15]

**Corporate and DISH Defendants**. Rule 9(b) is further satisfied as to each of the corporate entities. While the corporate defendants attempt to read the allegations against them in a vacuum, the Complaint as a whole, construed in Relator's favor, identifies their specific roles in the overarching fraud scheme.

Notwithstanding that the corporate defendants here easily fall within *Gabelli*'s Rule 9(b) formulation, *see, e.g.*, *Gabelli*, 345 F. Supp. 2d at 339-40 (detailing the who, what, where, when, how of an FCC auction fraud), Defendants contend that the allegations are mere recitations of corporate structures without any conduct demonstrating a fraud. But this assertion entirely misses the point – these very corporate structures were established by DISH and were the instruments DISH employed to defraud the FCC. As alleged in the Complaint, DISH created, financed, and controlled Northstar and SNR to act as its agents in Auction 97 to obtain at heavily discounted prices nationwide spectrum licenses that would be turned over to DISH. DISH engineered the bidding strategy to obtain the licenses that DISH coveted. And, to maintain the pretense of independence throughout the regulatory process, Northstar and SNR failed to disclose that they were acting as DISH's agents and knowingly and falsely certified that they were not controlled by DISH. *See* Compl. ¶¶ 91-109. Based on these allegations, each of the corporate Defendants here are given more than sufficient notice as to how they are implicated in the fraud.

---

[15] Defendants' corporate veil argument is another red herring. *See* Dkt. 70 at 42-44. The allegations against the individuals are not made simply because of their corporate titles, but because the individuals themselves – personally – participated in the fraud. Compl. ¶¶ 91-109. The allegations are therefore more than sufficient to tie the individuals to the fraudulent scheme, separate and apart from their relationships to the corporate entities.

## II.   THIS CASE IS NOT FORECLOSED BY THE PUBLIC DISCLOSURE BAR.

Defendants' contention that the public disclosure bar requires dismissal of this case also misses the mark. Dkt. 70 at 17-25. The public disclosure bar does not apply here because: (1) neither the allegation of fraud at issue in this case nor its essential elements were publicly disclosed prior to the filing of this action; (2) Relator's allegations are not "substantially similar" to any of the alleged public disclosures identified by Defendants; and (3) in any event, Relator is an original source. Defendants' arguments to the contrary mischaracterize Relator's claims and disregard Relator's entitlement to the benefit of all reasonable inferences from its allegations.

### A.   Neither the Fraud nor its Essential Elements Were Publicly Disclosed.

The public disclosure bar applies if "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed[.]" 31 U.S.C. § 3730(e)(4)(A). Importantly, the public disclosure bar is triggered "only when *either* the allegation of fraud [Z] *or* the critical elements of the fraudulent transaction themselves [X + Y] were in the public domain." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994) (emphasis added).  Under this formulation, the "X" refers to the "misrepresented state of facts" and the "Y" refers to the "true state of facts," and *both* must appear publicly from a single source such that there exists "an inference that fraud has taken place." *United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. CV 10-1094 (BAH), 2017 WL 1422364, at *14 (D.D.C. Apr. 19, 2017); *see also United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 933 (D.C. Cir. 2017) (no public disclosure bar where "publicly available information [relied on by the defendant] failed to create an inference of fraud").

Defendants spend much of their Opposition arguing that the allegation of fraud (Z) was publicly disclosed, *see* Dkt. 70 at 18-22, but consistent with their entire brief, this argument mischaracterizes Relator's allegations. Again, the specific allegation of fraud in this case is that

Defendants violated the FCA by fraudulently seeking bidding credits to which they were not entitled by having Northstar and SNR misrepresent themselves as independent, very small entities to the FCC when, in fact, they were agents of DISH. To disguise DISH's direct control, Northstar and SNR purported to fully disclose their economic relationship with DISH to the FCC and postured their coordinated bidding activity as a result of agreements reached between independently controlled entities. But they never disclosed that Northstar and SNR were formed by DISH to function as agents of DISH.

