# EXHIBIT A

U.S. ex rel. Vermont National Telephone Company v. Northstar Wireless LLC et al., No. 15-CV-728 (CKK)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA EX REL. VERMONT NATIONAL TELEPHONE COMPANY** 354 River Street Springfield, Vermont 05156 (802) 885-7000, | Case No. 15-CV-728(CKK) |
| Plaintiff, | |
| v. | *Jury Trial Demanded* |
| **NORTHSTAR WIRELESS, L.L.C.; NORTHSTAR SPECTRUM, L.L.C.; NORTHSTAR MANAGER, L.L.C.;  DOYON, LIMITED; MIRANDA WRIGHT; ALLEN M. TODD;** 1 Doyon Place, Suite 300 Fairbanks, Alaska 99701 (907) 459-2000 **SNR WIRELESS LICENSECO, L.L.C.; SNR WIRELESS HOLDCO, L.L.C.; SNR WIRELESS MANAGEMENT, L.L.C.; ATELUM L.L.C.; JOHN MULETA;** 200 Little Falls Street, Suite 102 Falls Church, VA 22046 (703) 482-9411 **AMERICAN AWS-3 WIRELESS I L.L.C.; AMERICAN AWS-3 WIRELESS II L.L.C.; AMERICAN AWS-3 WIRELESS III L.L.C.; DISH WIRELESS HOLDING L.L.C.; DISH NETWORK CORPORATION; CHARLES W. ERGEN; CANTEY M. ERGEN** 9601 S. Meridian Blvd. Englewood, Colorado 80112 (303) 723-1000, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff-Relator Vermont National Telephone Company, Inc. ("Vermont") alleges, on behalf of the United States of America, for its First Amended Complaint against Defendants Northstar Wireless, L.L.C. ("Northstar Wireless"); Northstar Spectrum, L.L.C. ("Northstar Spectrum"); Northstar Manager, L.L.C. ("Northstar Manager"); Doyon, Limited ("Doyon"); Miranda Wright; Allen M. Todd; SNR Wireless LicenseCo, L.L.C. ("SNR Wireless"); SNR Wireless HoldCo, L.L.C. ("SNR HoldCo"); SNR Wireless Management, L.L.C. ("SNR Management"); Atelum L.L.C. ("Atelum"); John Muleta; American AWS-3 Wireless I L.L.C. ("American I"); American AWS-3 Wireless II L.L.C. ("American II"); American AWS-3 Wireless III L.L.C. ("American III"); and DISH Wireless Holding L.L.C. ("DISH Holding"), DISH Network Corporation ("DISH"), Charles W. Ergen, and Cantey M. Ergen (the "DISH-Controlling Defendants") (collectively, the "Defendants") as follows.

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, claims, and "reverse false claims" made and caused to be made by Defendants and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended ("the FCA" or "the Act").

2.    Defendants defrauded the United States Government of at least $3.3 billion that the Government was lawfully entitled to receive in return for according the Defendants exclusive licensing access to valuable wireless services spectrum. Those rights were auctioned by the Federal Communications Commission ("FCC"), acting under Congressional authority, between November 13, 2014, and January 29, 2015. The auction, designated as Auction 97, was for exclusive access to 1,614 Advanced Wireless Services licenses in the 1695-1710 MHz, 1755-

1780 MHz, and 2155-2180 MHz bands (collectively, the "AWS-3" bands). It is also referred to as the "AWS-3 Auction." Successful bidders were required under FCC rules and orders governing the AWS-3 Auction to tender payments to vest exclusive access rights on or before March 2, 2015.

3.      Defendants Northstar Wireless and SNR Wireless ("sham designated entities" or "sham DEs") became successful bidders under a scheme orchestrated by the DISH-Controlling Defendants, and falsely claimed and certified up to and through the March 2, 2015 payment deadline that they were independent "very small businesses" entitled to a 25 percent discount (or bidding credit) on the obligations to the United States incurred as a result of their successful bids. But they were, in fact, under the *de facto* control of the DISH-Controlling Defendants and thus not entitled to the discount.

4.      Had Defendants not falsely disclaimed *de facto* control by the DISH-Controlling Defendants, they would have been considered DISH-affiliated entities under FCC rules and required to pay the full amount of their bids, some $13.3 billion. Through the scheme described herein and their false certifications, however, Defendants paid approximately $10 billion to the United States for these rights. Accordingly, the United States has been damaged in the amount of at least $3.3 billion (25 percent of the bid amount) as a consequence of Defendants' fraud.

5.      Defendants' actions were taken with full awareness of the falsity of their claims and the legal violations in which they engaged. The decision to form the sham DEs was conceived by the DISH-Controlling Defendants, rather than by the individuals who purportedly controlled Northstar Wireless and SNR Wireless. The "bidders" were effectively fronts existing only on paper. Defendants intentionally created a complex chain of *de jure* controls to hide *de*

3

*facto* control by the DISH-Controlling Defendants and to create the illusion that the Northstar Wireless and SNR Wireless bidders were under the control of minority equity interests.

6.      Defendants also arranged for Northstar Wireless and SNR Wireless to bid against each other and against Defendants' disclosed DISH-controlled entity, American Wireless I, to further the illusion that the named entities were independent of each other.  This strategy of joint bidding allowed the DISH-Controlling Defendants to gain the added advantage of inducing other bidders to believe that certain frequency blocks being auctioned were subject to intense competition so that those other bidders would be deterred from bidding for those rights at prices that would have exceeded the winning bids from Defendants.  At the conclusion of the bidding, Defendants then arranged for the prevailing bidder on each block they pursued to be either Northstar Wireless or SNR Wireless to ensure that the 25 percent claimed discount would be maximized.  While this arrangement created the false impression that the bidder admittedly controlled by the DISH-Controlling Defendants, American I, obtained no rights in the auction, the DISH-Controlling Defendants were, in fact, benefitted by the rights now under their *de facto* control at a 25 percent discount to the detriment of the U.S. Government.  That the sham DEs exist solely to benefit the DISH-Controlling Defendants is further evidenced by Northstar Wireless's and SNR Wireless's failure to take steps to deploy a wireless system in the four years since Auction 97 concluded.

7.      Defendants' actions violated 31 U.S.C. § 3729 and entitle the United States to three times the loss it has incurred, as well as statutory penalties for each bid made under false representation and certification by Defendants Northstar Wireless and SNR Wireless. Defendants are also liable for all costs of this action, including Relator's attorney's fees and expenses as

required by statute.  Relator also seeks a determination that it be awarded the maximum share allowed by 31 U.S.C. Section 3730(d).

II.   **PARTIES**

### A.  The Plaintiff/Qui Tam Relator

8.      Relator Vermont National Telephone Company is a corporation formed in 1994 under the laws of Delaware.  The address for Vermont is 354 River Street, Springfield, Vermont 05156.  Vermont's wholly-owned subsidiary is VTel Wireless, Inc. ("VTel Wireless"), a corporation formed in 1995 also under the laws of Delaware.

9.      Vermont is a small, family-owned telephone company providing landline service to 14 rural Vermont villages, as well as 4G LTE wireless Internet to towns throughout the state. Vermont's telephone network, owned by Vermont and several predecessors, has been providing continuous telephone service to rural Vermonters since 1890.

10.      VTel Wireless registered and participated in Auction 97 as a "small business" entity entitled to a 15 percent bidding credit with respect to any spectrum licenses it obtained. Unlike Northstar Wireless and SNR Wireless, VTel Wireless is a true small business and is precisely the type of company that Congress and the FCC intended to promote by offering designated entity bid credits.

11.      VTel Wireless, however, obtained no spectrum during the auction.  Its failure to win any spectrum was due, at least in part, to the DISH-Controlling Defendants orchestrating joint bidding between Northstar Wireless, SNR Wireless, and American I.  Specifically, VTel Wireless withdrew from competition for certain blocks of spectrum where Northstar Wireless, SNR Wireless, and American I had created the false impression of high demand.

