# Exhibit A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Northstar Wireless, LLC | ) | File Nos. 0006670613, 0008243409 |
| | ) | |
| SNR Wireless LicenseCo, LLC | ) | File Nos. 0006670667, 0008243669 |
| | ) | |
| Applications for New Licenses in the 1695-1710 | ) | Report No. AUC-97AUC |
| MHz, and 1755-1780 MHz and 2155-2180 MHz | ) | |
| Bands | ) | |

**MEMORANDUM OPINION AND ORDER ON REMAND**

**Adopted:  November 17, 2020**                    **Released:  November 23, 2020**

By the Commission: Commissioner O'Rielly concurring in part, dissenting in part and issuing a statement; Commissioner Rosenworcel concurring; Commissioner Starks concurring and issuing a statement.

**TABLE OF CONTENTS**

Heading                                                                 Paragraph #

I.   INTRODUCTION ................................................................................................................. 1
II.  BACKGROUND ................................................................................................................. 12
III. DISCUSSION ..................................................................................................................... 39
    A. Procedural Issues ......................................................................................................... 43
        1. Objections to AT&T and T-Mobile's Filings........................................................ 45
        2. Objections to VTel's Comments ........................................................................... 54
        3. The Scope of the Remand ...................................................................................... 57
    B. *De Facto* Control Under the Intermountain Microwave Factors ................................ 61
        1. Investor Protection Provisions............................................................................... 65
        2. Control Over Daily Operations ............................................................................. 72
        3. Employment Decisions........................................................................................... 78
        4. Responsibility for Financial Aspects of the Business .......................................... 80
        5. Receipt of Monies and Profit................................................................................. 93
        6. Control of Policy Decisions ................................................................................. 104
        7. Unfettered Use of All Facilities and Equipment ................................................ 121
    C. *De Facto* Control Under the Competitive Bidding Fifth Order ................................ 124
    D. Applicants' Reliance on Auction 97 and Other Bidding Credit Awards ................... 147
IV. ORDERING CLAUSES.................................................................................................... 158

**I.    INTRODUCTION**

        1.        Fostering competition is a touchstone of the Communications Act.  To that end, Congress has directed the Federal Communications Commission not only to award spectrum licenses for the provision of wireless mobile and other services through auctions but also to adopt rules that encourage auction participation by small businesses, rural businesses, and businesses owned by members of minority

groups and women.  And to satisfy these mandates, the Commission has adopted rules that allow such "designated entities" to receive bidding credits, which are effectively discounts, if they prevail at auction.  The Commission's rules generally require winning bidders that claim to qualify as designated entities to submit detailed information to ensure that bidding credits are awarded only to truly qualifying businesses and are not accumulated by larger enterprises through companies under their control.  To ensure that these bidding credits provide "the opportunity to participate in the provision of spectrum-based services,"[1] as opposed to mere arbitrage, the Commission's rules also extend for a certain period of time after each auction—the "unjust enrichment" period—so that discounted licenses are not immediately acquired on the secondary market by non-qualifying larger companies.

2.      In 2014, the Commission launched Auction 97, in which it made available 1,614 AWS-3 spectrum licenses covering the entire United States.  The Commission also offered bidding credits equaling a 15% discount for "small" companies with average gross revenues not exceeding $40 million for the previous three years and a 25% discount for "very small" companies with average gross revenues not exceeding $15 million for the previous three years.  At the end of the auction, a plurality of the licenses had been won by Northstar Wireless, LLC (winning 345 licenses) and SNR Wireless LicenseCo, LLC (winning 357 licenses) based on their bids totaling over $13.3 billion.  Northstar and SNR submitted applications for bidding credits as very small businesses, which would have resulted in over $3.3 billion in discounts.

3.      The Commission determined, however, that Northstar and SNR were both under the *de facto* control of their principal investor, DISH Network Corporation, and that they therefore did not qualify as very small businesses.  DISH's control over the companies was manifest from, among other things, the unprecedented amount of financing that DISH had provided to Northstar and SNR (approximately 98% of their $13.3 billion winning bid amounts) to participate in the auction; DISH's extensive control over the companies' operations, finances, technologies, employees, and policy choices, as codified in a set of agreements among the parties; the parties' coordinated behavior, even beyond their codified agreements; and "put" rights, which made it inevitable that Northstar's and SNR's LLC Managing Members would sell their interests in the companies (and the spectrum licenses) to DISH after five years—*i.e.*, immediately after their unjust enrichment period.[2]

4.      Northstar and SNR petitioned the D.C. Circuit for review, challenging the determination that DISH exercised *de facto* control over them.  The D.C. Circuit affirmed the Commission's conclusion and reasoning in their entirety, explaining that under settled FCC precedent, DISH possessed *de facto* control over Northstar and SNR because of its control over their businesses and, alternatively, because exercise of the put rights by the LLC Managing Members was a foreordained conclusion.  The D.C. Circuit remanded the matter, however, for the limited purpose of permitting the Northstar and SNR the opportunity to negotiate cures with DISH to eliminate its *de facto* control.[3]

5.      Following procedures that the Commission adopted for the remand, Northstar and SNR have now modified their agreements with DISH in virtually identical fashion and claim to have cured its *de facto* control over them.  Based on our careful review of the record on remand, we conclude otherwise and find that Northstar and SNR are not eligible for bidding credits because they remain under DISH's *de facto* control.

6.      *First*, the parties' renegotiated agreements and relationships preserve DISH's control over Northstar and SNR as business enterprises.  For example, absent a material adverse change in their businesses, Northstar and SNR must operate under five-year business plans that DISH prepared or

---

[1] 47 U.S.C. § 309(j)(4)(D).

[2] *See Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, 1755-1780 MHz and 2155-2180 MHz Bands*, Memorandum Opinion and Order, 30 FCC Rcd 8887 (2015) (*Northstar and SNR Order*).

[3] *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017) (*SNR Wireless*).

participated in preparing at a time when it was unquestionably in *de facto* control of the companies. Moreover, DISH has the ability to stymie or foreclose all of the alternative business strategies that Northstar and SNR could conceivably pursue. DISH possesses extensive control over whether they can raise the billions of dollars that would be necessary to build out wireless networks. DISH also can frustrate if not prevent them from leasing their spectrum in any material respect or from engaging in sales, mergers, or other corporate transactions with anyone other than DISH. Cumulatively, then, DISH can make it difficult, if not impossible, for Northstar and SNR to generate any revenue—which they will need to satisfy their substantial existing and ongoing financial obligations to DISH.

7.  To be sure, the parties have restructured the vast majority of DISH's financial interest in the Northstar and SNR, which no longer takes the form of traditional debt. Now, some of DISH's financial interests take the form of preferred equity, which requires Northstar and SNR to make mandatory quarterly dividend payments that, if missed, accrete as additional preferred equity for DISH. Furthermore, this preferred equity must be paid before any common equity in the event of a merger or other "deemed liquidation event"—making it less likely, over time, that the LLC Managing Members or other investors (if any) would ever see a return on their investments in the companies.

8.  Beyond these contractual aspects of the parties' relationships, their conduct during the remand also demonstrates a continued pattern of DISH's controlling Northstar and SNR as enterprises. Notably, despite the fact that these two companies were in different financial positions vis-à-vis DISH and held different spectrum portfolios, they negotiated what are essentially identical purported cures to DISH's *de facto* control. We would expect that two genuinely autonomous companies with different starting positions would have adopted different negotiating positions and would have reached materially different outcomes. This did not happen, which reinforces our concern that DISH can determine whether these companies are, or could ever become, truly independent enterprises.

9.  Taken together, these aspects of the parties' agreements and relationships outweigh and blunt the impact of other changes that the parties negotiated in their attempt to cede DISH's *de facto* control back to Northstar and SNR.[4]

10.  *Second and independently*, the parties' revised agreements create incentives that once again appear designed to make it inevitable that the LLC Managing Members will sell their interests to DISH by exercising their put rights. In light of all of the limitations that DISH can impose on the ability of Northstar and SNR to generate revenues to pay off their massive financial obligations to DISH, and the resulting dilution of the value of their limited equity interests, the LLC Managing Members have no rational choice to do otherwise. The put rights guarantee the LLC Managing Members generous returns on their investments at minimal risk—and with no obligation to build out their networks, pay down their debt, or make dividend payments prior to the exercise of the put rights. However, such rights evaporate if they do not transfer their interests to DISH within specified put windows, which occur no more than one year after the expiration of the unjust enrichment period.

11.  We find that the parties' modifications to the put rights do not in any way change their significance for the locus of *de facto* control under the Commission's prior analysis as upheld by the D.C. Circuit. Under the revised agreements, the LLC Managing Members have 90 days, rather than 30, to choose whether to exercise their put rights at the first window, which opened on October 21, 2020. If they do not do so during the pendency of the Commission's consideration of their revised agreements, the revised agreements give them another 90-day put option at year six. And under the circumstances, these changes (extending the first put window and creating a second) are superficial. Northstar and SNR

---

[4] *Northstar and SNR Order*, 30 FCC Rcd at 8889 para. 5, 8937 para. 120 (holding that it is the "economic realities of investor relationships" that determine *de facto* control, "regardless of contractual provisions purporting to reserve the right of licensee to control the management and operation of its business").

continue to have "only one path to avoiding certain financial failure."[5] Such "relatively generous but fleeting . . . opportunit[ies]" involve "conditions that are designed to maximize the incentive of the licensee to sell (e.g., six years after issue . . . )." Indeed, they are "virtually certain to entice" such a sale.[6]

## II.     BACKGROUND

12.     On May 19, 2014, the Commission released a Public Notice announcing Auction 97, which made available spectrum licenses in the above-captioned bands (AWS-3 bands).[7] Shortly thereafter, the Commission adopted procedures for Auction 97 governing, among other things, filing requirements and deadlines, reserve prices, opening bids, and upfront payments. As directed by Congress, these procedures also included rules designed to ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women would be able to participate in the provision of spectrum-based services.[8] Specifically, the Commission offered bidding credits for licenses acquired by applicants meeting applicable criteria, which, in Auction 97 equaled a 15% discount for small businesses (average gross revenue not exceeding $40 million for the previous three years) and a 25% discount for very small businesses (average gross revenues not exceeding $15 million for the previous three years).[9] The bidding rules required applicants to certify to their eligibility for bidding credits in their "short-form" applications,[10] and required auction winners to submit more comprehensive "long-form" applications and relevant documents to demonstrate eligibility after the conclusion of the auction.[11]

13.     Eighty short-form applications were filed with the Commission, and seventy applicants were found to be qualified to participate in the Auction 97.[12] The qualified applicants included DISH, through its wholly owned subsidiary American AWS-3 Wireless I LLC (American I),[13] as well as Northstar[14] and SNR (hereinafter, together, the Applicants).[15] They also included three parties that have

---

[5] *SNR Wireless*, 868 F.3d at 1034, 1035 (quoting *Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-285, Fifth Memorandum Opinion & Order, 10 FCC Rcd 403, 455-56 (1994) (*Competitive Bidding Fifth Order*).

[6] *SNR Wireless*, 868 F.3d at 1034-35.

[7] *Auction of Advanced Wireless Services Licenses Scheduled for November 13, 2014; Comment Sought on Competitive Bidding Procedures for Auction 97*, AU Docket No. 14-78, Public Notice, 29 FCC Rcd 5217 (2014).

[8] 47 U.S.C. § 309(j)(3)(B); *see also Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-253, Second Report and Order, 9 FCC Rcd 2348, 2349, 2350, 2388-89, paras. 3, 6, 227-230 (1994).

[9] *Auction of Advanced Wireless Services Licenses Scheduled for November 13, 2014, Notice and Filing Requirements, Reserve Prices, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 97*, AU Docket No. 14-78, Public Notice, 29 FCC Rcd 8386 (WTB 2014) (*Auction 97 Procedures Public Notice*); *see also* 47 CFR § 27.1106.

[10] *See Northstar and SNR Order*, 30 FCC Rcd at 8940, para. 130 (discussing review of short-form applications).

[11] *See Northstar and SNR Order*, 30 FCC Rcd at 8910, para. 51 ("To enable the Commission to determine whether an applicant has appropriately attributed the revenues of its affiliates and controlling interests, our rules require all applicants seeking . . . bidding credits to submit all agreements and information that support the applicant's eligibility as a small business under the applicable designated entity provisions, including the establishment of *de facto* or *de jure* control or the presence of attributable material relationships.").

[12] *See Auction of Advanced Wireless Services (AWS-3) Licenses 70 Bidders Qualified to Participate in Auction 97*, AU Docket No. 14-78, Public Notice, 29 FCC Rcd 13465 (WTB 2014) (*Auction 97 Qualified Bidders Public Notice*).

[13] American AWS-3 Wireless I LLC, Form 175, Auction File No. 0006458188.

[14] Northstar Wireless, LLC, Form 175, Auction File No. 0006458325.

participated in these proceedings, each of whom unsuccessfully bid for certain of the licenses won by Northstar or SNR at auction and at issue in this remand proceeding: AT&T, T-Mobile, and VTel.[16]

14.     At the start of Auction 97, Northstar and SNR were brand new companies "that [had been] formed just in time to file short-form applications for Auction 97:  SNR was formed fourteen days and Northstar was formed eight days before the application deadline.  As nascent companies, [they] lacked officers, directors, and revenues when they each submitted a short-form application."[17]  According to their short-form submissions, DISH, through indirect wholly owned subsidiaries, owned an 85% non-controlling interest in each Applicant.[18]  Northstar Manager, LLC indirectly owned the remaining 15% controlling interest in Northstar.  Likewise, SNR Wireless Management, LLC indirectly owned the remaining 15% controlling interest in SNR.  Both LLC Managing Members had non-controlling investors.[19]

15.     The Auction began on November 13, 2014 and ended on January 29, 2015, after 341 rounds of bidding over 45 days.  There were 31 winning bidders in Auction 97, which raised (in net bids) a total of $41,329,673,325.[20]  American I participated and bid in Auction 97 but was subsequently outbid and was not a winning bidder for any licenses.[21]

16.     Northstar was the winning bidder for 345 licenses, with an aggregate gross bid of $7,845,059,400, and SNR was the winning bidder for 357 licenses, with an aggregate gross bid of $5,482,364,300.[22]  The Applicants' winning bids were comparable in size to the bids of incumbent providers, including AT&T and Verizon,[23] and dwarfed the bids of entities earning bidding credits in every prior spectrum auction.  Following the Auction procedures, Northstar and SNR timely filed FCC Form 601 Long-Form Applications covering the licenses each had won.[24]  Those Applications were accepted for filing on April 29, 2015.[25]  Each entity claimed in its FCC Form 601 that it was eligible for 25% bidding credits because it qualified as a very small business under the rules adopted for Auction

(Continued from previous page) ————————————

[15] SNR Wireless LicenseCo, LLC, Form 175, Auction File No. 0006458318.

[16] *See* Federal Communications Commission, *Auction 97: Advanced Wireless Services (AWS-3) Results*, https://www.fcc.gov/auction/97/round-results (last visited Oct. 5, 2020).

[17] *SNR Wireless*, 868 F.3d at 1027.

[18] *Northstar and SNR Order*, 30 FCC Rcd at 8888-89, paras. 3, 8893, 8894 paras. 14, 17.

[19] *See Northstar and SNR Order*, 30 FCC Rcd at 8893, 8894 paras. 14, 17.

[20] *See, e.g.*, Federal Communications Commission, *Auction 97: Advanced Wireless Services (AWS-3) Fact Sheet* http://wireless.fcc.gov/auctions/default.htm?job=auction_factsheet&id=97 (last visited Oct. 5, 2020).

[21] The final bid of DISH's indirect wholly owned subsidiary, American I, was in Round 24 when it placed one bid: $1,812,964,000 for the paired Block J in New York (AW-BEA010-J NYC-Long Is. NY-NJ-CT-PA-MA-VT).  Northstar and SNR each placed identical gross bids for this license ($1,359,723,000 net). *See* Federal Communications Commission, *Auction 97: Advanced Wireless Services (AWS-3) Results*, https://www.fcc.gov/auction/97/round-results (last visited Oct. 5, 2020).

[22] *See Auction of Advanced Wireless Services (AWS-3) Licenses Closes, Winning Bidders Announced for Auction 97*, Public Notice, 30 FCC Rcd 630, Att. B at 2 (2015) (*Auction 97 Closing Public Notice*).

[23] *See Auction 97 Closing Public Notice*, 30 FCC Rcd 630.

[24] *Auction 97 Closing Public Notice*, 30 FCC Rcd at Attachment A, 10-46.

[25] *See Wireless Telecommunications Bureau Announces that Applications for AWS-3 Licenses in the in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Bands are Accepted for Filing*, Public Notice, 30 FCC Rcd 3795 (2015)

97.[26]  As part of their long-form applications, the Applicants included copies of their LLC, management services, credit, trademark, joint bidding, and other agreements (collectively, the 2015 Agreements) with DISH.[27]  From the record, it became clear that DISH had provided "equity contributions and loans to the Applicants that account[ed] for approximately 98[%] of the[ir] winning bid amounts."[28]  Eight Petitions to Deny were filed against the 2015 Applications, all of which argued that DISH's gross revenues had to be attributed to both Northstar and SNR because DISH possessed *de facto* control over them.[29]

17.	In August 2015, the Commission issued the *Northstar and SNR Order*, concluding that it was "manifest that DISH, directly or indirectly, controls or has the power to control the Applicants via a variety of controlling mechanisms"[30]:

- significant ownership interest;
- excessive investor protections;
- control over policy decisions;
- domination of financial matters;
- control of financial decisions;
- control over build-out plans;

- control over business plans;
- control over the Auction 97 bidding process;
- coercive termination provisions;
- inadequate working capital; and
- control of employment decisions.

18.	The Commission emphasized that its review was "not undertaken on a piecemeal basis": "When the relationships between the Applicants and DISH are analyzed with regard to the totality of their actions . . ., the various agreements, and the facts and circumstances of this case, we conclude that DISH has *de facto* control over and the power to control SNR and Northstar."[31]  The Commission found, for example, that one "significant factor" in establishing DISH's control was the "unprecedented magnitude of the indebtedness to DISH that SNR and Northstar each incurred to pay [the billions of dollars] for the licenses won."[32]  The Commission also engaged in an extensive analysis of "the terms of all of the relevant agreements among the parties," noting that such terms are particularly important when evaluating an application for a new license, "since there is no record of an operating company to inform our analysis of control."[33]  The Commission also explained, however, that applicants cannot game the system by merely inserting language in agreements to "superficially recite the factors set forth in our rules" in an attempt to "avoid review of the economic realities of the parties' transactions."[34]  Thus, the Commission considered the "connections among and the cumulative effect on control of all of the agreements and their respective provisions," including those not cited by the parties, "as well as other relevant circumstances and facts that may not appear on the face of the agreements."[35]

_____

[26] Northstar Wireless, LLC Long-Form Application, FCC Form 601, ULS File No. 0006670613 (filed Feb. 13, 2015) (Northstar 2015 Application)*;* SNR Wireless LicenseCo, LLC Long-Form Application, FCC Form 601, ULS File No. 0006670667 (filed Feb. 13, 2015) (SNR 2015 Application).

[27] *See Northstar and SNR Order*, 30 FCC Rcd at 8896-8900 paras. 21-29 (summarizing LLC agreements, management services agreements, credit agreements, trademark agreements, and joint bidding agreements).  To indicate when we are referring to the applications or agreements that were filed in 2015, we use "2015 Applications" or "2015 Agreements."

[28] *See Northstar and SNR Order*, 30 FCC Rcd at 8924 para. 84.

[29] *See Northstar and SNR Order*, 30 FCC Rcd at 8891, 8900-8901, paras. 10, 30*.*

[30] *Northstar and SNR Order*, 30 FCC Rcd at 8890, para. 6.

[31] *Northstar and SNR Order*, 30 FCC Rcd at 8911, para. 54.

[32] *Northstar and SNR Order*, 30 FCC Rcd at 8890, para. 7.

[33] *Northstar and SNR Order*, 30 FCC Rcd at 8912, para. 57.

[34] *Northstar and SNR Order*, 30 FCC Rcd at 8912, para. 57.

[35] *Northstar and SNR Order*, 30 FCC Rcd at 8912, para. 57.

19.     This comprehensive analysis involved an application of Commission *de facto* control precedent—including the factors set forth in the *Intermountain Microwave Order*[36] as well as the guidance set forth in the *Competitive Bidding Fifth Order*.[37]

20.     In *Intermountain Microwave*, the Commission found the following six factors to be indicative of control: (1) who controls daily operations; (2) who is in charge of employment, supervision, and dismissal of personnel; (3) whether the licensee has unfettered use of all facilities and equipment; (4) who is in charge of the payment of financing obligations, including expenses arising out of operating; (5) who receives monies and profits from the operation of the facilities; and (6) who determines and carries out the policy decisions, including preparing and filing applications with the Commission.[38]  As the Commission noted, the *Intermountain Microwave* standard requires an analysis of the totality of the facts and circumstances, and thus "does not require a finding of control with regard to all [of these] factors."[39]

21.     And in the *Competitive Bidding Fifth Order*, the Commission noted that

> agreements between designated entities and strategic investors that involve terms (such as management contracts combined with rights of first refusal, loans, puts, etc.) that cumulatively are designed financially to force the designated entity into a sale (or major refinancing) will constitute a transfer of control under our rules. . . .  [O]ur concerns are greatly increased when a single entity provides most of the capital and management services and is the beneficiary of the investor protections.[40]

22.     Following this precedent, the Commission found, among other things, that: (1) DISH's investor protections in the parties' 2015 LLC Agreements, which included 19 separate and specific prohibitions, extended beyond typical protections giving a minority investor a decision-making role in major corporate decisions and instead conferred on DISH an impermissible level of control in the management, operations, and finances of the Applicants; (2) DISH controlled Northstar's and SNR's daily operations through the Management Services Agreements, as well as consultation, compensation, and termination rights reserved to DISH; (3) DISH exercised substantial control over the Applicants' employment decisions; (4) DISH dominated the financial aspects of Northstar's and SNR's businesses, especially in terms of the amount of capital that they could acquire and the sources of capital available to them; (5) the business arrangements between the parties were structured in such a way that the profits were likely to benefit only DISH; and (6) there were a number of provisions in the 2015 Agreements that restricted Northstar and SNR from making critical policy choices about technology, additional spectrum acquisitions, network construction, and disposition of the business—and especially put rights that maximized the Applicants' incentives to sell to DISH.

