**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERMONT NATIONAL TELEPHONE CO., | |
| Plaintiff-Relator, | |
| v. | Civil Action No. 15-0728 (CKK) |
| NORTHSTAR WIRELESS LLC, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**
(March 23, 2021)

The Federal Communications Commission ("FCC") uses public auctions to allocate spectrum licenses to telecommunications companies. But to prevent the overconcentration of spectrum licenses in large corporations, the FCC provides auction bidding credits to certain "designated entities," including small businesses. These bidding credits level the playing field by offering small businesses a discounted rate on the spectrum licenses they win at auction. To ensure the appropriate distribution of these bidding credits, the FCC requires small businesses to make accurate certifications regarding their gross revenues and their independence from external control.

In this *qui tam* action, Plaintiff-Relator Vermont National Telephone Company ("Vermont Telephone") alleges that DISH Network and its affiliates (collectively, "Defendants")[1] manipulated the FCC's auction rules to secure fraudulent small business discounts on spectrum licenses. As alleged, DISH Network created two shell companies to procure discounted spectrum

---

[1] In total, Vermont Telephone names eighteen Defendants in this law suit: Northstar Wireless, L.L.C. ("Northstar Wireless"); Northstar Spectrum, L.L.C. ("Northstar Spectrum"); Northstar Manager, L.L.C. ("Northstar Manager"); Doyon, Limited ("Doyon"); Miranda Wright; Allen M. Todd; SNR Wireless LicenseCo, L.L.C. ("SNR Wireless"); SNR Wireless HoldCo, L.L.C. ("SNR HoldCo"); SNR Wireless Management, L.L.C. ("SNR Management"); Atelum L.L.C. ("Atelum"); John Muleta; American AWS-3 Wireless I L.L.C. ("American I"); American AWS-3 Wireless II L.L.C. ("American II"); American AWS-3 Wireless III L.L.C. ("American III"); and DISH Wireless Holding L.L.C. ("DISH Holding"), DISH Network Corporation ("DISH Network"), Charles W. Ergen, and Cantey M. Ergen. The Court will discuss the relationships between these parties in detail below.

licenses at auction, while maintaining secret agreements with those shell companies that allowed DISH Network to use their discounted spectrum for its own national telecommunications network. Vermont Telephone asserts that DISH Network and its shell companies failed to disclose these secret agreements to the FCC, with the intention of preserving the shell companies' putative eligibility for small business discounts.

Based on these allegations, Vermont Telephone raises three claims under the False Claims Act, 31 U.S.C. § 3729, *et seq.*  In Count I, Vermont Telephone asserts a cause of action for an "affirmative" false claim.  In Count II, Vermont Telephone asserts a cause of action for a False Claims Act "conspiracy."  And finally, in Count III, Vermont Telephone asserts cause of action for a "reverse false claim."  In response, Defendants have now jointly moved to dismiss Vermont Telephone's *qui tam* action in its entirety.  Upon consideration of the briefing, the relevant authorities, and the record as a whole,[2] the Court will **GRANT** Defendants' motion and **DISMISS** Vermont Telephone's Amended Complaint in full.  As set forth herein, the Court concludes that the "government-action bar" and the demanding materiality standard of the False Claims Act both compel dismissal.

---

[2] The Court's consideration has focused on the following briefing and material submitted by the parties:

- Am. Compl., ECF No. 76;
- Defs.' Jt. Mot. to Dismiss ("Defs.' Mot."), ECF No. 77;
- Relator's Mem. in Opp'n to Defs.' Mot. ("Rel.'s Opp'n"), ECF No. 78;
- Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), ECF No. 80;

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

# I. BACKGROUND

The Court sets forth the relevant factual background below.  At the pleading stage, the Court's factual background derives from the well-pleaded allegations in Vermont Telephone's Amended Complaint.  *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 314–15 (D.C. Cir. 2014).  The Court also considers those facts properly subject to judicial notice and documents incorporated by reference into the pleadings.  *See Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017).

## A.  FCC Spectrum Auctions

"The electromagnetic spectrum is 'the range of electromagnetic radio frequencies used to transmit sound, data, and video across the country.'"  *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1025 (D.C. Cir. 2017) (quoting FCC, *About the Spectrum Dashboard*, http://reboot.fcc.gov/reform/systems/spectrum-dashboard/about).  Control over portions of the spectrum is "highly valuable," Am. Compl. ¶ 43, as it permits companies to "transmit sound, data, and video" through specific frequencies, thereby enabling "them to provide television, cell phone, and wireless internet service to consumers," *SNR Wireless*, 868 F.3d at 1025.  "In 1993, Congress authorized the FCC to use auctions to allocate spectrum licenses."  *Id.* (citing 47 U.S.C. § 309(j)(1)).  For the purposes of these auctions, the FCC divides spectrum into a variety of marketable blocks based on specific geographic regions and frequencies.  *See* Am. Compl. ¶ 43.

The Communications Act of 1934 ("Communications Act") sets forth certain objectives for the FCC to consider when establishing the bidding processes for these spectrum licenses. Section 309(j) of the Communications Act, for example, states that the FCC must, among other things, "ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision

of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures." 47 U.S.C. § 309(j)(4)(D).   Similarly, Section 309(j) states that the FCC should design a system of competitive bidding that promotes "economic opportunity and competition . . . by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women." *Id.* § 309(j)(3)(B); *see also* Am. Compl. ¶ 46.

"Consistent with those statutory instructions, FCC regulations provide that the Commission may encourage 'designated entities,' including small businesses, to participate in spectrum auctions by giving them bidding credits, *i.e.* discounts that may be used to cover part of the cost of any licenses those businesses win." *SNR Wireless*, 868 F.3d at 1026 (quoting 47 C.F.R. § 1.2110(a), (f) (2012)); *see also* Am. Compl. ¶¶ 46–56.  FCC regulations also specify, however, "that bidding credits can only be used by genuine small businesses—not by small sham companies that are managed by or affiliated with big businesses." *SNR Wireless*, 868 F.3d at 1026 (citing 47 C.F.R. § 1.2110(b)–(c)).  Moreover, "federal 'anti-trafficking' and 'unjust enrichment' restrictions prevent licensees from earning speculative profits through post-auction resale of discounted licenses." Am. Compl. ¶ 75.

## B.  Public Notice of Auction 97

This case involves a specific FCC spectrum auction, Auction 97.  The FCC announced Auction 97 in a public notice on May 19, 2014.  *SNR Wireless*, 868 F.3d at 1026.  Then, "[o]n July 23, 2014, the FCC's Wireless Telecommunications Bureau . . . published the procedures for the auction," *id.*, which was to include an "auction of 1,614 Advanced Wireless Services licenses in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz bands" of spectrum (collectively, the

"AWS-3" bands), *Auction of Advanced Wireless Servs. (Aws-3) Licenses Scheduled for Nov. 13, 2014* ("*Auction Notice*"), 29 F.C.C. Rcd. 8386, ¶ 1 (2014); *see also* Am. Compl. ¶ 2.  The FCC scheduled Auction 97 to begin on November 13, 2014 and stipulated that all potential bidders must apply to participate by submitting an FCC "short-form" application, also known as a "Form 175," by September 12, 2014.  *See Auction Notice*, 29 F.C.C. Rcd. at ¶ 4; 47 C.F.R. § 1.2105(a); Am. Compl. ¶ 16.

All Auction 97 applicants bore "full responsibility for submitting accurate, complete and timely short-form applications," and "certify[ing] on their short-form applications under penalty of perjury that they [we]re legally, technically, financially and otherwise qualified to hold a license." *Auction Notice*, 29 F.C.C. Rcd. at ¶ 65.  In particular, the FCC required Auction 97 applicants to disclose all joint bidding agreements on their short-form applications.  *See id.* at ¶¶ 23–25.  At the time of the Auction Notice, FCC regulations prohibited auction applicants from "cooperating or collaborating" during the bidding process, "unless such applicants [we]re members of a bidding consortium or other joint bidding arrangement identified on the bidder's short-form application . . . "  47 C.F.R. § 1.2105(c)(1) (2013).  Accordingly, the Auction Notice for Auction 97 required any applicant to disclose in its short-form application "all real parties in interest with whom it ha[d] entered into any agreements, arrangements, or understandings of any kind relating to the licenses being auctioned, including any agreements relating to post-auction market structure." *Auction Notice*, 29 F.C.C. Rcd. at ¶ 69.

