**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. VERMONT NATIONAL TELEPHONE CO., | Civil Action No. 1:15-cv-00728-CKK |
| Plaintiff, | ORAL ARGUMENT REQUESTED |
| v. | |
| NORTHSTAR WIRELESS, LLC, et al. | |
| Defendants. | |

### DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Pursuant to Federal Rule of Civil Procedure 12(c), defendants move for judgment on the pleadings. The bases for the motion, as set forth in the accompanying memorandum, are (1) that relator's claims are barred by the False Claims Act's public-disclosure bar, 31 U.S.C. §3730(e)(4), and (2) that relator's complaint fails to satisfy Federal Rules of Civil Procedure 8 and 9(b) as to all individual defendants and most corporate defendants. A proposed order is submitted herewith.

Defendants request oral argument on the motion.

November 28, 2022

Respectfully submitted,

s/ Daniel S. Volchok

Gejaa T. Gobena (#463833)
Jonathan L. Diesenhaus (#423753)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
202-637-5600
gejaa.gobena@hoganlovells.com
jonathan.diesenhaus@hoganlovells.com

*Counsel for SNR Wireless LicenseCo, LLC,
SNR Wireless Holdco, LLC, SNR Wireless
Management, LLC, Atelum LLC, and John
Muleta*

Howard M. Shapiro (#454274)
Jonathan E. Paikin (#466445)
Daniel S. Volchok (#466889)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
202-663-6000
howard.shapiro@wilmerhale.com
jonathan.paikin@wilmerhale.com
daniel.volchok@wilmerhale.com

*Counsel for American AWS-3 Wireless I LLC,
American AWS-3 Wireless II LLC, American
AWS-3 Wireless III LLC, DISH Wireless
Holding LLC, DISH Network Corporation,
Charles W. Ergen, and Cantey M. Ergen*

Peter B. Hutt II (#427331)
Benjamin C. Block (#479705)
Dennis B. Auerbach (#418982)
Amee M. Frodle (#1602371)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
202-662-6000
phuttjr@cov.com
bblock@cov.com
dauerbach@cov.com
afrodle@cov.com

*Counsel for Northstar Wireless, LLC,
Northstar Spectrum, LLC, Northstar
Manager, LLC, Doyon, Limited, Miranda
Wright, and Allen M. Todd*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA ex rel.
VERMONT NATIONAL TELEPHONE CO.,

       Plaintiff,

    v.

NORTHSTAR WIRELESS, LLC, et al.

       Defendants.

Civil Action No. 1:15-cv-00728-CKK

ORAL ARGUMENT REQUESTED

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................2

    A.      Statutory And Regulatory Background.................................................................2

          1.      The False Claims Act..............................................................2

          2.      The FCC's Designated-Entity Program ...................................3

    B.      Factual Background And Related Proceedings.......................................4

          1.      The FCC uses its standard disclosure-based process for Auction 97..............................................................................4

          2.      The Bidding Defendants apply to participate in Auction 97 by making the required disclosures............................5

          3.      The FCC publicly releases a bid-by-bid breakdown of the auction as soon as it ends ..............................................6

          4.      Auction 97 generates significant publicity ...............................7

          5.      The FCC investigates the allegations and finds no fraud .........13

    C.      Procedural History .........................................................................14

LEGAL STANDARD.......................................................................................17

ARGUMENT .................................................................................................17

I.      The Public-Disclosure Bar Requires Dismissal.............................................17

    A.      The Factual Allegations And Claim Of Fraud Were Publicly Disclosed Before Relator Filed Its Complaint ...................................18

          1.      The facts giving rise to the inference of the purported fraud (X + Y) were publicly disclosed ...................................19

          2.      The allegation of fraud (Z) was publicly disclosed ...................21

          3.      Any Theory Of Liability In The Amended Complaint Other Than The "Secret Agreement" Theory Would Likewise Have To Be Dismissed Under The Public-Disclosure Bar.......................25

    B.      Relator Is Not An Original Source.......................................................26

          1.      Relator did not voluntarily disclose any information to the government prior to the public disclosures on which relator's allegations depend ...............................................26

          2.      Relator cannot establish that its knowledge is independent of and materially adds to the publicly disclosed information ...................27

i

II.    Relator's Claims Against All Individual Defendants And Most Of The Corporate Defendants Should Be Dismissed For Failure To Allege Their Involvement In The Purported Fraud Plausibly Or With Particularity .............................. 30

    A.    Corporate Defendants .......................................................................... 31

    B.    Individual Defendants .......................................................................... 33

CONCLUSION ....................................................................................................... 37

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Plavix Marketing, Sales Practices & Products Liability Litigation*, 123 F.Supp.3d 584 (D.N.J. 2015) ...................................................27

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ........................................34

*Kambala v. Checchi & Co. Consulting*, 280 F.Supp.3d 131 (D.D.C. 2017) ................................17

*M3 USA Corp. v. Qamoum, No.*, 2021 WL 2324753 (D.D.C. June 7, 2021) ...............................31

*Miller v. Holzmann*, 563 F.Supp.2d 54 (D.D.C. 2008).................................................30

*Minnesota Association of Nurse Anesthetists v. Allina Health Systems Corp.*, 276 F.3d 1032 (8th Cir. 2002) ....................................18

*Redmon v. United States Capitol Police*, 80 F.Supp.3d 79 (D.D.C. 2015) ................................34

*Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401 (2011) .............................20

*Securities Industry Association v. Federal Home Loan Bank Board*, 588 F.Supp. 749 (D.D.C.1984) ................................31

*SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017)....................................19

*United States ex rel Coyne v. Amgen, Inc.*, 229 F.Supp.3d 159 (E.D.N.Y. 2017)........................29

*United States ex rel. Battle v. Board of Regents of Georgia*, 468 F.3d 755 (11th Cir. 2006) ......................18

*United States ex rel. Beauchamp v. Academi Training Center*, 816 F.3d 37 (4th Cir. 2016) ......................20

*United States ex rel. Bernier v. InfiLaw Corp.*, 311 F.Supp.3d 1288 (M.D. Fla. 2018) .........................8

*United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83 (D.C. Cir. 2014) .....................................27

*United States ex rel. Doe v. Staples, Inc.*, 932 F.Supp.2d 34 (D.D.C. 2013) ..............................20

*United States ex rel. Federal Recovery Services, Inc. v. Crescent City E.M.S., Inc.*, 72 F.3d 447 (5th Cir. 1995) ...........................18

*United States ex rel. Findley v. FPC-Boron Employees's Club*, 105 F.3d 675 (D.C. Cir. 1997) .............................3

*United States ex rel. Green v. Service Continental Education & Training Trustee Fund*, 843 F.Supp.2d 20 (D.D.C. 2012)...................................................................21

*United States ex rel. Harper v. Muskingum Watershed Conservancy District*, 2015 WL 7575937 (N.D. Ohio Nov. 25, 2015) ..............................................................21

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25 (D.D.C. 2007) ............................................................................31, 35, 36

*United States ex rel. Hong v. Newport Sensors, Inc.*, 2016 WL 8929246 (C.D. Cal. May 19, 2016) ....................................................................................21

*United States ex rel. Jones v. Sutter Health*, 499 F.Supp.3d 704 (N.D. Cal. 2020) ....................29

*United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F.Supp.2d 35 (D. Mass. 2000)........................................................................................32

*United States ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075 (8th Cir. 2014)..................................................................20, 21, 29

*United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148 (2d Cir. 1993)..............................................................................18

*United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516 (6th Cir. 2020) ................................20

*United States ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935 (6th Cir. 1997)....................................................................................18

*United States ex rel. O'Connor v. United States Cellular Corp.*, 2022 WL 971290 (D.D.C. Mar. 31, 2022)............................................................................2, 16

*United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466 (D.C. Cir. 2016) ..............................................................................18, 19, 20, 21

*United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F.Supp.3d 111 (D.D.C. 2015) ..................................................................................20, 21

*United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49 (1st Cir. 2009) ..........................18

*United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805 (11th Cir. 2015) ................8, 20, 27

*United States ex rel. Patriarca v. Siemens Healthcare Diagnostics, Inc.*, 295 F.Supp.3d 186 (E.D.N.Y. 2018) ..................................................................28

*United States ex rel. Pilecki-Simko v. Chubb Institute*, 443 F.App'x 754 (3d Cir. 2011) ........................................................................................34, 35

*United States ex rel. Precision Co. v. Koch Industries, Inc.*, 971 F.2d 548 (10th Cir. 1992)....................................................................................18

iv

*United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813 (6th Cir. 2021) ................................19

*United States ex rel. Schumann v. AstraZeneca Pharms. L.P.*, 769 F.3d 837 (3d Cir. 2014) .............................................................................................................28

*United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913 (D.C. Cir. 1999) ......................................................................................................19, 21

*United States ex rel. Shea v. Cellco Partnership*, 863 F.3d 923 (D.C. Cir. 2017) ......................28

*United States ex rel. Sirls v. Kindred Healthcare, Inc.*, 536 F.Supp.3d 1 (E.D. Pa. 2021) ......................................................................................................................29

*United States ex rel. Sonnier v. Standard Fire Insurance Co.*, 84 F.Supp.3d 575 (S.D. Tex. 2015) ...................................................................................................28

*United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994) .............................................................................................2, 23, 27

*United States ex rel. Vermont National Telephone Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022) ...................................................................................16

*United States ex rel. Vierczhalek v. MedImmune, Inc.*, 803 F.App'x 522 (2d Cir. 2020) .................................................................................................................27, 28

*United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228 (3d Cir. 2013) .........18, 28, 29

*United States ex rel. Zverev v. USA Vein Clinics of Chicago, LLC*, 244 F.Supp.3d 737 (N.D. Ill. 2017) ...........................................................................................30, 32

*United States v. Kellogg Brown & Root Services, Inc.*, 800 F.Supp.2d 143 (D.D.C. 2011) ...................................................................................................................30

*United States v. Toyobo Co.*, 811 F.Supp.2d 37 (D.D.C. 2011) ....................................................30

*United States v. Universal Health Services, Inc.*, 2010 WL 4323082 (W.D. Va. Oct. 31, 2010) ...................................................................................................30, 31

*Washington Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) .....................................................8

## REGULATORY MATERIALS

American I Short Form, FCC File Number 0006458188, Auction 97 (2014) (Appendix B, Tab 3) ...............................................................................................5, 6

AT&T Letter to FCC, *Re: Updating Part 1 Competitive Bidding Rules, WT Docket No. 14-170* (Feb. 20, 2015) (Appendix B, Tab 14) ...................................11

