## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERMONT NATIONAL TELEPHONE COMPANY,<br><br>                Plaintiff,<br><br>   v.<br><br>NORTHSTAR WIRELESS, LLC, *et al.*,<br><br>                Defendants. | Civil Action No. 15-00728 (CKK) |

## RELATOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Stephen J. Obermeier (D.C. Bar # 979667)
Bennett L. Ross (D.C. Bar # 978122)
Bert W. Rein (D.C. Bar # 067215)
Mark B. Sweet (D.C. Bar # 490987)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone:  (202) 719-7000
Facsimile:  (202) 719-7049
sobermeier@wiley.law
bross@wiley.law
brein@wiley.law
msweet@wiley.law

*Counsel for Relator Vermont National Telephone Company*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

SUMMARY OF ALLEGATIONS ............................................................................. 2

PROCEDURAL POSTURE ....................................................................................... 5

ARGUMENT .............................................................................................................. 7

I.    Relator Has Adequately Stated A Claim Against All Defendants..................................... 7

    A.    The D.C. Circuit Held That Relator Adequately Stated A Claim Against All Defendants. ...................................................................... 8

    B.    The Amended Complaint Confirms That Relator Adequately Stated A Claim Against All Defendants.......................................................... 9

II.    Defendants' Public Disclosure Bar Argument Is Foreclosed By DOJ'S Statutory Veto And Is Without Merit In Any Event. ...................................... 15

    A.    Defendants Affirmatively Waived The Public Disclosure Bar Argument. .......... 17

    B.    The Public Disclosure Bar Does Not Foreclose This Case................................. 20

        1.    Defendants Fail to Demonstrate That The Case Should Be Dismissed Under The Public Disclosure Bar As A Matter of Law............................ 21

        2.    At A Minimum, Defendants' Arguments Raise Serious Factual Issues That Require Discovery. .................................................................. 37

CONCLUSION............................................................................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Council of Blind v. Mnuchin,*
977 F.3d 1 (D.C. Cir. 2020) ...................................................................................2, 9

*United States ex rel. Barajas v. Northrop Corp.,*
5 F.3d 407 (9th Cir. 1993) ...........................................................................................37

*United States ex rel. Beauchamp v. Academi Training Ctr.,*
816 F.3d 37 (4th Cir. 2016) ........................................................................................29

*Blue Citi, LLC v. 5Barz Int'l Inc.,*
338 F. Supp. 3d 326 (S.D.N.Y. 2018), *aff'd*, 802 F. App'x 28 (2d Cir. 2020) .......18

*Burns v. Levy,*
No. 13-cv-898, 2019 WL 6465142 (D.D.C. Dec. 2, 2019) .............................17, 18

*Cause of Action v. Chi. Transit Auth.,*
815 F.3d 267 (7th Cir. 2016) ......................................................................................21

*City of Cleveland, Ohio v. Fed. Power Comm'n,*
561 F.2d 344 (D.C. Cir. 1977) ...................................................................................17

*City of Oberlin, Ohio v. FERC,*
39 F.4th 719 (D.C. Cir. 2022) ....................................................................................18

*United States ex rel. Conroy v. Select Med. Corp.,*
211 F. Supp. 3d 1132 (S.D. Ind. 2016) ...............................................................1, 15

*Dist. No. 1, Pac. Coast Dist., Marine Engineers Beneficial Ass'n, AFL-CIO v.
Liberty Mar. Corp.,*
933 F.3d 751 (D.C. Cir. 2019) ........................................................................17, 21, 37

*United States ex rel. Doe v. Staples, Inc.,*
932 F. Supp. 2d 34 (D.D.C. 2013), *aff'd* 773 F.3d 83 (D.C. Cir. 2014) .................30

*Eli Lilly & Co. v. Home Ins. Co.,*
794 F.2d 710 (D.C. Cir. 1986) ...........................................................................17, 20

*United States ex rel. Goldberg v. Rush Univ. Med. Ctr.,*
680 F.3d 933 (7th Cir. 2012) ......................................................................................31

*United States ex rel. Green v. Serv. Cont. Educ. and Training Tr. Fund*,
    843 F. Supp. 2d 20 (D.D.C. 2012) ......................................................................30

*United States ex rel. Hong v. Newport Sensors, Inc.*,
    728 Fed. App'x 660 (9th Cir. 2018) ...................................................................29

*United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*,
    No. 12-cv-1694, 2019 WL 3282619 (C.D. Cal. July 16, 2019), *rev'd and*
    *remanded on different grounds*, 854 F. App'x 840 (9th Cir. 2021) ...............30, 31

*Keepseagle v. Perdue*,
    856 F.3d 1039 (D.C. Cir. 2017) .........................................................................19

*United States ex rel. Mateski v. Raytheon Co.*,
    816 F.3d 565 (9th Cir. 2016) .........................................................................31, 32

*United States ex rel. Maur v. Hage-Korban*,
    981 F.3d 516 (6th Cir. 2020) ..............................................................................30

*United States ex rel. May v. Purdue Pharma L.P.*,
    737 F.3d 908 (4th Cir. 2013) ..............................................................................15

*United States ex rel. MC2 Sabtech Holdings, Inc. v. GET Eng'g Corp.*,
    580 F. Supp. 3d 876 (S.D. Cal. 2022) ............................................................30, 31

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
    608 F.3d 871 (D.C. Cir. 2010) .......................................................................10, 14

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
    812 F.3d 294 (3d Cir. 2016) ...............................................................................36

*Murphy v. Dep't of Air Force*,
    326 F.R.D. 47 (D.D.C. 2018) .............................................................................21

*Northstar Wireless, LLC v. FCC*,
    38 F. 4th 190 (D.C. Cir. June 21, 2022) ...............................................................3

*United States ex rel. O'Connor v. United States Cellular Corp.*,
    No. 20-cv-2070, 2022 WL 971290 (D.D.C. Mar. 31, 2022) ................................28

*United States ex rel. Oliver v. Philip Morris USA, Inc.*,
    101 F. Supp. 3d 111 (D.D.C. 2015) ...............................................................29, 33

*United States ex rel. Oliver v. Philip Morris USA Inc.*,
    826 F.3d 466 (D.C. Cir. 2016) ...........................................................................28

*United States ex rel. Osheroff v. Humana, Inc.*
   776 F.3d 805 (11th Cir. 2015) ...................................................................30

*United States ex rel. Patriarca v. Siemens Healthcare Diagnostics, Inc.*,
   295 F. Supp. 3d 186 (E.D.N.Y. 2018) .........................................................35

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*,
   No. 15-cv-750, 2020 WL 686009 (D.D.C. Feb. 11, 2020) ..........................37

*River Cross Land Co., LLC v. Seminole Cnty.*,
   No. 6:18-cv-1646, 2019 WL 12518728 (M.D. Fla. Aug. 21, 2019) ..............19

*Role Models Am., Inc. v. Geren*,
   514 F.3d 1308 (D.C. Cir. 2008) ..................................................................17

*Rollins v. Wackenhut Servs., Inc.*,
   703 F.3d 122 (D.C. Cir. 2012) ....................................................................19

*United States ex rel. Schumann v. Astrazeneca Pharms. L.P.*,
   769 F.3d 837 (3d Cir. 2014) ........................................................................35

*\*United States ex rel. Scutellaro v. Capitol Supply, Inc.*,
   No. 10-cv-1094, 2017 WL 1422364 (D.D.C. Apr. 19, 2017) ...............22, 28, 32

*\*United States ex rel. Shea v. Cellco P'ship*,
   863 F.3d 923 (D.C. Cir. 2017) ..............................................................22, 28, 32

*United States ex rel. Sobek v. Ed. Mgmt., LLC*,
   No. 10-cv-131, 2013 WL 2404082 (W.D. Pa. May 31, 2013) .....................37

*United States ex rel. Sonnier v. Standard Fire Ins. Co.*,
   84 F. Supp. 3d 575 (S.D. Tex. 2015) ..........................................................35

*\*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) ...........................................................22, 33, 34, 35

*Tapp v. Washington Metro. Area Transit Auth.*,
   306 F. Supp. 3d 383 (D.D.C. 2016) .......................................................20, 23

*United States v. Allergan, Inc.*,
   46 F.4th 991 (9th Cir. 2022) .......................................................................29

*United States v. Comstor Corp.*,
   308 F. Supp. 3d 56 (D.D.C. 2018) ..............................................................27

*United States v. CSL Behring, L.L.C.*,
   855 F.3d 935 (8th Cir. 2017) ......................................................................21

*United States v. Doyle*,
    No. 1:18-cv-373, 2022 WL 1186182 (S.D. Ohio Apr. 21, 2022) .......................................1, 15

*United States v. Henry*,
    472 F.3d 910 (D.C. Cir. 2007) ...............................................................................................17

*United States v. Husband*,
    312 F.3d 247 (7th Cir. 2002) ............................................................................................18, 20

*United States v. Janssen Biotech, Inc.*,
    576 F. Supp. 3d 212 (D.N.J. 2021) ........................................................................................29

*United States v. Kpodi*,
    888 F.3d 486 (D.C. Cir. 2018) ...............................................................................................17

*United States v. Medtronic, Inc.*,
    327 F. Supp. 3d 831 (E.D. Pa. 2018) .....................................................................................38

*United States v. Merck-Medco Managed Care, L.L.C.*,
    336 F. Supp. 2d 430 (E.D. Pa. 2004) .....................................................................................37

*Scollick ex rel. United States v. Narula*,
    No. 1:14-cv-01339, 2022 WL 3020936 (D.D.C. July 29, 2022) ...........................................10

*USAir, Inc. v. Dep't of Transp.*,
    969 F.2d 1256 (D.C. Cir. 1992) .............................................................................................19

*\*United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*,
    34 F.4th 29 (D.C. Cir. 2022) ........................................................................................... *passim*

*Williams v. Washington Metro. Area Transit Auth.*,
    No. 17-cv-00890, 2019 WL 2058723 (D.D.C. May 9, 2019) ................................................27

*Wood v. Milyard*,
    566 U.S. 463 (2012) ................................................................................................................19

*United States ex rel. Zizic v. Q2Administrators, LLC*,
    728 F.3d 228 (3d Cir. 2013) ...................................................................................................35

## Statutes

31 U.S.C. § 3730 ......................................................................................................... *passim*

## Other Authorities

47 C.F.R. § 1.2104(g)(2) ..............................................................................................................4

47 C.F.R. § 1.2109(a) ....................................................................................................4

Comments of AT&T, *In the Matter of Updating Part 1 Competitive Bidding
    Rules*, WT Docket. No. 14-170 at 10 (Feb. 20, 2015),
    https://www.fcc.gov/ecfs/document/60001018945/1 ............................................25

