# Exhibit 1

WILMERHALE

December 12, 2022

Jonathan E. Paikin

+1 202 663 6703 (t)
+1 202 663 6363 (f)
jonathan.paikin@wilmerhale.com

Mark B. Sweet
Wiley Rein LLP
2050 M St. NW
Washington, DC 20036
msweet@wiley.law

**Via Email**

Re:     *United States ex rel. Vermont National Telephone Co. v. Northstar Wireless, LLC—*
        DISH's Responses to Relator's First Set of Document Requests

Dear Mr. Sweet,

I write in regard to relator's discovery requests to DISH in the above-referenced matter, and specifically the meet and confer teleconference we held on December 7, 2022.  As I mentioned during the conference, DISH appreciates relator's willingness to engage in dialogue so that the parties may understand one another's positions and determine whether compromise is possible. The purpose of this letter is to memorialize the discussion held on December 7, and outline certain next steps.  We remain open to further discussions on any of the issues below.

I.      Scope of Discovery Generally

DISH understands relator's position is that the First Amended Complaint ("FAC") did not serve to narrow the scope of relator's legal theories in this litigation or the scope of permissible discovery.  Rather, as you stated during the meet and confer, relator's position is that any DISH document related to Auction 97 is relevant to relator's claims and properly discoverable.

DISH disagrees with relator's position.  Relator is only entitled to discovery of information that is both relevant to its claims (or to defendants' defenses to those claims) and proportional to the needs of the litigation.  Fed. R. Civ. P. 26(b)(1).  Courts in this circuit have long recognized the need to bar discovery into "issues that stray too far away from the core facts of the case."  *United States v. Kellogg Brown & Root Servs., Inc*., 284 F.R.D. 22, 36 (D.D.C. 2012).  That is exactly what we believe relator is attempting to do here.  We further disagree with relator's apparent position that alleged facts are inherently relevant to the claims and defenses in the case—and thus fair game for discovery—solely by virtue of being included in the FAC.  *See Cobell v. Norton*, 226 F.R.D. 67, 79 (D.D.C. 2005) ("the only relevant consideration for the purposes of Rule 26 is the *nature of the claims that the parties have asserted*").  Unlike the original complaint, the FAC advances a single, specific theory of False Claims Act liability, namely that defendants' certifications to the FCC were fraudulent "by virtue of Northstar Wireless' and SNR Wireless' failure to disclose relevant instruments, agreements, and understandings."  FAC ¶128. What the FAC does *not* allege is any false claim based on Northstar's or SNR's assertion of

WILMERHALE

Mark B. Sweet
December 12, 2022
Page 2

eligibility for bidding credits, or in either entity's failure to identify DISH as having *de facto* control over it.  *Id.*; *see also* Dkt. 78, pp.44-45.  From DISH's perspective, there are numerous allegations in the FAC—largely left over from the original complaint—that have no bearing on this secret-agreement theory, and are thus not relevant to the only claim remaining in the case (and defendants' defenses to that claim).  Yet rather than focusing discovery on such purportedly undisclosed "instruments, agreements, and understandings," relator appears to be taking the unreasonable position that *any* DISH document mentioning SNR, Northstar, or Auction 97 from *any* time period is properly discoverable.

Notwithstanding our disagreement, and without waiving any of DISH's rights regarding the outer limits of discovery in this matter, DISH expressed on the December 7 call our desire to work productively with relator in responding to the RFPs.  To that end, DISH intends to begin by producing relevant records responsive to relator's RFPs based on a reasonable search, using as custodians the individuals identified in DISH's initial disclosures.[1]  More specifically, DISH will produce non-privileged records hitting on search terms crafted to capture internal communications related to Auction 97; DISH's communications with the Federal Communications Commission or the Department of Justice related to Auction 97; and DISH's communications related to Auction 97 with Northstar and/or SNR, or known representatives of/investors in those entities.  DISH will also conduct a reasonable search for and produce records consistent with its response to RFP 22, *i.e.*, any agreements with Northstar and SNR relevant to the allegations in relator's complaint.  To the extent DISH identifies documents (or categories of documents) in this universe that we believe are not relevant to relator's claims, DISH agrees to confer with relator regarding the general nature of those documents and why they should be withheld.

II.     Time Period for DISH's Production

Relator's RFPs demanded production of documents from January 1, 2013, to the present.  DISH objected to this date range in its written responses, and agreed to produce documents from January 1, 2014, to October 25, 2015.

While we did not reach agreement on a reasonable date range during our December 7 conference, both sides agreed to continue to consider what such a date range might be.  When we asked about relator's rationale for an expansive, decade-long discovery window, you noted that

---

[1] DISH also intends to include as a custodian Cantey Ergen.  Thus, the custodians for DISH's document productions in response to relator's RFPs will be Charles Ergen, Tom Cullen, Mariam Sorond, Brandon Ehrhart, Jason Kiser, Jeff Blum, Tim Messner, Alison Minea, Eric Pagels, and Cantey Ergen.

WILMERHALE

Mark B. Sweet
December 12, 2022
Page 3

(a) relator alleges public statements from Charles Ergen going back to 2013, and (b) relator believes that the alleged fraud perpetrated by defendants is "ongoing" in nature.

Having considered those arguments, we continue to believe that relator's proposed time period is too broad on both ends. To start, the FAC contains virtually no allegations concerning conduct prior to 2014. In fact, there is only a single reference to pre-2014 conduct: an allegation about Mr. Ergen's statements in a "Q3 2013" earnings call. And even that allegation appears to reflect a generic discussion about the value of wireless spectrum, with no mention whatsoever of the other parties in this case or any issues relevant to relator's claims. *See* FAC ¶78. Moreover, neither Northstar nor SNR even existed in 2013. As a result, we continue to believe January 1, 2014, is a reasonable and appropriate start date for DISH's review and production in this case. That said, in the interest of compromise, and without waiving any rights, DISH is willing to use a start date of July 1, 2013, which would be sufficient to capture documents relating to the one 2013 allegation in the FAC.

