**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* VERMONT NATIONAL TELEPHONE CO., | |
| Plaintiff, | |
| v. | Civil Action No. 1:15-cv-00728-MAU |
| NORTHSTAR WIRELESS, LLC, *et al.* | |
| Defendants. | |

**SNR DEFENDANTS' OPPOSITION**
**TO RELATOR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     BACKGROUND .....................................................................................................3

        A.      SNR's Document Production Efforts.........................................................3

        B.      SNR Has Raised Valid Scope and Burden Objections Based on the Case
                As Currently Pled.......................................................................................7

III.    ARGUMENT ...........................................................................................................9

        A.      Relator Seeks to Compel Documents SNR Has Agreed to Produce .......9

                1.      There are No Actual Documents in Dispute .................................9

        B.      Burden and Proportionality Considerations Dictate Adoption of SNR's
                Proposals with Respect to Temporal Scope and Custodians ................11

                1.      SNR's Production of Post-October 2015 Documents is Properly
                        Limited to Only Two Broad Categories.....................................11

                2.      SNR Should Be Required to Produce Outside Counsel's
                        Communications with the FCC and DOJ Only..........................15

                3.      Relator's Request for Attorneys' Fees Should be Denied .........17

IV.     CONCLUSION......................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3E Mobile, LLC v. Glob. Cellular, Inc.*,
    222 F. Supp. 3d 50 (D.D.C. 2016) ..............................................................................17

*Borum v. Brentwood Vill, LLC*,
    No. Civ. 16-1723, 2020 U.S. Dist. LEXIS 162664 1 (D.D.C. Sept. 4, 2020) ........................17

*Champion v. Does*,
    No. Civ. 1:22-cv-2697, 2022 U.S. Dist. LEXIS 200942 (D.D.C. Nov. 4, 2022) ...................14

*EEOC v. George Wash. Univ.*,
    No. Civ. 17-cv-1978, 2020 U.S. Dist. LEXIS 112933 (D.D.C. June 26, 2020)......................16

*Menashe v. Covington & Burling LLP*,
    No. 1:20-MC-46-ZMF, 2021 WL 3507637 (D.D.C. Aug. 3, 2021) (denying
    request for discovery of law firm's files under 28 U.S.C. § 1782)........................................16

*United States v. Kellogg Brown & Root Servs., Inc.*,
    284 F.R.D. 22 (D.D.C. 2012)........................................................................................13

*United States v. United Technologies Corp.*,
    No. 3:16-cv-01730, 2020 WL 7339916 (D. Conn. Dec. 14, 2020) ........................................13

*United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*,
    34 F.4th 29 (D.C. Cir. 2022) ..........................................................................................7

**Rules**

Fed. R. Civ. P. 26(b)(1)..................................................................................................14

Fed. R. Civ. P. 37 ............................................................................................................18

Fed. R. Civ. P. 37(a)(5)(A) ............................................................................................18

**Regulatory Cases**

*Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New
    Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz
    Bands*, Memorandum Opinion and Order, 30 F.C.C. Rcd. 8887 (2015) ..................................7

## I.   INTRODUCTION

Vermont National Telephone Company ("Relator") has filed a Motion to Compel Production of Documents (the "Motion") that is not really about documents. SNR Wireless LicenseCo, LLC; SNR Wireless HoldCo, LLC; SNR Wireless Management, LLC; Atelum, LLC; and John Muleta (collectively, "SNR") have produced over 3,000 documents totaling over 30,000 pages. SNR has made five productions—including all documents provided to the Department of Justice ("DOJ") during its investigation of Relator's claims—and has produced the most documents of any party in this matter to date, despite being, essentially, a sole proprietorship. SNR continues to search for responsive documents and to make productions on a rolling basis. While SNR has objected to certain requests on relevance and burden grounds, SNR has not withheld any responsive, non-privileged documents it has uncovered to date on the basis of those objections, a fact that SNR told Relator on multiple occasions prior to the filing of Relator's Motion. Further, SNR notified Relator that it would be amending its responses to Relator's Requests for Production—and did so—*before* Relator filed its Motion to Compel to make clear that it has and will continue to produce documents responsive to the nine requests identified in the instant Motion.

