IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (WASHINGTON, DC)

VERMONT NATIONAL TELEPHONE COMPANY *
UNITED STATES OF AMERICA ex rel, *
Plaintiff, * 15-cv-728-CKK-MAU
* March 10, 2023
vs. * Washington, D.C.
*
NORTHSTAR WIRELESS, LLC, et al., *
Defendants. *
***************************

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

FOR THE PLAINTIFF:

MR. MARK B. SWEET, ESQ.
Wiley Rein
2050 M Street NW
Washington, DC 20036
202-719-4649

MR. STEPHEN J. OBERMEIER, ESQ.
Wiley Rein
2050 M. Street NW
Washington, DC 20036
202-719-7465

MS. KRYSTAL BRUNNER SWENDSBOE, ESQ.
Wiley Rein
2050 M. Street NW
Washington, DC 20036
202-719-4197

FOR THE DEFENDANTS:

MR. GEJAA T. GOBENA, ESQ. (SNR)
Hogan Lovells US
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

MR. JONATHAN LEE DISENHAUS, ESQ. (SNR)
Hogan Lovells US
555 13th Street NW
Washington, DC 20004
202-637-5416

MR. DANIEL S. VOLCHOK, ESQ. (DISH)
Wilmer Cutler Pickering Hale & Dorr
2100 Pennsylvania Avenue NW
Washington, DC 20037
202-663-6103

MR. BENJAMIN CONRAD BLOCK, ESQ. (Northstar)
Covington & Burling
850 Tenth Street NW
One City Center
Washington, DC 20001
202-662-5205

COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

Proceedings recorded by FTR DIGITAL AUDIO RECORDING and later transcribed by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2. Transcript produced by computerized stenotype.

**P R O C E E D I N G S**

(In open court.)

THE COURT: Call the case, please.

COURTROOM DEPUTY: Good afternoon, Your Honor.

This is Civil Case 15-728, Vermont National Telephone Company versus Northstar Wireless, L.L.C., et al. This matter is set for a status conference.

Parties, please introduce yourselves for the record, starting with the plaintiff.

THE COURT: Starting with the movant.

MR. SWEET: Good afternoon, Your Honor.

THE COURT: Can you come to the podium, please? Our audio -- you'll thank me later when you seek a transcript.

MR. SWEET: Good afternoon, Your Honor.

Mark Sweet on behalf of the Relator, Vermont National. I'm joined today by two of my colleagues, Stephen Obermeier and Krystal Swendsboe.

THE COURT: Okay. Good afternoon, Mr. Sweet.

MR. GOBENA: Good afternoon, Your Honor.

My name is Gejaa Gobena. I'm here on behalf of the SNR defendants along with my colleague, Jonathan Diesenhaus.

THE COURT: Mr. Gobena? Am I pronouncing that correctly?

MR. GOBENA: Gobena, yeah.

THE COURT: Gobena?

MR. GOBENA: Yeah.
THE COURT: Okay. And you're SNR?
MR. GOBENA: SNR, correct.
THE COURT: Okay. Good afternoon.
Okay. Do I have any other parties appearing?
MR. VOLCHOK: Good afternoon, Your Honor.
I'm Daniel Volchok representing the DISH defendants.
THE COURT: Okay. Good afternoon, Mr. -- Volchok?
MR. VOLCHOK: Volchok, yes.
THE COURT: Okay. Good afternoon.
Do we have anyone else? Yes.
MR. BLOCK: Good afternoon, Your Honor. Benjamin Block of Covington & Burling, L.L.P. on behalf of the Northstar defendants.
THE COURT: Okay. Thank you. Good afternoon, Mr. Block.
Is that it?
Okay. I believe this motion involves the Relator and SNR defendants.
So I called this status conference to understand a few things: What the status of the dispute is currently -- I've -- there is some dispute in the papers as to whether there's actually a live controversy. So I just want to get a very brief understanding. And that was also approximately a month ago right before this was referred to me. So I would like to

get an understanding of what the status of the dispute is.

Also, despite calling the docket, I'm having some difficulty understanding what your current schedule is. So I would like to get some information about that, and then we will discuss where we go from there.

So let me ask, Mr. Sweet, if you could please approach and tell me -- you know, the SNR defendants say in their opposition to your motion to compel that there are actually no live controversy or no actual disputes about documents that Vermont or the Relator is seeking. That said, they do go on to dispute some of the records.

So I would like to get an understanding of where things stand right now and whether anything has changed since you filed your motion.

MR. SWEET: So nothing has changed with regard to the disputes. There have been some further productions of documents since the motions were filed. Additionally, the parties have issued some additional subpoenas and requests for documents. But there are still four disputes.

Specifically, there are, first, six specific document requests where the SNR defendants are objecting and refusing to produce all the documents responsive to the requests. They are, instead, offering to appear [sic] what appears to be a smaller set of documents without making clear what they're actually withholding.

Second, there is a broader dispute --

THE COURT: Let me ask you: With respect to those specific document requests, have you conferred with the SNR defendants after they filed their response in which they offered to discuss and try to clarify any questions that the Relator has about those document requests?

MR. SWEET: So we've conferred many times with them. And we specifically did in response to their -- what they told us was going to be their amended responses. And we asked them to just give us a straightforward answer as to whether they were going to produce all the documents responsive to these requests or they were going to withhold some documents responsive to the requests. And we could not get a straight answer from them. It has been an ongoing challenge.

THE COURT: Did you confer after -- my question was: Did you confer after they filed their opposition to try to get any clarification about this?

MR. SWEET: I don't believe we conferred after the opposition.

THE COURT: Okay. So you don't know at this time whether there are documents being withheld pursuant to their -- the SNR defendants' objections to their request -- to these specific document requests?

