**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. VERMONT NATIONAL TELEPHONE CO., | Civil Action No. 1:15-cv-00728-CKK |
| Plaintiff, | |
| v. | |
| NORTHSTAR WIRELESS, LLC, et al. | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT ON ACTUAL DAMAGES**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 2

    A.    The FCC's Designated-Entity Program ............................................... 2

    B.    Auction 97 .......................................................................................... 3

    C.    Post-Auction Proceedings .................................................................. 4

    D.    Defendants Challenge Relator's Damages Allegations At The
Motion-To-Dismiss Stage .................................................................. 6

    E.    The FCC's Declaration ....................................................................... 7

LEGAL STANDARD ................................................................................................. 9

ARGUMENT ............................................................................................................ 9

    I.    THE FCC'S DECLARATION CONFIRMS THAT EVEN IF THERE WERE
ANY FCA VIOLATION HERE, THERE ARE NO ACTUAL DAMAGES ......... 10

    II.    THE FCC'S DECLARATION ALSO FORECLOSES RELATOR'S
NEWFOUND DAMAGES THEORY .......................................................... 12

    III.    THIS MOTION SHOULD BE RULED ON WITHOUT DELAY ...................... 15

CONCLUSION ........................................................................................................ 16

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................9, 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................9

*Cook County v. United States ex rel. Chandler*, 538 U.S. 119 (2003) ....................................9, 14

*Dookeran v. Mercy Hospital of Pittsburgh*, 281 F.3d 105 (3d Cir. 2002)....................................15

*Grimes v. District of Columbia*, 794 F.3d 83 (D.C. Cir. 2015) ......................................................9

*Scott v. Harris*, 550 U.S. 372 (2007) ..............................................................................9

*United States ex rel. Davis v. District of Columbia*, 679 F.3d 832 (D.C. Cir. 2012) ...................10

*United States ex rel. Raggio v. Jacintoport International, LLC*, 2015 U.S. Dist. LEXIS 116432 (D.D.C. Mar. 12, 2015) ..................................................................9

*United States ex rel. Taylor v. Gabelli*, 345 F.Supp.2d 313 (S.D.N.Y. 2004)...............................14

*United States v. Neifert-White Co.*, 390 U.S. 228 (1968) ..............................................................15

*United States v. Newman*, 2017 U.S. Dist. LEXIS 131056 (D.D.C. Aug. 17, 2017) ...................14

*United States v. TXL Mortgage Corp.*, 2016 U.S. Dist. LEXIS 127594 (D.D.C. Sept. 20, 2016) ......................................................................................................14

### DOCKETED CASES

*United States ex rel. Vermont National Telephone Co. v. Northstar Spectrum LLC*, No. 21-7039 (D.C. Cir. Nov. 15, 2021) ...............................................................13, 14

### REGULATORY MATERIALS

*Auction of Advanced Wireless Services (AWS-3) Licenses 70 Bidders Qualified to Participate in Auction 97*, 29 FCC Rcd. 13465 (2014) ...........................................................4

*Auction of Advanced Wireless Services (AWS-3) Licenses Closes*, 30 FCC Rcd. 630 (2015)...............................................................................................................4

*Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for Nov. 13, 2014*, 29 FCC Rcd. 8386 (2014)........................................................................3, 13

*In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, 9 FCC Rcd. 5532 (1994) .........................................................................................3

*In the Matter of Northstar Wireless, LLC*, 30 FCC Rcd. 8887 (2015) ...................................2, 5

*Letter from FCC to Northstar Wireless,* 30 FCC Rcd. 10700 (2015) .........................................11

*Letter from FCC to SNR Wireless,* 30 FCC Rcd. 10704 (2015) ..................................................11

## STATUTES, RULES, AND REGULATIONS

31 U.S.C. §3729 .........................................................................................................................9, 14

47 U.S.C. §309 .............................................................................................................................2, 3

47 C.F.R.
   §1.2107 .................................................................................................................................3
   §1.2110 ............................................................................................................................2, 3

Fed. R. Civ. P.
   Rule 45 .................................................................................................................................7
   Rule 56 .................................................................................................................................9

