**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, *ex rel.* VERMONT NATIONAL TELEPHONE CO.,<br>    Plaintiff-Relator,<br>    v.<br>NORTHSTAR WIRELESS LLC, *et al.*,<br>    Defendants. |

Civil Action No. 15-0728 (CKK)

**MEMORANDUM OPINION**
(November 9, 2023)

In this *qui tam* action, Plaintiff-Relator Vermont National Telephone Company ("Vermont Telephone") alleges that DISH Network and its affiliates (collectively, "Defendants")[1] manipulated the Federal Communications Commission's ("FCC") auction rules to secure fraudulent small business discounts on wireless-spectrum licenses. These allegations were exhaustively litigated before the FCC in an antecedent administrative proceeding and in the court of public opinion. As a result, Defendants argue that the Court should dismiss this case pursuant to the False Claim Act's "public-disclosure" provision, which requires a Court to dismiss a *qui tam* action where the fraud allegations were known to the federal government in advance of a relator's commencement of suit in federal court. That provision, however, is subject to a crucial and dispositive exception: where the United States opposes dismissal. Here, the United States opposes

---

[1] In total, Vermont Telephone names eighteen Defendants in this law suit: Northstar Wireless, L.L.C. ("Northstar Wireless"); Northstar Spectrum, L.L.C. ("Northstar Spectrum"); Northstar Manager, L.L.C. ("Northstar Manager"); Doyon, Limited ("Doyon"); Miranda Wright; Allen M. Todd; SNR Wireless LicenseCo, L.L.C. ("SNR Wireless"); SNR Wireless HoldCo, L.L.C. ("SNR HoldCo"); SNR Wireless Management, L.L.C. ("SNR Management"); Atelum L.L.C. ("Atelum"); John Muleta; American AWS-3 Wireless I L.L.C. ("American I"); American AWS-3 Wireless II L.L.C. ("American II"); American AWS-3 Wireless III L.L.C. ("American III"); and DISH Wireless Holding L.L.C. ("DISH Holding"), DISH Network Corporation ("DISH Network"), Charles W. Ergen, and Cantey M. Ergen. The Court will discuss the relationships between these parties in detail below.

dismissal of all claims, vitiating Defendants' reliance on the FCA's "public-disclosure" provision. Additionally, Defendants' alternative grounds for dismissal as to most corporate Defendants, that the operative complaint fails to state a claim, were already rejected on appeal. Accordingly, upon consideration of the briefing, the relevant authorities, and the record as a whole,[2] the Court shall **DENY** Defendants' [115] Motion for Judgment on the Pleadings.

## I.     BACKGROUND

The Court sets forth relevant factual background below. At the pleading stage, the Court's factual background derives from the well-pleaded allegations in Vermont Telephone's Amended Complaint. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 314–15 (D.C. Cir. 2014). The Court also considers those facts properly subject to judicial notice and documents incorporated by reference into the pleadings. *See Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017).

### A.  FCC Spectrum Auctions

"The electromagnetic spectrum is the range of electromagnetic radio frequencies used to transmit sound, data, and video across the country." *SNR Wireless LicenseCo, LLC v. FCC*, 868

---

[2] The Court's consideration has focused on the following briefing and material submitted by the parties:

- Am. Compl., ECF No. 76;
- Defendants' Motion for Judgment on the Pleadings ("Motion" or "Mot."), ECF No. 115;
- Relator's Opposition to Defendant's Motion for Judgment on the Pleadings ("Opp."), ECF No. 120;
- Defendants' Reply in Support of Defendants' Motion for Judgement on the Pleadings ("Defs.' Repl."), ECF No. 121;
- The United States' Response in Support of its Opposition to Dismissal of Certain Claims Under the Public Disclosure Bar ("Gov.'s Opp."), ECF No. 124; and
- Relator's Surreply in Opposition to Defendants' Motion for Judgment on the Pleadings ("Relator's Surrepl."), ECF No. 125.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of   assistance in rendering a decision. *See* LCvR 7(f).

F.3d 1021, 1025 (D.C. Cir. 2017) (internal quotation marks omitted).  Control over portions of the spectrum is "highly valuable," Am. Compl. ¶ 43, as it permits companies to "transmit sound, data, and video" through specific frequencies, thereby enabling "them to provide television, cell phone, and wireless internet service to consumers," *SNR Wireless*, 868 F.3d at 1025.  "In 1993, Congress authorized the FCC to use auctions to allocate spectrum licenses."  *Id.* (citing 47 U.S.C. § 309(j)(1)).  For the purposes of these auctions, the FCC divides spectrum into a variety of marketable blocks based on specific geographic regions and frequencies.  *See* Am. Compl. ¶ 43.

The Communications Act of 1934 ("Communications Act") sets forth certain objectives for the FCC to consider when establishing the bidding processes for these spectrum licenses. Section 309(j) of the Communications Act, for example, states that the FCC must, among other things, "ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures."  47 U.S.C. § 309(j)(4)(D).   Similarly, Section 309(j) states that the FCC should design a system of competitive bidding that promotes "economic opportunity and competition . . . by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women."  *Id.* § 309(j)(3)(B); *see also* Am. Compl. ¶ 46.

