## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. VERMONT NATIONAL TELEPHONE CO., <br><br>Plaintiff, <br><br>v. <br><br>NORTHSTAR WIRELESS, LLC, et al. <br><br>Defendants. | Civil Action No. 1:15-cv-00728-CKK |

## DEFENDANTS' OPPOSITION TO
## RELATOR'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER

**INTRODUCTION**

The Court should reject relator's objections to Magistrate Judge Upadhyaya's discovery order.  A magistrate judge's rulings on non-dispositive discovery disputes are entitled to "great deference" and may be set aside "only if [they are] 'clearly erroneous or contrary to law.'" *United States v. All Assets Held at Bank Julius*, 234 F.Supp.3d 115, 119 (D.D.C. 2017) (quoting Fed. R. Civ. P. 72(a)).  The "clear error" component of this standard applies to "the magistrate judge's factual findings or discretionary decisions," *id*., including the "case by case factual determination" of "[w]hether a Rule 30(b)(6) deposition or a … contention interrogatory is more appropriate," *Sigmund v. Starwood Urban Retail VI*, 236 F.R.D. 43, 47 (D.D.C. 2006); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 2004 WL 739959, at *3 (E.D. Pa. Mar. 23, 2004), as well as "question[s] of fact" as to whether a defendant "waived [its] attorney-client privilege," *United States v. Mackin*, 561 F.2d 958, 961 (D.C. Cir. 1977); *see also United States v. International Brotherhood of Teamsters*, 961 F.Supp. 665, 673 (S.D.N.Y. 1997) (citing Weinstein's Federal Evidence §503.09[1] (2d ed.1997)).  Under the clear-error standard, Judge Upadhyaya's determinations may be set aside "only if on the entire evidence the court is left with the definite and firm conviction that a mistake has been committed."  *Buie v. District of Columbia*, 2019 WL 4345712, at *3 (D.D.C. Sept. 12, 2019) (Kollar-Kotelly, J.) (quotation marks omitted); *see also, e.g.*, *Bura v. George Washington University*, 2017 WL 11726143, at *1 (D.D.C. Nov. 2, 2017).  Relator never even mentions this demanding standard, and comes nowhere close to meeting it.  Nor does relator even attempt to explain how either of Judge Upadhyaya's rulings involved a legal determination that is contrary to law.

Relator's objections are the latest in a series of tactics designed to burden defendants while withholding from them (and the government) information at the heart of relator's case.

Relator has demanded sweeping and burdensome discovery from defendants and third parties, even after the FCC submitted a sworn declaration establishing that defendants never received the discounts relator alleges they sought to obtain by fraud, and that there are no actual damages because defendants "fully and timely satisfied their obligations to pay money to the Government arising from" Auction 97.  Dkt. 157-4 ¶¶25, 27.  But at the same time, relator has dodged defendants' efforts to discover the factual basis, if any, for relator's claims about the existence of allegedly undisclosed agreements.

The United States has recognized relator's evasiveness.  In August 2023, the United States informed the parties that the government could not respond to discovery requests until relator provided clarity about the alleged undisclosed agreement(s) at the center of its claims.  Dkt. 157-9.  Relator promised to provide this information by supplementing interrogatory responses, but its supplementation contained only unsupported, conclusory theories.

Defendants therefore noticed a Rule 30(b)(6) deposition to discover the factual basis for relator's allegation about the alleged secret agreements.  Relator objected to that notice, but at a hearing on December 19, Judge Upadhyaya ordered that the deposition take place.  Judge Upadhyaya recognized that the objected-to deposition topics were "very clearly asking to probe the core allegations that are being made in this case," i.e., "that there were … secret agreements," Dkt. 178 ("Hr'g Tr.") at 33:13-15, and held that defendants are entitled to "understand the bases for the allegations made in Relator's amended complaint," *id.* at 19:1-3, including by "test[ing] through testimony statements that [relator] made under oath in [its responses to] interrogatories," *id*. at 21:25-22:2.

