UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*  ) | |
| VERMONT NATIONAL TELEPHONE CO.,  ) | |
|   ) | |
| Plaintiffs,  ) | |
|   ) | Civil Action No. 15-00728 (CKK) |
| v.  ) | |
|   ) | |
| NORTHSTAR WIRELESS, L.L.C. *et al.*,  ) | |
|   ) | |
| Defendants.  ) | |
| ———————————————————— ) | |

**UNITED STATES' MOTION TO INTERVENE PURSUANT TO
31 U.S.C. § 3730(c)(3) AND TO DISMISS PURSUANT TO 31 U.S.C. § 3729(c)(2)(A)**

Pursuant to 31 U.S.C. § 3730(c) of the False Claims Act and Rule 41 of the Federal Rules of Civil Procedure, the United States moves to intervene for good cause in this action brought in its name under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733, for the purpose of moving to dismiss the False Claims Act claims in this action pursuant to 31 U.S.C. § 3730(c)(2)(A). For the reasons set out in more detail in the attached Memorandum in Support of United States' Motion to Intervene and to Dismiss Pursuant to 31 U.S.C. § 3730(c)(2)(A), the United States, after careful review of the evidence produced in discovery and having heard from Relator, believes that "this suit would not do what all *qui tam* actions are supposed to do: vindicate the Government's interests." *United States ex rel. Polansky v. Exec. Health Res., Inc*., 599 U.S. 419, 143 S. Ct. 1720, 1735 (2023). Accordingly, and having so notified the relators of its intent to seek dismissal, the United States respectfully moves for this Court to issue an order dismissing this case with prejudice to Relator and without prejudice to the United States.

Pursuant to Local Civil Rule 7(m), counsel for the United States has informed counsel for Relator of this motion and the reasons for seeking intervention and dismissal.  Counsel for Relator has informed the United States that Relator opposes the motion and the relief sought.

Date: March 8, 2024                    Respectfully submitted,


                                        /s/ *Darrell C. Valdez*
                                       DARRELL C. VALDEZ, D.C. Bar # 420232
                                       Assistant United States Attorney
                                       U.S. Attorney's Office for the District of Columbia
                                       601 D Street, N.W., Civil Division
                                       Washington, D.C.  20530
                                       (202) 252-2507

                                       JAMIE A. YAVELBERG
                                       PATRICIA L. HANOWER
                                       BENJAMIN C. WEI
                                       Attorneys, Civil Division,
                                       Commercial Litigation Branch
                                       U.S. Department of Justice
                                       Post Office Box 261
                                       Washington, D.C. 20044
                                       (202) 616-2875

                                       *Counsel for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | ) | |
| VERMONT NATIONAL TELEPHONE CO., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 15-00728 (CKK) |
| v. | ) | |
| | ) | |
| NORTHSTAR WIRELESS, L.L.C. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION TO INTERVENE PURSUANT TO
31 U.S.C. § 3730(c)(3) AND TO DISMISS PURSUANT TO 31 U.S.C. § 3729(c)(2)(A)**

## <u>TABLE OF CONTENTS</u>

I.   BACKGROUND ................................................................................................... 2

   A.   AWS-3 AUCTION ....................................................................................... 2

   B.   RELATOR'S *QUI TAM* ACTION ............................................................... 7

   C.   PROCEDURAL HISTORY OF THIS *QUI TAM* ACTION FOLLOWING
   DECLINATION ................................................................................................ 8

   D.   SUMMARY OF RELATOR'S DISCOVERY IN THIS *QUI TAM* ACTION.................. 11

   E.   RELATOR'S MEETINGS WITH THE GOVERNMENT ................................................. 11

   F.   DISCOVERY BURDEN ON THE GOVERNMENT ....................................................... 13

II.  LEGAL STANDARD ......................................................................................... 14

III. ARGUMENT ..................................................................................................... 16

   A.   THE UNITED STATES HAS A WELL-GROUNDED, REASONABLE BELIEF THAT
   THE RELATOR'S CLAIMS, IF ALLOWED TO PROCEED, WILL NOT VINDICATE THE
   UNITED STATES' INTEREST .......................................................................... 16

   B.   THE UNITED STATES HAS GOOD CAUSE TO INTERVENE TO DISMISS THIS
   *QUI TAM* ACTION. ............................................................................................. 21

   C. NO ADDITIONAL HEARING IS NECESSARY TO DISMISS THIS *QUI TAM*
   ACTION. ............................................................................................................ 22

IV.  CONCLUSION ................................................................................................... 23

## TABLE OF AUTHORITIES

*Cases*                                                                                                *Page(s)*

*Brutus Trading v. Standard Chtd. Bank*,
   Civ. A. No. 20-2578, 2023 U.S. App. LEXIS 21868 (2d Cir. Aug. 21, 2023) ............... 16, 22

*Innovator Enters. v. Jones*,
   28 F. Supp. 3d 14 (D.D.C. 2014) ......................................................................... 6

*Northstar Wireless, L.L.C. v. FCC*,
   38 F.4th 190 (D.C. Cir. 2022) ............................................................................ 7

*SNR Wireless LicenseCo, L.L.C. v. FCC*,
   868 F.3d 1021 (D.C. Cir. 2017) ................................................................ 2, 3, 6, 7, 8

*\*United States ex rel. Carver v. Physicians Pain Specialists of Ala., P.C.*,
   2023 U.S. App. LEXIS 19592 (11th Cir. July 31, 2023) ................................... 14-15, 16, 21

*United States ex rel. CIMZNHCA, L.L.C. v. UCB, Inc.*,
   970 F.3d 835 (7th Cir. 2020) ........................................................................... 21

*United States ex rel. Davis v. District of Columbia*,
   679 F.3d 832 (D.C. Cir. 2012) ......................................................................... 18

*United States ex rel. Erik K. Sargent v. McDonough*,
   Civ. A. No. 1:23-cv-00328-LEW, 2024 U.S. Dist. LEXIS 32973 (D. Me. Feb. 26, 2024) ... 16

*\*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
   599 U.S. 419, 143 S. Ct. 1720 (2023) ....................................... 1, 14-16, 20-21, 22

