# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, VERMONT NATIONAL TELEPHONE CO., <br><br> Plaintiff, <br><br> v. <br><br> NORTHSTAR WIRELESS, LLC, e*t al.*, <br><br> Defendants. | Civil Action No. 1:15-cv-0728 (CKK) |

## DECLARATION OF FRED CAMPBELL

## I.  Introduction and Summary

1.      My name is Fred Campbell. I am a Senior Policy Advisor with Wireless 20/20, an independent market research and consulting company. I assist clients in the wireless and mobile broadband markets with the formulation and implementation of complex technology regulatory policies. I have more than 20 years of experience in the communications and information technology sectors. A complete description of my qualifications, including a list of the publications I have recently authored and proceedings in which I have provided expert testimony, are described in my curriculum vitae, which is attached as Exhibit FC-1

2.      My professional experience includes serving as Chief of the Federal Communications Commission's ("FCC") Wireless Telecommunications Bureau ("WTB") from 2006 to 2008 and as wireless legal advisor to former FCC chairman Kevin Martin from 2005 to 2006. In those capacities, I represented the FCC on all wireless spectrum policy matters and was responsible for two large and successful spectrum auctions—Auctions 66 and 73—which paved the way for the transition from 3G to 4G wireless services.

3.      Auction 66 was conducted in 2006, which made available 70 MHz of spectrum in the AWS-1 band and which resulted in the sale of 1,087 licenses for approximately $14 billion in gross winning bids. Auction 73 was conducted in 2008, which made available 62 MHz of spectrum in the 700 MHz band and which resulted in the sale of 1,090 licenses for approximately $19 billion in gross bids. Auction 73 involved several innovative features, including the FCC's first use of anonymous bidding, package bidding, and block specific aggregate reserive prices.

4.      In both Auction 66 and Auction 73, I was personally responsible for and involved in the management of and decision-making processes related to: (i) the testing of auction designs; (ii) the adoption of the rules and procedures governing the auctions; (iii) the short-form and long-form review processes, including designated entity ("DE") eligibility determinations; (iv) oversight of the bidding process; and (v) the close of the auctions, including license awards and winning bid payment requirements.

5.      I have been retained by Vermont National Telephone Corporation ("Relator") in connection with its *qui tam* action under the False Claims Act ("FCA") against DISH Network Corporation ("DISH"), SNR Wireless LicenseCo, LLC ("SNR"), Northstar Wireless, LLC ("Northstar"), and several affiliated companies and individuals (collectively, "Defendants"), alleging that Defendants defrauded the United States government of at least $3.3 billion in Auction 97. Specifically, Relator alleged that Northstar and SNR "knowingly failed to disclose all of their instruments, agreements, and understandings with . . . DISH" and "falsely certified" that they had disclosed all instruments, agreements, and understandings relevant to their status as very small businesses eligible for bidding credits in Auction 97. Am. Compl. ¶¶ 125, 128.

6.      Auction 97 was a critical auction for mobile service providers. It was the first major release of mobile broadband spectrum since the 700 MHz auction, and mobile providers,

particularly AT&T, were experiencing spectrum shortages.[1] Auction 97, which began in

November 2014, made available 65 MHz of spectrum covering the entire United States. This

bandwidth was divided into six blocks ranging from 5 MHz to 20 MHz, which were divided

geographically into a total of 1,614 AWS-3 spectrum licenses. Blocks A1, B1, H, I, and J were

offered on an Economic Area basis, which divides the country into 176 different geographic

areas, and Block G was offered on a Cellular Market Area (CMA) basis, which divides the

country into 734 different geographic areas.

      7.     The FCC also offered bidding credits to designated entities, which "operate as a

discount on the spectrum DEs purchase, allowing them sometimes to outbid companies that

make higher bids." *Council Tree Investors, Inc. v. FCC*, 863 F.3d 237, 239 (3d Cir. 2017). In

Auction 97, these bidding credits equaled a 15% discount for "small" companies with average

gross revenues not exceeding $40 million for the previous three years and a 25% discount for

"very small" companies with average gross revenues not exceeding $15 million for the previous

three years. In making bidding credits available for designated entities in Auction 97, the FCC

utilized the traditional two-part application process described below, which requires applicants

seeking bidding credits to demonstrate their eligibility as a designated entity on both a short-form

application and a long-form application.

      8.     I have been asked by Relator to respond to the argument by the Department of

Justice ("DOJ") that Relator's FCA complaint should be dismissed because, according to the

DOJ, "there is significant doubt it will be able prove damages under the False Claims Act

---

[1] *See, e.g.*, Phil Goldstein, *Analysts: AWS-3 auction helps AT&T catch up to Verizon in spectrum ownership in major markets*, |Fierce Wireless (Feb. 2, 2015) (noting that AT&T needed spectrum to remain competitive with Verizon, its primary rival at that time).

because the Defendants were never awarded any bidding credits." Dkt. 188, at 17. The DOJ

reasons that, had SNR and Northstar disclosed the arrangements, agreements, and understandings

with DISH that Relator asserts were not disclosed to the FCC (collectively, "Understandings"),

"the result would be the same: the FCC would have denied SNR and Northstar bidding credits."

*Id.* at 18.

9.      While I am not an expert on damages under the FCA, the DOJ's reasoning

misapprehends the FCC's spectrum auction application process, mischaracterizes the

significance of the undisclosed Understandings in the context of the FCC's short-form

application review process, and misstates the harms resulting from an applicant's fraudulent

short-form application. Each of these issues is discussed in greater detail below.

## II.    <u>Background of FCC Spectrum Auctions</u>

10.     Spectrum is comprised of electromagnetic waves that occur on a theoretically

infinite range of different frequencies. In the communications context, the term "spectrum" refers

to the "radio spectrum," which is generally considered the set of frequencies that are suitable for

radiocommunications.[2]

11.     The radio spectrum is considered both an infinitely renewable and scarce

resource. It is infinitely renewable because use of the spectrum does not permanently consume it.

It is scarce because harmful interference generally occurs when different people attempt to use a

radiofrequency simultaneously for the same radiocommunications service in the same

geographic area. *See* 47 C.F.R. § 2.1(c). The FCC generally avoids harmful interference by

---

[2] The radio spectrum theoretically extends from 3 kHz to 3,000 GHz. *See* 47 C.F.R.
§ 2.101(b), Table 1. In the United States, however, frequencies have been allocated for use only
from 8.3 kHz to 275 GHz. *See* 47 C.F.R. § 2.106, Table of Frequency Allocations at 1, 68.

granting exclusive licenses to operate a radiocommunications service on specific frequencies in specific geographic areas. Like all scarce resources, the limited amount of spectrum available for any given radiocommunications service generally makes spectrum licenses very valuable, which has implications for the economic efficiency and equitableness of the processes used to assign spectrum licenses.

