IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES *ex rel.* VERMONT NATIONAL TELEPHONE CO.,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHSTAR WIRELESS, LLC, *et al.*,<br><br>Defendants. | Case No. 1:15-CV-00728-CKK |

## **DECLARATION OF DR. ROBERT KULICK**

1. My name is Dr. Robert Kulick, and I am a Managing Director at National Economic Research Associates, Inc. ("NERA"). I am of the age of majority and competent to make this declaration.

2. Relator Vermont National Telephone Company has engaged me to testify as an expert witness in this litigation. Specifically, Relator has asked me to evaluate the damages suffered by the United States Government (the "Government") as a result of Defendants' fraudulent conduct and to determine the monetary amount necessary to fully compensate the Government for the harm it suffered. Specifically, I have been asked to evaluate the actual damages necessary to "make the government whole" in light of Defendants' fraud.

3. I had been analyzing these issues in preparation of a full report of the opinions I planned to express and the basis and reasons for them, which was to be disclosed on February 28, 2024, in accordance with the Second Amended Scheduling and Procedures Order. *See* Dkt. 160 at 5. However, in light of the Government's motion to dismiss this case and the resulting suspension of

discovery, I am providing this declaration, which summarizes some of the key findings from my analysis and previews my report. If this litigation continues, I will prepare a complete report of my opinions consistent with Federal Rule of Civil Procedure 26(a)(2).

**Qualifications**

4.      My primary areas of expertise are the economic analysis of competition policy, communications policy, and consumer protection issues and the assessment of damages in complex litigation. I have testified and served as an expert in matters involving antitrust liability and damages, commercial damages, and tort damages. I have also consulted on bidding strategy for clients engaged in spectrum auctions. My academic research on mergers, competition policy, communications policy, class certification, entrepreneurship, and labor markets has been published in leading scholarly journals and volumes and been cited by the White House, the U.S. Court of Appeals for the D.C. Circuit, and popular outlets like *Axios* and *Protocol*.

5.      I received my Ph.D. in economics from the University of Maryland and my Bachelor of Arts in Economics (High Honors) from Princeton University. I am also an Adjunct Professor at the Antonin Scalia Law School at George Mason University and a Visiting Fellow at the American Enterprise Institute.

**Auction 97 Rules and Results**

6.      FCC Spectrum License Auction 97 (Auction 97) involved the auction of 1,614 spectrum licenses in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz bands, collectively known as the "AWS-3" bands.[1] The auction took place from November 13, 2014 to January 29, 2015

---

[1] Federal Communications Commission, *Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for November 13, 2014: Notice and Filing Requirements, Reserve Prices, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 97*, AU Docket No. 14-78 (July 23, 2014) (available at https://docs.fcc.gov/public/attachments/DA-14-1018A1.pdf) (hereafter *Public Notice*) at ¶¶ 1, 6 ("Of the 1,614 licenses offered in Auction 97, 880 will be Economic Area ("EA") licenses and 734 will be Cellular Market Area ("CMA") licenses.").

2

lasting 341 rounds with 70 bidders. A total of 1,611 licenses were purchased by 31 bidders with three licenses remaining unsold. Gross auction proceeds amounted to $44,899,451,600.[2]

7. Auction 97 used a simultaneous multiple-round auction ("SMRA") structure.[3] The auction provided bidding credits of 15% and 25% to two categories of small businesses, defined by revenue; those businesses eligible for such credits were referred to as "designated entities."[4] Net proceeds accounting for bidding credits were $41,329,673,325.[5]

8. Subsequent to the close of the auction, the Federal Communications Commission (FCC) found two bidders who had been qualified as designated entities based on representations made to the Commission, Northstar Wireless L.L.C. ("Northstar") and SNR Wireless LicenseCo L.L.C. ("SNR"), were not eligible designated entities.[6] Northstar and SNR jointly defaulted on 197 licenses, acquiring the remaining 505 licenses won at auction at non-discounted prices.[7]

**Economic Framework for Assessing Damages**

9. In any transaction, a seller considers whether selling a good at the price offered by a buyer outweighs the economic benefit of keeping the good for future sale or other use. The value to the

---

[2] Federal Communications Commission, Auction of Advanced Wireless Services (AWS-3) *Licenses Closes: Winning Bidders Announced for Auction 97*, DA 15-131 (January 30, 2015) (available at https://docs.fcc.gov/public/attachments/DA-15-131A1.pdf) (hereafter *Winning Bidders*) at ¶ 1 and Federal Communications Commission, Auction 97: Advanced Wireless Services (AWS-3), *Summary* (available at https://www.fcc.gov/auction/97).

