**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, *ex rel.*,
VERMONT NATIONAL TELEPHONE CO.,

             Plaintiff,

        v.

NORTHSTAR WIRELESS, LLC, e*t al.*,

             Defendants.

Civil Action No. 1:15-cv-0728 (CKK)

**DECLARATION OF STEPHEN J. OBERMEIER**

1.      My name is Stephen J. Obermeier.  I am a partner at Wiley Rein LLP ("Wiley"), a position I have held for nine years.  I previously served as an Assistant United States Attorney ("AUSA") in the civil section in the Eastern District of Virginia (2010-2013), where, among other things, I represented the United States in False Claims Act ("FCA") matters and responded to and litigated discovery requests (including *Touhy* requests) served on federal agencies.  I hold an undergraduate degree from Princeton University and juris doctorate from Vanderbilt University.

2.      I have been one of the lead attorneys on this case since Wiley was retained to represent Vermont National Telephone Company ("Relator") in this case in 2015.  I am submitting this declaration in support of Relator's opposition to the government's Motion to Dismiss this case ("Motion").

**DOJ's Purported Investigation of Relator's Claims**

3.      From the outset of this litigation, the individual at the Department of Justice ("DOJ") with primary responsibility for this case has been Senior Trial Attorney Benjamin Wei.

1

As explained in greater detail below, the Motion mischaracterizes and omits key details about the investigation of those claims conducted by or under the direction of Mr. Wei.

4.      According to the DOJ, it investigated Relator's allegations for more than "16 months" after Relator filed its complaint in May 2015.  Dkt. No. 188 at 7.  However, my understanding from the DOJ is that the DOJ did not issue a single subpoena or civil investigative demand.  And, while the DOJ's investigation may have "included the review of thousands of pages of documents produced by the Defendants that were not part of the proceedings before the FCC," *id.*, my understanding from the DOJ is that those documents were voluntarily made available to—and necessarily curated by—Defendants.  During discovery, Defendants identified the documents provided by them to the DOJ.  Those documents did not include the hundreds of documents uncovered by Relator during discovery that confirm the fraud in which Defendants engaged.

5.      Under the circumstances, any "significant reservations" the DOJ may have expressed about Relator's case when it declined to intervene in 2016 were reached without the benefit of critical information evidencing Defendants' fraud, which DOJ did not bother to subpoena or consider.  *Id.* at 8.  And, despite such "reservations," the DOJ never suggested to Relator during the period its complaint was under seal that dismissal might be an option.

6.      One concern about Relator's complaint expressed by the DOJ involved its belief that Relator had alleged a regulatory fraud claim—*i.e.*, that Defendants misinterpreted an ambiguous regulatory requirement—under *U.S. ex rel. Purcell v. MWI*, 807 F.3d 281 (D.C. Cir. 2015).  Even though Relator never made any such allegations, Relator agreed to amend its complaint in 2019 at the direction of the DOJ (in collaboration with Defendants, as described more fully below) to address the DOJ's concern.  The DOJ's concern subsequently was rendered

moot after the Supreme Court's decision in *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023), which overruled *Purcell*.

7.      The DOJ also expressed concern about Relator's theory of damages.  But after it decided not to intervene in 2016, the DOJ never discussed the damages issue with Relator again until January 2024, and only after it had threatened to seek dismissal of the case.  Furthermore, the DOJ declined multiple meeting requests by Relator to discuss the case and refused, for reasons it never explained, to defer any decision about dismissal until after it had a chance to consider Relator's alternative damages theory (which the DOJ still has never addressed) and review the expert report of Relator's damages expert, as explained more fully below.

8.      Discovery in this case commenced in the fall of 2022, and Defendants began producing responsive documents on a rolling basis in late 2022.

9.      On June 26, 2023, I emailed Mr. Wei and others, including Michael Granston, Deputy Assistant Attorney General for the Commercial Litigation Branch, requesting a meeting to discuss Relator's "progress to date."  I did not receive a response from the DOJ to this request.

10.     On July 7, 2023, I emailed Mr. Wei again requesting a meeting.  This time, Mr. Wei responded, declining to meet, and stating instead that Relator should "[f]eel free to send over any documents you think we should review." Mr. Wei also requested that Mr. Granston be taken "off these emails, as he does not have day-to-day responsibilities regarding the case."

11.     In response to Mr. Wei's email, on August 10, 2023, Relator sent more than 1,000 documents to Mr. Wei via Wiley's file transfer software platform and again offered "to meet with [him] to provide a briefing."  Mr. Wei did not respond to my email and never requested a briefing.

12.     On September 1, 2023, following a joint call with Defendants about the case schedule during which Mr. Wei indicated that the government still did not understand Relator's theory of the case, I emailed Mr. Wei asking how DOJ could take that position when Wiley's file transfer software platform reflected that he had never opened any of the documents provided on August 10, 2023.

13.     Mr. Wei responded that same day, indicating he had "reviewed the materials [Relator] sent the FCC."  But Relator had not provided the FCC with copies of any written materials as of the date of Mr. Wei's September 1, 2023 email.  When confronted with the truth, Mr. Wei backtracked, saying that he had "had a long debrief with the FCC" following a presentation that Relator had made to the FCC in July 2023.

14.     On September 11, 2023, I emailed Mr. Wei indicating that Relator would be resending the documents provided previously on August 10.  I also offered to meet to explain the significance of these documents and to provide copies of Relator's responses to interrogatories and requests for admission served by Defendants.  Mr. Wei never responded to this offer and never asked for copies of Relator's discovery responses.

15.     On September 11, 2023, Relator re-sent the documents to Mr. Wei.  These documents included 900 in .pdf format that were in a zip file (in folders "IMAGES\IMG001") and 147 in native format (in folders "NATIVES\NATIVE001").  Wiley's file transfer software indicates that Mr. Wei only opened the 147 documents provided in native format and never opened the zip file containing the 900 documents provided in .pdf format.  That Mr. Wei never bothered to review all the documents provided by Relator is confirmed by the DOJ's Motion, which asserts that Relator only sent the DOJ "147 documents that it claimed support its case" when in fact Relator provided the DOJ with more than 1,000 documents.  Dkt. No. 188 at 12.

**DOJ Collaboration With Defendants' Counsel**

16.     Since the inception of this case in 2015, the DOJ appears to have collaborated closely with Defendants' counsel.  Such conduct is unusual in my experience in other FCA cases and as a former AUSA.

17.     For example, in 2019, the DOJ insisted that Relator amend its complaint to clarify its claims.  According to the DOJ, the entire point of the amendment exercise was to eliminate any allegations by Relator that implicated the *Purcell* issue.  The DOJ claimed that if Relator removed the issue from the Complaint, the DOJ would be more likely to veto dismissal of Relator's claims based on the public disclosure bar.

