**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. VERMONT NATIONAL TELEPHONE CO., | Civil Action No. 1:15-cv-00728-CKK |
| Plaintiff, | |
| v. | |
| NORTHSTAR WIRELESS, LLC, et al. | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ON RELATOR'S MOTION FOR SHARE OF ALTERNATE REMEDY AND GOVERNMENT'S MOTION TO DISMISS**

Relator's alternate-remedy motion is specious.  Northstar's and SNR's defaults on certain licenses after the FCC denied their applications for bidding credits in Auction 97 cannot constitute an alternate remedy for the fraud relator alleges here because, in denying the bidding credits, the FCC expressly found that Northstar and SNR had *not* "attempted to mislead the Commission about their respective relationships with DISH," and that there was nothing that Northstar or SNR fraudulently "failed to disclose."  *In the Matter of Northstar Wireless, LLC*, 30 FCC Rcd. 8887, ¶¶129, 132 (2015) ("FCC Op.").  There cannot be "alternate remedy" liability under the False Claims Act based on a proceeding in which it was determined that no fraud was committed; the statute limits cognizable alternate remedies to "those species of false and fraudulent claims" proscribed by 31 U.S.C. §3729, *United States v. Novo A/S*, 5 F.4th 47, 55 (D.C. Cir. 2021).[1]

The FCC's no-fraud determination was plainly correct.  Contending otherwise, relator asserts that defendants fraudulently failed to disclose four agreements to the FCC.  Yet, after massive discovery—involving the production of over a million pages of documents and dozens of depositions—relator could not identify anything that was not "cumulative of what the Defendants had affirmatively disclosed" to the FCC.  MTD 16-17.  This is because, as the FCC explained in 2015, "the relationships between DISH and SNR, and DISH and Northstar, [we]re well-documented through the numerous agreements filed as attachments to" defendants'

---

[1] Moreover, contrary to relator's allegations, nothing about the decisions of Northstar and SNR to default on certain licenses implies that their default payments were a remedy for fraud. Selective default is an option available to all high bidders at the close of an FCC auction. *See* 47 C.F.R. §1.2104(g)(2); *see also* Letter from Roger C. Sherman, Chief, Wireless Telecommunications Bureau, FCC, to Ari Q. Fitzgerald, Outside Counsel, SNR Wireless LicenseCo, LLC, 30 FCC Rcd 10704, 10705 (2015) ("The Commission has previously allowed winning bidders at auction to default selectively on licenses where the applicant has a sufficient amount of money on deposit to cover the licenses the bidder wishes to retain, plus the associated interim default payment obligations."); Ex. A at 182-190.

applications for bidding credits, FCC Op. ¶20, and those disclosed "[a]greements enabled" the FCC "to fully evaluate and independently assess SNR's and Northstar's claims to [designated-entity] status," *id*. ¶130.

These same points also show that the government's motion to dismiss should be granted. As the Supreme Court made clear just last year, "all that is needed for the Government to prevail on a … motion to dismiss" under 31 U.S.C. §3730(c)(2)(A) is "a reasonable argument for why the burdens of continued litigation outweigh its benefits." *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 438 (2023). That is true, the Court explained, even when the relator "vigorously dispute[s]" the government's assessment of the merits or "presents a credible assessment to the contrary." *Id.* The government here has certainly offered "a reasonable argument for why the burdens of continued litigation outweigh its benefits," *id.*; *see* Dkt. 188 ("MTD") at 16-21. But because relator has made the spurious assertion in its opposition that "[e]vidence obtained to date confirms Defendants' fraud as alleged by Relator," Dkt. 190 ("MTD Opp.") at 1, defendants submit this memorandum to set the record straight as to why relator's arguments about the existence of four supposed undisclosed agreements all lack merit.

1.    Relator claims that "Defendants had an undisclosed understanding that Northstar and SNR would serve as vehicles to acquire discounted spectrum for DISH." MTD Opp. 11; *see also id*. at 26. To the extent that relator uses the word "vehicles" to imply that Northstar and SNR were "sham" entities, MTD Opp. 11, discovery showed that is not true. For example, discovery demonstrated that Northstar was an entity formed by Doyon Limited, an Alaska Native Corporation that had successfully participated in prior FCC auctions and built out a wireless network in the Chicago area. Ex. A at 102:16-18. As for SNR, discovery and the FCC record

made clear that the professional background of its founder, John Muleta—a veteran wireless and internet-access entrepreneur trained as a lawyer and engineer, whose decades-long career in the telecommunications industry included service as the Chief of the FCC's Wireless Telecommunications Bureau and as a senior executive for a large, publicly-traded internet-services pioneer—made SNR exactly the kind of small, minority-run business the FCC's designated-entity program was designed to help enter the market. Ex. B.

