UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | ) | |
| VERMONT NATIONAL TELEPHONE CO., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 15-0728(CKK) |
| v. | ) | |
| | ) | |
| NORTHSTAR WIRELESS, L.L.C. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' REPLY IN SUPPORT OF
ITS MOTION TO INTERVENE PURSUANT TO 31 U.S.C. § 3730(c)(3)
<u>IN ORDER TO DISMISS PURSUANT TO 31 U.S.C. § 3730(c)(2)(A)</u>**

## <u>TABLE OF CONTENTS</u>

I.    Argument .................................................................................................................... 1

  A.   Relator Articulates the Wrong Legal Standard ..................................................... 1

  B.   Relator Has Not Established the Government's Dismissal Is in Bad Faith ...................... 3

     i.    The Government Has Been Consistent with this Court and Relator ........................... 3

     ii.   The Government Has an Adequate Basis to Conclude the Benefit of this Qui Tam
           Action is Marginal ................................................................................ 5

     iii.  The Government Has a Reasonable Belief that Continued Litigation Would Impose a
           Significant Resource Drain ...................................................................... 8

     iv.   The Government Has Reasonable Concerns Regarding the Sufficiency of the
           Evidence ........................................................................................... 11

     v.    The Government's View of Damages Does not Ignore Harm to the United States ... 12

     vi.   The Government's Decision to Dismiss this Case is Consistent with its Past
           Application of Section 3730(c)(2)(A) .......................................................... 14

     vii.  Relator's Speculation About the Government's Actual Motive to Dismiss Shows Its
           Argument of Bad Faith is Unsubstantiated .................................................... 17

  C.   Prejudice to Relator is Not A Ground to Deny the Government's Motion to Dismiss ..... 19

  D.   Dismissal Would Not Violate Relator's Fifth Amendment Rights ................................... 20

  E.   No Hearing Is Necessary .............................................................................. 21

II.   Conclusion .............................................................................................. 24

## **TABLE OF AUTHORITIES**

### Cases

*Borzilleri v. Bayer Healthcare Pharms., Inc.*,
    24 F.4th 32 (1st Cir. 2022) ................................................................................. 3

*Brutus Trading, LLC v. Standard Chtd. Bank*,
    No. 20-2578, 2023 U.S. App. LEXIS 21868 (2d Cir. Aug. 21, 2023) ......................... 3, 21, 22, 23, 24

*Citizens for Responsibility & Ethics in v. United States DOC*,
    2020 U.S. Dist. LEXIS 146783 (D.D.C. Aug. 14, 2020) ............................................ 10, 11

*Citizens for Responsibility & Ethics in Wash. v. United States DOJ*,
    538 F. Supp. 3d 124 (D.D.C. 2021) ...................................................................... 9

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833, 118 S. Ct. 1708, 1716-17 (1998) ...................................................... 3

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ......................................................................................... 21

*McLaughlin v. Cheshire*,
    676 F.2d 855 (D.C. Cir. 1982) ............................................................................ 22

*Polansky v. Exec. Health Res. Inc.*,
    17 F.4th 376 (3d Cir. 2021) ............................................................... 2, 3, 14, 15, 20

*Polansky v. Exec. Health Res., Inc.*,
    422 F. Supp. 3d 916 (E.D. Pa. 2019) ................................................................... 10, 16

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
    599 U.S. 419, 143 S. Ct. 1720 (2023) ................ 1,2, 3, 8, 10, 11, 12, 14, 15, 16, 17, 19, 20, 21, 22, 23

*Protect Democracy Project, Inc. v. NSA*,
    10 F.4th 879 (D.C. Cir. 2021) ............................................................................ 6

*United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*,
    970 F.3d 835 (7th Cir. 2020) ................................................................ 7, 8, 11, 22, 23

*United States ex rel. May v. City of Dallas, Civ. A. No. 3:13-CV-4194-N-BN*,
    2014 U.S. Dist. LEXIS 152322 (N.D. Tex. Sep. 25, 2014) ........................................ 21

*United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*,
    151 F.3d 1139 (9th Cir. 1998) ............................................................................ 11, 12

*United States ex rel. Sibley v. Delta Reg'l Med. Ctr., Civ. A. No. 417CV000053GHDRP*,
    2019 WL 1305069 (N.D. Miss. Mar. 21, 2019) ...................................................... 21

*United States ex rel. Stevens v. Vermont Agency of Nat. Res.*,
    529 U.S. 765 (2000) ......................................................................................... 20

*United States. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Civ. A. No. 1:17-cv-0558*,
    2023 U.S. Dist. LEXIS 217620 (N.D. Ohio Dec. 7, 2023) .......................................................... 11, 16

**Statutes, Rules, and Regulations**

18 U.S.C. § 1001 ....................................................................................................................... 14

31 U.S.C. § 3730 ........................................................................ 1, 5, 11, 4, 8, 14, 15, 19, 21, 22

47 C.F.R. § 1.80 ........................................................................................................................ 14

47 C.F.R. § 1.429 ...................................................................................................................... 19

47 C.F.R. § 1.2110 .................................................................................................................... 13

47 U.S.C. § 503 ......................................................................................................................... 14

Fed. R. Civ. P. 30 ....................................................................................................................... 5

Fed. R. Civ. P. 41 .................................................................................................................... 2, 22

Fed. R. Civ. P. 45 .............................................................................................................. 9, 10, 16

Public Notice, 30 FCC Rcd 11622 (WTB 2015) ............................................................... 1, 12

Moore's Federal Practice - Civil § 45.41 (2024) .................................................................... 10

