## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERMONT NATIONAL TELEPHONE COMPANY,<br><br>                       Plaintiff,<br><br>    v.<br><br>NORTHSTAR WIRELESS, LLC, *et al.*,<br><br>                   Defendants. | Civil Action No. 15-00728 (CKK) |

### VERMONT NATIONAL TELEPHONE COMPANY'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff-Relator Vermont National Telephone Company ("Relator"), by counsel and pursuant to Federal Rules of Civil Procedure 26 and 33, the Local Rules of this Court, and the Parties' Joint Schedule, *see* ECF No. 159, hereby submits its supplemental responses and objections to the First Set of Interrogatories ("Interrogatories") propounded by Defendants. Specifically, Relator hereby supplements its responses to Interrogatories 5, 8, and 14 as agreed to in the Joint Schedule, as well as Interrogatories 6-7 and 9-12. Because Relator's investigation of facts relevant to this litigation are ongoing, these responses and objections are based on currently available information provided to the best of Relator's current knowledge. Without waiving or prejudicing the following objections, Relator reserves the right to supplement, clarify, revise, or correct any or all of the responses and objections herein at any time.

Nothing in these supplemental responses and objections constitutes or should be construed as a waiver of any rights that otherwise might be available to Relator, nor does Relator's answering of any Interrogatory constitute an admission of the relevance of the information requested. None of Relator's supplemental responses or objections is or should be

construed as an admission concerning the truth or accuracy of any characterization contained in any request.

## **GENERAL OBJECTIONS**

With respect to the Interrogatories propounded by Defendants, Relator asserts the following general objections:

1.      Relator objects generally to the Interrogatories insofar as they seek information covered by the attorney-client privilege, the attorney work-product doctrine, the joint prosecution privilege, or any other applicable privilege or immunity (collectively, "Privileged Information").

2.      Relator objects generally to the Interrogatories on the grounds of overbreadth and undue burden to the extent that they seek documents and information that are not related or relevant to any party's claim or defense presented in this matter, exceed the scope of permissible discovery, or are not proportional to the needs of the case.

3.      Relator objects generally to the Interrogatories on the grounds of overbreadth and undue burden as they seek information from an undefined, overly broad, or unduly burdensome time period.

4.      Relator objects generally to the Interrogatories on the grounds of overbreadth and undue burden to the extent they seek information that is not obtainable through a reasonably diligent search by Relator.

5.      Relator objects generally to the Interrogatories to the extent they seek to obtain from Relator information that is publicly available, already in the Defendants' possession, and/or equally or more readily available to Defendants.

6.      Relator objects generally to the Interrogatories to the extent that they use language incorporating or calling for a legal conclusion or making an erroneous statement of law or fact.

2

Relator's objections shall not be construed as admitting to any legal conclusion or erroneous statement of fact within the Interrogatories.

7.      Unless otherwise so stated, by objecting to the Interrogatories, Relator's objections are not intended to be and shall not be construed as an admission of the matters stated, implied, or assumed by the Interrogatories.  No objection or limitation, or lack thereof, made in these objections should be deemed an admission by Relator as to the existence or nonexistence of information.

8.      Relator's responses to these Interrogatories do not constitute a waiver of any objections that Relator may have as to the admissibility or relevance of any information provided.  Relator reserves all objections regarding the relevance, materiality, admissibility, privilege, or competency of all information provided in response to these Interrogatories as evidence in any later proceeding or trial of this action.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.      To the extent Defendants have incorporated their Definitions and Instructions set forth in Defendants' First Set of Requests for Production of Documents dated November 22, 2022, Relator incorporates and reaffirms its objections to those Definitions and Instructions as stated in its December 22, 2022 Responses and Objections to Defendants' First Set of Requests for Production of Documents.

2.      Relator generally objects to Instruction 5 to the extent it requires Relator to furnish all information "including hearsay" whether in its "actual or constructive possession." This Instruction goes beyond the requirements of Federal Rule of Civil Procedure 33 and is therefore overly broad and unduly burdensome.  Relator will respond to the extent required by the Federal Rules.

3

## SPECIFIC OBJECTIONS AND SUPPLEMENTAL RESPONSES

With respect to the Interrogatories propounded by Defendants, Relator specifically objects and responds as follows:

**INTERROGATORY NO. 5:**  Identify each of the agreements you allege Defendants failed to disclose to the United States as referenced in paragraphs 124-128 of the complaint, stating with respect to each such agreement the parties, date, signatories, and relevant terms thereof.

**SPECIFIC OBJECTIONS:** Because discovery is ongoing, Relator objects to this interrogatory as premature to the extent it requests specific details of each undisclosed "agreement."  Responding to this interrogatory requires a review of documents and evidence in the possession of Defendants and third parties that have yet to produce all requested documents or submit to any depositions.  Relator also objects to this interrogatory to the extent it erroneously implies that an "agreement" requires a specific "date" or "signatories."

