UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERMONT NATIONAL TELEPHONE CO., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 15-0728 (CKK) |
| v. | ) ) | |
| NORTHSTAR WIRELESS, L.L.C. *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

**UNITED STATES' OPPOSITION TO RELATOR'S
MOTION FOR SHARE OF "ALTERNATIVE REMEDY"**

## <u>TABLE OF CONTENTS</u>

I.    Background..................................................................................................................... 2

   A.   FCC Wireless Spectrum Default Provisions............................................................ 2

   B.   The FCC's Licensing Proceeding ........................................................................... 3

   C.   The Default Proceeding .......................................................................................... 5

   D.   Relator's Qui Tam Action ...................................................................................... 6

II.   Legal Standard .............................................................................................................. 6

III.  Argument ....................................................................................................................... 8

   A.   The imposition of default payments on SNR and Northstar is not an "alternate remedy" because it is based on facts that do give rise to a claim under the False Claims Act. ........ 9

   B.   The default payments were not a result of the licensing proceeding. ............................... 14

   C.   The licensing proceeding expressly rejected Relator's allegations. ................................. 16

   D.   Relator is not entitled to attorney's fees and costs from the United States......................... 19

IV.   Conclusion ................................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Avco Corp. v. U.S. Dep't of Justice*,
 884 F.2d 621 (D.C. Cir. 1989) ........................................................................... 1

*Ervin & Assocs. v. United States*,
 2003 U.S. Dist. LEXIS 25064 (D.D.C. Aug. 14, 2003) .................................... 11

*Northstar Wireless, LLC v. FCC*,
 38 F.4th 190 (D.C. Cir. 2022) ........................................................................... 17

*Smith v. Athena Constr. Grp., Inc.*,
 2022 U.S. Dist. LEXIS 54567 (D.D.C. Mar. 25, 2022) ................................... 6-7

*United States ex rel. Folliard v. Comstor Corp.*,
 308 F. Supp. 3d 56 (D.D.C. 2018) ...................................................................... 6

*United States ex rel. Glasser v. Boykin Contracting, Inc., Civ.*
 2021 WL 194272 *2 (D.S.C. Jan. 19, 2021) ..................................................... 19

*United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*,
 495 F.3d 103 (3d Cir. 2007) ............................................................................... 17

*United States ex rel. Kennedy v. Novo A/S*,
 5 F.4th 47, 56 (D.C. Cir. 2021) ............................................... 7, 8, 9, 11, 12, 14, 16

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
 599 U.S. 419, 143 S. Ct. 1720 (2023) ............................................................... 19

*United States ex rel. Schutte v. SuperValu Inc.*,
 598 U.S. 739, 143 S. Ct. 1391 (2023) ................................................................. 9

*United States ex rel. Taylor v. Gabelli*,
 345 F. Supp. 2d 340 (S.D.N.Y. 2004) ............................................................... 18

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
 525 F.3d 370 (4th Cir. 2008) ............................................................................. 16

*United States v. Molina Healthcare of New Mexico, Inc.*,
 2023 WL 5526373 (Aug. 28, 2023) .................................................................. 11

*United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, LLC*,
 34 F.4th 29 (D.C. Cir. 2022) ............................................................ 3, 9, 15, 16, 18

**Statutes, Rules, and Regulations**

31 U.S.C § 3730 ............................................................................ 1, 2, 7, 12, 16, 17, 18

31 U.S.C. § 3729 ............................................................................................................ 7

47 C.F.R. § 1.17 ................................................................................................... 14, 18

47 C.F.R. § 1.80 ......................................................................................................... 18

47 C.F.R. § 1.2104 ............................................................................................ 2, 3, 9, 10

47 C.F.R. §§ 1.2104 ............................................................................................ 5, 13

**Other Authorities**

*Baker Creek Communications, LLC, Memorandum Opinion and Order,*
   13 FCC Rcd 18709, (September 22, 1998) ............................................................ 16

*Cable One, Inc.,*
   37 FCC Rcd 13049 (October 31, 2022) ................................................................ 13

*In re Auction of AWS-3 Licenses Scheduled for November 13, 2014,*
   29 FCC Rcd 8386 (July 23, 2014) ........................................................................ 3

*In re Northstar Wireless, LLC,*
   30 FCC Rcd 10700 (F.C.C. March 1, 2015) .................................... 5, 6, 8, 10, 11

*In re Northstar Wireless, LLC; SNR Wireless Licenseco, LLC,*
   30 FCC Rcd 8887 (F.C.C. August 18, 2015) ................................................ 3, 4, 5

*In re SNR Wireless License Co, LLC,*
   30 FCC Rcd 10704 (F.C.C. October 1, 2015) .......................................... 5, 8, 10

*Interim Default Payment Obligation for Auction 86, Trident Global Communications, LLC, Letter Order,*
   27 FCC Rcd 3193 (April 2, 2012) ........................................................................ 13

*LMDS Communications, Inc., Order,*
   15 FCC Rcd 8618 (F.C.C. March 17, 2000) ........................................................ 13

*Notice of LocaLoop, Inc.'s Interim Default Payment Obligation for Licenses Won in Auction 105, Letter Order,*
   36 FCC Rcd 8279 (May 10, 2021), ...................................................................... 13

