ORAL ARGUMENT NOT YET SCHEDULED

## No. 21-7039

# In the United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA, EX REL. VERMONT NATIONAL TELEPHONE COMPANY,

*Plaintiff-Appellant,*

v.

NORTHSTAR SPECTRUM LLC, ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Columbia
Case No. 1:15-cv-00728-CKK (Hon. Colleen Kollar-Kotelly, J.)

———————————————

## BRIEF FOR PLAINTIFF-APPELLANT

———————————————

Bert W. Rein
Bennett L. Ross
Stephen J. Obermeier
WILEY REIN LLP
1776 K St., N.W.
Washington, D.C. 20006
(202) 719-7000

Jeffrey A. Lamken
 *Counsel of Record*
MOLOLAMKEN LLP
The Watergate, Ste. 500
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

Eugene A. Sokoloff
MOLOLAMKEN LLP
300 N. LaSalle St., Ste. 5350
Chicago, IL  60654
(312) 450-6700

Mark W. Kelley
MOLOLAMKEN LLP
430 Park Ave.
New York, NY 10022
(212) 607-8160

*Counsel for Vermont National Telephone Company*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellant Vermont National Telephone Company certifies the following:

### A. Parties

1. *Plaintiff-Appellant*

   - Vermont National Telephone Company

2. *Defendants-Appellees*

   - Northstar Wireless, LLC

   - Northstar Spectrum, LLC

   - Northstar Manager, LLC

   - Doyon, Limited

   - Miranda Wright

   - Allen M. Todd

   - SNR Wireless LicenseCo, LLC

   - SNR Wireless HoldCo, LLC

   - SNR Wireless Management, LLC

   - Atelum, LLC

   - John Muleta

   - American AWS-3 Wireless I, LLC

   - American AWS-3 Wireless II, LLC

- American AWS-3 Wireless III, LLC

- DISH Wireless Holding, LLC

- DISH Network Corporation

- Charles W. Ergen

- Cantey M. Ergen

3.  *Interested Party*

- The United States of America submitted a Statement of Interest in the district court proceedings below.

4.  *Rule 26.1 Disclosure Statement*

- Vermont National Telephone Company does not have any parent corporation, is not publicly held, and no publicly traded company owns 10% or more of its stock.

## B. **Rulings Under Review**

The rulings under review are (1) the district court's March 23, 2021 order, *see* Dkt. No. 86, and (2) the district court's March 23, 2021 memorandum opinion granting defendants' motion to dismiss the complaint, *see* Dkt. No. 87, published as *United States v. Northstar Wireless LLC*, No. CV 15-0728 (CKK), 2021 WL 1110844 (D.D.C. Mar. 23, 2021).

## C. **Related Cases**

This case has not previously been before this Court.  However, Defendants-Appellees Northstar Wireless, LLC and SNR Wireless LicenseCo, LLC have filed a petition for review of and a protective notice of appeal from the FCC's decision in a related administrative proceeding, *In the Matter of Northstar Wireless, LLC*, FCC No. 20-160.  The Court has ordered those proceedings consolidated with an earlier related appeal from an earlier FCC decision, *In the Matter of Northstar Wireless, LLC*, FCC No. 18-98, that had been held in abeyance.  *See Northstar Wireless, LLC, et al. v. FCC*, D.C. Cir. Nos. 18-1209(L), 18-1210, 20-1507, 20-1508.  Plaintiff-Appellant Vermont National Telephone Company's wholly owned subsidiary, VTel Wireless, Inc., is an intervenor in those proceedings.

Dated: November 15, 2021                              /s/ Jeffrey A. Lamken
                                                                    Jeffrey A. Lamken

## **TABLE OF CONTENTS**

Page

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................3

ISSUES PRESENTED....................................................................................3

STATEMENT OF THE CASE......................................................................4

I.    Legal and Regulatory Background ....................................................4

    A.  The False Claims Act .................................................................4

    B.  The FCC Spectrum Auction and "Designated-Entity" Bidding
       Credits .........................................................................................6

    C.  Pre- and Post-Auction Qualification and Licensing Procedures ..............7

II.   Factual Background .............................................................................8

    A.    The DISH-Controlled Entities File False Short-Form
         Applications To Bid ................................................................9

    B.    SNR and Northstar's Auction Conduct ..............................13

    C.    The Sham Entities' License Applications and Payments ...................13

III.  Proceedings Below and Before the FCC .........................................14

    A.  The FCC's Licensing Proceeding ..........................................15

    B.  SNR and Northstar Default on Certain Licenses ...................17

    C.  Vermont National's *Qui Tam* Complaint ..............................18

    D.  The Decision Below................................................................20

STANDARD OF REVIEW ........................................................................23

SUMMARY OF ARGUMENT ..............................................................23

ARGUMENT ...................................................................................25

I.    The FCC's Licensing Proceeding Did Not Trigger the Government-
      Action Bar ...........................................................................26

      A. The FCC Licensing Proceeding Was Not a "Civil Money Penalty
         Proceeding" and Imposed No "Civil Money Penalty" ...........................27

          1.   Default Payments Are Not "Civil Money Penalties"
               Within the Meaning of the False Claims Act ...........................27

          2.   The False Claims Act's "Same Allegations or
               Transactions" Requirement Was Not Met ...............................32

      B. The FCC Conducted No Proceeding in Which It Could Levy a
         "Civil Money Penalty" ..............................................................36

      C. The District Court's Decision Contravenes the Statute's Purpose .........38

II.   Vermont National Pled Facts Sufficient To Establish Materiality...............43

      A. SNR and Northstar's Misrepresentations Were Material to the
         FCC's Determination of Eligibility for Bidding Credits .......................44

      B. The District Court Disregarded Well-Pleaded Factual Allegations
         Plausibly Establishing Materiality ...............................................49

          1.   Vermont National Plausibly Alleged Misrepresentations
               Material to the FCC's Decision To Accept Discounted
               Payment.....................................................................51

          2.   SNR and Northstar's Omissions Were Material.......................54

CONCLUSION ................................................................................57

STATUTORY AND REGULATORY ADDENDUM

# TABLE OF AUTHORITIES[*]

Page(s)

## CASES

*Affum v. United States*,
   566 F.3d 1150 (D.C. Cir. 2009) ..........................................................28

*U.S. ex rel. Campie v. Gilead Scis., Inc.*,
   862 F.3d 890 (9th Cir. 2017) ..............................................................48

*Cimino v. Int'l Bus. Machs. Corp.*,
   No. 13-CV-00907 (APM), 2019 WL 4750259 (D.D.C. Sept. 30,
   2019) ....................................................................................................56

*\*U.S. ex rel. Cimino v. Int'l Bus. Machs. Corp.*,
   3 F.4th 412 (D.C. Cir. 2021) .................................. 3, 5, 23, 44, 45, 48, 49, 54, 57

*Costner v. URS Consultants, Inc.*,
   153 F.3d 667 (8th Cir. 1998) ................................................5, 39, 41

*Dodge v. Comptroller of the Currency*,
   744 F.3d 148 (D.C. Cir. 2014) ............................................................28

*U.S. ex rel. Harman v. Trinity Indus. Inc.*,
   872 F.3d 645 (5th Cir. 2017) ........................................................46, 48

*U.S. ex rel. Johnson v. Shell Oil Co.*,
   26 F. Supp. 2d 923 (E.D. Tex. 1998) ................................................38

*U.S. ex rel. Longhi v. United States*,
   575 F.3d 458 (5th Cir. 2009) ........................................................45, 48

*U.S. ex rel. Loughren v. Unum Grp.*,
   613 F.3d 300 (1st Cir. 2010) ........................................................47, 52

*U.S. ex rel. McDermott v. Genentech, Inc.*,
   No. 05-147-P-C, 2006 WL 3741920 (D. Me. Dec. 14, 2006) ............38

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*U.S. ex rel. McDermott v. Genentech, Inc.*,
  No. CIV. 2:05-CV-147, 2007 WL 2128410 (D. Me. July 24, 2007) ...............38

*U.S. ex rel. Miller v. Weston Educ., Inc.*,
  840 F.3d 494 (8th Cir. 2016) ...........................................................................48

*In the Matter of Northstar Wireless*,
  No. 0006670613, 2020 WL 6955431 (OHMSV Nov. 23, 2020) .....................16

*Nw. Airlines, Inc. v. U.S. Dep't of Transp.*,
  15 F.3d 1112 (D.C. Cir. 1994)..........................................................................31

*U.S. ex rel. Oliver v. Philip Morris USA Inc.*,
  826 F.3d 466 (D.C. Cir. 2016)..........................................................................23

*Orton Motor, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  884 F.3d 1205 (D.C. Cir. 2018)........................................................................28

*Peter v. Nantkwest, Inc.*,
  140 S. Ct. 365 (2019).........................................................................................27

*U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.*,
  892 F.3d 822 (6th Cir. 2018) ...............................................................48, 49, 52

*U.S. ex rel. Prose v. Molina Healthcare of Ill., Inc.*,
  10 F.4th 765 (7th Cir. 2021) .............................................................................49

*\*U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Me.*,
  24 F.3d 320 (1st Cir. 1994)...............................................................6, 38, 39, 41

*U.S. ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Tex.*,
  545 F.3d 256 (3d Cir. 2008) .............................................................................48

*U.S. ex rel. Schagrin v. LDR Indus., LLC*,
  No. 14 C 9125, 2018 WL 6064699 (N.D. Ill. Nov. 20, 2018) .........................38

*U.S. ex rel. Schwedt v. Plan. Rsch. Corp.*,
  59 F.3d 196 (D.C. Cir. 1995).............................................................................45

*SNR Wireless LicenseCo, LLC v. FCC*,
  868 F.3d 1021 (D.C. Cir. 2017)....................................... 9, 11, 16, 19, 29, 41, 56

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) ................................................................. 6, 32, 34

*United States v. Dynamic Visions Inc.*,
   971 F.3d 330 (D.C. Cir. 2020) ................................................................. 45

*U.S. ex rel. Totten v. Bombardier Corp.*,
   286 F.3d 542 (D.C. Cir. 2002) ................................................................. 5

*United States v. DynCorp Int'l, LLC*,
   253 F. Supp. 3d 89 (D.D.C. 2017) ................................................................. 53

*United States v. Neifert-White Co.*,
   390 U.S. 228 (1968) ................................................................. 4, 44

*United States v. Rivera*,
   55 F.3d 703 (1st Cir. 1995) ................................................................. 45

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
   136 S.Ct. 1989 (2016) ................................................................. 46, 49

### STATUTES

8 U.S.C. § 1324c(d)(3) ................................................................. 28

12 U.S.C. § 1715z-23(g)(2) ................................................................. 28

12 U.S.C. § 1818(i)(2) ................................................................. 28

21 U.S.C. § 333 ................................................................. 28

28 U.S.C. § 1291 ................................................................. 3

28 U.S.C. § 2461(a) ................................................................. 30

31 U.S.C. § 3717 ................................................................. 32

42 U.S.C. § 1320a-7a(a)(10) ................................................................. 28

42 U.S.C. § 1320a-8 ................................................................. 28

The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

31 U.S.C. § 3729(a)(1)(A).................................................................3, 45

31 U.S.C. § 3729(a)(1)(B)......................................................................45

31 U.S.C. § 3729(a)(1)(G)..............................................................4, 45, 50

31 U.S.C. § 3729(b)(4)........................................................3, 4, 5, 44, 45

31 U.S.C. § 3730(b)................................................................................5

31 U.S.C. § 3730(d)................................................................................5

31 U.S.C. § 3730(e)(3) ...................................... 4, 5, 20, 26, 27, 32, 37

31 U.S.C. § 3732 ....................................................................................3

The Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.*

47 U.S.C. § 309(j) .................................................................................6

47 U.S.C. § 309(j)(4)(D) ....................................................................6, 7

47 U.S.C. § 309(j)(4)(E) ........................................................................7

*47 U.S.C. § 503 ..................................................................................30

47 U.S.C. § 503(b).................................................................................36

47 U.S.C. § 503(b)(3)(A) .....................................................................17

47 U.S.C. § 503(b)(4)......................................................................36, 37

47 U.S.C. § 503(b)(4)(A) .....................................................................17

Federal Civil Monetary Penalty Inflation Adjustment Act of 1990,
   Pub. L. No. 101-410..........................................................................30

Federal Civil Penalties Inflation Adjustment And Improvements Act
   of 2015, 129 Stat. 599, § 3(2)...........................................................29

### REGULATIONS

*47 C.F.R. §1.80 .................................................................................26, 36

47 C.F.R. §1.80(a)...............................................................................30

47 C.F.R. §1.80(b)(8) ..........................................................................30

47 C.F.R. §1.80(b)(9) ..........................................................................30

47 C.F.R. §1.80(e)...............................................................................36

47 C.F.R. §1.80(f) ...............................................................................36

47 C.F.R. §1.80(f)(3) ...........................................................................17

47 C.F.R. §1.80(g) ..............................................................................36

47 C.F.R. §1.80(g)(1)...........................................................................17

47 C.F.R. §1.1940 ...............................................................................32

47 C.F.R. §1.2103(b)(2)........................................................................31

47 C.F.R. §1.2104(g) ...........................................................................31

47 C.F.R. §1.2104(g)(2).........................................................12, 17, 30, 35

47 C.F.R. §1.2105 .................................................................................8

47 C.F.R. §1.2105(a)..............................................................................9

47 C.F.R. §1.2105(a)(2)(iv) ..............................................................10, 11

47 C.F.R. §1.2105(a)(2)(viii)............................................................10, 46

47 C.F.R. §1.2105(a)(2)(ix)..............................................................10, 46

47 C.F.R. §1.2105(b)(1)....................................................................11, 47

47 C.F.R. §1.2106 ...............................................................................31

47 C.F.R. §1.2107(b) ..................................................................12, 14, 31

47 C.F.R. §1.2107(c) ......................................................................13, 14

47 C.F.R. §1.2108 ................................................................................8

47 C.F.R. §1.2109(a) ....................................................................14, 17, 31

47 C.F.R. §1.2109(b) ......................................................................17, 31

47 C.F.R. §1.2109(d) ..............................................................26, 31, 36, 37

47 C.F.R. §1.2110 ................................................................................7

47 C.F.R. §1.2110(b)(3)(iv)(A) ......................................................12, 47

47 C.F.R. §1.2110(c)(i) ......................................................................10

47 C.F.R. §1.2110(j) ..........................................................................13

47 C.F.R. §1.2111(b) ..........................................................................7

47 C.F.R. §1.2112 ................................................................................7

47 C.F.R. §1.2112(b)(1)(iii) ......................................................10, 11, 46

47 C.F.R. §1.2112(b)(1)(iv) ......................................................10, 47

47 C.F.R. §1.2112(b)(2) ......................................................................8

47 C.F.R. §1.2112(b)(2)(iv) ................................................................47

47 C.F.R. §1.2112(b)(2)(vii) ..............................................................46

## ADMINISTRATIVE MATERIALS

*Auction of Advanced Wireless Services (AWS-3) Licenses, 70 Bidders*
  *Qualified To Participate in Auction 97,*
  29 F.C.C. Rcd. 13465 .............................................................8, 12, 52

*Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled
   for November 13, 2014,
   29 F.C.C. Rcd. 8386 ....................................................... 8, 10, 12, 22, 50, 51, 53

In Re Final Default Payments for Auction No. 17,
   17 F.C.C. Rcd. 16047 (2002).................................................................31

In re Implementation of Section 309(j) of the Communications Act –
   Competitive Bidding,
   9 F.C.C. Rcd. 2348 .................................................................................53

In Re LMDS Commc'ns, Inc.,
   15 F.C.C. Rcd. 8618 (2000)...................................................................17

In the Matter of Lotus Commc'ns Corp.,
   23 F.C.C. Rcd. 9107 (2008)...................................................................52

Letter to John A. Prendergast, Esq.,
   14 F.C.C. Rcd. 6323 (1999)...................................................................17

Letter to L.T. Simes, II & Raymond Simes,
   26 F.C.C. Rcd. 15673 (2011).................................................................51

Letter to Mr. Paul S. Alexander, Jr.,
   No. DA21-781, 2021 WL 2869998 (OHMSV July 1, 2021) ...........................51

Letter to Robert J. Keller,
   19 F.C.C. Rcd. 22843 (2004).................................................................51

Letter to Timothy E. Welch,
   17 F.C.C. Rcd. 14754 (2002).................................................................52

Short-Form Application (FCC Form 175) of Sonic Staffing, Inc.,
   No. DA21-782, 2021 WL 2785297 (OHMSV July 1, 2021)............................52

## OTHER AUTHORITY

The False Claims Act, S. Rep. No. 99–345 (1986) ....................................................4

## **INTRODUCTION**

Vermont National Telephone Company blew the whistle on an unprecedented scheme: DISH Network—a public company with billions in revenues—conceived and executed a plan to buy approximately $13 billion of wireless spectrum at heavily discounted prices, using sham entities to obtain auction bidding credits the Federal Communications Commission had reserved for "very small businesses." DISH's sham entities, SNR Wireless and Northstar Wireless, falsely certified compliance with FCC disclosure rules, misrepresented their business arrangements with DISH, and fraudulently concealed agreements to act in DISH's interests and to transfer any spectrum that they won to DISH as soon as practicable.

