ORAL ARGUMENT SCHEDULED FOR MARCH 3, 2022

## No. 21-7039

# In the United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA, EX REL. VERMONT NATIONAL TELEPHONE COMPANY,

*Plaintiff-Appellant,*

v.

NORTHSTAR SPECTRUM LLC, ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Columbia
Case No. 1:15-cv-00728-CKK (Hon. Colleen Kollar-Kotelly, J.)

_____

### REPLY BRIEF FOR PLAINTIFF-APPELLANT
_____

Bert W. Rein
Bennett L. Ross
Stephen J. Obermeier
WILEY REIN LLP
1776 K St., N.W.
Washington, D.C.  20006
(202) 719-7000

Jeffrey A. Lamken
  *Counsel of Record*
MOLOLAMKEN LLP
The Watergate, Ste. 500
600 New Hampshire Ave., N.W.
Washington, D.C.  20037
(202) 556-2000
jlamken@mololamken.com

Eugene A. Sokoloff
MOLOLAMKEN LLP
300 N. LaSalle St., Ste. 5350
Chicago, IL  60654
(312) 450-6700

Mark W. Kelley
MOLOLAMKEN LLP
430 Park Ave.
New York, N.Y.  10022
(212) 607-8160

*Counsel for Vermont National Telephone Company*

# **TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ..............................................................................................4

I.    The Government-Action Bar Does Not Apply Here .......................................4

      A.    The FCC Could Not Levy "Civil Money Penalties" in the
            Licensing Proceeding ........................................................................5

      B.    The FCC Did Not Levy "Civil Money Penalties" in the
            Licensing Proceeding ........................................................................9

            1.    Default Payments Are Not "Civil Money Penalties" ..............10

            2.    The "Same Allegations or Transactions" Requirement Is
                  Not Met ......................................................................11

      C.    This Action Can Provide a "Useful Return" to the Government ........13

II.   Vermont National Amply Pled Materiality ..................................................15

      A.    Defendants—Like the Decision Below—Misconstrue the Legal
            Standard ........................................................................................15

      B.    Defendants' False Statements and Certifications Were Material
            Under Any Standard ........................................................................18

III.  The Complaint Adequately Pleads Defendants' Fraud ................................22

      A.    Vermont National Pled Facts Supporting the Conclusion that
            SNR and Northstar Had Undisclosed Agreements with DISH ..........23

      B.    Defendants' Alternative Explanations Are Unavailing ....................25

      C.    Vermont National Satisfied Rule 9(b) ..............................................27

CONCLUSION ..........................................................................................29

i

# TABLE OF AUTHORITIES[*]

Page(s)

## CASES

*U.S. ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced Sys. Int'l*,
   600 F. App'x 969 (6th Cir. 2015) .......................................................16

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................26

*Butler v. McKellar*,
   494 U.S. 407 (1990).......................................................................21

*\*U.S. ex rel. Cimino v. Int'l Bus. Machs. Corp.*,
   3 F.4th 412 (D.C. Cir. 2021).......................................16, 19, 22, 23, 28

*FCC v. AT&T Inc.*,
   562 U.S. 397 (2011).......................................................................10

*Goldring v. District of Columbia*,
   416 F.3d 70 (D.C. Cir. 2005) ..........................................................11

*U.S. ex rel. Heath v. AT&T, Inc.*,
   791 F.3d 112 (D.C. Cir. 2015)............................................16, 27, 28

*U.S. ex rel. Longhi v. United States*,
   575 F.3d 458 (5th Cir. 2009) ...........................................................16

*U.S. ex rel. McBride v. Halliburton Co.*,
   848 F.3d 1027 (D.C. Cir. 2017).......................................................16

*U.S. ex rel. Nathan v. Takeda Pharms. N.A., Inc.*,
   707 F.3d 451 (4th Cir. 2013) ...........................................................26

*In re NextWave Pers. Commc'ns, Inc.*,
   200 F.3d 43 (2d Cir. 1999) ..............................................................19

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Peter v. Nantkwest, Inc.*,
  140 S.Ct. 365 (2019) ........................................................................6

*U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Me.*,
  24 F.3d 320 (1st Cir. 1994) ...........................................................14

*\*SNR Wireless LicenseCo, LLC v. FCC*,
  868 F.3d 1021 (D.C. Cir. 2017) ...................................3, 21, 25, 26

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) .........................................................27

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) ....................................................13, 14

*Strike 3 Holdings, LLC v. Doe*,
  964 F.3d 1203 (D.C. Cir. 2020) ................................................24, 25

*Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United
  Auto., Aerospace, Agric. Implement Workers of Am., Int'l Union*,
  523 U.S. 653 (1998) ......................................................................8, 9

*U.S. ex rel. Totten v. Bombardier Corp.*,
  286 F.3d 542 (D.C. Cir. 2002) .......................................................29

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016) ........................................................16, 17, 22

*W. Va. Univ. Hosps., Inc. v. Casey*,
  499 U.S. 83 (1991) ...........................................................................6

*Wash. All. of Tech. Workers v. Dep't of Homeland Sec.*,
  892 F.3d 332 (D.C. Cir. 2018) ...................................................12, 23

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
  389 F.3d 1251 (D.C. Cir. 2004) .....................................................29

### STATUTES

The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

  31 U.S.C. § 3729(b)(4) .................................................................17

*31 U.S.C. § 3730(e)(3) ................................................................1, 4, 5, 7, 10, 11

The Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.*

47 U.S.C. § 503 ................................................................................................5, 6

47 U.S.C. § 503(b)(3) ..........................................................................................5

47 U.S.C. § 503(b)(4) ..........................................................................................5

## Regulations

47 C.F.R. § 0.111(a) .............................................................................................7

47 C.F.R. § 1.80 ....................................................................................................6

47 C.F.R. § 1.80(a) ...............................................................................................5

47 C.F.R. § 1.80(g) ...............................................................................................8

47 C.F.R. § 1.2104(g)(2) .....................................................................................19

47 C.F.R. § 1.2105(a)(2)(ix) ...............................................................................15

47 C.F.R. § 1.2109(a) ......................................................................................3, 20

## Rules

Fed R. Civ. P. 9(b) .............................................................................................28

## Administrative Materials

*In re Capitol Broad. Co. Inc.*,
   19 F.C.C. Rcd. 20854 (2004) ...........................................................................7

*In re Cascade Access LLC*,
   DA 09-207 (Feb. 10, 2009) ...............................................................................7

*In re ClearSKY Sys., Inc.*,
   DA 21-89 (Feb. 25, 2021) ..................................................................................6

*FCC Public Notice DA 07-30*, *Auction of Broadband PCS Spectrum*
  *Scheduled for May 16, 2007*,
  22 F.C.C. Rcd. 433 (2007).....................................................................................6

## OTHER AUTHORITIES

Oral Argument, *Northstar Wireless, LLC v. FCC*,
  No. 18-1209 (D.C. Cir. Jan. 14, 2022) ...........................................................2, 13

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants' effort to rehabilitate the district court's decision defies basic principles of statutory construction in favor of creative reinterpretation. Defendants' scheme—to fraudulently obtain bidding credits reserved for small businesses—goes to the core of the False Claims Act's text and purpose. That scheme succeeded in allowing defendants to avoid paying $3.3 billion dollars they had promised to remit promptly at the close of auction.

Defendants cannot hide behind the False Claims Act's government-action bar, which is limited to suits "based upon allegations or transactions" that already "are the subject of . . . an administrative civil money penalty proceeding." 31 U.S.C. § 3730(e)(3). They identify no proceedings commenced to impose a "civil money penalty." They identify no civil money penalties the FCC could have imposed in the proceedings actually conducted, much less civil money penalties for the fraudulent conduct alleged in the amended complaint. While defendants catalog (at 30-34) "penalties" supposedly available in those proceedings, they do not argue *any* are "civil money penalties" as the statute requires. And defendants concede that the licensing proceeding "did *not*" invoke procedures "required" to impose a "forfeiture penalty"—the only civil money penalty in the Commission's arsenal. Opp. 33 (emphasis added). That leaves defendants with no option but to assert a reading of "civil money penalty proceeding" so expansive—encompassing anything that could

conceivably *lead to* a civil money penalty *proceeding*—that it covers virtually every proceeding the FCC conducts.

Defendants invoke (at 35-41) default payment obligations triggered *after* the licensing proceeding, when SNR and Northstar elected to default on certain licenses. But they do not seriously argue those were "civil money penalties" either—and with reason: Congress has consistently used that phrase to describe fines or forfeitures for *violations* of federal law. SNR and Northstar's selective defaults, defendants admit, were *permitted* by Commission rules. The fact that those permissible choices triggered payment obligations cannot retroactively convert previously instituted licensing proceedings into civil money penalty proceedings. And the default payments were not based on the "allegations or transactions" in this suit. They resulted from SNR and Northstar's later business decisions, as two judges of this Court have already observed. *See* Oral Arg. at 1:38:13-1:41:11, *Northstar Wireless, LLC v. FCC*, No. 18-1209 (D.C. Cir. Jan. 14, 2022) (questioning by Millett and Jackson, JJ.).

Defendants' efforts (at 44-52) to resuscitate the district court's materiality ruling are equally unavailing. They insist that the FCC's eventual denial of bidding credits is relevant to whether their fraud was "capable of influencing" a payment decision. Opp. 45. But defendants' fraud caused the FCC to permit them to use bidding credits in a multi-billion-dollar auction. And it led the FCC to accept

payments from them that were $3.3 billion short.  Those were not "deposits," as defendants assert, but "final payments" required by Commission rules.  JA0669; 47 C.F.R. § 1.2109(a).  That defendants eventually proved ineligible on other grounds does not render their false statements immaterial; it does not deprive those statements of the "natural tendency" to affect decisionmaking.  Defendants cannot argue their ineligibility was so blatantly obvious nothing else mattered; they fought the FCC's decision to deny them bidding credits all the way to appeal.  And the FCC's decision *assumed* that SNR and Northstar *had* disclosed all relevant agreements—a factual premise that is disputed here.

Defendants' bid (at 52-59) for affirmance on alternative grounds also fails. Vermont National's amended complaint details SNR and Northstar's auction conduct—conduct this Court and the FCC found "*inexplicable* from a business perspective."  *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1042 (D.C. Cir. 2017) (emphasis added).  The complaint shows why that conduct is best explained by SNR and Northstar's *un*disclosed agreements to act on behalf of, and transfer spectrum to, DISH, rather than their "respective strategic purposes" as defendants claim.  Opp. 56.  And the complaint's description of the circumstances of defendants' submissions amply satisfies Rule 9(b)'s particularity requirement.

## <u>ARGUMENT</u>

### I.   THE GOVERNMENT-ACTION BAR DOES NOT APPLY HERE

The government-action bar extends only to actions (a) asserting "allegations or transactions" that (b) already "are the subject of . . . an administrative civil money penalty proceeding" or civil action.  31 U.S.C. § 3730(e)(3).  Defendants all but abandon the district court's view that the FCC had the authority to impose and did impose "civil money penalt[ies]" in its post-auction consideration of SNR and Northstar's license applications.  JA0132-33.  Instead, defendants appear to argue (at 29-35) that the bar applies because the Commission had authority to impose "penalties" or "sanctions" for misconduct during those proceedings.

But the question is not whether the Commission can penalize misconduct during licensing proceedings.  It is whether the licensing proceeding was "an administrative civil money penalty proceeding."  Defendants cannot point to *any* "civil money penalty" the FCC sought to or could impose in that proceeding.  The default payment obligations were not "civil money penalties."  And they were not imposed based on the fraudulent "allegations or transactions" asserted in this suit. They resulted from defendants' voluntary decision—permitted under FCC rules— to default on some of their bids after the fact.

4

## A.    The FCC Could Not Levy "Civil Money Penalties" in the Licensing Proceeding

Defendants argue that the FCC could levy "an array of different penalties" in the licensing proceeding.  Opp. 29.  As defendants acknowledge (at 30), however, the question is whether the licensing proceeding was a "civil money penalty proceeding," 31 U.S.C. § 3730(e)(3), *i.e.*, a proceeding to assess a civil money penalty.  It was not.  The *only* "civil money penalties" the Commission can impose are the "forfeiture penalties" authorized by the Communications Act.  *See* Vt. Nat'l Br. 27-30; 47 U.S.C. § 503; 47 C.F.R. § 1.80(a).  Defendants concede (at 33) that the FCC could *not* impose "forfeiture penalties" in the licensing proceeding it actually conducted; the Commission "did not" even invoke the "required" procedures.

The Communications Act is clear:  "[N]o forfeiture penalty shall be imposed" on anyone "unless and until" the Commission (a) issues a "notice of apparent liability" that offers reasonable time for response or (b) convenes an evidentiary hearing.  47 U.S.C. § 503(b)(3), (4).  The Commission did neither here.  *See* Vt. Nat'l Br. 36-38.  Defendants cannot explain how a proceeding to determine fitness for a license, and eligibility for bidding credits, could be a "civil money penalty proceeding" when the Commission could not have imposed civil money penalties in that proceeding.

Defendants identify no other "civil money penalty" the Commission could impose in the licensing proceeding.  Defendants' authorities (at 31, 33) merely

reiterate that bidders who make false certifications may face "monetary forfeitures" or even "criminal prosecution." *See, e.g.*, *FCC Public Notice DA 07-30, Auction of Broadband PCS Spectrum Scheduled for May 16, 2007*, 22 F.C.C. Rcd. 433, ¶¶45, 63 (2007). But such forfeitures cannot be imposed unless the Commission initiates a "[f]orfeiture proceeding," which it never did. *See* 47 C.F.R. § 1.80.

Defendants insist (at 31-32) that the Commission could have imposed "false-certification penalties" (whatever that means). But defendants carefully avoid labeling those "civil money penalties." That distinction is critical. A "civil money penalty," as Congress has used that term throughout the U.S. Code, is a fine or forfeiture imposed for a violation of a federal statute or regulation. *See* Vt. Nat'l Br. 27-30 & n.3 (collecting examples). Congress's use of the phrase "civil money penalty proceedings" in the False Claims Act has the same established meaning and encompasses proceedings for the same class of penalties. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88, 101 (1991) (consistent "record of statutory usage" establishes the "plain" meaning of a statutory phrase); *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 373 (2019) (same). And defendants nowhere dispute that the *only* fines or forfeitures the FCC can levy for violations of its rules or the Communications Act are "forfeiture penalties" that were not invoked here. *See* 47 U.S.C. § 503. The fact that the Commission may *also* be able to impose *different* "penalties" or "sanctions" is irrelevant. Defendants thus miss the point when they criticize Vermont National

6

for supposedly having argued that forfeiture penalties are the only "penalties" available to the FCC.  Opp. 33.  Vermont National's argument is that forfeiture penalties are the only "*civil money penalties*" the FCC may levy, and that the proceedings did not implicate such forfeitures here.  Vt. Nat'l Br. 2, 26.  For that argument, defendants have no genuine answer.

Defendants hypothesize (at 33) that the Commission "could have" somehow converted the licensing proceeding into a civil money penalty proceeding by instituting the necessary procedures.  Defendants cite no case in which that has happened.  Where misconduct warranting a civil money penalty is found, the matter ordinarily is referred to the Enforcement Bureau—the "primary Commission entity responsible" for enforcing the Communications Act and the Commission's rules, 47 C.F.R. § 0.111(a)—to institute *separate* civil monetary proceedings, *see, e.g.*, *In re ClearSKY Sys., Inc.*, Notice of Apparent Liability for Forfeiture, DA 21-89 (Feb. 25, 2021), https://docs.fcc.gov/public/attachments/DA-21-89A1.pdf; *In re Cascade Access LLC*, Notice of Apparent Liability for Forfeiture, DA 09-207 (Feb. 10, 2009), https://docs.fcc.gov/public/attachments/DA-09-207A1.pdf; *Capitol Broad. Co. Inc.*, Consent Decree, 19 F.C.C. Rcd. 20854 (2004).  The Enforcement Bureau lacks authority to act on matters in "a pending application for a license."  47 C.F.R. § 0.111(a).

Regardless, the government-action bar applies only where the fraud allegations in the *qui tam* action "*are* the subject of . . . an administrative civil money penalty proceeding."  31 U.S.C. §3730(e)(3) (emphasis added).  Courts have held repeatedly that the bar does not apply where those allegations merely *could have been* the subject of such a proceeding.  *See* Vt. Nat'l Br. 37-38 & n.7 (collecting cases).  Here, the FCC declined to take steps required to impose a civil money penalty.  It rejected a request to refer SNR and Northstar to the Enforcement Bureau, JA0822-23 ¶44, and declined to convene an evidentiary hearing, JA0862 ¶145; *see* 47 C.F.R. §1.80(g) (requiring "a notice of opportunity for hearing" where the Commission considers a forfeiture penalty in the context of another proceeding).

The breadth of defendants' position compels its rejection.  In defendants' view, the FCC's ability to somehow *convert* a licensing proceeding into a civil money penalty proceeding means that licensing proceedings are "civil money penalty proceeding[s]" to begin with.  But that would turn almost *everything* that the Commission does into a "civil money penalty proceeding," because the Commission always has the option to initiate a forfeiture proceeding if it perceives a violation of its rules, as defendants concede (at 33).   In defendants' view, if a government questionnaire asked whether someone had been the "subject of an administrative civil money penalty proceeding," everyone who ever applied for an FCC license would have to answer "yes."  That cannot be right.

It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace, Agric. Implement Workers of Am., Int'l Union*, 523 U.S. 653, 657 (1998). Thus, in *Textron*, the Supreme Court rejected an argument seeking a broad reading of "suits for violation of contracts" based on the dictionary's definition of the word "for." *Id.* "It is not the meaning of 'for' we are seeking here," the Court explained, "but the meaning of '[s]uits for violation of contracts.'" *Id.*

Defendants commit the same error here. Rather than address the meaning of the *phrase* "civil money penalty proceeding," they isolate individual *words* like "penalty" (or sometimes "money"). But a "civil money penalty," as Congress has used that phrase time and again, is a fine or forfeiture imposed for a violation of federal law. A "civil money penalty proceeding" is a proceeding to assess such a penalty. *See* pp. 5-7, *supra*; Vt. Nat'l Br. 27-32. That phrase cannot be chopped apart and reconstructed to encompass a proceeding not so instituted, in which no civil money penalty was at issue, on the theory that the FCC could either impose other penalties or initiate a civil money penalty proceeding (even though it did not).

**B.    The FCC Did Not Levy "Civil Money Penalties" in the Licensing Proceeding**

Despite insisting that the FCC found they did nothing wrong, *but see* p. 27, *infra*, defendants argue (at 35-37) that the FCC actually imposed "penalties" on them through default payment obligations.  But defendants do not seriously contend that the default payments are "civil money penalties."  And the government-action bar applies only to *qui tam* suits based on allegations or transactions that "are the subject of" a civil money penalty proceeding.  31 U.S.C. § 3730(e)(3).  The "subject" of the proceedings in which the Commission assessed default payments was SNR and Northstar's decision to selectively default—a permissible decision not connected to the fraud at issue in this suit.

1.    *Default Payments Are Not "Civil Money Penalties"*

Defendants spend pages (at 35-38) arguing that default payments are "penalties," or "civil penalties," as a matter of "plain meaning."  But the government-action bar does not simply refer to "penalty," or "civil penalty," proceedings; it refers to "civil money penalty proceedings."  31 U.S.C. § 3730(e)(3).  The meaning of that statutory phrase is more than "the sum of its" words.  *FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011).  Congress has used "civil money penalty proceedings" consistently to describe proceedings for the exaction of money penalties as punishment for violations of the law.  *See* p. 6, *supra*.

10

The default payments cannot satisfy that definition:  Defendants admit (at 38) the payments were triggered "based on" SNR and Northstar's selective defaults, which are *permitted* by Commission rules.  JA0960; *see* JA0959; Vt. Nat'l Br. 31. The assessment of default payments based on permissible conduct cannot convert Commission proceedings into civil money penalty proceedings.

The result does not change merely because, according to defendants (at 39), reading the government-action bar more expansively would better serve its purposes. Where, as here, the record of statutory usage makes the meaning of a textual "expression" "clear," the "sole function of the courts" is to enforce that expression "according to its terms."  *Goldring v. District of Columbia*, 416 F.3d 70, 74 (D.C. Cir. 2005).  And policy—to say nothing of fidelity to Congress's choice of words— points the other way regardless.  Vt. Nat'l Br. 42-43; pp. 13-15, *infra*.

2.    *The "Same Allegations or Transactions" Requirement Is Not Met*

SNR and Northstar's default payment obligations cannot help defendants for another reason:  The government action bar extends only to *qui tam* actions "based upon allegations or transactions" that "are the subject of" the civil money penalty proceeding.  31 U.S.C. § 3730(e)(3).  Here, the default payments were not based on (or assessed in a proceeding based on) the allegations and transactions undergirding the *qui tam* action.  They were "based on the election" SNR and Northstar made— in letters they sent six weeks after licensing proceedings ended—to selectively

11

default on some of their winning bids. JA0960. The FCC's notices of default payment obligation thus nowhere mention any of the "allegations or transactions" this action is "based upon." They do not mention or suggest defendants committed fraud in making certifications and misrepresentations. They rest solely on SNR and Northstar's voluntary decision to default.[1]

Defendants argue (at 40) that the default payments were as much part of the licensing proceeding as sentencing is part of a criminal proceeding. But sentencing occurs only if the defendant is convicted. SNR and Northstar could have made the same decision to default—and would have been subject to the same default payment obligations—even if the licensing proceeding had *never* convened or defendants had been found eligible for bidding credits. The FCC's licensing decision did not find SNR or Northstar in default, require them to default, or suggest they would. It allowed them to keep *all* their licenses so long as they paid full price; SNR and Northstar just chose not to.

Defendants' argument reduces to the idea that—while the licensing proceeding itself could not have resulted in a civil money penalty—it was retroactively converted into a civil money penalty proceeding when SNR and Northstar chose to default on some of their bids and accept the resulting

---

[1] Defendants object (at 25-29) that Vermont National forfeited any argument that the licensing proceeding was based on different "allegations or transactions." But, as explained, the default payments were unconnected with that proceeding.

consequences.  Defendants thus would have *their* later choices determine the nature of the proceeding the FCC initiated.  To state the idea is to reject it.

The same defect dooms defendants' protestation that default payments "would never have been imposed" if SNR and Northstar had not submitted "winning bids" before being found "ineligible for price discounts."  Opp. 41.  As two judges of this Court have noted, SNR and Northstar's default payment obligations were not based on their failure to qualify for bidding credits.  *See* Oral Arg. at 1:38:13-1:41:11, *Northstar Wireless*, No. 18-1209 (questioning by Millett and Jackson, JJ.).  They resulted from SNR and Northstar's decisions to default on pre-auction commitments to pay winning bids.  *See id.*; JA0960; JA0964.  Besides, what matters for False Claims Act purposes are "'allegations or transactions' of *fraudulent conduct*."  *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653 (D.C. Cir. 1994) (emphasis added).  Here, the fraudulent conduct alleged was not placing "winning bids," being found "ineligible for price discounts," or taking advantage of regulatory provisions that allow winning bidders to default on bids.  It was making fraudulent representations and certifications in applications for bidding credits at the outset.

### C.    This Action Can Provide a "Useful Return" to the Government

Finally, defendants argue that this action is "not needed" because the government has already remedied their fraud "'to its satisfaction.'"  Opp. 42.  But the FCC never investigated whether SNR and Northstar withheld relevant agreements and

never referred this case for investigation—it "assume[d]" they had disclosed all agreements. JA0812 n.69; *see* p. 27, *infra*. That is why the *government itself* told the district court that it had a "substantial interest in any discovery produced in this case that related to [d]efendants' alleged failure to disclose material facts to the Commission." JA0060. Barring this suit would contravene the statute's purpose of encouraging suits that "seek[] to remedy fraud that the government has not yet attempted to remedy" itself. *U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Me.*, 24 F.3d 320, 328 (1st Cir. 1994).

Defendants object (at 25-26) that Vermont National's submissions in the licensing proceeding included some of the "allegations or transactions" at issue here. But the only allegations that count for the government-action bar are allegations "of *fraudulent conduct.*" *Springfield*, 14 F.3d at 653 (emphasis added). The *fraud* Vermont National alleges is the false certification that SNR and Northstar had disclosed all relevant agreements, an issue *not* addressed by the licensing proceeding. Vt. Nat'l Br. 39-40. Defendants protest (at 43) that Vermont National forfeited any argument about the scope of the FCC's investigation. That is wrong. *See* p. 12 n.1, *supra*. And it does not prevent this Court from considering whether barring this suit comports with the statute's purpose regardless.

Defendants' insistence that the government "suffer[ed] no loss from Northstar's and SNR's conduct," Opp. 42, goes too far. The default payments

address only the risk that the defaulted spectrum might fetch less when re-auctioned. They do not punish defendants for the $3.3 billion payment obligation they long avoided through their fraud.  Nor do the default payments redress the harm defendants inflicted by crowding out *legitimate small businesses* at auction using bidding credits or the fact that spectrum that could otherwise have been utilized has been left fallow by SNR and Northstar's fraud.

## II.   VERMONT NATIONAL AMPLY PLED MATERIALITY

Applying for bidding credits, SNR and Northstar falsely certified they had disclosed all "agreements . . . or understandings of any kind" relevant to eligibility, but concealed plans to transfer any spectrum they won to DISH.  47 C.F.R. § 1.2105(a)(2)(ix); JA0086-100 ¶¶91-136.  Those misrepresentations were not only "capable of influencing" FCC decisions, as the False Claims Act requires.  They actually caused the Commission to allow SNR and Northstar to bid using credits, and then caused the Commission to accept $3.3 billion less from SNR and Northstar than it otherwise would have.  JA0205-06 ¶228, JA0678.  Defendants' efforts to salvage the district court's contrary holding fail.

### A.   Defendants—Like the Decision Below—Misconstrue the Legal Standard

Defendants insist (at 45-46) that SNR and Northstar's misrepresentations were immaterial because disclosing them "would not have changed" the FCC's eventual "decision to deny bidding credits."  JA0138 (emphasis omitted).  But that

15

asks the wrong question. A statement may be "capable of influencing the government's decision" to pay a claim "without causing the government to do so." *U.S. ex rel. Cimino v. Int'l Bus. Machs. Corp.*, 3 F.4th 412, 419 (D.C. Cir. 2021). What matters is whether the government "would attach importance" to the matter misrepresented, not whether the misrepresentation actually affected a payment decision. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016).

Defendants also look to the wrong point in time. The False Claims Act "proscribes the knowing or reckless *submission* of false claims for payment." *U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 115 (D.C. Cir. 2015) (emphasis added). Consequently, what matters is "the potential effect of the false" submission "when it is made," not "when it is discovered." *U.S. ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced Sys. Int'l*, 600 F. App'x 969, 977 (6th Cir. 2015); *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 470 (5th Cir. 2009) (same).

Defendants properly note (at 47-48) courts may consider the government's "actual behavior" when determining whether the government "attaches importance to the specific matter" allegedly misrepresented. *Escobar*, 579 U.S. at 193. Thus, in the case defendants cite, the government's decision to pay the defendant's claims despite *actual knowledge of the alleged fraud* suggested that the government did not attach importance to the matter misrepresented. *See U.S. ex rel. McBride v.*

*Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017).   Here, by contrast, defendants concede (at 51) the FCC was *un*aware that SNR and Northstar had concealed relevant agreements; it denied their claims for unrelated reasons following hard-fought proceedings.   That "payment decision" sheds no light on whether the Commission "attaches importance" to the disclosure obligations here.

The FCC's undisputed track record, moreover, shows it *does* "attach importance" to short-form disclosures.   The Commission told bidders that their short-form applications "will be used" to determine eligibility for bidding credits. JA0164-65.   Disclosure of the concealed agreements to transfer spectrum to DISH would have disqualified defendants at the outset.   Vt. Nat'l Br. 46-47.   And the FCC routinely denies credits based on its pre-auction review of short forms.   *See id.* at 51-52.   That is precisely the kind of evidence the Supreme Court has said supports a finding of materiality.   *See Escobar*, 579 U.S. at 194-95 ("consistent[] refus[al] to pay claims" based on noncompliance with regulatory requirement is "proof of materiality").

Defendants insist (at 45) that SNR and Northstar's false statements and certifications cannot have mattered *here* because their bidding-credit claims were doomed anyway.   That argument, unsupported by citation, doubly fails.   First, the False Claims Act defines materiality to include anything with "a natural tendency" to influence a payment decision.   31 U.S.C. § 3729(b)(4).   It makes no sense to say

17

that statements on a matter critical to a claim for payment lack a "natural tendency" to influence the government's payment decision just because some other factor caught the government's eye first.   Second, as explained below, defendants' insistence that their claims were doomed ignores the record and the misrepresentations' actual impact.

### B.    Defendants' False Statements and Certifications Were Material Under Any Standard

Without the false certification that all relevant agreements were disclosed, the FCC would not even have accepted SNR and Northstar's applications, let alone approved their use of bidding credits.   Vt. Nat'l. Br. 46-47.   By concealing those agreements and falsely certifying full disclosure in their short forms, SNR and Northstar were able to use bidding credits in Auction 97 and to make discounted payments when the auction closed.

1.    Defendants (at 47) repeat the district court's assertion that falsehoods in SNR and Northstar's short forms could not have influenced the FCC's decision to accept discounted payments because the Commission did not "substantially review" eligibility for bidding credits until after payments were due.   JA0856.   But defendants ignore the Commission's representation that short-form information "*will be used* to determine" the applicants' eligibility to "participate" in the auction and "whether the applicant is eligible for the claimed bidding credit."   JA0164-65 (emphasis added).   Nor do they address the cases in which the Commission denied

18

bidding credits *before* auction based on information in a short-form application.  Vt. Nat'l Br. 51-52.  The FCC clearly *does* scrutinize claims for bidding credits at the outset, even if it takes a closer look after the auction closes.[2]

   Defendants' contention that FCC acceptance of a short-form application is not a "payment decision" (at 48-49) fails for the same reason.  The Commission relies on that short form when determining amounts to be paid at auction's close, before the Commission can review applications more thoroughly.  "A bidder assumes a binding obligation to pay its full bid amount upon acceptance of the winning bid *at the close of an auction*."  47 C.F.R. § 1.2104(g)(2) (emphasis added); JA0655 ¶25; *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 57 (2d Cir. 1999) (bidder becomes "obligated to assure payment" at close of auction).  Defendants cite no law for the proposition that a false claim subject to further review is not actionable; nor do they address the many cases showing that it is.  Vt. Nat'l Br. 52-53.  And the Commission actually relied on the short-form applications in accepting $3.3 billion less than it was owed.  *Id.*

---

[2] Insofar as defendants urge that initial FCC review is insufficiently "substantial" to identify any agreement to transfer spectrum to DISH, that is at best a fact issue that cannot be resolved against Vermont National at this stage. *See, e.g.*, *Cimino*, 3 F.4th at 422 (plausible that false audit was capable of influencing government even when relator "did not explicitly allege" the government accepted the audit).

Defendants' effort to recharacterize those payments "as deposits" rather than "payments," Opp. 46, is wrong and irrelevant. The FCC does require bidders to make "refundable deposit[s]"—called "upfront payments"—*before* the auction starts.[3] JA0180 ¶126. But the *post*-auction payments were "final payment[s]." JA0669. March 2, 2015 was the deadline for Auction 97 bidders to pay the "full amount of the Final Balance Due" on any winning bids. *Id.* Payments made within 10 days after that deadline were subject to a 5% "late fee." 47 C.F.R. § 1.2109(a). After 10 days, the bidder is "considered to be in default." *Id.* Of course, bidders later found to owe *more* money, as SNR and Northstar were, must make up any difference. But defendants do not explain how that converts what the Commission calls a "final payment" into a "deposit." Regardless, a "deposit" *is* a payment. Fraudulently reducing deposit payments is still fraud.

2.    Defendants object (at 49) to the allegation that the FCC's electronic submission portal will reject applications unless they include the certifications SNR and Northstar falsified. According to defendants, deeming the certifications material on that basis "reads materiality out of the FCA." Opp. 49. That assertion is remarkable. If the FCC set up its submission portal to reject any application that lacks certain certifications (under penalty of perjury), it is reasonable to infer the

---

[3] SNR and Northstar made approximately $900 million in "upfront payments." JA0178-80; JA0668-69, JA0678.

FCC thinks the matters addressed by those certifications are critical.  That should prove conclusively that the certification is material—not the other way round.

Ultimately, defendants argue that the FCC found it so "*obvious*" from "the disclosed materials" that SNR and Northstar did not qualify for bidding credits that disclosing their secret agreements could not have affected "acceptance of the short-form applications."  Opp. 50.  This Court need not address whether an application can be so categorially and facially deficient on other grounds as to render its falsehoods immaterial.  Defendants did not think themselves so obviously disqualified by the disclosed materials.  They vigorously litigated the issue before the Commission and on appeal, making "a range of arguments that the FCC was bound to grant bidding credits to them." *SNR Wireless*, 868 F.3d at 1037.

Regardless, the Commission's assertion that DISH's control was "manifest" is hardly dispositive. *Cf. Butler v. McKellar*, 494 U.S. 407, 415 (1990) ("Courts frequently view their decisions as being 'controlled' or 'governed' by prior opinions even when aware of reasonable contrary conclusions.").  Besides, the Commission's determination was based on the *record* compiled in the *licensing proceeding*.  JA0806 ¶6.  That included "the totality of their actions during Auction 97," which came *after* the FCC accepted their short forms, and "the various agreements" attached to their *long*-form applications.  JA0806 ¶7; JA0826-28 ¶¶51, 57.  The Commission never suggested that the *short* forms themselves—which attached only

summaries of the disclosed agreements and were accepted before SNR and Northstar's suspicious auction conduct—manifested anything.

Defendants' counterfactuals are no basis for ignoring Vermont National's well-pleaded factual allegations. The complaint does not plead a "hypothetical." Opp. 50. It alleges facts—that certifications of complete disclosure are required to submit a short-form application, JA0075-80 ¶¶46-62, and that SNR and Northstar made those certifications knowing they were false, JA0095-99 ¶¶124-31. Those facts support the inference that the FCC would not have accepted SNR or Northstar's applications but for their false certifications. That is not "speculation," Opp. 50; it is how courts assess materiality, *see, e.g.*, *Cimino*, 3 F.4th at 423 (complaint pled materiality where it was "plausible" that the government would not have renewed a contract, "had [it] known" the truth); *Escobar*, 579 U.S. at 194-195 ("proof of materiality" includes facts from which the court can infer that the government would refuse payment if it knew the truth).

## III.   THE COMPLAINT ADEQUATELY PLEADS DEFENDANTS' FRAUD

Defendants ask the Court to affirm on the alternative ground that Vermont National's allegations are insufficient. But the amended complaint details how SNR and Northstar's auction conduct left them with a patchwork of spectrum that "made no sense" for either to hold independently. JA0093 ¶117. And it explains why those and other facts support the inference that SNR and Northstar had undisclosed

agreements to transfer any spectrum rights they won to DISH.  JA0083-95 ¶¶77-101, 105-31.  That goes beyond Rule 8's notice-pleading standard.  And the complaint's detailed description of the who, what, where, and when of the fraudulent applications satisfies Rule 9(b)'s particularity requirement.

### A.   Vermont National Pled Facts Supporting the Conclusion that SNR and Northstar Had Undisclosed Agreements with DISH

Complaints survive a motion to dismiss where they plead facts that "'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Cimino*, 3 F.4th at 421.  That does not require "'detailed factual allegations.'"  *Wash. All. of Tech. Workers v. Dep't of Homeland Sec.*, 892 F.3d 332, 343 (D.C. Cir. 2018).  The pleaded facts need only "'raise a right to relief above the speculative level.'"  *Id.*

The amended complaint alleges that defendants violated the False Claims Act by (among other things) falsely certifying that SNR and Northstar disclosed all agreements relevant to their eligibility for bidding credits when, in fact, they never disclosed their agreements to act for, and transfer spectrum rights to, DISH. Defendants err in asserting that the complaint pleads "no facts" supporting the existence of those agreements.  Opp. 53.  The complaint alleges, among other things, that:

- SNR and Northstar bid anonymously for the same licenses 744 times. JA0087 ¶95.  Where they submitted identical winning bids for the same

licenses, they accepted the Commission's random choice of winner. JA0088 ¶96.

- As a result, SNR and Northstar "finished the auction with geographic gaps in their spectrum licenses," affording complete coverage only when combined.  JA0088 ¶97.

- Their post-auction selective defaults exacerbated those gaps, "promoting the uniformity of spectrum coverage provided by their combined holdings" to the detriment of "the continuity of geographic coverage for each." JA0090 ¶105.

- The result was a patchwork that "made no sense from the point of view of providing communications services."  JA0093 ¶117.

- Neither entity took steps to deploy a wireless system.  JA0094 ¶120.

- DISH's CEO had stated his intention to acquire and hold wireless spectrum for future exploitation.  JA0083 ¶¶77-80.

- SNR and Northstar were formed as shells, without assets or revenues, at DISH's direction immediately before the deadline to apply to bid in Auction 97.  JA0069 ¶16, JA0070-71 ¶24; JA0072 ¶32.

- DISH funded SNR and Northstar's bidding and guaranteed their default payment obligations.  JA0086 ¶91; JA0088 ¶100; JA0090 ¶¶106-07.

The complaint alleges that such conduct makes sense only if SNR and Northstar agreed in advance that DISH would ultimately control the licenses they won.  JA0090 ¶107; JA0093-94 ¶¶117-21.  Taking those "well-pleaded allegations as true" and drawing "all reasonable inferences from those allegations in the plaintiff's favor," Vermont National plausibly alleged the existence of undisclosed agreements to pursue discounted licenses on DISH's behalf.  *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1211 (D.C. Cir. 2020).

Defendants ignore virtually all those facts.  They single out (at 53) the allegation that Vermont National consulted an expert in FCC bidding and game theory, who confirmed that SNR and Northstar's behavior is inconsistent with their independent interests.  JA0092-93 ¶¶115-17.  Defendants protest that opinions cannot substitute for facts.  But the complaint pleads the facts the expert considered—facts that speak for themselves.  JA0087-88 ¶¶95-96.  Indeed, this Court considered the same facts and drew the same conclusion:  It held that "SNR and Northstar's unusually cross-subsidizing bidding behavior" in Auction 97 "is *inexplicable* from a business perspective."  *SNR Wireless*, 868 F.3d at 1042 (emphasis added).

Defendants fault Vermont National (at 54) for not alleging *how* SNR and Northstar failed to deploy a communications network.  It is undisputed, however, that the entities took no steps towards offering wireless service.  That supports the "reasonable inference[ ]," *Strike 3*, 964 F.3d at 1211, that "[d]efendants' plan all along" was to obtain spectrum for DISH's benefit, JA0094 ¶121.  Indeed, DISH recently disclosed it is in the process of acquiring SNR's spectrum.  *See* DISH Network Corp., Current Report (Form 8-K) (Nov. 19, 2021).

### B.    Defendants' Alternative Explanations Are Unavailing

Defendants invoke SNR and Northstar's disclosure that they would "coordinate" bidding for "*their respective* strategic purposes."  Opp. 56 (emphasis

added).  But the Commission concluded that SNR and Northstar "were *not* acting in their own *individual interests*"—their respective interests—"but were acting with a common goal of securing the same list of licenses *for DISH's benefit*."  JA0849-50 ¶113 (emphasis added); JA0847-50 ¶¶109-14.  This Court likewise found "no evidence in the record" of the licensing proceeding that "could explain" SNR and Northstar's "asymmetric cooperation" and "non-mutually-beneficial" bidding "as reflecting anything other than their control by DISH."  *SNR Wireless*, 868 F.3d at 1042.  While the disclosed agreements portrayed SNR and Northstar as "separate companies who just happen to have the same business manager and financial backer (DISH)," they behaved as "two arms of DISH, working together to advance DISH's goals."  *Id.*

Quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007), defendants characterize the complaint's allegations as "merely consistent with" liability.  Opp. 55.  But *Twombly* proves defendants wrong.  It directs courts to consider "the suggestions raised by" a defendant's conduct "in light of common economic experience."  *Twombly*, 550 U.S. at 565.  Invoking common economic experience, the FCC and this Court found defendants' conduct "*inexplicable*" except as an effort to

advance *DISH's interests* at SNR and Northstar's expense.  *SNR Wireless*, 868 F.3d at 1042; (emphasis added); *see* JA0849-50 ¶ 113.[4]

Contrary to defendants' assertions (at 57-58), the FCC never suggested that a misunderstanding of FCC rules explained that conduct.  The FCC found—based on what it erroneously "assume[d]" was a complete record—that SNR and Northstar's view they were insufficiently controlled by DISH resulted from a misunderstanding.  JA0857 ¶ 132; JA0812 n.69.  But it found their *auction* conduct was intended "for DISH's benefit," a finding that *supports* rather than contradicts the complaint's allegations of an agreement to transfer spectrum to DISH.  JA0849-50 ¶ 113.

## C.    Vermont National Satisfied Rule 9(b)

A False Claims Act complaint satisfies Rule 9(b) if it "sets forth in sufficient detail the time, place, and manner" of the fraudulent scheme.  *Heath*, 791 F.3d at 123.  "Rule 9(b) does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations."  *Id.* at 125.  The point "is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process."  *Id.*

---

[4] The complaint plainly does not plead "general facts"; it details exactly what defendants did and why it supports an inference of liability.  *U.S. ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 460 (4th Cir. 2013).  Nor do the complaint's allegations present "'obvious alternative explanation[s]'" for defendants' conduct.  *Somers v. Apple, Inc.*, 729 F.3d 953, 962-65 (9th Cir. 2013).

Defendants assail the complaint (at 58) for not detailing the who, where, and when of the undisclosed agreements. But the agreements are not the fraud. The fraud is *claiming bidding credits* while *falsely certifying* that no undisclosed agreements exist. The complaint pleads the "circumstances" of those fraudulent certifications with particularity. Fed. R. Civ. P. 9(b). It alleges that John Muleta (for SNR) and Miranda Wright and Allen Todd (for Northstar)—"who"—submitted short- and long-form applications containing false statements and omissions, including false certifications that SNR and Northstar had disclosed all relevant agreements—"what" and "how." JA0095-99 ¶¶124-31. They submitted those applications and certifications through the FCC's electronic submission portal on September 12, 2014 and February 13, 2015, respectively—"where" and "when." JA0089 ¶101, JA0095-99 ¶¶124-31.

Even if Rule 9(b) required details about the undisclosed agreements, those were pleaded sufficiently. The complaint alleges that SNR and Northstar had agreements with DISH ("who") to obtain spectrum on DISH's behalf ("what" and "how"), which they concluded at some point in the days between the time SNR and Northstar were incorporated—August 29 and September 4, 2014, respectively—and when they filed their short form applications—September 12, 2014 ("when"). JA0069 ¶16; JA0070-71 ¶24; JA0090-91 ¶¶108-09; JA0095-99 ¶¶124-31; JA0101 ¶142; *see Heath*, 791 F.3d at 125 ("identifying precisely who pulled" "corporate

levers" is "not an inexorable requirement of Rule 9(b)"). Where, as here, the details are "within the defendant's control," that is more than enough. *Cimino*, 3 F.4th at 424.

The complaint thus provides a "detailed description of the specific falsehoods that are the basis for" this suit. *U.S. ex rel. Totten v. Bombardier Corp*., 286 F.3d 542, 552 (D.C. Cir. 2002). And unlike the complaint in *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256-57 (D.C. Cir. 2004), the complaint here alleges the precise "'time'" each false claim was submitted, identifies "'with specificity who'" was involved in the scheme, and sets forth the "fact[s] misrepresented." JA0090-91 ¶¶108-09; JA0095-99 ¶¶124-31; JA0101 ¶142. Defendants have everything they need to respond.

## CONCLUSION

The judgment of the district court should be reversed.

February 18, 2022                          Respectfully submitted,

                                           /s/ Jeffrey A. Lamken

Bert W. Rein                               Jeffrey A. Lamken
Bennett L. Ross                              *Counsel of Record*
Stephen J. Obermeier                       MOLOLAMKEN LLP
WILEY REIN LLP                             The Watergate, Ste. 500
1776 K St., N.W.                           600 New Hampshire Ave., N.W.
Washington, D.C.  20006                    Washington, D.C.  20037
(202) 719-7000                             (202) 556-2000
                                           jlamken@mololamken.com

                                           Eugene A. Sokoloff
                                           MOLOLAMKEN LLP
                                           300 N. LaSalle St., Ste. 5350
                                           Chicago, IL  60654
                                           (312) 450-6700

                                           Mark W. Kelley
                                           MOLOLAMKEN LLP
                                           430 Park Ave.
                                           New York, N.Y.  10022
                                           (212) 607-8160

*Counsel for Vermont National Telephone Company*

30

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(7) because it contains 6,497 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.


/s/ Jeffrey A. Lamken
Jeffrey A. Lamken

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2022, I caused this document to be electronically filed with the Clerk of Court by using the electronic filing system, which will send a notice of electronic filing to all parties who have registered with the electronic filing system.

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken