# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, VERMONT NATIONAL TELEPHONE CO., <br><br> Plaintiff, <br><br> v. <br><br> NORTHSTAR WIRELESS, LLC, e*t al.*, <br><br> Defendants. | Civil Action No. 1:15-cv-0728 (CKK) |

## RELATOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO GOVERNMENT'S MOTION TO DISMISS

Stephen J. Obermeier (D.C. Bar # 979667)
Bennett L. Ross (D.C. Bar # 978122)
Bert W. Rein (D.C. Bar #067215)
Mark B. Sweet (D.C. Bar # 490987)
Kathleen C. Cooperstein (D.C. Bar # 1017553)
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Relator Vermont National Telephone Co.*

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ................................................................................1

BACKGROUND ........................................................................................................7

    I.     FACTUAL BACKGROUND .............................................................................7

          A.     The FCC's Designated Entity (DE) Program ..................................7

          B.     DISH's Plans to Use a DE to Acquire Spectrum ...........................9

          C.     Evidence of Defendants' Fraud in Auction 97 ............................10

    II.    PROCEDURAL BACKGROUND.......................................................................14

STANDARD OF REVIEW ......................................................................................16

ARGUMENT ..........................................................................................................16

    I.     THE COURT SHOULD DENY THE DOJ'S MOTION TO DISMISS
          BECAUSE IT IS BROUGHT IN BAD FAITH. ...................................................17

          A.     The Government's Efforts to Frustrate Discovery by Relator and Its
                Failure to Consider Evidence of Defendants' Fraud Constitute Bad
                Faith. ................................................................................17

          B.     The Government's Reliance on Illusory Discovery Burdens
                  Associated with Defendants' Objectionable Discovery Requests and
                  Failure to Challenge Those Requests Constitute Bad Faith.......................22

          C.     The DOJ's Mischaracterization of the Sufficiency of the Evidence
                  Supporting Relator's Claims Constitutes Bad Faith. ................................25

          D.     The DOJ's Willingness to Ignore the Harms to the Government
                  Resulting From Defendants' Fraud Constitutes Bad Faith. ......................27

          E.     The Unprecedented Nature of DOJ's Decision to Seek Dismissal
                  Demonstrates Bad Faith.......................................................32

          F.     The DOJ May Have Other Motives in Seeking Dismissal of This
                  Case.........................................................................35

    II.    THE COURT SHOULD DENY THE DOJ'S MOTION TO DISMISS
          BECAUSE DISMISSAL WOULD PREJUDICE RELATOR...........................40

    III.    THE COURT SHOULD DENY THE DOJ'S MOTION BECAUSE
          DISMISSAL WOULD VIOLATE RELATOR'S FIFTH AMENDMENT
          RIGHTS. ............................................................................44

CONCLUSION.........................................................................................45


INTRODUCTION AND SUMMARY ................................................................................1

BACKGROUND ........................................................................................................7

I.      FACTUAL BACKGROUND ...................................................................................7

        A.      The FCC's Designated Entity (DE) Program.............................................7

        B.      DISH's Plans to Use a DE to Acquire Spectrum ......................................9

        C.      Evidence of Defendants' Fraud in Auction 97 ..........................................10

II.     PROCEDURAL BACKGROUND.........................................................................14

STANDARD OF REVIEW ...............................................................................................16

ARGUMENT ....................................................................................................................16

I.      THE COURT SHOULD DENY THE DOJ'S MOTION TO DISMISS
        BECAUSE IT IS BROUGHT IN BAD FAITH. ...................................................17

        A.      The Government's Efforts to Frustrate Discovery by Relator and Its
                Failure to Consider Evidence of Defendants' Fraud Constitute Bad
                Faith. .........................................................................................................17

        B.      The Government's Reliance on Illusory Discovery Burdens
                Associated with Defendants' Objectionable Discovery Requests and
                Failure to Challenge Those Requests Constitute Bad Faith......................22

        C.      The DOJ's Mischaracterization of the Sufficiency of the Evidence
                Supporting Relator's Claims Constitutes Bad Faith. ...............................25

        D.      The DOJ's Willingness to Ignore the Harms to the Government
                Resulting From Defendants' Fraud Constitutes Bad Faith. ......................27

        E.      The Unprecedented Nature of DOJ's Decision to Seek Dismissal
                Demonstrates Bad Faith...........................................................................32

        F.      The DOJ May Have Other Motives in Seeking Dismissal of This
                Case...........................................................................................................35

II.     THE COURT SHOULD DENY THE DOJ'S MOTION TO DISMISS
        BECAUSE DISMISSAL WOULD PREJUDICE RELATOR.............................40

III.    THE COURT SHOULD DENY THE DOJ'S MOTION BECAUSE
        DISMISSAL WOULD VIOLATE RELATOR'S FIFTH AMENDMENT
        RIGHTS. ...................................................................................................44

CONCLUSION..................................................................................................................45

## INTRODUCTION AND SUMMARY

Vermont National Telephone Company ("Relator") has labored for nearly nine years to hold DISH Network Corp. ("DISH") and related Defendants accountable for their fraud in a Federal Communications Commission ("FCC") spectrum auction ("Auction 97").  Defendants fraudulently used sham designated entities ("DEs") to obtain spectrum at a discount to which DISH was not entitled and failed to disclose to the FCC their actual arrangements, agreements, and understandings in that auction.  Evidence obtained to date confirms Defendants' fraud as alleged by Relator, as a result of which Defendants deprived the FCC of approximately $3.3 billion in auction proceeds (an amount that remains unpaid to date), thwarted the deployment of spectrum for the benefit of the public (a large portion of which remains fallow), corrupted a program designed to benefit bona fide small businesses, and distorted the FCC auction process.

Until recently, the government supported Relator's efforts in this case.  In October 2018, for example, the government filed with the Court a statement expressing its interest in Relator uncovering evidence of Defendants' fraud.  And, consistent with that interest, the government in December 2022 objected to the Court dismissing Relator's claims when Defendants moved for judgment on the pleadings—a position the government reiterated in November 2023 and upon which the Court relied in denying Defendants' motion.

But the DOJ has since had a change of heart.  And it now asks this Court to dismiss Relator's claims under 31 U.S.C. § 3730(c)(2)(A)—claims it opposed dismissing just months ago.  The DOJ does not explain, let alone even acknowledge, its change of position.  Nor does the DOJ explain the timing of its decision, which was made just weeks before the close of Relator's discovery.  The DOJ insists it previously opposed dismissal of this case to give Relator the "chance, in discovery, to uncover evidence supporting" its claims.  Dkt. 188, at 10.  But the DOJ inexplicably decided to move for dismissal before Relator was fully given that chance.

And to make matters worse, the DOJ went out of its way to prevent Relator from uncovering critical evidence of Defendants' fraud—evidence the government purportedly was interested in Relator uncovering.  Specifically, the DOJ needlessly prevented Relator from deposing key witnesses in the case, such as Defendants Charles Ergen, his wife Cantey Ergen, and John Muleta.  The DOJ did so by informing the parties of its decision to seek dismissal on February 8, 2024—just days before the depositions of the Ergens, and two senior DISH executives, among others, and less than a month before the end of fact discovery—even though the DOJ would not ultimately file its motion until March 8, 2024, *after fact discovery would have been completed*.  In other words, the DOJ rushed to declare its *intention* to dismiss, knowing that doing so would result in Defendants cancelling key depositions in the case, which is precisely what happened.

Under the circumstances, the DOJ's assertion that it made its decision to seek dismissal only after "careful consideration of the evidence" is simply untrue.  *Id.* at 1.  And not only did the DOJ needlessly cut discovery short and thereby prevent Relator from obtaining critical evidence.  It also turned a blind eye to the evidence that Relator did uncover, not attending a single deposition of Defendants, their employees, or their affiliated third parties and not reviewing documents and other written materials provided by Relator.  The DOJ also repeatedly refused to even meet with Relator about the case prior to its threatening dismissal.  And while the DOJ now attempts to deflect from its own investigatory failures by pointing to various meetings between the Relator and FCC staff, those meetings—which the DOJ mischaracterizes—occurred before document discovery was complete and before a single Defendant had been deposed.

Under *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 435-36 (2023), because the government has moved to dismiss this case over Relator's objection at a late

stage in the proceedings, the DOJ must show that it is acting in "good faith" in seeking dismissal at this juncture. Fed. R. Civ .P. 41(a). But the DOJ cannot make this showing. In fact, the government's bad faith is so pervasive that this case presents the "extraordinary circumstance" to which the *Polansky* court referred and requires that the DOJ's Motion be denied.

And it is not just the procedural irregularities that taint its Motion. The reasons the DOJ offers for dismissal are so baseless that they can only be viewed as pretextual. It is telling that the DOJ devotes a mere five paragraphs of its 24-page Motion to discussing these reasons without offering a single declaration or record cite in support.

***First***, the purported "burdens" to the government in responding to Defendants' discovery requests are illusory. Although the DOJ lists the volume of documents already produced by the government, it does not "enumerate[] the significant costs of *future* discovery in the suit." *Polansky*, 599 U.S. at 438 (emphasis added). Nor could it because, unlike in *Polansky*, the government has done nothing to challenge the discovery about which it complains.

Indeed, in contrast to *Polansky* where the DOJ fought the defendant's discovery demands for years, the DOJ here has not bothered to pursue objections to Defendants' discovery, even though their requests are plainly objectionable, as the DOJ concedes. In fact, many of Defendants' requests are borderline-absurd and likely could be resolved pursuant to this Court's informal discovery procedures without the need for motion practice. Relator provided the government with a detailed plan for objecting to Defendants' discovery requests that Relator agreed to litigate on behalf of the government pursuant to Rule 45. Even though it would have minimized if not eliminated the burdens on the FCC, Relator's plan was promptly ignored by the DOJ. By refusing to even attempt to contest Defendants' improper discovery requests, or to permit Relator to do so on the government's behalf, the DOJ's claims about potential future

discovery burden cannot be given credence and are further evidence of bad faith.  Indeed, by invoking a phantom burden, the DOJ invites all FCA defendants to serve overbroad discovery in hopes of laying a foundation for lobbying for dismissal.

**Second**, the DOJ's belief that there is insufficient evidence supporting Relator's fraud claims is belied by the record.  Indeed, unlike it did in *Polanksy*, the DOJ fails to "explain[] *in detail* why it ha[s] come to believe that the suit ha[s] little chance of success on the merits." *Polansky* at 438 (emphasis added).  The lack of a detailed explanation is unsurprising given the evidence Relator has uncovered to date that confirms Relator's allegations, namely that, contrary to their representations and certifications to the FCC, Defendants arranged, agreed, and understood that Northstar Wireless, LLC ("Northstar") and SNR Wireless LicenseCo, LLC ("SNR") would acquire for DISH discounted spectrum that DISH selected, which would be transferred to DISH and not used to provide wireless services in the interim.  And despite falsely representing that DISH was merely a passive investor in Northstar and SNR, multiple documents obtained during discovery confirm that Defendants were parties to a joint venture through which they agreed that DISH would own Northstar's and SNR's spectrum for accounting purposes. Northstar and SNR knowingly and intentionally failed to disclose these understandings—and falsely certified otherwise—because they knew that doing so would disqualify them from using bidding credits in Auction 97.

The DOJ glosses over completely the overwhelming evidence of Defendants' fraud.  Its only response—that the multiple undisclosed arrangements among Defendants that Relator has uncovered are "cumulative of what the Defendants had affirmatively disclosed" to the FCC—is false.  Dkt. 188, at 17.  Not only does the DOJ fail to point to anything in support of this representation, but it also is flatly contradicted by the testimony of DISH's own witness.

***Third***, the DOJ's willingness to overlook the harms to the government resulting from Defendants' fraud is still further evidence of its bad faith.  Indeed, the contention that the government has not been harmed by Defendants' fraud because "the Defendants were never awarded any bidding credits" defies common sense.  Dkt. 188, at 17.  At bottom, the government still has not been paid the $3.3 billion it was owed in 2015, on which the interest alone is approximately $1 billion.  These damages are not only cognizable under the False Claims Act ("FCA"), but they are fully supported by economic principles, as explained in the declaration of Dr. Robert Kulick, an economist with NERA Economic Consulting.

Moreover, the DOJ's damages argument is just the flip side of Defendants' materiality argument, which the D.C. Circuit considered and rejected in *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022).  It also misapprehends the FCC's spectrum auction application process, mischaracterizes the significance of the undisclosed understandings in the context of the FCC's short-form application review process, and misstates the harms resulting from Northstar's and SNR's fraudulent short-form applications.

As explained in the declaration of Fred Campbell, former chief of the FCC's Wireless Telecommunications Bureau ("WTB"), had Northstar and SNR disclosed in their short-form applications the undisclosed understandings uncovered by Relator, they never would have qualified as bona fide very small businesses at the short-form stage and never would have been permitted to use bidding credits in the auction.  Were it otherwise, bidders would be incentivized to lie in their short form applications— just as Northstar and SNR did here—knowing that there would be no consequences if they are caught at the long form application stage.  That the DOJ is willing to espouse such a position, which even the FCC staff does not embrace, further demonstrates bad faith.

It also is telling that the DOJ's decision to move for dismissal of this case represents a significant departure from any previous *qui tam* case the DOJ has moved to dismiss. Notwithstanding the DOJ's assertion otherwise, this case is not remotely similar, let alone "identical," to *Polansky*. Dkt. 188, at 20. Nor is this case like any of the other "rare instances" when the DOJ has sought dismissal. *Id.* at 16. Indeed, the DOJ has moved to dismiss only 65 of the approximately 4,000 *qui tam* actions filed by relators since 2018. And in those cases where the DOJ has sought dismissal, it generally was because the relator had engaged in misconduct (as in *Polansky*), was *pro se*, or had asserted claims not cognizable under the FCA. This case suffers from none of those defects. Relator is unaware of any case—and the DOJ points to none— where the agency has sought to dismiss claims near the end of discovery that the DOJ previously opposed dismissing and that two federal courts had declined to dismiss.

Relator cannot know for certain the government's motivation for the Motion, but it is notable that DISH and the Ergens are important political allies of the Biden Administration. Charles Ergen has been a regular visitor to the White House, and he was a member of President Biden's recent trade mission to the Philippines. The government also has a vested interest in DISH's success in the wireless market, given that: (1) both the DOJ and the FCC touted DISH as a nationwide competitor whose entry would mitigate the competitive harms resulting from T-Mobile's acquisition of Sprint in 2019; and (2) DISH is relying upon—and is a vocal advocate for—Open Radio Area Network ("O-RAN") technology, the global deployment of which is an important policy imperative of the Biden Administration.

It also is notable that the Ergens and the Biden Administration have been the beneficiaries of each other's largesse. For example, Defendants Charlie and Cantey Ergen—who had never previously donated to President Biden's campaign despite contributing millions to

Democratic candidates and causes over the years—made contributions totaling more than $113,000 to the President's reelection efforts just four months ago.  And the Biden Administration reciprocated by awarding DISH a $50 million grant for O-RAN deployment in January 2024.  Less than a month after the Ergens' donations and just two days after DISH's award was publicly announced, the DOJ threatened Relator with dismissal of the case.

Regardless of the motivation, there can be little doubt that the DOJ has failed to establish a good faith basis for its dismissal decision as required by *Polansky*.  In addition, the Rule 41 standard applied in *Polansky* also requires the Court to consider the prejudice of dismissal to Relator, which is substantial here, and which the DOJ does not address at all.  The considerations under this standard—Relator's interests in the case going forward, Relator's commitment of time and money to this case, and the stage of the litigation and the movant's timing—all support Relator.  Accordingly, this Court should deny the Motion and permit Relator to complete discovery and continue litigating its fraud claims against Defendants.

## BACKGROUND

### I.     FACTUAL BACKGROUND

To help contextualize the Government's bad faith, Relator offers the following summary of: (A) the FCC's designated entity ("DE") program, (B) DISH's interest in using DEs to acquire spectrum, and (C) evidence of Defendants' fraud in Auction 97.

#### A.     The FCC's Designated Entity (DE) Program

In authorizing the assignment of spectrum licenses by competitive bidding, Congress directed the FCC to design its auction processes in a manner that would disseminate licenses "among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women" (groups known as "designated entities" or "DEs").  47 U.S.C. §§ 309(j)(3)(B), (4)(D). The FCC generally complies with

Congress's directive by permitting DEs to utilize bidding credits in a spectrum auction, which "operate as a discount on the spectrum DEs purchase, allowing them sometimes to outbid companies that make higher bids." *Council Tree Investors, Inc. v. FCC*, 863 F.3d 237, 239 (3d Cir. 2017). Bidding credits are intended to enable designated entities both to participate in "the competitive bidding process" as well as to provide "spectrum-based services."[1]

To ensure that bidding credits are used in the manner intended by Congress, FCC rules require applicants to provide detailed ownership information in their short-form applications and establish a controlling interest standard for determining which applicants qualify as *bona fide* small businesses. Declaration of Fred Campbell ¶¶ 18-19 ("Campbell Decl."). These rules are designed to "deter the use of sham companies," *Second Report and Order* ¶ 266, seeking to take advantage of bidding credit benefits, as well as to prevent otherwise ineligible companies, such as "large incumbent wireless service providers" from "obtaining those benefits indirectly." *Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures,* Second Report and Order and Second Further Notice of Proposed Rulemaking, 21 FCC Rcd. 4753, ¶¶ 1, 58 (2006).[2]

---

[1]     *See Implementation of Section 309(j) of the Commc'ns Act - Competitive Bidding*, Second Report and Order, 9 FCC Rcd. 2348, ¶ 229 (1994) ("*Second Report and Order*"); *see also Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, Order on Reconsideration of the Second Report and Order, 21 FCC Rcd. 6703, ¶ 3 (2006) (emphasizing the need "to provide opportunities for designated entities to become robust independent facilities-based service providers with the ability to provide new and innovative services to the public . . . . ").

[2]     The need for such deterrence is illustrated by Wall Street money manager Mario Gabelli who corrupted the DE program by recruiting friends and relatives, including a former aerobics instructor and the caretaker of Gabelli's vacation home, to serve as officers of sham DEs that used bidding credits during FCC spectrum auctions. Campbell Decl. ¶ 21. Gabelli was the subject of a *qui tam* action under the FCA, *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313 (S.D.N.Y. 2004), which eventually resulted in a $130 million settlement. *Gabelli, others to pay $130 million in fraud case*, NBC News (July 13, 2006), *available at* https://www.nbcnews.com/id/wbna13844976.

The FCC's rules for determining attributable relationships require FCC staff to scrutinize the short-form applications of entities claiming DE status.  Campbell Decl. ¶ 22.  Despite modifications to its DE rules over the years, *Updating Part 1 Competitive Bidding Rules*, Report and Order, 30 FCC Rcd. 7493, ¶¶ 15, 21 (2015), the FCC seeks to "ensure that only *bona fide* small businesses qualify for and benefit from the designated entity program." *Id*. ¶ 15; *see also Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, Further Notice of Proposed Rulemaking, 21 FCC Rcd. 1753, ¶¶ 6-7 (2006) (endeavoring to ensure that the benefits of the designated entity program are "available only to bona fide small businesses" and "to prevent companies from circumventing the objectives of the designated entity eligibility rules").

## B.   DISH's Plans to Use a DE to Acquire Spectrum

Defendant Charles Ergen, DISH's former Chief Executive Officer and current Chairman, had a vision that DISH would compete "in the wireless communications sector on a large scale, and possibly at the level of being a new national entrant ...."  Hillard Depo. at 42-43.[3]  DISH sought to achieve that vision by using a DE to acquire discounted spectrum.  *Id.* at 47.  DISH was not motivated by a desire to promote competition by small businesses but rather cared only whether use of a DE arrangement to acquire spectrum would be more financially beneficial to DISH than if it acquired that spectrum on its own.

In 2013, DISH began discussions with Council Tree Investors ("Council Tree") about a possible investment in a designated entity to acquire spectrum in Auction 96 in which the FCC

---

[3]    All deposition excerpts and Relator exhibits referenced in this filing are available in the concurrently filed Confidential and Public Appendices.

auctioned H Block spectrum.  Rel. Ex. 156D; Hillard Depo. at 54-56.[4]  DISH understood that use of a DE could result in ***"very attractive" returns for DISH.***  Rel. Ex. 44 (emphasis added). According to Defendant John Muleta, who worked as a wireless consultant for DISH at the time, "The fundamental concept behind the DE is to ***think of the DE [bidding] credit it provides as a financial asset that matures over a 5 year period***." *Id.* (emphasis added).

However, DISH abandoned its plan to use a DE in Auction 96 when the only other competitor that could derive significant value from the H Block spectrum (Sprint) announced that it would not participate in the auction.  Rel. Ex. 391.  Without Sprint, a DE was not "a useful tool to Dish," *id.*, because, with "DISH as the only strategic bidder" for H Block spectrum, ***"a DE partnership brings no advantage"*** to DISH.  Rel. Ex. 443, at 3 (emphasis added).  DISH ultimately acquired all H Block licenses for the minimum price, making "***DISH's decision to pursue this alone the right decision for DISH***." *Id.* (emphasis added).

### C.    Evidence of Defendants' Fraud in Auction 97

Shortly after opting not to use a DE in Auction 96 because it brought "no advantage," DISH shifted its attention to Auction 97, which involved the sale of AWS-3 spectrum that was slated to start in 2014.  DISH was interested in acquiring AWS-3 spectrum because of its importance to DISH's wireless strategy.  Brokaw Depo. at 47; Sorond Depo. at 46-47, 65-66. Specifically, DISH had contiguous spectrum (AWS-4) that made it a "logical buyer" for and provided "higher interest" in AWS-3 spectrum, Rel. Ex. 443, at 18, which would "augment"

---

[4]    Council Tree, which is "a company organized to identify and develop investment opportunities for minority and women-owned businesses in the communications industry," had previously invested in multiple DEs.  *See Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 286 (3d Cir. 2007).

DISH's existing spectrum holdings and make its "wireless broadband service even more highly competitive." Rel. Ex. 239; Rel. Ex. 253 (AWS-3 spectrum was "absolutely critical" for DISH).

But rather than pay full price for AWS-3 spectrum, DISH leveraged the DE arrangements developed for Auction 96 for use in Auction 97. Rel. Ex. 499 (Ergen "would be nuts not to go after AWS-3 in a DE partnership"). By working with a DE, DISH sought to acquire spectrum by *"pay[ing] 25% less than gavel price on auction*." Rel. Ex. 508 (emphasis added); *see also* Rubenstein Depo. at 54 (understanding "that DISH wanted to bid with a designated entity to obtain the spectrum at a discount"). DISH recognized that, in Auction 97, it would be bidding against large wireless carriers such as Verizon Wireless (VZW) and AT&T (T), which had considerably greater financial resources. By using a *"well heeled DE partner," DISH could "bid strategically" and thereby "tip the scales when going up against VZW and T*." Rel. Ex. 18 (emphasis added).

Relator has uncovered evidence of multiple arrangements, agreements, and understandings among Defendants to implement their fraudulent scheme that were never disclosed to the FCC. Summarized below are just three examples.

*First*, Defendants had an undisclosed understanding that Northstar and SNR would serve as vehicles to acquire discounted spectrum for DISH. That Northstar and SNR were sham DEs that existed solely to acquire discounted spectrum for DISH is made plain in a presentation provided by DISH management to the company's Board of Directors on October 30, 2014. Blum Depo. at 85-86. Entitled "AWS-3 Spectrum Auction Overview," this presentation stressed the importance of AWS-3 spectrum to DISH and outlined DISH's strategy to acquire discounted spectrum utilizing a DE: "*The utilization of Designated Entities (DEs) in the upcoming auction provides an avenue to remain competitive with the large carriers and to acquire spectrum at a*

*discount[.]*" Rel. Ex. 36, at 2 (emphasis added).  The presentation also included a chart depicting the "value" to DISH of the "DE bid credit" and the reduced "net license cost" that DISH would pay as a result.  *Id.* at 11.[5]

**Second**, because they existed solely to acquire discounted spectrum for DISH, Defendants had an undisclosed understanding that neither SNR nor Northstar would use the AWS-3 licenses they acquired in Auction 97 to provide wireless services.  As one SNR investor explained, SNR "wasn't an operating entity, but a single asset, being blocks of spectrum. … It was an asset-backed deal underpinned by this spectrum as collateral.  So that makes it unique in that that collateral produces no cash flow."  Rubenstein Depo. at 91.  In fact, SNR and Northstar never even considered the financial implications of their operating a wireless business.  As another SNR investor—Nat Klipper with ADK—testified, ADK never modeled the return it would earn if SNR were to compete in the wireless business because "ADK never expected SNR to compete in the wireless business."  Klipper Depo. at 189-90.[6]

**Third,** there was no reason for SNR and Northstar to operate a wireless business given Defendants' undisclosed understanding that SNR and Northstar would exercise their put rights and sell their interests to DISH after approximately five years.  This understanding is embodied

---

[5]    Northstar and SNR also understood that their purpose was to acquire discounted spectrum for DISH.  For example, one of the Northstar investors conceded that Northstar was formed to permit DISH "to realize a 25% winning bid discount ("Bidding Credit") on any licenses obtained from the FCC."  Rel. Ex. 381, at 1.  Likewise, in the workpapers of DISH's auditor, KPMG, it is noted that DISH's investment in Northstar "**was solely to provide the Designated Entity benefit, and was designed so that DISH Network and its affiliates become 100% owners of the investment structure as soon as legally possible.**"  KPMG-VTEL-0008410 (emphasis added).

[6]    That SNR existed solely to acquire AWS-3 licenses for DISH—and not to put those licenses to use—is reflected in the term sheet to which SNR investors agreed and in deal documents used to solicit investments in SNR.  Klipper Depo. at 88, 190-98.  That explains why the investors in SNR had no interest in—and never inquired about—SNR's business plans.  *Id.* at 90-91 & 98-99; Rel. Ex. 353.

in DISH's financial modeling of the scenarios under consideration—namely, the "DE" and

"Standalone" structures—both of which assumed that DISH would own the "***licenses at end of***

***5.7 years***."  Rel. Ex. 531A (emphasis added); Rel. Ex. 459, at 4.  Likewise, both Northstar and

SNR and their respective investors understood and agreed that their AWS-3 spectrum would be

transferred to DISH after five years.  *See, e.g.*, Rel. Ex. 103, at 12 ("The expected term [of the

investment] is five years from the date the licenses are awarded by the FCC"); Rel. Ex. 473;

Klipper Depo. at 51-52 (testifying that "ADK's investment was predicated on the put right"); *see*

*also id.* at 58-65 ("If you look at our structure, we are dependent on the put right for our return of

capital").  When asked whether ADK analyzed the return on its investment that ADK would earn

absent the exercise of the put, Mr. Klipper responded: "the answer is no."  *Id.* at 189-90.

     Even though DISH aspired "to purchase a significant amount of AWS-3 spectrum"

because of its "unique value in the DISH ecosystem," Rel. Ex. 101, at 4, DISH did not win a

single license.  Rather, at the close of Auction 97, Northstar and SNR had won 702 of the 1614

licenses being auctioned, with a total of $13.327 billion in gross winning bids.  *Northstar*

*Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710*

*MHz, 1755-1780 MHz and 2155-2180 MHz Bands*, Mem. Op. and Order, 30 FCC Rcd. 8887, ¶ 3

(2015) ("*Bidding Credit Order*").  Under the governing FCC rules and regulations, Northstar and

SNR were required to pay the full amount of their gross winning bids to the FCC on or before

March 2, 2015.  *See* 47 C.F.R. § 1.2104(g)(2) (2014); 47 C.F.R. § 1.2109(a) (2014); *Auction 97*

*(AWS-3) Winning Bidders*, Public Notice, 30 FCC Rcd. 630, ¶ 8 (Jan. 30, 2015).  But instead,

they only paid approximately $10 billion because Northstar and SNR failed to disclose their

arrangements, agreements, and understandings with DISH in their short-form applications,

which, had they been disclosed, would have rendered them ineligible to use bidding credits in Auction 97.  Campbell Decl. ¶¶ 46-49.

## II.      PROCEDURAL BACKGROUND

The Court is familiar with the procedural background of this case.  Of particular importance to this Motion, after the D.C. Circuit's decision in *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022), Defendants moved for judgment on the pleadings, arguing that Relator's claims were foreclosed by the FCA's public disclosure bar and challenging the sufficiency of Relator's allegations as to certain Defendants. In response to Defendants' motion, the DOJ supported Relator, exercising its statutory right under the FCA to object to dismissal of Relator's claims based on the public disclosure bar.  *See* Dkt. 118 (citing 31 U.S.C. § 3730(e)(4)(A)).  Because of the DOJ's opposition, on November 9, 2023, the Court entered an order denying Defendants' motion.  Dkt. 165.

Approximately two months after the Court's order, the government did an about face.  On January 11, 2024, the government requested that Relator join a call with counsel for the DOJ and FCC.  This call, which the government considered urgent by scheduling it while Relator's counsel was defending a deposition in the case, took place on January 12, 2024.  During this call, Benjamin Wei, Senior Trial Attorney at the DOJ with primary responsibility for this case, advised that the DOJ had decided that the case should not proceed based on the government's purported review of materials submitted by Relator and after "lots of communications" internally and with the FCC.  Declaration of Stephen J. Obermeier ¶¶ 53-55 ("Obermeier Decl.").

When pressed on the call for details about the purported deficiencies in Relator's case, Mr. Wei declined to address the merits, other than to say that the government did not believe Relator had adequately established fraud or damages.  Even though the DOJ typically would not authorize a settlement with a "nominal amount" of damages and high attorney's fees, Mr. Wei

14

expressed his belief that he could get authorization for such a settlement in this case "as a courtesy" because Relator's attorneys "had done a good job."  But Mr. Wei threatened that, if the parties did not have at least a "handshake" settlement by January 26, 2024 (two weeks later), he would seek DOJ authority to dismiss the case under 31 U.S.C. § 3730(c)(2)(A).  Mr. Wei gave Relator until Tuesday, January 16, 2024 (following a federal holiday on Monday) to let the government know whether Relator would pursue a settlement with DISH.  Obermeier Decl. ¶ 56.

As of January 12, 2024, when Mr. Wei first threatened that the DOJ would seek dismissal of Relator's claims, Relator had deposed just 12 fact witnesses, only one of whom was a Defendant (Miranda Wright).  Relator had noticed more than 30 depositions of Defendants and affiliated third parties, including depositions under Rule 30(b)(6), with 11 depositions scheduled for the last two weeks in January 2024 and 12 depositions scheduled for February 2024.  Among the depositions scheduled for February included Defendant Charles Ergen (February 16), Defendant Cantey Ergen (February 14), Defendant John Muleta (February 21), and two senior DISH executives (February 9 and February 13), among others.  Relator's fact discovery was scheduled to conclude on February 23, 2024, and Relator's expert reports were due on February 28, 2024.  *Id.* ¶¶ 57, 62.

Although Relator accepted the DOJ's invitation to discuss settlement with Defendants, negotiations with Defendants proved unsuccessful because Relator would not agree to the unethical settlement proposed by Mr. Wei, which created a conflict between Relator and its counsel.  *Id.* ¶ 60.  Consequently, on February 8, 2024, Mr. Wei informed Defendants of the DOJ's intention to seek dismissal of the case, which was just days before Relator was scheduled to depose key witnesses in the case, including Charles and Cantey Ergen.  As a result, and at

Defendants' insistence, the remaining depositions in the case were cancelled.  *Id.* ¶ 79.  The
government then waited a month to file its Motion.

## STANDARD OF REVIEW

Under the Rule 41(a) standard applied in *Polansky*, *see* 599 U.S. at 435-36, "an action
may be dismissed" post-answer "at the plaintiff's request only by court order, on terms that the
court considers proper."  Fed. R. Civ. P. 41(a)(2).  The "proper terms" analysis under Rule
41(a)(2) requires the Court to ask two questions.  First, has the plaintiff moved for voluntary
dismissal in "good faith"?  *See Guttenberg v. Emery*, 68 F. Supp. 3d 184, 187 (D.D.C. 2014)
(quoting *Conafay v. Wyeth Labs.*, 793 F.2d 350, 353 (D.C. Cir. 1986)).  Second, will the relator
"'suffer prejudice' . . . based on the dismissal?"  *Id.* (quoting *Conafay*, 793 F.2d at 353); *see*
*Polansky*, 599 U.S. at 437 (explaining that, in the FCA context, prejudice is assessed with respect
to the relator rather than the defendant).  Moreover, *Polansky* requires the Court to consider
whether dismissal would violate "constitutional constraints on Government action."  *Polansky*,
599 U.S. at 436 n.4; *see Borzilleri v. Bayer Healthcare Pharms., Inc.*, 24 F.4th 32, 42-43 (1st Cir.
2022).

## ARGUMENT

All three factors identified in *Polansky* require denial of the DOJ's Motion.  First, the
DOJ has acted in bad faith, as evidenced by its misconduct in this case and its complete failure to
support its purported bases for dismissal.  Second, the prejudice to Relator of dismissing the case
now after investing substantial resources in the case for over nine years—including throughout
discovery—is significant.  And third, dismissal violates the Takings Clause of the Fifth
Amendment, which prohibits the government from taking action that "denies all economically
beneficial or productive use" of a person's property.

16

## I.       THE COURT SHOULD DENY THE DOJ'S MOTION TO DISMISS BECAUSE IT IS BROUGHT IN BAD FAITH.

"Good faith is a question of fact, assessed against a plaintiff's reasons for seeking voluntary dismissal."  *Smith v. Dep't of the Treasury*, No. 17-CV-1796 (TSC), 2022 WL 4547810, at *2 (D.D.C. Mar. 8, 2022) (citing *Conafay*, 793 F.2d at 352 n.4).  The facts here demonstrate that the DOJ is not seeking dismissal in good faith.  Specifically, the government: (A) frustrated discovery by Relator and failed to consider evidence of fraud uncovered by Relator; (B) relies on the illusory and speculative burdens of future discovery when it never bothered to challenge Defendants' obviously objectionable discovery requests; (C) mischaracterizes the sufficiency of the evidence supporting Relator's claims; (D) overlooks the demonstrable harms to the government from Defendants' fraud; (E) fails to demonstrate any of the criteria on which the agency has relied in the few cases it has previously moved to dismiss; and (F) appears to have ulterior motives that have nothing to do with the reasons offered in support of dismissal.

### A.       The Government's Efforts to Frustrate Discovery by Relator and Its Failure to Consider Evidence of Defendants' Fraud Constitute Bad Faith.

At the very least, good faith necessitates that the government adequately investigate allegations of fraud and take consistent positions before the Court.  The DOJ fails on both counts here.

The government not once but twice objected to dismissal of Relator's claims in opposing Defendants' motion for judgment on the pleadings, most recently in November 2023.  But some two months later, the DOJ threatened Relator with dismissal of those same claims.  The Motion is devoid of any explanation for—or even an acknowledgment of—the government's sudden change of heart in seeking dismissal of claims it opposed dismissing just two months earlier.

Nor does the DOJ explain why it did not alert the Court or the Relator that it was considering dismissal when it reiterated its objection to Relator's claims being dismissed in November 2023.

The Motion also is contrary to the reason given by the government for opposing Defendants' motion for judgment on the pleadings, namely its stated interest in Relator uncovering evidence of Defendants' fraud. The government first declared that interest in October 2018, noting the importance of any "evidence" Relator may "uncover" establishing "that the Defendants violated their disclosure obligations" to the FCC. Dkt. 65, at 3. The government reconfirmed this interest in October 2022 and again in November 2023. Dkt. 188, at 10 ("The United States' objection gave VTel a chance, in discovery, to uncover evidence supporting its core allegation that the Defendants failed to disclose material information").

If the DOJ were acting in accordance with the government's interests, it would have deferred any decision about dismissal at least until after the close of Relator's fact discovery on February 23, 2024, and submission of Relator's expert reports on February 28, 2024. Once fact discovery had concluded and Relator had submitted its expert reports, the DOJ could have made an informed decision about the merits of Relator's case based on all the evidence Relator had uncovered. Nothing prevented the DOJ from engaging in such informed decision-making, particularly when it was not even prepared to file its Motion until March 8, 2024, weeks after Relator's fact discovery and expert report deadlines.

But instead, the DOJ timed its dismissal decision during discovery to have the effect—if not the purpose—of preventing Relator from uncovering the very evidence the government was purportedly interested in Relator uncovering. Specifically, the DOJ stated its intention to move for dismissal on February 8, 2024, just days before the depositions of key actors involved in the fraud, including Charles Ergen, knowing full well that Defendants would cancel the remaining

18

depositions, which is precisely what happened.  The timing of the DOJ's dismissal decision, which was made before key witnesses had been deposed and just weeks before the end of fact discovery, cannot be reconciled with the DOJ's representation that it made its decision only after "careful consideration of the evidence." Dkt. 188, at 1.[7]

That the DOJ did not carefully consider the evidence in this case also is underscored by its failure to take into account any deposition testimony in deciding whether to move for dismissal.  Neither the DOJ nor FCC staff attended a single deposition of Defendants or their affiliated third parties.  Nor, to Relator's knowledge, did they ever request or review a single transcript from these depositions.  In fact, when the DOJ first threatened Relator with dismissal on January 12, 2024, final transcripts were available for only 10 of the more than 30 depositions Relator had noticed.  Obermeier Decl. ¶ 57.

The Motion also mischaracterizes and omits key details about the purported investigation of Relator's claims conducted by or under the direction of Mr. Wei.  For example, the DOJ claims it investigated Relator's allegations for more than "16 months" after Relator filed its complaint in May 2015.  Dkt. 188, at 7.  However, it is Relator's understanding that the DOJ did not issue a single subpoena or civil investigative demand, which means that the "thousands of pages of documents" voluntarily provided by Defendants and purportedly reviewed by the DOJ were necessarily curated by Defendants.  Unsurprisingly, none of the cherry-picked documents

---

[7]     The timing of the announcement of its dismissal decision also strongly suggests that the DOJ was protecting Mr. Ergen from having to testify under oath, even though Mr. Ergen was a key player in Defendants' fraud given his involvement in developing DISH's "strategy" in Auction 97.  Dravenstott Depo. at 179, 268:5-9; Dunn Depo. at 348-53.  As described by one DISH employee, Ergen was "very engaged and stated that this auction project was 'the most intellectually interesting/challenging thing that he has done in his entire career.'"  Rel. Ex. 170D.

Defendants provided to the DOJ included the voluminous documents uncovered by Relator that confirm the fraud in which they engaged.  Obermeier Decl. ¶ 4.

Likewise, the DOJ's claim that its decision to seek dismissal was only made after "having heard from Relator" overlooks the DOJ's repeated unwillingness to meet to hear what Relator had to say.  Dkt. 188, at 1.  For example, with written discovery underway, Relator emailed Mr. Wei and his DOJ colleagues on June 26, 2023, requesting a meeting to discuss Relator's "progress to date."  Mr. Wei never responded.  Obermeier Decl. ¶ 9.  Relator reiterated its meeting request on July 7, 2023, which Mr. Wei declined.  *Id.* ¶ 10.  On August 9, 2023, and again on September 11, 2023, Relator emailed Mr. Wei offering to meet to provide a briefing about the evidence in the case.  Mr. Wei never responded.  *Id.* ¶¶ 11, 14.[8]

Mr. Wei showed a similar lack of interest in reviewing written materials about the case. For example, rather than agreeing to meet with Relator in July 2023, Mr. Wei invited Relator "to send over any documents you think we should review."  Relator accepted Mr. Wei's invitation, sending him on August 10, 2023, via Wiley's file transfer software platform more than 1,000 documents obtained during discovery.  Mr. Wei did not review these documents—despite initially representing that he did—and Relator had to resend them to Mr. Wei a month later.  Of the more than 1,000 documents that Relator provided to Mr. Wei on September 11, 2023, Wiley's file transfer software indicates—and the DOJ essentially concedes—that Mr. Wei only opened a small fraction (147 documents), leaving untouched and unreviewed the vast majority (900 documents).  Obermeier Decl. ¶ 15; Dkt. 188, at 12.  Relator also offered to make available

---

[8]     According to the Motion, the only meeting between Relator and the DOJ after the commencement of discovery in late 2022 occurred on January 25, 2024.  Dkt. 188, at 13.  This meeting took place ten days after the DOJ had threatened to dismiss Relator's case.  Obermeier Decl. ¶¶ 63-65.

to Mr. Wei copies of Relator's responses to Defendants' written discovery requests—an offer to which Mr. Wei never responded.  Obermeier Decl. ¶ 14.

Furthermore, Relator sent the DOJ multiple letters and memoranda summarizing the evidence confirming Defendants' fraud and outlining Relator's damages theories, but the DOJ did not discuss with Relator—and never asked Relator a single question about—any of these materials.  *Id.* ¶ 44.  And it appears the DOJ never bothered to review some or most of the letters and memoranda provided by Relator.  *Id.*

Because it abdicated its investigatory responsibilities, the DOJ has no choice but to point to communications between Relator and FCC staff in asserting that Relator had "ample opportunity to convey the fruits of discovery it believed supported its allegations to the *United States*."  Dkt. 188, at 11 (emphasis added).  But the DOJ neglects to mention that all four of the meetings between Relator and FCC staff occurred before a single Defendant had been deposed in the case and before the conclusion of written discovery.  Obermeier Decl. ¶ 57.  The DOJ also mischaracterizes the substance of two of these meetings, as Relator's "theory of damages" was not discussed with FCC staff on either the September 15, 2023, or October 23, 2023 calls. *Id.* ¶¶ 37, 45-46.

At bottom, the DOJ frustrated Relator's ability to obtain evidence of Defendants' fraud and failed to consider evidence that Relator had uncovered—conduct that was contrary to the government's interests in this case and renders false the DOJ's representations to this Court about the process it employed in deciding to seek dismissal.  Such conduct also constitutes bad faith that calls into serious question the veracity of the DOJ's characterization of the evidence supporting Relator's claims.  The merits of the case are discussed more fully below.

**B.**     **The Government's Reliance on Illusory Discovery Burdens Associated with Defendants' Objectionable Discovery Requests and Failure to Challenge Those Requests Constitute Bad Faith.**

The DOJ's reliance on the purportedly "significant resource drain on" and the "high" costs "[to] the United States and this Court" if the government must respond to Defendants' "extraordinary discovery" also demonstrates bad faith.  Dkt. 188, at 19-20.[9]  According to the DOJ, various government agencies, especially the FCC, purportedly face "significant discovery burdens" in responding to Defendants' subpoenas.  But these burdens, which the DOJ has neither documented nor quantified, are entirely illusory and speculative because the discovery requests propounded by Defendants are objectionable (as even the DOJ acknowledges), and, for reasons the DOJ has not explained, it has made no effort to assert these objections or otherwise contest Defendants' discovery demands.[10]

The DOJ has made clear that the scope of permissible discovery from the government is narrow.  Specifically, according to the DOJ, "the only information relevant for purposes of discovery from the government must be specifically tethered to specific 'instruments, agreements, and understandings' that were not disclosed, [as identified by Relator]." Obermeier Decl. ¶ 87 & Ex. SO-7 (emphasis in original; citation omitted).  Nearly all Defendants' requests fail this standard, which the DOJ's "burden" argument ignores.  Obermeier Decl. ¶¶ 99-101.

---

[9]     The DOJ's focus on burdens on this Court as grounds for dismissal is curious.  Every FCA action is burdensome to the court in which the case is pending, and the DOJ does not cite any authority for the notion that burdens on the judiciary constitute "good cause" that would justify dismissal under Rule 41(a).

[10]     According to the DOJ, certain discovery requests by Defendants are objectionable because they "impose an undue burden" and "seek privileged materials."  Dkt. 188, at 20.  Nevertheless, the DOJ has failed to pursue those objections.

For example, the DOJ points to the "thousands of pages of internal documents relating to its evaluation of bidders in Auction 97" that Defendants have subpoenaed from the FCC as illustrative of the burdens the government purportedly faces in litigating this case. Dkt. 188, at 13. However, such documents have nothing to do with—and are not "specifically tethered to"—the understandings Relator alleges Defendants fraudulently failed to disclose to the FCC. The same is true for the documents Defendants requested from the Department of Interior, Department of Commerce, Department of the Army, Department of the Navy, and Department of the Air Force. And yet the DOJ has done nothing to resist Defendants' discovery requests.[11]

Defendants' discovery requests also fail the standards for seeking third-party discovery from the government under *United States ex rel. Touhy v. Ragen*, 340 U.S. 452 (1951). A good example concerns the deposition notice Defendants issued for Thomas Johnson, the former General Counsel of the FCC (and current partner at Wiley), which the DOJ also cites in support of its "burden" argument. Dkt. 188, at 14. Putting aside the improper nature of a request for testimony from an agency's former General Counsel about the government's knowledge and decision-making in an administrative proceeding and related FCA case (the subjects on which Defendants seek testimony from Mr. Johnson), Auction 97 occurred ***two years before*** Mr. Johnson was even employed at the FCC. Thus, he lacks firsthand knowledge about the FCC's rationale in deciding to deny bidding credits to SNR and Northstar in 2015, even assuming this

---

[11]    As further evidence of the government's bad faith, the DOJ never mentioned the requests to federal agencies other than the FCC prior to the filing of its Motion, and Mr. Wei's original explanation for the DOJ's decision to seek dismissal never mentioned "burden" at all. Obermeier Decl. ¶ 55.

topic were an appropriate subject of inquiry (which it is not) and is not foreclosed by the deliberative process privilege (which it is).  Obermeier Decl. ¶ 99.[12]

   And yet, as far as Relator is aware, the DOJ has not raised any objections to Defendants' request to depose Mr. Johnson (or to any other of Defendants' discovery requests), nor did the FCC exercise its substantial discretion to oppose discovery under *Touhy*.  While the government's failure to do so has no good faith explanation, it renders false the DOJ's claims about the "extraordinary burden" facing the FCC in responding to discovery from Defendants.

   The inaction of the DOJ in this case stands in stark contrast to the government's vigorous efforts to oppose discovery in *Polansky*.  There, the DOJ opposed a series of subpoenas seeking documents and deposition testimony to several federal agencies from the defendant, which filed a motion to compel that the government opposed.  Eventually, the parties' discovery disputes were referred to a Special Master, who recommended that the government be ordered to produce certain documents withheld based on the deliberative process privilege and search for and produce responsive documents from the files of additional government custodians.  The government's objections to the Special Master's recommendation were largely rejected by the district court, which directed the government to produce the documents in question, including those withheld based on the deliberative process privilege.  Dkt. No. 520.

   Importantly, it was only then—*i.e.*, after **it had litigated and lost its objections** to the defendants' discovery demands—that the DOJ moved to dismiss the relator's claims in

---

[12]    Defendants also purport to want Mr. Johnson to testify about why the DOJ decided to veto dismissal of Relator's claims under the public disclosure bar and why the government allegedly treated Relator differently from another relator that filed a *qui tam* action in connection with Auction 97.  *Id.* ¶¶ 99-100.  But this Court settled the public disclosure bar in denying Defendants' motion for judgment on the pleadings.  In any event, the DOJ exercised its veto right in December 2022—***nearly two years*** after Mr. Johnson stepped down as FCC General Counsel in January 2021.  *Id.* ¶ 100.

*Polanksy*.  In this case, by contrast, the DOJ has moved to dismiss Relator's claims without lifting a finger to oppose Defendants' objectionable discovery requests.  Indeed, the government here is under no court order to produce any documents or witnesses, rendering its burden claims entirely speculative.

Because the DOJ failed to protect the interests of the federal agencies about which the DOJ now professes concern, Relator assumed this responsibility.  Specifically, pursuant to Rule 45, Relator initiated the meet-and-confer process required under the Court's discovery procedures to oppose Defendants' efforts to pursue irrelevant, burdensome, and privileged discovery from the government.  Obermeier Decl. ¶ 75.  While Defendants refused to participate in this process after the DOJ's decision to move for dismissal, Relator's willingness to assume the burden of litigating Defendants' discovery demands from the government relieves the government of this burden.  Dkt. 188, at 20.  Furthermore, unless and until the meet-and-confer process is complete—and the Court decides whether Defendants' discovery requests are consistent with the Federal Rules—it is entirely speculative that discovery in this case will "drain" any government resources as claimed by the DOJ.

In short, the government has compelling and substantial grounds to oppose Defendants' discovery requests, which would minimize if not eliminate the burdens and costs about which the DOJ complains.  But rather than doing its job to protect the government's interests—or even allowing Relator to do the DOJ's job—the DOJ has sat on its hands, opting to proceed in bad faith by using Defendants' objectionable discovery requests to seek dismissal of this case.

**C.**      **The DOJ's Mischaracterization of the Sufficiency of the Evidence Supporting Relator's Claims Constitutes Bad Faith.**

While this Court is not tasked here with deciding the merits of the cases, the record evidence confirms Defendants' fraud, which further demonstrates the government's bad faith in

representing otherwise.  The DOJ has nothing to say about the evidence in this case, except to assert that it is "cumulative of what the Defendants had affirmatively disclosed" to the FCC. Dkt. 188, at 16-17.  But the DOJ fails to point to anything in support of this assertion.  Where, for example, did SNR and Northstar disclose to the FCC that they would serve as vehicles to acquire discounted spectrum for DISH?  And where did they disclose that they would not provide wireless services using their licenses that would be transferred to DISH after five years? It would have been easy enough for the DOJ to direct the Court to these disclosures had they been made, which they were not.

The DOJ's "cumulative" assertion also is contradicted by the sworn testimony of Jeffrey Blum, DISH's Executive Vice President of External and Legislative Affairs and DISH Rule 30(b)(6) designee.  Relator deposed Mr. Blum on February 8, 2024, the same day when the DOJ announced its intention to seek dismissal of Relator's case.  Mr. Blum testified that neither SNR nor Northstar had disclosed to the FCC any of the undisclosed understandings alleged by Relator (the existence of which DISH denies).  Blum Depo. at 210:12 - 218:11.  When asked whether DISH ever asked SNR and Northstar to disclose each of the undisclosed understandings alleged by Relator, Mr. Blum responded "no."  *Id.*  Furthermore, according to Mr. Blum, DISH never told the FCC about any of the undisclosed understandings alleged by Relator, nor, to DISH's knowledge, did any of the Defendants.  *Id*.  By definition, understandings that DISH concedes were never disclosed to the FCC cannot be "cumulative" of whatever agreements SNR and Northstar did disclose.

Brushing aside the substantial evidence of Defendants' fraud, the DOJ insists that the government "continues to have confidence" in the FCC's prior determination that Defendants merely "proceeded under an incorrect view" of FCC rules.  Dkt. 188, at 17.  Of course, to do

otherwise would require that FCC staff admit the agency made a mistake—an admission FCC staff is understandably anxious to avoid. But the government's "confidence" in the correctness of the FCC's prior determination also is misplaced given the evidence uncovered by Relator.

As just one example, multiple documents and deposition testimony confirm that Defendants were parties to a "joint venture" arrangement.[13] Under FCC rules, by virtue of their joint venture arrangement, DISH, SNR, and Northstar were "considered to be affiliated with each other," and thus SNR and Northstar were required to aggregate DISH's revenues in determining compliance with the FCC's designated entity requirements. 47 C.F.R. § 1.2110 (c)(x)(B) (2014). Defendants were not laboring under any "incorrect view" of the FCC's affiliation rules when they did not disclose their joint venture with DISH or include DISH in their aggregated revenues. Rather, SNR and Northstar intentionally and fraudulently failed to do so because they knew it would disqualify them using bidding credits in Auction 97.

The DOJ's representations about the sufficiency of the evidence supporting Relator's allegations lack any support in the record. And they confirm the DOJ's bad faith in seeking dismissal of Relator's claims based on such falsehoods.

### D. The DOJ's Willingness to Ignore the Harms to the Government Resulting From Defendants' Fraud Constitutes Bad Faith.

The DOJ argues that this case should be dismissed because "significant doubt" exists that Relator "will be able [to] prove damages" under the FCA. Dkt. 188, at 17. According to the DOJ, because "the FCC denied both SNR and Northstar bidding credits after review of their

---

[13] *See, e.g.*, Rel. Ex. 398, at 15 (stating in its annual report that Doyon "is the managing member" of a "joint venture" with DISH "to acquire and develop wireless spectrum licenses" in Auction 97); Wright Depo. at 24-25 ("We had a joint venture with DISH"); *id.* at 144 ("[I]t was more of a joint venture type of arrangement than a partnership"); Dattilo Depo. at 138-39 (testifying that DISH's accounting team prepared a preliminary analysis of the consolidation issue in August 2014 after learning of a "joint venture being formed …").

'long-form' applications," had the Defendants disclosed the undisclosed understandings

uncovered by Relator, "the result would be the same: the FCC would have denied SNR and

Northstar bidding credits."  *Id.* at 18.

Importantly, the DOJ does not claim that Relator is unable to establish damages under the

FCA as a matter of law.  Nor could it.  As noted in his declaration, consistent with the

appropriate legal standard that damages must be calculated to restore the government to the

position it would have enjoyed had it received the "benefit of the bargain," Dr. Kulick calculates

actual damages to the government of approximately $3.3 billion, which is the amount the

government would have received in the absence of Defendants' fraudulent conduct.  Declaration

of Robert Kulick ¶ 16.  Given that the FCA "is the Government's primary tool for redressing the

knowing misuse of taxpayer funds" and that *qui tam* cases "serve as the predominant source of

False Claims Act recoveries,"[14] any "doubts" about Relator's ability to prove damages should be

resolved by a jury at trial, not the DOJ on a motion to dismiss.

Furthermore, the DOJ's "damages" argument is predicated on the FCC's denial of

bidding credits after review of SNR's and Northstar's ***long-form applications***.  But this is just

the flip side of Defendants' argument that their fraud was not material under the FCA because

"the alleged undisclosed agreements would not have changed the Commission's ultimate

decision to deny bidding credits …."  *Northstar Wireless, LLC*, 34 F.4th at 37.  In rejecting this

argument, the D.C. Circuit reasoned that SNR's and Northstar's failure to disclose agreements

---

[14]     Remarks of Deputy Assistant Attorney General Michael D. Granston at the ABA Civil
False Claims Act and Qui Tam Enforcement Institute (Dec. 2, 2020), *available at*
https://www.justice.gov/opa/speech/remarks-deputy-assistant-attorney-general-michael-d-
granston-aba-civil-false-claims-act.

and the false certifications on their **short-form applications** "had the potential to affect the Commission's eligibility determinations regarding such bidding credits." *Id.*

The D.C. Circuit expected that the degree to which the FCC "substantially reviews short-form applications" would "be addressed at a later stage in this litigation." *Id.* at 38. But the DOJ has nothing to say on this subject. The DOJ's silence is unsurprising given that, in every FCC spectrum auction, staff conducts a substantive review of the short-form applications of applicants seeking bidding credits, which review plays a critical role in preventing an applicant that is not a bona fide designated entity from using bidding credits in a spectrum auction. Campbell Decl. ¶ 32. That is why the rules mandate that full final payment is due after the short form process and is a necessary condition to an applicant submitting a long form application. *See* 47 C.F.R. § 1.2104(g)(2) (2014); 47 C.F.R. § 1.2109(a) (2014). Had the DOJ allowed Relator to submit its expert reports, it would have seen the evidence of this obvious point that the D.C. Circuit anticipated would be an issue in the case.

Indeed, the public notice setting forth the procedures governing Auction 97 expressly put applicants on notice that, "[i]f an applicant claims eligibility for a bidding credit, the information provided in its FCC Form 175 *[short-form application] will be used to determine whether the applicant is eligible for the claimed bidding credit*." DA 14-1018, ¶ 64 (WTB July 23, 2014) (emphasis added). And there are multiple examples in Auction 97 of FCC staff assessing an applicant's claim for bidding credits and finding that claim wanting based on the information in that applicant's short-form application. Campbell Decl. ¶ 41.

There also are examples from other spectrum auctions of applicants being found ineligible for bidding credits based on their short-form applications. In *Letter to Robert J. Keller*, 19 FCC Rcd. 22843 (WTB 2004), and *Letter to Timothy Welch*, 17 FCC Rcd. 14754

(WTB 2002), for example, FCC staff found that the applicants were ineligible for bidding credits because they failed to identify all their applicant's officers and directors, concluding that this information was necessary to ensure that only bona fide small business receive bidding credits. *Welch*, 17 FCC Rcd. at 14756; *see also Keller* 19 FCC Rcd. at 22846 (noting the importance of applicants "satisfy[ing] eligibility qualifications prior to the auction," which "could be substantially impaired if the Commission is required to guess whether applicants will qualify for bidding credits"). These decisions confirm the FCC's interest in identifying applicants that do not qualify for designated entity status and denying those applicants' use of bidding credits prior to commencement of the auction rather than waiting for the submission of long-form applications as the DOJ erroneously suggests. Campbell Decl. ¶ 39.

In addition to ignoring the critical nature of the short-form application in the FCC process for determining an applicant's eligibility for bidding credits, the DOJ understates the effect of Defendants' fraud on that determination. As explained in detail in the Campbell Declaration, each of the undisclosed understandings uncovered by Relator would have disqualified Northstar and SNR from being bona fide designated entities and rendered them ineligible to use bidding credits in Auction 97, had they been fully and truthfully disclosed in their short-form applications. *Id.* ¶¶ 46-62.

The DOJ's "doubt" about Relator's ability to prove damages because SNR and Northstar were never awarded bidding credits ***after the auction*** ignores the harms to the government and the public from SNR's and Northstar's fraud in their short-form applications and their resulting improper use of bidding credits ***during the auction***. By improperly using bidding credits in Auction 97, Defendants prevented rival service providers from obtaining AWS-3 spectrum they needed to compete; artificially increased the amounts that competitors paid for the AWS-3

spectrum they were able to win; and artificially increased the value of DISH's spectrum holdings. *Id.* ¶¶ 64-69.

These harms were the direct result of SNR's and Northstar's failure to disclose in their short-form applications the parties' undisclosed understandings and false certifications as alleged by Relator, which allowed SNR and Northstar to use bidding credits during the auction to which they were not entitled. *Id.* ¶ 63. And these harms exist independent of—and are not remedied by—the denial of bidding credits. *Id.* ¶ 64.

Despite the DOJ's assertion otherwise, the denial of bidding credits does not put the government in the same position as it would have been had Northstar and SNR disclosed in their short-form applications the undisclosed understandings uncovered by Relator and not falsely certified otherwise. Had they made these disclosures and certified truthfully, Northstar and SNR would have been ineligible to use bidding credits in Auction 97. *Id.* ¶ 71. Because DISH had a "budget of about $10 billion" to spend in Auction 97 "for DISH itself and for its investment in Northstar and SNR …," Blum Depo. at 101:8-16, they (or more likely DISH) would only have submitted bids in the amount of $10 billion. *See* Northstar 30(b)(6) Todd Depo. at 325:3-9 (testifying that Northstar was "without sufficient funds to pay for all of the licenses" and therefore default "was a forgone conclusion, in our view"). In these circumstances, rival providers would have bought the $3.3 billion in licenses that SNR and Northstar could not afford to buy and would have used those licenses to provide wireless services. Campbell Decl. ¶ 71. Thus, the "result" definitely would not have been the same had Defendants made the disclosures Relator alleges they fraudulently failed to make.

Furthermore, it is impossible to take seriously the suggestion that the government is unharmed by two designated entities that lied about and falsely certified to their relationship with

DISH on their short-form applications.  First, not even FCC staff shares this view.  Obermeier Decl. ¶ 32.  Second, the government still has not been paid the $3.3 billion it was owed in 2015, on which the interest alone is approximately $1 billion, and the spectrum on which Northstar and SNR defaulted has remained fallow for nine years.  Third, that Northstar and SNR ultimately did not enjoy the financial benefit of bidding credits because they got caught also ignores the deterrent purpose that damages under the FCA are intended to serve, another issue the DOJ fails to acknowledge let alone address.

### E.   The Unprecedented Nature of DOJ's Decision to Seek Dismissal Demonstrates Bad Faith.

As the DOJ acknowledges, it only seeks dismissal in "rare instances."  Dkt. 188, at 16. But this case is unlike any other *qui tam* action in which the DOJ has sought dismissal over the relator's objection, and DOJ cannot seriously argue otherwise.

According to the DOJ, it moved to dismiss only 45 of the more than 1,170 *qui tam* actions filed in 2018 and 2019.  Those 45 cases involved factors not present here, such as: (i) actions that were filed by relators unrepresented by counsel; (ii) "a relator who is alleged to have shorted the stock of the defendants named in his complaints"; (iii) claims that were "not legally cognizable" under the FCA; and (iv) actions that "could undermine patient care" or threatened the disclosure of "classified information."  Obermeier Decl. ¶ 81.

Based on Relator's research of *qui tam* cases filed since 2019, the DOJ has moved to dismiss only 24 of the approximately 2,800 cases brought during this period.  In 20 of those 24 cases, the relator was *pro se*, did not object to dismissal, and/or had asserted non-cognizable or meritless claims under the FCA.  In the remaining four cases, the relator had objected to a proposed settlement or engaged in misconduct, or the DOJ moved to dismiss the case before an

answer had been filed and the relator had engaged in discovery.  None of these circumstances exists here.  *Id.* ¶¶ 82-83.

This case also is not "identical" to *Polansky*.  Dkt. 188, at 20.  Foremost, although not mentioned by the DOJ, a "material" factor in the district court's decision in *Polansky* was the relator's "behavior" that "caused serious prejudice to Defendant and unnecessary delays in pretrial proceedings," which included: (i) belatedly failing to produce approximately 14,000 documents that resulted in sanctions against the relator; and (ii) "unilaterally" and "without offering any explanation" purporting to change the settled method for selection of claims in a bellwether trial "that had been painstakingly arrived at after several pretrial conferences . . . ." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 422 F. Supp. 3d 916, 920-21 (E.D. Pa. 2019).  This behavior called into question the relator's "credibility," which cast doubt on the relator's likelihood of "potential financial recovery."  *Id.* at 927.[15]

Furthermore, the district court was "satisfied" that the government had "thoroughly investigated" and "sufficiently documented" the costs if the case were to proceed.  *Id.* at 927 & 930.  These documented costs included: "internal staff obligations" associated with the litigation; "anticipated costs related to" the government's compliance with a Special Master's discovery recommendation; and "expected attorney time" for deposition preparation and litigation monitoring.  *Id.* at 928 (footnotes omitted).  The government submitted a declaration "to quantify the burden" of continued litigation, which included detailed estimates of the attorney hours

---

[15]    Doubts about the relator's prospects for recovery in *Polansky* were underscored by the district court's decision to grant summary judgment to the defendant on certain of relator's claims for which "there can be no FCA liability" as a matter of law and for which it was unlikely the relator will "be able to establish that Defendant's alleged misconduct was material to the Government's payment decision," which, according to the court, were "additional reasons that support dismissal of this case."  *Polansky*, 422 F. Supp. 3d at 935-39.

involved.  *Id.* n.5; *see also Polanksy*, 599 U.S. at 438 (noting that "the Government, in moving to dismiss, enumerated the significant costs of future discovery in the suit, including the possible disclosure of privileged documents").  And that declaration was based on the government's need to comply with a court order that had been entered following a long discovery fight.

Here, Relator has not engaged in any behavior of the type at issue in *Polansky* or done anything to call into question its credibility.  Nor has the DOJ "thoroughly investigated" let alone "sufficiently documented" the burdens the government purportedly would incur if this case were to proceed.  In contrast to *Polansky*, the DOJ has not submitted a declaration that enumerates or quantifies the purported burdens facing the government from future discovery.  And as explained above, those supposed burdens are illusory and speculative because the DOJ never bothered to challenge Defendants' discovery requests and there is no court order compelling the government's response.[16]

The DOJ also relies erroneously on *United States. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs.*, No. 1:17-cv-0558, 2023 U.S. Dist. LEXIS 217620 (N.D. Ohio Dec. 7, 2023), *appeal pending* No. 24-3022 (6th Cir.).  Dkt. 188, at 21.  In that case, the district court granted the DOJ's motion to dismiss the relator's claim that the defendant had fraudulently induced NASA to enter into inflated contracts based on false price proposals.  Unlike here, the relator in that case was the subject of a motion to disqualify for breaching the seal requirements of 31 U.S.C. § 3730(b)(2), which led the government and the district court to express concerns about the relator's "credibility."  *Id.* at *4-5.  Unlike here, the relator's fraud allegations in that case, which depended upon the assertion that the defendant's proposals received little to no review by NASA

---

[16]    In the event the government attempts to submit any declarations with its reply, Relator intends to seek leave of the Court file a surreply.

before being approved, were "contradict[ed]" by the deposition testimony of NASA employees who testified that the proposals were approved only after "a lengthy review process." *Id.* And, unlike here, the DOJ moved to dismiss the relator's claims only after discovery had closed.[17]

### F.   <u>The DOJ May Have Other Motives in Seeking Dismissal of This Case.</u>

Relator cannot know for certain what explains the DOJ's sudden change of heart in seeking dismissal of this case before the completion of discovery and its failure to offer a valid basis for seeking dismissal. But three points cannot be ignored, each of which strongly suggests bad faith.

***First***, FCC staff has an institutional incentive to ignore—or, at the very least, discount—evidence of Defendants' fraud because of the agency's prior determinations on the subject (determinations in which the government blindly expresses continued "confidence"). In 2015 when it found that SNR and Northstar were ineligible for bidding credits, the FCC concluded that Defendants would "be forthright with the Commission in the future." *Bidding Credit Order* at ¶ 132. Likewise, in 2015, the FCC concluded that there was no need to refer the matter to the FCC's Enforcement Bureau, as Relator and others had requested. *Id.* ¶ 44.

Evidence that SNR and Northstar had fraudulently failed to disclose and affirmatively misrepresented their relationship with DISH in their FCC filings would make the FCC's conclusions look foolish. And it would require the FCC to explain why it let lapse the statutory deadline for initiating a forfeiture proceeding against Defendants for their fraud in Auction 97.

---

[17]     In *United States ex rel. Carver v. Physicians Pain Specialists of Ala., P.C.*, No. 22-13608, 2023 U.S. App. LEXIS 19592 (11th Cir. July 31, 2023), which also is cited by the DOJ, the relator likewise engaged in misconduct that warranted dismissal. *See id.* at *11 (noting that the relator had "failed to prosecute this action to an enforceable judgment, neglected her responsibilities as a relator, burdened the United States with discovery requests that are either irrelevant or premature, and undercut the United States' FCA enforcement efforts . . . . ").

**Second**, and although mentioned nowhere in the Motion, the Biden Administration is closely allied politically with DISH and the Ergens.  The genesis of this alliance was T-Mobile's acquisition of Sprint in 2019, during which the DOJ and the FCC concluded that four nationwide facilities-based providers were required to ensure a competitive wireless market and that DISH should be that fourth provider.[18]  Consistent with this conclusion, the government has an incentive to ensure that DISH's market entry is successful.

Because it lacks the financial resources of the other nationwide providers such as AT&T and Verizon, DISH is relying upon O-RAN technology to compete.[19]  The global deployment of O-RAN also is a policy imperative of the Biden Administration.[20]  The more flexible network architecture enabled by O-RAN reduces dependence on a small group of equipment suppliers, which include Chinese vendors that work closely with and benefit from the support of the Chinese government.  The Biden Administration is committed to commercializing O-RAN

---

[18]    *See* Second Am. Compl. ¶ 3, *United States v. Deutsche Telekom AG*, No. 1:19-cv-02232-TJK (D.D.C. Oct. 2, 2019) (ECF No. 1); Mot. and Mem. in Supp. of Entry of Final J. at 6, *Deutsche Telekom AG* (Nov. 8, 2019) (ECF No. 44) (noting that "the proposed Final Judgment is designed to address the likely anticompetitive effects of [T-Mobile's acquisition of Sprint] by" enabling "DISH to enter the market as a new 5G mobile wireless services provider and a fourth nationwide facilities-based wireless carrier"); *see also Applications of T-Mobile US, Inc., and Sprint Corp. for Consent To Transfer Control of Licenses and Authorizations*, Mem. Op. and Order, Decl. Ruling, and Order of Proposed Modification, 34 FCC Rcd. 10578, ¶ 12 (2019).

[19]    O-RAN involves the interoperability of open hardware, software, and interfaces for cellular wireless networks and affords DISH a less expansive way to provide nationwide wireless coverage.  *An Overview of Open RAN: Basics, Recent Advances and Future Research*, https://classes.engineering.wustl.edu/~jain/cse574-22/ftp/open_ran/index.html.

[20]    Eva Dou, *Trump dreamt of a 'Huawei killer.' Biden is trying to unleash it*, Wash. Post (Feb. 12, 2024), https://www.washingtonpost.com/technology/2024/02/12/oran-biden-china-huawei-technology/ (noting that President Biden has personally "involved himself" in "evangelizing" for O-RAN, "with the issue mentioned in the official readouts of his meetings with Philippine President Ferdinand Marcos Jr. in May and Indian Prime Minister Narendra Modi in June, among others").

deployment to reduce reliance upon these Chinese vendors and to minimize the threat they pose to national security.

DISH is a champion of—and one of the most vocal cheerleaders for—O-RAN deployment, rarely missing an opportunity to support publicly the Biden Administration's O-RAN initiatives.[21]  And the Biden Administration has reciprocated, recently awarding DISH a $50 million grant for O-RAN deployment, an award that DISH described as "historic" and the "largest" of its kind to date.[22]  DISH's award was publicly announced on January 10, 2024, two days before DOJ first threatened Relator with dismissal of this case.

The Ergens also have other political connections to the Biden Administration.  Charles and Cantey Ergen recently donated generously to President Biden's reelection efforts, each contributing $50,000 to President Biden's Political Action Committee (Biden Victory Fund) and the maximum of $6,600 to the President's campaign committee (Biden for President) on December 15, 2023, just weeks after the Court denied Defendants' motion for judgment on the pleadings.  Less than a month after the Ergens made their substantial contributions to President Biden's campaign, the DOJ threatened Relator with dismissal of this case.[23]

---

[21]     *See, e.g.*, Press Release, *DISH Supports 5G Open RAN Provisions in National Defense Authorization Act* (Dec. 14, 2023), *available at* https://about.dish.com/2023-12-14-DISH-Supports-5G-Open-RAN-Provisions-in-National-Defense-Authorization-Act.

[22]     Press Release, *DISH Wireless Awarded $50 Million NTIA Grant for 5G Open RAN Integration and Deployment Center* (Jan. 10, 2014), *available at* https://about.dish.com/2024-01-10-DISH-Wireless-Awarded-50-Million-NTIA-Grant-for-5G-Open-RAN-Integration-and-Deployment-Center.

[23]     The Ergens' recent contributions to President Biden's reelection efforts are aberrational. Even though the Ergens (and DISH's Political Action Committee) have contributed more than $4.8 million to Democratic candidates and causes since 2008, there is no record of Charles or Cantey Ergen having contributed previously to the Biden campaign, including when he ran for President in 2020.  Obermeier Decl., Ex. SO-8.  Indeed, the Ergens did not contribute to President Obama's campaign in 2008 or 2012 when Mr. Biden ran for Vice President, other than contributions by Charles Ergen in 2008 that totaled less than $5,000.  *Id.*

But the Ergens are no ordinary campaign contributors.  Charles Ergen has made multiple visits to the White House in the past two years during which he met with senior representatives of the Biden Administration.  Obermeier Decl. ¶ 109.  And just last month, Mr. Ergen was named by the White House as a member of the delegation for the Presidential Trade and Investment Mission to the Philippines.[24]

Under these circumstances, the government risks political embarrassment if this case were to proceed to trial and DISH and the Ergens were found to have defrauded the United States.  Dismissal of this case would eliminate that risk and would insulate DISH and the Ergens from being held accountable for the fraud alleged by Relator.

***Third***, and related to the first two points, since at least August 2023, the government has worked in concert with—and acted to benefit the interests of—the Ergens and DISH.  In fact, the DOJ's Motion represents just the latest attempt by the government to have this case go away.

The first attempt occurred in August 2023 when FCC staff provided Defendants with a declaration from Paul Malmud, Associate Division Chief, Broadband Division of the FCC's WTB ("Malmud Declaration").[25] Ostensibly intended to obviate the need for the FCC to respond to three discovery requests from Defendants related to damages, there was, in fact, no need for the government to provide the Malmud Declaration.  This is particularly true when the FCC had not produced documents in response to Defendants' other discovery requests or determined that

---

[24]     Announcement of the Presidential Trade and Investment Mission to the Philippines (Mar. 7, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/07/announcement-of-the-presidential-trade-and-investment-mission-to-the-philippines/.

[25]     The government had been working with Defendants for some time on the Malmud Declaration without any prior notice to Relator.  Although FCC staff represented that Defendants had not been provided a draft of the Malmud Declaration or given the opportunity to edit it, the Malmud Declaration tracks language and theories raised by Defendants in their *Touhy* requests, strongly suggesting that it was drafted in consultation with Defendants.  Obermeier Decl. ¶ 30.

such requests were appropriate under *Touhy*.  *Id.* ¶ 31.  And contrary to representations by FCC staff that it would only contain a factual recitation of events and not address legal conclusions, the Malmud Declaration summarized (often incorrectly or without citation) FCC rules and regulations and purported to offer conclusions about issues related to this litigation.  *Id.* ¶ 30.[26]

The purpose of the Malmud Declaration—and the government's motive in providing it to Defendants—was not to avoid the FCC having to produce documents but rather to support an argument by Defendants that the FCC had suffered no damages because of Defendants' fraud. Indeed, it was no surprise when Defendants promptly used the Malmud Declaration to argue that there were "no damages to the government here."  *Id.* ¶ 33.[27]  Defendants also used the Malmud Declaration twice as the basis for seeking partial summary judgment on damages (albeit unsuccessfully), even though Mr. Malmud testified during his deposition that: (i) he lacked personal knowledge of many facts in his declaration; (ii) his declaration did not set forth "an opinion" or "conclusions" about any "harms" or "damages" suffered by the government as a result of Defendants' fraud; and (iii) the rules referenced in the Malmud Declaration do not actually say what he claims they say.  *Id.* ¶ 50.[28]

---

[26]   Notably, the DOJ does not even reference the Malmud Declaration in the Motion, even though the DOJ's "doubt" about Relator's ability to prove damages under the FCA "because the Defendants were never awarded any bidding credits," Dkt. 188, at 17, embraces the same logic espoused by Mr. Malmud in his legally and factually flawed declaration.

[27]   In a telephone conversation with Relator's counsel on August 30, 2023, FCC staff acknowledged awareness that Defendants intended to use the Malmud Declaration to argue that the FCC had not been harmed by Defendants' fraud.  However, FCC staff stated that it did not agree with Defendants' position and noted that the FCC had not reached any definitive conclusions regarding damages in this case.  Obermeier Decl. ¶ 32.

[28]   Mr. Wei's conduct during the deposition of Mr. Malmud was needlessly confrontational and completely inappropriate by raising objections that attempted to prevent Mr. Malmud from answering straightforward questions about the content of his declaration.  Indeed, Mr. Wei objected 71 times during 97 minutes of questions by Relator.  Obermeier Decl. ¶ 52.

When Defendants' efforts to secure partial summary judgment on damages were unsuccessful, the government pivoted to Plan B, which involved trying to coerce Relator into settling the case on terms favorable to Defendants. This coercion commenced with the January 12, 2024, call during which Mr. Wei threatened Relator with dismissal of this case unless Relator agreed to a settlement that did not benefit the government and that was unethical in any event. And rather than attempting to broker a reasonable and ethical settlement, Mr. Wei undermined the settlement negotiations by coordinating with Defendants about settlement strategy and the government's dismissal plans. *Id.* ¶¶ 66-71.

And as yet another favor to Defendants, as soon as Mr. Wei heard from Defendants that no settlement had been reached, he frantically attempted to schedule a meeting with Relator to inform Relator of the DOJ's intent to dismiss the case. But when Relator's counsel was unavailable for an immediate meeting because of preexisting conflicts and rather than put something in writing about the DOJ's dismissal plans, Mr. Wei called Defendants, which ensured that the remaining DISH depositions—including the depositions of Charles and Cantey Ergen—would not take place. *Id.* ¶ 78.

The government's conduct in this case cannot be explained by any good faith reason. *See* Fed. R. Civ. P. 41. As such, the Motion should be denied.

## II.    THE COURT SHOULD DENY THE DOJ'S MOTION TO DISMISS BECAUSE DISMISSAL WOULD PREJUDICE RELATOR.

In addition to the government's bad faith, the Court should deny the Motion because "dismissal will inflict clear legal prejudice on" Relator. *Kellmer v. Raines*, 674 F.3d 848, 851 (D.C. Cir. 2012) (quoting *Conafay v. Wyeth Labs.*, 841 F.2d 417, 419 (D.C. Cir. 1988) (per curiam)). According to *Polansky*, the Court's prejudice analysis must consider, at a minimum, Relator's interests in the case going forward and its "commitment of time and money" to the

case. *Polansky*, 599 U.S. at 437 (citation omitted).  In addition, courts in this District consider

the stage of the litigation and the movant's timing.  *See In re Vitamins Antitrust Litig.*, 198

F.R.D. 296, 304 (D.D.C. 2000).  All these considerations support denial of the Motion.[29]

The FCA is "designed to punish and deter fraud."  *United States v. Sci. Applications Int'l

Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010); *accord United States ex rel. Roby v. Boeing Co.*,

302 F.3d 637, 641 (6th Cir. 2002) ("The FCA has since become the primary means by which the

Government combats and deters fraud.").  Relator has an interest in this case going forward to

serve the FCA's purpose of holding Defendants accountable and deterring similar misconduct

that costs bona fide small businesses vital opportunities to compete in FCC spectrum auctions.

Relator is the parent of a small, family-owned company that provides telephone service to rural

Vermonters on a network that has been in operation since 1890.  Amend. Compl. ¶¶ 8-9.

Relator's wholly-owned subsidiary, VTel Wireless, Inc. ("VTel"), provides 4G LTE wireless

service throughout Vermont.  And its ability to provide that service is partly the result of VTel

participating and obtaining spectrum as a small or very small business in nearly every previous

spectrum auction.  Stocker Depo. at 59:18-60:13.

Defendants' fraud caused a different result in Auction 97.  VTel properly registered and

participated as a "small business" entitled to a 15 percent bidding credit on any spectrum licenses

it obtained in Action 97.  Amend. Compl. ¶¶ 8, 10.  Unlike Northstar and SNR, VTel is an

---

[29]     As *Polanksy* explained, the Supreme Court "has never set out a grand theory of what . . .
Rule [41] requires" and "[t]he inquiry is necessarily 'contextual.'"  *Polansky*, 599 U.S. at 437.
Accordingly, while this Court should look to non-FCA precedent to determine the scope and
application of the prejudice analysis in this case, there are limits to relying on such precedent.
For example, non-FCA decisions interpreting whether to grant Rule 41(a)(2) dismissal focus on
considerations applicable to defendants that are not transferrable to relators (who are akin to
plaintiffs). *See, e.g.*, *In re Vitamins Antitrust Litig.*, 198 F.R.D. at 305 (noting that "[m]ost
denials of voluntary dismissals are justified by the fact that defendants had already filed motions
for summary judgment").

operating business that was properly eligible to claim small business bidding credits under FCC rules. *Id.* ¶ 10. But VTel did not obtain any spectrum in Auction 97, due to Defendants' fraudulent conduct during the auction. In effect, predatory bidding by the sham DEs and DISH led VTel to stop bidding on the spectrum it sought to deploy in rural Vermont. *See id.* ¶¶ 11, 92.

Dismissal of this case would undermine Relator's interest in the FCA's deterrence function. It would send the message that companies can break the FCC's auction rules and face little consequence. In doing so, dismissal would create an unfair playing field for genuine small businesses like VTel. The resulting prejudice would be significant and supports denying the government's Motion.

In addition, Relator's "'commitment of time and money' militates against dismissal." *Polansky*, 599 U.S. at 437 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397 (1990)). Relator has invested substantial time and money in detecting and exposing DISH's elaborate scheme to defraud the government (and the public) of billions of dollars in spectrum bidding credits that were intended to aid legitimate small businesses. And, according to the DOJ, Relator's counsel has "done a good job." Obermeier Decl. ¶ 56.

Since Wiley was retained by Relator at the inception of this case in 2015 through March 31, 2024, the firm has expended nearly 15,000 hours in unearthing the fraud in which Defendants were engaged and attempting to hold Defendants accountable. Relator also engaged the help of multiple experts, who similarly expended approximately 1,100 hours in their work. Counsel and the experts operated efficiently and diligently throughout. *Id.* ¶ 110. As of March 31, 2024, in the nine years Relator has been litigating this case, including through three rounds of Rule 12 motion briefing, an appeal, and discovery, it has incurred approximately $13 million in legal expenses and costs prosecuting this case on behalf of the government. *Id.* ¶ 111. That

commitment of resources will be for naught if the case is dismissed and the evidence uncovered by Relator is not brought to an impartial factfinder.  Making matters worse, the government premises dismissal on defendants' payment of FCC default payments but nevertheless seeks to block Relator's recovery of its share of the proceeds from this alternate remedy if dismissal is granted.  *See* 31 U.S.C. § 3730(c)(5).  Relator's substantial commitment of resources is another source of prejudice that favors denial of the Motion.

Finally, courts assessing prejudice under Rule 41(a)(2) also consider "the stage of the litigation at the time the motion to dismiss is made."  *In re Vitamins Antitrust Litig.*, 198 F.R.D. at 304; *see also In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, ERISA Litig.*, 725 F. Supp. 2d 147, 154 (D.D.C. 2010).  Courts should ensure a relator is "not denied a fair opportunity to prove her case."  *United States ex rel. Carver v. Physicians Pain Specialists of Ala., P.C.*, No. 22-13608, 2023 U.S. App. LEXIS 19592 (11th Cir. July 31, 2023).  But that is exactly what will happen here if the case is dismissed mid-discovery.

As set forth above, the government prevented depositions of the key architects of the fraud from going forward.  The government also caused expert reports that would shed light on the very issues upon which the government premises its decision to dismiss to be buried from view.  And the government did all this mere months after *vetoing* dismissal—letting preparation for these depositions and expert reports happen in the first place.  The government's decision to seek dismissal at this juncture inflicts severe and unnecessary prejudice on Relator.

In sum, application of *Polansky*'s "contextual" Rule 41 prejudice analysis also supports denial of the government's Motion.  *Polansky*, 599 U.S. at 437.

**III.     THE COURT SHOULD DENY THE DOJ'S MOTION BECAUSE DISMISSAL WOULD VIOLATE RELATOR'S FIFTH AMENDMENT RIGHTS.**

The Fifth Amendment of the U.S. Constitution provides that the federal government shall not take private property for public use without just compensation.  The Takings Clause "is not addressed to the action of a specific branch or branches" and therefore applies to all of them. *Stop the Beach Renourishment, Inc. v. Fla. Dept. of Env't Prot.*, 560 U.S. 702, 713-14 (2010). The Clause "protects 'private property' without any distinction between different types," *i.e.*, "between real and personal property."  *Horne v. USDA*, 576 U.S. 350, 358, 360 (2015).

A government action that "denies all economically beneficial or productive use" of a person's property is an unconstitutional regulatory taking.  *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992).  The Supreme Court has "eschewed any set formula for determining" what constitutes a regulatory taking, "choosing instead to engage in essentially *ad hoc*, factual inquiries."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 326 (2002) (cleaned); *see also id.* at 322 (regulatory-taking inquiry requires a "careful examination and weighing of all the relevant circumstances.").

The FCA "gives the relator himself an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery."  *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772-73 (2000).  And that interest is "a species of property protected" by the Constitution.  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 275-76 (2008) (a cause of action is a form of property known as a "chose in action").  The Fifth Amendment, then, "confers on the *qui tam* relator a vested interest in the nature of a property right once the suit is commenced."  *United States ex rel. Stevens v. Vermont Agency of Nat. Res.*, 162 F.3d 195, 224 (2d Cir. 1998) (Weinstein, J., dissenting), *rev'd*, *Stevens*, 529 U.S. 765.

44

Historically, DOJ-initiated dismissal of a *qui tam* suit was "so rare—approaching zero, statistically speaking—that they enjoy[ed] a form of unicorn status."  Steven Schooner, *False Claims Act: Greater DOJ Scrutiny of Frivolous Qui tam Actions?* 32 Nash & Cibinic Rep. NL ¶ 20 (Apr. 2018).  In recent years, the government has never sought dismissal of a case like this. This reality, combined with the FCA's assurance that successful relators will share in whatever sums they help the government recover, provided prospective relators with reasonable expectations that if they invested in a pursuing the government's interests through a *qui tam* suit, it would not seek dismissal except under egregious circumstances that are not present here.

Accordingly, in 2015 Relator filed this qui tam suit—alleging fraud of billions of dollars. As explained above, and for nearly a decade now, Relator has invested substantial time, money, and effort in prosecuting this case.

Because dismissal nine years into the lawsuit would "interfere[] with [Relator's] reasonable investment-backed expectations," *Eastern Enters. v. Apfel*, 524 U.S. 498, 532 (1998), it would constitute an unconstitutional regulatory taking.  Relator has relied on the DOJ's practice of only seeking dismissal in "rare" cases—reliance that was reinforced when Relator litigated this case for years without any indication that the DOJ would move to dismiss until discovery was nearly complete.  In short, Relator had a reasonable investment-backed expectation that the government would not do to it what it had not done to anyone else under similar circumstances.  Dismissal would be unconstitutional for that reason.

## CONCLUSION

For the reasons stated above, the Court should deny the DOJ's motion to dismiss.

Dated: June 13, 2024                              Respectfully submitted,

By: */s/ Stephen J. Obermeier*
     Stephen J. Obermeier (D.C. Bar # 979667)
     Bennett L. Ross (D.C. Bar # 978122)
     Bert W. Rein (D.C. Bar #067215)
     Mark B. Sweet (D.C. Bar # 490987)
     Kathleen C. Cooperstein (D.C. Bar # 1017553)
     **WILEY REIN LLP**
     2050 M Street, NW
     Washington, DC 20036
     (202) 719-7000
     sobermeier@wiley.law

     *Counsel for Relator Vermont National
     Telephone Co.*