# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERMONT NATIONAL TELEPHONE COMPANY,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>NORTHSTAR WIRELESS, LLC, *et al.*,<br><br>　　　　　　Defendants. | Civil Action No. 15-00728 (CKK) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RELATOR'S MOTION FOR SHARE OF ALTERNATE REMEDY

Stephen J. Obermeier (D.C. Bar # 979667)
Bennett L. Ross (D.C. Bar # 978122)
Bert W. Rein (D.C. Bar #067215)
Mark B. Sweet (D.C. Bar # 490987)
Kathleen C. Cooperstein (D.C. Bar # 1017553)
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Relator Vermont National Telephone Co.*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    I.    STATUTORY BACKGROUND ........................................................... 2

    II.    THE FCC PROCEEDINGS............................................................... 4

ARGUMENT ...................................................................................................................... 8

    I.    THE DEFAULT PAYMENTS IMPOSED BY THE FCC CONSTITUTE
        AN "ALTERNATE REMEDY" UNDER THE FCA. ........................... 8

    II.    THE GOVERNMENT CANNOT DIVORCE THE DEFAULT
        PAYMENTS FROM RELATOR'S FRAUD ALLEGATIONS. ......................... 14

CONCLUSION................................................................................................................. 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CapitalKeys, LLC v. Dem. Rep. of Congo,*
    278 F. Supp. 3d 265 (D.D.C. 2017) ...................................................................12

*In re NextWave Pers. Commc'ns, Inc.,*
    200 F.3d 43 (2d Cir. 1999) ................................................................................12

*Nguyen v. Nissan N. Am., Inc.,*
    932 F.3d 811 (9th Cir. 2019) .............................................................................12

*Nw. Airlines, Inc. v. U.S. Dep't of Transp.,*
    15 F.3d 1112 (D.C. Cir. 1994) ..........................................................................11

*SNR Wireless LicenseCo, LLC v. FCC,*
    868 F.3d 1021 (D.C. Cir. 2017) ........................................................................11

*United States v. Sci. Applications Int'l Corp.,*
    626 F.3d 1257 (D.C. Cir. 2010) ........................................................................12

*United States ex rel. Barajas v. United States,*
    258 F.3d 1004 (9th Cir. 2001) ..............................................................3, 4, 14, 16

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
    342 F.3d 634 (6th Cir. 2003) ...............................................................................3

*United States ex rel. Kennedy v. Novo A/S,*
    5 F.4th 47 (D.C. Cir. 2021) ........................................................................ *passim*

*United States ex rel. Rushing v. Lick,*
    No. 1:20-CV-210-SA-DAS, 2024 WL 170762 (N.D. Miss. Jan. 16, 2024).......................3, 14

*United States ex rel. Taylor v. Gabelli,*
    345 F. Supp. 2d 340 (S.D.N.Y. 2004)...........................................................12, 13

*United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC,*
    34 F.4th 29 (D.C. Cir. 2022) ..........................................................................8, 14

**Statutes**

31 U.S.C. § 3729...................................................................................................2

31 U.S.C. § 3730....................................................................................... *passim*

**Administrative Decisions**

*Implementation of the Commercial Spectrum Enhancement Act and
  Modernization of the Commission's Competitive Bidding Rules & Procedures*,
  Declaratory Ruling and Notice of Proposed Rulemaking,
  20 FCC Rcd. 11268 (2005) ............................................................................................12

*Implementation of Section 309(j) of the Communications Act—Competitive
  Bidding*, Second Report and Order, 9 FCC Rcd. 2348 (1994) ...................................12, 14, 15

*Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New
  Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz
  Bands*, Memorandum Opinion and Order, 30 FCC Rcd. 8887 (2015) ..........................6, 7, 15

**Other Authorities**

*Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for
  November 13, 2014; Notice and Filing Requirements, Reserve Prices,
  Minimum Opening Bids, Upfront Payments and other Procedures for Auction
  97*, Public Notice, 29 FCC Rcd. 8386 (2014) ...................................................................11, 15

Letter from Roger Sherman, Chief – Wireless Telecommunications Bureau, FCC,
  to Mark Dever, Counsel, Northstar Wireless, LLC, DA 15-1108 (Oct. 1, 2015).....................8

Letter from Roger Sherman, Chief – Wireless Telecommunications Bureau, FCC,
  to Ari Q. Fitzgerald, Counsel, SNR Wireless LicenseCo, LLC, DA 15-1109
  (Oct. 1, 2015) .........................................................................................................................8

## INTRODUCTION

Pursuant to 31 U.S.C. §§ 3730(c)(5) and (d)(2), and in the event the Court is inclined to grant the government's Motion to Dismiss, Relator Vermont National Telephone Company ("Relator") moves for an award of $128,888,798, which represents Relator's share of the government's alternative recovery under the False Claims Act ("FCA").  This amount is 25 percent of the $515,555,190 in default payments paid to the Federal Communications Commission ("FCC") by Defendants Northstar Wireless, LLC ("Northstar") and SNR Wireless LicenseCo, LLC ("SNR"), which, in moving to dismiss, the government has chosen to accept in lieu of further prosecution of Relator's *qui tam* action under the FCA against Defendant DISH Network Corporation ("DISH") and the other Defendants.  Relator also requests costs, attorney's fees, and expenses for its efforts in this litigation.[1]

The default payments made by Northstar and SNR were the direct result of the petition filed by Relator's wholly owned subsidiary—VTel Wireless ("VTel")—requesting that the FCC deny the bidding credits sought by Northstar and SNR in Auction 97 ("Petition to Deny").  The Petition to Deny was filed after—and based in part on allegations raised in—the disclosure statement that Relator submitted to the Department of Justice ("DOJ"), which initiated this FCA case.  According to the government, Relator's *qui tam* Complaint and the Petition to Deny make "***essentially the same arguments***"—"namely, that SNR and Northstar had failed to disclose its [*sic*] relationship with DISH in the FCC's Auction 97."  Dkt. 188, at 7 (emphasis added).  And the Petition to Deny requested that the FCC impose the same default payments on Northstar and SNR that they ultimately paid to the FCC.

---

[1]  Pursuant to 31 U.S.C. § 3730(d)(2), Relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs."

In moving to dismiss Relator's *qui tam* action, the government has chosen to rely solely upon the default payments paid to the FCC to make itself whole from any fraud committed by Defendants, effectively settling Relator's FCA claims for that amount.  The result of those proceedings was the $515,555,190 default payment to the FCC.  Accordingly, although Relator believes that it could pursue damages through this *qui tam* action—and should be permitted to do so—at a minimum Relator is entitled to its share of the proceeds from the government's alternate remedy, *see* 31 U.S.C. § 3730(c)(5), particularly in light of the government's bad faith in seeking dismissal, as articulated in Relator's concurrently filed opposition.

## BACKGROUND

## I.    STATUTORY BACKGROUND

Section 3729 of the FCA generally makes individuals liable for a civil penalty and treble damages if they submit "[f]alse claims" to the federal government.  31 U.S.C. § 3729.  The FCA authorizes the Attorney General to bring "[c]ivil actions for false claims" as well as relators to bring civil *qui tam* actions in the name of the United States for violations of the Section 3729 prohibitions.  31 U.S.C. §§ 3730(a), (b)(1).  A relator brings a *qui tam* action "in the name of the Government," 31 U.S.C. § 3730 (b)(1), and, if successful, may receive up to 30 percent of the damages recovered, as well as reasonable attorneys' fees and costs.  31 U.S.C. § 3730(d).

Section 3730(c)(5) of the FCA allows the government to "pursue its claim" through an "alternate remedy" if it does not wish to pursue a *qui tam* action under the FCA.  In relevant part, section 3730(c)(5) provides:

> Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty.  If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

31 U.S.C. § 3730(c)(5).

Under the express language of section 3730(c)(5), "**any** alternative" to pursuing a relator's *qui tam* allegations through intervention may qualify as an alternative remedy to which a relator is entitled a share, *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 647 (6th Cir. 2003) (emphasis added), so long as "the claim pursued in the alternate remedy is of the type that could have been pressed under the False Claims Act." *United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47, 54 (D.C. Cir. 2021). Indeed, alternate remedies approved by courts have taken many forms, ranging from criminal forfeiture, *see, e.g.*, *United States ex rel. Rushing v. Lick*, No. 1:20-CV-210-SA-DAS, 2024 WL 170762 (N.D. Miss. Jan. 16, 2024), to settlement arising from administrative suspension or debarment proceedings, *see, e.g.*, *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1010-13 (9th Cir. 2001). And the government need not intervene in a *qui tam* action for a relator to be entitled to a share of an alternate remedy. "If the government has recovered funds lost from conduct asserted in Relator's *qui tam* action, then the government has essentially settled Relator's claims, regardless of whether it formally intervened in Relator's action or not." *Bledsoe*, 342 F.3d at 649.

At bottom, the purpose of section 3730(c)(5) is to ensure a "coordinated effort of both the Government and the citizenry" by protecting the relator when the government, "having been apprised of possible FCA violations by a private citizen," "settle[s] that suit's claims separately and den[ies] the relator his or her share of the settlement proceeds." *Id.* at 649-50. As the Sixth Circuit warned, "[s]uch a result would not further Congress' legislative intent that the government and private citizens collaborate in battling fraudulent claims, and it would impede, not further, Congress' legislative intent to encourage private citizens to file *qui tam* suits." *Id.* And according to the Ninth Circuit:

> It would be inconsistent not only with the plain meaning of the broad language employed in the statute, but also with the purpose of the statute, to allow the government to obtain from a *qui tam* defendant a remedy that could have been obtained in an already-filed FCA action, and then to argue that the proceeds of that remedy need not be shared with the whistleblower because the remedy was not an 'alternate remedy' within the meaning of the FCA.

*Barajas*, 258 F.3d at 1012.

## II.    THE FCC PROCEEDINGS

Prior to filing its *qui tam* Complaint in this case, Relator submitted a voluntary disclosure of Defendants' fraud to the DOJ on May 11, 2015.  Later the same day, VTel filed the Petition to Deny with the FCC that was based, in part, on allegations from the disclosure.  *See* Petition to Deny of VTel Wireless, Inc. (filed May 11, 2015) at 1.

In urging that the FCC find that Northstar and SNR were ineligible for bidding credits, the Petition to Deny made numerous allegations of fraud that mirrored those in Relator's FCA Complaint.  For example, the Complaint alleged that Northstar and SNR:

> became successful bidders under a scheme orchestrated by the DISH-Controlling Defendants, and falsely claimed and certified up to and through the point of payment that they were independent 'very small businesses' entitled to a 25 percent discount (or bidding credit) on the obligations to the United States incurred as a result of their successful bids.

Dkt. No. 1 ¶ 3 ("Compl.").  The Complaint also alleged that Defendants failed to "disclose that the DISH-Controlling Defendants alone controlled the bidding" or that Northstar and SNR "were not independent decision-makers."  *Id.* ¶ 115.  Additionally, the Complaint alleged that Northstar and SNR falsely certified that "they had identified all agreements, arrangements, or understandings of any kind relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure."  *Id.* ¶ 116.  Finally, the Complaint alleged that Northstar and SNR knowingly submitted false certifications "because they failed to include and attribute the revenues of the controlling DISH-Controlling Defendants."  *Id.* ¶ 114.

The Petition to Deny likewise alleged that:

- "The DISH Entities orchestrated a carefully crafted scheme to undermine the integrity of Auction 97, as an integral part of which DISH created Northstar and SNR, provided 98 percent of the funding for the licenses they won, and dictated their activities during the bidding process."  Petition to Deny at 2.

- "Northstar and SNR were the vehicles by which DISH was able to suppress competitive bidding and obtain licenses at discounted prices to which it was not entitled – including two licenses in Vermont on which VTel actively bid."  *Id.*

- "… Northstar and SNR did not accurately disclose their relationship with DISH or attribute DISH's gross revenues when certifying their eligibility for bidding credits in violation of Commission rules.  The material misrepresentations and lack of candor exhibited by Northstar and SNR – in addition to their misconduct during the auction – are inconsistent with the basic character qualifications of a Commission licensee." *Id.* at 4.

- "The inexorable conclusion is that neither Northstar nor SNR was acting in its own self-interest but coordinated and allocated licenses during the auction under the direction of DISH."  *Id.* at 24-25.

- "… Northstar and SNR were required to disclose DISH as an 'Affiliate' … and to attribute DISH's average gross revenues over the past three years in establishing their eligibility for bidding credits.  Northstar and SNR failed to make these required disclosures and attributions.  Likewise, Northstar and SNR affirmatively certified that their disclosures were correct, even though that was not the case.  By virtue of these false representations and certifications, Northstar and SNR received bidding credits to which they were not entitled."  *Id.* at 25-26.

- "In connection with these representations [as 'very small businesses'], Northstar and SNR were required to provide the Commission full and complete information, including information relating to gross revenues and information about all entities having an attributable interest in the bidding entities.  However, both entities omitted information about DISH, which is an affiliate and controlling interest."  *Id.* at 27.

- "Northstar and SNR also made several certifications in their applications that were false, or, at a minimum, made without a reasonable basis for believing that the statements were correct and not misleading."  *Id.* at 28.

- "While Northstar and SNR included certain high-level information about their bidding agreements at the outset of the auction, they did not disclose … the extent to which DISH would dictate their bidding activities."  *Id.* at 30.

Because "[m]erely requiring that Northstar and SNR pay the full price of the licenses

they 'won' during the auction – a price they should have paid in the first place – would still"

5

permit Defendants "to benefit from licenses acquired only as a result of their auction misconduct and collusive bidding," *id.* at 31, VTel also urged that Northstar and SNR be required to pay the default payment amounts "that may be due under section 1.2104(g)(2) of the Commission's rules." *Id.* at 34-35.  As VTel explained, "[b]y failing to pay the full amount of its bids and by taking advantage of bidding credits to which it was not entitled, Northstar and SNR are in default," and default payments "***will ensure that Northstar and SNR are held accountable for their misconduct and that the federal government is made whole***."  *Id.* at 33-35 (emphasis added).

In August 2015, the FCC granted in part the Petition to Deny, finding that Northstar and SNR were not eligible for the approximately $3.3 billion in bidding credits they had claimed. *See Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands*, Memorandum Opinion and Order, 30 FCC Rcd. 8887, ¶ 4 (2015) ("*Bidding Credit Order*").[2]  In so doing, the FCC agreed with many of VTel's assertions about the relationship between Northstar, SNR, and DISH.  *See, e.g., id.* ¶ 72 ("agree[ing] with VTel that, in the circumstances presented here, 'no meaningful limit exists on the ability of DISH, through its subsidiaries, to influence or dictate the build-out, management, and operation of SNR and Northstar's wireless systems'"); *id.* ¶ 73 ("agree[ing] with VTel that DISH's broad consultative role effectively amounts to 'veto power,' because 'it is doubtful that either SNR or Northstar would ever cross DISH' given the leverage that DISH possesses over them"); *id.* ¶ 85 ("agree[ing] with VTel that SNR and Northstar

---

[2]      In addition to VTel, seven other parties timely filed petitions to deny against the Northstar and SNR applications.  *Bidding Credit Order* ¶ 30.  However, other than the petitions filed by VTel and Central Texas Telephone Investments LP/Rainbow Telecommunications Association, Inc., the FCC dismissed the other petitions to deny for lack of standing.  *Id.* ¶ 38.

essentially lack authority to raise capital without DISH's consent"); *id.* ¶ 86 ("agree[ing] with VTel that SNR's and Northstar's claims that their contractual ability to select their own financial institutions for loans signifies their retention of control of their financial obligations are not persuasive given the severe restrictions on their abilities to secure financing from any lender other than DISH"); *id.* ¶ 112 ("agree[ing] with VTel that the bidding behavior of SNR, Northstar, and DISH during the auction pursuant to the Joint Bidding Agreements is an additional indicator of DISH's common control over SNR's and Northstar's business decisions"); *id.* ¶ 114 ("agree[ing] with VTel that DISH enjoyed effective veto power over the daily bidding activity, due to DISH's ability to withhold payment for the licenses if the Applicants bid on anything other than DISH's target licenses, another indicator of its ability to dominate SNR and Northstar").

By claiming bidding credits for their spectrum licenses, Northstar and SNR only paid on the final payment date the amount of their net winning bids, which totaled approximately $10 billion, rather than the full amount of their gross winning bids, which totaled approximately $13.3 billion.  *Id.* ¶¶ 153, 155.  Consequently, after denying the bidding credits, the FCC directed Northstar and SNR to pay this difference, by either submitting payment in the amount of approximately $1.961 billion and $1.373 billion, respectively, or delivering to the FCC acceptable irrevocable, standby letters of credit ("LOC") in those amounts.  *Id.*  The FCC warned that the "[f]ailure to complete payment or alternatively deliver the LOC … will result in a default" and Northstar and SNR "will be liable for the default payment set forth in section 1.2104(g)(2) of the Commission's rules."  *Id.*

Rather than pay the full amount of their gross winning bids or deliver a LOC, however, Northstar and SNR notified the FCC that they were defaulting on approximately $3.3 billion of

licenses on which they were the winning bidders.  *See, e.g., United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 33 (D.C. Cir. 2022).  In response to their default, the FCC imposed default payments upon Northstar and SNR in the amounts of $333,919,350 and $181,635,840, respectively.[3]  These default payments, which totaled $515,555,190, were imposed by the FCC pursuant to section 1.2104(g)(2) of its rules.  *Northstar Default Notice* at 1; *SNR Default Notice* at 1.

## ARGUMENT

If the Court grants the DOJ's Motion to Dismiss, Relator is entitled to a share of Defendants' default payments.  The alternate remedy provision of the FCA on its face protects relators in precisely these circumstances, *i.e.*, when the government chooses to forego an FCA remedy in lieu of compensation through a regulatory proceeding.  Here, the government has chosen to accept Defendants' default payments as compensation in lieu of damages for Defendants' fraud—effectively settling the matter—thus rendering those payments subject to the alternate remedy provision.  And the government cannot demonstrate otherwise by claiming now—after moving to dismiss and effectively seeking to settle the matter based on the default payments—that its regulatory recovery is somehow independent from Relator's actions and allegations of fraud.

## I.   THE DEFAULT PAYMENTS IMPOSED BY THE FCC CONSTITUTE AN "ALTERNATE REMEDY" UNDER THE FCA.

The default payments made by Northstar and SNR constitute an "alternate remedy" under section 3730(c)(5) of the FCA, which entitles Relator to a share of these payments.  Section

---

[3]      Letter from Roger Sherman, Chief – Wireless Telecommunications Bureau, FCC, to Mark Dever, Counsel, Northstar Wireless, LLC, DA 15-1108 (Oct. 1, 2015) ("*Northstar Default Notice*"); Letter from Roger Sherman, Chief – Wireless Telecommunications Bureau, FCC, to Ari Q. Fitzgerald, Counsel, SNR Wireless LicenseCo, LLC, DA 15-1109 (Oct. 1, 2015) ("*SNR Default Notice*").

3730(c)(5) permits the government to elect to pursue "**any**" available alternate remedy in another proceeding rather than obtaining relief through a *qui tam* action.  The government has now made that election here, opting to accept Northstar's and SNR's default payments in lieu of permitting Relator's case to move forward.  By pursuing "such alternate remedy" in the FCC proceedings, Relator "shall have the same rights in such proceeding" as it "would have had if the action had continued under this section."  31 U.S.C. § 3730(c)(5).

In *Novo A/S*, the D.C. Circuit addressed the types of governmental actions that count as an "alternate remedy" for section 3730(c)(5) purposes.  According to the Court of Appeals, section 3730(c)(5) entitles a "relator to recoveries arising from the type of fraud claims that could have been brought in a *qui tam* action under the False Claims Act."  5 F.4th at 54.  As the D.C. Circuit explained:

> Section 3730's alternate-remedy provision authorizes the government, when confronted with a *qui tam* complaint, to choose to vindicate its legal claim arising from the fraud and falsity that Section 3729 proscribes through either (i) the *qui tam* action, or (ii) an alternate remedy for that same type of false or fraudulent claim.

*Id.* at 55 (citing 31 U.S.C. §§ 3730(a), (b) & (c)(5)).[4]

The default payments paid by Northstar and SNR in the FCC proceedings constitute an "alternate remedy" under section 3730(c)(5) because they arise from the same type of fraud

---

[4]      Although the D.C. Circuit eventually ruled that the relator in *Novo A/S* was not entitled to a share of the government's recovery in a misbranding claim under the Food, Drug, and Cosmetic Act, the circumstances in that case were different than those here.  The government had already settled that relator's *qui tam* action, which resulted in the relator receiving "an 18% share (approximately $7.8 million) of the False Claims Act settlement," and the relator "never objected to the fairness of her settlement even though the government gave her advance notice of its separate settlement under the Food, Drug, and Cosmetic Act."  *Novo A/S*, 5 F. 4th at 58.  The D.C. Circuit ultimately concluded that it had "no occasion to decide in [that] case what the consequences (if any) would be"—as in the case here—"were the government to use a relator's information in a separate proceeding without fairly compensating the relator in the *qui tam* litigation."  *Id.*

claims that Relator brought in this *qui tam* action.  The government acknowledges as much, conceding that the Petition to Deny in the FCC proceedings made "essentially the same arguments" as Relator's Complaint in this Court.  Dkt. No. 188, at 7.  The Petition to Deny in the FCC proceedings also included a request that Northstar and SNR be required to pay default payments pursuant to section 1.2104(g)(2) to make the government whole—the same rule under which the FCC imposed default payments upon Northstar and SNR.  And Relator's Complaint seeks to recover damages for "the loss [the government] has incurred" as a result of Defendants' fraud, *see* Compl. ¶ 7, and the default payments can constitute an appropriate alternate measure of those damages as explained below.

Furthermore, when the FCC determined that Northstar and SNR were ineligible for bidding credits—a determination that was the direct consequence of the allegations raised in the Petition to Deny—it turns out that Northstar and SNR had no choice but to default, which triggered the default payments the FCC imposed under section 1.2101(g)(2).  *See* DISH 30(b)(6) Blum Dep. Tr. at 309-312 (agreeing the Northstar and SNR had "no choice but to default," and characterizing the default penalties assessed against these entities as "damaging to DISH").[5]  The reason was that, as Relator uncovered during discovery, DISH had a "budget of about $10 billion" to spend in Auction 97 "for DISH itself and for its investment in Northstar and SNR …," *id.* at 101:13-16, and thus Northstar and SNR lacked the financial wherewithal to pay the full amount of their gross winning bids (approximately $13.3 billion) as directed by the FCC.  *See* Northstar 30(b)(6) Todd Dep. Tr. at 325:3-9 (testifying that Northstar was "without sufficient funds to pay for all of the licenses" and therefore default "was a forgone conclusion, in our

---

[5]    All deposition excerpts referenced in this filing are available in the concurrently filed Appendix.

view"). And Northstar and SNR were only able to pay their net winning bid amounts (approximately $10 billion) on the payment due date rather than the full amount of their gross winning bids because of the fraudulent disclosures and false certifications in Northstar's and SNR's short form applications as alleged by Relator.[6]

Moreover, in ordering Northstar and SNR to pay full price for their spectrum licenses, the FCC made clear that they would be subject to default payments if they failed to do so. Both types of payments were designed to compensate the government, which was willing to accept the default payments if Northstar and SNR did not pay the full amount of their gross winning bids. *See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1028-29 (D.C. Cir. 2017) (characterizing 47 C.F.R. § 1.2104(g)(2)(i), the provision under which the FCC imposed the default payments, as "requiring defaulters to ***compensate*** the FCC in the manner the FCC described") (emphasis added).

Indeed, the FCC established default payments as a deterrent exactly because "defaults weaken the integrity of the auction process." *Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for November 13, 2014; Notice and Filing Requirements, Reserve Prices, Minimum Opening Bids, Upfront Payments and other Procedures for Auction 97*, Public Notice, 29 FCC Rcd. 8386, ¶ 240 (2014).[7] And here the default payments paid by Northstar and SNR

---

[6]    Because Northstar and SNR had neither the intention nor the ability to pay the full amount of their gross winning bids as required by FCC rules, their default was not an after-the-fact business decision. Thus, this is not the case contemplated by the FCC's rules that enact the principle of efficient breach by which winning bidders have the option—without prejudice to their other licenses—to make default payments in lieu of taking spectrum licenses they no longer want. *Cf. Nw. Airlines, Inc. v. U.S. Dep't of Transp.*, 15 F.3d 1112, 1120 n.5 (D.C. Cir. 1994) ("'Efficient breach' refers to the principle that a breaching party has the option of paying damages rather than performing its contractual obligations where damages are an adequate substitute for specific performance.").

[7]    This deterrence is consistent with the FCC's historical recognition that the default payment regime serves as a proxy for the cost to the government of having to reauction licenses

serve as both a recognition and measure of a portion of the damages for Defendants' misconduct that resulted in Northstar and SNR defaulting.  Courts have described this payment as "the functional analog of expectation damages," *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 58 (2d Cir. 1999), which are appropriately included in the calculation of single damages under the FCA.  *See, e.g.*, *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 821 (9th Cir. 2019) (benefit of the bargain model of damages "is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true"); *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010) (FCA damages "put[] the government in the same position as it would have been if the defendant's claims had not been false" under the "benefit-of-the-bargain measure"); *CapitalKeys, LLC v. Dem. Rep. of Congo*, 278 F. Supp. 3d 265, 272 (D.D.C. 2017) ("Under District of Columbia law, the standard measure of actual damages arising from a breach of contract is the non-breaching party's expectation interest—that is, an amount sufficient to give the non-breaching party the benefit of the bargain.").

Nor should there be any serious dispute that the government is choosing here to designate the FCC's proceedings as an alternative proceeding "to pursue the Government's 'claim.'"  *Novo A/S*, 5 F.4th at 55.  In fact, in *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 340

---

upon which a bidder defaults.  *See, e.g.*, *Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, Second Report and Order, 9 FCC Rcd. 2348, ¶ 154 (1994) ("*Second Report and Order*") (recognizing that "default imposes extra costs on the government," which "must generally incur the additional expense of re-auctioning the license"); *Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules & Procedures*, Declaratory Ruling and Notice of Proposed Rulemaking, 20 FCC Rcd. 11268, ¶ 32 (2005) ("In cases where defaults result from the failure of bidders realistically to assess in advance their ability to pay for their bids, a larger [default] payment requirement may provide added incentive for bidders to conduct the necessary analysis and refrain from placing bids they cannot afford or at least for them to withdraw such bids rather than defaulting on them.").

(S.D.N.Y. 2004), the court held that FCC proceedings such as those conducted by the FCC in response to the Petition to Deny offer an alternate remedy for the government in instances of fraud during an FCC spectrum auction.

In *Gabelli*, the relator alleged that the defendants had fraudulently withheld information from the FCC about the control exercised by certain investors in purported designated entities seeking bidding credits in FCC spectrum auctions. When the government declined to intervene, the defendants moved for a stay of the *qui tam* action pending referral to the FCC, arguing that the FCC was better suited to resolve the salient issues relating to control. *Id.* at 344. The district court noted that "[a]pplicants seeking licenses from the FCC have a 'duty of candor,' or an affirmative duty to fully and truthfully disclose information required in their submissions," such as who controlled the applicants (the same duty of candor VTel alleged in Petition to Deny that Northstar and SNR violated). *Id.* at 350. The court described the ongoing FCA and prospective FCC petition to deny proceedings as "interdependen[t]." *Id.* at 353. And referencing 31 U.S.C. § 3730(c)(5), the *Gabelli* court explained that the government could very well elect to resolve the allegations through the FCC, characterizing the agency proceedings as an "alternative" to the FCA *qui tam* action. *Id.*

Indeed, the government previously acknowledged the interconnected nature of the FCC proceedings and this case. On October 10, 2018, the government opposed a further stay of this case during the FCC's proceedings because, "if this case were to uncover evidence that the Defendants violated their disclosure obligations, that evidence would be relevant to the ongoing administrative proceeding." Dkt. 65 at 3. This Court agreed, stating in its decision to lift the stay that the FCC's eventual findings "may affect any ultimate finding of liability and the quantity of damages in this case." Dkt. 68 at 2.

The bottom line is that the government is now electing to resolve the allegations against Defendants in this case through the FCC proceedings, both of which involve "essentially the same arguments" and implicate similar claims for relief.  Under the circumstances, the default payments paid by Northstar and SNR as ordered by the FCC constitute an "alternate remedy" under the FCA.[8]

## II.   THE GOVERNMENT CANNOT DIVORCE THE DEFAULT PAYMENTS FROM RELATOR'S FRAUD ALLEGATIONS.

Refusing to grant Relator a share of Northstar's and SNR's default payments, the government contends that these payments "are not damages in this case."  Dkt. 188, at 18.  But this contention misses the mark.  For "alternate remedy" purposes under section 3730(c)(5), it only matters that the government has elected to recover funds "arising from the type of fraud claims that could have been brought in a *qui tam* action," not the moniker attached to that recovery.  *Novo A/S*, 5 F.4th at 54; *see also Rushing*, 2024 WL 170762 (criminal forfeiture); *Barajas*, 258 F.3d at 1010-13 (settlement arising from administrative suspension or debarment proceedings).

Furthermore, the government's argument cannot be reconciled with the FCC's own pronouncements on this topic.  In adopting its auction rules, the FCC concluded that "it is critically important to the success of our system of competitive bidding that potential bidders understand that there will be a substantial penalty assessed if they . . . default on a balance due."  *Second Report and Order* ¶ 197.  The FCC noted that the penalty for default "should be

---

[8]     Relator's Motion is not foreclosed by *Northstar Wireless*, 34 F.4th at 36, in which the D.C. Circuit held that the FCC's administrative proceedings did not constitute a "civil money penalty proceeding" subject to the FCA's government action bar.  According to the plain language of section 3730(c)(5), it applies to "***any*** alternate remedy available to the Government," not just an "administrative proceeding to determine a civil money penalty."  31 U.S.C. § 3730(c)(5) (emphasis added).

rationally related to the harm caused, yet be set high enough to deter unwanted conduct."  *Id.*  In short, default payments serve the same function as damages in an FCA action: to make the government whole and deter "unwanted conduct."

The government also argues that "the default payments by SNR and Northstar were triggered by their decision to default, not the decision by the FCC to deny bidding credits."  Dkt. 188, at 19.  But this is a distinction without a difference.  The only reason SNR and Northstar defaulted, and thus were subject to default payments, was because (i) they were denied bidding credits by the FCC in response to the Petition to Deny; and (ii) as explained above, discovery has made clear that Defendants had no intention or ability to pay the full amount of Northstar's and SNR's gross winning bids.  That they had no choice but to default as a result of their fraud—and effectively settle with the FCC—does not render the FCC proceedings any less an alternate remedy, given the government's decision to forego this *qui tam* case.  This argument also ignores the express language of the FCC's *Bidding Credit Order*, which states that "[f]ailure to complete payment or alternatively deliver the LOC to the Commission" would "result in a default" and Northstar and SNR would "**be liable** for the default payment set forth in section 1.2104(g)(2) of the Commission's rules." *Bidding Credit Order* ¶¶ 153, 155 (emphasis added).

Finally, the government's assertion that the "default payments did not result from a violation of the FCC's rules, but rather compliance with such rules" is absurd.  Dkt. 188, at 19.  Under the FCC's Auction 97 procedures, default payments are triggered when a winning bidder "**fails** to remit the required down payment within the prescribed period of time, **fails** to submit a timely long-form application, **fails** to make full payment, or is otherwise **disqualified**." *Auction of Advanced Wireless Services (AWS-3) Licenses Public Notice*, 29 FCC Rcd. at ¶ 239 (emphasis added).  In other words, Northstar and SNR were subject to default payments because they failed

to comply with their obligation to pay the full amount of their gross winning bids and had no choice but to default instead.  That the FCC's rules contemplate that a bidder may default and provide for amounts that must be paid in the eventuality does not alter the inescapable conclusion that they were imposed here because Northstar and SNR *failed* to comply with their payment obligations as a result of their own fraud.

At bottom, in seeking to dismiss Relator's *qui tam* action and thereby prevent Relator from recovering on behalf of the government the full range of damages due to the United States from Defendants' fraud, the government has opted to accept Northstar's and SNR's default payments as a compromise instead.  The government's decision now to "choose to vindicate its legal claim" through the FCC's proceedings rather than pursue full recovery through Relator's *qui tam* action—particularly in light of the government's bad faith in moving to dismiss, as articulated in Relator's opposition to the government's Motion to Dismiss—is precisely the situation contemplated by the FCA's alternate remedies provision.  *Novo A/S*, 5 F.4th at 55; *see also Barajas*, 258 F.3d at 1012 (holding that it would be "inconsistent not only with the plain meaning of the broad language employed in the statute, but also with the purpose of the statute, to allow the government to obtain from a *qui tam* defendant a remedy that could have been obtained in an already-filed FCA action, and then to argue that the proceeds of that remedy need not be shared with the whistleblower because the remedy was not an 'alternate remedy' within the meaning of the FCA").

## <u>CONCLUSION</u>

If Relator's *qui tam* action is to be dismissed, Relator is entitled to compensation for bringing the Defendants' wrongdoing to light, prodding the government to take action against Defendants, and shouldering the burden in litigating this action against Defendants over the past

nine years.  Accordingly, and for the reasons outlined above, the Court should enter an order awarding Relator the amount of $128,888,798, which represents 25 percent of the $515,555,190 in default payments paid by Northstar and SNR to the FCC, and granting its expenses, attorney's fees, and costs.

Dated: June 13, 2024                       Respectfully submitted,

                                    By: */s/ Stephen J. Obermeier*
                                           Stephen J. Obermeier (D.C. Bar # 979667)
                                           Bennett L. Ross (D.C. Bar # 978122)
                                           Bert W. Rein (D.C. Bar #067215)
                                           Mark B. Sweet (D.C. Bar # 490987)
                                           Kathleen C. Cooperstein (D.C. Bar # 1017553)
                                           **WILEY REIN LLP**
                                           2050 M Street, NW
                                           Washington, DC 20036
                                           (202) 719-7000
                                           sobermeier@wiley.law

                                           *Counsel for Relator Vermont National*
                                           *Telephone Co.*