Not one of the alleged public disclosures relied on by Defendants identified this alleged fraud; in fact, none raised even a general allegation that Defendants had committed *fraud* at all. Several sources speculated about possible collusion in violation of "the antitrust laws," Dkt. 70 at 22 n.5, which necessarily assumes, contrary to Relator's position, that the Defendants were separate entities. And the remaining sources raised vague allegations that Defendants had "taken advantage of" or had "violated" FCC rules, *id.* at 18, 20, or suggested ambiguously that "something didn't smell right." *Id.* at 21. Such vague allegations of malfeasance could not meaningfully alert the Government to the fact that Defendants fraudulently conspired through undisclosed agreements to have Northstar and SNR act as agents of DISH to obtain spectrum on the cheap. *Cf. Scutellaro*, 2017 WL 1422364, at *17 (allegations raised in prior FCA case involving the same defendant and subject matter were too "vague" to constitute a public disclosure of the Z element).

Defendants also fail to demonstrate that an "inference of fraud" existed in the public domain. Not surprisingly, Defendants focus on the "misrepresented state of facts" [X]. *See* Dkt. 70 at 16-18. But there is no dispute about X. Relator alleges that Northstar and SNR misrepresented to the FCC that they were bona fide small business entities that had negotiated arms-length arrangements with DISH to finance their acquisition of AWS-3 licenses at Auction 97. Putting this

34

information out in the public domain was, in fact, central to Defendants' scheme of concealing the true state of affairs from regulatory and public view. In other words, under Relator's theory, the misrepresented state of facts was *necessarily* publicly disclosed.

The true state of facts (Y), on the other hand, was never publicly disclosed. *See Scutellaro*, 2017 WL 1422364, at *17 ("[B]oth parts of the equation [i.e. X + Y] must be disclosed to trigger the public disclosure bar."). Despite Defendants' attempts to disguise their fraud through their public filings, the true state of facts was that Northstar and SNR were nothing more than sham entities that DISH created for the sole purpose of obtaining spectrum licenses for DISH at a steep discount to which DISH was not entitled. *See* Compl. ¶¶ 3, 15, 23. None of the alleged public disclosures cited by Defendants revealed this true state of facts, *i.e.*, that DISH entered into agreements with Northstar and SNR to act as its agents at Auction 97. At most, the sources cited by Defendants suggested that DISH may have dominated the decision-making of otherwise independent entities in violation of FCC regulations, or that DISH, Northstar, and SNR Wireless colluded to stifle competition in violation of the antitrust laws. *See* Dkt. 70 at 18-22. But those allegations do not "give rise to an inference that fraud has taken place." *Scutellaro*, 2017 WL 142234 at *14. The fraudulent transaction (X + Y) at issue here was not publicly disclosed prior to the filing of this action.[16]

---

[16]    That Relator's claims may be based on application materials and bidding data publicly available on the FCC's website is not sufficient to trigger the public disclosure bar because such records did not disclose the "allegations or transactions of fraud," in contrast to the cases cited by Defendants  *Cf. United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918-19 (D.C. Cir. 1999) (finding public disclosure of alleged false claims when defendant testified publicly that it was using federal funds "outside the letter of the statute" governing use of such funds); *Oliver*, 826 F.3d at 472-74 (affirming dismissal of relator's fraud allegations when defendant's failure to provide the government with the best price on cigarettes and its contracts with the government containing Most Favored Customer provisions were publicly disclosed).

Finally, to the extent Defendants claim to have pieced together the allegation of fraud (Z) or its essential elements (X + Y) across multiple public statements—which they have not done—their public disclosure bar argument still fails.  Defendants' attempt to create a public disclosure bar issue out of a patchwork of news articles and other public sources is improper. *See Scutellaro*, 2017 WL 1422364, at *16 (rejecting attempt to "piece together a public disclosure . . . from multiple disparate sources"). Defendants' failure to point to a single alleged public disclosure that satisfies their burden is fatal to their public disclosure bar argument.

**B.    Relator's Allegations Are Not Substantially Similar to the Alleged Public Disclosures.**

Nor are Relator's allegations "substantially similar" to the alleged public disclosures identified by Defendants. In analyzing whether a relator's claims are substantially similar to publicly disclosed allegations or transactions, courts have cautioned "against reading *qui tam* complaints at only the 'highest level of generality[.]'" *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 578 (9th Cir. 2016); *see also, e.g.*, *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933 (7th Cir. 2012) ("[B]oosting the level of generality in order to wipe out qui tam suits that rest on genuinely new and material information is not sound."). Rather, the question is whether the relator has alleged a "fraud that is different in kind and in degree from the previously disclosed information[.]" *Mateski*, 816 F.3d at 578.

In *Mateski*, for example, the Ninth Circuit rejected the defendant's argument that the public disclosure bar foreclosed the relator's FCA claims because prior public reports had extensively disclosed problems with the defendant's performance under the same government contract at issue. *See id.* at 567, 577-79. The Ninth Circuit held that the public disclosure bar did not apply because "[a]lthough prior public reports had described general problems with [the defendant's] work on [the contract at issue], none provided specific examples or the level of detail offered by [the

relator]." *Id.* at 578. In other words, the public disclosure bar did not apply because the relator had "allege[d] fraud that [wa]s different in kind and degree from the previously disclosed information about [the defendant's] problems in performing on the contract at issue." *Id.* at 567; *see also Shea*, 863 F.3d at 934-35 (concluding that public disclosure bar did not apply where it was the relator who "supplied the missing link between the public information and the alleged fraud" through his own "own efforts and experience").

As in *Mateski*, Relator is raising an allegation of fraud that is "different in kind and in degree" from the alleged public disclosures identified by Defendants. *Mateski*, 816 F.3d at 578. As noted above, at best, the sources identified by Defendants raised general concerns about DISH's bidding behavior and relationship with Northstar and SNR. Dkt. 70 at 19-20. Many of those sources identified antitrust concerns, which are directly at odds with Relator's theory of fraud. And none of the alleged public disclosures raised the allegations that Relator raises here, let alone do they come close to describing Defendants' fraud at the level of specificity contained in the Complaint. Said differently, when viewed at the proper level of generality, it is clear that Relator's allegations are not substantially similar to the alleged public disclosures identified by Defendants, *see Mateski*, 816 F.3d at 578; *Shea*, 863 F.3d at 934-35, and could not have meaningfully alerted a hypothetical government investigator to the fraud alleged in this case. *Scutellaro*, 2017 WL 142234 at *17. Therefore, the public disclosure bar does not apply.

**C.    In Any Event, Relator Is An Original Source.**

Even if the Court were to conclude that the public disclosure bar does apply as a threshold matter, it still would not require dismissal of this case because Relator has plausibly pleaded that it is an original source under the FCA. An "original source" is defined as "an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who

has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).  Relator has plausibly pled that it qualifies under either prong of Section 3730(e)(4)(B).

First, as discussed above, Defendants have not identified a qualifying public disclosure that disclosed the allegation of fraud or its essential elements prior to Relator. Relator's subsidiary, VTel, participated in Auction 97, and it was VTel's inability to win any spectrum in its own rural territory in Vermont that led Relator to investigate what happened and uncover Defendants' fraud. Relator then reported that fraud to the Department of Justice *before* filing its petition to deny with the FCC on May 11, 2015. *See* Compl. ¶ 39.[17]  Relator therefore qualifies as an original source with respect to any public disclosures made after it disclosed its allegations to DOJ on May 11, 2015. *See* 31 U.S.C. § 3730(e)(4)(B)(i).[18]  In short, through its filing of the Complaint on May 13, 2015, Relator became the first entity to allege that Defendants engaged in fraud and violated the FCA. Far from being a "parasitic" suit, this is precisely a case in which a relator has come forward

---

[17]    Relator disclosed the substance of the allegations in its Complaint to DOJ at 3:53pm on May 11, 2015, *before* VTel filed its petition to deny with the FCC.  *See* Ex. A attached hereto. This exhibit is properly considered on a motion to dismiss as it is incorporated by reference in the Complaint.  *See* Compl. ¶ 39; *Mpoy v. Rhee*, 758 F.3d 285, 291 (D.C. Cir. 2014) (court may consider an "email [that] was not attached to the complaint" if it is "incorporated into the complaint by reference"); *Slate v. Pub. Def. Serv. for the D.C.*, 31 F. Supp. 3d 277, 287–88 (D.D.C. 2014) (noting that "[c]ourts have considered documents attached to motions to dismiss and opposition papers without converting the motion into one for summary judgment when the documents were referenced in the Complaint and were central to the plaintiff's claims").

[18]    To the extent any public disclosures were made in the few petitions to deny that were filed with the FCC before Relator's petition on May 11, 2015, it cannot be determined which, if any filings were made before Relator's disclosure of Defendants' fraud to DOJ.  Thus, Defendants cannot credibly contend that Relator was even aware of those filings, let alone that it relied on them in making its allegations in this case.

with "valuable information" concerning Defendants' fraud. *Shea*, 863 F.3d at 927. Thus, Relator has plausibly pleaded that it is an original source under the first prong of Section 3730(e)(4)(B).[19]

Relator also has plausibly pleaded that it is an original source under the second prong of Section 3730(e)(4)(B). First, Relator possesses "independent knowledge" of the information on which its claims are based. *See United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 128 (D.D.C. 2015) (a "relator must have ... independent knowledge of the 'information upon which the relators' allegations are based,' not the 'information on which the publicly disclosed allegations that triggered the public-disclosure bar are based'"). Again, as a participant in Auction 97, Relator's subsidiary directly observed, and was adversely affected by, Defendants' irregular and fraudulent bidding behavior. These experiences led Relator to investigate Defendants' conduct, and that investigation revealed, *inter alia*, that Defendants' bidding behavior could only be explained by the exercise of central, coordinated control by a single entity: DISH. *See id.* Relator's investigation revealed the true state of facts (Y) (*i.e.* that DISH had created Northstar and SNR Wireless as part of a scheme to defraud the Government) because of its independent knowledge. *See Shea*, 863 F.3d at 935 (public disclosure bar did not apply where relator "supplied the missing link between the public information and the alleged fraud" based on his "own efforts and experience"); *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014) (public disclosure bar not applicable where relator's "allegations . . . required independent investigation and analysis to reveal any fraudulent behavior").[20]

---

[19]     Defendants do not cite any legal authority in support of their argument that Relator could only qualify as an original source under the first prong by reporting Defendants' fraud to the Government *before* that fraud had been effectuated.  Dkt. 70 at 23.

[20]     The cases cited by Defendants are distinguishable.  *See* Dkt. 70 at 24.  In *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83 (D.C. Cir. 2014), for example, the court concluded that a relator's "private investigation" of the alleged fraud was insufficient to overcome the public

Relator also has plausibly pleaded that it has "materially add[ed]" to the alleged public disclosures.[21] Although the D.C. Circuit does not appear to have opined on the issue, other courts have held that a relator materially adds to a publicly disclosed allegation or transaction of fraud when it "contribute[s] significant additional information to that which has been publicly disclosed so as to improve its quality." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306 (3d Cir. 2016). Relator has done so here. Relator's independent investigation—which included an expert analysis of Defendants' bidding activities and the results of the auction—revealed that Defendants had engaged in an intentional scheme to defraud the Government in violation of the FCA. Specifically, Relator's expert concluded that "the observed behavior of [DISH] could not be explained as the product of an agreement among independent entities, but could have arisen only if a single person or entity as controlling all three bidders," Compl. ¶ 104, and that given the patchwork distribution of licenses won by each bidding entity, "[n]o rational entity would independently take such actions unless it had confidence that it would control any licenses issued to the sham entities." *Id.* ¶ 105. Relator has thus "contribute[d] information—distinct from what was publicly disclosed—that adds in a significant way to the essential factual background" of Defendants' fraud. *Moore & Co.*, 812 F.3d at 307. Relator

---

disclosure bar because "[b]y his own pleadings and concessions, the material elements of the fraud, X and Y, were already public[.]" As discussed at length above, neither the allegation of fraud (Z) nor its essential elements (X + Y) were publicly disclosed prior to Relator's filing of this action. Thus, this is not a case in which a relator has merely contributed "collateral research." Dkt. 70 at 24 (citing *Shea*, 863 F.3d at 934). To the contrary, Relator has "bridge[d] the gap by [its] own efforts and experience," and thus the public disclosure bar does not apply. *Shea*, 863 F.3d at 935.

[21] Whether a relator has "materially added" to previous public disclosures is a "fact-intensive inquiry that involves weighing the prior public disclosures against the information relayed to the government in the present case." *United States v. Medtronic, Inc.*, 327 F. Supp. 3d 831, 852 (E.D. Pa. 2018). Thus, on a motion to dismiss, the question is only whether the relator has plausibly pled that it has materially added to the alleged public disclosures at issue—a question that must be answered in the affirmative here.

therefore has plausibly pleaded that it has "materially added" to the alleged public disclosures identified by Defendants.

## III.   THIS CASE IS NOT FORECLOSED BY THE GOVERNMENT ACTION BAR.

Finally, there is no merit to Defendants' argument that Relator's Complaint should be dismissed because it is based "entirely on allegations and transactions" that were the subject of an FCC proceeding, and "the FCC had authority there to fully investigate and impose penalties for any allegation of fraud." Dkt. 70 at 25. Defendants' argument misconstrues the government action bar and mischaracterizes the FCC proceeding upon which their argument is based.

The government action bar prohibits a relator from bringing an FCA action "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C. § 3730(e)(3). Added as part of the 1986 amendments to the FCA, courts must "proceed with caution" when applying the government action bar, which "must be analyzed in the context of [its] twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *United States ex rel. S. Prawer & Co. v. Fleet Bank of Me.*, 24 F.3d 320, 326 (1st Cir. 1994); s*ee also Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994).

In addressing what constitutes an "administrative civil money penalty proceeding" for purposes of Section 3730(e)(3), courts generally agree that whether the government has already imposed a "penalty" against the defendant is key to applying the government action bar. *See United States ex rel. Costner v. URS Consultants, Inc.*, 153 F.3d 667, 676 (8th Cir. 1998) (citing *Prawer*, 24 F.3d 320 (1st Cir. 1994)); *United States ex rel. Int'l Bhd. of Elec. Workers, Local Union No. 98 v. Farfield Co.*, No. CIV.A. 09-4230, 2013 WL 3327505, at *12 (E.D. Pa. July 2, 2013) (denying motion to dismiss FCA claim because Department of Labor ("DOL") audit did not seek a penalty);

*United States ex rel. Jonson v. Shell Oil Co.*, 26 F. Supp. 2d 923, 928 (E.D. Tex. 1998) (denying motion to dismiss FCA claim because a government audit did not seek a penalty).

In *Prawer*, the First Circuit held that the government action bar did not apply to an FCA case "seeking to remedy fraud that the government has not yet attempted to remedy," making the FCA case "wholly unlike the one the drafters of § 3730(e)(3) almost certainly had in mind and sought to preclude (i.e., a *qui tam* action based upon allegations or transactions pleaded by the *government* in an attempt to recover for fraud committed against it)." 24 F.3d at 328 (emphasis in original). Here, the government has not imposed – or even sought to impose – a penalty against Defendants for their fraud, which makes the government action bar inapplicable.[22]

That no penalty has been imposed on Defendants for their fraud readily distinguishes *Foundation for Fair Contracting, Ltd. v. G & M Eastern Contracting*, 259 F. Supp. 2d 329 (D.N.J. 2003), the lone case cited by Defendants in support of their government action bar argument. In that case, the court dismissed a *qui tam* action under Section 3730(e)(3) because the DOL had already imposed a penalty on the defendants in the case for their inaccurate reporting of employee number and wage misclassifications. The court found that the transactions were "identical between the DOL's *penalty proceeding* and the [relator's] case" and that allowing the relator's suit to proceed, even though it is based on the same facts underlying the DOL's investigation, "would provide a second recovery by another entity despite the resolution of the government's investigation into the very same transactions, in contravention of the statutory purpose." *Id*. at 337-38 (emphasis added).

---

[22]    To be sure, Northstar and SNR were required to pay approximately $516 million to the Government when they selectively defaulted on certain spectrum licenses rather than paying the $3.3 billion in bidding credits they had improperly claimed. *See* Dever Letter at 2-3; Fitzgerald Letter at 2-3. However, this $516 million amount was triggered under Section 1.2104(g)(2) of the FCC's rules due to Northstar's and SNR's default; it was not a penalty for fraud.

Here, any recovery here for Defendants' fraud would not be duplicative, and Defendants do not contend otherwise. Indeed, with the exception of Northstar and SNR, none of Defendants were even parties to the FCC proceeding upon which Defendants' government action bar argument is predicated. *See Bidding Credit Order* ¶¶ 30-31; *cf. Prawer*, 24 F.3d at 328, n.9 (finding the government action bar inapplicable when the government "was *not* proceeding against the defendants in this action, for fraud or otherwise, in the Collection case" when only two of the defendants were even "parties to the Collection case" and then only by means of "a series of third-party claims against them").

Furthermore, even as to Northstar and SNR, the FCC proceeding to which they were parties was not an "administrative civil money penalty proceeding" within the meaning of Section 3730(e)(3) because the FCC could not lawfully have sought to penalize these entities for fraud in that proceeding. As explained in the *Bidding Credit Order*, the FCC proceeding was conducted pursuant to Section 1.2108 of its rules, which "governs the filing of petitions to deny the applications of winning bidders." *Id.* ¶ 39. Under Section 1.2108, the Commission had only three options in resolving the petitions to deny Northstar's and SNR's applications for bidding credits: (1) grant the applications; (2) deny the applications; or (3) designate the applications for hearing if "[s]ubstantial and material issues of fact require a hearing." 47 C.F.R. § 1.2108(d). Nothing in Section 1.2108 would authorize the FCC to impose penalties on Northstar and SNR, which further eviscerates Defendants' government action bar argument. *See, e.g., RKO Gen., Inc. v. FCC*, 670 F.2d 215, 232 (D.C. Cir. 1981) (proceeding in which FCC reviews petitions to deny applications is not a "penalty proceeding").

That the FCC could have initiated a different proceeding in which it could have exercised its power to "subpoena witnesses" or "require the production of evidence" or could have referred

the matter "to the Office of Inspector General or the Department of Justice for investigation or institution of criminal proceedings" is irrelevant. Dkt. 70 at 26. Section 3730(e)(3) only bars *qui tam* actions based on a pending "administrative civil money penalty proceeding in which the Government is already a party," not a hypothetical proceeding in which the Government theoretically could be a party. *See, e.g., Prawer*, 24 F.3d at 328 (finding the government action bar inapplicable when the government could not have sued the defendants for fraud as part of its administrative proceeding "as that case was constituted"); *United States ex rel. McDermott v. Genetech, Inc.*, No. 05-147-P-C, 2006 WL 3741920, at *7 (D. Me. Dec. 14, 2006) (denying motion to dismiss FCA claim based on a DOJ investigatory subpoena, because "there is nothing but . . . speculation to suggest that the government will obtain redress through its investigation"); *United States ex rel. Schagrin v. LDR Indus., LLC*,  No. 14 C 9125, 2018 WL 6064699, at *4 (N.D. Ill. Nov. 20, 2018) (agreeing with the Government's position that *qui tam* action should not be dismissed under the government action bar based on potential penalties that represent "'contingent or unmatured' claims that U.S. Customs 'might have' but never 'actually assessed'").

The FCC proceeding here had one purpose – to determine whether Northstar and SNR were eligible for small business bidding credits – which the FCC found was not the case.  The FCC did not and could not use that proceeding to penalize Defendants for that fraud, and thus Section 3730(e)(3) is not grounds for dismissing Relator's Complaint.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated:  January 4, 2019                      Respectfully submitted,

                                             By:     /s/ Stephen J. Obermeier
                                                   Bert W. Rein (D.C. Bar # 067215)
                                                   brein@wileyrein.com
                                                   Bennett L. Ross (D.C. Bar # 978122)
                                                   bross@wileyrein.com

Stephen J. Obermeier (D.C. Bar # 979667)
sobermeier@wileyrein.com
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Phone: (202) 719-7000
Facsimile: (202) 719-7049
*Attorneys for Relator Vermont National
Telephone Company*