12.      Shortly after the auction, VTel Wireless and its parent company Vermont became aware of the irregular bidding activity of Northstar Wireless, SNR Wireless, and American I.

Following a review of information regarding the auction results, including a bid-by-bid breakdown of the auction provided by the FCC, Vermont consulted with an expert in bidding economics and game theory to evaluate whether the irregular bidding activity between Northstar Wireless, SNR Wireless, and American I could have occurred as a result of a bidding agreement between three independent entities, or whether it necessarily resulted from a single entity controlling the activity of all three entities.

13.     The expert's analysis clearly established that the bidding behavior of Northstar Wireless, SNR Wireless, and American I could only be explained by the exercise of central, coordinated control by a single entity, in this case, the DISH-Controlling Defendants.  Vermont respects the initiatives, innovations, and multi-billion dollar revenue growth achieved by DISH, and DISH-Controlling Defendants in prior decades; however, Vermont believes that all FCC auction participants—large and small—must follow the rules, including the rules for small businesses.  Vermont therefore decided to voluntarily disclose information regarding Defendants' misconduct in the auction to the United States and thereafter file this action on behalf of the United States to recover the proceeds of the fraud.

14.     Vermont voluntarily disclosed Defendants' fraud to the U.S. Department of Justice on May 11, 2015.  This voluntary disclosure—which included the substance of Relator's allegations—occurred before VTel Wireless filed its petition with the FCC on May 11, 2015 to deny Northstar Wireless's and SNR Wireless's claims for bidding credits.  No other parties that filed petitions to deny with the FCC on May 11, 2015 raised even a general allegation that Defendants had committed the fraud that Relator alleges in this action.

**B.  Defendants**

15.     Defendants are all legal entities created and controlled by the DISH-Controlling Defendants for the single purpose of obtaining spectrum at a substantial discount through

6

coordinated bidding during Auction 97.  The complex network of sham DEs and *de jure*

control—which was created by the DISH-Controlling Defendants to mask their *de facto* control

over all Defendants—is summarized in the following chart and described more fully below.



a.    Bidder Northstar Wireless and Affiliated Defendants

16.    Defendant Northstar Wireless, L.L.C. ("Northstar Wireless") is organized as a limited liability company under the laws of Delaware.  Its business address is listed as 1 Doyon Place, Suite 300, Fairbanks, Alaska 99701-2941.  Northstar Wireless was formed at the direction of the DISH-Controlling Defendants on or about September 4, 2014, eight days before the September 12, 2014 deadline to file an application to participate in the FCC's Auction 97 (referred to as the "Short-Form" or "Form 175" application).

17.    Defendant Northstar Spectrum, L.L.C. ("Northstar Spectrum") is Northstar Wireless's sole member and Manager.  Northstar Spectrum is a limited liability company also formed under the laws of Delaware and its business address is also listed as 1 Doyon Place, Suite 300, Fairbanks, Alaska 99701-2941.  Northstar Spectrum was formed at the direction of the DISH-Controlling Defendants on or about September 3, 2014, one day before Northstar Wireless was formed, and nine days before Northstar Wireless submitted its Short-Form to participate in Auction 97.

18.    Defendant Northstar Spectrum, in turn, has two members, Defendant Northstar Manager, L.L.C. ("Northstar Manager") and Defendant American AWS-3 Wireless II L.L.C. ("American II").

19.    85 percent of all member interests in Northstar Spectrum are held by American II. American II is a limited liability company that was formed at the direction of the DISH-Controlling Defendants under the laws of Colorado on August 22, 2014.  The address for both American II and its Registered Agent, Timothy Allen Messner, is listed as 9601 S. Meridian Blvd., Englewood, Colorado 80112.  Timothy Allen Messner serves as Executive Vice President and General Counsel of DISH.

8

20.     The remaining 15 percent of all member interests in Northstar Spectrum is held by Defendant Northstar Manager, which is also Northstar Spectrum's manager member. Defendant Northstar Manager is a limited liability company formed under the laws of Delaware. It shares the same business address as Defendants Northstar Spectrum and Northstar Wireless. At the direction of the DISH-Controlling Defendants, Northstar Manager was registered with the state of Delaware on or about the same day as Northstar Spectrum—September 3, 2014, nine days before the Short-Form application filing deadline for Auction 97.

21.     Defendant Doyon, Limited ("Doyon") holds 40.1 percent of all member interests in Defendant Northstar Manager and is also its manager member.  Doyon is a business corporation formed in Alaska.  The address listed for Doyon, as well as that of its Registered Agent, Defendant Allen M. Todd, is 1 Doyon Place, Suite 300, Fairbanks, Alaska 99701—the same address as listed for Northstar Wireless, Northstar Spectrum, and Northstar Manager. Doyon is an Alaska Native Regional Corporation with numerous affiliates in various fields including oil and gas land drilling, natural resource development, government contracting, and tourism.  It is not a telecommunications company.

22.     Defendant Miranda Wright is listed as a Director and Treasurer of Doyon.

23.     Aside from its activity in Auction 97, Northstar Wireless is engaged in no other lines of business, and has no other operations, assets, or revenues.

    b.     <u>Bidder SNR Wireless and Affiliated Entities</u>

24.     Defendant SNR Wireless, L.L.C. ("SNR Wireless") is organized as a limited liability company formed under the laws of Delaware.  Its business address is listed as 200 Little Falls Street, Suite 102, Falls Church, Virginia, 22046.  SNR Wireless was formed at the direction

of the DISH-Controlling Defendants on or about August 29, 2014, fourteen days before the

September 12, 2014 deadline to file a Short-Form application to participate in Auction 97.

25.     Defendant SNR Wireless HoldCo, L.L.C. ("SNR HoldCo") is SNR Wireless's

sole member and manager member.  Like SNR Wireless, SNR HoldCo was formed at the

direction of the DISH-Controlling Defendants under the laws of Delaware on or about August

29, 2014.  Its address is listed as 200 Little Falls Street, Suite 102, Falls Church, Virginia, 22046.

26.     Defendant SNR HoldCo, in turn, has two members, Defendant SNR Wireless

Management, L.L.C. ("SNR Management") and Defendant American AWS-3 Wireless III

L.L.C. ("American III").

27.     85 percent of all member interests in SNR HoldCo are held by American III.  Like

American II, American III is a limited liability company that was formed at the direction of the

DISH-Controlling Defendants under the laws of Colorado on or about August 22, 2014.  Both its

principal office address and the address of its Registered Agent, Timothy Allen Messner, are

listed as 9601 S. Meridian Blvd., Englewood, Colorado 80112.  Timothy Allen Messner serves

as Executive Vice President and General Counsel of DISH.

28.     The remaining 15 percent of all member interests in SNR HoldCo is held by

Defendant SNR Management, L.L.C. ("SNR Management").  Defendant SNR Management is a

limited liability company formed at the direction of the DISH-Controlling Defendants under the

laws of Delaware.  It shares the same business address as Defendants SNR HoldCo and SNR

Wireless, as well as the same date of formation—August 29, 2014, fourteen days before the

Short-Form application filing deadline for Auction 97.

29.     Defendant Atelum L.L.C. ("Atelum") is the sole manager of Defendant SNR

Management.  Atelum is a limited liability company formed under the Virginia Limited Liability

Company Act on March 9, 2011. The listed address for Atelum is the same address listed for SNR Wireless, SNR HoldCo, and SNR Management—200 Little Falls Street, Suite 102, Falls Church, Virginia, 22046. Atelum is a consulting firm. It is not a telecommunications company.

30.     Defendant John Muleta is listed as the sole member and CEO of Defendant Atelum, and he holds a 7.73 percent member interest in SNR Management.

31.     Aside from its activity in Auction 97, SNR Wireless is engaged in no other lines of business, and has no operations, assets, or revenues

       c.     <u>Bidder American I and Affiliated Defendants</u>

32.     Defendant American AWS-3 Wireless I L.L.C. ("American I") is a limited liability company. Like American II and American III, American I was formed at the direction of the DISH-Controlling Defendants on or about August 22, 2014 in Colorado. American I lists both its principal office address and the address of its Registered Agent, Timothy Allen Messner, as 9601 S. Meridian Blvd., Englewood, Colorado 80112.

33.     American I's Authorized Bidders for the auction were Charles Ergen, who at the time of the bidding was Chairman of the Board of Directors of DISH; Jeffrey Blum, American I's Responsible Party and Senior Vice President and Deputy General Counsel of Defendant DISH; and Thomas Cullen, the Executive Vice President of DISH.

34.     American I also lists Defendants Cantey M. Ergen, Charles W. Ergen, DISH, and DISH Holding as its disclosable interest holders.

35.     Aside from its activity in Auction 97, American I is engaged in no other lines of business, and has no operations, assets, or revenues.

     d.    <u>DISH-Controlling Defendants</u>

36.    Defendants American I, American II, and American III are wholly-owned, direct subsidiaries of Defendant DISH Holding.  DISH Holding is a limited liability company formed under the laws of Colorado.  The address for both DISH Holding and its Registered Agent, Timothy Allen Messner, is listed as 9601 S. Meridian Blvd., Englewood, Colorado 80112.  DISH Holding holds an 85 percent indirect interest in both Northstar Wireless and SNR Wireless.

37.    Defendant DISH Holding is a wholly-owned, direct subsidiary of Defendant DISH, which is a Nevada corporation.  W. Erik Carlson is listed as the President of DISH, with an address of 9601 S. Meridian Blvd., Englewood, Colorado 80112, and Brandon Ehrhart is DISH's Secretary.  DISH holds an 85 percent indirect interest in both Northstar Wireless and SNR Wireless.

38.    Defendants Charles W. Ergen and Cantey M. Ergen together beneficially own an approximately 51 percent equity interest and 85 percent voting interest in DISH.

## III.    <u>JURISDICTION AND VENUE</u>

39.    This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

40.    Under 31 U.S.C. § 3730(e), Relator qualifies as an "original source" because it has knowledge that is independent of and materially adds to the publicly disclosed information regarding the auction.  Relator has voluntarily provided the information to the United States Government before filing an action under this section.

41.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because at least one of the Defendants can be found in, resides or transacts or has transacted business in this District.  In

this case, Defendants have used the FCC and its application and auction processes as an instrumentality of the fraud committed against the federal Government.  Both the FCC's headquarters and the FCC's Wireless Telecommunications Bureau, Auctions Division, which managed and supervised Auction 97, are located at 445 12th Street SW, in the District of Columbia.  Having committed the fraudulent acts and made the fraudulent statements as alleged in this First Amended Complaint within the District of Columbia fraudulently to claim and obtain "very small business" bidding credits in the FCC's Auction 97, Defendants are subject to the jurisdiction of this Court.

42.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because at least one Defendant in this action can be found in or transacts or has transacted business in this District.  Further, venue is appropriate because the Defendants committed the fraudulent acts and made fraudulent statements as alleged in this First Amended Complaint within the District of Columbia fraudulently to claim and obtain "very small business" bidding credits in Auction 97.

IV.    **BACKGROUND AND APPLICABLE LAW**

43.     The right to use specific frequencies to provide communications services through the air ("spectrum") is a highly valuable, publicly-owned asset managed and controlled by the FCC.  Since 1993, Congress has authorized the FCC to use competitive bidding in public auctions as a means of allocating commercial spectrum licenses among competing applicants. The FCC divides the spectrum into blocks based on frequency and geography; winning auction bidders obtain the exclusive right to pursue a license to use a particular block or set of blocks.

**A.  The Auction Process**

a.     Short-Form Applications and Certifications

44.     An entity seeking to participate in an FCC auction must first submit a Short-Form application or FCC Form 175, in which it makes certain disclosures and certifications regarding

its qualifications under penalty of perjury.  The application provides the FCC with the information it needs to determine whether the applicant is legally, technically, and financially qualified to participate in Commission auctions for licenses or permits, including whether its attributable revenues qualify it for "designated entity" status.  A Short-Form application including all requisite disclosures and certifications is a prerequisite to participation in a spectrum auction.

i.   **Ownership Disclosures**

45.     Among other things, the applicant must disclose in its Short-Form application certain ownership information.  Specifically, the applicant is required to disclose fully information regarding the real party- or parties-in-interest and the ownership structure of the applicant, including both direct and indirect ownership interests of 10 percent or more.  A "real party in interest" is a person or entity directly or indirectly owning or controlling (or both) the applicant.

ii.   **Designated Entity Disclosures**

46.     Congress directed that the spectrum auctions provide incentives to promote economic opportunity and to foster small business participation.  Congress intended to "ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women…"  47 U.S.C. § 309(j)(3)(B).

47.     To effectuate Congress's intent, the FCC adopted rules providing that qualified "small businesses" or "designated entities" could receive bidding credits, or discounts, of a specified percentage of the competitively determined actual value, *i.e.*, the "gross" bid for a

license opportunity available for auction.  Only legitimate independent businesses that will

participate in the wireless marketplace by offering facilities-based communications services to

the public are the intended beneficiaries of small business bidding discounts; entities that do not

intend to offer service to the public and instead would hold licenses under control of unqualified

entities are not eligible for bidding discounts.

48.     For the license opportunities open for bids in Auction 97, FCC rules provided that

qualifying "small businesses" like Vermont would receive a 15 percent discount off their gross

winning bids.  Qualifying "very small businesses" would receive a 25 percent discount off of

their gross winning bids.  A "small business" was entitled to its discount only if it represented

and certified accurately to the FCC, in both its Short-Form and Long-Form and associated

documentation, that the applicant, together with its affiliates, its controlling interest holders, the

affiliates of the controlling interest holders, and the entities with which it has an attributable

material relationship, had average annual gross revenues of not more than $40 million for the

preceding three years.  An applicant seeking a "very small business" designation similarly could

not have annual gross revenues of more than $15 million for the preceding three years.

49.     An applicant seeking to qualify as a designated entity either as a "small business"

or "very small business" also was required to make certain disclosures to demonstrate that it was

a legitimate small business and not merely a proxy for a larger enterprise.  In addition to the

applicant's own gross revenues, the FCC requires a designated entity applicant to disclose the

gross revenues from the three preceding years for its affiliates, its controlling interests, the

affiliates of its controlling interests, and the entities with which it has an attributable material

relationship.  The revenues of the applicant and its affiliated entities are then aggregated for

15

purposes of determining whether the entity is, in fact, a "small business" or "very small business" eligible for a bidding credit.

50.     The FCC provides guidance as to what qualifies as an applicant's affiliate, controlling interest, or an entity with which the applicant has an attributable material relationship.

51.     "Controlling interests" of an applicant include individuals and entities with either *de facto* or *de jure* control of the applicant. 47 C.F.R. § 1.2110(c)(2).

52.     *De jure* control typically is evidenced by ownership of more than 50 percent of an applicant's voting interests.  *Id.*

53.     *De facto* control is determined on the basis of all the circumstances of the particular case.  The analysis of *de facto* control includes whether—despite the existence of legal documents or other arrangements that place *de jure* control of an entity in the hands of one party—there exist relationships (*e.g.*, familial or business), practical realities (*e.g.*, indebtedness), or other factors (*e.g.*, experience) that place actual control of the applicant in the hands of another.  *Id.*

54.     Among the factors that determine *de facto* control are: (a) who makes management and policy decisions for the applicant, including who determines the applicant's activities and actions; (b) who is in charge of financing of the applicant's business activities; (c) who controls the day-to-day operations; (d) who is in charge of employment decisions; (e) whether the applicant shares facilities and equipment; (f) the existence and nature of business and social relationships; and (g) the nature of stock ownership, contractual, employment and other business relationships between the applicant and another entity or entities, including lenders, investors, and limited partners. *Id.*

55.     FCC regulations define an "affiliate" as any individual or entity that (a) directly or indirectly controls or has the power to control the applicant, (b) is directly or indirectly controlled by the applicant, (c) is directly or indirectly controlled by a third party that also controls or has the power to control the applicant, or (d) has an identity of interest with the applicant.  47 C.F.R. § 1.2110(c)(5).   Affiliate revenues are added to entity revenues to determine qualification for designated entity status.

56.     An applicant also has an "attributable material relationship" when it has one or more agreements with any individual entity for the lease or resale (including under a wholesale agreement) of, on a cumulative basis, more than 25 percent of the spectrum capacity of any individual license held by the applicant or licensee.  The attributable material relationship will cause the gross revenues of that entity and its attributable interest holders to be attributed to the applicant for the purposes of calculating the average annual gross revenue for a small business qualification.  Public Notice, DA 14-1018, ¶ 88 (July 23, 2014).

        iii.    **Bidding Agreement Disclosures**

57.     An applicant also must disclose in its Short-Form application all real parties in interest with which the applicant has entered into any agreements, arrangements, or understandings of any kind relating to the licenses that may arise from the auction, including any agreements relating to post-auction market structure.  47 C.F.R. § 1.2105(a)(2)(viii)-(ix).

        iv.    **Certifications**

58.     In conjunction with these disclosures, an applicant seeking designated entity status must make several certifications under penalty of perjury as part of its Short-Form application, including the following:

a. A statement and a declaration that the applicant is a qualified designated entity eligible for bidding credits as either a "small business" or "very small business" if the applicant applies as such, *id.* § (a)(2)(iv);

b. An exhibit identifying all parties with whom the applicant has entered into partnerships, joint ventures, consortia or other agreements, arrangements or understandings of any kind relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure, *id.* § (a)(2)(viii); and

c. A certification that the applicant has not entered and will not enter into any explicit or implicit agreements, arrangements or understandings of any kind with any parties other than those identified pursuant to paragraph (a)(2)(viii) regarding the amount of their bids, bidding strategies or the particular licenses on which they will or will not bid, *id.* § (a)(2)(iv).

59.    These certifications are made by the requisite attachments, declarations or statements as well as through the *Certify and Submit* screens of the Short-Form application. The *Certify and Submit* screen lists the certifications required of all applicants in the Commission's competitive bidding processes, requests the identification of the applicant's certifying official, and then requires the certifying official to certify the entire application.

60.    There may be more than one party making certifications for an applicant. For example, one individual may certify, under penalty of perjury, the separately required statement and declaration that the applicant is a qualified designated entity, while another individual certifies and signs the *Certify and Submit* screens.

61.    If an applicant fails to make these certifications, its Short-Form application will be rejected, and the applicant will not be permitted to participate in the auction or to obtain a

spectrum license through the auction process.  If an applicant fails to submit certifications to

qualify as "very small business," then it is not eligible for the 25 percent bid credit and would be

required to pay the federal Government the full amount of its winning bids.

62.     Entities whose Short-Form applications are accepted by the FCC are authorized to

participate in the auction.

       b.     <u>Auction Rules</u>

63.     Auction 97 involved multiple blocks of "AWS-3" spectrum.  Qualified bidders

were able to bid on separate geographic blocks across the nation.

64.     The auction was conducted as a simultaneous multiple-round auction.  Every

available block was offered for bid at the same time, and participants placed bids on individual

licenses in successive bidding rounds until no further bid was made on any available block.

65.     Before the commencement of bidding, each potential bidder was required to

purchase refundable bidding units sufficient to permit participation in the auction of all blocks on

which it wanted to bid.  The FCC specified the number of bidding units triggering eligibility for

each block, and placing a bid on any block put those bidding units in use until a bidder was

outbid and shifted its units to another block.  Northstar Wireless purchased $508 million worth of

bidding units, and SNR Wireless purchased $412 million worth of units.  Thus, both controlled

entities had broad access to available blocks.  On information and belief, the funds for those

purchases were provided or otherwise enabled by the DISH-Controlling Defendants.

66.     At the end of each bidding round, provisionally winning bids ("PWBs") were

determined based on the highest bid amount received for each block.  In the event of identical

high bids, the tiebreaker was the highest random number that the FCC attached to each bid upon

submission.  Losers of the tiebreaker then could give up on that particular block or submit a higher bid in a subsequent round.

67.     Each bidding round was followed by a release of the round results to apprise participants of the bid amounts.  Bidding results were reported anonymously; that is, bidders were informed how many bids had been placed and the amount of those bids, but they could not identify the other bidders.

68.     If a bidder was outbid on a particular license, it could use its bidding units to submit a bid on any other license in the next round for which it had the requisite bidding units.

69.     After all bidding ended, the FCC issued a public notice declaring the auction closed, identifying the winning bidders, and setting forth the deadlines for down payments, final payments, Long-Form applications, and ownership disclosure information reports.

c.     Long-Form Application and Payment for Licenses

70.     Winning bidders obtained the exclusive right to apply formally for licenses to use the blocks of spectrum they had won at auction.  The Commission's rules provide that, within ten business days after release of the auction closing notice, winning bidders must electronically submit a Long-Form (or "Form 601") application for those license(s).  In the closing notice for Auction 97, winning bidders were notified that their Long-Forms were due on February 13, 2015.

71.     Winning bidders that claimed eligibility for a bidding credit as a designated entity were again required to demonstrate their eligibility for the bidding credit in the Long-Form, affirming all designated entity certifications in the Short-Form application.

72.     The Long-Form application also requires the bidders to verify the information in their ownership disclosure report that previously was submitted with their Short-Forms, which is

then incorporated into the Long-Form.  This includes verification of disclosures with respect to bidding agreements.

73.    As with the Short-Form, the Long-Form is submitted electronically, and the applicant ultimately reaches a *Certification* screen that provides General Certification Statements and requests the applicant's electronic signature.  By electronically signing this form, an applicant certifies that the statements listed on the screen are true, complete, correct, and made in good faith.

74.    Winning bidders were required to pay in full for their exclusive rights before license applications were processed and approved.  Final payment of winning bids in Auction 97 was due March 2, 2015.

d.    Post-Auction Rules and Regulations

75.    Once a license is awarded, federal "anti-trafficking" and "unjust enrichment" restrictions prevent licensees from earning speculative profits through post-auction resale of discounted licenses.  Such restrictions are intended to prevent "shams" from circumventing Congressional policy favoring small business opportunity, by stopping "sham" licensees from acquiring licenses at a discount and then ceding control over the licenses to entities that are not qualified to obtain bid discounts.

76.    The AWS-3 spectrum available in Auction 97 was also subject to an additional use restriction.  Winning bidders must coordinate their use with the U.S. Government, which is the current user of the spectrum.  The U.S. Government maintains a number of wide area licenses that cover the U.S. and protectorates that will remain for up to 42 months, so AWS-3 licensees may not have access to a portion of the spectrum for a considerable time.

**B. The Actions of Northstar Wireless, SNR Wireless, and American I Were Directed by the DISH-Controlling Defendants During Auction 97 to Obtain Nationwide AWS-3 Spectrum for DISH at a Discount.**

    a. <u>DISH's Spectrum Strategy and the Short-Form Applications of Northstar Wireless, SNR Wireless, and American I</u>

77.    Leading up to Auction 97, DISH publicly expressed to investors the great value of nationwide spectrum for its own business, and regularly updated investors of its larger goal to aggressively acquire additional valuable spectrum through the FCC auction process and to use the acquired spectrum to advance its own business interests.

78.    In a Q3 2013 earnings call with investors, for example, when asked whether DISH was an "acquirer" versus a "seller" of spectrum, Defendant Charles Ergen responded that possessing and acquiring spectrum was "like an oil company having oil reserves. You have to – they may get in the refining business. They may get in the retail gas station and convenience market. But it's all predicated on the fact that they've got the reserves in the ground even though they're not – even though you have to go drill for them and invest first."

79.    In a Q1 2014 earnings call, Defendant Charles Ergen forecasted the aggressive approach that DISH would take in Auction 97, indicating that the auction would help augment and complement the value of the spectrum that DISH already possessed, but also noting that "there'll be winners and losers in an auction.  And winners will be happy, and the losers won't have a lot of places to go."

80.    Shortly before the start of Auction 97, Defendant Charles Ergen stated in a Q2 2014 earnings call that "we [DISH] feel confident in auctions [including Auction 97], we're going to participate."  As addressed further below, because of the bidding strategy they employed to ensure that the sham DEs won the spectrum, the DISH-Controlling Entities would ultimately win *no* spectrum in Auction 97.

81.     Consistent with the public statements of Defendant Charles Ergen, Northstar Wireless, SNR Wireless, and American I each applied to bid in Auction 97.  These three entities uploaded their respective Short-Forms to the FCC on September 12, 2014, and thus purported to be qualified to participate in Auction 97.

82.     Northstar Wireless and SNR Wireless each represented in its Form 175 application that its respective average gross annual revenues, aggregated with the gross revenues of its affiliates, controlling interests, the affiliates of those controlling interests, and the entities with which it had an attributable material relationship, did not exceed $15 million for the three years preceding its Form 175 application.

83.     Miranda Wright, Treasurer of Doyon, and Allen M. Todd, Registered Agent of Doyon, certified in Northstar Wireless's Short-Form application on September 12, 2014 that the average annual gross revenues of Northstar Wireless, its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it had any attributable material relationship, were zero dollars on a cumulative basis for the preceding three years.  *See* Northstar FCC Form 175, Exhibit B, Status As A Very Small Business.  Northstar Wireless certified that it had no attributable material relationship with any entity, and that it had no affiliates, other than its controlling interest holders.  *Id*.  Ms. Wright electronically signed Northstar Wireless's "Very Small Business" statement, and Mr. Todd certified the applicant's Short-Form via the *Certify and Submit* screens.

84.     John Muleta, the sole owner and CEO of Defendant Atelum, made the certification for SNR Wireless.  Specifically, Muleta certified in SNR Wireless's Short-Form application on September 12, 2014, that the average annual gross revenues of SNR Wireless, its affiliates, its controlling interest, the affiliates of the controlling interests, and the entities with

which it has an attributable material relationship, were $399,566 on a cumulative basis for the preceding three years. *See* SNR FCC Form 175, Exhibit B, Status As A Very Small Business. This calculation was based on Muleta's activities alone and claimed zero average gross revenue from SNR Wireless, SNR HoldCo, and SNR Management.  SNR Wireless certified that it had no attributable material relationship with any entity, and that it had no affiliates, other than its controlling interest holders.  *Id*.

85.    Neither Northstar Wireless nor SNR Wireless mentioned American I, American II, American III, or the DISH-Controlling Defendants in their Very Small Business Certifications, nor did they include of any of the gross revenues of these entities in demonstrating their purported eligibility for bidding credits as "very small businesses."

86.    Because American I answered that it was not seeking bidding credit eligibility in its Short-Form application, it made no revenue disclosure and no disclosures regarding the revenue of affiliates, controlling interests, affiliates of controlling interests or entities with which it had an attributable material relationship.  It disclosed that American I is a wholly-owned subsidiary of DISH Holding, which is a wholly-owned subsidiary of DISH, and that Charles and Cantey Ergen beneficially hold Class A and Class B common stock of DISH, representing an approximately 51 percent equity interest, and 85 percent voting interest, in DISH and indirectly in the American I.

87.    Northstar Wireless, SNR Wireless, and American I also disclosed the existence of multiple bidding agreements between them allegedly arising from independent business decisions.

88.    According to their respective Short-Form applications, SNR Wireless and American I entered into a "Bidding Protocol and Joint Bidding Arrangement" as of September

12, 2014 with SNR Management, SNR HoldCo, and American III ("SNR-American Bidding Protocol and Joint Bidding Arrangement").

89.     SNR Wireless, Northstar Wireless, and American I also disclosed in their respective Short-Forms that they entered into a Letter Agreement as of September 12, 2014, with American II, American III, Northstar Manager, Northstar Spectrum, Doyon, SNR HoldCo, and SNR Management ("SNR-Northstar-American Joint Bidding Agreement").

90.     Northstar Wireless and SNR Wireless later confirmed and recertified in their Long-Form applications submitted on February 13, 2015, all disclosures and representations made in their Short-Form applications.

        b.     Bidding Behavior of Northstar Wireless, SNR Wireless, and American I

91.     At the direction of the DISH-Controlling Defendants, and with financing provided almost exclusively from entities controlled by the DISH-Controlling Defendants, Northstar Wireless, SNR Wireless, and American I purchased a substantial amount of bidding units. Northstar Wireless's upfront payment total was $508 million, SNR Wireless's upfront payment total was $412 million, and American I's upfront payment total was $400 million.  These bidding units were sufficient to allow Northstar Wireless, SNR Wireless, and American I to compete for all spectrum being auctioned nationwide.  Thus, the DISH-Controlling Defendants were able to orchestrate the accumulation of nationwide AWS-3 spectrum.

92.     Once the bidding commenced, the DISH-Controlling Defendants implemented a strategy of overlapping bidding by Northstar Wireless, SNR Wireless, and American I in order to create the illusion of high demand on blocks sought by the DISH-Controlling Defendants and to deter competitors from bidding on those blocks.  The sham DEs and American I frequently bid on the same licenses in the same rounds, and due to the anonymity accorded bidders, created the

appearance of intense competition for those licenses.  This artificial appearance of heavy demand caused the DISH-Controlling Defendants' competitors, including Vermont, to drop out from bidding on those blocks.

93.     Once the DISH-Controlling Defendants were able to eliminate competitors for the spectrum they sought, American I—the non-designated-entity applicant—dropped out of the bidding and "handed off" the spectrum to either Northstar Wireless or SNR Wireless.  American I was very active in the early rounds, becoming the PWB on several hundred licenses.  Then, beginning in Rounds 21 and 22, the DISH-Controlling Defendants directed the sham DEs to top American I's PWBs on virtually all of those licenses, while American I abruptly discontinued its bidding.  The DISH-Controlling Defendants continued to bid elsewhere to keep the auction alive so that the sham designated entities could make additional prevailing bids on desired blocks.

94.     American I—the only non-designated-entity bidder under the DISH-Controlling Defendants' *de jure* and *de facto* control—did not win a single license.  But by orchestrating a "hand off" strategy through their *de facto* control of Northstar Wireless and SNR Wireless—the DISH-Controlling Defendants were able to obtain all of the spectrum they desired to control at the DE-discounted 25 percent lower price.

95.     At the point that American I discontinued bidding, the competitive bidding between the sham DEs would stop as well.  That is, when the sham DEs were competing against other active bidders—*i.e.*, competitors of the DISH-Controlling Defendants—they increased their bids.  However, after the DISH-Controlling Defendants were able to push out the competitors, the sham DEs generally stopped bidding.  For instance, the sham DEs only bid against each other in head-to-head competition on 19 licenses.  This is compared to the 744 licenses on which the sham DEs both bid when they were competing with outside bidders.

26

96.     Because the DISH-Controlling Defendants were ultimately in control of the sham

DEs, they benefited regardless of which of them ultimately were high bidders.  Thus, where at

the close of a round, the sham DEs had submitted the same high bid, instead of bidding more in

the next round, the sham DEs accepted the FCC's random assignment number to determine the

winner of the tiebreaker in 27 percent of the licenses they won (190 licenses).  This choice—*i.e.*,

to accept the FCC's random assignment rather than continue bidding—occurred only five other

times for all other bidders of Auction 97.  The majority of bidders in tie breakers chose to

continue competing, rather than risk losing due to a randomly generated number.

97.     Moreover, the sham entities bid in a manner inconsistent with the relative future

operation of a mobile network.  Both sham entities finished the auction with geographic gaps in

their spectrum licenses.  But taken together, they were able to obtain near nationwide coverage

of AWS-3 spectrum.  This benefited their single controlling entity, the DISH-Controlling

Defendants.

98.     After 77 days and 341 rounds, Auction 97 closed on January 29, 2015.

99.     Northstar Wireless won $7.8 billion of licenses for a net bid total (after

application of the very small business discount) of just under $5.9 billion. SNR Wireless won

$5.5 billion of licenses for a net bid total of approximately $4 billion (after application of the

very small business discount).  American I, by contrast, did not win a single spectrum license in

Auction 97.

100.    With a cumulative 702 spectrum license opportunities valued at $13.3 billion, the

DISH-Controlling Defendants, through the sham DEs, won more than anyone else in Auction 97.

And, because of the very small business status falsely certified by the sham DEs, the total price

paid by the DISH-Controlling Defendants through the sham DEs was discounted by $3.3 billion.

101.    As required under the Commission's rules, after the close of Auction 97, the sham DEs submitted their respective Long-Form applications (with all requisite certifications) and made their down payments by February 13, 2015.  The sham DEs completed their payments (net of pre-payments already made) to the FCC on March 2, 2015.  The payment was financed almost entirely through loans and other equity provided by the DISH-Controlling Defendants. American I, in turn, was refunded its $400 million payment for bid credits

102.    On May 11, 2015, VTel Wireless filed with the FCC a petition to deny the sham DEs' applications for the wireless licenses they purportedly "won" during the AWS-3 auction and the bidding credits they wrongfully claimed.   Other parties also filed petitions to deny with the FCC.

103.    In an order released on August 18, 2015, the FCC found that Northstar Wireless and SNR Wireless were not "very small businesses" eligible for the approximately $3.3 billion in bidding credits because, based on the totality of the facts and circumstances in the administrative record, SNR Wireless and Northstar Wireless were under the *de facto* control of DISH. *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz and 1755-1780 MHz and 2155-2180 MHz Bands*, 30 F.C.C. Rcd. 8887 (2015). The FCC directed SNR Wireless and Northstar Wireless to either submit payment in the full amount of their winning bids or to provide an acceptable irrevocable, standby letter of credit.

104.    Following the FCC's decision to disallow them bidding credits – and rather than pay the full amount of their winning bids or post a letter of credit, Northstar Wireless and SNR Wireless defaulted on approximately 28 percent of the licenses they originally won at auction for approximately $3.3 billion.  After the defaults, Northstar Wireless and SNR Wireless were left

with sufficient spectrum on a combined basis to provide nationwide coverage, as they continue to have two or three licenses for the vast majority of the United States.

105.    However, the defaults created additional geographic holes in the individual coverage areas of Northstar Wireless and SNR Wireless.  As a result, the defaults continued the pattern by the sham DEs of acting contrary to their economic self-interests for the benefit of DISH by promoting the uniformity of spectrum coverage provided by their combined holdings, at additional cost to the continuity of geographic coverage for each Northstar Wireless and SNR Wireless individually.

106.    In implementing their post-auction license default scheme, Northstar Wireless and SNR Wireless each entered into agreements by which DISH guaranteed payment to the FCC of the deficiency amounts due under the FCC's rules when the licenses on which Northstar Wireless and SNR Wireless defaulted are re-auctioned.  These agreements were required because of the substantial amount of the potential deficiency payments and the FCC's concern about Northstar Wireless's and SNR Wireless's ability to make these payments.

107.    DISH's guarantee of Northstar Wireless's and SNR Wireless's penalty payments confirm that the sham DEs exist solely for DISH's benefit.  DISH had no business reason to agree to make any deficiency payments that Northstar Wireless and SNR Wireless are obligated to pay – except as part of the ongoing strategy by the DISH-Controlling Defendants to obtain the benefit of bidding credits to which they are not entitled.

## V.    THE DEFENDANTS' FRAUD

### A. The DISH-Controlling Defendants Orchestrated the Acquisition of Nationwide AWS-3 Spectrum at a Substantial Discount Through the *De Facto* Control of the Sham DEs.

108.    By executing the fraudulent bidding scheme described above, the DISH-Controlling Defendants secured the rights to nationwide spectrum while depriving the U.S.

29

Government of at least $3.3 billion in auction proceeds.  The DISH-Controlling Defendants were sophisticated parties experienced in FCC auctions and regulations and thus took steps designed to disguise their exercise of *de facto* control of Northstar Wireless and SNR Wireless while purporting to make full disclosure of their economic interests in the sham entities and posture their coordinated bidding activity as a result of agreements reached between independently controlled entities.

109.    Northstar Wireless, SNR Wireless, and their parent LLCs were pop-up entities created shortly before the opening of Auction 97 for the sole purpose of participating in the auction.  The DISH-Controlling Defendants, through their control of DISH and its subsidiaries American II and American III, effectively held more than 90 percent of the equity in Northstar Wireless and SNR Wireless.

110.    An Alaskan corporation holding only 6 percent of the equity in Northstar Wireless was nominally given control of Northstar Wireless.

111.    An individual recruited by and having a previous relationship with the DISH-Controlling Defendants and holding only 7.73 percent of the equity in SNR Wireless was nominally given sole management control of SNR Wireless.

112.    Placing nominal control of Northstar Wireless and SNR Wireless in persons other than the DISH-Controlling Defendants permitted those entities to claim that they were not under the *de jure* control of the DISH-Controlling Defendants.

113.    Because the FCC does not independently examine the existence of *de facto* control prior to a spectrum auction, but instead relies on participants' certifications that *de facto* control has been disclosed, Northstar Wireless and SNR Wireless were able to qualify for

designated entity status by falsely certifying that they were not under the *de facto* control of the
DISH-Controlling Defendants.

114.    Recognizing that the orchestrated bidding of the sham entities and the disclosed
DISH-Controlling Defendant entity (American I) would be apparent and raise *de facto* control
issues, Defendants disclosed to the FCC, as permitted by its regulations, that the sham entities
and American I had entered into joint bidding arrangements.  The FCC does not expressly
prohibit such arrangements, if disclosed, between independent entities so long as these
arrangements do not violate the antitrust laws.  Through the joint bidding disclosure, the DISH-
Controlling Defendants sought to disguise that the behavior of Northstar Wireless, SNR
Wireless, and American I was conceived and directed by a single controlling interest for the
purposes of obtaining a 25 percent discount to which they were not lawfully entitled.  Rather
than being the product of an agreement between independently-controlled bidders, the DISH-
Controlling Defendants sought to hold down the cost of acquiring nationwide spectrum by
creating an illusion of intense competition that persuaded Vermont and other *bona fide* bidders to
drop out of the bidding on that spectrum.

115.    Relator requested that its attorneys, who are experienced with FCC auctions,
investigate the conduct of the DISH-Controlling Defendants in Auction 97, which included
consulting a recognized expert in FCC bidding and game theory.  This investigation revealed that
the observed behavior of the DISH-Controlling Defendant entities could not be explained as the
product of an agreement among independent entities, but could have arisen only if a single
person or entity was controlling all three bidders.

116.    The expert initially noted that American I, despite being party to the alleged
agreement and being the only party controlled by a communications provider, did not win a

single bid.  American I bid actively on many spectrum opportunities and became the PWB on

hundreds of blocks as late as Round 20 of the auction.  American I then ceased bidding on those

blocks and permitted Northstar Wireless and/or SNR Wireless to supersede it as PWB in every

case.  No rational entity would independently take such actions unless it had confidence that it

would control any licenses issued to the sham entities

117.    The expert also observed that Northstar Wireless and SNR Wireless pursued

blocks in patterns that made no sense from the point of view of providing communications

services but were designed solely to permit DISH to operate nationwide in the AWS-3 spectrum.

118.    The FCC's rules include post-auction restrictions on the sale or transfer of

spectrum for a defined five-year period to deter speculative or collusive bidding.  The peculiar

circumstances of Auction 97, however, made those restrictions an ineffective instrument.

119.    The AWS-3 spectrum, prior to Auction 97, was assigned to U.S. Government

users.  Bidders were advised that their operations must be coordinated with existing U.S.

Government systems in the "uplink" portion of the AWS-3 spectrum.  AWS-3 spectrum is

classified as "uplink," representing spectrum for transmitting from a mobile unit to a base

station, or "downlink," representing spectrum for transmitting from a base station to a mobile

unit.  The uplink and downlink spectrum is in different portions of the radio spectrum to avoid

interference, and the U.S. Government operations were only in the uplink bands.  U.S.

Government uses included broad area authorizations for the entire U.S. and its protectorates for

temporary, itinerant operations.  Because those operations could pop up anywhere, the operations

will severely constrain the use of the uplink for the 42 months it will take for those operations to

be relocated to other bands.  The 42-month delay meant that the 60-month holding period was, in

fact, only an 18-month holding period at the end of which the controlled entities could be

directed to transfer the licenses they obtained to DISH without FCC restriction or penalty.  Even assuming an opportunity cost of an 18-month delay, the 25 percent discount generated by the DISH-Controlling Defendants' fraudulent scheme dwarfed that cost.  Moreover, because the DISH-Controlling Defendants' *de facto* controlled both Northstar Wireless and SNR Wireless, they could plan DISH's future operations with full confidence that those entities would make all acquired spectrum available to DISH when it was needed.

120.    Correspondingly, there is no reason to believe that Northstar Wireless and SNR Wireless will use any spectrum, let alone the massive amount purchased in the auction.  Neither Northstar Wireless nor SNR Wireless conducts actual independent business operations.  And even if they plan to develop communications offerings during the government hold period, it is implausible that these "very small businesses" would require the volume of spectrum purchased.  Tellingly, in the four years since Auction 97 concluded, neither Northstar Wireless nor SNR Wireless has taken steps to deploy a wireless system.

121.    Defendants' plan all along was for Northstar Wireless and SNR Wireless to obtain spectrum at a steep discount that DISH would use for its benefit rather than for DISH to pay full price for spectrum.

122.    Defendant Charles Ergen confirmed this plan on a February 23, 2015 earnings call, after the auction had ended, during which he told DISH investors and analysts that "there were two things that we [DISH] needed to accomplish in the auction, both of which I think we were able to do with our partners, our DE partners [sic]. One was we obviously need uplink spectrum to go – we needed to build it to go all down link with their spectrum if we could. So we've realized we have the option to do that. It was a next year to go all down link if we so

choose. We now have the ability to do that because of the uplink spectrum that our partner [sic] acquired in the auction."

123.    In other words, and despite misleading references to the DEs as "partners," DISH plainly was the intended beneficiary of the spectrum licenses for which Northstar Wireless and SNR Wireless were the winning bidders.  Furthermore, DISH fully intended to control those licenses for DISH's use – notwithstanding the fact that Northstar Wireless and SNR Wireless were purportedly independent entities, which they were not.

**B.   Defendants Submitted or Caused to Be Submitted False Claims or Statements Regarding the "Very Small Business" Status of Northstar Wireless and SNR Wireless, as well as the Existence of Agreements Between Those Entities to Transfer the Spectrum Obtained in the Auction to the DISH-Controlling Defendants.**

124.    To induce the FCC to allow "very small business" bidding credits, the sham DEs filed Short-Form and Long-Form applications with the FCC for Auction 97 that included numerous fraudulent statements and omissions.

125.    First, the DEs knowingly and falsely certified to the FCC in their Short-Forms and Long-Forms that they had disclosed all (oral or written) instruments, agreements, and understandings relevant to their claimed designated entity status in Auction 97.  Specifically, Northstar Wireless and SNR Wireless both falsely represented that they had listed and summarized in their Short-Form all (oral or written) instruments, agreements, and understandings that supported their eligibility as a "very small business," including (but not limited to) articles of incorporation and by-laws, partnership agreements, shareholder agreements, voting or other trust agreements, management agreements, franchise agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, investor protection agreements (including rights of first refusal, supermajority clauses, options, veto rights, and rights to hire and fire employees and to appoint members to boards of directors or

management committees), letters of intent, any documents or communications made internally or with third parties reflecting the nature and extent of control by the DISH-Controlling Defendants, and any other relevant instruments, agreements, and understandings.  Likewise, Northstar Wireless and SNR Wireless both falsely represented they had listed and summarized on their Long Form all (oral or written) instruments, agreements, and understandings relevant to their designated entity status.

126.    Defendant Miranda Wright, Treasurer of Defendant Doyon, Limited, which is the Manager member of Northstar Manager, which, in turn, is the Manager Member of Northstar Spectrum, which, in turn, is the Manager member of the applicant, Northstar Wireless, certified in Defendant Northstar Wireless's Short-Form application on September 12, 2014 that it had listed and summarized all (oral or written) instruments, agreements, and understandings relevant to its eligibility as a "very small business," including (but not limited to) articles of incorporation and by-laws, partnership agreements, shareholder agreements, voting or other trust agreements, management agreements, franchise agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, investor protection agreements (including rights of first refusal, supermajority clauses, options, veto rights, and rights to hire and fire employees and to appoint members to boards of directors or management committees), letters of intent, any documents or communications made internally or with third parties reflecting the nature and extent of control by the DISH-Controlling Defendants, and any other relevant instruments, agreements, and understandings.  This certification was knowingly false because Defendant Miranda Wright knew that Northstar Wireless had failed to disclose to the FCC one or more such instruments, agreements, or understandings with the DISH-Controlling Defendants.

127.    Also on September 12, 2014, Defendant John Muleta, the sole owner and CEO of

Defendant Atelum, which is the Manager of SNR Management, which, in turn, is the Managing

Member of SNR HoldCo, which, in turn, is the sole Member and Manager of SNR Wireless,

certified in Defendant SNR Wireless's Short-Form application that it had listed and summarized

all (oral or written) instruments, agreements, and understandings relevant to its eligibility as a

"very small business," including (but not limited to) articles of incorporation and by-laws,

partnership agreements, shareholder agreements, voting or other trust agreements, management

agreements, franchise agreements, spectrum leasing arrangements, spectrum resale (including

wholesale) arrangements, investor protection agreements (including rights of first refusal,

supermajority clauses, options, veto rights, and rights to hire and fire employees and to appoint

members to boards of directors or management committees), letters of intent, any documents or

communications made internally or with third parties reflecting the nature and extent of control

by the DISH-Controlling Defendants, and any other relevant instruments, agreements, or

understandings.  This certification was knowingly false because Defendant John Muleta knew

that SNR Wireless had failed to disclose to the FCC one or more such instruments, agreements,

or understandings with the DISH-Controlling Defendants.

128.    The Short-Form and Long-Form of SNR Wireless and Northstar Wireless

(including the certifications identified in Paragraphs 125-127 above) were false because they

knowingly failed to disclose all of their instruments, agreements, and understandings with the

DISH-Controlling Defendants, which was a necessary precondition to obtaining any bidding

credit in Auction 97.  Had SNR Wireless and Northstar Wireless made those disclosures, they

would not have been eligible for any such bidding credits.  As such, Relator is not advancing any

claim premised upon the Defendants' misinterpretation of the "*de facto* control" rules—such as

claiming the Short-Form or Long-Form of Northstar Wireless or SNR Wireless were false in claiming eligibility for a 25 percent "very small business" credit or in not including the income of the DISH-Controlling Defendants when reporting revenues—but rather alleges that these certifications were false by virtue of Northstar Wireless' and SNR Wireless' failure to disclose relevant instruments, agreements, and understandings, as described above, or disclosure to the FCC of instruments, agreements, and understandings with the DISH-Controlling Defendants that contained false statements.

129.    In addition, the sham DEs identified the existence of the SNR-American Bidding Protocol and Joint Bidding Arrangement and SNR-Northstar-American Joint Bidding Agreement to deceive the FCC into believing that American I, Northstar Wireless, and SNR Wireless were independent bidders working in concert.  While the certification facially complied with 47 C.F.R. § 1.2015(viii)-(ix) in that it disclosed the existence of a bidding arrangement, the disclosure did not disclose that the DISH-Controlling Defendants alone controlled the bidding or that Northstar Wireless and SNR Wireless were not independent decision-makers.

130.    Moreover, Northstar Wireless and SNR Wireless certified, pursuant to 47 C.F.R. § 1.205(viii)-(ix), that they had identified all agreements, arrangements, or understandings of any kind relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure.  These certifications were also false.  As clearly established by expert analysis of the entities' behavior during the auction and their post-auction conduct, the DISH-Controlling Defendants necessarily had an agreement or arrangement with Northstar Wireless and SNR Wireless to obtain, or use, or buy and re-sell the spectrum purchased during the auction after the five-year non-transfer period.  No such agreement was disclosed by Defendants.

131.    Instruments, agreements, or understandings between and among the defendants that were relevant to the claim by Northstar Wireless and SNR Wireless that they were not under the *de facto* control of DISH were not disclosed notwithstanding that such disclosures were mandated by FCC rules.  And the instruments, agreements, and understandings with the DISH-Controlling Defendants that were disclosed to the FCC were false.

### C.  Defendants' False Claims Caused Substantial Damage to the Federal Government.

132.    Defendants made these knowing omissions and false certifications with the intention of inducing the FCC to allow "very small business" bidding credits to the sham DEs of 25 percent off of their high bids.  Absent these false certifications, Northstar Wireless and SNR Wireless could not have qualified as "very small businesses," and thus could not have received the 25 percent discount.

133.    Based upon these false certifications, the FCC gave Northstar Wireless and SNR Wireless the benefit of those bidding credits totaling approximately $3.3 billion.  Specifically, Northstar Wireless won $7.8 billion worth of license exclusivities for which it paid just under $5.9 billion.  Thus, for these exclusivities, Northstar Wireless and other Defendants benefited from a bid credit in the amount of approximately $1.9 billion.

134.    SNR Wireless won $5.5 billion worth of license exclusivities for which it paid approximately $4 billion.  Thus, for these exclusivities, SNR Wireless and other Defendants obtained from the FCC total bid credits in the amount of approximately $1.5 billion.

135.    In total, the Defendants fraudulently appropriated approximately $3.3 billion in auction payments properly owed to the United States Government.

136.    In addition, Defendants' false certifications permitted a bidding strategy that deterred participation by other bidders like Vermont and otherwise undermined the integrity of the FCC's auction process, further causing damage to the federal Government.

## VI.    DEFENDANTS' FRAUD IS CONFIRMED BY DISH'S SEC FILINGS.

137.    In every quarterly and annual financial report it has filed with the Securities and Exchange Commission ("SEC") since Auction 97, DISH included SNR Wireless and Northstar Wireless in its consolidated financial statements.  DISH did so because it has treated their parent companies (Defendants Northstar Spectrum and SNR Wireless HoldCo) as Variable Interest Entities ("VIEs") consistent with generally accepted accounting principles ("GAAP").

138.    Under GAAP, if a reporting entity has a controlling financial interest in another legal entity, it is required to consolidate the assets, liabilities, and results of that legal entity into its financial statements.  Thus, financial control is a predicate to consolidated financial reporting.

139.    A legal entity is a VIE if, by design, it has any of the following three characteristics: (i) the total equity investment at risk is not sufficient to permit the legal entity to finance its activities without additional subordinated financial support provided by any parties, including equity holders; (ii) the holders of the equity investment at risk, as a group, lack any of the characteristics of a controlling financial interest, including: (a) the power, through voting rights or similar rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance; (b) the obligation to absorb the expected losses of the legal entity; or (c) the right to receive the expected residual returns of the legal entity; or (iii) the legal entity is structured with non-substantive voting rights.

140.    A reporting entity has a controlling financial interest in a VIE if it has: (i) the power to direct the activities of a VIE that most significantly impact the VIE's economic performance (power); and (ii) either the obligation to absorb losses of the VIE that could

39

potentially be significant to the VIE or the right to receive benefits from the VIE that could

potentially be significant to the VIE (benefits).  A reporting entity that has included a VIE in its

consolidated financial reports necessarily has determined that the entity has a controlling

financial interest in that VIE.

141.    By treating the parent companies of Northstar Wireless and SNR Wireless as

VIEs in its consolidated financial reports consistent with GAAP, DISH necessarily determined

that it has financial control of those entities—control it has exercised since Northstar Wireless

and SNR Wireless were established and that continues to this day.

142.    DISH's filings with the SEC also confirm that Northstar Wireless and SNR

Wireless fraudulently failed to disclose to the FCC all relevant instruments, agreements or

understandings with the DISH-Controlling Defendants.  Indeed, Northstar Wireless and SNR

Wireless never disclosed to the FCC that their parent companies were to be treated as VIEs by

DISH or that their assets, liabilities, and financial results would be included in DISH's

consolidated financial reports.

**COUNT ONE**
**FALSE CLAIMS ACT- 31 U.S.C. § 3729(a)(1)(A) and (B)**

143.    Plaintiff-Relator Vermont re-alleges and incorporates by reference the allegations

contained in Paragraphs 1 through 142 of this First Amended Complaint.

144.    This is a claim for treble damages under the False Claims Act, 31 U.S.C. § 3729,

*et seq.*, as amended.

145.    By virtue of the acts described above, Defendants knowingly presented, or caused

to be presented, false or fraudulent claims for payment or approval to the United States

Government, and knowingly failed to disclose material facts, in order to induce Government

payment or approval.

146.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to the United States Government in order to induce the Government to pay or approve false and fraudulent claims.

147.     By reason of these credits, payments or license grants, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT TWO
## FALSE CLAIMS ACT- 31 U.S.C. § 3729(a)(1)(C)

148.     Plaintiff-Relator Vermont repeats and re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 147 of this First Amended Complaint.

149.     This is a claim for treble damages under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

150.     By virtue of the acts described above, the Defendants conspired to defraud the United States by inducing the Government to pay or approve false and fraudulent claims and to accept lower payments based on false records and statements and Defendants' concealment and avoidance of obligations to pay. Defendants, moreover, took substantial steps in furtherance of the conspiracy, *inter alia*, by making fraudulent representations, by preparing fraudulent records and by failing to disclose material facts to the United States Government.

151.     By reason of these payments or approvals, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT THREE
## FALSE CLAIMS ACT- 31 U.S.C. § 3729(a)(1)(G)

152.     Plaintiff-Relator Vermont repeats and re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 151 of this First Amended Complaint.

153.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

154.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

155.     By reason of the Defendants' false records and/or fraudulent concealment and/or avoidance, the United States has been damaged, and continues to be damaged, in substantial amount.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator Vermont prays for judgment against the Defendants as follows:

1.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

2.     That Plaintiff-Relator be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act;

3.     That to the extent the Government pursues its claims through any alternative remedy in another proceeding, as provided by Section 3730(c)(5) of the False Claims Act, that Relator be awarded the maximum percentage of that recovery allowed pursuant to Section 3730(d);

4.     That Plaintiff-Relator be awarded all costs of this action, including its attorneys' fees and expenses; and

5.      That the United States and Plaintiff-Relator recover such other relief as the Court

deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby

demands a trial by jury.

Date:  February 4, 2019

Respectfully submitted,

/s/ Stephen J. Obermeier
Bert W. Rein (D.C. Bar # 067215)
brein@wileyrein.com
Bennett L. Ross (D.C. Bar # 978122)
bross@wileyrein.com
Stephen J. Obermeier (D.C. Bar # 979667)
sobermeier@wileyrein.com
Nicole A. Richardson (D.C. Bar # 1024628)
nrichardson@wileyrein.com

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Phone: (202) 719-7000
Facsimile: (202) 719-7049
*Attorneys for Relator*
*Vermont National Telephone Company*