---

[36] *Intermountain Microwave*, 24 Rad. Reg. (P&F) 983 (1963) (*Intermountain Microwave*).

[37] *Competitive Bidding Fifth Order*, 10 FCC Rcd at 445-455, paras. 78-96.  The Commission alternatively found that DISH exercised *de facto* control under FCC Rule 1.2110(c)(2)(ii)(H), which provides that a management agreement affords *de facto* where it allows the manager to "significantly influence" the type of service that an applicant provides.  47 CFR § 1.2110(c)(2)(ii)(H); *see also Northstar and SNR Order*, 30 FCC Rcd at 8938-8940, paras. 122-28.  Because this rule applies to the provision of management services, which the parties have terminated from their 2015 Agreements, we do not consider this rule here.

[38] *Intermountain Microwave*, 24 Rad. Reg. at 984.

[39] *Northstar and SNR Order*, 30 FCC Rcd at 8911, para. 56 n.202.

[40] *Competitive Bidding Fifth Order*, 10 FCC Rcd at 456, para. 96.

23.     Based on its finding of *de facto* control, the Commission found that the Applicants were not eligible for very small business bidding credits.[41]  The Commission also found, however, that the Applicants had the basic qualifications to hold all of the spectrum licenses they had won at auction provided that they paid the full amount of their winning bids.[42]  Rather than do so, the Applicants opted to default on 197 of the licenses and to apply the money that they had already paid for those defaulted licenses to the amount owed for the remaining licenses.[43]

24.     Thereafter, the Applicants petitioned for review of the *Northstar and SNR Order*.  The D.C. Circuit squarely rejected the Applicant's primary argument that the Commission had departed from prior precedent, describing that "[f]ar from ignoring Commission decisions, the FCC reasonably interpreted and applied them when it determined that DISH had *de facto* control over SNR and Northstar."[44]  The court thus affirmed "that the petitioners [we]re required to pay full price for the spectrum licenses they won in Auction 97."[45]  It specifically concluded that "the Commission reasonably determined" that (1) "each" of the *Intermountain Microwave* factors and (2) the *Competitive Bidding Fifth Order* "counseled in favor of a finding that DISH *de facto* controlled SNR and Northstar."[46]

25.     With respect to the *Intermountain Microwave* factors, the D.C. Circuit affirmed that the Commission had reasonably found that *each factor* supported a finding of *de facto* control.  The court also specifically endorsed the *Northstar and SNR Order*'s "pragmatic" approach to applying the factors, which the court found to "comport[] with other FCC cases."[47]  As the court explained:

> The thrust of the Commission's *Intermountain Microwave* analysis was that the [Applicants] wrote into their contracts general terms that formally spoke to the six factors in ways that seemed to promise SNR and Northstar's independence, but at the same time functionally belied those promises with specific contract terms empowering DISH to control and benefit from virtually all critical aspects of SNR and Northstar's businesses.  What mattered, in the Commission's analysis, was the substance of the terms of DISH's control, not the formal recitations of compliance with *Intermountain Microwave*'s six control factors.[48]

26.     With respect to the *Competitive Bidding Fifth Order* guidance, the D.C. Circuit held that the finding of *de facto* control was "*strongly* supported," because the relationships between DISH,

---

[41] *See Northstar and SNR Order*, 30 FCC Rcd at 8890, para. 4.

[42] *See Northstar and SNR Order*, 30 FCC Rcd at 8948-8951, paras. 151-156.

[43] Letter from Mark F. Dever, Counsel to Northstar, to Jean Kiddoo, Deputy Bureau Chief, Wireless Telecommunications Bureau, ULS File Nos. 0006670613 (Oct. 1, 2015) (Dever Letter); Letter from Ari Q. Fitzgerald, Counsel to SNR, to Jean Kiddoo, Deputy Bureau Chief, Wireless Telecommunications Bureau, ULS File Nos. 0006670667 (Oct. 1, 2015) (Fitzgerald Letter).  *See also Wireless Telecommunications Bureau Actions on AWS-3 Licenses in the 1755-1780 MHz and 2155-2180 MHz Bands*, Public Notice, DA 15-1223 (WTB rel. Oct. 27, 2015).  Northstar stated that it would selectively default on 84 licenses ($2,226,129,000). *See* Dever Letter at Attachment 2.  SNR stated that it would selectively default on 113 licenses ($1,210,905,600). *See* Fitzgerald Letter at Attachment 2.  The Applicants purported to reserve their rights with respect to the determination that they were not qualified for bidding credits.  Dever Letter at 6; Fitzgerald Letter at 5.

[44] *SNR Wireless*, 868 F.3d at 1030.

[45] *SNR Wireless*, 868 F.3d at 1030.

[46] *SNR Wireless*, 868 F.3d at 1030.  As noted above, the court also so concluded with respect to the management services rule, which is no longer applicable under the revised agreements under review here.

[47] *SNR Wireless*, 868 F.3d at 1033.

[48] *SNR Wireless*, 868 F.3d at 1033.

Northstar, and SNR were "materially identical" to an example that the Commission had provided in that guidance.[49] In that example, the Commission described that a transfer of control would occur where a strategic investor makes debt financing available on very favorable terms (including no payments of principal or interest for six years) and the applicant is given "one-time put right" exercisable "at a time and under conditions that are designed to maximize the incentive of the licensee to sell (e.g., six years after issue)."[50] Thus, according to the court, the *Competitive Bidding Fifth Order* "clearly presaged the FCC's *de facto* control finding."[51] And, applying that test, the court concluded that the agreements "left SNR and Northstar only one path to avoiding certain financial failure"—*i.e.*, exercise of "a relatively generous but fleeting, one-time-only opportunity" that "was virtually certain to entice SNR and Northstar to sell their companies to DISH."[52]

27.     The D.C. Circuit also rejected Northstar's and SNR's argument that the Commission's analysis could not be squared with other approvals from the Wireless Telecommunications Bureau (the Bureau) of bidding credits in purportedly similar circumstances. The court held that this argument suffered from two flaws. First, those Bureau-level actions issued without any accompanying decision explaining their rationale were non-precedential.[53] Second, those approvals involved applications that were materially different from Northstar's and SNR's.[54]

28.     The D.C. Circuit also held, however, that the Commission had failed to provide the Applicants "adequate notice that, if their relationships with DISH cost them their bidding credits, the FCC would also deny them an opportunity to cure" by renegotiating their agreements with DISH.[55] The court stated that "an opportunity for petitioner to renegotiate their agreements with DISH provides the appropriate remedy here," and therefore remanded the matter for further proceedings consistent with its opinion.[56] In response to the Commission's concern about providing disincentives for compliance with the designated entity rules in permitting such an opportunity to cure, the court emphasized that "[n]othing in our decision requires the FCC to permit a cure," and that "[t]hat choice lies with the FCC."[57]

29.     In January 2018, the Bureau issued an *Order on Remand*, adopting remand-specific procedures to provide the Applicants with an opportunity to renegotiate their agreements with DISH pursuant to the D.C. Circuit's mandate.[58] The *Order on Remand* established a 90-day window, with the possibility of a 45-day extension, for each Applicant to "renegotiate [its] respective agreements with DISH . . . and to file the necessary documentation in the record to demonstrate that, in light of such changes, each Applicant qualifies for the very small business bidding credit that it sought in Auction 97."[59] The *Order on Remand* provided that the parties that had filed written submissions regarding the

---

[49] *SNR Wireless*, 868 F.3d at 1033 (emphasis added).

[50] *Id.*

[51] *SNR Wireless*, 868 F.3d at 1035.

[52] *Id.*

[53] *See SNR Wireless*, 868 F.3d at 1036-1040.

[54] *See SNR Wireless*, 868 F.3d at 1040-1043.

[55] *SNR Wireless*, 868 F.3d at 1025.

[56] *SNR Wireless*, 868 F.3d at 1025, 1046.

[57] *Id.* at 1046.

[58] *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz,1755-1780 MHz and 2155-2180 MHz Bands,* Order on Remand, 33 FCC Rcd 231 (2018) (*Order on Remand*).

[59] *Order on Remand*, 33 FCC Rcd at 232, para. 5. Because of limitations with ULS, a new ULS file number was generated for each Applicant when it filed the Form 601 documenting its revisions. The record for the remand proceeding for each Applicant encompasses both ULS filings (*i.e.*, the record for the original ULS filing (ULS File

2015 Applications (collectively "Parties of Record") would have 45 days from the time the Applicants submitted their revised applications to file comments on the Applicants' amended agreements.[60] The Applicants jointly filed an Application for Review (AFR) of the *Order on Remand* contesting the remand process and alleging that the court's mandate required an iterative process in which the Applicants could negotiate contractual changes directly with the Commission.[61]

30.    The Commission generally denied the AFR and upheld the remand process with slight modifications.  As modified, the procedures provided that (1) the Applicants would seek to negotiate changes to their 2015 Agreements with DISH; (2) the Applicants would file revised applications and agreements to demonstrate that they had cured DISH's *de facto* control; (3) the Parties of Record would have an opportunity to comment on any such changes; (4) the Applicants would be extended yet a further opportunity to cure in order to make further changes based on the record, and/or to file responsive comments to the submissions by the Parties of Record; and (5) the Commission would consider the record to determine whether DISH still exercised *de facto* control over the Applicants.[62]

31.    Following the Commission's modified remand procedures, on June 8, 2018, the Applicants submitted new Form 601 applications for the licenses they had previously defaulted on, along with supporting materials including their amended agreements (collectively, the 2018 Agreements), and new pleadings in support of their applications.  In their filings, the Applicants claim that they have substantially modified the 2015 Agreements with DISH to cure every *de facto* control issue identified in the *Northstar and SNR Order*.[63]  As a result, the Applicants argue that they now qualify for very small business bidding credits and should be awarded the licenses on which they defaulted.[64]

32.    As discussed at greater length below, the Applicants negotiated many modifications to their agreements with DISH, including, among other things:

- terminating the 2015 Management Services Agreements and the 2015 Trademark License Agreements;

---

(Continued from previous page)
No. 0006670613 for Northstar and ULS File No. 0006670667 for SNR)) and the filings associated with the new ULS file number made pursuant to the remand procedures (ULS File No. 0008243409 for Northstar and ULS File No. 0008243669 for SNR).  *See Order on Remand*, 33 FCC Rcd at 232, para. 6, n.12.

[60] *Order on Remand*, 33 FCC Rcd at 233, para. 7; Attachment A (listing the Parties of Record to Northstar's 2015 Applications); and Attachment B (listing the Parties of Record to SNR's 2015 Applications).  The Applicants filed their revised applications on June 8, 2018; comments were due on July 23, 2018.

[61] *See* Joint Application for Review of Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, ULS File Nos. 0006670613 and 0006670667 (Feb. 21, 2018) (*AFR*).

[62] *See Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, 1755-1780 MHz and 2155-2180 MHz Bands*, Memorandum Opinion and Order, 33 FCC Rcd 7248, 7259-60, para. 33 (2018) (*Northstar and SNR AFR Order*).  We note that Northstar and SNR have taken a protective appeal of the *Northstar and SNR AFR Order*, which adopts the remand procedures.  The Applicants and the FCC have agreed to stay this appeal pending the outcome of this proceeding.  *Northstar Wireless, LLC et al. v. FCC*, Nos. 18-1209, 18-1210 (D.C. Cir. filed Aug. 2, 2018).

[63] Northstar states that it has "cured 'the *de facto* control the [Commission] found that DISH exercise[d]' over Northstar."  *See* Northstar 2018 Application, Exhibit D – Appendix, at 11 (Northstar Submission on Remand).  Similarly, SNR states that it has "revised their agreements [with DISH] to address the *de facto* control issues."  SNR 2018 Application, Exhibit D – Comments in Support of Grant of Bidding Credits, at 2-4 (SNR Comments).

[64] *See* Consolidated Opposition of SNR Wireless LicensceCo, LLC and Northstar Wireless, LLC, ULS File Nos. 0006670613, 0006670667, 0008243409, and 0008243669, at 50-55 (Oct. 22, 2018) (Consolidated Opposition); *see also* Northstar Submission on Remand at 1-2; SNR Comments at 2-5.

- converting all but $500 million of each Applicant's debt into preferred equity, repayment of which would be required only after a liquidation or deemed liquidation event;

- applying an 8% per annum dividend rate to that preferred equity;

- reducing the annual interest rate on the remaining DISH debt from 12% to 6%;

- eliminating certain of the prior investor protection rights;

- eliminating restrictions on the Applicants' rights to acquire additional spectrum;

- eliminating obligations on the Applicants to consult with DISH regarding budgets and business plans;

- removing interoperability requirements;

- eliminating loan prepayment and required interest payments such that accrued interest would not be payable until the loan maturity date;

- eliminating the excess cash flow recapture provision;

- eliminating restrictions on the Applicants' owning real property;

- reducing from 10 to 5 years the period during which the LLC Managing Members are restricted from selling their ownership interests without DISH's consent;

- removing DISH's right-of-first refusal on sales and DISH's tag-along rights on the sale of the LLC Manager Members' ownership interests;

- eliminating monetary limits on equipment financing and third-party unsecured debt;

- adjusting the put rights to increase the original put window from 30 to 90 days after year five, adding a second put window after year six, and adding an opportunity after year seven for a fair market value appraisal; and

- expanding the Applicants' flexibility to initiate a public offering.[65]

33.     The Applicants argue that their 2018 Agreements are consistent with transaction terms of other Auction 97 winners who were awarded bidding credits by the Bureau after the Commission issued the *Northstar and SNR Order*.[66]

34.     Five Parties of Record filed comments.  The National Association of Black-Owned Broadcasters and the Multicultural Media, Telecom and Internet Council submitted comments arguing that the FCC should grant Northstar's and SNR's request for bidding credits.[67]  In contrast, VTel argues that DISH still has *de facto* control over Northstar and SNR and that the Applicants' request for the bidding credits should be denied.[68]  VTel also claims that even if the Applicants have cured the *de facto* control issues, the grant of the defaulted licenses to Applicants would violate the Commission's rules.[69]

---

[65] *See* Northstar Submission on Remand at 4-5; SNR Comments at 3-4.

[66] *See* Northstar Submission on Remand at 24-38; SNR Comments at 4-5.

[67] *See* National Association of Black-Owned Broadcasters Comments (filed July 23, 2018); Multicultural Media Comments, Telecom and Internet Council Comments (filed July 23, 2018).

[68] *See* VTel Comments (filed July 23, 2018).

[69] *See* VTel Comments at 29-32.

AT&T filed comments that similarly argue that the Applicants are not entitled to the defaulted licenses and that the Commission should re-auction these licenses.[70] And T-Mobile filed comments, questioning whether, under the 2018 Agreements, exercising the put options and selling to DISH remains the only realistic business path available to the Applicants.[71]

35.    The Applicants and DISH elected not to take the opportunity granted by the Commission to make any further changes to their agreements in response to these criticisms. Instead, they filed a consolidated opposition (the Consolidated Opposition) reiterating that Northstar and SNR are each in control of their respective companies and that they have negotiated cures with DISH to all of the *de facto* control issues, arguing that "the capital structures and spectrum assets of Northstar and SNR offer their managing members a set of business options that extend well beyond their contractual put options."[72] The Applicants also echo their previous argument, claiming that the 2018 Agreements are consistent with the transaction terms of other Auction 97 winners who were deemed eligible to receive bidding credits after the issuance of *Northstar and SNR Order*.[73] In response to the other commenters, the Applicants also argue that our review of the 2018 Agreements should be limited to the revised provisions in the 2018 Agreements that address concerns that the Commission identified as problematic in the *Northstar and SNR Order*—to the exclusion of aspects of the relationship that have not materially changed since 2015, or any other matters not identified in the *Northstar and SNR Order*.[74] The Applicants also claim that the Commission should dismiss the filings of AT&T and T-Mobile for lacking standing.[75] And finally, the Applicants also refute VTel's and AT&T's comments regarding whether they may be awarded the defaulted licenses.[76]

36.    On November 21, 2018, T-Mobile filed a "Response" to the Consolidated Opposition, arguing that: (1) DISH still exercises *de facto* control over Northstar and SNR; (2) T-Mobile has standing to comment on the amended applications; and (3) the remand process provided the Applicants with the opportunity to negotiate cures with DISH as required by the D.C. Circuit, and no further iterative, back-and-forth negotiations with Commission staff are necessary or appropriate.[77]

37.    In response, the Applicants filed a Motion to Strike or Surreply, arguing that the Commission should strike or dismiss T-Mobile's November 2018 Comments because the filing was inconsistent with the procedures delineated in the *Order on Remand*, and that T-Mobile's arguments are factually and legally incorrect.[78] T-Mobile replied on December 31, 2018, claiming that that the Commission should accept its filing because it is in the public interest and reiterating that the Applicants have not cured their *de facto* control by DISH.[79] The Applicants responded that T-Mobile's filing should be dismissed because it is procedurally and substantively defective.[80]

---

[70] *See* AT&T Response to Submissions by Northstar Wireless, LLC and SNR Wireless LicenseCo, LLC (filed July 23, 2018) (AT&T Comments).

[71] *See* T-Mobile USA, Inc. Comments (filed July 23, 2018).

[72] Consolidated Opposition at 28-29.

[73] Consolidated Opposition at 19-23.

[74] Consolidated Opposition at 35-44.

[75] Consolidated Opposition at 46-49.

[76] Consolidated Opposition at 50-55.

[77] T-Mobile USA, Inc. Response to Consolidated Opposition (filed Nov. 21, 2018) (T-Mobile Response).

[78] Motion to Strike of SNR Wireless LicenseCo, LLC and Northstar Wireless, LLC. File Nos. 0008243409, 0008243669 at 10-24 (filed Dec. 21, 2018) (Northstar/SNR Motion to Strike).

[79] T-Mobile USA, Inc. Comments (filed Dec. 31, 2018) (T-Mobile December 2018 Comments).

[80] Reply to Opposition of Northstar Wireless, LLC and SNR Wireless LicenseCo, LLC. (filed January 11, 2019).

38.     The Applicants and their counsel attended video conferences with Commissioners and/or their staff in November 2020 to present arguments that they had successfully cured DISH's *de facto* control through the modifications to their agreements.  Because of the restricted nature of this proceeding under the *ex parte* rules,[81] the other Parties of Record were afforded an opportunity to attend these meetings—which several Parties did—and to present arguments—which VTel, AT&T, and T-Mobile jointly did through counsel.  Consistent with the *ex parte* rules, summaries of those meetings were filed in these proceedings via ULS and constitute part of the record.[82]

## III.   DISCUSSION

39.     Our review requires us to consider both procedural issues raised by the Applicants and the substantive questions that determine whether DISH still exercises *de facto* control over Northstar and SNR based on the parties' revised agreements and relationships.

40.     The *procedural* issues raised by the Applicants relate to (1) who, if anyone, could submit comments on their 2018 Applications, and/or whether particular filings were procedurally defective; and (2) the scope of the court's remand, and whether there are aspects of the parties' agreements and relationships that are now foreclosed from consideration.

41.     The *substantive* question is whether DISH continues to possess *de facto* control over Northstar and SNR.

42.     We address these issues mindful of the D.C. Circuit's clear statement that it was not dictating a particular outcome:  The Commission has full discretion to determine whether DISH still possesses *de facto* control, based on the application of FCC precedent as endorsed by the D.C. Circuit and the record before us on remand.  As explained below, our analysis follows two independent lines of inquiry endorsed by the D.C. Circuit: (1) the factors set forth in the Intermountain Microwave for evaluating de facto control of a designated entity, and (2) the transfer of control that can be effectuated when the relationships between the parties appear to be designed to cause the designated entity to sell its interests to its investors.

### A.   Procedural Issues

43.     Before turning to the substantive question presented on remand, we must resolve several procedural issues raised by the Applicants and the Parties of Record.

44.     The first issue involves which if any filings we may consider from AT&T, T-Mobile, and VTel on the Applicants' 2018 Agreements.  The Applicants contend that the various filings suffer from various shortcomings, including that AT&T and T-Mobile are prohibited from participating in this proceeding, that T-Mobile's comments filed after the Applicants Consolidated Opposition are contrary to the remand procedures that the Commission affirmed in the *Northstar and SNR AFR Order* and therefore must be dismissed, and that VTel's comments lack a factual foundation and must be dismissed.  The second issue relates to the scope of the remand, and what aspects of the parties' 2018 Agreements and relationships we may consider in determining whether DISH still exercises *de facto* control over the

---

[81] 47 CFR 1.1208.

[82] *See* Letter from Ari Q. Fitzgerald, Counse to SNR Wireless LicenseCo, LLC and Mark F. Dever, Counsel to Northstar Wireless, LLC to Marlene Dortch, FCC, ULS File Nos. 0006670613, 0008243409, 0006670667, 0008243669 (Nov. 17, 2020) (Applicants' 11-17-20 Summary); Letter from Ari Q. Fitzgerald, Counsel to SNR Wireless LicenseCo, LLC, and Mark F. Dever, Counsel to Northstar Wireless, LLC, to Marlene Dortch, Secretary, FCC, ULS File Nos. 0006670613, 0008243409, 0006670667, 0008243669 (Nov. 4, 2020) (Applicants' 11-4-20 Summary); *see also* Letters from Bennet L. Ross, Counsel to VTel to Marlene Dortch, Secretary, FCC (Nov. 16, 2020); Letter from Bennett L. Ross, Counsel to VTel to Marlene Dortch, Secretary, FCC, File Nos. 0006670613, 0008243409, 0006670667, 0008243669 (Nov. 4, 2020) (Commenters' 11-4-20 Letter).  Except where otherwise noted in this order, during these meetings and in their written submissions, the Applicants and Parties of Record reiterated arguments they had made in prior submissions and which have been fully considered as part of the record.

Applicants.  The Applicants would limit our review to the modified terms in the 2018 Agreements that address areas of concern that the Commission specifically identified in the *Northstar and SNR Order*.  We address each issue in turn.

### 1.     Objections to AT&T and T-Mobile's Filings

45.     In their AFR, the Applicants urged us to disqualify from these proceedings those entities who were "previously dismissed from these license application proceedings for lack of standing or failure to timely file pleadings" in opposition to the Applicants' initial pre-remand license applications—*i.e.*, AT&T and T-Mobile.[83]

46.     In the *Northstar and SNR AFR Order*, the Commission explained that the D.C. Circuit's remand in *SNR Wireless* states merely that the Commission should conduct further proceedings consistent with the court's opinion: "[T]he remand instructions were silent about whether the Parties of Record to the applications should be divested of their *ex parte* status during the remand process."[84]  Because the court's remand was silent on this issue, the Commission found that it was free to exercise its "broad discretion under Section 4(j) to determine whether to exclude the Parties of Record from continued participation in these remand proceedings."[85]  The Commission further explained that, under its rules, the definition of a "party," is based on whether or not a filing is made—not on whether a party has standing to make the filing (or on whether the filing was procedurally flawed).[86]  The Commission thus concluded that AT&T, T-Mobile, and VTel remained Parties of Record independent of whether each had previously satisfied the legal or procedural requirements for certain filings.[87]  The Commission alternatively noted that it has "broad discretion to consider the views of such interested parties as informal objections under section 1.41 of the Commission's rules"—an approach that the D.C. Circuit has described as "commendable" for addressing untimely filed petitions.[88]  Nevertheless, it also allowed the Applicants to raise objections to any particular filing on the record and stated that the Commission would, at the close of the record, "determine if [any challenged] filing [is] appropriate."[89]

47.     In their Consolidated Opposition, the Applicants renew their objections to AT&T's and T-Mobile's participation in the remand proceedings.  They argue that AT&T's filing should be dismissed because its prior opposition to the Applicants' 2015 applications was construed and dismissed as an untimely petition to deny.[90]  They argue that T-Mobile's comments should be dismissed because it did not participate in their license application proceedings, and because it has already been found, in a separate proceeding, to lack standing to challenge aspects of the *Northstar and SNR Order*.[91]  The Applicants also argue that by including AT&T and T-Mobile in these proceedings, the Commission would violate the

---

[83] *See* Applicants' AFR at 4.  On May 18, 2015 AT&T filed a partial opposition to the petitions to deny regarding the 2015 Applications.  *See* AT&T Partial Opposition to Petitions to Deny.  ULS File Nos. 0006670613 and 0006670667, (filed May 18, 2015) (AT&T Partial Opposition).  T-Mobile submitted its filing on November 17, 2015.  *See* Letter from Kathleen Ham, Senior Vice President Federal Government Affairs, T-Mobile, to Marlene H. Dortch, Sec'y, FCC, ULS File Nos. 0006670613, 0006670667 (filed Nov. 17, 2015).

[84] *Northstar and SNR AFR Order*, 33 FCC Rcd at 7257 para. 27.

[85] *Northstar and SNR AFR Order*, 33 FCC Rcd at 7258, para. 28.

[86] *Northstar and SNR AFR Order*, 33 FCC Rcd at 7258 para. 29.

[87] *Northstar and SNR AFR Order*, 33 FCC Rcd at 7258 para. 29.

[88] *Northstar and SNR AFR Order*, 33 FCC Rcd at 7259 para. 30 & n.89 (citing *Marsh v. FCC*, 436 F.2d 132, 136 (D.C. Cir. 1970)).

[89] *Northstar and SNR AFR Order*, 33 FCC Rcd at 7259 para. 31.

[90] *See* Consolidated Opposition at 46-47.

[91] *See* Consolidated Opposition at 47-48.

remand mandate and Section 402(h) of the Act.[92]  The Applicants also request that the Commission dismiss or strike the T-Mobile Response as contrary to the remand procedures established by the Commission.[93]

48.    Turning first to AT&T, we reject the Applicants' arguments to deny participation in this remand proceeding, which we conclude would "best conduce to the proper dispatch of business and to the ends of justice" under our broad discretion afforded by Section 4(j) of the Communications Act.[94]  While the *Northstar and SNR Order* dismissed AT&T's partial opposition to the petitions to deny the Applicants' 2015 Applications, the Commission did so because Commission rules did not permit a commenter, like AT&T, to file an "opposition" to petitions to deny license applications, and the Commission further found that if the filing were construed as a petition to deny, it was untimely.[95]  The Commission did not hold that AT&T lacked *standing*—a holding that the Commission did reach with respect to numerous other commenters in the 2015 Application proceedings.[96]  Indeed, both AT&T and T-Mobile had and have standing here, because they participated in Auction 97 and unsuccessfully bid on licenses in markets that were won by both Northstar and SNR, through application of their bidding credits.[97]  The Applicants offer no support or explanation for why a party that previously made one procedurally defective filing thereby forfeits standing to participate in that proceeding on remand.[98]  Nor have they made any persuasive showing why the public interest would not be served by permitting comments by such parties with standing to inform our analysis of the facts and circumstances relevant to the *de facto* control question on remand following an opportunity to cure afforded the Applicants and their filing of revised applications.[99]

49.    For its part, T-Mobile did not file a Petition to Deny or other pleading regarding Northstar's and SNR's 2015 Applications, but after the Commission issued the *Northstar and SNR Order*, T-Mobile submitted a letter in both application dockets and in the Commission's Incentive Auction docket, regarding the Applicants' partial defaults.[100]  T-Mobile also filed a Petition for Reconsideration of the *Application Procedures Public Notice* in the Incentive Auction docket, or in the alternative, requested a declaratory ruling asking the Commission to find that DISH, Northstar, and SNR were "former defaulters" under the Commission's rule, thus subject to paying larger upfront payments to participate in

---

[92] *See* Consolidated Opposition at 48-49.

[93] *See* Motion to Strike or Dismiss or, in the Alternative, Surreply (Dec. 21, 2018).

[94] 47 U.S.C. § 154(j); *see FCC v. Schreiber*, 381 U.S. 279 (1965).

[95] *Northstar and SNR Order*, 30 FCC Rcd at 8906-07, para. 44.

[96] *See Northstar and SNR Order*, 30 FCC Rcd at 8906, para. 42.

[97] *See* Federal Communications Commission, *Auction 97: Advanced Wireless Services (AWS-3) Results*, https://www.fcc.gov/auction/97/round-results (last visited Oct. 5, 2020); *see also* T-Mobile USA, Inc. Opposition to Joint Application for Review at 8 (Mar. 8, 2018).

[98] *See* Consolidated Opposition at 38 nn.136-37.  Footnote 136 merely cites the Commission's prior *de facto* control analysis.  Footnote 137 argues that parties may not collaterally attack FCC orders, but allowing AT&T to file a procedurally appropriate filing to address the issue posed by the court on remand is not in any way a collateral attack on the Commission's finding that it filed a procedurally improper filing previously.

[99] In any event, for the reasons set forth below with respect to T-Mobile, we conclude that AT&T's filing should be accepted pursuant to 47 CFR § 1.41.

[100] *See* Letter from Kathleen Ham, Senior Vice President Federal Government Affairs, T-Mobile, to Marlene H. Dortch, Sec'y, Federal Communications Commission, ULS File Nos. 0006670613, 0006670667, WT Docket No. 14-170, 12-269, 12-269 GN Docket No. 12-268, AU Docket No. 14-252, MB Docket No. 15-146 (filed Nov. 17, 2015) (T-Mobile *Ex Parte*).

the Incentive Auction.[101]  The Bureau dismissed the petition for reconsideration insofar as it addressed aspects of the *Northstar and SNR Order*, finding that T-Mobile did not meet the procedural requirements for filing such a petition.[102]  The Bureau described that T-Mobile was not a party to the 2015 Applications proceedings when the Commission issued the *Northstar and SNR Order*.  The Bureau's ruling, however, was limited to T-Mobile's ability to file a petition for reconsideration and did not constitute a determination on T-Mobile's standing or party status to comment on the issue subsequently posed by the D.C. Circuit on remand following the provision of an opportunity to negotiate cures with DISH and the filing of revised applications.[103]

50.      Furthermore, the Bureau's concerns animating its rejection of T-Mobile's petition for reconsideration in the Incentive Auction docket are simply not present here, where the Applicants have refiled entirely new applications with revised agreements designed to inform our consideration of the issues remanded for the Commission's further consideration.  There, the Bureau explained that granting T-Mobile's requested relief would require the Bureau to adopt conclusions that were "inconsistent with the Commission's prior findings with respect to the DISH entities' conduct" in the *Northstar and SNR Order*.[104]  Permitting T-Mobile's participation now, to comment on the parties' refiled applications reflecting the 2018 Agreements following the opportunity to cure required by the D.C. Circuit on remand, which did not exist in their present form when the Commission issued the *Northstar and SNR Order*, does not involve revisiting or rejecting prior findings and determinations regarding the parties' 2015 Agreements.

51.      In the alternative, even if there were some bar to T-Mobile's participation, we would not be precluded from considering the substance of its comments under Commission Rule 1.41.[105]  That rule allows us to designate T-Mobile, to the extent necessary, as an informal objector, whose concerns may be considered as part of the record.[106]  The D.C. Circuit has described that this is an appropriate and "commendable procedure," especially when a filing raises important questions and issues.[107]  We believe that is particularly true here, where the court has remanded these proceedings for further consideration by the Commission following the filing of revised applications reflecting an opportunity to cure required by the court.

52.      We also reject the Applicants' argument that allowing AT&T and T-Mobile to participate on remand is inconsistent with *SNR Wireless* or otherwise violates Section 402(h) of the Act.  Their

---

[101] *See Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions et al.*, GN Docket No. 12-268, Order, 31 FCC Rcd 905 at 909, para.11 (*Incentive Auctions Order*).

[102] *See* 47 CFR § 1.106(b).

[103] The Bureau did describe that "T-Mobile did not file a petition to deny or otherwise participate in either the SNR or Northstar license application proceedings *and it therefore lacks standing* to challenge the determinations in the [*Northstar and SNR Order*]."  *Incentive Auctions Order*, 31 FCC Rcd at 914, para. 26 (emphasis added).  But the Bureau's conclusion was limited to T-Mobile's "challenge[s]" to the *Northstar and SNR Order*, and, as we discuss, T-Mobile's submissions on remand do not challenge any aspect of that order.  However, to the extent the Bureau characterized T-Mobile's failure timely to participate in the earlier proceedings as a lack of standing, we disavow that characterization.  *See SNR Wireless*, 868 F.3d at 1037 (citing *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008)).

[104] *Incentive Auctions Order*, 31 FCC Rcd at 912, para. 21; *see also id.* at 915, para. 26 ("T-Mobile may not challenge the Commission's determinations in the [*Northstar and SNR Order*] with respect to the DISH entities.").

[105] *See* 47 CFR § 1.41.

[106] *See, e.g.*, *Adelphia Communications Corp.*, 21 FCC Rcd 8203, 8216, paras. 19-20 (2006).

[107] *Marsh v. FCC*, 436 F.2d 132, 136 (D.C. Cir. 1970); *see also Northstar and SNR AFR Order*, 33 FCC Rcd at 7259, para. 30.

argument relies on the D.C. Circuit's decision in *Qualcomm v. FCC*,[108] and the Commission's decision in *Southland Television*.[109]  But *Qualcomm* involved a remand that was materially different.  Specifically, in *Qualcomm*, the court's remand dictated a particular outcome—*viz.*, the granting of Qualcomm's application for PCS licenses.[110]  Because the remand dictated the outcome, the Commission's subsequent actions to reopen the proceeding for comments were contrary to Section 402(h).  Here, the D.C. Circuit's remand provides the Commission "more than a ministerial role"[111] in the remand, permitting us to exercise our broad discretion under Section 4(j) of the Act to request and consider comments by the Parties of Record, based on a wholly new record provided by the filing of revised applications.[112]  The Applicants' reliance on *Southland Television* is likewise misplaced.[113]  They cite this precedent for the proposition that Section 402(h) precludes the Commission from granting party status to an entity that, by its own actions, is no longer part of the proceeding.  But in that decision, the party who was excluded by Section 402(h) had "voluntarily dismissed" its own appeal from the original proceeding and had taken other steps that effectively disqualified its original application from further consideration on remand.[114]  There has been no such conduct by either AT&T or T-Mobile here.

53.     Nevertheless, we grant the Applicants' motion with respect to the T-Mobile Response, which was not authorized by the *Order on Remand* or the *Northstar and SNR AFR Order*.[115]  Under the process laid out in the *Order on Remand*, the Parties of Record had 45 days from the date that the Applicants filed their revised FCC Form 601 applications to file comments.[116]  The Applicants filed their revised applications on June 8, 2018, so comments from the Parties of Record were due on July 23, 2018.[117]  T-Mobile timely filed its comments on that date.[118]  The *Order on Remand* set forth that the Applicants were entitled to amend their agreements again in response to comments from the Parties of Record—in which case, the Parties of Record would have had 30 days from the filing of the further-amended agreements to file additional comments.[119]  The Applicants did not further amend their 2018 Agreements, however, and instead took advantage of the revised procedures in the *Northstar and SNR AFR Order* to file a responsive pleading.[120]  Accordingly, there was no opportunity for further comment by the Parties of Record.

---

[108] Consolidated Opposition at 49 & n.183 (citing *Qualcomm*, 181 F.3d 1370 (D.C. Cir. 1999)).

[109] Consolidated Opposition at 49 & n.184 (citing *Southland Television*, 44 F.C.C. at 1239).

[110] *Qualcomm*, 181 F.3d at 1376 n.9.

[111] *Qualcomm*, 181 F.3d at 1377.

[112] The Court's remand instructions state that the Commission must conduct further proceedings consistent with the Court's directive to provide the Applicants with an opportunity to cure "the *de facto* control the FCC found that DISH exercises over them."  *SNR Wireless v. FCC*, 868 F.3d at 1025.  There is nothing in those instructions that expressly or implicitly requires a certain outcome or limits the participation of commenters.  Indeed, as noted above, the D.C. Circuit made clear that "[n]othing in our decision requires the FCC to permit a cure," and that "[t]hat choice lies with the FCC."  *Id.* at 1046.

[113] *See Northstar and SNR AFR Order*, 33 FCC Rcd at 7259, para. 32 n.95.

[114] *Applications of Southland Television Co.*, 44 F.C.C. at 1239, 1241 paras. 2, 6-7.

[115] *See* Northstar/SNR Motion to Strike at 4.

[116] *See Order on Remand*, 33 FCC Rcd at 233, para. 7.

[117] *See* Northstar 2018 Application; SNR 2018 Application.

[118] *See* T-Mobile Comments.

[119] *See Order on Remand*, 32 FCC Rcd 233, para. 8.

[120] *See Northstar and SNR AFR Order*, 33 FCC Rcd at 7260, para. 33.

### 2.    Objections to VTel's Comments

54.    Northstar and SNR also request that VTel's filing be dismissed pursuant to Section 309(d)(1) of the Communications Act.  Under that provision, a petition to deny a license application must set forth "specific allegations of fact to show that the petitioner is a party in interest and that a grant of the application " is not in the public interest—which allegations of fact "shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof."[121]  The Applicants argue that because VTel's comments on remand seeks to deny a grant of bidding credits in connection with revised license applications and are not supported by such an affidavit, the comments should be dismissed.[122]

55.    As a threshold matter, we find that Section 309(d) and our related rules[123] are inapplicable given the unique posture of this remand and the sole remaining issue to be resolved.  Section 309(d) requires that petitions to deny be based on "specific allegations of fact sufficient to show . . . that a grant of the application would be prima facie inconsistent with [Section 309(a)]."[124]  Section 309(a), in turn, requires a showing that a grant of applications will serve the public interest.[125]  Here, the questions of whether the Applicants are qualified to hold licenses and whether grant of the licenses would serve the public interest have already been resolved and are not being challenged on remand.  The only remaining question is whether the Applicants qualify for bidding credits or whether they are still subject to DISH's *de facto* control in light of the court's decision—which is not subject to Section 309(d)'s requirements in this posture.[126]  Under these unique circumstances, the Communications Act provides us with flexibility to "conduct [our] proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice."[127]  The Supreme Court has affirmed that this grant includes the "broad discretion" to "make ad hoc procedural rulings in specific instances,"[128] as the Commission did in the *Order on Remand* and the *Northstar and SNR AFR Order.*

56.    Even if Section 309 and Sections 1.2108 and 1.939 of the Commission's rules did apply to VTel's filing, however, we would find those requirements satisfied.  VTel submitted the Affidavit of Dr. J. Michel Guite with its original comments on the 2015 Applications to establish its party-in-interest

---

[121] 47 U.S.C. § 309(d)(1)).

[122] The Applicants make a similar argument that "[t]o the extent the Commission treats the AT&T Comments and T-Mobile Comments as petitions to deny based on allegations of fact, the Commission should dismiss those filings for failing to provide an affidavit of an individual with personal knowledge concerning the facts alleged."  Consolidated Opposition at 49 n.185.  As explained below, we find that Section 309 and the Commission's implementing rules are not applicable in this posture on remand.  Furthermore, and in any event, AT&T's and T-Mobile's party-in-interest status and arguments are based on public information, Commission precedent, and application materials—as to all of which we may take official notice.  *See supra* note 97 (public materials reflecting AT&T, T-Mobile, and the Applicants bid in the same market), *infra* note 131 (FCC may take notice of its precedent and applicants' materials).  Alternatively, we would accept their filings as informal objections pursuant to Section 1.41 of our rules, discussed *supra* notes 105-107 and accompanying text.

[123] *See* 47 CFR §§ 1.2108, 1.939.

[124] 47 U.S.C. § 309(d)(1).

[125] 47 U.S.C. § 309(a).

[126] *Cf. In re Auction of Licenses for VHF Public Coast and Location and monitoring Service Spectrum*, Order, 17 FCC Rcd 19746, 19749-50, paras. 6-7 (WTB 2002) (describing that "[e]ligibility to participate in an auction . . . and eligibility to receive a bidding credit are two entirely different issues" and that "[a] determination that an applicant is eligible to participate in an auction . . . does not preclude the Commission from subsequently determining that the applicant is *ineligible for a bidding credit or for grant of a license*" (emphasis added)).

[127] 47 U.S.C. § 154(j).

[128] *FCC v. Schreiber*, 381 U.S. 279, 289 (1965); *see also Mozilla Corp. v. FCC*, 940 F.3d 1, 73 (2019) (same).

status.[129]  We see no basis for concluding that a new affidavit was necessary on this point.[130]  And VTel's arguments did not require affidavit support, because "its allegations . . . are based on facts contained in [the Applicants'] application[s], pleadings, and declarations, and we find they are, therefore, appropriately considered."[131]  And finally, to the extent necessary, we alternatively deem VTel an informal objector under our rules and consider its arguments accordingly.

### 3. The Scope of the Remand

57.     We next turn to questions raised by the Applicants about the scope of our analysis on remand as to whether DISH continues to exercise *de facto* control over the Applicants.

58.     The Applicants first argue that we may not consider their bidding conduct with DISH during the course of Auction 97, noting that "[i]n deciding to remand the Commission's action, the D.C. Circuit was fully aware of the . . . stated concerns and analysis regarding the parties' bidding conduct," and yet remanded to allow the parties to cure in any event.[132]  They argue that if the bidding conduct had established DISH's *de facto* control, a remand would have been futile, as the Applicants would not be able to "cure" conduct that has already taken place.  We accept the Applicants' argument that we should not consider on remand their and DISH's bidding conduct in Auction 97 or VTel's arguments regarding the portfolio of licenses that each company acquired in Auction 97,[133] as these are issues that could not have been "cured."  Our decision is based on our review of the parties' revised 2018 Agreements and their conduct *since* the remand.[134]

59.     The Applicants next argue that we may not consider contractual provisions that were not identified in the *Northstar and SNR Order*—which, according to the Applicants, provided a "roadmap for how to cure potential *de facto* control concerns—and that have not materially changed since that order.[135]  This argument fundamentally misunderstands the Commission's long-established standard for evaluating *de facto* control based on an assessment of all of the facts and circumstances.  The *Northstar and SNR Order* comprehensively explained how specific features of the 2015 Agreements demonstrated DISH's *de*

---

[129] *See* Petition to Deny of VTel Wireless, Inc. File Nos. 0006670613 & 0006670667, Affidavit of Dr. J. Michel Guite (May 11, 2015).

[130] *See Order on Remand*, 33 FCC Rcd at 232, para 6 n.12 ("The record for the remand proceeding for each Applicant will encompass both ULS filings (*i.e.*, the record for the original ULS filings . . . and the filings associated with the new ULS file number made pursuant to these procedures).").

[131] *In re Applications of Sevier Valley Broadcasting, Inc. (Assignor) and Mid-Utah Radio, Inc. (Assignee)*, Memorandum Opinion and Order, 10 FCC Rcd 9795, 9796, para. 10 n.4 (1995); *see also Fort Myers Broadcasting Co.*, Letter, 19 FCC Rcd 19556, 19560 (2004) ("Even if we were [to] require FMBC to comply with [Section 309(d)(1)'s] pleading standards, matters of which the Commission may take official notice need not be supported by affidavit.  Here, FMBC's petition is based on Commission records and precedent, of which we may take official notice.").

[132] Consolidated Opposition at 35; *see also id.* at 35-42.

[133] *See* VTel Comments at 20-23; *see also* Consolidated Opposition at 26.

[134] As discussed below, the *Northstar SNR Order* found the parties' bidding conduct to be relevant to the question of who, ultimately, controlled the Applicants' policy decisions, and the D.C. Circuit agreed that the parties' unusually coordinated conduct was "suspicious" and "strongly suggests that each . . . was an arm of DISH."  *SNR Wireless*, 868 F.3d at 1041.  So too, here, we find that the Applicants' *post*-remand contractual negotiations with DISH was unusually coordinated, continuing the pattern of the Applicants' acting as arms of DISH.  The remand, which did not require the Commission to permit the Applicants' proposed cure but rather left that "choice . . . with the FCC," *id.* at 1046, does not preclude our conclusion that the Applicants' post-remand conduct is "suspicious" in similar ways to their conduct during Auction 97—which was affirmed as supporting our prior finding of DISH's *de facto* control under the parties' prior agreements.

[135] Consolidated Opposition at 4 n.3; *see also id.* at 42-44.

*facto* control over the Applicants.[136] But the Commission's ultimate conclusion was based on a totality-of-the-circumstances analysis, which the D.C. Circuit expressly affirmed.[137] We follow the same approach here. Under *Intermountain Microwave* and the *Competitive Bidding Fifth Order*—the application of which was affirmed by the D.C. Circuit here—we consider the modified terms in their 2018 Agreement terms *in relation* to other, unmodified aspects of their agreements, and in relation to other aspects of the relationships between the parties.

60.     Finally, to the extent that the Applicants argue that we may not consider modified provisions in their 2018 Agreements that do not specifically address issues that the Commission identified in the *Northstar and SNR Order*, we reject the argument as inconsistent with precedent, discussed above. Any modifications that the parties made to their agreements are relevant to our analysis. Indeed, in the *Northstar and SNR Order*, the Commission made clear that its analysis involved not only a review of the contractual provisions on which the Applicants relied, but also an independent consideration of other contractual provisions and aspects of the relationships between the parties that were not clear from the face of the agreements.[138] So too here.

## B.    *De Facto* **Control Under the Intermountain Microwave Factors**

61.     Northstar and SNR claim that under their 2018 Agreements, DISH has ceded *de facto* control back to them. But while the Applicants claim to base these conclusions on the Commission's *de facto* control precedent, their arguments myopically focus on individual changes to their agreements with DISH. This approach fails to reflect the fact that *de facto* control must be assessed based on the totality of the circumstances. And here, the 2018 Agreements in conjunction with the other economic realities of the Applicants' relationships with DISH continue to vest *de facto* control over both Applicants with DISH under the factors set forth in the *Intermountain Microwave Order*.[139]

62.     Specifically, based on our review of the parties' 2018 Agreements and relationships on remand, we find that several of the factors set forth in *Intermountain Microwave* continue to demonstrate DISH's control and that these factors outweigh the changes made to these agreements as indicia of control.

- The Applicants' initial five-year business plans were established at a time when they were under DISH's control, as found by the Commission and confirmed by the D.C. Circuit. The Applicants have negotiated the right to modify their business plans without consultation with DISH but are permitted to effectuate such changes only upon "material changes" affecting their businesses. The practical effect of this restriction is that DISH could object to almost any changes in the ordinary course of business from the path established when DISH controlled them. This substantially reduces any effect that would

---

[136] *See* Consolidated Opposition at 43; *see also Order on Remand*, 33 FCC Rcd at 232, para. 4.

[137] *See SNR Wireless*, 868 F.3d at 1033-34 (affirming FCC's "pragmatic application" of *de facto* control precedent, which transcends formulas and examines the facts and special circumstances presented in each case).

[138] *See Northstar and SNR Order*, 30 FCC Rcd at 8912, para. 57 ("Our review of each case considers the connections among and the cumulative effect on control of all of the agreements and their respective provisions, as well as other relevant circumstances and facts that may not appear on the face of the agreements.").

[139] The six *Intermountain Microwave* factors are (1) who controls daily operations; (2) who is in charge of employment, supervision, and dismissal of personnel; (3) whether the licensee has unfettered use of all facilities and equipment; (4) who is in charge of the payment of financing obligations, including expenses arising out of operating; (5) who receives monies and profits from the operation of the facilities; and (6) who determines and carries out the policy decisions, including preparing and filing applications with the Commission. *See* 24 Rad. Reg. at 984. In the *Northstar and SNR Order*, the Commission discussed "investor protections" as a related but separate factor, which we do here as well.

otherwise have resulted from the termination of their Management Services Agreements with DISH.

- DISH still has substantial responsibility for the financial aspects of the businesses. This includes control over the Applicants' financial obligations and their access to the funding necessary to buildout and operate wireless networks. DISH has the right, but not necessarily the obligation, to make all such funding available to the Applicants—which, if offered would *increase* DISH's financial control over the Applicants—while also having the ability to delay, if not prevent, the Applicants from securing any significant funding from other lenders or any funding from third-party investors or partners.

- The 2018 LLC Agreements and 2018 Credit Agreements preserve DISH's ability to stymie or foreclose the Applicants' and the LLC Managing Members' opportunities to generate revenues necessary to satisfy their substantial financial obligations to DISH and/or exit the business. Notably, DISH retained its veto rights with respect to the sale of any "major asset," which assets include spectrum licenses, and it expanded this protection to also encompass the leasing of (and other transactions involving) such major assets. It is noteworthy that under instructions to negotiate cures with DISH, the Applicants gave DISH the newfound ability to control whether the Applicants can pursue the alternative business model of leasing their spectrum.[140] This expanded restriction shuts down an alternative business model from which the Applicants could generate revenue without engaging in the capital-intensive buildout and operation of their own wireless networks. The fact that the Applicants' own economic expert identified spectrum leasing as one of three viable pathways for the Applicants to monetize their spectrum for a return that could exceed the return from their put rights, without acknowledging that DISH now effectively exercises a veto over their pursuing this pathway in addition to retaining control over the other two pathways, reinforces our finding that this new protection is material.

- The parties' efforts to restructure DISH's financial interests in the Applicants make no material difference to our analysis. The Applicants each still owe to DISH $500 million in debt as well as substantial amounts of already accrued interest and dividend payments, and face going-forward financial obligations in the form of additional dividend payments and likely additional debt in the range of what may reasonably be estimated to be collectively 10 times this size for the buildout of a nationwide wireless network. Whether billions of dollars of prior debt have been restructured in the form of preferred stock does not change these economic realities. Moreover, DISH has considerable ability to frustrate the Applicants' efforts to make the required quarterly dividend distributions at the rate of 8% per annum in cash, and their failure to do so results in the dilution of the value of the LLC Managing Members' financial interests, accretion of DISH's equity interests, and a further increase of its share of any profits in the Applicants in the event of a liquidation or deemed liquidation event.

---

[140] Under the 2015 Agreements the Applicants could lease their spectrum without seeking DISH's approval but under the 2018 LLC Agreements leasing of major assets (including spectrum) is considered a "significant matter" requiring DISH approval. *Compare* Northstar 2015 Application, Exhibit D – Limited Liability Company Agreement of Northstar Spectrum, LLC § 1.1 (definition of "Significant Matter"), *and* SNR 2015 Application, Exhibit D – First Amended and Restated Limited Liability Company Agreement of SNR Wireless Holdco, LLC § 1.1 (definition of "Significant Matter"), *with* Northstar 2018 Application, Exhibit D – Third Amended and Restated Limited Liability Company Agreement of Northstar Spectrum, LLC (Northstar 2018 LLC Agreement) § 1.1 (definition of "Significant Matter"), *and* SNR 2018 Application, Third Amended and Restated Limited Liability Company Agreement of SNR Wireless Holdco, LLC (SNR 2018 LLC Agreement) § 1.1 (definition of "Significant Matter").

- DISH also has retained control over critical policy decisions for the Applicants' businesses. Apart from retaining a substantial restriction on the ability of the Applicants to revise their original business plans in the ordinary course of business, DISH has the ability to stymie or foreclose the Applicants' business opportunities and to frustrate or veto many transactions by which the Applicants or the LLC Managing Members would exit the business or sell their interests or assets. Moreover, during the remand process, the Applicants again appeared to function as "arms of DISH," as the D.C. Circuit put it: The fact that these two purportedly autonomous entities attempted to negotiate dozens of modifications to numerous separate agreements, and yet the resulting changes are nearly identical notwithstanding the vast differences in their financial obligations and license portfolios, buttresses our conclusion that DISH is in control of the Applicants' major policy decisions. The Applicants have again failed to demonstrate any significant independent contribution to critical policy decisions—as reflected in the virtually identical terms governing their relationship with their common principal if not exclusive creditor and investor.

63.     Based on these findings, and applying Commission precedent to all of the facts and circumstances applicable to Applicants' relationships with DISH in light of the record as supplemented by the remand, we find that the 2018 Agreements preserve DISH's ability to control the Applicants. This control is manifest in the key areas of limiting their ability to revise in the ordinary course of business the business plans established at a time when DISH controlled the Applicants, dominating the financial aspects of their businesses including their enormous credit obligations, retaining and accreting its allocation of monies and profits in the event of liquidation and deemed liquidation events, and continuing to restrict the Applicants in the conduct of their most fundamental policy decisions. We conclude that the parties' modifications to the 2015 Agreements serve to eliminate some of the prior identified concerns regarding DISH's control over other aspects of the Applicants' daily operations, the Applicants employment decisions, and their use of facilities and equipment. Nevertheless, these changes do not change our bottom-line conclusion that the Applicants remain ineligible for the very small bidding credits that they sought in Auction 97.[141] Because the Applicants do not currently provide service, our assessment of their 2018 Agreements with DISH "necessarily involves an assessment of the likely role of the respective parties in the conduct of the business after grant of the licenses,"[142] which is the kind of predictive judgment that is subject to deferential review.[143]

64.     In short, our careful review of all of the facts and circumstances in light of the economic realities of the revised relationships lead us to conclude that DISH's remaining controls continue to vest it with *de facto* control under the *Intermountain Microwave* standard as applied by the Commission and endorsed by the D.C. Circuit.[144]

## 1.     Investor Protection Provisions

65.     In the *Northstar and SNR Order*, the Commission found that the "extensive provisions" in the 2015 LLC Agreements that "require[d] DISH consent for a myriad of corporate decisions

---

[141] *See Northstar and SNR Order*, 30 FCC Rcd at 8911, para. 56 n.202 ("[A] totality analysis does not require a finding of control with regard to all *Intermountain Microwave* factors [and] each factor may or may not be individually sufficient to support a [*de facto*] control finding.").

[142] *See Northstar and SNR Order*, 30 FCC Rcd at 8921, para. 57.

[143] *Sorenson v. FCC*, 897 F.3d 214, 230 (D.C. Cir. 2018); *accord SNR Wireless*, 868 F.3d at 1032 (describing that review of FCC's analysis of *de facto* control is "deferential").

[144] Because we find that DISH still exercises *de facto* control over the Applicants, the question is moot whether we can and/or should reinstate and award the Applicants the licenses on which they defaulted. *Compare* Consolidated Opposition at 50-55 (arguing for reinstatement), *with* AT&T Comments, *and* VTel Comments at 29-33.

extend[ed] beyond those that give a minority investor a decision-making role in major corporate decisions that fundamentally affect its interests, and instead confer[red] on DISH an impermissible level of control."[145]  The Commission contrasted DISH's 19 protections in the 2015 LLC Agreements with the "illustrative list" of "typical protections" identified in *Baker Creek* as generally permissible.[146]  Those typical protections relate to (1) the issuance or reclassification of stock; (2) setting compensation for senior management; (3) expenditures that significantly affect market capitalization; (4) incurring significant corporate debt; (5) the sale of major corporate assets; and (6) fundamental changes in corporate structure.[147]

66.     The Applicants have since renegotiated DISH's investor protections, and the 2018 LLC Agreements' investor protections include variations of the six matters enumerated in *Baker Creek*.  The Applicants also included in the 2018 LLC Agreements language stipulating that these protections would apply only to the extent consistent with the decision in *Baker Creek* and the Commission's issuance of bidding credits to other designated entities in Auction 97.[148]

67.     Before applying the Commission's established *de facto* control standards to these changes in the sections that follow, it is important to note that *Baker Creek* recognized that even these six protections can confer actual control upon an investor "where they give it the power to dominate the management of corporate affairs":  "[T]he analysis of whether an investment protection grants . . . the power to control is a fact-based inquiry with no precise formula for evaluating all factors."[149]  The *Northstar and SNR Order* likewise warned the Applicants that they could not rely on these protections as having talismanic properties:  It described that *Baker Creek* set forth an "illustrative list" of "typical protections" without categorically endorsing these protections in every context.[150]  To construe *Baker Creek* otherwise would require us to repudiate the Commission's longstanding approach to analyzing *de facto* control—an approach which the D.C. Circuit upheld in this proceeding.

68.     Additionally, the fact that the 2018 LLC Agreements expressly state that the protections are limited "to the extent consistent with the decision in *Baker Creek*" is illusory.  First, *Baker Creek's* holding was that the agreements and relationships between Baker Creek and Hyperion *did* confer actual control on the latter under the *Intermountain Microwave* factors; it did not construe or "limit" these six investor protections in a manner that can be incorporated into a contractual provision in any meaningful way.  Second, as *Baker Creek* itself acknowledged, investor protections that might be appropriate given one set of relationships and agreements may confer actual control under another set of relationships and agreements.  As described in the *Northstar and SNR Order*, "the mere insertion of language in agreements to superficially recite the factors set forth in our rules . . . cannot serve to avoid review of the economic realities of the parties' transactions."[151]

---

[145] *Northstar and SNR Order*, 30 FCC Rcd at 8913, para. 59.

[146] *Northstar and SNR Order*, 30 FCC Rcd at 8913, para. 59; *see also Baker Creek Communications, L.P.*, Memorandum Opinion and Order, 13 FCC Rcd 18709 (1998) (*Baker Creek Order*).

[147] *See Baker Creek Order*, 13 FCC Rcd at 18713-714 para. 9.

[148] Northstar 2018 LLC Agreement § 6.3 (Supermajority Approval Rights for all "Significant Matters"); *see also id.* § 1.1 (definition of "Significant Matter"); *accord* SNR 2018 LLC Agreement § 6.3 (Supermajority Approval Rights for all "Significant Matters"); *see also id.* § 1.1 (definition of "Significant Matter").

[149] *Baker Creek Order*, 13 FCC Rcd at 18715 para. 9.

[150] *Northstar and SNR Order*, 30 FCC Rcd at 8913, para. 60; *see also id.* at 8916, para. 63 ("[C]ontrary to SNR's and Northstar's contentions, the presence of any particular provision or a combination of provisions is not dispositive to our control analysis, which considers each provision within the context of, and in connection with, all of the other factors and provisions unique to each case.").

[151] *Northstar and SNR Order*, 30 FCC Rcd at 8912, para. 57; *see also SNR Wireless*, 868 F.3d 1033 (agreeing that "substance" matters more than "formal recitals of compliance with *Intermountain Microwave's* six control factors").

69.     Furthermore, when considered as part of the totality of the circumstances, which include the other factors discussed below, two of the remaining investor protections reinforce DISH's control.

70.     *First*, the limitation on the Applicants' incurring any "significant" indebtedness—or pledging, assigning, or otherwise using any assets as security for any significant indebtedness—could operate to restrict the Applicants from obtaining additional funding that is necessary for their business plans.[152]  At a minimum, this restriction blunts the impact of the parties' eliminating from the 2015 Credit Agreements the cap on the Applicants' incurring more than $25 million in unsecured indebtedness.  As discussed in the *Northstar and SNR Order*, the 2015 Credit Agreements' cap limited the Applicants to receiving "trivial" amounts of financing "in comparison to the value of the spectrum . . . and the potential costs associated with building and operating an extensive network or otherwise utilizing the substantial amount of spectrum acquired during this auction."[153]  To address this concern, the parties have eliminated the cap in the 2018 Credit Agreement.[154]  But DISH can still seek to invoke the 2018 LLC Agreements to veto, at its sole and absolute discretion, for any reason or no reason, any attempt by the Applicants to incur unsecured indebtedness—potentially even in amounts below the $25 million threshold—which DISH can claim is nonetheless "significant."[155]  Moreover, this limitation operates in tandem with other restrictions that may make it virtually impossible for the Applicants to find meaningful third-party funding in any event.[156]

71.     *Second*, the 2018 LLC Agreements include protections that go beyond those identified as typical in *Baker Creek* by giving DISH a veto right not only over the sale, but now also the transfer, exchange, *lease*, mortgage, pledge, or assignment of any major asset "(where assets include but are not limited to, licenses)";[157] these additional types of transactions (*i.e.*, those other than "sale") were not included in the 2015 LLC Agreements.  This expanded protection appears to give DISH the unfettered ability to foreclose the last of the business models (which was not previously restricted) that, as the Applicants' own expert agrees, either Applicant might otherwise choose to pursue to monetize their spectrum assets: "offering access to the spectrum available under the SNR and/or Northstar FCC licenses via a spectrum sharing model, including spectrum leasing, with an existing wireless provider."[158]  This addition in the 2018 LLC Agreements serves as a critical *new* index of DISH's *de facto* control over the Applicants' business opportunities.  If DISH so chooses, it has the ability to frustrate or prevent the Applicants from building out their networks, leasing their spectrum in any significant amount, or transferring their spectrum in any significant amount.  This leaves the LLC Managing Members with no

---

[152] Northstar 2018 LLC Agreement § 1.1 (definition of "Significant Matter"); *accord* SNR 2018 LLC Agreement § 1.1 (same).

[153] *Northstar and SNR Order*, 30 FCC Rcd at 8924, paras. 85.

[154] Northstar 2018 Application, Exhibit D – Third Amended and Restated Credit Agreement of Northstar Spectrum, LLC (Northstar 2018 Credit Agreement) § 6.9(g); *accord* SNR 2018 Application, Third Amended and Restated Credit Agreement of SNR Wireless Holdco, LLC (SNR 2018 Credit Agreement) § 6.9(g).

[155] *See* NorthStar 2018 LLC Agreement §§ 1.1 (definition of Significant Matters), 6.3 (veto rights for Significant Matters); *accord* SNR 2018 LLC Agreement §§ 1.1, 6.3.

[156] *See* NorthStar 2018 LLC Agreement § 13.3 (priority rights in liquidation); Northstar 2018 Credit Agreement §§ 2.5 (security rights), 6.9 (restrictions on debt); *accord* SNR 2018 LLC Agreement § 13.3; SNR 2018 Credit Agreement §§ 2.5, 6.9.  These limitations and their effects on potential third-party financing are discussed at greater length in Parts III.B.4 below.

[157] Northstar 2018 LLC Agreement § 6.3 (Supermajority Approval Rights for all "Significant Matters"); *see also id.* § 1.1 (definition of "Significant Matter"); *accord* SNR 2018 LLC Agreement § 6.3 (Supermajority Approval Rights for all "Significant Matters"); *see also id.* § 1.1 (definition of "Significant Matter").

[158] Consolidated Opposition, Exhibit B Declaration of Carlyn R. Taylor at para. 9 (Taylor Decl.); *see also* Consolidated Opposition at 29.

way to realize a return on their investment except by exercising their put rights so as to vest DISH with sole ownership of both Northstar and SNR.

## 2.    Control Over Daily Operations

72.    In the *Northstar and SNR Order*, the Commission found that the first *Intermountain Microwave* factor—who controls daily operations—weighed in favor of finding that DISH exercised *de facto* control over the Applicants.  Central to this analysis was the parties' 2015 Management Services Agreement.  The Commission recounted that while a "management agreement[] between an investor and an applicant [is] not in and of [itself] necessarily dispositive of *de facto* control or the power to control under our rules," the existence of the agreement whereby the provider of the applicant's capital is also the beneficiary of investor protections and other rights *and* serves as manager of the applicant's daily operations warrants "particularly close attention."[159]

73.    The D.C. Circuit affirmed this reasoning that both the scope[160] and the restrictive termination provisions[161] of the Management Services Agreements supported a finding that DISH controlled the daily operations of both Applicants.

74.    On remand, the Applicants have terminated the 2015 Management Services Agreement. The Applicants also have "clarified" that the compensation cap that appeared to cover many aspects of the LLC Managing Members' day-to-day operations is actually more limited in scope than the Commission previously believed:  They have modified the relevant provision in the 2018 LLC Agreements to state "the Management Fee is meant solely as a payment to the Manager in lieu of a board of managers fee . . . and is not meant to cover the operating, overhead, or employee compensation expenses of the Company and its Subsidiaries,"[162] all of which are covered by the 2018 Credit Agreements, which permit the Applicants to draw working capital to pay expenses and operating costs, including costs for personnel.[163] And the Applicants also have negotiated further modifications, such that the 2018 LLC Agreements now make clear that all future business plans and budgets "shall be adopted or modified . . . by the Manager in its sole and unilateral judgment," with only a requirement to provide copies to, rather than engage in consultation with, DISH regarding such plans and budgets.[164]

75.    These changes do not fully resolve our concerns.  Although the Applicants now can manage their own operations and set their own plans going forward, their choices continue to be circumscribed by previously adopted business plans developed at a time when DISH was in *de facto* control (as confirmed by the Commission and the D.C. Circuit).  The Applicants point out that under the 2018 LLC Agreements, they may now "modify" their business plans without consultation with DISH.[165] But their ability to do so is subject to an important limitation:  They may not modify those prior business plans in the absence of "material changes affecting" the companies.[166]  Under traditional principles of

---

[159] *Northstar and SNR Order*, 30 FCC Rcd at 8919, para. 72.

[160] *See SNR Wireless*, 868 F.3d at 1031 (finding that "[u]nder the parties' comprehensive Management Services Agreement, DISH managed virtually all aspects of SNR and Northstar's businesses," and that the agreements "left SNR and Northstar nor practical means of ensuring that DISH would use those managerial powers to further SNR and Northstar's own goals rather than DISH's").

[161] *SNR Wireless*, 868 F.3d at 1031 (describing that the termination provisions as establishing a process that would be "prohibitively time-consuming and costly").

[162] Northstar 2018 LLC Agreement § 6.6; *accord* SNR 2018 LLC Agreement § 6.6.

[163] Northstar 2018 Credit Agreement §§ 1.1, 2.2; *accord* SNR 2018 Credit Agreement §§ 1.1, 2.2.

[164] Northstar 2018 LLC Agreement § 6.5; *accord* SNR 2018 LLC Agreement § 6.5.

[165] Joint Motion to Strike or Surreply at 9 & n.30.

[166] *See* Northstar 2018 LLC Agreement § 6.5(a); *accord* SNR 2018 LLC Agreement § 6.5(a).

Delaware law under which these agreements are to be construed, the Applicants would bear the burden of demonstrating that a material change has actually occurred to invoke this right.[167] And similar provisions have been construed to require substantial exogenous changes, beyond mere hiccups or short-term effects, outside the ordinary course of business.[168] Absent such a change, the Applicants remain locked in to the business plans prepared during DISH's *de facto* control. In other words, when presented with an opportunity to revise their agreements with DISH to cure such control, the Applicants did not secure the basic right to make any changes to the business plans established during the period of DISH's control absent any showing of such material changes. In the ordinary course of business, the existing business plans restrict the management of their operations, regardless of the termination of their Management Services Agreements with DISH.

76. The Applicants argue that the Commission has not historically reviewed business plans when evaluating eligibility for bidding credits.[169] That is true, and, here, we have not reviewed nor evaluated the Applicants' initial business plans (for example, to pass judgment on their efficacy).[170] But even without regard to the substance of the initial plans the contractual restrictions governing those business plans may affect the ability of the Applicants to manage their businesses in the ordinary course of business. Specifically, both 2018 LLC Agreements recite that the business plan for each company was established on the same day, at a time in which DISH was found to be in *de facto* control. Moreover, the Commission previously noted the relevance of the fact that DISH "either prepared or participated in preparing" those business plans.[171] The Applicants argue they have negotiated a cure to address DISH's prior role in controlling daily operations, but the only thing that DISH has done with respect to the business plans is grant the Applicants the theoretical ability to modify them without DISH's consent *if and only if* circumstances materially change.

77. Under these circumstances, and as explained in the *Northstar and SNR Order*, DISH's role in "prepar[ing] or participat[ing] in preparing" the Applicants' initial business plans and their inability to adjust the management of their operations in the ordinary course of business prevent us from finding that this factor supports the Applicants' position.

### 3. Employment Decisions

78. In the *Northstar and SNR Order*, the Commission found that the second *Intermountain Microwave* factor also supported a finding of *de facto* control by DISH, given its ability to exert control

---

[167] *See Capitol Justice LLC v. Wachovia Bank, N.A.*, 706 F. Supp. 2d 23, 28-29 (D.D.C. 2009) (citing *Hexion Spec. Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715 (Del. Ct. Ch. 2008)).

[168] *Cf. Akorn, Inc. v. Fresenius Kabi, AG*, CA No. 2018-0300, 2018 WL 4719347, at *53 (Del. Ct. Ch. Oct. 1, 2018) (recounting that in merger agreements, "[a] buyer faces a heavy burden when it attempts to invoke a material adverse effect clause" to avoid obligation to acquire; that "[a] short-term hiccup in earnings should not suffice; rather the Material Adverse Effect should be material when viewed from the longer-term perspective of a reasonable acquiror"; and that the adverse change should be "consequential to the company's long-term earnings power over a commercially reasonable period, which one would expect to be measured in years rather than months" (quotation marks omitted)); *accord In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 68 (Del. Ct. Ch. 2001) (finding, under New York law, that "even where a Material Adverse Effect conditions is . . . broadly written . . . that provision is best read as a backstop protecting . . . [against] unknown events that substantially threaten . . . overall earnings . . . in a durationally significant manner").

[169] *See* Consolidated Opposition at 19, 25; *see also* Applicants' 11-4-20 Summary at 4, 6-7 (arguing that *de facto* control test does not include assessing an applicant's "viability").

[170] In this respect, we expressly reject any argument that the Applicants were required to submit their business plans to demonstrate their eligibility for bidding credits. *See* VTel Comments at 14-17.

[171] *See Northstar and SNR Order*, 30 FCC Rcd at 8920, para. 74.

over staffing decisions and compensation decisions.[172]  The D.C. Circuit affirmed this reasoning that "SNR and Northstar had little control over their employment decisions," noting DISH's power to appoint the Systems Manager for each company, the limited budget each company would receive, the $200,000 cap on employee compensation, and DISH's ability to set its own compensation as the Operations Manager.[173]

79.    Since the remand, the parties have negotiated several modifications to address the Commission's prior concerns regarding DISH's control of the Applicant's employment decisions.  They have clarified that the LLC management fee is not intended to cover the Applicants' operating costs in retaining and paying employees and supporting facilities for their businesses.[174]  In addition, in the 2018 LLC Agreements, they also have eliminated DISH's veto rights over paying any director, officer, or employee $200,000 or more per year.  And finally, as noted, the parties have terminated entirely the Management Services Agreement, eliminating DISH's responsibilities for various aspects of the selecting, arranging, training, and supervising of employees.  Accordingly, we find that there is no indication that DISH will exercise control over the Applicants' employment decisions under the 2018 Agreements.[175]

### 4.    Responsibility for Financial Aspects of the Business

80.    In the *Northstar and SNR Order*, the Commission found that another indicium of DISH's *de facto* control was its responsibility for the Applicants' financial obligations.[176]  Based on its review of the record, the Commission found that DISH "dominate[d] the financial aspects of SNR's and Northstar's businesses," noting initially that DISH was "the source of the vast majority of SNR's and Northstar's capital, beginning with the initial payment stage of Auction 97, continuing through the final payment, and persisting for future financial obligations such as build-out and operating costs."[177]  While the Commission declined to find DISH's initial investment to be determinative of *de facto* control, the Commission considered the "unprecedented amounts of combined equity and debt . . . to be pertinent to [the] analysis" and an "indicator of the level of DISH's control."[178]  The Commission also expressed concern that the 2015 Credit Agreement appeared to "restrict the Applicants from obtaining additional funding from alternative sources, thereby further intensifying Northstar's and SNR's dependence on DISH."[179]  The Commission specifically cited the cap that limited each Applicant to a total of $25 million in purchase money financing and $25 million in unsecured debt from third parties—amounts the Commission described as "trivial in comparison to the value of the spectrum . . . and the potential costs associated with building and operating an extensive network or otherwise utilizing the substantial amount of spectrum acquired during this auction."[180]  The D.C. Circuit affirmed that these conclusions were a reasonable application of FCC precedent.[181]

---

[172] *Northstar and SNR Order*, 30 FCC Rcd at 8921-22, para. 79.

[173] *SNR Wireless*, 868 F.3d at 1031.

[174] *See* Northstar 2018 LLC Agreement § 6.6; *accord* SNR 2018 LLC Agreement § 6.6.

[175] We note that under the 2018 LLC Agreements, the Applicants' LLC Managing Members are still compensated "with a fee rather than through compensation normally associated with ownership—profit." *Northstar and SNR Order*, 30 FCC Rcd at 8922, para. 81.

[176] *Northstar and SNR Order*, 30 FCC Rcd at 8923, para. 84.

[177] *Northstar and SNR Order*, 30 FCC Rcd at 8923-24, para. 84.

[178] *Northstar and SNR Order*, 30 FCC Rcd at 8924, para. 84.

[179] *Northstar and SNR Order*, 30 FCC Rcd at 8924, para. 85.

[180] *Northstar and SNR Order*, 30 FCC Rcd at 8924, para. 85.

[181] *See SNR Wireless*, 868 F.3d at 1032-33.

81. The Applicants have sought to address these concerns through a variety of changes reflected in the 2018 LLC and Credit Agreements. The Applicants assert that these changes "individually and in the aggregate provide Applicants with substantially greater financial flexibility than they had" under the 2015 Agreements.[182] First, they have eliminated the $25 million cap on Applicants' acquiring purchase money financing or unsecured third-party debt; such borrowing is now not subject to any quantifiable concrete limit.[183] Second, the parties have negotiated modifications to DISH's interest in the Applicants. These changes include transforming nearly $7 billion in Northstar debt and over $5 billion in SNR debt into new Class A Preferred Equity—leaving a balance of exactly $500 million of indebtedness for each company.[184] The Class A Preferred Equity is non-voting, non-participating, and non-convertible, and it does not have a maturity date.[185] The preferred equity accrues quarterly distributions at the rate of 8% per annum from and after June 7, 2018, which must be paid either in cash or by adding such amounts to the then-current face amount.[186] The liquidation preference on the preferred equity is due and payable upon a liquidation or deemed liquidation event.[187] Third, the parties have also reduced in the 2018 Credit Agreements the interest rate on the remaining indebtedness from 12% to 6% per year from and after March 31, 2018, while also eliminating the default interest rate on past due amounts.[188] The parties also have eliminated prepayment obligations and required interest payments, such that accrued interest is not payable until the loan maturity date, which has been extended from 7 to 10 years, while also eliminating the excess cash recapture provisions from the 2015 Credit Agreements.[189]

82. Even after these changes, however, the fact remains that DISH provided Northstar and SNR with approximately $13 billion in loans to participate in Auction 97, and while the Applicants have negotiated changes as to the *form* of their debt to DISH, the sheer quantity of their financial obligations remains the same. Additionally, there is nothing in the record to suggest that either Northstar or SNR has accrued significant investment or debt from anyone other than DISH, either before or after the auction. These facts are not dispositive as to this *Intermountain Microwave* factor, but they remain relevant to our analysis.

83. Moreover, the revisions that the Applicants negotiated still leave each of them $500 million in debt to DISH (in addition to the already accrued interest)—even without regard to the future financing of their buildout obligations under the Commission's rules. Whether the remaining approximately $5 billion (or, in Northstar's case, $7 billion) has been exchanged for preferred stock with cumulative 8% per annum quarterly dividend distributions does not alter the facts that (1) the Applicants require substantial additional capital for network buildout; (2) DISH has been and remains the primary source of the Applicants' capital; (3) DISH may, but is not obligated to, make adequate buildout funding available; and (4) DISH's contractual protections and the economic realities of the parties' relationships make it difficult if not impossible for the Applicants to raise any secured debt, other than possibly limited amounts of purchase money financing for specific types of equipment, or significant, if any, unsecured financing.

---

[182] Consolidated Opposition at 13.

[183] Northstar 2018 Credit Agreement § 6.9(g); *accord* SNR 2018 Credit Agreement § 6.9(g).

[184] Northstar 2018 Credit Agreement § 2.2(g)(ii); *accord* SNR 2018 Credit Agreement § 2.2(h)(ii).

[185] Northstar 2018 LLC Agreement § 2.2(e); *accord* SNR 2018 LLC Agreement § 2.2(f).

[186] Northstar 2018 LLC Agreement § 3.1; *accord* SNR 2018 LLC Agreement § 3.0.

[187] Northstar 2018 LLC Agreement § 3.2; *accord* SNR 2018 LLC Agreement § 3.1.

[188] Northstar 2018 Credit Agreement § 2.3(a); *accord* SNR 2018 Credit Agreement § 2.3.

[189] Northstar 2018 Credit Agreement § 1.1 (definition of "Maturity Date"); *accord* SNR 2018 Credit Agreement § 1.1 (same).

84.     For the Applicants to buildout their licenses into wireless networks, they will need substantial additional funding.  One source of such funding would be additional loans from DISH.  And under the 2018 Credit Agreements, DISH continues to have baseline commitments to fund the Applicants' "reasonable" buildout expenses as well as their "reasonable" working capital expenses.[190] Given the enormously expensive nationwide wireless network represented by the over 700 licenses as to which the Applicants were the highest bidders,[191] this would require substantial further investments by DISH on a going-forward basis.  DISH disclosed as much in its 2019 U.S. Securities and Exchange Commission Form 10-K, describing that it might "need to make significant additional loans to [Northstar and SNR] . . . so that [they] may commercialize, build-out and integrate" their licenses into a wireless network.[192]  If DISH makes such adequate buildout and operating funding available—which it is under no obligation to do—the provision of such additional debt of this scope would increase DISH's responsibility for Applicants' financial obligations under this *Intermountain Microwave* factor.

85.     Our independent conclusion as to the importance of this factor under *Intermountain Microwave* is reinforced by DISH's own continued recognition of its financial responsibility for the Applicants.  Under Financial Accounting Standards Board (FASB) Accounting Standards Codification 810-10-25-38A, an entity is required to consolidate its financial statement with other entities where it has (1) the power to direct activities that most significantly impact economic performance and (2) either the obligation to absorb losses that could potentially be significant or the right to receive benefits that could potentially be significant.[193]  And in its Q1 2020 SEC Form 10-Q, DISH acknowledged that Northstar and SNR are "considered variable interest entities" under "applicable accounting guidance," and, "based on the characteristics of the structure of these entities," DISH "consolidate[d] these entities into [its] financial statements."[194]  Further, DISH explained under its "Principles of Consolidation" that it consolidated "all majority owned subsidiaries, investments in entities in which [it has] controlling influence and variable interest entities where [DISH has] been determined to be the primary beneficiary."[195]  Notably, DISH's treatment of Northstar and SNR for reporting purposes appears not to have changed following the modifications that the parties negotiated to their agreements in 2018.[196]

---

[190] Northstar 2018 Credit Agreement § 2.2; *accord* SNR 2018 Credit Agreement § 2.2.

[191] Based on a review of the Commission's Universal Licensing System on October 5, 2020.  The licenses that Northstar and SNR won in Auction 97, when combined, cover the entire United States.  *See also* Federal Communications Commission, *Auction 97: Advanced Wireless Services (AWS-3) Results*, https://www.fcc.gov/auction/97/round-results (last visited Oct. 5, 2020).]  The Applicants currently hold approximately 500 licenses, after their selective defaults following the *Northstar and SNR Order*, but our assessment of their buildout costs is based on the full portfolio of over 700 licenses that they claim to be entitled to in this proceeding.

[192] DISH Network Corporation, Form 10-K at 22 (filed Feb. 25, 2020) https://ir.dish.com/node/31586/html.

[193] FASB, Accounting Standard Update, Consolidation Topic 810, at 5 (2016), https://asc.fasb.org/imageRoot/28/96871528.pdf.

[194] DISH Network Corp., Form 10-Q, at 9 (May 7, 2020), https://www.sec.gov/ix?doc=/Archives/edgar/data/1001082/000155837020005524/dish-20200507x10q.htm (DISH Q1 2020 10-Q); *see also id.* at 10-11 (discussing redeemable noncontrolling interests in Northstar and SNR for reporting purposes).

[195] DISH Q1 2020 10-Q at 10.

[196] *See* DISH Network Corp., Form 10-Q, at 4-5 (May 11, 2015), https://dish.gcs-web.com/node/29001/html (noting that Northstar and SNR were considered variable interest entities based on similar principles of consolidation under parties' 2015 Agreements).  While DISH refers to its investment in the Applicants as "non-controlling" in its most recent 10-Q, that fact is of limited probative value, given that DISH also referred to its investments in the Applicants as "non-controlling" in 2015.

86.     Nor is that all.  DISH also has retained significant control over the financial aspects of Applicants' businesses by placing substantial limits on the amount of its own required financial obligations.

87.     Specifically, the SNR 2018 Credit Agreement requires DISH to make buildout loans upon request, but "[i]n no event shall" DISH "be obligated to make an aggregate amount" of such loans "in excess of the "Build-Out Sub-Limit.""[197]  The SNR 2018 Credit Agreement defines "Build Out Sub-Limit" to mean only {[          ]} "plus such additional amounts" as SNR and DISH "mutually agree are necessary to meet . . . Build-Out plans."[198]

88.     The Northstar 2018 Credit Agreement is effectively similar.  Its definition of Build-Out Sub Limit is the same as the SNR 2018 Credit Agreement's except that it also "such additional amounts as are required to fund Working Capital requirements."[199]  But this change appears to be immaterial for present purposes.  The Northstar 2018 Credit Agreement expressly distinguishes "Working Capital requirements" from funds mutually agreed to be necessary for buildout.[200]  And typically, a working capital loan is one "taken to finance a company's everyday operations" and "not used to buy long-term assets or investments," but rather "short-term operational needs."[201]  In any event, whatever the scope of "reasonable" working capital expenses may be under the "Working Capital" definition of the agreement, they would appear to be "'trivial' in comparison to what it would cost to build and use a nationwide wireless network."[202]

89.     Under these agreements, DISH has the ability to delay or deny funding to the Applicants for network buildout by not agreeing that requested levels of funding above the minimum threshold are necessary to meet buildout plans (which the Applicants have not provided or described).  Whatever the scope of this limitation may be, or however it may be exercised in the future, this limitation is especially concerning here because of the levels of buildout funding that would be necessary to deploy wireless networks for the hundreds of licenses that the Applicants acquired across the country in Auction 97.  Indeed, we expect that the buildout costs for their shared nationwide set of AWS-3 licenses[203] would likely collectively be many orders of magnitude greater than the designated build-out sub-limit, and ten times the size of Applicants' collective existing debts to DISH, based on DISH's own $10 billion budget for its buildout of another nationwide network—a figure analysts have criticized as likely being *inadequate* based on other providers' capex in recent years.[204]

---

[197] SNR 2018 Credit Agreement § 2.2(b).

[198] SNR 2018 Credit Agreement § 1.1 (definition of "Build-Out Sub Limit").  Material set off by double brackets {[  ]} is confidential and is redacted from the public version of this document.

[199] Northstar 2018 Credit Agreement § 1.1.

[200] *See* Northstar 2018 Credit Agreement § 1.1 ("Build-Out Sub-Limit" and "Working Capital").

[201] Investopedia, *Working Capital Loan – Definition*, https://www.investopedia.com/terms/w/workingcapitalloan.asp#:~:text=A%20working%20capital%20loan%20is,company's%20short%2Dterm%20operational%20needs. (last visited Oct. 5, 2020).

[202] *SNR Wireless*, 868 F.3d at 1033.

[203] Based on a review of the Commission's Universal Licensing System on October 5, 2020. Northstar's and SNR's licenses, when combined, cover the entire U.S. *See also* Federal Communications Commission, *Auction 97: Advanced Wireless Services (AWS-3) Results*, https://www.fcc.gov/auction/97/round-results (last visited Oct. 5, 2020).

[204] *See* DISH Network Corporation CEO Erik Carlson Q4 2019 Results, Earnings Call Transcript (Feb. 19, 2020), https://seekingalpha.com/article/4325471-dish-network-corporation-dish-ceo-erik-carlson-q4-2019-results-earnings-call-transcript?.

90.     Additionally, the rules for the AWS-3 licenses that the Applicants won in Auction 97 establish an interim buildout requirement at six years after the grant of the licenses.[205]  In the event that a licensee fails to meet this interim benchmark, however, the primary consequence is that final buildout deadline is accelerated by two years (from 12 to 10 years).[206]  We find it noteworthy that in either case, the final buildout requirement would occur *after* the Applicants' put windows under the 2018 LLC Agreements.  We see nothing that would prevent DISH from declining to provide the funding that would be necessary for the Applicants to satisfy their interim buildout requirements, leaving them in a highly risky position vis-à-vis their final buildout requirements at each put window.[207]

91.     Finally, even under the 2018 Agreements, DISH has significantly limited the availability of other funding sources for the Applicants.[208]  Specifically, the 2018 Credit Agreements prohibit the Applicants from incurring *any* secured debt other than purchase money financing of telecommunications and broadband equipment.[209]  And, while the Applicants have eliminated the $25 million quantified cap on Applicants' raising purchase money financing and unsecured debt,[210] DISH retains unilateral and unfettered veto rights on the Applicants' incurring any "significant" indebtedness (including unsecured) under the revised investor protections in the 2018 LLC Agreements.[211]  Of course, an investor protection that relates to the incurrence of significant third-party debt is not *per se* impermissible.  But here, considering the enormity of Applicants' continuing need for capital, as well as DISH's apparent ability to delay or avoid making all of the capital available that would be necessary to build out the Applicants'

---

[205] *See* 47 CFR § 27.14(s).

[206] *See* 47 CFR § 27.14(s).

[207] The Applicants argue that Commission scrutiny of their "buildout progress at this juncture would impose a new DE standard . . . that would violate their due process rights."  Applicants' 11-17-20 Summary at 10.  But this order does not consider their buildout progress against the AWS-3 deadlines as a regulatory matter, but instead considers whether they have any realistic hope of raising the financing to buildout their networks, which they must do to satisfy their financial obligations to DISH or to have any option other than exercising their put rights.

[208] The Applicants claim that the Commission should not adopt a "novel and unprecedented *de facto* control standard based on . . . proof of the ability to secure funding from parties other than DISH" because "such standards have never been used to assess eligibility for DE bidding credits."  Applicants' 11-17-20 Summary at 5.  But an applicant's ability to secure funding is a relevant consideration under this *Intermountain Microwave* factor, as applied in the *Northstar and SNR Order*.  *See Northstar and SNR Order*, 30 FCC Rcd at 8924, para. 85.

[209] *See* Northstar 2018 Credit Agreement § 6.9(b); *accord* SNR 2018 Credit Agreement § 6.9(b).  The 2018 LLC Agreements also give DISH unilateral veto rights over the incurrence of any debt secured by major assets, including spectrum licenses, which are likely to be the only meaningful assets that these nascent companies hold.  *See* Northstar 2018 LLC Agreement §§ 1.1 (definition of "Significant Matter"), 6.3 (veto rights); *accord* SNR LLC Agreement §§ 1.1 6.3.  The Applicants claim that DISH's consent is "not required for the Applicants to take on secured debt that does not rise to the threshold of the well-established *Baker Creek* investor protections."  Applicants' 11-17-20 Summary at 7.  But the *Baker Creek* limitation on the investor protections is illusory, because that decision does not identify some obvious or quantifiable "threshold" of "significance."  Moreover, this claim does not account for the 2018 Credit Agreements, which separately prohibit the incurrence of any secured debt other than purchase-money financing of certain equipment.  Thus, the Applicants can invoke their investor protections in tandem with the 2018 Credit Agreements' prohibition to block the incurrence of *any* secured debt.  And even if DISH permitted a third-party lender to take a security interest in the proceeds of a sale of the licenses or the Applicants, any such security interest likely would be subordinate to the debt held by DISH, including any already accrued interest.  *See* NorthStar 2018 LLC Agreement §§ 1.1 (definitions of "Deemed Liquidation Event" and "Liquidation Event"), 3.1, 13.3(d); *accord* SNR 2018 LLC Agreement §§ 1.1 (definitions of "Deemed Liquidation Event" and "Liquidation Event"), 3.1, 13.3(d).

[210] *See* Northstar 2018 Credit Agreement § 6.9(g); *accord* SNR 2018 Credit Agreement § 6.9(g).

[211] For this reason, we reject the Applicants' characterization that they are not "limited in any way in their ability to get equipment financing and unsecured debt."  Applicants' 11-4-20 Summary at 7.

networks, the protection couples virtually exclusive responsibility for financial operations with powerful financial leverage.

92.     Indeed, we are concerned that these aspects of the parties' 2018 Agreements could "have the effect of deterring potential outside lenders in the first instance."[212]  As VTel explains, "[c]urrent market trends and institutional lending practices make it highly unlikely that any creditor would lend funds to Northstar and SNR on an unsecured basis.  Nor is it likely that any vendor would be willing to finance the sale of equipment to a company with no customers and no reasonable prospects for ever getting customers."[213]  And in *Baker Creek*, the Bureau found that two aspects of the partnership agreement between Hyperion and Baker Creek would likely leave Hyperion "ultimately responsible" for Baker Creek's financial obligations: first, a provision which denied Baker Creek the right to secure loans with partnership property; and, second, a provision which granted Hyperion a right of first refusal with regard to loans sought from outside parties.[214]  Here too, the Applicants are prohibited from raising any secured third-party funding (other than purchase money financing for certain equipment), and DISH has a right to veto any "significant" loans sought from third parties.  Thus, DISH "has the right to determine the amount and source of [Applicants'] future commitments" and appears to have "ultimate responsibility" for their financial obligations.[215]

5.     **Receipt of Monies and Profit**

93.     In the *Northstar and SNR Order*, the Commission found that the 2015 Agreements and relationships among the parties "firmly raise[d] the specter of control" by DISH under the fifth *Intermountain Microwave* factor.[216]  The Commission noted that while certain provisions of those agreements directed that profits would be distributed *pro rata* in accordance with the ownership interests of the parties, the business arrangements between the parties as a whole were "structured in such a way that the profits [were] likely only to benefit DISH."  Thus, the Commission raised "serious questions as to whether *any* profits could be generated that could result in distributions to SNR and Northstar."[217]

94.     The Commission initially found that under the 2015 Credit Agreements, "prior to realizing any profits from their business operations, SNR and Northstar" were required to "first repay the billions of dollars in loans they ha[d] secured from DISH."[218]  The Commission noted that the interest was capitalized during the initial five years of the loan, which was potentially problematic because the Applicants were likely to be building out their respective network during those first five years," and it was "unlikely that any profits would be generated" during that period.[219]  The Commission then noted that if any profits were realized in years five to seven, "the amount of cash in excess of a reasonable reserve for

---

[212] *Baker Creek Order*, 13 FCC Rcd at 18722 para. 24.

[213] VTel Comments at 16.  We need not find that it is "highly unlikely that any creditor would lend funds to Northstar and SNR in" *any* amount "on an unsecured basis."  But we agree with VTel that it is highly unlikely that any creditor would lend unsecured funds to Northstar and SNR in any significant amount and that, in the highly unlikely event that any creditor were to offer to do so, DISH could veto acceptance by the Applicants.  And nowhere in their Consolidated Opposition do the Applicants address VTel's well-founded concerns that third-party creditors will be deterred from providing unsecured or purchase money funding to Northstar and SNR.

[214] *Baker Creek Order*, 13 FCC Rcd at 18722, para. 24.  Critically, the Bureau reached this conclusion notwithstanding its recognition that investor protections regarding "encumbering corporate assets" are generally permissible.  *Baker Creek Order*, 13 FCC Rcd at 18714-15, para. 9.

[215] *Baker Creek Order*, 13 FCC Rcd at 18722-23 para. 25.

[216] *Northstar and SNR Order*, 30 FCC Rcd at 8925, para. 89.

[217] *Northstar and SNR Order*, 30 FCC Rcd at 8925, para. 88.

[218] *Northstar and SNR Order*, 30 FCC Rcd at 8925, para. 89.

[219] *Northstar and SNR Order*, 30 FCC Rcd at 8925, para. 89.

expenses [would have to be] paid to DISH as lender to reduce the multi-billion dollar loans," and that "the Credit Agreement[s] terminate[d] after year seven," at which point the Applicants would be required to repay the full remaining balance plus accrued interest."[220]  The Commission summarized that "the transactional documents effectively ensure that the Applicants are highly unlikely to ever see any profit during the term of the loan.  Instead, . . . the transactional documents . . . provid[e] the Applicants with an annual income, via the LLC management fee, for which they oversee building a network . . . followed by a put option."[221]  The Commission explained that these concerns were "exacerbated by the repayment terms that require[d] repayment of 50 percent of the loans between the fifth and seventh year of the term, and the balance as a balloon payment at the end of year seven."[222]

95.     Separately, the Commission expressed concern that the 2015 Management Services Agreements also revealed DISH's control by requiring that the Applicants reimburse DISH for all out of pocket expenses, and by establishing a "circularity by which the funds [would] flow from DISH, as lender, to the Applicants and then back to DISH, as Operating Manager."[223]

96.     The D.C. Circuit endorsed this reasoning:

> Before realizing any profits from their business operations, SNR and Northstar would first have to repay the billions of dollars in loans they owed to DISH.  And, given that SNR and Northstar would need to undertake extensive construction before they could begin providing wireless service, it was very unlikely for the foreseeable future that they would be able to repay those loans and begin earning profits.[224]

97.     The Applicants have renegotiated the terms of their debt to DISH, such that in the 2018 Credit Agreements they each owe $500 million to DISH in the form of debt, with a reduced interest rate and extended maturity date; the remainder of their prior debt (billions of dollars for each company) has been converted into preferred equity with no maturity date and mandatory quarterly distributions at an 8% per annum rate, made in cash or added to the then-current face amount and subject to compounding.[225]  Moreover, the parties have terminated the Management Services Agreements.

98.     Based on our review of the revised agreements, we conclude that the parties have changed the form but not the controlling nature of DISH's financial interests with respect to the receipt of monies and profits.

99.     *First*, the changes the Applicants have negotiated do not materially change the economic reality of their shared relationship—an overwhelming financial obligation—with DISH.  For example, it appears that the Applicants still owe DISH the 12% annual interest on the full loan amounts ($7.3 billion for Northstar and $5.5 billion for SNR) under the 2015 Agreements that accrued for the three and a half years from the loan advance date up until the date that they entered into the 2018 Agreements.[226]  Moreover, the Applicants also owe DISH the 6% annual interest that has accrued and will accrue on the

---

[220] *Northstar and SNR Order*, 30 FCC Rcd at 8925, para. 89.

[221] *Northstar and SNR Order*, 30 FCC Rcd at 8926, para. 90.

[222] *Northstar and SNR Order*, 30 FCC Rcd at 8926, para. 92.

[223] *Northstar and SNR Order*, 30 FCC Rcd at 8926, paras. 91, 93.

[224] *SNR Wireless*, 868 F.3d at 1033.

[225] *See* Northstar 2018 Credit Agreement § 2.2(g)(ii); Northstar 2018 LLC Agreement §§ 2.2(e), 3.1; *accord* SNR 2018 Credit Agreement § 2.2(h)(ii); SNR 2018 LLC Agreement §§ 2.2(f), 3.0.

[226] *See* T-Mobile Comments at 6; *see also* Northstar 2018 Credit Agreement § 2.3(a); *accord* SNR 2018 Credit Agreement § 2.3.

remaining $500 million loan balance from that date forward.[227]  The $500 million outstanding debt for each Applicant is also due upon maturity in 2025.  And with respect to the new preferred equity, the Applicants appear to have been obligated to pay DISH a 12% per annum distribution for Q2 2018 and now face quarterly distributions at an 8% per annum rate from Q3 2018 forward, either in the form of cash or as an addition to the face value already held by DISH (subject to compounding).[228]  Thus, the amounts that the Applicants already owe and will have to regularly pay to DISH (or add to its face value) going forward are substantial.[229]

100.    Moreover, because DISH can control whether the Applicants are able to make their quarterly dividend payments in cash, it can effectively accrete preferred equity on a quarterly basis, which compounds.  Although the preferred equity has no maturity date, it operates here as substantively similar to traditional debt upon a liquidation or deemed liquidation event,[230] because it has higher priority than the LLC Managing Members' common equity.[231]  In short, accretion of preferred equity to DISH results in a corresponding dilution of the potential return on the LLC Managing Members' 15% common equity interests in such event, and their theoretical right to any profits upon a sale or larger transaction with any party other than DISH becomes substantially diminished.[232]  The fact that "the new preferred equity has no ownership interest in the common equity" is of no moment;[233] the Applicants face a scenario where DISH can dictate whether the LLC Managing Members have any chance of realizing a return on their investment.

---

[227] See T-Mobile Comments at 6; see also Northstar 2018 Credit Agreement § 2.3(a); accord SNR 2018 Credit Agreement § 2.3.

[228] Northstar 2018 LLC Agreement § 3.1; accord SNR 2018 LLC Agreement § 3.0.

[229] VTel argues that the Applicants' liability to DISH under the preferred equity swap will actually be greater than the amount of indebtedness either entity would have incurred under the 2015 Credit Agreements.  See VTel Comments at 18.  VTel likewise argues that the Conversion of debt to preferred equity is harmful because the Applicants will no longer be able to reduce their taxable income by a factor of the interest paid to DISH.  See VTel Comments at 9-10.  The Applicants counter that VTel's estimates of the Applicants' net liability is based on a flawed set of assumptions, and that VTel's taxable-income argument ignores the capital-intensive nature of the Applicants' businesses, which make it extremely unlikely that they would ever be able to claim an interest tax deduction.  See Consolidated Opposition at 13-17.  We need not resolve these disputes.  Even under the Applicants' own conservative estimates, the extent of DISH's interest in the Applicants will be massive (after 10 years, at minimum, approximately $11.9 billion in preferred equity in Northstar and approximately $8.8 billion in preferred equity in SNR).  See Consolidated Opposition, Ex. C, Table 3A, Discussion Note 2, Table 3B, Discussion Note 2.  Moreover, these estimates assume DISH does not make any other significant additional loans to the Applicants, which, as noted above, DISH itself has recognized in its SEC filings it may have to do for the Applicants to buildout and operate their networks.

[230] The Applicants argue that under Commission precedent, a critical factor in determining whether a debt obligation should be treated as equity is whether there is an unconditional promise to repay.  See Consolidated Opposition at 12 (citing Fox Television Studios, Inc., Second Memorandum Opinion and Order, 11 FCC Rcd 5714, 5720, para. 16 (1995) (Fox II)).  But our conclusion with respect to this Intermountain Microwave factor does not require a finding that DISH's preferred equity is the functional equivalent of debt in all or even many respects.  What is relevant here is that from Northstar's and SNR's perspective, the preferred equity carries (1) mandatory quarterly distributions (the payment of which DISH can make difficult if not impossible), and (2) distribution priority in the event of a liquidation or deemed liquidation event.  Here, this is a critical aspect of "the economic reality and substance" of this transaction.  Fox II, 11 FCC Rcd at 5270, para. 6.

[231] The Applicants describe the preferred equity as having a "subordinate . . . liquidation priority," but this is misleading, as the preferred equity is senior to the LLC Managing Members' common equity.  Consolidated Opposition at 15.

[232] See VTel Comments at 9-10.

[233] Consolidated Opposition at 16.

101.    *Second*, DISH exerts substantial control over whether and how the Applicants will be able to fund the buildout and operation of their networks—and thus whether they will be able to generate the revenues necessary to satisfy their quarterly and ultimate financial obligations.[234]  Even if DISH agrees to fund the Applicants' buildout and operating costs, Applicants would of course increase their overall financial obligations to DISH, and it appears that DISH can frustrate their attempts to do so.  The Applicants alternatively could seek to obtain significant amounts of third-party funding for buildout and operating costs.  But their doing so would be subject to the 2018 Credit Agreements' prohibition on secured financing other than limited purchase money financing, and the 2018 LLC Agreements' veto rights to any "significant" third-party debt.  And even if DISH were to consent to the Applicants' taking on significant third-party debt, we have serious doubts whether Applicants could obtain third-party funding or investment of the magnitude required given that Applicants are still young companies with no revenue, no existing network or operations, no significant assets with which they are permitted to secure the debt, and an investor with veto and priority rights in liquidation.[235]

102.    *Third*, DISH also has the ability to exert substantial control over the alternative, non-capital intensive business models by which Northstar and SNR could generate the revenues needed to pay the interest payments and mandatory distributions—*i.e.*, leasing their spectrum in any significant amount or engaging in corporate transactions, major sales, or partnerships with any entity other than DISH.[236]  Thus, taken together, DISH's rights allow it to delay, frustrate, or prevent the Applicants from successfully deploying, leasing, or selling their spectrum to the extent that would be necessary to generate revenues to pay down their debt and make their required dividend payments.

103.    In sum, even though DISH converted all but $500 million of its loans to each Applicant into preferred equity and modified the loan terms for the remaining debt, we conclude that under this aspect of the *Intermountain Microwave* inquiry any profits of Applicants' operations are still, as the Commission found previously, "only likely to benefit DISH."[237]

### 6.    Control of Policy Decisions

104.    As the Commission explained in the *Northstar and SNR Order*:

> Because policy decisions are crucial to the daily functioning, future outlook, and independence of an entity, we expect that, among other things, an autonomous entity would retain control of major decisions affecting the use of their licenses . . . whether to expand their respective businesses by purchasing additional spectrum licenses, and, of course, the fundamental choice of whether to remain in operation.[238]

---

[234] *See supra* Part III.B.4.

[235] *See* NorthStar 2018 LLC Agreement §§ 1.1 (definition of Significant Matters), 6.3 (veto rights for Significant Matters), 13.3 (priority rights); Northstar 2018 Credit Agreement §§ 2.5 (security rights), 6.9 (restrictions on debt); *accord* SNR 2018 LLC Agreement §§ 1.1, 6.3, 13.3; SNR 2018 Credit Agreement §§ 2.5, 6.9.

[236] *See infra* Part III.B.6.

[237] Our analysis under this *Intermountain Microwave* factor is also relevant to our alternative holding that the 2018 Agreements confer control on DISH under the *Competitive Bidding Fifth Order* as outlined by the D.C. Circuit.  Because DISH can cause the LLC Managing Members' value in their holdings to dilute significantly over time, they will face substantial incentives to exercise their put rights to DISH in order to "recoup their base contributions plus a [set] return on their contributions in a relatively short time without their ever having to deploy a wireless system or operate a business.'"  *Northstar and SNR Order*, 30 FCC Rcd at 8929-30, para. 103 (citing Reply of VTel Wireless, Inc. in Support of Petition to Deny of File Numbers 0006458325 and 0006458318 at 11 (filed May 26, 2015)).

[238] *Northstar and SNR Order*, 30 FCC Rcd at 8927, para. 94.

105.    With respect to this *Intermountain Microwave* factor, too, the Commission noted in the *Northstar and SNR Order* that the parties had inserted express recitals in their 2015 Agreements which purported to vest policy control in Northstar and SNR.[239]  However, the Commission found these statements "unconvincing" as they were "undercut by other provisions that combine[d] to cede DISH the power to control management and operation decisions."[240]  The Commission specifically highlighted the following examples of DISH's control:

- Interoperability:  Northstar and SNR were compelled to use technology that was compatible with DISH's own system.[241]

- Acquisition of Additional Spectrum:  The 2015 LLC Agreements required Northstar and SNR to secure written permission from DISH prior to acquiring new spectrum.[242]

- Network Construction:  The Applicants were required to consult with DISH regarding the timing of network construction.[243]

- Transfer and Sale:  The 2015 Agreements "essentially dictate[d] when SNR and Northstar should sell their interests and exit the business."[244]

- Interest Rates:  The credit rates in the 2015 Credit Agreements were "well above market rate," and would likely "have the effect of driving the loan principal as high as possible given that the interest is capitalized."[245]

- Ownership of Property:  The 2015 Agreements prohibited the Applicants from owning any freehold real property.[246]

- Right to Licenses:  A provision in the 2015 LLC Agreements gave DISH the option to end Northstar's and SNR's businesses if denied bidding credits.[247]

- Joint Bidding:  The Commission's determinations were informed by the circumstances surrounding the bidding that resulted in Northstar's and SNR's winning bids.  "All three companies . . . worked jointly to advance DISH's interests, rather than SNR and Northstar functioning as independent bidders seeking to advance their own interests."[248]

106.    The D.C. Circuit affirmed that the Commission had "reasonably concluded that DISH effectively controlled . . . every essential policy decision for SNR and Northstar[]," citing DISH's control over "(a) the type of wireless technology that SNR and Northstar would use; (b) the number of spectrum licenses that SNR and Northstar would hold; (c) the timetable for SNR and Northstar to build networks

---

[239] *See Northstar and SNR Order*, 30 FCC Rcd at 8927, para. 94.

[240] *Northstar and SNR Order*, 30 FCC Rcd at 8927, para. 94.

[241] *Northstar and SNR Order*, 30 FCC Rcd at 8927, para. 96; *see also id.* at 8928, para. 97 ("[T]he technology selected, and ultimately, the direction of their business, is one of the most critical decisions a licensee can make regarding its spectrum holdings . . . .").

[242] *See Northstar and SNR Order*, 30 FCC Rcd at 8928, para. 98.

[243] *Northstar and SNR Order*, 30 FCC Rcd at 8928, para. 99.

[244] *Northstar and SNR Order*, 30 FCC Rcd at 8928, para. 100.

[245] *Northstar and SNR Order*, 30 FCC Rcd at 8931, para. 106.

[246] *Northstar and SNR Order*, 30 FCC Rcd at 8931, para. 107.

[247] *See Northstar and SNR Order*, 30 FCC Rcd at 8931, para. 108.

[248] *Northstar and SNR Order*, 30 FCC Rcd at 8932, paras.109, 111; *see also id.* at 8933, paras. 112-14.

and begin offering services to customers; (d) when SNR and Northstar might sell their businesses; (e) SNR's and Northstar's ownership of real property; and (f) SNR and Northstar's bidding strategy."[249]

107.    On remand, in addition to making the changes documented above (such as changes to the investor protections in the 2015 LLC Agreements and elimination of the Management Services Agreements), the parties removed restrictions on Northstar's and SNR's rights to acquire additional spectrum, eliminated the interoperability requirements and the prohibition on the Applicants' owning real property, removed DISH's right of first refusal and tag-along rights on the sale of the LLC Managing Members' interests, modified and created new put rights, expanded the Applicants' rights to initiate public offerings, eliminated DISH's rights to reclaim licenses if the Applicants failed to qualify for bidding credits, and reduced from 10 to 5 years the amount of time during which the LLC Managing Members could not transfer their interests without DISH's consent.[250]

108.    Notwithstanding these modifications, we nonetheless find that DISH continues to control the Applicants' and their LLC Managing Members' most fundamental policy decisions identified by the D.C. Circuit:  Whether, when, and how to use their spectrum, whether to lease their spectrum, whether and how to exit the business, and how to renegotiate arrangements with their principal creditor and investor.

109.    *First*, because DISH can determine whether, to what extent, and from whom, the Applicants can raise additional "significant" unsecured funding (and has prohibited the incurrence of any new secured debt other than limited purchase money financing), it also can continue to exercise control over whether the Applicants ultimately can *use* the spectrum that they selected for acquisition when DISH was in control of their business in order to build and operate nationwide wireless networks.  As the Applicants' expert has explained, the primary business model for Northstar and SNR would be deploying a wireless network designed for enterprise or consumer applications and providing wireless network series directly or through partnerships with media, data, or other companies.[251]  And an alternative business model would be "offering wireless network capacity or roaming on a wholesale basis to other providers or users of wireless network services."[252]  But both of these business models require network buildout, which is highly capital intensive.  Thus, even though the Applicants now have the express rights, for example, to own property, to choose their own technologies, and to acquire additional spectrum, those rights are mere fig leaves if they are deprived of access to the substantial funding necessary to implement their decisions.

110.    *Second*, in addition to making the changes recounted above, DISH now has—for the first time—a unilateral veto over any "lease" by the Applicants of any major asset, where assets include spectrum licenses.[253]  As the Applicants' expert has opined, another alternative business option for the Applicants would be "offering access to the spectrum available under the . . . FCC licenses via a spectrum sharing model, including spectrum leasing."[254]  Thus, we find the new lease provision in the 2018 LLC

---

[249] *SNR Wireless*, 868 F.3d at 365.  The D.C. Circuit discussed the effect of the "put" separately, *see id.* at 366-67, as we do below.

[250] *See* Northstar Submission on Remand at 4-5, 16; SNR Comments at 3-4, 15-16, 18; Consolidated Opposition at 4-5, 18.

[251] *See* Taylor Decl. at 2, 4, paras. 6, 9.

[252] *See* Taylor Decl. at 4, para 9.

[253] Northstar 2018 LLC Agreement § 6.3 (Supermajority Approval Rights for all "Significant Matters"); *see also id.* § 1.1 (definition of "Significant Matter"); *accord* SNR 2018 LLC Agreement § 6.3 (Supermajority Approval Rights for all "Significant Matters"); *see also id.* § 1.1 (definition of "Significant Matter").  While DISH's rights might not extend to the lease of a single license, it almost certainly would extend to any leasing arrangement from which the Applicants could expect to derive enough revenue to make a meaningful dent in their financial obligations to DISH.

[254] *See* Taylor Decl. at 2, 4, paras. 6, 9.

Agreements further limits the Applicants' "range of business options"—and the Commission has characterized such limitations as "clearly" relevant when "determining control of a company's policy decisions."[255]  And neither Northstar nor SNR currently holds *any* lease of *any* of its many AWS-3 licenses.

111.    *Third*, we find that the 2018 LLC and Credit Agreements still give DISH the ability, found significant by the D.C. Circuit, to influence if, how, when, and under what circumstances the Applicants and/or the LLC Managing Members *exit* the business.  While the 2018 LLC Agreements permit the LLC Managing Members to sell their interests without DISH's consent after five years,[256] this modification is subject to important limitations which preserve DISH's control in this area.

112.    For example, DISH's express veto right as to any transfer of the LLC Managing Members' interests now extends five rather than ten years.  But DISH's veto still runs up to precisely the first put window, which is followed by a second put window a year later.  The 2018 LLC and Credit Agreements appear likely to result in the LLC Managing Members' exercising one of these two options, so this change is consistent with that intended outcome and thus affects no material change in our analysis.[257]

113.    Additionally, DISH's remaining investor protections under the 2018 LLC Agreements allow it to veto, even after year five, any "sale, transfer, exchange, or assignment" of any "major asset (where assets include, but are not limited to, licenses)."[258]  Thus, if the LLC Managing Members were to try to earn a return on investment by selling a substantial part of the Applicants' spectrum holdings at some point after year 5, DISH can prevent them from doing so.  Whatever the permissibility of such an investor protection in other contexts, here, it functions to further box in the Applicants by making it difficult for them to realize a return if their spectrum holdings increase dramatically in value.

114.    Relatedly, as VTel points out, any sale by the LLC Managing Members that is a "Deemed Liquidation Event"—any "merger, consolidation or similar transaction" or "the sale, license, or lease of all or substantially all" of the Applicants' assets—other than as an exercise of their put rights

[255] *Northstar and SNR Order,* 30 FCC Rcd at 8928, para. 98.  The leasing restriction is also relevant because it means that DISH can deprive the Applicants of the ability to monetize the value of their licenses without incurring the capital expense of constructing network facilities for a retail or wholesale wireless business (and thereby to meet all or some of their debt and dividend obligations to DISH).  As noted below, this provision also reinforces our independent concern that the Applicants have no rational choice but to exercise their put rights, given that DISH can prevent them from meeting the buildout or lease obligations attendant to their spectrum licenses.

[256] Northstar 2018 LLC Agreement §§ 7.1(a), 7.2; *accord* SNR 2018 LLC Agreement §§ 7.1(a), 7.2.

[257] Furthermore, even after five years, any sale by either of the LLC Managing Members of more than 25% of its shares triggers a transfer of management rights to a new manager who is subject to DISH's prior approval. Northstar 2018 LLC Agreement § 7.1(b); *accord* SNR 2018 LLC Agreement § 7.1(b).  This restriction further limits the LLC Managing Members' options for disposing of their interests:  Any purchaser who acquires less than 25% of the shares held by either LLC Managing Member will hold only non-preferred, common equity (at risk of continuing dilution through missed quarterly dividend distributions) with no management rights; and any purchaser who acquires more than 25% must either abide by DISH's selection of a manager or seek pre-approval from DISH to become the manager.  The 2018 LLC Agreements also continue to restrict the LLC Managing Members from transferring any portion of their interests to any competitor of DISH, any competitor of DISH's affiliates, or an affiliate of a DISH's competitor.  Northstar 2018 LLC Agreement §§ 7.1(c), 7.2; *accord* SNR 2018 LLC Agreement §§ 7.1(c), 7.2.  This restriction also will likely significantly limit the pool of potential purchasers of the LLC Managing Members' interests.  Northstar and SNR—and their assets—will be of value primarily to other companies in the telecommunications industries.  While these restrictions are not *per se* indicative of control, here they reinforce our conclusion that it would be difficult, if not impossible, for the LLC Managing Members to sell their interests to any entity other than DISH.

[258] Northstar 2018 LLC Agreement §§ 1.1 (definition of "Significant Matter"), 6.3 (supermajority approval rights for "Significant Matters"); *accord* SNR 2018 LLC Agreement §§ 1.1, 6.3.

would require that DISH be paid in full for its outstanding debt and its preferred equity.[259]  For any such transaction to be acceptable to the LLC Managing Members, the purchase price would need to cover all of DISH's billions of dollars in debt (possibly including the billions of dollars in additional debt for buildout) and preferred stock; otherwise, they would not realize any return.  Thus, as with DISH's tag-along rights under the 2015 Agreements, in the event of a Deemed Liquidation Event, "[the] purchaser of [the] 15 percent interest from either of the Applicants . . . would also [effectively] have . . . to buy [out] DISH's 85 percent interest."[260]  In isolation, this protection in a liquidation or deemed liquidation event could be permissible, but here it works in tandem with other restrictions to reduce the likelihood that the LLC Managing Members would enter into certain types of corporate transactions with any entity other than DISH.[261]

115.    *Fourth and finally*, we find that the parties' post-remand conduct suggests that both Applicants have continued to demonstrate a pattern of  "function[ing] as arms of DISH, rather than as independent small companies each pursuing [its] own, independent interests."[262]  Specifically, we find the Applicants' coordinated post-remand contract modifications to be troubling for the same reasons that the Commission and the D.C. Circuit found their pre-remand coordinated conduct in Auction 97 to be suspicious.  The Applicants engaged in what appear to be coordinated contract-modification negotiations with DISH during the remand and, despite their purportedly independent nature, the results of these two renegotiations, by two separate Applicants represented by two different set of lawyers, provide persuasive additional evidence of serving as "arms of DISH," in the form of dozens of pages of virtually identical LLC and credit agreement provisions and modifications.

116.    DISH responds to this concern by explaining that the overlapping nature of the modifications derives from the fact that "the vast majority of the provisions in their agreements were

---

[259] *See* VTel Comments at 10-11; *see also* Northstar 2018 LLC Agreement §§ 1.1 (definitions of "Deemed Liquidation Event" and "Liquidation Event"), 3.1, 13.3(d); *accord* SNR 2018 LLC Agreement §§ 1.1, 3.1, 13.3(d).

[260] *Northstar and SNR Order*, 30 FCC Rcd at 8929, para. 101.

[261] We are not persuaded that the 2018 LLC Agreements' modified provisions permitting the LLC Managing Members to take the Applicants to initial public offerings (IPOs) meaningfully changes DISH's *de facto* control. Under these provisions, the LLC Managing Members may now initiate IPOs after 7 years—which is more flexible than the 2015 LLC Agreement's 14-year prohibition, but still outside the put windows.  Northstar 2018 LLC Agreement § 9.1; *accord* SNR 2018 LLC Agreement § 9.1.  Moreover, the 2015 LLC Agreements' other restrictions still apply, granting DISH (1) the right to purchase all of the LLC Managing Members' interests in the companies "at a price equal to the midpoint of the [underwriters'] preliminary range" for the price in the offering; (2) the right to purchase all of the shares of the companies at the IPO price; and (3) and the right to delay the IPOs by up to 180 days. Northstar 2018 LLC Agreement §§ 9.2-.4; *accord* SNR 2018 LLC Agreement §§ 9.2-.4.  Although these provisions do not prevent the LLC Managing Members from disposing of their interests, they do ensure that if the LLC Managing Members are able to take the Applicants to public offerings, DISH still has an opportunity to obtain control over the businesses and the licenses—and to exercise its financial leverage over the buildout and operations of the Applicants to determine what if any value the Management Members' equity would have at such a point in time.

[262] *SNR Wireless*, 868 F.3d at 1025.  Our decision in this respect does not depend on the parties' bidding conduct in Auction 97, nor does it contravene the D.C. Circuit's remand in *SNR Wireless*.  *See supra* note 134.  Instead, we find that the parties' post-remand conduct mirrors its pre-remand conduct in a manner that the D.C. Circuit has confirmed is relevant to our analysis of the locus of control of policy decisions.  Our analysis also does not involve consideration of DISH's guarantees for the Applicants' default payments, *see* Consolidated Opposition at 44-46, and we reject VTel's arguments that the guarantees evince DISH's *de facto* control, *see* VTel Comments at 25.  *See also* Letter from Roger C. Sherman, Chief, WTB, to Mark F. Dever, Esq., Counsel for Northstar, DA 15-1108 (Oct. 1, 2015) ("These security provisions entered into after the date of the *MO&O* will not be relied upon by the Commission to demonstrate control of Northstar by DISH."); Letter from Roger C. Sherman, Chief, WTB, to Ari Q. Fitzgerald, Esq., Counsel for SNR, DA 15-1109 (Oct. 1, 2015) ("These security provisions entered into after the date of the *MO&O* will not be relied upon by the Commission to demonstrate control of SNR by DISH.").

modeled on—and virtually identical to—the terms of the Denali Spectrum License, LLC transaction," and that the modifications in the 2018 Agreements "address[] a common set of Commission concerns."[263] This response fails.

117.    *First*, it was not somehow inevitable that both Applicants would once again look to agreements from other bidding credit awardees to cure DISH's *de facto* control. Indeed, the *Northstar and SNR Order* and *SNR Wireless* decision made clear that applicants could not merely copy and paste individual terms of prior agreements to avoid a finding of *de facto* control. The test for *de facto* control looks beyond individual terms to all the facts and circumstances relevant to the parties' relationships.

118.    *Second*, the virtually identical contractual modifications are surprising, given that Northstar and SNR differ in ways that might be expected to have resulted in different negotiating strategies and outcomes during the remand process. For example, DISH held nearly $2 billion more in debt in Northstar than in SNR. And yet both Northstar and SNR separately converted all but $500 million of their respective debt loads (*i.e.*, the same amount in both cases) to identical preferred equity (*i.e.*, the same mandatory quarterly dividend distribution at the same rate, and the same priority rights). Northstar and SNR also acquired different spectrum portfolios in different markets, reflected in their very different purchase prices—and yet they acquiesced to effectively the same limit on buildout funding from DISH irrespective of these differences.

119.    *Third*, the fact that the Commission identified a common set of concerns with the two Applicants does not somehow mean that it was inevitable that the two Applicants would separately negotiate precisely the same cures. The two sets of virtually identical agreements are quite extensive, and there are many different aspects to them, at least some of which could reasonably have been expected to show some variation following any independent arm's-length negotiations. Yet they do not—even where the Applicants' differences pre-remand would have augured for a different outcome. For example, to address the Commission's concern about the unprecedented debt held by DISH, it was reasonable for both Applicants to renegotiate DISH's financial interests. But we find it significant, under the circumstances, that both Applicants acceded to (1) retention of (a) the same amount of debt (*i.e.*, $500 million), subject to (b) the same modified maturity and interest rates, and (2) conversion of the remaining debt into preferred equity with the same distribution requirements and priority rights. Similarly, given the Commission's analysis under the *Competitive Bidding Fifth Order*, it is not surprising that each Applicant sought to revise its put rights. What is noteworthy, however, is that for both Applicants, the modified put windows occur at the same times, offer the same rate of return during the first put window, last for the same duration, and entail the same obligations for DISH.[264] We also find it especially noteworthy that both Northstar and SNR separately agreed to give DISH newfound control over their rights to lease their spectrum, even though this grant did not address any of the concerns identified in the *Northstar and SNR Order*.

120.    In sum, the 2018 Credit and LLC Agreements continue to give DISH meaningful control over key policy decisions of the Applicants, quite apart from its prior role in the selection and bidding for the licenses that are now their only significant assets: (1) the Applicants' access to funding that would be necessary for them to *use* their spectrum to buildout and operate a wireless network; (2) the Applicant's rights to *lease* significant blocks (or potentially any) of their spectrum as an alternative business model; (3) the *disposition* of the Applicants' assets or the LLC Managing Members' interests, whether by engaging in larger corporate transactions, targeted sales, or public offerings; and (4) the precise terms of

---

[263] Consolidated Opposition at 11-12 n.20.

[264] We acknowledge that the modified put rights differ slightly by offering SNR a slightly more generous return than Northstar for exercising the put at year six. *See* Northstar 2018 LLC Agreement § 8.1(b); SNR 2018 LLC Agreement § 8.1. But we find that this difference is immaterial: In the case of both Applicants, the put rights offer generous, risk-free returns on investment whose allure DISH can make all but irresistible by exercising its rights with respect to the Applicants' policy decisions.

their relationship with the principal creditor and investor they share in common. Taken together, these restrictions continue to demonstrate a pattern of substantial DISH control over the locus of the Applicants' policy decisions.

### 7.    Unfettered Use of All Facilities and Equipment

121.    In the *Northstar and SNR Order*, the Commission concluded that the Applicants lacked unfettered access to their facilities and equipment under their 2015 Agreements with DISH. This conclusion was based on two primary findings. First, the Commission found that the interoperability requirement, discussed above, was a "critical element of the business arrangements between and among SNR, Northstar, and DISH," and could deprive the Applicants of use of their networks.[265] Second, the Commission relatedly found that Northstar's, SNR's, and DISH's coordinated bidding behavior suggested a "strong likelihood that DISH would either integrate SNR's and Northstar's systems with DISH's network or, by virtue of DISH's position as Operations Manager, require SNR and Northstar to integrate their systems with those of another telecommunications provider selected by DISH."[266]

122.    The D.C. Circuit described that this analysis was "relatively thin," noting FCC precedent affirming the benefits of interoperability for smaller providers.[267] The court nonetheless deferred to the stated concern "that [Applicants'] agreement to interoperate with DISH's yet-to-be-chosen network could prevent them from prompt development of their own spectrum" and found that the Commission had permissibly applied this factor.[268]

123.    The parties have since eliminated the interoperability requirement and related consultation requirements that would give DISH clear control over the Applicants' technology choices going forward. Thus, on the present record, we find that this factor does not support a finding of *de facto* control by DISH.

### C.    *De Facto* Control Under the Competitive Bidding Fifth Order

124.    Consistent with the D.C. Circuit's decision in *SNR Wireless*, we find that, even separate and independent from our analysis under the *Intermountain Microwave* factors discussed above, the *Competitive Bidding Fifth Order* supports a finding that the modified put rights in the parties' 2018 LLC Agreements effectuate a transfer of control over Northstar and SNR to DISH.

125.    In the *Competitive Bidding Fifth Order*, the Commission provided additional guidance on FCC requirements designed to ensure that bidding credits support genuinely qualified entities, "not those that are either proxies for larger investors or plan to become their subsidiaries."[269] The Commission offered the following example of an arrangement that would constitute a transfer of control:

> [If] an agreement between a strategic investor and a designated entity provides that (1) the investor makes debt financing available to the applicant on very favorable terms (e.g., 15 year-term, no payments of principal or interest for six years) and (2) [] the designated entity has a one-time put right that is exercisable at a time and under conditions that are designed to maximize the incentive of the licensees to sell (e.g., six years after issue, option to put partnership interests in lieu of payment of

[265] *See Northstar and SNR Order*, 30 FCC Rcd at 8935, para. 116.

[266] *Northstar and SNR Order*, 30 FCC Rcd at 8935, para. 116.

[267] *SNR Wireless*, 868 F.3d at 1033.

[268] *SNR Wireless*, 868 F.3d at 1033.

[269] *SNR Wireless*, 868 F.3d at 1034.

principal and accrued interest on a loan), we may conclude that *de facto* control has been relinquished.[270]

126.    In the *Northstar and SNR Order*, the Commission applied this analysis to the 2015 LLC Agreements and found that their put rights, combined with the repayment terms in the 2015 Credit Agreements, were designed to force Northstar and SNR into a sale or major refinancing with DISH—and hence effectuated a transfer of control.[271]

127.    The D.C. Circuit squarely agreed with this reasoning.[272]  The court described that under the 2015 Agreements, Northstar and SNR each held a one-time right at the end of the five-year designated entity holding period to require purchase by DISH at the price of their investment, and a "generous" annual rate of return.[273]  The court affirmed the conclusion that Northstar and SNR "would have every interest" in exercising this put right as the "only . . . path to avoiding certain financial failure."[274]  The D.C. Circuit described that the "facts in [the *Competitive Bidding Fifth Order*] example are materially identical to the facts" under the 2015 LLC and Credit Agreements.[275]

128.    On remand, the parties negotiated modifications to the LLC Managing Members' put rights by (1) expanding the duration of the put window after year five from 30 to 90 days; (2) adding a second put window after year six; and (3) adding a new window after year seven for a fair market value appraisal.[276]  The put price after year five remains the same: the LLC Managing Members' invested capital plus a {[        ]} rate of return.  At the new second put window after six years, the price is the LLC Managing Members' invested capital plus a {[

]}.

129.    As the Commission explained in the *Competitive Bidding Fifth Order*, "[w]e will look at the totality of circumstances in each particular case," to determine whether the arrangements "are designed financially to force the designated entity into a sale (or major refinancing)."[277]  Based on the record, we conclude that the 2018 LLC and Credit Agreements are not materially different in this respect from those that the D.C. Circuit agreed were sufficient to confer *de facto* control, including the put rights at year five that the court analyzed in its decision.

130.    We start with the 2018 LLC Agreements' carrot:  The put price during the 90-day period after year five remains equally "generous"—a {[              ]} rate of return on their investment.[278]  As of the adoption of this Memorandum Opinion and Order on Remand, that put window is currently open, and the LLC Managing Members still may choose to exercise their put rights during it.  But even if they do not, the put price after year six also offers a guaranteed rate of return of {[

]}.  And at both points, the generous payout to the LLC Managing Members is independent of the fair market value of the companies, does not depend on whether they have made any progress in

---

[270] *Competitive Bidding Fifth Order*, 10 FCC Rcd at 455-56, para. 95

[271] *See Northstar and SNR Order*, 30 FCC Rcd at 8929-8931, paras. 102-105.

[272] *See SNR Wireless*, 868 F.3d at 1034-35.

[273] *SNR Wireless*, 868 F.3d at 1034-35.

[274] *SNR Wireless*, 868 F.3d at 1034.

[275] *SNR Wireless*, 868 F.3d at 1034.

[276] Joint Opposition at 18; Northstar Submission on Remand at 15-17; SNR Comments at 16; *see also* Northstar 2018 LLC Agreement § 8.1; *accord* SNR 2018 LLC Agreement § 8.1.

[277] *Competitive Bidding Fifth Order*, 10 FCC Rcd at 456, para. 96.

[278] *See SNR Wireless*, 868 F.3d at 1034-35; Northstar 2018 LLC Agreement § 8.1; *accord* SNR 2018 LLC Agreement § 8.1.

deploying, using, or leasing their spectrum, and does not trigger DISH's priority rights as to its debt or preferred equity. In short, by exercising either the year-five or year-six put options, the LLC Managing Members receive healthy, above-market returns even if they have not constructed networks or repaid their loans (*i.e.*, with virtually zero risk).[279]

131.    Next we turn to the stick. As with the 2015 Agreements, "SNR and Northstar are committed to repayment terms that will be difficult, if not impossible, to manage unless they exercise their put option[s]."[280] Indeed, if the LLC Managing Members do not exercise their put rights, DISH exerts considerably control over whether they will see any return on their interests.

132.    DISH has the unilateral right to prevent the LLC Managing Members from transferring their interests for five years. Accordingly, during this period, the Applicants will be incurring additional interest on their $500 million outstanding loan and will be responsible for quarterly dividend payments that, if not paid, are added to DISH's face value and subject to compounding. These new financial obligations will be additional to what appear to be amounts still owed in the form of the interest that accrued on the full value of the initial loans during the three years before the parties negotiated the 2018 Agreements. Nonpayment of these mandatory quarterly dividend distributions will result in continuing dilution of any possible future right to profits by the Applicants.

133.    The Applicants' own projections (which assume that DISH provides no further debt to the Applicants for network buildout) confirm that the 2018 Agreements, like the 2015 Agreements, create an overwhelming incentive for the LLC Managing Members to exercise their put rights. According to those projections, during the first put window (*i.e.*, as of the date of this order), Northstar's outstanding obligation to DISH is $9.2 billion, and SNR's is $6.9 billion.[281] Even if we were to credit these projections—which we do not, given the Applicants' need for additional financing for network buildout—they amount to an approximately 10% reduction in Northstar's and SNR's respective obligations to DISH relative to the 2015 Agreements. This reduction does not materially change the calculation for the LLC Managing Members from that found by the Commission and the D.C. Circuit to support a finding of *de facto* control, based on the likelihood that each will choose the guaranteed rate of return on its investment by exercising the put right, rather than risk any return on its investments if it cannot generate enough revenue to satisfy its remaining multi-billion dollar obligation to DISH.

134.    That is especially so because DISH can make it difficult if not impossible for the Applicants to generate enough revenues to satisfy these obligations—whether by engaging in the capital-intensive buildout and operation of their networks by the deadline imposed under the Commission's rules[282] or by leasing their spectrum to other network providers. And even if DISH does provide funding to the Applicants for network buildout and operation, that will increase the Applicants' debt to DISH. Thus, DISH can materially influence the Applicants' financial position both before and after the five-year restriction on transfer expires.

135.    Even after the five-year transfer-prohibition window, any Deemed Liquidation Event triggers DISH's full prioritized distribution rights. Additionally, any transfer of 25% or more the LLC Managing Members' shares triggers a transfer of management rights to a new manager which DISH must approve. And finally, the LLC Managing Members are prohibited from transferring their interests to any DISH competitor (arguably any entity that operates in the telecommunications or adjacent markets).

---

[279] Northstar 2018 LLC Agreement § 8.1; *accord* SNR 2018 LLC Agreement § 8.1.

[280] *Northstar and SNR Wireless Order*, 30 FCC Rcd at 8930-31, para. 105.

[281] *See* Consolidated Opposition at 15 nn.34-35.

[282] For AWS-3 licenses, the interim buildout requirement for 40% of the licensed area population is six years (*i.e.*, October 2021) which coincides with the second put window. The final buildout requirement for 75% of such population is twelve years (*i.e.*, October 2027), or ten years (October 2025) if the licensee does not meet the interim buildout requirement. 47 CFR § 27.14(s).

Taken together, these provisions are likely to deter many prospective purchasers and also allow DISH to impose further roadblocks to at least some subset of the prospective purchasers (if any) who are not so deterred—by, for example, designating them competitors or denying approval for them to receive management rights.

136.    In these circumstances, the LLC Managing Members' opportunity to realize a guaranteed return on their investment at year five or year six still appears to be "designed to maximize the incentive of the [Applicants] to sell."[283]  The creation of the second put window and the extension of the put windows from 30 to 90 days does nothing to change these realities.

137.    The fact that the LLC Managing Members can now request market appraisals at the end of year seven also does not address our concerns.  If this occurs, DISH has the right, but not the obligation, to purchase all of the LLC Managing Members' interests.  And critically, the purchase price DISH would pay following the appraisals is calculated by subtracting DISH's debt and preferred equity from the fair market valuations before multiplying the remaining amount by the LLC Managing Members' common equity percentages.  In other words, under this scenario, the LLC Managing Members will earn a return on their investments only if the companies have achieved valuations that exceed their outstanding debt and equity obligations to DISH after seven years.  Moreover, here DISH holds the ability to tilt the scales as to whether the Applicants can generate revenues that would allow them to achieve such growth.  Indeed, the 2018 LLC Agreements implicitly recognize as much, since they state that in no event shall the purchase price following an appraisal be less than zero.[284]

138.    The Applicants argue that the LLC Managing Members' exercising their put rights is not inevitable, relying in part on testimony from an economic consultant (the Taylor Declaration) who claims that, depending on the value of spectrum, the LLC Managing Members' equity returns "could potentially" be greater than the value of their put rights.[285]  As a threshold matter, we find the arguments raised in this testimony to be foreclosed by the D.C. Circuit's decision in *SNR Wireless*, which found that the incentives created by the put rights were "virtually certain" to entice Northstar and SNR to sell their companies to DISH.[286]  To be sure, that would not be true had the Applicants and DISH made any material changes to the put rights at issue before the court.  But even after the criticisms identified by the Parties of Record, they did not elect to do so.  The Applicants' incentives to exercise their put rights at year five or six is not materially different now from what the Commission and the court found problematic before.  Nor do we see the slight expansion of the window for the put as a material change.

139.    In any event, we find this testimony both speculative and conclusory—and ultimately unpersuasive.

140.    The Taylor Declaration essentially argues that the Applicants' decisions at the end of year five and six will depend on the value of their spectrum holdings:  If that value is projected to increase to an extent similar to, or greater than, the rate of return from the put price, then the Applicants will hold the spectrum for other uses.[287]  The Taylor Declaration then goes on to identify reasons why these spectrum holdings may be expected to increase in value—because, among other things, spectrum values

---

[283] *See SNR Wireless*, 868 F.3d at 1035.

[284] Northstar 2018 LLC Agreement § 8.1(c)(ii); *accord* SNR 2018 LLC Agreement § 8.1(c)(ii).

[285] *See* Taylor Decl. at 2.  The Applicants alternatively now argue that to the extent they have experienced difficulty pursuing business opportunities, it is because "there is so much regulatory uncertainty regarding the potential application of the FCC's DE eligibility rules."  Applicants' 11-17-20 Summary at 10.  But there is no reason that the uncertainty surrounding licenses on which the Applicants chose to default should have affected their ability to buildout their networks or make plans in connection with particular markets or services with their existing portfolio of licenses.

[286] *See SNR Wireless*, 868 F.3d at 1035.

[287] *See* Taylor Decl. at 3-4, paras.7-8.

have steadily increased, demand for wireless services continues to increase, the industry is transitioning to 5G, and volatility benefits Northstar and SNR (since the put rights operate as a price floor for their spectrum interests).[288]

141.    The Taylor Declaration does not adequately account for the fact that the Applicants already owe a substantial debt to DISH from the accrued interest on the full loan amounts (from issuance through the modification of the agreements in 2018), and must make quarterly mandatory dividend payments to DISH or the LLC Managing Members' interests will lose value.  Given these obligations, the Applicants almost certainly needed to start generating revenue from their spectrum holdings well in advance of the put options.  The Taylor Declaration does not identify any activity that the Applicants have taken or are taking in the short term to monetize their holdings to prevent further dilution of the value of their common equity.[289]  Nor is there any other evidence on the record that the Applicants have pursued business opportunities that would have allowed them to satisfy some of their financial obligations to DISH:  As of October 5, 2020, neither SNR nor Northstar has entered into *any* lease of *any* of its many AWS-3 licenses.[290]

142.    The Taylor Declaration also suggests that the Applicants have a long runway because of their capital structure, which has no near-term debt maturities and permits in-kind payments for the mandatory quarterly distributions.[291]  But this conclusion overlooks the extent and operation of DISH's investor protections as well as other aspects of the 2018 LLC and Credit Agreements.[292]

143.    For example, the primary business model for the Applicants—building and operating a wireless network—is capital intensive, requiring the Applicants to incur further debt from DISH (which as noted above it may not be obligated to furnish in full) or to seek third-party unsecured funding (subject to DISH's veto when in "significant" amounts).  The Taylor Declaration states that DISH's consent rights would not prevent the Applicants from "working with third parties to buildout and operate the spectrum,"[293] without acknowledging the facts (1) that DISH may veto any "significant" third-party debt; or (2) that many prospective partners and purchasers may be deterred from such ventures by the parties' agreements and relationships (especially the companies' preexisting debt and DISH's priority interests).

144.    Likewise, the Taylor Declaration notes that the value of the Applicants' spectrum likely has increased because of its synergy with downlink spectrum holdings:  "The ability to pair the AWS-3 uplink spectrum with the AWS-4 downlink spectrum makes the AWS-3 uplink spectrum inherently more attractive and valuable to potential business partners or purchasers."[294]  But the 2018 LLC Agreement

---

[288] *See* Taylor Decl. at 4-6, paras.10-18.

[289] The fact that the Applicants both have "demonstrated experience and knowledge of the wireless industry," Opposition at 29-34, does not address our concern.  The qualifications of the Applicants' investors and executives are facts that we may consider among the totality of the circumstances.  But here, the Applicants' existing and future financial obligations to DISH, combined with DISH's control over their options for pursuing business opportunities, suggest that no team of investor or executives would be likely to shepherd the Applicants to any outcome other than exercising their put rights.

[290] Based on a review of the Commission's Universal Licensing System on Oct. 5, 2020.

[291] *See* Taylor Decl. at 2, para. 6 & n.4.

[292] Taylor's assertion that these are "limited" and "standard" rights, Taylor Decl. at 7, para. 20, is conclusory and does not change our analysis that these protections operate in tandem with other aspects of the parties' agreements and relationships to vest DISH with considerable control over the Applicants.

[293] Taylor Decl. at 7, para. 20.

[294] Taylor Decl. at 6, para. 17.  The Applicants recently described that during the COVID-19 pandemic, they have made their spectrum available to any wireless carrier that needed it to bolster capacity, and that AT&T and Verizon quickly integrated the spectrum into their network operations, demonstrating "the ease with which wireless carriers can readily use the spectrum."  Applicants' 11-4-20 Summary at 8.  But the fact that the Applicants were able to find

(continued....)

allows DISH (1) to veto any lease or sale of a "major asset" where assets include spectrum licenses;[295] and (2) to prohibit the LLC Managing Members from transferring any of their interests in the Applicants to any of DISH's competitors.[296]  These restrictions make it difficult, if not impossible, for the LLC Managing Members to monetize this feature of their spectrum with any entity other than DISH.[297]  In any event, two DISH subsidiaries are the exclusive holders of all of AWS-4 licenses with which the Taylor Declaration notes these licenses could be paired.[298]  This business option is thus wholly illusory.

145.    Finally, as noted above, the Taylor Declaration  overlooks the fact that DISH's investor protections in the 2018 LLC Agreements extend to the second "business option[]"[299] that Taylor identifies as viable for Northstar and SNR—*i.e.*, any leasing arrangements by the Applicants that involve leasing "major" assets (at a time when neither Applicant is yet operational or likely to have many if any other major assets) and that could thus be expected to generate significant revenues from leasing.

146.    These shortcomings persuade us that the Taylor Declaration does not reflect the totality of the circumstances, as required by our *de facto* control test, and does not meaningfully establish that Northstar and SNR have viable business options other than exercising their put rights.

### D.    Applicants' Reliance on Auction 97 and Other Bidding Credit Awards

147.    In the *Northstar and SNR Order*, the Applicants' primary argument was that they had "structured DISH's equity participation and its investor protections in accordance with various features contained in other applications [for bidding credits] previously granted by the Commission."[300]  The Commission rejected the argument, explaining that the Applicants had not "claim[ed] to have relied on any reported decisions in which the Commission staff—much less the Commission—has articulated any basis" for permitting bidding credits under similar circumstances.[301]  The Commission further held that "[t]o the extent any prior actions of Commission staff could be read to be inconsistent with [its] interpretation of the Commission's rules in the [*Northstar and SNR Order*], those actions are not binding on the Commission and are "disavow[ed]."[302]

148.    The Applicants' petition for review to the D.C. Circuit similarly "rest[ed] largely on the assertion that [the *Northstar and SNR Order*] . . . [could] not be squared with" purportedly "more specific guidance provided by two wireless Bureau actions approving applications" for bidding credits by Denali

---

(Continued from previous page)

carriers who could use their spectrum during the COVID-19 pandemic does not demonstrate that the Applicants have viable longer-term business opportunities with any entity other than DISH.  Moreover, VTel correctly points out that Northstar's and SNR's actions during the pandemic demonstrate that the spectrum is "lying fallow" and "on the sidelines" because the applicants have no plans to ensure the spectrum is quickly deployed.  Commenters' 11-4-20 Letter at 8-9.

[295] Northstar 2018 LLC Agreement §§ 1.1 (definition of "Significant Matter"), 6.3 (supermajority approval rights for "Significant Matters"); *accord* SNR 2018 LLC Agreement §§ 1.1, 6.3.

[296] Northstar 2018 LLC Agreement §§ 7.1(c), 7.2; *accord* SNR 2018 LLC Agreement §§ 7.1(c), 7.2.  *See* Commenters' 11-4-20 Letter at 5-6.

[297] DISH could invoke the same provision to prohibit a significant transfer of the spectrum (or interests therein) to broadcasters to pair with their broadcast spectrum for ATSC 3.0 operations.  *See* Taylor Decl. at 6, para. 17 n.12.

[298] *See Service Rules for Advanced Wireless Services in the 2000-2020 MHz and 2180-2200 MHz Bands*, WT Docket No. 12-70 et al., Report & Order and Order of Proposed Modification, 27 FCC Rcd 16102 (2012).  Confirmed by review of the Commission's Universal Licensing System on Oct. 5, 2020.

[299] Taylor Decl. at 4, para. 9.

[300] *Northstar and SNR Order*, 30 FCC Rcd at 8396, para. 118.

[301] *Northstar and SNR Order*, 30 FCC Rcd at 8397, para. 121.

[302] *Northstar and SNR Order*, 30 FCC Rcd at 8397, para. 121 n.354.

Spectrum and Salmon PCS.[303]  The D.C. Circuit rejected the Applicants' argument on two separate bases. Noting that the two applications cited by the Applicants had been "approved by the Bureau with a one-word action communicating that the application was 'granted,'" without any opinion or explanation, the court held that "the unexplained approvals of small business credits [in these cases] are non-precedential and [alternatively] do not detract from the FCC's decision here."[304]

149.    With respect to its primary holding that staff approvals of this kind are "non-precedential," the D.C. Circuit explained that "[t]he FCC is not bound to treat the provisions of agreements filed with a pair of long-form applications, which the Wireless Bureau administratively granted *without opinion or any public statement of reasons*, as if those provisions established a Commission position from which it could not deviate without reasoned explanation."[305]  The court further explained that there were no assurances "that the Commission [had] ever accepted those decisions as correct even on their own terms, nor even that the Commission [had] scrutinized the details of the filings on which petitioners . . . claim[ed] to rely."[306]  The court further noted its longstanding holding that "a lower component of a government agency does not bind the agency as a whole."[307]  And it concluded that "[t]he Commission is not required to approve applications for bidding credits just because the applicants modeled terms of their investor contracts on terms used by designated entity applicants the Wireless Bureau approved."[308]  With respect to its alternative holding, the D.C. Circuit held that the approvals were not "on all four with SNR and Northstar's" facts and circumstances.[309]

150.    The D.C. Circuit concluded, however, that the Bureau-level approvals cited by the Applicants were relevant to the question of whether the Applicants had received adequate notice that they would receive no opportunity to negotiate cures with DISH.  As the court explained, "Wireless Bureau staff have in earlier decisions repeatedly read the FCC's *de facto* control rules to permit large investors to exert significant influence over their small business partners."[310]  The court explained that such confusion "at the ground level" can suggest that an agency's interpretation of its own regulations fails to provide fair notice to regulated parties.[311]  Thus, the court concluded, the Applicants "had little basis on which to anticipate that a Commission that read the *de facto* control standard to prohibit DISH's powerful influence over [Applicants] would . . . deny [them] bidding credits . . . without at least offering them a chance to seek a cure."[312]

151.    Following the remand, the parties once again seek to support their contract modifications with agreements from Bureau-level grants of bidding credits issued *after* the *Northstar and SNR Order*.[313] According to the Applicants, these approvals involve "contractual passive investor protections that are consistent with, or provide more favorable protections than, Applicants' revised agreements provide to

---

[303] *SNR Wireless*, 868 F.3d at 1035.

[304] *SNR Wireless*, 868 F.3d at 1036.

[305] *SNR Wireless*, 868 F.3d at 1037 (emphasis added).

[306] *SNR Wireless*, 868 F.3d at 1037.

[307] *SNR Wireless*, 868 F.3d at 1037 (citations and quotation marks omitted).

[308] *SNR Wireless*, 868 F.3d at 1040.

[309] *SNR Wireless*, 868 F.3d at 1040.

[310] *See SNR Wireless*, 868 F.3d at 1044-45.

[311] *SNR Wireless*, 868 F.3d at 1045.

[312] *SNR Wireless*, 868 F.3d at 1045.

[313] Consolidated Opposition at 7; *see also* Northstar Submission on Remand at 24-38; SNR Comments at 9-17.

DISH."[314]  The Applicants also claim that these approvals "involved levels of indebtedness to large investors significantly greater, as a percentage of total winning bides, than the level of indebtedness to DISH that Applicants now have."[315]

152.	The Applicants' reliance on Bureau-level, unwritten approvals granting bidding credits to other auction winners is misplaced.  The Commission and D.C. Circuit have both found that such one-word, unexplained approvals cannot be precedential for the Commission, because, among other things, (1) the Commission is not bound by staff actions, (2) such approvals do not address or explain the merits of why there was no finding of *de facto* control; and (3) there is no basis to conclude that the Commission has independently analyzed the underlying agreements or factual circumstances and accepted or agreed with the Bureau's approval.

153.	The Applicants try to distinguish the D.C. Circuit's holding with respect to such Bureau-level approvals in two respects.  First, the Applicants argue, because the D.C. Circuit considered Bureau-level precedent to be relevant to the question of notice, it purportedly follows that the Commission may not penalize the Applicants for relying on other approvals absent fair notice that the Commission would reject the relevance of those approvals.[316]  Second, the Applicants argue, even if the Commission is not bound by Bureau decisions, the Bureau was bound by the *Northstar and SNR Order*, such that "[s]ubsequent Bureau decisions . . . must be read as consistent with [that order]."[317]

154.	As before, we conclude that one-word, unexplained Bureau-level approvals cited by the Applicants are not precedential—indeed, they are not "decisions" at all.  Moreover, the Applicants were undoubtedly aware that these approvals would not be precedential when they once again invoked other parties' agreement terms, rather than engaging in a substantive analysis of DISH's continuing control.  And when the Commission afforded them yet a further opportunity to restructure their agreements in light of the criticisms of the Parties of Record, they elected not to do so.

155.	We reject the Applicants' first argument—*i.e.*, that we must rely on Bureau-level approvals issued after the *Northstar and SNR Order*, absent a satisfactory reason for rejecting them, because the Commission somehow failed to provide fair notice that it would not rely on those approvals.  The Commission has repeatedly made clear—in the *Northstar and SNR Order* and in the Bureau's *Order on Remand* which the Commission largely affirmed—that the Commission would determine *de facto* control based on the specific facts and circumstances of each case, including the contractual provisions and economic relationships between particular parties.[318]  The D.C. Circuit affirmed this approach to evaluating *de facto* control in *SNR Wireless* and rejected the Applicants' prior iteration of this same argument.[319]  Accordingly, the Applicants' first argument is now foreclosed.

---

[314] Consolidated Opposition at 19; *see also id.* at 19-24; Northstar Submission on Remand 24-25, 27-38; SNR Comments at 9-11, 14-17.

[315] Consolidated Opposition at 19; *see also* Northstar Submission on Remand at 25-27; SNR Comments at 11-14.

[316] See Consolidated Opposition at 22.

[317] Consolidated Opposition at 22.

[318] In the *Northstar and SNR Order*, the Commission used the phrase "totality of circumstances," or some variation thereof, a total of eighteen times.  And in the *Order on Remand*, the Bureau noted that the Commission had "analyzed the relationship between the Applicants and DISH and articulated its findings in detail" as to "specific features of the relationship[s] between each Applicant and DISH, as evidenced by their various corporate agreements and by their bidding behavior throughout the auction."  *Order on Remand*, 33 FCC Rcd at 232, para. 4.

[319] *See SNR Wireless*, 683 F.3d at 1038 (rejecting argument that the FCC has an obligation to follow Wireless Bureau precedent because the Auction Notice directed participants to Bureau precedent for further guidance on questions of control).

156.    We likewise reject the Applicants' second argument—*i.e.*, that because the Bureau is bound by the Commission, subsequent Bureau approvals must be read as consistent with the *Northstar and SNR Order*, and therefore any agreements based on those subsequent Bureau approvals also must be read as consistent with the *Northstar and SNR Order*.  As before, these unwritten approvals do not offer any reasoning as to why the Bureau found there to be no *de facto* control problems; hence any reliance on isolated provisions in the underlying agreements is misplaced.  Moreover, given the repeated emphasis in the *Northstar and SNR Order* on the flexible approach to *de facto* control required by the totality-of-the-circumstances test, regulated parties had ample notice that Bureau-level approvals could not be reasonably relied upon as controlling given different facts and circumstances.  Yet the Applicants continue to rely on such non-binding, non-decisional, and non-precedential actions by Commission staff.

157.    The D.C. Circuit was very clear in its decision that such one-word, unexplained approvals are not precedential or binding on the Commission—and cannot be reasonably relied upon as precedential by other bidding credit applicants.  In any event, to the extent any such staff grants could be viewed as inconsistent with our determination here, we expressly disavow them.

## IV.    ORDERING CLAUSES

158.    ACCORDINGLY, IT IS ORDERED that, pursuant to section 4(i) and 309(j) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 309(j) and section 27.1106 of the Commission's rules, 47 C.F.R. § 27.1106, Northstar Wireless, LLC request for a very small business designated entity bidding credit in connection with file numbers 0006670613 and 0008243409 is DENIED.

159.    IT IS FURTHER ORDERED that, pursuant to section 4(i) and 309(j) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 309(j) and section 27.1106 of the Commission's rules, 47 C.F.R. § 27.1106, SNR Wireless License Co request for a very small business designated entity bidding credit in connection with file numbers 0006670667, 0008243669 is DENIED

160.    IT IS FURTHER ORDERED that the Motion to Strike or Dismiss T-Mobile's "Response of T-Mobile USA, Inc. to Consolidated Opposition" filed by Northstar Wireless, LLC and SNR Wireless LicenseCo, LLC IS GRANTED.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**STATEMENT OF**
**COMMISSIONER MICHAEL O'RIELLY**
**CONCURRING IN PART AND DISSENTING IN PART**

Re:     *Northstar Wireless, LLC,* File Nos. 0006670613, 0008243409; *SNR Wireless LicenseCo, LLC,* File Nos. 0006670667, 0008243669; *Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands*, Report No. AUC-97AUC

When I first voted on the designated entity status of SNR and Northstar in August 2015, I agreed with the analysis that DISH exercised effective control over these two auction participants, making them ineligible for bidding credits. The order detailed how the actions of the entities during the auction and the agreements entered into by the parties were not consistent with the Commission's rules. In reviewing this decision, the U.S. Court of Appeals for the D.C. Circuit generally agreed with the Commission's findings but remanded the case due to a failure to allow the parties the opportunity to cure their previous filings. Accordingly, the parties have since amended certain agreements in an attempt to come into compliance with the Commission's rules. While I appreciate their efforts, I agree that these revisions are insufficient to warrant a finding that DISH lacks the ability to unduly influence SNR and Northstar's operations and decision making.

The Commission's fact-based designated entity determinations are, under even best-case scenarios, far from a perfect process, and I am sympathetic to the frustrations of all those involved. But, these were the rules in place at the time, and it is unfortunate that our case-by-case analysis did not give applicants the certainty or transparency they wanted, either prior to the auction or in response to their eligibility being challenged.

These procedural flaws were exaggerated, in this case, because the process has inexplicably been mishandled and dragged out for over five years. While litigation always takes time, the Commission voted in July 2018 on the process to expedite our final decision in response to the court's August 2017 remand. It is now well over two years after the Commission voted on the remand order. All parties deserve quick responses from the Commission, whether they agree with our decisions or not, and whether we agree with the Court or not. Entities need to be able to make business decisions not only about their spectrum needs but about capital expenditures, and we keep them in limbo by failing to adequately respond in a timely fashion. Additionally, letting licenses sit dormant for long stretches of time is very problematic. Everyone deserves better.

For these reasons, I concur in the outcome of today's item, but dissent in part with respect to the extremely flawed process.

## STATEMENT OF
## COMMISSIONER GEOFFREY STARKS
## CONCURRING

Re:     *Northstar Wireless, LLC,* File Nos. 0006670613, 0008243409; *SNR Wireless LicenseCo, LLC,* File Nos. 0006670667, 0008243669; *Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands*, Report No. AUC-97AUC

Nearly 30 years ago, Congress directed the Commission, in establishing its competitive bidding rules for wireless spectrum licenses, to "promot[e] economic opportunity and competition and ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women."[320]  Congress further directed the Commission to promote economic opportunity for those same groups and ensure their participation in the provision of spectrum-based services, including by considering the use of "tax certificates, bidding preferences and other procedures."[321]

While the current agreements between DISH and the companies in this case may have fallen short of our *de facto* control prohibitions, I reiterate my support for the Commission's Designated Entity program and its accompanying rules.  Congress has made it clear that diversity among Commission licensees is critical.  The Designated Entity program seeks to create economic opportunities so that our country's wireless spectrum isn't strictly controlled by a few large carriers.  We must do better.

---

[320] 47 U.S.C. 309(j)(3)(B).

[321] *Id.* at 309(j)(B)(4).