On their short-form applications, Auction 97 applicants could also claim eligibility for "small business bidding credits."  *Id.* at ¶ 80.  A potential "bidder with attributed average annual gross revenues that d[id] not exceed **$40 million** for the preceding three years w[ould] receive a **15 percent discount** on its winning bid," and a potential "bidder with attributed average annual

gross revenues that d[id] not exceed **$15 million** for the preceding three years w[ould] receive a **25 percent discount** on its winning bid." *Id.* at ¶ 82 (emphasis added).  The Auction Notice and FCC regulations required bidders applying for these "small business" bidding credits to include within their qualifying gross revenue calculations the revenues of any "individuals [or] entities with either *de facto* or *de jure* control of the applicant."  *Auction Notice*, 29 F.C.C. Rcd. at ¶ 85; *see also* 47 C.F.R. § 1.2110(b) (2012).  Any Auction 97 applicant seeking bidding credits was also required to certify in its short-form application that it was a "designated entity," duly qualified to receive these bidding credits.  Am. Compl. ¶ 58(a) (citing 47 C.F.R. § 1.2105(a)(2)(iv)).  The FCC, however, "does not substantially review [designated entity] eligibility claims until" after the auction.  *In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887, ¶ 130 (2015); *see also* Am. Compl. ¶ 113.

Auction 97 ultimately concluded on January 29, 2015, "with 31 winning bidders winning a total of 1,611 licenses." *Auction of Advanced Wireless Servs. (Aws-3) Licenses Closes* ("*Closing Public Notice*"), 30 F.C.C. Rcd. 630, ¶ 1 (2015).  On January 30, 2015, the FCC issued a notice requiring each winning bidder to submit a "long-form" application (an "FCC Form 601"), by February 13, 2015.  *See id.* at ¶ 27.  In their long-form applications, winning bidders "were again required to demonstrate their eligibility" for the bidding credits they claimed in their pre-auction short-form applications.  Am. Compl. ¶ 71.  "The long-form application also require[d] the bidders to verify the information in their ownership disclosure report that previously was submitted with their short-form[]" applications, including "verification of disclosures with respect to bidding agreements."  *Id.* ¶ 72; *see also* 47 C.F.R. § 1.2107(b).  "At the time of submitting its [long-form application]," a winning bidder was also required to "have on file with the Commission a current

ownership disclosure information report (FCC Form 602) providing the applicant's complete and accurate ownership information." *Closing Public Notice*, 30 F.C.C. Rcd. at ¶ 30.

For payment, the FCC required winning bidders to deposit "twenty percent of the aggregate net amount of its winning bids" by February 13, 2015 and "the balance of the net amount of its winning bid(s)" by March 2, 2015. *Id.* at ¶¶ 5, 8. The FCC would then grant spectrum licenses to the winning bidders "after full and timely payment of any winning bids (and any applicable late fees) and a determination that the long-form application met Commission requirements for grant." *Id.* at ¶ 24. As made clear in the January 30, 2015 *Closing Public Notice*, however, the FCC "review[ed] an applicant's long-form application only after receipt of full and timely payment for the winning bid amount and any applicable late fees." *Id.*

## C. Defendants' Participation In Auction 97

Vermont Telephone alleges that Defendants used a "complex chain" of corporate controls to distort the competitive bidding in Auction 97 and procure spectrum licenses at a fraudulent discount. Am. Compl. ¶ 5. As described in further detail below, Vermont Telephone alleges that DISH Network utilized two shell companies, Northstar Wireless and SNR Wireless, to secure FCC spectrum licenses with "very small business" discounts, while ultimately retaining control of those companies and the licenses they won.

### 1. Defendants and Their Corporate Structure

In total, Vermont Telephone's theory of fraud implicates eighteen separate Defendants, three of whom were Auction 97 participants. To better illustrate Vermont Telephone's theory of how these parties defrauded the FCC during Auction 97, the Court will first describe the alleged relationships between this web of corporate entities. In the Amended Complaint, Vermont Telephone presents Defendants' corporate relationships graphically, as follows:



### a.  DISH-Controlling Defendants

Vermont Telephone's theory begins with four Defendants—(1) DISH Network, (2) Mr. Charles Ergen, (3) Mrs. Cantey Ergen, and (4) DISH Holding—which Vermont Telephone describes collectively as the "DISH-Controlling Defendants."  At the top of Vermont Telephone's alleged chain of corporate control is DISH Network.  *See* Am. Compl. ¶ 37.  DISH Network is a publicly traded telecommunications company incorporated in Nevada, *see id.*, which generates billions of dollars in annual revenues, *see SNR Wireless*, 868 F.3d at 1025.  Next, Vermont Telephone includes Mr. Charles Ergen and Mrs. Cantey Ergen as Defendants in this case and parties to the alleged Auction 97 fraud.  At the time of Auction 97, Mr. Ergen was the Chairman of the Board of Directors for DISH Network.  *See* Am. Compl. ¶ 33.  Mr. Ergen and his wife Mrs. Cantey Ergen "together beneficially own an approximately 51 percent equity interest and 85 percent voting interest in DISH [Network]."  *Id.* ¶ 38.  Finally, beneath the Ergens and DISH

Network rests another corporate entity, DISH Holding.  *Id.* ¶ 36.  DISH Holding is a limited liability company formed under the laws of Colorado and a wholly-owned subsidiary of DISH Network.  *See id.* ¶¶ 36–37.  "The address for both DISH Holding and its Registered Agent, Timothy Allen Messner, is listed as 9601 S. Meridian Blvd., Englewood, Colorado 80112."  *Id.* ¶ 36.  According to Vermont Telephone, these four "DISH-Controlling Defendants" led a coordinated and fraudulent bidding strategy during Auction 97, using three subsidiaries as auction participants: American I, Northstar Wireless, and SNR Wireless.

### b.  American I (Auction 97 Participant #1)

The first of the three Auction 97 participants under the control of the "DISH-Controlling Defendants" was a company called American I.  *See id.* ¶¶ 32–36.  American I is a limited liability company formed under the laws of Colorado "at the direction of the DISH-Controlling Defendants on or about August 22, 2014."  *Id.* ¶ 32.  American I is also a wholly-owned direct subsidiary of DISH Holding.  *See id.* ¶ 36.  Like DISH Holding, American I "lists both its principal office address and the address of its Registered Agent, Timothy Allen Messner, as 9601 S. Meridian Blvd., Englewood, Colorado 80112."  *Id.* ¶ 32.  Moreover, American I "list[ed] Defendants Cantey M. Ergen, Charles W. Ergen, DISH [Network], and DISH Holding as its disclosable interest holders," *id.* ¶ 34, and identified Mr. Ergen as one of its authorized bidders for Auction 97, *see id.* ¶ 33.  "Aside from its activity in Auction 97, American I is engaged in no other lines of business, and has no operations, assets, or revenues."  *Id.* ¶ 35.

### c.  Northstar Wireless (Auction 97 Participant #2)

The next Auction 97 participant, allegedly under the control of the "DISH-Controlling Defendants," is Northstar Wireless.  Northstar Wireless was formed as a limited liability company under Delaware law on or about September 4, 2014, "eight days before the September 12, 2014

deadline to file an application to participate in the FCC's Auction 97." *Id.* ¶ 16.  According to Vermont Telephone, Northstar Wireless was formed "at the direction of the DISH-Controlling Defendants," *id.*, and "[a]side from its activity in Auction 97, Northstar Wireless is engaged in no other lines of business, and has no other operations, assets, or revenues," *id.* ¶ 23.

Northstar Wireless has a "sole member and Manager," another corporate entity called Northstar Spectrum.  *Id.* ¶ 17.  Northstar Spectrum, itself, was formed on or about September 3, 2014, approximately one day before the formation of Northstar Wireless.  *Id.*  In turn, Northstar Spectrum has two controlling members: Northstar Manager and American II.  *See id.* ¶¶ 19–20. "American II is a limited liability company that was formed at the direction of the DISH-Controlling Defendants under the laws of Colorado on August 22, 2014. The address for both American II and its Registered Agent, Timothy Allen Messner, is listed as 9601 S. Meridian Blvd., Englewood, Colorado 80112.  Timothy Allen Messner [also] serves as Executive Vice President and General Counsel of DISH [Network]."  *Id.* ¶ 19.  American II holds 85% of all member interests in Northstar Spectrum, *see id.*, and American II itself is a "wholly-owned, direct subsidiar[y] of Defendant DISH Holding," *id.* ¶ 36, which in turn is a wholly-owned subsidiary of DISH Network.

The remaining 15% of the member interests in Northstar Spectrum is held by another Delaware limited liability company, Northstar Manager.  *See id.* ¶ 20.  Northstar Manager was registered at the direction of the DISH-Controlling Defendants on September 3, 2014 and shares the same business address as Defendants Northstar Spectrum and Northstar Wireless.  *See id.* Defendant Doyon, yet another corporate entity, "holds 40.1 percent of all member interests" in Northstar Manager.  *Id.* ¶ 21.  Doyon is not a telecommunications company, but rather "an Alaska Native Regional Corporation with numerous affiliates in various fields including oil and gas land

drilling, natural resource development, government contracting, and tourism." *Id.* Defendant Allen M. Todd is Doyon's registered agent and Defendant Miranda Wright is Doyon's director and treasurer. *Id.* ¶¶ 21–22.

### d. SNR Wireless (Auction 97 Participant #2)

The third and final corporate participant in Auction 97 allegedly under the control of the DISH-Controlling Defendants is SNR Wireless. SNR Wireless is a Delaware limited liability company allegedly formed at the direction of the DISH-Controlling Defendants "on or about August 29, 2014, fourteen days before the September 12, 2014 deadline to file a Short-Form application to participate in Auction 97." *Id.* ¶ 24. SNR Wireless's business address is listed as 200 Little Falls Street, Suite 102, Falls Church, Virginia, 22046. *Id.* "Aside from its activity in Auction 97, SNR Wireless is engaged in no other lines of business, and has no operations, assets, or revenues." *Id.* ¶ 31.

The sole manager member of SNR Wireless is a Delaware limited liability company called SNR HoldCo, which was formed at the direction of the DISH-Controlling Defendants. *Id.* ¶ 25. SNR HoldCo was formed on the same day as SNR Wireless—August 29, 2014—and shares the same listed address as SNR Wireless. *See id.* In turn, 85% percent of all member interests in SNR HoldCo is controlled by another corporate entity, American III. *See id.* ¶ 27. Like American II, which controls 85% of Northstar Wireless, *see* disc. *supra* at 10, "American III is a limited liability company that was formed at the direction of the DISH-Controlling Defendants under the laws of Colorado on or about August 22, 2014." *Id.* American III's "principal office address and the address of its Registered Agent, Timothy Allen Messner, are listed as 9601 S. Meridian Blvd., Englewood, Colorado 80112, and "Timothy Allen Messner serves as Executive Vice President and General Counsel of DISH [Network]." *Id.* Also like American II, American III is a wholly-

owned subsidiary of DISH Holding, which is itself a wholly-owned subsidiary of DISH Network. *See id.* ¶¶ 36–37.

The remaining 15% member interests in SNR HoldCo is held by SNR Management, another Delaware limited liability company formed at the direction of the DISH-Controlling Defendants. *See id.* ¶ 28. SNR Management "shares the same business address as Defendants SNR HoldCo and SNR Wireless, as well as the same date of formation—August 29, 2014, fourteen days before the Short-Form application filing deadline for Auction 97." *Id.* The sole manager of SNR Management is a Virginia limited liability company called Atelum, which is a consulting firm sharing the same address as SNR Wireless, SNR HoldCo and SNR Management. *See id.* ¶ 29. Defendant John Muleta is the sole member and CEO of Atelum. *See id.* ¶ 30. Mr. Muleta also holds a 7.73% member interest in SNR Management. *Id.*

## 2. Defendants' Pre-Auction Conduct

In the time leading up to Auction 97, DISH Network (the large public company at the top of Vermont Telephone's alleged corporate chain) "publicly expressed to investors the great value of nationwide spectrum for its own business, and regularly updated investors of its larger goal to aggressively acquire additional valuable spectrum through the FCC auction process and to use the acquired spectrum to advance its own business interests." Am. Compl. ¶ 77. For example, in successive quarterly earning calls in 2014, Defendant Charles Ergen forecasted the aggressive approach DISH Network would take in future spectrum auctions. *See id.* ¶¶ 79–80.

In accordance with these statements, American I—DISH Network's wholly-owned subsidiary—submitted an FCC short-form application on September 12, 2014 to participate in Auction 97. *See id.* ¶ 81. Therein, American I disclosed that it is "a wholly-owned subsidiary of DISH Holding, which is a wholly-owned subsidiary of DISH [Network], and that Charles and

Cantey Ergen beneficially hold Class A and Class B common stock of DISH [Network], representing an approximately 51 percent equity interest, and 85 percent voting interest, in DISH [Network] and indirectly in . . . American I." *Id.* ¶ 86.  American I also listed Mr. Charles Ergen as an authorized bidder for Auction 97.  *Id.* ¶ 33.  American I, however, did not apply for any bidding credits, *i.e.,* auction discounts, as a "designated entity" in its short-form application.  *See id.* ¶ 86.

Also on September 12, 2014, both SNR Wireless and Northstar Wireless submitted their own respective short-form applications to participate in Auction 97.  *See id.* ¶ 81.  But unlike American I, these two companies *did* apply for auction bidding credits as "designated entities." Specifically, SNR Wireless and Northstar Wireless "each represented in its [short-form] application that its respective average gross annual revenues, aggregated with the gross revenues of its affiliates, controlling interests, the affiliates of those controlling interests, and the entities with which it had an attributable material relationship, did not exceed $15 million for the three years preceding its [short-form] application."  *Id.* ¶ 82.  These revenue calculations qualified Northstar Wireless and SNR Wireless as "very small businesses" entitled to a 25% discount on successful spectrum bids during Auction 97.  *See Auction Notice*, 29 F.C.C. Rcd. 8386, ¶ 82 (2014).  Defendants Miranda Wright and Allen Todd certified the accuracy of Northstar Wireless's short-form application, while Defendant John Muleta certified the accuracy of SNR Wireless's short-form application.  *See* Am. Compl. ¶¶ 83–84.

In their short-form applications for Auction 97, Northstar Wireless and SNR Wireless also "reported numerous agreements" between them and DISH Network, *In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887, ¶ 13 (2015), including "the existence of multiple bidding agreements," Am. Compl. ¶ 87.  For example, both Northstar Wireless and SNR Wireless disclosed

the existence of a "Bidding Protocol and Joint Bidding Arrangement" with American I.  *See id.*; Defs.' Mot. at 7 (citing short-form applications).  Therein, Northstar Wireless and SNR Wireless agreed to a "joint bidding arrangement" with American I, "under which they w[ould] undertake to coordinate bidding for licenses in Auction 97 . . . to facilitate coordination of their systems." Northstar Wireless, Form 175 (Ex. C), at 27; *see also* SNR Wireless, Form 175 (Ex. E), at 26.[3]

SNR Wireless, Northstar Wireless, and American I also entered into a "Letter Agreement," which they disclosed to the FCC on their short-form applications for Auction 97 as well.  Am. Compl. ¶ 89.  The Letter Agreement disclosure explained that the three bidding Defendants had agreed to a "joint bidding arrangement under which they may coordinate bidding in Auction 97 to fulfill their respective strategic purposes," which included compliance with "spectrum aggregation limits," the facilitation of "roaming arrangements," and system consolidation amongst the parties. *See, e.g.*, SNR Wireless, Form 175 (Ex. E), at 26.  The Letter Agreement disclosure further stated that DISH Network "holds a 100 percent ownership in American I and 85 percent indirect equity interests in Northstar Wireless and SNR Wireless . . . through American II and American III, respectively." *Id.* at 27.  Lastly, three bidding Defendants disclosed to the FCC that they "will be deemed to have knowledge of the other's bids or bidding strategies" during Auction 97, and that their joint bidding arrangements "contemplate that American I, American II, and/or American III will coordinate regarding bids, bidding strategy and post-auction market structure. . . . " *Id.*  Both Northstar Wireless and SNR Wireless certified in their September 12, 2014 short-form applications that they had disclosed all agreements relevant to their "designated entity" status as "very small businesses," entitled to Auction 97 bidding credits.  *See, e.g.*, Am. Compl. ¶¶ 90, 124–27.

---

[3] The Auction 97 short-form applications for Northstar Wireless and SNR Wireless may be accessed at: https://auctionfiling.fcc.gov/form175/search175/index.htm.

### 3.   Defendants' Conduct During Auction 97

American I, Northstar Wireless, and SNR Wireless each qualified as bidders for Auction 97.  When it began, Auction 97 "was conducted as a simultaneous multiple-round auction.  Every available block [of spectrum] was offered for bid at the same time, and participants placed bids on individual licenses in successive bidding rounds until no further bid was made on any available block."  Am. Compl. ¶ 64.  "Before the commencement of bidding, each potential bidder was required to purchase refundable bidding units sufficient to permit participation in the auction of all blocks on which it wanted to bid."  *Id.* ¶ 65.  "Northstar Wireless purchased $508 million worth of bidding units, and SNR Wireless purchased $412 million worth of units," each company allegedly using funds from the DISH-Controlling Defendants to purchase these bidding units.  *Id.*

According to Auction 97 rules, a "provisional winning bid" ("PWB") was determined at the end of each bidding round for each respective spectrum license at auction.  *Id.* ¶ 66.  "In the event of identical high bids, the tiebreaker was the highest random number that the FCC attached to each bid upon submission.  Losers of the tiebreaker then could give up on that particular block or submit a higher bid in a subsequent round."  *Id.*  "Each bidding round was followed by a release of the round results to apprise participants of the bid amounts," but "[b]idding results were reported anonymously," meaning that "bidders were informed how many bids had been placed and the amount of those bids, but they could not identify the other bidders."  *Id.* ¶ 67.  "After all bidding ended, the FCC issued a public notice declaring the auction closed, identifying the winning bidders, and setting forth the deadlines for down payments, final payments, Long-Form applications, and ownership disclosure information reports."  *Id.* ¶ 69.

Within this auction framework, Vermont Telephone alleges that American I, Northstar Wireless, and SNR Wireless coordinated a bidding scheme at the direction of the DISH-

Controlling Defendants to ensure that Northstar Wireless and SNR Wireless won spectrum licenses at a discount. *See id.* ¶¶ 91–92. "Once the bidding commenced, the DISH-Controlling Defendants implemented a strategy of overlapping bidding by Northstar Wireless, SNR Wireless, and American I in order to create the illusion of high demand on blocks sought by the DISH-Controlling Defendants and to deter competitors from bidding on those blocks." *Id.* ¶ 92. The three bidding Defendants would allegedly "bid on the same licenses in the same rounds, and due to the anonymity accorded bidders, created the appearance of intense competition for those licenses," driving competing bidders away. *Id.* Then, "[o]nce the DISH-Controlling Defendants were able to eliminate competitors for the spectrum they sought, American I—the non-designated-entity applicant—dropped out of the bidding and 'handed off' the spectrum to either Northstar Wireless or SNR Wireless." *Id.* ¶ 93. For example, American I was allegedly "very active" in early bidding rounds, offering the PWB for numerous spectrum licenses. *Id.* But in the later bidding rounds, "the DISH-Controlling Defendants directed [Northstar Wireless and SNR Wireless] to top American I's PWBs on virtually all of those licenses, while American I abruptly discontinued its bidding." *Id.*

As a result, when Auction 97 closed on January 29, 2015, American I did not win a single spectrum license, *see id.* ¶ 94, while Northstar Wireless and SNR Wireless, collectively, won 702 of the 1,611 spectrum licenses auctioned off by the FCC, *see id.* ¶ 100. Absent any bidding credits, the 702 spectrum licenses secured by Northstar Wireless and SNR Wireless at Auction 97 carried a bidding value of $13.3 billion. *See id.* With their claimed "very small business" bidding credits, however, Northstar Wireless and SNR Wireless procured their spectrum licenses from Auction 97 for $10 billion, a 25% discount worth approximately $3.3 billion. *See id.* ¶ 4.

### 4.   Defendants' Post-Auction Conduct

Following their successful bids at Auction 97, Northstar Wireless and SNR Wireless submitted their long-form applications to the FCC on February 13, 2015.  *See id.* ¶ 70.  On these post-auction long-form applications, both entities again certified their eligibility for bidding credits as "very small businesses" and confirmed their complete disclosure of all relevant bidding agreements.  *See id.* ¶¶ 70–73.  Along with their February 13, 2015 applications, Northstar Wireless and SNR Wireless also submitted to the FCC "a number of agreements regarding their relationship with DISH [Network] and each other."  *In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887, ¶ 21 (2015).  For example, Northstar Wireless and SNR Wireless submitted their respective joint bidding agreements with DISH Network, as well as the Letter Agreement which further governed the bidding arrangements between DISH Network, Northstar Wireless, and SNR Wireless.  *Id.*  Northstar Wireless and SNR Wireless also provided the FCC with the "Management Services Agreements" they had each entered into with DISH Network.  *Id.*

On February 13, 2015, Northstar Wireless and SNR Wireless made their initial down payments on the total discounted value ($10 billion) of their winning bids for spectrum licenses.  *See* Am. Compl. ¶ 101.  On March 2, 2015, the two entities then completed their full payments to the FCC, net of their February 13, 2015 down payments.  *Id.*  According to Vermont Telephone, the payments Northstar Wireless and SNR Wireless made on their $10 billion in spectrum licenses were "financed almost entirely through loans and other equity provided by the DISH-Controlling Defendants."  *Id.*

### D.  Post-Auction FCC Proceedings

On April 29, 2015, the FCC found, "upon initial review," that the long-form applications submitted by Northstar Wireless and SNR Wireless were "acceptable for filing."  *Wireless*

*Telecommunications Bureau Announces That Applications for Aws-3 Licenses in the 1695-1710 Mhz, & 1755-1780 Mhz & 2155-2180 Mhz Bands Are Accepted for Filing*, 30 F.C.C. Rcd. 3795 (2015). Nonetheless, the FCC explained that it "may return or dismiss any application if it [wa]s found, upon further examination, to be defective or not in conformance with the Commission's rules." *Id.* The FCC then requested that any party seeking to challenge the winning bids from Auction 97 file a "petition to deny" by May 11, 2015. *Id.*; *see also* 47 C.F.R. § 1.2108.

On May 11, 2015, seven parties, including Vermont Telephone's subsidiary VTel Wireless, Inc., filed petitions with the FCC to deny Northstar Wireless and SNR Wireless's applications for the spectrum licenses they purportedly won during the auction "and the bidding credits they wrongfully claimed." Am. Compl. ¶ 102; *see also* 47 C.F.R. § 1.2108(d). First, these petitions argued that Northstar Wireless and SNR Wireless had incorrectly discounted the *de facto* control of DISH Network when calculating their gross revenues for the purposes of bidding credit eligibility. *See In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. at ¶¶ 49–50. The petitioners, however, went further and also advanced "claims that the failure by SNR [Wireless] and Northstar [Wireless] to disclose in their Applications the controlling interest held by DISH [Network] constitute[d] a material misrepresentation and demonstrate[d] a lack of candor." *Id.* at ¶ 129. Similarly, the petitioners asserted that Northstar Wireless and SNR Wireless "did not adequately disclose and misrepresented their joint bidding agreements with DISH [Network]." *Id.* at ¶ 133.

On August 18, 2015, the FCC ruled on the petitions to deny and determined that "DISH's revenues should have be[en] attributed to each of SNR and Northstar, and therefore neither SNR nor Northstar [wa]s eligible for very small business bidding credits." *In re Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887, ¶ 45 (2015). The FCC reached this conclusion after it identified:

> [T]wo separate and independent ways by which DISH is found to be a controlling entity of, or affiliated with the Applicants within [FCC] rules: 1) DISH has *de facto* control of the Applicants, or the power to control them, under an analysis of the totality of the circumstances surrounding their participation in Auction 97 and the plans for operations after grant of the licenses as reflected in the various Agreements entered into among and between DISH, SNR and Northstar; and 2) DISH is an affiliate of the Applicants by virtue of the breadth of DISH's responsibilities under Management Services Agreements with SNR and Northstar.

*Id.* The FCC, however, *did not* find that Northstar Wireless and SNR Wireless had made any "material misrepresentations" or failed to disclose agreements on their FCC application forms. *Id.* at ¶¶ 129–36; *see also id.* at ¶ 129 ("VTel fails to identify any 'material factual information' that the Applicants failed to disclose in their applications."). In fact, the FCC found "no showing . . . that SNR and Northstar attempted to mislead the Commission about their respective relationships with DISH," and concluded that "the Applicants and DISH disclosed their ownership structures and related Agreements as required." *Id.* ¶ 132. Accordingly, the FCC determined "that the companies could retain the spectrum licenses they won in the auction if they were willing to pay full price for them." *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1028 (D.C. Cir. 2017).

Following the FCC's order, Northstar Wireless and SNR Wireless notified the FCC "that they would pay the full bid amount for some of the licenses they won and would default on their obligation to buy the rest." *Id.* In total, Northstar Wireless and SNR Wireless "defaulted on approximately 28 percent of the licenses they originally won at auction." Am. Compl. ¶ 104. The FCC, therefore, "ordered SNR [Wireless] and Northstar [Wireless] to compensate it for the difference between their own winning bids in Auction 97 and the amount that the FCC receives when it re-auctions the licenses." *SNR Wireless*, 868 F.3d at 1029. "The FCC also ordered [the two companies] to make an additional payment equal to fifteen percent of the petitioners' own bids, or fifteen percent of the winning bid when their licenses are re-auctioned, whichever is less." *Id.* Vermont Telephone alleges that DISH Network has entered into agreements with both

19

Northstar Wireless and SNR Wireless to pay these deficiency penalties owed to the FCC. *See* Am. Compl. ¶¶ 106–07.

Northstar Wireless and SNR Wireless appealed the FCC's order to the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"). The D.C. Circuit, however, affirmed the FCC's decision that DISH Network's revenues were attributable to Northstar Wireless and SNR Wireless, rendering those two companies ineligible for their small business bidding credits. *SNR Wireless*, 868 F.3d at 1025. Nonetheless, the D.C. Circuit observed "that there was considerable uncertainty at the time of Auction 97 about the degree of control [FCC] rules would tolerate." *Id.* at 1044. The D.C. Circuit, therefore, remanded the case to back to the FCC with instructions to permit Northstar Wireless and SNR Wireless an opportunity "to renegotiate their agreements with DISH [Network]" and "cure" the deficiencies that prevented them from obtaining their bidding credits. *Id.* at 1046.

On November 23, 2020, the FCC finally concluded these remand proceedings and found that Northstar Wireless and SNR Wireless had not sufficiently addressed the agency's concerns regarding the control exercised by DISH Network over those entities. *See* Nov. 23, 2020 FCC Order, ECF No. 82-1, ¶ 5. The FCC, therefore, sustained its original determination that neither Northstar Wireless nor SNR Wireless was eligible to receive a small business bidding credit. *See id.* Northstar Wireless and SNR Wireless have now appealed the FCC's November 23, 2020 FCC order back to the D.C. Circuit, where the appeal presently remains pending. *See* Defs.' Not., ECF No. 85, at 1.

### E.  Vermont Telephone's Amended Complaint

The current *qui tam* action before the Court rests against this protracted history surrounding Defendants' involvement in Auction 97. Vermont Telephone originally filed its *qui tam* action

against Defendants for their alleged fraud on May 13, 2015—two days after Vermont Telephone's subsidiary filed a petition to deny in the parallel FCC proceedings discussed above.  On September 20, 2016, the United States elected not to intervene in this *qui tam* action, and the Court then unsealed Vermont Telephone's relator complaint.  *See* Gov't Not., ECF No. 17, at 1.  Without opposition from Defendants, Vermont Telephone subsequently amended its complaint in February 2019.  *See* Order, ECF No. 74, at 1.  Vermont Telephone's Amended Complaint is now the operative pleading before the Court in this action.

As described above, Vermont Telephone's Amended Complaint alleges that Defendants fraudulently deprived the United States of $3.3 billion dollars—the total discount Northstar Wireless and SNR Wireless initially received with the "very small business" bidding credits they claimed during Auction 97.  *See* Am. Compl. ¶ 108.  Vermont Telephone's theory of fraud in its Amended Complaint, however, is narrow.  Therein, Vermont Telephone makes clear that it "is not advancing any claim premised upon the Defendants' misinterpretation of the [FCC's] 'de facto control' rules—such as claiming the Short-Form or Long-Form of Northstar Wireless or SNR Wireless were false in claiming eligibility for a 25 percent 'very small business' credit or in not including the income of the DISH-Controlling Defendants when reporting revenues."  *Id.* ¶ 128.

Instead, Vermont Telephone grounds its theory of fraud on the alleged non-disclosure of additional agreements that supposedly existed between Defendants, but that were omitted from their Auction 97 applications.  Specifically, Vermont Telephone asserts that, based on Defendants' conduct during Auction 97, "the DISH-Controlling Defendants necessarily had an agreement or arrangement with Northstar Wireless and SNR Wireless to obtain, or use, or buy and re-sell the spectrum purchased during the auction."  *Id.* ¶ 130.  Vermont Telephone alleges that "[t]he Short-Form and Long-Form [applications] of SNR Wireless and Northstar Wireless" omitted this

arrangement and were therefore "false because they knowingly failed to disclose all of their instruments, agreements, and understandings with the DISH-Controlling Defendants, which was a necessary precondition to obtaining any bidding credit in Auction 97." *Id.* ¶ 128. According to Vermont Telephone, "[h]ad SNR Wireless and Northstar Wireless made those disclosures, they would not have been eligible for any such bidding credits." *Id.* Vermont Telephone further alleges that the joint bidding arrangements Defendants *did disclose* for Auction 97, were merely intended "to deceive the FCC into believing that American I, Northstar Wireless, and SNR Wireless were independent bidders working in concert," while in fact "Northstar Wireless and SNR Wireless were not independent decision-makers." *Id.* ¶ 129.

On the basis of this non-disclosure theory of fraud, the Amended Complaint asserts three causes of action under the False Claims Act, 31 U.S.C. § 3729, *et seq. See* Am. Compl. ¶¶ 143–55. In Count I, Vermont Telephone asserts an affirmative False Claims Act claim, alleging that Defendants "knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States Government, and knowingly failed to disclose material facts, in order to induce Government payment or approval." *Id.* ¶ 145. In Count II, Vermont Telephone asserts a conspiracy claim, alleging that Defendants "conspired to defraud the government" and took "substantial steps in furtherance of the conspiracy." *Id.* ¶ 150. Finally, in Count III, Vermont Telephone asserts a cause of action for a so-called "reverse false claim," alleging that Defendants made false statements to decrease their obligation to pay money owed to the government. *Id.* ¶ 154.

Defendants have now jointly moved on multiple grounds to dismiss Vermont Telephone's Amended Complaint in its entirety. *See* Defs.' Mot. at 1–4. With Vermont Telephone's opposition

and Defendants' reply fully briefed, Defendants' motion to dismiss is now ripe for this Court's review.

## II. LEGAL STANDARDS

### A.  Subject Matter Jurisdiction under Rule 12(b)(1)

A court must dismiss a case pursuant to Federal Rule of Civil Procedure 12(b)(1) when it lacks subject matter jurisdiction.  In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").  "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005).

In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence.  *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted).

**B.  Failure to State a Claim under Rule 12(b)(6)**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

"Plaintiffs suing under the False Claims Act must also satisfy the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b)."  *Scollick ex rel. United States v. Narula*, No. 14-CV-1339 (RCL), 2021 WL 737077, at *5 (D.D.C. Feb. 25, 2021) (citing *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016)).  Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This includes pleading "with sufficient particularity the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud."  *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 68 (D.D.C. 2018) (quotations omitted).

### III. DISCUSSION

For the reasons set forth below, the Court concludes that (1) the "government-action bar" and (2) the materiality standard of the False Claims Act both compel dismissal of Vermont Telephone's claims. The Court will, therefore, **GRANT** Defendants' motion and **DISMISS** the Amended Complaint.

### A.  Government-Action Bar

Defendants first raise a jurisdictional argument that the "government-action bar" forecloses Vermont Telephone's *qui tam* action.  *See* Defs.' Mot. at 16–20.  This putative "bar" derives from the statutory text of the False Claims Act, which provides that "[i]n no event may a person bring [a *qui tam* action] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."  31 U.S.C. § 3730(e)(3).  In this case, Defendants argue that "the FCC proceeding that followed Auction 97" is an administrative proceeding sufficient to trigger the government-action bar under the False Claims Act.  Defs.' Mot. at 16.  For the reasons set forth below, the Court agrees that § 3730(e)(3) forecloses Vermont Telephone's *qui tam* action.

To begin, Defendants have identified a "proceeding" involving the "government" as a "party."  31 U.S.C. § 3730(e)(3).  Here, a post-auction proceeding involving the FCC began on May 11, 2015, when Vermont Telephone's subsidiary, VTel Wireless, Inc., along with seven other parties, filed petitions with the FCC to deny the spectrum licenses and bidding credits claimed by Northstar Wireless and SNR Wireless at Auction 97.  *See In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887, ¶ 30 (2015).  In response to these petitions, the FCC investigated the control relationship between Northstar Wireless, SNR Wireless, and DISH Network, and on August 18, 2015, decided to deny Northstar Wireless and SNR Wireless the "very small business" bidding credits they had claimed.  *See id.* at ¶¶ 151–56.  The FCC then litigated this August 18, 2015 order on appeal before the D.C. Circuit, *see SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017), and subsequently reconsidered the scope of its August 18, 2015 order during remand proceedings with Northstar Wireless and SNR Wireless, *see generally* Nov. 23, 2020 FCC Order, ECF No. 82-1. Then, on November 23, 2020, the FCC issued yet another order, reaffirming that

neither Northstar Wireless nor SNR Wireless was qualified for Auction 97 bidding credits.  *See id.* at ¶ 5.  Northstar Wireless and SNR Wireless have now appealed this most recent FCC order back to the D.C. Circuit, where the appeal presently remains pending.  *See* Defs.' Not., ECF No. 85, at 1.  For the purposes of § 3730(e)(3), the FCC has been a "party" to these post-auction proceedings, and Vermont Telephone offers no argument to the contrary.  *See* Rel.'s Opp'n at 37–41.

Next, the Court concludes that these post-auction FCC proceedings addressed the same "allegations" and "transactions" now presented in Vermont Telephone's Amended Complaint.  31 U.S.C. § 3730(e)(3).  When considering the commonality between these "allegations and transactions," the Court focuses specifically on the "allegations or transactions of *fraudulent conduct*."  *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 707 (7th Cir. 2014) (citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653–54 (D.C. Cir. 1994)).  In this case, Vermont Telephone's theory of fraud hinges directly on the alleged efforts of Northstar Wireless and SNR Wireless to procure discounted spectrum licenses at Auction 97, without disclosing to the FCC certain agreements indicative of the *de facto* control exercised over them by DISH Network.  *See* Am. Compl. ¶¶ 128–30.  For example, Vermont Telephone's central allegation in the Amended Complaint asserts that "[t]he Short-Form and Long-Form of SNR Wireless and Northstar Wireless . . . were false because they knowingly failed to disclose all of their instruments, agreements, and understandings with the DISH-Controlling Defendants, which was a necessary precondition to obtaining any bidding credit in Auction 97.  Had SNR Wireless and Northstar Wireless made those disclosures, they would not have been eligible for any such bidding credits."  *Id.* ¶ 128.

These non-disclosure claims are comparable to allegations presented during the FCC's post-auction proceeding.  Therein, the FCC addressed not only whether DISH Network exercised

26

*de facto* control over Northstar Wireless and SNR Wireless, *see In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. at ¶¶ 49–58, but also "claims that the failure by SNR [Wireless] and Northstar [Wireless] to disclose in their Applications the controlling interest held by DISH constitute[d] a material misrepresentation and demonstrate[d] a lack of candor," *id.* at ¶ 129.  Even further, the FCC proceeding involved allegations that Northstar Wireless and SNR Wireless "did not adequately disclose and misrepresented their joint bidding agreements with DISH [Network]." *Id.* at ¶ 133.  Accordingly, the "allegations" and "transactions" of fraud in the Amended Complaint were also raised and addressed in the FCC's post-auction proceedings.  *See United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292, 302–03 (D.D.C. 1996) (applying government-action bar where allegations were "duplicative").

Vermont Telephone's briefing offers no challenge to the factual overlap between the allegations at issue during the post-auction FCC proceeding and those supporting the Amended Complaint.  *See* Rel.'s Opp'n at 37–41.  Instead, Vermont Telephone contends that the government-action bar does not apply in this case because the post-auction FCC proceeding was not, in fact, an "administrative civil money penalty proceeding."  31 U.S.C. § 3730(e)(3).  Specifically, Vermont Telephone argues that "[t]he FCC did not and could not use that proceeding to penalize Defendants, and thus Section 3730(e)(3) is not grounds for dismissing the Amended Complaint." Rel.'s Opp'n at 41.  Vermont Telephone's position, however, is difficult to square with the record for two reasons.

First, the FCC did levy a penalty against Northstar Wireless and SNR Wireless for defaulting on their spectrum licenses from Auction 97.  The FCC's August 18, 2015 administrative order required both Northstar Wireless and SNR Wireless to either submit full payment for their respective spectrum licenses, absent the disallowed 25% discount, or default on those licenses.

*See In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. at ¶ 155.  The FCC's order specifically explained that, "[u]pon default, any amounts due and owing to the Commission hereunder shall accrue interest, *penalties* and other charges pursuant to 47 C.F.R. § 1.1940." *Id.* at ¶ 155 n.449.  And when Northstar Wireless and SNR Wireless subsequently defaulted on a portion of their spectrum licenses, the FCC promptly ordered the companies "to compensate it for the difference between their own winning bids in Auction 97 and the amount that the FCC receives when it re-auctions the licenses."  *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1029 (D.C. Cir. 2017).  "The FCC also ordered [the two companies] to make an additional payment equal to fifteen percent of the petitioners' own bids, or fifteen percent of the winning bid when their licenses are re-auctioned, whichever is less." *Id.*  The D.C. Circuit described these payments as "*penalties* [that] will amount to hundreds of millions of dollars."  *Id.* (emphasis added).  In a very plain sense then, Northstar Wireless and SNR Wireless both received a "civil money penalty" as the result of an FCC administrative proceeding addressing their conduct during Auction 97.  31 U.S.C. § 3730(e)(3).

Second, the FCC possessed the authority during its post-auction proceeding to penalize Northstar Wireless and SNR Wireless not only for their license defaults, but also for any violations of "the Commission's rules in connection with their participation in the competitive bidding process."  47 C.F.R. § 1.2109(d).  And here, the FCC proceeding involved a review of the short-form and long-form applications submitted by Northstar Wireless and SNR Wireless, including allegations that within these forms Northstar Wireless and SNR Wireless materially misrepresented their relationship with DISH Network.  *See In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887 at ¶¶ 129–36.  If the FCC had identified any such misrepresentations or false certifications, the agency had the authority to "subject" the companies to "applicable

sanctions," including "forfeiture of their upfront payment, down payment or full bid amount." 47 C.F.R. § 1.2109(d). Indeed, the FCC has previously made clear that "[i]f, during review of the long-form applications, an applicant is discovered to have made a false certification or to be ineligible for the license on which it bid, the Commission has a number of sanctions it can impose against the applicant, *in penalties*, including monetary forfeitures, license forfeitures, ineligibility to participate in future auctions, and/or criminal prosecution." *In the Matter of Applications of Am. Samoa Telecommunications Auth. for Broadband Pers. Commc'ns Servs. & Advanced Wireless Serv. Licenses*, 26 F.C.C. Rcd. 417, ¶ 57 n.121 (2011) (emphasis added). As such, Northstar Wireless and SNR Wireless's alleged Auction 97 non-disclosure fraud was "subject" to an administrative proceeding through which the FCC could have levied "civil money penalties" against those two companies had they identified any actionable violations. 31 U.S.C. § 3730(e)(3).

On this point, Vermont Telephone contends that the FCC's "hypothetical" capacity to levy a penalty for alleged non-disclosure violations is insufficient to trigger the government-action bar. Rel.'s Opp'n at 40. Further, Vermont Telephone argues that even if such a bar came into effect, it should not apply to the Defendants in this action, aside from Northstar Wireless and SNR Wireless, who were not party to the post-auction FCC proceeding. *See id.* at 41. The Court, however, disagrees with this interpretation of § 3730(e)(3). Beginning with the statutory text, § 3730(e)(3) precludes *qui tam* actions based on "*allegations or transactions* which" themselves "are *the subject of* a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C. § 3730(e)(3) (emphasis added). Nothing in this plain language limits the government-action bar to particular *parties*. To the contrary, the bar applies on the basis of "allegations or transactions," irrespective of which relator might later advance them in a given *qui tam* action. Similarly, the language of § 3730(e)(3) does not tie the government-action bar to the

*imposition* of a penalty.  Instead, the statute only requires that the allegations or transactions in question were the "*subject of*" an "administrative civil money penalty proceeding," leaving open the logical possibility that a government investigation might take place, yet ultimately uncover no wrongdoing that would support the assessment of a penalty.  *Id.*

Vermont Telephone's construction of § 3730(e)(3) is also at odds with the broader purpose of the False Claims Act.  At bottom, the False Claims Act's jurisdictional bars reflect "congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior."  *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 475 (D.C. Cir. 2016) (quotation omitted).  Accordingly, "they must be understood in the context of the[] twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own."  *Id.*; *see also United States ex rel. S. Prawer and Co. v. Fleet Bank of Maine*, 24 F.3d 320, 329 (1st Cir. 1994), *overruled on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008).  In this way, § 3730(e)(3) precludes *qui tam* actions that take "support, advantage or the like from the host case in which the government is a party, without giving any proper or useful return to the government."  *United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292, 302 (D.D.C. 1996) (quotation omitted).  In particular, a *qui tam* action offers even less prospect for "useful return" to the United States where the government has declined to intervene.  *Id.* at 303.

Within this framework, Vermont Telephone's *qui tam* claims cannot survive the govern action bar.  As set forth above, Vermont Telephone's claims rest on allegations and transactions already considered by the FCC in its post-auction proceedings.  And through those proceedings, the FCC ultimately denied Northstar Wireless and SNR Wireless their discounted bidding credits and, subsequently, penalized them for defaulting on their spectrum licenses.  In those same

proceedings, the FCC also had the capacity to levy further penalties against Northstar Wireless and SNR Wireless for violations of FCC rules, such as false certifications or disclosure violations, but, after investigation, the FCC chose not to do so.  Instead, the FCC found "no showing . . . that SNR and Northstar attempted to mislead the Commission about their respective relationships with DISH," but rather concluded "that the Applicants and DISH disclosed their ownership structures and related Agreements as required."  *In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. at ¶ 132.

Accordingly, Vermont Telephone's attempt to now revive such non-disclosure allegations in a subsequent *qui tam* action does not further the goal of "promoting [law suits] the government is not equipped to bring on its own."  *Oliver*, 826 F.3d at 475.  Furthermore, "there will be no useful return to the government as a result of this suit, financial or otherwise, because the United States government has declined to intervene in this matter."  *Dyncorp, Inc.*, 924 F. Supp. at 303. Vermont Telephone's *qui tam* action, therefore, falls within the scope of the "government-action bar" and its overall statutory purpose.  *See, e.g.*, *Gately v. City of Port Hueneme*, No. CV 16-4096-GW(JEMX), 2017 WL 8236269, at *9 (C.D. Cal. Oct. 2, 2017) (applying government-action bar to *qui tam* action that sought "to remedy alleged fraud that the government has already remedied to its satisfaction"); *Found. For Fair Contracting, Ltd. v. G & M E. Contracting & Double E, LLC*, 259 F. Supp. 2d 329, 337–38 (D.N.J. 2003) ("[T]o permit such a claim to proceed after the government's enforcement proceeding has obtained redress for the government would make little statutory sense.").  For these reasons, the Court concludes that the "government-action bar" forecloses Vermont Telephone's *qui tam* action.  31 U.S.C. § 3730(e)(3).  The Court must, therefore, **DISMISS** Vermont Telephone's Amended Complaint.

**B.  Materiality**

There is one final impediment to Vermont Telephone's *qui tam* action that bears mention: materiality.  To adequately plead a claim under the False Claims Act, a relator must offer plausible allegations showing that the false claims asserted were "material" to the government's payment decision.  *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 84 (D.D.C. 2018) (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016)).  The False Claims Act defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Escobar*, 136 S. Ct. at 2002 (quoting 31 U.S.C. § 3729(b)(4)).  Because "[t]he False Claims Act is not 'an all-purpose antifraud statute,'" the "materiality standard is demanding," *Escobar*, 136 S. Ct. at 2003 (quoting *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)), and includes "a heightened standard for pleading materiality," *Comstor Corp.*, 308 F. Supp. 3d at 85.

In this case, Vermont Telephone alleges that Defendants' false "claims" were the certifications Northstar Wireless and SNR Wireless made to the FCC "in their Short-Forms and Long-Forms that they had disclosed all (oral or written) instruments, agreements, and understandings relevant to their claimed designated entity status in Auction 97."  Am. Compl. ¶ 125.  According to Vermont Telephone, DISH Network "necessarily had an agreement or arrangement with Northstar Wireless and SNR Wireless to obtain, or use, or buy and re-sell the spectrum purchased during the auction," *id.* ¶ 130, which Northstar Wireless and SNR Wireless "knowingly failed to disclose" to the FCC on their auction applications, *id.* ¶ 128.  Vermont Telephone contends that if "SNR Wireless and Northstar Wireless [had] made those disclosures, [then] they would not have been eligible for any such bidding credits," *id.*, and would have owed

the FCC $13.3 billion for their spectrum licenses, as opposed to the discounted total of $10 billion they ultimately paid, *see, e.g.*, *id.* ¶¶ 4, 133.

There are several unique factors, however, that weigh against the materiality of these allegedly false claims.  The first is that, on August 18, 2015, the FCC *denied* Northstar Wireless and SNR Wireless the "very small business" bidding credits they applied for.  The Amended Complaint admits that "the FCC found that Northstar Wireless and SNR Wireless were not 'very small businesses' eligible for the approximately $3.3 billion in bidding credits because . . . SNR Wireless and Northstar Wireless were under the *de facto* control of DISH [Network]."  *Id.* ¶ 103. Accordingly, the "FCC directed SNR Wireless and Northstar Wireless to either submit payment in the full amount of their winning bids or to provide an acceptable irrevocable, standby letter of credit."  *Id.*  Plainly, the disclosure of any secret control agreement between Northstar Wireless, SNR Wireless, and DISH Network, *see id.* ¶ 130, would not have changed the FCC's August 18, 2015 order, which already reflected the agency's decision to *deny* bidding credits to Northstar Wireless and SNR Wireless because of DISH Network's control over those companies.

Beyond this point, however, Vermont Telephone correctly observes that in the time *leading up* to August 18, 2015, the government was still short $3.3 billion.  As winning bidders in Auction 97, Northstar Wireless and SNR Wireless owed the FCC full payment on the net value of their winning bids by March 2, 2015.  *See Closing Public Notice*, 30 F.C.C. Rcd. 630, ¶ 8 (2015).  But with the "very small business" bidding credits they had claimed in their short-form and long-form FCC applications, Northstar Wireless and SNR Wireless submitted March 2, 2015 payments of only $10 billion to the FCC, as opposed to the full $13.3 billion they would have otherwise owed. *See* Am. Compl. ¶ 4.  Consequently, the FCC's August 18, 2015 decision to ultimately deny Northstar Wireless and SNR Wireless their original discount does not end the materiality inquiry

33

entirely.  Nonetheless, the question still remains whether Vermont Telephone has plausibly alleged

a false statement capable of influencing the FCC's decision to permit the March 2, 2015 payments

from Northstar Wireless and SNR Wireless at a discount.  *See Escobar*, 136 S. Ct. at 2002 (quoting

31 U.S.C. § 3729(b)(4)).

Here, Vermont Telephone confronts two major impediments, the first of which is

chronological.  As described above, Vermont Telephone alleges that Northstar Wireless and SNR

Wireless made false statements by certifying in their short-form and long-form applications to the

FCC that they had disclosed all agreements "that supported their eligibility as a 'very small

business.'"  Am. Compl. ¶ 125.  The problem for Vermont Telephone, however, is that the FCC

"does not substantially review [designated entity] eligibility claims until provisionally winning

bidders file their long-form applications."  *In the Matter of Northstar Wireless, LLC*, 30 F.C.C.

Rcd. 8887, ¶ 130 (2015).  Moreover, in its public notice following Auction 97, the FCC further

explained that it would "review[] an applicant's long-form application only after receipt of full

and timely payment for the winning bid amount and any applicable late fees."  *Closing Public

Notice*, 30 F.C.C. Rcd. at ¶ 24 (emphasis added).  Accordingly, even if Northstar Wireless and SNR

Wireless *had disclosed* some secret control agreement with DISH Network in their short-form and

long-form applications, the FCC would not have reviewed the impact of these agreements on their

eligibility for discounted bidding credits until *after* the companies completed their March 2, 2015

payments.  *See id.*  In this way, it is not plausible that Northstar Wireless and SNR Wireless's non-

disclosure of any secret agreements would have influenced the government's decision to permit a

discounted payment of $10 billion on March 2, 2015.  *See Escobar*, 136 S. Ct. at 2002 (quoting 31

U.S.C. § 3729(b)(4)).

Finally, Vermont Telephone's secret-agreement theory of fraud must also confront the fact that Northstar Wireless and SNR Wireless *did disclose and submit* to the FCC "a number of agreements regarding their relationship with DISH [Newtork] and each other." *In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887 at ¶ 21. For example, in their short-form applications both Northstar Wireless and SNR Wireless disclosed the existence of Bidding Protocol and Joint Bidding Agreements with DISH Network, "under which they w[ould] undertake to coordinate bidding for licenses in Auction 97 . . . to facilitate coordination of their systems." *See* Northstar Wireless, Form 175 (Ex. C), at 27; *see also* SNR Wireless, Form 175 (Ex. E), at 26. Northstar Wireless and SNR Wireless also disclosed that DISH Network holds "85 percent indirect equity interests in Northstar Wireless and SNR Wireless" and that it would "coordinate" with these companies "regarding bids, bidding strategy and post-auction market structure. . . . " SNR Wireless, Form 175 (Ex. E), at 26. Furthermore, Northstar Wireless and SNR Wireless disclosed that they had entered into "Management Services Agreements" with DISH Network, and then supplied those agreements directly to the FCC for review. *In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. at ¶¶ 21, 24.[4]

According to the FCC, SNR Wireless and Northstar Wireless's disclosures adequately "set out the organizational structure and relationships between the parties [and DISH Network] for the periods before, during and after the auction, including plans to coordinate regarding bids and bidding strategies." *Id.* at ¶ 132 n.378. Consequently, the FCC was able to "conclude[] that, as a

---

[4] Such control disclosures distinguish Vermont Telephone's *qui tam* action from a case like *United States v. Newman*, No. CV 16-1169 (CKK), 2017 WL 3575848 (D.D.C. Aug. 17, 2017), upon which Vermont Telephone relies. *See* Rel.'s Opp'n at 15. In *Newman*, the discount-seeking FCC auction applicant claimed full independence on her long-form application from her allegedly disqualifying partner. *See Newman*, 2017 WL 3575848, at *2 ("Defendants allegedly represented that Defendant Cesta Newman's late husband, John Newman, and his company, Newman Media, Inc., *had no involvement or interests* in Newman Broadcasting.")(emphasis added).

legal matter, the facts disclosed show that DISH [Network] controlled [Northstar Wireless and SNR Wireless]." *Id.* at ¶ 131. Indeed, the FCC found it to be "*manifest* that DISH [Network], directly or indirectly, controls or has the power to control [Northstar Wireless and SNR Wireless]." *Id.* at ¶ 6 (emphasis added). The FCC even determined that the Management Services Agreements *alone* provided "a separate and independent legal basis for concluding that SNR [Wireless] and Northstar [Wireless] [we]re not eligible for the very small business bidding credits that they [sought]." *Id.* at ¶ 122.

These FCC findings demonstrate that the disclosures Northstar Wireless and SNR Wireless provided in their short-form and long-form applications were more than adequate to reveal their ineligibility for any "very small business" credits at Auction 97. Yet, these disclosures had no impact on the payment amount of $10 billion rendered by Northstar Wireless and SNR Wireless to the FCC on March 2, 2015. Therefore, even accepting as true that some *additional* secret agreement existed between Northstar Wireless, SNR Wireless, and DISH Network, *see* Am. Compl. ¶ 130, Vermont Telephone has not plausibly demonstrated how its disclosure would have affected the FCC's decision to accept a discounted payment of $10 billion from Northstar Wireless and SNR Wireless following Auction 97. In fact, the Amended Complaint contains no allegations about how these secret control agreements differed from those agreements the FCC *already possessed*, which independently demonstrated that Northstar Wireless and SNR Wireless were ineligible for any bidding discounts, yet had no impact on the amount of their March 2, 2015 payments.

For all these reasons, the Court concludes that Vermont Telephone has not plausibly alleged any false claims made by Defendants, which had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Escobar*, 136 S. Ct. at 2002

(quoting 31 U.S.C. § 3729(b)(4)).  Accordingly, Vermont Telephone has not met the "demanding"
materiality standard under the False Claims Act, and, this too, requires the dismissal of Vermont
Telephone's Amended Complaint.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' [77] Motion to Dismiss and
**DISMISSES WITH PREJUDICE** the Amended Complaint.  An appropriate Order accompanies
this Memorandum Opinion.

**Date**: March 23, 2021

                                     ___/s/_____
                                     COLLEEN KOLLAR-KOTELLY
                                     United States District Judge