FCC Public Notice, *Auction of Advanced Wireless Services (AWS-3) Licenses Closes*, 30 FCC Rcd. 630 (2015) (Appendix B, Tab 5) ...............................................7, 19, 20

FCC Public Notice, *Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for Nov. 13, 2014*, 29 FCC Rcd. 8386 (2014) (Appendix B, Tab 1) ...............4, 5, 6

*In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, 9 FCC Rcd. 5532 (1994) ........................................................................3, 4

*\*In the Matter of Northstar Wireless, LLC*, 30 FCC Rcd. 8887 (2015) ........3, 6, 13, 14, 23, 24, 26

Northstar Short Form, FCC File Number 0006458325, Auction 97 (2014) (Appendix B, Tab 4) ..............................................................................................5

Petition to Deny of Central Texas Telephone Investments LP et al. (May 11, 2015) (Appendix B, Tab 29) ...........................................................................13, 14

Petition to Deny of Communications Workers of America et al. (May 11, 2015) (Appendix B, Tab 30) ...................................................................................14

Petition to Deny of VTel Wireless, Inc. (May 11, 2015) (Appendix B, Tab 28) ...................13, 14

*Reply Comments of King Street Wireless, L.P.*, WT Docket No. 14-170 (March 6, 2015) (Appendix B, Tab 18) ..............................................................................23

SNR Short Form, FCC File Number 0006458318, Auction 97 (2014) (Appendix B, Tab 2) ........................................................................................................5, 6

Verizon Letter to FCC, *Re: Updating Part 1 Competitive Bidding Rules, WT Docket No. 14-170* (Apr. 24, 2015) (Appendix B, Tab 22) .......................................11, 12, 22

Verizon Letter to FCC, *Re: Updating Part 1 Competitive Bidding Rules, WT Docket No. 14-170* (Feb. 27, 2015) (Appendix B, Tab 16) .............................................22, 24

## STATUTES, RULES, AND REGULATIONS

False Claims Act, 31 U.S.C.
§3729.................................................................................................................2
*\*§3730................................................................1, 2, 3, 17, 18, 20, 21, 23, 26, 27

47 U.S.C. §309.............................................................................................................3

47 C.F.R.
§1.2105 (2014)...................................................................................................4
§1.2107..........................................................................................................5, 7
§1.2110.......................................................................................................3, 5, 7
§1.2112 (2014)...................................................................................................4

Fed. R. Civ. P.

    Rule 8 ................................................................................................................36

    Rule 9 ..........................................................................................................35, 36

    Rule 12 ..............................................................................................................17

## OTHER AUTHORITIES

Ayotte & Pai, Opinion, *Ending Welfare for Telecom Giants*, Wall St. J. (Feb. 4, 2015), http://on.wsj.com/18OXcyl (Appendix B, Tab 11) .......................................8

Buskirk & Chertock, *Dish's Bidding Strategy in AWS-3 Auction Said To Raise Big Questions for FCC*, Communications Daily (Mar. 6, 2015) (Appendix B, Tab 17) ...............................................................................................................10

Editorial Board, *Government Handouts at Wireless Auctions*, N.Y. Times (Feb. 3, 2015), http://nyti.ms/1zBVydL (Appendix B, Tab 8)..........................................7, 8

Farrar, *How To Blow Up A Spectrum Auction…*, TMF Associates Blog (Jan. 31, 2015 4:00 pm), https://bit.ly/2Qnuxqw (Appendix B, Tab 7) ..........................10, 23

Goldstein, *Dish's Road to $3.33B in AWS-3 Discounts Included a Complex Web of Investments*, FierceWireless (Feb. 4, 2015), https://bit.ly/2zvPWXq (Appendix B, Tab 10) ...........................................................................................9, 23

Gryta, et al., *Dish Network Surprise Winner In Spectrum Auction*, Wall St. J. (Jan. 30, 2015), https://on.wsj.com/2PTfqbx (Appendix B, Tab 6) ...................................9

Gryta & Knutson, *Behind Dish Network's Race for Wireless Spectrum*, Wall St. J. (Feb. 12, 2015), http://on.wsj.com/1F3CsAs (Appendix B, Tab 12) ..................................9, 24

Hendel & Buskirk, *FCC Raising New Questions About Role of DEs in Auctions*, Communications Daily (Mar. 25, 2015) (Appendix B, Tab 19)...............................10

Knutson, *Regulators May Reject Dish Entities' Spectrum Discount Claims*, Wall St. J. (Apr. 27, 2015), https://on.wsj.com/2F5B08v (Appendix B, Tab 23)...........................12

Letter from Sen. John Thune to Chairman Thomas Wheeler (Apr. 29, 2015), https://www.commerce.senate.gov/services/files/e865afff-3681-4f23-89fc-920d21fd557e (Appendix B, Tab 26) ...........................................................13, 22

Letter from Sen. John Thune to John Muleta, Atelum CEO (Apr. 29, 2015), https://bit.ly/2AZt3MB (Appendix B, Tab 25)....................................12, 13, 22, 25

Letter from Sen. Claire McCaskill to Chairman Thomas Wheeler (Feb. 26, 2015), https://docs.fcc.gov/public/attachments/DOC-332744A2.pdf (Appendix B, Tab 15) .................................................................................................................8

Marsh, *Lessons From Auction 97 For Future Auctions*, AT&T Public Policy Blog
(Feb. 20, 2015, 10:20 am), https://bit.ly/3NMzkAh (Appendix B, Tab 13)...............10, 23, 24

Press Release, *Commerce Probes $3 Billion Collusion Concern in FCC Spectrum
Auction* (Apr. 29, 2015), https://bit.ly/2yTl2Zl (Appendix B, Tab 24) ...................................12

Ramachandran, et al., *Behind Dish Wireless Coup, Ties to Alaskan Native
Groups*, Wall St. J. (Feb. 3, 2015), http://on.wsj.com/2ePOs20 (Appendix B,
Tab 9) ..............................................................................................................................8, 9

## INTRODUCTION

The False Claims Act ("FCA") authorizes *qui tam* actions to redress previously unknown fraud that harmed or could have harmed the government. This action does not do that. The amended complaint's allegations of fraud are based entirely on publicly available information that was known to the government before this suit was filed. Because relator Vermont National Telephone Company was not an original source of any of that information, the FCA's public-disclosure bar, 31 U.S.C. §3730(e)(4)(A), compels dismissal of this case.

Relator alleges—as its sole theory of liability—that defendants "necessarily" had one or more undisclosed agreements in addition to the many agreements they disclosed to the Federal Communications Commission ("FCC" or "Commission") in connection with a wireless-spectrum auction known as Auction 97. First Am. Compl., Dkt. 76, ¶130 ("FAC"). This "secret-agreement" theory, however, relies exclusively on information already in the public domain: defendants' corporate structures, the disclosed agreements between and among them, and their conduct during the auction. Before this lawsuit was filed, all this information was either disclosed by defendants to the government or made public by the government itself; none of it originated with relator. In fact, based on the same public information, relator and other auction participants (again, before this lawsuit was filed) presented the same fraud allegation to the FCC in public administrative proceedings—an allegation the FCC considered and rejected. All these prior public disclosures preclude relator from re-litigating the allegation the FCC rejected, because the public-disclosure bar requires courts to dismiss any *qui tam* action if "substantially the same allegations or transactions … were publicly disclosed" prior to the filing of the complaint, and the plaintiff was not an "original source" of the information. 31 U.S.C. §3730(e)(4). Indeed, while this case was on appeal, another court in this district dismissed a

similar *qui tam* case—also arising out of Auction 97—on that very ground.  *See United States ex rel. O'Connor v. United States Cellular Corp.*, 2022 WL 971290, at *6 (D.D.C. Mar. 31, 2022).

Dismissal of relator's claims against most of the 18 defendants would be required even if the public-disclosure bar were not triggered, because relator has not adequately alleged each one's particular involvement in any fraudulent activity.  Relator's claims are based on allegedly false certifications that two companies—Northstar Wireless, LLC ("Northstar") and SNR Wireless LicenseCo, LLC ("SNR")—made to the FCC in an effort to conceal the purported "secret agreement."  FAC ¶ 130.  But these claims fail both because the individuals and several of the companies named as defendants made no such certification and because relator fails to allege facts showing that each knew of, or was involved in, the allegedly fraudulent activity.  Those defendants have already been subjected to years of litigation and should be dismissed from the case even if the entire action is not dismissed.

## BACKGROUND

### A.    Statutory And Regulatory Background

#### 1.    *The False Claims Act*

The FCA imposes liability on anyone who "knowingly makes … a false … statement material to an obligation to pay … money … to the Government."  31 U.S.C. §3729(a)(1)(G).  It also authorizes private entities to sue on behalf of the government and "provide[s] cash bounties in certain circumstances" when such *qui tam* actions succeed.  *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994); *see* 31 U.S.C. §3730(b), (d).  Because "overly generous *qui tam* provisions present the danger of parasitic exploitation of the public coffers," however, Congress has enacted several limits on such lawsuits.  *Springfield Terminal*, 14 F.3d at 649.

One such limit is the FCA's mandate that "[t]he court shall dismiss an[y *qui tam*] action or claim … if substantially the same allegations or transactions … were publicly disclosed," unless the plaintiff was an "original source." 31 U.S.C. §3730(e)(4). As the D.C. Circuit has explained, "Congress sought to limit *qui tam* actions to those in which the relator has contributed significant independent information," via "the blocking of freeloading relators who copy their complaints directly from public disclosures." *United States ex rel. Findley v. FPC-Boron Employees's Club*, 105 F.3d 675, 682, 685 (D.C. Cir. 1997) (quotation marks omitted). Congress recognized that "[o]nce the information is in the public domain, … [a]llowing *qui tam* suits … may either pressure the government to prosecute cases when it has good reasons not to or reduce the government's ultimate recovery." *Id.* at 685.

2.    *The FCC's Designated-Entity Program*

The FCC uses competitive bidding to award wireless-spectrum licenses. *See In the Matter of Northstar Wireless, LLC*, 30 FCC Rcd. 8887, ¶13 (2015) ("FCC Order"); FAC ¶43. To address Congress's desire that such licenses be distributed among a "wide variety of applicants, including small businesses," 47 U.S.C. §309(j)(3)(B), the Commission implemented a "designated-entity" program to help small businesses compete successfully for licenses, 47 C.F.R. §1.2110(a). Under FCC rules, qualifying "small businesses" or "very small businesses" can apply for designated-entity status, which entitles them to discounts (sometimes referred to as "bidding credits") on any licenses won during a spectrum auction. *Id.* §1.2110(b), (f).

Because spectrum licenses are expensive, many designated entities lack sufficient capital (even with discounts) to buy the licenses. Indeed, the FCC has observed that "the primary impediment to participation [in FCC spectrum auctions] by designated entities is lack of access to capital." *In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, 9 FCC Rcd. 5532, ¶10 (1994). FCC rules therefore permit "investment in [designated

entities] by entities that do not meet the size restrictions" (i.e., are not themselves small businesses), so long as the investor does not exercise "de facto [or] de jure control" over the designated entity.  *Id.* ¶205; *accord id.* ¶15.

### B.    Factual Background And Related Proceedings

#### *1.    The FCC uses its standard disclosure-based process for Auction 97*

In 2014, the FCC announced that it would put certain wireless-service licenses up for bidding in Auction 97.  *See* FCC Public Notice, *Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for Nov. 13, 2014*, 29 FCC Rcd. 8386, ¶1 (2014) ("*Auction Announcement*"). Auction 97 employed the Commission's customary two-step disclosure process.

First, each prospective bidder had to submit a "short-form application" establishing its eligibility to participate in the auction and, for those seeking price discounts, its qualifications as a small or very small business.  *See Auction Announcement*, 29 FCC Rcd. 8386, ¶¶63-64, 84-89; *see also* 47 C.F.R. §1.2112(b)(1)(iii) (2014).  Consistent with then-governing FCC regulations, *see* 47 C.F.R. §1.2105(c)(1) (2014), Auction 97's rules permitted participants to enter into joint bidding arrangements with other bidders, provided those arrangements were disclosed to the Commission, *Auction Announcement*, 29 FCC Rcd. 8386, ¶23.  Applicants thus had to (1) disclose in their short-form applications the existence of any bidding agreements and (2) certify that they had disclosed all agreements required by applicable rules.  *See id.* ¶¶23, 26; *see also* 47 C.F.R. §1.2105(a)(2)(viii)-(ix) (2014); *id.* §1.2105(c)(1) (2014).

Second, after the auction, each winning bidder had to "file a more comprehensive long-form application," which the FCC reviewed to verify the applicant's eligibility to hold a spectrum license and (for those seeking designated-entity status) to receive the requested discount.  *Auction Announcement*, 29 FCC Rcd. 8386, ¶¶63, 231.  Long-form applications also

had to disclose the "specific terms, conditions, and parties involved in any agreement" relating to the licenses to be auctioned. *Id.* ¶¶33, 63, 230; *see also* 47 C.F.R. §§1.2107(d), 1.2110(j).

> 2. *The Bidding Defendants apply to participate in Auction 97 by making the required disclosures*

To participate in Auction 97, Northstar Wireless, LLC and SNR Wireless LicenseCo, LLC—two minority-owned very small businesses—borrowed money and secured equity investments from subsidiaries of DISH Network Corporation and others. Northstar, SNR, and American AWS-3 Wireless I LLC ("American I"), which are referred to collectively here as the Bidding Defendants, each filed an application with the FCC to participate in the auction. FAC ¶81. The applications described the applicants' organizational structures and business relationships, including DISH's interests in each. As a wholly-owned subsidiary of DISH, American I did not seek designated-entity status. *See* American I Short Form, FCC File Number 0006458188, Auction 97 (2014). Northstar and SNR did. FAC ¶¶82-84. To establish their eligibility for that status, Northstar and SNR disclosed their average annual gross revenues, including those of affiliates; their controlling interests; the affiliates of those interests; and the entities with which they had any attributable material relationship. Northstar Short Form, FCC File Number 0006458325, Auction 97, Ex. B at 1-2, 5 (2014); SNR Short Form, FCC File Number 0006458318, Auction 97, Ex B at 3 (2014).

The Bidding Defendants also disclosed that they had entered into joint bidding arrangements with each other. In particular, they disclosed (1) a bidding protocol and joint bidding arrangement among Northstar, American I, and their affiliates, (2) a similar arrangement among SNR, American I, and their affiliates, and (3) a letter agreement among the three applicants and their affiliates. Northstar Short Form, Agreements tab, Ex. C at 2, 25-28 (2014); SNR Short Form, Agreements tab, Ex. C, Ex. E at 1-2, 24-27 (2014); American I Short Form,

Agreements tab; *see also* FAC ¶¶87-89.  The applications summarized the contents of these agreements and the actions the parties intended to take pursuant to them.  For example, SNR stated that it and American I would "coordinate bidding for licenses in Auction 97 … to facilitate the consolidation of their systems," and that "such coordination [would] be effected by communications among authorized representatives of the parties at regular intervals during the auction."  SNR Short Form, Ex. E at 26.  The Bidding Defendants also disclosed that they would "coordinate regarding bids, bidding strategy and post-auction market structure" in order "to fulfill their respective strategic purposes, … to facilitate roaming arrangements among the Parties or their affiliates, and to facilitate consolidation of their systems to the extent contemplated by" the other disclosed agreements.  *Id.* at 27.  In addition, the letter agreement stated that, "[b]y virtue of DISH's interests in" American I, Northstar, and SNR, and of the parties' joint bidding arrangements, "each applicant will be deemed to have knowledge of the other[s'] bids [and] bidding strategies."  *Id.*

> 3.    *The FCC publicly releases a bid-by-bid breakdown of the auction as soon as it ends*

Bidding in Auction 97 ran from November 2014 to January 2015.  FCC Order ¶3.  The FCC's rules for the auction mandated bidder anonymity, meaning that during the auction, participants saw the amounts bid by competitors but not the competitors' identities.  FAC ¶67.  Throughout the auction, however, the Commission had visibility into every bid and each participant's bidding conduct.  *See Auction Announcement*, 29 FCC Rcd. 8386, ¶¶149-150.  It also had the authority to "delay, suspend, or cancel the auction" if there was "evidence of … unlawful bidding activity, or for any other reason that affects the fair and efficient conduct of competitive bidding."  *Id.* ¶180.  The FCC took no such action.

Soon after Auction 97 closed, the FCC publicly released a thorough bid-by-bid breakdown of the auction. *See* FCC Public Notice, *Auction of Advanced Wireless Services (AWS-3) Licenses Closes*, 30 FCC Rcd. 630, ¶4 (2015) ("*Auction Closes*"). That breakdown, which was (and remains) posted on the FCC's website, https://www.fcc.gov/auction/97/round-results, identifies each auction participant and the amounts each participant bid on each license in each of the auction's 341 rounds. It also includes "bidder summaries" regarding each participant.

As winning bidders, Northstar and SNR each filed post-auction disclosures that contained the same type of information about their organizational structures, ownership, and joint bidding arrangements as their pre-auction applications, including copies of their agreements. *See* 47 C.F.R. §1.2107(d) (requiring that long-form applications include "a detailed explanation of the terms and conditions and parties involved in any bidding … or other agreement or arrangement [the applicant] had entered into relating to the competitive bidding process"); *id.* §1.2110(j) (requiring designated entities to list, summarize, and provide copies of "all agreements that affect designated entity status" including spectrum leasing, resale, or use agreements). These applications, too, were posted and remain available on the FCC's public website.[1]

### 4. *Auction 97 generates significant publicity*

Immediately after the auction, several media outlets and members of Congress published editorials and other opinion pieces alleging that DISH took advantage of rules meant to help smaller business—including charging that DISH had set up Northstar and SNR as shams—and urging the FCC to investigate. For instance, a *New York Times* editorial argued that DISH had

---

[1] Long-form applications can be found by searching by applicant name or file number at http://wireless2.fcc.gov/UlsApp/ApplicationSearch/searchAppl.jsp. Northstar's file number is 0006670613, and SNR's is 0006670667.

"taken advantage of rules meant to help small, rural, female- and minority-owned businesses,"

and urged the FCC to "crack down on such abuse." Editorial Board, *Government Handouts at*

*Wireless Auctions*, N.Y. Times (Feb. 3, 2015), http://nyti.ms/1zBVydL. Similarly, a then-U.S.

senator and a then-FCC commissioner jointly argued in the *Wall Street Journal* that DISH

created Northstar and SNR to manipulate the bidding, questioning why and how "the two

companies magically managed to place bids more than seven times those of spectrum-hungry T-

Mobile." Ayotte & Pai, Opinion, *Ending Welfare for Telecom Giants*, Wall St. J. (Feb. 4, 2015),

http://on.wsj.com/18OXcyl. And another then-senator stated in an open letter to the FCC that

she was "troubled by reports of Dish Network's use of the [FCC's] designated entity program to

receive more than $3 billion in discounts," exhorting the Commission to "thoroughly

investigate" before awarding those entities any licenses. Letter from Sen. Claire McCaskill to

Chairman Thomas Wheeler (Feb. 26, 2015), https://docs.fcc.gov/public/attachments/DOC-

332744A2.pdf; *compare* FAC ¶¶2, 4, 108 (likewise alleging that defendants' supposed abuse of

the designated-entities program cost the government "at least $3.3 billion").[2]

Similar allegations, based on the information about the Bidding Defendants' corporate

structures and auction conduct that the FCC had made public, continued to appear in the media

in the ensuing weeks. The *Wall Street Journal*, for example, asserted that DISH "created two

investment vehicles" in order "to qualify for a 25% discount that is meant to bring small players

---

[2] The sources cited in this paragraph and elsewhere regarding public disclosure can be
considered by the Court, not to establish the truth of the allegations made in the sources—
defendants obviously do not assert or agree that those allegations are true—but rather for the
indisputable fact that each source contains the information described therein, i.e., that that
information was publicly disclosed. *See, e.g.*, *Washington Post v. Robinson*, 935 F.2d 282, 291
(D.C. Cir. 1991) (judicially noticing "newspaper articles"); *United States ex rel. Bernier v.
InfiLaw Corp.*, 311 F.Supp.3d 1288, 1292 (M.D. Fla. 2018) ("[C]ourts may take judicial notice
of documents such as newspaper articles and information on publicly available websites." (citing
*United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 n.4 (11th Cir. 2015))).

into the wireless industry."  Ramachandran, et al., *Behind Dish Wireless Coup, Ties to Alaskan Native Groups*, Wall St. J. (Feb. 3, 2015), http://on.wsj.com/2ePOs20.  One commentator also called on the FCC to investigate the "agreements among Dish, Northstar, and SNR" regarding "bidding, financial dealings, management, day-to-day operations and network sharing, among other issues," and to "also consider post-auction announcements, statements and actions by Dish, Northstar or SNR regarding their relationship" as well as "auction data relating to the bidding activity of Northstar and SNR in determining which company was really in control during the auction."  Goldstein, *Dish's Road to $3.33B in AWS-3 Discounts Included a Complex Web of Investments*, FierceWireless (Feb. 4, 2015), https://bit.ly/2zvPWXq.  This was a few days after the *Journal*, in reporting on "grumbling about Dish's access to bidding credits," noted that the Bidding Defendants had "frequently each bid the same amount in the same round on the same license."  Gryta, et al., *Dish Network Surprise Winner In Spectrum Auction*, Wall St. J. (Jan. 30, 2015), https://on.wsj.com/2PTfqbx; *compare* FAC ¶92.

A third *Journal* article likewise claimed that its authors had discovered DISH's "complex strategy" for the auction through an "examination of round-by-round bidding records, documents filed with the [FCC] and comments by Dish Chairman Charlie Ergen ahead of the auction"—an examination that found that early in the auction, the Bidding Defendants "were bidding aggressively on many licenses across the country, creating the impression there were more bidders than there actually were."  Gryta & Knutson, *Behind Dish Network's Race for Wireless Spectrum*, Wall St. J. (Feb. 12, 2015), http://on.wsj.com/1F3CsAs.  The article also specified instances when "Dish's entities appeared to bid against each other."  *Id.*; *compare* FAC ¶92.

Others made comparable allegations publicly.  AT&T, for example, called into question the relationship between DISH, Northstar, and SNR, alleging that DISH "incorporated two DEs

maintaining an 85% 'non-controlling' financial interest in both" and "entered into a joint bidding arrangement with both," and that the Bidding Defendants "routinely triple bid licenses (inflating demand) until Dish dropped out of the auction and then the DEs double bid them."  Marsh, *Lessons From Auction 97 For Future Auctions*, AT&T Public Policy Blog (Feb. 20, 2015, 10:20 am), https://bit.ly/3NMzkAh; *compare* FAC ¶92.  Based on those assertions, AT&T claimed that Northstar and SNR had not engaged in "independent decision making."  Marsh, *supra*.  In other words, AT&T alleged precisely what relator now alleges: that defendants "did not disclose that … Northstar … and SNR … were not independent decision-makers."  FAC ¶129.

Similarly, an industry blogger claimed months before this lawsuit was filed to have discerned that DISH was "distorting prices by bidding against" itself.  Farrar, *How To Blow Up A Spectrum Auction…*, TMF Associates Blog (Jan. 31, 2015 4:00 pm), https://bit.ly/2Qnuxqw. Analyzing public bidding data, the blogger hypothesized that DISH had "clearly" issued "instructions" to Northstar and SNR "to bid on all the licenses simultaneously in key cities, to ensure that AT&T, Verizon and T-Mobile simply didn't know how much spectrum each other and DISH were looking to buy."  *Id.*; *see also* Buskirk & Chertock, *Dish's Bidding Strategy in AWS-3 Auction Said To Raise Big Questions for FCC*, Communications Daily (Mar. 6, 2015); Hendel & Buskirk, *FCC Raising New Questions About Role of DEs in Auctions*, Communications Daily (Mar. 25, 2015).

Still more public disclosure occurred in the same time period in the form of letters to the FCC (which were publicly available on the Commission's website almost as soon as they were submitted).  For example, on the same day as its blog posting discussed above, AT&T wrote to the Commission alleging (1) that during Auction 97, "Dish, together with two newly formed entities in which Dish holds an 85 percent equity interest, engaged in a scheme in which they

placed double or even triple bids on numerous licenses throughout the auction;" (2) that "[t]hese 'insincere' double and triple bids created the illusion of an additional $17 billion worth of demand"; and (3) that "[v]irtually all of the unfair advantages the Dish entities were able to gain through gaming the joint bidding rules arise from the fact that there was, as a practical matter, a single bidding entity acting through three separate applicants." AT&T Letter to FCC, *Re: Updating Part 1 Competitive Bidding Rules, WT Docket No. 14-170*, at 2 (Feb. 20, 2015). Likewise, Verizon wrote to the FCC in April 2015, about a meeting with the Commission at which a supposed Verizon expert had "[p]resented her economic analysis of the bidding by DISH and two designated entities, Northstar Wireless and SNR Wireless, during the AWS-3 auction." Verizon Letter to FCC, *Re: Updating Part 1 Competitive Bidding Rules, WT Docket No. 14-170*, at 1 (Apr. 24, 2015) ("Verizon April Letter"). The letter attached the supposed expert's analysis, and summarized the following purported findings:

- "[B]y placing double and triple bids, DISH and the DEs sent the false signal to other bidders of more robust demand, which may have deterred other bidders or caused them to drop out of the auction."

- "For 27 percent of the licenses they won at auction (190 licenses), Northstar and SNR 'accepted' the FCC's random assignment of one of them as the randomly picked provisionally winner after they each bid the same amount, rather than compete against one another for the licenses. This occurred only five other times in the AWS-3 auction for all other bidders. This behavior suggests that the DEs anticipated that they would coordinate and allocate licenses between them post-auction."

- "The auction data show that DISH colluded with the DEs to exit the auction early, without risk and without penalty. It did this by ensuring that, when DISH exited the auction following round 20 when it was the high bidder on several hundred licenses, the DEs topped its previous high bids on virtually all those licenses."

- "[W]hen DISH suddenly exited the auction in rounds 20-22, the DEs replaced DISH on 91% of the licenses in these rounds which DISH had provisionally won…. [B]y handing off licenses to the DEs, DISH avoided the risk of having to pay for any of them—and the DEs became high bidders at a 25 percent lower price."

*Id.* at 2.

By the end of April 2015 (still before this case was filed), a congressional investigation was focused on these same bidding behaviors. On April 27, 2015, the press reported that then-FCC Chairman Tom Wheeler told Commission staff shortly after the auction ended to study SNR's and Northstar's applications closely because "something didn't smell right." Knutson, *Regulators May Reject Dish Entities' Spectrum Discount Claims*, Wall St. J. (Apr. 27, 2015), https://on.wsj.com/2F5B08v. Two days later, the Senate Committee on Commerce, Science, and Transportation announced an investigation into a "$3 Billion Collusion Concern in FCC Spectrum Auction," including an "examination of how these affiliated companies approached the auction." Press Release, *Commerce Probes $3 Billion Collusion Concern in FCC Spectrum Auction* (Apr. 29, 2015), https://bit.ly/2yTl2Zl. The committee's press release included links to letters sent that day to the FCC, DISH, Northstar, and SNR, noting that auction "participants have raised concerns that the pattern of bids by DISH and its affiliates suppressed competition." *Id*. The letters described the Bidding Defendants' behavior, including that: (1) the designated entities "would not continue to compete among themselves" after others ceased bidding; (2) they accepted the FCC's random-number generator to break ties between them; and (3) American I "dropp[ed] out when it was only competing against Northstar or SNR." Letter from Sen. John Thune to John Muleta, Atelum CEO (Apr. 29, 2015), https://bit.ly/2AZt3MB ("Thune Letter to Muleta"). Again, relator's complaint now repeats these allegations. It alleges, for example, that once the Bidding Defendants "eliminate[d] competitors for the spectrum they sought, American I … dropped out of the bidding," FAC ¶93, and that "after the DISH-Controlling Defendants … push[ed] out the competitors, [Northstar and SNR] generally stopped bidding," *id*. ¶95.

Congress's letters referenced "signs of collusion" and called for "investigation into the contractual arrangements and any potential coordinated Auction 97 bidding activity between DISH, Northstar, and SNR." Letter from Sen. John Thune to Chairman Thomas Wheeler (Apr. 29, 2015), https://www.commerce.senate.gov/services/files/e865afff-3681-4f23-89fc-920d21fd557e ("Thune Letter to Wheeler"). They also requested "all documents relating to the contractual and bidding arrangements between" the companies. Thune Letter to Muleta, *supra*.

5. *The FCC investigates the allegations and finds no fraud*

By May 11, 2015, seven parties, including relator, had petitioned the FCC to deny Northstar's and SNR's applications for the licenses they won in Auction 97. FCC Order ¶¶10, 30. Based on an analysis of the Bidding Defendants' publicly disclosed bidding behavior and agreements, the petitioners contended that Northstar and SNR were controlled by DISH and therefore did not qualify for price discounts. *Id.* ¶10. Some further claimed that Northstar and SNR had made material misrepresentations to the FCC by not disclosing DISH's control. *See id.*

Many of the specific arguments that relator advances in the operative complaint here appeared in these petitions. For example, relator claimed before the FCC that the Bidding Defendants failed to disclose all relevant joint bidding arrangements, *see* Petition to Deny of VTel Wireless, Inc. at 30 (May 11, 2015) ("VTel Pet."), and that "[t]he disclosures by SNR and Northstar about their joint bidding agreements with DISH were misleading and inaccurate," Reply of VTel Wireless, Inc. in Support of Petition to Deny at 29 (May 26, 2015); *see also id.* at 30-31 (alleging that Northstar and SNR failed to disclose "what they really intended to accomplish through joint bidding with DISH" and that "the 'purposes' of joint bidding were their plans to add 'value to DISH'"); *compare* FAC ¶130. Two petitions claimed the Bidding Defendants purposely created an impression of false demand that deterred other bidders. VTel Pet. 5, 14; Petition to Deny of Central Texas Telephone Investments LP et al., at 3-5 (May 11,

2015) ("Central Texas Pet."); *compare* FAC ¶92. And three petitions claimed that during the auction the Bidding Defendants used a "handoff" strategy to ensure that Northstar and SNR, rather than American I, won licenses and benefited from the price discounts. Central Texas Pet. 5-6; Petition to Deny of Communications Workers of America et al., at 5 (May 11, 2015) ("CWA Pet."); VTel Pet. 25; *compare* FAC ¶¶93-94. Relator's petition—which itself simply repeated the prior public disclosures discussed above—further alleged that "DISH dominated the bidding process" and "could veto any deviations to the agreed upon bidding plans of the parties." VTel Pet. 21-22; *compare* FAC ¶13.

In August 2015, the FCC granted in part the petitions to deny. FCC Order ¶163. Considering "the totality of the circumstances," including "the various Agreements entered into among and between DISH, SNR and Northstar," the Commission found that DISH exercised *de facto* control over Northstar and SNR, rendering them ineligible for price discounts. *Id.* ¶49. The FCC also found, however, that Northstar and SNR had complied with the auction's disclosure requirements, had not made any material misrepresentations to the agency, and had not "attempted to mislead the Commission about their respective relationships with DISH." *Id.* ¶132. The Commission specifically rebuffed the petitioners' fraud claims and found that Northstar's and SNR's "disclosure of their agreements and of the existence of their bidding arrangements was sufficient to comply with the disclosure obligations of [the FCC's] rules, and … their bidding activity did not violate the previous FCC rules that governed Auction 97." *Id.* ¶9; *see also id.* ¶132 ("the entire record indicates that the Applicants and DISH disclosed their ownership structures and related Agreements as required"); ¶136 (similar).

## C.     Procedural History

Relator filed this action in May 2015—after the petitions to deny were filed with the FCC and after the articles, letters, blogs and other material referenced above became public. Relator's

complaint asserted the same allegations of fraud and failure to disclose that were at issue in those petitions and other materials. Dkt. 1. The United States investigated relator's allegations and declined to intervene. Dkt. 7. Relator's complaint was then unsealed and served. *See* Dkts. 18, 38.

Relator's amended complaint presents a single fraud theory: that defendants' applications to participate in the auction were false because they allegedly failed to disclose unspecified "[i]nstruments, agreements, or understandings between and among the defendants that were relevant to the claim by Northstar … and SNR … that they were not under the *de facto* control of DISH." FAC ¶131. In particular, relator alleges that Northstar, SNR, and American I did not disclose all relevant joint bidding arrangements, *id.* ¶¶129-130, and that the bidding agreements they did disclose were misleading and inaccurate, *id.* ¶114. It also alleges that Northstar and SNR "necessarily" had one or more undisclosed agreements with DISH "to obtain, or use, or buy and re-sell" the spectrum Northstar and SNR won "after the five-year non-transfer period." *Id.* ¶130. Relator's inference that one or more undisclosed agreements existed is based on "the observed behavior" of the Bidding Defendants, *id.* ¶115, which supposedly included a coordinated bidding strategy that created an impression of false demand to deter other bidders, *id.* ¶92, and a "hand[] off" strategy to ensure that Northstar and SNR won licenses rather than American I, *id.* ¶93. Thus, according to the amended complaint, Northstar's and SNR's behavior during the auction was "designed solely to" add value to DISH. *Id.* ¶117.

Defendants moved to dismiss the amended complaint on multiple independent grounds, including the public-disclosure bar. Dkt. 77. Their reply brief, however, expressly withdrew the public-disclosure argument "without prejudice" and "for purposes of the motion to dismiss only." Dkt. 80 at 2 n.2.

This Court granted defendants' motion to dismiss, holding that the FCA's government-action bar required dismissal because this action is "based upon allegations or transactions which are the subject of … an administrative civil money penalty proceeding," and that relator's amended complaint failed to satisfy the FCA's "demanding" materiality standard. Dkt. 86. Relator appealed and the D.C. Circuit reversed. *See United States ex rel. Vermont National Telephone Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022).

While this case was before the D.C. Circuit, another judge in this district dismissed the complaint in *United States ex rel. O'Connor v. United States Cellular Corp*., 2022 WL 971290 (D.D.C. Mar. 31, 2022). The relator in that case similarly alleged undisclosed control of an entity claiming designated-entity status in the same auction at issue here, Auction 97. *Id*. at *3. The court dismissed on public-disclosure grounds, concluding that the relator's claims were based on documents that either were disclosed on the FCC's public website or that the relator itself had publicized and submitted to the FCC. *Id*. at *5. The court reiterated that "[a] relator cannot overcome the public disclosure bar by only contributing 'speculation, background information or collateral research' to publicly existing information." *Id.* It accordingly rejected as insufficient alleged "private surveillance" that the relator engaged in to build on the public FCC filings, holding that "it is not enough to simply allege that nonpublic information exists; relators must provide enough information to make the entire body of evidence in a claim not 'substantially the same' as what has already been publicly disclosed." *Id.* Because the filings with the FCC would themselves "have given the Government sufficient notice to 'adequately investigate the case and to make a decision whether to prosecute,'" the alleged additional information did not change the court's public-disclosure calculus. *Id.*

**LEGAL STANDARD**

"The standard for reviewing a motion for judgment on the pleadings is essentially the same as that for motions to dismiss under Rule 12(b)(6)." *Kambala v. Checchi & Co. Consulting*, 280 F.Supp.3d 131, 136 (D.D.C. 2017). Thus, "[j]udgment is appropriate when a complaint fails to state a claim upon which relief can be granted." *Id*. (quotation marks omitted). And "[a]s with a motion to dismiss, the court should grant judgment on the pleadings if the facts alleged in the complaint do not 'raise a right to relief above the speculative level' or if they 'fail to state a claim to relief that is plausible on its face.'" *Id*. at 137 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "When evaluating a motion for judgment on the pleadings, the court may rely on the pleadings, the exhibits to the pleadings, and any judicially noticeable facts to assess whether the movant has met its burden." *Id*.

The public-disclosure bar requires dismissal "if substantially the same allegations or transactions" in the complaint "were publicly disclosed" in an "administrative hearing in which the Government or its agent is a party," "in a congressional … or other Federal report, hearing, audit, or investigation," or by "the news media." 31 U.S.C. §3730(e)(4)(A). Where this standard is met, the relator can avoid dismissal only by qualifying as an "original source." *Id*. §3730(e)(4)(B).

**ARGUMENT**

**I. THE PUBLIC-DISCLOSURE BAR REQUIRES DISMISSAL**

Relator's amended complaint rests on a single theory of liability, namely that, given the observed bidding behavior of DISH, Northstar, and SNR during Auction 97, they must necessarily have had one or more "instruments, agreements, and understandings relevant to [Northstar's and SNR's] claimed designated entity status" that Northstar and SNR fraudulently failed to disclose to the FCC. FAC ¶125; *see also id.* ¶128. The amended complaint should be

dismissed because both "the transactions that give rise to [the claimed] inference of fraud" and "the allegation of fraud itself," *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 471 (D.C. Cir. 2016), were publicly disclosed—in many cases by the FCC itself—before this case was filed, and relator is not an original source.[3]

## A.     The Factual Allegations And Claim Of Fraud Were Publicly Disclosed Before Relator Filed Its Complaint

The FCA's public-disclosure bar applies "if substantially the same allegations or transactions" underlying a claim were previously disclosed through a statutorily enumerated channel.  31 U.S.C. §3730(e)(4)(A).  This test is met if a relator's allegations overlap "even partly" with the publicly disclosed allegations.  *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 238 (3d Cir. 2013).[4]

More specifically, the D.C. Circuit has held that the bar applies if there has been a public disclosure of either side of the equation X + Y = Z, where "Z represents the allegation of fraud and X and Y represent its essential elements."  *Oliver*, 826 F.3d at 471.  An action is precluded, that is, if qualifying disclosures either give rise to an inference of the fraud alleged in the complaint (X + Y) or expressly allege the fraud itself (Z).  *See id*.  In either situation, the public

---

[3] VTel has expressly disavowed any theory of liability here other than the "secret-agreement" theory articulated in paragraphs 125-128 of the amended complaint, including any claim of liability based on defendants' misinterpretation of the FCC's rules regarding *de facto* control.  *See* Dkt. 78 at 44-45.  But as explained below, *see infra* Part I.A.3, even if any such theory remained, dismissal of it would likewise be required under the public-disclosure bar.

[4] *Accord United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 58 (1st Cir. 2009); *United States ex rel. Battle v. Board of Regents of Georgia*, 468 F.3d 755, 762 (11th Cir. 2006) (per curiam); *Minnesota Association of Nurse Anesthetists v. Allina Health Systems Corp.*, 276 F.3d 1032, 1047 (8th Cir. 2002); *United States ex rel. McKenzie v. BellSouth Tele-communications, Inc.*, 123 F.3d 935, 940 (6th Cir. 1997); *United States ex rel. Federal Recovery Services, Inc. v. Crescent City E.M.S., Inc.*, 72 F.3d 447, 451 (5th Cir. 1995); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993); *United States ex rel. Precision Co. v. Koch Industries, Inc.*, 971 F.2d 548, 553 (10th Cir. 1992).

disclosures need not *prove* a case of fraud (or even "use the word 'fraud,'" *United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813, 823 (6th Cir. 2021)).  It is enough that they "could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999).  In other words, "[i]t is sufficient that the publicly disclosed transaction … raise[s] the inference of fraud." *Oliver*, 826 F.3d at 473.

Here, *both* X + Y *and* Z were publicly disclosed before relator filed suit.

      *1.*      *The facts giving rise to the inference of the purported fraud (X + Y) were publicly disclosed*

The "essential elements" (X + Y) of relator's fraud allegation include (1) the Bidding Defendants' corporate structures, the contents of their disclosed agreements, and their conduct during the auction, and (2) the allegedly false certifications that Northstar and SNR had disclosed all relevant agreements.  All of that was disclosed—through channels that qualify as public disclosures under the FCA—before the complaint here was filed.

To begin with, in October 2014 (many months before VTel brought this action), the FCC posted on its public website the Bidding Defendants' short-form applications, which describe the corporate and contractual relationships on which relator relies and contain the certifications that it claims are false. *Auction Closes*, 30 FCC Rcd. 630.  And on April 29, 2015 (weeks before this case was filed), the FCC posted on its website Northstar's and SNR's long-form applications, which repeat the short-form applications' detail concerning organization, ownership, and joint-bidding arrangements, as well as the certifications and underlying documents. *See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1028 (D.C. Cir. 2017).  All this information publicly disclosed by the FCC matches—nearly verbatim—relator's allegations here about the

defendants' organizational structures, disclosures and certifications, and bidding agreements. *Compare Auction Closes, supra*, *with* FAC ¶¶15-38, 77-90, 109-112.

Moreover, on January 30, 2015—over three months before relator filed this suit—the FCC published on its public website a summary of the 341 rounds of auction bidding activity. *Auction Closes, supra*. This included the identity of each auction participant and the amount each participant bid on each license in each round of Auction 97. *Id*. That summary contains all the information that relator subsequently alleged in the complaint about bidding activity during the auction. *Compare id.*, *with* FAC ¶¶91-107, 114-117. To be clear: Everything relator alleges about defendants' bidding behavior comes from this single public disclosure; relator has no independent or inside information about defendants' auction conduct. *See infra* pp.26-30.

These disclosures on a public government website constitute both a "Federal report" and a disclosure by "the news media" for purposes of the public-disclosure bar. 31 U.S.C. §3730(e)(4)(A); *see Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011); *Oliver*, 826 F.3d at 475-476; *United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F.Supp.3d 111, 124-125 (D.D.C. 2015). Indeed, appellate courts "have unanimously construed the term 'public disclosure' to include websites and online articles." *United States ex rel. Beauchamp v. Academi Training Center*, 816 F.3d 37, 43 n.6 (4th Cir. 2016); *see also United States ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1079 (8th Cir. 2014); *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 813 (11th Cir. 2015); *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 523 (6th Cir. 2020). That extends to websites not associated with traditional media outlets; as another judge in this district explained, for example, "news media" encompasses all "readily accessible websites," *United States ex rel. Doe v. Staples, Inc.*, 932 F.Supp.2d 34, 40 (D.D.C. 2013), *aff'd*, 773 F.3d 83 (D.C. Cir. 2014);

*accord Kraxberger*, 756 F.3d at 1079; *United States ex rel. Green v. Service Continental Education & Training Trustee Fund*, 843 F.Supp.2d 20, 32-33 (D.D.C. 2012); *Oliver*, 101 F.Supp.3d at 125; *United States ex rel. Hong v. Newport Sensors, Inc.*, 2016 WL 8929246, at *5 (C.D. Cal. May 19, 2016); *United States ex rel. Harper v. Muskingum Watershed Conservancy District*, 2015 WL 7575937, at *6 (N.D. Ohio Nov. 25, 2015).

Here there is no doubt, given the disclosures recited above that were made on public websites, that the government would "have [been] alerted … to the likelihood of [the alleged] wrongdoing," *Settlemire*, 198 F.3d at 918; *see also Oliver*, 826 F.3d at 471. And because those disclosures involved "substantially the same allegations or transactions as alleged in the action," 31 U.S.C. §3730(e)(4)(A), the "X + Y" side of the D.C. Circuit's equation is satisfied, barring relator's claims.

### 2. The allegation of fraud (Z) was publicly disclosed

The public-disclosure bar independently applies here because "Z"—that is, "the allegation of fraud itself," *Oliver*, 826 F.3d at 471—was publicly disclosed before relator filed its complaint, specifically in "the news media" and during "congressional … hearings," 31 U.S.C. §3730(e)(4)(A). As discussed, *see supra* pp.7-13, as soon as Auction 97 ended, there was reporting on the auction results as well as scrutiny by analysts, auction participants, and government officials (scrutiny on which the media also reported) of both the designated-entity program and defendants' conduct. These public materials closely mirror relator's later allegations; indeed, relator's complaint parrots them.

In particular, the public materials posited the same secret-agreement theory that relator presses here; that is, they disclosed "the allegation of fraud itself," *Oliver*, 826 F.3d at 471. For example, in April 2015, public letters from Sen. John Thune to the FCC, DISH, Northstar, and SNR—letters linked in a press release announcing a Senate committee investigation of Auction

97, *see supra* p.12—suggested the existence of undisclosed agreements between and among defendants here by referencing "signs of collusion" and calling for "investigation into the contractual arrangements and any potential coordinated Auction 97 bidding activity between DISH, Northstar, and SNR." Thune Letter to Wheeler, *supra*. The letters accordingly requested "all documents relating to the contractual and bidding arrangements between" the companies. Thune Letter to Muleta, *supra*.

Competitors publicly raised the same secret-agreement theory, alluding to an undisclosed relationship between or among DISH, Northstar, and SNR. For instance, months before relator brought this action, Verizon met with FCC representatives to discuss defendants' bidding behavior during the auction, as memorialized in a subsequent letter alleging that defendants had "engaged in concerted conduct that went beyond the activity that occurs during typical bidding agreements or bidding consortia" but rather suggested a "pattern … unlikely to have occurred by chance." Verizon Letter to FCC, *Re: Updating Part 1 Competitive Bidding Rules, WT Docket No. 14-170*, at 1-2 (Feb. 27, 2015) ("Verizon February Letter"). Verizon met with the FCC again in April 2015 (still weeks before this case was filed), this time having engaged an economics expert who alleged to the agency that "the auction data reveal extensive evidence of collusion" by defendants. *Verizon* April Letter at 1. Verizon also alleged that "by placing double and triple bids, DISH and the DEs sent the false signal to other bidders of more robust demand, which may have deterred other bidders or caused them to drop out of the auction," and that "by handing off licenses to the DEs, DISH avoided the risk of having to pay for any of them—and the DEs became high bidders at a 25 percent lower price." *Id.* at 2; *compare* FAC ¶¶92-93.

AT&T similarly alleged on a public blog (months before this case was brought) that Northstar and SNR had not engaged in "independent decision making."  Marsh, *supra*; *see also Reply Comments of King Street Wireless, L.P.*, WT Docket No. 14-170, at 8 (March 6, 2015) (alleging that defendants' "bidding patterns unmistakably show that collusion occurred"); *compare* FAC ¶129.  AT&T made much the same allegations in its February 2015 letter to the FCC, charging (at 1) that DISH, Northstar, and SNR "engaged in a scheme in which they placed double or even triple bids on numerous licenses throughout the auction," and concluding that "[t]hese 'insincere' double and triple bids created the illusion of an additional $17 billion worth of demand."  And other commentators made similar claims.  Analyzing the same public bidding data upon which relator relies, one industry blogger hypothesized that DISH had "clearly" issued "instructions" to Northstar and SNR.  Farrar, *supra*.  Another publication called on the FCC to investigate the "agreements among Dish, Northstar, and SNR" regarding "bidding, financial dealings, management, day-to-day operations and network sharing," as well as "statements and actions by Dish, Northstar or SNR regarding their relationship."  Goldstein, *supra*.

Finally, in the week before relator filed this case, several public petitions to deny Northstar's and SNR's applications were filed with the FCC.  *See supra* pp.13-14; *see also* FCC Order ¶¶10, 30.  The public Commission proceedings that these petitions commenced are "[f]ederal … hearings" for purposes of the public-disclosure bar.  31 U.S.C. §3730(e)(4)(A); *see Springfield Terminal*, 14 F.3d at 652 (for FCA purposes, "hearing" is synonymous with "proceeding").  And several of the petitions in those proceedings specifically contended, as relator now does, that Northstar and SNR did not fully or accurately characterize their relationships with DISH.  *See supra* pp.13-14.  A number of them also cited the Bidding

Defendants' bidding behavior, as relator now does, as supposed evidence of the alleged misrepresentation. *See supra* pp.13-14.

That these petitions alerted the government to the possibility of fraud (thereby triggering the public-disclosure bar) is clear from the fact that the FCC, presented with the same facts now made in relator's complaint, *actually opined* on whether there was fraud—and concluded there was not. As noted, the FCC found that Northstar and SNR had not "attempted to mislead the Commission about their respective relationships with DISH." FCC Order ¶132; *see supra* p.14.

It is unsurprising that relator's theory of liability here closely matches what was already disclosed in public materials, because many of the specific allegations in relator's amended complaint are drawn from those same materials. For instance, an article in the *Wall Street Journal* claimed, as noted, that its authors had discovered, through an "examination of round-by-round bidding records," that the Bidding Defendants "were bidding aggressively on many licenses across the country, creating the impression there were more bidders than there actually were." Gryta & Knutson, *supra*. The article also specified instances when "Dish's entities appeared to bid against each other." *Id.*; *see also* Verizon February Letter at 2 (alleging that defendants "deterred competition" through "double and triple bidding [that] created the false impression that there was more competition for certain licenses than was actually the case"). These allegations are repeated in relator's complaint, which states that "[o]nce the bidding commenced, … Defendants implemented a strategy of overlapping bidding by Northstar Wireless, SNR Wireless, and American I in order to create the illusion of high demand." FAC ¶92. Similarly, AT&T alleged on its blog that the Bidding Defendants "routinely triple bid licenses (inflating demand) until Dish dropped out of the auction and then the DEs double bid them." *See* Marsh, *supra*. Again, that allegation is repeated in relator's complaint. *See* FAC

¶92, *cited supra* p.15 (similar allegation of demand inflation). Relator's complaint also echoes

the public letters from Senator Thune to the FCC, DISH, Northstar, and SNR. Those letters

stated that the designated entities "would not continue to compete among themselves" after

others ceased bidding, that they accepted the FCC's random-number generator to break ties

between them, and that American I "dropp[ed] out when it was only competing against Northstar

or SNR." Thune Letter to Muleta, *supra*; *compare* FAC ¶93 (alleging that once the Bidding

Defendants "eliminate[d] competitors for the spectrum they sought, American I … dropped out

of the bidding"); *id.* ¶95 ("[A]fter the DISH-Controlling Defendants … push[ed] out the

competitors, [Northstar and SNR] generally stopped bidding.").

In sum, both the allegation of fraud and its essential elements were publicly disclosed,

repeatedly, and often by the government itself, before relator filed this action. The table attached

as Appendix A highlights examples from the foregoing disclosures. Those various disclosures

demonstrate unequivocally that relator's key allegations—those regarding defendants' auction

conduct and the supposed existence of one or more undisclosed agreements—simply parrot the

pre-existing public record.

> 3. *Any Theory Of Liability In The Amended Complaint Other Than The*
> *"Secret Agreement" Theory Would Likewise Have To Be Dismissed*
> *Under The Public-Disclosure Bar*

When VTel opposed defendants' motion to dismiss the amended complaint, it explicitly

disclaimed reliance on any claim of liability beyond the "secret-agreement" theory articulated in

paragraphs 125-128 of the amended complaint. *See* Dkt. 78 at 44-45; *supra* n.3. In particular, it

disavowed reliance on the theory of its original complaint: that defendants were liable under the

FCA because of their misinterpretation of the FCC's rules regarding *de facto* control. But even

if that original theory remained despite VTel's explicit disclaimer, the action would still have to

be dismissed under the public-disclosure bar. As the foregoing pages make clear, the abundant

public disclosures that predated the filing of this complaint fully encompassed not only VTel's secret-agreement theory but also its original theory. And for all the same reasons given in the next subsection, VTel is not an original source of its original theory any more than of its secret-agreement theory. Liability under VTel's original theory would therefore be foreclosed by the public-disclosure bar as well.

### B. Relator Is Not An Original Source

Since substantially the same allegations or transactions alleged in the complaint were publicly disclosed before it was filed, the case must be dismissed unless relator can show that it is an "original source of the information." 31 U.S.C. §3730(e)(4)(B). An "original source" is:

> an individual who either (1) *prior to a public disclosure* … has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) … has knowledge that is *independent of and materially adds* to the publicly disclosed allegations or transactions, and … has voluntarily provided the information to the Government before filing an action.

*Id.* (emphases added). Relator cannot satisfy either definition.

### 1. *Relator did not voluntarily disclose any information to the government prior to the public disclosures on which relator's allegations depend*

To qualify as an original source under the first definition, relator must have voluntarily disclosed to the government—"prior to a[ny] public disclosure"—the information on which the complaint is based. Relator does not allege that it did so. That is unsurprising: As a rival bidder lacking any inside knowledge, relator could not have made any meaningful disclosure to the government before the bidders' applications and the bid-by-bid breakdown were publicly posted. The FCC recognized this, finding that relator "relie[d] extensively" on SNR's and Northstar's applications in its petitions to deny the price discounts sought by those entities. FCC Order ¶130. Simply put, everything relator alleges in support of its secret-agreement theory comes from the FCC's public disclosure of defendants' applications and bidding activity, and the

extensive other public disclosures identified above—all of which predated this action (and most of which also predated relator's petition to deny). Relator did not voluntarily disclose any information to the government for the simple reason that it had no information of its own to share.

2. *Relator cannot establish that its knowledge is independent of and materially adds to the publicly disclosed information*

Relator likewise has not plausibly pled that it both has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and provided that information to the government before filing its complaint. 31 U.S.C. §3730(e)(4)(B). "'Independent knowledge' is knowledge that is not itself dependent on public disclosure." *Springfield Terminal*, 14 F.3d at 656; *accord United States ex rel. Vierczhalek v. MedImmune, Inc.*, 803 F.App'x 522, 525 (2d Cir. 2020). And to "materially add" to the public disclosures, a relator's allegations must "provide essential elements of the fraudulent scheme which were missing from the prior disclosures." *In re Plavix Marketing, Sales Practices & Products Liability Litigation*, 123 F.Supp.3d 584, 599 (D.N.J. 2015) (quotation marks omitted); *see also Osheroff*, 776 F.3d at 815 (relator did not "materially add to the public disclosures" where they "were already sufficient to give rise to an inference that the clinics were providing illegal remuneration to patients"). This "inquiry focuses not on the additional incriminating information a relator supplies, but instead on whether 'the quantum of information already in the public sphere' was sufficient to 'set government investigators on the trail of fraud.'" *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 87 (D.C. Cir. 2014).

Relator has no relevant "independent knowledge"; as noted, it is a competitor of the Bidding Defendants, and it lacks any inside information about them (which is why its allegations are based entirely on public information). Relator recognizes this, alleging that it is an original

source only because it *analyzed* the "bid-by-bid breakdown of the auction provided by the FCC" and "consul[ted]" with an "expert in FCC bidding economics and game theory." FAC ¶12. This, relator further alleges, led it to conclude that "the observed behavior" of Northstar, SNR, and American I—i.e., the *publicly available* information about their structures, agreements, and auction conduct—demonstrates that defendants submitted false claims. *Id*. ¶115. But claiming to have "uncover[ed] the specific manner" of an already alleged fraud "does not make [relator] an original source," *United States ex rel. Sonnier v. Standard Fire Insurance Co.*, 84 F.Supp.3d 575, 594 (S.D. Tex. 2015)—and of course relator cannot even claim to have done that; it simply copied public allegations of collusive bidding into its complaint.

Nor can relator acquire original-source status by "simply conduct[ing] some collateral research and investigations in response to public allegations, and pair[ing] the results of that research with her background information," *Vierczhalek*, 803 F.App'x at 525-526. Indeed, courts "have repeatedly rejected the argument that a [relator's] knowledge is independent when it is gained through the application of expertise to information publicly disclosed." *Zizic*, 728 F.3d at 240; *see also United States ex rel. Patriarca v. Siemens Healthcare Diagnostics, Inc.*, 295 F.Supp.3d 186, 203 (E.D.N.Y. 2018) (relator who relied on study that merely "parallel[ed the] results" of existing disclosures was not an original source). To qualify as an original source, a relator must instead "base [its] claims on nonpublic information," and not just "add[] speculation to the publicly existing information." *United States ex rel. Shea v. Cellco Partnership*, 863 F.3d 923, 934 (D.C. Cir. 2017). Put another way, relator "must possess substantive information about the particular fraud." *United States ex rel. Schumann v. AstraZeneca Pharms. L.P.*, 769 F.3d 837, 845 (3d Cir. 2014). Its amended complaint is bereft of any such non-public information.

For similar reasons, relator cannot show that its allegations "materially add to" the already-public information (although the Court need not even consider this issue, because the lack of independent knowledge suffices to defeat original-source status). As explained, all the alleged facts in relator's complaint were already publicly disclosed, including defendants' ownership structures and coordinated bidding activities. Nor can the light purportedly shed by relator's expert analysis fix this absence of non-public information. As explained, *see supra* p.11, Verizon disclosed identical-sounding expert analyses alleging collusive bidding behavior to the FCC prior to relator's complaint. In any event, a "disagreement as to the proper interpretation of publicly disclosed data … cannot, as a matter of law, have materially added to the government's knowledge" so as to confer original-source status on a relator, *United States ex rel Coyne v. Amgen, Inc.*, 229 F.Supp.3d 159, 173 (E.D.N.Y. 2017), *report and recommendation adopted*, 243 F.Supp.3d 295 (E.D.N.Y. 2017), *aff'd sub nom. Coyne v. Amgen, Inc.*, 717 F.App'x 26 (2d Cir. 2017). Put another way, "applying expertise to publicly disclosed data" does not make a relator an original source. *United States ex rel. Sirls v. Kindred Healthcare, Inc.*, 536 F.Supp.3d 1, 7-8 (E.D. Pa. 2021). In short, "[p]recedent rejects expertise as an exception to the public disclosure bar." *United States ex rel. Jones v. Sutter Health*, 499 F.Supp.3d 704, 716 (N.D. Cal. 2020); *accord Zizic*, 728 F.3d at 240.

In any event, relator's allegations do not add to the public disclosures regarding Auction 97 at all, let alone materially. Its allegations simply echo those made publicly before its complaint was filed. That is insufficient. Claims that are "substantially the same" as publicly disclosed information do not "materially add to" it. *Kraxberger*, 756 F.3d at 1080.

Because relator's allegations of fraud are entirely derivative of information that was made public before relator filed suit, and because relator is not an original source of any of that information, the public-disclosure bar mandates dismissal of the amended complaint.

## II. RELATOR'S CLAIMS AGAINST ALL INDIVIDUAL DEFENDANTS AND MOST OF THE CORPORATE DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO ALLEGE THEIR INVOLVEMENT IN THE PURPORTED FRAUD PLAUSIBLY OR WITH PARTICULARITY

In their motion to dismiss the amended complaint, defendants argued that relator has not pleaded a viable FCA claim against any individual defendant or most of the corporate defendants. Dkt. 77, at 33-38. This Court did not reach that argument because it dismissed on other grounds, but it should reach the argument now and dismiss all claims against those defendants on this ground as well.

Two overarching points warrant mention at the outset.

*First*, although relator's theory is that certifications to the Commission regarding designated-entity status were false because they did not disclose all required agreements and understandings, only two of the eighteen defendants—Northstar Wireless, LLC and SNR Wireless LicenseCo, LLC—are alleged to have made any such submission. That is crucial because an FCA violation is plausibly pleaded only if the complaint alleges that a defendant's conduct was "at least a substantial factor in causing, if not the but-for cause of, submission of false claims." *Miller v. Holzmann*, 563 F.Supp.2d 54, 119 n.95 (D.D.C. 2008) (subsequent history omitted); *accord United States v. Toyobo Co.*, 811 F.Supp.2d 37, 48 (D.D.C. 2011). This means that "[s]imply lumping defendants together because they share a common nomenclature is not enough." *United States ex rel. Zverev v. USA Vein Clinics of Chicago, LLC*, 244 F.Supp.3d 737, 748 (N.D. Ill. 2017). Instead, for each defendant, the "plaintiff must identify the 'who, what, when, where, and how of the alleged fraud.'" *United States v. Kellogg Brown & Root Services, Inc.*, 800 F.Supp.2d 143, 153 (D.D.C. 2011); *see also United States v. Universal Health*

*Services, Inc.*, 2010 WL 4323082, at *2 (W.D. Va. Oct. 31, 2010) (dismissing claims where the "Complaint as drafted fails to connect [parent companies] to the FCA violations in a way that would show such participation"). As explained below, relator has not done so.

*Second*, relator cannot rope these additional defendants in by simply making allegations concerning corporate or individual ownership, because such allegations alone do not state a claim. *See United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25, 60 (D.D.C. 2007); *M3 USA Corp. v. Qamoum, No*., 2021 WL 2324753, at *10 (D.D.C. June 7, 2021). Instead, relator must allege facts sufficient to pierce the corporate veil, a step reserved for "unusual circumstances." *Hockett*, 498 F.Supp.2d at 59-60 (emphasis added); *see also Securities Industry Association v. Federal Home Loan Bank Board*, 588 F.Supp. 749, 754 (D.D.C.1984) ("Except in unusual circumstances, courts will not disregard the separate identities of a parent and its subsidiary, even a wholly-owned subsidiary."). Specifically, a plaintiff has to plead (1) that there was "such unity of interest and ownership that the separate personalities of the corporation and the individual [or parent corporation] no longer exist," and (2) that it would be inequitable to treat the acts "as those of the corporation alone." *Hockett*, 498 F.Supp.2d at 60 (quoting *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982)). Relator's failure to do so mandates dismissal. *See Scollick*, 215 F.Supp.3d at 37 (dismissing claims against an individual where the relator did not allege facts demonstrating "commingling, manipulation, and diversion," and where "the allegations regarding the individuals' relationships with the corporations (e.g., as owner, CEO, or COO) do not appear to indicate a lack of formalities").

### A.     Corporate Defendants

**Northstar and SNR parent entities**. Relator's allegations about Northstar Spectrum, LLC; Northstar Manager, LLC; and Doyon, Limited (FAC ¶¶17-21) address only those defendants' ownership interests in Northstar. Similarly, the only allegations about SNR Wireless

HoldCo, LLC; SNR Wireless Management, LLC; and Atelum LLC (*id.* ¶¶25-29) concern those defendants' ownership interests in SNR. The complaint is silent as to how any of those defendants made or presented (or caused to be made or presented) any false claim to the government, made false statements to the government (or caused them to be made), entered into a conspiracy or took overt acts in furtherance thereof, or engaged in conduct that constitutes a reverse false claim. Relator's allegations concerning the direct or indirect ownership interests held by those defendants in Northstar or SNR "alone is plainly not enough" to support FCA liability. *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F.Supp.2d 35, 40 (D. Mass. 2000). Relator instead must "adequately allege each defendant['s] role in the fraudulent scheme." *Zverev*, 244 F.Supp.3d at 748. Because relator has not alleged that any of these corporate defendants caused a false statement or a false claim for payment to be made, or even knew that any such statement or claim was false, all claims against these six defendants should be dismissed.

**DISH defendants**. Relator alleges (FAC ¶¶19, 27, 36-37) that DISH Wireless Holding LLC and DISH Network Corporation have an ownership interest in defendants American AWS-3 Wireless II LLC ("American II") and American AWS-3 Wireless III LLC ("American III,") which in turn hold interests in Northstar and SNR, respectively. Defendants DISH Wireless and DISH Network are also included (along with defendants Charles and Cantey Ergen) in what relator calls the "DISH-Controlling Defendants," which relator alleges had "*de facto* control" over Northstar and SNR. *Id.* ¶119. Relator fails to allege facts about any of these four corporate defendants sufficient to state a plausible claim as to any of the counts in the amended complaint. It has not alleged how any of those defendants made or presented false claims to the government or made false statements to the government (or caused either of those things to happen), how any

of them entered into a conspiracy or took overt acts in furtherance thereof, or how any of them engaged in conduct constituting a reverse false claim. And relator's conclusory allegation that the DISH defendants had *de facto* control over the Bidding Defendants is insufficient because there is no specific allegation of any action they took to control the actions of Northstar or SNR. Claims against those defendants should be dismissed.

### B. Individual Defendants

**Miranda Wright.** The allegations against Miranda Wright fall short. The sole allegation against her concerns a certification she electronically signed in the "Very Small Business Statement" of Northstar Wireless's short-form application. *See* FAC ¶¶ 83, 126. That certification, however, was extremely narrow in scope, stating:

> I, Miranda Wright, am Treasurer of Doyon, Limited, which is the Manager member of Northstar Manager, LLC, which, in turn, is the Manager member of Northstar Spectrum, LLC, which, in turn, is the Manager member of the applicant, Northstar Wireless, LLC ("Northstar Wireless"). In this capacity, I am responsible the financial affairs of Northstar Wireless. Pursuant to Section 1.2110(o) of the Commission's Rules, I certify the gross revenues figures set forth in this EXHIBIT B are true, full, and accurate, and that Northstar Wireless does not otherwise have audited financial statements.

Appendix B at B524. Ms. Wright thus certified only the accuracy of the gross-revenue information contained in Northstar Wireless's Very Small Business Statement (and that Northstar Wireless does not otherwise have audited financial statements). Paragraph 128 of the amended complaint, in turn, explicitly states that plaintiff is basing its claims solely on Defendants' purported failure to disclose a secret agreement—*not* on any purported falsity of the Northstar financial information that Ms. Wright certified. Accordingly, relator has failed to state a claim against Ms. Wright.[5]

---

[5] Paragraph 126 of the FAC alleges that Ms. Wright also certified that Northstar Wireless had "listed and summarized all (oral or written) instruments, agreements, and understandings relevant to its eligibility as a 'very small business.'" However, the Very Small Business

Moreover, even if—contrary to fact—Ms. Wright's certification had been broader, the claims against her still would fail because the bare allegation that a party "knows that a claim … is false" "does not state facts supporting a reasonable inference that [defendant] knew, acted in reckless disregard, or deliberately ignored that … submissions were false." *United States ex rel. Pilecki-Simko v. Chubb Institute*, 443 F.App'x 754, 761 (3d Cir. 2011) (alteration in original). The amended complaint contains only conclusory allegations concerning Ms. Wright (*see* ¶¶83, 126), which are insufficient to support any such inference.

**Allen Todd.** Allen Todd appears in only two of the amended complaint's paragraphs, which allege that he is Doyon's Registered Agent, FAC ¶21, and that he "certified [Northstar's] Short-Form via the *Certify and Submit* screen," *id.* ¶83. Relator does not allege that Mr. Todd knew this certification was false or that he acted with deliberate ignorance or in reckless disregard of the truth or falsity of the information in the certification. Nor does relator allege that he had any role in or knowledge of the remainder of the fraudulent conduct alleged in the complaint. Relator thus has not come close to alleging facts against Mr. Todd sufficient to satisfy the requirement in Federal Rule of Civil Procedure 9(b) that a plaintiff plead fraud with particularity.

**John Muleta.** Relator's allegations are also insufficient as to John Muleta. The amended complaint states that he "certified that [SNR] had no attributable material relationship

---

Statement on which VTel relies for that allegation is clear that Ms. Wright's certification was limited to the referenced Northstar financial information. On a Rule 12 motion, the Court need not accept as true an allegation that is "flatly contradicted by a document incorporated into the Complaint." *Redmon v. United States Capitol Police*, 80 F.Supp.3d 79, 89 (D.D.C. 2015); *see also Kaempe v. Myers,* 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."); *Conteh*, 103 F.Supp.3d at 67 (dismissing FCA claim "because the plaintiff/relator's SCA allegations as pleaded are contradicted by his own exhibits").

with any entity" and that SNR had disclosed all agreements "relevant to its eligibility as a 'very small business," but that "the certification[s were] knowingly false." FAC ¶¶84, 127. It also provides general descriptions of his ownership interest in SNR, drawn from publicly disclosed materials submitted to the FCC before this case was filed, *id.* ¶¶30, 84, and a description of the certifications in the short-form application, *id.* ¶127. None of this pleads a plausible FCA claim. The bare allegation that Mr. Muleta knew the certifications were false does not support a reasonable inference of scienter, *see Pilecki-Simko*, 443 F.App'x at 761, nor is the conclusory allegation that SNR is a "pop-up entit[y] created … for the sole purpose of participating in the auction," FAC ¶109, sufficient to satisfy Rule 9(b), especially when the purpose of the designated-entity program is to encourage new entrants, *see supra* p.3. And as explained, the ownership allegations are insufficient to disregard SNR's corporate form and pierce the corporate veil. *See Hockett*, 498 F.Supp.2d at 60. Relator does not allege "such unity of interest and ownership that the separate personalities of [SNR] and [Mr. Muleta] no longer exist," or that it would be inequitable to treat SNR's acts "as those of the corporation alone"—or anything else suggesting Mr. Muleta knew anything about the alleged fraud.

**Charles and Cantey Ergen.** The amended complaint is equally deficient as to Charles and Cantey Ergen. It mentions Mrs. Ergen in three paragraphs (34, 38, and 86), and Mr. Ergen in nine (33- 4, 38, 78-81, 86, and 122). But those paragraphs primarily detail the Ergens' financial and business relationships with American I and what relator calls the "DISH defendants" (American II, American III, DISH Wireless Holding LLC, and DISH Network Corporation), alleging that the Ergens were listed as "disclosable interest holders" in American I's short-form application, FAC ¶34, and that together they hold substantial stock and voting interest in DISH and (indirectly) in American I, *id.* ¶¶38, 86. Relator also alleges that Mr. Ergen

mckenwas chairman of the board of directors of DISH Network Corporation and that he, along with two others, was an authorized bidder for the auction. *Id.* ¶33. And Mr. Ergen is alleged to have participated in earnings calls in his role as DISH's chairman. *Id.* ¶¶78-81, 122. Finally, the Ergens are included, along with the DISH defendants, in a group that relator labels the "DISH-Controlling Defendants," a group that allegedly had "*de facto* control" over Northstar and SNR. *E.g.*, *id.* ¶3.

Those allegations do not satisfy Rule 8(a) or Rule 9(b). As the foregoing recitation makes clear, relator nowhere specifies how Mr. or Mrs. Ergen supposedly participated in any of the alleged fraudulent activity. There is no allegation, for example, that either of them made or caused the making of any false statement, or the presentation of any false claim. The allegation that the Ergens were majority stockholders in DISH Network Corporation (FAC ¶¶34, 38, 86) is nowhere near the factual showing needed to pierce the corporate veil and hold them individually liable for corporate action. *See Hockett*, 498 F.Supp.2d at 60. And if relator is suggesting that the Ergens are liable because they stood to benefit due to their ownership of DISH, that is likewise insufficient to state a claim. *Id.* at 59-60. Moreover, Mr. Ergen's status as an authorized bidder for American I does not give rise to a plausible inference that he was involved in any false claim or statement made by Northstar or SNR. In particular, relator never alleges that Mr. Ergen (or American I) submitted a false statement or presented a false claim in connection with auction bidding. And his disclosed role as an authorized bidder is irrelevant to relator's secret-agreement theory. Nor can relator's inclusion of the Ergens in the "DISH-Controlling Defendants" save its claims, because there is no allegation of any action they took as part of that group to control the actions of the Bidding Defendants, or that the "DISH-Controlling Defendants" caused a false claim to be submitted.

**CONCLUSION**

This Court should grant defendants' motion for judgment on the pleadings.

November 28, 2022                                   Respectfully submitted,

                                                    *s/ Daniel S. Volchok*

Gejaa T. Gobena (#463833)                           Howard M. Shapiro (#454274)
Jonathan L. Diesenhaus (#423753)                    Jonathan E. Paikin (#466445)
HOGAN LOVELLS US LLP                                Daniel S. Volchok (#466889)
555 Thirteenth Street N.W.                          WILMER CUTLER PICKERING
Washington, D.C. 20004                              HALE AND DORR LLP
202-637-5600                                        1875 Pennsylvania Avenue N.W.
gejaa.gobena@hoganlovells.com                       Washington, D.C. 20006
jonathan.diesenhaus@hoganlovells.com                202-663-6000
                                                    howard.shapiro@wilmerhale.com
*Counsel for SNR Wireless LicenseCo, LLC,*          jonathan.paikin@wilmerhale.com
*SNR Wireless HoldCo, LLC, SNR Wireless*            daniel.volchok@wilmerhale.com
*Management, LLC, Atelum LLC, and John*
*Muleta*                                            *Counsel for American AWS-3 Wireless I LLC,*
                                                    *American AWS-3 Wireless II LLC, American*
                                                    *AWS-3 Wireless III LLC, DISH Wireless*
                                                    *Holding LLC, DISH Network Corporation,*
                                                    *Charles W. Ergen, and Cantey M. Ergen*

                                                    Peter B. Hutt II (#427331)
                                                    Benjamin C. Block (#479705)
                                                    Dennis B. Auerbach (#418982)
                                                    Amee M. Frodle (#1602371)
                                                    COVINGTON & BURLING LLP
                                                    One CityCenter
                                                    850 Tenth Street N.W.
                                                    Washington, D.C. 20001
                                                    202-662-6000
                                                    phuttjr@cov.com
                                                    bblock@cov.com
                                                    dauerbach@cov.com
                                                    afrodle@cov.com

                                                    *Counsel for Northstar Wireless, LLC,*
                                                    *Northstar Spectrum, LLC, Northstar*
                                                    *Manager, LLC, Doyon, Limited, Miranda*
                                                    *Wright, and Allen M. Todd*