Commerce, Science, & Transportation, *Commerce Probes $3 Billion Collusion
    Concern in FCC Spectrum Auction* (Apr. 29, 2015), https://rb.gy/arpipl ..................25, 26

Editorial Board, *Government Handouts at Wireless Auctions*, N.Y. Times (Feb. 3,
    2015), https://www.nytimes.com/2015/02/03/opinion/government-handouts-
    at-wireless-auctions.html .......................................................................................24

Fed. R. Civ. P. 8 ...........................................................................................5, 6, 8, 9

Fed. R. Civ. P. 9(b) ............................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6)....................................................................................5, 19

Fed. R. Civ. P. 12(c) ......................................................................................... *passim*

*In the Matter of Northstar Wireless, LLC*, Memorandum Opinion and Order, 30
    FCC Rcd. 8887 (Aug. 18, 2015) ......................................................................3, 26

Kelly Ayotte & Ajit Pai, *Ending Welfare for Telecom Giants*, Wall St. J. (Feb. 4,
    2015) https://www.wsj.com/articles/kelly-ayotte-and-ajit-pai-ending-welfare-
    for-telecom-giants-1423095287?ns=prod/accounts-wsj ..........................................24

Phil Goldstein, *Dish's Road to $3.33B in AWS-3 Discounts Included a Complex
    Web of Investments*, FierceWireless (Feb. 4, 2015), https://bit.ly/2zvPWXq...................23, 24

Shalini Ramachandran, et al., *Behind Dish Wireless Coup, Ties to Alaskan Native
    Groups*, Wall St. J. (Feb. 3, 2015), http://on.wsj.com/2ePOs20...............................24

Thomas Gryta & Ryan Knutson, *Behind Dish Network's Race for Wireless
    Spectrum*, Wall St. J. (Feb. 12, 2015), http://on.wsj.com/1F3CsAs ...........................24

Thomas Gryta, et al., *Dish Network Surprise Winner in Spectrum Auction*, Wall
    St. J. (Jan. 30, 2015), https://on.wsj.com/2PTfqbx ...................................................24

Tim Farrar, *How To Blow Up A Spectrum Auction . . .* , TMF Associates Blog
    (Jan. 31, 2015, 4:00 PM), https://rb.gy/csoyqt........................................................24

Verizon Letter to FCC, *In the Matter of Updating Part 1 Competitive Bidding
    Rules*, WT Docket. No. 14-170 (Apr. 24, 2015).....................................................25

*Winning Bidders*, Public Notice, 30 FCC Rcd. 630, ¶ 8 (Jan. 30, 2015)........................4

## INTRODUCTION

Since the D.C. Circuit held that Relator "has adequately pleaded its claims" because Defendants' "conduct makes little sense unless Northstar and SNR agreed in advance that DISH would ultimately control the licenses won at auction," *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 38–39 (D.C. Cir. 2022), Defendants have repeatedly attempted to stop this case from moving forward.[1]  Their Rule 12(c) motion is simply the latest procedural stunt to prevent the Government from learning the truth about Defendants' fraud.

The primary thrust of Defendants' motion for judgment on the pleadings is the public disclosure bar of the False Claims Act ("FCA").  However, dismissal on that ground is foreclosed because the Department of Justice ("DOJ") has exercised its statutory right under the FCA to oppose dismissal based on the public disclosure bar.  *See* Dkt. 118 (citing 31 U.S.C. § 3730(e)(4)(A)); *see also United States ex rel. Conroy v. Select Med. Corp.*, 211 F. Supp. 3d 1132, 1152 (S.D. Ind. 2016) ("[T]he government's exercise of that right [to veto] means the court's analysis under the public-disclosure bar ends here."); *United States v. Doyle*, No. 1:18-cv-373, 2022 WL 1186182, at *4 n.1 (S.D. Ohio Apr. 21, 2022) (declining to consider public disclosure bar as a basis for dismissal when the Government exercised its statutory veto).

---

[1]     Defendants are: (i) Northstar Wireless, L.L.C., Northstar Spectrum, L.L.C., Northstar Manager, L.L.C., Doyon, Limited ("Doyon"), Miranda Wright, and Allen M. Todd (collectively, "Northstar"); (ii) SNR Wireless LicenseCo, L.L.C., SNR Wireless HoldCo, L.L.C., SNR Management, L.L.C., Atelum L.L.C. ("Atelum"), and John Muleta (collectively, "SNR"); and (iii) American AWS-3 Wireless I L.L.C. ("American I"), American AWS-3 Wireless II L.L.C. ("American II"), American AWS-3 Wireless III L.L.C. ("American III"), DISH Wireless Holding L.L.C., DISH Network Corp. ("DISH"), Charles W. Ergen and Cantey M. Ergen (the "Ergens") (collectively, "DISH-Controlling Entities").

The sole remaining issue for the Court to resolve concerns Defendants' challenge to the sufficiency of Relator's allegations as to certain individual and corporate defendants.  But this challenge is foreclosed by the D.C. Circuit's express holding that Relator (i) "adequately pleaded its claims" under Rule 8, and (ii) "satisfied Rule 9(b)" by "provid[ing] sufficient substance to both afford Defendants the opportunity to prepare a response and to warrant further judicial process," *Northstar Wireless*, 34 F. 4th at 38–39 (citations, quotations, and alternations omitted). The Circuit Court's determination applies to all Defendants, as Defendants recognized in all seeking rehearing *en banc*.  Defendants' motion thus invites this Court to commit reversible error by issuing a ruling "inconsistent with" both "the spirit [and] express terms of [the D.C. Circuit's prior] holding."  *Am. Council of Blind v. Mnuchin*, 977 F.3d 1, 5 (D.C. Cir. 2020).

## SUMMARY OF ALLEGATIONS[2]

Defendants' fraudulent scheme began before the start of Auction 97 as part of an effort by Defendant Charles Ergen and DISH to acquire additional wireless spectrum through the FCC auction process.  *See* Dkt. 76 ¶ 77.  Defendant Charles Ergen forecasted the aggressive approach DISH would take in future spectrum auctions in successive quarterly earning calls in 2014.  *See id.* ¶¶ 79–80.  Yet, DISH ultimately walked away from Auction 97 without a single spectrum license to its name.

Instead, DISH opted to utilize SNR and Northstar to acquire discounted spectrum on its behalf.  *See id.* ¶¶ 80, 94.  Specifically, the DISH-Controlling Defendants coordinated with

---

[2]     Because the factual background regarding Auction 97 and the identities of Defendants are set forth in detail in this Court's opinion, Dkt. 87, and the D.C. Circuit's opinion, *United States ex rel. Vermont National Telephone Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022), Relator incorporates those recitations of fact by reference for purposes of responding to Defendants' Rule 12(c) motion.

Defendants Atelum and Doyon to form SNR and Northstar, which were created, funded, and operated solely to acquire discounted spectrum for DISH.  *Id.* ¶¶ 16, 24; *In the Matter of Northstar Wireless, LLC*, Memorandum Opinion and Order, 30 FCC Rcd. 8887, ¶¶ 14, 17 (Aug. 18, 2015) ("*Bidding Credit Order*").  While Defendants spun a complex web of commercial instruments designed to create the illusion that SNR and Northstar were independent entities, they existed only on paper to further DISH's goal of obtaining spectrum at a discount.  Dkt. 76 ¶¶ 3, 5.  Defendants Miranda Wright, Allen M. Todd, and John Muleta participated in creating these sham entities.  *See id.* ¶¶ 21−22, 30.  The DISH-Controlling Defendants also created American I to control SNR and Northstar's bidding activities.  *Id.* ¶¶ 94−95, 114.

In their short-form applications, SNR and Northstar disclosed DISH's ultimate economic interest but disguised their true relationship with DISH.  *Id.* ¶ 108.  Specifically, SNR and Northstar disclosed that "DISH (i) managed [their] businesses, (ii) was their principal investor and creditor, (iii) retained the power to veto important corporate decisions, and (iv) coordinated its own bidding strategy in the auction with" SNR and Northstar.  *Northstar Wireless, LLC v. FCC*, 38 F. 4th 190, 199 (D.C. Cir. June 21, 2022).  SNR and Northstar also disclosed various joint bidding agreements pursuant to which Defendants would ostensibly coordinate bidding for licenses in Auction 97—coordination that purportedly would advance each company's individual business interests.  *See, e.g.*, Dkt. 76 ¶¶ 90, 124–27.

However, SNR and Northstar misrepresented their true relationship with DISH by failing to disclose that they: (i) were created at DISH's direction; (ii) did not exist—and were never intended to operate—as independent businesses that would provide wireless communications services, lease spectrum, build out their own networks, or otherwise use the spectrum licenses they acquired in Auction 97; (iii) were implementing DISH's bidding strategy, which was falsely

3

presented to the FCC as the product of a mutually negotiated agreement between and for the benefit of independent entities; and (iv) were acquiring licenses that would eventually be transferred to DISH.  *See id.* ¶¶ 125−28.  In other words, while SNR and Northstar purportedly made full disclosures regarding their relationship with DISH, they fraudulently concealed the true nature of that relationship.

In submitting Northstar's short-form application, Defendants Wright and Todd certified that they were responsible for the financial affairs of Northstar and that Northstar qualified as a "very small business" under FCC rules.  *Id.* ¶¶ 82−85; *see also* Northstar FCC Form 175, Exhibit B, Status As A Very Small Business.  Defendant Muleta made the same certifications on behalf of SNR.  *Id.* ¶¶ 84, 124−27.  Defendants Wright, Todd, and Muleta also attested, on behalf of Northstar and SNR, that they had disclosed all oral or written instruments, agreements, and understandings relevant to their eligibility for the very small business credits they sought.  *Id.* ¶¶ 125−28.  These certifications were knowingly false.

On February 13, 2015, SNR and Northstar submitted their FCC Form 601 long-form applications, which reiterated their qualifications to hold spectrum licenses and eligibility for bidding credits and verified the information previously submitted in their short-form applications.  Dkt. 76 ¶¶ 69−72.  Once again, Defendants Wright, Todd, and Muleta certified that SNR and Northstar each qualified as a "very small business" and had disclosed all relevant instruments, agreements, and understandings relevant to their eligibility for bidding credits.  Once again, these certifications were knowingly false.  *Id.* ¶¶ 85, 95−96, 110.

The governing FCC rules and regulations required SNR and Northstar to pay $13.3 billion—the full value of their winning bids—to the FCC on or before March 2, 2015.  *See* 47 C.F.R. § 1.2104(g)(2); *id.* § 1.2109(a); *Auction 97 (AWS-3) Winning Bidders*, Public Notice, 30

FCC Rcd. 630, ¶ 8 (Jan. 30, 2015).  But on that date, relying on their fraudulently claimed

bidding credits, SNR and Northstar paid only approximately $10 billion for their licenses,

depriving the Government of $3.3 billion to which it was entitled and frustrating the

congressional policy of promoting competition in the wireless marketplace.  *Id.* ¶¶ 73, 94−96.

## PROCEDURAL POSTURE

On December 7, 2018, Defendants moved to dismiss Relator's original complaint under

Rule 12(b)(6).  The lead argument in that motion was that the claims were barred by the public

disclosure bar.  Dkt. 70 at 16.

At that time, the parties and DOJ were actively negotiating whether DOJ would exercise

its statutory authority to oppose dismissal of the public disclosure bar argument.  DOJ ultimately

agreed to do so if Relator clarified in an amended complaint that it was not alleging fraud based

on Defendants' purported misinterpretation of the FCC's *de facto* control rules.  On February 4,

2019, Relator did exactly that, moving to amend the complaint to "clarify certain of [Relator's]

allegations."  Dkt. 74 at 2.  Defendants did not oppose that motion.  *See id* at 1, 3.

On March 28, 2019, Defendants moved to dismiss the Amended Complaint.  *See* Dkt. 77.

Defendants again raised the public disclosure bar in their opening brief and argued that Relator's

claims "against all individual defendants and most of the corporate defendants should also be

dismissed for failure to allege their involvement in the purported fraud plausibly or with

particularity" under Rules 8 and 9(b).  *Id.* at 33.

In their reply, however, Defendants expressly withdrew their public disclosure bar

argument.  *Id.* at 41.  Specifically, Defendants represented to the Court:

> VTel's opposition confirms (at 1-2, 45) that the claims in its amended complaint
> are limited to two articulations of the secret-agreement theory: (1) defendants failed
> to disclose to the FCC one or more secret agreements or understandings; and (2)

> defendants' statements to the FCC that they had disclosed all agreements concerning disposition of the licenses obtained through auction were false because they failed to reflect those secret agreements. In reliance on VTel's representations, and for purposes of the motion to dismiss only, defendants now withdraw without prejudice the public-disclosure-bar arguments raised in their opening memorandum as a basis for dismissal of any claim in the amended complaint.

Dkt. 80 at 2 n.2.  In other words, Defendants stated that they were withdrawing the public disclosure bar argument because Relator clarified that it was not arguing a regulatory fraud.

After the Court dismissed the Amended Complaint on other grounds, the Court of Appeals reversed.  All Defendants sought affirmance on the alternative ground that Relator "failed to adequately plead its claims under Rules 8 and 9(b)."  *Northstar Wireless,* 34 F.4th at 38.  The D.C. Circuit flatly rejected that argument.  The Court of Appeals held that the Amended Complaint plausibly alleges that all Defendants entered "*undisclosed agreements* to act on DISH's behalf or transfer spectrum rights to DISH."  *Id.* at 39 (emphasis added).  The D.C. Circuit further explained that Relator "satisfied Rule 9(b) by setting forth detailed allegations regarding the time, place, and manner of the fraudulent scheme."  *Id.* (internal quotations omitted).  In reaching this conclusion, the Court of Appeals considered Relator's allegations as to each of the individual and corporate defendants noting, for example, that "members of the boards of Northstar's and SNR's parent companies submitted short-form applications . . . which contained false certifications . . . ."  *Id.*  Because the allegations provide "sufficient substance to both afford Defendants"—as in all Defendants—"the opportunity to prepare a response and to warrant further judicial process," Rule 9(b) is satisfied.  *Id.*

On June 16, 2022, all Defendants, including the individual defendants, petitioned for rehearing en banc challenging the "panel's rejection of defendants' plausibility argument." *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, No. 21-7039,

Defendants-Appellees' Petition for Rehearing or Rehearing En Banc, Dkt. 1950926 at 17 (D.C. Cir. Jun. 16, 2022).  On August 17, 2022, the D.C. Circuit denied the petition.  *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, No. 21-7039, Order Denying Petition for Rehearing or Rehearing En Banc, Dkt. 1959681 (D.C. Cir. Aug. 17, 2022).

Following remand, Defendants informed Relator at the September 30 Rule 26(f) conference that they intended to again raise the public disclosure bar argument in a Rule 12(c) motion, despite having represented to the Court that it had been withdrawn.  Rather than simply filing the motion, however, Defendants moved the Court to delay discovery, purportedly to allow DOJ to "complete its deliberations" regarding Defendants' public disclosure bar argument.  Dkt. 108.  Yet, Defendants' Rule 12(c) motion never so much as mentions those deliberations, likely because Defendants knew that DOJ intended to wield its statutory authority to oppose dismissal based on the public disclosure bar, as indeed it has.  *See* Dkt. 118.

## ARGUMENT

## I.   RELATOR HAS ADEQUATELY STATED A CLAIM AGAINST ALL DEFENDANTS.

Defendants' argument that this Court should dismiss "all claims against [certain] defendants" because "relator has not pleaded a viable FCA claim against" them, Dkt. 115 at 30–37, is foreclosed by the D.C. Circuit's holding that Relator "has adequately pleaded its claims" by "setting forth detailed allegations regarding the time, place, and manner of the fraudulent scheme."  *Northstar Wireless*, 34 F.4th at 38–39.  Even if the argument was not procedurally foreclosed—though it is—it is meritless because Relator has plausibly and with particularity stated a claim against all Defendants.

A. **The D.C. Circuit Held That Relator Adequately Stated A Claim Against All Defendants.**

In their motion to dismiss the Amended Complaint, Defendants specifically argued that Relator's claims "against all individual defendants and most of the corporate defendants should also be dismissed for failure to allege their involvement in the purported fraud plausibly or with particularity" under Rules 8 and 9(b).  Dkt. 77 at 33.  In defending Relator's appeal of the motion to dismiss decision, *all* Defendants then sought affirmance on the alternative ground that Relator had failed to state a claim under Rules 8 and 9(b).  *See United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, No. 21-7039, Brief for Defendants-Appellees, Dkt. 1931825 at 2 (D.C. Cir. Jan. 21, 2022).  And the D.C. Circuit squarely rejected these arguments.

The D.C. Circuit expressly held that Relator (i) "adequately pleaded its claims" under Rule 8, and (ii) "satisfied Rule 9(b)" by "provid[ing] sufficient substance to both afford Defendants the opportunity to prepare a response and to warrant further judicial process," *Northstar Wireless, LLC*, 34 F.4th at 38–39 (citations, quotations, and alternations omitted).  In so holding, the D.C. Circuit found that Relator pleaded plausibly and with particularity that "the parties entered into" "undisclosed agreements to act on DISH's behalf" and to "transfer spectrum rights to DISH."  *Id.* at 39.  Recounting the "detailed allegations" that "satisfied Rule 9(b)," the D.C. Circuit cited actions of "members of the boards of Northstar's and SNR's parent companies," who "submitted short-form applications on September 12, 2014 . . . which contained false certifications that Northstar and SNR had disclosed all agreements, arrangements, and understandings related to the licenses in Auction 97."  *Id.*

Defendants' argument that Relator failed to satisfy Rule 8 and Rule 9(b) as to certain individual defendants and corporate entities thus borders on the frivolous, as it is patently

"inconsistent with" both "the spirit [and] express terms of [the D.C. Circuit's] holding." *Mnuchin*, 977 F.3d at 5.  All Defendants raised Rule 8 and Rule 9(b) arguments before this Court, and all Defendants sought affirmance of the Court's dismissal on that alternative ground. The Appellate Court's holding was not limited to any specific persons or entities.  Indeed, the D.C. Circuit found adequate Relator's allegations that "*the parties*" agreed "to act o*n DISH's behalf*" in a scheme by which, *inter alia*, "*members of the boards of Northstar's and SNR's parent companies* submitted short-form applications . . . which contained false certifications." *Northstar Wireless*, 34 F.4th at 39 (emphases added).  Thus, the D.C. Circuit's holding that Relator adequately pleaded its claims applied to each Defendant before the Court of Appeals. And if there was any doubt, all Defendants sought *en banc* review of the Rule 8 and Rule 9(b) decision, indicating that they all understood that the appellate decision applies to them.  The D.C. Circuit's holding cannot be reconsidered now.

      **B.**    <u>**The Amended Complaint Confirms That Relator Adequately Stated A Claim Against All Defendants**</u>.

Even if Defendants could contest the sufficiency of Relator's pleadings as to certain Defendants—though they cannot—their arguments are meritless because Relator has adequately alleged "the 'time, place, and manner' of the fraudulent scheme" in order to "provide sufficient substance to both afford Defendants the opportunity to prepare a response and to warrant further judicial process."  *Northstar Wireless*, 34 F.4th at 39 (internal quotations omitted) (alterations accepted).

Relator has adequately alleged that all "Defendants conspired to defraud the United States."  Dkt. 76 ¶ 150.  "A FCA conspiracy claim requires (1) an agreement to make false or fraudulent claims that (2) each member of the alleged conspiracy joined where (3) at least one

conspirator knowingly committed an overt act in furtherance of the conspiracy." *Scollick ex rel. United States v. Narula*, No. 1:14-cv-01339, 2022 WL 3020936, at *11 (D.D.C. July 29, 2022) (Lamberth, J.); *see also United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010). Relator's allegations plausibly and with particularity allege each element of FCA conspiracy as to each defendant, as confirmed by the D.C. Circuit.

  *First*, Relator adequately alleged an agreement to make false or fraudulent claims. Namely, the Relator alleged that Defendants engaged in a "fraudulent bidding scheme" to "secure[] the rights to nationwide spectrum while depriving the U.S. Government of at least $3.3 billion in auction proceeds." Dkt. 76 ¶ 108; *accord Northstar Wireless*, 34 F.4th at 38 (finding adequate allegations of "agreements to act on DISH's behalf and transfer spectrum rights to DISH"); *id.* at 39 ("[T]he aforementioned conduct makes little sense unless Northstar and SNR agreed in advance that DISH would ultimately control the licenses won at auction."). *Second* and *third*, Relator adequately alleged that each Defendant was a member of the conspiracy, as demonstrated by their overt acts in furtherance of Defendants' fraudulent scheme:[3]

- **DISH**—seeking to obtain nationwide spectrum holdings at a substantial discount— created and secretly controlled sham companies to falsely claim eligibility for "very small business" credits in Auction 97. Dkt. 76 ¶¶ 15–31, 77–81, 100, 107. DISH used shell entities to "implement[] a strategy of overlapping bidding" to ensure that the sham

---

[3] To be clear, only "one conspirator" needs to have "knowingly committed an overt act in furtherance of the conspiracy." *Scollick*, 2022 WL 3020936, at *11; *Miller*, 608 F.3d at 899 (explaining requirement that "*one or more conspirators* knowingly committed one or more overt acts") (emphasis added). Relator has pleaded overt acts by each defendant, but—at the very least—has also adequately pleaded that each defendant was a member of the conspiracy, even if this Court finds that any individual defendant's behavior did not rise to an overt act in furtherance.

companies won significant spectrum holdings. *Id.* ¶¶ 92–94. DISH sought to obfuscate the existence of this scheme by creating a complex web of individual and corporate owners of the sham companies. *Id.* ¶¶ 15–31; *accord Northstar Wireless*, 34 F. 4th at 39 (citing "undisclosed agreements" that "involved Northstar's and SNR's procurement of spectrum licenses on DISH's behalf").

- **Northstar and SNR** were created and financed by DISH and submitted false certifications to fraudulently obtain bidding credits for which they were not eligible through the overlapping bidding strategy. Dkt. 76 ¶¶ 81–85, 91–100, 114, 116–117, 120–23, 128; *accord Northstar Wireless*, 34 F.4th at 38 ("Northstar and SNR were formed as shell companies without any assets or revenues, at DISH's direction").

- **Northstar and SNR's parent companies** were created by DISH and sought to obfuscate DISH's relationships—and agreements—with Northstar and SNR and to help administer the fraudulent scheme. Dkt. 76 ¶¶ 15, 89, 108–113; *accord Northstar Wireless*, 34 F.4th at 38 (quotations and alterations omitted) ("Northstar and SNR bid for spectrum licenses in Auction 97 with financing provided almost exclusively from entities controlled by DISH").

- **American I** was created by DISH to (i) obfuscate DISH's relationship and agreements with Northstar and SNR by creating the false impression that DISH had truthfully disclosed the bidding entity it controlled, and (ii) create the impression of false demand in Auction 97 to allow Northstar and SNR to win spectrum and fraudulently claim bidding credits for DISH's benefit. Dkt. 76 ¶¶ 32–35, 81, 86–88, 91–100, 114, 116.

- **Allen Todd, Miranda Wright, and John Muleta** prepared the false certifications for Northstar and SNR to fraudulently obtain bidding credits. Dkt. 76 ¶¶ 83–85; *accord*

11

*Northstar Wireless*, 34 F.4th at 39 ("[M]embers of the boards of Northstar's and SNR's parent companies submitted short-form applications . . . which contained false certifications that Northstar and SNR had disclosed all agreements, arrangements, and understandings related to the licenses in Auction 97").  These false certifications resulted in Northstar defrauding the Government of nearly $2 billion and SNR defrauding the Government of approximately $1.5 billion in order to obtain discounted spectrum for DISH.  Dkt. 76 ¶¶ 84, 99.

- **The Ergens** were among the DISH-Controlling Defendants that initiated the fraudulent scheme to defraud the government through sham entities.  *Id.* ¶¶ 16–35.  Indeed, Charles Ergen—"Chairman of the Board of Directors for DISH"—promised investors that DISH would aggressively pursue spectrum in Auction 97 and served as the "authorized bidder" for American I.  *Id.* ¶¶ 77–81, 122–23.  But because "American I—the only non-designated-entity bidder under the DISH-Controlling Defendants' *de jure* and d*e facto* control—did not win a single license," *id.* ¶ 94, those statements demonstrate that Charles Ergen understood and actively participated in the scheme through which DISH acquired spectrum in Auction 97, *i.e.*, coordinating bidding to ensure Northstar and SNR were able to win the relevant licenses on DISH's behalf.

Defendants' arguments to the contrary are unavailing.  For example, they suggest that Relator's allegations about the corporate entities "address only those defendants' ownership interests in" Northstar and SNR.  Dkt. 115 at 31–33.  But that is simply false.  As noted above, the Amended Complaint includes allegations—which the D.C. Circuit found adequate—that "Northstar and SNR were formed as shell companies without any assets or revenues, *at DISH's direction*" to facilitate "agreements *to act on DISH's behalf* and transfer spectrum rights to

12

DISH." *Northstar Wireless*, 34 F.4th at 38 (emphasis added).  The Amended Complaint alleges

that the holding companies participated in the fraud by serving as the means by which the DISH-

Controlling Defendants "disguise[d] their exercise of *de facto* control of Northstar Wireless and

SNR Wireless," *i.e.*, by exercising "nominal control of Northstar Wireless and SNR Wireless,"

the holding companies could "permit[] those entities to claim that they were not under the *de jure*

control of the DISH-Controlling Defendants." Dkt. 76 ¶¶ 108–12.  Thus, far from mere

ownership, the corporate defendants acted as key participants in furthering and concealing the

conspiracy.

Defendants also erroneously suggest that the allegations against Miranda Wright, Allen

Todd, and John Muleta fail to "support a reasonable inference of scienter" or knowledge that

"th[eir] certification[s] w[ere] false."  Dkt. 115 at 33–35.  Relator alleged that these individuals

were responsible for the sham DEs and "*knowingly and falsely* certified to the FCC in their

Short-Forms and Long-Forms that they had disclosed all (oral or written) instruments,

agreements, and understandings relevant to their claimed designated entity status in Auction 97."

Dkt. 76 ¶ 125 (emphasis added); *see also id.* ¶ 126 ("This certification was knowingly false

because Defendant Miranda Wright knew that Northstar Wireless had failed to disclose to the

FCC one or more such instruments, agreements, or understandings with the DISH-Controlling

Defendants."), ¶ 127 ("This certification was knowingly false because Defendant John Muleta

knew that SNR Wireless had failed to disclose to the FCC one or more such instruments,

agreements, or understandings with the DISH-Controlling Defendants.").

Moreover, while Defendants attempt to characterize the certification as "narrow," Dkt.

115 at 33, in fact, the certifications make clear that these individuals were "responsible for the

financial affairs" of Northstar and SNR.  *See id.*  Given that Relator alleges that these entities

were created only for purposes of perpetrating fraud on Auction 97, Relator plainly is entitled to an inference of scienter on the part of these individuals.  Indeed, Wright, Todd, and Muleta were on the boards of entities "formed as shell companies without any assets or revenues, at DISH's direction" and which "agree[d] to act on DISH's behalf." *Northstar Wireless*, 34 F.4th at 38. These allegations thus specify "the 'time, place, and manner'" by which "members of the boards of Northstar's and SNR's parent companies" participated in the fraud, *id.* at 39, and plainly raise the reasonable inference that these individuals were fully aware of their role in the scheme.[4]

In sum, as the D.C. Circuit has already found, it is clear from the face of the Amended Complaint that Relator has adequately alleged the participation of all Defendants in a conspiracy to defraud the United States in Auction 97.  As such, dismissal of any defendant would be inappropriate because each defendant is "liable for [their] co-conspirators' foreseeable actions in support of the conspiracy," including "submit[ting] false claims." *Miller*, 608 F.3d at 904 (citing *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983)).[5]

---

[4]    For this same reason, Defendants' corporate veil argument misses the mark.  Dkt. 115 at 31, 35, 36.  The allegations against the individuals are not made simply because of their corporate titles, but because the individuals themselves—personally—participated in the fraud.

[5]    Defendants misapprehend the nature of conspiracy liability.  For example, they erroneously argue for dismissal of Wright because she certified "only the accuracy of the gross-revenue information contained in Northstar Wireless's Very Small Business Statement," whereas "plaintiff is basing its claims solely on Defendants' purported failure to disclose a secret agreement."  Dkt. 115 at 33.  However, Wright was a member of the conspiracy to defraud the FCC, as demonstrated by her service on the board of—and certification of financial information for—"a pop-up entit[y] created shortly before the opening of Auction 97 for the sole purpose of participating in the auction" to fraudulently obtain spectrum for DISH.  Dkt. 76 ¶ 109.  Even if the precise information Wright certified was not the basis for the fraud alleged by Relator, she is nevertheless liable for the fraudulent acts of her co-conspirators.

14

## II.     **DEFENDANTS' PUBLIC DISCLOSURE BAR ARGUMENT IS FORECLOSED BY DOJ'S STATUTORY VETO AND IS WITHOUT MERIT IN ANY EVENT.**

The Court can ignore the bulk of Defendants' nearly 40-page brief, most of which is devoted to the public disclosure bar, because DOJ has vetoed dismissal on that basis.  In 2010, Congress amended the FCA, which now provides in pertinent part that courts "shall dismiss an action or claim under this section, *unless opposed by the Government*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed[.]"  31 U.S.C. § 3730(e)(4)(A) (emphasis added).  The 2010 amendments thus "deprive [Defendants] of the previously available jurisdictional defense and replace it with a non-jurisdictional defense that is triggered by a substantially narrower range of public disclosures and is, even then, *subject to veto by the government*."  *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 918 (4th Cir. 2013) (emphasis added).  Now that the Government has exercised its veto power here, the Court is powerless to consider Defendants' public disclosure bar argument.  *See United States ex rel. Conroy v. Select Med. Corp.*, 211 F. Supp. 3d 1132, 1152 (S.D. Ind. 2016) ("[T]he government's exercise of that right [to veto] means the court's analysis under the public-disclosure bar ends here."); *United States v. Doyle*, No. 1:18-cv-373, 2022 WL 1186182, at *4 n.1 (S.D. Ohio Apr. 21, 2022) (declining to consider public disclosure bar as a basis for dismissal

when the Government exercised its statutory veto). [6]  Thus, the Court need not waste further resources on this issue.[7]

Even if the Court could consider the substance of Defendants' argument—and there is no reason for the Court to do so—Defendants' motion would nevertheless fail on procedural and substantive grounds.  As to the former, Defendants' attempt to invoke the public disclosure bar is precluded by the mandate rule.  As to the latter, Defendants have not met the high burden of showing that there is no material disputed issue of fact regarding the public disclosure arguments and that they are entitled to judgment as a matter of law.  Indeed, even if the Court were "convinced" that Relator "is unlikely to prevail at trial," there are at a minimum material issues of fact concerning these questions that make the "remedy by motion for judgment on the

---

[6]     Although couched as a "partial opposition," DOJ exercised its right to oppose dismissal on public disclosure grounds of all claims "premised upon Relator's allegation that Defendants knowingly failed to disclose all of their instruments, agreements, and understandings with the DISH-Controlling Defendants to the [FCC] in connection with Auction 97."  Dkt. 118 at 1 (internal quotations and citations omitted).  All of Relator's claims of fraud are premised on this allegation, specifically SNR's and Northstar's: (i) failure to disclose their full relationship with the DISH-Controlling Defendants; (ii) misrepresentation of their actual relationship with the DISH-Controlling Defendants; and (iii) false certification to the FCC that they had disclosed all relevant agreements, instruments, understandings, and arrangements with the DISH-Controlling Defendants.  *See* Dkt. 76 ¶¶ 125−128.  And so there is no misunderstanding on this point, Relator is not alleging Defendants engaged in fraud based their purported misinterpretation of the FCC's *de facto* control rules.  Dkt. 76 ¶ 128.  Indeed, the Amended Complaint made this point abundantly clear at DOJ's request.  *See id.*

[7]     Aware of the Court's limited resources, Relator requested that Defendants abandon their public disclosure bar argument in light of DOJ's statutory veto, which disposes of the public disclosure bar issue.  Defendants declined to do so without explanation.  *See* Ex. A.  As a result, Relator is compelled to address the substance of the public disclosure bar issue simply to set straight the procedural and factual record as well as the governing legal framework, which are fatal to Defendants' argument.

pleadings" unavailable. *Dist. No. 1, Pac. Coast Dist., Marine Engineers Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 933 F.3d 751, 761 (D.C. Cir. 2019).

### A.   Defendants Affirmatively Waived The Public Disclosure Bar Argument.

The mandate rule prevents Defendants from raising the public disclosure bar.  "The mandate rule embodies the simple principle that 'an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'"  *United States v. Kpodi*, 888 F.3d 486, 491 (D.C. Cir. 2018) (quoting *Briggs v. Pennsylvania. R.R. Co.*, 334 U.S. 304, 306 (1948)).  It is "a 'more powerful version of the law-of-the-case doctrine, which prevents courts from reconsidering issues that have already been decided in the same case.'"  *Role Models Am., Inc. v. Geren*, 514 F.3d 1308, 1311 (D.C. Cir. 2008) (internal quotations omitted).  Under the mandate rule, a district court "is without power to do anything which is contrary to either the letter or spirit of the mandate."  *City of Cleveland, Ohio v. Fed. Power Comm'n*, 561 F.2d 344, 346–47 (D.C. Cir. 1977).

In addition to barring reconsideration of issues decided by the court of appeals, "the mandate rule bars litigation of issues decided by the district court but foregone on appeal or otherwise waived, for example because they were not raised in the district court."  *Burns v. Levy*, No. 13-cv-898, 2019 WL 6465142, at *14 (D.D.C. Dec. 2, 2019) (Kollar-Kotelly, J.) (quoting *United States v. Bazemore*, 839 F.3d 379, 385 (5th Cir. 2016)) (alteration accepted).  This specific application of the rule protects the integrity of the judicial process by requiring litigants to present their arguments to the district court at the first available opportunity "and not in subsequent hearings following a remand."  *Eli Lilly & Co. v. Home Ins. Co.*, 794 F.2d 710, 717 (D.C. Cir. 1986); *see United States v. Henry*, 472 F.3d 910, 913 (D.C. Cir. 2007) ("The widely-accepted bar promotes procedural efficiency and prevents the bizarre result that a party who has

17

chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." (internal quotations omitted)).

The Court's decision in *Burns* is illustrative.  There, a litigant asserted after remand that "the qualified common interest privilege" did not apply to statements she wished to admit into evidence, an argument she "did not raise . . . in the first round of summary judgment briefing" or "on appeal."  2019 WL 6465142, at *13, *15.  Because the litigant "raise[d] this issue for the first time" on remand, this Court held that it "need not reconsider its prior decision that the privilege applies under the law-of-the-case doctrine and the mandate rule."  *Id.* at *14; *accord City of Oberlin, Ohio v. FERC*, 39 F.4th 719, 730 (D.C. Cir. 2022) ("It is elementary that where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand." (citation omitted)).  As *Burns* exemplifies, "[a]n argument bypassed by the litigants, and therefore not presented in the court of appeals, may not be resurrected on remand and used as a reason to disregard the court of appeals' decision." *United States v. Husband*, 312 F.3d 247, 251 (7th Cir. 2002) (citation omitted).[8]

The same principle applies here.  In this case, it is undisputed that Defendants waived for purposes of their motion to dismiss any argument based on the public disclosure bar. Specifically, in their reply supporting the motion to dismiss, Defendants told the Court that they were withdrawing "the public-disclosure-bar arguments raised in their opening memorandum as a basis for dismissal of any claim in the amended complaint."  Dkt. 80 at 2 n.2.

---

[8]    In *Burns*, the Court decided the relevant issue prior to appeal whereas here the issue was not decided because Defendants withdrew it.  That potential distinction is immaterial, however, because the "[l]aw of the case operates the same way whether an argument is raised (and rejected) or waived."  *Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 334 (S.D.N.Y. 2018), *aff'd*, 802 F. App'x 28 (2d Cir. 2020).

That withdrawal plainly was intentional.  Defendants presented a public disclosure bar

argument in their motion to dismiss—both before and after Relator amended its complaint—and

then, upon reflection, affirmatively abandoned it.  Defendants thus made a "deliberate waiver"

and not "an 'inadvertent error.'"  *Wood v. Milyard*, 566 U.S. 463, 473–74 (2012); *see, e.g.*,

*Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017) (holding a party "explicitly waived

his claims" where, "[a]fter expressing a clear and accurate understanding of the issue, Counsel

deliberately steered the District Court away from the question" (alterations accepted and citation

omitted)).  Because Defendants chose to withdraw the public disclosure bar argument rather than

present it to this Court and the Court of Appeals, the mandate rule prevents Defendants from

raising the argument on remand.[9]

Contrary to Defendants' suggestion, it makes no difference that their waiver was

"'without prejudice' and 'for purposes of the motion to dismiss only.'"  Dkt. 115 at 15 (quoting

Dkt. 80 at 2 n.2).  Because Defendants' Rule 12(c) motion seeks "dismissal," *id.* at 17, it "is

functionally equivalent to a Rule 12(b)(6) motion," *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d

122, 130 (D.C. Cir. 2012); *see also USAir, Inc. v. Dep't of Transp.*, 969 F.2d 1256, 1260 (D.C.

Cir. 1992) ("litigants must not be encouraged to 'sandbag' [tribunals] by withholding legal

arguments for tactical reasons"); *River Cross Land Co., LLC v. Seminole Cnty.*, No. 6:18-cv-

---

[9]     The result is the same "[e]ven if we take a different tack and consider whether
[Defendants] forfeited (rather than waived) [their] claims."  *Keepseagle*, 856 F.3d at 1053.  "[A]
party forfeits a claim by failing to raise it below when the party 'knew, or should have known'
that the claim could be raised."  *Id.* at 1054 (quoting *Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071,
1091 (D.C. Cir. 1984)); *see id.* at 1053 ("forfeiture is the failure to make the timely assertion of a
right" (citation omitted)).  In addition to constituting waiver, Defendants' actions show the
public disclosure bar argument could have been raised previously.  Because the argument could
have been raised and was not, it is forfeited.

1646, 2019 WL 12518728, at *3 (M.D. Fla. Aug. 21, 2019) (denying Rule 12(c) motion because "a party's motion for judgment on the pleadings is not an opportunity for the party to re-argue the same issue it has already lost or waived").  Accordingly, Defendants' express waiver encompasses the instant Rule 12(c) motion even if the purported limitation adequately reserves the public disclosure bar issue for subsequent presentation at summary judgment or trial.

Nor have Defendants identified any "exceptional circumstances" that might authorize a departure from the mandate rule, *Eli Lilly & Co.*, 794 F.2d at 717 (citation omitted), and there are none.  The Amended Complaint remains the operative pleading, so there have been no changes in the factual allegations that must be taken as true.[10]  Furthermore, the D.C. Circuit has already examined the Amended Complaint and squarely held that Relator "has adequately pleaded its claims."  *Northstar Wireless*, 34 F.4th at 38.  Adhering to the mandate rule under these circumstances will fulfill a central purpose of the rule by ensuring that Defendants' waived argument will "not be resurrected on remand and used as a reason to disregard the court of appeals' decision."  *Husband*, 312 F.3d at 251 (citation omitted).

**B.    The Public Disclosure Bar Does Not Foreclose This Case.**

In addition to being procedurally improper, Defendants' contention that the public disclosure bar forecloses this case fails on the merits.  Defendants have not met their "substantial" burden of showing "*both* that there is no material dispute of fact . . . *and* that . . .

---

[10]    Defendants' answers and exhibits are irrelevant.  "It is axiomatic that for purposes of the court's consideration of the Rule 12(c) motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false."  *Tapp v. Washington Metro. Area Transit Auth.*, 306 F. Supp. 3d 383, 392 (D.D.C. 2016) (Ketanji Jackson, J.) (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1368 (3d ed.)) (alteration accepted).

20

[they are] entitled to judgment as a matter of law." *Murphy v. Dep't of Air Force*, 326 F.R.D. 47, 49 (D.D.C. 2018) (Ketanji Jackson, J.) (emphasis in original).  As to the latter, Defendants fail to establish that Relator's allegations were publicly disclosed, that the supposed public disclosures are substantially similar to Relator's allegations, or that Relator is not an original source as a matter of law.  *See* 31 U.S.C. § 3730(e)(4) (public disclosure bar applies "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed[,]" through an enumerated channel unless "the person bringing the action is an original source of the information.").  As to the former, Defendants' arguments reveal factual disputes that are inappropriate for judgment on the pleadings.  *Dist. No. 1*, 933 F.3d at 761.

1.  <u>Defendants Fail To Demonstrate That The Case Should Be Dismissed Under The Public Disclosure Bar As A Matter Of Law.</u>

In determining whether an action is subject to the public disclosure bar, courts generally consider three questions: *first*, whether the allegations in the complaint have been "publicly disclosed" through one of the enumerated channels; *second*, if so, whether the relator's lawsuit is "based upon," *i.e.*, "substantially similar to," those publicly disclosed allegations; and *third*, if it is, whether the relator is "an original source of the information" upon which the lawsuit is based. *See, e.g., Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 273–74 (7th Cir. 2016); *United States v. CSL Behring, L.L.C.*, 855 F.3d 935, 941, 947 (8th Cir. 2017).  Defendants' public disclosure bar argument fails each of these inquiries.  Defendants' arguments to the contrary mischaracterize Relator's claims and ignore that Relator is entitled to the benefit of all reasonable inferences from the allegations in the Amended Complaint.

21

a.      **Neither The Fraud Nor Its Essential Elements Were Publicly Disclosed.**

For the public disclosure bar to apply, either the allegation of fraud [Z] or its essential elements [X+Y] must have been made public through one of three statutorily recognized channels. *See United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 654 (D.C. Cir. 1994). In this formula, "X" is the "misrepresented state of facts" and "Y" is the "true state of facts" that together make up the allegation "Z." *United States ex rel. Shea v. Cellco P'ship,* 863 F.3d 923, 933 (D.C. Cir. 2017). The public disclosure bar is only triggered if either Z or *both* X and Y appear publicly in a manner sufficient to give rise to "an inference that fraud has taken place." *United States ex rel. Scutellaro v. Capitol Supply, Inc.,* No. 10-cv-1094, 2017 WL 1422364, at *14–16 (D.D.C. Apr. 19, 2017) (citation omitted). Defendants cannot "piece together a public disclosure . . . from multiple disparate sources." *Id.* at *16; *see also Shea,* 863 F.3d at 935 ("When the relator bridges the gap by his own efforts and experience, the public disclosure bar does not apply") (internal quotations and citations omitted and alterations accepted). Defendants' public disclosure bar argument fails because neither the allegations of fraud, nor its essential elements were ever made public, let alone through any of the statutorily defined channels.

i.      *The Allegation Of Fraud [Z] Was Never Disclosed.*

Defendants' argument that the allegation of fraud [Z] was publicly disclosed is based both on a mischaracterization of the fraud Relator alleges and misrepresentations of the alleged public disclosures. As to the former, in an attempt to narrow Relator's allegations, Defendants dub Relator's claims as a "secret-agreement theory," *see* Dkt. 115 at 21–22, but this phrase appears nowhere in the Amended Complaint. Rather, as Relator has explicitly (and repeatedly)

22

explained, the specific allegations of fraud involve SNR and Northstar's: (i) failing to disclose

their full relationship with the DISH-Controlling Defendants, specifically that SNR and

Northstar were formed, financed, and operated for the purpose of acquiring discounted spectrum

on behalf of and for the benefit of DISH; (ii) misrepresenting their actual relationship with the

DISH-Controlling Defendants, which they falsely characterized as nothing more than a non-

controlling passive investor when DISH was the true beneficiary of that relationship; and (iii)

falsely certifying to the FCC that they had disclosed all relevant agreements, instruments,

understandings, and arrangements with the DISH-Controlling Defendants.  *See* Dkt. 76 ¶¶ 125–

128.

  As to the latter, Defendants contend—without analysis—that certain "public materials"

satisfy the public disclosure bar because they "closely mirror [R]elator's allegations."  Dkt. 115

at 21.  None of the materials cited by Defendants allege the same fraud as Relator.  In fact, these

sources do not allege any fraud at all.[11]

  *First*, the media snippets referenced by Defendants, *see* Dkt. 115 at 21–23, are taken out

of context.  Those articles, in fact, *assume* that DISH complied with the FCC auction rules and

argue that the rules themselves are susceptible to manipulation.  One noted that "[a]ccording to

an investigation by the Wall Street Journal, *while the investment structure for the [DISH] entities

is legal,* it involves a complex web of investment partners, including a former FCC official."

---

[11] Defendants present these ostensible public disclosures in the factual background section of their motion, creating the impression that they form part of the factual fabric of this proceeding.  *See* Dkt. 115 at 7–13.  They do not.  *Cf. Tapp*, 306 F. Supp. 3d at 392 (when considering a motion for judgment on the pleadings "all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false."  (internal quotations and citations omitted)).

Phil Goldstein, *Dish's Road to $3.33B in AWS-3 Discounts Included a Complex Web of Investments*, FierceWireless (Feb. 4, 2015), https://bit.ly/2zvPWXq (emphasis added).  Echoing Defendants' intentionally misleading statements to the FCC, that author emphasized "[i]mportantly, while Dish owns 85 percent economic interest in both Northstar and SNR, *it does not have a controlling interest in either firm*."  *Id.* (emphasis added).  Another commentator likewise concluded that "*DISH complied with the letter of the [FCC bidding] rules*," and argued that "it's clear that the rules for future auctions will need to be rewritten significantly."  Tim Farrar, *How To Blow Up A Spectrum Auction . . .* , TMF Associates Blog (Jan. 31, 2015, 4:00 PM), https://rb.gy/csoyqt.  The thrust of these articles is not Defendants' fraud but rather a demand that the Government put an "end to this corporate welfare" by undertaking "a top-to-bottom review of policies that aid billion-dollar interests at the expense of entrepreneurs."[12]

> *Second*, Defendants mischaracterize FCC submissions made by Version and AT&T, contending that DISH's "[c]ompetitors publicly raised the same secret-agreement theory,

---

[12]   Kelly Ayotte & Ajit Pai, *Ending Welfare for Telecom Giants*, Wall St. J. (Feb. 4, 2015) https://www.wsj.com/articles/kelly-ayotte-and-ajit-pai-ending-welfare-for-telecom-giants-1423095287?ns=prod/accounts-wsj.  *See also* Editorial Board, *Government Handouts at Wireless Auctions*, N.Y. Times (Feb. 3, 2015), https://www.nytimes.com/2015/02/03/opinion/government-handouts-at-wireless-auctions.html (noting that DISH "sa[id] that it has fully followed rules approved unanimously by the five-member commission.  If that's true, then the rules need to be changed"); Shalini Ramachandran, et al., *Behind Dish Wireless Coup, Ties to Alaskan Native Groups*, Wall St. J. (Feb. 3, 2015), http://on.wsj.com/2ePOs20 (accepting Defendants' assertion that Northstar and SNR "registered for the 25% small-business discount because Dish technically doesn't control them," and noting that other large telecom companies "have used the same approach Dish is employing, striking partnerships with smaller entities to get a discount"); Thomas Gryta, et al., *Dish Network Surprise Winner in Spectrum Auction*, Wall St. J. (Jan. 30, 2015), https://on.wsj.com/2PTfqbx (accepting that "Dish may be in perfect compliance with the rules"); Thomas Gryta & Ryan Knutson, *Behind Dish Network's Race for Wireless Spectrum*, Wall St. J. (Feb. 12, 2015), http://on.wsj.com/1F3CsAs  (noting "Dish told the FCC it and its entities would 'have knowledge of the other's bids or bidding strategies,'" which is allowed by FCC rules).

alluding to an undisclosed relationship between or among DISH, Northstar, and SNR." Dkt. 115 at 22.  To the contrary, those letters focus on allegations of collusion and bid-rigging during the bidding process but take for granted Defendants' compliance with the FCC's disclosure requirements.  *See id.*  Indeed, the letters assume that DISH "successfully coordinated bidding" with Northstar and SNR "[u]nder the Commission's existing rules."  Comments of AT&T, *In the Matter of Updating Part 1 Competitive Bidding Rules*, WT Docket. No. 14-170 at 10 (Feb. 20, 2015), https://www.fcc.gov/ecfs/document/60001018945/1 (emphasis added); *see also* Verizon Letter to FCC, *In the Matter of Updating Part 1 Competitive Bidding Rules*, WT Docket. No. 14-170 at 3 (Apr. 24, 2015) ("[T]he Commission has been specific that 'compliance with the disclosure requirements of section 1.2105(c) will not insulate a party from enforcement of antitrust laws.'").[13]  And the antitrust concerns raised in the letters necessarily assume independent entities—the exact opposite of the fraud Relator alleges.

*Third*, Defendants' reliance on letters sent by the Senate Commerce Committee to the FCC, DISH, SNR, and Northstar in response to "concerns that the pattern of bids by DISH and its affiliates suppressed competition," *see* Press Release, U.S. Senate Committee on Commerce, Science, & Transportation, *Commerce Probes $3 Billion Collusion Concern in FCC Spectrum Auction* (Apr. 29, 2015), https://rb.gy/arpipl, is also misplaced.  Those letters did not suggest that Defendants had engaged in fraud or had falsely certified that they had disclosed all relevant agreements and arrangements between the parties.  Rather, the letters asked whether DISH and

---

[13]     Like other commentators, AT&T thus focused on strengthening the FCC auction rules to prevent gamesmanship.  *See id.* at 11 ("AT&T submits that the Commission should eliminate the agreement disclosure obligations and instead require a stronger anti-collusion certification from auction applicants."); *id.* at 16 ("Giant businesses, such as DISH, should not be able to creatively craft end-runs around the DE rules . . . .").

its affiliates engaged in "common antitrust violations such as bid rigging, complementary bidding, and bid suppression" due to congressional concern that DISH, Northstar and SNR, "suppress[ed] rival bidders"[14]—again, the opposite of the fraud alleged in the Amended Complaint.  This so-called "investigation" went no further.

*Fourth*, the public petitions to deny Northstar and SNR's applications are irrelevant. Relator disclosed the fraud to DOJ before filing its petition.  *See* Dkt. 76 ¶ 14.  Nothing disclosed in any of the petitions adds to Relator's voluntary disclosure to DOJ.  Moreover, Defendants' claim that the FCC "*actually opined* on whether there was fraud—and concluded there was not," Dkt. 115 at 23−24, is simply untrue.  Again, the FCC assumed that Defendants had disclosed all required information.  *Bidding Credit Order* ¶¶ 131, 145.  Indeed, the FCC filed a Statement of Interest in this case saying as much.  Dkt. 65.

If anything, as the FCC filing indicates, the purported public disclosures identified by Defendants reinforce the importance of Relator's allegations.  Defendants' scheme effectively threw the Government off the scent of the fraud.  Even Defendants' mischaracterization of Relator's allegations as a "secret agreement theory" recognizes this—if the understandings are

---

[14]     Letter from Commerce Committee to FCC at 4 (Apr. 29, 2015); *see also id.* at 5 (asking about FCC monitoring for "signs of signaling, coordination, or collusion," how the FCC addresses actual or suspected collusion, what would happen if the FCC determined collusion had taken place, and whether SNR, Northstar, and DISH communicated during Auction 97 in a manner that violated FCC's prohibitions on communications during an auction); Letter from Commerce Committee to Mr. Charles Ergen at 4-5 (Apr. 29, 2015) (comparing DISH's behavior to "common antitrust violations," requesting information and documents regarding DISH's communications with Northstar and SNR during Auction 97, and seeking documents "relating to the contractual and bidding arrangements" and "auction and bidding strategies" of DISH, SNR, and Northstar); Letter from Commerce Committee to Mr. Aaron Schutt, Doyon, Ltd. (Apr. 29, 2015) (same); Letter from Commerce Committee to Mr. John Muleta, Atelum, LLC (Apr. 29, 2015) (same).

26

"secret," they cannot be public, and that is precisely why Defendants originally waived the public disclosure bar argument. *See* Dkt. 80 at 2 n.2. In the end, the publicly disclosed facts fell far short of alerting the Government to the likelihood of Defendants' wrongdoing. *See Williams v. Washington Metro. Area Transit Auth.*, No. 17-cv-00890, 2019 WL 2058723, at *5 n.2 (D.D.C. May 9, 2019) (rejecting application of public disclosure bar because the report alleged to constitute the public disclosure did not address the fraud "at the heart" of the complaint). To the contrary, the publicly disclosed materials "suggest[ed] that the defendants were being *helpful* in working with" the government to provide all relevant information about their relationship with each other and to comply with FCC auction rules. *See United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 76 (D.D.C. 2018).

> ii.   *The True State Of Facts [X] Was Not Publicly Disclosed, Let Alone Through A Statutorily Cognizable Channel.*

Defendants seek to manufacture a disclosure of the essential elements [X+Y] of the fraud by mischaracterizing the X (the misrepresented state of facts) and the Y (the true state of facts) in this case. Specifically, Defendants contend that these "essential elements (X+Y) include (1) the Bidding Defendants' corporate structures, the contents of their disclosed agreements, and their conduct during the auction, and (2) the allegedly false certifications that Northstar and SNR had disclosed all relevant agreements" (collectively referred to as "FCC Materials"), and that these were disclosed before the Complaint was filed. Dkt. 115 at 19. This contention is incorrect.

*First*, the FCC Materials constitute only the misrepresented state of facts (X). *See id.* (comparing FCC materials with Dkt. 76 ¶¶ 15–38, 77–90, 109–112). Relator does not rely on the FCC Materials to establish (Y), the true state of facts. To the contrary, Relator asserts that these materials concealed and fraudulently failed to disclose the true state of facts, *see* Dkt. 76

¶ 124, which Relator uncovered *despite* the FCC Materials by conducting an independent investigation. *See e.g.*, Dkt. 76 ¶¶ 113, 115–17, 125–28, 130.  The thrust of Relator's allegations about (Y) is, as the D.C. Circuit confirmed, that SNR and Northstar entered "undisclosed agreements to act on DISH's behalf or transfer spectrum rights to DISH," based on an agreement made "in advance" of the auction. *Northstar Wireless*, 34 F.4th at 39.  Because both parts of the equation—*i.e.*, X+Y—were not disclosed, the public disclosure bar is not triggered. *See Scutellaro*, 2017 WL 1422364, at *17.[15]

*Second*, in addition to not disclosing the essential elements of the fraud, the FCC Materials do not qualify as public disclosures under the FCA.  *See United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 474 (D.C. Cir. 2016) ("If the public disclosure did not occur through a statutorily enumerated channel, the jurisdictional bar does not operate").  Without analysis, Defendants claim that the FCC Materials constitute both a "Federal report" under channel (ii) and a disclosure by "the news media" under channel (iii) because they were disclosed "on a public government website."  Dkt. 115 at 20.  But neither claim is correct.

---

[15]    In addition to paying short shrift to the controlling decision of the D.C. Circuit in this proceeding, Defendant inexplicably presents an unrelated district court opinion as part of the procedural history of this case.  *See* Dkt. 115 at 16 (discussing *United States ex rel. O'Connor v. United States Cellular Corp.*, No. 20-cv-2070, 2022 WL 971290 (D.D.C. Mar. 31, 2022)).  But while *O'Connor* also involved Auction 97 and the public disclosure bar, the relators' fraud allegations in that case were based on FCC filings.  Here, however, Relator alleges that Defendants' FCC filings concealed and misrepresented the true state of facts.  *See* Dkt. 76 ¶ 124.  The thrust of Relator's allegations is, as the D.C. Circuit confirms, that Defendants entered "*undisclosed agreements* to act on DISH's behalf or transfer spectrum rights to DISH," based on an agreement made "*in advance*" of Auction 97.  *Northstar Wireless*, 34 F.4th at 39 (emphases added).  As discussed, Relator thus "supplied the missing link between the public information and the alleged fraud" through its "own efforts and experience."  *Shea*, 863 F.3d at 935; *see* Dkt. 76 ¶¶ 10-13 (describing Relator's participation in the auction and work with an expert to analyze Defendants' bidding behavior).

Channel (ii) applies to a "congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation." 31 U.S.C. § 3730(e)(4)(A)(ii).  The applications that SNR and Northstar filed with the FCC do not fall into any of these categories.  Furthermore, channel (ii) applies "to a fact-finding or investigatory process 'to *obtain* information'" and was intended to "cover a wide array of *investigatory* processes."  *United States v. Allergan, Inc.*, 46 F.4th 991, 998 (9th Cir. 2022) (citation omitted) (emphasis added) (concluding that a patent prosecution is an administrative hearing within the meaning of channel (ii)).  But there is nothing investigatory about the bidding activity data released by the FCC after the close of the auction.  *Cf. United States v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212, 225 (D.N.J. 2021) (rejecting argument that prosecution materials were publicly disclosed in a "Federal report" under channel (ii) "because they were 'published' on the PTO's Patent Application Information Retrieval ('PAIR') system").  The bidding data is just that—data.

Nor do materials submitted on or available from the FCC's "public website" or the FCC's Universal Licensing System ("ULS") constitute "the news media" under channel (iii).  31 U.S.C. § 3730(e)(4)(A)(iii).  Although Defendants cite various cases which held that online information was publicly disclosed through the news media for purposes of the public disclosure bar, Dkt. 115 at 20−21, none of these cases have any relevance here.  *See, e.g.*, *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 43 (4th Cir. 2016) (parties agreed that an online news article constituted a "public disclosure" for FCA purposes such that court did not opine); *United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 125 (D.D.C. 2015) (declining to adopt the district court's holding that information on the websites of two military entities was disclosed through the news media because the purpose of the pages "was clearly to give the public an accurate account of those entities' contracting requirements");

*United States ex rel. Hong v. Newport Sensors, Inc.*, 728 Fed. App'x 660, 662−63 (9th Cir. 2018) (declining to adopt "the district court's broad holding that most public webpages . . . generally fall within the category of 'news media'").

While it is undisputedly true that public disclosures can occur through "websites and online articles," Dkt. 115 at 20, this does not mean that every website and online article constitutes "the news media" for FCA purposes as Defendants erroneously suggest.  Indeed, the cases cited by Defendants generally involved various media outlets, not a government website. *See, e.g., United States ex rel. Doe v. Staples, Inc.*, 932 F. Supp. 2d 34, 40 (D.D.C. 2013) (reports published by a company compiling manifest information submitted by shippers and made "readily accessible to the public" on the company's website constitutes "the news media"), *aff'd* 773 F.3d 83 (D.C. Cir. 2014); *United States ex rel. Osheroff v. Humana, Inc.* 776 F.3d 805, 813 (11th Cir. 2015) (articles published in the *Miami Herald*); *United States ex rel. Green v. Serv. Cont. Educ. and Training Tr. Fund*, 843 F. Supp. 2d 20, 23 (D.D.C. 2012) (public website maintained by the Service Contract Education and Training Trust Fund).[16]

Furthermore, courts have rejected the notion that "anything ever published publicly on the internet" constitutes the "news media" as "contrary to the ordinary meaning of the term" with "the potential to eviscerate the balance Congress struck between encouraging private parties to bring forth evidence of fraud and preventing parasitic suits." *United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, No. 12-cv-1694, 2019 WL 3282619, at *12 (C.D. Cal. July 16, 2019), *rev'd and remanded on different grounds*, 854 F. App'x 840 (9th Cir. 2021);

---

[16]    *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 523 (6th Cir. 2020), cited by Defendants, involved a federal report under section 3730(e)(4)(ii), not the news media under section 3730(e)(4)(iii).

*United States ex rel. MC2 Sabtech Holdings, Inc. v. GET Eng'g Corp.*, 580 F. Supp. 3d 876, 889 (S.D. Cal. 2022).  Rather, consistent with the plain definition of the term, only websites that have indicia of "news media" fall within channel (iii)'s penumbra.  *See, e.g.*, *id.*; *Integra Med Analytics*, 2019 WL 3282619, at *12.  The FCC's public website and ULS lack such indicia.

### b.   Relator's Allegations Are Not Substantially Similar To The Alleged Public Disclosures.

Perhaps recognizing that the purported public disclosures are inapplicable, Defendants attempt to "boost[] the level of generality" of Relator's allegations.  *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 936 (7th Cir. 2012).  Taken at the correct level of specificity, however, Relator's allegations are not "substantially similar" to the alleged public disclosures identified by Defendants because the fraud Relator alleges is "different in kind and in degree from the previously disclosed information."  *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 578 (9th Cir. 2016).

Indeed, in many instances, Relator's allegations refute the publicly disclosed materials.  For example, and as noted previously, the sources cited by Defendants that raise antitrust concerns in connection with Defendants' bidding behavior assume that Defendants are independent from each other—an assumption that is directly inconsistent with Relator's allegations that SNR and Northstar are not, and have never been, independent entities.  Other sources assume that Defendants complied with the FCC auction rules and candidly disclosed the nature and extent of the relationship between SNR, Northstar, and DISH, criticizing the rules themselves.  That assumption is likewise at odds with Relator's allegations that SNR and Northstar misrepresented their actual relationship with DISH and falsely certified to the FCC that they had disclosed all relevant agreements, instruments, understandings, and arrangements with

31

DISH.  In other words, when viewed at the proper level of generality, it is clear both that

Relator's allegations are not substantially similar to the alleged public disclosures identified by

Defendants, *see id.* at 578; *Shea*, 863 F.3d at 934−35, and that the alleged public disclosures

could not have meaningfully alerted a hypothetical government investigator to the fraud alleged

in this case.  *Scutellaro*, 2017 WL 142234, at \*17.

<strong>c.    Relator Is An Original Source.</strong>

Even assuming Defendants could establish the elements of the public disclosure bar—and

they cannot—Relator has plausibly pleaded that it is an original source under the statute.  An

"original source" is an:

> individual who either (1) prior to a public disclosure under subsection (e)(4)(a), has
> voluntarily disclosed to the Government the information on which allegations or
> transactions in a claim are based, or (2) who has knowledge that is independent of
> and materially adds to the publicly disclosed allegations or transactions, and who
> has voluntarily provided the information to the Government before filing an action
> under this section.

31 U.S.C. § 3730(e)(4)(B).  Relator has plausibly pleaded that it qualifies as an original source

under either prong.

Relator qualifies under the first prong because: (1) Defendants identify no public

disclosure of the fraud alleged by Relator prior to Relator commencing this action, *see supra* at

22–28; and (2) Relator reported the fraud to DOJ on May 11, 2015, before filing its petition to

deny with the FCC.  Dkt. 76 ¶ 39.[17]

---

[17]    Defendants assert, without explanation, that Relator "does not allege" that it "voluntarily
disclosed the information" forming the basis of the complaint prior to any public disclosure.  Dkt.
115 at 26.  This is false.  Relator explicitly alleges that it:

> voluntarily disclosed Defendants' fraud to the [DOJ] on May 11, 2015.  This
> voluntary disclosure—which included the substance of Relator's allegations—
> occurred before VTel Wireless filed its petition with the FCC on May 11, 2015 to

Relator also qualifies under the second prong, because Relator possesses direct and independent knowledge of the true state of facts, Y.  Specifically, Relator possesses independent knowledge of the information on which its claims are based through its participation in Auction 97 and its independent expert investigation of Defendants behavior.  *See Oliver*, 101 F. Supp. 3d at 128 (a "relator must have . . . independent knowledge of the 'information upon which the relators' allegations are based,' not the 'information on which the publicly disclosed allegations that triggered the public-disclosure bar are based.'").  Relator's subsidiary directly observed Defendants' irregular and suspicious bidding behavior.  That observation prompted Relator to independently investigate Defendant's conduct.  And the investigation revealed, *inter alia*, that Defendants' bidding behavior could only be explained by the exercise of central, coordinated control by a single entity: DISH.

Relator thus had "independent knowledge of essential information underlying the conclusion that fraud had been committed."  *Springfield*, 14 F.3d at 657.  The information disclosed by Defendants to the FCC "did not [by itself] suffice to indicate fraud," so Relator "had to have bridged the gap by its own efforts and experience, which in this case included personal knowledge of the [auction] proceedings and" work with an expert.  *Id.*  Even if Relator had "started with innocuous public information"—and, to be clear, the materials disclosed to the

---

deny Northstar Wireless's and SNR Wireless's claims for bidding credits.  No other parties that filed petitions to deny with the FCC . . . raised even a general allegation that Defendants had committed the fraud that Relator alleges in this action.

Dkt. 76 ¶ 14.

FCC are not public—Relator "completed the equation with information independent of any preexisting public disclosure." *Id.*

Defendants' assertion that Relator "has no relevant 'independent knowledge'" and instead bases its allegations "entirely on public information" again ignores the distinction between the misrepresented state of facts (X) and true state of facts (Y). Dkt. 115 at 27−28. The supposedly public information referenced by Defendants all go to the former. *See id.* As the D.C. Circuit has explained, however, the FCA does not require an original source to have "direct and independent knowledge of *all* of the vital ingredients to a fraudulent *transaction*," precisely because "the misrepresented state of affairs, *e.g.* X, would almost always have been disclosed to the government independently by the alleged defrauder." *Springfield*, 14 F.3d at 656−57. Accordingly, an original source need only have direct and independent knowledge of *either* essential element of the underlying fraud, X *or* Y. *Id.* at 657.

Moreover, Defendants' contention that Relator did nothing more than conduct "collateral research and investigations in response to public allegations" impermissibly mischaracterizes Relator's claims, which must be construed in the light most favorable to Relator. *See* Dkt. 115 at 28. In ascertaining the true state of facts (Y), Relator (i) through participation in Auction 97, observed an illogical and suspicious pattern of bidding for generally overlooked wireless spectrum in rural Vermont; (ii) engaged an expert in bidding economics and game theory who provided a comprehensive assessment of Defendants' bids; and (iii) concluded that Defendants failed to disclose all relevant agreements and understandings to the FCC, making Defendants' certifications false. "At each step, Relator based its claims on nonpublic information," namely (i) Relator's first-hand observations during the auction, (ii) the expert's analysis—which was far more comprehensive than mere collateral research and deployed the type of expertise unavailable

34

to the general public—and (iii) an inference of *undisclosed* agreements which, by definition, were not public.

The cases cited by Defendants—most of which are out-of-circuit and nonbinding—are inapposite.[18]  In *Zizic*, the Third Circuit concluded that a relator was not an original source when he failed to explain "how his expertise aided his analysis" of publicly available documents, noting that "a member of the public could conclude, *with minimal labor*, that the absence of evidence of a required review indicates that such a review was never performed."  *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 242 (3d Cir. 2013) (emphasis added).  By contrast, Relator here engaged an expert in FCC bidding economics and game theory to undertake a bid-by-bid breakdown of the auction—a labor-intensive analysis requiring highly specialized expertise.  Dkt. 76 ¶ 12.

In *Sonnier*, unlike this case, the relator did not contribute "new or *qualitatively different* information from what had already been publicly disclosed."  *United States ex rel. Sonnier v. Standard Fire Ins. Co.*, 84 F. Supp. 3d 575, 594 (S.D. Tex. 2015) (emphasis added) (internal quotations omitted).   In *Patriarca*, the Relator failed to plausibly allege "that his approach was significantly independent" from that adopted "in a number of published studies," and his findings "did not materially depart from those arrived at earlier by others."  *United States ex rel. Patriarca v. Siemens Healthcare Diagnostics, Inc.*, 295 F. Supp. 3d 186, 203 (E.D.N.Y. 2018). In this case, Relator's approach was wholly independent from that taken by any other entity and

---

[18]     The Court should disregard the Third Circuit's decision in *United States ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 845 (3d Cir. 2014), cited by Defendants, because it departs from the explicit ruling of the D.C. Circuit in *Springfield* by holding that a Relator must have "direct and independent knowledge of . . . *both* X and Y, the false and true sets of facts, to qualify under the FCA's original source exception." (emphasis added).

Relator's findings *did* materially depart from those arrived at by others—indeed, Relator is the only source to conclude that Defendants defrauded the government by falsely claiming to have disclosed all relevant agreements, instruments, and understandings to the FCC in their short- and long-form applications.  *Compare* Dkt. 76 ¶¶ 125–29 (alleging fraud) with Goldstein, *supra* (describing Wall Street Journal Investigation concluding Defendants' investment structure was legal).

At bottom, Relator plausibly pleaded that it has "materially add[ed]"[19] to the alleged public disclosures, because it "contribute[d] significant additional information to that which has been publicly disclosed so as to improve its quality." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306 (3d Cir. 2016).  Relator's independent investigation confirmed that Defendants had engaged in an intentional scheme to defraud the Government in violation of the FCA, because DISH's behavior "could not be explained as the product of an agreement among independent entities but could have arisen only if a single person or entity" controlled all three bidders.  Moreover, given the patchwork distribution of licenses won by each bidding entity, Relator's expert concluded that "[n]o rational entity would independently take such actions unless it had confidence that it would control any licenses issued to the sham entities." Dkt. 76 ¶¶ 115−16.  No other public source raises these issues.  And the Government could not have been expected to discover this fraud based on the smattering of details across various public sources.  Relator's unique position in the auction combined with its substantial and unique investigation has revealed the fraud here.

---

[19]     Whether the materiality standard for original sources applies in this circuit is an open question, as the D.C. Circuit does not appear to have addressed it.  Nevertheless, Relator meets the standard here.

36

2.      At A Minimum, Defendants' Arguments Raise Serious Factual Issues That
        <u>Require Discovery.</u>

At a minimum, and drawing all reasonable inferences in Relator's favor, Relator has

raised numerous material issues of fact that make judgment on the pleadings inappropriate.  *See*

*Dist. No. 1*, 933 F.3d at 761.

*First*, Relator disputes that the asserted public disclosures encompass the allegations of

fraud alleged in Relator's Amended Complaint, which is a question of fact.  *See, e.g., United*

*States ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 409 (9th Cir. 1993) (whether information in

relator's complaint was publicly disclosed within the meaning of the FCA "depend[s] on factual

findings"); *see also United States ex rel. Sobek v. Ed. Mgmt., LLC*, No. 10-cv-131, 2013 WL

2404082, at *5 (W.D. Pa. May 31, 2013) ("It is readily apparent that there are unresolved factual

questions regarding the applicability of the public disclosure bar" including whether there was

"sufficient public disclosure . . . to put the government on notice of fraud.").

*Second*, Relator contests Defendants' assertion that the alleged public disclosures predate

Relator's commencement of this action.  *See* Dkt. 76 ¶ 14.  Indeed, Defendants' have never even

seen Relator's voluntary disclosure to DOJ prior to filing the lawsuit.

*Third*, Defendants fail to explain why the Court should discredit Relator's claim that it is

an original source because it contributed qualitatively distinct, independent information based on

an independent investigation into DISH's behavior to uncover the false claims.  *See United*

*States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, No. 15-cv-750, 2020 WL

686009, at *31 (D.D.C. Feb. 11, 2020) (declining to dismiss on public disclosure grounds and

dismissing without prejudice on other grounds); *see also United States v. Merck-Medco*

*Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 447−48 (E.D. Pa. 2004) ("Whether the Relators are

original sources . . . will involve questions of fact not answered by the material available to the Court [thus] no further analysis of these claims is possible at this time.").

*Finally*, to the extent the standard even applies in this circuit, *see supra* n.19, Defendants fail to establish that Relator did not materially add to any alleged public disclosures. *United States v. Medtronic, Inc.*, 327 F. Supp. 3d 831, 852 (E.D. Pa. 2018) (materiality presents a "fact-intensive inquiry that involves weighing the prior public disclosures against the information relayed to the government in the present case").

Defendants' actions effectively concede that factual issues exist with respect to public disclosure. They have attached 1,298 pages of extraneous documents to their motion. Dkt. 115-2. At this stage of the proceedings, Defendants carry the burden of *proving* each of these factual issues. They have not done so, and thus Defendants' public disclosure bar arguments can also be denied on the merits.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Rule 12(c) motion.

Dated: December 12, 2022          Respectfully submitted,

                                  By:     /s/ Stephen J. Obermeier
                                          Stephen J. Obermeier (D.C. Bar # 979667)
                                          Bennett L. Ross (D.C. Bar # 978122)
                                          Bert W. Rein (D.C. Bar # 067215)
                                          Mark B. Sweet (D.C. Bar # 490987)
                                          WILEY REIN LLP
                                          2050 M Street NW
                                          Washington, DC 20036
                                          Phone:  (202) 719-7000
                                          Facsimile:  (202) 719-7049
                                          sobermeier@wiley.law
                                          bross@wiley.law
                                          brein@wiley.law

msweet@wiley.law

*Counsel for Relator Vermont National Telephone Company*