Relator's demand for documents running up to the present is similarly problematic. Liability under the False Claims Act attaches to claims for money or property submitted to the government. Relator's theory in this case is that defendants violated the statute by way of claims submitted in connection with Auction 97, which ran from November 13, 2014, to January 29, 2015. While DISH recognizes that some of relator's allegations concern post-auction activity, we believe it strains credulity to argue that activity *seven years* after the close of the auction is relevant to the core issue in this case. DISH reiterates its offer that, if relator is willing to identify specific types of records post-dating October 25, 2015, that relator believes are relevant, DISH is open to considering whether a supplemental production is warranted.

We note that, during the portion of our discussion on December 7 related to the date range for DISH's document productions, the parties also discussed certain approaches to privilege logging. Relator stated that it was willing to allow DISH to produce a "categorical" privilege log for certain types of communications from around the October 2015 period and onwards. Specifically, relator stated that categorical treatment would be acceptable for DISH's communications with its outside counsel, as well as internal communications with in-house counsel. With respect to communications protected by the common interest privilege, relator requested more specific information regarding the exact date when DISH entered into a common interest agreement related to post-Auction 97 proceedings. DISH appreciates relator's flexibility in this area, and we intend to provide more information in separate correspondence about DISH's plans for privilege logging.

III.     Other Points of Discussion

This section summarizes several other discrete topics that we discussed on December 7.

WilmerHale

Mark B. Sweet
December 12, 2022
Page 4

- RFPs 1 and 2.  With respect to RFPs 1 and 2, we clarified that DISH's written responses defined Northstar and SNR to include known representatives of those entities (including the individual defendants).  In other words, DISH does not intend to exclude the individual defendants from its search and review or in its responsiveness determinations.

- RFP 14.  The parties briefly discussed DISH's objection to relator's RFP 14, which seeks documents related to DISH's "potential or actual use of funding of … designated entities" in any FCC auction "prior to Auction 97."  We understand relator's position is that documents from prior auctions might demonstrate whether the "scheme" alleged in relator's complaint "is something the company looked at before."  We disagree with relator's argument, and note that the FAC contains no allegations concerning DISH's participation in or conduct during any other FCC auction.  We continue to view RFP 14 as seeking records that are not relevant and not proportional to the needs of the case.[2]

- RFPs 23 and 24.  The parties discussed DISH's objections to RFPs 23 and 24, which deal with "payments made by DISH to Northstar or SNR" and "payments for AWS Spectrum won during Auction 97."  Speaking theoretically, and setting to the side the question of whether any such payments ever occurred, we explained that we view these RFPs as encompassed by relator's separate RFPs 1 and 2.  In other words, DISH does not intend to exclude communications related to payment decisions from its search and review process or in its responsiveness determinations.

- RFPs 25-27 and 45-47.  The parties discussed DISH's objections to relator's RFPs 25-27, which deal explicitly with Northstar's and SNR's eligibility to participate in Auction 97 as very small businesses, and RFPs 45-47, which target DISH's communications with its accountants regarding the treatment of its investments in SNR and Northstar for various reporting purposes.  The parties agreed that the disputes about these RFPs implicate the same broader disagreement discussed above about relator's secret-agreement theory and the corresponding scope of discovery.  We were not able to resolve this broader dispute during the December 7 conference.  Rather, as mentioned above, the parties agreed that DISH would confer with relator if it identifies specific examples of documents that it believes are too far attenuated from relator's core theory.

- RFPs 50-51.  The parties discussed relator's concern about DISH's response to RFPs 50 and 51, which are targeted at DISH's records related to communications with the

---

[2] Relator also alluded to an argument that RFP 14 was proper because it would allow relator to probe whether DISH had supported minority-owned businesses historically.  If that argument were viable (and it is not), then relator would essentially be allowed boundless discovery into DISH's corporate history.  The fact that relator would raise such an argument simply underscores the "no-limits" approach relator seems, in our view, to be taking to discovery in this matter.

WilmerHale

Mark B. Sweet
December 12, 2022
Page 5

Department of Justice.  To the extent such records exist, we understand that the parties have agreed that DISH's search should be focused on the DOJ attorneys who were responsible for reviewing relator's *qui tam* complaint.  The parties also agreed that, if DISH identifies communications with any other office of DOJ that are relevant to relator's allegations, DISH will either produce them or confer with relator about DISH's bases for withholding them.

- RFP 56.  With respect to relator's RFP seeking organizational charts for DISH, we explained that, although we are unsure whether DISH maintains any such historical charts responsive to relator's request, DISH is willing to undertake a reasonable search for such materials.  The parties agreed that in its search, DISH would prioritize organizational charts from the 2014-2015 timeframe.

- Custodians and Methods of Search.  DISH confirmed during the conference that it plans to produce records from the custodians listed in DISH's initial disclosures.  DISH will also include Cantey Ergen as a custodian, since she is a named defendant, even though DISH does not anticipate she will have many (if any) responsive documents.  In addition, DISH agreed during the conference that it will conduct a reasonable search of non-custodial repositories where records related to Auction 97 may have been stored by DISH personnel, such as share folders, to the extent such repositories exist.

*** 

As noted above, DISH appreciates relator's willingness to engage on these issues.  If you have any questions or clarifications regarding DISH's responses to relator's RFPs, please let us know.

Best regards,

*s/ Jonathan E. Paikin*

Jonathan E. Paikin