In an effort to narrow the discovery disputes over relevance and burden, SNR offered to negotiate search terms, which would be an efficient way to bridge the gap in the parties' discovery disputes. Relator refused, even though it has negotiated search terms with other defendants in this matter. SNR also offered multiple times to further meet and confer by phone or video conference to discuss the burden posed by Relator's requests and reach agreement on some of the areas of dispute. Relator refused those offers too. Relator never properly explained its disparate treatment of SNR for discovery purposes or why, despite SNR producing the most documents in this case to date, it has targeted SNR for a motion to compel. Relator refused all reasonable efforts to resolve

1

disputes with SNR over relevance and burden, and now asks the Court to intervene in what is effectively a non-dispute, or at least, one where Relator has refused reasonable efforts to resolve it before resorting to motion practice. That history suggests this Motion is tactical, not substantive.

Despite Relator's recent attempts to expand it, the Amended Complaint in this action asserts a single, speculative theory of liability: that SNR sought to obtain wireless licenses in Auction 97 by submitting applications for small-business discounts to the Federal Communications Commission ("FCC") that failed to disclose one or more "instruments, agreements, and understandings"—namely, an alleged "secret agreement" whereby SNR agreed to later transfer those licenses to DISH ("the secret agreement theory"). Dkt. 76, First Am. Compl., ¶¶ 125-128. In reality, after reviewing agreements between SNR and DISH that were disclosed during the auction process, the FCC decided not to award "very small business" credits to SNR, finding, *inter alia,* that the disclosed agreements enabled DISH to force SNR to transfer its licenses to DISH.

Relator's problem in discovery is that it is not a classic insider with pre-existing knowledge about an alleged fraud, but rather a disappointed competitor who filed suit on a theory that an additional, undisclosed agreement "must" have existed. Carrying that speculation into the instant dispute, Relator claims that SNR has designed its discovery objections to "hide" relevant documents related to this alleged secret agreement that Relator imagines to exist. *See* 132-1, Relator's Mot. to Compel, at 6. In reality, SNR is hard at work searching for documents that would be relevant to Relator's theory of liability and responsive to Relator's document requests. To the extent it relates to any concrete universe of documents, Relator's Motion is a transparent fishing expedition, seeking an order that SNR be forced to review tens of thousands of documents unrelated to Relator's pre-Auction 97 secret agreement theory, including documents generated

well after the Auction, the filing of this action, and the FCC's decision not to award SNR the bidding credits.

For the reasons set forth below, the Motion and Relator's request for fees should be denied.

## II.   BACKGROUND

### A.  SNR's Document Production Efforts

Since discovery commenced in October 2022, SNR has worked diligently and in good faith to collect, review, and produce thousands of documents responsive to Relator's often duplicative and/or overlapping RFPs, including those at issue in this Motion. On November 23, 2022, SNR made its first production of documents. *See* Centola Aff. ¶ 9. This production, totaling 73 documents and 2,234 pages, included documents that SNR had provided to the Department of Justice ("DOJ") during the course of its investigation into the Relator's *qui tam*. *Id*. Many of the documents previously provided to DOJ and responsive to RFP No. 40[1] are also responsive to other (often overlapping) RFPs propounded by Relator. Accordingly, SNR's first production of documents included materials responsive to RFP Nos. 14 and 15,[2] two RFPs to which SNR had initially objected. *See* Centola Aff. ¶ 9.

On December 8, 2022, the parties convened the lone meet and confer session in which Relator agreed to discuss the contours of ongoing discovery disputes. *Id.* ¶ 10. SNR clarified that it would continue to make productions on a rolling basis and had not withheld any non-privileged

---

[1] Relator's Request 40 seeks "all documents SNR provided to the Department of Justice in connection with this litigation or otherwise relating to Auction 97 and/or the relationship between DISH, Northstar, and/or SNR." Dkt. 132-13 at 48-49.

[2] These documents include Bates numbers SNR-00000137 (State Corporation Commission Certificate of Organization for Atelum LLC); SNR-00000138-00000188 (First Amended and Restated Credit Agreement between American AWS-3 and SNR); and SNR-00000189-00000270 (First Amended and Restated Limited Liability Agreement between SNR and American AWS-3).

documents on the basis of the objections in dispute. *Id.* Since that call SNR has explained that many documents responsive to the disputed requests are being produced because they are responsive to other, overlapping undisputed requests. *Id.* ¶ 13.

Since December 8th, Relator has declined repeated requests to discuss ongoing discovery disputes, opting instead to engage in an unproductive letter and email campaign that devolved at times into silly word or "gotcha" games. *See id.* Throughout that six week period, SNR nevertheless continued to review and produce documents, repeatedly offering solutions to narrow remaining disputes.

Through Relator's correspondence, it became evident to SNR that Relator had, for some unknown reason, singled out SNR, and consequentially, SNR's sole proprietor, Mr. Muleta, to manufacture discovery disputes to put before the Court. For example, Relator agreed upon negotiated search terms with other defendants in order to minimize disputes over what would be deemed relevant and responsive, but refused to do so with SNR. *See id.* ¶ 12. Relator also aggressively pushed forward on this Motion even though it simultaneously continued to meet and confer with the other defendants on the exact same issues (*e.g.*, the temporal scope and custodians) on which all of the defendants had taken the same position. *See id.*

This targeting of SNR and Mr. Muleta over other defendants is especially peculiar given the realities of discovery in this case to date. Mr. Muleta is an engineer, lawyer and businessman with experience investing in and launching venture-capital-backed technology and telecommunications companies. He has over three decades of experience in the telecommunications industry, including time as Chief of the Wireless Telecommunications Bureau at the FCC. SNR is one of his several ventures. While dwarfed in size by Relator and his co-

defendants, SNR's review and production of documents has outpaced every other party, including Relator.[3]

    Despite these ongoing discovery disputes and the singling out of Mr. Muleta, SNR collected 96 gigabytes of email and Dropbox account data from Mr. Muleta and proactively applied <u>all of the search terms agreed upon by Relator and the Northstar Defendants</u> as well as additional SNR-specific terms. Centola Aff. ¶¶ 19-20. This search and collection returned more than 150,000 document "hits" covering a time period of January 1, 2013 through the date of collection in 2022, and which are being assessed for responsiveness and privilege by SNR's counsel. *Id.* ¶ 21. SNR would have happily provided this background detail to Relator had they accepted SNR's offer to discuss its search efforts.

    On December 14, 2022, December 28, 2022, January 6, 2023, and January 31, 2023, SNR made its second through fifth productions. *Id.* ¶¶ 22-26. In doing so, SNR expended considerable resources collecting and producing the more than 29,000 pages (more than 3,300 documents) responsive to Relator's RFPs. *Id.* ¶ 27. As noted in SNR's production letter, these 3,000+ documents include materials directly responsive to the nine requests over which Relator now

---

[3] By contrast, as of the date of its Motion, Relator had produced only 100 documents. As of the date of this filing, Relator has produced only 322 documents, less than 10% of what SNR has produced. Furthermore, Relator has acknowledged SNR's productivity with respect to discovery in communications with third parties, stating: "While the Relator and the SNR Defendants have discrete disagreements about Relator's requests for production, the SNR Defendants nonetheless have produced tens of thousands of pages of documents in response to those requests." *See* Dkt. 132-3 at 2.

moves to compel, and not one document was withheld based on the objections SNR made to those RFPs.[4] *Id.* ¶ 27. [5]

SNR is and remains willing to work with Relator to address any perceived gaps in the information provided by SNR even though it has not yet completed its review and production of responsive documents and plans to continue making productions on a rolling basis through the end of the discovery period.[6] SNR has repeatedly informed Relator that no responsive, non-privileged documents have been withheld on the basis of the objections Relator challenges here, and that if it did so, SNR would transparently identify any types or categories of documents withheld on that basis to Relator so that the parties could engage in a meet and confer over those specific documents and seek Court intervention if necessary. *Id.* ¶¶ 10, 13.

---

[4] With respect to Requests 22 and 23, Relator calls into question this representation. Dkt. 132-1 at 13. Requests 22 and 23 seek communications and documents relating to SNR's qualifications or eligibility and/or DISH/SNR's assessment of SNR's qualifications or eligibility for bidding credits as a "very small business." Dkt. 132-1 at 25. SNR's January 31, 2023 production includes documents with the term "very small business," including contracts, drafts of contracts, and email communications among Mr. Muleta/SNR and investors BlackRock and ADK. *See* Centola Aff. ¶ 26. It also includes a "Project Airwaves3" presentation (SNR-00028599), which discusses the FCC's rules on "very small business." *See id.*

[5] While Relator hyperbolically characterizes SNR's largest production (approximately 26,000 pages of documents produced on January 31) as some sort of nefarious, calculated document dump, *see* Dkt. 132-1 at 13, Relator knew for weeks that a month-end production was coming. On January 6, 2023 SNR informed Relator's counsel that it intended to make its fifth and largest production by the end of January and made yet another offer to try and further mediate the Relator's discovery concerns. *See* Centola Aff. ¶ 25 ("We anticipate making our next production of documents to you by the end of January and hope to continue discussing the points raised above as we move further into the discovery process."). Relator's suggestion that SNR produced documents at the last minute, prior to the filing of its Motion, is unfounded.

[6] For example, when Relator identified specific attachments that were referenced in email communications, but were not contained in the same production (a routine aspect of rolling document productions), SNR promptly produced the requested materials. Centola Aff. ¶¶ 24-25.

**B. SNR Has Raised Valid Scope and Burden Objections Based on the Case As Currently Pled.**

Relator filed this *qui tam* in 2015, and elected to pursue it in the wake of parallel administrative proceedings before the FCC and D.C. Circuit. In those proceedings, SNR was denied the very benefits Relator incorrectly contends SNR submitted false applications to obtain. Specifically, the FCC found that SNR did not qualify for Designated Entity ("DE") bidding credits under its rules while rejecting claims that SNR's conduct was fraudulent. *See Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands*, Memorandum Opinion and Order, 30 F.C.C. Rcd. 8887, 62-65 (2015) ("FCC Decision").

In 2019, Relator amended its complaint—based in part on a bargain it made with the U.S. Department of Justice and the General Counsel for the FCC—purportedly to avoid relitigating issues presented and decided in *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022). *See* Dkt. 65, U.S. Statement of Interest at 2-4; Dkt. 78, Relator's Opp. to Defs.' Mot. to Dismiss at 17-18, 52-53; Dkt. 110-2, Ex. B to Relator's Opp'n. to Defs.' Mot for Protective Order, at 4. Under that bargain, Relator was to narrow its complaint to state a theory ***not*** based on the question of whether DISH exercised *de facto* control over SNR under written agreements SNR presented to the FCC at the conclusion of Auction 97, a question the FCC answered to its own satisfaction prior to the time the complaint was amended. FCC Decision at 62-65.

Instead, Relator was expected to litigate the specific theory of liability that DISH and SNR had entered into a purported secret agreement prior to disclosing their written agreements to the FCC. Dkt. 78 at 9-10, 52-53; Dkt. 110-2 at 4. This secret agreement was allegedly carried out in connection with SNR's applications for DE bidding credits in 2015. As alleged, under the secret

7

agreement, SNR would acquire, hold, and transfer to DISH wireless licenses purchased at discounted amounts through Auction 97. *See* Dkt. 76 at ¶¶ 127-130. As the government explained in opposing a stay of this matter pending resolution of the FCC's administrative proceeding concerning *de facto* control, Relator would be pursuing a theory that the secret agreement with DISH existed **prior** to Auction 97 and that SNR had failed to disclose the purported pre-auction agreement to the FCC. *See* Dkt. 65 at 2. Of course, Relator's Amended Complaint is noticeably devoid of any actual evidence any such secret agreement exists.

Once discovery opened, Relator served 46 broad, lattice-like document requests on SNR that encompass virtually every written record Mr. Muleta and SNR maintain today. Many of these 46 requests directly overlap with one another. *See, e.g.*, Dkt. 132-13 at 21-23, 29, 31-33, 35-37 (demonstrating that Requests 10, 11, 12, 18, 21, and 26 all pertain to documents and communications regarding SNR's participation in FCC Auction 97).

Apparently believing its right to discovery to be unbounded, Relator's Motion argues that every SNR record is relevant to its assessment of whether SNR was established by DISH "as a 'sham' designated entity that existed 'only on paper.'" *See* Dkt. 132-1 at 25 (citing Dkt. 76 ¶ 5). Notably, Relator studiously avoids citing any of the thousands of documents in SNR's five productions to date to support this contention, many of which reflect the opposite—arms-length dealings between SNR (through Mr. Muleta) and DISH prior to the auction. However, through its own distorted lens, Relator argues that the Amended Complaint entitles its attorneys to rifle through every document and communication pertaining to SNR's founding, formation, function, operation, and management over the past nine years. And, lacking the evidence a classic insider normally brings to whistleblower litigation, Relator contends, unreasonably, that each and every SNR record through the present could theoretically support its theory that at some time **prior** to

2015, SNR hatched a secret agreement with DISH. That a fishing expedition motivates the instant Motion (and this litigation generally) could not be more clear.

## III.    ARGUMENT

### A.   Relator Seeks to Compel Documents SNR Has Agreed to Produce

Relator's Motion seeks to compel production under its Requests for Production ("RFP Nos.") 14-15, 22-23, 29, and 32. However, as is made clear by SNR's Amended Objections and Responses to Relator's RFPs ("Amended Responses"), SNR has produced documents within its possession, custody, and control in response to these requests and will continue to do so. *See* Dkt. 132-11 at 24, 31-32, 26-28. Relator now quibbles over semantics, taking issue with the fact that SNR continues to preserve objections tied to the actual scope of the Amended Complaint, while nevertheless agreeing to produce the very documents at issue under other, duplicative requests.

#### 1.   There are No Actual Documents in Dispute

Relator's Motion asks this Court to strike SNR's good faith objections tying discovery to the proper scope of this litigation. This unusual request is simply not necessary. SNR's Amended Responses cross-reference Relator's other RFPs and indicate that documents will be produced under those duplicative requests. In other words, although SNR's good faith objections relate to critical issues—which this Court must ultimately decide—concerning the scope of Relator's remaining claims, SNR has already made reasonable compromises and concessions in an effort to produce the responsive, non-privileged documents Relator seeks.

Rather than accede to Relator's position that its Amended Complaint states claims broader than the narrow "secret agreement" theory, SNR's RFP Responses were intended to bring proportionality to Relator's demands and to preserve SNR's objections to Relator's unauthorized

expansion of it claims.[7] *See* Centola Aff. ¶ 8. On the basis of this objection, SNR's initial RFP Responses objected in full to producing documents responsive to Requests 14-25, 22-23, 29, and 32, and 36-38, but SNR made it clear early in the discovery process that it was reviewing records to determine whether it even had documents responsive to those requests and whether they would be withheld. *Id.*

SNR determined that records it identified in its search were responsive to multiple RFPs, including RFPs to which it did not object. SNR removed all doubt that it has and will produce documents responsive to the nine disputed requests by serving its Amended Responses which made clear that it is producing documents responsive to multiple RFPs, including the nine in Relator's Motion. *See* Dkt. 132-12 at 2; Dkt. 132-13. Intent on filing this Motion, Relator now attempts to parse and edit SNR's objections so as to manufacture confusion. Relator also has chosen to ignore SNR's repeated assurances that it is reviewing and producing documents responsive to all of Relator's RFPs and has not withheld any non-privileged document on the basis of the objections over the scope of the case, and would advise Relator if and when it had withheld responsive documents. Centola Aff. ¶¶ 10, 13, 16-18.

---

[7] The dispute over the proper scope of Relator's pending claims is also before the Court on Defendants' Motion for Judgment on the Pleadings. In briefing on that motion, Relator's characterization of its remaining claims has shown to be at odds with that of the Government. *Compare* Dkt. 124, United States' Response in Support of Its Opp'n. to Dismissal of Certain Claims Under the Public Disclosure Bar at 10 (opposing dismissal of "any claim that is premised upon Defendants' knowing failure to disclose to the FCC all of their instruments, agreements, and understandings with the DISH-Controlling Defendants in connection with Auction 97"), *with* Dkt. 125, Relator's Sur-Reply at 2 (enumerating two additional theories of liability to which Relator claims DOJ's Opposition applies). But, as Relator informed the Court, its theory of liability is confined to the secret agreement theory alone. *See* Dkt. 78 at 45 ("Paragraphs 125 through 128 of the Relator's Amended Complaint define the scope of Relator's claims[.]"); *see also* Dkt. 76 at ¶ 128; Dkt. 80, Defs' Reply in Supp. of Defs.' Mot. to Dismiss at 8 n.2.

For the reasons set forth above, there are no specific documents that could be subject to an order compelling production under RFPs 14-15, 22-23, 29, and 32. Nor need the Court strike SNR's good faith objections as to Relator's limited theory of liability. SNR maintains that the scope of Relator's remaining claims is a fundamental threshold issue in this litigation, but SNR has nevertheless faithfully carried out its discovery obligations. SNR has made numerous concessions to Relator, most recently amending written responses to Relator's RFPs in an effort to clear up Relator's purported confusion about what SNR had agreed to produce. Because there are no withheld documents to compel, Relator's Motion should be denied.

### B. Burden and Proportionality Considerations Dictate Adoption of SNR's Proposals with Respect to Temporal Scope and Custodians

#### 1. SNR's Production of Post-October 2015 Documents is Properly Limited to Only Two Broad Categories

Relator unreasonably seeks documents from a 10-year period (January 1, 2013 through the present), even though their claim is premised expressly on conduct that allegedly took place in advance of Auction 97 in 2015. Given the overbreadth of Relator's 46 RFPs and the fact that SNR was formed in 2014, Relator's current demand would require review of nearly every communication and business record created or received by Mr. Muleta during that nearly 10 year period. This is overly burdensome and not proportional to the needs of the case.

The scope of discovery Relator seeks from SNR has no articulable limit because, viewed through Relator's looking glass, any document in SNR's possession could be spun to evidence a pre-Auction 97 secret agreement that Relator imagines existed. But the secret agreement theory, by its very nature, concerns interactions between SNR and DISH that occurred prior to the 2015 auction. Therefore, documents generated between 2013 and 2015 logically fall within the scope of Relator's theory. Defendants' allegedly "failed to disclose all of their relevant instruments,

agreements, and understandings" and/or "disclosure to the FCC of such instruments, agreements, and understandings" between SNR, Northstar or DISH that allegedly "contained false statements" necessarily would have occurred prior to January 29, 2015, the end of FCC Auction 97. *See* Dkt. 76 at ¶ 128. This alleged scheme (had it actually occurred) would have endured only through October 2015; in the wake of the FCC Decision denying it the discounts at issue, SNR selectively defaulted on certain licenses it won in that auction and paid the full, undiscounted price for licenses it retained, as well as a penalty.

Relator's justification for obtaining every SNR document generated after October 2015 piles speculation on speculation. For example, Relator points to publicly disclosed information from 2021 as evidence of why SNR should produce documents after the 2015 period. *See* Dkt. 132-1 at 20. Seven years after executing written agreements that were disclosed to the FCC, SNR exercised a "put" to DISH which was afforded to it under those agreements. *Id.* The "put" option was disclosed in the agreements provided to the FCC during Auction 97 and specifically referenced in the agency's decision on the discounts; details related to the exercise of the disclosed option are not evidence of any secret or non-disclosed agreements. There is nothing revelatory or indicative of an alleged fraud about SNR and DISH openly and notoriously acting in a manner consistent with an agreement that was disclosed to the FCC prior to the auction.

Because documents after October 2015 are far less likely to be relevant to Relator's theory of liability, the burden and proportionality associated with collecting and reviewing those documents weighs strongly against compelling further production. Indeed, courts have consistently held that discovery should not "stray" too far from the core allegations in the case, and that discovery subsequent to the complaint should be narrowly tailored. *See United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 36 (D.D.C. 2012); *see also United States v.*

*United Technologies Corp.*, No. 3:16-cv-01730, 2020 WL 7339916 at *6-7 (D. Conn. Dec. 14, 2020).

To date, SNR has collected and reviewed tens of thousands of documents from the 2013-2015 time period. Centola Aff. ¶ 28. As of SNR's January 31 production, approximately 10,000 documents within this time period remain for review. *Id*. This is expected to take approximately 150-250 hours of attorney work. *Id*.

When SNR applied search terms to SNR records (which included all of Mr. Muleta's email communications) and isolated documents from November 1, 2015 through the present, it identified more than 100,000 documents that "hit" on search terms. *Id.* ¶ 29. Not only are these documents unlikely to be relevant to Relator's "secret agreement" theory, but the vast majority of these documents also represent privileged communications between and among Mr. Muleta, other co-defendants, and their respective attorneys. Many of the communications in the post-2015 time period pertain to the Relator's *qui tam*, the FCC's administrative hearings, and this litigation. The burden of reviewing and privilege logging these documents is not proportional to the needs of the case or to Relator's theory of liability.

As F.R.C.P 26(b)(1) instructs, "in assessing proportionality, courts should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. The consideration of proportionality is critical as "[c]ourts must ensure that the benefits are realized without imposing an undue burden" through discovery." *See Champion v. Does*, No. Civ. 1:22-cv-2697, 2022 U.S. Dist. LEXIS 200942, at *16 (D.D.C. Nov. 4, 2022). Where

13

"[p]laintiffs seem to propose seemingly limitless discovery" Courts are apt to put up guardrails. *Id.* at *18.

SNR has offered, as a compromise that both ensures Relator receives documents actually relevant to the case and reduces the burden on SNR, to produce documents after the October 31, 2015 cutoff for two broad categories of information that bear on their claim that SNR had an undisclosed or secret agreement to simply transfer any licenses it won in Auction 97 to DISH: (1) business plans relating to the licenses SNR acquired in Auction 97, including SNR's efforts to deploy wireless service on that spectrum; and (2) non-privileged documents relating to SNR's consideration of whether to exercise its put rights with DISH. Centola Aff. ¶ 15. Extending the temporal scope of SNR's review of documents to these two categories will no doubt be burdensome as it will require review of tens of thousands of additional (and likely privileged) documents, but nevertheless represents SNR's best efforts to reasonably compromise with Relator.

Relator rejected this compromise, but offers no reasonable basis for doing so or an alternative.[8] Even its Motion is devoid of rationale, stating only that "SNR Defendants' attempt to limit the temporal scope of discovery rests on the same flawed foundation as their attempt to limit the substantive scope of discovery and fails for the same reasons." *See* Dkt. 132-1 at 20. Relator will not—because it cannot—identify any specific types of documents post-October 2015 that are relevant to this litigation and that would not be captured by the two categories offered by SNR.

---

[8] Relator presents a flawed argument that because SNR seeks documents after 2015, it should be required to produce documents from that same period. Dkt. 132-1 at 21. But, as this Court knows, discovery is proportional to the facts surrounding each party. SNR's defensive theories involve exploration of the manner in which this *qui tam* came about and how it has been pursued by Relator, and thus, post-2015 documents from Relator are relevant to the case in a way that post-2015 documents from SNR are not.

For these reasons, SNR's proposal with respect to producing two categories of documents post-October 2015—(1) business plans relating to the licenses SNR acquired in Auction 97, including efforts to deploy service on that spectrum; and (2) non-privileged documents relating to SNR's consideration of whether to exercise its put rights—should be adopted by the Court, and Relator's request that SNR be compelled to produce any and all documents from November 1, 2015 through the present should be denied.

### 2. SNR Should Be Required to Produce Outside Counsel's Communications with the FCC and DOJ Only

Relator has also taken the unusual position of moving to compel SNR to search the files of its outside counsel. *See* Dkt. 132-1 at 28-30. Relator seeks an order requiring SNR to engage in a time intensive and costly review and collection of attorney emails even though Mr. Muleta's emails, including emails with his counsel and third parties, have already been collected and are being reviewed. The likelihood of responsive, non-privileged materials residing in the communications of SNR's outside counsel that do **not** also have Mr. Muleta on the email is extremely low. This unreasonable request is particularly burdensome given the high likelihood that such emails will be privileged, and as courts in this circuit have recognized, searches of outside counsel's files impose a "hefty" burden because such files "consist overwhelmingly of attorney-client privileged or otherwise protected work product." *Menashe v. Covington & Burling LLP*, No. 1:20-MC-46-ZMF, 2021 WL 3507637 (D.D.C. Aug. 3, 2021) (denying request for discovery of law firm's files under 28 U.S.C. § 1782).

Relator's request is not proportional to the needs of the case. Nevertheless, in an effort to reach compromise, SNR joined in a defense proposal to Relator, offering to search for and produce responsive email communications between Hogan Lovells and the FCC and DOJ related to Auction 97 that do not include Mr. Muleta (since those emails are already included in the collection

of SNR's emails). Centola Aff. ¶ 18. And once again, Relator refused this proposal. SNR also offered to search for outside counsel's communications with investors and with the other defendants in Mr. Muleta/SNR's records, but Relator's response to this offer bizarrely devolved into litigating the meaning of the words "any" and "all." *Id*. Regardless, SNR has already produced hundreds of responsive, non-privileged communications involving SNR's outside counsel at Hogan Lovells and Venable LLP[9] which fall into this category, and will continue to search for additional such records during its review.

Relator's request simply does not meet the required burden analysis requiring that discovery be designed to capture relevant and unique information. *See EEOC v. George Wash. Univ.*, No. Civ. 17-cv-1978, 2020 U.S. Dist. LEXIS 112933, at *22 (D.D.C. June 26, 2020) (citing *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 8 (D.D.C. 2017)). Nearly everything contained in these files is already being produced via Mr. Muleta's records. Accordingly, without a reasonable explanation as to *why* Relator believes a search of Hogan Lovells' files is likely to yield relevant documents or an explanation as to *why* the need for these documents outweighs the burden, extensive privilege review, and costs associated with such a review, the request that SNR be ordered to "review and produce *all* nonprivileged, responsive documents from outside counsel's files" should be denied. *See* Dkt. 132-1 at 30.

Instead, SNR should only be required to search for and produce responsive email communications between Hogan Lovells and the FCC and DOJ related to Auction 97 that do not include Mr. Muleta.[10]

---

[9] Venable LLP also represented ADK, an SNR investor, in connection with transactions involving SNR and DISH related to Auction 97.

[10] To the extent the Court feels additional attorney communications with outside entities are relevant and proportional, SNR is willing to discuss additional review of Hogan Lovells'

### 3. Relator's Request for Attorneys' Fees Should be Denied

Relator's request for an award of attorneys' fees lacks both legal and factual justification. *See* Dkt. 132-1 at 8 n. 3. Indeed, Relator offers no legal basis for an award of fees because, as this Court knows, reasonable discovery objections simply do not warrant fees. *Compare 3E Mobile, LLC v. Glob. Cellular, Inc.*, 222 F. Supp. 3d 50, 56 (D.D.C. 2016) (where fees were awarded because defendants produced 90% of their documents ***after*** the discovery deadline) (emphasis added) *with Borum v. Brentwood Vill, LLC*, No. Civ. 16-1723, 2020 U.S. Dist. LEXIS 162664 1, at *26-27 (D.D.C. Sept. 4, 2020) (holding that no fees should be awarded where nondisclosures are based on reasonable objections that are justified to a degree satisfying a reasonable person).

Moreover, Rule 37 of the Federal Rules of Civil Procedure states that the Court "must not" order attorneys' fees where the movant did not attempt in good faith to obtain the discovery without court action, where the opposing party's response or objection was substantially justified, or where circumstances otherwise make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A). All three are true here. As detailed above, SNR has expended substantial effort proposing good faith concessions and compromises to Relator in order to resolve these disputes. And it did so while expending considerable resources to review and produce thousands of documents in a timely manner. Relator refused to negotiate with SNR in good faith (even when it continued to do so with other defendants), and instead raced to file a tactical, yet meritless, motion before the Court. It should not be rewarded for doing so, and its request for fees should be denied.

---

communications with investors (ADK, Black Rock) and other government agencies (NOAA, DOD, DOI).

## IV.    CONCLUSION

For the foregoing reasons, SNR respectfully request that the Court deny Relator's Motion to Compel as well as its request for expenses and attorneys' fees in connection with its Motion.

Dated: February 13, 2023                              Respectfully submitted,

                                                       *s/ Gejaa T. Gobena*

                                                       Gejaa T. Gobena (#463833)
                                                       Jonathan L. Diesenhaus (#423753)
                                                       HOGAN LOVELLS US LLP
                                                       555 Thirteenth Street N.W.
                                                       Washington, D.C. 20004
                                                       202-637-5600
                                                       gejaa.gobena@hoganlovells.com
                                                       jonathan.diesenhaus@hoganlovells.com

                                                       *Counsel for SNR Wireless LicenseCo, LLC;*
                                                       *SNR Wireless HoldCo, LLC; SNR Wireless*
                                                       *Management, LLC; Atelum LLC; and John*
                                                       *Muleta*