MR. SWEET: That's correct. It has been too difficult to tell whether they were withholding any documents based on

the way they have answered our questions.

THE COURT: Okay. All right. Please continue.

MR. SWEET: The second dispute involves a broader dispute about what documents must be produced after October, 2015.

In that situation, I don't believe there is any question that there's a live dispute and that the SNR defendants have withheld, to date, documents that postdate that time period.

The third dispute is about whether the SNR defendants must search the files of their outside counsel for non-privileged external communications between their counsel and FCC, DOJ, other defendants, and investors.

Again, I don't believe there's any question that that is a live dispute.

And then, fourth, there's a global dispute about whether the SNR defendants can object to all the requests, based on their theory of the complaint, without identifying specifically what documents they plan to withhold on the basis of that objection. And that's been an issue since the beginning of discovery, and I don't believe the parties have moved any closer on that.

THE COURT: Okay. I should have asked this at the beginning of the hearing. Has this matter been fully unsealed?

MR. SWEET: Yes.

THE COURT: Okay. So there's nothing that we need to close the courtroom for?

MR. SWEET: No.

THE COURT: Okay. And what is the schedule that you're operating under? I did notice that Judge Kollar-Kotelly resolved another dispute relating to a third party recently; is that correct?

MR. SWEET: That is correct. One of the nonparties was not responding to a subpoena, and Judge Kollar-Kotelly was able to resolve that earlier this week through a video call.

The parties have a joint discovery plan that breaks down the overall discovery period into different phases. The first phase is the written discovery phase, which is scheduled currently to end at the end of this month. After that, the parties would proceed to depositions and then have a third phase for expert discovery, which I believe the current schedule would end around October or November of this year.

THE COURT: Okay. So written discovery. Does that include interrogatories and RFAs?

MR. SWEET: Yes, Your Honor. So there was a deadline of late February for issuing any kind of written discovery requests.

THE COURT: Okay. And when did you say -- are you separating fact depositions from expert depositions? Is there a cutoff for fact depositions?

MR. SWEET: Yes, Your Honor. So I don't have the exact dates in front of me, but the second phase of discovery was for fact depositions. And then the third phase of discovery would be for expert reports and depositions.

THE COURT: Okay. If you or someone here knows those dates or where on the docket this plan -- was this plan filed with the Court?

MR. SWEET: Yes. There was a -- after the initial status conference with the Court, there was a joint discovery plan that was filed by the parties together that has the full schedule. I will see if we can pull it up.

THE COURT: Yeah. That would be helpful. Okay. So fact -- well, I would be -- I'm curious to know when fact deposition cutoff is or when fact discovery -- I know that you've bifurcated it into written discovery and deposition discovery. But would see what the actual cutoff for fact discovery -- and you said -- or, frankly, you're taking expert depositions, you said, into October?

MR. SWEET: So the -- yes. The expert deposition phase was scheduled, I believe, to end in October or November of this year.

THE COURT: Okay. So that's the drop-dead close of discovery in the fall?

MR. SWEET: Yes.

THE COURT: Okay. All right. Is there anything else

at this time that you need to -- any changes in the positions of Vermont or anything that's changed in terms of this particular dispute since you filed?

MR. SWEET: I would say the only thing that -- new event that I would just bring to your attention is, as I mentioned, there have been some additional requests made by the [break in recording] side. One, the request came after the parties filed their briefing. As you know, one of the issues is the relevant time period.

The defendants issued several new subpoenas to the government and to a third party, Verizon, in which they, again, ask for documents all the way up through the present. So that's something that happened after the briefing concluded in this motion.

THE COURT: The SNR defendants asked the third party for documents through the present?

MR. SWEET: That's correct.

THE COURT: Okay. All right. Are there any -- other than that, though, are there any new disputes between the Relator and the SNR defendants?

MR. SWEET: No, Your Honor.

THE COURT: Okay. All right. Thank you.

I'll hear from Mr. Gobena. I'll ask you the same question, which is what the status of the dispute is -- disputes are as you see them, sir.

MR. GOBENA: Absolutely, Your Honor. So I'll walk through the four categories that Mr. Sweet laid out and address them specifically.

With respect to the six categories identified in the Relator's motion to compel, we've been producing documents responsive to them. All documents that we've identified as we've done our document review, we've produced it. We've withheld nothing. We made that point clear in our filing.

And we told them that, if we are going to withhold anything, that we would identify what we withheld and either meet and confer or bring it before the Court for a resolution on whether or not those documents should be produced. But no documents have fallen into that category to date, Your Honor. We have just been producing.

And, in fact -- and I don't want to waste the Court's time, but I literally have 50 examples of documents responsive to each of the six -- not 50 to each request but 50 examples of documents responsive to the six requests because we aren't holding anything back. So there is no dispute there, from our perspective.

You know, we disagree -- they disagree with us about making the objection. We've objected, but that hasn't stopped us from providing documents that we've identified.

THE COURT: Okay. So with respect to -- and I just want to make sure the record is clear on this.

MR. GOBENA: Yeah.

THE COURT: With respect to document request number -- let me pull them up.

MR. GOBENA: 14, 15, 22, 23, 29, and 32.

THE COURT: All documents within the possession, custody, or control of the SNR defendants have been produced pursuant to those requests?

MR. GOBENA: Or will be produced. We're still in the process of reviewing our documents.

THE COURT: Or will be produced.

MR. GOBENA: Correct.

THE COURT: Okay. By the end of this month?

MR. GOBENA: Yes. That's our plan. But that does lead to the second issue, which is the timing -- sorry. The time period to be covered by the requests.

So I'll pause here, though, to see if the Court has anymore questions about that topic. Otherwise, I can address that.

THE COURT: Okay. So -- well, I think you're -- I think you're going to elucidate my question on this first topic by answering the second topic, so go ahead.

MR. GOBENA: Okay. Sounds good.

So with respect to the second topic, there is a dispute. And the position that we've taken and that's shared by DISH is that any documents beyond October, 2015 should not

be the subject of discovery. And the reason for that -- I'll explain the October, 2015 date, and that is because that's really the end of all the relevant conduct in this case.

The auction in this case started in the fall of 2014 and ended in January of 2015. And the Relator's case is about whether or not there was a secret agreement or undisclosed agreements between ourselves and DISH that predated the auction that started in October of 2014.

So, really, when we're talking about documents after the auction ended, you know, what we've agreed to and offered is a couple of things. Number one is anything that's responsive up to October, 2015 -- and that's because that's the date when basically -- where our client said, you know, what? We're going to pay full price for these licenses. They gave up some licenses, agreed to pay some fines. You know, and so at that point, sort of the action that is the subject of the allegations sort of ends.

We realize that there may be some documents beyond then that might be relevant. So, for example, the allegation is that our client was a pass-through, right; he basically let himself be used to acquire certain licenses because he was going to later on then go claim very small business credits, 25-percent credit on the licenses.

Any documents that postdate, you know, 2015 that go to his attempts to build out the license would be relevant, we

believe, because that shows that he wasn't a pass-through and that there wasn't this secret agreement with DISH.

In addition, you know, there is an issue of an option for DISH to acquire the licenses later on. And that option was exercised later on. So that obviously is an issue that may be the subject of discovery.

So we offered those as categories of post-2015 documents to, you know, provide and do production under. And we invited the Relator to identify other categories. And our point is that it shouldn't just be everything because this -- and it should be related to the allegations in the complaint.

But they haven't taken us up on identifying additional categories of documents beyond the two that we identify in our papers that we think are -- directly go to their complaint.

So that's on the time frame.

And we haven't conferred. We're open to conferring about additional categories. I offered that in some email correspondence with the Relator. For whatever reason, they haven't taken me up on talking about additional categories, which may resolve this issue before the Court has to deal with it.

THE COURT: So with respect to the specific document requests, Numbers 14 to 15, 22 to 23, 29, and 32, has SNR ended or kind of on the back end said that anything after 2015 with respect to those documents won't be produced? So are you

actually withholding documents that are post 20 -- I guess, what, October, 2015?

MR. GOBENA: Yeah. October 2015.

THE COURT: Okay.

MR. GOBENA: So we haven't produced anything that's past October, 2015. We are willing to do that for the categories that are identified in our papers with respect to the build-out of the licenses and with respect to the exercise of that put option, which is, you know, at issue here.

With respect to other categories, we object to just wholesale everything SNR post -- we're talking about a ten-year period, right, related to an auction that took place in 2014 and '15. So we believe there has to be some limits with respect to, you know, the post-auction production, and that's why we proposed some reasonable topics. And I know that's an additional subject at this point.

THE COURT: I guess my question is: Then in that case, there are documents that exist that the SNR defendants have not produced that are responsive to these requests; is that correct?

MR. GOBENA: Related to the temporal objection, yes.

THE COURT: Right. Okay. So that there are documents out there that the SNR defendants have not produced.

MR. GOBENA: Correct.

THE COURT: You're withholding them subject to that

objection.

MR. GOBENA: Yeah. But originally the -- in the motion, there's a claim that we're not -- you know, we're unwilling to produce related to those particular requests. And we are. But we have this dispute, obviously, of the time period and, you know, depending on how the Court resolves it, you know, we either, you know, go with those two categories or more categories or whatever. But yes. Technically, that's correct, Your Honor.

THE COURT: Okay. So can you say with any certainty which requests are really implicated by virtue -- you know, in that -- by virtue of that objection? In other words, if you -- if the SNR defendants do have documents in their possession, custody, or control that are responsive to one or more of these six requests that postdate October, 2015, which requests are at issue? I'm trying to just understand, you know --

MR. GOBENA: Yeah, right. I understand. So --

THE COURT: If you don't -- in other words, if -- say, just example, Request Number 14, you've produced documents that are responsive to Request Number 14 -- there are actually no documents that exist that are responsive post October 2015, we don't have to address that, right?

MR. GOBENA: Right. I can say definitively for 14, yes, because that's about the formation of SNR which predates the auction.

THE COURT: Okay.

MR. GOBENA: Now, with respect to Request 15, it's all documents related to investment and funding of financing of the SNR corporate entities -- if they're talking about -- that's interpreted as being before, you know, the auction. Those documents have or will be produced.

Request 22 is documents related to SNR's qualifications or eligibility for bidding credits. And 23 is documents related to DISH or SNR's assessment of qualifications for eligibility. To the extent to which there are non-privileged documents before the auction, we would produce that.

Now, there's litigation that's happened afterwards, and there's a common interest joint defense arrangement between ourselves, DISH, and Northstar. So there could be documents that postdate that go to this issue of eligibility because it was a hotly litigated matter in front of the SEC. It's separate litigation from this litigation that we have -- that has us here today, Your Honor.

So there are documents that postdate. But the vast majority of those are going to be privileged. In fact, I can't -- you know, maybe that all of them are. I can't make a representation.

THE COURT: Right. Yeah. That's my next question.

MR. GOBENA: Yeah.

THE COURT: Do you know of any non-privileged, non-protected documents?

MR. GOBENA: I don't know. I can't say that I know for definitely.

THE COURT: Okay. All right. And what about 29?

MR. GOBENA: 29 is SNR business plans, strategies. They'll -- to the extent -- you know, we produced -- I mean, that would all predate the auction they're talking about. Business plans or strategies or there might be something post auction that relates to build-out, for example, of the Spectrum that was the subject of the auction, which we have offered as a category that we would be willing to produce on.

So there may be with respect to that one, depending on -- you know, again, I don't know to what extent the Relator's interpretation of business plans is broader than that. But to the extent to which it is plans leading up to the auction, we would definitely -- we are producing that or have produced that. With respect to after October, 2015, we are willing to do that with respect to this issue of the build-out of the -- potential build-out of the licenses.

THE COURT: Okay. So, potentially, only Document Request Number 29 and 32 -- if you can confirm that all non-privileged documents have been produced and that everything post October, 2015 is subject to a protection, common interest privilege, or attorney-client or work product, is it fair to

say that the only requests that really are implicated by this dispute because you actually have documents post October, 2015 that you're withholding are Request Number 29 and 32? I mean, subject to confirmation on 22 and 23.

MR. GOBENA: Yes. Subject to confirmation. I think that's a fair reading, Your Honor.

THE COURT: Okay. All right. Okay. What do you make -- you know, what's your response to the Relator's argument that you've actually sought post-October 2015 documents from third parties and then are taking the position with respect to the Relator that those documents are largely not relevant?

MR. GOBENA: Yeah. The response is that we have affirmative defenses that we have to develop, you know, so -- and for -- part of our defense is going to be the fact that we did actively try to build out the Spectrum. Also, we ran into challenges. So with -- some of the challenges had to deal with government agencies basically sitting on the Spectrum. So there is a lot of back and forth post auction with certain agencies like NOAA, DOD, DOI. It's going to postdate the auction. And it went on for sometime. It will reflect our client's, you know, efforts to try and build out on the Spectrum and not just be someone who is a pass-through in effect.

So our affirmative defenses are different from the

case that they have to prove. They have to prove a pre-auction agreement, right, that wasn't disclosed to the FCC. It's about what happened before the auction.

Part of -- for us to sort of defend the case, you know, there's no agreements that -- we don't have to prove the lack of agreement, but we have to also show as an affirmative defense, though, that, you know, like, there was -- or we're going to show that there was efforts with respect to that, to the Spectrum.

So it's apples and oranges. I don't think you can use one -- it's not tit for tat so to speak. It should be looked at within the context of what we need -- each of us needs to do respectively to prove our cases or defend ourselves.

THE COURT: Okay. Outside counsel documents, what's the status of those?

MR. GOBENA: Yeah. So the status is we've offered to provide any documents that were not in our client's possession that are non-privileged and responsive that reflect communications with the FCC and DOJ.

And this is actually consistent with the decision that Judge Kollar-Kotelly just issued with respect to that third-party subpoena that you referenced earlier. Because in that matter, what Judge Kollar-Kotelly said was basically, okay, if our client doesn't have it in their possession and it's in the possession of that third party, third party only

produces -- would not come from us. Right? And, similarly, here, what we're -- our proposal is the exact same, you know. We will look through our files. Again, as we plan our papers, it is a little bit unusual for outside counsel to do this, but we're willing to do it for non-privileged responsive communications with the FCC and DOJ as they relate to the auction, which is directly on point with respect to the --

[Unintelligible cross-talking.]

THE COURT: So is outside counsel with your firm, sir? Is it a predecessor counsel?

MR. GOBENA: No. It would be -- for us, anyways, it's Hogan Lovells. Obviously, this would implicate other defendants as well. So I will let them speak for themselves, but with respect to SNR, Hogan Lovells was the firm that represented them in the pre-auction activities and in interactions with FCC and DOJ.

THE COURT: And so those are the documents that are being sought that -- your colleagues' --

MR. GOBENA: Yes. Hogan Lovells -- emails with lawyers at Hogan Lovells that aren't privileged.

THE COURT: Okay. Okay. And then with respect to the final issue?

MR. GOBENA: I mean, the final issue is -- we basically have a broader -- we have a broad objection in terms of the scope of the case. But it hasn't impacted discovery,

from our perspective.

In other words, when we filed our responses to the requests for production, you know, we did object based on the fact that the case, as amended, is narrower than as it was originally pled. It's focused on this pre-auction supposed agreement between DISH and our client. But that hasn't affected, you know, the scope of our discovery response.

So from my -- the way I read their papers is that they want you to make a ruling on our objection. We don't think that's appropriate. You know, we can lodge an objection so that we preserve it. At the same time, the question is, practically speaking, what are we doing in terms of our production; and that is, we're not limiting our production based on our objection. We're producing any documents that are responsive to their request except for this temporal dispute, as the Court has noted earlier.

THE COURT: Well, the final issue --

MR. GOBENA: I thought that's what Mr. Sweet was referring to.

THE COURT: Well, I would like to get some clarity because there are four issues in dispute.

There are the specific document requests, the objection of -- the post-October, 2015 objection, the search for outside counsel documents, and the fourth issue --

MR. GOBENA: I thought it was just a reference to our

general objection to them seeking discovery on -- related to --

THE COURT: Oh. The -- right. Okay.

MR. GOBENA: But I just want to be clear, Your Honor: It's not affecting, practically speaking, how we're approaching the -- we're reviewing our documents, using their requests, even if we object to it. We amended our core request -- actually, our responses -- to make clear that we are producing under every single RFP. And so, as a practical matter, we don't think that's an issue, necessarily, that, from our perspective, needs to be dealt with by this Court. Really, it's about the -- practically what documents we should be obligated to provide.

THE COURT: So the SNR defendants have made an objection that, after Judge Kollar-Kotelly's order memorandum opinion on the motion to dismiss, the sole theory of liability is really the only live issue, but you've still produced documents subject to that objection?

MR. GOBENA: Yeah. It's not so much with respect to the motion to dismiss. It actually relates to the fact that they amended their complaint.

You know, I don't know -- again, I don't want to go into too much background here, but basically they amended their complaint to take an issue off the table, which was, like, whether or not we lied about our eligibility on our -- in the application process. And that was part of a bargain with the

DOJ that -- because DOJ was litigating that on an administrative side, and they, frankly, had been winning, I think, and they didn't want to disrupt that litigation. So in 2019, the complaint was amended to focus in on this secret agreement theory.

And so that's -- so from our perspective, that's what the case is about. And that's how it's currently pled. And you can actually see we've cited to documents in our complaint where we believe that DOJ shares the same view as well.

But that being said, it doesn't have, again, a practical impact here in terms of the documents.

THE COURT: So you're making the representation that there are no documents in your client's possession, custody, or control that are being withheld pursuant to that objection?

MR. GOBENA: No. I mean, for example, the request for -- on eligibility, right, which, from our perspective, is out of the case now -- we're still producing documents with respect to that.

THE COURT: Even post 2015?

MR. GOBENA: That needs to be -- that is the issue we would like the Court to resolve basically.

THE COURT: Okay. Okay. All right. But other than that, you've produced everything pre --

MR. GOBENA: Or will be producing.

THE COURT: Let me just finish. Pre-October, 2015,

even though you've made this objection?

MR. GOBENA: Correct.

THE COURT: Okay. All right. And do you have information about the cutoff date? Do you know what the cutoff date is for fact discovery?

MR. GOBENA: So Mr. Sweet I think laid it out clearly. It is written discovery --

MR. SWEET: I got it.

THE COURT: Okay. Thank you. Yes.

MR. SWEET: I have it on my phone, sorry, not my computer, but it's docket number -- it's ECF Number 113 is the parties' joint discovery plan. Which deadline were you asking for?

THE COURT: Fact discovery.

MR. SWEET: The deadline for all fact witness depositions currently is August 16th, 2023. And then we go into expert disclosures with the close of discovery November 30th, 2023.

THE COURT: Okay.

MR. SWEET: And, Your Honor, for the Court's awareness, defendants have -- and I believe that's also on behalf of the FCC and DOJ -- have a request in to Relator to agree to a 90-day extension of the deadlines in part because of the later-served -- the most recently served subpoenas, et cetera, for all of the parties to complete document production.

So, depending on whether we work something out with them or not, there may be a motion coming to the Court for an extension of those deadlines.

I wasn't -- I wasn't clear from the -- Judge Kollar-Kotelly's order referring this dispute to you and noting that deadlines could be adjusted whether we would present that motion to Your Honor or to Judge Kollar-Kotelly. Hopefully we will work it out and we present it as a stipulation, but if we didn't --

THE COURT: Well, regardless, even if all the parties consent, it should still be done by motion instead of stipulation unless she has given you that ability.

MR. SWEET: Yes. I meant to say joint motion or unopposed motion. And yes, Your Honor. I apologize for that.

THE COURT: Okay. But -- sorry. Regardless, August is the fact -- I see now on Docket Number 113, yeah. I appreciate that. Thank you for clarifying that.

MR. SWEET: Sure thing, Your Honor.

THE COURT: Okay. All right.

Mr. Gobena, is there anything further that you would like to add with respect to the status of these four disputes?

MR. GOBENA: I don't believe so.

(Discussion off the record.)

THE COURT: Okay. All right.

MR. GOBENA: No, Your Honor.

THE COURT: Okay. Thank you.

Mr. Sweet, so first I would like you to respond to Mr. Gobena's representation that there really is no dispute on the first issue that the Relator has raised about the sole theory of liability objection.

If they are not withholding any documents -- if SNR is not withholding any documents other than post October, 2015 with respect to this objection, I don't see there being a live controversy before the Court.

MR. SWEET: So I would agree, if we're just clear for the record, that SNR defendants are not withholding any documents in response to these requests, these specific requests, and will not withhold any documents in response to these requests, there is no dispute.

What I understood from their written papers, their amended responses, is that they were not going to produce all documents responsive to those requests. They were only going to produce a subset that happened to also be responsive to other requests. That's not a complete production in response to our requests.

What I heard Mr. Gobena say today is they will produce all documents responsive to those requests. And so if that is the position, then I would agree there is no controversy there.

THE COURT: Okay. And this is really -- you know, look. I understand you all are in the throws of contentious

litigation, but, you know, had I not clarified this, the Court would have spent time on something that really wasn't a live issue.

So I am really asking the parties to be communicating about these issues, you know. I will just leave it at that. That's what I'm expecting from you all. Because, otherwise, the Court's, you know, spending precious time considering and researching an issue that really doesn't need to be -- any time needs to be spent on it.

So unless there's any objection, we can at least say that that issue is moot.

Looks like Mr. Gobena agrees. It looks -- seems like you agree.

MR. SWEET: I would agree.

THE COURT: Okay.

MR. SWEET: And I do want to follow up.

You had asked me earlier if there were any further discussions after the opposition was filed, and I remembered after I sat down that we did have a further discussion on one issue.

So we were able to reach an agreement with the Northstar defendants on categorical privilege logging that would alleviate some of the burden concerns they had raised about producing documents up through the present as well as an agreement on searching the files of their outside counsel by

limiting it to only the principal counsel on specific issues.

We offered the SNR defendants and DISH defendants an opportunity to do the same type of categorical privilege logging for the post-2015 time period to alleviate any burden concerns they had about the fact that there were a lot of privileged materials from that time period. They chose not to do that. They did not want to have that discussion or engage in that agreement, so we were not able to reach an agreement on that. But that was after the opposition was filed I believe.

THE COURT: Okay. That issue is not before the Court, though, is it, at this time?

MR. SWEET: Well, my understanding is one of their objections is that the post-2015 time period requires extensive burden for logging privilege as well as the obligation or our request that they search their outside custodian files creates a possibility for looking through a lot of privileged materials.

And so we're looking for ways to minimize the burden on both -- in both situations. One would be through categorical privilege logging of certain topics that are likely to come up a lot. The other is by limiting our requests that they search their outside counsel files to only the principal counsel on certain issues.

So it would be the principal counsel dealing with the FCC, the principal counsel dealing with the DOJ, and the

principal deal counsel that was negotiating agreements with the other defendants or the other investors.

In other words, trying to limit the number of custodians that they would need to search.

THE COURT: Okay. Well, with respect to that issue, I will just say -- I mean, I will issue an order at the end of this hearing, but if SNR is going to take the position that it has to log all these documents, notwithstanding the fact that the Relator has offered to reach some agreements, the Court is not going to consider that as a burden if there's an agreement or potential -- proposed agreement on the table to categorically log certain documents. So I'll take that into consideration if and when I need to.

But with respect to -- let me just go back to the specific -- the issue about the specific requests.

SNR defendants say that there actually are no documents that are responsive to Request Numbers 14, 15, 22, and 23 that postdate October, 2015 in their possession, custody, or control that would not be privileged or protected.

Do I need to consider the dispute about those four requests?

MR. SWEET: So I can't make any representations about what documents are in their possession. I can tell you, based on what we've seen so far, we have reason to believe that, at least some of these categories, there are documents that would

postdate October, 2015.

For example, Request Number 15 has to do with the investment, funding, or financing of SNR. I know that as late as 2018, there was renegotiation of their investments from -- one of their investors, ADK, bought out the interest of another investor, BlackRock and then, subsequently -- I think 2021 -- ADK exited the investment and there was a new lender that came in.

So there are further -- as far as we can tell, there should be further documents relating to investment funding and financing that would be responsive to Request Number 15 that postdate October, 2015.

THE COURT: How is that -- I don't want to get into every single one of these disputes at this status conference, but how would that be relevant to Relator's claim unless it reflected some sort of common ownership by DISH or some sort of affiliation by DISH if there is a transaction post 2015 that SNR engages in? How would that be relevant?

MR. SWEET: So I think it's relevant because we're trying to figure out what it is that SNR is representing to these investors that causes them to invest, you know, hundreds of millions of dollars -- sometimes more than that -- in a company that has no assets, no employees, and is holding on to these licenses that it won at this auction after cooperating with DISH.

We believe it's because everybody knows that they're going to get paid by DISH at the end once they transfer these licenses back to DISH, which was their agreement from the start.

And so these -- all of these communications and events that happened after the auction show the true nature of the relationship between the parties. And the -- what they're representing to investors I think is -- reveals this -- what they are telling investors that causes these investors to suddenly invest a lot of money in an organization that has no assets and no operation other than these licenses that they're holding on to.

I think it's very revealing of the true nature of the relationship and their understanding and agreement between the different defendants.

THE COURT: And the Relator's position is that those documents -- the temporal scope comes all the way up to present day?

MR. SWEET: So it comes up very close.

So there are events in 2021, in 2022 when SNR and Northstar are exercising their put rights. So this is the final part of the agreement between them where the licenses that they won during the auction are now transferred back to DISH and, in exchange, DISH is paying them money; they're buying them out. And that is the closing of their arrangement

from the get-go.

The understanding at the beginning was that these companies would bid -- they were to be formed and then financed and bid on behalf of DISH to win licenses for DISH. Once they did so, they waited a few years until they were able to transfer those licenses back to DISH. During that time period in between, they weren't building out networks like they represented to the FCC they would.

So we think this is the conclusion, the fulfillment of the fraudulent scheme that was initially -- that was initially formed.

THE COURT: Well, look. Rule 26 is pretty clear that even if something is -- could be relevant or even tangentially relevant, it still has to be proportional to the needs of this case.

So with respect to some of these documents post October, 2015, I'm concerned by the representation made -- and I want to give you an opportunity to respond -- that the SNR defendants have actually agreed to sit down and try to come up with an agreement to certain categories of documents they will search for and produce documents that were created after October, 2015.

Is it true that the Relator has rejected those attempts to reach a compromise on post-October, 2015 documents?

MR. SWEET: So we have insisted on full production in

response to all the requests. And I can explain why.

SNR is not a company like a lot of other companies -- maybe like DISH or others that have a lot of operations independent of this case. They were created for one purpose. There's a whole bunch of SNR defendants, most of which have no employees at all. There's only one custodian. So it's not particularly burdensome. And all of their operations, all their existence is related to Auction 97. That's the only reason they came into creation, and that is the only operation they've had is to work with the licenses that they won in Auction 97 and then eventually transferred them back to DISH. So everything they do is related to Auction 97. On top of that, they only have one custodian. So we're not asking them to search for a lot.

And, additionally, I would say to keep in mind that this is a case involving billions of dollars of potential fraud to the government. So the stakes are very high. And I don't think it's too much to ask for them to search up to at least the time of their -- when they exercised the put right and transferred the licenses back to DISH.

THE COURT: In 2018?

MR. SWEET: I believe it was 2021 or 2022 when they did that.

THE COURT: Okay. Well, this case was filed in May of 2015. So, you know, look. I'm happy to hear argument, but

it's going to be a really uphill battle, I think, to argue that everything up to the present day for every single request is necessary to proving up Relator's claim.

MR. SWEET: So I understand that. I would say that, you know, they've already expressed a willingness to produce documents related to the exercise of their put rights and their plans for developing the Spectrum.

They've additionally asked for documents from all the third parties that they've issued requests to and to us for documents up through the present. We would say that they should additionally produce documents relating to their financials, their financing and investment from other companies up through the present, as well as their communications with the other defendants, and their communications agreements and other payments that occurred between the defendants.

THE COURT: Okay. Well, I'm going to -- I'm not going to get in the middle of that right now. I think you all need to have a conversation about this because I'm having a hard time seeing how every document from -- you know, post -- there may be certain categories of documents.

I don't disagree with you on the fact that there may be certain categories of documents which are post October, 2015 that are relevant and proportional to the needs of the case. I think that there are some, though, that go beyond that. And so simply because something is relevant doesn't necessarily mean

that it's proportional to the needs of the case.

So what I'm going to order is -- I would like to have the parties meet and confer with this in mind about the specific requests and report back to me as to which of these six requests are still at issue if you can't reach an agreement.

If SNR defendants are willing to go beyond October, 2015 on the categories that you request, then that really takes care of a big chunk of this dispute. So --

MR. SWEET: Your Honor, can I just clarify one thing?

THE COURT: Yeah.

MR. SWEET: So there is a dispute about the six separate requests, and then there's a separate dispute about time period that applies to both those six requests as well as all the other requests.

THE COURT: Right. So let me -- yeah. I appreciate you asking that.

I'm going to order the parties to meet and confer as to, I mean, frankly, all of the active disputes and see if you can come to some agreement. But, based on what the parties have represented today, it seems that there are -- there is an opportunity here to come to some sort of compromise or some sort of agreement with respect to the temporal objection, the post, you know, October, 2015 objection.

SNR defendants are saying, look. We're willing to

talk to you and give you what you might want. And maybe there's no -- you know, maybe there's some other documents that you might want but you don't necessarily need, and maybe you can come to some sort of agreement on that.

So I would like you to meet and confer and hear them out on these categories of documents that postdate October, 2015 that apply to all your requests and that aren't limited to those six requests and see if you can come to an agreement -- agreement on that.

And then if you can't and there are still certain documents, say, with respect to the put, the exercise of the put rights, they don't want to produce documents, then come -- then let the Court know: Okay. This is what we really need that postdates October, 2015. Court, can you please resolve this particular category?

Because, you know, just saying, okay, as a blanket ruling that the SNR defendants' objections post October, 2015 is overruled and you can go get anything you want past October, 2015 -- it's just not -- it's not a practical ruling.

I really need to know what you need that postdates October, 2015 and -- that they're not willing to give you. It sounds like they're willing to give you some, maybe all, of it. So I think having that discussion is necessary and then reporting back to the Court. So that's a topic I'm ordering the parties to discuss.

And then with respect to the six specific requests, I would like you to have the discussion with the SNR defendants as to whether there really is anything after October, 2015 that they are withholding with respect to Request Number 14, 15, 22, and 23.

And, you know, I need you all to be speaking clearly. Make representations that are clear and not hiding the ball. I understand that there are tactics you may be employing, you know, strategy of discovery. But by the time it's coming to the Court, I need to know what's being withheld, and why, by any party and why -- and then for the party that's seeking the discovery, why do you need it.

So that needs to be teed up much more clearly than it has been thus far. And so I'm not, you know, necessarily blaming anyone. I haven't been in the trenches with you all. But what I can say is that, right off the bat, you know, spending less than an hour with you all, I realize that there's an entire category of documents that aren't even at issue.

So that communication needs to be happening before you come through the doors of this courtroom. Okay? So I'd like both parties to be communicating a little bit better than they have been.

So with respect to the specific requests -- so Dispute Number 1 is moot.

Dispute Number 2 are these six specific requests.

You're going to talk about those and report back to the Court as to what actual documents are still being withheld and are at issue so I can rule on that specific issue.

You're going to talk about whether the Relators can get the documents that they need and that they want post October 2015 by talking about categories of documents that the SNR defendants are willing to produce.

And then it seems to me, with respect to the final dispute, which is the outside counsel -- you know, if you can take another stab at having the discussion -- and, SNR, I'm expecting you to truly consider the offer that the Relator is making about logging categories of documents and see if you can narrow or resolve that dispute.

And then I'm happy to -- and will; it's my job -- to rule on what's still at issue. It's just that it's clear to me that there are some things that were presented as disputes -- for whatever reason, you didn't get a clear answer or people were talking past each other -- I'm not saying it was intentional. But I didn't need to, you know -- I'm glad I had a chance to speak to you all today because it's much clearer to me what's at issue and what's not at issue.

So what I'm going to do is order you all to meet and confer about these topics and then file a joint report to the Court -- now, I know the end of written discovery is end of this month. But I will certainly, in light of the fact that

you filed your motion well in advance of that particular time -- in fact, discovery is still ongoing. You know, I'm obviously going to still hear the dispute if it goes past March 31st.

How long do you think you need, Mr. Sweet, a couple of weeks to meet and confer and then file something with the Court?

MR. SWEET: I think two weeks would be sufficient for us.

THE COURT: Okay. All right. Mr. Gobena, is that enough time?

MR. GOBENA: Yes.

THE COURT: Okay. All right. So why don't you all meet and confer and file a joint report with the Court by March 24th? Or you can meet and confer and then I can give you an additional time to prepare the report. Would you prefer that?

(Discussion off the record.)

MR. SWEET: I think two weeks is sufficient for a report.

THE COURT: Okay. So if you could all file that by March 24th and lay out very clearly with respect to the four disputes that have been -- well, three remaining disputes. What has been narrowed, explore whether there's anything else on Request Number 14, 15, 22, and 23 that they still have that

you might need and that you can't, you know, reach a resolution on and then the post October, 2015 and outside counsel disputes.

Just provide the status, please, of what the disputes are after you've met and conferred -- hopefully there are none or narrowed -- and let the Court know what you're seeking a ruling on, what specific issues you're seeking a ruling on.

And then I will consider if you want to put -- I mean, I would like you to make the report brief, but if there's -- you know, if you want to refer back to your argument in your papers so that you kind of tie the dispute to any briefing you've previously done -- I would assume you don't need additional time -- additional briefing, but you can, you know, put a statement in there as to, you know, any argument you would like the Court to tie it back to. But I have all the papers; I've reviewed the papers.

And then I will have you all back in here for a discovery conference -- let me look at my calendar. It may be that based on -- I'm going to go ahead and set something today, but I may vacate it if I feel that I don't need any sort of argument. But I will go ahead and set this so that everyone can have it in their calendar.

(Discussion off the record.)

THE COURT: How does April 6th look for everyone?

MR. GOBENA: Your Honor, I'm going to actually be out

of the country on April 6th but, I mean [inaudible]. I don't know if Mr. Diesenhaus -- [inaudible].

MR. DIESENHAUS: Don't appoint me. We have a big enough team that we'll cover it.

MR. GOBENA: We'll cover it.

THE COURT: Well, are you representing the SNR defendants, sir?

MR. DIESENHAUS: Yes. We are co-counsel.

THE COURT: Co-counsel. Okay. Well, I'm happy to -- Mr. Gobena, I'm happy to re -- when will you be back from being out -- and I will just ask you to come to the podium.

MR. GOBENA: Sure. I apologize. I will be back by April 11th.

THE COURT: Okay. Well, I mean, certainly -- oh, I'm on criminal duty.

MR. GOBENA: But, as we mentioned, we can have someone cover from the SNR team --

THE COURT: Okay.

MR. GOBENA: -- if the Sixth works for everybody else.

THE COURT: Let me ask Mr. Sweet whether that date works for -- April 6th works for you, sir.

MR. SWEET: We can be available then.

(Discussion off the record.)

THE COURT: Okay. Let's go ahead and set it for April 6th. It will be better than pushing it back to the next

week because I will be on criminal duty the following week.

How about 1:00 p.m. on April 6th? Okay?

MR. GOBENA: That should work, Your Honor.

THE COURT: Okay. We will set it for a discovery conference then April 6th, 1:00 p.m. And, like I said, I may vacate the hearing if I don't feel the need. If I feel that I can decide it without it -- decide the dispute without it. But I also hope that there will be some movement here between the parties on these disputes.

Okay. Is there anything further, sir?

MR. SWEET: Not from us.

THE COURT: Okay.

MR. GOBENA: Not from us, but with respect to the categorical logging, we actually already agreed to it post October 2015. So -- and I think that's referenced in Exhibit 1 to their reply brief where you see there's an exchange between ourselves and counsel.

So on that issue, to the extent the Court was wondering whether we are not in support of the idea, we are fine with categorical logging of privileged documents post October, 2015.

THE COURT: Okay. Well, clearly there's some miscommunication here, and this is --

MR. GOBENA: Yes. It's in the email very clearly. I said, we accept your proposal on that, but we want to limit it

to these two categories post '15. Do you have other categories you want to propose? They never responded to it. So --

THE COURT: Okay. All right. This is the sort of thing I'm talking about.

MR. GOBENA: Yeah.

THE COURT: I'm not blaming anyone.

MR. GOBENA: I understand.

THE COURT: But there needs to be better communication. I'm sure you all can understand the other matters that the Court has before it. I'm one person. And so I'm happy to hear your dispute. Like I said, it's my job, and I will make myself available to hear arguments. But to the extent there actually are no disputes, that's where, you know, it gets very concerning for the Court.

MR. GOBENA: Yeah.

THE COURT: And so talk about it and report back on March 24th as to what the issue is.

MR. GOBENA: I understand. We said repeatedly, Your Honor, we're happy to talk to counsel for the Relator, and we look forward to a meet and confer coming up.

THE COURT: Okay.

MR. GOBENA: Like I said, if you see Exhibit 1 to their reply, you will see that we actually responded positively to that one proposal.

THE COURT: I can't hear you, sir.

MR. GOBENA: Sorry.

THE COURT: What did you say?

MR. GOBENA: If you look at Exhibit 1 to their reply, you will see that we responded positively.

So I don't know where the talking past each other is coming from, but we will diligently meet and confer from here on out so that we reduce the burden for the Court.

THE COURT: Okay. Yeah. Try to be very clear with each other as to what's being withheld and what's not. And if something's, you know -- or what -- you know, what you are or are not willing to do.

I don't know where -- I don't know where communication is breaking down here, but I'll hear from -- I'll review the report on March 24th and resolve anything I need to. All right?

All right. Thank you.

COURTROOM DEPUTY: All rise. Court is now adjourned.

(The Proceedings were concluded on March 10, 2023.)

C E R T I F I C A T E

I, the undersigned, hereby certify that the foregoing pages contain a true and correct transcript of the aforementioned proceedings as is hereinabove set out to the best of my ability, as the same was recorded by FTR digital audio recording and later taken down by me in stenotype and transcribed utilizing computer-aided transcription.

This is the 16th day of March of 2023.

Cheryl K. Powell, CCR, RPR, FCRR
Federal Certified Realtime Reporter