## INTRODUCTION

Relator Vermont National Telephone Company brought this case under the False Claims Act ("FCA") alleging that defendants defrauded the United States of roughly $3.3 billion by applying for price discounts (often called "bidding credits") on wireless-spectrum licenses auctioned by the Federal Communications Commission ("FCC"), despite supposedly knowing they were not entitled to such discounts.  The government itself—the real party in interest here, and the supposed victim—has now established beyond genuine dispute that in fact it suffered *no* actual damages from the alleged violations.  Indeed, in direct contradiction to relator's core claim that the government was damaged because defendants did not pay everything they should have (and at what relator deems the appropriate time), the FCC has provided the attached sworn declaration stating unequivocally that Northstar and SNR "fully and timely satisfied their obligations to pay money to the Government arising from Auction 97."  Ex. A ¶27 ("FCC Decl.").[1]

The FCC's declaration—which the government provided in lieu of having to turn over documents responsive to defendants' discovery requests regarding damages—further confirms what defendants argued in moving to dismiss relator's actual-damages claim: (1) that the price discounts/bidding credits that defendants allegedly obtained through fraud were in fact "never awarded" to defendants, and (2) that defendants—"[p]ursuant to the FCC's rules"—have already paid the government the designated penalties for choosing not to purchase certain licenses, and are obligated to make up any shortfall between what they bid on those licenses and what the

---

[1] All "Ex." citations are to exhibits attached to the declaration of Jude Knab, filed concurrently herewith.

government eventually receives for them.  FCC Decl. ¶¶22, 25-27.  The declaration thus flatly forecloses relator's damages theories.

Because there is no genuine dispute as to whether the government sustained any actual damages here, the Court should grant partial summary judgment for defendants on that issue. The Court should also reject any request by relator to delay ruling on this motion:  Relator seeks to continue to impose enormous costs on defendants and third parties via expansive discovery, discovery that it has tried to justify (including to Magistrate Judge Upadhyaya) on a proportionality rationale, i.e., that this case is about billions of dollars in actual damages to the government.  That rationale should be promptly rejected so that relator can no longer invoke it to continue imposing costs on defendants and others (and at the same time running up the attorneys' fees it no doubt hopes to recover).

## BACKGROUND

### A.     The FCC's Designated-Entity Program

The FCC uses competitive bidding to award wireless-spectrum licenses.  *See In the Matter of Northstar Wireless, LLC*, 30 FCC Rcd. 8887, ¶13 (2015) ("*2015 FCC Order*"); First Am. Compl. (Dkt. 76), ¶43 ("FAC"); FCC Decl. ¶3.  To address Congress's desire that such licenses be distributed among a "wide variety of applicants, including small businesses," 47 U.S.C. §309(j)(3)(B), the Commission implemented a "designated-entity" program to help small businesses compete successfully for licenses, 47 C.F.R. §1.2110(a).  Under FCC rules, qualifying "small businesses" or "very small businesses" can apply for designated-entity status, which entitles them to price discounts (or "bidding credits") on any licenses won during a spectrum auction.  SUMF ¶2.

Spectrum licenses are expensive, and many designated entities lack sufficient capital (even with discounts) to buy the licenses.  FCC rules therefore permit "investment in [designated

entities] by entities that do not meet the size restrictions" (i.e., are not themselves small businesses), so long as the investor does not exercise "de facto [or] de jure control" over the designated entity.  *In re Implementation of Section 309(j) of the Communications Act— Competitive Bidding*, 9 FCC Rcd. 5532, ¶205 (1994); *accord id*. ¶15.

### B.     Auction 97

In 2014, the FCC announced that it would put certain wireless-service licenses up for bidding in Auction 97.  *See Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for Nov. 13, 2014*, 29 FCC Rcd. 8386, ¶1 (2014) ("*Auction of Licenses*").  Auction 97 employed the Commission's customary two-step process for entities to demonstrate their eligibility to participate in the auction, to hold licenses, and (if sought) to receive price discounts.  SUMF ¶3. First, each prospective bidder had to submit a "short-form application" stating its qualifications to participate in the auction and, for those seeking price discounts, describing its status as a small or very small business.  *Id.*  Second, after the auction, each winning bidder had to "file a more comprehensive long-form application," which the FCC reviewed to verify the applicant's eligibility to hold a spectrum license and (for those seeking designated-entity status) to receive the requested price discounts.  *Id*. ¶4.  Long-form applications also had to disclose the "specific terms, conditions, and parties involved in any agreement" relating to the licenses to be auctioned. *Auction of Licenses*, ¶¶33, 63, 230; *see also* 47 C.F.R. §§1.2107(d), 1.2110(j).

To participate in Auction 97, defendants Northstar Wireless, LLC and SNR Wireless LicenseCo, LLC—two very small businesses—borrowed money and secured equity investments from subsidiaries of defendant DISH Network Corporation and others.  *See* FAC ¶¶19, 27. Northstar and SNR each filed a short-form application with the FCC, each requesting bidding credits as a designated entity.  SUMF ¶¶5-6; FAC ¶82.  Although those applications were

accepted, SUMF ¶7; FAC ¶62, the FCC's notice regarding auction procedures explained that the FCC's acceptance of a short-form application "is not determinative of an applicant's qualifications to hold a license or entitlement to a bidding credit," *Auction of Advanced Wireless Services (AWS-3) Licenses 70 Bidders Qualified to Participate in Auction 97*, 29 FCC Rcd. 13465, 13465 n.3 (2014).

### C.   Post-Auction Proceedings

The day after Auction 97 ended, the FCC announced that it had raised over $41 billion in net bids from 31 winning bidders, including Northstar and SNR.  *Auction of Advanced Wireless Services (AWS-3) Licenses Closes*, 30 FCC Rcd. 630, 630 (2015) ("*Auction Closes*"); FCC Decl. ¶11.  Northstar's and SNR's combined gross winning bids totaled approximately $13.3 billion. SUMF ¶11.  As winning bidders, Northstar and SNR each filed a long-form application that contained information about the entity's organizational structure, ownership, and joint bidding arrangements, including copies of all relevant agreements.  *Id.* ¶12.  The FCC announced that if, upon reviewing a winning bidder's long-form application, it determined that "a winning bidder is not entitled to the level of bidding credit that it has claimed," the FCC "may require an additional payment to cover the amount of any percentage discount for which it was not eligible." *Auction Closes*, ¶33 & n.42.

On March 2, 2015, before FCC review of their long-form applications, Northstar and SNR each made a post-auction payment equaling its total gross winning bid amount minus the price discounts each entity sought.  SUMF ¶17.  At that point, accounting for both these post-auction payments and pre-auction upfront payments, Northstar had paid approximately $5.9 billion, and SNR had paid approximately $4.1 billion, to the FCC in connection with Auction 97. *Id*. ¶18.

Two months later, several parties, including relator, petitioned the FCC to deny Northstar's and SNR's applications for the licenses for which they were winning bidders. *2015 FCC Order* ¶¶10, 30; FCC Decl. ¶17. The petitions contended that Northstar and SNR were controlled by DISH and thus did not qualify for the price discounts they were seeking. *2015 FCC Order* ¶10. Before the FCC ruled on the petitions, relator filed this action under the False Claims Act, alleging (as relevant here) that "the FCC gave Northstar Wireless and SNR Wireless the benefit of th[e] bidding credits" they applied for, and that "[b]y reason of" Northstar's and SNR's "credits, payments or license grants, the United States has been damaged, and continues to be damaged, in substantial amount." Compl. (Dkt. 1) ¶¶119, 127. The United States investigated relator's allegations and declined to intervene. *See* Dkt. 17.

After the original complaint was filed, the FCC granted in part relator's (and others') petitions to deny. *See 2015 FCC Order* ¶163. Based on "the various Agreements" included in Northstar's and SNR's long-form applications, the FCC concluded that DISH exercised *de facto* control over Northstar and SNR, rendering them ineligible for price discounts. *2015 FCC Order* ¶49. The agency further held that although Northstar and SNR were ineligible for the discounts for which they had applied, each could acquire the licenses it had won during the auction by paying the undiscounted price. SUMF ¶23. Northstar and SNR notified the FCC that they would do so for some licenses and not others. *Id.* ¶24.

In accordance with FCC rules, Northstar and SNR then made—and the FCC accepted—payments to compensate the government for their decision not to buy some of the licenses. SUMF ¶25. DISH also "guaranteed to pay any future shortfall in any future re-auction of the licenses on which SNR and Northstar defaulted." FCC Decl. ¶26.

**D.     Defendants Challenge Relator's Damages Allegations At The Motion-To-Dismiss Stage**

Relator filed the amended complaint in this case after the FCC's decision not to award Northstar and SNR the price discounts for which they had applied, and after Northstar and SNR made default payments to compensate the government for the licenses won but not purchased. Relator nevertheless alleged that "the FCC gave Northstar Wireless and SNR Wireless the benefit of th[e] bidding credits" sought, and that defendants "fraudulently appropriated … payments properly owed to the United States Government."  FAC ¶¶133, 135.

Defendants moved to dismiss relator's claim for treble damages on the ground that relator failed to plausibly plead damages to the government.  *See* Dkt. 77 at 38-41.  Noting that relator "filed its original complaint … when the FCC was still considering granting the bidding credits" to Northstar and SNR, defendants argued that after the FCC "denied the credits, there simply [was] no basis for a claim that the United States suffered actual damages."  *Id*. at 39 n.10.  In response, relator argued that the government was harmed because Northstar and SNR were obligated to pay the full amount of their gross winning bids (not the full amount minus the price discounts sought) on March 2, 2015.  Dkt. 78 at 42-43.  Defendants replied that under both general FCC regulations and the specific rules for Auction 97, "only *net* winning bids"—i.e., gross winning bids adjusted by the bidding credits sought—"were due on that date."  Dkt. 80 at 25 (emphasis added).  Relator also contended that the government was damaged because it would receive the full amount of SNR's and Northstar's bids *later* than it would have if not for SNR's and Northstar's default on certain licenses.  Dkt. 78 at 42.  Defendants replied that the government "ha[d] already compensated itself for that delay by requiring SNR and Northstar to pay 15 percent *more* than the total amount of their winning bids."  Dkt. 80 at 25.

This Court's other rulings on defendants' motion to dismiss obviated the need for the Court to reach defendants' arguments regarding damages.  *See* Dkt. 87.

### E.      The FCC's Declaration

Although it bears the burden of proof, including on damages, relator sought no written discovery from the FCC regarding damages (or anything else for that matter) before the deadline for such discovery passed.

Defendants, by contrast, served a Rule 45 subpoena (and accompanying so-called "*Touhy* requests") on the FCC, seeking documents relevant to relator's claims—including documents pertaining to any alleged damages that the FCC suffered as a result of the alleged conduct.  *See* SUMF ¶¶28-29; Exs. C, D, E.  Defendants, the FCC, and representatives of the Department of Justice met and conferred regarding the document requests on numerous occasions in 2023.  In the course of those discussions, the government proposed that, in lieu of producing documents responsive to the damages-related document requests, it would provide a sworn declaration addressing facts relevant to the question of damages.  Defendants accepted that proposal, and on August 25, 2023, FCC litigation counsel provided a sworn declaration executed by FCC Associate Division Chief Paul Malmud "in lieu of producing documents responsive to" defendants' subpoena and *Touhy* requests on damages.  Ex. B; *see* FCC Decl.

*Damages*.  As noted, the declaration states (after recounting the relevant background regarding defendants' conduct in connection with Auction 97) that "the FCC considers … SNR and Northstar to have *fully* and *timely* satisfied their obligations to pay money to the Government arising from Auction 97."  FCC Decl. ¶27 (emphases added).

*Price discounts/bidding credits*.  The declaration confirms that "[t]he FCC's acceptance of a 'short-form' application … is not an award of any small business bidding credit."  FCC

Decl. ¶4.  Rather, "[t]he 'long-form' application is the document that the FCC evaluates in order to actually award … licenses, along with any claimed small business bidding credits."  *Id.* ¶5. Consistent with that fact, the declaration explains (regarding Northstar's and SNR's post-auction payments on March 2, 2015) that "the fact that the amount" Northstar and SNR "paid on that date was adjusted by the bidding credits [they] claimed does not indicate" that Northstar or SNR "was awarded any bidding credit."  *Id.* ¶¶14-15.  Indeed, the declaration states unequivocally that "the FCC *never* awarded SNR or Northstar any such bidding credit."  *Id.* ¶25 (emphasis added). "To the contrary," the declaration continues, "prior to granting any application for any license in Auction 97 for which SNR or Northstar was the winning bidder, the FCC determined that SNR and Northstar *were not eligible for the bidding credits* they sought."  *Id.* (emphasis added); *see* SUMF ¶20.  Moreover, the declaration makes clear that "[t]he fact that" Northstar and SNR were "denied the bidding credits" they sought "does not render" the adjusted amounts they paid on March 2, 2015, "improper."  FCC Decl. ¶¶14-15.

 *Default payments and penalties*.  The declaration explains that "[t]he FCC's auction rules contemplate that some bidders will turn out to be unable or unwilling to pay for licenses for which they are the winning bidder," and that "[s]o long as bidders abide by the FCC's rules governing … defaults, they will have fully satisfied their obligation to pay money to the Government arising from their participation in the auction."  FCC Decl. ¶6.  The declaration then confirms that "[w]hile SNR and Northstar defaulted on certain licenses, they followed the established procedures and timely made the required interim default payments."  *Id.* ¶26. "Further," the declaration explains, "DISH guaranteed to pay any future shortfall in any future re-auction of the licenses on which SNR and Northstar defaulted."  *Id.*

**LEGAL STANDARD**

A court "shall" grant summary judgment if "there is no genuine issue as to any material

fact and … the moving party is entitled to judgment as a matter of law."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(a), (c).  A dispute over a

material fact is genuine only if it could lead a reasonable jury to return a verdict in favor of the

non-moving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Grimes v. District of*

*Columbia*, 794 F.3d 83, 94-95 (D.C. Cir. 2015).  And while "justifiable inferences are to be

drawn in [the non-movant's] favor," *Anderson*, 477 U.S. at 255, the non-movant's opposition

must consist of more than mere denials and "go beyond the pleadings," *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986).

A party may move for summary judgment on "part" of any claim.  Fed. R. Civ. P. 56(a).

That includes seeking partial summary judgment on damages.  For instance, in *United States ex*

*rel. Raggio v. Jacintoport International, LLC*, another judge of this Court granted a "motion for

partial summary judgment" as to whether the defendant was "eligible for reduced damages

pursuant to section 3729(a)(2) of the FCA,"  2015 U.S. Dist. LEXIS 116432, at *2 (D.D.C. Mar.

12, 2015).

**ARGUMENT**

The FCA allows for recovery of three times "the amount of damages which the

Government sustains because of" a violation of the statute.  31 U.S.C. §3729(a)(1), (2).  In

determining "the amount of damages," *id.*, courts look only to the actual and direct harm to the

government resulting from a violation, because the statute does not provide for "consequential

damages that typically come with recovery for fraud," *Cook County v. United States ex rel.*

*Chandler*, 538 U.S. 119, 131 (2003).

Here, the FCC's recent declaration forecloses any credible assertion that the government suffered any actual damages as a result of the alleged false claims. It undermines both relator's original damages theory (for precisely the reasons given in defendants' motion to dismiss) and the newfound damages theory to which relator has since alluded. All of the pertinent material facts necessary to decide the motion have been addressed by the FCC and cannot genuinely be disputed. The Court therefore should hold as a matter of law—as the D.C. Circuit has done at an even earlier stage in FCA litigation—"that the government suffered no damages." *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 839 (D.C. Cir. 2012).

I.     **THE FCC'S DECLARATION CONFIRMS THAT EVEN IF THERE WERE ANY FCA VIOLATION HERE, THERE ARE NO ACTUAL DAMAGES**

The damages theory pleaded in the operative complaint rests on the allegation that the *gross* amount of Northstar's and SNR's winning bids, i.e., the $13.3 billion that would have been owed without the price discounts sought, "was due on March 2, 2015." Dkt. 78 at 43. Hence, relator argued at the motion-to-dismiss stage, "the moment SNR and Northstar paid the FCC $3.3 billion *less* than what" relator claims "was due" on March 2, 2015, "damages were sustained by the United States in that amount." *Id.* at 42.

Relator reiterated this theory in its initial disclosures, contending that the government was damaged because March 2, 2015, was "the payment due date" for "the full price of the spectrum for which SNR and Northstar were the winning bidders in Auction 97 (approximately $13.3 billion)." Ex. G at 6. Likewise, in its responses to defendants' first set of interrogatories, relator stated that Northstar and SNR "paid only approximately $10 billion by the payment due date." Ex. H at 20. As noted, however, relator sought no written discovery from the government to substantiate these allegations.

Now we know why:  The FCC's declaration makes clear that relator's position has no basis in fact or law.  In particular, the declaration explains that "[t]he FCC's auction rules contemplate that some bidders will turn out to be unable or unwilling to pay for licenses for which they are the winning bidder"—and adds that "[s]o long as bidders abide by the FCC's rules governing … defaults, they will have *fully satisfied their obligation to pay money to the Government* arising from their participation in the auction."  FCC Decl. ¶6 (emphasis added).  Accordingly, the FCC's declaration makes clear that the adjusted amounts paid by SNR and Northstar on March 2, 2015, were not improper.  *Id*. ¶¶14-15.  The declaration then states that "[w]hile SNR and Northstar defaulted on certain licenses, they followed the established procedures and *timely made the required interim default payments*."  *Id.* ¶26 (emphasis added).  And making even clearer that the United States sustained no damages here, the declaration recounts not only that "DISH guaranteed to pay any future shortfall in any future re-auction of the licenses on which SNR and Northstar defaulted," *id*., but also that:

> Pursuant to the FCC's rules and auction procedures, SNR and Northstar paid an interim default payment of 15% of the gross winning bids on the defaulted licenses, and were held liable for future amounts pending a subsequent auction of the spectrum covered by the defaulted licenses, including any shortfall between the subsequent winning bids and the amounts of their defaulted bids.  In SNR's case, the 15 percent interim default payment amounted to $181,635,840, and Northstar's amounted to $333,919,350.

*Id*. ¶22 (citing *Letter from FCC to SNR Wireless*, 30 FCC Rcd 10704 (2015), and *Letter from FCC to Northstar Wireless*, 30 FCC Rcd. 10700 (2015)).  The declaration thus confirms that the enormous default payments, together with defendants' obligation to make up any difference between what SNR and Northstar bid on the licenses they did not buy and what the FCC eventually receives when it re-auctions those licenses, means the United States has suffered no loss, i.e., it was not damaged by any of the conduct alleged in relator's complaint.

In light of the FCC's statements, no reasonable fact-finder could credit relator's claim that March 2, 2015, was "the payment due date" for "the *full* price of the spectrum for which SNR and Northstar were the winning bidders in Auction 97 (approximately $13.3 billion)," Ex. G at 6 (emphasis added), much less relator's argument that "damages were sustained" "the moment SNR and Northstar paid the FCC $3.3 billion *less* than" that, Dkt. 78 at 42. Indeed, the declaration directly refutes that assertion by stating in no uncertain terms that "the FCC considers that SNR and Northstar … have *fully* and *timely* satisfied their obligations to pay money to the Government arising from Auction 97." FCC Decl. ¶27 (emphases added). That statement leaves "no genuine issue" in dispute regarding actual damages, *Anderson*, 477 U.S. at 250. Indeed, as the real party in interest, *only* the government can determine whether defendants have fully and timely satisfied their payment obligations.

## II. THE FCC'S DECLARATION ALSO FORECLOSES RELATOR'S NEWFOUND DAMAGES THEORY

During discovery, relator has suggested that it is shifting to a new damages theory, one premised on Northstar's and SNR's supposed "*use* of bidding credits in Auction 97." Ex. J at 7 (emphasis added); *see also id.* at 5, 9, 11; Ex. K at 4, 6, 7, 8; Ex. I at 3, 4, 5, 6, 8, 9. Relator's new theory is that the FCC awarded Northstar and SNR bidding credits upon accepting their short-form applications, and that Northstar and SNR used those bidding credits to deter bidding from competitors during Auction 97 and to avoid paying the FCC the full amount they owed on March 2, 2015. The FCC's declaration, however, likewise forecloses this new theory, explaining that "the FCC never awarded SNR or Northstar any … bidding credit." FCC Decl. ¶25. Given that bidding credits were "never awarded," *id.*, they could not possibly have been used in Auction 97—which, again, is the premise of relator's new theory. That theory thus provides no basis to deny this motion.

A.      Throughout this litigation, defendants have maintained that they "never received any bidding credits."  Dkt. 77 at 39.  The FCC's declaration shows that that is true.  *See* FCC Decl. ¶25.  Indeed, the declaration avers that "the contrary" of relator's claim is true: that "prior to granting any application for any license in Auction 97 for which SNR or Northstar was the winning bidder, the FCC determined that SNR and Northstar were *not eligible* for the bidding credits they sought."  *Id.* (emphasis added); *see* SUMF ¶20.

To the extent relator has ever explained its position that the FCC awarded price discounts to Northstar and SNR, the explanation has been that the FCC *effectively* did so by accepting Northstar's and SNR's short-form applications.  That is so—in relator's words to the D.C. Circuit—because "the short-form application is 'used to determine whether the applicant is eligible for the claimed bidding credit.'"  Appellant's Opening Brief at 10, *United States ex rel. Vermont National Telephone Co. v. Northstar Spectrum LLC*, No. 21-7039 (D.C. Cir. Nov. 15, 2021) ("*VTel* Opening Brief") (quoting *Auction of Licenses*, ¶64).  The FCC's declaration belies this premise, definitively explaining that "[t]he FCC's acceptance of a 'short-form' application … is *not* an award of any small business bidding credit."  FCC Decl. ¶4 (emphasis added).  That is consistent with the FCC notice that relator quoted to the D.C. Circuit, which explains that it is not the short-form application itself but rather "*the information provided in*" a short-form application that "will be used to determine whether the applicant is eligible" for any claimed credits, *Auction of Licenses*, ¶64 (emphasis added).  That same information (and more) must also be included in an applicant's *long*-form application.  *Id*. ¶63.  And as the declaration explains, "[t]he 'long-form' application is the document that the FCC evaluates in order to actually award … licenses, along with any claimed small business bidding credits," FCC Decl. ¶5.  The declaration, in other words, flatly contradicts relator's assertion on appeal that "[t]he FCC …

relies on [an applicant's short-form application] *up front*."  *VTel* Opening Brief 51 (emphasis added).

B.  Because Northstar and SNR were "never awarded" bidding credits, FCC Decl. ¶25, they could not possibly have "used" them, Ex. I at 3.  Relator claims that Northstar and SNR "use[d] bidding credits … to deter bidding from competitors during the auction and to avoid paying the full $13.3 billion of their winning bids" on March 2, 2015.  *VTel* Opening Brief 19.  But any purported damages under that theory would not be actionable because they would be either (1) sustained by competitors, whereas the FCA recognizes only "damages which *the Government* sustains," 31 U.S.C. §3729(a)(1) (emphasis added), or (2) to the extent sustained by the government, precisely the type of "consequential damages" the Supreme Court has held are not allowed under the FCA, *Cook County*, 538 U.S. at 131 & n.9.  And to the extent relator argues that Northstar and SNR used bidding credits "to avoid paying the full $13.3 billion of their winning bids" on March 2, 2015, *VTel* Opening Brief 19, the FCC's declaration forecloses that argument too, explaining that "the fact that the amount" Northstar and SNR "paid on that date was adjusted by the bidding credits [they] claimed *does not indicate*" that Northstar or SNR "was awarded any bidding credit," FCC Decl. ¶¶14, 15 (emphasis added).

C.  The fact that Northstar and SNR were never awarded, and thus never used, any price discounts distinguishes this case from other *qui tam* actions based on FCC spectrum auctions where the defendants actually "obtained" such discounts.  *United States v. Newman*, 2017 U.S. Dist. LEXIS 131056, at *1 (D.D.C. Aug. 17, 2017); *see also United States ex rel. Taylor v. Gabelli*, 345 F.Supp.2d 313, 322-323 (S.D.N.Y. 2004).  It also distinguishes this case from FCA cases in which the defendants actually "acquired" insurance from the government, *United States v. TXL Mortgage Corp.*, 2016 U.S. Dist. LEXIS 127594, at *5 (D.D.C. Sept. 20,

- 14 -

2016), or in which the government actually "extend[ed]" loans to defendants, *United States v. Neifert-White Co.*, 390 U.S. 228, 230 (1968).

This is instead a case in which the defendants never acquired—because the government never extended—the thing of value (price discounts/bidding credits) that was allegedly obtained through fraud.  This case is thus more analogous to *Dookeran v. Mercy Hospital of Pittsburgh*, 281 F.3d 105 (3d Cir. 2002), in which the defendant's allegedly fraudulent "application was simply the first step in a process that ultimately might have led, but in actuality did not lead, to the authorization of the payment of federal funds," *id.* at 109.  The Third Circuit held that "the facts of th[at] case could not possibly support" a claim for damages under the FCA.  *Id.* at 107.  The FCC's declaration confirms beyond any genuine dispute that the same is true here.

### III.   THIS MOTION SHOULD BE RULED ON WITHOUT DELAY

Defendants respectfully request a prompt ruling on this motion.  To begin with, relator should not be heard to claim that it must be given time to seek damages-related discovery from the government.  As explained, relator allowed the deadline for serving written discovery to pass without seeking *any* such discovery from the government (on damages or otherwise).  Relator does not get a do-over just because defendants' efforts to obtain discovery from the government yielded a declaration that forecloses relator's damages theories.

Moreover, relator has imposed enormously expansive and burdensome discovery on defendants (and many third parties).  And when Magistrate Judge Upadhyaya questioned relator about why such expansive discovery was necessary or appropriate, relator responded that "the stakes are very high" because it alleges "billions of dollars of potential fraud" against the government.  Dkt. 144 (March 10, 2023, Hearing Tr.) 34:15-17.  That purported justification does not suffice if in fact the maximum recovery even theoretically possible here is an infinitesimal fraction of the $10 billion relator has alleged.  A prompt ruling would allow further

discovery to be tailored in a way appropriate and proportionate to the potential recovery, ensuring that defendants—as well as the government and the many third parties relator has also served with expansive discovery requests—will not continue to incur substantially disproportionate burdens based on relator's legally infirm damages claims.[2]

## CONCLUSION

The Court should enter partial summary judgment for defendants on the ground that, as a matter of law, the United States suffered no actual damages from the alleged False Claims Act violations.

September 22, 2023

Respectfully submitted,

*s/ Daniel S. Volchok*

Gejaa T. Gobena (#463833)
Jonathan L. Diesenhaus (#423753)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
202-637-5600
gejaa.gobena@hoganlovells.com
jonathan.diesenhaus@hoganlovells.com

*Counsel for SNR Wireless LicenseCo, LLC,
SNR Wireless HoldCo, LLC, SNR Wireless
Management, LLC, Atelum LLC, and John
Muleta*

Howard M. Shapiro (#454274)
Jonathan E. Paikin (#466445)
Daniel S. Volchok (#466889)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
202-663-6000
howard.shapiro@wilmerhale.com
jonathan.paikin@wilmerhale.com
daniel.volchok@wilmerhale.com

*Counsel for American AWS-3 Wireless I LLC,
American AWS-3 Wireless II LLC, American
AWS-3 Wireless III LLC, DISH Wireless
Holding LLC, DISH Network Corporation,
Charles W. Ergen, and Cantey M. Ergen*

---

[2] Relator has also justified its expansive approach to discovery by pointing to the supposedly expansive scope of its claims. Defendants have previously explained (in briefing their still-pending motion for judgment on the pleadings) that the scope of relator's claims is in fact much narrower. *See* Dkt. 115 at 25; Dkt. 121 at 20. The government recently expressed the same view. *See* Ex. F.

Peter B. Hutt II (#427331)
Benjamin C. Block (#479705)
Dennis B. Auerbach (#418982)
Amee M. Frodle (#1602371)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
202-662-6000
phuttjr@cov.com
bblock@cov.com
dauerbach@cov.com
afrodle@cov.com

*Counsel for Northstar Wireless, LLC, Northstar Spectrum, LLC, Northstar Manager, LLC, Doyon, Limited, Miranda Wright, and Allen M. Todd*