"Consistent with those statutory instructions, FCC regulations provide that the Commission may encourage 'designated entities,' including small businesses, to participate in spectrum auctions by giving them bidding credits, *i.e.* discounts that may be used to cover part of the cost of any licenses those businesses win."  *SNR Wireless*, 868 F.3d at 1026 (quoting 47 C.F.R.

§ 1.2110(a), (f) (2012)); *see also* Am. Compl. ¶¶ 46–56.  FCC regulations also specify, however, "that bidding credits can only be used by genuine small businesses—not by small sham companies that are managed by or affiliated with big businesses." *SNR Wireless*, 868 F.3d at 1026 (citing 47 C.F.R. § 1.2110(b)–(c)).  Moreover, "federal 'anti-trafficking' and 'unjust enrichment' restrictions prevent licensees from earning speculative profits through post-auction resale of discounted licenses." Am. Compl. ¶ 75.

### B.  Public Notice of Auction 97

This case involves a specific FCC spectrum auction, Auction 97.  The FCC announced Auction 97 in a public notice on May 19, 2014.  *SNR Wireless*, 868 F.3d at 1026.  Then, "[o]n July 23, 2014, the FCC's Wireless Telecommunications Bureau . . . published the procedures for the auction," *id.*, which was to include an "auction of 1,614 Advanced Wireless Services licenses in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz bands" of spectrum (collectively, the "AWS-3" bands), *Auction of Advanced Wireless Servs. (Aws-3) Licenses Scheduled for Nov. 13, 2014* ("*Auction Notice*"), 29 F.C.C. Rcd. 8386, ¶ 1 (2014); *see also* Am. Compl. ¶ 2.  The FCC scheduled Auction 97 to begin on November 13, 2014 and stipulated that all potential bidders must apply to participate by submitting an FCC "short-form" application, also known as a "Form 175," by September 12, 2014.  *See Auction Notice*, 29 F.C.C. Rcd. at ¶ 4; 47 C.F.R. § 1.2105(a); Am. Compl. ¶ 16.

All Auction 97 applicants bore "full responsibility for submitting accurate, complete and timely short-form applications," and "certify[ing] on their short-form applications under penalty of perjury that they [we]re legally, technically, financially and otherwise qualified to hold a license." *Auction Notice*, 29 F.C.C. Rcd. at ¶ 65.  In particular, the FCC required Auction 97 applicants to disclose all joint bidding agreements on their short-form applications.  *See id.* at ¶¶

23–25.  At the time of the Auction Notice, FCC regulations prohibited auction applicants from "cooperating or collaborating" during the bidding process, "unless such applicants [we]re members of a bidding consortium or other joint bidding arrangement identified on the bidder's short-form application . . . "  47 C.F.R. § 1.2105(c)(1) (2013).  Accordingly, the Auction Notice for Auction 97 required any applicant to disclose in its short-form application "all real parties in interest with whom it ha[d] entered into any agreements, arrangements, or understandings of any kind relating to the licenses being auctioned, including any agreements relating to post-auction market structure."  *Auction Notice*, 29 F.C.C. Rcd. at ¶ 69.

Auction 97 ultimately concluded on January 29, 2015, "with 31 winning bidders winning a total of 1,611 licenses."  *Auction of Advanced Wireless Servs. (Aws-3) Licenses Closes* ("*Closing Public Notice*"), 30 F.C.C. Rcd. 630, ¶ 1 (2015).  On January 30, 2015, the FCC issued a notice requiring each winning bidder to submit a "long-form" application (an "FCC Form 601"), by February 13, 2015.  *See id.* at ¶ 27.  In their long-form applications, winning bidders "were again required to demonstrate their eligibility" for the bidding credits they claimed in their pre-auction short-form applications.  Am. Compl. ¶ 71.  "The long-form application also require[d] the bidders to verify the information in their ownership disclosure report that previously was submitted with their short-form[]" applications, including "verification of disclosures with respect to bidding agreements."  *Id.* ¶ 72; *see also* 47 C.F.R. § 1.2107(b).  "At the time of submitting its [long-form application]," a winning bidder was also required to "have on file with the Commission a current ownership disclosure information report (FCC Form 602) providing the applicant's complete and accurate ownership information."  *Closing Public Notice*, 30 F.C.C. Rcd. at ¶ 30.

For payment, the FCC required winning bidders to deposit "twenty percent of the aggregate net amount of its winning bids" by February 13, 2015 and "the balance of the net amount of its

winning bid(s)" by March 2, 2015.  *Id.* at ¶¶ 5, 8.  The FCC would then grant spectrum licenses to the winning bidders "after full and timely payment of any winning bids (and any applicable late fees) and a determination that the long-form application met Commission requirements for grant." *Id.* at ¶ 24.  As made clear in the January 30, 2015 *Closing Public Notice*, however, the FCC "review[ed] an applicant's long-form application only after receipt of full and timely payment for the winning bid amount and any applicable late fees."  *Id.*

### C.  Defendants' Participation In Auction 97

Vermont Telephone alleges that Defendants used a "complex chain" of corporate controls to "falsely disclaim" to the FCC DISH Defendants' *de facto* control over the bidding entities in order to procure spectrum licenses at a fraudulent discount.  Am. Compl. ¶¶ 5-6.  As described in further detail below, Vermont Telephone alleges that DISH Network utilized two shell companies, Northstar Wireless and SNR Wireless, to secure FCC spectrum licenses with "very small business" discounts, while ultimately retaining control of those companies and the licenses they won.

### 1.  Defendants and Their Corporate Structure

In total, Vermont Telephone's theory of fraud implicates eighteen separate Defendants, three of whom were Auction 97 participants.  To better illustrate Vermont Telephone's theory of how these parties defrauded the FCC during Auction 97, the Court will first describe the alleged relationships between this web of corporate entities.   In the Amended Complaint, Vermont Telephone presents Defendants' corporate relationships graphically, as follows:



### a.  DISH-Controlling Defendants

Vermont Telephone's theory begins with the DISH-controlling Defendants: (1) DISH Network, (2) Mr. Charles Ergen, (3) Mrs. Cantey Ergen, and (4) DISH Holdings.  At the top of Vermont Telephone's alleged chain of corporate control is DISH Network.  *See* Am. Compl. ¶ 37. DISH Network is a publicly traded telecommunications company incorporated in Nevada.  *Id.*  At the time of Auction 97, Mr. Ergen was the Chairman of the Board of Directors for DISH Network. *See* Am. Compl. ¶ 33.  Mr. Ergen and his wife Mrs. Cantey Ergen "together beneficially own an approximately 51 percent equity interest and 85 percent voting interest in DISH [Network]."  *Id.* ¶ 38.  Finally, beneath the Ergens and DISH Network rests another corporate entity, DISH Holding. *Id.* ¶ 36.

7

### b.   American I (Auction 97 Participant #1)

The first of the three Auction 97 participants allegedly under the control of the "DISH-Controlling Defendants" was a company called American I.  *See id.* ¶¶ 32–36.  American I is a wholly-owned direct subsidiary of DISH Holding.  *See id.* ¶ 36.  Like DISH Holding, American I "lists both its principal office address and the address of its Registered Agent, Timothy Allen Messner, as 9601 S. Meridian Blvd., Englewood, Colorado 80112."  *Id.* ¶ 32.   Moreover, American I "list[ed] Defendants Cantey M. Ergen, Charles W. Ergen, DISH [Network], and DISH Holding as its disclosable interest holders," *id.* ¶ 34, and identified Mr. Ergen as one of its authorized bidders for Auction 97, *see id.* ¶ 33.  "Aside from its activity in Auction 97, American I is engaged in no other lines of business, and has no operations, assets, or revenues."  *Id.* ¶ 35.

### c.   Northstar Wireless (Auction 97 Participant #2)

The next Auction 97 participant, allegedly under the control of the "DISH-Controlling Defendants," is Northstar Wireless.  Northstar Wireless was formed as a limited liability company under Delaware law on or about September 4, 2014, "eight days before the September 12, 2014 deadline to file an application to participate in the FCC's Auction 97."  *Id.* ¶ 16.  According to Vermont Telephone, Northstar Wireless was formed "at the direction of the DISH-Controlling Defendants," *id.*, and "[a]side from its activity in Auction 97, Northstar Wireless is engaged in no other lines of business, and has no other operations, assets, or revenues," *id.* ¶ 23.

Northstar Wireless has a "sole member and Manager," another corporate entity called Northstar Spectrum.  *Id.* ¶ 17.  Northstar Spectrum, itself, was formed on or about September 3, 2014, approximately one day before the formation of Northstar Wireless.  *Id.*  In turn, Northstar Spectrum has two controlling members: Northstar Manager and American II.  *See id.* ¶¶ 19–20.  "American II is a limited liability company that was formed at the direction of the DISH-

Controlling Defendants under the laws of Colorado on August 22, 2014. The address for both American II and its Registered Agent, Timothy Allen Messner, is listed as 9601 S. Meridian Blvd., Englewood, Colorado 80112. Timothy Allen Messner [also] serves as Executive Vice President and General Counsel of DISH [Network]." *Id.* ¶ 19. American II holds 85% of all member interests in Northstar Spectrum, *see id.*, and American II itself is a "wholly-owned, direct subsidiar[y] of Defendant DISH Holding," *id.* ¶ 36, which in turn is a wholly-owned subsidiary of DISH Network.

The remaining 15% of the member interests in Northstar Spectrum is held by another Delaware limited liability company, Northstar Manager. *See id.* ¶ 20. Northstar Manager was registered at the direction of the DISH-Controlling Defendants on September 3, 2014 and shares the same business address as Defendants Northstar Spectrum and Northstar Wireless. *See id.* Defendant Doyon, yet another corporate entity, "holds 40.1 percent of all member interests" in Northstar Manager. *Id.* ¶ 21. Doyon is not a telecommunications company, but rather "an Alaska Native Regional Corporation with numerous affiliates in various fields including oil and gas land drilling, natural resource development, government contracting, and tourism." *Id.* Defendant Allen M. Todd is Doyon's registered agent and Defendant Miranda Wright is Doyon's director and treasurer. *Id.* ¶¶ 21–22.

### d. SNR Wireless (Auction 97 Participant #2)

The third and final corporate participant in Auction 97 allegedly under the control of the DISH-Controlling Defendants is SNR Wireless. SNR Wireless is a Delaware limited liability company allegedly formed at the direction of the DISH-Controlling Defendants "on or about August 29, 2014, fourteen days before the September 12, 2014 deadline to file a Short-Form application to participate in Auction 97." *Id.* ¶ 24. SNR Wireless's business address is listed as

200 Little Falls Street, Suite 102, Falls Church, Virginia, 22046.  *Id.*  "Aside from its activity in Auction 97, SNR Wireless is engaged in no other lines of business, and has no operations, assets, or revenues."  *Id.* ¶ 31.

The sole manager member of SNR Wireless is a Delaware limited liability company called SNR HoldCo, which was formed at the direction of the DISH-Controlling Defendants.  *Id.* ¶ 25. SNR HoldCo was formed on the same day as SNR Wireless—August 29, 2014—and shares the same listed address as SNR Wireless.  *See id.*  In turn, 85% percent of all member interests in SNR HoldCo is controlled by another corporate entity, American III.  *See id.* ¶ 27.  Like American II, which controls 85% of Northstar Wireless, *see* disc. *supra* at 10, "American III is a limited liability company that was formed at the direction of the DISH-Controlling Defendants under the laws of Colorado on or about August 22, 2014."  *Id.*  American III's "principal office address and the address of its Registered Agent, Timothy Allen Messner, are listed as 9601 S. Meridian Blvd., Englewood, Colorado 80112, and "Timothy Allen Messner serves as Executive Vice President and General Counsel of DISH [Network]."  *Id.*  Also like American II, American III is a wholly-owned subsidiary of DISH Holding, which is itself a wholly-owned subsidiary of DISH Network. *See id.* ¶¶ 36–37.

The remaining 15% member interests in SNR HoldCo is held by SNR Management, another Delaware limited liability company formed at the direction of the DISH-Controlling Defendants.  *See id.* ¶ 28.  SNR Management "shares the same business address as Defendants SNR HoldCo and SNR Wireless, as well as the same date of formation—August 29, 2014, fourteen days before the Short-Form application filing deadline for Auction 97."  *Id.*  The sole manager of SNR Management is a Virginia limited liability company called Atelum, which is a consulting firm sharing the same address as SNR Wireless, SNR HoldCo and SNR Management.  *See id.* ¶

29.  Defendant John Muleta is the sole member and CEO of Atelum.  *See id.* ¶ 30.  Mr. Muleta also holds a 7.73% member interest in SNR Management.  *Id.*

### 2.  Defendants' Post-Auction Conduct

Ultimately, Northstar Wireless and SNR Wireless won the auction and submitted their long-form applications to the FCC on February 13, 2015.  *See id.* ¶ 70.  On these post-auction long-form applications, both entities again certified their eligibility for bidding credits as "very small businesses" and confirmed their complete disclosure of all relevant bidding agreements.  *See id.* ¶¶ 70–73.  Along with their February 13, 2015 applications, Northstar Wireless and SNR Wireless also submitted to the FCC "a number of agreements regarding their relationship with DISH [Network] and each other."  *In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887, ¶ 21 (2015).  For example, Northstar Wireless and SNR Wireless submitted their respective joint bidding agreements with DISH Network, as well as the Letter Agreement which further governed the bidding arrangements between DISH Network, Northstar Wireless, and SNR Wireless.  *Id.* Northstar Wireless and SNR Wireless also provided the FCC with the "Management Services Agreements" they had each entered into with DISH Network.  *Id.*

On February 13, 2015, Northstar Wireless and SNR Wireless made their initial down payments on the total discounted value ($10 billion) of their winning bids for spectrum licenses. *See* Am. Compl. ¶ 101.  On March 2, 2015, the two entities then completed their full payments to the FCC, net of their February 13, 2015 down payments.  *Id.*  According to Vermont Telephone, the payments Northstar Wireless and SNR Wireless made on their $10 billion in spectrum licenses were "financed almost entirely through loans and other equity provided by the DISH-Controlling Defendants."  *Id.*

### D.  Post-Auction FCC Proceedings

On April 29, 2015, the FCC found, "upon initial review," that the long-form applications submitted by Northstar Wireless and SNR Wireless were "acceptable for filing."  *Wireless Telecommunications Bureau Announces That Applications for Aws-3 Licenses in the 1695-1710 Mhz, & 1755-1780 Mhz & 2155-2180 Mhz Bands Are Accepted for Filing*, 30 F.C.C. Rcd. 3795 (2015).  Nevertheless, on May 11, 2015, seven parties, including Vermont Telephone's subsidiary VTel Wireless, Inc., filed petitions with the FCC to deny Northstar Wireless and SNR Wireless's applications for the spectrum licenses they purportedly won during the auction "and the bidding credits they wrongfully [and fraudulently] claimed."  Am. Compl. ¶ 102; *see also* 47 C.F.R. § 1.2108(d).  First, these petitions argued that Northstar Wireless and SNR Wireless had incorrectly discounted the *de facto* control of DISH Network when calculating their gross revenues for the purposes of bidding credit eligibility.  *See In the Matter of Northstar Wireless, LLC*, 30 F.C.C. Rcd. at ¶¶ 49–50.  The petitioners, however, went further and also advanced "claims that the failure by SNR [Wireless] and Northstar [Wireless] to disclose in their Applications the controlling interest held by DISH [Network] constitute[d] a material misrepresentation and demonstrate[d] a lack of candor."  *Id.* at ¶ 129.  Similarly, the petitioners asserted that Northstar Wireless and SNR Wireless "did not adequately disclose and misrepresented their joint bidding agreements with DISH [Network]."  *Id.* at ¶ 133.

On August 18, 2015, the FCC ruled on the petitions to deny and determined that "DISH's revenues should have be[en] attributed to each of SNR and Northstar, and therefore neither SNR nor Northstar [wa]s eligible for very small business bidding credits."  *In re Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887, ¶ 45 (2015).  The FCC reached this conclusion after it identified:

> [T]wo separate and independent ways by which DISH is found to be a controlling entity of, or affiliated with the Applicants within [FCC] rules: 1) DISH has *de facto*

control of the Applicants, or the power to control them, under an analysis of the totality of the circumstances surrounding their participation in Auction 97 and the plans for operations after grant of the licenses as reflected in the various Agreements entered into among and between DISH, SNR and Northstar; and 2) DISH is an affiliate of the Applicants by virtue of the breadth of DISH's responsibilities under Management Services Agreements with SNR and Northstar.

*Id.*  The FCC, however, *did not* find that Northstar Wireless and SNR Wireless had made any "material misrepresentations" or failed to disclose agreements on their FCC application forms.  *Id.* at ¶¶ 129–36; *see also id.* at ¶ 129 ("VTel fails to identify any 'material factual information' that the Applicants failed to disclose in their applications.").  In fact, the FCC found "no showing . . . that SNR and Northstar attempted to mislead the Commission about their respective relationships with DISH," and concluded that "the Applicants and DISH disclosed their ownership structures and related Agreements as required."  *Id.* ¶ 132.  Accordingly, the FCC determined "that the companies could retain the spectrum licenses they won in the auction if they were willing to pay full price for them."  *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1028 (D.C. Cir. 2017).

Following the FCC's order, Northstar Wireless and SNR Wireless notified the FCC "that they would pay the full bid amount for some of the licenses they won and would default on their obligation to buy the rest."  *Id.*  In total, Northstar Wireless and SNR Wireless "defaulted on approximately 28 percent of the licenses they originally won at auction."  Am. Compl. ¶ 104.  The FCC, therefore, "ordered SNR [Wireless] and Northstar [Wireless] to compensate it for the difference between their own winning bids in Auction 97 and the amount that the FCC receives when it re-auctions the licenses."  *SNR Wireless*, 868 F.3d at 1029.  "The FCC also ordered [the two companies] to make an additional payment equal to fifteen percent of the petitioners' own bids, or fifteen percent of the winning bid when their licenses are re-auctioned, whichever is less."  *Id.*  Vermont Telephone alleges that DISH Network has entered into agreements with both

Northstar Wireless and SNR Wireless to pay these deficiency penalties owed to the FCC.  *See* Am. Compl. ¶¶ 106–07.

Northstar Wireless and SNR Wireless appealed the FCC's order to the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit").  The D.C. Circuit, however, affirmed the FCC's decision that DISH Network's revenues were attributable to Northstar Wireless and SNR Wireless, rendering those two companies ineligible for their small business bidding credits.  *SNR Wireless*, 868 F.3d at 1025.  Nonetheless, the D.C. Circuit observed "that there was considerable uncertainty at the time of Auction 97 about the degree of control [FCC] rules would tolerate."  *Id.* at 1044.  The D.C. Circuit, therefore, remanded the case to back to the FCC with instructions to permit Northstar Wireless and SNR Wireless an opportunity "to renegotiate their agreements with DISH [Network]" and "cure" the deficiencies that prevented them from obtaining their bidding credits.  *Id.* at 1046.

On November 23, 2020, the FCC finally concluded these remand proceedings and found that Northstar Wireless and SNR Wireless had not sufficiently addressed the agency's concerns regarding the control exercised by DISH Network over those entities.  *See* Nov. 23, 2020 FCC Order, ECF No. 82-1, ¶ 5.  The FCC, therefore, sustained its original determination that neither Northstar Wireless nor SNR Wireless was eligible to receive a small business bidding credit.  *See id.*  Northstar Wireless and SNR Wireless have now appealed the FCC's November 23, 2020 FCC order back to the D.C. Circuit, where the appeal presently remains pending.  *See* Defs.' Not., ECF No. 85, at 1.

### E.  Motion to Dismiss and Subsequent Proceedings

After the United States declined to officially intervene in this matter, Vermont Telephone subsequently amended its complaint in February 2019.  *See* Order, ECF No. 74, at 1.  Defendants

successfully moved to dismiss that complaint on two grounds:  (1) the FCA's "government-action bar" and (2) the FCA's materiality standard.  As the Court explained in its opinion granting Defendants' motion to dismiss, the "government-action bar" provides that "[i]n no event may a person bring [a *qui tam* action] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."  31 U.S.C. § 3730(e)(3).   The Court concluded that the operative complaint was, in essence, a rehashing of administrative proceedings that were already, and unsuccessfully, appealed to the D.C. Circuit.  *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless LLC*, 531 F. Supp. 3d 247, 264 (D.D.C. 2021).  The "government-action bar" therefore precluded the suit.  Similarly, the Court agreed with Defendants that Relator offered no plausible allegations of "material" fraudulent conduct, i.e., fraudulent conduct that naturally caused the FCC to award the licenses due to the allegedly fraudulent conduct.  *Id.* at 268.

On appeal, the D.C. Circuit reversed, concluding that the FCC administrative proceedings were not civil *monetary* proceedings, because the FCC did not have the authority to assess civil monetary penalties during those proceedings.  *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless LLC*, 34 F.4th 29, 36 (2022).  Next, the D.C. Circuit held that Relator plausibly alleged the omissions described above had the potential to dispositively inform the FCC's ultimate determination regarding whether small-business credits were warranted.  *See id.* at 37.  As to the broader merits, the Court of Appeals also held that Relator plausibly pleaded, with particularity, that "the parties entered into" undisclosed agreements of DISH's behalf" and to "transfer spectrum rights to DISH," i.e., materially and fraudulently omitted key information from their FCC submissions.  *Id.* at 39.

Now on remand, Defendants press two new arguments.  Defendants argue that the Court should dismiss this case pursuant to the False Claim Act's "public-disclosure" provision, which requires a Court to dismiss a *qui tam* action where the fraud allegations were known to the federal government in advance of a relator's commencement of suit in federal court.  Mot. at 18.  Next, Defendants insist that the amended complaint does not sufficiently allege wrongdoing by any Defendant other than Northstar Wireless and SNR Wireless.  *Id.* at 30.

## II.    LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A motion brought pursuant to Rule 12(c) requires the Court to render "a judgment on the merits . . . by looking at the substance of the pleadings and any judicially noted facts."  *All. of Artists & Recording Cos., Inc. v. Gen. Motors Co.*, 162 F. Supp. 3d 8, 16 (D.D.C. 2016).  In other words, the moving party must "demonstrate that the law entitles him to win given the undisputed facts that have been alleged in both parties' pleadings."  *Murphy v. Dep't of Air Force*, 326 F.R.D. 47, 48 (D.D.C. 2018).  Although Rule 12(c) motions have frequently been analyzed pursuant to the same framework as motions brought under Rule 12(b)(6), a Rule 12(c) motion "comes closer to a summary judgment type of determination." *Lopez v. Nat'l Archives & Records Admin.*, 301 F. Supp. 3d 78, 84 (D.D.C. 2018).  Accordingly, the Rule 12(c) burden is "substantial" and requires the movant to demonstrate "both that there is no material dispute of fact" and that "the law is such that the movant is entitled to judgment as a matter of law."  *Id.*  (citing *Tapp v. WMATA*, 306 F. Supp. 3d 383, 391–92 (D.D.C. 2016)).

## III.   DISCUSSION

### A. Public-Disclosure Bar

Defendants request that the Court dismiss all claims pursuant to the "public-disclosure bar."  This provision of the FCA prevents a plaintiff from pressing claims predicated on

information that the government could or should have known in advance of suit.  *See* 31 U.S.C. § 3730(d)(4)(A); *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012).   In such a circumstance, the FCA mandates that the Court "shall dismiss [such an] action or claim," unless, crucially, dismissal is "opposed by the government."  31 U.S.C. § 3740(d)(4)(A). This exception provides the government "veto power over dismissal of an FCA suit on public disclosure grounds."  *United States ex rel. Scutellaro v. Capitol Supply, Inc.*, Civ. A. No. 10-1094 (BAH), 2017 WL 1422364, at *12 (D.D.C. Apr. 29, 2017).  The United States has "partially" exercised its veto power here, opposing the dismissal of claims that "are premised upon Defendants' knowing failure to disclose all their instruments, agreements, and understandings with DISH-Controlling Defendants . . . to the Federal Communications Commission in connection with Auction 97."  ECF No. 164 at 1.  Rather than specifically identifying which claims the United States intend proceed to through discovery, the United States leaves it to the Court to determine which of the operative complaint's three claims are predicated upon an alleged knowing failure to disclose "all their instruments, agreements, and understandings" to the FCC.

It would appear from the face of the complaint that all three claims are "predicated" upon a failure to disclose.  As discussed in more detail above, Relator claims that Defendants Northstar Wireless and SNR Wireless "scheme[d]" with DISH-Controlling Defendants to "falsely claim and certify" to the FCC that they were "very small businesses" entitled to a discount on their bids.  Am. Compl. ¶ 3.  Relator alleges that, as part of this conspiracy, Defendants SNR Wireless and Northstar Wireless fraudulently "fail[ed] to disclose relevant instruments, agreements, and understandings" that would have more clearly demonstrated *de facto* coordination between Defendants SNR Wireless, Northstar Wireless, and Dish-Controlling Defendants.  *Id.* ¶ 128.  In Count One, therefore, Relator insists that Defendants collectively "knowingly failed to disclose

17

material facts" to the FCC "in order to induce" the FCC's "payment and approval." *Id.* ¶ 145. Relator claims in Count Two that Defendants "conspired to defraud the United States" through, among other things, "failing to disclose material facts" and "making fraudulent representations" to the FCC. *Id.* ¶ 150.  Lastly, incorporating by reference each fact pled in the operative complaint, Relator claims in Count Three that Defendants "knowingly made, used, or caused to be made or used, a false record or statement," evidently including statements made false by omission. *See id.* ¶ 154.  Because "failure to disclose" formed, at least in part, the alleged fraudulent conduct, and because the operative complaint makes that allegation part of each of the its three claims for relief, all three claims are "predicated" upon this "failure-to-disclose" theory of liability.  As such, the United States opposes dismissal of all three claims, precluding dismissal through the public-disclosure bar.

Citing nothing but general canons of statutory construction, Defendants maintain that the United States' opposition is nevertheless ineffective.  To the contrary—these same canons of statutory construction make clear that the Government *must* defer to the United States' wishes, even where the basis of the alleged fraud was known to it at the time of suit.

Insofar as Defendants press a question of statutory construction, the Court must, as always, begin with the text and give each clause its plain and ordinary meaning. *SW General, Inc. v. NLRB*, 796 F.3d 67, 75 (D.C. Cir. 2015).   The provision setting out the public-disclosure bar reads as follows:

> The court shall dismiss an action or claim under this section, unless opposed by the government, if substantially the same allegations or transactions in the action or claim were publicly disclosed—
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigator; or
>
> (ii) from the news media,
>
> Unless the action is brought by the Attorney General or the person bringing the action is the original source of the information.

31 U.S.C. § 3740(d)(4)(A).  For present purposes, two clauses are key.  First, the public-disclosure bar states that a court "shall" dismiss a claim or action provided the prerequisites are met.  Second, the provision includes a key:  where the United States "opposes" dismissal of a claim or the action.

Defendant begins with the term "opposed by the government."  Contrary to then-Chief Judge Beryl Howell's conclusion in *Scutellaro* that "oppose" means "veto," Defendants argue that "'oppose' does not mean 'veto'" because, among other things, "oppose" should require something more than a simple "notice" of opposition.  Repl. at 12-13.  For this proposition, Defendants cite no caselaw.  Rather, they note that Black's Law Dictionary defines "opposition brief" as "a brief that "ask[s] that the other party's request be denied."  *Id.* at 12.  This is, of course, a *non sequitur*.  The FCA does not use the term "opposition brief."  It uses the term "oppose."  And the term "oppose" means, in its ordinary usage, "adverse or hostile to."  Oxford English Dictionary (3d ed. 2004); *see also* "Oppose," Websters Third New International Dictionary ("3: to place over against something so as to provide resistance, counterbalance, or contrast . . . 4: to offer resistance to, contend against, or forcefully withstand [e.g.] a congressional bill").  Because Defendants' proposed reading conflicts with the statute's plain text, the Court must reject it.

Next, Defendants argue that the provision permits the Court to dismiss an action or a claim even where the Government opposes dismissal.  This particularly strained reading is somewhat difficult to follow, but it appears that Defendants understand the word "unless" to render "shall" into "may."  "Shall" is a particularly potent word in statutory construction.  "Unlike the word

'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016).  In this regard, Congress makes clear that the Court "must" dismiss the "action" or "claim" where either is "opposed" by the Government. *See Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 170-71 (D.D.C. 2022) (CKK) (discussing use of word "shall" in statutory scheme).  For the purposes of statutory construction, "shall" is usually considered a kind of antonym of "may," particularly where Congress uses "may" elsewhere in the statutory section.  *See Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016).  Here, the False Claims Act does exactly that, providing, for instance, that a court "*may* limit the participation of" a relator under certain circumstances, 31 U.S.C. § 3730(c)(2)(C)-(D), and the United States "*may*" in its discretion "elect to intervene" in an action instituted by a relator, *id.* (b)(2).  In other words, Congress clearly knew how to insert a clause clarifying that a court "may or may not in its discretion" dismiss a claim where dismissal is opposed by the United States, but it did not do so.  The plain and ordinary meaning of this clause, then, sets up a dichotomy:  either the Court must dismiss a claim where dismissal is *not* opposed by the United States, or the Court must permit a claim to proceed where dismissal *is* opposed by the United States.

Stated differently, Defendants would have the Court read into the statute a circumstance that is not envisioned in the plain language: discretionary dismissal notwithstanding government opposition.   Yet a circumstance for which "a text does not provide is unprovided."  Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 93-100 (2012) (discussing "omitted-case canon"); *see also Wash.-Balt. News Guild v. Wash. Post*, Civ. A. No. 22-2484 (CKK), 2023 WL 4314177, at *3 (July 3, 2023) (in contracts case, explaining that canon "instructs that nothing is to be added to what the text states or reasonably implies" (cleaned up)).  As another court explained

in rejecting this argument, "Congress expressed only one directive [in the public-disclosure bar]: courts must dismiss *qui tam* claims based the government objects to the relator qualifies as an original source." *United States ex rel. Conroy v. Select Med. Corp.*, 211 F. Supp. 3d 1132, 1150 (S.D. Ind. 2016). "Anything else simply finds no support in the statute." *Id.* Therefore, the Court joins every other court to consider this question in rejecting Defendants' proposed reading of the public-disclosure bar's use of the conjunction "unless."[3]

In addition to textual canons, Defendants rely on a substantive constitutional-avoidance canon—unless a statute clearly states otherwise, it should not be read to "place in executive hands authority to remove cases from the Judiciary's domain." *Kucana v. Holder*, 558 U.S. 233, 237 (2010). The United States' power to "prevent the dismissal of an FCA claim" is not jurisdictional, however, because there is no judicial power to share in these circumstances. *United States ex rel. Hagerty v. Cyberonics, Inc.*, 95 F. Supp. 3d 240, 256 (D. Mass. 2015) *aff'd sub nom. Hagerty ex rel. United States v. Cyberonics, Inc.*, 844 F.3d 26 (1st Cir. 2016); *see also United States ex rel. Turner v. Dynamic Med. Sys., LLC*, No. 1:17-cv-01757-NONE-SAB, 2022 WL 20804350, at *12 (E.D. Cal. Jan. 24, 2022) (holding same and collective cases). An FCA claim is brought in the United States' name, and the United States may certainly have the right, as the party in interest, to prevent dismissal where opposition necessarily furthers the public-disclosure's bar purpose in deterring "parasitic" FCA claims. *See United States v. Select Med. Corp.*, Civ. A. No. 3:12-00051-RLY-DML, at *4 (S.D. Ind. Feb. 3, 2017). If anything, to the extent that any constitutional prerogative is exercised through the public-disclosure bar in these circumstances, it is the

---

[3] *Accord United States ex rel. Bernstein v. Prime Healthcare Servs., Inc.*, 2014 WL 12480026, at *2 (C.D. Cal. Nov. 20, 2014); *United States ex rel. Baker v. Community Health Sys., Inc.*, 2014 WL 1021574, at *25 (D.N.M. May 16, 2014); *United States ex rel. Szymoniak v. Am. Home Mortg. Servs., Inc.*, 2104 WL 1910845, at *2 (D.S.C. May 12, 2014).

Executive exercising its prosecutorial discretion to see that an action in its name continues.  Nor can there be any due process violation where a statute creating a statutory right permissibly "provides all the process that is due."  *See Kernan v. Am. Dredging Co.*, 355 U.S. 426, 433 (1958); *Conroy*, 211 F. Supp. 3d at 1152.  As with the textual canons, the Court therefore joins every other court to consider the issue in concluding that the constitutional-avoidance canon does not disturb the plain meaning of the public-disclosure bar.

Altogether, the Court concludes that the United States' opposition to dismissal pursuant to the public-disclosure bar is effective.  Dismissal on these grounds therefore fails.

### B.  Failure to State a Claim

Lastly, Defendants argues that the amended complaint fails to plead that all defendants beyond SNR Wireless and Northstar Wireless were connected to the allegedly fraudulent FCC filings.  Yet the D.C. Circuit has already held in this case that Relator has plausibly pleaded that there were "undisclosed agreements" as between SNR Wireless, Northstar Wireless, and the Dish-Controlling Defendants, including "members of the boards of Northstar's and SNR's parent companies[.]"  34 F.4th at 39.  The mandate rule precludes this Court from revisiting the Circuit's holding.  As such, Defendants' final argument in favor of dismissal fails. *See Independent Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001).

### IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' [115] Motion for Judgment on the Pleadings.  An appropriate order accompanies this memorandum opinion.

**Date**: November 9, 2023

                            /s/
                            COLLEEN KOLLAR-KOTELLY
                            United States District Judge

22