Continuing with its evasiveness—and in particular with its effort to delay the deposition until after the agreed cut-off date for completion of fact depositions—relator now asks this Court

to reverse Judge Upadhyaya's ruling, as well as her separate decision on a purported privilege waiver. The Court should not countenance such tactics.

## ARGUMENT

### I. JUDGE UPADHYAYA'S ORDER FOR RELATOR TO PROVIDE 30(b)(6) TESTIMONY IS NOT CLEARLY ERRONEOUS

Relator's challenge to Judge Upadhyaya's order that relator produce a Rule 30(b)(6) witness on topics 1-8 in defendants' deposition notice is relator's latest attempt to avoid providing information needed to move this case forward. Relator alleges that defendants failed to disclose one or more material agreements, arrangements, or understandings to the FCC in connection with their applications to bid and obtain spectrum in Auction 97. Defendants are entitled to know what facts (if any) support the existence of the purportedly undisclosed agreements. Those facts (to the extent they exist) are plainly in relator's possession and are a proper subject for 30(b)(6) questioning.

#### A.      Background

Defendants attempted to discover the information covered by topics 1-8 *without* a deposition, asking relator to state the basis for its claim of the existence of one or more undisclosed agreements. But relator's supplemental interrogatory responses contained, as noted, conclusory assertions devoid of any factual basis. *See* Ex. A at 4-7. Rather than burdening this Court with motions practice over those responses, defendants noticed a 30(b)(6) deposition. *See* Ex. B at 4-5.

Judge Upadhyaya correctly concluded that relator, like any other corporate party, is subject to Rule 30(b)(6). In response to relator's *ipse dixit* claim that defendants' proposed topics for the deposition posed an "unnecessary burden," Judge Upadhyaya explained that "test[ing] the other side's factual basis for making … allegations" is "the most basic form of

- 3 -

discovery," Hr'g Tr. 21:5-6.  What relator raises, in other words, is (as Judge Upadhyaya put it) "basically just a general objection to having to go through the process of a 30(b)(6) deposition"—something that is entirely unremarkable "in a complex case with a lot of documents." *Id*. at 25:6-9; *see also id.* at 24:7-8 (noting, in response to relator's claim of burden, that "what you're describing, sir, is complex civil litigation").  Judge Upadhyaya also rejected relator's demand that defendants be forced to accept additional interrogatory responses in lieu of a 30(b)(6) deposition, as "the federal rules are very clear that a party can … use any of the tools available to that party" for discovery purposes.  *Id*. at 17:25-18:2.  She further advised that if the "specific questions posited" at the deposition veered into impermissible "data dump" territory—for example, a question like "[t]ell me everything you learned from discovery"—then relator's counsel can object.  *Id*. at 25:21-27:1.  But, Judge Upadhyaya continued, "that's not what [topics 1-8] appear to be getting at." *Id*. at 33:11-12.  Rather, she explained, topics 1-8 are "asking to probe the core allegations that are being made in this case," i.e., "that there were … secret agreements."  *Id*. at 33:13-15.

The parties had agreed that fact depositions would be completed by February 15, 2024.  Relator has refused to provide a 30(b)(6) deponent on these topics by that date, granting itself an extension by reprising before this Court the arguments it made to Judge Upadhyaya.

**B.     Discussion**

The Magistrate Judge's rejection of relator's arguments was plainly correct.

1.     Judge Upadhyaya correctly recognized that the noticed deposition topics sought to discover not contentions or legal theories but "the bases for the allegations made in Relator's amended complaint," Hr'g Tr. 19:1-3, including by "test[ing] through testimony statements that [relator] made under oath in [its responses to] interrogatories," *id*. at 21:25-22:2.  Topics 1-8, in

other words, typify "what a 30(b)(6) deposition is" and represent a "most basic form of discovery." Hr'g Tr. 21:5, 22:21-22. And case law in this district holds both that defendants are entitled to such information, i.e., factual information underpinning a *qui tam* relator's claims, *see United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 235 F.R.D. 521, 526 (D.D.C. 2006), and that 30(b)(6) topics may target "the facts that underlie [a party's] conclusions set forth in response to [an] [i]nterrogatory," *Lockheed Martin Corp. v. United States*, 2013 WL 1968372, at *6 (D.D.C. May 13, 2013). Contrary to relator's suggestion, moreover (Dkt. 180 at 16), it makes no difference whether the facts sought were "identified by … counsel." *See also id*. at 17 n.7. "The duty to present and prepare [a] corporate designee extends to … information [that] was transmitted through counsel." *Travelers Property Casualty Co. of America v. Daimler Trucks North America, LLC*, 2015 WL 1728682, at *4 (S.D.N.Y. Apr. 14, 2015).

The cases relator cites do not support its contrary position. In two of them, courts declined to compel 30(b)(6) testimony on topics that were "irrelevant to any material issue in the case," *JP Morgan Chase Bank v. Liberty Mutual Insurance Co.*, 209 F.R.D. 361, 363 (S.D.N.Y. 2002), or where the requesting party "provide[d] no rationale in support of its purported need for [the] information," *Lockheed*, 2013 WL 1968372, at *7. In one of the cases, moreover, the court *did* compel 30(b)(6) testimony where the information was "relevant to th[e] litigation." *Id*. at *6. Here, as noted, Judge Upadhyaya rightly emphasized that topics 1-8 are "very clearly asking to probe the core allegations that are being made in this case," i.e., "that there were … secret agreements." Hr'g Tr. 33:13-14. Indeed, as the United States has told this Court, "this case is *narrowly about*" those alleged agreements. Dkt. 157-9 at 2 (emphasis added).

The case on which relator principally relies—*American National Red Cross v. Travelers Indemnity Co. of Rhode Island*, 896 F. Supp. 8 (D.D.C. 1995)—likewise supports Judge

Upadhyaya's approach here.  In that case, a 30(b)(6) deposition included questions such as "tell [me] all of the facts which [you] contend[] support[] [your] defense[s] to the complaint." *Id*. at 13.  The deponent's counsel objected that these "data dump" questions sought privileged and work-product-protected information and thus instructed the deponent not to answer. *Id*.  That is consistent with Judge Upadhyaya's observation that, if defendants were to ask relator's 30(b)(6) witness similar "data dump" questions, "there are tools ... to deal with that at the deposition." Hr'g Tr. 26:23, 35:24-25.  Nothing in *American National Red Cross* counsels in favor of barring topics 1-8 *preemptively*, "without having specific questions posited to the witness," *id*. at 25:22-23, especially given that topics 1-8 on their face do not remotely suggest "that that sort of [data dump] question is going to get asked." *Id*. at 26:8-9.

In fact, courts routinely follow the approach Judge Upadhyaya adopted here, i.e., "await[ing] the conclusion of the 30(b)(6) deposition[] and entertain[ing], if necessary, any claim that the power to take [the deposition] was abused by the manner in which the deposition[] [was] conducted." *Tri-State Hospital Supply Corp. v. United States*, 226 F.R.D. 118, 126 (D.D.C. 2005); *see also Milwaukee Electric Tool Corp. v. Chervon North America, Inc.*, 2015 WL 4393896, at *5 (E.D. Wis. July 16, 2015) ("[R]ather than issue a blanket protective order, objections raised and/or instructions not to answer given in response to specific questions during the depositions will adequately protect plaintiffs' interests.").

In sum, relator offers no basis to conclude that Judge Upadhyaya erred in rejecting relator's "very broad and general request" for pre-deposition relief, Hr'g Tr. 25:21-22.

2. Relator's related argument—that a 30(b)(6) deposition should have been off the table because relator "offered to answer contention interrogatories" (Dkt. 180 at 17)—fares no better.  There is no bar on obtaining the *factual* support for a party's allegations via depositions,

- 6 -

even if that is information the deposing party "has already received … via other discovery devices." *Tri-State Hospital*, 226 F.R.D. at 125-126.  Indeed, courts in this district and elsewhere routinely allow such discovery.  *See id.*; *Moore v. Hartman*, 241 F.R.D. 59, 64 (D.D.C. 2007) (plaintiff was entitled to 30(b)(6) testimony "concern[ing] the factual basis underlying [defendants'] contention").[1]  Even relator's cited case law holds that "[w]hether contention interrogatories are more appropriate than Rule 30(b)(6) depositions will be a case by case factual determination," one aspect of which is whether "the reason for the proposed deposition[] is because the [noticed party] ha[s] refused to provide … information in response to interrogatories." *SmithKline*, 2004 WL 739959, at *3 (quotation marks omitted)).  Given that relator's own inadequate interrogatory responses prompted defendants' 30(b)(6) notice, relator's argument that it may avoid 30(b)(6) testimony "because it can provide all available evidence through contention interrogatories is unpersuasive." *Milwaukee Electric*, 2015 WL 4393896, at *5.

## II.   JUDGE UPADHYAYA'S RULING ON THE PRIVILEGE DISPUTE IS NOT CLEARLY ERRONEOUS

Defendants have produced all responsive communications with one another (i.e., between Northstar and DISH, or SNR and DISH, or among all three)—including communications between and among their outside counsel—through the end of Auction 97 and up to the entry of the parties' common interest agreement on March 25, 2015.  Unable to find any evidence of a "secret agreement" in any of this extensive production, relator has burdened Judge Upadhyaya

---

[1] *Accord International Business Machines Corp. v. LzLabs GmbH*, 2023 WL 2392740, at *2 (W.D. Tex. Mar. 6, 2023); *Erickson v. City of Lakewood*, 2021 WL 4947231, at *5 (D. Colo. Sept. 23, 2021); *Dunkin Donuts Franchised Restaurants, LLC v. Agawam Donuts, Inc.*, 2008 WL 427290, at *2 (D. Mass. Feb. 13, 2008); *E.E.O.C. v. Albertson's LLC*, 2007 WL 1299194, at *7 (D. Colo. May 1, 2007).

and now this Court with an effort to discover internal, privileged communications of each of the respective parties.

None of these communications contains a secret agreement, but the law does not require parties to waive attorney-client privilege or work-product protection to prove a negative. And Judge Upadhyaya correctly concluded that, on the record before her, there was no basis to find waiver regarding privileged and work-product-protected communications among and between members of Northstar Manager, LLC ("NSM") (including with consultants retained by NSM) and among and between members of SNR Wireless Management, LLC ("SNR").

Notably, Judge Upadhyaya deferred a final ruling on the issue before her, permitting relator to renew its challenge after further discovery, including upcoming depositions of NSM, SNR, and members of the respective LLCs. Relator's objection on this issue is therefore premature and should not be entertained. The objection takes issue simply with how Judge Upadhyaya manages her docket, which is not a valid ground for reversal under Rule 72. *Cf. Khath v. Midland Funding, LLC*, 334 F.Supp.3d 499, 507 (D. Mass. 2018) (magistrate judge did not act "contrary to law" in denying motion to compel arbitration without prejudice subject to further discovery relevant to that motion because the judge "had discretion to deny the motion to compel without prejudice").

In any event, there is no basis for finding a waiver of the attorney-client privilege or work-product protection over any of the challenged documents. None of these materials was shared with "third parties" external to the privilege. To the contrary, all of the communications were either among and between members of LLCs—NSM and SNR, respectively—or among and between DISH and members of those LLCs after entry of the parties' common-interest

agreement.[2]  As confirmed by declarations submitted under penalty of perjury, LLCs NSM and SNR shared privileged communications with their own members (but not with one another or with DISH) so that the small number of members of the respective LLCs were fully apprised of important legal issues impacting the LLCs' businesses (such as the negotiation of Auction 97 transactional documents, the efforts to secure bidding credits from the FCC, the deliberations for selective default, and the status of this litigation) and so that the members could exercise their contractual LLC advise-and-consult rights on a fully informed basis.[3]  The declarations further confirm that the communications were all disseminated on a confidential basis and all treated as confidential by the recipients.  These declarations are not conclusory, but rather concisely state the factual basis for the claims of privilege without revealing the privileged content of the withheld communications.  *See* Fed. R. Civ. P. 26(b)(5)(A).[4]

Relator has no authority for the proposition that communications within an LLC are disclosures to *third parties* that waive the LLC's privilege over the communications.  The only case it cites, *Zirn v. VLI Corp.*, was a shareholder-derivative suit in which a shareholder sought

---

[2] At the time of Auction 97, NSM had six members: Doyon, Limited (the managing member); Caribou Creek Partners (formed by the principals of Council Tree); Chugach Alaska Corporation; two Catalyst entities; and TFNP Spectrum (formed by principals of Madison Dearborn).  SNR had four members: Atelum LLC (the managing member), ADK Spectrum LP; and two ASG Airwaves entities, which were owned 100% by BlackRock, Inc.

[3] *See* Dkt. 173-1 (Todd (NSM) Decl.) ¶¶12-13; Dkt. 173-2 (Muleta (SNR) Decl.) ¶¶13-14; *see also* Dkt. 173-3 (Laub (Council Tree/Caribou Creek) Decl.) ¶¶14-15; Dkt. 173-4 (Rich (Catalyst) Decl.); Dkt. 173-5 (Hsu (TFNP) Decl.); Dkt. 173-6 (Astle (Chugach) Decl.).

[4] Relator's suggestion (Dkt. 180 at 12) that it was improper to submit declarations confirming the representations made during the parties' meet-and-confer process is wrong.  At the informal, pre-discovery conference stage, defendants advised relator and the Court that "[i]f the Court elects to have this matter resolved via the filing of a motion to compel, Defendants will submit declarations attesting to the confidential treatment of the LLC's respective legal advice shared with LLC members and retained consultants …." Dkt. 163 at 17.  Defendants did just that after the Court converted the letter into a motion to compel and referred it to Judge Upadhyaya for resolution, *see* Minute Order of Nov. 9, 2023.

discovery of privileged advice that her company received. That case therefore raised the question whether a corporation could shield privileged information from one of its own owners, and answered that question in the negative because any privilege had been waived through partial disclosures to the *whole world* in public SEC filings about the nature of legal advice provided to the LLC. *See* 621 A.2d 773, 780-781 (Del. 1993).

In this case, NSM and SNR shared privileged communications *internally*, on a confidential basis, with their few respective members so that those members were informed of legal issues important to the business of the LLCs and would have information necessary to exercise their contractual advise-and-consult rights. Such "limited distribution of the documents in keeping with their asserted confidentiality" does not waive privilege. *FTC v. GlaxoSmithKline*, 294 F.3d 141, 147 (D.C. Cir. 2002).[5]

To find a waiver here would effectively eviscerate privilege for LLCs, partnerships, and similar business entities. Courts have rejected such a rule, consistently holding that dissemination of privileged documents or communications on a confidential basis within a limited-member business entity does *not* waive privilege. *See, e.g.*, *Nesse v. Pittman*, 206 F.R.D. 325, 329 (D.D.C. 2002) ("[A] privileged communication made to an attorney by one member of

---

[5] At times during colloquy at the December 8 hearing, counsel for Northstar inadvertently juxtaposed the words "advice-and-consent" with "advise-and-consult." Relator's effort to turn this molehill into a mountain is unavailing given that the full record—including the submitted briefing and declarations—makes clear that defendants were pointing to the members' advise-and-*consult* rights. *See, e.g.*, Dkt. 175 at 40:7–8 ("[T]he members of each LLC have a right under the LLC agreement to advise and consult with the managing member on significant business issues"); *id*. at 44:13–18 ("[T]he other LLC members, as I mentioned, they do have a right to advise and consult the managing member. So I submit that—they are being provided legal advice or legal advice is being shared with them so that they can fulfill that advice and consent [sic] right on a fully informed basis."); *id*. at 48:13–18 ("[I]t's the advice and consent [sic] provision that is critical here, because these are—it is true that the nonmanaging members—they are not managing the LLC, but they have the right to consult with the manager. They have the right to provide input concerning the manager's decisionmaking.").

a corporate client does not lose its privileged status by being passed on from that attorney to other members of the client." (citing *Mead Data Center, Inc. v. U.S. Department of Air Force*, 566 F.2d 242, 253 n.24 (D.C. Cir. 1977))); *see also* Paul R. Rice, *Attorney-Client Privilege in the United States* §5:7 (2023) ("[C]ases have held that disclosure of confidential information between members of an LLC does not constitute waiver of the privilege ….").[6]

Perhaps recognizing that it has no authority for the proposition that members of an LLC are "third parties" for purposes of the legal advice that their LLC receives, relator incorrectly asserts (Dkt. 180 at 3) that because some communications went to email accounts for individuals employed by Council Tree, BlackRock, and Madison Dearborn, those individuals were "two levels removed" from membership in the LLC. But as defendants' declarations confirm, those individuals were, in fact, representatives of members of the NSM and SNR LLCs. The three "Council Tree" individuals, for example, had formed an LLC, Caribou Creek, which was a member of NSM and which was also retained by NSM to consult on Auction 97 matters, serving as an important part of the NSM advisory team engaging with counsel on regulatory and litigation matters arising out of the Auction. *See* Dkt. 173-1 (Todd (NSM) Decl.) ¶¶14-16; Dkt. 173-3 (Laub (Council Tree/Caribou Creek) Decl.) ¶¶11-13. These consulting services included functions of a kind that would typically be provided by employees of a company (e.g., providing

---

[6] Such cases include *Santella v. Grizzly Industrial, Inc.*, 286 F.R.D. 478, 484 (D. Or. 2012) (no privilege waiver over "legal advice provided to the members of this limited liability company at its annual meeting"); *Carpenters Pension Trust v. Lindquist Family LLC*, 2014 WL 1569195, at *4 (N.D. Cal. Apr. 18, 2014) (no waiver where LLC members "communicated with each other and with the LLC's attorneys about legal advice relating to the LLC's business"); *PharmaNetics, Inc. v. Aventis Pharmaceuticals, Inc.*, 2005 WL 8159272, at *3 (E.D.N.C. Feb. 15, 2005) (no privilege waiver when non-Board-member shareholder attended corporate Board meeting, as shareholder was "neither a 'third party' nor a 'stranger'" to company sufficient to break privilege); and *Baptiste v. Cushman & Wakefield, Inc.*, 2004 WL 330235, at *2 (S.D.N.Y. Feb. 20, 2004) ("[T]he distribution within a corporation of legal advice received from its counsel does not, by itself, vitiate the privilege." (quotation marks omitted)).

financial analysis), and were critical to NSM because it had no employees of its own. Sharing privileged communications with these individuals in both their member and consultant capacities did not waive privilege. *See, e.g.*, *GlaxoSmithKline*, 294 F.3d at 148 (rejecting a claim that a company waived privilege by sharing privileged communications with consultants, based partly on evidence that its counsel "worked with these consultants in the same manner as they d[id] with full-time employees").[7]

Judge Upadhyaya's determination that John Muleta's use of the servicebid01@dish.com email account did not constitute a privilege waiver was also not clearly erroneous. Judge Upadhyaya correctly noted that the waiver standard is whether Mr. Muleta had a reasonable expectation of privacy over the 29 communications that he forwarded from his personal email account to the "servicebid01@dish.com" email address that he used during Auction 97. *See In re Ahlan Industries*, 2020 WL 3620332, at *15-16 (Bankr. W.D. Mich. July 2, 2020) (no waiver when an expectation of privacy was objectively reasonable given (1) the company's lack of policies concerning email monitoring and (2) the fact that no steps had ever been taken to invade the confidentiality of the accounts); *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 256 (Bankr. S.D.N.Y. 2005) (declining to find waiver over the use of an external email system to communicate with a personal attorney).

In a sworn declaration, Mr. Muleta affirmed: "I believed that I had exclusive access to the servicebid01@dish.com account, and I had no intention to waive privilege by sending or

---

[7] In no event could there have been a waiver of work-product protection, which requires disclosure to an "adversary," "potential adversary," or "conduit to an adversary." *See, e.g.*, *United States v. All Assets Held at Bank Julius Baer & Co.*, 315 F.R.D. 103, 109-110 (D.D.C. 2016). The non-managing members of NSM and SNR, and Caribou Creek in its capacity as an NSM consultant, do not fall within any of those categories; even relator does not argue otherwise.

receiving privileged communications to or from john@johnmuleta.com or john@atelum.com." ECF 173-2 (Muleta (SNR) Decl.) ¶17. As the declaration further sets forth, to facilitate bidding and ensure secure digital communications, all bidders in the auction were assigned specific computers, email accounts, and seating positions in the bidding room. *Id.* Because Mr. Muleta could not connect his personal device to the internet in the bidding room, he forwarded 29 privileged communications with his counsel to what he believed to be his exclusive-use bidding-room email domain, servicebid01@dish.com. *Id.* ¶16.

Relator attempts to analogize Mr. Muleta's use of the servicebid01 email address to an employee who lacks a reasonable expectation of privacy over his employer-owned email account. Dkt. 180 at 8. These circumstances are simply not analogous. Mr. Muleta is not a DISH employee; he received from DISH exclusive use of a DISH-based email address while using a specific terminal located in DISH's bidding room because external devices were not permitted in that room during the auction. *Id.* ¶¶16-17. Mr. Muleta was aware that a DISH employee had set up the email address, and therefore had access to the server, but no representations were ever made that DISH employees would monitor or otherwise attempt to review to the contents of the servicebid01 emails. *Id.* ¶17. *Cf Roe 1 v. George Washington University* 480 F.Supp.3d 224, 226 (D.D.C. 2020) (determining communications not to be privileged after finding that a university had cautioned its students that they had no right of personal privacy with respect to their use of university email messages). Given these circumstances, Mr. Muleta's decision to forward 29 privileged communications to himself at the servicebid01 email address to review those emails while access to his other email accounts was blocked was reasonable.

- 14 -

Finally, there is no merit to relator's assertion (Dkt. 180 at 7) that Judge Upadhyaya improperly shifted the burden of proof. Defendants' declarations more than suffice to establish that NSM and SNR "limited distribution of the documents in keeping with their asserted confidentiality." *GlaxoSmithKline*, 294 F.3d at 147. In any event, Judge Upadhyaya afforded relator an opportunity to overcome defendants' evidence, and to renew its waiver motion at a later date, which is entirely consistent with defendants having the ultimate burden of proof on their privilege claims.

In short, relator's lengthy and misleading complaints about how Judge Upadhyaya has handled the dispute about purported waiver of privilege, if entertainable at all at this juncture, do not demonstrate clear error.

## CONCLUSION

Relator's objections to the Magistrate Judge's order should be overruled.

- 15 -

January 16, 2024

Gejaa T. Gobena (#463833)
Jonathan L. Diesenhaus (#423753)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
202-637-5600
gejaa.gobena@hoganlovells.com
jonathan.diesenhaus@hoganlovells.com

*Counsel for SNR Wireless LicenseCo, LLC, SNR Wireless HoldCo, LLC, SNR Wireless Management, LLC, Atelum LLC, and John Muleta*

Respectfully submitted,

*s/ Jonathan E. Paikin*
Howard M. Shapiro (#454274)
Jonathan E. Paikin (#466445)
Daniel S. Volchok (#466889)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
202-663-6000
howard.shapiro@wilmerhale.com
jonathan.paikin@wilmerhale.com
daniel.volchok@wilmerhale.com

*Counsel for American AWS-3 Wireless I LLC, American AWS-3 Wireless II LLC, American AWS-3 Wireless III LLC, DISH Wireless Holding LLC, DISH Network Corporation, Charles W. Ergen, and Cantey M. Ergen*

Peter B. Hutt II (#427331)
Benjamin C. Block (#479705)
Dennis B. Auerbach (#418982)
Amee M. Frodle (#1602371)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
202-662-6000
phuttjr@cov.com
bblock@cov.com
dauerbach@cov.com
afrodle@cov.com

*Counsel for Northstar Wireless, LLC, Northstar Spectrum, LLC, Northstar Manager, LLC, Doyon, Limited, Miranda Wright, and Allen M. Todd*