*\*United States ex rel. Polansky v. Exec. Health Res. Inc.*,
   17 F.4th 376 (3d Cir. 2021) ................................................................. 15, 20, 21

*\*United States ex rel. USN4U, L.L.C. v. Wolf Creek Fed. Servs.*,
   Civ. A. No. 1:17-cv-0558, 2023 U.S. Dist. LEXIS 217620 (N.D. Ohio Dec. 7, 2023) ... 16, 21

*United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless Co.*,
   34 F.4th 29 (D.C. Cir. 2022) ........................................................................ 9, 19

*United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless L.L.C.*,
   531 F. Supp. 3d 247 (D.D.C. 2021) ................................................................. 2, 9

*Statutes, Rules, and Regulations*

31 U.S.C. § 3730 ................................................................................... *passim*

47 C.F.R. § 1.17 ................................................................................... 19, 8

47 C.F.R. § 1.2104 ................................................................................. 6, 19

iii

47 C.F.R. § 1.2105 ................................................................................................. 3

47 C.F.R. § 1.2107 ................................................................................................. 3

47 C.F.R. § 1.2108 ................................................................................................. 3

47 C.F.R. § 1.2109 ................................................................................................. 6

47 C.F.R. § 1.2110 ............................................................................................. 2, 3

Fed. R. Civ. P. 30 ............................................................................................ 11, 14

Fed. R. Civ. P. 41 ........................................................................................ 1, 14, 15

Fed. R. Civ. P. 45 ..................................................................................................20

The United States submits this Memorandum of Law in support of its Motion to Intervene Pursuant to 31 U.S.C. § 3730(c)(3) and to Dismiss Pursuant to 31 U.S.C. § 3730(c)(2)(A) of the False Claims Act, 31 U.S.C. §§ 3729-3733, and Fed. R. Civ. P. 41.  The False Claims Act authorizes a private party, known as a "relator," to bring suit on behalf of the United States to recover damages sustained by the United States because of false claims or statements submitted to the United States.  31 U.S.C. § 3730(b)(1).  Such suits, known as *qui tam* actions "allege[] injury to the Government **alone**."  *United States ex rel. Polansky v. Exec. Health Res., Inc*., 599 U.S. 419, 143 S. Ct. 1720, 1734 (2023) (emphasis added).  For that reason, Congress included several protections to ensure that the United States retains substantial control over *qui tam* lawsuits filed on its behalf.  Among these protections is the right of the United States to "dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion."  31 U.S.C. § 3730(c)(2)(A).

As explained in more detail below, the United States has determined, after careful consideration of the evidence and legal arguments, that continued litigation of this *qui tam* action is unlikely to vindicate the United States' interests and would needlessly expend the Government's and this Court's resources.  Additionally, the United States has notified the Relator, Vermont National Telephone Company ("Relator" or "VTel"), of its intent to dismiss and the reasons for dismissal.  Accordingly, good cause exists for the United States to intervene in this *qui tam* action under Section 3730(c)(3) for the purpose of dismissal under Section 3730(c)(2)(A).

# I.    **Background**

A. <u>AWS-3 Auction</u>

In 2014, the Federal Communications Commission ("FCC" or "Commission") held an auction of wireless spectrum licenses, some of which were for spectrum that was then in use by various federal agencies, called "Auction 97."  First Amended Complaint at ¶ 2; *U.S. ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless LLC, et al.*, 531 F. Supp. 3d 247, 252 (D.D.C. 2021). Auction 97, like many previous auctions of wireless spectrum, included rules designed to encourage small business participation.  Of relevance here, Auction 97 provided that businesses with less than an average of $15 million in "attributable" annual revenue (which are referred to as "designated entities" or "DEs") would have to pay only 75 percent of any winning bid.  *VTel*, 531 F. Supp. 3d at 253; *see also SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1025-26 (D.C. Cir. 2017) (describing Auction 97).  For example, if a DE had the winning bid of $100 for a wireless spectrum license, it would only have to pay the Government $75, whereas other bidders would have to pay the full $100.  Thus, DEs would effectively benefit from a 25 percent "bidding credit."

As noted above, a DE had to have an average of less than $15 million in "attributable" annual revenue.  Under the FCC's rules, "[a]ttributable" revenues include, in addition to the revenues of the DE, the revenues of any entity that exercises *de jure* or *de facto* control over the DE.  *See* 47 C.F.R. § 1.2110(b), (c).

The FCC's public notice announcing Auction 97 specified that the FCC would use an established, two-step process to verify that an auction participant qualified as a DE.  *See* Public Notice, Auction of Advanced Wireless Servs. (AWS-3) Licenses Scheduled for Nov. 13, 2014, 29 FCC Rcd. 8386 ¶¶ 63, 80-92, 230-231 (2014) ("Auction Public Notice").  First, "[i]n order to be eligible to bid, an applicant [was required to] timely submit a short-form application" in

which the applicant would state its attributable revenues and claim eligibility for designated-entity status. 47 C.F.R. § 1.2105(a), (a)(2)(iv); *see VTel*, 531 F. Supp. 3d at 253. If the entity participated in the auction and was the highest bidder for a license, it would then submit a "long-form application," 47 C.F.R. § 1.2107(b) & (c), accompanied by a payment of total gross bids minus any claimed bidding credits, Auction Public Notice ¶¶ 228-231. In the long-form application, the Commission required that an applicant provide additional documentation and certifications supporting its assertion of designated-entity status. *Id*. § 1.2110(j); *see VTel*, 531 F. Supp. 3d at 253. Interested parties then had the opportunity to file petitions to deny the application. *Id*. § 1.2108(b). Only after considering the long-form application and any petitions or responsive filings would the agency determine: (1) whether the winning bidder qualified as a DE, (2) whether to grant or deny the license application, and (3) the final amount each winning bidder would be required to pay the Government for the wireless spectrum licenses. *Id*. § 1.2108(d).

VTel was one of 70 participants in Auction 97, along with Defendants DISH Network Corporation ("DISH"), Northstar Wireless, LLC ("Northstar") and SNR Wireless, LLC ("SNR") (collectively, "Defendants"). *See VTel*, 531 F. Supp. 3d at 254-256. Northstar and SNR filed short-form applications claiming eligibility for a 25 percent bidding credit as a DE. *Northstar Wireless, LLC*, 30 FCC Rcd. 8887, 8892 ¶ 13 (2015), attached as Exhibit A (hereinafter "SNR/Northstar Order"). The auction began on November 13, 2014, and ended on January 29, 2015, after 341 rounds of bidding over 45 days, resulting in 31 winning bidders for licenses in the "AWS-3" spectrum band, and raising (in net bids) a total of $41,329,673,325. *Id.* ¶ 12. SNR and Northstar emerged from the auction as the provisionally winning bidders for 702 licenses totaling $13.3 billion in gross bid value. *See* Complaint ¶ 100. VTel failed to win any licenses.

*See id.* ¶¶ 10-11. DISH was also not the winning bidder for any licenses. *SNR/Northstar Order* ¶ 12.

SNR and Northstar each timely filed a long-form application, and the FCC accepted those applications on April 29, 2015. *Id.* On February 13, 2015, SNR and Northstar made the payment required by the rules, which was 20 percent of their winning "net bids," *i.e.*, 20 percent of their winning gross bids minus the 25 percent DE bidding credits they claimed. On March 2, 2015, consistent with the rules of Auction 97, SNR and Northstar paid the remainder of the balance of their winning net bids, bringing the total amount tendered to 75 percent of their winning gross bids. *Id.*

After the Commission placed the companies' license applications on public notice as accepted for filing, eight parties (of which VTel was one)[1] filed petitions that "generally argue that the Commission should not award SNR and Northstar the bidding credits they sought due to their affiliation with DISH." *Id.* ¶ 30. Notably, VTel argued to the FCC that SNR's and Northstar's failure to disclose DISH's controlling interest at the time of their applications evinced a lack of candor demonstrating that the companies lacked the basic qualifications to hold some or all of the licenses they had won. *Id.* ¶ 129. VTel also argued that SNR and Northstar failed to adequately disclose the true intent of their bidding arrangements and DISH's control over the bidding conduct of SNR and Northstar. *Id.* ¶ 133. VTel asked the FCC not just to deny

---

[1] The seven other parties who filed petitions were Citizen Action, ESC Company, Communications Workers of America/National Association for the Advancement of Colored People, National Action Network, Americans for Tax Reform/Center for Individual Freedom, Citizens Against Government Waste/MediaFreedom.org/ National Taxpayers Union/Taxpayers Protection Alliance, and Central Texas Telephone Investments LP/Rainbow Telecommunications Association, Inc. SNR/Northstar Order ¶ 30.

SNR and Northstar the bidding credits, but to reauction certain wireless licenses in Burlington,

VT, that VTel had bid on but were won by SNR.  *Id.* ¶ 137.

On August 18, 2015, the Commission concluded that DISH had *de facto* control over

SNR and Northstar and that its revenues were attributable to SNR and Northstar.  *Id.* ¶ 8.  As a

consequence, the FCC did not award SNR and Northstar the bidding credit they had sought.  *Id.*

In reaching this conclusion, the FCC explained:  "Based on the record before us, it is manifest

that DISH, directly or indirectly, controls or has the power to control the Applicants via a variety

of controlling mechanisms including, but not limited to: significant ownership interest; excessive

investor protections; control over policy decisions; domination of financial matters; control of

financial decisions; control over build-out plans; control over business plans; control over the

Auction 97 bidding process; coercive termination provisions; inadequate working capital; and

control of employment decisions."  *Id*. ¶ 6.  The FCC also found that the "behavior exhibited by

the parties during the actual bidding demonstrate[d] that DISH was in control of all three

companies who worked jointly to advance DISH's interests, rather than SNR and Northstar

functioning as independent bidders seeking to advance their own interests."  *Id*. ¶ 111.

Despite agreeing with VTel (and the seven other parties who filed petitions) that SNR

and Northstar were not eligible for DE bidding credits, the FCC expressly rejected VTel's

arguments that SNR and Northstar failed to disclose their relationship with DISH.  *Id.* ¶ 9.  In

particular, the FCC concluded that SNR and Northstar "complied with the disclosure obligations

of our competitive bidding rules."  *Id.* ¶ 135.  The FCC found:

> no substantial and material question of fact as to whether SNR and Northstar have
> shown a lack of truthfulness or reliability in their dealings with the Commission.
> There is no showing here that SNR and Northstar attempted to mislead the
> Commission about their respective relationships with DISH.  Rather, the entire
> record indicates that the Applicants and DISH disclosed their ownership

> structures and related Agreements as required, and proceeded under an incorrect
> view about how the Commission's affiliation rules apply to these structures.

*Id.* ¶ 132.  Accordingly, the FCC denied VTel's request to reauction certain licenses that SNR
and Northstar had won and instead directed SNR and Northstar to pay the "full amount of [their]
winning bids" to receive the licenses.  *Id.* ¶¶ 152, 154.  The FCC further stated that failure to pay
would "result in a default," and that the entities would "be liable for the default payment set forth
in section 1.2104(g)(2) of the Commission's rules."  *Id*. ¶¶ 153, 155.  In turn, Section 1.2104(g)
instructs the FCC to impose payments on bidders who withdraw high bids during the course of
the auction, who default on payments due after the auction closes, or who are deemed
disqualified.  Section 1.2104(g) is not triggered by (or even references) the denial of bidding
credits.

　　　　In response, SNR and Northstar notified the FCC that they wanted to utilize Auction 97's
default provisions and not pay the winning bids on some licenses.  Accordingly, consistent with
the FCC's rules, including the rules for Auction 97, SNR and Northstar paid the full amount of
their winning bids on most of their licenses, and declined to pay their winning bids on the
remainder.  In so doing, SNR and Northstar "defaulted" on winning bids worth approximately
$3.3 billion.  *See* Complaint ¶ 104; *VTel*, 28 F. Supp. 3d at 30.  Following the FCC's rules for
default, *see* 47 C.F.R. §§ 1.2104(g)(2) & 1.2109(c), SNR and Northstar each paid an interim
default payment of 15 percent of the gross winning bids on the defaulted licenses, and agreed to
compensate the FCC for the difference between their own winning bids in Auction 97 and the
amount that the FCC receives when it re-auctions the licenses.  *SNR Wireless*, 868 F.3d at 1029.
Additionally, and at the FCC's request, DISH provided a guarantee to make any deficiency
payments that may be required under the rules that SNR or Northstar are unable to make.  *See*
*Northstar Wireless*, 30 FCC Rcd. 10700, 10702-03 (2015); *SNR Wireless*, 30 FCC Rcd 10704,

10706-07 (2015).  "Because of the size of the penalties for default, SNR and Northstar each made partial, 'interim' payments to the Commission: SNR paid $181,635,840 and Northstar paid $333,919,350."  *SNR Wireless*, 868 F.3d at 1029.  SNR and Northstar were then awarded the licenses for which they had paid their full winning bid.  The defaulted licenses were never awarded to SNR or Northstar, but rather remain in the FCC's inventory pending reauction.

The D.C. Circuit upheld the FCC's determination that SNR and Northstar were ineligible for their claimed bidding credits, *SNR Wireless*, 868 F.3d at 1042, but remanded the case for the Commission to give the companies an opportunity to cure their disqualifying control by DISH, *id.* at 1046.  On remand, the FCC concluded that, despite changes to their arrangements, the two companies were still under DISH's *de facto* control, and therefore remained ineligible for the claimed bidding credits.  *See Northstar Wireless LLC*, 35 FCC Rcd. 13317 (2020).  The D.C. Circuit affirmed the FCC's remand order, and the Supreme Court denied Northstar's petition for *certiorari*.  *See Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 196-97 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 2693 (2023).

B.  Relator's *Qui Tam* Action

VTel filed this *qui tam* action on May 15, 2015, four days after it had made essentially the same arguments to the FCC in its Petition to Deny, namely, that SNR and Northstar had failed to disclose its relationship with DISH in the FCC's Auction 97.  Over the next 16 months, VTel's allegations were investigated by the Civil Division of the Department of Justice, the United States Attorney's Office for the District of Columbia, the FCC's Office of General Counsel, and the FCC's Office of Inspector General.  The Government's investigation included the review of thousands of pages of documents produced by the Defendants that were not part of the proceedings before the FCC, and multiple meetings with counsel for Defendants, counsel for VTel, and subject matter experts at the FCC who planned and conducted Auction 97.  Of note,

7

VTel was given ample opportunity to convey its views to the Department of Justice. On September 20, 2016, the United States declined to intervene pursuant to 31 U.S.C. § 3730(b)(4)(B). Dkt. No. 17. Despite being informed of significant reservations the United States had with this *qui tam* action given the results of its investigation, VTel elected to litigate on its own under 31 U.S.C. § 3730(c)(3).

     C.  <u>Procedural History of this *Qui Tam* Action Following Declination</u>

     Following declination, this Court stayed the action pending resolution of the then-ongoing administrative proceedings before the FCC -- which the D.C. Circuit had directed the Commission to conduct -- in which the Defendants made changes to their contractual arrangements in an effort to cure DISH's disqualifying control of SNR and Northstar so that the latter two entities would qualify for bidding credits. *SNR Wireless*, 868 F.3d at 1046. In connection with an order by this Court on July 9, 2018, for a Joint Status Report, the United States filed a Statement of Interest on October 10, 2018, explaining, in essence, that the ongoing administrative proceedings were unlikely to have a direct effect on this *qui tam* action because the administrative proceedings rested on the FCC's conclusion that there had been full compliance with the applicable disclosure requirements, *see, e.g.*, 47 C.F.R. § 1.17 (requiring truthful and accurate statements to the FCC), whereas this *qui tam* action is premised upon the Defendants' alleged failure to disclose material information. Dkt. No. 65. This Court then ordered on October 26, 2018, that this *qui tam* action should no longer be stayed and set a briefing schedule for any Motion to Dismiss by Defendants. Dkt. No. 68.

     On February 4, 2019, VTel filed an Amended Complaint that made clear the alleged false claims in this *qui tam* were tied to the Defendants' alleged failure to disclose material information to the FCC at the time of the auction. Dkt. No. 74. In particular, the Amended Complaint explained that the basis for the alleged false claims was that the Defendants

knowingly failed "to disclose all of their instruments, agreements, and understandings with the DISH-Controlling Defendants" to the FCC in the "Short-Form and Long-Form" they submitted as part of Auction 97.  *See* Amended Complaint ¶ 128.  Based upon these clarifications, the United States indicated to the Court it was not, at that time, going to exercise any of its statutory rights under the False Claims Act.  Dkt. No. 75.

On March 23, 2021, this Court dismissed this *qui tam* action on two grounds.  *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless LLC*, 531 F. Supp. 3d 247 (D.D.C. 2021).  First, this Court found the FCC proceedings following Auction 97 to be an "administrative civil money penalty proceeding," and therefore barred the *qui tam* action pursuant to 31 U.S.C. § 3730(e)(3).  *Id.* at 264.  This provision prohibits any *qui tam* action (but not an action brought by the Government) that is "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."  Second, the court found that the Relator failed to plausibly plead materiality primarily because the Defendants disclosed enough information to allow the FCC to deny the bidding credits at issue.  *Id.* at 54-55.

On appeal, the D.C. Circuit reversed and remanded.  *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless Co.,* 34 F.4th 29 (D.C. Cir. 2022).  Specifically, the D.C. Circuit held that the FCC's auction was not a "civil money penalty proceeding" because the FCC had not imposed penalties when it held SNR and Northstar ineligible for bidding credits.  *Id.* at 35-36.  Instead, the default payments arose later pursuant to section 1.2104(a)(2) after the two companies had selectively defaulted on their bids.  *Id*.  The D.C. Circuit also addressed the pleading standard with regard to materiality but determined that the merits of the materiality argument "should be addressed at a later stage in this litigation."  *Id.* at 37.

On remand, Defendants moved for Judgment on the Pleadings on November 28, 2022. Dkt. No. 115. Primarily, Defendants argued that Relator's claims were foreclosed by the False Claims Act's "public disclosure bar," which requires a court to dismiss a *qui tam* claim, "unless opposed by the government," "if substantially the same allegations or transactions were publicly disclosed" unless the plaintiff relator is "an original source of the information." 31 U.S.C. § 3730(e)(4). At that point, the United States objected to such a dismissal only as to claims that are premised upon Defendants' knowing failure "to disclose all of their instruments, agreements, and understandings with the DISH-Controlling Defendants" to the FCC in the "Short-Form and Long-Form" they submitted as part of Auction 97. Dkt. No. 124.[2] The rationale for this objection was that the cited "public disclosure" was the administrative proceedings before the FCC where the Defendants were denied the bidding credits, and those proceedings rested on the FCC's conclusion that there had been full compliance with the applicable disclosure requirements. In contrast, this *qui tam* action is premised upon the Defendants' alleged failure to disclose material information. The United States' objection gave VTel a chance, in discovery, to uncover evidence supporting its core allegation that the Defendants failed to disclose material information. This was consistent with the United States Statement of Interest that it filed on October 10, 2018. This Court denied Defendants' motion for Judgement on the Pleadings on November 9, 2023, concluding "that the United States' opposition to dismissal pursuant to the public-disclosure bar [was] effective." Dkt. No. 166 at 22.

On September 22, 2023, Defendants moved for Partial Summary Judgment that there are no "actual damages" because, *inter alia*, the FCC never awarded the Defendants any bidding

---

[2] As the United States further explained in a response to this Court's Minute Order of November 1, 2023, its objection to dismissal under the public disclosure bar was limited to those claims and that it was taking "no other position in this case." Dkt. No. 164.

credits and Defendants paid full price for every spectrum license that they actually received.

Dkt. No. 157. This Court denied the Defendants' motion without prejudice on September 26,

2023, explaining that it would not consider dispositive motions until after setting a briefing

schedule following the parties' post-discovery status conference.

    D.  Summary of Relator's Discovery in this *Qui Tam* Action

    The parties filed a Joint Discovery Plan on November 14, 2022. Since that time, VTel

propounded a significant amount of discovery on Defendants and third-parties searching for

evidence of the "instruments, agreements, and understandings" that VTel alleges were not

disclosed to the FCC. *See* Amended Complaint ¶ 128. By January 2024, VTel's document

discovery was substantially complete. In summary, VTel had obtained from SNR and six related

entities -- who were technical consultants, investors, and potential investors -- nearly 68,000

documents totaling over 350,000 pages. From Northstar and five investors, VTel obtained over

73,000 documents totaling over 280,000 pages. From DISH and DISH's auditor, VTel obtained

over 19,000 documents totaling over 150,000 pages. VTel also obtained nearly 600 documents

totaling over 5,000 pages from Morgan Stanley, which refinanced some of SNR's debt. All told,

VTel obtained over 160,000 documents totaling over 1.07 million pages. In addition, VTel had

completed depositions of 18 witnesses by the end of January, including the deposition of

Northstar pursuant to Fed. R. Civ. P. 30(b)(6).

    E.  Relator's Meetings with the Government

    VTel has had ample opportunity to convey the fruits of discovery it believed supported its

allegations to the United States, which it took advantage of in multiple meetings and letters.

These included the following:

- July 13, 2023 - VTel attorneys made a presentation to the FCC discussing

  Relator's legal theories on the merits of the case and damages.

11

- September 11, 2023 - VTel sent to the Department of Justice 147 documents that it claimed support its case.

- September 15, 2023 - VTel attorneys discussed Relator's theory of damages with the FCC.

- October 2, 2023 - VTel sent a 17-page memorandum to the FCC providing an overview of the documentary evidence gathered by Relator to that date.

- October 4, 2023 - VTel attorneys made a presentation to the FCC on the evidence they had gathered and their theory of damages.  VTel sent 49 documents to the FCC in support of its presentation.

- October 11, 2023 - VTel sent a 13-page memorandum to the FCC providing its view of damages.  Accompanying this memorandum was an additional five documents.

- October 16, 2023 - VTel supplemented its interrogatory responses to identify six agreements, arrangements, and understandings that were allegedly not disclosed or misrepresented to the FCC.

- October 23, 2023 - VTel attorneys discussed the Relator's theory of damages with the FCC.

- January 5, 2024 - VTel sent a 7-page memorandum to the FCC summarizing additional evidence it believes supports its claims, including deposition excerpts.

- January 16, 2024 - VTel sent an eight-page letter to the Department of Justice and FCC discussing potential dismissal of this *qui tam* action under Section 3730(c)(2)(A).

- January 25, 2024 - VTel presented to the Department of Justice and FCC information obtained in discovery, its theory of damages, and why this *qui tam* action should not be dismissed under Section 3730(c)(2)(A).

- January 30, 2024 - VTel sent a 10-page letter discussing its view of damages.

- February 8, 2024 - VTel sent a three-page letter to the Department of Justice opposing dismissal of this *qui tam* action under Section 3730(c)(2)(A).

F. <u>Discovery Burden on the Government</u>

The United States has expended significant resources to date responding to discovery requests by the parties to this *qui tam* action. In particular, Defendants served a subpoena on the FCC on December 2, 2022. The subpoena sought documents from September 14, 2014, to the present, identified 68 FCC officials as potential custodians, and listed thirteen topics, including the agency's analysis and decision-making in evaluating SNR's and Northstar's claims for bidding credits, the finances associated with Auction 97, and communications between Relator and the Government. In response to the subpoena and related Freedom of Information Act requests, the FCC has produced over 10,000 pages. Three other agencies of the United States, who were the prior users of the spectrum auctioned in Auction 97, have also produced a significant volume of documents. These include the Department of Interior (nearly 3,000 pages), the Department of Commerce (nearly 23,000 pages), and the United States Department of the Navy (267 pages). In total, the United States has produced nearly 38,000 pages of documents. In addition, an FCC witness was deposed by VTel on December 11, 2023.

Despite these efforts, the most burdensome portion of discovery for the United States remains. In particular, the FCC is being subpoenaed for thousands of pages of internal documents relating to its evaluation of bidders in Auction 97. These documents are highly

sensitive, and the FCC will need to carefully review each document to redact confidential, proprietary/business sensitive, and privileged information. Moreover, as the majority of the remaining documents are protected by privilege (including the attorney-client and deliberative process privileges), the Government is likely facing an extended discovery dispute and litigation before this Court. In addition, Defendants have subpoenaed three senior FCC witnesses for deposition. These include the former General Counsel of the FCC, the Deputy Chief of the FCC's Wireless Telecommunications Bureau and Chair of the Incentive Auction Task Force and Broadband Data Task Force, and the designee of the FCC under Fed. R. Civ. P. 30(b)(6).

Several other agencies likewise face substantial additional discovery burdens. The Department of Commerce, which has already produced nearly 23,000 pages of documents, would have to perform additional searches and productions relating to internal communications with technical experts. The United States Department of the Army would have to redact and log nearly 2,000 pages of documents. The United States Department of the Air Force is still in the process of collecting documents. Should this case proceed, each of these agencies face not only substantial burdens in responding to voluminous document production requests, but also the prospect of litigating sensitive issues of the deliberative process and attorney-client privileges.

## II.    Legal Standard

Section 3730(c)(2)(A) of the False Claims Act permits the United States to "dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." Such requests for dismissals are evaluated under Fed. R. Civ. P. 41(a). *Polansky*, 143 S. Ct. at 1733. Additionally, to dismiss a *qui tam* action in which the United States initially declined to intervene under Section 3730(b)(4)(B), the United States must first intervene for "good cause" under Section 3730(c)(3). *Id.* 1732. However, "the

same grounds that support dismissal also provide good cause to intervene." *United States ex rel. Carver v. Physicians Pain Specialists of Ala., P.C.*, 2023 U.S. App. LEXIS 19592, at *18 n.4 (11th Cir. July 31, 2023). Thus, the singular applicable standard here is "set out in Federal Rule 41." *Polansky*, 143 S. Ct. at 1735.

Fed. R. Civ. P. 41(a)(2) governs cases like this one where the defendant has filed an answer and provides that dismissal may be granted only "on terms the court considers proper." "The application of Rule 41 in the False Claims Act context will differ in two ways from the norm." *Polansky*, 143 S. Ct. at 1734. First, the court should assess whether the relator has had the "opportunity for a hearing on the motion" required by Section 3730(c)(2)(A). *Id.* Second, the court should consider the interests of the relator in determining whether dismissal is proper. *Id.* In making this determination, the Supreme Court made clear that "the Government's views are entitled to substantial deference." *Id.* This is because a *qui tam* suit "is on behalf of and in the name of the Government," and "alleges injury to the Government alone." *Id.* "Given all that, a district court should think several times over before denying a motion to dismiss. If the Government offers a reasonable argument for why the burdens of continued litigation outweigh its benefits, the court should grant the motion. And that is so even if the relator presents a credible assessment to the contrary." *Id.* "Absent some extraordinary circumstance, that sort of showing is all that is needed for the Government to prevail on a (2)(A) motion to dismiss." *Id.* at 1735.

Critically, the Government's motion to dismiss under Section 3730(c)(2)(A) should be denied only under "extraordinary circumstances." *Id.* Such circumstances exist only where the Government engages in the "most egregious official conduct" as to be "arbitrary in the constitutional sense." *Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 390 n.17 (3d Cir. 2021),

*aff'd*, 599 U.S. 419 (2023).  Thus, a relator's disagreement with the Government's views on the merits of his claims is not a reason to deny the Government's motion to dismiss, regardless how purportedly reasonable the relator believes its position might be.  *Polansky*, 143 S. Ct. at 1734; *Brutus Trading, LLC v. Standard Chtd. Bank*, No. 20-2578, 2023 U.S. App. LEXIS 21868, at *7-8 (2d Cir. Aug. 21, 2023) (Rejecting relator's argument that "boil[s] down to nothing more than a subjective disagreement with the government's investigation and its ultimate decision as to [relator's] claims.").

In the wake of Polansky, courts have consistently affirmed the Government's broad dismissal authority in those rare instances where the United States has sought to dismiss.  *See, e.g.*, *Brutus Trading*, 2023 U.S. App. LEXIS 21868; *United States ex rel. Carver v. Physicians Pain Specialists of Ala., P.C.*, No. 22-13608, 2023 U.S. App. LEXIS 19592 (11th Cir. July 31, 2023); *United States ex rel. Erik K. Sargent v. McDonough*, No. 1:23-cv-00328-LEW, 2024 U.S. Dist. LEXIS 32973 (D. Me. Feb. 26, 2024), *United States ex rel. Guglielmo v. Ledios, Inc.*, No. 19-1576, ECF No. 22 (D.D.C. February 20, 2024); *United States. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs.*, No. 1:17-cv-0558, 2023 U.S. Dist. LEXIS 217620 (N.D. Ohio Dec. 7, 2023); *United States ex rel. Farmer v. Republic of Honduras*, No. 17-470-KD-N, ECF No. 97 (S.D. Ala. Jan. 10, 2024).

## III.    Argument

### A.  The United States Has a Well-Grounded, Reasonable Belief That the Relator's Claims, If Allowed to Proceed, Will Not Vindicate the United States' Interest.

The United States respectfully submits there are three interrelated reasons why "this suit would not do what all *qui tam* actions are supposed to do: vindicate Government's interests," and should be dismissed.  *Polansky*, 143 S. Ct. at 1735.  **First**, the United States does not believe there is sufficient evidence supporting the lynchpin of Relator's allegations, *i.e.*, that the

Defendants failed "to disclose all of their instruments, agreements, and understandings with the DISH-Controlling Defendants" in their short and long form filings with the FCC. *See* Amended Complaint ¶ 128. The United States reached this conclusion after careful review, with the assistance of subject matter experts at the FCC, of the fruits of the extensive discovery conducted by VTel that it proffered to the United States on multiple occasions. This United States found this evidence to be cumulative of what the Defendants had affirmatively disclosed in their long and short form filings.[3] As such, the United States continues to have confidence in the FCC's previous determination that the Defendants "disclosed their ownership structures and related Agreements as required, and proceeded under an incorrect view about how the Commission's affiliation rules apply to these structures." SNR/Northstar Order at ¶ 132.

**Second**, even if VTel was able to prove Defendants failed to disclose material facts, there is significant doubt it will be able prove damages under the False Claims Act because the Defendants were never awarded any bidding credits. SNR/Northstar Order ¶¶ 152, 154. As explained above, Auction 97 used a two-part process to award small business bidding credits. First, applicants seeking small business bidding credits claim eligibility on a "short-form" application. The FCC's acceptance of a "short-form" application, which allows the applicant to participate in the auction, is not an award of any small business bidding credit. Public Notice, 29 FCC Rcd 11606 (WTB 2014) ¶ 4 ("Thus, a determination that a short-form application is complete and complies with the Commission's competitive bidding rules and policies is not

---

[3] Among other things, the Defendants disclosed LLC agreements, credit agreements, trademark license agreements, management services agreements, and joint bidding agreements. SNR/Northstar Order ¶ 21. The upshot of these agreements, as the FCC summarized at the time, was that "pursuant to these various Agreements, DISH serves as the majority investor, the primary lender for both SNR and Northstar and, pursuant to the Management Services Agreements, the manager [] responsible for the build-out, management, and operation of any systems constructed using SNR's and Northstar's AWS-3 licenses." *Id.*

determinative of an applicant's qualifications to hold a license or of entitlement to a bidding

credit."). Second, after the auction, bidders that submitted the highest bid for any license must

then submit a "long-form" application. The "long-form" application is the document that the

FCC evaluates to actually award the licenses, along with any claimed small business bidding

credits. *See* Public Notice, 29 FCC Rcd 8386 ¶ 231 (WTB 2014).

Here, the FCC denied both SNR and Northstar bidding credits after review of their "long-

form" applications. As to SNR, the FCC concluded: "SNR has not met its burden to establish

that it is eligible for a very small business bidding credit and we must deny SNR's request for a

bidding credit." SNR/Northstar Order ¶ 152. And as to Northstar, the FCC concluded:

"Northstar has not met its burden to establish that it is eligible for a very small business bidding

credit and we deny Northstar's request for a bidding credit." *Id.* ¶ 154. Thus, neither SNR nor

Northstar received any bidding credits. Had the Defendants done as VTel argues they should

have and disclosed some additional "instruments, agreements, and understandings with the

DISH-Controlling Defendants," Amended Complaint ¶ 128, the result would be the same: the

FCC would have denied SNR and Northstar bidding credits. Given these particular facts, there is

significant doubt VTel will be able to prove meaningful False Claims Act damages, which are

"meant to 'put[] the government in the same position as it would have been if the defendant's

claims had not been false.'" *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832,

839 (D.C. Cir. 2012) (quotation marks and alterations in original).

In this vein, it bears noting that the "default" payments by SNR and Northstar following

the auction are not damages in this case. As the D.C. Circuit observed, "The default payments

were not assessed during the licensing proceeding. In that proceeding, the Commission

determined only whether Northstar and SNR were 'qualif[ied]' to hold spectrum licenses and

18

'eligible' for bidding credits. The question of whether to impose default payments arose later, after Northstar and SNR chose to selectively default on their obligations to pay for some of their winning bids." *VTel*, 36 F.4th at 35 (quotation marks and alterations in original) (internal citations omitted).  Thus, the default payments by SNR and Northstar were triggered by their decision to default, not the decision by the FCC to deny bidding credits or a determination that they knowingly failed to "disclose all of their instruments, agreements, and understandings with the DISH-Controlling Defendants." Amended Complaint ¶ 128.

More importantly, the "default" payments were not part of a proceeding where the FCC did (or even could) evaluate alleged submissions of false or misleading statements.  47 C.F.R. § 1.17(a).  As the D.C. Circuit observed, such violations are assessed only in "forfeiture" proceedings, which were not initiated in this case.  *VTel*, 34 F.4th at 35; *see also* SNR/Northstar Order ¶¶ 44, 156 (declining to refer the matter to the Enforcement Bureau for possible forfeiture penalties).  Indeed, the default payments did not result from a violation of the FCC's rules, but rather compliance with such rules.  Defaults were an option available to any winning bidder who elected not to purchase the licenses it had won at auction and were not reserved for bidders who had claimed bidding credits.  *See* FCC Op., 30 F.C.C. Rcd. At 8950-51; 47 C.F.R. § 1.2104(g)(2)(ii) (requiring defaulters to pay a penalty set by the FCC prior to each auction); Auction Notice, 29 F.C.C. Rcd. At 8451 (announcing the fifteen-percent default payment for Auction 97).  Thus, the default payments by SNR and Northstar were a result of their business decision to select an option available to them under Auction 97's rules, not a case of the FCC imposing a penalty for a violation of its rules.

**Third**, continued litigation of this *qui tam* action will impose a significant resource drain on the United States and this Court.  As noted above, several agencies of the United States face

significant discovery burdens.  The FCC, in particular, faces the extraordinary burden of having

to review, redact, and log thousands of internal documents relating to its evaluation of bidders in

Auction 97 and to respond to three deposition subpoenas.  Likewise, five other agencies have yet

to complete their response to subpoenas issued in this case: the Department of Interior,

Department of Commerce, Department of the Army, Department of the Navy, and Department of

the Air Force.  Moreover, the United States believes some requests made in these subpoenas

impose an undue burden, and thus violate Fed. R. Civ. P. 45(d)(1), and seek privileged materials

protected from production under Fed. R. Civ. P. 45(e)(2) and 26(b)(5).  Resolution of these

concerns will likely involve litigation before this Court.  Thus, continued litigation of this *qui*

*tam* action will require a significant expenditure of resources by six federal agencies, the United

States Attorney's Office for the District of Columbia, the Department of Justice, and this Court.

Taking the above into consideration, it is clear the benefits to the Government of

continued litigation are marginal given the lack of evidence and the difficulty in establishing

damages.  Conversely, the costs to the Government (and this Court) are high as a result of

extraordinary discovery.  While VTel will likely "vigorously dispute[]" the United States'

assessment, "claiming that the Government [is] leaving billions of dollars of potential recovery

on the table," "that competing assessment . . .  c[an] not outweigh the Government's reasonable

view of the suit's costs and benefits."  *Polansky*, 143 S. Ct. at 1735.  "The Government gave

good grounds for thinking that this suit would not do what all *qui tam* actions are supposed to do:

vindicate the Government's interests.  Absent some extraordinary circumstance, that sort of

showing is all that is needed for the Government to prevail on a (2)(A) motion to dismiss."  *Id.*

Indeed, this case is identical to *Polansky* in almost every salient respect.  In both cases,

the relator aggressively litigated the *qui tam* action for several years following the United States'

declination, in the process investing "considerable time and resources in the case." *Polansky*, 17 F.4th at 381. Also in both cases, the Government "enumerated the significant costs of future discovery in the suit," and "explained in detail why it had come to believe that the suit had little chance of success on the merits." *Polansky*, 143 S. Ct. at 1735. And like VTel here, the relator in *Polansky* "vigorously disputed the latter point, claiming that the Government was leaving billions of dollars of potential recovery on the table." *Id.* (internal quotation marks omitted). The Supreme Court held that it was "not a close call" to grant the Government's motion to intervene and dismiss in *Polansky*, and this Court should follow suit. *Id.* at 1734.

A similar result occurred in *United States. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs.*, No. 1:17-cv-0558, 2023 U.S. Dist. LEXIS 217620 (N.D. Ohio Dec. 7, 2023). There, the relator litigated the *qui tam* action following a decision by the United States to decline to intervene. *Id.* at *2. Following discovery, the United States moved to intervene and dismiss because, in its view, "discovery has cast doubt on the Relator's ability to prove any False Claims Act violations against Defendants." *Id.* at *4. While the relator argued that his expert could prove liability, the court granted the United States' motion because the relator "has not been able to uncover enough evidence to **convince the Government** that any significant violations of the False Claims Act actually took place." *Id.* at *6-7 (emphasis added). That is the also the case here, and this Court should likewise grant the Government's motion to intervene and dismiss.

B. The United States Has Good Cause to Intervene to Dismiss this *qui tam* Action.

To dismiss this *qui tam* action after the United States initially declined to intervene, it must first intervene for "good cause" under Section 3730(c)(3). *Id.* 1732. Showing "good cause" in this context is not burdensome. *Polansky*, 17 F. 4th at 387. It is a "uniquely flexible and capacious concept," meaning simply a "legally sufficient reason." *United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 846 (7th Cir. 2020), *abrogated by Polansky*, 143 S. Ct.

at 1720. "[T]he same grounds that support dismissal also provide good cause to intervene under 31 U.S.C. § 3730(c)(3)." *Carver*, 2023 U.S. App. LEXIS 19592, at *18 n.4. As discussed above, there are three reasons justifying the United States' decision to seek dismissal in this case. These reasons, some of which VTel has been aware of since before the United States initially declined to intervene, also establish that the United States has "good cause" to intervene to effectuate that dismissal. *Id.*; *Wolf Creek Fed. Servs*, 2023 U.S. Dist. LEXIS 217620 at *4-5 (citing the United States' basis for dismissal under Section 3730(c)(2)(A) as establishing "good cause" to intervene); *United States ex rel. Farmer v. Republic of Honduras*, No. 17-470-KD-N, ECF No. 97 (S. D. Ala. January 10, 2024) (same).

      C. <u>No Additional Hearing is Necessary to Dismiss this *qui tam* Action.</u>

      Section 3730(c)(2)(A) provides that the United States may dismiss a *qui tam* action over the objection of the Relator "if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." "[I]n order to comply with the False Claims Act's 'hearing' requirement, a district court must exercise some degree of scrutiny in evaluating the government's motion to dismiss; in other words, the government does not have an unfettered right to dismiss a *qui tam* action." *Brutus Trading,* 2023 U.S. App. LEXIS 21868, at *6. This Court can scrutinize the United States' motion to dismiss by considering the "parties' voluminous briefs, declarations, and exhibits before granting the government's motion." *Id.* at *7. Thus, this Court can provide VTel with the required "opportunity for a hearing" by considering the parties' briefs and there is no need for a separate hearing.

## IV.    <u>Conclusion</u>

The United States has devoted significant resources to analyzing the issues raised in this *qui tam* action, beginning even before this case was filed when eight parties (including VTel) filed petitions with the FCC in an independent administrative proceeding that argued, *inter alia*, that SNR and Northstar misrepresented their relationship with DISH and should not be awarded bidding credits.  The United States further conducted a sixteen-month long investigation of VTel's allegations before declining to intervene and has closely monitored developments in the litigation since.  In this litigation, VTel conducted extensive discovery of the Defendants and related third-parties and taken advantage of over a dozen opportunities to present to the United States the evidence it claims to have uncovered and its view of the applicable laws and regulations.  After consideration of all of these inputs, the United States has concluded the costs of continued litigation outweigh its benefits.  Understandably, VTel disagrees with this assessment, as it did with the FCC's decision to deny its request to reauction certain wireless licenses that VTel was outbid on by SNR.  But VTel's "competing assessment . . . c[an] not outweigh the Government's reasonable view of the suit's cost and benefits."  *Polansky*, 143 S. Ct. at 1735.  The United States has explained why it has concluded "that this suit would not do what all *qui tam* actions are supposed to do: vindicate Government's interests.  Absent some extraordinary circumstance, that sort of showing is all that is needed for the Government to prevail on a (2)(A) motion to dismiss."  *Id.*

\*    \*    \*

Date: March 8, 2024                    Respectfully submitted,

   /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. Bar # 420232
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W., Civil Division
Washington, D.C.  20530
(202) 252-2507

JAMIE A. YAVELBERG
PATRICIA L. HANOWER
BENJAMIN C. WEI
Attorneys, Civil Division,
Commercial Litigation Branch
U.S. Department of Justice
Post Office Box 261
Washington, D.C. 20044
(202) 616-2875

*Counsel for the United States of America*