12.     When faced with multiple applications for the same license, the FCC historically selected a licensee using comparative hearings in which each applicant attempted to demonstrate why its application should be granted and the others should not. *See Ashbacker Radio Corp. v. FCC*, 326 U.S. 327 (1945). This approach had high costs—comparative hearings are a time consuming and resource intensive processes that delay the provision of new wireless services to the public—and nebulous benefits.[3] These problems were exacerbated when the FCC began rapidly introducing new wireless services in the 1980s, which resulted in the filing of large numbers of competing applications. *See, e.g.*, *Amend. of the Commission's Rules to Allow the Selection from Among Mutually Exclusive Competing Cellular Applications Using Random Selection or Lotteries Instead of Compar. Hearings*, Report and Order, 98 F.C.C.2d 175, ¶ 12 (1984).

13.     Congress initially attempted to solve these problems by authorizing the FCC to assign spectrum licenses by random selection (lottery). The FCC initially pre-screened lottery applications to ensure the applicants were qualified to hold spectrum licenses, but later eliminated pre-screening to speed up the licensing process. *Telecommunications Rsch. & Action*

---

[3] *See* The FCC Report to Congress on Spectrum Auctions 6-8, FCC 97-353 (1997) ("FCC Spectrum Report"); R. H. Coase, *The Federal Communications Commission*, 2 J. Law Econ. 1, 18 (1959) (noting that comparative hearings produce misallocations of spectrum due to political pressures, the absence of pricing signals, and the limited information available to the FCC).

*Ctr. v. FCC*, 836 F.2d 1349, 1359-60 (D.C. Cir. 1988) (citing 47 U.S.C. § 309(i)(1) (1982 Supp.) (repealed 1982)). The elimination of pre-lottery screening encouraged speculators to apply for spectrum licenses that they later sold for windfall profits. FCC Spectrum Report at 6-8. The large number of license transfers sought by speculative lottery winners and their attendant transaction costs slowed service to the public for years without an offsetting administrative or public benefit. *See Amend. of the Commission's Rules for Rural Cellular Serv.*, Further Notice of Proposed Rule Making, 1 FCC Rcd. 499, ¶ 7 (1986).

14.     After the widespread abuse of spectrum lotteries erupted in a national scandal,[4] Congress adopted the current system of assignment by competitive bidding (auction) in 1993. 47 U.S.C. § 309(j). A spectrum auction was intended to prevent unjust enrichment by (generally) requiring auction winners to pay market value for their spectrum licenses.[5]

## III.     Background of FCC Designated Entity Program

15.     Though spectrum auctions were generally intended to avoid unjust enrichment by requiring that licensees pay market values for their spectrum rights, Congress was concerned that a pure market-based approach would result in an excessive concentration of licenses. To ameliorate this concern, Congress directed the FCC to design its auction processes in a manner that would disseminate licenses "among a wide variety of applicants, including small businesses,

---

[4] *See, e.g.*, Edmund L. Andrews, *Radio Rights: A Move to Auction Licenses That Sell*, N.Y. Times (Mar. 21, 1993), *available at* http://nyti.ms/ZR11ZT (describing the unjust enrichment of the lucky few who hit the jackpot in spectrum lotteries).

[5] *See Implementation of Section 309(j) of the Commc'ns Act - Competitive Bidding*, Second Report and Order, 9 FCC Rcd. 2348, ¶ 212 (1994) ("*Competitive Bidding Second Report and Order*"). The FCC stopped using lotteries to assign spectrum licenses after receiving auction authority, and Congress eliminated the FCC's authority to award licenses through random selection in 1997. *See* 47 U.S.C. § 309(i)(5).

rural telephone companies, and businesses owned by members of minority groups and women" (groups known as "designated entities"). 47 U.S.C. §§ 309(j)(3)(B), (4)(D); 47 C.F.R. § 1.2110.

16.     The principal means of fulfilling this objective is to permit DEs to utilize bidding credits in an FCC auction, which are intended to enable designated entities "to participate in both the competitive bidding process and in the provision of spectrum-based services." *Competitive Bidding Second Report and Order* ¶ 229; *see also Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, Order on Reconsideration of the Second Report and Order, 21 FCC Rcd. 6703, ¶ 3 (2006) (emphasizing the need "to provide opportunities for designated entities to become robust independent facilities-based service providers with the ability to provide new and innovative services to the public …").

17.     Congress recognized that unjust enrichment was likely to continue to be a problem when designated entities receive preferential treatment and directed the FCC to establish safeguards to avoid unjust enrichment. *See* 47 U.S.C. §§ 309(j)(3)(C), (j)(4)(E); *Competitive Bidding Second Report and Order* ¶¶ 211-212. In complying with this directive and to prevent the abuse of bidding credits, the FCC adopted rules to "deter the use of sham companies," *id.* ¶ 266, seeking to take advantage of the designated entity program, as well as to prevent otherwise ineligible companies, such as "large incumbent wireless service providers" from "obtaining those benefits indirectly." *Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures, Second Report and Order and Second Further Notice of Proposed Rulemaking*, 21 FCC Rcd. 4753, ¶¶ 1, 58 (2006) ("*Second Further Notice*"); *see also Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and*

*Procedures*, Further Notice of Proposed Rulemaking, 21 FCC Rcd. 1753, ¶¶ 6-7 (2006) ("*Competitive Bidding Further Notice*") (endeavoring to ensure that the benefits of the designated entity program are "available only to bona fide small businesses" and "to prevent companies from circumventing the objectives of the designated entity eligibility rules"). But consistent with its desire to achieve this goal "in a manner that permits easy resolution of eligibility issues without the delay of administrative hearings," *Competitive Bidding Second Report and Order* ¶ 278, the FCC's initial competitive bidding rules required detailed ownership disclosures only when an auction winner applied to transfer an auctioned license to another entity rather than during the auction process. *Id.* ¶¶ 214-215.

18.     In 1997, the FCC adopted a generally applicable rule requiring auction participants to file detailed ownership information in their pre-auction short-form applications.[6] These rules require all applicants to disclose any party holding a ten percent or greater interest in the applicant whether directly or indirectly, and any regulated entity or other applicant in which the auction applicant or its ten percent interest holders have a ten percent interest. The FCC requires additional disclosures for applicants claiming DE status. *See* 47 C.F.R. § 1.2112(b).

19.     In 2000, the FCC further refined its approach by adopting a controlling interest standard for determining which applicants qualify as bona fide small businesses. *Amend. of Part 1 of the Commission's Rules - Competitive Bidding Procs.*, Order on Reconsideration of the Third Report and Order, Fifth Report and Order, and Fourth Further Notice of Proposed Rule Making, 15 FCC Rcd. 15293, ¶¶ 4-5, 58-67 (2000) ("*Amend. of Part 1 of Commission's Rules-*

---

[6] *See Amend. of Part 1 of the Commission's Rules - Competitive Bidding Procs.*, Third Report and Order and Second Further Notice of Proposed Rule Making, 13 FCC Rcd. 374, ¶ 71 (1997); 47 C.F.R. § 1.2112. Prior to 1997, the FCC implemented service-specific ownership disclosure rules on an ad hoc basis.

*Order on Reconsideration*"),. This standard requires applicants to identify controlling interests

based on the principles of either *de jure* or *de facto* control. *Id.* These orders formed the basis for

the current rules in which an applicant qualifies as a designated entity if its gross revenues are

below a threshold specified in service-specific rules (i.e., on an auction-by-auction basis). 47

C.F.R. § 1.2110(b)(1)(i). When determining the gross revenue of an applicant under this

standard, the FCC attributes to an applicant the gross revenues of it, its controlling interests, its

affiliates, and the affiliates of the applicant's controlling interests. *Id.* § 1.2110(c)(2). The FCC

also defines "affiliates" to include various affiliation relationships, including joint venture

arrangements.

20.     In its 1997 and 2000 orders, the FCC effectively rebalanced its initial approach by

eschewing the "easy resolution of eligibility issues" and refocusing its efforts on preventing

unjust enrichment through more rigorous pre-screening of short-form applications. The FCC

imposed stricter ownership disclosure and attribution requirements on DE applicants based on

the agency's experience, which had shown that "detailed ownership information is necessary to

ensure that applicants claiming designated entity status qualify for such status." *See Amend. of

Part 1 of Commission's Rules-Order on Reconsideration* ¶ 9. This experience was hard won.

21.     The most notorious example of the abuse during this period was perpetrated by

Wall Street money manager Mario Gabelli, who executed a fraudulent DE scheme over the

course of eight FCC auctions from 1995 to 2000. *See* News Release, *Mario Gabelli & Affiliate

Companies Pay U.S. $130 Million for Allegedly Defrauding FCC*, DOJ 06-431 (Jul. 13, 2006).

Gabelli recruited friends and relatives to serve as officers of sham DEs "solely to certify that they

met the FCC's eligibility rules" for bidding preferences. *Id.* The officers included "a former

aerobics instructor, the caretaker of Gabelli's vacation home, a retired professional basketball

player, and a relative of Gabelli who did not know the meaning of 'spectrum' or what FCC stood

for, and that none of these individuals possessed any relevant telecommunications experience or

knowledge." *Id.* Like the lottery winners in the pre-auction era, Gabelli never had any intention

of providing wireless services to the public but rather created the sham DEs to obtain a windfall

at taxpayers' expense.

22.     The publicity garnered by these revelations generated another unjust enrichment

embarrassment for the FCC. Gabelli's sustained success in circumventing the DE rules indicated

that the FCC's initial processes had failed to prevent the unjust enrichment that triggered

Congress's grant of auction authority. In response, the FCC adopted substantially stricter rules

for determining attributable relationships—a determination that required FCC staff to scrutinize

the short-form applications of entities claiming DE status. *Competitive Bidding Further Notice*

¶¶ 6-7.

23.     While the FCC has modified its designated entity rules in the intervening years, it

has not altered its controlling interest or affiliation standards or relaxed pre-auction ownership

disclosure requirements. *Updating Part 1 Competitive Bidding Rules*, Report and Order, 30 FCC

Rcd 7493, ¶¶ 15, 21 (2015) ("*Bidding Rules Update Order*"). Rather, the FCC has reaffirmed its

intent to "ensure that only *bona fide* small businesses qualify for and benefit from the designated

entity program." *Id*. ¶ 15.

## IV.    Overview of FCC Auction Process

24.     The two-step process of filing short-form and long-form applications is designed

to satisfy Congress's directive prohibiting a potential bidder from participating in an auction

"unless such bidder submits such information and assurances as the Commission may require to

demonstrate that such bidder's application is acceptable for filing." 47 U.S.C. § 309(j)(5). It

further provides that no license shall be granted to a winning bidder unless the Commission determines the bidder is qualified pursuant to the standard licensing provisions in Section 308(b) and Section 310. *Id.* The FCC's pre-auction review of short-form applications satisfies the first requirement, and its post-auction review of long-form applications satisfies the second.

25.     Congress required the FCC to pre-screen potential bidders to avoid the unjust enrichment scandals that occurred when the FCC stopped pre-screening lottery applicants. The two-step licensing process is intended to fulfill this purpose while avoiding the unnecessary delay that would result if the FCC conducted an in-depth review of every short-form application. *See Implementation of Section 309(j) of the Commc'ns Act Competitive Bidding*, 8 FCC Rcd. 7635, ¶ 97 (1993).

26.     The short-form application process, while abbreviated, must have teeth to serve its intended purpose of avoiding unjust enrichment about which Congress was concerned. The potential for the FCC to deny bidding credits during its review of long-form applications after a spectrum auction has concluded does not, and should not, give potential bidders a pass to knowingly file false short-form applications prior to the start of an auction. Though review of a long-form application affords the FCC an opportunity to prevent a sham DE from ultimately enjoying the financial benefit of bidding credits, it is too late to redress fully the harms to competition and the public that result from a sham DE's use of bidding credits in an auction.

27.     While the ownership disclosures required by both the short-form and long-form applications are largely the same,[7] the WTB typically has only a few weeks to review short-form applications before the auction is scheduled to commence. Success of the truncated short-form

---

[7] Applicants that claim designated entity status and seek bidding credits also must include the information required by 47 C.F.R. §§ 1.2105(a) and 1.2112.

process depends on the filing of detailed ownership information and the candor of applicants. The FCC presumes the certifications and information contained in the short-form applications are true unless they are incomplete, internally inconsistent, or contradicted by information in the agency's records. *Auction of Licenses for Vhf Pub. Coast & Location & Monitoring Serv. Spectrum*, 17 FCC Rcd. 19746, ¶ 7 (2002).

28.     Detailed and truthful ownership information in the short-form application allows the WTB to flag problems with an applicant's representations and disclosures that are apparent on their face. For problems that are not facially apparent, however, the FCC is highly dependent on applicant candor. The "fundamental importance of truthfulness and candor on the part of applicants and licensees in their dealings with the Commission is well established." *Hispanic Christian Cmty. Network, Inc.*, Order to Show Cause, DA 23-678, 2023 WL 5197159, ¶ 71 n.223 (MB Aug. 10, 2023) (citing *FCC v. WOKO, Inc.*, 329 U.S. 223 (1946)). If the FCC were forced to mistrust the truthfulness and accuracy of the information in short-form applications, it would be unable to fulfill the statutory objectives of Section 309(j). *Amend. of Section 1.17 of Commission's Rules Concerning Truthful Statements to the Commission*, Notice of Proposed Rule Making, 17 FCC Rcd. 3296, ¶ 3 (2002). The honesty and probity of applicants are especially important in the context of FCC spectrum auctions where the tens-of-billions-of-dollars at stake create extraordinarily strong financial and competitive incentives to game the system.[8]

---

[8] The importance of verity in the context of applications is reflected in the fact that the FCC's rule prohibiting auction applicants from providing false or misleading information is not limited to intentional conduct. 47 C.F.R. § 1.17(a)(2) (prohibiting an auction applicant from providing false or misleading information "without a reasonable basis for believing that any such material factual statement is correct and not misleading"). The FCC adopted this provision to "prohibit incorrect statements or omissions that are the result of negligence, as well as an intent

29.     When the WTB finds that a short-form application lacks required information, is internally inconsistent, or is contradicted by information in the FCC's records, the application will be designated as "incomplete" on the short-form status public notice. Simultaneous with the release of the status public notice, the staff contacts applicants whose short-form applications are determined to be incomplete, explains the reasons for the staff's determination, and provides an opportunity for the applicant to correct the deficiencies and refile its short-form application before the filing deadline. Providing applicants with an opportunity to correct their short-form applications serves the public interest by maximizing participation in the auction, which in turn promotes the assignment of licenses to those who value them most highly and thus are most likely to use them for the benefit of the public and compete effectively in the wireless market.

30.     Applicants may engage in discussions with WTB staff to ensure their resubmitted short-form applications correct the deficiencies identified and will be deemed complete. Applicants claiming designated entity status that successfully correct deficiencies in their short-form application and make their downpayment by the applicable deadline would still be qualified to bid and to use bidding credits in the auction. Applicants that are unable to remedy such deficiencies would not.

31.     In the context of a short-form application submitted by a purported designated entity, the term "incomplete" does not indicate that an application's deficiency is merely

---

to deceive." *Amendment of Section 1.17 of the Commission's Rules Concerning Truthful Statements to the Commission*, Report and Order, 18 FCC Rcd. 4016, ¶¶ 1-2 (2003).  Auction applicants are thus "require[d] [to] use due diligence in providing information that is correct and not misleading to the Commission, including taking appropriate affirmative steps to determine the truthfulness of what is being submitted." *Id.* ¶ 12.

procedural. Rather, it reflects a substantive determination by the WTB staff that the applicant's request for bidding credits does not pass regulatory muster.

32.     There are numerous examples in spectrum auctions where the WTB staff has determined that the short-form application of an applicant seeking bidding credits is deficient and the applicant has resubmitted that application to remedy those deficiencies. These include Auctions 66,[9] 73,[10] 87,[11] 103,[12] and 105.[13] In my experience managing spectrum auctions while at the FCC, WTB staff conducts a substantive review of short-form applications to assess an applicant's claimed designated entity status and eligibility for bidding credits. If this review indicates that an applicant is not entitled to the bidding credits it seeks, staff will designate the short-form application as incomplete, which has the effect of prohibiting the applicant's participation in the auction absent changes to that application by the filing deadline. In my experience, and consistent with FCC practice, short-form review plays a critical role in

---

[9] *Auction of Advanced Wireless Servs. Licenses*, 21 FCC Rcd. 8585, 8586 n.4, 8594 (WTB 2006). I was wireless legal advisor to the FCC Chairman during this auction and was responsible for the decisions of Commission staff related to the auction. Q: Cite is to both footnote 4 (8586 n.4) and p. 8594?

[10] *Auction of 700 MHz Band Licenses*, 23 FCC Rcd. 276, ¶ 1 n.2 & ¶ 49 (WTB 2008). I was Chief of the Wireless Telecommunications Bureau at all times during this auction and was directly responsible for managing the auction process. Q: Cite is to both footnote 2 (¶ 1 n.2) and p. 287 (or ¶ 49)?

[11] *Auction of Lower & Upper Paging Bands Licenses 69 Bidders Qualified to Participate in Auction 87*, 25 FCC Rcd. 5407, ¶ 2 n.2 & ¶ 48 (WTB 2010) Q: Cite is to both footnote 2 (¶ 2 n.2) and p. 5417 (or ¶ 48)?; *see also* Petition for Reconsideration of Various Auction 87 Public Notices, 27 FCC Rcd. 4374 (WTB 2012).

[12] *Incentive Auction of Upper Microwave Flexible Use Serv. Licenses in the Upper 37 GHz, 39 GHz, & 47 GHz Bands for Next-Generation Wireless Servs. 35 Applicants Qualified to Bid in Auction 103*, 34 FCC Rcd. 9626 (WTB 2019).

[13] *Auction of Priority Access Licenses for the 3550-3650 MHz Band 271 Applicants Qualified to Bid in Auction 105*, 35 FCC Rcd. 6672 (WTB 2020).

preventing an applicant that is not a bona fide designated entity from using bidding credits in a spectrum auction.

## V.     DOJ Motion to Dismiss

33.     The DOJ seeks dismissal of Relator's FCA complaint, in part, because, according to the DOJ, even if Relator were "able to prove Defendants failed to disclose material facts, there is significant doubt it will be able prove damages under the False Claims Act because the Defendants were never awarded any bidding credits." Dkt. 188, at 17. The DOJ reasons that, had SNR and Northstar disclosed the Understandings that Relator asserts were not disclosed to the FCC, "the result would be the same: the FCC would have denied SNR and Northstar bidding credits." *Id.* at 18.

34.     While I am not an expert on damages under the FCA, the DOJ's reasoning is flawed in three respects. First, it misapprehends the FCC's spectrum auction application process. Second, it mischaracterizes the significance of the undisclosed understandings in the context of the FCC's short-form application review process. Third, it misstates the harms resulting from an applicant's fraudulent short-form application.

### A.     The DOJ Misapprehends the FCC's Auction Application Process

35.     I agree with the DOJ that the FCC's acceptance of a short-form application "is not an award of any small business bidding credit," Dkt. 188, at 17. However, I disagree with the DOJ's suggestion that the FCC only evaluates "any claimed small business bidding credits" at the long-form application stage. *Id.* at 18. This suggestion is not consistent with my experience at the FCC or FCC practice.

36.     Contrary to the DOJ's apparent view of FCC auction procedures, the WTB reviews an applicant's short-form application to assess an applicant's claimed designated entity

status and eligibility for bidding credits. Indeed, the WTB previously has denied requests for bidding credits based on the information in an applicant's short-form application. Two examples occurred in Auction 40, when the WTB, whose chief at the time was Defendant John Muleta, found that applicants were not eligible for bidding credits based on the information in their short-form applications.[14]

37.     In the *Welch* decision, the WTB denied a petition filed by Mobilfone Service, Inc. ("Mobilfone") seeking reconsideration of the staff's decision prior to the auction that Mobilfone was not eligible for bidding credits on licenses won in Auction 40. Mobilfone's initial short-form application was deemed incomplete, and its resubmitted short-form application failed to identify all the applicant's officers and directors, which resulted in the WTB denying Mobilfone's request for bidding credits prior to the auction. In its reconsideration petition, Mobilfone argued that it was not required to identify which persons named in its application served as officers or directors under Rule 1.2110. In rejecting this argument, Mr. Muleta, on behalf of the WTB, concluded that "allowing applicants to list names without identifying information would deprive the Commission of information necessary to conduct its controlling interest analysis" and that this analysis is necessary to achieve the disclosure rule's purpose of ensuring that only bona fide small business receive bidding credits. 17 FCC Rcd. at 14756.

38.     Likewise, in *Keller* the applicant similarly did not disclose all its officers and directors in its resubmitted short-form application. The WTB concluded that, because it could not draw any conclusions regarding gross revenues attributable to any of the applicant's undisclosed officers and/or directors, the application provided insufficient information to verify

---

[14] *See Letter to Robert J. Keller*, 19 FCC Rcd. 22843 (WTB 2004); *Letter to Timothy E. Welch*, 17 FCC Rcd. 14754 (WTB 2002).

the applicant's eligibility for bidding credits. The WTB rejected the applicant's contention that its oversight was minor because the officers and directors were named in other capacities in the short-form application. According to Mr. Muleta, on behalf of the WTB, "[t]he public interest in a transparent auction process which [sic] assures that applicants satisfy eligibility qualifications prior to the auction could be substantially impaired if the Commission is required to guess whether applicants will qualify for bidding credits." 19 FCC Rcd. at 22846.

39.     These decisions confirm that FCC staff conducts a substantive review of short-form applications requesting bidding credits and will determine an applicant's status as a designated entity and bidding credit eligibility based on information in the applicant's short-form application. These decisions also demonstrate the FCC's interest in identifying applicants that do not qualify for designated entity status and denying those applicants' use of bidding credits prior to commencement of the auction.

40.     In addition to being inconsistent with FCC practice, the DOJ's apparent view that the FCC did not evaluate a claim for bidding credits based on an applicant's short-form application in Auction 97 is contradicted by the Public Notice governing Auction 97. This Public Notice states explicitly: "If an applicant claims eligibility for a bidding credit, the information provided in its FCC Form 175 [short-form application] will be used to determine whether the applicant is eligible for the claimed bidding credit." DA 14-1018, ¶ 64 (Jul. 23, 2014).

41.     Indeed, in Auction 97, there are multiple examples of the WTB assessing an applicant's claim for bidding credits and finding that claim wanting based on the information in that applicant's short-form application. For instance, the WTB issued a public notice in Auction 97 that identified two applicants seeking bidding credits whose short-form applications were deemed deficient due to discrepancies in the applicants' ownership disclosures: Geneseo

Communications, Inc. ("Geneseo") and S&T Communications, Inc. ("S&T"). *Auction of Advanced Wireless Servs. (AWS-3) Licenses 70 Bidders Qualified to Participate in Auction 97*, Public Notice, 29 FCC Rcd. 13465, ¶ 2 n.2 & ¶ 52 (WTB 2014). According to the public notice, Geneseo amended its short-form application to lower its request for a bidding credit from 25 percent to 15 percent, and S&T amended its short-form application to withdraw its request for a bidding credit altogether. *Id.* ¶ 2 n.2.

42.     Although the WTB's written explanation of the incomplete status of these applications is not publicly available, Geneseo stated in an attachment to its amended short-form application that, "upon further review of the rules, [Geneseo] subsequently determined that three potential [sic] companies may fall under the affiliate rules described in Section 47 C.F.R. §1.2110 (c)(5)(viii) or §1.2110(c)(5)(ix)." Geneseo's revised ownership disclosure indicates that its "further review" was prompted by a letter from the WTB regarding Geneseo's original ownership disclosure, in response to which Geneseo revised its ownership disclosure to include these three companies "in the affiliate section of the application" and incorporate "the gross revenues associated with these entities." The revised disclosure also notes that Geneseo had several discussions with the FCC staff so that it could submit a valid and complete application. A copy of Geneseo's revised ownership disclosure filing is attached as Exhibit FC-2. The publicly available attachments to S&T's short-form application do not provide any indication as to why it withdrew its request for bidding credits.

43.     The short-form applications of both Northstar and SNR also were listed as "incomplete" in Auction 97's status public notice. A comparison of the initial and revised ownership disclosures of Northstar reflect that the company initially had stated that Defendant Doyon, Limited's ownership in Defendant Northstar Manager "could *increase* to not more than

48.78 percent of all member interests ….” The revised version states that Doyon, Limited's ownership in Defendant Northstar Manager “could *decrease* to not less than 32.89 percent of all member interests ….” The other change between these two submissions appears to relate to a request by FCC staff for additional explanation of Northstar's assertion that it was exempt from filing gross revenues for itself and its affiliates under Section 1.2110(c)(5)(xi) of the FCC's rules. Though Northstar did not include an attachment to its resubmission explaining why it made these changes, the changes demonstrate that the WTB conducted a substantive review of Northstar's short-form application in assessing its status as a designated entity. The changes to SNR's application informed the Commission that the following agreements were amended in mid-October 2014: Amended and Restated Limited Liability Company Agreement of SNR Wireless HoldCo LLC; Limited Liability Company Agreement of SNR Wireless Management, LLC; and Amended and Restated Credit Agreement. It is unclear whether these changes were made at the behest of Commission staff.

44.     These examples from Auction 97 confirm the critical role that the short-form application plays in the WTB's determination of an applicant's qualifications for designated entity status and its eligibility to use bidding credits in the auction before bidding commenced. And the WTB relies upon the accuracy and truthfulness of the information in the applicant's short-form application in making that determination.

**B.     The DOJ Mischaracterizes the Significance of the Undisclosed Understandings at Issue.**

45.     Relator has alleged the existence of multiple Understandings that Northstar and SNR did not disclose to the FCC in either their short-form or long-form applications. These Understandings are identified and described in Relator's Supplemental Responses to Defendants' First Set of Interrogatories, which I have reviewed and upon which my Declaration relies.

46.     While I have not been asked to evaluate—and offer no opinion about—the evidence supporting Relator's allegations, my analysis assumes that Relator can prove the existence of each undisclosed Understanding described more fully below. In my opinion, each undisclosed Understanding alleged by Relator would have disqualified Northstar and SNR from being bona fide designated entities and rendered them ineligible to use bidding credits in Auction 97, had that Understanding been fully and truthfully disclosed in their short-form applications.

       *1.*     *"Northstar and SNR would serve as vehicles to acquire discounted spectrum for DISH."*

47.     An arrangement, agreement, or understanding that Northstar and SNR would serve as vehicles to acquire discounted spectrum for DISH is precisely the outcome the FCC's ownership disclosure rules are intended to prevent. The rules are designed to fulfill the FCC's statutory duty to "prevent unjust enrichment as a result of the methods employed to issue licenses." 47 U.S.C. § 309(j)(4)(E). The FCC has concluded that "certain agreements, by their very nature, are generally inconsistent with an applicant's or licensee's ability to achieve or maintain designated entity eligibility because they are inconsistent with Congress's legislative intent." *Second Further Notice* ¶ 23. There is no better description of such an agreement than an arrangement by which billions of dollars in subsidies are funneled to a multi-billion-dollar corporation (DISH) under the guise of benefiting very small businesses (Northstar and SNR).

48.     Preventing the use of sham DEs that function solely as a vehicle to obtain discounted spectrum for the benefit of another entity is what prompted the Commission to revise its DE rules in response to the Gabelli scandal. An understanding that Northstar and SNR would serve as vehicles to acquire discounted spectrum for DISH is indistinguishable from Gabelli, except that the beneficiary of the scam in this case is a nationwide wireless operator (DISH) rather than a private investor (Gabelli). Spectrum should not go "to those most willing and able

20

to manipulate the rules of the game," but rather "to the entities Congress actually intended to benefit." Separate Statement of Commissioner Michael J. Copps, *Second Further Notice* . Here, the bidding credits available in Auction 97 were intended to benefit bona fide small and very small businesses, not DISH.

49.     Based on my experience and consistent with FCC practice, had Northstar and SNR disclosed in their short-form applications that they were serving as vehicles to acquire discounted spectrum for DISH, I believe the WTB staff would have determined that Northstar and SNR were not bona fide very small businesses and would have found them ineligible to use bidding credits in Auction 97 prior to the start of the bidding.

> *2.*     *"DISH would dictate the parties' bidding strategy in Auction 97 and select the AWS-3 licenses on which Northstar and SNR would bid and the amounts of their bids."*

50.     Although joint bidding agreements are permitted under FCC rules, the Understanding that DISH would dictate the bidding strategy and bid amounts of Northstar and SNR and select the licenses on which they bid would have raised red flags during the short-form application review process. Such an Understanding would have indicated that Northstar and SNR were under DISH's *de facto* control, which would make DISH a disclosable interest holder and thus render Northstar and SNR ineligible to use bidding credits during the auction.

51.     The FCC's decision finding that Northstar and SNR were ineligible for bidding credits *after the auction* confirms the importance of the Understanding about DISH's influence over the bidding process to staff's assessment of their eligibility *before the auction*. In that decision, the FCC found that "the circumstances surrounding the bidding that resulted in SNR's and Northstar's winning bids" informed its "determination about DISH's power to control" SNR and Northstar. *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New*

*Licenses in the 1695-1710 MHz, 1755-1780 MHz and 2155-2180 MHz Bands*, Mem. Op. and Order, 30 FCC Rcd. 8887, ¶ 109 (2015) ("*Bidding Credit Order*"). These circumstances included: (i) SNR and Northstar designating target licenses that were "precisely the same" for both companies; and (ii) "behavior exhibited by the parties during the actual bidding" demonstrating that SNR and Northstar were working jointly with DISH "to advance DISH's interests, rather than SNR and Northstar functioning as independent bidders seeking to advance their own interests." *Id.* ¶¶ 110-111. The Understanding that DISH would dictate SNR's and Northstar's bidding "further evidences that DISH controlled the parties and that they were all acting with the objective of securing spectrum for DISH, with the simultaneous effect of constraining [SNR's and Northstar's] control over the policy decisions related to acquiring their licenses." *Id.* ¶ 112.

52.     That the Understanding about DISH's influence over the bidding process was indicative of DISH's *de facto* control likely explains why it was not disclosed by SNR and Northstar in their short-form applications. The FCC's rules provide that a "bidder assumes a binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of an auction." 47 C.F.R. § 1.2104(g)(2). Northstar and SNR were newly formed entities with no revenues, no spectrum licenses, no network infrastructure, and no wireless customers. It would have been unreasonable to conclude that a truly independent designated entity in these circumstances would be willing to give another company carte blanche to (1) obligate that entity to pay an unknown sum of up to billions of dollars or face default penalties (2) for an unknown set of spectrum assets that could obligate that entity to build out a wireless network utilizing those assets. It would likewise be unreasonable to conclude that Northstar and SNR would be able to meet such obligations on their own or would be able to find an investor willing to support

such obligations without insisting on control. This latter point was confirmed by the DEs' own actions when they were unable to modify their agreements with DISH in a way that would require DISH to relinquish control, and by DISH's own actions when it was unwilling to relinquish control.[15]

53.     Based on my experience and consistent with FCC practice, had Northstar and SNR disclosed in their short-form applications that DISH would dictate the parties' bidding strategy and select the licenses on which Northstar and SNR would bid and the amounts of their bids, I believe the WTB staff would have determined that Northstar and SNR were not bona fide very small businesses and would have found them ineligible to use bidding credits in Auction 97 prior to the start of the bidding.

> 3.     *"Northstar and SNR would transfer their spectrum to DISH after five years when the FCC's unjust enrichment period had lapsed."*

54.     The Understanding that Northstar and SNR would transfer their spectrum to DISH after five years when the FCC unjust enrichment period has lapsed suffers from the same defect as the Understanding that Northstar and SNR would serve as vehicles to acquire discounted spectrum for DISH: it is anathema to the purposes of the DE program. Though DEs are permitted to transfer their spectrum licenses, "[t]he designated entity and unjust enrichment rules were adopted to ensure the creation of new telecommunications businesses owned by small businesses that will continue to provide spectrum-based services." *Second Further Notice* ¶ 36. The unjust enrichment rules are thus intended to "deter[] speculation and participation in the licensing process by those who do not intend to offer service to the public." *Id.*

---

[15] *Northstar Wireless, LLC SNR Wireless Licenseco, LLC Applications for New Licenses in the 1695-1710 Mhz, & 1755-1780 Mhz & 2155-2180 Mhz Bands*, Mem. Op. and Order on Remand, 35 FCC Rcd. 13317, ¶ 5 (2020).

55.     An Understanding reached before the auction had been held—and thus before the DEs had an opportunity to provide any service at all—that SNR and Northstar would transfer to DISH any AWS-3 spectrum licenses they might win would make clear that the DEs had no intention of providing spectrum-based services but instead were created solely to obtain discounted spectrum for DISH. In my experience doing business case analyses for wireless companies, no new entrant to the wireless business expects to earn a positive rate-of-return within five years of obtaining their first spectrum licenses. This is even more improbable at the scale contemplated by the parties in the Auction 97.[16] It would be unreasonable to conclude that a bona fide designated entity intending to enter the wireless business would agree to sell its core business assets at the time the company was conceived.

56.     Based on my experience and consistent with FCC practice, had Northstar and SNR disclosed in their short-form applications that they would transfer their spectrum to DISH after five years when the FCC's unjust enrichment period had lapsed, I believe the WTB staff would have determined that Northstar and SNR were not bona fide very small businesses and would have found them ineligible to use bidding credits in Auction 97 prior to the start of the bidding.

> *4.     "DISH would own SNR's and Northstar's AWS-3 spectrum for accounting and financial reporting purposes, which also allowed DISH to take advantage of certain tax benefits."*

57.     The Understanding that DISH would own SNR's and Northstar's spectrum licenses for accounting and financial reporting purposes meant that DISH treated those licenses

---

[16] *See Bidding Rules Update Order* ¶ 3 (noting that "even new large-scale wireless providers, backed by well-capitalized corporations have struggled to develop successful business models to compete in today's wireless marketplace").

as assets of DISH. While I am not an accountant, the treatment of SNR's and Northstar's licenses as DISH's assets provided a right to economic benefits controlled by DISH under applicable accounting rules and reflected a level of control by DISH that is inconsistent with SNR's and Northstar's status as bona fide designated entities.[17]

58.     In essence, by DISH owning their licenses for accounting and financial reporting purposes, SNR and Northstar ceded the future economic benefit of their spectrum to DISH, effectively ceding their entire value to DISH, and thus their ability to raise financing independently of DISH. The accounting value of a wireless company's spectrum assets is frequently used as a basis for securing loans or obtaining additional investment, *see, e.g.*, *In re Tracy Broad. Corp.*, 696 F.3d 1051, 1055 (10th Cir. 2012) (noting that security interests in the economic value of a license improves licensees' access to capital), and I have personally prepared spectrum valuations for various clients for this purpose. As recently noted by Deloitte, "spectrum licenses make up a major portion of [wireless service providers]' assets—an average 35 percent of the assets of US" wireless service providers.[18] For the newly formed DEs, the AWS-3 spectrum would be their *only* asset. Ceding the accounting and financial reporting value of that asset to DISH would make the DEs entirely reliant on DISH for financing, which would leave them with no other option for financing the network build that would be required to provide wireless services.

-----

[17] *See* Generally Accepted Accounting Principles (defining an "asset is a present right of an entity to an economic benefit"); International Financial Reporting Standards (defining "assets" as "future economic benefits controlled by the entity as a result of past transactions or other past events").

[18] Dan Littman et al., *How much is spectrum worth?*, Deloitte Insights (May 14, 2018), https://www2.deloitte.com/us/en/insights/industry/telecommunications/5g-spectrum-valuation-portfolio-telecommunications-industry.html.

59.     A "significant" factor in the FCC's finding that SNR and Northstar were under DISH's *de facto* control was "the unprecedented magnitude of the indebtedness to DISH that SNR and Northstar each incurred to pay for the licenses won." *Bidding Credit Order* ¶ 54. The FCC also noted that this debt would increase when SNR and Northstar constructed the facilities for license areas that would span the nation. *Id.* The Understanding that DISH would own SNR's and Northstar's spectrum licenses for accounting and financial reporting purposes cemented DISH's control by effectively preventing SNR and Northstar from ever obtaining financing from or refinancing their existing debt through another party. In short, the FCC relied upon Northstar's and SNR's financial dependence on DISH in finding them ineligible for bidding credits *after the auction*, which confirms the importance of the Understanding by which they ceded their ability to raise financing independently of DISH to the staff's assessment of their eligibility *before the auction*.

60.     Based on my experience and consistent with FCC practice, had Northstar and SNR disclosed in their short-form applications that DISH would own their spectrum for accounting and financial reporting purposes, I believe the WTB staff would have determined that Northstar and SNR were not bona fide very small businesses and would have found them ineligible to use bidding credits in Auction 97 prior to the start of the bidding.

> 5.     *"SNR and Northstar would not use the AWS-3 spectrum they won in Auction 97 to provide wireless services."*

61.     The Understanding that SNR and Northstar would not provide wireless services using their AWS-3 spectrum is antithetical to the very purpose of the FCC's DE rules, which are intended to "ensure that, in accordance with the intent of Congress, every recipient of our designated entity benefits is an entity that uses its licenses to directly provide facilities-based

telecommunications services for the benefit of the public." *Second Further Notice* ¶ 3.[19] That the Understanding that SNR and Northstar would not provide wireless services was contrary to the FCC's DE rules almost certainly explains why it was not disclosed in SNR's and Northstar's short-form applications.

62.     Based on my experience and consistent with FCC practice, had Northstar and SNR disclosed in their short-form applications that they would not use their AWS-3 spectrum to provide wireless services, I believe the WTB staff would have determined that Northstar and SNR were not bona fide very small businesses and would have found them ineligible to use bidding credits in Auction 97 prior to the start of the bidding.

**C.     The DOJ Misstates the Harms Resulting from an Applicant's Fraudulent Short-Form Application.**

63.     The DOJ's position that Relator cannot prove damages because SNR and Northstar were never awarded bidding credits *after the auction* ignores the harms to the government and the public from SNR's and Northstar's fraud *before the auction* and their resulting improper use of bidding credits *during the auction*. These harms were the direct result of SNR's and Northstar's failure to disclose the Understandings in their short-form applications and false certifications, as alleged by Relator, which allowed SNR and Northstar to use bidding credits during the auction to which they were not entitled.

64.     These harms include preventing rival service providers from obtaining AWS-3 spectrum they needed to maintain or enhance their competitive position in the wireless market;

---

[19] Though the FCC subsequently determined that "there is no statutory requirement for DEs to directly provide facilities-based service to the public with each license they hold," the FCC affirmed its "statutory objectives [were to] facilitat[e] the ability of small businesses to acquire licenses and participate in the provision of spectrum-based services to the public." *Bidding Rules Update Order* ¶¶ 26, 30.

artificially increasing the amounts that rival service providers paid for the AWS-3 spectrum they were able to obtain in Auction 97; and artificially increasing the value of DISH's spectrum holdings. These harms exist independent of—and are not remedied by—the denial of bidding credits and adversely impact competition in the wireless market, thereby undermining the FCC's "primary mission in conducting auctions." *See Commission Opens Inquiry on Competitive Bidding Process for Rep. to Cong.*, Public Notice, 12 FCC Rcd. 10040, 10042 (1997).

65.     By using bidding credits to which they were not entitled in Auction 97, SNR and Northstar were able to submit gross bids that were higher than they otherwise would have placed in the absence of bidding credits. This bidding conduct drove AWS-3 prices artificially higher on a nationwide basis, which prevented rival service providers from obtaining spectrum they needed to maintain or enhance their competitive position or resulted in providers paying more for the spectrum they were able to acquire. Spectrum auctions typically make a large number of highly valuable licenses available simultaneously. The "big bang" nature of the auction process tends to stretch a provider's ability to raise sufficient capital to obtain all the spectrum licenses it may want or need. At some point, a provider will run out of the money required to make the post-auction downpayments and final payments that are required within weeks of an auction's close—a point that is reached sooner when bidding against a sham DE with a 25% bidding advantage. These competitive distortions can have a substantial impact on the wireless market, especially when DISH's rivals are already capacity constrained or lack sufficient "greenfield" spectrum for a smooth transition to a new generation of wireless technology (e.g., from 4G to 5G), as was the case here.

66.     Artificially increasing auction prices of AWS-3 spectrum also tended to inflate the value of DISH's current spectrum holdings. The industry and investors use a comparable

valuation methodology to value spectrum holdings. These valuations rely heavily on gross bid prices in recent spectrum auctions because the prices paid for spectrum in secondary market transactions are usually confidential. Valuations based on comparable auctions typically do not consider whether the license applications are ultimately granted, because the value placed on the spectrum exists independently of sham DE shenanigans. The inflation in the value of DISH's spectrum holdings undermines investor confidence in the integrity of FCC spectrum auctions.

67.     The FCC's "primary mission in conducting auctions is promoting competition by awarding licenses rapidly to those who value them most highly." *Commission Opens Inquiry on Competitive Bidding Process*, 12 FCC Rcd. at 10042. Those who value licenses most highly have the strongest economic incentives to provide service as quickly as possible and compete more effectively. *Amend. of Part 95 of the Commission's Rules to Modify Constr. Requirements for Interactive Video & Data Serv. (IVDS) Licenses*, Notice of Proposed Rule Making, 10 FCC Rcd. 8700, ¶ 3 (1995). The FCC achieves these objectives only by holding fair and transparent spectrum auctions because, "[w]hen auction applicants undermine our disclosure rules, such actions threaten the very foundation upon which we conduct our auctions." *Mar. Commc'ns/Land Mobile, LLC*, Order to Show Cause, 26 FCC Rcd. 6520, ¶ 49 (2011). The Defendants' conduct as alleged by Relator contravened the FCC's disclosure rules and undermined the integrity of Auction 97 as a result.

68.     The public also was harmed by the indefinite delay in the provision of new wireless broadband services utilizing AWS-3 spectrum resulting from the Defendants' conduct. *See, e.g.*, *Implementation of Section 309(j) of the Commc'ns Act*, 13 FCC Rcd. 15920, ¶ 152 (1998) (noting the importance of avoiding delays in the deployment of new services due to bidder disqualification). As evidenced by their default on 197 licenses for which they

collectively bid $3.3 billion, the Defendants did not have the financial wherewithal to pay the gross amount of SNR's and Northstar's winning bids. Thus, when the FCC found that SNR and Northstar were ineligible for bidding credits, they had no choice but to default.

69.     The FCC has never made the licenses on which SNR and Northstar defaulted available for use to benefit the public. The $3.3 billion in defaulted licenses have laid fallow for more than nine years, nearly an entire standard FCC license term. Because spectrum is an infinitely renewable resource, the public is harmed whenever spectrum lays fallow. *See, e.g.*, *Expanding Flexible Use of the 3.7 to 4.2 Ghz Band*, 35 FCC Rcd. 2343, ¶ 92 (2020). "Every day that a family lacks adequate Internet access may be a day a doctor's appointment is missed, a picture to loved ones goes unsent, and, yes, homework remains unfinished." *See id.*, Concurring Statement of Commissioner Brendan Carr. This harm was exacerbated by Defendants' multiple challenges to the FCC's decisions regarding SNR's and Northstar's ineligibility for bidding credits.[20]

70.     If the DOJ's argument was accepted—that there are no damages so long as bidding credits are denied during long-form review—it would create incentives for bidders to seek bidding credits by knowingly filing false short-form applications. A savvy bidder may conclude that the potential benefits of falsifying its short-form application outweigh the costs of the FCC's relatively small default payment obligations. With respect to the potential benefits, there is always a chance that, during long-form review, the FCC will miss the falsehood or approve bidding credits despite the falsification. Sophisticated bidders know that a denial of

---

[20] *See* FCC, *Connecting America: The National Broadband Plan* (noting that "[c]ontentious spectrum proceedings can be time-consuming, sometimes taking many years to resolve, and incurring significant opportunity costs"), https://transition.fcc.gov/national-broadband-plan/national-broadband-plan.pdf (last visited Apr. 3, 2024).

bidding credits that forces defaults after the auction will impose opportunity costs on the public

and potentially embarrass the FCC, factors that may prove sufficient for the FCC to approve a

DE application that it otherwise would not or for the FCC to enter a settlement favorable to the

sham DE. With respect to the potential costs, they are heavily dependent on the outcome of a

reauction of the defaulted licenses at some point in the future. If a subsequent winning bid equals

or exceeds the amount of the defaulted bid, no deficiency payment will be assessed. 47 C.F.R.

§ 1.2104(g)(2)(i). And the additional payment can be as low as 3% of the applicable bid. *Id.*

§ 1.2104(g)(2)(ii). The FCC may ultimately owe a defaulting bidder a refund from the bidder's

interim default payment.[21] Is the DOJ prepared to claim "no harm, no foul," if a sham DE

knowingly files a false short-form application to obtain discounted spectrum for AT&T, which

results in spectrum laying fallow for nearly a decade, so long as the bidding credits are denied?

71.     The denial of bidding credits does not put the government in the same position as

it would have been had Northstar and SNR disclosed in their short-form applications the

Understandings alleged by Relator. In my opinion, those disclosures would have resulted in: (i)

the WTB determining that Northstar and SNR were not bona fide very small businesses and thus

were ineligible to use bidding credits in Auction 97; and (ii) Northstar and SNR (or more likely

DISH) submitting bids for AWS-3 licenses that did not exceed approximately $10 billion, which

apparently was the maximum amount they could afford. In these circumstances, a rival provider

would have bought the $3.3 billion in licenses for which SNR and Northstar were only able to

bid with the benefit on bidding credits to which they were not entitled and would have put those

---

[21] *See How Does A Default Payment Become A Refund? When The FCC Auction Winner Stays The Same*, Insideradio.com (Dec. 5, 2022), https://www.insideradio.com/free/how-does-a-default-payment-become-a-refund-when-the-fcc-auction-winner-stays-the/article_78638438-7472-11ed-8c56-87d7dca52622.html.

licenses to use in providing valuable wireless broadband services to consumers throughout the country.[22]


    I, Fred Campbell, hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

_____
Fred Campbell


Dated:  April 20, 2024

---

[22] Note that I am not suggesting that the harm to the public in this case is limited to the value of the defaulted licenses. Because spectrum value is approximately one-third of the cost of providing wireless services, the opportunity cost to the government in terms of lost services is likely to be three-times or more than the defaulted licenses' auction value.