[3] *Public Notice* at ¶¶ 7, 143, 145.

[4] *Public Notice* at ¶¶ 79-83. Credits were also provided for bidders stating their intentions to use spectrum to expand services on tribal lands. See *Public Notice* at ¶¶ 94, 236-238.

[5] *Winning Bidders* at ¶ 1.

[6] Federal Communication Commission, *In the Matter of Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands: Memorandum Opinion and Order,* FCC-15-104 (rel. August 18, 2015) (available at https://docs.fcc.gov/public/attachments/FCC-15-104A1.pdf) at ¶ 4.

[7] Federal Communication Commission, *In the Matter of Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands: Memorandum Opinion and Order on Remand,* FCC-20-160 (rel. November 23, 2020) (available at https://docs.fcc.gov/public/attachments/FCC-20-160A1.pdf) at n. 43 and Declaration of Paul Malmud (August 25, 2023) at ¶24.

seller of keeping the good is often referred to by economists as the "continuation value" of the good.

10.     In economics, the minimum price at which a seller will sell is known as the willingness-to-accept ("WTA"). The seller's WTA is determined by, and equal to, the continuation value of the good for sale; otherwise, it would not be worthwhile for the seller to sell.

11.     In auctions, the market price of a good (or goods) being sold is not known ahead of time by the seller and is "discovered" through the auction process. However, economics shows that a rational seller will use what is known as a "reserve price" to ensure a good sold at auction is not sold below the seller's WTA.

12.     A seller seeking to maximize revenue may set a reserve price above the WTA for strategic reasons. However, a basic principle of the economic theory of auctions is that the reserve price will be set at a value <u>greater than or equal</u> to the seller's WTA, and thus, the seller's continuation value.[8]

13.     The reserve price in an auction can be set in different ways by the seller. For instance, reserve prices may be expressed as undisclosed or disclosed prices below which the good will not be sold or as minimum opening bid amounts.  In every FCC spectrum auction, the FCC is required by law to consider the imposition of reserve prices.[9] The FCC determines the appropriate reserve price for each license auctioned based on its assessment of the public interest, and reserve prices must explicitly be set to ensure that "licenses will not be assigned at unacceptably low prices" and

---

[8] See e.g., Paul Milgrom, "Auctions and Bidding: A Primer," *Journal of Economic Perspectives* 3:3 (1989) at 7 ("Here the auctioneer begins with the lowest acceptable price – the *reserve price* – and proceeds to solicit successively higher bids from the customers until no one will increase the bid."); Paul Klemperer, "Auction Theory: A Guide to the Literature," *Journal of Economic Surveys* 13:3 (1999) at 235.

[9] 47 U.S.C. § 309(j)(4)(F)  ("In prescribing regulations pursuant to paragraph (3), the Commission shall— (F)prescribe methods by which a reasonable reserve price will be required, or a minimum bid will be established, to obtain any license or permit being assigned pursuant to the competitive bidding, unless the Commission determines that such a reserve price or minimum bid is not in the public interest.").

4

can be set at the minimum opening bid.[10] Thus, the reserve price set by the FCC for each license in an auction reveals the maximum value of the Government's WTA for the license.

14. The FCC balances multiple objectives when conducting spectrum auctions including promoting "efficient and intensive spectrum usage" and "speedy development and deployment of new technology and services to benefit the public, including rural areas."[11] All else equal, the consideration of public interest factors such as these tends to reduce the Government's continuation value of holding on to spectrum licenses, typically leading to the setting of reserve prices well below the "fair market value" that would obtain in private transactions. Thus, the value that the Government derived from Defendants' return of the licenses at issue cannot be assessed with reference to the commercial fair market value of the licenses. Rather, as shown below, damages must be assessed based on the Government's WTA as revealed through the reserve prices associated with the licenses at issue.

**Damages**

15. I understand that the Government, in its Motion to Dismiss, asserted that "there is significant doubt VTel will be able to prove meaningful False Claims Act damages." Dkt. 189 at 18. For the reasons discussed herein, I disagree.

16. I understand that the appropriate legal standard for assessing damages in this matter is that damages must be calculated to restore the Government to the position it would have enjoyed had it received the "benefit of the bargain" in exchange for the licenses acquired by Northstar and SNR in Auction 97. Thus, in the absence of Defendants' fraudulent conduct, the Government would

---

[10] Federal Communications Commission, Amendment of Part 1 of the Commission's Rules – Competitive Bidding Procedures, WT Docket No. 97-82, *Third Report and Order and Second Further Notice of Proposed Rule Making* (rel. December 31, 1997) at ¶ 140.
[11] Federal Communications Commission, The FCC Report to Congress on Spectrum Auctions, WT Docket No. 97-150, *Report*, at 8 (updated September 30, 1997).

have received the full proceeds from the licenses at issue—*i.e.*, $3,437,034,600—reflecting Northstar's and SNR's undiscounted bid amounts.[12]

17. In the actual world, Defendants defaulted on the licenses, and the spectrum associated with the licenses was returned to the Government. Thus, damages are equal to:

$$D = P - V_c$$

where $P$ represents the $3.4 billion in proceeds lost by Government on the licenses and $V_c$ represents the Government's continuation value of the restored spectrum.

18. As discussed above, the reserve price, $R$, in an auction will be set such that:

$$R \geq WTA$$

i.e., the reserve price must meet or exceed the seller's WTA.

19. In Auction 97, license-level reserve prices were set through a minimum opening bid.[13] Denoting the sum of the minimum bids on the licenses at issue as $B_{min}$, it follows that:

$$B_{min} \geq WTA$$

20. Since a seller's WTA is defined by, and hence equivalent to, the continuation value of the asset, it also follows that:

$$D = P - V_c \geq P - B_{min}$$

21. Thus, the quantity $P - B_{min}$ provides a conservative basis for estimating actual damages on the licenses at issue. Hence, I calculate actual damages as:

---

[12] Federal Communication Commission, *In the Matter of Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands: Memorandum Opinion and Order on Remand,* FCC-20-160 (rel. November 23, 2020) (available at https://docs.fcc.gov/public/attachments/FCC-20-160A1.pdf) at n. 43 ($2,226,129,000 + $1,210,905,600 = $3,437,034,600); DISH-VTEL-000115116.

[13] The FCC also set band-level reserve prices to ensure that the relocation and sharing costs associated with transitioning the spectrum to new use would be covered. However, the band-level reserve prices do not provide information about the Government's valuation of individual licenses. Rather, they reflect thresholds which if auction proceeds had not exceeded, all auction results for the entire band would have been voided. Proceeds in the auction substantially exceeded the band-level reserve prices. See *Public Notice* at ¶¶ 184-190.

6

$$D = P - B_{min}$$

22.     As discussed above, the value of $P$ is $3,437,034,600. The value of $B_{min}$ is $129,319,400.[14] Thus, actual damages are $3,437,034,600 less $129,319,400, which is equal to $3,307,715,200.

23.     In other words, that the Government maintains the defaulted upon licenses does not mean that there are no damages. The reserve price demonstrates that, taking into account the public interest value of allocating the spectrum through the auction mechanism, the maximum value to the Government of retaining the undeployed licenses as an asset is only $129,319,400. Thus, to make the Government whole, an additional $3,307,715,200 in compensatory damages is required.

24.     I also understand that it may be asserted that, as a legal matter, the interim default payment to be imposed under the auction rules represents a cap on actual damages. I have no opinion as to whether this position is accurate from a legal perspective. However, since the actual damages calculated based on my economic methodology exceed the interim default payments associated with the licenses at issue, in this scenario, the minimum actual damages would be $515,555,190 – the full value of the interim default payments.

**Conclusion**

25.     I understand Relator offered to share my analysis with economists from the FCC, so that they could consider it before determining whether, and to what extent, the Government was harmed by Defendants' conduct. I understand that the Government declined that offer and filed its motion to dismiss and request for a stay of discovery without the benefit of my analysis. I would still welcome the opportunity to meet with economists from the FCC to discuss my analysis in more detail.

---

[14] *Public Notice* at Attachment A (available at https://docs.fcc.gov/public/attachments/DA-14-1018A2.pdf); DISH-VTEL-000115116.

I hereby declare this statement to be true and correct under penalty of perjury on this 21st day of April, 2024.

_____
Dr. Robert Kulick