18.     In fact, it appears the DOJ was working with Defendants to limit Relator's claims to their so-called "secret agreements" theory (Defendants' and the DOJ's term), which Defendants would then seek to dismiss under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Indeed, that is precisely what transpired when Defendants filed their Rule 12(b)(6) motion seeking dismissal of Relator's amended complaint on March 28, 2019.  Dkt. No. 77.

19.     Relator began discussing proposed amendments to its complaint with the DOJ beginning in late 2018.  On December 28, 2018, Mr. Wei sent proposed "edits that would narrow the Complaint to an extent, were the decision made to do so, that [DOJ] would veto a motion to dismiss under the public disclosure bar."  Mr. Wei sent additional edits on January 28, 2019. Relator emailed Mr. Wei that same day indicating that Relator was reviewing the proposed edits but requesting that, in an effort to avoid "any misunderstanding on our part regarding next steps," the DOJ explain its "position about the process the parties will follow if the Relator consents to [DOJ's] proposed edits."

20.     Mr. Wei responded via email on January 28, 2019 as follows:

... the document we sent represents those allegations we feel comfortable allowing to proceed in this action.  If you and your client come to the decision that you can appropriately make those allegations, one next step is for you to file a motion to amend that attaches a copy of the amended complaint.  In that event, we would then inform the Defendants that we would veto any attempt to dismiss the amended complaint on public disclosure grounds, which would most likely result in them abandoning that argument.

21.     From January 28, 2019 through February 4, 2019, Relator's counsel discussed with the DOJ additional edits to the complaint.  As part of those discussions, Mr. Wei directed Relator to share its working draft of the amended complaint with Defendants' counsel so that Defendants' counsel could either approve those edits or propose further revisions, which Mr. Wei would then support.

22.     On February 4, 2019, Relator agreed to additional edits from the DOJ and Defendants but pushed back on their proposed edits to one specific paragraph (¶ 142).  Relator also noted that "we still have yet to receive confirmation from the DOJ that, if the Relator consents to these changes, the DOJ will veto dismissal of the amended complaint on public disclosure bar grounds."

23.     Michael Granston, at the time Director of the Fraud Section of the Commercial Litigation Branch, responded via email on February 4, 2019 questioning Relator's reluctance to edit paragraph 142 in the manner requested by the DOJ and Defendants.  Regarding Relator's request for "confirmation," Mr. Granston represented as follows:

As to your latter question, I advised you earlier when we spoke that we are prepared to move forward with the exercise of our veto authority, if we are comfortable with the form of the amended complaint that the relator proposes to file.

Based on Mr. Granston's representation that DOJ would oppose a public disclosure bar dismissal, Relator acquiesced to DOJ and Defendants' edits to paragraph 142 and filed a motion to amend its complaint with a copy of the proposed amendment later that day on February 4, 2019.  Dkt. No. 74.

24.     On September 30, 2022, during a meet and confer on a proposed joint discovery plan, Defendants informed Relator that they intended to move for judgment on the pleadings based on several defenses, including the FCA's public disclosure bar.  Dkt. No. 107-1 at 2.  After this call, Relator made multiple requests in October 2022 for a meeting or call with the DOJ to confirm that it would oppose dismissal, as the DOJ had committed to doing in 2019.  These requests were ignored, until Mr. Wei agreed to a call with Relator on October 20, 2022.  But on that call, Mr. Wei merely indicated that the DOJ needed additional time to decide whether it would oppose dismissal based on the public disclosure bar and declined to discuss the merits of that decision.

25.     Finally, on November 23, 2022, Mr. Wei telephoned me and informed me that the DOJ had decided to oppose dismissal on public disclosure grounds but that this opposition would be limited to claims related to "undisclosed agreements."  Mr. Wei provided no explanation for the DOJ's decision.

26.     Shortly thereafter, Defendants served a Rule 45 subpoena on the FCC and a related *Touhy* request on November 28, 2022.  Three of those requests sought documents related to Relator's damages claims (Request Nos. 11-13).

27.     On or around August 15, 2023, I telephoned Megan Davis with the FCC's Office of General Counsel ("OGC") to discuss an extension of the discovery schedule that would give the FCC more time to respond to Defendants' discovery requests.  Ms. Davis did not return my call.  But on August 25, 2023, Ms. Davis emailed that she had "just received [my] voice message asking for a call about the schedule" and that "[t]he FCC was experiencing issues with voice messages not being delivered."

28.     During a telephone conversation with Relator's counsel later that day, Ms. Davis revealed for the first time that the government intended to provide a declaration to Defendants about damages.  According to Ms. Davis, the purpose of the declaration was to obviate the need for the FCC to produce documents responsive to Defendants' discovery requests related to Relator's damages claims (Request Nos. 11-13).  Ms. Davis represented that the declaration was not final; would be a factual recitation of the events in the auction, such as what payments and guarantees were made; and would only address facts, not legal conclusions.

29.     Relator's counsel spoke again with Ms. Davis the following Monday, August 28, 2023.  During that call, which occurred at 3:30 p.m., Ms. Davis confirmed that the FCC would provide a declaration as a result of negotiations with Defendants over damages discovery.  She stated that it was the government's idea to provide the declaration, which had been drafted to generally track language in public orders.  According to Ms. Davis, she had discussed "the concepts" with Defendants but claimed that Defendants had neither seen a draft of nor had an opportunity to edit the declaration.

30.     On August 28, 2023, at 6:09 p.m., Ms. Davis emailed Relator "a courtesy copy" of the final declaration of Paul Malmud, Associate Division Chief, Broadband Division within the Wireless Telecommunications Bureau at the FCC, which, according to Ms. Davis, the FCC had produced that evening "in response to the third-party subpoena and *Touhy* request served on the FCC by Defendants" ("Malmud Declaration").  It was immediately obvious that the Malmud Declaration had been in the works for some time, although neither the FCC nor the DOJ had informed Relator about the government's plan to provide a declaration in lieu of responding to Defendants' discovery requests prior to August 25, 2023. And, contrary to Ms. Davis' representations, the Malmud Declaration did not focus on a factual recitation of events but rather

8

summarized (often incorrectly or without citation) FCC rules and regulations and purported to offer conclusions about Defendants' participation in Auction 97 related to this litigation.  In fact, the Malmud Declaration tracked language and theories raised by Defendants in their *Touhy* requests, strongly suggesting that the Malmud Declaration was drafted by the DOJ and the FCC in consultation with Defendants.

31.     There was no need for the government to provide Defendants with the Malmud Declaration to avoid producing documents in response to Defendants' discovery requests about Relator's damages claims.  First, the three requests at issue sought documents that either were: (i) publicly available or already in Defendants' possession, custody, or control (Request No. 11—"records reflecting any demand for money or property submitted to the FCC by SNR, Northstar, or DISH in connection with Auction 97"; Request No. 12—"records reflecting any demand for money or property that the FCC submitted to SNR, Northstar, or DISH in connection with Auction 97"); or (ii) not relevant to any issue in this litigation (Request No. 13—"records reflecting or concerning the monetary value of spectrum licenses made available for sale during Auction 97 …").  Second, the government had not produced documents in response to Defendants' other discovery requests and had not offered to provide a declaration to Defendants to avoid doing so.

32.     In a telephone conversation with Relator's counsel on August 30, 2023, Jacob Lewis, Associate General Counsel for the FCC, acknowledged the OGC's awareness that Defendants intended to use the Malmud Declaration to argue that the FCC had not been harmed by Defendants' fraud.  However, according to Mr. Lewis, the OGC did not agree with Defendants' position that the FCC is not harmed by deceptive claims, fraudulent misrepresentations, and false certifications in an applicant's short-form application seeking

bidding credits merely because that applicant is subsequently denied bidding credits after the auction has concluded.  Indeed, according to Mr. Lewis, the FCC had not reached any definitive conclusions regarding damages in this case, which is why Mr. Lewis suggested that Relator brief Michelle Ellison, the FCC's General Counsel, on the case—a briefing that Mr. Lewis recommended focus on damages.

33.     On September 8, 2023, Defendants—citing the Malmud Declaration—sent a letter to Relator threatening to seek legal fees if the case continued because, according to their counsel, the Malmud Declaration established "beyond dispute" that there were "no damages to the government here." According to Defendants, "the most that could be recovered even if there were any such basis [for FCA liability] would be statutory penalties."

34.     On September 15, 2023, Relator's counsel emailed Mr. Lewis about its response to Defendants' letter, indicating that Relator intended to share the substance of the August 30, 2023 phone conversation during which Mr. Lewis indicated that FCC did not share Defendants' position on damages.  Relator noted that it did not want FCC "to be blindsided" and wanted "to make sure we accurately reflect OGC's position on the damages issue."

35.     In response, Mr. Lewis telephoned Relator's counsel the same day asking for details about the language that Relator proposed to include in its response.  Relator's counsel emailed the following language to Mr. Lewis: "it is our understanding that neither the FCC nor the DOJ has made a final determination about the damages the government may have sustained as a result of Defendants' fraud as alleged by Relator.  Under the circumstances, your view that the Malmud Declaration disposes of the damages issue is unfounded."

36.     In response to that email, Mr. Lewis and Ms. Davis telephoned Relator's counsel again on September 15, 2023, requesting that Relator's response to Defendants not discuss the

government's views on damages.  Relator agreed to this request as an accommodation to FCC

staff, not because Relator's proposed language was inaccurate.

37.     Although the Motion asserts that Relator discussed its "theory of damages with

the FCC" on September 15, 2023, Dkt. No. 188 at 18, this assertion is not accurate.  The two

calls that Relator had with the OGC on September 15, 2023, concerned the FCC's position on

damages, not Relator's "theory of damages."

38.     On September 22, 2023, Defendants moved for partial summary judgment on

damages based on the Malmud Declaration.

39.     On September 25, 2023, Relator issued a subpoena and *Touhy* request to the FCC

to depose Mr. Malmud.

40.     As Mr. Lewis had suggested, Relator requested a meeting with Ms. Ellison to

discuss the case generally and damages specifically.  In advance of that meeting, which was to be

held the week of October 2, 2023, Relator emailed Ms. Ellison, Mr. Lewis, and Ms. Davis a

memorandum summarizing "the documentary evidence provided by defendants to date that

confirm Relator's fraud allegations."  Only addressing the written discovery that had taken place

to date, the memorandum was intended to answer "any lingering questions about the specifics of

Relator's claims" and to "facilitate OGC's review of the particularly critical documents in the

case," copies of which Relator delivered to OGC later that week.

41.     Also on October 2, 2023, Relator forwarded the memorandum it had provided to

FCC staff to the DOJ and offered to provide "the exhibits" referenced in the memorandum "if

[they were] interested."  The DOJ did not respond to this offer.  The Motion does not refer to this

memorandum, which suggests it was not reviewed by the DOJ as part of its "careful

consideration of the evidence and legal arguments."  Dkt. No. 188 at 7.

42.     On October 4, 2023, Relator participated in a virtual meeting with Ms. Ellison, Mr. Lewis, Ms. Davis, and Karen Onyeije, Deputy General Counsel at the FCC, and provided a presentation that focused on damages.  Relator emailed a copy of that presentation to those individuals after the meeting.

43.     On October 11, 2023, Relator emailed Mses. Ellison, Davis, and Onyeije and Mr. Lewis a memorandum "outlining in greater detail Relator's theories of damages and explaining how they are consistent with False Claims Act (FCA) jurisprudence …."  This memorandum addressed Relator's primary theory that the approximately $3.3 billion underpayment represents single damages under the FCA.  That amount represents the difference between the binding obligation that SNR and Northstar incurred when they were the winning bidder on $13.3 billion of licenses in Auction 97 and their payment of approximately $10 billion on the due date for final payment as established in the FCC rules and regulations as a consequence of their fraudulent disclosures and false certifications of very small business status.  The memorandum also outlined an alternative damages theory under which the single-damages amount should equal the $516 million in initial default payments made by SNR and Northstar, which amount constitutes expectancy damages from Defendants' default.  In response to OGC's request, Relator also provided FCC staff with copies of five documents that confirm "Defendants had neither the intention nor the ability to pay the full amount of SNR's and Northstar's winning bids at the close of Auction 97 . . . ."

44.     Also on October 11, 2023, Relator emailed a copy of the same damages memorandum to the DOJ.  The DOJ did not respond to this memorandum.  The DOJ also did not ask any questions about Relator's alternative damages theory, which Relator had not previously shared with the DOJ.  The Motion does not refer to this memorandum, which suggests that it was

not reviewed by the DOJ as part of its "careful consideration of the evidence and legal arguments." Dkt. No. 188 at 7.

45.     On October 23, 2023, Relator's counsel had a telephone call with Jacob Lewis and Megan Davis with OGC regarding the Malmud Declaration. During this call, Relator's counsel explored alternatives to a deposition of Mr. Malmud, which included the possibility of Relator interviewing Mr. Malmud (with FCC counsel present) and his submitting a supplemental declaration making clear that his original declaration did not address the factual allegations of fraud or damages under the FCA. Also discussed on this call were: (1) topics that Mr. Malmud would or would not be able to address whether by means of a supplemental declaration or a deposition; and (2) objections that may be raised if a deposition of Mr. Malmud were to proceed.

46.     Although the Motion asserts that Relator discussed its "theory of damages with the FCC" on October 23, 2023, Dkt. No. 188 at 18, this assertion is not accurate. The call that Relator had with FCC staff on October 23, 2023, concerned the Malmud Declaration, not Relator's "theory of damages."

47.     On October 24, 2023, Defendants moved for leave to re-file their motion for partial summary judgment on actual damages.

48.     On October 25, 2023, Relator's counsel emailed Mr. Lewis and Ms. Davis with a copy of Defendants' motion and requested that the FCC staff provide a supplemental declaration from Mr. Malmud "to set the record straight to avoid wasting the Court's time" consistent with the OGC's representation "that the Malmud Declaration does not address damages under the FCA, an issue Mr. Malmud is not qualified to address." Mr. Lewis and Ms. Davis never responded to this request.

49.     Given Defendants' position that the Malmud Declaration established "that there simply are no actual damages" under the FCA and "debunk[s]" Relator's damages theory, and because the OGC failed to respond to Relator's request for a supplemental declaration from Mr. Malmud, Relator had no choice but to depose Mr. Malmud.  On November 14, 2023, Ms. Ellison sent Relator's counsel a letter finding that, "on balance and taken as a whole, the factors set forth in the FCC's *Touhy* regulation … weigh against authorizing" a deposition of Mr. Malmud as requested by Relator but concluding staff's "concerns with regard to burden, scope, privilege, and misconstruing staff opinion for Commission policy are minimized by limiting the scope of the authorized testimony."  Specifically, OGC permitted Mr. Malmud "to testify to the contents of his declaration, which simply recites record-based facts and does not state any legal conclusions or opinions" but prohibited him from offering "opinions or legal conclusions as part of his testimony" or interpreting, opining on, or analyzing "Defendants' characterization of [his] declaration."  A copy of Ms. Ellison's November 14, 2023 letter is attached as Exhibit SO-1.

50.     Relator's deposition of Mr. Malmud took place on December 11, 2023.  During his examination, Mr. Malmud conceded that he lacked personal knowledge of the facts in his declaration, despite representing otherwise in his declaration.  For example, Mr. Malmud never reviewed the short-form or long-form applications at issue in this case and had no personal knowledge of the FCC's review of those applications.  Malmud Dep. at 32:19-22; 33:1-2; 33:10-19; 39:5-19 (objections omitted).  While his declaration purports to explain the FCC's short-form application review process, Mr. Malmud has never reviewed a short-form application and thus was "not certain" about the process the FCC employs in deciding whether to accept a short-form application.  *Id*. at 49:18-21; 50:20-22; 51:1-3; 57:12-13.  And, because his declaration does not set forth "any policies, opinions, or conclusions," *id*. at 23:5-11, Mr. Malmud acknowledged that

his declaration does not set forth "an opinion" or "conclusions" about any "harms" or "damages" suffered by the government as a result of Defendants' fraud.  *Id.* at 25:13-22; 26-1; 26:2-12; 27:5-15; 30:3-8; 30:12-19.  That the Malmud Declaration does not address damages in this case is understandable given that Mr. Malmud never considered the fraud in which Relator alleges Defendants engaged.  *Id.* at 105:9-22; 106:1-22; 107:1-14 (objections omitted).  And Mr. Malmud acknowledged that the rules referenced in his declaration to which Defendants point in claiming that the government has not been harmed from the alleged fraud do not actually say what he claims they say.  *Id.* at 73:4-13; 75:5-7; 92:12-22; 93:3-4 (objections omitted).  The referenced excerpts from the deposition of Mr. Malmud are attached as Exhibit SO-2.

51.      In short, the Malmud Declaration is significantly flawed as a legal, factual, and evidentiary matter.  And the DOJ does not even reference the Malmud Declaration in the Motion, even though the DOJ's "doubt" about Relator's ability to prove damages under the FCA "because the Defendants were never awarded any bidding credits" embraces the same logic espoused by Mr. Malmud in his declaration.

52.      Mr. Wei's conduct during Relator's deposition of Malmud was inappropriately hostile and confrontational.  Relator attempted to cooperate with the FCC prior to the deposition, offering during their October 23, 2023 call "to work closely with OGC" about questions that FCC staff may believe to be objectionable.  But the OGC never responded to this offer.  Instead, during the deposition of Mr. Malmud, Mr. Wei repeatedly made improper and frivolous speaking objections intended to coach the witness, repeated frivolous objections raised by Defendants, and overall, attempted to prevent Mr. Malmud from answering straightforward questions about the content of his declaration.  Indeed, Mr. Wei objected 71 times during 97 minutes of questioning

by Relator focused only on the declaration.  Some examples of Mr. Wei's improper conduct during Relator's deposition of Mr. Malmud are set forth in Exhibit SO-3.

53.     Approximately one month after the deposition of Mr. Malmud, Ms. Davis emailed Relator's counsel on January 11, 2024, asking about availability for a call the next day at 10:00 a.m. with the DOJ and Sarah Citrin, Deputy Associate General Counsel at FCC.  Relator's counsel responded asking if the call could occur at 3:00 p.m. because the parties were going to be in a deposition in the case that day.  Relator's counsel also asked what would be discussed "[s]o that we can be prepared for the call …."

54.     Evidently, the government considered the call to be urgent, because Ms. Davis responded that the government "can't make 3:00 work" and asked to "speak during [Relator's] deposition lunch break around noon."  Ms. Davis did not provide any information about the subject of the call.

55.     Despite the short notice and ongoing deposition, Relator agreed, and on January 12, 2024, participated in a virtual meeting with Mr. Wei, Assistant United States Attorney Darrell Valdez, and Mses. Davis and Citrin.  Mr. Wei, who did all the speaking for the government, claimed that the DOJ had decided that the case should not proceed based on the government's review of materials submitted by Relator and after "lots of communications" internally and with the FCC.  When pressed on the call for details about the purported deficiencies in Relator's case, Mr. Wei declined to address the merits, except to say that the government did not believe Relator had adequately established fraud or damages.  During this virtual meeting, Mr. Wei never mentioned any burdens to the FCC or any other government agency in responding to Defendants' discovery requests as a purported justification for the DOJ seeking dismissal of Relator's claims.

56.     Nevertheless, Mr. Wei attempted to induce Relator's counsel to accept a plainly unethical settlement as an alternative to the DOJ seeking dismissal of Relator's claims.  Mr. Wei explained that, despite the government's contention that it had suffered no "significant loss," and even though the DOJ typically would not authorize a settlement with a "nominal amount" of damages and high attorney's fees, he believed that he could get authorization for such a settlement here "as a courtesy" because Relator's attorneys "had done a good job."  In other words, Mr. Wei offered to agree to have Defendants pay Relator's attorney's fees, even though the government and Relator would receive little or no recovery, creating a blatant conflict between what is best for Relator and what is best for Relator's counsel.  But Mr. Wei threatened that, if the parties did not have at least a "handshake" settlement by January 26, 2024 (two weeks later), he would seek DOJ authority to dismiss the case under 31 U.S.C. § 3730(c)(2)(A).  Mr. Wei gave Relator until Tuesday, January 16, 2024 (following a federal holiday on Monday) to let the government know whether Relator would pursue a settlement with DISH.

57.     As of January 12, 2024, when Mr. Wei first threatened that the DOJ would seek dismissal of Relator's claims unless Relator agreed to an unethical settlement, Relator had deposed just 12 fact witnesses, only one of whom was a Defendant (Miranda Wright).  Relator noticed more than 30 depositions of Defendants and affiliated third parties, including depositions under Rule 30(b)(6), with 11 depositions scheduled for the last two weeks in January 2024 and 12 depositions scheduled for February 2024.  Exhibit SO-4 includes information about the depositions noticed by Relator, including the name of the deponent, the deponent's affiliation, the date the deposition was taken (if applicable), and the date the final transcript was available (if applicable).  Among the depositions scheduled for February included Defendant Charles Ergen (February 16), Defendant Cantey Ergen (February 14), Defendant John Muleta (February 21),

two senior DISH executives (February 9 and February 13), among others.  The date of Mr.

Ergen's deposition was proposed by DISH's counsel, who consistently sought to ensure that Mr.

Ergen was the last DISH witness deposed by Relator.

58.     Following the call on January 12, 2024, Relator's counsel emailed the

government asking Mr. Wei whether the FCC was planning to produce documents in response to

Defendants' subpoena the following week and, if not, what the FCC had told the Defendants

about the agency not doing so.  Mr. Wei did not respond to this email.

59.     On January 16, 2024, Relator emailed Mr. Wei requesting a response to the

question regarding FCC's document production, noting that, if "the government has reached

some accommodation with Defendants regarding the deadline for producing documents, we do

not believe it is too much to ask for the government to share the details with Relator's counsel."

Relator also indicated Relator's willingness to discuss settlement with—and make a settlement

offer to—Defendants consistent with Relator's view of the harms to the government caused by

its fraudulent conduct and the current procedural posture of this case.

60.     Shortly thereafter, Mr. Wei responded to the email by asking for a call later that

day.  During this call on January 16, 2024, Mr. Wei demanded to know what settlement amount

Relator was prepared to offer Defendants.  Relator's counsel responded that no final decision had

been made about a possible settlement amount but made clear that Relator would not agree to a

settlement based solely on statutory damages and attorney's fees.  Mr. Wei responded by

threatening that, if Relator's settlement offer was too high, he would potentially seek dismissal of

the case that week—a false threat in retrospect because, as it turned out, the DOJ was not

prepared to file its motion to dismiss until March 8, 2024, almost two months later.

61.     After this telephone call, on January 16, 2024, Relator sent a letter to the DOJ expressing "disbelief and disappointment" with the government's threats to seek dismissal of Relator's claims.  The letter summarized the evidence supporting Relator's claims, explained Relator's damages theories, and outlined the practical challenges the DOJ would face in seeking dismissal of Relator's claims.  The letter also noted that "dismissal of this case could not be justified based on a purported burden to the government," pointing out that this was not a case like *Polanksy*—and Mr. Wei had never suggested otherwise—where demands for "both documents and deposition testimony from the Government" should lead to the decision "that the varied burdens of the suit outweighed its potential value."

62.     While declining to pursue the unethical settlement proposed by Mr. Wei, Relator expressed its willingness to discuss settlement with—and make a settlement offer to— Defendants consistent with Relator's view of the harms to the government caused by Defendants' fraudulent conduct and the current procedural posture of this case.  In its January 16, 2024, letter, Relator also requested that it be permitted to complete fact discovery and thereafter meet with the government to explain its case in detail and discuss next steps.  Under the discovery schedule to which the parties had agreed, Relator's depositions of Defendants and affiliated third parties would conclude on February 23, 2024, and its expert reports were due on February 28, 2024.

63.     The DOJ did not provide a substantive response to Relator's letter.  Instead, Mr. Wei emailed Relator on January 19, 2024 offering to hold a virtual meeting on January 25, 2024 to discuss the issues raised in Relator's letter.  Mr. Wei did not provide an agenda for the call or indicate that Relator would be given the opportunity to present its case to the DOJ and the FCC. Moreover, Mr. Wei scheduled the virtual meeting for only thirty minutes.

64.     On January 19, 2024, I contacted Jonathan Paikin, counsel for DISH, to discuss settlement.  No offers were exchanged, but Mr. Paikin suggested that DISH would only be willing to pay Relator's attorney's fees because of the Malmud Declaration.  Based on this call, it appeared to me that Defendants were at least aware of the DOJ's proposal that a settlement should consistent only of the payment of attorney's fees and statutory penalties.  Mr. Paikin agreed to follow up regarding whether DISH was willing to discuss settlement and potential next steps.

65.     On January 25, 2024, as requested by Mr. Wei, Relator met virtually with Mr. Granston; Jamie Yavelberg, Director of the Fraud Section of the Commercial Litigation Branch at DOJ; Brian Hudak, head of the civil division in the D.C. U.S. Attorney's Office; Mr. Valdez; Ms. Davis; and Ms. Citrin.  DOJ's Motion states that "VTel presented to the Department of Justice and FCC information obtained in discovery, its theory of damages, and why this qui tam action should not be dismissed under Section 3730(c)(2)(A)."  In fact, Relator had no idea what the DOJ expected from the meeting, and Messrs.  Granston and Wei appeared to have no agenda, leaving Relator with limited time to argue its position without the ability to show any documents or delve into its legal analysis.  Relator used its limited time to expound upon the issues in its January 16, 2024 letter and respond to several questions from Mr. Granston about damages, the benefits of continuing discovery, and ways to relieve the burdens on the FCC associated with Defendants' discovery demands.  This call was the first time the government had raised the burden issue as a purported justification for seeking dismissal of Relator's claims, although no mention was made of any federal agencies other than the FCC.  Relator reiterated its request that the DOJ wait approximately four weeks so that Relator could complete discovery before making a decision about the case.

66.     On the same day, Mr. Paikin followed up with me about settlement, and Mr. Paikin and I spoke the following day, January 26, 2024.  Again, without divulging the specifics of the parties' confidential settlement negotiations, Mr. Paikin reiterated DISH's position from its letter threatening to seek legal fees that the Malmud Declaration demonstrates the absence of damages.  And, although, as DOJ states in its Motion, it rarely seeks the dismissal of *qui tam* cases, Mr. Paikin twice mentioned the possibility that the DOJ would seek to dismiss Relator's claims, which further indicated to me that Defendants were at least aware of the DOJ's position.

67.     Although the DOJ fails to mention it in the Motion, also on January 26, 2024, Relator sent a letter to the DOJ refuting the purported "burdens" imposed on the FCC in responding to Defendants' discovery requests.  The letter outlines, request by request and topic by topic, objections to the Defendants' obviously improper document requests and requests for depositions, including the request for a Rule 30(b)(6) deposition.  Neither the DOJ nor the FCC staff ever responded to this letter, served these objections on Defendants, or moved this Court for a protective order, despite Relator having effectively done all of the work for them.

68.     On January 30, 2024, Relator sent a letter to the DOJ and FCC summarizing its position on damages, detailing both its primary and alternative damages theories.  In this letter, Relator also informed the government that it intended to provide an expert report—due on February 28, 2024—supporting its damages claims.  Neither the DOJ nor the FCC ever responded or directly addressed any of the issues raised in Relator's January 30, 2024 letter.

69.     The government's attempts to coerce Relator into accepting an unethical settlement continued on February 2, 2024, when Relator's counsel was asked to join a call with Messrs. Wei and Valdez and Mses. Davis and Citrin.  During this call, Mr. Wei reiterated the government's desire for Relator to settle with Defendants for attorney's fees and its intention to

seek dismissal of Relator's claims if a settlement is not reached the following week.  During this call, Relator's counsel asked whether the government had discussed its plans to seek dismissal with Defendants, which Mr. Wei denied.

70.     On February 5, 2024, Mr. Wei emailed Relator's counsel again at approximately 4:00 p.m. requesting to have a call at 5:00 p.m.  Because of a conflicting commitment at 5:00 p.m., Relator's counsel proposed a call the following morning.  Mr. Wei responded: "This is pretty time sensitive, can you do after your call or early tomorrow?"  The parties agreed to talk at 9:30 a.m. the following morning.

71.     Relator's counsel again spoke with Messrs. Wei and Valdez and Mses. Davis and Citrin on February 6, 2024.  During this discussion, Mr. Wei declined to facilitate a meaningful settlement by also advising Defendants to settle the case given their own substantial litigation risk because, according to Mr. Wei, doing so would be "unethical" given the government's view of the case.  Mr. Wei again denied speaking to Defendants about the government's plans and gave Relator until the close of business to confirm whether Relator was willing to make a settlement offer to Defendants.  Mr. Wei further stated that Relator had until the end of the week to reach a deal.  Otherwise, according to Mr. Wei, the DOJ intended to tell Defendants that the government would move for dismissal and seek a stay of discovery.

72.     Later that day, Relator emailed the DOJ and Mses. Davis and Citrin, confirming that Relator would make a written settlement demand on Defendants to be communicated to Defendants' counsel no later than close of business the following day.

73.     On February 7, 2024, I emailed a settlement offer to Mr. Paikin.  Within three hours, Mr. Paikin rejected the offer and made no counteroffer.

74.     Defendants apparently informed the DOJ and the FCC of their rejection of Relator's settlement offer shortly thereafter, because the following day, on February 8, 2024, during the first day of a two-day deposition of DISH executive Jeffrey Blum, Mr. Wei emailed Relator's counsel at 10:55 a.m. asking about Relator's availability "for a brief call today before 1PM ET."  Without any input from Relator, Ms. Davis scheduled a call for 12:30 p.m.

75.     Relator's counsel emailed Mr. Granston and Ms. Yavelberg at 11:00 a.m., attaching a letter that accused the government of cutting a sweetheart deal with Defendants to prevent Mr. Ergen from testifying under oath.  Relator also noted its intent to submit a joint letter brief to Defendants and request a meet and confer about Defendants' Rule 45 subpoena and Rule 30(b)(6) notice of deposition to the FCC, which "Relator intend[ed] to oppose vigorously."  The DOJ did not respond to Relator's letter.

76.     Relator emailed Mr. Wei at 12:11 p.m. on February 8, 2024, offering to "get back to [him] with a time with for a call" once counsel was available.  At 12:27 p.m., Mr. Wei emailed Relator: "It has to be before 4PM ET."  At 12:49 p.m., Relator responded: "Unfortunately, with the deposition and everything else happening today, it will be difficult to schedule a call by 4:00 on short notice.  Can you send us an email with your message and we will respond as soon as possible?"

77.     At 12:51 p.m., Mr. Wei responded: "That will not be possible.  Please make one of your team available."  At 1:30 p.m., Mr. Wei emailed again: "Just to add slightly more color to this, if you are unable or unwilling to connect today before 4, we are proceeding as we had previously notified you at 4:30 today."

78.     At 5:52 p.m. on February 8, 2024, DISH's counsel emailed Relator's counsel, noting that Defendants had been informed by counsel for the United States that the government

intended to intervene in the case to seek dismissal pursuant to 31 U.S.C. 3730(c)(2)(A) and requesting confirmation "immediately that all depositions in the case scheduled for tomorrow or any other day this rest of this month—including that of Jeff Blum scheduled for tomorrow (February 9)—are canceled and will not take place as currently scheduled."

79.     Relator's counsel responded to DISH's email: "We have not spoken to DOJ today.  However, we will agree to postpone the depositions that have been noticed, and thus they will not place as currently scheduled.  We assume you will agree to do likewise for the Rule 30(b)(6) depositions of Relator.  Similarly, we will not be submitting today our expert identification and subject matter disclosures."

**Other *Qui Tam* Cases The DOJ Has Sought to Dismiss**

80.     Relator agrees with the DOJ that it only seeks dismissal of *qui tam* cases in "rare instances."  Dkt. No. 188 at 16.

81.     In a December 19, 2019, Stephen E. Boyd, Assistant Attorney General, DOJ Office of Legislative Affairs, wrote a letter to Senator Charles E. Grassley (R-IA) about how frequently the DOJ seeks dismissal of *qui tam* cases.  According to this letter, a copy of which is attached as Exhibit SO-5, of the more than 1,170 *qui tam* actions filed in 2018 and 2019, the DOJ moved to dismiss only 45. Those 45 cases involved actions that: (i) were brought by the same for-profit private investment group that filed nearly identical *qui tam* complaints in seven judicial districts against 38 defendants; (ii) were filed by relators unrepresented by counsel, "notwithstanding that every appellate court that has considered the question has concluded that *pro se* relators may not prosecute *qui tam* actions once the United States has declined to intervene"; (iii) were brought by "a relator who is alleged to have shorted the stock of the defendants named in his complaints"; (iv) asserted claims "not legally cognizable" under the

FCA; (v) "could undermine patient care"; or (vi) threatened the disclosure of "classified information."  Relator's case does not involve any of these factors.

82.     Wiley has researched *qui tam* cases that the DOJ has moved to dismiss after December 2019 using Lexis Courtlink.  Specifically, Wiley searched for motions to dismiss that included 31 U.S.C. § 3730(c)(2)(A) anywhere in the document, filed from December 1, 2019 to Match 20, 2024.  The universe of cases returned from this search were reviewed to determine which cases were responsive.  As a result of this review, Wiley identified 24 cases, each of which is listed in Exhibit SO-6.

83.     As reflected in Exhibit SO-6, in 20 of those 24 cases, the relator was *pro se*, did not object to dismissal, and/or had asserted non-cognizable or meritless claims under the FCA. In the remaining four cases, the relator had objected to a proposed settlement or engaged in misconduct, or the DOJ moved to dismiss the case before an answer had been filed and the relator had engaged in discovery.  Relator's case does not involve any of these circumstances.

84.     Relator has no way of identifying whether the DOJ has moved to dismiss cases that remain under seal, nor does the 24 cases identified by Relator include *qui tam* cases where a relator settled under threat of dismissal.  However, the combined total of 68 cases that the DOJ has moved to dismiss from January 1, 2018 through the present as determined by Relator is consistent with public comments made by DOJ employees in December 2023 that the DOJ had moved to dismiss in "approximately 65" cases since 2018.  *See* The Employment Law Group, P.C., *(c)(2)(A) Dismissals After Polansky / An FBA Qui Tam Section Zoom Roundtable*, YOUTUBE at 3:40 https://www.youtube.com/watch?v=F3HShJpcp20 (Feb. 5, 2024) (statements of Colin Huntley, Civil Fraud Section, U.S. Department of Justice).

**The Purported Burden on the Government**

85.     Although the DOJ asserts that the continued litigation of this case would impose a "significant resource drain on" and "high" costs to the government in responding to Defendants' "extraordinary discovery," Dkt. No. 188 at 19-20, this assertion is not supported by the record.

86.     In August 2023, Mr. Wei sent the parties a letter advising the parties that the scope of permissible discovery from the government was narrow.  A copy of this letter is attached as Exhibit SO-7.

87.     Nearly all Defendants' requests—including the documents requested in Defendant's Rule 45 subpoena served on November 28, 2022 ("November 2022 Subpoena")— exceed the scope of permissible discovery articulated by Mr. Wei, as explained in detail in the January 26, 2024 correspondence sent by Relator to the DOJ that the DOJ's Motion fails even to mention.

88.     For example, Request No. 1 in the November 2022 Subpoena seeks seven categories of documents involving SNR's and Northstar's short and long form applications, four of which expressly relate to *de facto* control issues that, as Mr. Wei has correctly concluded, are not relevant to any issue in this case and directly implicate the deliberative process privilege. Two categories involve: (i) agreements that Defendants disclosed to the FCC, which are not relevant to Relator's claims predicated on arrangements, agreements, and understandings that Defendants were required but failed to disclose to the FCC; and (ii) agreements that Defendants did not disclose to the FCC for which the FCC would not have any responsive documents.  The final category of documents involves Defendants' bidding conduct—documents that either: (i) Defendants do not need the FCC to produce because such records are publicly available and are already in Defendants' possession; or (ii) the FCC does not have because Defendants did not

disclose their arrangement, agreement, or understanding that DISH would dictate the parties'
bidding strategy and select the licenses on which Northstar and SNR would bid and the amounts
of their bids.

89.     Requests Nos. 2, 3, and 4 in the November 2022 Subpoena generally seek
documents about communications between FCC personnel and: (i) any Auction 97 bidder
concerning Defendants' bidding conduct; (ii) specified third parties concerning the results of
Auction 97; and (iii) specified third parties concerning the action the FCC intended to take
regarding SNR's and Northstar's applications.  The only possible relevance of the requested
documents relates to the public disclosure bar, an issue settled by the Court and on which
Defendants represented to the Magistrate Judge they were not seeking discovery.

90.     Request No. 5 in the November 2022 Subpoena seeks internal FCC
communications regarding SNR's and Northstar's selective defaults and interim default
payments.  Documents regarding the licenses on which SNR and Northstar selectively defaulted
are publicly available.  And the only relevant documents regarding this issue relate to whether
DISH selected the licenses on which SNR and Northstar selectively defaulted as alleged by
Relator—documents that would be in Defendants' possession, not the FCC's.  Likewise, the
interim default payments were established pursuant to FCC rules, and the other "terms"
negotiated by the FCC and Defendants are a matter of public record.  Any internal agency
communications on these topics are objectionable based on attorney-client and deliberative
process privileges.

91.     Request Nos. 6 and 7 in the November 2022 Subpoena seeks documents between
the FCC and Relator regarding Auction 97, including this litigation.  Even though the requested
documents are not relevant to any claim or defense in this case, the FCC already has produced

more than 150 documents responsive to this request.  The FCC also has withheld (properly) communications in this case between Relator and the government under the common interest privilege and produced a privilege log identifying the withheld communications.  Under the circumstances, there should be nothing more for the FCC to do regarding this request.

92.     Request No. 8 in the November 2022 Subpoena seeks "communications of any sort between FCC and DOJ concerning Auction 97."  In addition to being irrelevant to any claim or defense in this case, the requested communications are clearly objectionable under the attorney-client privilege, the deliberative process privilege, or both.

93.     Request Nos. 9 and 10 in the November 2022 Subpoena seek documents regarding the FCC's consideration of other applications for bidding credits, both in Auction 97 and in prior FCC spectrum auctions.  The requested documents are not relevant to any claim or defense in this case.  Although Defendants appear interested in relitigating the FCC's *de facto* control determination, Mr. Wei has correctly stated that "[t]his case is pointedly *not* about" that issue.

94.      Defendants' Rule 30(b)(6) notice served on November 16, 2023—not coincidentally just days after the District Court's order denying their motion for judgment on the pleadings—fares no better.  Defendants' Rule 30(b)(6) seeks testimony from the FCC on 14 topics, all of which are objectionable for the same reasons outlined above.

95.     For example, five of the Rule 30(b)(6) topics seek testimony from the FCC about the agency's determination that SNR and Northstar were under DISH's *de facto* control and its review of applications seeking bidding credits in Auction 97.  These topics are not relevant to any issue in this proceeding and also are objectionable as overly broad, unduly burdensome, and

not proportional to the needs of the case, in addition to seeking information shielded from discovery under the deliberative process privilege.

96.     Seven topics relate to the FCC's "understanding or assessment" of the arrangements, agreements, or understandings that Relator alleges were not disclosed to the FCC. Because an entity's obligation under Rule 30(b)(6) is limited to "information known or reasonably available to the organization," the FCC has no ability to provide testimony about its "understanding" of arrangements, agreements, or understandings that Defendants never disclosed to the agency.  Regarding the agency's "assessment" of these matters, the assessment is set forth in the FCC's August 18, 2015 Order, which speaks for itself and on which testimony would be unnecessary and irrelevant.

97.     Topic 4 concerns "[w]hether Northstar and SNR have fully and timely complied with all payment obligations related to Auction 97."  However, the FCC already provided a declaration from Paul Malmud—and permitted Mr. Malmud to be deposed—about this subject. Defendants chose to forego their opportunity to question Mr. Malmud about Northstar's and SNR's compliance with their payment obligations during his deposition, and they have no right to, and should not be given, a second bite at this apple.

98.     Topic 14 involves communications between the FCC and Relator regarding Auction 97, including this litigation.  This topic is not relevant to any claim or defense in this case and involves communications subject to the common interest privilege.

99.     Many of Defendants' discovery requests also fail the standards for seeking third-party discovery from the government under *United States ex rel. Touhy v. Ragen*, 340 U.S. 452 (1951).  A good example concerns the deposition notice Defendants issued for Thomas Johnson, the former General Counsel of the FCC (and current partner at Wiley).  According to

Defendants, they seek Mr. Johnson's testimony "pertaining to the [FCC's] awareness and understanding of Defendants and the arrangements among them at points in time pertinent to [Auction 97] and this litigation." Putting aside the improper nature of a request for testimony from an agency's former General Counsel about the government's knowledge and decision-making in an administrative proceeding and related FCA case, Auction 97 occurred two years before Mr. Johnson was even employed at the FCC.  Thus, he lacks firsthand knowledge about the FCC's rationale in deciding to deny bidding credits to SNR and Northstar in 2015, even assuming this topic were an appropriate subject of inquiry (which it is not) and is not foreclosed by the deliberative process privilege (which it is).

100.     Defendants also purport to want Mr. Johnson to testify about why the DOJ decided to veto dismissal of Relator's claims under the public disclosure bar and why the government allegedly treated Relator differently from another relator that filed a *qui tam* action in connection with Auction 97.  But this Court settled the public disclosure bar in denying Defendants' motion for judgment on the pleadings, and the discovery Defendants seek from Mr. Johnson would contravene their representation to the Magistrate Judge.  In any event, the DOJ exercised its veto right in December 2022—nearly two years after Mr. Johnson stepped down as General Counsel in January 2021.

101.     As far as Relator is aware, the FCC has not raised any objections to Defendants' request to depose Mr. Johnson (or to any other of Defendants' discovery requests), even though it has substantial discretion over discovery requests they receive under *Touhy*.  This renders false the DOJ's claims about the "extraordinary burden" facing the FCC in responding to discovery from Defendants.

102.    The DOJ has never provided Relator with an explanation for the government's
failure to litigate Defendants' discovery requests (and raise its defenses under the FCC's *Touhy*
regulations).  Nor has the DOJ explained why it would not delay making a decision about
whether to seek dismissal of this action until Relator had exhausted its efforts to oppose
Defendants' discovery requests on behalf of the government and to seek the Court's assistance if
Defendants persist in pursuing irrelevant, burdensome, and privileged discovery from the
government.  If those efforts were successful, the burden on the government in responding to
Defendants discovery would be minimized, if not eliminated.

**DISH Political Donations**

103.    The FEC maintains a database that allows users to search individual contributions
to political candidates and campaign committees (https://www.fec.gov/data/receipts/individual-
contributions).  At the direction of Relator's counsel, a Wiley Rein Senior Reporting Specialist
searched that database in March 2024 to identify all contributions made by Charles Ergen and
Cantey Ergen that were received between January 1, 2008 and December 31, 2023.  The
specialist removed from the results of that search contributions by Charles Ergen and Cantey
Ergen to the DISH Political Action Committee ("PAC") and added party affiliation for each
contribution by Charles Ergen or Cantey Ergen based on recipient information maintained by the
FEC.  The Specialist sorted the results of that search by year and party, which are set forth in
Exhibit SO-8 to this Declaration.

104.    In conducting this search and preparing Exhibit SO-8, the Specialist included
contributions that appeared to list a misspelling of or variation of Charles Ergen or Cantey Ergen
but that disclosed an address on a contribution with the correct name of Charles or Cantey Ergen.

105.    In conducting this search and preparing Exhibit SO-8, the Specialist separated

joint fundraising memorandum entries to ensure that contributions were not doubled

counted.  For example, according to the FEC database, Cantey Ergen made an $1,100

contribution to Colorado Senate 2008 in March 2008.  This $1,100 contribution was transferred

to the DSCC, a participant in the joint fundraiser, and the DSCC disclosed a memorandum entry

indicating that Cantey Ergen's contribution comprised part of the transfer from Colorado Senate

2008.  Both the original contribution to Colorado Senate 2008 and the DSCC memorandum entry

are listed under Cantey Ergen's name in the FEC database, but they represent the same

$1,100.  Only the original $1,100 to Colorado Senate 2008 is included in the amounts reflected

in Exhibit SO-8.

106.    The Specialist also compiled data on contributions made by the DISH PAC by

party affiliation for the 2010, 2012, 2014, 2016, 2018, 2020, 2022, and 2024 election cycles

using the OpenSecrets database (https://www.opensecrets.org/political-action-committees-

pacs/dish-network/C00330647/summary/2024).  For 2008 data, the Specialist pulled FEC

records of DISH PAC disbursements and added party affiliation based on information maintained

by the FEC.  The Specialist sorted the results by year and party, which are set forth in Exhibit

SO-8 to this Declaration.

107.    Finally, the Specialist searched these datasets for contributions by Charles Ergen,

Cantey Ergen, or the DISH PAC with "Obama" or "Biden" in the recipient's name.  The results

of that search are set forth in Exhibit SO-8 to this Declaration.

**Ergen White House Visits**

108.     The White House maintains a log that includes information about visitors to the

White House and the individuals with whom they meet.  This information is available at

https://www.whitehouse.gov/disclosures/visitor-logs/.

109.     Based on a search of the White House visitor's log, Mr. Ergen made multiple

visits to the White House in the past two years.  For example, on October 14, 2022, Mr. Ergen

(along with his wife Cantey Ergen) met with Sarah Feldmann, Special Assistant to the President

and Deputy Director, Office of Administration.  On January 23, 2023, Mr. Ergen met with Anne

Neuberger, Deputy National Security Advisor for Cyber & Emerging Technology.  And, on

October 16, 2023, Mr. Ergen met with Kurt Campbell, Deputy Assistant to the President.  The

White House visitor's log does not indicate the subject of these meetings.

**Substantial Resources Committed By Relator in Prosecuting This Case**

110.     Since Wiley was retained by Relator at the inception of this case in 2015 through

March 31, 2024, the firm has expended nearly 15,000 hours in unearthing the fraud in which

Defendants were engaged and attempting to hold Defendants accountable.  Relator also engaged

the help of multiple experts, who similarly have expended approximately 1,100 hours in their

work.  Counsel and the experts operated efficiently and diligently throughout.

111.     As of March 31, 2024, in the nine years Relator has been litigating this case,

including through three rounds of Rule 12 motion briefing, an appeal, and discovery, it has

incurred approximately $13 million in legal expenses and costs prosecuting this case on behalf of

the government.

I, Stephen J. Obermeier, hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


*/s/ Stephen J. Obermeier*
Stephen J. Obermeier


Dated:  April 22, 2024