In any event, to the extent Northstar and SNR could be described as "vehicles to acquire discounted spectrum for DISH," MTD Opp. 11, the basis for that description was disclosed to the FCC. The FCC concluded in 2015 that:

- Northstar and SNR were "acting with the objective of securing spectrum for DISH," FCC Op. ¶112;

- Northstar and SNR "were acting with a common goal of securing the same list of licenses for DISH's benefit, without importance to which company ended up with any particular license," *id*. ¶113;

- "DISH ha[d] the ability to effectively terminate the continued existence of these companies if they were unable to qualify as [designated entities] and help DISH secure discounted licenses," *id*. ¶108; and

- Northstar and SNR were "created for the purposes of: (i) acquiring licenses in the Auction and as otherwise agreed to" with DISH, and "(ii) deploying the licenses … using technology fully compatible and interoperable with the technology or technologies employed by DISH," *id*. ¶23.

Relator's purported *further* evidence that Northstar and SNR were "vehicles to acquire discounted spectrum for DISH," MTD Opp. 11; *see id*. at 11-12 & n.5, is, as the government's motion to dismiss explains (at 16-17), cumulative of what was disclosed to the FCC. It thus cannot, by definition, be evidence of an *undisclosed* agreement.

2.    Relator claims that there was an "undisclosed understanding that SNR and Northstar would exercise their put rights and sell their interests to DISH after approximately five years." MTD Opp. 12; *see also id*. at 26. But Northstar's and SNR's put rights—including the

five-year window in which to exercise them—were disclosed to the FCC.  And discovery

confirmed that Northstar's and SNR's exercise of the put right was "not guaranteed."  Ex. C at

131:13; *see also id*. at 130:10-131:5; Ex. D at 89:11-21.  To the extent that any defendant or

other investor ever thought that Northstar and SNR were *likely* to exercise their put rights,

moreover—which is in substance what relator argues, *see* MTD Opp. 12-13—that expectation

was also disclosed to, and expressly recognized by, the FCC.  The FCC found in 2015 that:

- "[t]he LLC Agreements" disclosed in defendants' applications "permit the LLC Managing Members of SNR and Northstar to 'put' their respective interests to DISH after the five-year anniversary of license grant, which is also when the 'unjust enrichment' period ends," FCC Op. ¶23;

- "[t]he Agreements essentially *dictate* when SNR and Northstar should sell their interests and exit the business," *id*. ¶100 (emphasis added);

- "the LLC Agreements essentially force [Northstar and SNR] out of the business" by "grant[ing] [them] a put right enabling each of them to require DISH to purchase their interest for a 30-day period at the end of the fifth year," *id*. ¶102; and

- "[t]he DISH right of first refusal, coupled with the tag along right, is very coercive and is designed to ensure that any sale by [Northstar or SNR] will be to DISH," *id*. ¶101.

Again, the FCC found that defendants' disclosed agreements revealed what relator now says was

fraudulently concealed.

3.      Relator claims that "Defendants had an undisclosed understanding that neither

SNR nor Northstar would use the AWS-3 licenses they acquired in Auction 97 to provide

wireless services."  MTD Opp. 12; *see also id*. at 26.  There was no such understanding.  Indeed,

the exhibits that relator cites make clear that Northstar and SNR intended to build out networks.

*See, e.g.*, Dkt. 195 at A-26 (Northstar's equity "will grow with the development of the wireless

spectrum"); *id.* at A-54 (Northstar was created "to acquire and develop wireless spectrum

licenses"); *id.* at A-68 (observing intent to "build out, manage, and operate the license systems").

The record further reflects that at least some defendants "assume[d]" that the licenses Northstar

and SNR acquired would "allow[] those small businesses to go into business," and that Northstar and SNR "*could* be[come] … cell phone provider[s]" using the licenses they acquired.  Ex. C at 45:9-46:7.  Moreover, discovery showed that SNR and Northstar undertook pre- and post-auction business planning focused on building out networks, engaging with technical and business consultants regarding prospective buildouts, including negotiating coordination agreements with government users, vendors, and standards bodies.  Exs. B, E.

That aside, to the extent that any defendants thought that Northstar and SNR were *unlikely* to build out wireless networks—which is in substance what relator suggests, *see* MTD Opp. 12—that too was timely disclosed to, and expressly found by, the FCC.  The FCC concluded in 2015 that DISH controlled Northstar's and SNR's ability to build out any wireless network, and that Northstar and SNR lacked both the incentive and the ability to build out on their own.  Specifically, the FCC found that:

- "it is manifest that DISH … has … control over build-out plans," FCC Op. ¶6;

- the "'investor protection' [that] precludes [Northstar and SNR] from acquiring any new spectrum holdings other than those acquired in Auction 97 without written permission from DISH … frustrates" Northstar's and SNR's ability to "develop a network and provide wireless services to the public," *id*. ¶66;

- DISH's "veto right [over expenditures in excess of $2,000,000] effectively places DISH in the position of having the power to control expenditures that will likely be essential to [Northstar's and SNR's] build-out and operation of their facilities," *id*. ¶67;

- "no meaningful limit exists on the ability of DISH, through its subsidiaries, to influence or dictate the build-out," *id*. ¶72;

- Northstar and SNR "simply cannot commence *any* construction of their networks unless and until DISH unilaterally chooses a technology," *id*. ¶99;

- "by exercising their 'put rights,'" SNR and Northstar "would recoup their cash contributions plus an undisclosed return on their contributions in a relatively short period of time, *without their ever having to deploy a wireless system*," *id*. ¶103 (emphasis added); and

- "the cap … on the total annual compensation that can be paid to the LLC Managing Member of [Northstar and SNR] is hardly sufficient to support the number of management, financial, and technical employees that we would expect to be required to … operate a wireless telecommunications network spanning the nation," *id*. ¶74.

4.      Finally, relator claims that defendants secretly "agreed that DISH would own Northstar's and SNR's spectrum for accounting purposes."  MTD Opp. 4.  Wrong again; there was no "agreement" regarding DISH's accounting treatment of Northstar and SNR other than— as disclosed to the FCC—that the accounting would be determined in accordance with generally accepted accounting principles (GAAP).  The GAAP determination that DISH would consolidate SNR and Northstar as variable interest entities "was not made until" after Auction 97 bidding had concluded and defendants' bidding-credit applications had been submitted.  Ex. F at 49:5-15.

Contrary to relator's suggestion, moreover (MTD Opp. 27), the fact that DISH ultimately consolidated Northstar and SNR in its financial statements does not mean defendants were parties to a "joint venture" under FCC regulations.  The accounting analysis under section 810 of the Accounting Standards Codification (ASC), which dictates whether one entity should consolidate another in its financial accounting, is different from the de facto and de jure control analysis under the FCC's regulations, and unrelated to those regulations' definition of "joint venture."  That is why there is no requirement to disclose an ASC 810 analysis in FCC auction applications.  Indeed, the FCC has frequently awarded bidding credits to designated entities despite those entities being consolidated in the financial statements of another (non-qualifying) entity, including to other entities that participated in Auction 97.  *See, e.g.*, *Wireless Telecommunications Bureau Grants AWS-3 Licenses in the 1695-1710 MHz, 1755-1780 MHz and 2155-2180 MHz Bands*, 31 FCC Rcd. 7129 (2016) (awarding Auction 97 credits to Advantage Spectrum L.P.); United States Cellular Corp., Form 10-Q, at 14 (Oct. 31, 2014)

("U.S. Cellular holds a variable interest in and consolidates the following [variable interest entities] under GAAP: … Advantage Spectrum L.P.").

Relator points to statements in the record in which defendants' relationships were colloquially described as a "joint venture." MTD Opp. 27 n.13. In context, however, it is clear that that label was used as a shorthand for the fact that SNR and Northstar were entities that had multiple investors. *See, e.g.*, Ex. G at 24:22-25:1. None of the cited references was to a "joint venture" as defined in the FCC's designated-entity regulations. And the relevant regulation expressly provides that "[t]he determination whether an entity is a joint venture" under the regulatory definition is to be made "regardless of how the business operation may be designated by the parties involved." 47 C.F.R. §1.2110(c)(5)(x).

In any event, the substantive information pertaining to the accounting treatment was disclosed to the FCC. DISH's accounting "conclusions were based off of … what was provided to the FCC, and [the FCC] had a full understanding of … the contractual arrangements associated with the designated entities." Ex. F at 174:12-19; *see also id*. at 154:21-155:3 (DISH's consolidation analysis was based on "the same documents as the FCC" received). To be sure, the FCC did not conduct the ASC 810 analysis (because that is not part of the FCC's standard). But the FCC found, based on the disclosed agreements, that DISH was closely financially associated with Northstar and SNR. In particular, the FCC found that:

- "DISH dominates the financial aspects of SNR's and Northstar's businesses," and Northstar and SNR "are both dependent upon DISH for the amount of capital that they may acquire and the sources of capital available to them," FCC Op. ¶84; and

- "the circularity by which the funds flow from DISH, as lender, to [Northstar and SNR] and then back to DISH, as Operating Manager, [are] indicative of the locus of control over the financial aspects of [Northstar's and SNR's] business" *id*. ¶93.

- 8 -

* * *

The government's conclusion that relator's evidence is cumulative of what was disclosed to the FCC with respect to each of the four allegedly undisclosed agreements is correct, and relator's contrary arguments mischaracterize the record. Indeed, relator's initial opposition to the government's motion so brazenly misrepresented deposition testimony that relator was forced to accede to defendants' demand that it file a correction. Specifically, relator initially told this Court that "DOJ's 'cumulative' assertion … is contradicted" by the fact that a DISH executive (Jeffrey Blum) answered "no" when asked in his deposition whether defendants "had disclosed to the FCC any of the undisclosed understandings alleged by Relator." MTD Opp. 26. That was not Mr. Blum's testimony, as relator belatedly acknowledged. Mr. Blum answered "no" not because those understandings existed and were fraudulently concealed but because defendants "*did not have* [the] understanding[s]" relator alleges, Dkt. 195 at A-201 (emphasis added). Yet relator, despite agreeing to correct its misrepresentation—by filing an amended brief acknowledging that DISH denies the existence of the alleged undisclosed agreements—continues to rely on the now plainly nonsensical argument that Mr. Blum's testimony is evidence of fraud.

## CONCLUSION

At the end of the day, as relator concedes, "this Court is not tasked here with deciding the merits." MTD Opp. 25. Under *Polansky*, the government is not required to "explain[] *in detail* why it ha[s] come to believe that the suit ha[s] little chance of success on the merits," MTD Opp. 4. Here, as demonstrated by a simple comparison of relator's arguments to the findings and observations that the FCC published nearly a decade ago, the government is justified in "not believ[ing] there is sufficient evidence supporting" relator's allegations of fraud, MTD 16. The motion to dismiss should be granted and relator's motion for a share of Northstar's and SNR's default payments to the FCC should be denied.

June 6, 2024

Gejaa T. Gobena (#463833)
Jonathan L. Diesenhaus (#423753)
Michael C. Theis (*pro hac vice*)
Courtney Caruso (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
202-637-5600
gejaa.gobena@hoganlovells.com
jonathan.diesenhaus@hoganlovells.com
michael.theis@hoganlovells.com
courtney.caruso@hoganlovells.com

*Counsel for SNR Wireless LicenseCo, LLC,
SNR Wireless HoldCo, LLC, SNR Wireless
Management, LLC, Atelum LLC, and John
Muleta*

Respectfully submitted,

*s/ Jonathan E. Paikin*

Howard M. Shapiro (#454274)
Jonathan E. Paikin (#466445)
Daniel S. Volchok (#466889)
Joseph M. Meyer (#1718940)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
202-663-6000
howard.shapiro@wilmerhale.com
jonathan.paikin@wilmerhale.com
daniel.volchok@wilmerhale.com
joseph.meyer@wilmerhale.com

*Counsel for American AWS-3 Wireless I LLC,
American AWS-3 Wireless II LLC, American
AWS-3 Wireless III LLC, DISH Wireless
Holding LLC, DISH Network Corporation,
Charles W. Ergen, and Cantey M. Ergen*

Peter B. Hutt II (#427331)
Benjamin C. Block (#479705)
Dennis B. Auerbach (#418982)
Amee M. Frodle (#1602371)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
202-662-6000
phuttjr@cov.com
bblock@cov.com
dauerbach@cov.com
afrodle@cov.com

*Counsel for Northstar Wireless, LLC,
Northstar Spectrum, LLC, Northstar
Manager, LLC, Doyon, Limited, Miranda
Wright, and Allen M. Todd*