The United States has offered three interrelated reasons why this *qui tam* action will not vindicate the Government's interests: (1) the lack of evidence that Defendants DISH Network Corporation ("DISH"), Northstar Wireless, LLC ("Northstar") and SNR Wireless, LLC ("SNR") (collectively, "Defendants") failed to make a material disclosure to the FCC; (2) the apparent lack of damages; and (3) the burden on several government agencies responding to discovery. Dkt. No. 189.  In opposition, relator Vermont National Telephone Company ("Relator" or "VTel") does not the Government had a basis for its reasoning.  Relator's Memo. Of Points and Authorities in Opp. to Gov't's Mot. to Dismiss, Dkt. No. 190 (hereinafter "Relator Op.").  Specifically, Relator admits it made numerous submissions to the Government of the evidence it found in discovery.  *See* Part I.B.ii, *infra*.  Relator also does not contest that the Defendants paid **full** price for every license they received, *see* Public Notice, 30 FCC Rcd 11622 (WTB 2015), because they were never awarded any bidding credits, SNR/Northstar Order ¶¶ 152, 154.  *See* Part I.B.v, *infra*.  Finally, Relator acknowledges that continued litigation will incur some burden on the Government, at a minimum in the form of litigating disputes over the Defendants subpoenas.  *See* Part I.B.iii, *infra*.  Accordingly, this Court should grant the Government's motion to dismiss this *qui tam* action, which "is on behalf of and in the name of the Government" and "alleges injury to the Government alone."  *United States ex rel. Polansky v. Exec. Health Res., Inc*., 599 U.S. 419, 143 S. Ct. 1720, 1734-35 (2023).

## I.    Argument

### A.  Relator Articulates the Wrong Legal Standard

As a threshold matter, Relator asks this Court to apply the wrong legal standard. Specifically, Relator argues that this Court should only "ask two questions": whether the Government is moving for dismissal in "good faith" and whether Relator "will suffer prejudice

based upon the dismissal." Relator Opp. at 16 (internal quotation marks and alterations omitted). Those are not the right questions.

Fed. R. Civ. P. 41(a)(2), applicable here, provides for dismissal "on terms that the court considers proper." "The application of Rule 41 in the FCA context will differ . . . from the norm." *Polansky*, 143 S. Ct. at 1734. "In this context, the Government's views are entitled to substantial deference." *Id.* While the "the 'proper terms' assessment is more likely to involve the relator," the primary interests this Court should consider are the Government's. *Id.* This is because a *qui tam* suit "is on behalf of and in the name of the Government," and "alleges injury to the Government alone." *Id.* Thus, if the "Government offers a reasonable argument for why the burdens of continued litigation outweigh its benefits, the court should grant the motion . . . even if the relator presents a credible assessment to the contrary." *Id.* "Absent some extraordinary circumstance, that sort of showing is all that is needed for the Government to prevail on a (2)(A) motion to dismiss." *Id.* at 1735.

Where, as here, the Government has "offer[ed] a reasonable argument for why the burdens of continued litigation outweigh its benefits," *id.*, this Court need not wade into Relator's wildly speculative argument that the Government's reasons for dismissal are in "bad faith" because they are intended to avoid embarrassment, Relator Opp. at 35, or act as political favor, *id.* at 36-40. Rather, this Court need only determine whether "extraordinary circumstances" exist to deny the motion. Such circumstances exist only where the Government engages in the "most egregious official conduct" as to be "arbitrary in the constitutional sense." *Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 390 n.17 (3d Cir. 2021). "Government action is arbitrary in the constitutional sense when it violates a right otherwise protected by the substantive Due Process Clause and shocks the conscience, or when government officials abuse

their power and employ it as an instrument of oppression to the extent that it shocks the conscience." *Borzilleri v. Bayer Healthcare Pharms., Inc*., 24 F.4th 32, 43 (1st Cir. 2022) (internal quotation marks and citations omitted), *abrogated by Polansky*, 143 S. Ct. at 1720. *See also Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 118 S. Ct. 1708, 1716-17 (1998) (only extreme and outrageous conduct, and not mere harm to the complainant, can "shock the conscience" and rise to a constitutional violation), cited in *Polansky*, 17 F.4th at 390 n. 17.

Relator does not even make those allegations here, and the Court can appropriately end its inquiry and grant the Government's motion.  In any event Relator's claim of "bad faith" "boil[s] down to nothing more than a subjective disagreement with the government's investigation and its ultimate decision as to [relator's] claims," which is not a basis to deny the Government's motion.  *Brutus Trading, LLC v. Standard Chtd. Bank*, No. 20-2578, 2023 U.S. App. LEXIS 21868, at *7-8 (2d Cir. Aug. 21, 2023).

   B.  Relator Has Not Established the Government's Dismissal Is in Bad Faith

        i.     *The Government Has Been Consistent with this Court and Relator*

Relator argues that the Government's motion to dismiss is inconsistent with past positions it has taken before this Court.  To the contrary, the Government has taken a consistent view of this case -- both with this Court and Relator -- from the outset.  As Relator acknowledges, the Government conveyed substantial concerns regarding its ability to establish liability and damages when it declined the case in 2016.  Obermeier Decl. ¶¶ 6-7.  The Statement of Interest the Government filed in 2018 was limited to informing the Court of the Government's view of the relationship between the ongoing administrative proceedings and this *qui tam* action.  Dkt. No. 65.  While the Government stated it would be interested in evidence that Defendants failed to disclose material agreements to the FCC as part of Auction 97, it did not make any

3

judgment as to whether Relator had uncovered such evidence.  *Id.*  Indeed, any such judgment

would then have been impossible since, at that point, discovery had not yet begun.

    When the Government objected to the Defendants' Motion for Judgment on the

Pleadings, it strictly limited its objection to the application of the FCA's "public disclosure bar."

Relator Opp. at 17-18.  The FCA's "public disclosure bar" does not speak to the merits of the *qui*

*tam* action.  Instead, it only considers whether "substantially the same allegations or

transactions" alleged in the *qui tam* action "were publicly disclosed" and whether the relator is

"an original source of the information."  31 U.S.C. § 3730(e)(4).  Moreover, Relator concedes

the objection was the result of an agreement made in 2019, before discovery had begun, for

Relator to amend its complaint to make clear it was pursuing claims only based upon undisclosed

agreements.  Obermeier Decl. ¶ 23.  Thus, the Government's objection did not stem from an

appraisal of the evidence.  Indeed, the United States made clear it was taking "no position on the

merits of these allegations or whether they should be dismissed on grounds other than the public

disclosure bar."  United States Notice of Partial Opposition to Dismissal Under the Public

Disclosure Bar at 2, Dkt. No. 118; United States' Response in Support of its Notice of Partial

Opposition to Dismissal Under the Public Disclosure Bar at 10, Dkt. No. 124 (same).  That the

United States now seeks to dismiss this *qui tam* action under Section 3730(c)(2)(A) -- a "ground

other than the public disclosure bar" -- is not an inconsistent position.

    In short, while the United States afforded the Relator multiple opportunities to prove up

the missing elements of its case, the United States never advised Relator that its concerns about

the merits of the case had been resolved.  The United States has now concluded that those

continuing concerns warrant dismissal of this *qui tam* action.

   ii.  *The Government Has an Adequate Basis to Conclude the Benefit of this*
      *Qui Tam Action is Marginal*

  Relator argues that the Government did not have a basis to conclude the benefit of

continued litigation of this *qui tam* action is marginal.  This argument does not withstand

scrutiny.  First, Relator alleges that it was prevented from uncovering evidence of undisclosed

agreements because it could not complete all the depositions it had noticed.  Relator Opp. at 18.

The Government has reasonably concluded, however, that the few remaining depositions would

not uncover agreements that had not already been revealed by over a year of document discovery

(which resulted in the production of hundreds of thousands of documents totaling over a million

pages) and 18 depositions (more than the ordinary number of depositions provided by Fed. R.

Civ. P. 30(a)(2)(A)(i)).  *See* Obermeier Decl. Exhibit SO-5.  Indeed, Relator's counsel previously

acknowledged as much during a meeting with the Government on January 25, 2024.  There, in a

response to a direct question on what evidence Relator expected to uncover in the upcoming

depositions, Relator's counsel replied that he expected further support for the fraud they already

identified.

  Moreover, Relator purported to identify all the "undisclosed agreements" back in October

2023 when it served Supplemental Interrogatory Responses after the close of document

discovery.  There, Relator identified six undisclosed agreements: (1) SNR and Northstar "would

serve as vehicles to acquire discounted spectrum for DISH"; (2) "DISH would dictate the parties'

bidding strategy"; (3) SNR and Northstar "would transfer their spectrum to DISH after five

years"; (4) "DISH would own SNR Wireless' and Northstar Wireless' AWS-3 spectrum for

accounting and financial reporting purposes"; (5) "SNR Wireless and Northstar Wireless would

not use the AWS-3 spectrum they won in Auction 97"; and (6) "minority investors in SNR

Wireless could transfer their interests despite contrary language in the parties' disclosed

agreements." *See* Exhibit A.  Except for the last item, Relator identified the exact same undisclosed agreements in letters it sent to the Government in January of 2024.[1]  Even today, when Relator has had the benefit of 25 of its 34 noticed depositions, *see* Obermeier Decl. Exhibit SO-5, it does not identify any new "undisclosed agreements," claiming again: (1) SNR and Northstar would serve as "vehicles to acquire discounted spectrum for dish; (2) SNR and Northstar would not use their wireless licenses; and (3) SNR and Northstar would transfer their spectrum to DISH after five years.  Relator Opp. at 26.  Thus, there is no reason to believe that the handful of depositions Relator did not take would suddenly uncover some new "undisclosed agreement."

Second, Relator argues the Government "did not take into account **any** deposition testimony in deciding whether to move for dismissal."  *Id.* at 19 (emphasis added).  This is inaccurate.  Among other things, Relator wrote a letter to the FCC dated Jan. 5, 2024, that purports to  "summarizes additional evidence," including "depositions recently completed in the

---

[1] On January 5, 2024, Relator sent a letter to the FCC that "summarizes additional evidence," including "depositions recently completed in the case."  Relator sent a second letter to the Department of Justice on January 16, 2024, in response to being informed that the Government was considering exercising its authority to dismiss under Section 3730(c)(2)(A).  Exhibit A.  Both letters are marked as privileged; the Jan. 5, 2024, letter to the FCC is marked as "ATTORNEY WORK PRODUCT" and "COMMON INTEREST PRIVILEGE" and the Jan. 16, 2024, letter is marked as "CONFIDENTIAL – COMMON INTEREST PRIVILEGE."

Relator concedes that its unilateral disclosures of its communications with the Government in its motion opposing dismissal served as a waiver of any privilege concerning the Jan 16, 2024, letter, but continues to claim that the Jan. 5, 2024, letter is somehow still privileged.  Given that the Relator has put squarely into issue the content of its communications with the Government during the course of the litigation, it is unclear how the document is still privileged.  *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 891 (D.C. Cir. 2021) ("In the attorney-client privilege context, voluntary disclosure of privileged material . . . to unnecessary third parties . . . waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter") (internal quotation marks omitted) (alterations in original).  In any event, and to avoid another unnecessary dispute, the United States will submit the letter separately to the Court rather than attaching it to this memorandum.

case," and a letter to the Department of Justice dated Jan. 16, 2024, that includes multiple citations to deposition transcripts. These letters were considered in the Government's final decision to dismiss, which was not reached until February 5, 2024.

Third, Relator argues the Department of Justice was not willing to "hear what Relator had to say." Relator Opp. at 20-21. This too is inaccurate. As Relator admits, it had no less than four meetings with the FCC, who are the subject matter experts, to discuss this case. *Id.* at 21. This is in addition to the meeting Relator had with the Department of Justice just prior to declination, Obermeier Decl. ¶ 5-7, and with senior leadership at the Department of Justice, including with the Deputy Assistant Attorney General, before the Government reached the formal decision to dismiss, *id.* ¶ 65. On top of that, Relator admits it made numerous written submissions to the Government, *see, e.g.*, Obermeier Decl. ¶¶ 40 (Oct. 2, 2023, memorandum "summarizing the documentary evidence provided by defendants); 42 (Oct. 4, 2023, written presentation); 43 (Oct. 11, 2023, memorandum "outlining in greater detail relator's theory of damages"); 66 (Jan. 16, 2024, letter attached as Exhibit B), & 68 (Jan. 30, 2024, letter concerning damages), Jan. 5 Letter to FCC, along with emails and telephone calls almost too numerous to count. Indeed, Relator admits it sent the Government "multiple letters and memorandum summarizing the evidence confirming Defendant's fraud and outlining Relator's damages theories." Relator Opp. at 21. Thus, Relator had abundant opportunity to communicate its view of the evidence and damages to the Government.

Given these facts, Relator is left arguing that it was "bad faith" for the Government not to agree to each and every one of its numerous meeting requests. In particular, Relator complains it was unable to secure a meeting with one member of the Department of Justice in July of 2023 to re-present information it just provided to the FCC earlier that month. Relator Opp. at 20;

Obermeier Decl. ¶ 13. Avoiding duplicative presentations, however, is not evidence of "bad faith." *United States ex rel. CIMZNHCA, LLC v. UCB, Inc*., 970 F.3d 835, 850 (7th Cir. 2020) ("The law does not require the doing of a useless thing"). Moreover, as illustrated above, Relator had ample subsequent opportunities to present any information it wanted to the Government. Notably, Relator cannot point to any substantive evidence it possessed that it was blocked from providing to the Government.

At bottom, Relator had the opportunity to convey to the Government any evidence it found and every argument it could imagine; the Government simply disagreed with Relator's view of the facts and the law. But such a disagreement, the Supreme Court made clear, does not constitute the "extraordinary circumstances" that justify the denial of the Government's motion to dismiss under Section 3730(c)(2)(A). *Polansky*, 143 S. Ct. at 1735. Almost every relator whose case is being dismissed believes they have incontrovertible evidence of fraud that resulted in significant damages. Otherwise, they would have voluntarily dismissed their case and the Government would have assented to that dismissal under 31 U.S.C. § 3730(b)(1). Accepting Relator's argument would thus mean that it would be the "extraordinary circumstance" anytime the Government moved to dismiss, which would turn the standard articulated by the Supreme Court in *Polansky* on its head.

      iii.      *The Government Has a Reasonable Belief that Continued Litigation Would Impose a Significant Resource Drain*

As the United States explained in its opening brief, continued litigation of this *qui tam* action is likely to impose significant burdens on several federal agencies. This burden rests particularly heavy with the FCC, which faces the extraordinary burden of having to review, redact, and log thousands of internal documents relating to its evaluation of bidders in Auction 97 and to respond to three deposition subpoenas. This is in addition to burdens faced by five

other agencies which have not yet completed their responses to subpoenas in this case: the Department of Interior, Department of Commerce, Department of the Army, Department of the Navy, and Department of the Air Force.  These burdens, Relator concedes, have been created by the subpoenas issued by Defendants in this case.  *See* Obermeier Decl. ¶¶ 87-98 (arguing the Defendants' Rule 45 subpoena to the FCC is overbroad).  Indeed, Relator characterizes the subpoenas as seeking "irrelevant, burdensome, and privileged discovery from the government." *Id.* ¶ 102.  Yet Relator argues these burdens are "illusory and speculative" until the United States has "litigated and lost its objections to the defendants' discovery demands."  Relator Opp. at 22, 24.  This argument misses the point.

Avoiding the burdens of litigating discovery disputes is a reason for the Government's motion to dismiss.  The Government reasonably believes the cost of such litigation -- both for the Government and this Court -- is and will be significant given its extensive discussions with Defendants regarding the subpoenas they issued.  Contrary to Relator's speculation, the Government has raised numerous objections with the Defendants, including in a letter Relator cites that the Government sent to the parties articulating its view of permissible discovery. Obermeier Decl. ¶ 87.  While the Government and the Defendants were able to resolve some disputes, they reached an impasse on major issues concerning scope and applicable privileges. Litigating these disputes would be a resource-intensive undertaking given how many of the Defendants' requests would be at issue, *see* Obermeier Decl. ¶¶87-98 (Arguing "[n]early all Defendants' requests . . . exceed the permissible scope of discovery...."), and the involvement of claims of privilege that potentially require document-by-document analysis and *in camera* review by this Court.  *See*, *e.g.*, *Citizens for Responsibility & Ethics in Wash. v. United States*

*DOJ*, 538 F. Supp. 3d 124, 139-40 (D.D.C. 2021) (evaluating a claim of deliberative process privilege after an *in camera* review of the document).

Moreover, even if the Government were to win all of its discovery arguments, that would only reduce, not eliminate, the Government's additional burden in this case.  At a minimum, the FCC and other agencies would still have to review and produce documents, review documents for responsiveness and potential privilege, and prepare witnesses for depositions.  In addition, the Government would have to devote "attorney time associated with . . . monitoring the litigation, including the filing of statements of interest."  *Polansky v. Exec. Health Res., Inc*., 422 F. Supp. 3d 916, 928-29 (E.D. Pa. 2019).  Thus, there is no dispute that dismissing this *qui tam* action now would conserve the resources of the Government and this Court.

Relator does correctly observe that the Government did not move to dismiss in *Polansky* until after it had invested significant resources in an unsuccessful effort to prevent production of materials it believed were protected by the deliberative process privilege.  *Polansky v. Exec. Health Res., Inc*., 422 F. Supp. 3d 916, 921-22 (E.D. Pa. 2019).  But the lesson there should not be that the Government must first "litigate[] and los[e]" its objections to discovery, but rather that it should move to dismiss as soon as it has reasonably determined that "this suit would not do what all *qui tam* actions are supposed to do: vindicate the Government's interests."  *Polansky*, 143 S. Ct. at 1735.  That is exactly what has happened here.

Finally, Relator argues that any burden would be mitigated by its "willingness to assume the burden of litigating Defendant's discovery demands from the government."  Relator Opp. at 25.  This makes no sense.  Relator has no standing to assert objections to Rule 45 subpoenas issued to the Government.  9 Moore's Federal Practice - Civil § 45.41 (2024) ("Only the person subject to the subpoena, therefore, may raise the written objection authorized by the rule, and a

party does not have standing to object").  Moreover, even if the United States believed Relator was an appropriate steward of its interests, Relator's very act of litigating the Government's privileges (a core discovery issue in this case) risks waiving the privilege because of a voluntary disclosure to a third-party.  *Citizens for Responsibility & Ethics in v. United States DOC*, 2020 U.S. Dist. LEXIS 146783, at *4 (D.D.C. Aug. 14, 2020) ("A voluntary disclosure . . . to unnecessary third parties waives the deliberative process privilege as to the document or information specifically released") (internal quotation marks omitted) (alterations in original).  Thus, Relator can no more "assume the burden" of the Government's discovery responses than it can "assume the burden" of this Court of having to decide any discovery disputes.

     iv.     *The Government Has Reasonable Concerns Regarding the Sufficiency of the Evidence*

Relator complains that the Government did not explain how every bit of evidence Relator uncovered was "cumulative" of what was already disclosed to the FCC.  Relator Opp. at 26.  But, as Relator acknowledges, "this Court is not tasked here with deciding the merits of the cases [sic]...."  *Id.*  As such, the Government need not disprove Relator's case before it can dismiss.  CIMZNHCA, 970 F.3d at 852 ("The government is not required to justify its litigation decisions in this way, as though it had to show 'reasoned decisionmaking' as a matter of administrative law") (quotation marks in original).  It is enough that the relator "has not been able to uncover enough evidence to **convince the Government** that any significant violations of the FCA actually took place."  *United States. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs*., No. 1:17-cv-0558, 2023 U.S. Dist. LEXIS 217620 at *6-7 (N.D. Ohio Dec. 7, 2023) (emphasis added).  For the reasons discussed above, the United States has considered the evidence Relator claims

supports its case and concluded it was inadequate.  That is sufficient to justify dismissal.[2]

*Polansky*, 143 S. Ct. at 1735.

> v.    *The Government's View of Damages Does not Ignore Harm to the United States*

Relator also claims it was "bad faith" for the Government to be concerned about

Relator's ability prove damages under the FCA.  But Relator never challenges the factual basis

for that concern: the Defendants paid **full** price for every license they received, *see* Public

Notice, 30 FCC Rcd 11622 (WTB 2015), because they were never awarded any bidding credits,

SNR/Northstar Order ¶¶ 152, 154.  Indeed, the FCC's official position is that "SNR and

Northstar [] have fully and timely satisfied their obligations to pay money to the Government

arising from Auction 97...."  Malmud Decl. ¶ 27.  Instead, Relator merely offers reasons why it

believes it will be able to prove damages to a "jury at trial."  Relator Opp. at 28.  But the fact that

Relator can advance a contrary argument on damages does not demonstrate that the

Government's concerns are unreasonable, let alone the product of "bad faith."  The

Government's concerns about the existence of damages support is a "reasonable argument" that

---

[2] Indeed, the Government is entitled to dismiss even a clearly meritorious *qui tam* action.  One of the earliest exercises of the Government's authority under Section 3730(c)(2)(A) was to dismiss a *qui tam* action alleging certain citrus growers had failed to pay assessments on shipments of oranges and lemons.  *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1142 (9th Cir. 1998).  The United States initially attempted to settle the cases by intervening in the action, over the objection of the relators, and represented that "it would litigate the *qui tam* actions . . .  if a settlement could not be reached."  *Id.* at 1142.  The Government subsequently reversed that decision, and decided to "clean the slate" by dismissing the *qui tam* action.  *Id.*  The Government's dismissal was granted and upheld on appeal.  *Id.* at 1145.  While that court applied a different standard than the one adopted in *Polansky*, it was arguably more restrictive.  143 S. Ct. at 1733.  Thus, even if Relator is right that its case is meritorious, that would still not serve as a barrier to the Government's motion to dismiss.

supports its decision to dismiss, which is all the Supreme Court requires. *Polansky*, 143 S. Ct. at 1734.

Even if this Court wanted to wade into the merits, Relator's argument on damages is at odds with the facts and a fails on its own terms. Relator's entire argument rests upon the premise that the fraud it identified could have led the FCC to reject the Defendants' "short form" application. Relator Opp. at 26. This is incorrect. Following an established process, the FCC did not scrutinize the substance of agreements entered into by bidders claiming small business bidding credits until it received the "long form" application. 47 C.F.R. § 1.2110(j); Malmud Decl. ¶ 5 ("The "long-form" application is the document that the FCC evaluates in order to actually award the licenses, along with any claimed small business bidding credits"). Indeed, the FCC could not have performed the review earlier as the actual agreements are submitted only as part of the "long form" application. 47 C.F.R. § 1.2110(j) ("Designated entities . . . must list and summarize on their long-form applications **all agreements** that affect designated entity status....") (emphasis added). Thus, while the FCC conducts an abbreviated review of "short form" applications, that review did not extend to evaluating whether the bidder has any agreements that would render it ineligible for bidding credits.[3]

Moreover, even if Defendants were denied bidding credits based upon their "short form" applications, it is even less clear how that translates into a showing of damages. Specifically,

---

[3] This two-step process conserves the FCC's limited resources. The review of complex "partnership agreements, shareholder agreements, management agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, spectrum use agreements, and all other agreements," 47 C.F.R. § 1.2110(j), is time consuming process. A review of all "short form" applications in that detail would be unnecessary because many parties submitting "short form" applications do not win any spectrum. By reviewing in detail only "long form" applications, which are submitted by winning bidders, the FCC ensures it is rules are applied where it counts.

Relator contends that Defendants' fraudulent "short form" allowed them to use "bidding credits during the auction." Relator Op. at 30 (emphasis omitted). This, in turn, "artificially increased the amounts that competitors paid for the AWS-3 spectrum they were able to win...." *Id*. But if this were true, that means an effect of the Defendant's fraud was to "increase[] the amounts" that the Government received from the auction. Under those circumstances, it is even more difficult to see how the Government was "damaged."

Relator concludes its argument on this point by boldly stating: "it is impossible to take seriously the suggestion that the government is unharmed by two designated entities that lied about and falsely certified to their relationship with DISH on their short-form applications." Relator Opp. at 31. The Government suggests no such thing. The United States is only stating that even if Relator proved liability, the facts here raise significant doubt Relator could prove damages under the FCA. In this vein, it bears noting that damages under the FCA are not the only means to remedy "harm" done to the United States. The United States can also prosecute lies to the FCC under several criminal statutes, *e.g.*, 18 U.S.C. § 1001, and the FCC may initiate forfeiture proceedings against entities who violate its rules, *see* 47 U.S.C. § 503(b); 47 C.F.R. § 1.80. Thus, the Government's doubts about Relator's ability to prove FCA damages in this case does not mean that the Government is indifferent to the Defendants' alleged conduct.

vi.     *The Government's Decision to Dismiss this Case is Consistent with Its Past Application of Section 3730(c)(2)(A)*

Relator next argues that it is improper to dismiss this *qui tam* action because it is "unprecedented" based upon its review of the Government's Section 3730(c)(2)(A) motions filed since 2019. Relator Opp. at 32. This argument is legally unsupported, misleading, and factually wrong. As a legal matter, only the "most egregious official conduct" that is "arbitrary in the constitutional sense" is a basis to deny dismissal. *Polansky*, 17 F.4th at 390 n.17. Dismissing a

14

*qui tam* action "unlike any other *qui tam* action in which the DOJ has sought dismissal" does not qualify. If that were not the case, the Government would be unreasonably constrained from responding to novel circumstances.

More importantly, Relator's argument is misleading because it is based only upon instances where the Government actually had to move to dismiss under Section 3730(c)(2)(A). For every such motion to dismiss, there are many more instances where a relator, when informed the Government does not believe there is sufficient evidence of liability and damages and that continued litigation is not in the Government's interest, will voluntarily dismiss. In that event, the Government would have assented to that dismissal under Section § 3730(b)(1) instead of having to move to dismiss under Section 3730(c)(2)(A). Thus, the fact that Relator is unable to find an identical precedent is more likely due to Relator acting "unlike any other" relator than any conduct by the Government that is "arbitrary in the constitutional sense."

In any event, there is an analogous precedent: *Polansky*. In that case, the relator litigated the *qui tam* action for several years following the United States' declination, despite concerns expressly raised by the United States about the merits of the case, and, in the process, invested "considerable time and resources in the case." *Polansky*, 17 F.4th at 381. The Government moved to dismiss based upon "the significant costs of future discovery in the suit," and "explained in detail why it had come to believe that the suit had little chance of success on the merits." *Polansky*, 143 S. Ct. at 1735. The relator "vigorously disputed the latter point, claiming that the Government was leaving billions of dollars of potential recovery on the table." *Id.* (internal quotation marks omitted). The same situation is present here.

In response, Relator attempts to distinguish *Polansky* using tangential details. Primarily, Relator argues that it, unlike the relator in *Polansky*, did not engage in any misconduct during the

course of the litigation.  Relator. Opp. at 33-34.  However, relator misconduct is not a necessary condition for dismissal.  Indeed, the Supreme Court did not even mention the relator's conduct in *Polansky* as a basis for affirming the Government's motion to dismiss, keeping instead the focus on the "Government's views [, which] are entitled to substantial deference."  *Polansky*, 143 S. Ct. at 1734.  The Supreme Court was persuaded that the "costs of future discovery in the suit" and the Government's belief that the "suit had little chance of success on the merits," both of which are present here, not only justified dismissal, but made that conclusion "not a close call." *Id.*

Relator also argues that this case is distinguishable from *Polansky* because the Government in that case submitted a declaration detailing its anticipated litigation costs.  Relator Opp. at 33.  But such a declaration is not necessary here because the Government's litigation costs are self-evident.  As Relator acknowledges, if this case were to continue, there would be litigation over very broad Rule 45 subpoenas issued to the Government.  *See* Obermeier Decl. ¶¶ 87-98 (arguing the Defendants' Rule 45 subpoena to the FCC is overbroad).  Relator concedes that such litigation will impose a burden on the Government when it offered to "assume th[at] burden."  Relator Opp. at 25.  Moreover, regardless how this Court decides any discovery dispute, it is likely to require at least some motions practice and the production of documents (along with the review and logging of privileged materials) by the Government.  In addition to responding to discovery, the Government would have to prepare witnesses for deposition and devote "attorney time associated with . . . monitoring the litigation, including the filing of statements of interest."  *Polansky*, 422 F. Supp. 3d at 929.  Thus, there manifestly will be some burden on the Government of continued litigation, and a declaration would be repetitive and unnecessary.

Finally, Relator claims that this case is distinguishable from *United States. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs.*, No. 1:17-cv-0558, 2023 U.S. Dist. LEXIS 217620 (N.D. Ohio Dec. 7, 2023), because "[u]nlike here, the relator's fraud allegations in that case . . . were contradict[ed] by the deposition testimony of [Government] employees...."  Relator Opp. at 34. Except that is what already occurred here with Relator's contention that SNR and Northstar "use[d] bidding credits in Auction 97," Relator Opp. at 30, which conflicts with testimony from the FCC that "the FCC never awarded SNR or Northstar any such bidding credit," Malmud Decl. ¶ 25.  And such rifts will likely only multiply if this case goes forward, as the United States and Relator obviously disagree on whether the evidence Relator relies upon is or is not cumulative of what the Defendants had affirmatively disclosed in their long and short form filings.  A case that "is on behalf of and in the name of the Government" should not depend upon facts and argument that the Government does not agree with, and this Court should accordingly grant the Governments motion to dismiss.  *Polansky*, 143 S. Ct. at 1734.

> **vii.**     ***Relator's Speculation About the Government's Actual Motive to Dismiss Shows Its Argument of Bad Faith Is Unsubstantiated***

Finally, Relator speculates on the Government's true motive for dismissing.  First, Relator guesses that the Government is moving to dismiss this case to avoid having the FCC "look foolish" given its 2015 conclusion that "[t]here is no showing here that SNR and Northstar attempted to mislead the Commission about their respective relationships with DISH." SNR/Northstar Order ¶ 132.  But that conclusion was based before the evidence before it at the time, which was made clear by the preface "no showing here."  *See* Statement of Interest at 3 ("[T]he current administrative proceeding assumes full compliance with the applicable disclosure requirements"), Dkt. No. 65.  Thus, the FCC left open the possibility that new evidence could

cause it to revisit its prior conclusion.  It is thus unclear how this *qui tam* action, which relies upon evidence not previously before the FCC, could make the FCC look "foolish."

Next, Relator speculates that the Government is moving to dismiss because the current administration is "closely allied politically with DISH," and the "government risks political embarrassment if this case were to proceed."  Relator Opp. at 36, 38.  But the only support Relator cites for this claim is: (1) DISH supported a broad public initiative to encourage interoperability of cellular network equipment, *id.* at 36 n.19; (2) DISH was one of many telecommunications companies to receive grants in furtherance of this policy initiative,[4] *id.* at 37; (3) the principal owners of DISH were contributors to the campaign of the current President and visited the White House, *id.* at 37-38; and (4) DISH's principal owner was one of 22 members of a Presidential Trade and Investment Mission to the Philippines, *id.* at 38.[5]  None of these facts even remotely suggest that DISH or any Defendant has had any influence on the Government's handling of the case.

Moreover, Relator's accusation of political favoritism is dispelled by the history of this case.  As noted above, the United States first expressed to Relator concerns about liability and damages in 2016, under a different Administration.  Obermeier Decl. ¶¶ 6-7.  Relator also complains that the "DOJ appears to have collaborated closely with Defendants' counsel," by "working with Defendants to limit Relator's claims to their so-called "secret agreements" theory

---

[4] *See* Press Release, *Biden-Harris Administration Announces $420M Funding Opportunity to Promote Wireless Equipment Innovation*, available at https://www.ntia.gov/press-release/2024/biden-harris-administration-announces-420m-funding-opportunity-promote-wireless ("NTIA has already awarded more than $140 million to 17 grantees").

[5] *See* Announcement of the Presidential Trade and Investment Mission to the Philippines, available at https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/07/announcement-of-the-presidential-trade-and-investment-mission-to-the-philippines/.

(Defendants' and the DOJ's term), which Defendants would then seek to dismiss...." *Id.* ¶ 18. But this allegedly occurred in 2019, under yet another Administration.

Throughout, this case has been handled consistent with the standard followed by the Department of Justice, as reaffirmed most recently by Attorney General Garland: "Our job is not to do what is politically convenient. . . . Our job is to follow the facts and the law. And that is what we do." Attorney General Merrick B. Garland Delivers Opening Statement Before the House Judiciary Committee, Sept. 20, 2023, available at https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-opening-statement-house-judiciary-committee.

C.  Prejudice to Relator is Not a Ground to Deny the Government's Motion to Dismiss

Relator argues that the Government's motion should be denied because "dismissal will inflict clear legal prejudice on Relator." Relator Opp. at 40. The existence of prejudice to the relator is not an independent ground to deny the Government's motion to dismiss. Rather, prejudice to relator is only one "set of interests the court should consider," with the focus on the Government's views, which "are entitled to substantial deference." *Polansky*, 143 S. Ct. at 1720. Thus, where, as here, the Government "offers a reasonable argument for why the burdens of continued litigation outweigh its benefits," the Government's motion should be granted even if it results in prejudice to the relator. *Id.* at 1735.

In any event, Relator's asserted interest relies on the premise that Defendants are guilty of committing fraud. To the extent Relator has an additional interest resulting from its contention that Defendant's conduct prevented it from obtaining certain licenses, Relator Opp. at 42, it raised those concerns with the FCC when it asked that spectrum won by SNR and Northstar be reauctioned. SNR/Northstar Order ¶ 152. Relator could have, but did not, ask the

FCC to reconsider its decision to deny that remedy.  *See* 47 C.F.R. § 1.429.  This FCA action is not the appropriate forum to litigate that issue, nor would it result in such a remedy.

Relator also cites the attorney time and resources it devoted to litigating this action. Relator Opp. at 42.  But this too is not a unique circumstance, and was done with full knowledge of the Government's strong concerns about the merits of the Relator's case.  Moreover, as the Supreme Court noted, "all relators faced with a (2)(A) motion want their actions to go forward, and many have by then committed substantial resources."  *Polansky*, 143 S. Ct. at 1734.  Indeed, the relator in *Polansky* committed even more resources, having litigated the case for several years to the eve of trial.  *Polansky*, 17 F.4th at 381, 393 ("[T]he litigation was at an advanced stage and significant resources had been expended on it by both the parties and the Court...."). And still, granting the Government's motion to dismiss was "not a close call."  *Polansky*, 143 S. Ct. at 1734.

    D.  <u>Dismissal Would Not Violate Relator's Fifth Amendment Rights</u>

Finally, Relator argues that dismissal would constitute a regulatory taking in violation of the Due Process Clause of the Fifth Amendment because it has a protected property interest in this *qui tam* action.  This is mistaken.  Relators file *qui tam* suits "on behalf of and in the name of the Government" that "allege[] injury to the Government alone."  *Polansky*, 143 S. Ct. at 1734. Thus, while the FCA "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" to the relator, it does not convert the relator into the real party in interest, nor does it give the relator exclusive control of the litigation.  *United States ex rel. Stevens v. Vermont Agency of Nat. Res.*, 529 U.S. 765, 773 (2000).  Indeed, Relator only has a right to the "proceeds of the action or settlement of the claim," 31 U.S.C. § 3730(d), which does not materialize until after success on the merits.  *See Stevens*, 529 U.S. at 773 n.3 ("Blackstone noted, with regard to English qui tam actions, that 'no particular person, A or B, has any right,

claim or demand, in or upon [the bounty], till after action brought,' and that the bounty

constituted an 'inchoate imperfect degree of property . . . [which] is not consummated till

judgment'") (quotation marks and alterations in original).  For that reason, Relator does not have

a protected property interest in the claims of the United States, let alone for claims that have not

yet been proven.

   In addition, Relator is receiving the right to notice and an opportunity to be heard

guaranteed by the Due Process Clause of the Fifth Amendment.  *See Mathews v. Eldridge*, 424

U.S. 319, 348 (1976).  Therefore, Relator cannot establish that the grant of the motion to dismiss

would violate its Constitutional rights.  Indeed, the relator in *Polansky* argued the dismissal

deprived him of a property interest, but the Supreme Court did not even mention the Fifth

Amendment as part of the standard to evaluate the Government's motion to dismiss under

Section 3730(c)(2)(A).

   E.   No Hearing Is Necessary

   The Second Circuit held in *Brutus Trading, LLC v. Standard Chtd. Bank* that Section

3730(c)(2)(A) "did not mandate universal requirements for [an FCA] hearing in every case," and

the "hearing requirement" can be met by "carefully considering the parties' written

submissions."  No. 20-2578, 2023 U.S. App. LEXIS 21868, at *6 (2d Cir. Aug. 21, 2023).

Relator attempts to distinguish that case on the facts, but never challenges its core principle that

this Court can, in its discretion, decide this motion based upon the parties' written submissions.

*Id.*; *United States ex rel. Sibley v. Delta Reg'l Med. Ctr.*, No. 417CV000053GHDRP, 2019 WL

1305069, at *10 (N.D. Miss. Mar. 21, 2019) ("As numerous courts have held, the hearing

requirement is satisfied by allowing the relator an opportunity to submit a response to the

motion") (internal quotations and citations omitted)); *United States ex rel. May v. City of Dallas*,

No. 3:13-CV-4194-N-BN, 2014 U.S. Dist. LEXIS 152322, at *8 (N.D. Tex. Sep. 25, 2014) ("the

hearing requirement is satisfied by allowing the relator an opportunity to submit a response to the motion").  In short, this Court is not obligated to hold a hearing.  Given the extensive written submissions by the parties (with Relator filing hundreds of pages on this issue), the United States respectfully submits that such a hearing is not necessary here.

Relator's attempts to distinguish *Brutus Trading* do not hold water.  First, Relator argues that the Government's dismissal in that case occurred before the defendant had answered or filed a motion for summary judgment and was thus governed by Fed. R. Civ. P. 41(a)(1) instead of 41(a)(2).  Relator Mot. For Hearing at 2.  But regardless of the procedural timing, "a district court must exercise some degree of scrutiny in evaluating the government's motion to dismiss," which it can accomplish by "carefully considering the parties' written submissions."  *Brutus Trading*, 2023 U.S. App. LEXIS 21868 at *6.  Thus, this Court is free to decide whether to "rely entirely on written submissions from the parties" even when the dismissal is under Fed. R. Civ. P. 41(a)(2).  This, not incidentally, is the rule under Fed. R. Civ. P. 41(a)(2).  *McLaughlin v. Cheshire*, 676 F.2d 855, 857 (D.C. Cir. 1982) ("[T]he District Court may, in its discretion, rely entirely on written submissions from the parties....").

Second, Relator points to the fact that in *Brutus Trading*, but not here, the Government submitted supporting declarations.  But in that case, the information the Government considered before reaching its decision to dismiss was not before the court because it was considered during its confidential investigation.  Here, in contrast, the information the Government considered can be reviewed merely by looking at Relator's filings and letters.  *See, e.g.*, Relator Opp. at 9-14; Relator's Supplemental Interrogatory Responses, Exhibit A, Relator Jan 5, 2024, Letter, & Relator Jan. 16, 2024, Letter, Exhibit B.  Moreover, as Relator acknowledges, "this Court is not tasked here with deciding the merits of the cases [sic]...."  Relator Opp. at 26.  Thus, there is no

need for the Government to submit declarations correcting every inaccuracy in Relator's argument and detailing every facet of its weighing of this *qui tam* action's costs and benefits; it need only "offer[] a reasonable argument for why the burdens of continued litigation outweigh its benefits...." *Polansky*, 143 S. Ct. 1734; *CIMZNHCA*, 970 F.3d at 852 ("The government is not required to justify its litigation decisions in this way, as though it had to show 'reasoned decisionmaking' as a matter of administrative law") (quotation marks in original).  That is what the Government has done here.

Third, Relator argues that in this case, it has "documented in detail the objective inadequacies of the DOJ's investigation of Relator's claims."  Relator Mot. For Hearing at 3.  As noted above, those arguments are without merit.  But, more importantly for this issue, the relator in *Brutus Trading* raised the same arguments.  For example, the relator in *Brutus Trading* claimed the Government: "reviewed only a small sample" of the allegedly fraudulent transactions, "refused to consider the documents submitted by Relator," "generally ignored thousands of [] files" received after it "wrapped up" its investigation, and "did not examine the massive volume of evidence Relator produced."  Relator's Opp. to the Gov't Motion to Dismiss at 3-5, Case No. 18-cv-11117, Jan. 22, 2020 (S.D.N.Y.), Dkt. No. 49, attached as Exhibit C.  The relator in *Brutus Trading* further argued that the Government's conclusion that it could not substantiate the relator's allegation was only a "conclusory statement" that "does not explain how" the evidence submitted by Relator did not support its allegations, *id.* at 5, and the Government was seeking to "dismiss Relator's complaint based on conclusory statements and undisclosed and generally unidentified evidence," *id.* at 22.  The relator in *Brutus Trading* even went on to speculate that the Government was acting to protect the defendant, seeking to "limit [the defendant's] exposure to the damages of its fraud on the public fisc...."  *Id.* at 27.  But both

the District Court and Second Circuit found all that overheated rhetoric "boil[s] down to nothing more than a 'subjective disagreement' with the government's investigation and its 'ultimate decision....'" *Brutus Trading*, 2023 U.S. App. LEXIS 21868, at *7 (quotation marks in original). This Court can, and should, do the same here.

Finally, Relator claims that, unlike in *Brutus Trading*, the Government here is moving to dismiss as a political favor.  Relator Mot. For Hearing at 5.  But, as noted above, Relator has no supporting evidence, and the entire theory is contrary to the history of this case.  A hearing will not change these facts. *See Brutus Trading*, 2023 U.S. App. LEXIS 21868 at *8 (requiring a "'substantial threshold showing' of government impropriety" before allowing relator further proceedings on that issue).  Accordingly, the Government does not believe a hearing is necessary.

## II.   Conclusion

For the foregoing reasons, the United States respectfully submits that this Court should grant the Government's motion to dismiss and do so based upon consideration of the parties' written submissions.

Date: June 6, 2024                        Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          Principal Deputy Assistant Attorney General
                                          Civil Division

                                           /s/ *Benjamin Wei*
                                          JAMIE A. YAVELBERG
                                          PATRICIA L. HANOWER
                                          BENJAMIN C. WEI
                                          Attorneys, Civil Division,
                                          Commercial Litigation Branch
                                          U.S. Department of Justice
                                          Post Office Box 261
                                          Washington, D.C. 20044
                                          (202) 616-2875

24

MATTHEW M. GRAVES
United States Attorney for the District of Columbia


 /s/ *Darrell C/ Valdez*
DARRELL C. VALDEZ, D.C. Bar # 420232
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W., Civil Division
Washington, D.C.  20530
(202) 252-2507

*Counsel for the United States of America*