**RESPONSE:** Subject to and without waiving any of its objections, based on the evidence currently available, Relator alleges that Defendants had one or more undisclosed instruments, arrangements, agreements, or understandings that Northstar Wireless, L.L.C. ("Northstar Wireless") and SNR Wireless LicenseCo, L.L.C. ("SNR Wireless") were formed, financed, and operated under the control of DISH Network Corporation ("DISH") and for DISH's benefit for the purpose of obtaining spectrum on behalf of DISH and then transferring the licenses to DISH.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of its objections, Defendants were parties to the following undisclosed arrangements, agreements, or understandings:

First, Defendants had an undisclosed arrangement, agreement, or understanding that Northstar Wireless and SNR Wireless would serve as vehicles to acquire discounted spectrum for DISH.  DISH participated in Auction 97 because it greatly valued AWS-3 spectrum. But

4

rather than pay the full amount for spectrum purchased in Auction 97 and to obtain an advantage in bidding against larger wireless carriers, Defendants arranged, agreed, or understood that Northstar Wireless and SNR Wireless would acquire spectrum for DISH that DISH selected at a discount to which DISH was not entitled. Defendants reached this agreement, arrangement, or understanding as early as July 2014.

Second, Defendants had an undisclosed arrangement, agreement, or understanding that DISH would dictate the parties' bidding strategy in Auction 97 and select the AWS-3 licenses on which Northstar Wireless and SNR Wireless would bid and the amounts of their bids. Defendants reached this agreement, arrangement, or understanding as early as July 2014.

Third, Defendants had an undisclosed arrangement, agreement, or understanding that Northstar Wireless and SNR Wireless would transfer their spectrum to DISH after five years when the FCC's unjust enrichment period had lapsed. Consistent with Defendants' undisclosed arrangement, agreement, or understanding that Northstar Wireless and SNR Wireless would serve as vehicles to acquire discounted spectrum for DISH that DISH selected, Defendants arranged, agreed, or understood that the AWS-3 licenses on which Northstar Wireless and SNR Wireless were the winning bidders would end up in DISH's hands. Defendants reached this agreement, arrangement, or understanding as early as July 2014.

Fourth, Defendants had an undisclosed arrangement, agreement, or understanding that DISH would own SNR Wireless' and Northstar Wireless' AWS-3 spectrum for accounting and financial reporting purposes, which also allowed DISH to take advantage of certain tax benefits. Well before the close of Auction 97, Defendants arranged, agreed, or understood that DISH would include SNR Wireless and Northstar Wireless in DISH's consolidated financial reports. Consolidation of SNR Wireless and Northstar Wireless with DISH for accounting and financial

5

reporting purposes was based on the determination that they were so-called "variable interest entities" that should be treated as a "related party group" with DISH, which Defendants understood was the "primary beneficiary" of SNR Wireless and Northstar Wireless.  The treatment of DISH as the primary beneficiary of SNR Wireless and Northstar Wireless for accounting and financial reporting purposes conflicted with the treatment of DISH's relationship with SNR Wireless and Northstar Wireless for *de facto* control purposes.  As a result, Defendants failed to disclose the former and misrepresented the latter.  Defendants reached this agreement, arrangement, or understanding as early as July 2014.

Fifth, Defendants had an undisclosed arrangement, agreement, or understanding that SNR Wireless and Northstar Wireless would not use the AWS-3 spectrum they won in Auction 97 to provide wireless services. Even though the FCC's rules are designed to ensure that every designated entity "uses its licenses to directly provide facilities-based telecommunications services for the benefit of the public," *Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, Order on Reconsideration of the Second Report and Order, WT Docket No. 05-211, FCC 06-78, ¶ 3 (rel. June 2, 2006), SNR Wireless and Northstar Wireless arranged, agreed, or understood with DISH that they would not provide wireless services, which was consistent with—and a natural consequence of—their arrangement, agreement, or understanding that SNR Wireless and Northstar Wireless existed solely to acquire discounted spectrum on behalf of DISH. Defendants reached this agreement, arrangement, or understanding as early as July 2014.

Sixth, the DISH-Controlling Defendants and SNR had an undisclosed arrangement, agreement, or understanding that minority investors in SNR Wireless could transfer their

6

interests despite contrary language in the parties' disclosed agreements.[1]   SNR Wireless' short-form application and the LLC Agreement filed with the FCC state that the transfer of a member's interests to another member is prohibited during the ten years after the last initial grant date, except with the consent of DISH, "which may be withheld in its sole and absolute discretion." The implication of this language was that investors in SNR Wireless were in it for the long haul. But before SNR Wireless filed its short-form application and before the LLC agreement was ever executed, SNR and DISH-Controlling Defendants arranged, agreed, or understood in August 2014 that investors in SNR Wireless could transfer their interests "if there is regulatory delay to closing the put," although they did "not want that as a contractual term in the agreement" [SNR-00002439; SNR-00002574].   Consistent with this undisclosed arrangement, agreement, or understanding, BlackRock sold its interests in SNR Wireless to ADK in April 2018 [SNR-00039123], which was just months after the FCC established in January 2018 the process to give SNR Wireless and Northstar Wireless the opportunity to cure DISH's *de facto* control.

**INTERROGATORY NO. 6:**  Identify each Defendant whom you allege knowingly failed to disclose an agreement to the United States, stating with respect to each such Defendant the particular agreement(s) the Defendant failed to disclose and the factual bases for your allegation regarding the Defendant's alleged knowledge of the purportedly undisclosed agreement(s).

   **SPECIFIC OBJECTIONS:**  Because discovery is ongoing, Relator objects to this interrogatory as premature to the extent it requests specific details, such as the factual bases

---

[1]      "DISH-Controlling Defendants" refers to Defendants DISH; American AWS-3 Wireless I L.L.C.; American AWS-3 Wireless II L.L.C.; American AWS-3 Wireless III L.L.C.; DISH Wireless Holding L.L.C.; Charles W. Ergen; and Cantey M. Ergen.  "SNR" refers collectively to SNR Wireless, and the owners, managers, members, and individuals who formed and operated it, including Defendants SNR Wireless HoldCo, L.L.C.; SNR Wireless Management, L.L.C.; Atelum L.L.C.; and John Muleta.

regarding each such Defendant's alleged knowledge.  Responding to this interrogatory requires a review of documents and evidence in the possession of Defendants and third parties that have yet to produce all requested documents or submit to any depositions.

**RESPONSE:** Subject to and without waiving any of its objections, based on the current available evidence, Relator alleges that Northstar Wireless and the owners, managers, members and individuals who formed and operated it, including Defendants Northstar Spectrum, L.L.C.; Northstar Manager, L.L.C.; Doyon, Limited; Miranda Wright; and Allen M. Todd (collectively "Northstar") knowingly submitted Northstar Wireless' short-form and long-form applications in Auction 97 without disclosing that they had entered into one or more agreements, instruments, arrangements, or understandings of the nature described in response to Interrogatory No. 5, even though the FCC required applicants to disclose all "agreements, arrangements, and understandings of any kind relating to the licenses being auctioned."  *See* 47 C.F.R. § 1.2105(a)(2)(viii); *see also id.* § 1.2105(a)(2)(ix) (requiring certification that applicant will not enter into any agreements, arrangements, or understandings of any kind with unidentified parties regarding bids or licenses); *id.* § 1.2110(j) (requiring disclosure of "all agreements that affect designated entity status"); *id.* § 1.2112(b)(1)(iii) (requiring disclosure of all agreements that support eligibility as small business, including the "presence or absence of attributable material relationships"); *id.* § 1.2112(b)(2)(iii) (same); *id.* § 1.2112 (b)(2)(vii) (requiring disclosure of any agreements for the lease or resale of any spectrum capacity of applicant's license).

Similarly, Defendant SNR Wireless LicenseCo, L.L.C. ("SNR Wireless") and the owners, managers, members, and individuals who formed and operated it, including Defendants SNR Wireless HoldCo, L.L.C.; SNR Wireless Management, L.L.C.; Atelum L.L.C.; and John Muleta (collectively, "SNR") knowingly submitted SNR Wireless' short-form and long-form

8

applications in Auction 97 without disclosing that they had entered into one or more agreements, arrangements, instruments, or understandings of the nature described in response to Interrogatory No. 5, even though the FCC required applicants to disclose all "agreements, arrangements, and understandings of any kind relating to the licenses being auctioned." *See* 47 C.F.R. § 1.2105(a)(2)(viii); *see also id.* § 1.2105(a)(2)(ix); *id.* § 1.2110(j); *id.* § 1.2112(b)(1)(iii); *id.* § 1.2112(b)(2)(iii); *id.* § 1.2112 (b)(2)(vii).

Defendants DISH; American AWS-3 Wireless I L.L.C.; American AWS-3 Wireless II L.L.C.; American AWS-3 Wireless III L.L.C.; DISH Wireless Holding L.L.C.; Charles W. Ergen; and Cantey M. Ergen (collectively, the "DISH-Controlling Defendants") knowingly caused and/or conspired with Northstar and SNR to fail to disclose that Northstar Wireless and SNR Wireless were formed, financed, and operated under DISH's control and for DISH's benefit for the purpose of obtaining spectrum on behalf of DISH and then transferring the licenses to DISH.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of its objections, Northstar Wireless and the owners, managers, members and individuals who formed and operated it knowingly submitted Northstar Wireless' short-form and long-form applications in Auction 97 without disclosing that they had entered into the agreements, arrangements, or understandings described in Relator's supplemental response to Interrogatory No. 5, even though disclosure of these agreements, arrangements, or understandings was required under FCC rules, as explained more fully in Relator's supplemental response to Interrogatory No. 7.

Similarly, SNR Wireless and the owners, managers, members and individuals who formed and operated it knowingly submitted SNR Wireless' short-form and long-form applications in Auction 97 without disclosing that they had entered into the agreements,

arrangements, instruments, or understandings described in Relator's supplemental response to
Interrogatory No. 5, even though disclosure of these agreements, arrangements, or
understandings was required under FCC rules, as explained more fully in Relator's supplemental
response to Interrogatory No. 7.

The DISH-Controlling Defendants knowingly caused and/or conspired with Northstar
and SNR to ensure that Northstar Wireless and SNR Wireless would not disclose the agreements,
arrangements, instruments, or understandings described in Relator's supplemental response to
Interrogatory No. 5, even though disclosure of these agreements, arrangements, or
understandings was required under FCC rules, as explained more fully in Relator's supplemental
response to Interrogatory No. 7.

**INTERROGATORY NO. 7:**  For each agreement identified in response to Interrogatory No. 5,
state the basis for your allegation that the existence of the agreement was "material" to the
United States as defined under the False Claims Act.

**SPECIFIC OBJECTIONS:** Because discovery is ongoing, Relator objects to this
interrogatory as premature to the extent it requests identification of each undisclosed
"agreement."  Responding to this interrogatory requires a review of documents and evidence in
the possession of Defendants and third parties that have yet to produce all requested documents
or submit to any depositions.  Relator also objects to this interrogatory because it calls for a legal
conclusion.

**RESPONSE:** Subject to and without waiving any of its objections, based on the
currently available evidence, Relator responds that, as the D.C. Circuit has ruled, the existence of
such an undisclosed agreement, arrangement, instrument, or understanding was material to the
United States:

10

At the time Northstar and SNR submitted their short- and long-form applications, their eligibility for bidding credits depended on their disclosure of all "agreements, arrangements or understandings of any kind relating to the licenses being auctioned." 47 C.F.R. § 1.2105(a)(2)(viii) (requiring "[c]ertification that the applicant has provided" all agreements, arrangements, and understandings); *id.* § 1.2112 (b)(2)(vii) (requiring applicants to "[l]ist and summarize any agreements in which the applicant has entered into arrangements for the use of any of the spectrum capacity of the license that is the subject of the application"). Moreover, if Northstar and SNR had disclosed their alleged agreements to "[resell] the spectrum purchased during the auction" to DISH, Am. Compl. ¶ 130, they "could not have qualified as 'very small businesses,' and thus could not have received the 25 percent [bidding credits]," *id.* ¶ 132; *see id.* ¶ 56. Northstar's and SNR's alleged false certifications and failures to disclose agreements therefore had the potential to affect the Commission's eligibility determinations regarding such bidding credits.

*United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 37 (D.C. Cir. 2022).

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of its objections, Relator responds as follows:

First, SNR Wireless and Northstar Wireless were required to disclose Defendants' agreement, arrangement, or understanding that they were acquiring discounted spectrum selected by DISH on behalf of DISH because this agreement, arrangement, and understanding related "to the licenses being auctioned, including any such agreements relating to the post-auction market structure." 47 C.F.R. § 1.2105(a)(2)(viii) (2014). This disclosure also was required because the parties' agreement, arrangement, and understanding that SNR Wireless and Northstar Wireless would acquire discounted spectrum selected by DISH on behalf of DISH constituted an "explicit or implicit" agreement, arrangement, or understanding regarding "bidding strategies." 47 C.F.R. § 1.2105(a)(2)(ix) (2014). But SNR Wireless and Northstar Wireless knowingly and intentionally failed to make these required disclosures—and falsely certified otherwise—because they knew that doing so would make them ineligible as designated entities and disqualify them using bidding credits in Auction 97.

Second, SNR Wireless and Northstar Wireless were required to disclose Defendants'
agreement, arrangement, or understanding that DISH controlled their bidding because this
agreement, arrangement, or understanding related "to the licenses being auctioned, including any
such agreements relating to the post-auction market structure." 47 C.F.R. § 1.2105(a)(2)(viii)
(2014). This disclosure also was required because the parties' agreement, arrangement, or
understanding that DISH controlled SNR Wireless' and Northstar Wireless' bidding constituted
an "explicit or implicit" agreement, arrangement, or understanding regarding "the amount of
their bids, bidding strategies or the particular licenses on which they will or will not bid," 47
C.F.R. § 1.2105(a)(2)(ix) (2014). But SNR Wireless and Northstar Wireless knowingly and
intentionally failed to make these required disclosures—and falsely certified otherwise—because
they knew that doing so would make them ineligible as designated entities and disqualify them
using bidding credits in Auction 97.

Third, SNR Wireless and Northstar Wireless were required to disclose Defendants'
agreement, arrangement, or understanding that they would transfer their spectrum to DISH after
five years because this agreement, arrangement, or understanding related "to the licenses being
auctioned, including any such agreements relating to the post-auction market structure." 47
C.F.R. § 1.2105(a)(2)(viii) (2014). But SNR Wireless and Northstar Wireless knowingly and
intentionally failed to make this required disclosure—and falsely certified otherwise—because
they knew that doing so would make them ineligible as designated entities and disqualify them
using bidding credits in Auction 97.

Fourth, SNR Wireless and Northstar Wireless were required to disclose Defendants'
agreement, arrangement, or understanding that DISH would own their spectrum for accounting
and financial reporting purposes, which also allowed DISH to take advantage of certain tax

benefits, because this agreement, arrangement, or understanding related "to the licenses being auctioned." 47 C.F.R. § 1.2105(a)(2)(viii) (2014). But SNR Wireless and Northstar Wireless knowingly and intentionally failed to make this required disclosure—and falsely certified otherwise—because they knew that doing so would render them ineligible as designated entities and disqualify them using bidding credits in Auction 97.  Furthermore, DISH's ownership of SNR Wireless' and Northstar Wireless' licenses for accounting and financial reporting purposes reflects Defendants' joint venture arrangement, by virtue of which DISH, SNR Wireless, and Northstar Wireless were "considered to be affiliated with each other," and SNR Wireless and Northstar Wireless were required to aggregate DISH's revenues in determining compliance with the FCC's designated entity requirements. 47 C.F.R. § 1.2110 (c)(x)(B) (2014). SNR Wireless and Northstar Wireless knowingly and intentionally failed to do so because they knew it would render them ineligible as designated entities and disqualify them using bidding credits in Auction 97.

Fifth, SNR Wireless and Northstar Wireless were required to disclose Defendants' agreement, arrangement, or understanding that they would not use their spectrum to provide wireless services because this agreement, arrangement, or understanding related "to the licenses being auctioned."  47 C.F.R. § 1.2105(a)(2)(viii) (2014). But SNR Wireless and Northstar Wireless knowingly and intentionally failed to make this required disclosure—and falsely certified otherwise—because they knew that doing so would make them ineligible as designated entities and disqualify them using bidding credits in Auction 97.  Defendants' agreement, arrangement, or understanding that SNR Wireless and Northstar Wireless would not use any AWS-3 spectrum acquired in Auction 97 to provide wireless services also rendered false their

13

statements and declarations that they were qualified as designated entities. 47 C.F.R. § 1.2105(a)(2)(iv) (2014).

Sixth, SNR Wireless was required to disclose SNR's and DISH-Controlling Defendants' agreement, arrangement, or understanding about when the minority investors in SNR Wireless could transfer their interests because this agreement, arrangement, or understanding related "to the licenses being auctioned, including any such agreements relating to the post-auction market structure." 47 C.F.R. § 1.2105(a)(2)(viii) (2014). But SNR Wireless knowingly and intentionally failed to make this required disclosure—and falsely certified otherwise—because it knew that doing so would reveal Defendants' true plans that SNR Wireless existed solely to acquire discounted spectrum on behalf of DISH that would be transferred to DISH after five years and thereby make SNR Wireless ineligible as a designated entity and disqualify it from using bidding credits in Auction 97.

**INTERROGATORY NO. 8:** Identify each false or fraudulent claim you allege Defendants submitted in violation of 31 U.S.C. §3729(a)(1)(A).

**SPECIFIC OBJECTIONS:** Because discovery is ongoing, Relator objects to this interrogatory as premature. Responding to this interrogatory requires a review of documents and evidence in the possession of Defendants and third parties that have yet to produce all requested documents or submit to any depositions.

**RESPONSE:** Subject to and without waiving any of its objections, Relator responds that SNR Wireless and Northstar Wireless submitted false claims in their short-form and long-form applications in Auction 97. In their short-form applications, SNR Wireless and Northstar Wireless disclosed DISH's ultimate economic interest but disguised their true relationship with DISH. *Id.* ¶ 108. Specifically, SNR Wireless and Northstar Wireless disclosed that "DISH (i)

14

managed [their] businesses, (ii) was their principal investor and creditor, (iii) retained the power to veto important corporate decisions, and (iv) coordinated its own bidding strategy in the auction with" SNR and Northstar.  *Northstar Wireless, LLC v. FCC*, 38 F. 4th 190, 199 (D.C. Cir. 2022).  SNR Wireless and Northstar Wireless also disclosed various joint bidding agreements pursuant to which Defendants would ostensibly coordinate bidding for licenses in Auction 97—coordination that purportedly would advance each company's individual business interests.  *See, e.g.*, Am. Compl. ¶¶ 90, 124–27.

However, SNR Wireless and Northstar Wireless misrepresented their true relationship with DISH by failing to disclose that they: (i) did not exist—and were never intended to operate—as independent businesses that would provide wireless communications services, lease spectrum, build out their own networks, or otherwise use the spectrum licenses they acquired in Auction 97; (ii) were implementing DISH's bidding strategy, which was falsely presented to the FCC as the product of a mutually negotiated agreement between and for the benefit of independent entities; and (iii) were acquiring licenses that would eventually be transferred to DISH.  *See id.* ¶¶ 125–28.  In other words, while SNR Wireless and Northstar Wireless purportedly made full disclosures regarding their relationship with DISH, they fraudulently concealed the true nature of that relationship.

In submitting Northstar Wireless's short-form application, Defendants Wright and Todd certified that they were responsible for the financial affairs of Northstar and that Northstar qualified as a "very small business" under FCC rules.  *Id.* ¶¶ 82–85; *see also* Northstar FCC Form 175, Exhibit B, Status As A Very Small Business.  Defendant Muleta made the same certifications on behalf of SNR Wireless.  *Id.* ¶¶ 84, 124–27.  Defendants Wright, Todd, and Muleta also attested, on behalf of Northstar Wireless and SNR Wireless, that they had disclosed

all oral or written arrangements, agreements, and understandings relevant to their eligibility for the very small business credits they sought. *Id.* ¶¶ 125−28. These certifications were knowingly false as Defendants knew that SNR Wireless and Northstar Wireless had failed to disclose to the FCC one or more such arrangements, agreements, or understandings with the DISH-Controlling Defendants.

On February 13, 2015, SNR Wireless and Northstar Wireless submitted their FCC Form 601 long-form applications, which reiterated their qualifications to hold spectrum licenses and eligibility for bidding credits and verified the information previously submitted in their short-form applications. Am. Compl. ¶¶ 69−72. Once again, Defendants Wright, Todd, and Muleta certified that SNR and Northstar each qualified as a "very small business" and had disclosed all relevant arrangements, agreements, and understandings relevant to their eligibility for bidding credits. Once again, these certifications were knowingly false. *Id.* ¶¶ 85, 95−96, 110.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of its objections, Relator responds that SNR Wireless and Northstar Wireless submitted false or fraudulent claims in their short-form and long-form applications in Auction 97 by failing to disclose the agreements, arrangements, or understandings described in Relator's supplemental response to Interrogatory No. 5, even though disclosure of these agreements, arrangements, or understandings was required under FCC rules, as explained more fully in Relator's supplemental response to Interrogatory No. 7. SNR Wireless and Northstar Wireless also submitted false or fraudulent claims in their short-form and long-form applications in Auction 97 by fraudulently misrepresenting in their disclosed agreements their true relationship with DISH, as explained more fully in Relator's response to Interrogatory No. 14, as supplemented.

In submitting Northstar Wireless's short-form application, Defendants Wright and Todd certified that they were responsible for the financial affairs of Northstar Wireless and that Northstar Wireless qualified as a "very small business" under FCC rules.  Am. Compl. ¶¶ 82−85; *see also* Northstar Wireless FCC Form 175, Exhibit B, Status As A Very Small Business. Defendants Wright and Todd also attested, on behalf of Northstar Wireless, that all oral or written arrangements, agreements, and understandings relevant to its eligibility for the very small business credits it sought had been disclosed and certified to the accuracy of the written arrangements, agreements, and understandings that were disclosed.  Am. Compl. ¶¶ 125−28. These certifications were knowingly false as Defendants knew that Northstar Wireless had: (1) failed to disclose to the FCC the agreements, arrangements, instruments, or understandings described in Relator's supplemental response to Interrogatory No. 5, even though disclosure of these agreements, arrangements, or understandings was required under FCC rules, as explained more fully in Relator's supplemental response to Interrogatory No. 7; and (2) fraudulently misrepresented in its disclosed agreements Northstar Wireless' true relationship with DISH, as explained more fully in Relator's response to Interrogatory No. 14, as supplemented.

In submitting SNR Wireless' short-form application, Defendant Muleta certified that he was responsible for the financial affairs of SNR Wireless and that SNR Wireless qualified as a "very small business" under FCC rules.  *Id.* ¶¶ 82−85; *see also* SNR Wireless FCC Form 175, Exhibit B, Status As A Very Small Business.  Defendant Muleta also attested, on behalf of SNR Wireless, that all oral or written arrangements, agreements, and understandings relevant to its eligibility for the very small business credits it sought had been disclosed and certified to the accuracy of the written arrangements, agreements, and understandings that were disclosed.  Am. Compl. ¶¶ 125−28.  These certifications were knowingly false as Defendants knew that SNR

Wireless had: (1) failed to disclose to the FCC the agreements, arrangements, instruments, or understandings described in Relator's supplemental response to Interrogatory No. 5, even though disclosure of these agreements, arrangements, or understandings was required under FCC rules, as explained more fully in Relator's supplemental response to Interrogatory No. 7; and (2) fraudulently misrepresented in its disclosed agreements SNR Wireless' true relationship with DISH, as explained more fully in Relator's response to Interrogatory No. 14, as supplemented.

On February 13, 2015, SNR Wireless and Northstar Wireless submitted their FCC Form 601 long-form applications, which reiterated their qualifications to hold spectrum licenses and eligibility for bidding credits and verified the information previously submitted in their short-form applications. *Id.* ¶¶ 69–72. Once again, Defendants Wright, Todd, and Muleta certified that SNR Wireless and Northstar Wireless each qualified as a "very small business," had disclosed all relevant arrangements, agreements, and understandings relevant to their eligibility for bidding credits, and attested to the accuracy of the arrangements, agreements, and understandings that were disclosed. Once again, these certifications were knowingly false, for the reasons explained in Relator's supplemental responses to Interrogatory Nos. 5 and 7.

**INTERROGATORY NO. 9:** For each claim identified in response to Interrogatory No. 8, state the basis for your allegation that the claim was false or fraudulent.

**SPECIFIC OBJECTIONS:** Because discovery is ongoing, Relator objects to this interrogatory as premature. Responding to this interrogatory requires a review of documents and evidence in the possession of Defendants and third parties that have yet to produce all requested documents or submit to any depositions.

**RESPONSE:** Subject to and without waiving any of its objections, Relator refers to its response to Interrogatory No. 8.

18

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of its objections, Relator refers to its supplemental responses to Interrogatory Nos. 5-8.

**INTERROGATORY NO. 10:** For each claim identified in response to Interrogatory No. 8, state the basis for your allegation that each Defendant acted "knowingly" with regard to the alleged falsity of the claim, as that term is defined under the False Claims Act.

**SPECIFIC OBJECTIONS:** Because discovery is ongoing, Relator objects to this interrogatory as premature. Responding to this interrogatory requires a review of documents and evidence in the possession of Defendants and third parties that have yet to produce all requested documents or submit to any depositions.

**RESPONSE:** Subject to and without waiving any of its objections, Relator refers to its response to Interrogatory No. 8.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of its objections, Relator refers to its supplemental responses to Interrogatory Nos. 5-8.

**INTERROGATORY NO. 11:** For each claim identified in response to Interrogatory No. 8, state the basis for your allegation that each Defendant knew that the alleged undisclosed agreement would be "material" to the FCC's decision to award or not award bidding credits to the particular Defendant.

**SPECIFIC OBJECTIONS:** Because discovery is ongoing, Relator objects to this interrogatory as premature. Responding to this interrogatory requires a review of documents and evidence in the possession of Defendants and third parties that have yet to produce all requested documents or submit to any depositions. Relator also objects to this interrogatory because it calls for a legal conclusion.

**RESPONSE:** Subject to and without waiving any of its objections, Relator refers to its responses to Interrogatory Nos. 6-8.

19

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of its objections, Relator refers to its supplemental responses to Interrogatory Nos. 5-8.

**INTERROGATORY NO. 12:** For each claim identified in response to Interrogatory No. 8, describe in detail the manner in which the claim was presented to the United States, including by stating the specific date of its submission and the party or parties who you allege submitted the claim to the United States.

**SPECIFIC OBJECTIONS:** Because discovery is ongoing, Relator objects to this interrogatory as premature. Responding to this interrogatory requires a review of documents and evidence in the possession of Defendants and third parties that have yet to produce all requested documents or submit to any depositions.

**RESPONSE:** Subject to and without waiving any of its objections, Relator refers to its response to Interrogatory No. 8.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of its objections, Relator refers to its supplemental responses to Interrogatory Nos. 5-8.

**INTERROGATORY NO. 14:** Identify each false record or statement you allege each Defendant made, used, or caused to be made or used in violation of 31 U.S.C. §3729(a)(1)(B).

**SPECIFIC OBJECTIONS:** Because discovery is ongoing, Relator objects to this interrogatory as premature. Responding to this interrogatory requires a review of documents and evidence in the possession of Defendants and third parties that have yet to produce all requested documents or submit to any depositions.

**RESPONSE:** Subject to and without waiving any of its objections, Relator responds that, based on the currently available evidence, SNR Wireless and Northstar Wireless made false statements about: (1) their business plans; (2) the purpose of their joint bidding arrangements; (3) the mechanics of their joint bidding arrangements; and (4) DISH's control.

20

*First*, SNR Wireless and Northstar Wireless represented that their purpose was "to establish and conduct the business … of (A) acquiring licenses in Auction 97" and "(B) the deployment of such licenses in a manner consistent with applicable law and the Commission's rules …."  SNR Wireless Short-Form Application, Exhibit E, at 4, 21; Northstar Wireless Short-Form Application, Exhibit E. However, neither SNR Wireless nor Northstar Wireless had any ability or intent to deploy the licenses they acquired in Auction 97 but rather existed solely to transfer those licenses to DISH. Indeed, as the D.C. Circuit observed in 2017, "instead of scrambling to build a national network in the space of less than five to seven years in the quixotic mission of generating enough revenue to pay back their multibillion dollar loans," SNR Wireless and Northstar Wireless had "every incentive simply to sell their interests at year five to DISH in exchange for complete forgiveness of those loans plus a guaranteed cash payment." *SNR Wireless Licenseco, LLC v. FCC*, 868 F.3d 1021, 1040 (D.C. Cir. 2017); *see also id.* at 1041 (noting that "[t]he business arrangements" between the DISH Entities were "more likely to induce a buyout—rather than network development by [SNR Wireless and Northstar Wireless]"). The D.C. Circuit's observation proved prescient, as both SNR Wireless and Northstar Wireless exercised their put rights in 2021 and 2022, respectively, and DISH has applied for FCC consent to acquire *de jure* control of both companies.

*Second*, SNR Wireless and Northstar Wireless misrepresented the purposes of their coordinated bidding, which they claimed was to "comply with spectrum aggregation limits or policies" and "facilitate" the "consolidation of their systems," the "business" of SNR Wireless and Northstar Wireless, and "roaming arrangements among the Parties and their affiliates."  *See, e.g.,* SNR Wireless Short-Form Application, Exhibit C, at 26-27; Northstar Wireless Short-Form Application, Exhibit C, at 27-28. In reality, (i) neither SNR Wireless nor Northstar Wireless had

any existing spectrum to aggregate, and the spectrum upon which the Defendants were jointly bidding in Auction 97 was not subject to the Commission's spectrum aggregation rules; (ii) SNR Wireless and Northstar Wireless did not have – and never intended to have – any systems that would require consolidation; (iii) neither SNR Wireless nor Northstar Wireless had any existing business to facilitate, and the spectrum they acquired facilitated DISH's business interests, not any future business of SNR Wireless and Northstar Wireless; *see SNR Wireless Licenseco, LLC v. FCC*, 868 F.3d 1021, 1042 (D.C. Cir. 2017) (noting that "the joint bidding" in which Defendants engaged "strongly suggests" that SNR Wireless and Northstar Wireless were each "an arm of DISH"); and (iv) no need existed for SNR Wireless or Northstar Wireless to facilitate roaming arrangements when they did not even provide mobile services and had no ability or intent to do so.  In fact, SNR Wireless and Northstar Wireless were implementing DISH's bidding strategy, which was falsely presented to the FCC as the product of a mutually negotiated agreement between and for the benefit of independent entities. Am. Compl. ¶¶ 6, 13, 15, 91-97, 108-111, 129.

*Third*, SNR Wireless falsely stated that its "participation in Auction 97 would be directed and implemented by an auction committee consisting of three members, two of whom are appointed by SNR Management and one of whom is appointed by American III." SNR Short-Form Application, Exhibit C, at 24.  In fact, SNR's "auction committee" consisted of only two members – John Muleta of SNR Management and Tom Cullen of DISH.  Likewise, Northstar Wireless falsely stated that its "participation in Auction 97 would be directed and implemented by an auction committee consisting of three members, two of whom are appointed by Northstar Manager and one of whom is appointed by American II."  Northstar Short-Form Application, Exhibit C, at 26.  Although Northstar's "auction committee" ostensibly consisted of three

members – Allen Todd (Auction Chair and Bidding Manager) and Patrick W. Duke of Doyon

(the Northstar Manager) and Tom Cullen of DISH – bidding decisions routinely were made by

Cullen with the concurrence of only one other member of the Northstar auction committee.

Likewise, contrary to their representations about the mechanics of their joint bidding, both SNR

Wireless and Northstar Wireless made bidding decisions at the direction or with the approval of

DISH, whose representative was physically present in the same room during the auction process.

*Fourth*, the underlying agreements filed with the FCC represented that the manager of

each SNR and Northstar entity – rather than DISH – was vested with "day-to-day control" over

that entity. In fact, SNR and Northstar functioned as arms of DISH that operated under DISH's

control.  As the D.C. Circuit recently confirmed, "SNR and Northstar, rather than acting like

individual businesses with their own interests and identities, only pantomimed independence,

while functionally operating at DISH's beck and call."  *Northstar Wireless LLC v. FCC*, 38 F.

4th 190, 199 (D.C. Cir. 2022).  Indeed, although SNR Wireless and Northstar Wireless

represented to the FCC that neither was controlled by DISH, DISH effectively treated both as

wholly owned subsidiaries, including each entity in every consolidated quarterly and annual

financial report filed by DISH with the SEC since Auction 97.

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of its objections,

in addition to the fraudulent misrepresentations identified in Relator's initial response to this

interrogatory, SNR Wireless' and Northstar Wireless' disclosed agreements fraudulently

misrepresented their relationship with DISH.  These disclosed agreements represented that DISH

was merely a "passive investor" in SNR Wireless and Northstar Wireless. *Northstar Wireless,*

*LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz and*

*1755-1780 MHz and 2155-2180 MHz Bands*, 30 FCC. Rcd. 8887, ¶¶ 15, 18 (2015), *aff'd and*

*remanded*, 38 F.4th 190 (D.C. Cir. 2022), *cert. denied*, 143 S.Ct. 2693 (2023) (noting SNR and Northstar "claims that DISH is a purely passive investor" and thus "DISH's revenues" are "not attributable to" SNR and Northstar "for the purpose of determining [their] DE eligibility").

In fact, DISH enjoyed a very different—and considerably closer—relationship with SNR Wireless and Northstar Wireless. Defendants and third parties routinely referred to this relationship as a "joint venture" [NS-00059170 at 15], "affiliates" [DISH-VTEL-000022312], and a "partnership." [CT_00000464 at 3].   From an accounting standpoint, DISH was part of a "related party group" together with SNR Wireless and Northstar Wireless, which functioned as "de facto agents of DISH." [KPMG-VTEL-0002854, 0002856-2857].   Furthermore, by consolidating SNR Wireless and Northstar Wireless in DISH's financial reports and by considering SNR Wireless' and Northstar Wireless' spectrum as owned by DISH for accounting purposes, SNR Wireless and Northstar Wireless were effectively treated as DISH subsidiaries and reflected as such on DISH's organizational charts. [KPMG-VTEL-0002047]. Such treatment makes false SNR Wireless' and Northstar Wireless' representations about their having a "passive investor" relationship with DISH.

Dated: October 16, 2023                    Respectfully submitted,

                                           By:      */s/ Mark B. Sweet*
                                                    Stephen J. Obermeier (D.C. Bar # 979667)
                                                    Bennett L. Ross (D.C. Bar # 978122)
                                                    Bert W. Rein (D.C. Bar #067215)
                                                    Mark B. Sweet (D.C. Bar # 490987)
                                                    WILEY REIN LLP
                                                    2050 M Street NW
                                                    Washington, DC 20036
                                                    Phone:  (202) 719-7000
                                                    Facsimile: (202) 719-7049
                                                    sobermeier@wiley.law
                                                    bross@wiley.law
                                                    brein@wiley.law
                                                    msweet@wiley.law

                                                    *Counsel for Relator Vermont National Telephone Company*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 16th day of October 2023, I have caused a true and correct copy of the foregoing document to be served by email on the following counsel of record:

Jonathan E. Paikin (#466445)
Daniel S. Volchok (#497341)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
202-663-6000
jonathan.paikin@wilmerhale.com
daniel.volchok@wilmerhale.com

*Counsel for defendants American AWS-3
Wireless I LLC; American AWS-3
Wireless II LLC; American AWS-3
Wireless III LLC; DISH Wireless Holding
LLC; DISH Network Corporation;
Charles W. Ergen; and Cantey M. Ergen*

Gejaa T. Gobena (#463833)
Jonathan Diesenhaus (#423753)
HOGAN LOVELS U.S., LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004-1190
202-637-5600
gejaa.gobena@hoganlovells.com
jonathan.diesenhaus@hoganlovells.com

*Counsel for defendants SNR Wireless Licenseco,
LLC; SNR Wireless Holdco, LLC; SNR Wireless
Management, LLC; Atelum LLC; and John
Muleta*

Peter B. Hutt II (#427331)
Benjamin C. Block (#479705)
Dennis B. Auerbach (#418982)
Amee M. Frodle (#1602371)
COVINGTON & BURLING LLP
850 Tenth Street N.W.
Washington, D.C. 20001-4956
202-662-6000
phuttjr@cov.com
bblock@cov.com
dauerbach@cov.com
afrodle@cov.com

*Counsel for defendants Northstar
Wireless, LLC; Northstar Spectrum, LLC;
Northstar Manager, LLC; Doyon,
Limited; Miranda Wright; and Allen M.
Todd*

*/s/ Mark B. Sweet*
Mark B. Sweet