*Tel-Com Wireless Cable TV Corporation, Order,*
   12 FCC Rcd 6747 (May 23, 1997) ...................................................................... 13

*Trompex Corporation, Order,*
   16 FCC Rcd 18874 (October 25, 2001) ................................................................ 13

*ZTark Communications, LLC, Memorandum and Order,*
   DA 13-2088  (Oct. 29, 2013) ................................................................................ 16

The False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), is "the government's primary litigative tool for the recovery of losses sustained as the result of **fraud** against the government." *Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 622 (D.C. Cir. 1989) (emphasis added). The FCA allows a private person, known as a "relator," to bring suit alleging violations of the FCA on behalf of the government. *Id.* § 3730(b)(1). When a *qui tam* action is filed, the FCA gives the Government the option to pursue that fraud claim through the *qui tam* action or "any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." 31 U.S.C. § 3730(c)(5). In either case, the relator is awarded a share of the "proceeds of the action or settlement of the claim." *id.* § 3730(c)(5) & (d). In both cases, the underlying claim must be for "losses sustained as a result of fraud against the government." *Avco*, 884 F.2d at 622.

Here, Relator Vermont National Telephone Company ("Relator") filed this *qui tam* action alleging that Defendants DISH Network Corporation ("DISH"), Northstar Wireless, LLC ("Northstar") and SNR Wireless, LLC ("SNR") (collectively, "Defendants") defrauded the Government by failing to "disclose all of their instruments, agreements, and understandings" in order to fraudulently obtain small business bidding credits in an auction for wireless spectrum licenses run by the Federal Communications Commission ("FCC" or "Commission"). *See* Amended Complaint ¶ 128. The Government moved to dismiss this *qui tam* action due to, among other things, the lack of evidence and difficulty proving damages. *See* Dkt. No. 189. In response, Relator claims that the Government actually pursued the claims in its *qui tam* action through the "alternate remedy" of a "default proceeding" where SNR and Northstar were assessed "default payments" totaling $515,555,190 following their decision to not pay, *i.e.*, default, on some of their winning bids in the auction. Memorandum of Points and Authorities in

Support of Relator's Motion for Share of Alternative Remedy ("Relator Memo.") at 1.  As a result, Relator asks this Court to award it $128.89 million of taxpayer money.  *Id.*

This Court should reject Relator's request because, fundamentally, Relator's allegations were for a different claim that turned out to be meritless and thus could not be the basis for any sort of recovery by the United States.  In Relator's own words: "By contrast, "default payments" are just that: "payments" that are a consequence of a default, not "civil money penalties" for misconduct."  Relator's Br. in *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022) at 30, attached as Exhibit C.  "Indeed, the selective defaults that triggered SNR and Northstar's default payment obligations here were "permitted by Commission rules." *Id.* at 31 (quotation marks in original).  "Those payments are not a 'penalty' for a 'violation.'  They result from a business decision that all successful bidders at a spectrum auction (blameless or blameworthy) are permitted to make."  *Id.* (quotation marks in original).  Thus, "the default payments were not based on (or assessed in a proceeding based on) the allegations and transactions undergirding the *qui tam* action."  Relator's Reply Br. in *VTel*, 34 F.4th 29 at 11, attached as Exhibit D.

## I.  <u>Background</u>

### A. <u>FCC Wireless Spectrum Default Provisions</u>

The FCC's regulations governing auctions of wireless spectrum recognize that there will be instances where winning bidders will be unwilling or unable to pay the full amount of their winning bids.  In that event, "the defaulting bidder will be subject to a default payment consisting of a deficiency payment . . . and an additional payment."  47 C.F.R. § 1.2104(g)(2).  "The deficiency payment will equal the difference between the amount of the defaulted bid and the amount of the winning bid in a subsequent auction....  If the subsequent winning bid or any intervening subsequent withdrawn bid equals or exceeds the defaulted bid, no deficiency

2

payment will be assessed." *Id.* § 1.2104(g)(2)(i). "[T]he additional payment will equal between 3 and 20 percent of the applicable bid...." *Id.* § 1.2104(g)(2)(ii). For the AWS-3 Auction at issue in this case, the "additional payment" was set at fifteen percent. Auction Notice, 29 F.C.C. Rcd. at 8451 (announcing the fifteen percent default payment for Auction 97).

A default payment can be assessed upon the default of a winning bidder. 47 C.F.R. §1.2104(g)(2). There is no need to find the bidder engaged in misconduct or determine the bidder's reasons for the default. Misconduct is ordinarily addressed not in "default proceedings," but rather "in 'forfeiture proceeding[s],' which the Commission initiates by issuing either a 'notice of apparent liability' or a "'notice of opportunity for hearing.'" *VTel.*, 34 F.4th at 35. In such a "forfeiture proceeding," the FCC may levy sanctions against a bidder for violations of "the Commission's rules in connection with its participation in the competitive bidding process . . . including forfeiture of its upfront payment, down payment or full bid amount.'" *Id.* at 32 (internal quotation marks and alterations omitted). Without initiating forfeiture proceedings, the FCC does not have "authority to impose forfeiture penalties." *Id.*

B.  The FCC's Licensing Proceeding

Following the close of the AWS-3 auction, the Commission announced that SNR's and Northstar's license applications had been accepted for filing. *Northstar Wireless, LLC*, 30 FCC Rcd. 8887, 8892 ¶ 10 (2015), (hereinafter "SNR/Northstar Order"). In response, in May of 2015, eight parties (of which Relator was one)[1] filed petitions to deny those applications, and

---

[1] The seven other parties who filed petitions were Citizen Action, ESC Company, Communications Workers of America/National Association for the Advancement of Colored People, National Action Network, Americans for Tax Reform/Center for Individual Freedom, Citizens Against Government Waste/MediaFreedom.org/ National Taxpayers Union/Taxpayers

"generally argue[d] that the Commission should not award SNR and Northstar the bidding credits they sought due to their affiliation with DISH." *Id.* ¶ 30.  If granted, the bidding credits would have entitled SNR and Northstar to a 25 percent discount on their winning bids. *Id.* ¶ 13. Notably, as it does in this *qui tam* action, Relator separately argued to the FCC that SNR's and Northstar's failure to disclose DISH's controlling interest at the time of their applications evinced a lack of candor such that the companies lacked the basic qualifications to hold some or all of the licenses they had won. *Id.* ¶ 129.  Relator also argued that SNR and Northstar failed to adequately disclose the true intent of their bidding arrangements and DISH's control over the bidding conduct of SNR and Northstar. *Id.*  ¶ 133.

On August 18, 2015, the Commission concluded that DISH had *de facto* control over SNR and Northstar and DISH's revenues had to be included in calculating the revenue of SNR and Northstar in determining whether the two bidders were eligible for bidding credits. *Id.* ¶ 8. Including DISH's revenue rendered SNR and Northstar ineligible for the bidding credits they sought, and the FCC denied the bidding credits. *Id.*  Critically here, the FCC expressly rejected Relator's arguments that SNR and Northstar failed to disclose their relationship with DISH. *Id.* ¶ 9.  In particular, the FCC concluded that SNR and Northstar "complied with the disclosure obligations of our competitive bidding rules." *Id.* ¶ 135.  The FCC also found there was "no substantial and material question of fact as to whether SNR and Northstar have shown a lack of truthfulness or reliability in their dealings with the Commission.  There is no showing here that SNR and Northstar attempted to mislead the Commission about their respective relationships with DISH." *Id.* ¶ 132.  Accordingly, the FCC declined to levy any penalty, institute "forfeiture

---

Protection Alliance, and Central Texas Telephone Investments LP/Rainbow Telecommunications Association, Inc.  SNR/Northstar Order ¶ 30.

proceedings," or "to grant any of the relief requested in the petitions other than the denial of the bidding credits sought by Applicants." *Id*. ¶ 156.  SNR and Northstar thus were eligible for the licenses and were given 30 days to pay the remaining balance on the full winning bid prices to take the licenses they won. *Id*. ¶ 152-55.  Thus, the consequence of the FCC's decision in the licensing proceeding was that SNR and Northstar did not get the bidding credits they had sought.

C. The Default Proceeding

Following the FCC's decision, SNR and Northstar notified the FCC on October 1, 2015, that they intended to utilize Auction 97's default provisions and not pay the winning bids on some licenses. *See SNR Wireless*, 868 F.3d 1028 n.3.  Later that day and following the FCC's rules for default, *see* 47 C.F.R. §§ 1.2104(g)(2) & 1.2109(c), the FCC imposed on SNR and Northstar default payments, including an "additional payment" of 15 percent of the gross winning bids on the defaulted licenses. *Id.*  SNR and Northstar timely satisfied their obligations to pay default payments. *Id.* at 1029.  The total default payment assessed was $515,55,190, which is significantly less than the value of the unawarded bidding credits, which was close to $3.3 billion. *Id.*

In assessing these payments, the FCC expressly found that neither SNR nor Northstar engaged in actions "involving gross misconduct, misrepresentation or bad faith" and that their selective defaults will not render them "ineligible to participate in future auctions."  In re SNR Wireless License Co, LLC, 30 FCC Rcd 10704, 10707 (F.C.C. October 1, 2015); In re Northstar Wireless, LLC, 30 FCC Rcd 10700, 10702-10703 (F.C.C. October 1, 2015).  The payment was for the selective default of certain licenses, and was not related to any bidding credit that SNR or Northstar claimed, but did not receive.

D.  Relator's Qui Tam Action

Relator filed this *qui tam* action on May 13, 2015, and filed an Amended Complaint on

Feb. 4, 2019.  As the Amended Complaint makes clear, the basis for the alleged FCA violation in

this *qui tam* action is that the Defendants knowingly failed "to disclose all of their instruments,

agreements, and understandings with the DISH-Controlling Defendants" to the FCC in the

"Short-Form and Long-Form" license applications they submitted as part of Auction 97.

Amended Complaint ¶ 128, Dkt. No. 74.  Relator further clarified that it was "not advancing any

claim premised upon the Defendants' misinterpretation of the 'de facto control' rules…." *Id.*

Relator "rather alleges that these certifications were false by virtue of Northstar Wireless' and

SNR Wireless' failure to disclose relevant instruments, agreements, and understandings, as

described above, or disclosure to the FCC of instruments, agreements, and understandings with

the DISH-Controlling Defendants that contained false statements." *Id.*  Thus, the gravamen of

this *qui tam* action is not that Defendants claimed eligibility for a bidding credit they were not

entitled to.  Rather, it is that the Defendants falsely claimed to have made all the disclosures

required by the rules of Auction 97 for bidders claiming bidding credits.

## II.    Legal Standard

A violation of the FCA requires showing "the defendant submitted [1] a claim to the

government, [2] that the claim was **false**, and [3] that the defendant **knew** that the claim was

false." *United States ex rel. Folliard v. Comstor Corp.*, 308 F. Supp. 3d 56, 79 (D.D.C. 2018)

(*quoting United States ex rel. Davis v. District of Columbia*, 793 F.3d 120, 124 (2015))

(emphasis added) (internal quotation marks omitted).  The falsity must also be material to the

government's decision to pay in order to be actionable under the FCA.  *Id.* at 79.  Thus, "the

FCA is 'not an all-purpose antifraud statute.'  Nor is the FCA intended to punish each 'garden

variety breach[] of contract or regulatory violation.'" *Smith v. Athena Constr. Grp.*, Inc., 2022

6

U.S. Dist. LEXIS 54567, at *48 (D.D.C. Mar. 25, 2022) (alterations and internal quotation marks in original) (internal citations omitted).  As the D.C. Circuit explained, "false and fraudulent claims [] are the raison d'être of the False Claims Act, 31 U.S.C. § 3729."  *United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47, 54 (D.C. Cir. 2021).

An action under the FCA may be filed by the Government or a private person.  31 U.S.C § 3730(a) & (b)(1).  When a private person, a "relator," files such an action, the action is known as a *qui tam* action.  When such a *qui tam* action is filed, the government may intervene and litigate the case itself or may instead allow the relator "to conduct the action." *Id.* § 3730(b)(4). In either case, to encourage individuals with knowledge of fraud to come forward, the FCA gives the relator a share of any proceeds from the action. *See id.* § 3730(d).

Section 3730(c)(5) of the FCA permits the Government to elect to pursue an FCA violation "through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty."  The purpose of this provision is to provide the government with the flexibility to redress the defendants' fraud using whatever remedy is most suitable.  Where the government elects to forgo the *qui tam* action and instead proceed with a different fraud remedy, the FCA protects the relator by putting the relator in the same position they would have been if the government had pursued the fraud scheme under the FCA.  Specifically, the FCA provides that "if any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section." *Id.*  Thus, a relator is entitled to a share of any recovery that results from the pursuit of an "alternate remedy" for fraud.

The alternate remedy provision was not intended, however, to expand the rights of a relator beyond those conferred by the FCA, including receiving a share of government recoveries that would not be actionable under the FCA.  As the D.C. Circuit has made clear, "the alternative remedial proceedings from which a relator can recover a share must redress the same type of falsity and fraud claims that otherwise could be pursued by a private relator's *qui tam* lawsuit under the False Claims Act."  *Kennedy*, 5 F. 4th at 56.  In other words, the "claim pursued in the alternate remedy is of the type that could have been pressed under the False Claims Act." *Id.* at 47.  Thus, "if the alternate proceeding seeks recompense for some other type of claim that the relator could not have brought, then the proceeding is not covered by subsection 3730(c)(5) because it is not 'alternate' to the False Claims Act *qui tam* remedy.  It is a different legal claim altogether, arising beyond the False Claims Act's borders." *Id.* at 56.  This is true even if the alternate proceeding "arose from the same underlying facts" as the *qui tam* action. *Id.* at 57.  This is because the FCA "does not reward relators any time the government pursues any 'alternate claim or cause of action' arising from the same facts and circumstances." *Id.* (quotation marks in original).

### III.   <u>Argument</u>

Relator's claim that the "default payments" by SNR and Northstar were the results of the Government's pursuit of this *qui tam* action through an "alternate remedy" fail for three reasons.  First, the "default payments" were imposed without the eponymous "false claim" that is the hallmark of every action under the FCA.  Instead, the FCC assessed the "default payments" because SNR and Northstar opted not to take some of the licenses they had won and thus defaulted those bids.  In assessing those "default payments," the FCC expressly observed that neither SNR nor Northstar made any "misrepresentation[s]."  In re SNR Wireless License Co, LLC, 30 FCC Rcd 10704, 10707 (F.C.C. October 1, 2015); In re Northstar Wireless, LLC, 30

8

FCC Rcd 10700, 10702-10703 (F.C.C. October 1, 2015) (same).  Second, the "licensing proceeding," where Relator's allegations of fraud by Defendants' were considered, was a completely separate proceeding from the "default proceeding" and did not result in any recovery to the government.  The licensing proceeding determined whether SNR and Northstar were entitled to bidding credits on the licenses they had won at the auction and, significantly, it was fully concluded before SNR and Northstar defaulted on any licenses and before the default payment was owed or imposed.  Finally, the "licensing proceeding" actually rejected Relator's allegations and found "**no evidence** that SNR and Northstar attempted to mislead the Commission about their respective relationships with DISH or that they did not adequately disclose the nature of their relationship and joint bidding arrangements with DISH."  *VTel*, 34 F.4th at 33 (emphasis added); SNR/Northstar Order ¶ 132.  Thus, Relator can point to no part of the default payment that is predicated on the allegations in their *qui tam* action, which means it cannot be an "alternate remedy."  Instead, it is "a different legal claim altogether, arising beyond the False Claims Act's borders."  *Kennedy*, 5 F.4th at 56.

    A.  The imposition of default payments on SNR and Northstar is not an "alternate remedy" because it is based on facts that do give rise to a claim under the False Claims Act.

"[T]he alternative remedial proceedings from which a relator can recover a share must redress the same type of falsity and fraud claims that otherwise could be pursued by a private relator's *qui tam* lawsuit under the False Claims Act."  *Kennedy*, 5 F. 4th at 56.  "[T]wo essential elements of an FCA violation are (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity."  *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 143 S. Ct. 1391, 1398 (2023).  Neither of those two "essential elements of an FCA violation" were elements necessary to impose the "default payments."

Instead, a default payment is imposed on any "bidders who withdraw high bids during the course of an auction, or who default on payments due after an auction closes or who are disqualified." 47 C.F.R. § 1.2104(g)(2). There is no need to prove the defaulting bidder made a false statement to the FCC, let alone had knowledge that statement was false. Nor is there a need to first deny a bidder bidding credits. Instead, all that the FCC had to show to impose a default payment on SNR and Northstar is the fact they "default[ed] on payments due after an auction closes." 47 C.F.R. § 1.2104(g)(2).

Consistent with that limited requirement, the "proceeding" where the FCC imposed the default payments on SNR and Northstar consisted of a notice to each entity. Specifically, on October 1, 2015, SNR and Northstar separately submitted letters to the FCC indicating they would pay the full bid price on some licenses, but were defaulting on others. That very day, the FCC issued a notice to SNR and Northstar of their obligation to make an "interim default payment," which "pursuant to the rule in effect at the time of Auction 97, is equal to fifteen percent (15%) of the defaulter's bid." In re SNR Wireless License Co, LLC, 30 FCC Rcd 10704, 10707 (F.C.C. October 1, 2015); In re Northstar Wireless, LLC, 30 FCC Rcd 10700, 10702-10703 (F.C.C. October 1, 2015) (same). There was no part of the proceeding that found that either SNR or Northstar had made any false statements to the FCC, let alone that they knowingly made such false statements. In fact, the opposite occurred. The notices assessing the default payments included the express finding that neither SNR nor Northstar were engaging in "gross misconduct, **misrepresentation** or bad faith." *Id.* (emphasis added). Thus, the "default payments" were imposed in the absence of any false statement (or knowing false statement) by either SNR or Northstar.

Relator completely agreed with this view of the "default proceedings" in its prior briefing in this case before the D.C. Circuit.  There, Relator explained: "By contrast, 'default payments' are just that: 'payments' that are a consequence of a default, not 'civil money penalties' for misconduct."  Relator Br. at 30 (quotation marks in original), attached as Exhibit C.  "Those payments are not a 'penalty' for a 'violation.'  They result from a business decision that all successful bidders at a spectrum auction (blameless or blameworthy) are permitted to make."  *Id.* at 31 (quotation marks in original).  "Nor were the default payment amounts 'based on' allegations of fraud.  They were based on the winning bids for the spectrum SNR and Northstar decided to relinquish."  *Id.* at 34 (quotation marks in original).  "Indeed, the selective defaults that triggered SNR and Northstar's default payment obligations here were **permitted by Commission rules**."  *Id.* at 31 (emphasis added).  Thus, as Relator summarized, "the default payments were not based on (or assessed in a proceeding based on) the allegations and transactions undergirding the *qui tam* action."  Relator Reply Br. at 11, Exhibit D.  The "default payments" thus were distinct from the conduct alleged in the *qui tam* and the Government plainly did not "elect," in October of 2015, to pursue the "default payments" in lieu of pursuing the *qui tam* action.  31 U.S.C. § 3730(c)(5).

Moreover, the "default payments" were "not the type of claim that could have been litigated under the False Claims Act," which "is a prerequisite for obtaining a relator's share under the alternate-remedy provision."  *Kennedy*, 5 F. 4th at 56; *Ervin & Associates v. United States*, 2003 U.S. Dist. LEXIS 25064, at *14 (D.D.C. Aug. 14, 2003) ("The plain language of the alternate remedy provision is logically read as applying to remedies for fraudulent conduct only…."); *United States v. Molina Healthcare of New Mexico, Inc.,* 2023 WL 5526373, at *17 (August 28, 2023) ("Relator has not presented evidence from which a reasonable factfinder could

infer that any of [the administrative] recoupments were in fact a remedy for a claim that could have been brought under the FCA").  That fact alone means that the default payments could not have been an alternate remedy under the FCA.

Indeed, the "default payments" are even more incongruent to a claim under the FCA than the settlement at issue in *Kennedy*.  There, the relator brought an FCA case alleging that defendant Novo Nordisk had marketed certain drugs for unapproved uses and thus caused the "people to submit to the federal government millions of dollars in false claims for payment under federal health care programs…."  5 F.4th at 52.  Separately, the Government brought an action alleging that Novo Nordisk's improper marketing also violated the Food Drug and Cosmetic Act ("FDCA").  *Id.*  The Government settled the FDCA claim, and the relator demanded a share of that resolution under Section 3730(c)(5).  *Id.* at 53.  The D.C. Circuit rejected the relator's claim, even though "the FDCA claim arose from the **same underlying facts** identified in her *qui tam* lawsuit."  *Id.* at 57 (emphasis added).  This was because the FCA only provides a share only where the "government pursues an 'alternate remedy specifically for a false or fraudulent taking of governmental money or property." *Id.*  Relators are not entitled to a share "any time the government pursues any 'alternate claim or cause of action' arising from the same facts and circumstances." *Id.*

Here, the "default payments" do not even share the same underlying facts and circumstances as the *qui tam* action.  As noted above, "the default payments were not based on (or assessed in a proceeding based on) the allegations and transactions undergirding the *qui tam* action."  Relator Reply Br. at 11, Exhibit D.  But even if they were, liability for the "default payments" did not require showing the Defendants engaged in "the fraudulent or false

deprivation of a monetary or property interest," which is a prerequisite for the relator having a right to share in the recovery of the other proceeding. *Kennedy*, 5 F. 4th at 57.

This conclusion is perfectly consistent with the fact that the default payment was not intended as a remedy for false statements or fraud. Indeed, the FCC has imposed "default payments" on numerous bidders who were not even alleged to have made any false statements. *See*, *e.g.*, *Order Assessing Cable One, Inc.'s Interim Default Payment Obligation for Four Licenses Won in Auction 105*, 37 FCC Rcd 13049 (Oct. 31, 2022) (assessing default payment for bidder withdrawal of long form application for licenses it won in auction that would violate the FCC's aggregation limit rules); *Notice of LocaLoop, Inc.'s Interim Default Payment Obligation for Licenses Won in Auction 105, Letter Order*, 36 FCC Rcd 8279 (May 10, 2021) (setting forth default obligations for failure to remit full payment for winning bids); *Interim Default Payment Obligation for Auction 86, Trident Global Communications, LLC, Letter Order*, 27 FCC Rcd 3193 (Apr. 2, 2012) (setting forth default obligations for failure to remit full payment for winning bids); *Trompex Corporation, Order*, 16 FCC Rcd 18874 (Oct 25, 2001) (setting forth default obligations for prohibited major amendment after filing of the short-form disqualifying bidder to apply for licenses); *LMDS Communications, Inc.*, *Order*, 15 FCC Rcd 8618 (ordering a default payment after denying bidders request for sixty day extension to submit the remaining payment for its winning bids); *Tel-Com Wireless Cable TV Corporation, Order*, 12 FCC Rcd 6747 (May 23, 1997) (ordering default payment obligations resulting from bidder's failure to remit the required down payment on licenses for which it was the winning bidder). Notably, there are separate rules and procedures to address fraud, bad faith, or other misconduct. *See*, *e.g.*, 47 C.F.R. 1.2109(d) ("Bidders who are found to have violated . . . the Commission's rules in connection with their participation in the competitive bidding process may be subject, in

addition to any other applicable sanctions, to forfeiture of their upfront payment, down payment or full bid amount, and may be prohibited from participating in future auctions."). Thus, a default payment is not intended to "recover damages for any use of **falsity or fraud** to deprive the government of its money or property, which is the hallmark of a claim litigable under the False Claims Act." *Kennedy*, 5 F.4th at 56 (emphasis added).

       B. <u>The default payments were not imposed in the licensing proceeding.</u>

       Perhaps recognizing the default payment itself could not be considered an "alternate remedy," Relator attempts to invoke the licensing proceeding in which the FCC evaluated SNR's and Northstar's license applications and their eligibility for bidding credits. Relator Memo. at 10. In the licensing proceeding, Relator did raise allegations of false statements and fraud (that SNR and Northstar failed to disclose their relationship with DISH), which are the same allegations that form the basis of this *qui tam* action. *See SNR/Northstar* Order ¶¶ 129 & 133. Relator posits that the licensing proceeding resulted in the denial of bidding credits, the denial of the bidding credits led to the default by SNR and Northstar, and the default by SNR and Northstar led to the imposition of "default payments." As such, Relator continues, the two different administrative proceedings should be conflated to determine whether the Government has pursued an "alternate remedy." Relator Br. at 10. This argument was already expressly rejected by the D.C. Circuit.

       "The default payments were not assessed during the licensing proceeding. In that proceeding, the Commission determined only whether Northstar and SNR were 'qualif[ied]' to hold spectrum licenses and 'eligible' for bidding credits. The question of whether to impose default payments arose later, after Northstar and SNR chose to selectively default on their obligations to pay for some of their winning bids." *VTel*, 36 F.4th at 35 (quotation marks and alterations in original) (internal citations omitted). Thus, the FCC imposed "default payments"

on SNR and Northstar because of their decision to default, and because of the prior decision by the FCC to deny bidding credits or a determination that they knowingly failed to "disclose all of their instruments, agreements, and understandings with the DISH-Controlling Defendants." Amended Complaint ¶ 128.

More importantly, the "default payments" were not part of a proceeding where the FCC imposed financial penalties for the submissions of false or misleading statements.  47 C.F.R. § 1.17(a).  As the D.C. Circuit observed, financial penalties are assessed in "forfeiture" proceedings, which were not initiated in this case.  *VTel*, 34 F.4th at 35; *see also* SNR/Northstar Order ¶¶ 44, 156 (declining to refer the matter to the Enforcement Bureau for possible forfeiture penalties).  Thus, "the default payments did not flow directly, from the Commission's determination in the licensing proceeding that Northstar and SNR were ineligible for bidding credits.  An intervening event—Northstar's and SNR's decisions to selectively default— occurred before the Commission assessed default payments against these companies."  *Id.* (internal quotation marks and alterations omitted).  Thus, the licensing proceeding, which did not require SNR or Northstar to make any payment at all, has no bearing on whether the "default proceeding" is an "alternate remedy" to this *qui tam* action.

Here too, Relator agreed with this view of the "licensing proceedings" in its prior briefing in this case before the D.C. Circuit.  There, Relator explained that:  "Six weeks after the FCC decided SNR and Northstar's eligibility to hold licenses and use bidding credits, those entities chose to selectively default—to forgo some of the licenses they won.  The default payment obligation was imposed as a consequence of that later decision (a decision FCC rules permitted)."  Relator Br. at 29 (internal quotation marks in original).  In fact, "[t]he FCC did not assess default payments . . . in the FCC licensing proceeding….  The payments were assessed six

weeks after that proceeding ended.  And they were not in any sense 'based upon' the same

allegations or transactions as the *qui tam* complaint. They were based on SNR and Northstar's

decision to selectively default on certain licenses—something the Commission's rules permit."

*Id*. at 31 (quotation marks in original).  And as to the "licensing proceeding" itself, Relator

explained:  "The fraud Vermont National alleges is the false certification that SNR and Northstar

had disclosed all relevant agreements, **an issue not addressed by the licensing proceeding**."

Relator Reply Br. at 14, (emphasis added) Exhibit D.

      C.  <u>The licensing proceeding expressly rejected Relator's allegations.</u>

      Even if the licensing and default proceedings were one unified proceeding (which they

are not), it becomes even more clear that the "default proceedings" did not resolve the sort of

claims that "could have been pressed under the False Claims Act."  *Kennedy*, 5 F. 4th at 47.  This

is because in the licensing proceeding, the FCC expressly **rejected** Relator's arguments that SNR

and Northstar made false statements.  While the FCC denied SNR and Northstar bidding credits,

the denial of bidding credits is not itself a finding of fraud or bad faith, *see e.g.*, *ZTark*

*Communications, LLC*, Memorandum and Order, DA 13-2088  (Oct. 29, 2013); *Baker Creek*

*Communications, LLC*, Memorandum Opinion and Order, 13 FCC Rcd 18709, (Sept 22, 1998).

Instead, the FCC found:

> no substantial and material question of fact as to whether SNR and Northstar have
> shown a lack of truthfulness or reliability in their dealings with the Commission.
> There is no showing here that SNR and Northstar attempted to mislead the
> Commission about their respective relationships with DISH.  Rather, the entire
> record indicates that **the Applicants and DISH disclosed their ownership**
> **structures and related Agreements as required, and proceeded under an**
> **incorrect view about how the Commission's affiliation rules apply to these**
> **structures**.

*SNR/Northstar Order* ¶ 132 (emphasis added).  Relator's FCA claim is not viable under these

facts.  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir.

2008) ("While the phrase 'false or fraudulent claim' in the False Claims Act should be construed broadly, it just as surely cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any objective falsehood…. To hold otherwise would render meaningless the fundamental distinction between actions for fraud and breach of contract") (quotation marks in original) (internal citations omitted).  And since this *qui tam* action would be invalid, there can be no "alternate remedy" for it.  *See U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 112 (3d Cir. 2007) ("Relator is not entitled to a share in the proceeds of an alternate remedy when the relator's qui tam action under § 3729 is invalid: As § 3730(c)(5) provides, a relator's rights in an alternate remedy proceeding are the 'same rights' that the relator would have had if the action had proceeded under the FCA").

If, as Relator contends, the licensing proceeding was actually an "alternate remedy," then this *qui* tam action necessarily fails.  The third sentence of Section 3730(c)(5) provides "[a]ny finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section."  Here, the FCC found that Defendants were, "at all times, truthful with the FCC in their relationship with DISH Network, and that the Defendants and DISH Network fully disclosed their ownership structures and related Agreements as required" in both the short-form application and the long-form application.  SNR/Northstar Order at ¶ 132.  The FCC further found that the long-form was not submitted with any intent to defraud, but rather "the entire record indicates that the Applicants and DISH Network disclosed their ownership structures and related agreements as required, and proceeded under an incorrect view about how the Commission's affiliation rules apply to these structures."  *Id.*  The FCC's decision was upheld by the D.C. Circuit Court and was therefore a "final finding of fact or conclusion of law" that has conclusive effect on all parties to a "alternative remedy"

action, including Relator.  *See Northstar Wireless, LLC v. FCC*, 38 F.4th 190 (D.C. Cir. 2022) (cert. denied 143 S. Ct. 2693 (2023)).  Thus, the licensing proceeding was a dead end for claims that SNR and Northstar failed to disclose their relationship with DISH, not the road to any sort of "alternate remedy."

Nothing in *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 340 (S.D.N.Y. 2004), is inconsistent with this conclusion.  In that case, the relator filed an FCA action alleging the defendants "made numerous fraudulent statements and omissions to the FCC" to qualify for small business bidding credits.  *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 322 (S.D.N.Y. 2004).  The defendants requested a stay of the *qui tam* action pending referral to the FCC of two issues underlying the FCA allegations.  *Gabelli*, 345 F. Supp. 2d at 352.  In denying the stay, the court observed that "the FCA specifically authorizes the Government to require the resolution of FCA claims though administrative, rather than judicial, proceedings."  *Id.* at 353 (citing Section 3730(c)(5)).  The court did not hold that every FCC proceeding is properly considered an "alternate remedy" for an FCA claim, and only observed that it was **possible** for an FCC regulatory proceeding to resolve FCA claims.  Indeed, in this case the FCC **could** have initiated, among other things, "forfeiture proceedings," 47 C.F.R. § 1.80(a), to address violations of the rule prohibiting the intentional submission of false or misleading statements to the Commission, *id.* § 1.17(a).  But the FCC did not do so and, as a result, the administrative proceedings that did occur here did not address the FCA allegations in this *qui tam* action.  *VTel*, 34 F.4th at 35 (noting the FCC "had no authority to impose forfeiture penalties" in the selective default matter).  Relator previously agreed.  Relator Reply Br. at 14, Exhibit D ("The fraud Vermont National alleges is the false certification that SNR and Northstar had disclosed all relevant agreements, **an issue not addressed by the licensing proceeding**") (emphasis added).

18

D.  Relator is not entitled to attorney's fees and costs from the United States.

Relator also asks this Court to award it "costs, attorney's fees, and expenses for its efforts in this litigation."  Relator Memo. at 1.  Relator does not specify exactly from which party the Court should make this award.  It is clear, however, that the award cannot come from the United States.  Section 3730(f) of the FCA expressly provides that "[t]he Government is not liable for expenses which a person incurs in bringing an action under this section."  *See United States ex rel. Glasser v. Boykin Contracting, Inc.,* 2021 WL 194272 *2 (D.S.C. Jan.19, 2021) (Relator, and by extension relator's counsel, may not seek reasonable expenses from the Government under the FCA.). Accordingly, this Court should deny Relator's request.

## IV.    Conclusion

Relator concludes its argument by claiming that it is "entitled to compensation for bringing Defendants' wrongdoing to light, prodding the government to take action against Defendants, and shouldering the burden in litigating this action against Defendants over the past nine years."  Relator Memo. at 16-17.  The problem is that Relator did not, in fact, bring any "wrongdoing to light" as its allegations were rejected by the very administrative proceedings it claims were an "alternate remedy" to its *qui tam* action.  Likewise, it did not "prod[] the government to take action against the defendants" as the FCC's decision to deny SNR and Northstar bidding credits was premised upon the information that the Defendants had disclosed, not information provided by Relator.  Indeed, Relator itself explained that "[t]he fraud Vermont National alleges is the false certification that SNR and Northstar had disclosed all relevant agreements, **an issue not addressed by the licensing proceeding**."  Relator Reply Br. at 14, (emphasis added) Exhibit D.  Finally, Relator is not entitled to compensation for merely litigating a (non-meritorious) *qui tam* action, particularly given the Government's view that "this suit would not do what all *qui tam* actions are supposed to do: vindicate Government's interests."

19

*United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 143 S. Ct. 1720, 1735

(2023).  This Court should deny Relator's request for a $128.9 million windfall as a result of

payments Relator itself acknowledges "were not in any sense 'based upon' the same allegations

or transactions as the qui tam complaint."  Relator Br. at 32, Exhibit C.


Date: June 6, 2024                             Respectfully submitted,


                                               BRIAN M. BOYNTON
                                               Principal Deputy Assistant Attorney General
                                               Civil Division


                                                /s/ *Benjamin C. Wei*
                                               JAMIE A. YAVELBERG
                                               PATRICIA L. HANOWER
                                               BENJAMIN C. WEI
                                               Attorneys, Civil Division,
                                               Commercial Litigation Branch
                                               U.S. Department of Justice
                                               Post Office Box 261
                                               Washington, D.C. 20044
                                               (202) 616-2875


                                               MATTHEW M. GRAVES
                                               United States Attorney for the District of Columbia


                                                /s/ *Darrell C. Valdez*
                                               DARRELL C. VALDEZ, D.C. Bar # 420232
                                               Assistant United States Attorney
                                               U.S. Attorney's Office for the District of Columbia
                                               601 D Street, N.W., Civil Division
                                               Washington, D.C.  20530
                                               (202) 252-2507

                                               *Counsel for the United States of America*