Vermont National promptly filed a False Claims Act suit detailing the fraud and how DISH perpetrated it. The district court dismissed the complaint without hearing argument. The court invoked the "government-action bar" because, *after* the auction, the FCC conducted a licensing proceeding to determine whether SNR and Northstar were qualified to hold licenses and eligible for the bidding credits they had used. But the government-action bar precludes only False Claims Act suits asserting frauds the government has addressed in an "administrative *civil money penalty* proceeding" or civil action. The licensing proceeding the district court invoked was not a "civil money penalty proceeding."

The term "civil money penalty," used in hundreds of federal statutes, has a specific meaning.  The district court pointed to so-called "default payments" the FCC assessed.  But those payments were assessed after the licensing proceeding.  They were not "penalties" to punish SNR or Northstar for violating the law or Commission rules—let alone for *the fraud* Vermont National alleged.  They resulted from SNR and Northstar's business decision, after the FCC found they were ineligible for bidding credits:  Rather than pay their full bid amounts (and spend more of DISH's money), SNR and Northstar *chose* to give up some of their licenses to reduce their total payment obligations.  FCC rules *allow* bidders—all bidders—to make that election on identical terms.

Although the FCC has authority to impose civil money penalties, that authority is confined by statute and rule to "forfeiture proceedings," which the Commission never instituted here.  That the Commission could, in theory, have convened such a separate proceeding does not convert the post-auction review it actually conducted into a "civil money penalty proceeding"—any more than the FCC's authority to refer applicants for criminal prosecution converts review of their license applications into "criminal proceedings."

Alternatively, the district court ruled that SNR and Northstar's false statements and certifications were not "material" because the FCC ultimately determined—months after the sham entities fraudulently obtained their $3.3 billion

discount—that they were not eligible for it.  But the False Claims Act prohibits making a false *claim* in connection with payment obligations, not for successfully retaining the fruits of a fraud.  *See* 31 U.S.C. § 3729(a)(1)(A).  The statute's definition of materiality asks whether a misrepresentation is "*capable* of influencing" a government decision, not whether it ultimately made a difference in a particular case. *U.S. ex rel. Cimino v. Int'l Bus. Machs. Corp.*, 3 F.4th 412, 423 (D.C. Cir. 2021); *see* 31 U.S.C. § 3729(b)(4).  Here, the misrepresentations and false certifications were capable of, and in fact did, influence government action.  They went directly to SNR and Northstar's eligibility for "very small business" credits that they actually used at auction and that allowed them to avoid paying a $3.3 billion obligation to the government for months on end.  Reversal is warranted.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 31 U.S.C. § 3732.  The court's March 23, 2021 order finally disposed of all the parties' claims.  JA0105.  Vermont National timely filed its notice of appeal on April 21, 2021.  JA0017; Fed. R. App. P. 4(a)(1)(A).  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Whether the False Claims Act's government-action bar, which precludes *qui tam* suits "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the

Government is already a party," 31 U.S.C. § 3730(e)(3), is triggered by an administrative proceeding which did not investigate the suit's allegations and in which the agency did not and had no authority to impose a "civil money penalty."

2.     Whether a complaint under the False Claims Act plausibly alleges a misrepresentation "having a natural tendency to influence" or "capable of influencing" a government decision to award a benefit, 31 U.S.C. § 3729(b)(4), when it pleads that the defendants made false statements and certifications necessary to obtain that benefit.

## STATEMENT OF THE CASE

### I.     LEGAL AND REGULATORY BACKGROUND

#### A.     The False Claims Act

First enacted in 1863, the False Claims Act remains the government's "primary litigative tool for combatting fraud." S. Rep. No. 99–345, at 2 (1986). The Act provides for civil penalties and treble damages against any person who (among other things) "makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

The statute sweeps broadly. It punishes "all fraudulent attempts to cause the Government to pay out sums of money"—not just those that succeed. *United States*

*v. Neifert-White Co.*, 390 U.S. 228, 233 (1968).  Its definition of materiality covers any misrepresentation that has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  The misrepresentation thus need not actually "caus[e] the government to" approve a fraudulent claim.  *U.S. ex rel. Cimino v. Int'l Business Machs. Corp.*, 3 F.4th 412, 419 (D.C. Cir. 2021).  What matters is that the alleged fraud was "*capable* of influencing [the government's] decision."  *Id.* at 423.

To "augment[] the government's limited enforcement resources," the Act creates "a strong financial incentive for private citizens to guard against efforts to defraud the public fisc."  *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 546 (D.C. Cir. 2002).  "Relators" can file suits—*qui tam* actions—on the government's behalf and share in the recovery if their claims prove meritorious.  *See* 31 U.S.C. § 3730(b), (d).

The Act, however, places limits on relator suits.  The Act's "government-action bar" withdraws district-court jurisdiction over any action "which is based upon allegations or transactions which are the subject of *a civil suit or an administrative civil money penalty proceeding* in which the Government is already a party."  31 U.S.C. § 3730(e)(3) (emphasis added).  That provision "will typically bar only a '*qui tam* action'" that is "'based upon allegations or transactions pleaded *by the government* in an attempt to recover for fraud committed against it.'"  *Costner*

5

*v. URS Consultants, Inc.*, 153 F.3d 667, 676 (8th Cir. 1998).  It is not meant to preclude suits "seeking to remedy fraud that the government has not yet attempted to remedy." *U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Me.*, 24 F.3d 320, 328 (1st Cir. 1994).  The provision thus walks "a fine line between encouraging whistleblowing and discouraging opportunistic behavior" such as suits that merely duplicate the government's enforcement efforts.  *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994).

## B.    The FCC Spectrum Auction and "Designated-Entity" Bidding Credits

This case arises from a $41 billion wireless spectrum auction the FCC conducted in 2014.  Spectrum is the range of electromagnetic radio frequencies that carry sound, data, and video wirelessly.  Enabling everything from cellular communications to broadcast television, spectrum is a public good with extraordinary value.  But it is finite.  To allocate that important resource, Congress has authorized the FCC to auction spectrum licenses.  *See* 47 U.S.C. § 309(j).  At the same time, Congress has directed the FCC to establish mechanisms that help level the playing field for small, minority-, and women-owned businesses.  *See* 47 U.S.C. § 309(j)(4)(D).

Implementing those mandates, the FCC offers special bidding credits to "Designated Entities" meeting specified criteria. 47 C.F.R. § 1.2110.[1] For the auction at issue here, Auction 97, the Commission limited bidding credits to small businesses based on their total "attributed" revenues—an amount that included the bidder's own revenues *plus* the revenues of any person with a controlling interest in or an "attributable material relationship" with the bidder. *See* JA0169 ¶¶ 80-81; 47 C.F.R. § 1.2112. As relevant here, an entity with attributed gross revenues of $15 million or less was eligible for "very small business" credits equivalent to a 25% discount off the amount of any winning bid. JA0804 ¶ 3.

## C.    Pre- and Post-Auction Qualification and Licensing Procedures

To prevent "unjust enrichment" at taxpayer expense, the FCC imposes requirements to ensure only genuine small businesses benefit from designated-entity credits. 47 U.S.C. § 309(j)(4)(D), (E). For example, the FCC attaches conditions to licenses awarded to designated entities, such as "unjust enrichment" restrictions, that prevent licensees from transferring their discounted licenses for 60 months after the auction, unless the transfer is made to another designated entity. 47 C.F.R. § 1.2111(b).

---

[1] Unless otherwise noted, all citations of the Code of Federal Regulations refer to the regulations in force during the relevant period, from July 2014, when the FCC issued the rules for Auction 97, to February 2015, when SNR and Northstar submitted their license applications.

The Commission also requires applicants for bidding credits to furnish detailed information about their finances and business relationships.  Before auction, all would-be bidders must submit a "streamlined, short-form application."  29 F.C.C. Rcd. 8386 ¶63 (2014) (JA0164).   As explained in greater detail below, the Commission uses that short form to decide who can participate at auction and to make a preliminary determination of which bidders may use bidding credits.  *Id.* ¶64; *see* 47 C.F.R. §1.2105 ("Bidding application and certification procedures").

After auction, winning bidders must "file a more comprehensive long-form application" for "the license(s) they won."  29 F.C.C. Rcd. 8386 ¶¶63, 230 (JA0164; JA0206); *see* 47 C.F.R. §1.2112(b)(2) (listing information designated entities must include with a long-form "application for a license").  The FCC uses the information in that license application to determine whether the winning bidder is qualified to hold a license and to confirm eligibility for any bidding credits used at auction.  29 F.C.C. Rcd. 13465 ¶2 n.3 (2014) (JA0651).  Parties that oppose the issuance of a license to the winning bidder or its eligibility for bidding credits may file a "petition to deny" the application.  47 C.F.R. §1.2108.

## II.   FACTUAL BACKGROUND

Defendant DISH Network is a publicly traded company with annual revenues of more than $15 billion—a thousand times the maximum revenue permitted for an entity that seeks bidding credits for "very small business[es]."  The amended

complaint alleged that, in the months leading up to Auction 97, DISH's CEO told shareholders that spectrum licenses were like "oil reserves," a valuable asset to acquire and hold for future exploitation.  JA0083 ¶78.  DISH, however, was not prepared to pay full price.  It conspired with its co-defendants to create sham entities that could claim to be "very small businesses" and thereby obtain a 25% discount.  JA0064 ¶3.[2]  Using that discount together with DISH's vast resources, the conspirators could deter and outbid legitimate businesses, all on the understanding that they would transfer the spectrum they won to DISH at the first opportunity.  JA0083-90 ¶¶80-107.

### A.  The DISH-Controlled Entities File False Short-Form Applications To Bid

Three of the DISH-created entities—SNR Wireless, Northstar Wireless, and American AWS-3 Wireless I ("American I")—"were formed just in time to file short-form applications for Auction 97."  *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1027 (D.C. Cir. 2017).  They had no operations, assets, or revenues; they existed only on paper.  JA0070 ¶23; JA0072 ¶31.  Each applied to bid and uploaded a bidding application through the FCC's electronic submission portal on September 12, 2014.  JA0084 ¶81; *see* 47 C.F.R. § 1.2105(a); JA0651.

---

[2]  "DISH" as used herein includes Defendants DISH Wireless Holding L.L.C., DISH Network Corporation, and their owners, Charles and Cantey Ergen.

Bidding applications must include, among other things, an exhibit "certified as truthful under penalty of perjury" that identifies any agreements "or understandings of any kind relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure."   47 C.F.R. § 1.2105(a)(2)(viii).   They also must include a "[c]ertification under penalty of perjury" that the applicant "has not" and "will not" enter into any bidding-related arrangements not already disclosed.  *Id.* § 1.2105(a)(2)(ix).

Where, as here, "an applicant claims eligibility for a bidding credit, the information provided in" the short-form application is "used to determine whether the applicant is eligible for the claimed bidding credit."  29 F.C.C. Rcd. 8386 ¶ 64 (JA0165).   Among other things, applicants for designated-entity status must separately certify "under penalty of perjury" that they are "qualified as a designated entity."  47 C.F.R. § 1.2105(a)(2)(iv).  They must also summarize all agreements relating to the sale or leasing of any spectrum they might win at auction.  *Id.* § 1.2112(b)(1)(iii).  And they must disclose the gross revenues of any entity that has either (1) a "controlling interest" in the applicant, including any relationship that gives the entity *de facto* control over the applicant, *see id.* § 1.2110(c)(i); or (2) an "attributable material relationship" with the applicant, *id.* § 1.2112(b)(1)(iv).

The FCC's electronic submission portal will not accept an application without all the required certifications.  29 F.C.C. Rcd. 8386 ¶ 59, Attachment D (JA0079);

*see* JA0226-28.  Any bidding application that lacks a required certification "is unacceptable for filing and cannot be corrected" once the initial filing deadline has passed.  47 C.F.R. § 1.2105(b)(1).

SNR, Northstar, and American I each submitted electronic applications that disclosed various business arrangements with DISH, including agreements to coordinate bidding with DISH.  JA0085 ¶ 88.  Only American I disclosed that it was controlled by DISH.  JA0085 ¶ 86.  SNR and Northstar's applications made it seem "as if they [we]re separate companies who just happen to have the same business manager and financial backer (DISH)."  *SNR Wireless*, 868 F.3d at 1042.

SNR and Northstar claimed to be "very small businesses" with attributable revenues well below the $15 million threshold, entitling them to bidding credits worth 25% off their winning bids.  JA0084-85 ¶¶ 82-84; *see* 47 C.F.R. § 1.2105(a)(2)(iv).  They certified that they satisfied all the requirements of designated-entity status and that they had disclosed all agreements relevant to their eligibility, including agreements or understandings relating to the sale or lease of any spectrum they might win.  JA0095-96 ¶¶ 125-27; *see* 47 C.F.R. § 1.2112(b)(1)(iii).  They further certified that they were not party to any agreement to buy or lease more than 25% of their spectrum rights—a *per se* "material attributable relationship" that would have required them to attribute the revenues of

11

the agreement's other parties toward the $15 million threshold.   47 C.F.R. §1.2110(b)(3)(iv)(A); JA0354; JA0567; JA0647.

The FCC approved all three bidding applications and cleared SNR and Northstar to use the bidding credits they requested.   JA0664-65.   That approval carried immediate benefits.   While ordinary bidders assume an obligation to promptly pay the full amount of any winning bid, applicants using bidding credits need pay only the *net* discounted amount of their bids—that is, the winning bid amount less the bidding credit.   *See* 29 F.C.C. Rcd. 8386 ¶¶228-29 (JA0205-06); 47 C.F.R. §1.2104(g)(2).

Although the FCC reserves the right to revisit initial eligibility determinations once it reviews a winning bidder's license application, that process begins *after* the Commission requires payment.   29 F.C.C. Rcd. 13465 ¶2 n.3 (JA0651).   For example, a bidder that submits a $10 million winning bid will owe a $2 million down-payment and a final payment of $8 million.   *See* 47 C.F.R. §1.2107(b).   A bidder approved as a "very small business" before auction, however, pays 25% less—in the above example, the very small business with a $10 million winning bid would make a $1.5 million down-payment and a later payment of $6 million.   *See* 29 F.C.C. Rcd. 8386 ¶228 (JA0205-06).

### B.    SNR and Northstar's Auction Conduct

In multiple rounds of simultaneous bidding, SNR, Northstar, and American I scared off bona fide bidders with the illusion of fierce competition and then either SNR or Northstar accepted the FCC's random choice as to which was the winner. JA0086-88 ¶¶92-96; *see* JA0848-49 ¶11 & n.324.  As a result, the entity DISH openly controlled, American I, won no licenses, while SNR and Northstar—entities with no assets, operations, or revenues of their own—got a 25% discount on licenses worth a combined $13.3 billion using funds provided almost exclusively by DISH. JA0842 ¶91; JA0844 ¶100.

### C.    The Sham Entities' License Applications and Payments

Bidders in a spectrum auction obtain the exclusive right to seek FCC licenses for any spectrum for which they submit the winning bid.  To exercise that right, they must submit a "long-form application" for "all licenses" they won.  JA0673 ¶27. That application must "demonstrate" the winning bidder's "qualifications to hold a Commission license" and "its eligibility for [any] requested bidding credit."  JA0651 ¶2 n.3; 47 C.F.R. §1.2107(c).  In addition to re-certifying eligibility for bidding credits and verifying disclosures in their short-form applications, license applicants must provide copies of all agreements that affect their designated-entity status, including any agreements to sell or lease the spectrum won at auction.  47 C.F.R. §1.2110(j).  Winning bidders must also deposit a down payment—normally at the

same time as they submit the long-form application.  47 C.F.R. §1.2107(b), (c).  The balance is due soon after.  *See id.* §1.2109(a).

SNR and Northstar submitted their license applications and made down payments on the licenses they had won on February 13, 2015.  JA0089 ¶101; 47 C.F.R. § 1.2107(c); JA0668 ¶5; JA0673 ¶27.  They paid the remaining balances due on March 2, 2015.  JA0089 ¶101; JA0669 ¶8.  Those payments reflected the *net* value of SNR and Northstar's winning bids after the 25% discount the Commission had approved based on their short-form applications; they thus paid just $10 billion of their $13.3 billion in winning bids.  JA0808 ¶12.

## III.   PROCEEDINGS BELOW AND BEFORE THE FCC

Vermont National's affiliate, VTel Wireless, was among the bona fide small businesses crowded out by DISH's scheme.  After the auction closed, it consulted an expert in bidding economics.  JA0092 ¶115.  The expert concluded that the sham entities' behavior could be explained only by a single entity controlling all three bidders.  JA0092 ¶115.  Examining the conduct of American I, which DISH openly controlled, she further concluded that no entity would behave as American I had *unless* it was confident that it would eventually control any licenses won by SNR and Northstar.  JA0092-93 ¶116.  That analysis suggested the existence of an undisclosed agreement that SNR and Northstar would transfer their spectrum to

DISH after the five-year lock-up period—a plan that fit DISH's avowed plan to acquire spectrum for future exploitation.  JA0098 ¶130.

Vermont National disclosed its evidence to the Department of Justice on May 11, 2015.  Later that same day, VTel Wireless filed a petition to deny SNR and Northstar's applications (in particular their bidding credits) at the FCC.  JA0067 ¶14.  Vermont National filed this lawsuit two days later, on May 13, 2015.

### A.    The FCC's Licensing Proceeding

The petitions filed by VTel Wireless and others triggered FCC review.  The FCC concluded that, while SNR and Northstar were qualified to hold spectrum licenses, they were ineligible for bidding credits.  JA0806-07 ¶9.  The Commission focused on a single question:  Whether DISH had control of SNR and Northstar.  *See* JA0804-05 ¶¶2-4.  The Commission answered that question based on the materials SNR and Northstar had submitted with their short- and long-form applications, which made "manifest that DISH, directly or indirectly, controls or has the power to control" both SNR and Northstar.  JA0806 ¶6.  Consequently, DISH's revenues— an average of $13 billion for the three years preceding Auction 97—had to be attributed to SNR and Northstar, rendering them ineligible for bidding credits. JA0805 ¶4.

The FCC made its decision based "on the record before it."  JA806 ¶6; JA0857 ¶¶131-32.  It did not probe whether it had all relevant information.  It did

not investigate the fraud that Vermont National alleged.  The FCC simply "*assume[d]*" that SNR and Northstar had "provided [it] with, and that [it] therefore [was] able to review, copies and/or summaries of all oral and written arrangements between themselves and DISH that would bear on their eligibility" for bidding credits.  JA0812 ¶21 n.69 (emphasis added).  Having concluded that SNR and Northstar were ineligible for bidding credits, the FCC gave each entity 30 days (later extended another 14 days) to pay the $3.3 billion difference between the discounted net amounts they had already paid and the gross amounts of their winning bids.  JA0867-68 ¶¶157-60.

SNR and Northstar appealed.  This Court affirmed in part, but remanded to the FCC to afford SNR and Northstar an opportunity to restructure their relationships to "cure" DISH's control.  *See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017).  On remand, the FCC found that the entities' cure attempts only further demonstrated DISH's domination.  *In the Matter of Northstar Wireless*, No. 0006670613, 2020 WL 6955431, at *34 (OHMSV Nov. 23, 2020).  SNR and Northstar's appeal of that decision remains pending.  *See Northstar Wireless, LLC v. FCC*, Nos. 20-1507, -1508 (D.C. Cir.).

The Commission did not commence proceedings to assess "forfeiture penalt[ies]" against SNR or Northstar for violations of its rules—the means by which the FCC imposes civil money penalties—despite VTel's and others' requests.  It

never issued the charging document (called a "notice of apparent liability") or "notice" of "an opportunity for a hearing" required to seek penalties. 47 U.S.C. § 503(b)(3)(A), (4)(A). Nor did the FCC give SNR or Northstar time "to show, in writing, why a forfeiture penalty should not be imposed" or convene "a full evidentiary hearing before an administrative law judge." 47 C.F.R. § 1.80(f)(3), (g)(1).

### B.    SNR and Northstar Default on Certain Licenses

Under the Commission's rules, bidders may "selectively default" if they decide that they no longer want a subset of the licenses they won at auction. *See, e.g.*, *In Re LMDS Commc'ns, Inc.*, 15 F.C.C. Rcd. 8618 ¶ 10 (2000); *Letter to John A. Prendergast, Esq.*, 14 F.C.C. Rcd. 6323, 6425-26 (1999). When that happens, the bidder is required to make a "default payment" with respect to any licenses it has chosen to forgo, and the application moves forward with respect to any remaining licenses. 47 C.F.R. § 1.2104(g)(2); *see id.* § 1.2109(a)-(b). The default payment comprises two parts: (1) a "deficiency payment" that makes the government whole if the license later sells for less than the defaulted bid, and (2) an "additional payment" (functionally a restocking fee) equal to 15% of the defaulted bid. 47 C.F.R. § 1.2104(g)(2); *see* JA0671-72 ¶ 21.

Rather than pay the FCC the remaining $3.3 billion, SNR and Northstar opted to selectively default. On October 1, 2015—more than six weeks after the FCC's

licensing decision—SNR and Northstar informed the FCC they would give up $3.3 billion worth of licenses they had won at auction.  JA0876-81; JA0918-23; JA0961-65.

That same day, the Commission accepted SNR's and Northstar's selective defaults as consistent with its practice of "allow[ing] winning bidders at auction to default selectively on licenses."  JA0959; JA0964.  Because the licenses had yet to be re-auctioned, the FCC could not immediately determine whether SNR or Northstar might owe a "deficiency payment" to cover any shortfall between their bids and a subsequent winning bid.  JA0961; JA0965.  Nevertheless, "based on the elections made" by SNR and Northstar, the Commission calculated "interim" default payment obligations—the "additional payment" of 15% per defaulted license—and agreed to deduct those amounts from the "funds already on deposit at the Commission."  JA0961; JA0965.  DISH guaranteed any additional amount either entity might owe based on the prices the defaulted licenses eventually fetched at a later auction.  JA0961; JA0965.

### C.    Vermont National's *Qui Tam* Complaint

Vermont National filed this action concurrently with Commission proceedings on the license applications and the petitions to deny.  Vermont National's amended complaint disclaimed any argument based on the *de facto* control issue scrutinized in the FCC proceeding.  JA0097-98 ¶ 128.  It alleged instead

that SNR and Northstar's short- and long-form applications "were false because they knowingly failed to disclose all of their instruments, agreements, and understandings with" DISH, while certifying that they had. *Id.* It further alleged SNR and Northstar made false representations about their relationship with DISH. *Id.*

Vermont National alleged that SNR and Northstar's disclosures gave no indication of a plan to bid at DISH's direction, JA0098 ¶ 129, but their conduct at the auction gave every indication that "SNR and Northstar were acting as two arms of DISH, working together to advance DISH's goals," *SNR Wireless*, 868 F.3d at 1042. Moreover, while SNR and Northstar certified that "they had identified all agreements, arrangements, or understandings of any kind relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure," neither disclosed any agreement to transfer their spectrum to DISH, even though Vermont National's expert opined that only such an understanding could explain the parties' bidding behavior. JA0092-93 ¶ 116; JA0097-98 ¶¶ 127-28; JA0098 ¶ 130.

The amended complaint alleged further that both certifications were essential to the Commission's decision to approve SNR and Northstar to use bidding credits, which allowed them to deter bidding from competitors during the auction and to avoid paying the full $13.3 billion of their winning bids when those payments were originally due. JA0097-98 ¶ 128; JA0099 ¶¶ 132-35.

**D.    The Decision Below**

The government declined to intervene, and the case was unsealed but stayed pending SNR and Northstar's appeal of the FCC's decision.   When this Court remanded that appeal, the United States filed a statement of interest urging the district court to lift its stay.   JA0057-61.   The government argued that the Commission's decision on remand was "unlikely to shed light on the allegations in the Relator's complaint" because the FCC was "operating under *the assumption* that the Defendants have made full and truthful disclosures" and would "*not consider* whether Defendants violated their disclosure obligations."   JA0059 (emphasis added).   Vermont National's suit, by contrast, could "uncover evidence that the Defendants violated their disclosure obligations"—evidence in which the Commission would have "a substantial interest."  JA0059-60.

After lifting the stay, Dist. Ct. Dkt. No. 68, the district court dismissed the amended complaint without hearing argument.  JA0106-42.

1.    The district court first ruled that Vermont National's suit was precluded by the False Claims Act's government-action bar.  JA0130-36.  That prohibition extends to *qui tam* suits "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."  31 U.S.C. §3730(e)(3).  The court reasoned that, because SNR and Northstar incurred default payments when they chose to default

on some licenses (instead of paying the full, undiscounted price), "both received a 'civil money penalty' as the result of an FCC administrative proceeding addressing their conduct during Auction 97."  JA0133.

The court stated that the entities were "subject" to a "proceeding through which the FCC could have levied 'civil money penalties'" because "the FCC possessed the authority during its post-auction proceeding to penalize" them for violating Commission rules.  JA0133-34.  The court did not address the meaning of "civil money penalty" or "civil money penalty proceedings."  It did not explain why licensing proceedings (or proceedings on a petition to deny) would be viewed as "civil money penalty proceedings" under the False Claims Act.  And it did not address the fact that the default payment obligations resulted from SNR and Northstar's *voluntary choice* not to keep some of their licenses (so as to avoid paying full price), or explain how the consequences of that choice could be characterized as a civil money penalty for *the fraud* that Vermont National alleged.

Alternatively, the court held that Vermont National had not plausibly alleged that SNR and Northstar's false certifications were "material."  The court assumed that the alleged fraud could not have mattered to the FCC's decision on bidding credit eligibility because its order (issued after auction and after suit was filed) "already reflected the agency's decision to *deny* bidding credits" to SNR and Northstar.  JA0138.  That, of course, did "not end the materiality inquiry":  The

21

"government was still short $3.3 billion" between when SNR and Northstar made required payments on their bids and when the Commission approved their decisions to selectively default.  *Id.*  But the court held it was "not plausible" that the disclosure of any "secret control agreement" would have "influenced the government's decision to permit a discounted payment" because the FCC does not "substantially review" claims for bidding credits until *after* auctions close and the FCC receives full payment.  JA0139.

"[E]ven if Northstar Wireless and SNR Wireless *had disclosed* some secret control agreement with DISH Network in their short-form and long-form applications," the court stated, "the FCC would not have reviewed the impact of these agreements on their eligibility for discounted bidding credits until *after* the companies" completed their payments months later.  JA0139.  The court did not mention that the FCC has previously denied bidding credits before an auction even starts.  Nor did it square its reasoning with the agency's announcement, in the rules for Auction 97, that information in the short-form bidding applications "*will be used* to determine whether the applicant is eligible" to use any claimed bidding credit at auction.  29 F.C.C. Rcd. 8386 ¶64 (JA0165) (emphasis added).

Alternatively, the court held that the complaint had "not plausibly demonstrated" that any undisclosed "control" agreements would have added anything to the evidence of control already in the FCC's possession when it

approved SNR and Northstar's discounted payments.  JA0140-41.  The court did not

explain why control was relevant, given that Vermont National's amended

complaint expressly *disclaimed* reliance on the FCC's *de facto* control rules and

instead focused exclusively on SNR and Northstar's false certifications that they had

disclosed all agreements relevant to their eligibility for bidding credits and their false

statements about their relationship with DISH.  JA0097-98 ¶128.

## STANDARD OF REVIEW

This Court reviews dismissal of a *qui tam* action for lack of subject-matter

jurisdiction under the False Claims Act's government-action bar, and for failure to

state a claim, *de novo*.  *See U.S. ex rel. Cimino v. Int'l Bus. Machs. Corp.*, 3 F.4th

412, 422 (D.C. Cir. 2021); *U.S. ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d

466, 471 (D.C. Cir. 2016).  The "facts alleged in the Complaint are taken to be true,

and all inferences are drawn in [the relator's] favor."  *Oliver*, 826 F.3d at 469 n.2.

## SUMMARY OF ARGUMENT

I. A.   The False Claims Act's government-action bar applies only where the

government has pursued a "civil money penalty proceeding" or civil action

addressing the same transactions or allegations.  Here, the licensing proceeding

invoked by the district court was not a "civil money penalty proceeding," and the

"default payments" SNR and Northstar incurred for voluntarily forgoing licenses

won at auction were not "civil monetary penalties," as Congress and the Executive

use those terms.   Nor were the default payments invoked by the district court assessed in the licensing proceeding.   They resulted from *SNR and Northstar*'s voluntary decision—made six weeks *after* the licensing proceeding—to default on some licenses they won.   They certainly were not penalties for the fraudulent "allegations or transactions" alleged in this *qui tam* action.

B.     The FCC could not have levied penalties in the licensing proceeding the district court invoked.   The Communications Act and Commission rules confine FCC penalty authority to "forfeiture proceedings" the agency never convened.   The unexercised authority to initiate *separate* forfeiture proceedings cannot transform other actions the Commission takes into civil money penalty proceedings.

C.     The district court's contrary rulings contravene the statute's purpose. The licensing proceeding, which examined only whether DISH controlled SNR and Northstar, did not and was not meant to address the fraud asserted here.   Yet the court held that it precluded a suit that could yield discovery the Government has said it needs, as well as civil penalties and treble damages.

II. A.   The amended complaint plausibly pled materiality.   A misrepresentation can be material to the government's decision to approve a claim without actually causing the government to do so.   What matters is that the falsehood, when made, was *capable* of influencing government action.   The false statements and certifications alleged here—without which the FCC would not even have accepted SNR

24

or Northstar's applications—obviously were capable of having that effect. That is true even if the Commission, after auction, found both entities ineligible for the bidding credits they wielded at auction.

B.    The district court's contrary ruling departs from the statute and impermissibly draws inferences that contradict Vermont National's allegations. FCC procedures leave no doubt that the Commission reviews and relies on information in applicants' short-form applications when deciding whether to award bidding credits to use at auction, even if it can revisit those decisions after auction. The fact that SNR and Northstar's applications ultimately revealed DISH's *de facto* control is irrelevant to the distinct fraud alleged here.

## **ARGUMENT**

The decision below effectively rewrote two important provisions of the False Claims Act. First, it read the government-action bar to encompass agency proceedings *on license applications* as "civil money penalty proceedings." That stretches the well-known phrases "civil money penalty" and "civil money penalty proceedings" beyond the breaking point. The "default payments" SNR and Northstar made, moreover, resulted from their voluntary choice to give up certain spectrum licenses they won at auction. They were not a penalty—let alone a penalty for the fraud that Vermont National alleged.

Second, the district court read "materiality" to require an actual impact on a government decision. The statutory definition and this Court's precedents are squarely to the contrary: The statute's text reaches misconduct *capable* of influencing government decision making. It does not require success.

## I. THE FCC'S LICENSING PROCEEDING DID NOT TRIGGER THE GOVERNMENT-ACTION BAR

The district court held that, because the FCC conducted a review of SNR and Northstar's license applications, the government-action bar precludes this *qui tam* suit. JA0130-36. But the proceeding conducted by the FCC was not a "civil money penalty proceeding" within the meaning of that provision. Nor did the "default payments" SNR and Northstar made after selectively defaulting on certain licenses constitute "civil money penalties" for "their conduct during Auction 97." JA0133. The Commission did not assess them in response to SNR and Northstar's "[mis]conduct during Auction 97." They resulted from SNR and Northstar's voluntary decision to relinquish some of the licenses they won at auction to avoid paying for them—a business decision that had nothing to do with the fraudulent "allegations or transactions" at issue in this suit. 31 U.S.C. § 3730(e)(3). The FCC did not even have authority in the licensing proceeding to impose monetary sanctions to punish violations of its rules. JA0133-35. Such penalties may be imposed only through a separate forfeiture proceeding, 47 C.F.R. §§ 1.80, 1.2109(d), which the Commission never instituted.

## A.   The FCC Licensing Proceeding Was Not a "Civil Money Penalty Proceeding" and Imposed No "Civil Money Penalty"

The government-action bar forecloses False Claims Act suits that are "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding." 31 U.S.C. §3730(e)(3). The decision below attempted to characterize the FCC's licensing proceedings as civil money penalty proceedings. In the district court's view, the default payment obligations SNR and Northstar incurred when they chose to default on some of their licenses were "civil money penalties" imposed "as the result of an FCC administrative proceeding addressing their conduct during Auction 97." JA0133. Every part of that reasoning is wrong. The default payments are not "civil money penalties"; the assessment of those payments did not convert licensing proceedings into "civil money penalty proceedings"; and the default payments had nothing to do with SNR or Northstar's "conduct during Auction 97"—let alone the fraud Vermont National alleged.

### 1.   *Default Payments Are Not "Civil Money Penalties" Within the Meaning of the False Claims Act*

It is a cardinal rule of statutory construction that the words Congress chooses must be read in light of the "'record of statutory usage.'" *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 373 (2019). Here, more than one hundred sections of the U.S. Code use the term "civil money penalty" or "civil monetary penalty" to describe fines or

monetary forfeitures for a wide range of statutory and regulatory violations. *See, e.g.*, 8 U.S.C. §1324c(d)(3) (for document fraud under the Immigration and Nationality Act); 12 U.S.C. §1818(i)(2) (for violations of laws, regulations, or other requirements under the Federal Deposit Insurance Act); 21 U.S.C. §333 (for sales of cigarettes to minors under the Tobacco Control Act); 42 U.S.C. §1320a-8 (for making false statements in connection with an application for disability benefits under the Social Security Act).[3]

The district court's effort to equate FCC licensing proceedings—commenced to determine SNR and Northstar's *eligibility* for licenses and bidding credits—with "civil monetary penalty proceedings" does not withstand scrutiny. The district court was of the view that the phrase "civil money penalty proceeding" encompasses any proceeding that culminates in a monetary obligation that could be deemed a penalty. The default payment obligations SNR and Northstar incurred when they chose to default selectively, the court declared, were in a "plain sense" civil money penalties. JA0133. But the district court's "plain sense" reasoning is plainly mistaken. First,

---

[3] Congress and this Court use the terms "civil money penalty" and "civil monetary penalty" interchangeably. *See, e.g.*, 12 U.S.C. §1715z-23(g)(2) (authorizing, in a subparagraph entitled "civil monetary penalties" the imposition of a "civil money penalty"); 42 U.S.C. §1320a-7a(a)(10) (setting, in a section entitled "civil monetary penalties," a "civil money penalty"); *Orton Motor, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 884 F.3d 1205, 1208 (D.C. Cir. 2018); *Dodge v. Comptroller of the Currency*, 744 F.3d 148, 154-55 (D.C. Cir. 2014); *Affum v. United States*, 566 F.3d 1150, 1159 (D.C. Cir. 2009).

it ignores that "civil money penalty" and "civil money penalty proceedings" are well-known terms of art; they do not encompass every proceeding (*e.g.*, every breach of contract suit) where a monetary obligation results. Second, it ignores *when*, *where*, *why*, and *how* SNR and Northstar incurred default payment obligations here. Six weeks *after* the FCC decided SNR and Northstar's eligibility to hold licenses and use bidding credits, those entities chose to selectively default—to forgo some of the licenses they won. JA0876-81; JA0918-23. The default payment obligation was imposed as a consequence of that later decision (a decision FCC rules permitted). It is hard to see how that after-the-fact business decision could retroactively convert the licensing proceedings into "civil money penalty proceedings" as Congress uses that term.[4]

Congress and agencies know how to create civil money penalties and civil money penalty proceedings. Congress has enacted general statutes to govern the application of provisions authorizing civil money penalties. *See, e.g.*, Federal Civil Penalties Inflation Adjustment And Improvements Act of 2015, 129 Stat. 599, § 3(2);

---

[4] Although this Court colloquially referred to the default payments as "penalties," *SNR Wireless*, 868 F.3d at 1029, that dictum does not answer whether default payments are "civil money penalties" or licensing proceedings are "civil money penalty proceedings" within the meaning of the FCA. The same goes for the Commission's occasional use of "penalty." The text and structure of the statute and duly enacted regulations control, and they make clear that "default payments" do not qualify as "civil money penalties."

Federal Civil Monetary Penalty Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890 (28 U.S.C. § 2461 note); *cf.* 28 U.S.C. § 2461(a) (giving federal courts jurisdiction over actions to recover any "civil fine, penalty or pecuniary forfeiture . . . prescribed for the violation of an Act of Congress").

In the Communications Act, Congress authorized the FCC to issue civil monetary penalties in the form of "forfeiture penalties" for violations of the Communications Act and implementing regulations. 47 U.S.C. § 503. The rules that define those "penalt[ies]" address a broad range of misconduct, including "lack of candor" with the FCC. 47 C.F.R. § 1.80(a), 1.80(b)(8) note. And they incorporate the Civil Monetary Penalty Inflation Adjustment Act by reference, demonstrating that the Commission understood it was defining civil money penalties. *See id.* § 1.80(b)(9).

By contrast, "default payments" are just that: "payments" that are a consequence of a default, not "civil money penalties" for misconduct. Unlike the monetary forfeitures prescribed in 47 U.S.C. § 503 and 47 C.F.R. § 1.80(a), default payments do not punish *violations* of federal law. They establish the financial consequences of non-payment, whether non-payment is voluntary or the result of happenstance beyond the bidder's control. "[T]he Commission will impose payments on bidders who withdraw high bids during the course of an auction, or who default on payments due"—period. 47 C.F.R. § 1.2104(g)(2). Where the

Commission's rules describe the consequences of auction *misconduct*, they speak of "sanctions," including "forfeiture"—they do not mention default payments.   47 C.F.R. § 1.2109(d).[5]

Indeed, the selective defaults that triggered SNR and Northstar's default payment obligations here were "*permitted* by Commission rules."  *In Re Final Default Payments for Auction No. 17*, 17 F.C.C. Rcd. 16047, 16049 n.1 (2002) (emphasis added); JA0959 & n.11 (collecting auction rules); JA0963 & n.13 (same). Rather than punishing selective defaulters, the rules enact the principle of efficient breach.  They give winning bidders the option—without prejudice to their other licenses—to make default payments in lieu of taking spectrum licenses they no longer want. *Cf. Nw. Airlines, Inc. v. U.S. Dep't of Transp.*, 15 F.3d 1112, 1121 n.5 (D.C. Cir. 1994) ("'Efficient breach' refers to the principle that a breaching party has the option of paying damages rather than performing its contractual obligations where damages are an adequate substitute for specific performance.").  Those payments are not a "penalty" for a "violation."  They result from a business decision that all successful bidders at a spectrum auction (blameless or blameworthy) are permitted to make.

---

[5] Other provisions consistently refer to the payments defined in 47 C.F.R. § 1.2104(g) as "default payments." *E.g.*, *id.* §§ 1.2103(b)(2); 1.2107(b); 1.2109(a), (b). The lone exception is 47 C.F.R. § 1.2106, which refers twice to "penalt[ies]" "assessed pursuant to § 1.2104."  That unexplained variation from the Commission's otherwise-consistent nomenclature cannot displace the text of § 1.2104 itself.

The district court relied on the fact that the FCC's Order referenced regulations providing for "interest, *penalties* and other charges." JA0133 (quoting 47 C.F.R. § 1.1940). But the cited provision—governing debt collection—provides for penalty interest on amounts "due on a debt that is *delinquent* for more than 90 days." 47 C.F.R. § 1.1940 (emphasis added). The possibility that a defaulting bidder *might* incur penalty interest for failing to make default payments cannot transform the default payment obligation itself into a civil money penalty. The contrary view would convert virtually every payment obligation to the government—which are almost universally subject to penalty interest for delinquency, 31 U.S.C. § 3717— into a "civil money penalty."

2.   *The False Claims Act's "Same Allegations or Transactions" Requirement Was Not Met*

The government-action bar is also limited to suits "based upon *allegations or transactions* which are the subject of" the "administrative civil money penalty proceeding." 31 U.S.C. § 3730(e)(3) (emphasis added). The phrase "allegations or transactions," this Court has explained, refers to "'allegations or transactions' of *fraudulent conduct*." *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653 (D.C. Cir. 1994) (emphasis added).

The district court ruled that the FCC's post-auction review of SNR and Northstar's license applications—the licensing proceeding—met both requirements. JA0130-31. In its view, Vermont National's amended complaint included

32

allegations "comparable to" those asserted in the petitions to deny SNR and Northstar's license applications. JA0131. And it held that the licensing proceeding was an "administrative civil money penalty proceeding" because it supposedly "result[ed]" in the default payment obligations the district court characterized as "civil money penalties." JA0133.

That premise fails for a simple reason (wholly apart from the meaning of "civil money penalty"): The FCC did *not* assess default payments—the supposed "civil money penalties"—in the FCC *licensing* proceeding the district court invoked as giving rise to the bar. JA0133. The payments were assessed six weeks after that proceeding *ended*. And they were not in any sense "based upon" the same allegations or transactions as the *qui tam* complaint. They were based on SNR and Northstar's decision to selectively default on certain licenses—something the Commission's rules *permit*. *See* p. 31, *supra*.

The sequence of events makes that clear. The FCC reached its conclusion in the licensing proceeding in August 2015. Finding SNR and Northstar ineligible for bidding credits, it ruled that they must pay the full amount of their winning bids. JA0864-68 ¶¶ 151-60. Six weeks *later*, SNR and Northstar notified the FCC of their decision to selectively default, and the FCC issued a "Notice of Interim Default Payment Obligation" to each in response. JA0958-62. Those notices addressed SNR and Northstar's "*election to selectively default* in the manner described in

33

the[ir] Selective Default Letter[s]."  JA0960-65.  The notices and corresponding

default payment obligations had nothing to do with the licensing proceeding or SNR

and Northstar's conduct in Auction 97, much less the allegations of fraud that

Vermont National asserted.  *See Quinn*, 14 F.3d at 653.

Far from accusing SNR or Northstar of misconduct for defaulting, the FCC

stated that its rules "allow[]" selective defaults.  JA0959 & n.11; JA0963 & n.13.

And it accepted SNR and Northstar's proposal to "apply the money that they had

already paid for th[e] defaulted licenses to the amount owed for the remaining

licenses."  JA0974 ¶23; *see* JA0960-61; JA0965.  The FCC *never* investigated the

fraud alleged in Vermont National's complaint; it "assume[d]" defendants made

complete disclosures.  *See* p. 40, *infra*.  Nor were the default payment amounts

"based on" allegations of fraud.  They were based on the winning bids for the

spectrum SNR and Northstar decided to relinquish.  JA0969-60; JA0964.

The default payment obligations thus cannot convert the licensing

proceeding—the proceeding that supposedly overlapped with Vermont National's

suit—into a civil money penalty proceeding, because they *were not imposed* as a

result of the licensing proceeding or in response to allegations of fraud.  The district

court's assertion that the FCC assessed default payments against SNR and Northstar

"as the result of an FCC administrative proceeding *addressing their conduct during

Auction 97*," JA0133 (emphasis added), elides that distinction.  Even if a default

payment could convert licensing proceedings into "administrative civil money penalty proceedings"—and it cannot—the default payment here resulted from SNR and Northstar's freely made decision to selectively default under Commission rules; the payment was not the product of proceedings initiated to investigate fraudulent conduct, much less the fraud Vermont National alleged.  Indeed, insofar as the FCC's default notices mention the licensing proceedings, they do so only to explain why SNR and Northstar were *not* already in default (though months had passed since full payments were due).  JA0959; JA0963.

The district court pointed to a footnote in the licensing decision warning SNR and Northstar that they *would be* "liable for the default payment set forth in section 1.2104(g)(2) of the Commission's rules" *if* they failed to pay the balances on their winning bids.  JA0133; *see* JA0866 ¶153; JA0866-67 ¶155.  But neither SNR nor Northstar were then in default and the Commission never suggested that they would be.  JA0860 ¶138.  To the contrary, it gave them a month to pay the balance of their winning bids and later granted an additional extension.  JA0866-67 ¶¶153, 155; JA0874-75.  If the Commission had reminded SNR and Northstar that certain conduct could result in criminal prosecution, that would not convert the licensing proceeding into, much less merge it with, a later criminal proceeding if one were commenced.  The Commission's rote reminder of the rules applicable to *any* bidder that defaults cannot do that either.

### B. The FCC Conducted No Proceeding in Which It Could Levy a "Civil Money Penalty"

The district court also held that the government-action bar applied because "the FCC *possessed the authority during its post-auction proceeding* to penalize Northstar Wireless and SNR Wireless not only for their license defaults, but also for *any violations of the 'Commission's rules*.'" JA0133 (emphasis added). That is incorrect. The Commission does have authority to impose civil money penalties in the form of monetary forfeitures where an applicant is "discovered to have made a false certification or to be ineligible for the license on which it bid." JA0134 (quoting 26 F.C.C. Rcd. 417, ¶ 57 n.121); *see* 47 U.S.C. § 503(b); 47 C.F.R. §§ 1.80, 1.2109(d). But the statute and the Commission's rules are clear: Those penalties cannot be imposed in the proceedings the Commission convened here.

Forfeitures may be imposed only in "*forfeiture proceedings*." 47 C.F.R. § 1.80 (emphasis added); *see* 47 U.S.C. § 503(b)(4). To initiate "a forfeiture proceeding" against SNR or Northstar (or DISH), the FCC would either have had to (a) issue "a notice of apparent liability" that specified the "violation" "charged" against each entity and offered a reasonable time for response, or (b) convene "a full evidentiary hearing before an administrative law judge." 47 C.F.R. § 1.80(e)-(g). It did neither. Petitions filed by VTel Wireless and other parties—not a notice of apparent liability—prompted the licensing proceeding. *See* p. 15, *supra*. The Commission declined to hold a hearing on DISH's control—let alone any violation

36

of Commission rules.  *See* JA0862 ¶145.  And it rejected a request to refer SNR and

Northstar "to the FCC's Enforcement Bureau for possible forfeiture penalties."

JA0822-23 ¶44.  Absent a forfeiture proceeding, "no forfeiture penalty" could be

imposed.  47 U.S.C. §503(b)(4).[6]

The FCC's (unexercised) authority to initiate a forfeiture proceeding could no

more transform the licensing proceeding into a "civil money penalty proceeding"

than the FCC's ability to make criminal referrals could transform it into a criminal

proceeding.  The government-action bar applies only where the "allegations or

transactions" at issue in a *qui tam* action "*are* the subject of a civil suit or an

administrative civil money penalty proceeding to which the government is *already*

a party." 31 U.S.C. §3730(e)(3) (emphasis added).  As the United States has urged,

that language does not encompass the inchoate possibility that an agency *could*

decide, during the course of one proceeding, to initiate a *different* proceeding that

might qualify as a civil monetary proceeding.  *See* United States Statement of

Interest, *U.S. ex rel. Schagrin v. LDR Indus., LLC*, No. 14-cv-9125, Dkt. 75 at 2-4

---

[6]  Section 1.2109(d), relied on by the district court, JA0133-34, is not to the contrary.
That provision describes penalties to which bidders "may be subject" if they are
found to have "violated the antitrust laws or the Commission's rules."  It does not
create a new penalty authority.  Reading that provision to authorize penalties by new
means would contravene the Communication Act's plain text.  *See* 47 U.S.C.
§503(b)(4).

(N.D. Ill. Aug. 15, 2018); *accord U.S. ex rel. Schagrin v. LDR Indus., LLC*, No. 14 C 9125, 2018 WL 6064699, at *4 (N.D. Ill. Nov. 20, 2018).  Myriad courts agree.[7]

## C.    The District Court's Decision Contravenes the Statute's Purpose

The district court defended its atextual expansion of the government-action bar by characterizing Vermont National's case as a bid to "revive" rejected allegations that would not provide a " 'useful return to the government.' "  JA0136.  The Commission, however, did not even consider—let alone reject—the fraud alleged in this case.  Pursuing the allegations may well yield "useful returns."  And statutory text controls regardless.

The government-action bar seeks to curb "parasitic" claims that rely upon "support, advantage, or the like" from a proceeding to which the government is already a party "without giving any useful or proper return."  *U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Me.*, 24 F.3d 320, 327-328 (1st Cir. 1994) (quotation marks

---

[7] *See, e.g.*, *U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Me.*, 24 F.3d 320, 328 (1st Cir. 1994) (government-action bar inapplicable when the government could not have sued defendants for fraud in administrative proceeding "as that case was constituted"); *U.S. ex rel. McDermott v. Genentech, Inc.*, No. 05-147-P-C, 2006 WL 3741920, at *7 (D. Me. Dec. 14, 2006) (investigation not a civil money proceeding merely because it *could* result in monetary penalties should the Government seek them" when "there [was] nothing but [defendant's] speculation to suggest that the government will obtain redress through its investigation") *report and recommendation adopted*, No. CIV. 2:05-CV-147, 2007 WL 2128410 (D. Me. July 24, 2007); *U.S. ex rel. Johnson v. Shell Oil Co.*, 26 F. Supp. 2d 923, 928 (E.D. Tex. 1998) (government-action bar inapplicable where agency had authority to, but did not, initiate penalty proceedings by issuing notice of noncompliance).

omitted).  Those concerns do not arise where, as here, a relator "seeks recovery from alleged defrauders of the government for fraud that has not yet been the subject of a claim by the government."  *Id.* at 329.

1.     The only supposed overlap the district court identified between the allegations in Vermont National's amended complaint and the FCC's licensing proceeding was DISH's *de facto* control over SNR and Northstar.  JA0131.  But Vermont National's amended complaint expressly disclaimed "any claim premised" on that "'control.'"  JA0097 ¶128.  Accordingly, this is *not* the kind of action, "based upon allegations or transactions" already "pleaded by the government in an attempt to recover for fraud committed against it," that Congress sought to foreclose.  *Prawer*, 24 F.3d at 328; *accord Costner v. URS Consultants, Inc.*, 153 F.3d 667, 676 (8th Cir. 1998).  This case instead "seek[s] to remedy fraud that the government has not yet attempted to remedy."  *Prawer*, 24 F.3d at 328.

The amended complaint alleges that SNR and Northstar certified they had disclosed all bidding arrangements, yet failed to "disclose that the DISH-Controlling Defendants alone controlled the bidding or that Northstar Wireless and SNR Wireless were not independent decision-makers."  JA0098 ¶129.  It alleges that SNR and Northstar certified they had disclosed all agreements "relating to the licenses being auctioned," yet failed to disclose that "the DISH-Controlling Defendants necessarily had an agreement or arrangement with Northstar Wireless and SNR

Wireless to obtain, or use, or buy and re-sell the spectrum purchased during the auction."  JA0098 ¶130; *see* JA0058-59.

The district court stressed that the FCC found no reason to doubt SNR and Northstar's candor.  JA0132.  But the Commission never investigated whether SNR or Northstar had undisclosed agreements that rendered their certifications knowingly false.  Nor did it consider *DISH's* conduct:  The amended complaint alleged that DISH and other defendants not before the FCC masterminded the scheme to create SNR, Northstar, and American I and use them to fraudulently obtain billions in discounted spectrum on DISH's behalf.  The Commission simply "assumed" that SNR and Northstar had disclosed "copies and/or summaries of all oral and written arrangements between themselves and DISH that would bear on their eligibility" for bidding credits.  JA0812 n.69; *see* JA0059-60.  It confined its review to *those documents*.  And it concluded, based in part on the ambiguity of its precedent, JA0857 ¶131, that "the Applicants and DISH disclosed their ownership structures and related Agreements as required, and proceeded under an incorrect view about how the Commission's affiliation rules apply to these structures," JA0857 ¶132.

That does not address Vermont National's allegations that SNR and Northstar's applications were *knowingly* false because they intentionally *concealed* agreements relating to their relationships with DISH and their plans to transfer spectrum—information that had to be disclosed, but was not.  JA0097-98 ¶¶128,

130.  As Vermont National's economist explained, SNR, Northstar, and American

I's bidding behavior was inexplicable *unless* American I expected the licenses to end

up under its control regardless.    JA0098 ¶130; *see* JA0849 ¶112 (SNR and

Northstar's choice of licenses inconsistent with actions of "two separate companies

with no disclosed intention to combine services").  This Court found "the parties'

unusually coordinated conduct" during Auction 97 "suspicious," as though "SNR

and Northstar were acting as two arms of DISH, working together to advance

DISH's goals," *SNR Wireless*, 868 F.3d at 1041-42—behavior explained by the

agreements Vermont National alleges SNR and Northstar fraudulently concealed.

That allegation is made more plausible still by the Commission's finding that SNR

and Northstar's "post-remand conduct" was "'suspicious' in similar ways." JA0985

¶58 n.134; *see also, e.g.*, JA0969 ¶8; JA1005 ¶115; JA1006-07 ¶120.

2.      This action thus has the potential to yield a "useful or proper return."

As the United States explained in its Statement of Interest, discovery in this case has

the potential to uncover evidence of the fraud suggested by SNR and Northstar's

conduct, but unexplored by the Commission.  JA0059-60.  And this action "has the

potential to restore money to the public fisc that would not and could not have been

restored" in the existing proceeding.  *Prawer*, 24 F.3d at 329.

SNR and Northstar's default payments are not compensation for the fraud

perpetrated on the FCC.  *See Prawer*, 24 F.3d at 329; *Costner*, 153 F.3d at 676.  That

fraud deprived the United States of $3.3 billion that SNR and Northstar should have paid—but did not pay—on March 2, 2015, and that was not accounted for until much later. Nor do the default payments provide the deterrence civil penalties provide, or compensate for non-monetary harms, such as the corruption of the auction process or the six years the spectrum on which SNR and Northstar defaulted has remained unavailable for public use.

3. The district court's expansive view of "civil money penalty proceeding" thus threatens the False Claims Act's purposes. By counting default payments as "civil money penalties"—even though they are not punishment for fraud—the district court would allow willful frauds to go unpunished. By deeming any administrative proceeding to be a "civil money penalty" proceeding simply because it *might* uncover a basis for initiating a separate action for civil money penalties, the district court's decision threatens to foreclose *qui tam* actions that would otherwise uncover compelling evidence of fraud.

As the United States has argued elsewhere, "[i]mplying an exception to FCA liability where there exists a parallel regulatory scheme has as little basis in common sense as it does in congressional text and purposes." United States Statement of Interest, *U.S. ex rel. Gohil v. Aventis Pharms., Inc.*, 02-cv-2964, Dkt. 142 at 5 (E.D. Pa. July 17, 2015). Ordinary regulatory and False Claims Act actions implicate distinct enforcement regimes. Agency officials should be able to conduct routine

administrative proceedings without worrying that the mere *potential* to seek penalties will prevent whistleblowers from revealing fraud the proceeding is not intended or designed to uncover.

## II.  VERMONT NATIONAL PLED FACTS SUFFICIENT TO ESTABLISH MATERIALITY

The district court also ruled that any agreements SNR and Northstar concealed, and misrepresentations regarding their relationships with DISH, were not material because the FCC eventually determined they were ineligible for bidding credits regardless. JA0138. The court acknowledged that the Commission initially allowed SNR and Northstar to make discounted payments on the licenses they won, permitting them to pay far less than otherwise would have been required. But it held their misrepresentations were not material to that decision, because the Commission did not "substantially review" eligibility beforehand. JA0139. It ruled, moreover, that Vermont National had "not plausibly demonstrated" that disclosing the secret agreements would have affected the decision-making process because other agreements "independently demonstrated" that DISH had "de facto" control over SNR and Northstar, rendering them ineligible for the bidding credits anyway. JA0141. Each part of that rationale is mistaken.

## A.   SNR and Northstar's Misrepresentations Were Material to the FCC's Determination of Eligibility for Bidding Credits

The district court's primary rationale reflects a clear error of law.  The district court declared that the false certifications and statements in SNR and Northstar's applications were immaterial because they "would not have changed" the FCC's ultimate "decision to *deny* bidding credits."    JA0138.    In its view, the misrepresentations were immaterial because the FCC eventually reached the correct result.  But the False Claims Act provides no "all's well that ends well" exception to its prohibitions.    The statute reaches "*all* fraudulent attempts to cause the Government to pay out sums of money," not just successful ones.  *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968) (emphasis added).

Consequently, a misrepresentation can be "material" to the government's decision to approve a claim "*without causing the government to do so*."  *Cimino*, 3 F.4th at 419 (emphasis added).  What matters is that the falsehood "was *capable* of influencing" government decisions.  *Id.* at 423; 31 U.S.C. §3729(b)(4).  The false statements and certifications alleged here—without which the FCC would never have found SNR or Northstar eligible to use bidding credits at auction or to pay lesser amounts in the first instance—obviously were.

The district court's insistence that a misrepresentation must actually *change* the outcome of a government decision contravenes the False Claims Act's text.  That Act prohibits submission of false claims and the "use[ ]" or "mak[ing]" of false

44

records or statements material to those claims.  31 U.S.C. § 3729(a)(1)(A), (B), (G).

It "'attaches liability, not to . . . the government's wrongful payment, but to the *claim*

for payment,'" regardless of what comes next.  *U.S. ex rel. Longhi v. United States*,

575 F.3d 458, 467 (5th Cir. 2009) (emphasis added); *see United States v. Dynamic*

*Visions Inc.*, 971 F.3d 330, 336 (D.C. Cir. 2020) (submission of false claim is

sufficient to establish liability); *U.S. ex rel. Schwedt v. Plan. Rsch. Corp.*, 59 F.3d

196, 199 (D.C. Cir. 1995) (similar).  That approach reflects Congress's judgment

that fraud against the government "is best prevented by attacking the activity that

presents the risk of wrongful payment, and not by waiting until the public fisc is

actually damaged."  *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995).

The statute's definition of materiality requires factfinders to examine the

defendant's conduct, not necessarily the government's response.  It asks whether a

statement has "a natural tendency to influence, or [is] capable of influencing, the

payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).  The answer does

depend on whether an allegedly false claim is ultimately paid.  As this Court recently

explained, "a statement could be material—that is, capable of influencing the

government's decision" to pay a claim—"*without causing the government to do so*."

*Cimino*, 3 F.4th at 419 (emphasis added).  The Act "requires proof only that the

defendant's false statements 'could have' influenced the government's pay decision

or had the 'potential' to influence the government's decision, not that the false

statements actually did so." *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017).[8]

The amended complaint easily meets that standard. Vermont National alleged that SNR and Northstar's short-form applications falsely certified that they had disclosed all agreements and "understandings of any kind related to the licenses being auctioned," including "bidding strategies" and "post-auction market structure," while deliberately concealing their true relationship with DISH and their plan to transfer any spectrum that they won to DISH. JA0064-65 ¶5; JA0095-98 ¶¶125-29; *see* 47 C.F.R. § 1.2105(a)(2)(viii), (ix). It alleged that, without those false certifications, SNR and Northstar would not even have been able to submit their short-form applications through the FCC's electronic portal, let alone obtain approval to use bidding credits. JA0078-80 ¶¶58-61.

SNR and Northstar's failure to disclose agreements to transfer their spectrum to DISH also violated their obligations to disclose, in both their short- and long-form applications, any "spectrum resale arrangements." JA0095-97 ¶¶125-27; JA0098 ¶130; *see* 47 C.F.R. § 1.2112(b)(1)(iii), (b)(2)(vii). Those agreements were particularly important because then-applicable regulations required treating as an

---

[8] A results-based interpretation of materiality would lead to absurd results. When making claims, claimants would never know whether or not a particular representation or certification is "material to the Government's payment decision." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989, 1996 (2016).

"attributable material relationship" any arrangement for the lease or resale of more than 25% of any of its licenses' spectrum.   JA0078 ¶56 (quoting 47 C.F.R. §1.2110(b)(3)(iv)(A)).   The undisclosed agreements to transfer spectrum thus rendered SNR and Northstar's certifications that they had "no attributable material relationship with any entity under Section 1.2110(b)(3)(iv)(A) of the Commission's Rules" entirely false.   JA0354; JA0567; JA0647.   And the undisclosed agreements triggered a requirement to count DISH's revenues as SNR and Northstar's own— putting them billions of dollars over the $15 million revenue cap for "very small business" credits—whether or not DISH was also a "controlling interest" under the rules.   *See* 47 C.F.R. §1.2112(b)(1)(iv), (b)(2)(iv).

Each of those misrepresentations was "capable of influencing" the FCC's eligibility determination.   Without SNR and Northstar's false certifications, the Commission would not have even *processed* the short-form applications.   *See* JA0079-80  ¶61  JA0082 ¶73;  47 C.F.R. §1.2105(b)(1) (short-form lacking certifications "is unacceptable for filing"); *U.S. ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 310 (1st Cir. 2010) (fact that applicant "would not receive benefits" if they "were to fail to answer" or leave "blank" a particular question is evidence that the answer is material).   Moreover, the deliberate concealment of their actual relationship, including the plan to transfer all their spectrum to DISH, allowed SNR and Northstar to avoid being found facially ineligible for the "very small business"

credits SNR and Northstar used.  Vermont National's amended complaint thus alleged "more than the mere possibility that the government would be entitled to refuse payment if it were aware of the violation"; the factual allegations plausibly establish the government would have.  *U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 907 (9th Cir. 2017).

The district court's effort to invoke SNR and Northstar's ultimate failure to retain the benefit of bidding credits, JA0139, cannot be reconciled with *Cimino*. *Cimino* explains that a misrepresentation can satisfy the statute's standard of materiality—"that is, [be] capable of influencing" a government decision to approve a claim—"without causing the government to do so."  3 F.4th at 419.  Materiality "focuses on the potential effect of the false statement *when it is made*."  *Longhi*, 575 F.3d at 470 (emphasis added); *accord Harman*, 872 F.3d at 661.  It does not require proof the government was ultimately misled.  "[A]ctual harm" is simply "not an element of materiality."  *U.S. ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 505 (8th Cir. 2016); *accord U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 835 n.7 (6th Cir. 2018).[9]

---

[9] Nor is actual harm a requirement for liability.  A defendant remains liable for the False Claims Act's civil penalties even where "the government discovers that a claim is false before it makes payment."  *U.S. ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Tex.*, 545 F.3d 256, 259 (3d Cir. 2008).

Of course, the government's *past* practice can inform the "likely" effect of a misrepresentation. *Escobar*, 136 S.Ct. at 2002. But a relator "is not required to make allegations regarding past government action." *Prather*, 892 F.3d at 834. Such arguments are more appropriate for "a later stage [of] the litigation," when a factfinder may weigh competing evidence and the inquiry is not limited to whether the plaintiff "plausibly *pleaded* materiality," *Cimino*, 3 F.4th at 423; *see also U.S. ex rel. Prose v. Molina Healthcare of Ill., Inc.*, 10 F.4th 765, 777 (7th Cir. 2021) ("[T]his argument is better saved for a later stage, once both sides have conducted discovery."). Here, Vermont National's amended complaint plausibly alleged false certifications and statements that, when made, had the potential to influence SNR and Northstar's claims for bidding credits. The statute requires nothing more.

## B. The District Court Disregarded Well-Pleaded Factual Allegations Plausibly Establishing Materiality

The misrepresentations at issue here were not merely "capable of influencing" government decisions. They actually did so—twice. They did so first when the FCC approved SNR and Northstar to bid as designated entities. As explained, pp. 46-48, *supra*, SNR and Northstar would not have been granted bidding credits for use at auction without falsely certifying they had disclosed all agreements required to be disclosed; no false certifications, no bidding credits. Thus, while the Commission defers intensive scrutiny of applications until after an auction closes, it relies on the disclosures and certifications in applicants' short forms "to determine whether" they

are eligible for bidding credits during the auction itself.  29 F.C.C. Rcd. 8386 ¶64 (JA0164-65).

The misrepresentations affected government action yet again after auction. As the district court acknowledged, the FCC's decision to accept discounted payment at the close of Auction 97 left the government "short $3.3 billion" in payments for some time.  When payments were initially due, SNR and Northstar paid less than otherwise required based on their bidding credits—underpayments that were not corrected until the FCC approved SNR and Northstar's selective defaults and reduced their payment obligations accordingly.  JA0138.  That put the fraud in the heartland of the False Claims Act's prohibition against "knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money" to the government.  31 U.S.C. §3729(a)(1)(G).

The district court ruled that the false statements and certifications in SNR and Northstar's applications could not have affected the FCC's initial decision to accept less money after auction because the FCC did not "substantially review" eligibility until after the initial (discounted) payments were made.   JA0139 (quoting JA0856 ¶130).  It denied that Vermont National had "plausibly demonstrated" materiality because, in the court's view, the FCC accepted SNR and Northstar's discounted payments despite disclosures establishing DISH's disqualifying *de facto* control.

50

JA0141.   Those rulings misconstrue the FCC's procedures and impermissibly contradict Vermont National's well-pleaded factual allegations.

1.   *Vermont National Plausibly Alleged Misrepresentations Material to the FCC's Decision To Accept Discounted Payment*

The Notice announcing Auction 97's rules is unequivocal:  "If an applicant claims eligibility for a bidding credit, the information provided in its [short-form application] ***will be used*** to determine whether the applicant is eligible for the claimed bidding credit." 29 F.C.C. Rcd. 8386 ¶ 64 (JA0165) (emphasis added).  That is why applicants must certify eligibility, disclose attributable revenues, and amend short forms immediately to report "[c]hanges that cause a loss of or reduction in the percentage of bidding credit specified on the originally-submitted application."  29 F.C.C. Rcd. 8386 ¶ 109 (JA0176).   The FCC needs that information precisely because it relies on it up front.

The FCC, moreover, rejects applications for bidding credits before auction based on the content of short-form applications.  *See, e.g.*, *Letter to Mr. Paul S. Alexander, Jr.*, No. DA21-781, 2021 WL 2869998, at *1 (OHMSV July 1, 2021) (explaining that applicant was disqualified prior to auction because, among other reasons, its short-form claim for bidding credits failed to disclose attributable interests); *Letter to L.T. Simes, II & Raymond Simes*, 26 F.C.C. Rcd. 15673 (2011) (denying reconsideration of decision finding applicant ineligible for bidding credits prior to auction); *Letter to Robert J. Keller*, 19 F.C.C. Rcd. 22843 (2004) (same);

*Letter to Timothy E. Welch*, 17 F.C.C. Rcd. 14754 (2002) (same).   Indeed, the Commission found numerous Auction 97 applicants ineligible to bid *at all* based on their short-form applications.  29 F.C.C. Rcd. 13465 ¶4 (JA0652).[10]  The amended complaint plausibly alleged that disclosing all agreements as required—or omitting the false certification that they had been disclosed—would have prompted the same result here.

The district court seized upon a comment in the FCC's licensing order that the Commission "does not substantially review" eligibility for bidding credits before winning bidders make initial payments after auction.  JA0139 (quoting JA0856 ¶130).  But the fact that the FCC *audits* bidding-credit applications *after* auction does not diminish the materiality of the alleged misrepresentations—let alone render Vermont National's amended complaint "implausible."  *See Loughren*, 613 F.3d at 310 (fact that government undertakes independent review does not render applicant's false assertion of compliance immaterial); *Prather*, 892 F.3d at 835 n.7 (similar).

Reserving more intensive review until after auction, when the FCC can focus only on applicants that actually win spectrum, "reduce[s] the administrative burdens

---

[10] *See also, e.g.*, *Short-Form Application (FCC Form 175) of Sonic Staffing, Inc.*, No. DA21-782, 2021 WL 2785297, at *2 (OHMSV July 1, 2021) (applicants disqualified based on short-form applications); *In the Matter of Lotus Commc'ns Corp.*, 23 F.C.C. Rcd. 9107 (2008) (similar).

on bidders and the FCC and minimize[s] the potential for delay." *In re Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, 9 F.C.C. Rcd. 2348 ¶ 165 (1994). It does not suggest the Commission is indifferent to whether applicants commit fraud on their short-form applications. "That would be like saying that because the IRS sometimes pays tax refunds before conducting audits, it does not care whether tax returns are accurate." *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 102 (D.D.C. 2017). "Whether the government chooses to pay before it audits is an administrative matter." *Id.* The government relies on the applicant's candor in the first instance precisely because it will not closely examine the representations until later.

Moreover, the context of the language quoted by the district court makes clear that the FCC was not disclaiming reliance on short-form applications or contradicting its pre-auction statement that information in short form applications "*will be used* to determine" eligibility for bidding credits at the auction's outset. 29 F.C.C. Rcd. 8386 ¶ 64 (JA0165) (emphasis added). The Commission was explaining why SNR and Northstar "were not required to provide *copies* of the Agreements" they disclosed *in addition to* the "extensive summaries" already in their short-form applications. JA0856 ¶ 130 (emphasis added).

The district court may have thought the FCC would not have discerned the disqualifying nature of SNR and Northstar's secret agreements with DISH until it

53

"substantially reviewed" their applications.  But that ignores the fraudulent certification that all necessary agreements were disclosed, without which their applications would have been rejected.  *See* pp. 47-48, *supra*.  It also impermissibly draws inferences against Vermont National's well-pleaded allegations.  The amended complaint alleged that truthful and complete responses to the questions and certifications required on the short form would have rendered SNR and Northstar *facially* ineligible for bidding credits, either because the FCC would not have accepted their applications for filing *or* because SNR and Northstar would have been required to attribute DISH's revenues.  *See* pp. 46-47, *supra*.  "Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations."  *Cimino*, 3 F.4th at 423 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

2.    *SNR and Northstar's Omissions Were Material*

The court's alternative rationale—that the allegedly concealed agreements were immaterial because the FCC had all the information it needed to discern DISH's control over SNR and Northstar—similarly fails.  For one thing, it cannot be reconciled with what actually happened *before* auction.  The Commission accepted SNR and Northstar's applications for bidding credits because of the false certifications that all agreements were disclosed (without which the applications would have been rejected).  The Commission found SNR and Northstar eligible to

use bidding credits at auction even though, as Vermont National alleged, proper disclosure of all required agreements would have facially disqualified both.

For another, the district court cannot evade the complaint's allegations by changing the topic. This case is *not* about SNR and Northstar's efforts to conceal DISH's control or supposed "misinterpretation of the '*de facto* control' rules." JA0097-98 ¶128. It is about their cover-up of plans to bid in DISH's interests and transfer any spectrum they won. JA0097-98 ¶¶128-30. That the Commission possessed information it *later* relied on to deny bidding credits—*for entirely different reasons* relating to DISH's *de facto* control—has no bearing on the materiality of Vermont National's allegations. Before the fact, the undisclosed agreements and false certifications had the capacity to influence government action—and thus were material—even if other information had the capacity to convince the government to take similar action regardless.

The district court may have thought that disclosures relevant to DISH's *de facto* control necessarily revealed the unrelated secret agreements between SNR and Northstar on the one hand and DISH on the other. But that unsupported supposition contradicts Vermont National's well-pleaded allegations. The amended complaint alleged that SNR and Northstar actively concealed their true relationship and plan to transfer spectrum. JA0095-99 ¶¶124-31. It alleged that each entity represented in its short-form application that it had "entered into *no* arrangements for the spectrum

lease or resale (including wholesale agreements) of any capacity of any of its spectrum" and certified that they had "*no* attributable material relationship" with any entity. JA0084-85 ¶¶ 82-85; *see* JA0354; JA0567; JA0647 (emphasis added). While SNR and Northstar disclosed arrangements to coordinate bidding, the amended complaint alleged that they "sought to disguise" their separate agreements to advance *DISH's* interests rather than their own. JA0092 ¶ 114; JA0098 ¶ 129. The district court was required to credit those allegations, which are corroborated by Vermont National's expert and this Court. *See* JA0092-93 ¶¶ 116-17; *SNR Wireless*, 868 F.3d at 1042; pp. 14-15, *supra*.

Even if the FCC *had* been aware of those secret agreements when it decided to let SNR and Northstar make discounted payments, that *still* would not be a proper basis for dismissal. As *Cimino* makes clear, what matters is potential effect, not actual outcomes. In *Cimino*, the district court held that a fabricated audit that IBM submitted to the IRS was immaterial because the agency continued to perform under, and even extended, its contract with IBM after learning of the fraud. The district court reasoned that it was "implausible that the IRS sat on its hands upon learning that IBM had tricked it" and refused to credit allegations that supposedly would "require the court to ignore 'what actually occurred.'" *Cimino v. Int'l Bus. Machs. Corp.*, No. 13-CV-00907 (APM), 2019 WL 4750259, at *7 (D.D.C. Sept. 30, 2019).

This Court reversed.  It held that the "district court's dismissal boils down to a disbelief that the IRS would pay IBM millions of dollars after learning that it had been hoodwinked."  *Cimino*, 3 F.4th at 423.  "At a later stage in the litigation," the Court explained, evidence of the government's continued performance "might" suggest the fraud was *incapable* of affecting the IRS's conduct and was therefore immaterial.  *Id.*  But "the resolution of th[o]se questions is for another day."  *Id.* "The question" on a motion to dismiss is whether the relator "plausibly *pleaded* materiality" by alleging misrepresentations "*capable* of influencing" the government's decision.  *Id.*  Likewise here, the misrepresentations and omissions were capable of influencing government action even if one could argue that the government was not ultimately influenced.

## CONCLUSION

The judgment of the district court should be reversed.

November 15, 2021                    Respectfully submitted,

                                     /s/ Jeffrey A. Lamken

Bert W. Rein                         Jeffrey A. Lamken
Bennett L. Ross                        *Counsel of Record*
Stephen J. Obermeier                 MOLOLAMKEN LLP
WILEY REIN LLP                       The Watergate, Ste. 500
1776 K St., N.W.                     600 New Hampshire Ave., N.W.
Washington, D.C. 20006               Washington, D.C. 20037
(202) 719-7000                       (202) 556-2000
                                     jlamken@mololamken.com

57

Eugene A. Sokoloff
MOLOLAMKEN LLP
300 N. LaSalle St., Ste. 5350
Chicago, IL 60654
(312) 450-6700

Mark W. Kelley
MOLOLAMKEN LLP
430 Park Ave.
New York, NY 10022
(212) 607-8160

*Counsel for Vermont National Telephone Company*

# STATUTORY AND
# REGULATORY ADDENDUM

## <u>STATUTORY AND REGULATORY PROVISIONS</u>

31 U.S.C. § 3729 ................................................................ Add.-1

31 U.S.C. § 3730 ................................................................ Add.-3

47 U.S.C. § 503 ................................................................. Add.-4

47 C.F.R. § 1.80 (2014) ........................................................ Add.-6

47 C.F.R. § 1.1940 (2014) ...................................................... Add.-8

47 C.F.R. § 1.2104 (2014) ..................................................... Add.-11

47 C.F.R. § 1.2105 (2014) ..................................................... Add.-13

47 C.F.R. § 1.2107 (2014) ..................................................... Add.-16

47 C.F.R. § 1.2109 (2014) ..................................................... Add.-17

47 C.F.R. § 1.2110 (2014) ..................................................... Add.-19

47 C.F.R. § 1.2111 (2014) ..................................................... Add.-22

47 C.F.R. § 1.2112 (2014) ..................................................... Add.-23

**31 U.S.C. § 3729.  False claims.**

(a) Liability for Certain Acts.—

(1) In general.—Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

* * *

Add.-1

(b)Definitions.—For purposes of this section—

* * *

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

**31 U.S.C. §3729.  Civil actions for false claims.**

\* \* \*

(e) Certain Actions Barred.—

\* \* \*

(3) In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

**47 U.S.C. § 503.  Forfeitures.**

\* \* \*

(b) Activities constituting violations authorizing imposition of forfeiture penalty; amount of penalty; procedures applicable; persons subject to penalty; liability exemption period

(1) Any person who is determined by the Commission, in accordance with paragraph (3) or (4) of this subsection, to have—

(A) willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission;

(B) willfully or repeatedly failed to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter or under any treaty, convention, or other agreement to which the United States is a party and which is binding upon the United States;

(C) violated any provision of section 317(c) or 509(a) of this title; or

(D) violated any provision of section 1304, 1343, 1464, or 2252 of title 18;

shall be liable to the United States for a forfeiture penalty. A forfeiture penalty under this subsection shall be in addition to any other penalty provided for by this chapter; except that this subsection shall not apply to any conduct which is subject to forfeiture under subchapter II, part II or III of subchapter III, or section 507 of this title.

\* \* \*

(3)    (A) At the discretion of the Commission, a forfeiture penalty may be determined against a person under this subsection after notice and an opportunity for a hearing before the Commission or an administrative law judge thereof in accordance with section 554 of title 5. Any person against whom a forfeiture penalty is determined under this paragraph may obtain review thereof pursuant to section 402(a) of this title.

(B) If any person fails to pay an assessment of a forfeiture penalty determined under subparagraph (A) of this paragraph, after it has become a final and unappealable order or after the appropriate court has entered final judgment in favor of the Commission, the Commission shall refer the matter to the Attorney General of the United States, who shall recover the amount assessed in any appropriate district court of the United States. In such action, the validity and appropriateness of the final order imposing the forfeiture penalty shall not be subject to review.

(4) Except as provided in paragraph (3) of this subsection, no forfeiture penalty shall be imposed under this subsection against any person unless and until—

(A) the Commission issues a notice of apparent liability, in writing, with respect to such person;

(B) such notice has been received by such person, or until the Commission has sent such notice to the last known address of such person, by registered or certified mail; and

(C) such person is granted an opportunity to show, in writing, within such reasonable period of time as the Commission prescribes by rule or regulation, why no such forfeiture penalty should be imposed.

Such a notice shall (i) identify each specific provision, term, and condition of any Act, rule, regulation, order, treaty, convention, or other agreement, license, permit, certificate, instrument, or authorization which such person apparently violated or with which such person apparently failed to comply; (ii) set forth the nature of the act or omission charged against such person and the facts upon which such charge is based; and (iii) state the date on which such conduct occurred. Any forfeiture penalty determined under this paragraph shall be recoverable pursuant to section 504(a) of this title.

**47 C.F.R. §1.80.  Forfeiture proceedings.**

* * *

(e) Alternative procedures. In the discretion of the Commission, a forfeiture proceeding may be initiated either:

> (1) By issuing a notice of apparent liability, in accordance with paragraph (f) of this section, or
>
> (2) a notice of opportunity for hearing, in accordance with paragraph (g).

(f) Notice of apparent liability. Before imposing a forfeiture penalty under the provisions of this paragraph, the Commission or its designee will issue a written notice of apparent liability.

> (1) Content of notice. The notice of apparent liability will:
>
> > (i) Identify each specific provision, term, or condition of any act, rule, regulation, order, treaty, convention, or other agreement, license, permit, certificate, or instrument of authorization which the respondent has apparently violated or with which he has failed to comply,
> >
> > (ii) Set forth the nature of the act or omission charged against the respondent and the facts upon which such charge is based, (iii) State the date(s) on which such conduct occurred, and (iv) Specify the amount of the apparent forfeiture penalty.
>
> (2) Delivery. The notice of apparent liability will be sent to the respondent, by certified mail, at his last known address (see §1.5).
>
> (3) Response. The respondent will be afforded a reasonable period of time (usually 30 days from the date of the notice) to show, in writing, why a forfeiture penalty should not be imposed or should be reduced, or to pay the forfeiture. Any showing as to why the forfeiture should not be imposed or should be reduced shall include a detailed factual statement and such documentation and affidavits as may be pertinent.

* * *

(g) Notice of opportunity for hearing. The procedures set out in this paragraph will ordinarily be followed only when a hearing is being held for some reason other than the assessment of a forfeiture (such as, to determine whether a renewal application should be granted) and a forfeiture is to be considered as an alternative or in addition to any other Commission action. However, these procedures may be followed whenever the Commission, in its discretion, determines that they will better serve the ends of justice.

(1) Before imposing a forfeiture penalty under the provisions of this paragraph, the Commission will issue a notice of opportunity for hearing. The hearing will be a full evidentiary hearing before an administrative law judge, conducted under procedures set out in subpart B of this part, including procedures for appeal and review of initial decisions. A final Commission order assessing a forfeiture under the provisions of this paragraph is subject to judicial review under section 402(a) of the Communications Act.

(2) If, after a forfeiture penalty is imposed and not appealed or after a court enters final judgment in favor of the Commission, the forfeiture is not paid, the Commission will refer the matter to the Department of Justice for collection. In an action to recover the forfeiture, the validity and appropriateness of the order imposing the forfeiture are not subject to review.

(3) Where the possible assessment of a forfeiture is an issue in a hearing case to determine which pending application should be granted, and the applicant facing a potential forfeiture is dismissed pursuant to a settlement agreement or otherwise, and the presiding judge has not made a determination on the forfeiture issue, the order of dismissal shall be forwarded to the attention of the full Commission. Within the time provided by §1.117, the Commission may, on its own motion, proceed with a determination of whether a forfeiture against the dismissing applicant is warranted. If the Commission so proceeds, it will provide the applicant with a reasonable opportunity to respond to the forfeiture issue (see paragraph (f)(3) of this section) and make a determination under the procedures outlined in paragraph (f) of this section.

**47 C.F.R. § 1.1940.  Assessment.**

(a) Except as provided in paragraphs (g), (h), and (i) of this section or § 1.1941, the Commission shall charge interest, penalties, and administrative costs on debts owed to the United States pursuant to 31 U.S.C. 3717. The Commission will mail, hand-deliver, or use other forms of transmission, including facsimile telecopier service, a written notice to the debtor, at the debtor's CORES contact address (see section 1.8002(b)) explaining the Commission's requirements concerning these charges except where these requirements are included in a contractual or repayment agreement, or otherwise provided in the Commission's rules, as may be amended from time to time. These charges shall continue to accrue until the debt is paid in full or otherwise resolved through compromise, termination, or waiver of the charges. This provision is not intended to modify or limit the terms of any contract, note, or security agreement from the debtor, or to modify or limit the Commission's rights under its rules with regard to the notice or the parties' agreement to waive notice.

(b) The Commission shall charge interest on debts owed the United States as follows:

    (1) Interest shall accrue from the date of delinquency, or as otherwise provided by the terms of any contract, note, or security agreement, regulation, or law.

    (2) Unless otherwise established in a contract, note, or security agreement, repayment agreement, or by statute, the rate of interest charged shall be the rate established annually by the Treasury in accordance with 31 U.S.C. 3717. Pursuant to 31 U.S.C. 3717, an agency may charge a higher rate of interest if it reasonably determines that a higher rate is necessary to protect the rights of the United States. The agency should document the reason(s) for its determination that the higher rate is necessary.

    (3) The rate of interest, as initially charged, shall remain fixed for the duration of the indebtedness. When a debtor defaults on a repayment agreement and seeks to enter into a new agreement, the agency may require payment of interest at a new rate that reflects the current value of funds to the Treasury at the time the new agreement is executed. Interest shall not be compounded, that is, interest shall not be charged on interest, penalties, or administrative costs required by this section. If, however, a debtor defaults on a previous

repayment agreement, charges that accrued but were not collected under the defaulted agreement shall be added to the principal under the new repayment agreement.

(c) The Commission shall assess administrative costs incurred for processing and handling delinquent debts. The calculation of administrative costs may be based on actual costs incurred or upon estimated costs as determined by the Commission. Commission administrative costs include the personnel and service costs (e.g., telephone, copier, and overhead) to notify and collect the debt, without regard to the success of such efforts by the Commission.

(d) Unless otherwise established in a contract, repayment agreement, or by statute, the Commission will charge a penalty, pursuant to 31 U.S.C. 3717(e)(2), currently not to exceed six percent (6%) a year on the amount due on a debt that is delinquent for more than 90 days. This charge shall accrue from the date of delinquency. If the rate permitted under 31 U.S.C. 3717 is changed, the Commission will apply that rate.

(e) The Commission may increase an administrative debt by the cost of living adjustment in lieu of charging interest and penalties under this section. Administrative debt includes, but is not limited to, a debt based on fines, penalties, and overpayments, but does not include a debt based on the extension of Government credit, such as those arising from loans and loan guaranties. The cost of living adjustment is the percentage by which the Consumer Price Index for the month of June of the calendar year preceding the adjustment exceeds the Consumer Price Index for the month of June of the calendar year in which the debt was determined or last adjusted. Increases to administrative debts shall be computed annually. Agencies should use this alternative only when there is a legitimate reason to do so, such as when calculating interest and penalties on a debt would be extremely difficult because of the age of the debt.

(f) When a debt is paid in partial or installment payments, amounts received by the agency shall be applied first to outstanding penalties and administrative cost charges, second to accrued interest, and third to the outstanding principal.

(g) The Commission will waive the collection of interest and administrative charges imposed pursuant to this section on the portion of the debt that is paid within 30 days after the date on which interest began to accrue. The Commission will not extend this 30-day period except for good cause shown of extraordinary and compelling

Add.-9

circumstances, completely documented and supported in writing, submitted and received before the expiration of the first 30-day period. The Commission may, on good cause shown of extraordinary and compelling circumstances, completely documented and supported in writing, waive interest, penalties, and administrative costs charged under this section, in whole or in part, without regard to the amount of the debt, either under the criteria set forth in these standards for the compromise of debts, or if the agency determines that collection of these charges is against equity and good conscience or is not in the best interest of the United States.

(h) The Commission retains the common law right to impose interest and related charges on debts not subject to 31 U.S.C. 3717.

**47 C.F.R. § 1.2104.  Competitive bidding mechanisms.**

\* \* \*

(g) Withdrawal, Default and Disqualification Payment. As specified below, when the Commission conducts an auction pursuant to §1.2103, the Commission will impose payments on bidders who withdraw high bids during the course of an auction, or who default on payments due after an auction closes or who are disqualified.

\* \* \*

(2) Default or disqualification after close of auction. A bidder assumes a binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of an auction. If a bidder defaults or is disqualified after the close of such an auction, the defaulting bidder will be subject to a default payment consisting of a deficiency payment, described in §1.2104(g)(2)(i), and an additional payment, described in §1.2104(g)(2)(ii) and (g)(2)(iii). The default payment will be deducted from any upfront payments or down payments that the defaulting bidder has deposited with the Commission.

(i) Deficiency payment. The deficiency payment will equal the difference between the amount of the defaulted bid and the amount of the winning bid in a subsequent auction, so long as there have been no intervening withdrawn bids that equal or exceed the defaulted bid or the subsequent winning bid. If the subsequent winning bid or any intervening subsequent withdrawn bid equals or exceeds the defaulted bid, no deficiency payment will be assessed. If there have been intervening subsequent withdrawn bids that are lower than the defaulted bid and higher than the subsequent winning bid, but no intervening withdrawn bids that equal or exceed the defaulted bid, the deficiency payment will equal the difference between the amount of the defaulted bid and the amount of the highest intervening subsequent withdrawn bid. In the event that a bidding credit applies to any of the applicable bids, the deficiency payment will be based solely on net bids or solely on gross bids, whichever results in a lower payment.

(ii) Additional payment—applicable percentage. When the default or disqualification follows an auction without combinatorial bidding, the

additional payment will equal between 3 and 20 percent of the applicable bid, according to a percentage (or percentages) established by the Commission in advance of the auction. When the default or disqualification follows an auction with combinatorial bidding, the additional payment will equal 25 percent of the applicable bid.

(iii) Additional payment—applicable bid. When no deficiency payment is assessed, the applicable bid will be the net amount of the defaulted bid. When a deficiency payment is assessed, the applicable bid will be the subsequent winning bid, using the same basis—i.e., net or gross— as was used in calculating the deficiency payment.

**47 C.F.R. §1.2105.   Bidding application and certification procedures; prohibition of certain communications.**

(a) Submission of Short-Form Application (FCC Form 175). In order to be eligible to bid, an applicant must timely submit a short-form application (FCC Form 175), together with any appropriate upfront payment set forth by Public Notice. Beginning January 1, 1999, all short-form applications must be filed electronically.

(1) All short-form applications will be due:

(i) On the date(s) specified by public notice; or

(ii) In the case of application filing dates which occur automatically by operation of law (see, e.g., 47 CFR 22.902), on a date specified by public notice after the Commission has reviewed the applications that have been filed on those dates and determined that mutual exclusivity exists.

(2) The short-form application must contain the following information:

(i) Identification of each license on which the applicant wishes to bid;

(ii)      (A) The applicant's name, if the applicant is an individual. If the applicant is a corporation, then the shortform application will require the name and address of the corporate office and the name and title of an officer or director. If the applicant is a partnership, then the application will require the name, citizenship and address of all general partners, and, if a partner is not a natural person, then the name and title of a responsible person should be included as well. If the applicant is a trust, then the name and address of the trustee will be required. If the applicant is none of the above, then it must identify and describe itself and its principals or other responsible persons; and

(B) Applicant ownership and other information, as set forth in §1.2112.

(iii) The identity of the person(s) authorized to make or withdraw a bid;

(iv) If the applicant applies as a designated entity pursuant to §1.2110, a statement to that effect and a declaration, under penalty of perjury, that the applicant is qualified as a designated entity under §1.2110.

(v) Certification that the applicant is legally, technically, financially and otherwise qualified pursuant to section 308(b) of the Communications Act of 1934, as amended. The Commission will accept applications certifying that a request for waiver or other relief from the requirements of section 310 is pending;

(vi) Certification that the applicant is in compliance with the foreign ownership provisions of section 310 of the Communications Act of 1934, as amended;

(vii) Certification that the applicant is and will, during the pendency of its application(s), remain in compliance with any service-specific qualifications applicable to the licenses on which the applicant intends to bid including, but not limited to, financial qualifications. The Commission may require certification in certain services that the applicant will, following grant of a license, come into compliance with certain service-specific rules, including, but not limited to, ownership eligibility limitations;

(viii) An exhibit, certified as truthful under penalty of perjury, identifying all parties with whom the applicant has entered into partnerships, joint ventures, consortia or other agreements, arrangements or understandings of any kind relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure.

(ix) Certification under penalty of perjury that it has not entered and will not enter into any explicit or implicit agreements, arrangements or understandings of any kind with any parties other than those identified pursuant to paragraph (a)(2)(viii) regarding the amount of their bids, bidding strategies or the particular licenses on which they will or will not bid.

(x) Certification that the applicant is not in default on any Commission licenses and that it is not delinquent on any non-tax debt owed to any Federal agency.

(xi) An attached statement made under penalty of perjury indicating whether or not the applicant has ever been in default on any Commission license or has ever been delinquent on any non-tax debt owed to any Federal agency. NOTE TO PARAGRAPH (a): The Commission may also request applicants to submit additional information for informational purposes to aid in its preparation of required reports to Congress. (xii) For auctions required to be conducted under Title VI of the Middle Class Tax Relief and Job Creation Act of 2012 (Pub. L. 112–96), certification under penalty of perjury that the applicant and all of the person(s) disclosed under paragraph (a)(2)(ii) of this section are not person(s) who have been, for reasons of national security, barred by any agency of the Federal Government from bidding on a contract, participating in an auction, or receiving a grant. For the purposes of this certification, the term ''person'' means an individual, partnership, association, joint-stock company, trust, or corporation, and the term ''reasons of national security'' means matters relating to the national defense and foreign relations of the United States.

(b) Modification and Dismissal of Short Form Application (FCC Form 175).

(1) Any short-form application (FCC Form 175) that does not contain all of the certifications required pursuant to this section is unacceptable for filing and cannot be corrected subsequent to the applicable filing deadline. The application will be dismissed with prejudice and the upfront payment, if paid, will be returned.

**47 C.F.R. §1.2107.  Submission of down payment and filing of long-form applications.**

(a) After bidding has ended, the Commission will identify and notify the high bidder and declare the bidding closed.

(b) Unless otherwise specified by public notice, within ten (10) business days after being notified that it is a high bidder on a particular license(s), a high bidder must submit to the Commission's lockbox bank such additional funds (the ''down payment'') as are necessary to bring its total deposits (not including upfront payments applied to satisfy bid withdrawal or default payments) up to twenty (20) percent of its high bid(s). (In single round sealed bid auctions conducted under §1.2103, however, bidders may be required to submit their down payments with their bids.) Unless otherwise specified by public notice, this down payment must be made by wire transfer in U.S. dollars from a financial institution whose deposits are insured by the Federal Deposit Insurance Corporation and must be made payable to the Federal Communications Commission. Down payments will be held by the Commission until the high bidder has been awarded the license and has paid the remaining balance due on the license or authorization, in which case it will not be returned, or until the winning bidder is found unqualified to be a licensee or has defaulted, in which case it will be returned, less applicable payments. No interest on any down payment will be paid to the bidders.

(c) A high bidder that meets its down payment obligations in a timely manner must, within ten (10) business days after being notified that it is a high bidder, submit an additional application (the ''long-form application'') pursuant to the rules governing the service in which the applicant is the high bidder. Except as otherwise provided in §1.1104, high bidders need not submit an additional application filing fee with their long-form applications. Specific procedures for filing applications will be set out by Public Notice. Ownership disclosure requirements are set forth in §1.2112. Beginning January 1, 1999, all long-form applications must be filed electronically. An applicant that fails to submit the required long-form application under this paragraph and fails to establish good cause for any late-filed submission, shall be deemed to have defaulted and will be subject to the payments set forth in §1.2104.

**47 C.F.R. §1.2109.  License grant, denial, default, and disqualification.**

(a) Unless otherwise specified by public notice, auction winners are required to pay the balance of their winning bids in a lump sum within ten (10) business days following the release of a public notice establishing the payment deadline. If a winning bidder fails to pay the balance of its winning bids in a lump sum by the applicable deadline as specified by the Commission, it will be allowed to make payment within ten (10) business days after the payment deadline, provided that it also pays a late fee equal to five percent of the amount due. When a winning bidder fails to pay the balance of its winning bid by the late payment deadline, it is considered to be in default on its license(s) and subject to the applicable default payments. Licenses will be awarded upon the full and timely payment of winning bids and any applicable late fees.

(b) If a winning bidder withdraws its bid after the Commission has declared competitive bidding closed or fails to remit the required down payment within ten (10) business days after the Commission has declared competitive bidding closed, the bidder will be deemed to have defaulted, its application will be dismissed, and it will be liable for the default payment specified in §§1.2104(g)(2) or 1.2104(g)(3), whichever is applicable. In such event, the Commission, at its discretion, may either re-auction the license(s) to existing or new applicants or offer it to the other highest bidders (in descending order) at their final bids. If the license(s) is offered to the other highest bidders (in descending order), the down payment obligations set forth in §1.2107(b) will apply. However, in combinatorial bidding auctions, the Commission will only re-auction the license(s) to existing or new applicants. The Commission will not offer the package or licenses to the next highest bidder.

(c) A winning bidder who is found unqualified to be a licensee, fails to remit the balance of its winning bid in a timely manner, or defaults or is disqualified for any reason after having made the required down payment, will be deemed to have defaulted, its application will be dismissed, and it will be liable for the payment set forth in §§1.2104(g)(2) or 1.2104(g)(3), whichever is applicable. In such event, the Commission may either re-auction the license(s) to existing or new applicants or offer it to the other highest bidders (in descending order) at their final bids. However, in combinatorial bidding auctions, the Commission will only re-auction the license(s) to existing or new applicants. The Commission will not offer the package or licenses to the next highest bidder.

(d) Bidders who are found to have violated the antitrust laws or the Commission's rules in connection with their participation in the competitive bidding process may be subject, in addition to any other applicable sanctions, to forfeiture of their upfront payment, down payment or full bid amount, and may be prohibited from participating in future auctions.

**47 C.F.R. §1.2110.  Designated entities.**

(a) Designated entities are small businesses, businesses owned by members of minority groups and/or women, and rural telephone companies.

(b) Eligibility for small business and entrepreneur provisions—

(1) Size attribution.

(i) The gross revenues of the applicant (or licensee), its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship shall be attributed to the applicant (or licensee) and considered on a cumulative basis and aggregated for purposes of determining whether the applicant (or licensee) is eligible for status as a small business, very small business, or entrepreneur, as those terms are defined in the service-specific rules. An applicant seeking status as a small business, very small business, or entrepreneur, as those terms are defined in the service-specific rules, must disclose on its short and long-form applications, separately and in the aggregate, the gross revenues for each of the previous three years of the applicant (or licensee), its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship.

(ii) If applicable, pursuant to §24.709 of this chapter, the total assets of the applicant (or licensee), its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship shall be attributed to the applicant (or licensee) and considered on a cumulative basis and aggregated for purposes of determining whether the applicant (or licensee) is eligible for status as an entrepreneur. An applicant seeking status as an entrepreneur must disclose on its short and long-form applications, separately and in the aggregate, the gross revenues for each of the previous two years of the applicant (or licensee), its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship.

(2) Aggregation of affiliate interests. Persons or entities that hold interests in an applicant (or licensee) that are affiliates of each other or have an identity of interests identified in §1.2110(c)(5)(iii) will be treated as though they were one person or entity and their ownership interests aggregated for purposes of determining an applicant's (or licensee's) compliance with the requirements of this section.

Example 1 to paragraph (b)(2): ABC Corp. is owned by individuals, A, B and C, each having an equal one-third voting interest in ABC Corp. A and B together, with two-thirds of the stock have the power to control ABC Corp. and have an identity of interest. If A&B invest in DE Corp., a broadband PCS applicant for block C, A and B's separate interests in DE Corp. must be aggregated because A and B are to be treated as one person or entity.

Example 2 to paragraph (b)(2): ABC Corp. has subsidiary BC Corp., of which it holds a controlling 51 percent of the stock. If ABC Corp. and BC Corp., both invest in DE Corp., their separate interests in DE Corp. must be aggregated because ABC Corp. and BC Corp. are affiliates of each other.

* * *

(3) Exceptions—

(iv) Applicants or licensees with material relationships—

(A) Attributable material relationships. An applicant or licensee must attribute the gross revenues (and, if applicable, the total assets) of any entity, (including the controlling interests, affiliates, and affiliates of the controlling interests of that entity) with which the applicant or licensee has an attributable material relationship. An applicant or licensee has an attributable material relationship when it has one or more arrangements with any individual entity for the lease or resale (including under a wholesale agreement) of, on a cumulative basis, more than 25 percent of the spectrum capacity of any one of the applicant's or licensee's licenses.

* * *

(j) Designated entities must describe on their long-form applications how they satisfy the requirements for eligibility for designated entity status, and must list and summarize on their long form applications all agreements that affect designated entity status such as partnership agreements, shareholder agreements, management agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, and all other agreements including oral agreements, establishing as applicable, de facto or de jure control of the entity or the presence or absence of attributable material relationships. Designated entities also must provide the date(s) on which they entered into of the agreements listed. In addition, designated entities must file with their long-form applications a copy of each such agreement. In order to enable the Commission to audit designated entity eligibility on an ongoing basis, designated entities that are awarded eligibility must, for the term of the license, maintain at their facilities or with their designated agents the lists, summaries, dates and copies of agreements required to be identified and provided to the Commission pursuant to this paragraph and to §1.2114.

**47 C.F.R. §1.2111.  Assignment or transfer of control: unjust enrichment.**

(a) Reporting requirement. An applicant seeking approval for a transfer of control or assignment (otherwise permitted under the Commission's rules) of a license within three years of receiving a new license through a competitive bidding procedure must, together with its application for transfer of control or assignment, file with the Commission a statement indicating that its license was obtained through competitive bidding. Such applicant must also file with the Commission the associated contracts for sale, option agreements, management agreements, or other documents disclosing the local consideration that the applicant would receive in return for the transfer or assignment of its license (see §1.948). This information should include not only a monetary purchase price, but also any future, contingent, in-kind, or other consideration (e.g., management or consulting contracts either with or without an option to purchase; below market financing).

(b) Unjust enrichment payment: set aside. As specified in this paragraph an applicant seeking approval for a transfer of control or assignment (otherwise permitted under the Commission's rules) of, or for entry into a material relationship (see §§1.2110, 1.2114) (otherwise permitted under the Commission's rules) involving, a license acquired by the applicant pursuant to a set-aside for eligible designated entities under §1.2110(c), or which proposes to take any other action relating to ownership or control that will result in loss of eligibility as a designated entity, must seek Commission approval and may be required to make an unjust enrichment payment (Payment) to the Commission by cashier's check or wire transfer before consent will be granted. The Payment will be based upon a schedule that will take account of the term of the license, any applicable construction benchmarks, and the estimated value of the set-aside benefit, which will be calculated as the difference between the amount paid by the designated entity for the license and the value of comparable non-set-aside license in the free market at the time of the auction. The Commission will establish the amount of the Payment and the burden will be on the applicants to disprove this amount. No Payment will be required if:

> (1) The license is transferred or assigned more than five years after its initial issuance, unless otherwise specified; or

> (2) The proposed transferee or assignee is an eligible designated entity under §1.2110(c) or the service-specific competitive bidding rules of the particular service, and so certifies.

**47 C.F.R. §1.2112.  Ownership disclosure requirements for applications.**

(a) Each application to participate in competitive bidding (i.e., short-form application (see 47 CFR 1.2105)), or for a license, authorization, assignment, or transfer of control shall fully disclose the following:

(1) List the real party or parties in interest in the applicant or application, including a complete disclosure of the identity and relationship of those persons or entities directly or indirectly owning or controlling (or both) the applicant;

(2) List the name, address, and citizenship of any party holding 10 percent or more of stock in the applicant, whether voting or nonvoting, common or preferred, including the specific amount of the interest or percentage held;

(3) List, in the case of a limited partnership, the name, address and citizenship of each limited partner whose interest in the applicant is 10 percent or greater (as calculated according to the percentage of equity paid in or the percentage of distribution of profits and losses);

(4) List, in the case of a general partnership, the name, address and citizenship of each partner, and the share or interest participation in the partnership;

(5) List, in the case of a limited liability company, the name, address, and citizenship of each of its members whose interest in the applicant is 10 percent or greater;

(6) List all parties holding indirect ownership interests in the applicant as determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain, that equals 10 percent or more of the applicant, except that if the ownership percentage for an interest in any link in the chain exceeds 50 percent or represents actual control, it shall be treated and reported as if it were a 100 percent interest; and

(7) List any FCC-regulated entity or applicant for an FCC license, in which the applicant or any of the parties identified in paragraphs (a)(1) through (a)(5) of this section, owns 10 percent or more of stock, whether voting or nonvoting, common or preferred. This list must include a description of each such entity's principal business and a description of each such entity's relationship to the

applicant (e.g., Company A owns 10 percent of Company B (the applicant) and 10 percent of Company C, then Companies A and C must be listed on Company B's application, where C is an FCC licensee and/or license applicant).

(b) Designated entity status. In addition to the information required under paragraph (a) of this section, each applicant claiming eligibility for small business provisions shall disclose the following:

(1) On its application to participate in competitive bidding (i.e., short-form application (see 47 CFR 1.2105)):

(i) List the names, addresses, and citizenship of all officers, directors, affiliates, and other controlling interests of the applicant, as described in §1.2110, and, if a consortium of small businesses or consortium of very small businesses, the members of the conglomerate organization;

(ii) List any FCC-regulated entity or applicant for an FCC license, in which any controlling interest of the applicant owns a 10 percent or greater interest or a total of 10 percent or more of any class of stock, warrants, options or debt securities. This list must include a description of each such entity's principal business and a description of each such entity's relationship to the applicant; and

(iii) List and summarize all agreements or instruments (with appropriate references to specific provisions in the text of such agreements and instruments) that support the applicant's eligibility as a small business under the applicable designated entity provisions, including the establishment of de facto or de jure control or the presence or absence of attributable material relationships. Such agreements and instruments include articles of incorporation and by-laws, partnership agreements, shareholder agreements, voting or other trust agreements, management agreements, franchise agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, and any other relevant agreements (including letters of intent), oral or written;

(iv) List separately and in the aggregate the gross revenues, computed in accordance with §1.2110, for each of the following: The applicant,

its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship; and if a consortium of small businesses, the members comprising the consortium.

(2) As an exhibit to its application for a license, authorization, assignment, or transfer of control:

(i) List the names, addresses, and citizenship of all officers, directors, and other controlling interests of the applicant, as described in §1.2110;

(ii) List any FCC-regulated entity or applicant for an FCC license, in which any controlling interest of the applicant owns a 10 percent or greater interest or a total of 10 percent or more of any class of stock, warrants, options or debt securities. This list must include a description of each such entity's principal business and a description of each such entity's relationship to the applicant;

(iii) List and summarize all agreements or instruments (with appropriate references to specific provisions in the text of such agreements and instruments) that support the applicant's eligibility as a small business under the applicable designated entity provisions, including the establishment of de facto or de jure control or the presence or absence of attributable material relationships. Such agreements and instruments include articles of incorporation and by-laws, partnership agreements, shareholder agreements, voting or other trust agreements, management agreements, franchise agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, and any other relevant agreements (including letters of intent), oral or written;

(iv) List and summarize any investor protection agreements, including rights of first refusal, supermajority clauses, options, veto rights, and rights to hire and fire employees and to appoint members to boards of directors or management committees;

(v) List separately and in the aggregate the gross revenues, computed in accordance with §1.2110, for each of the following: the applicant, its affiliates, its controlling interests, affiliates of its controlling interests,

and parties with which it has attributable material relationships; and if a consortium of small businesses, the members comprising the consortium; and

(vi) List and summarize, if seeking the exemption for rural telephone cooperatives pursuant to §1.2110, all documentation to establish eligibility pursuant to the factors listed under §1.2110(b)(3)(iii)(A).

(vii) List and summarize any agreements in which the applicant has entered into arrangements for the lease or resale (including wholesale agreements) of any of the spectrum capacity of the license that is the subject of the application.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,977 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.


/s/ Jeffrey A. Lamken
Jeffrey A. Lamken

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2021, I caused this document to be electronically filed with the Clerk of Court by using the electronic filing system, which will send a notice of electronic filing to all parties who have registered with the electronic filing system.

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken