**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, VERMONT NATIONAL TELEPHONE CO., <br><br> Plaintiff, <br><br> v. <br><br> NORTHSTAR WIRELESS, LLC, e*t al.*, <br><br> Defendants. | Civil Action No. 1:15-cv-0728 (CKK) |

**PUBLIC APPENDIX OF EXHIBITS IN SUPPORT OF**
**(1) RELATOR'S OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS**
**AND**
**(2) RELATOR'S MOTION FOR SHARE OF ALTERNATE REMEDY**

**PUBLIC APPENDIX**

## Table of Contents

| | Exhibit | Designation | Page Number |
|---|---|---|---|
| 1 | **Relator Exhibit 18** | **Public** | **A-1** |
| 2 | Relator Exhibit 36 | Confidential | A-4 |
| 3 | Relator Exhibit 44 | Confidential | A-13 |
| 4 | Relator Exhibit 101 | Confidential | A-17 |
| 5 | Relator Exhibit 103 | Confidential | A-23 |
| 6 | **Relator Exhibit 156D** | **Public** | **A-28** |
| 7 | Relator Exhibit 170D | Confidential | A-32 |
| 8 | Relator Exhibit 239 | Confidential | A-34 |
| 9 | Relator Exhibit 253 | Confidential | A-39 |
| 10 | **Relator Exhibit 353** | **Redacted** | **A-41** |
| 11 | Relator Exhibit 381 | Confidential | A-45 |
| 12 | Relator Exhibit 391 | Confidential | A-49 |
| 13 | **Relator Exhibit 398** | **Public** | **A-51** |
| 14 | Relator Exhibit 443 | Confidential | A-56 |
| 15 | Relator Exhibit 459 | Confidential | A-66 |
| 16 | Relator Exhibit 473 | Confidential | A-73 |
| 17 | Relator Exhibit 499 | Confidential | A-75 |
| 18 | **Relator Exhibit 508** | **Public** | **A-80** |
| 19 | Relator Exhibit 531A | Confidential | A-82 |
| 20 | KPMG-VTEL-0008410 | Confidential | A-84 |
| 21 | **Deposition of George Brokaw** | **Public** | **A-91** |
| 22 | **Deposition of Robert Dravenstott** | **Public** | **A-99** |
| 23 | **Deposition of Larry Dunn** | **Public** | **A-106** |
| 24 | Deposition of Stephen Hillard | Confidential | A-117 |
| 25 | **Deposition of Nat Klipper** | **Public** | **A-132** |
| 26 | **Deposition of Mark Rubenstein** | **Public** | **A-162** |
| 27 | **Deposition of Mariam Sorond** | **Redacted** | **A-169** |
| 28 | **Deposition of Fran Stocker** | **Public** | **A-178** |
| 29 | **Deposition of Miranda Wright** | **Public** | **A-185** |
| 30 | **Deposition of DISH 30(b)(6) Jeffrey Blum** | **Public** | **A-193** |
| 31 | **Deposition of DISH 30(b)(6) (Accounting) Peter Dattilo** | **Public** | **A-214** |
| 32 | **Deposition of Northstar 30(b)(6) Allen Todd** | **Public** | **A-221** |

**PUBLIC APPENDIX**

# Relator Exhibit 18

## PUBLIC

Message

**Relator Exhibit 18 (10-3-23)**
WWW.DIGITALEVIDENCEGROUP.COM

**From:** George Brokaw [GB@brokawmail.com]
**Sent:** 3/6/2014 4:06:20 PM
**To:** Rubenstein, Mark [Mark.Rubenstein@highbridge.com]
**Subject:** RE: Update

great

**From:** Rubenstein, Mark [mailto:Mark.Rubenstein@highbridge.com]
**Sent:** Wednesday, March 05, 2014 1:10 PM
**To:** George Brokaw
**Subject:** RE: Update

Hey George, FYI we have the FCC team from Latham stopping by on Friday including the guy who runs their Washington bureau. We're going to talk about structuring DE deals, the upcoming auction etc. So you know I've invited the BlackRock to participate via phone or in person.

Any further updates on your end?

**From:** George Brokaw [mailto:GB@brokawmail.com]
**Sent:** Friday, February 28, 2014 4:13 PM
**To:** Rubenstein, Mark
**Subject:** Fwd: Update

FYI

Sent from my iPhone

Begin forwarded message:

> **From:** John Muleta <john@johnmuleta.com>
> **Date:** February 28, 2014 at 4:06:42 PM EST
> **To:** George Brokaw <GB@brokawmail.com>
> **Subject: Update**
>
> George - just landed from Madrid after spending the week in Barcelona at Mobile Wireless Congress with Charlie and Tom.  I had a chance to review the basic outline of the DE cap  structure and we agreed to do the deep dive after they have a chance to review the indicative term sheets.
>
> As you know,  we've been waiting for 3 years to develop a spectrum partnership and I think Charlie is excited that I have finally found the right structure and financial partners to make it a go.   As Charlie explained, Dish's ability to bid strategically alongside a well heeled DE partner will tip the scales when going up against VZW and T.
>
> Charlie and Tom were impressed about the hard work so far and they have lots of questions on how to make sure it is regulatorily compliant so it behooves all of us to get to the next steps pretty quickly.
>
> Talk to you this weekend,

Confidential

HPS_0001787

John

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information. If you are not the intended recipient you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.

# Relator Exhibit 36 (excerpted)

CONFIDENTIAL AND FILED
UNDER SEAL
A-4 – A-12

# Relator Exhibit 44

## CONFIDENTIAL AND FILED UNDER SEAL
## A-13 – A-16

# Relator Exhibit 101 (excerpted)

CONFIDENTIAL AND FILED
UNDER SEAL
A-17 – A-22

# Relator Exhibit 103 (excerpted)

CONFIDENTIAL AND FILED
UNDER SEAL
A-23 – A-27

# Relator Exhibit 156D

## PUBLIC



FCC Federal Communications Commission

Browse by CATEGORY    Browse by BUREAUS & OFFICES

Search

About the FCC    Proceedings & Actions    Licensing & Databases    Reports & Research    News & Events    For Consumers

Home / Economics and Analytics / Auctions

# Auction 96: H Block

**Go to an auction**

Select an Auction

Summary
General Releases
Archived Auction Releases
About Auctions
Broadcast Incentive Auction
CAF-II Auction (Auction 903)
833 Auction
Prohibited Communications
Conferences
Consumer Alert
Tribal Lands Credits
About Form 175
Band Plans
Maps
Experiments, Papers & Studies
Round Results
Tracking Tools
C & F Block Payment Information
Cross References
Contact Auctions

Summary | Fact Sheet | Releases | Results | Application Search

## Fact Sheet

| | |
|---|---|
| Date: | Auction 96 began on 1/22/2014 and closed on 2/27/2014. |
| Licenses: | 176 licenses total: 1 in each of the 176 Economic Areas (EAs) |
| Spectrum: | 1915-1920 MHz and 1995-2000 MHz bands |
| Bandwidth: | 10 MHz (1915-1920 /1995-2000 MHz) |
| Winning Bidders: | 1 Bidder won 176 Licenses |
| Rounds: | 167 |
| Qualified Bidders: | 23 |
| Licenses Won: | 176 |
| Total Licenses: | 176 |
| Net Bids: | $1,564,000,000 |
| Gross Bids: | $1,564,000,000 |

General information and associated licensing parameters are provided below. Public notices provide specific information regarding this auction. This fact sheet includes:

- Key Dates
- Licenses Offered
- Permissible Operations
- License Period and Construction Requirements
- Small Business Bidding Credit
- Tribal Land Bidding Credit
- Licensing Rules

Relator's
Exhibit 156D
(12-22-23)
WWW.DIGITALEVIDENCEGROUP.COM

## Key Dates

| Event | Date |
|---|---|
| Comments Due | 8/5/2013 |
| Reply Comments Due | 8/16/2013 |
| Auction Tutorial Available (via Internet) | 11/4/2013 |
| Form 175 (Short Form) Application Filing Window Opens | 11/4/2013; Noon ET |
| Form 175 (Short Form) Application Filing Deadline | 11/15/2013; 6:00 pm ET |
| Upfront Payments Deadline | 12/18/2013; 6:00 pm ET |
| Mock Auction | 1/17/2014 |
| Auction Start | 1/22/2014 |
| Auction Closed | 2/27/2014 |

## Licenses Offered

Auction 96 will offer one license for each of the 176 Economic Areas (EAs), including the Gulf of Mexico. The H Block frequencies will be licensed as paired 5 megahertz blocks, with each license having a total bandwidth of 10 megahertz: 1915-1920 MHz for mobile and low power fixed (i.e., uplink) operations and 1995-2000 MHz for base station and fixed (i.e., downlink) operations.

H Block Band Plan (pdf)

For a complete list of the licenses available in Auction 96, see Attachment A of Public Notice DA 13-1885, released September 13, 2013.

*Cost-Sharing Obligations.* The spectrum in the Lower H Block and the Upper H Block is subject to cost-sharing requirements related to the past clearing and relocation of incumbent users from these bands. See Public Notice DA 13-1885 for more detailed information.

*Reserve Price.* There will be an aggregate reserve price of $1.564 billion for the H Block licenses in Auction 96. See Public Notice DA 13-1885 for more detailed information.

## Permissible Operations

Spectrum in the H Block can be used to provide any terrestrial fixed or mobile wireless services, including broadband services.

## License Period and Construction Requirements

*License Period.* Initial authorizations will be granted for a ten year term.

*Construction Requirements.* There are certain buildout requirements for the H Block licenses offered in Auction 96. You must provide reliable signal coverage and offer service to at least 40 percent of the population in each of your license areas within 4 years after license grant, and provide reliable signal coverage and offer service to at least 75 percent of the population in each of your license areas within 10 years after license grant.

Partitioning and/or disaggregation of H Block licenses is permitted.

## Small Business Bidding Credit

Eligible applicants in Auction 96 may claim a small business bidding credit. A bidding credit represents the amount by which a bidder's winning bids are discounted. The size of the bidding credit depends on the average annual gross revenues for the preceding three years for the applicant, its affiliates, its controlling interests, and the affiliates of its controlling interest, as well as the average annual gross revenues of any entity with which the applicant has an attributable material relationship, as defined by the Commission's rules.

The level of bidding credit for the Auction 96 is determined as follows:

- A bidder with attributable average annual gross revenues that do not exceed $40 million for the preceding three years receives a 15 percent discount on its winning bid;
- A bidder with attributable average annual gross revenues that do not exceed $15 million for the preceding three years receives a 25 percent discount on its winning bid.

Bidding credits are not cumulative. A qualifying applicant will receive either a 15 percent or a 25 percent bidding credit on its winning bids, but not both.

## Tribal Land Bidding Credit

A winning bidder that intends to use its license(s) to deploy facilities and provide services to federally-recognized tribal lands that are unserved by any telecommunications carrier or that have a wireline penetration rate equal to or below 85 percent is eligible to receive a tribal lands bidding credit as set forth in 47 C.F.R. §§ 1.2107(e) and 1.2110(f). A tribal lands bidding credit is in addition to, and separate from, any other bidding credit for which a winning bidder may qualify. A winning bidder need not qualify for a small business bidding credit to be eligible for a tribal lands bidding credit.

## Licensing Rules

47 C.F.R. Parts 1 and 27

---

Federal Communications Commission
45 L Street NE
Washington, DC 20554

| | | |
|---|---|---|
| Website Policies & Notices | CATEGORIES | BUREAUS & OFFICES |
| Privacy Policy | About the FCC | Consumer |
| FOIA | Proceedings & Actions | Enforcement |

Phone: 1-888-225-5322

ASL Video Call: 1-844-432-2275

Fax: 1-866-418-0232

Contact Us

Visiting FCC Facilities

No Fear Act Data

Digital Strategy

Open Government Directive

Plain Writing Act

RSS Feeds & Email Updates

Accessibility

Vulnerability Disclosure Policy

USA.gov

Licensing & Databases

Reports & Research

News & Events

For Consumers

Inspector General

Media

Public Safety

Space

Wireless

Wireline

Offices





# Relator Exhibit 170D

CONFIDENTIAL AND FILED
UNDER SEAL
A-32 – A-33

# Relator Exhibit 239 (excerpted)

## CONFIDENTIAL AND FILED UNDER SEAL
## A-34 – A-38

# Relator Exhibit 253

CONFIDENTIAL AND FILED
UNDER SEAL
A-39 – A-40

# Relator Exhibit 353

## Unredacted Version Filed Under Seal

Message

**Relator Exhibit
353 (1-31-24)**
WWW.DIGITALEVIDENCEGROUP.COM

**From:**      Nat Klipper [nat@adkcapital.com]
**Sent:**      8/5/2015 7:56:28 PM
**To:**        Nat Klipper [nat@adkcapital.com]
**CC:**        Micah Feitz [micah@adkcapital.com]
**BCC:**       ███████████████████████████████████████
              ██████████████████████████████████████████
              ███████████████████████████████

**Subject:**   Ergen's comments during today's conference call


Dear ADK Spectrum Investors,

I am attaching Charlie Ergen's comments regarding our Designated Entity from today's conference call.  In a nutshell, he says that his company will only know what path to take once the official ruling gets published but reviews some of DISH's options.  The rest of his commentary provides some background to the genesis of the DEs and his thoughts on competition in general.

Best,

Nat Klipper
ADK Capital LLC
646-783-5491


(Q)
And then the second question is a bigger-picture
question for Charlie. In terms of the DE discounts, there's confusion as to what your actual options are or SNR's options. I guess first is, if you decide to sue the FCC, do you have to pay the $3 billion first and then sue to get it back, or if you don't pay, do you have a penalty? And then the other question is instead of suing, can you choose to withdraw your application if you so choose? Thanks.

(A)
On the DE question, the – I'm going to – and Stan, you jump in here if I get this wrong, but I think – we believe that the FCC has told us that the order from the Chairman's office is going to deny the DE discount. I haven't gone into reasons particularly why that is, but they've indicated that's the case. So that would give – obviously we have two DE partners, and we'd also have to consult with them, and ultimately I think we'll work together to figure out kind of what makes sense for everybody, but – or at least I hope that we would. But the – the one option is not to pay the money, in which case you immediately would be charged 15% penalty.
Long term that number could be higher because that spectrum would be re-auctioned, and you would owe the difference between what it re-auctions for and the price paid. So you could owe more than 15% although in reality, when you really think about it, it's – for various reasons it's probably a 15% penalty. So you would owe couple billion dollars and in theory get your money back and life would go on.
Door number two is you could pay the money. And life would go on. And you would – it would eliminate some of the very negative handcuffs on the spectrum if for example you could sell it, lease it, lease it all to one person and so forth what you can't really do today, under restrictions today. Or you could sue and in that case I don't know exactly whether you would pay and then sue or just sue or whatever. I think – I don't think we know until we see the order. I think you'd have to be prepared to pay and sue if that was the route that you decided to go.

(Q)
And I'm wondering what – how you viewed the shape that's occurring and
what role Dish might play to advance your overall wireless strategy in the context of M&A? Thank you.

(A)
To the extent that the FCC really goes through with the order as we understand it when we lose the DE discount, that would move us more likely in a different direction than if we were to get the discount. And there's two reasons why. One is $3.3 billion is a lot of money. So if you actually have to pay that money or decide to pay that money, then you've got less to work with and certainly it would make M&A, and it would complicate M&A and perhaps a way you couldn't do it. Right? So that's one possibility. The second thing is that the FCC's really, they can pick winners and losers. And they're always, in every situation, they have good arguments on both sides of an argument. And I think in this case, whether they allow the discount or don't allow the discount, there would be probably good arguments on both

ADK0016648

sides. And the FCC therefore picks winners and losers. But it gives you an indication of what they're thinking about in terms of the industry.

Our bet was that, first of all, this is a very competent FCC, from the staff to the commissioners, they work hard. This is a really talented team, and one of the best that I've seen in 30 years. So, and this team has talked about competition almost from day one. So our bet was that, based on the rules of the option, that they were set up for us to do exactly what we did. That any rational person would look at those rules and say we want to compete against AT&T and Verizon. We want to enter this marketplace and based on the rules, particularly with things like volume bidding and things like that, and particularly with DE discounts with no caps and no limits, that this is exactly what they want us to do. They want us disruptive in the marketplace, and they want us to be disruptive in an auction.

Going by the rules, but obviously being disruptive. So to the extent that the FCC would say, no, we want you disruptive in the marketplace but not in an option, and if we're going to side with the big guys and disallow the discount, then that's a pretty strong signal that you're probably not going to get into the marketplace in a competitive way as a new entrant. And it probably means that even in an M&A situation, you're going to have a lot of difficulties, there's more risk than we would anticipate. The opposite of that would have been true had they said, you know what, yeah, we know that there's some pressure that the headline is not very good, that the company would get $3 billion discount. But we believe you followed the rules, and we think that competition's important, and we like the fact you're going to get in and compete. And so they can allow the discount. Then you'd feel more comfortable to go in and compete. So I think that when you see – I think that we get pushed more towards we still have all our options open. But we certainly get pushed more towards a sale or lease of spectrum. I mean obviously we have to work with DE partners to understand where we can and can't go. But we own spectrum outside of the DE regime. And there's no restrictions on what we can do with that spectrum. So I think we take a more conservative route. We take a little bit shorter term view of where our options are today.

Your next question comes from the line of Walter Piecyk from BTIG. Your line is open.

<Q>: Thank you. Just going back to Charlie, to your earlier comments about the FCC kind of signaling support for the duopoly and maybe not wanting to get involved with the challenger being in a competitive market, given the depth of your spectrum, does that mean your options might also now include breaking up that block of spectrum and selling it in smaller chunks rather than just one large chunk of spectrum?

<A>: I don't know, Tom, if you want to add to this, but, yeah. I think that well, a couple things that we look at. One is we look at the order of what the FCC says about AWS-3 auction and see what they have to say and kind of see how we feel about it. And then obviously DE's going to be able to do whatever they want to do about that. And then we'll look and see what the next incentive auction looks like. So those are decision points, 3GPP's [ph] a decision point for us. And then I think the way we look at it is, we say – and then our uplink, we can go all down link as an option. So we have to decide that within the next nine months or something, too. So all those factors, I think, we'll be able to make – I think our evidence will be obvious which way for us to go based on those decisions.

And then it gives us kind of five bands of spectrum. One, if we go all down link, which is a very attractive option for us, we end up with an upper AWS-4 [ph] down link that can be combined with AWS-3 spectrum we won at auction. You end up with a band that is the unpaired AWS-3 [ph] band that could be combined with the lower AWS-4 [ph] spectrum and upper H Block. And then you end up with an H Block, and you end up with an E Block and 700 megahertz. Then we also have 11-7 [ph] to 12-2 [ph] spectrum which we have a vast majority of the United States spectrum as well. So we've got a number of bands. And then if you got into, then you look at corporate structure. So, I think one of the things that we'll do and that Jason has kind of chartered with is to look at corporate structure. If you were to break those bands out, how would you do that from a corporate structure? And it looks like it may be more attractive at some point to split our video business away from our spectrum business. We thought long term those two were better together.  As a long-term shareholder if I'd look at 10-year span, I think those things should stay together, and I think competing

in the marketplace would be the best avenue for us. But if we're not really allowed to do that or were handcuffed by the government to do that, then you look at corporate structure and maybe you break those things out. And then you have a lot of flexibility, whether your bands are in a single unit, whether they're in multiple units or whether they're actually in a band could be in different geographies. Right?

<Q>: I mean, that sounds like new options, because you had tied this stuff together in the past. So now if you're kind of at this point that the FCC is kind of signaling this one direction that's, it sounds like in your mind, opening up a couple of different options. I know on a past call, you talked about when someone asked you if you'd consider leasing it, you just said yes, and leased it. But now you're saying, yeah, leasing's in the mix, maybe breaking up spectrum in different buckets is the mix, separating the company. I mean, it sounds like your view on the options has, once again, expanded in the past couple of months. Is that an accurate statement?

<A>: Yeah, I don't know if – I think the options are all still the same. And I just think that we would be, based on where we think the FCC's going to go, we'd wake up the next day based on when we were informed of that. We woke

ADK0016649

up the next day and said, on average, the leasing sale of option or pieces of are spectrum could be a more attractive option for us and for our shareholders, because the risk is so low to do that. And it's – and we think our spectrum is really undervalued on our balance sheet, by the street. So – and that's the way you'd prove it, right?

So that you might split it up. We – otherwise in my heart, I think we – I think the best long-term thing for our shareholders would actually be to go compete with the big guys and probably some kind of M&A, and things that we could do there. I think that would be the best long-term option, but that's not – you're not going to get there without government support. You just can't. The scale is too important in this industry. And if the big guys can comment and get Congress to write letters and the FCC to set – to make decisions rightly or wrongly, we're not that good, we're not that big, and that's just too risky.

So that – your thought process changes by actions that are happening in the marketplace. There could be M&A stuff that happens in the marketplace that would affect us and there certainly could be things that the government decisions – government – decisions by government, that force us one way or the other. [indiscernible]

<Q>: Yeah, the government changes over – the government changes over time. Chairman Wheeler [ph] is not going to be there forever, nor are all the other commissioners.

<A - Charles William Ergen>: Yeah, but I – yeah, b
ut I'm – you know, in general, I'm a pretty big fan of Chairman
Wheeler [ph]. I mean, I – I mean, this is – this is a very good commission. So this is – this is a commission that's thought about competition, this is a good commission. So I think that's one of the most disappointing things is, this is a commission that we were fairly confident would – was encouraging us in the option of doing exactly what we did. Right? And for whatever reason, they sided with the big guys. And so, it's – this is as good as it gets for us at the commission probably, and I can't imagine – there may be a better commission in the next administration, but this one's really good.

<Q>: Okay.

<A - Charles William Ergen>: These are good staff and these are good people, and in general I – in general I'm a pretty big fan.

ADK0016650

# Relator Exhibit 381 (excerpted)

CONFIDENTIAL AND FILED
UNDER SEAL
A-45 – A-48

# Relator Exhibit 391

## CONFIDENTIAL AND FILED UNDER SEAL
## A-49 – A-50

# Relator Exhibit 398 (excerpted)

## PUBLIC



2018 ANNUAL REPORT

REMEMBER THE PAST. INSPIRE THE FUTURE.

Relator Exhibit
398 (1-23-24)

WWW.DIGITALEVIDENCEGROUP.COM

DOYON
Limited

<div style="text-align:right">

MANAGEMENT'S
# DISCUSSION AND ANALYSIS

</div>

Located in Fairbanks, the business holdings are situated in the heart of the Company's shareholder base and provide numerous opportunities for our shareholder employees to develop critical job skills. Employees of Doyon's facilities department perform a variety of functions in support of our real estate, including renovations and repair work, planned maintenance, project construction, project management, project accounting and catering.



## NATURAL RESOURCE DEVELOPMENT

The following table displays the results of our natural resources earnings (in thousands):

|  |  | 2018 | 2017 | 2016 |
|---|---|---|---|---|
| Revenues: |  |  |  |  |
| 7(i) revenue sharing | $ | 18,836 | 13,769 | 8,480 |
| Natural resources development revenue | $ | 139 | 225 | 483 |
| Natural resource revenues | $ | 18,975 | 13,994 | 8,963 |
| Oil and gas exploration expense | $ | 14,421 | 4,947 | 5,355 |
| Shareholder wages paid | $ | 357 | 221 | 447 |

ANCSA Section 7(i) natural resource revenue sharing was $18.8 million in 2018, an increase of $5 million from 2017 as the result of greater shareable natural resource revenue earned by other Alaska Native regional corporations. The increase in oil and gas exploration expense of $9.5 million to $14.4 million is driven by the cost of drilling the Totchaket #1 exploration well in 2018. Oil and gas exploration expense is presented net of State of Alaska exploration tax credits applied for and exploration partner reimbursements received.

Natural resource revenues consist primarily of ANCSA Section 7(i) revenue sharing, net of the 50 percent distribution to village corporations and at-large shareholders each May pursuant to section 7(j) of ANCSA. We receive the majority of our 7(i) revenues from Arctic Slope Regional Corporation and NANA Regional Corporation. In 2018, Doyon's share of income from 7(i) increased by $5 million from the prior year as a result of higher commodity prices and increased production.

Revenue from Doyon's natural resource development pillar's activities primarily consists of license fees generated from third-parties who explore for minerals on our lands and from the sale of sand, gravel and rock for construction projects in rural Alaska. Sales of these construction materials fluctuate in relation to government spending on rural capital projects.

The natural resource development pillar is tasked with oversight and management of Doyon's 12.5 million acres of land ownership interest, including the ongoing implementation of ANCSA land conveyances, surface land management, and pursuit of natural resource exploration and development opportunities on ANCSA and nearby public lands.

Doyon has funded exploration programs on its lands to generate information to assist in efforts to encourage exploration and investment by third-party oil, gas and mining companies. Doyon's exploration and marketing efforts also utilize more than 30 years of accumulated exploration data either owned or licensed for use by Doyon.

During 2018, Doyon finalized two mineral exploration agreements for lands near Northway and the Seventymile River area west of Eagle; field programs were completed during the year and additional exploration is expected in 2019. Doyon continued exploration for oil and gas in the frontier Nenana Basin, completing the drilling of the fourth well in this basin, Totchaket #1. Cook Inlet Region, Inc. has been a substantial investor in our recent exploration activities. Additionally, the State of Alaska provides significant incentives for Doyon's oil and gas exploration efforts through exploration tax credit programs.

CONFIDENTIAL                                                                 NS-00058718

# MANAGEMENT'S
# DISCUSSION AND ANALYSIS

## WIRELESS TELECOMMUNICATIONS

The following table displays the results of our wireless telecommunications venture (in thousands):

|  |  | 2018 | 2017 | 2016 |
|---|---|---|---|---|
| Equity earnings of unconsolidated subsidiaries | $ | 43,169 | 35,887 | 30,066 |
| Earnings attributed to noncontrolling interest | $ | (31,870) | (26,188) | (22,117) |
| Pre-tax net income attributed to Doyon | $ | 11,299 | 9,699 | 7,979 |

Equity earnings of unconsolidated subsidiaries increased by $7.3 million to $43.2 million in 2018 as a result of interest on a minimum return guarantee associated with our wireless telecommunications venture. As this venture is not wholly owned, the interest earnings of the other venture partners (noncontrolling interest) also increased in proportion to those earned by Doyon. The net of these amounts represents Doyon's share of pre-tax net income and totaled $11.3 million, an increase of $1.6 million over what we earned in 2017.

Doyon is the managing member in a joint venture created to acquire and develop wireless spectrum licenses. In 2015, Doyon invested in wireless telecommunication licenses through Federal Communications Commission Auction 97. This was the Company's third venture into the telecommunications industry, having acquired licenses and built out infrastructure in the past, through similar structured transactions. The wireless industry is growing because of the increased use of digital communications that require the transfer of wireless data, and we believe our investment is positioned in a way that gives the Company a significant upside in this industry with contractual arrangements that limit our downside risk.

Doyon manages 261 wireless spectrum licenses through a joint venture with a wholly owned subsidiary of DISH Network (DISH). Accounting rules require that DISH carry the value of the licenses on their balance sheet. Our accounting for the investment in wireless licenses is governed by the terms of our joint venture, which provide for a structured return over the initial stages of license development.

Our long-term investment performance related to our purchase of these licenses will be impacted by the development of future events that cannot be reliably predicted. For example, if Doyon exits this investment during or before 2021, our investment return is likely to be governed by a minimum return defined in our joint venture agreements. The economic environment, business decisions and our decisions on development and marketing the licenses will determine investment performance.

CONFIDENTIAL

NS-00058719

MANAGEMENT'S
# DISCUSSION AND ANALYSIS



## GENERAL AND ADMINISTRATIVE EXPENSE

The following table displays general and administrative expense for each of the fiscal years ended (in thousands):

|  |  | 2018 | 2017 | 2016 |
|---|---|---|---|---|
| Consolidated general and administrative | $ | 48,078 | 47,236 | 47,826 |
| Contribution to Doyon Foundation | $ | 1,870 | 2,286 | 2,398 |
| Total general and administrative expense | $ | 49,948 | 49,522 | 50,224 |

Doyon's total general and administrative expenses (G&A) increased by less than 1 percent ($400 thousand) in 2018. The Company continues to focus efforts on managing costs through the downturn in activity in our oil field contracting business and by improving efficiencies in our government services business. G&A at the parent company totaled $26.4 million in 2018, which was relatively flat compared to the 2017 G&A of $26.3 million.

G&A at the parent company as a percentage of total revenue was stable at 8.5 percent in 2018 and 2017. G&A expenses are incurred by the Company and its subsidiaries in our efforts to provide corporate governance and oversight of our increasingly complex subsidiary operations, to pursue new investments, to protect the Company's assets, to provide shareholder services, and to fund annual contributions to the Doyon Foundation, potlatch payments, and donations. The contribution to the Doyon Foundation for 2018 was slightly lower than that of 2017 due to the decrease in pre-tax net income during the year.

## TAXES

The following table displays our income tax expense, which is broken out between current and deferred expense (in thousands):

|  |  | 2018 | 2017 | 2016 |
|---|---|---|---|---|
| Current income tax expense (benefit) | $ | (2,322) | 13,292 | (4,610) |
| Deferred income tax expense (benefit) | $ | (66,500) | 4,345 | 26,108 |
| Total income tax expense (benefit) | $ | (68,822) | 17,637 | 21,498 |

Doyon's blended tax rate is approximately 32 percent of our pre-tax income. This rate declined by approximately 9 percent in 2018 as a result of the passage of the Tax Cuts and Jobs Act of 2017 that lowered federal corporate income tax rates. Total tax expense is comprised of both current and deferred U.S. federal, state and local tax expense. Current tax represents expected taxes that Doyon will owe to taxing authorities based on our current year tax return filings. Deferred tax expense represents the amount of taxes that are reported in this year's financial statements but will not be payable to taxing authorities until a later date. Deferred income taxes arise because of different rules with respect to when certain items of income and expense are recognized under the tax code, compared to treatment in our financial statements.

The most significant of these differences has to do with IRS rules regarding how and when we deduct the cost of property and equipment purchases from taxable earnings. The Internal Revenue Code often allows for costs to be deducted in the year of purchase or over a short period of time thereafter, while accounting rules require Doyon to depreciate these assets over a longer period of time. This acceleration of cost deductions for income tax purposes benefits the Company by reducing taxable income in the near term and deferring when our tax obligations will become due.

Doyon was able to recognize an income tax benefit of $47.4 million in 2018 as the result of determining the value associated with certain natural resource assets. An additional benefit of $32.9 million is associated with the lower corporate federal income tax rate from the Tax Cuts and Jobs Act.

CONFIDENTIAL
NS-00058720

# Relator Exhibit 443 (excerpted)

## CONFIDENTIAL AND FILED UNDER SEAL
## A-56 – A-65

# Relator Exhibit 459

CONFIDENTIAL AND FILED
UNDER SEAL
A-66 – A-72

# Relator Exhibit 473

## CONFIDENTIAL AND FILED UNDER SEAL
## A-73 – A-74

# Relator Exhibit 499 (excerpted)

CONFIDENTIAL AND FILED
UNDER SEAL
A-75 – A-79

# Relator Exhibit 508

## PUBLIC

Message

| | |
|---|---|
| **From**: | Rubenstein, Mark [Mark.Rubenstein@highbridge.com] |
| **Sent**: | 1/24/2014 8:08:19 PM |
| **To**: | Rubenstein, Mark [Mark.Rubenstein@highbridge.com] |
| **Subject**: | Spectrum Notes |

Dish is looking to participate in Sep spectrum auction with minority owned bidding vehicle: advantage pay 25% less than gavel price on auction
AWS 3 spectrum, slightly higher frequency than L-squared but adjacent to a lot of what Dish has
Around $1bn +/-
Dish can provide a put to the entity (but can't have a call)
Has been done before, bunch of people (former black execs) that have done for AT&T and others
Former head of FCC's wireless bureau is George's former roommate, John Muleta (who we're meeting next week)
Idea is to set up an idea where he would have majority voting but not majority of the equity
Historically put is at a 15% IRR, however with Dish being a stronger credit the idea would be idea to whack up the capital structure to get closer to 10%
Dish would put in up to 49% of the equity
Go to DB and get senior debt and run auction for the mezz OR pick your partner on the mezz and run auction on the senior debt
You need fiduciaries in the equity who if it's worth a lot would benefit, although without Dish transaction would never happen
Will try to find build-out partners
Big question: could Dish lease some spectrum to provide cash flow?

**Relator Exhibit
508 (2-6-24)**

WWW.DIGITALEVIDENCEGROUP.COM

**A-81
PUBLIC APPENDIX**

# Relator Exhibit 531A

CONFIDENTIAL AND FILED
UNDER SEAL
A-82 – A-83

# KPMG-VTEL-0008410

CONFIDENTIAL AND FILED
UNDER SEAL
A-84 – A-90

# Brokaw Deposition Transcript (excerpted)

## PUBLIC

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

_____

THE UNITED STATES OF AMERICA,  )

ex rel. VERMONT NATIONAL        )

TELEPHONE COMPANY,              )

                                )   CASE NO. 15-00728(CKK)

            Plaintiff,          )

                                )

        -against-               )

                                )

NORTHSTAR WIRELESS, LLC, et al.)

                                )

            Defendant.   )

_____)

*** CONTAINS CONFIDENTIAL PORTIONS ***

Pages 250 - 308


VIDEO-RECORDED DEPOSITION OF

GEORGE BROKAW

Zoom Recorded Videoconference

10/03/2023

8:04 a.m. (MDT)


REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 13

```
 1                  AUTOMATED MESSAGE:  Recording in

 2          progress.

 3                  THE TECH:  We're on the record.

 4          This is the remote video deposition of George

 5          Brokaw in the matter of The United States of

 6          America, ex rel. Vermont National Telephone

 7          Company versus Northstar Wireless, LLC, et

 8          al., in the United States District Court for

 9          the District of Columbia.

10                  My name is Billy Fahnert.  I am the

11          video technician today.  The court reporter

12          is Amanda Gorrono.  We both represent Digital

13          Evidence Group.

14                  Today's date is October 3, 2023.

15          The time is 8:04 a.m. Mountain Daylight Time.

16                  Counsel has stipulated to the

17          witness being sworn in remotely.

18                  Will counsel please identify

19          yourselves for the record and then the

20          witness will be sworn in.

21                  MR. ROSS:  Good morning.  This is

22          Bennett Ross with Wiley Rein representing the
```

Page 14

1          Relator, Vermont National Telephone.

2                    I'm here with my colleague Steve

3          Obermeier.

4                    MR. PAIKIN:  And this is Jonathan

5          Paikin of WilmerHale representing DISH.

6                    I'm here with my colleague Sam Allen

7          also from WilmerHale; and Larry Capson from

8          inhouse at DISH is present in the room as

9          well.

10                   THE WITNESS:  Should I introduce

11         myself?

12                   MR. PAIKIN:  You'll do it in a

13         second.

14                   MR. GOBENA:  This is Gejaa Gobena

15         representing the SNR Wireless defendants, as

16         well as Atelum LLC and John Muleta

17         individually.

18                   MS. FRODLE:  This is Amee Frodle

19         Covington & Burling representing Doyon

20         Limited, the Northstar defendants, and Allen

21         Todd, and Miranda Wright.

22    GEORGE BROKAW, called as a witness, having been

Page 15

1    first duly sworn by a Notary Public of the State

2    of New York, was examined and testified as

3    follows:

4                    THE WITNESS:  I do.

5                    THE COURT REPORTER:  Thank you.

6        I'll go off camera.  You may proceed.

7    EXAMINATION

8    BY MR. ROSS:

9        Q.    Good morning, Mr. Brokaw.  Could you

10   state your full name for the record, please?

11       A.    George Rogers Brokaw.

12       Q.    Have you been deposed before,

13   Mr. Brokaw?

14       A.    I have.

15       Q.    Okay.  I'll go over some ground

16   rules.  It probably is old news to you.  I'm

17   going to be asking you a series of questions, if

18   at any time you do not understand the question,

19   please let me know and I'll be happy to rephrase

20   the question.

21                    Because my questions and your

22   answers are being transcribed, it's important

Page 47

1       try to acquire spectrum in Auction 97?

2               A.      Nobody.  I mean, I don't -- DISH --

3       DISH was interested in acquiring spectrum at --

4       so to the extent I was on the board, you know, I

5       guess I was aware of it and supportive of it.

6               Q.      I mean, my question was:  Did

7       anybody, the management team ask you to get

8       involved, or was it a unilateral decision on your

9       part to -- to work with others in trying to come

10      up with an arrangement for DISH's consideration?

11              MR. PAIKIN:  Object to form.

12              A.      I think what you may be asking is

13      why did I help John Muleta think through

14      financing structures or introduce him to Botein?

15      If that's what you're asking, you may know that

16      John Muleta and I went to law school together.

17      I'm sure you know that.  And we were classmates

18      and business school classmates, so I've known

19      John for 30 years.

20              And he would have -- I can't

21      remember whether Botein called me and said, you

22      know, we're looking to see if there's financing

A-96
PUBLIC APPENDIX

```
                                                        Page 322

 1      Digital Evidence Group, LLC

 2      1730 M Street, NW, Suite 812

 3      Washington, D.C.  20036

 4      (202)232-0646

 5

 6                      ERRATA SHEET

 7

 8      Case: USA, ex rel. Vermont National Telephone Company v. Northstar Wireless,
        LLC et al.

 9      Witness Name: George Brokaw

10      Deposition Date: October 3, 2023

11      Page No.    Line No.      Change

12      14          7             "Capson" change to "Katzin"

13      18          20            "the part that was at the hedge fund" change to

14                                "the part that was not at the hedge fund"

15      22          19            "trust" change to "LLC"

16      38          2             "Roydan" change to "Rohatyn"

17      52          13            "run" change to "ran"

18      59          17            "loss" change to "low"

19      63          6             "variety" change to "virtue"

20      68          10            "precedence" change to "precendents"

21      75          14            "preparing" change to "comparing"

22      75          15            "preparing" change to "comparing"
```

10/3/2023     USA, ex rel. Vermont National Telephone Company v. Northstar Wireless, LLC et al.   George Brokaw
Contains Confidential Portions

Page 323

| 1 | 197 | 8 | "is a puts exercised in DISH buys" change to |
| 2 | | | "is a put is exercised and DISH buys" |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | 12 / 1 / 23 |
| 22 | Signature | | Date |

# Dravenstott Deposition Transcript (excerpted)

PUBLIC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


------------------------------x
UNITED STATES OF AMERICA,         :
ex rel. VERMONT NATIONAL          :
TELEPHONE COMPANY,                :
                                  :
          Plaintiff,        : Civil Action No.
                                  :
     vs.                    :  15-00728 (CKK)
                                  :
NORTHSTAR WIRELESS, LLC,          :
et al.,                           :
          Defendants.       :
------------------------------x


     ***  C O N F I D E N T I A L  ***
   VIRTUAL VIDEOTAPED DEPOSITION OF
        ROBERT "ROB" DRAVENSTOTT
       Friday, December 22, 2023
    7:58 a.m. Mountain Standard Time


REPORTER:  Dawn A. Jaques, CSR, CLR


_____

          DIGITAL EVIDENCE GROUP
       1730 M Street, NW, Suite 812
         Washington, D.C. 20036
            (202) 232-0646

A-100
PUBLIC APPENDIX

Page 12

```
1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Okay, we are now

3    on the record.  My name is Henry Marte; I'm a

4    videographer on behalf of Digital Evidence

5    Group.

6              Today's date is December 22nd, 2023,

7    and the time is 7:58 a.m.

8              This deposition is being held in the

9    matter of United States of America, ex rel.

10   Vermont National Telephone Company versus

11   Northstar Wireless, LLC, et al.

12             The deponent today is Mr. Robert

13   Dravenstott.

14             All parties to this deposition are

15   appearing remotely and have agreed to the

16   witness being sworn in remotely.

17             Counsel, please identify themselves

18   for the record, after which the court reporter

19   will administer the oath to the witness.

20             MR. OBERMEIER:  Good morning,

21        Steve Obermeier from Wiley Rein on behalf

22        of the Relater.
```

Page 13

```
 1              With me in the room today is my

 2         colleague, Rachel Tuteur.

 3              MR. ALLEN:  Good morning, Samuel

 4         Allen, WilmerHale, on behalf of the

 5         DISH defendants and the witness, and

 6         I'm joined today by my colleague,

 7         Phoebe Silos.

 8              MS. CARUSO:  Good morning, Courtney

 9         Caruso on behalf of -- well, from

10         Hogan Lovells on behalf of the SNR

11         defendants, including John Muleta.

12              MS. DOLAN:  Good morning, Madeleine

13         Dolan on behalf of the Northstar

14         defendants, Allen Todd, Miranda Wright,

15         and Doyon Limited, with

16         Covington & Burling.

17              THE REPORTER:  Mr. Dravenstott, if

18         you'll raise your right hand to be sworn,

19         sir.

20

21    (The witness was administered the oath.)

22
```

Page 14

```
 1     Whereupon,

 2               ROBERT DRAVENSTOTT,

 3        was called as a witness, after having

 4        been first duly sworn by the Notary

 5        Public, was examined and testified as

 6        follows:

 7      EXAMINATION BY COUNSEL FOR THE RELATER

 8               BY MR. OBERMEIER:

 9        Q    Good morning, Mr. Dravenstott.

10               As I said before, my name is Steve

11     Obermeier.  I'm with my colleague here, Rachel

12     Tuteur, and we're here on behalf of the

13     Relater.

14               Can you please state and spell your

15     full name for the record?

16        A    Sure.  It's Rob Dravenstott, legal

17     name is Robert, but R-O-B-E-R-T, Dravenstott

18     is D-R-A-V-E-N-S-T-O-T-T.

19        Q    Thank you.  And we are again, for

20     the record, doing this via video.

21               Where are you physically located,

22     Mr. Dravenstott?
```

Page 179

```
1          A     It appears so.

2          Q     Was it your experience that

3    Mr. Ergen was very engaged in the process

4    leading up to Auction 97?

5               MR. ALLEN:  Object to form,

6          foundation.

7               THE WITNESS:  He was certainly

8          engaged, along with a lot of other

9          people, in planning and prep for

10         Auction 97, yes.

11              BY MR. OBERMEIER:

12         Q     Did he ever say something similar to

13   you about it being the most intellectually

14   interesting/challenging thing that he has

15   done?

16              MR. ALLEN:  Object to form.

17              THE WITNESS:  I don't think he said

18         anything in those words, but he did

19         mention, I recall, during H Block that

20         the AWS-3 would be a much more

21         challenging, relatively speaking,

22         given -- because we talked about the
```

A-104
PUBLIC APPENDIX

Page 268

1    requests regarding, you know, what columns are

2    shown, what round results are shown; is that

3    right?

4        A    Yes.

5        Q    So it sounds like Mr. Ergen is

6    making specific requests regarding what is in

7    the tool and how it operates; is that right?

8        A    Yeah, that's what it seems to

9    indicate.

10       Q    And number 5 says, "There is a new

11   'G Factor' we're going to use for normalizing

12   G data against H, I, J licenses.  I have the

13   formula and initial set of calculations in my

14   Calc spreadsheet (I will send this out

15   shortly)."  Do you see that?

16       A    Yes.

17       Q    What is the G Factor?

18       A    I can't remember, to be honest.  I

19   know there was something because the G license

20   band was CMAs and the other bands were EAs.

21   There was -- I think this was a factor to try

22   to help more easily compare, but I cannot

# Dunn Deposition Transcript (excerpted)

## PUBLIC

1/17/2024  USA, ex rel. Vermont National Telephone Company v. Northstar Wireless, LLC et al. Larry Dunn
Confidential

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------x

UNITED STATES OF AMERICA,         :

ex rel. VERMONT NATIONAL          :

TELEPHONE COMPANY,                :

            Plaintiff,         : Civil Action No.

                          :

     vs.                          :  15-00728 (CKK)

                          :

NORTHSTAR WIRELESS, LLC,          :

et al.,                           :

            Defendants.        :

------------------------------x

*** C O N F I D E N T I A L  ***

VIRTUAL VIDEOTAPED DEPOSITION OF

LARRY DUNN

Wednesday, January 17, 2024

8:07 a.m. Mountain Standard Time

REPORTER:  Dawn A. Jaques, CSR, CLR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 14

```
 1                P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  This begins the

 3      media of the videotaped deposition of

 4      Larry Dunn.  Today's deposition is being

 5      conducted by Zoom and recorded in Irving,

 6      Texas, on January 17th, 2024.  The time on the

 7      video screen is 8:07 a.m. Mountain Time.

 8              My name is Andy Mortensen; I'm the

 9      legal videographer from Digital Evidence

10      Group.  The court reporter is Dawn Jaques, in

11      association with Digital Evidence Group.

12              All parties for this deposition are

13      appearing remotely and have agreed to the

14      witness being sworn in remotely.

15              Due to the nature of remote

16      reporting, please pause briefly before

17      speaking to ensure all parties are heard

18      completely.

19              Will counsel please introduce

20      themselves for the record?

21              MR. OBERMEIER:  Yes, Steve Obermeier

22          on behalf of Relator.
```

1/17/2024 USA, ex rel. Vermont National Telephone Company v. Northstar Wireless, LLC et al. Larry Dunn
Confidential

```
                                                        Page 15

 1                In the room with me is my colleague,

 2           Rachel Tuteur.

 3                MR. ALLEN:  Samuel Allen,

 4           WilmerHale, on behalf of the DISH

 5           defendants and the witness.

 6                I'm joined today by my colleague,

 7           Phoebe Silos, also at WilmerHale.

 8                MR. THEIS:  This is Mike Theis from

 9           Hogan Lovells, representing SNR Wireless.

10                MS. FRODLE:  This is Amee Frodle

11           from Covington & Burling, representing

12           the Northstar defendants.

13                THE VIDEOGRAPHER:  Thank you.

14                Will the court reporter please swear

15           in the witness?

16                THE REPORTER:  Will you raise your

17           right hand to be sworn, Mr. Dunn?

18

19      (The witness was administered the oath.)

20

21

22
```

Page 16

1      Whereupon,

2                    LARRY DUNN,

3           was called as a witness, after having

4           been first duly sworn by the Notary

5           Public, was examined and testified as

6           follows:

7           EXAMINATION BY COUNSEL FOR RELATOR

8                 BY MR. OBERMEIER:

9           Q    Good morning, Mr. Dunn.  Like I said

10     before, my name is Steve Obermeier from

11     Wiley Rein, and in the room with me is my

12     colleague, Rachel Tuteur.

13               Can you please state and spell your

14     full name for the record?

15          A    Larry Dunn, D-U-N-N.

16          Q    Okay.  And just again, it's a bit

17     repetitive, but we're doing this deposition

18     via video based on the consent of everyone

19     involved.

20               And where are you physically

21     located, the address?

22          A    Right now?

1/17/2024 USA, ex rel. Vermont National Telephone Company v. Northstar Wireless, LLC et al. Larry Dunn
Confidential

Page 348

```
 1          A    I believe I did, or I worked with
 2     others to do it.
 3          Q    And if you just take a look at the
 4     list here of holding entities, who are the
 5     partners you were referencing, the affiliated
 6     partners?
 7          A    I assume we mean the DEs.
 8          Q    SNR and Northstar?
 9          A    Yes.
10          Q    Okay.  So you're referring to them
11     here as "affiliated partners," correct?
12          A    I think that was the language that
13     we were using at that time, yes.
14               MR. OBERMEIER:  Let's go to Tab 46,
15          please, which will be Relator
16          Exhibit 292.
17               (Relator Exhibit 292 was
18                marked for identification.)
19               BY MR. OBERMEIER:
20          Q    And this is Bates number DISH-123385
21     to 386, and 386 is another native file.
22               Mr. Dunn, you emailed Ms. Sundheim
```

Page 349

1    on December 14th, 2015.  Do you see that?

2        A    I see that.

3        Q    The subject is "AWS-3 Valuations,

4    G Factor."  Do you see that?

5        A    Mm-hmm.

6        Q    What's the G Factor?

7        A    I don't recall.  I remember there

8    was some discussion about that.  I don't know

9    what that is.

10       Q    Okay.

11       A    Probably a valuation.  Some type of

12   calculation.

13       Q    Sorry, did you say a calculation or

14   a valuation?

15       A    Probably both, actually.

16       Q    You say, "Phanie - I think this is

17   the document that I found regarding CE's input

18   into valuations.  It was dated 12/2/14."

19            Do you see that?

20       A    I see that.

21       Q    And CE is Charlie Ergen, correct?

22       A    Presumably, yes.

Page 350

1          Q    And then let's pull up the

2    attachment, please, the native.  I'm sorry,

3    can you scroll to the -- I can't see all the

4    tabs.  Can you go to the first tab,

5    "CMA Estimates"?  Thank you.

6                And if you look at the top of this

7    tab, Mr. Dunn, you can see it's entitled CMA

8    $MP Estimates using Population and Population

9    Density Weighting Factors."  Do you see that?

10         A    I see that.

11         Q    And one of the columns there is the

12   G Factor, correct?

13         A    Yeah, I see that.

14         Q    So in sending this to Ms. Sundheim,

15   you're saying that this document is showing

16   Mr. Ergen's G Factor being integrated into the

17   spectrum valuations during the auction?

18              MR. ALLEN:  Object to form.

19              THE WITNESS:  Would you say that

20         question again?  I'm not quite sure I

21         followed you.

22

Page 351

```
 1              BY MR. OBERMEIER:

 2         Q    Sure.  So you're sending this to

 3    Ms. Sundheim, and you're saying this is the

 4    document I found regarding CE's input into

 5    valuations, correct?

 6         A    Yes.

 7         Q    So you're saying -- and the subject

 8    of the email is "AWS-3 Valuations, G Factor,"

 9    correct?

10         A    Yes.

11         Q    So you're saying that this document,

12    which you attached and sent to Ms. Sundheim,

13    is Mr. Ergen's input with respect to

14    valuations, correct?

15         A    That must have been my understanding

16    at the time, yes.

17         Q    Including the G Factor, correct?

18         A    Yes, but I honestly don't know what

19    the G Factor is.  9 years ago maybe I did.

20         Q    And you said this document, when you

21    sent it, was dated 12/2/2014, correct?

22         A    According to that email, yes.
```

Page 352

1        Q    Okay.  And that's during

2    Auction 93 -- Auction 97, correct?

3        A    Yes, it would be.

4        Q    Okay.  But it's after DISH has

5    dropped out of the auction, correct?

6             MR. ALLEN:  Object to form,

7        foundation.

8             THE WITNESS:  That's true.  We were

9        still working with the DEs at that time,

10       of course.

11            BY MR. OBERMEIER:

12       Q    So this email is showing -- you're

13   sending Mr. Ergen's valuation inputs from

14   after DISH had left the auction, correct?

15            MR. ALLEN:  Object to form,

16       misstates the document.

17            THE WITNESS:  I was sending a

18       document with a number of values on it,

19       including the ones in question, and it

20       was, yes, after when we dropped out, but

21       we were still working with the DEs.

22

Page 353

```
 1              BY MR. OBERMEIER:

 2       Q    So Mr. Ergen was giving his input

 3   into the valuation for the DEs?  Is that what

 4   you're saying?

 5              MR. ALLEN:  Object to form,

 6         foundation, misstates the testimony.

 7              THE WITNESS:  I don't know if that's

 8         true or not.  I don't know how that was

 9         used or how he used it.

10              BY MR. OBERMEIER:

11       Q    So you then forward this email to

12   the Service BID email a few days later.

13              Do you see that?

14       A    I see that.

15       Q    Do you know why you did that?

16       A    No, unless we were trying to use

17   that in a different auction tool.  I think we

18   were preparing for another auction back then.

19       Q    Did someone tell you to do that, or

20   do you think you did that on your own?

21       A    I don't remember it at all, so ...

22       Q    Mr. Dunn, I don't have any further
```

# Hillard Deposition Transcript (excerpted)

CONFIDENTIAL AND FILED
UNDER SEAL
A-117 – A-131

# Klipper Deposition Transcript (excerpted)

## PUBLIC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA, )

ex rel. VERMONT NATIONAL   )

TELEPHONE COMPANY,         ) Civil Action

                Plaintiff, ) No. 15-00728(CKK)

vs.                        )

NORTHSTAR WIRELESS, LLC,   )

et al.,                    )

                Defendants. )

_____)


CONFIDENTIAL

VIDEOTAPED DEPOSITION OF NATHANIEL KLIPPER

APPEARING REMOTELY

January 31, 2024

2:04 p.m. (Spain Time)


Reported by: Eileen Mulvenna, CSR/RMR/CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 14

```
 1                 THE VIDEOGRAPHER:  We are now on the

 2         record.

 3                 My name is Henry Marte.  I'm a

 4         videographer on behalf of Digital Evidence

 5         Group.

 6                 Today's date is January 31, 2024, and

 7         the time is 2:04 p.m.

 8                 This deposition is being held remotely

 9         in the matter of United States of America Ex

10         Rel Vermont National Telephone Company,

11         Plaintiff, versus Northstar Wireless LLC,

12         et al., Defendants.

13                 The deponent today is Mr. Nathaniel

14         Klipper.

15                 All parties to this deposition are

16         appearing remotely and have agreed to the

17         witness being sworn in remotely.

18                 Counsel please identify themselves for

19         the record, after which the court reporter

20         will administer the oath to the witness.

21                 MR. ROSS:  Good morning.  This is

22         Bennett Ross with Wiley Rein on behalf of
```

Page 15

1          Relator Vermont National.  My colleague Frank

2          Scaduto is also here with me.

3                  MR. RANA:  Good morning.  This is Amit

4          Rana from Venable on behalf of ADK Capital as

5          well as the witness, Nathaniel Klipper.

6                  MR. GOBENA:  Good morning.  This is

7          Gejaa Gobena and joined by colleague Alex

8          Tobin of Hogan Lovells representing SNR

9          defendants, Atelum and John Muleta.

10                 MS. WILK:  This is Laura Wilk from

11         Covington & Burling on behalf of the

12         Northstar defendants Doyon, Limited; Allen

13         Todd; and Miranda Wright.

14                 MS. ALDRICH:  This is Jessica Aldrich

15         from WilmerHale for DISH defendants.

16

17

18

19

20

21

22

Page 16

1    NATHANIEL KLIPPER,

2        having been duly sworn by Eileen Mulvenna,

3        a Notary Public of the State of New York,

4        was examined and testified as follows:

5    EXAMINATION

6    BY MR. ROSS:

7            Q.    Good morning, Mr. Klipper.  My name is

8    Bennett Ross and I'm counsel for Vermont National.

9    I'll be asking you a series of questions that -- you

10   should have received a binder with some documents

11   that we're going to be referring to this morning.

12               Did you get that binder?

13           A.    Yes, I did.

14           Q.    And I understand that you opened the

15   binder; is that correct?

16           A.    That is correct.

17           Q.    Did you look at any documents after

18   opening the binder?

19           A.    No, I did not.

20           Q.    Have you given a deposition before?

21           A.    Yes.

22           Q.    You know the ground rules.  Your

Page 51

1          A.     Yes, maybe even less.  I think we

2    ended up funding 40.  So maybe it was 25 to 75.  It

3    was something in that range.

4          Q.     For ADK Capital, was an investment of

5    that size -- let's just say $50 million, was that a

6    large amount, small amount?

7               MR. RANA:  Objection.

8               THE WITNESS:  ADK Capital didn't make

9          the investment.

10   BY MR. ROSS:

11         Q.     No, I -- I'm just -- I'm asking in

12   terms of ADK Capital generally.  I know ADK Capital

13   didn't make this investment.

14              But when someone comes to ADK Capital

15   to -- with a possible investment opportunity, I'm

16   just trying to understand whether 50 million is a

17   big deal or not.

18         A.     It's on the larger side.

19         Q.     And when you were discussing this

20   investment opportunity with Mr. Muleta, what was

21   your understanding of the return that ADK was likely

22   to receive on its investment?

Page 52

1          A.      The terms of the put agreement

2     outlined a given investment rate of return, which is

3     what we relied on in making the investment.

4          Q.      And by that I mean -- I understand you

5     to mean that you were -- ADK was expecting to

6     receive a return on its investment by -- through the

7     put right; is that correct?

8          A.      ADK's investment was predicated on the

9     put right, that is correct.

10         Q.      I want to go back to -- I think I

11    forgot to ask you.

12               I think you also had testified as part

13    of your diligence process, you tried to get an

14    understanding of the bidding that was going to be

15    done in the auction.  What was the process you

16    employed in that regard?

17         A.      I don't recall asking for an

18    understanding of the bidding.

19         Q.      You testified that you did not know

20    Mr. Muleta prior to learning of this investment

21    opportunity in SNR.  Did you look into Mr. Muleta's

22    background?  Did you do any diligence on Mr. Muleta

Page 58

1          Q.      BlackRock, for example.

2          A.      Did I speak to them about what?

3          Q.      About SNR, their views of whether this

4     was a good opportunity, whether they had any

5     concerns, things like that?

6          A.      Yes, yes.  We shared notes.

7          Q.      And what do you recall BlackRock

8     telling you about the SNR investment?

9          A.      I don't recall.  I don't recall.

10          Q.      And do you recall what you told

11     BlackRock about the SNR -- your view of the SNR

12     investment?

13          A.      My view of the SNR investment was

14     straightforward, that the way the deal was

15     contemplated gave us ample asset coverage in the

16     event that DISH did not survive or DISH went

17     bankrupt ahead of its consummation of the -- or our

18     exercise of the put and its consummation of the

19     acquisition of the spectrum which underlied our put.

20          Q.      Can you maybe break that down a little

21     bit and explain was meant by your view.

22          A.      Sure.  If you look at our structure,

1/31/2024   USA, ex rel. Vermont National Telephone Company v. Northstar Wireless, LLC et al    Nathaniel Klipper
Confidential

Page 59

1    we are dependent on the put right for our return of

2    capital.

3            Q.      Okay.

4            A.      All other securities, debt and equity,

5    are contractually subordinated to our put right.

6    Our put right represented two and a half percent of

7    the aggregate purchase price.  Therefore,

8    definitionally the spectrum would have to decline

9    97.5 percent from its acquisition price to impact

10   our investment in the spectrum.  And that seemed

11   like an overly egregious assumption.

12           Q.      In your experience in the marketplace,

13   spectrum doesn't tend to decline in value, does it?

14           A.      No, not that much.

15           Q.      Can I ask you to go back to Tab 7,

16   which is the entity structure that we were

17   discussing previously.  You referred to the put

18   right.  We'll talk a little bit more about that, but

19   there's a line where the put exists between -- I

20   guess SNR Management Co. actually held the put

21   right; is that correct?

22           A.      Yes.

Page 60

1        Q.      And you had mentioned I think security

2    and having licenses in case, as I understand it,

3    DISH went belly up --

4        A.      That is not correct.

5        Q.      I'm sorry.  What -- could you --

6        A.      We had structural seniority, so DISH

7    had subordinated its position to our put right.

8        Q.      If I understand you correctly, if --

9    when SNR management exercised the put and the put

10   wasn't paid, there was sufficient security that was

11   held, by virtue of your priority, that you would be

12   able to sell the licenses and be made whole and earn

13   your return; is that correct?

14              MR. RANA:  Objection to form.

15              THE WITNESS:  We did not have -- we

16       did not have a secured interest, no.

17   BY MR. ROSS:

18       Q.      Can you explain the priority that

19   you're referring to then.

20       A.      Sure.  We had a -- the put right was

21   structurally senior to AWS-3's interest.  It was not

22   secured.  In the event that AWS-3 did not honor the

Page 61

1    exercise of the put right, there was an agreement in

2    place to liquidate the holdings such that SNR

3    Management Company got its agreed-upon return under

4    the put right.

5         Q.    All right.  And for the record,

6    American AWS-3 Wireless Holding LLC was a

7    wholly-owned subsidiary of DISH; is that correct?

8         A.    That's my understanding, yes.

9         Q.    And is it correct that SNR License Co.

10   didn't have the funds directly to pay the put, but,

11   rather, it would be relying upon American AWS-3

12   Wireless for the funds to pay the put price?

13              MR. RANA:  Objection to form.

14              THE WITNESS:  I don't recall.

15   BY MR. ROSS:

16        Q.    Do you know what revenues SNR License

17   Co. had during the -- after you made your

18   investment?

19              MR. RANA:  Objection to form.

20              THE WITNESS:  I don't.

21   BY MR. ROSS:

22        Q.    Did you speak to anyone at Highbridge

Page 62

```
 1   about the SNR investment opportunity?

 2            A.     I did.

 3            Q.     And who did you speak with at

 4   Highbridge?

 5            A.     We spoke with Mark Rubenstein.

 6            Q.     And how did you know Mr. Rubenstein?

 7            A.     I don't recall.  We might have worked

 8   together on a transaction.  I knew his boss or one

 9   of his coworkers I used to work with.

10            Q.     Did you happen to -- was

11   Mr. Rubenstein at Perry Capital with you, if you

12   recall?

13            A.     He was not.

14            Q.     And what did you discuss with

15   Mr. Rubenstein?

16            A.     We discussed the structure.  And he

17   was familiar with the structure as well.  And he

18   made an investment in ADK Spectrum.

19            Q.     Did you ask Mr. Rubenstein why

20   Highbridge had decided not to invest in SNR?

21            A.     I did not, no.

22            Q.     Prior to deciding whether to invest in
```

Page 63

1    SNR, did you speak to anybody at DISH about the

2    proposed investment?

3            A.      No, I did not.

4            Q.      Prior to deciding whether to invest in

5    SNR, did you speak to anybody else about this

6    opportunity?

7            A.      No, I did not.

8            Q.      Does ADK Capital have criteria that it

9    typically considers in deciding whether to make an

10   investment?

11           A.      No, nothing -- nothing written.

12           Q.      Whether written or not, in practice,

13   for example, does it look for certain types of rates

14   of return?

15                   MR. RANA:  Objection, form.

16                   THE WITNESS:  No.

17   BY MR. ROSS:

18           Q.      Does it consider -- does ADK Capital

19   consider the payback period in deciding whether or

20   not to make an investment?

21           A.      No.

22           Q.      And does ADK Capital -- I'm sorry.  Go

Page 64

1   ahead.

2           A.      Not as a primary importance, no.

3           Q.      Whether it's primary or secondary,

4   does it consider a payback period in deciding

5   whether to make an investment?

6                   MR. RANA:  Objection to form.

7                   THE WITNESS:  No.

8   BY MR. ROSS:

9           Q.      And does ADK Capital consider an exit

10  strategy in deciding whether or not to make an

11  investment?

12                  MR. RANA:  Objection to form.

13                  THE WITNESS:  Yes.

14  BY MR. ROSS:

15          Q.      And what is the -- what is ADK Capital

16  typically looking for in the way of an exit strategy

17  in deciding whether to make an investment?

18          A.      ADK is looking for an adequate return

19  relative to the commensurate risk.  So that could

20  mean anything from, let's say, 7 percent for

21  something that's less risky to 20-plus percent on

22  something that's more risky.

Page 65

1        Q.      Did ADK Capital consider the

2   investment in SNR to be risky or not so much?

3                MR. RANA:  Objection to form.

4                THE WITNESS:  Medium risk.

5   BY MR. ROSS:

6        Q.      And why would you characterize it as

7   medium risk?

8        A.      Because it was unclear how or when or

9   if John Muleta would exercise the put.

10       Q.      We'll come back to that.

11               Why -- but help me understand why it

12  was uncertain.  What was the uncertainty about the

13  put, in your view?

14       A.      There was no guarantee that John would

15  exercise the put.

16       Q.      Whether there's a guarantee, did you

17  expect Mr. Muleta would exercise the put?

18               MR. RANA:  Objection to form.

19               THE WITNESS:  That was the premise of

20          the investment, yes.

21               MR. ROSS:  Why don't we take a short

22          break, maybe ten minutes, and we'll be right

Page 88

1  auction before Mr. Brokaw approached you about the

2  SNR investment opportunity?

3          A.      I don't recall.

4          Q.      Can you -- can I ask you to go back to

5  Tab 27, which is Exhibit 345, the term sheet, which

6  is ADK0021293.

7          A.      Yes.

8          Q.      The introduction to the term sheet

9  reflects that the entity, SNR, exists, quote, "for

10  the purpose of acquiring AWS-3 spectrum licenses as

11  part of a bidding group that includes DISH Network

12  Corp. and its affiliates and may also include other

13  parties"; is that correct?

14          A.      Yes.

15          Q.      Is that consistent with your

16  understanding of SNR's purpose?

17          A.      Yes.

18          Q.      Prior to deciding to invest in SNR,

19  what was your understanding of why SNR was

20  interested in acquiring AWS-3 spectrum?

21          A.      John -- why were they interested in

22  acquiring AWS-3 spectrum?  John set up SNR for the

Page 90

1    interested in SNR's business plan?

2              MR. RANA:  Objection to form.

3              THE WITNESS:  Not particularly, no.

4    BY MR. ROSS:

5         Q.    Why not?

6         A.    As I described previously, my

7    investment was solely predicated on the put right

8    and the subordination of the interest of the other

9    parties to my put right.

10        Q.    So I'm going to assume I know the

11   answer to these questions, but I'm going to ask them

12   anyway for purposes of the complete record.

13             Prior to deciding to invest in SNR,

14   did you have an understanding of the geographic

15   areas where SNR was interested in offering wireless

16   services?

17        A.    No.

18        Q.    Prior to deciding to invest in SNR,

19   did Mr. Muleta discuss with you his plans for SNR to

20   offer wireless services?

21        A.    No.

22        Q.    Prior to deciding to invest in SNR,

Page 91

1   did Mr. Muleta provide you with any written

2   materials, including a business plan, about SNR's

3   plans to offer wireless services to customers?

4            A.      No.

5            Q.      Regarding the corporate structure --

6   and it may be helpful to turn back to Tab 7, which

7   is Exhibit 337.

8            A.      Okay.

9            Q.      I think you testified you're the

10  managing partner of ADK Spectrum GP LP; is that

11  correct?

12           A.      Yes.

13           Q.      And ADK Spectrum GP LP is the sole

14  owner of ADK Spectrum LP; is that right?

15           A.      Sole owner of -- yes, that is correct.

16           Q.      And as indicated on the chart, the ADK

17  entity that's under the "SNR Management Co." is ADK

18  Spectrum LLP; is that correct?

19           A.      Not LLP.  ADK Spectrum LP.

20           Q.      I'm sorry.  Thank you.

21                   ADK Spectrum LP is --

22           A.      That's correct.

Page 98

1          A.      No.

2          Q.      Prior to the start of the bidding in

3    Auction 97, did you have any understanding of what

4    SNR hoped to accomplish in the auction in acquiring

5    AWS-3 spectrum?

6                  MR. RANA:  Objection to form.

7                  THE WITNESS:  No.

8    BY MR. ROSS:

9          Q.      Prior to the start of the bidding in

10   Auction 97, did you have any understanding of the

11   wireless services that SNR was interested in

12   offering using AWS-3 spectrum?

13         A.      No.

14         Q.      Prior to the start of the bidding in

15   Auction 97, did you have any understanding of the

16   geographic areas where SNR was interested in

17   offering wireless services using AWS-3 spectrum?

18         A.      No.

19         Q.      Prior to the start of the bidding in

20   Auction 97, did Mr. Muleta discuss with you his

21   plans for SNR to offer wireless services to

22   customers?

Page 99

1          A.      No.

2          Q.      And prior to the start of the bidding

3     in Auction 97, did Mr. Muleta share with you any

4     written materials, such as a business plan, about

5     SNR's plans to offer wireless services to customers?

6          A.      No.

7          Q.      To your knowledge, did SNR have a

8     bidding strategy in Auction 97 that was independent

9     of DISH's bidding plans?

10               MR. RANA:  Objection to form.

11               THE WITNESS:  I have no idea.

12    BY MR. ROSS:

13         Q.      I'll ask you to look at the document

14    behind Tab 25.  The document behind Tab 25 is an

15    e-mail chain, the last of which is an e-mail from

16    you dated September 20, 2014, to Mr. Muleta and the

17    folks at BlackRock, Bates stamped SNR-00025870

18    regarding "Weekly Review/Update."

19               Do you recognize this e-mail?

20         A.      I do.

21         Q.      And you're responding to an e-mail

22    that Mr. Muleta had sent the previous day where he

Page 189

1        Q.      Any understanding as to why Mr. Ergen

2    would want to get vengeance on Mr. Muleta?

3                MR. RANA:  Objection.

4                THE WITNESS:  No.

5    BY MR. ROSS:

6        Q.      You have no understanding as to what

7    bind Mr. Muleta may have put Mr. Ergen in?

8                MR. RANA:  Objection.

9                THE WITNESS:  No.  You can ask John.

10   BY MR. ROSS:

11       Q.      We looked at the financial outline,

12   analysis that was done assuming that

13   SNR Management -- Wireless Management exercised the

14   put in year 5.5.

15               Did ADK do any analysis of the return

16   that it would earn on its investment absent SNR

17   Wireless Management exercising the put?

18       A.      The entirety of our return was

19   predicated on the put being exercised.  So anything

20   beyond that would have been hypothetical.

21       Q.      So the answer to the question is no?

22       A.      If we modeled out anything that was

Page 190

1    beyond -- that didn't -- that didn't revolve around

2    the put being exercised, the answer is no.

3         Q.    Just again to clarify the record, ADK

4    never modeled the return that it would earn if SNR

5    were to compete in the wireless market rather than

6    exercise the put; is that correct?

7         A.    That is correct.

8         Q.    Is it correct that ADK never modeled

9    the return that it would earn if SNR were to use its

10   spectrum licenses for commercial purposes rather

11   than exercise the put?

12        A.    That is correct.

13        Q.    And is it true that ADK never expected

14   SNR to compete in the wireless business?

15        A.    I -- I -- that was not the intention

16   so, yes, that is correct.

17        Q.    Can I ask you to look at Tab 27 again.

18        A.    Okay.

19        Q.    This is a document that we had marked

20   previously as Exhibit 345.  I'd like to direct your

21   attention to the term sheet.

22        A.    Okay.

Page 191

1          Q.      Sorry about that.

2                  I want to ask you about the language

3      in the description of the transaction.

4          A.      Let me pull up the term sheet.

5          Q.      Yes, please.

6          A.      Sorry.  I'm here.

7          Q.      It says that the "Formation of a

8      limited" -- the description of the transaction is

9      the "Formation of a limited liability company" --

10         A.      Uh-huh.

11         Q.      -- "to be taxed as a partnership,"

12     quote, "for the sole purpose of acquiring and

13     managing AWS-3 spectrum licenses to be auctioned by

14     the FCC during 2014."

15                 Do you see that?

16         A.      I do.

17         Q.      Is that an accurate statement of the

18     transaction?

19         A.      Yes.

20         Q.      And there's no reference in that

21     description of the transaction about SNR actually

22     using AWS-3 spectrum licenses for commercial

Page 192

1   purposes; correct?

2           A.      In that sentence, no.

3           Q.      And if you look at the use of the

4   proceeds language on the third page of the term

5   sheet, likewise it refers to, quote, "The proceeds

6   from the equity investment, together with the

7   proceeds of the indebtedness advanced by DISH from

8   time to time, shall be used to acquire the spectrum,

9   to fund costs relating to the bids to acquire the

10  spectrum, and other associated costs of the

11  Parties."

12                  Do you see that?

13          A.      Yes.

14          Q.      Is there any mention here of using

15  proceeds for SNR to operate a wireless business?

16                  MR. GOBENA:  Object to the form.

17                  THE WITNESS:  In this sentence, no.

18  BY MR. ROSS:

19          Q.      Are you aware of any language in the

20  term sheet or any other agreements to which ADK is a

21  partner where SNR was contemplated to be offering

22  wireless services to the public?

1/31/2024    USA, ex rel. Vermont National Telephone Company v. Northstar Wireless, LLC et al   Nathaniel Klipper
Confidential

                                                         Page 193

1                    MR. GOBENA:  Object to the form.

2                    MR. RANA:  Objection to form.

3                    THE WITNESS:  I don't recall.  I don't

4          recall.

5     BY MR. ROSS:

6          Q.    In its solicitation materials to

7     investors, other than the term sheet, do you recall

8     whether ADK ever mentioned that SNR intended to

9     compete in the wireless market?

10         A.    I don't recall.

11         Q.    Can I ask you to look at the

12    investment management agreement, which is part of

13    this exhibit, ADK0021230.

14         A.    It's before the term sheet?

15         Q.    Yes.

16         A.    Okay.  Let me see.

17               Yes.

18         Q.    Can you explain what this document is?

19         A.    One second.

20         Q.    Sure.

21               (Document review.)

22               THE WITNESS:  This is a management

Page 194

1          agreement between ADK Capital and -- and ADK

2          Spectrum.

3     BY MR. ROSS:

4          Q.     And the first whereas clause in this

5     document says, quote, "Whereas the Fund is a special

6     purpose vehicle formed to invest substantially all

7     of its assets in an acquisition of AWS-3 spectrum

8     licenses as part of a bidding group (the

9     'Transaction'), and may engage in activities

10    necessary, incidental or ancillary to the

11    foregoing."

12              Do you see that?

13         A.     Yes.

14         Q.     Is there any discussion in that clause

15    that refers to the use of AWS-3 spectrum licenses to

16    offer wireless services to the public?

17              MR. GOBENA:  Object to the form, the

18         document speaks for itself.

19              THE WITNESS:  No.

20    BY MR. ROSS:

21         Q.     I didn't hear.  Was that a "no,"

22    Mr. Klipper?

Page 195

1          A.      No.  Yes, that was a "No."

2          Q.      Thank you.

3                  Can I ask you to look at the amended

4    and restated agreement of limited partnership of ADK

5    Spectrum, which is ADK0021247.

6          A.      Yep.

7          Q.      Could you -- the document's Amended

8    and Restated Agreement of Limited Partnership of ADK

9    Spectrum.

10                 Can you tell me what this document is?

11         A.      An agreement between the investors --

12   let's see.  This is the document that was signed by

13   investors to subscribe to the investment in -- I

14   guess it wasn't signed, so it's just -- this was the

15   governing document of the -- of the LP.

16         Q.      And who -- I agree the document is not

17   signed, but was it signed eventually?

18         A.      I don't recall.  I don't recall.  I

19   don't see a signature.  I don't see a signature

20   line, but I don't recall.  It might have been

21   referenced in one of the other documents.

22         Q.      The signature block is on page 39 of

```
                                           Page 196
 1   the document, ADK0021284.  It's not signed, but --

 2         A.     Okay.  In that case, I assume it was

 3   signed, but I don't recall.

 4         Q.     That's fine.

 5                Going back to Section 2.6 of the

 6   agreement.

 7         A.     Okay.

 8         Q.     It says, "Purpose," quote, "The

 9   Partnership has been organized for the object and

10   purpose of participating in an acquisition of AWS-3

11   spectrum licenses as part of a bidding group (the

12   'Transaction') and engaging in those activities

13   necessary, incidental or ancillary thereto."

14                Do you see that?

15         A.     Yes.

16         Q.     Is there any reference to using the

17   AWS-3 spectrum licenses to offer wireless services

18   to the public?

19                MR. GOBENA:  Object to the form.

20                MR. RANA:  Join in the objection.

21                THE WITNESS:  No.

22
```

Page 197

1    BY MR. ROSS:

2         Q.    You can answer the question.

3         A.    No.

4         Q.    Can I ask you to look at the ADK

5    Spectrum LP subscription booklet, which is

6    ADK0021309.

7         A.    Yep.

8         Q.    I'm sorry.  308.

9               What is a subscription booklet?

10        A.    It is a booklet that investors use to

11   subscribe to an investment.

12        Q.    They have to sign this document to

13   make their investment?

14        A.    There's a signature block, yes.  I

15   would assume so, yes.

16        Q.    In the subscription agreement, on

17   page 5, Bates stamped ADK0021313, it contains a

18   description of the investment and the partnership;

19   is that correct?

20        A.    Yes, that's correct.

21        Q.    The language I'm focused on, it says,

22   quote, "The Fund will invest a substantial portion

Page 198

1    of its assets in the acquisition of AWS-3 spectrum

2    licenses as part of a bidding group as described in

3    the term sheet regarding the Transaction."

4           A.      That is correct, that's what it says.

5           Q.      Is that an accurate statement?

6           A.      That's what it says.

7           Q.      Is that an accurate statement?

8           A.      Yes.

9           Q.      Is there any mention of AWS-3 spectrum

10   licenses being used to provide wireless services to

11   the public?

12          A.      No.

13                  MR. RANA:  Objection, form.

14   BY MR. ROSS:

15          Q.      In the absence of a put right, would

16   ADK have made an investment in SNR?

17          A.      That's -- that's tautological.  The

18   put right was inherent in the investment, so I can't

19   answer that.

20          Q.      I'm sorry.  You can't answer that?

21          A.      I cannot answer that.  Because the

22   investment was predicated on the put right, so

# Rubenstein Deposition Transcript (excerpted)

## PUBLIC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------X

UNITED STATES OF AMERICA, EX REL.:

VERMONT NATIONAL TELEPHONE        :

COMPANY,                          :

               Plaintiff,     :

                           : Case No.:

  v.                              :

                           : 15-00728 (CKK)

NORTHSTAR WIRELESS, LLC, ET AL., :

               Defendants.    :

--------------------------------X


** CONFIDENTIAL **

Deposition of MARK RUBENSTEIN

Conducted Remotely

Tuesday, February 6, 2024

9:04 a.m.


Reported by: Matthew Goldstein, RMR, CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 9

1              THE VIDEOGRAPHER:  We are now on the

2    record.

3              This is Video No. 1 of the video

4    recorded deposition of Mr. Mark Rubenstein.  This

5    is taken in the matter of the United States of

6    America ex rel Vermont National Telephone Company

7    v. Northstar Wireless LLC, et al.  This case is

8    pending before the United States District Court

9    for the District of Columbia, Case No. 15-00278.

10             This deposition is being conducted by

11   Zoom video remote conferencing on February 6th,

12   2024.

13             The time on the video screen is

14   9:04 a.m. Eastern Standard Time.

15             My name is Daniel Holmstock.  I am the

16   legal videographer and digital exhibit technician

17   from Digital Evidence Group.

18             Our court reporter today is Mr. Matthew

19   Goldstein, also in association with Digital

20   Evidence Group.

21             All parties have stipulated to the

22   witness being sworn in remotely.

Page 10

```
 1              Counsel, will you please introduce
 2    yourselves and state whom you represent, followed
 3    by the court reporter administer the oath.
 4              MS. SWENDSBOE:  Good morning.  On behalf
 5    of relator, Vermont National Telephone Company,
 6    I'm Krystal Swendsboe.  And my colleague, Frank
 7    Scaduto, is here, as well.
 8              MS. STEEL:  Good morning.  This is Karen
 9    Steel from Schindler Cohen & Hochman, on behalf of
10    the witness, Mark Rubenstein, and also nonparty
11    HPS Investment Partners.
12              And with me today is my colleague,
13    Marcos Otazu, and Stephen Schuh, in-house counsel
14    at HPS Investment Partners.
15              MS. MONTGOMERY:  Good morning.  This is
16    Carrie Montgomery.  I'm from WilmerHale, and I
17    represent the DISH defendants.
18              MS. DOLAN:  Good morning.  Madeleine
19    Dolan from Covington & Burling, and I represent
20    the Northstar defendants.
21
22
```

Page 11

```
 1              P R O C E E D I N G S

 2  Whereupon,

 3              MARK RUBENSTEIN,

 4  being first duly sworn or affirmed to testify to

 5  the truth, the whole truth, and nothing but the

 6  truth, was examined and testified as follows:

 7      EXAMINATION BY COUNSEL FOR THE PLAINTIFF

 8  BY MS. SWENDSBOE:

 9      Q.   Thank you.  Good morning,

10  Mr. Rubenstein.

11      A.   Good morning.

12      Q.   Thanks for being here.

13           For the record, we're doing this

14  deposition via video, based on the consent of the

15  parties.

16           Have you ever been deposed before?

17      A.   I have not.

18      Q.   So in that case, I'll start with a few

19  instructions.  Your counsel has probably already

20  told them to you, but I'll repeat them just for

21  general enjoyment.

22           You are under oath.  That means you are
```

Page 54

1        Q.   Did you understand that DISH wanted to

2    bid with a designated entity to obtain the

3    spectrum at a discount?

4             MS. STEEL:  Object to form.

5             THE WITNESS:  Yes, to use this vehicle

6    to bid and purchase spectrum at a discount.

7    BY MS. SWENDSBOE:

8        Q.   I'm going to direct your attention, I

9    think, four bullets down from the line we were

10   just looking at.  It states, "Bid: uplink band for

11   DISH, the 25X25 megahertz chunk, would bid in 2nd

12   Tier Markets."

13            Do you see that language?

14       A.   Yes.

15       Q.   What does that mean?

16       A.   Well, it's saying two different things.

17   One is there's uplink and downlink, and so it's

18   saying they're interested in a 25X25 megahertz

19   chunk of uplink and that they're more interested

20   in second tier markets versus first tier markets.

21       Q.   When you say "they," who do you mean?

22       A.   DISH and the -- well, DISH.

Page 91

```
 1              The time is 10:49 a.m., and we're going

 2    off the record.

 3              (Recess from the record.)

 4              THE VIDEOGRAPHER:  The time is

 5    11:03 a.m., and we're back on the record.

 6    BY MS. SWENDSBOE:

 7        Q.   Mr. Rubenstein, you testified earlier

 8    about this deal being kind of complicated and

 9    yieldy.

10              What about its structure made it

11    complicated?

12        A.   Primarily, the fact that it wasn't an

13    operating entity, but a single asset, being blocks

14    of spectrum.  So this wasn't like lending IBM

15    money.  It was an asset-backed deal underpinned by

16    this spectrum as collateral.  So that makes it

17    unique in that that collateral produces no cash

18    flow.

19              So it's enterprise value.  The value of

20    that cash flow is, you know, based on an

21    assessment of what you could sell it for to

22    someone else as opposed to, you know, if a company
```

# Sorond Deposition Transcript (excerpted)

Unredacted Version Filed
Under Seal

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------X

UNITED STATES OF AMERICA, EX REL.:

VERMONT NATIONAL TELEPHONE          :

COMPANY,                            :

                 Plaintiff,         :

                                    :  Case No.:

     v.                             :

                                    :  15-00728 (CKK)

NORTHSTAR WIRELESS, LLC, ET AL., :

                 Defendants.        :

--------------------------------X

   ** CONFIDENTIAL UNDER THE PROTECTIVE ORDER **

         Deposition of MARIAM SOROND

              Conducted Remotely

           Thursday, January 25, 2024

                  9:09 a.m.

Reported by: Matthew Goldstein, RMR, CRR

_____

            DIGITAL EVIDENCE GROUP

         1730 M Street, NW, Suite 812

            Washington, D.C. 20036

               (202) 232-0646

Page 14

1                THE VIDEOGRAPHER:  We are now on the

2    record.

3                This is Video No. 1 in the

4    video-recorded deposition of Mariam Sorond, taken

5    in the matter of United States of America ex rel

6    Vermont National Telephone Company v. Northstar

7    Wireless LLC, et al.  The case is pending before

8    the United States District Court for the District

9    of Columbia, Case No. 15-00728.

10               This deposition is being conducted by

11   Zoom video remote conferencing on January 25th,

12   2024.  The time on the video screen is 9:09 a.m.

13   Eastern Standard Time.

14               My name is Daniel Holmstock.  I am the

15   legal videographer and digital exhibit technician

16   from Digital Evidence Group.  The court reporter

17   today is Mr. Matthew Goldstein, also in

18   association with Digital Evidence Group.

19               All parties have stipulated to the

20   witness being sworn in remotely.

21               Counsel, will you please state your

22   appearances and whom you represent, followed by

Page 15

1   the court reporter administering the oath.

2          MR. OBERMEIER:  Good morning.  This is

3   Steve Obermeier on behalf of relator.  In the room

4   with me are Rachel Tuteur and Frank Scaduto.

5          MR. ALLEN:  Good morning.  Samuel Allen,

6   WilmerHale, for the DISH defendants and the

7   witness.  And I'm joined by my colleague, Jessica

8   Aldrich, also of WilmerHale.  And that's Aldrich,

9   A-L-D-R-I-C-H.

10          MR. GOBENA:  This is Gejaa Gobena from

11   Hogan Lovells, on behalf of the SNR defendants,

12   Atelum and John Muleta.

13          MS. WILK:  This is Laura Wilk from

14   Covington & Burling, on behalf of the Northstar

15   defendants, Doyon Limited, Allen Todd, and Miranda

16   Wright.

17

18

19

20

21

22

Page 16

1                P R O C E E D I N G S

2    Whereupon,

3                     MARIAM SOROND,

4    being first duly sworn or affirmed to testify to

5    the truth, the whole truth, and nothing but the

6    truth, was examined and testified as follows:

7        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

8    BY MR. OBERMEIER:

9        Q.   Good morning, Ms. Sorond.  We sort of

10   met before we went on the record, but my name is

11   Steve Obermeier.  I'm with Wiley Rein.  And,

12   again, with me in the room are my colleagues,

13   Rachel Tuteur and Frank Scaduto.

14            You already stated your full name and

15   spelled it.

16            For the record, we're doing this

17   deposition via video based on the consent of

18   everyone involved.

19            Am I right that you're at WilmerHale's

20   D.C. offices?

21            MR. ALLEN:  That's correct.

22

Page 46

1  BY MR. OBERMEIER:

2      Q.   Right.  I guess my question is:  At this

3  point, AWS-3 is going to be auctioned, and the FCC

4  is trying to figure out how -- like what blocks to

5  put it in.

6          Is that what's going on here, and DISH

7  is going to lobby how that's going to be?

8          MR. ALLEN:  Object to form, foundation.

9          THE WITNESS:  Judging by the time, it

10 seems to be pre-auction.  So, typically, operators

11 who are interested in the auction, it would be

12 reasonable to assume that they would go to the FCC

13 or the FCC would ask for their input because of

14 being able to make a decision on the auction on

15 their behalf.

16 BY MR. OBERMEIER:

17     Q.   And is it fair to say DISH is going to

18 the FCC about this because they anticipate winning

19 spectrum in the auction?

20         MR. ALLEN:  Object to form, foundation.

21         THE WITNESS:  I believe it definitely

22 is -- yes, DISH was interested in the AWS-3

**A-174**

Page 47

1    auction.  So these conversations are around that

2    with the FCC.

3    BY MR. OBERMEIER:

4        Q.   If you could turn to Tab 4, please,

5    Ms. Sorond.  And this will be Relator Exhibit 402.

6            (Relator Deposition Exhibit 402 was

7    marked for identification and attached to the

8    transcript.)

9    BY MR. OBERMEIER:

10       Q.   And for the record, this is SNR-31340 to

11   31343.

12           And, Ms. Sorond, again, I'll walk you

13   through this and give you a chance to look at it

14   as we go.

15           So, Ms. Sorond, if you look at the

16   bottom, there's two e-mails on the first page.

17   And the first one, Alison Minea is sending a

18   meeting invitation on February 12th, 2014, to you

19   and several others for 2 to 3 p.m. on

20   February 17th, 2014.

21           Do you see that?

22       A.   Yes.

1/25/2024     USA, ex rel. Vermont National Telephone Company v. Northstar Wireless, LLC et al.     Mariam Sorond
Confidential - Under the Protective Order

Page 65

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



**A-176**
**PUBLIC APPENDIX**

1/25/2024      USA, ex rel. Vermont National Telephone Company v. Northstar Wireless, LLC et al.      Mariam Sorond
Confidential - Under the Protective Order

Page 66



# Stocker Deposition Transcript (excerpted)

## PUBLIC

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF COLUMBIA
 3
 4    UNITED STATES OF AMERICA EX
      REL. VERMONT NATIONAL
 5    TELEPHONE COMPANY,
                    Plaintiff,
 6           vs.                       Case No.
 7    NORTHSTAR WIRELESS, L.L.C.;    15-CV-728(CKK)
      NORTHSTAR SPECTRUM, L.L.C.;
 8    NORTHSTAR MANAGER, L.L.C.;
      DOYON LIMITED; MIRANDA
 9    WRIGHT; ALLEN M. TODD; SNR
      WIRELESS LICENSECO, L.L.C.;
10    SNR WIRELESS HOLDCO, L.L.C.;
      SNR WIRELESS MANAGEMENT,
11    L.L.C.; ATELUM L.L.C.; JOHN
      MULETA; AMERICAN AWS-3
12    WIRELESS I L.L.C.; AMERICAN
      AWS-3 II, L.L.C.; AMERICAN
13    WIRELESS AWS-3 III, L.L.C.;
      DISH WIRELESS HOLDING L.L.C.;
14    DISH NETWORK CORPORATION;
      CHARLES E. ERGEN; CANTEY M.
15    ERGEN,
16                  Defendants.
      _____/
17                    -- CONFIDENTIAL --
18
19        VIDEO-RECORDED DEPOSITION OF FRANCES STOCKER
20                 Remote Zoom Proceedings
                     Springfield, Vermont
21                Thursday, February 1, 2024
22
23    REPORTED BY:
24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25    Pages 1 - 156                    Job No. 6405802

                                            Page 1
```

CONFIDENTIAL

```
 1        Springfield, Vermont; Thursday, February 1, 2024

 2              9:13 a.m. Eastern Standard Time

 3                    PROCEEDINGS

 4

 5                    --oOo--                            09:13:09

 6        THE VIDEOGRAPHER:  Good morning.  We are going

 7   on the record at 9:13 a.m. on February 1st, 2024.

 8        Please note that this deposition is being

 9   conducted virtually.  Quality of recording depends on the

10   quality of the camera and internet connection of          09:13:39

11   participants.

12        What is seen from the witness and heard on

13   screen is what will be recorded.

14        This is Media Unit 1 of the video-recorded

15   deposition of Frances Stocker, taken by counsel in the    09:13:51

16   matter of United States of America ex rel Vermont

17   National Telephone Company versus Northstar Wireless LLC,

18   et al., filed in the United States District Court for the

19   District of Columbia, Civil Action Number 15-00728(CKK).

20        My name is Soseh Kevorkian, representing            09:14:19

21   Veritext, and I'm the videographer.  Our court reporter

22   is Leslie Rosas, also from the firm Veritext.

23        At this time would counsel and all present

24   please state their appearances and affiliations for the

25   record, and we will begin with the noticing attorney.     09:14:34
```

Page 10

CONFIDENTIAL

```
 1          MR. BLOCK:  Good morning.  Benjamin Block of
 2   Covington & Burling LLP, joined by my colleague Madeleine
 3   Dolan, and we're here on behalf of the Northstar
 4   defendants.
 5          MR. OBERMEIER:  Good morning.  Steve Obermeier   09:14:47
 6   from Wiley Rein on behalf of Relator.  In addition to
 7   Ms. Stocker, Dr. Michel Guité is in the room.
 8          MS. CARUSO:  Good morning.  Courtney Caruso from
 9   Hogan & Lovells, on behalf of John Muleta and the SNR
10   defendants.                                            09:15:08
11          MS. MONTGOMERY:  Good morning.  This is
12   Carrie Montgomery from Wilmer Hale, and I'm representing
13   the DISH defendants.
14          THE VIDEOGRAPHER:  Thank you.
15          Leslie, whenever you're ready.                  09:15:17
16          THE REPORTER:  Thank you.
17          Ms. Stocker, if you would raise your right hand,
18   please, I'll swear you in.  Thank you.
19          You do solemnly swear and affirm that you will
20   tell the truth, the whole truth, and nothing but the
21   truth?
22          THE WITNESS:  I do.
23          THE REPORTER:  Thank you, ma'am.
24          You may begin, Counsel.
25          MR. BLOCK:  Thank you.                          09:15:37
```

Page 11

CONFIDENTIAL

```
 1                      EXAMINATION

 2   BY MR. BLOCK:

 3       Q.  Good morning, Ms. Stocker.  Could you please

 4   state your full name for the record.

 5       A.  Frances Mary Stocker.                    09:15:41

 6       Q.  And your address, please.

 7       A.  My home address?

 8       Q.  Yes, please.

 9       A.  497 Gould Road, Chester, Vermont 05143.

10       Q.  Ms. Stocker, have you ever given testimony under  09:15:56

11   oath before?

12       A.  I have not.

13       Q.  Do you understand the significance of the oath

14   that you just took?

15       A.  I do.                                    09:16:02

16       Q.  And is there any reason you won't be able to

17   answer my questions today with the truth, the whole

18   truth, and nothing but the truth?

19       A.  I do not believe so.

20       Q.  And where are you physically located today?    09:16:12

21   What's the address?

22       A.  This is the Vermont Telephone Company office at

23   354 River Street, Springfield, Vermont 05156.

24       Q.  And the two people in the room with you are

25   Mr. Obermeier and Dr. Guité?                    09:16:27
```

Page 12

CONFIDENTIAL

```
 1          A.  I don't believe so.

 2          Q.  And how about VTel Wireless, Inc.; did it have

            any FCC spectrum licenses?

 4          A.  It did.

 5          Q.  How many or which ones?  Could you describe      09:50:22

 6      those licenses for me, please.

 7          A.  There were numerous, but I don't have a count.

 8      There were PCS licenses, some AWS licenses.  There were

 9      700 megahertz.  I don't recall if the BRS licenses were

10      still there at that point.                              09:51:01

11          (Reporter clarification.)

12          THE WITNESS:  The BRS.  I'm sorry, I don't know

13      what that stands for.  It's another set of licenses, but

14      I -- I don't recall the dates on those, and they were

15      primarily Vermont and -- 2014.  I think there was the   09:51:13

16      Albany, New York, one.

17          I'm actually not sure about that at the time,

18      Vermont and bordering New Hampshire.

19          Q.  And what was the acronym you were using to

20      describe that last set, the one that may or may not have 09:51:36

21      included Albany?

22          A.  That may or may not have included Albany was, I

23      believe, PCS.

24          Q.  PCS?

25          A.  Correct.                                        09:51:50
```

Page 38

1        Q.  All right.  And how had Vermont Wireless, Inc.,

2    acquired those licenses that you were just referencing?

3        A.  Mostly through FCC auctions.  There were some

4    that were purchased from third parties that held them.

5        Q.  What -- which auctions do you remember VTel        09:52:16

6    having participated in?

7        A.  Well, I recall participating in -- I recall from

8    PCS Auction 5 in 1995 probably nine or ten different

9    auctions over the -- over that time frame.  But the

10   specific auction numbers, I -- I -- I don't recall them    09:52:46

11   that clearly.

12       Q.  And did you have -- did you have involvement

13   with any of those auctions?

14       A.  I did.

15       Q.  Which auctions were you involved in?             09:52:58

16       A.  I recall being starting with Auction 5 and the

17   auctions since then, but as I said, I don't recall the

18   auction numbers.

19       Q.  And could you just -- fair enough.  Can you

20   describe for me generally what your involvement was with   09:53:15

21   those auctions?

22       A.  Basically helping prepare the -- the

23   documentation associated with applying, processing, that

24   sort of thing, as well as the -- doing the bidding

25   itself, entering the bids, drawing the results, reporting  09:53:38

                                                        Page 39

# Wright Deposition Transcript (excerpted)

## PUBLIC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------------X

UNITED STATES OF AMERICA, EX REL.:

VERMONT NATIONAL TELEPHONE        :

COMPANY,                          :

              Plaintiff,        :

                         : Civil Action No.:

  v.                              :

                         : 15-00728 (CKK)

NORTHSTAR WIRELESS, LLC, ET AL., :

             Defendants.    :

---------------------------------X

*** CONFIDENTIAL ***

Deposition of MIRANDA WRIGHT

Conducted Remotely

Tuesday, December 5, 2023

12:01 p.m.

Reported by: Matthew Goldstein, RMR, CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 7

```
 1              THE VIDEOGRAPHER:  We are now beginning

 2     this deposition.

 3              Today's date is December 5th, 2023.

 4     This is the video deposition of Ms. Miranda

 5     Wright, taken in the matter of USA ex rel Vermont

 6     Telephone Company versus Northstar.

 7              Will all counsel please identify

 8     themselves for the record and whom they represent.

 9              MS. SWENDSBOE:  Good morning.  My name

10     is Krystal Swendsboe from Wiley Rein.  We

11     represent the relator, Vermont National.  My

12     colleague, Mark Sweet, is also in the room with

13     me.

14              MR. BLOCK:  And good morning.  This is

15     Benjamin Block from Covington & Burling LLP on

16     behalf of the Northstar defendants, including

17     Ms. Wright.  Allen Todd, general counsel of Doyon

18     Limited, is also here.

19              MS. MONTGOMERY:  Carrie Montgomery,

20     WilmerHale, for the DISH defendants.

21

22
```

Page 8

 1                    P R O C E E D I N G S

 2     Whereupon,

 3                      MIRANDA WRIGHT,

 4     being first duly sworn or affirmed to testify to the

 5     truth, the whole truth, and nothing but the truth,

 6     was examined and testified as follows:

 7          EXAMINATION BY COUNSEL FOR THE RELATOR

 8     BY MS. SWENDSBOE:

 9          Q.   Thank you.  I appreciate it.

10               Ms. Wright, good morning.  Thank you for

11     starting so early.  I know we're in different time

12     zones.

13               For the record, could you please state

14     your full name?

15          A.   Miranda Wright.

16          Q.   And I've already introduced myself.  My

17     name is Krystal.  My colleague, Mark, is in the

18     room, as well.  We represent Vermont National

19     Telephone Company in connection with the lawsuit.

20               For the record, we're doing the

21     deposition via video based on the consent of all

22     parties involved.

Page 24

1    the board reviewed it, we gave a directive to the

2    management to proceed with the investment.

3        Q.   So I want to drill down a little bit.

4             When you say "opportunity," what do you

5    mean?

6        A.   When you're in business and something

7    comes around or you have an opportunity to make a

8    profit, you naturally go for it.

9        Q.   So this was a profitable opportunity

10   then for Doyon?

11       A.   Yes.

12       Q.   And what was the relationship --

13       A.   Potentially.  You know, I mean,

14   everything has a risk factor in that.

15       Q.   What was the relationship between Doyon

16   and DISH for this opportunity?

17       A.   We had a joint --

18            MR. BLOCK:  Object to the form.

19            Sorry, just give me a second.

20            THE WITNESS:  Okay.

21            MR. BLOCK:  Go ahead.

22            THE WITNESS:  We had a joint venture

Page 25

1    with DISH.  They were an investor.

2    BY MS. SWENDSBOE:

3         Q.   Can you tell me a little bit more about

4    that joint venture?  What do you mean when you say

5    that?

6              MR. BLOCK:  Object to the form.

7              THE WITNESS:  I think you said the joint

8    venture.  Is that what you were asking?

9    BY MS. SWENDSBOE:

10        Q.   Yes.  You had used the phrase.  I'm just

11   trying to understand what you meant when you said

12   it.

13             MR. BLOCK:  Well, objection, misstates

14   the testimony.

15             THE WITNESS:  I'm sorry, I couldn't

16   understand what she was asking.

17   BY MS. SWENDSBOE:

18        Q.   I'll ask it again.

19             What's the relationship between DISH and

20   Doyon in relation to that opportunity?

21             MR. BLOCK:  Object to the form.

22             THE WITNESS:  DISH was an investor in

Page 144

1    strategic partner, in this case DISH Networks.

2              Do you see that language?

3        A.   Yes.

4        Q.   You understand that this is an

5    opportunity where DISH would partner with Doyon in

6    relation to Northstar Spectrum Manager?

7              MR. BLOCK:  Object to the form.

8              THE WITNESS:  No, the word "partner" I

9    think is misleading in this document.

10   BY MS. SWENDSBOE:

11       Q.   What did you understand the relationship

12   to be between Doyon and DISH with respect to

13   Northstar Spectrum Manager?

14       A.   Well, they were an investor just like

15   all of the other companies that are listed, and it

16   was more of a joint venture type of arrangement

17   than a partnership.

18       Q.   Now, the third paragraph on this page,

19   "NSM will partner with DISH Networks in a venture

20   called Northstar Spectrum."

21             Is that what you're referring to?

22       A.   Right.

12/5/2023       USA, ex rel. Vermont National Telephone Company v. Northstar Wireless, LLC et al.   Miranda Wright
Confidential

```
                                                          Page  217
1      Digital Evidence Group, LLC

2      1730 M Street, NW, Suite 812

3      Washington, D.C.  20036

4      (202)232-0646

5

6                        ERRATA SHEET

7

8      Case: USA, ex rel. Vermont National Telephone Company v. Northstar Wireless,
    LLC et al.

9      Witness Name: Miranda Wright

10     Deposition Date: December 5, 2023

11        Page No.      Line No.        Change

12     16               9               'got' my BA

13     16               21              Alaska Native Studies and Rural Development

14     28               5 & 6           Delete 'kind of'

15     40               17              Weeds instead of wool

16     111              15              delete 'no'

17     209              2               where instead of when

18     209              3               should be "...targeting  investments 'to', ..."

19

20

21     _____            1-18-24

22     Signature                           Date
```

A-192
PUBLIC APPENDIX

# DISH 30(b)(6) Blum Transcript (excerpted)

PUBLIC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------x

UNITED STATES OF AMERICA,        :

ex rel. VERMONT NATIONAL         :

TELEPHONE COMPANY,               :

                                 :

          Plaintiff,             : Civil Action No.

                                 :

     vs.                         :  15-00728 (CKK)

                                 :

NORTHSTAR WIRELESS, LLC,         :

et al.,                          :

          Defendants.            :

------------------------------x

     ***  C O N F I D E N T I A L   ***


   REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF

DISH NETWORK CORPORATE REPRESENTATIVE JEFF BLUM

          Thursday, February 8, 2024

       9:01 a.m. Eastern Standard Time


REPORTER:  Dawn A. Jaques, CSR, CLR


_____

          DIGITAL EVIDENCE GROUP

     1730 M Street, NW, Suite 812

        Washington, D.C. 20036

          (202) 232-0646

Page 10

1                P R O C E E D I N G S

2                THE VIDEOGRAPHER:  We are now on the

3     record.  This is Video No. 1 in the 30(b)(6)

4     deposition of DISH Network LLC, today being

5     represented by Mr. Jeff Blum.

6                This is taken in the matter of the

7     United States of America, ex rel. Vermont

8     National Telephone Company v. Northstar

9     Wireless, LLC, et al.  The case is pending

10    before the United States District Court for

11    the District of Columbia, Case No. 15-00728.

12                This deposition is being conducted

13    by Zoom Video Remote Conferencing on

14    February 8th, 2024.  The time on the video

15    screen is 9:01 a.m. Eastern Standard Time.

16                My name is Daniel Holmstock; I am

17    the legal videographer and digital exhibit

18    technician from Digital Evidence Group.  Our

19    court reporter today is Dawn Jaques, also in

20    association with Digital Evidence Group.

21                All parties have stipulated to the

22    witness being sworn in remotely.

Page 11

1          Counsel, will you please state your

2     appearances and whom you represent, followed

3     by the court reporter administering the oath.

4          MR. ROSS:  Good morning, Bennett

5          Ross with Wiley Rein on behalf of the

6          Relator, Vermont National Telephone

7          Company, along with my colleague,

8          Frank Scaduto.

9          MR. PAIKIN:  Good morning, Jonathan

10         Paikin from WilmerHale, representing

11         DISH, and with me today in the room is

12         Sam Allen, also from WilmerHale.

13         MR. GOBENA:  Good morning,

14         Gejaa Gobena on behalf of SNR Defendants,

15         Atelum, and John Muleta.

16         MS. FRODLE:  Good morning,

17         Amee Frodle from Covington & Burling on

18         behalf of the Northstar Defendants.

19         THE REPORTER:  Yes, Mr. Blum, if

20         you'll raise your right hand to be sworn,

21         sir.

22         (The witness was administered the oath.)

Page 12

1    Whereupon,

2                          JEFF BLUM,

3            was called as a witness, after having

4            been first duly sworn by the Notary

5            Public, was examined and testified as

6            follows:

7        EXAMINATION BY COUNSEL FOR THE RELATOR

8                BY MR. ROSS:

9        Q    Good morning, Mr. Blum.

10       A    Good morning.

11       Q    Bennett Ross on behalf of Vermont

12   National.  I believe we've met before.

13            Just before we get started, I want

14   to do a few housekeeping matters regarding

15   your deposition.

16            Have you been deposed before?

17       A    Yes.

18       Q    So then you'll know -- you know the

19   drill.  I'll be asking you a series of

20   questions.  If at any time you do not

21   understand my question, please let me know and

22   I'll be more than happy to rephrase it.

Page 85

1    a good time.

2         A    Thank you.

3              THE VIDEOGRAPHER:  All right, the

4         time is 10:34 a.m.  We're going off the

5         record.

6              (A break was taken.)

7              THE VIDEOGRAPHER:  The time is

8         10:45 a.m.  We're back on the record.

9              BY MR. ROSS:

10        Q    Mr. Blum, if I could ask you to look

11   at the document behind Tab 70, which is

12   the minutes of the October 30, 2014, meeting

13   of the DISH board.  It's been marked as

14   Relator Exhibit 35.  Are you there?

15        A    I have it.  I'm just looking at it.

16   I am here.

17        Q    Just for the record, this meeting,

18   October 30, 2014, took place some six weeks

19   after DISH had entered into definitive

20   commercial agreements with SNR and Northstar;

21   is that correct?

22        A    Yes, we entered into the definitive

Page 86

1    agreements with Northstar and SNR I believe on

2    September 12th, 2014.

3         Q    And September 12th, 2014, was also

4    the date that SNR Wireless and Northstar

5    Wireless submitted their short-form

6    applications to the FCC for participation in

7    Auction 97; is that correct?

8         A    Correct, as well as American I on

9    the same day.

10        Q    There's a reference -- if you'll

11   turn to page 20 of the minutes, there's a

12   discussion under "CHAIRMAN'S REPORT" about the

13   AWS-3 Auction, and there's a reference to a

14   presentation or materials that were

15   distributed to the board.

16             Do you see that?

17        A    I see that.

18        Q    And if you'll look at Tab 70 -- the

19   document behind Tab 71, which has been marked

20   as Relator Exhibit 36, AWS-3 Spectrum Auction

21   Overview, dated October 28, 2014.

22             Do you see that?

Page 101

1              BY MR. ROSS:

2         Q    Okay.  What does the dry powder

3    target of $10 billion reflect?

4         A    I don't know what it means by dry

5    powder target, though generally we had,

6    pursuant to board approvals, a budget of about

7    $10 billion.

8         Q    And as the corporate representative

9    testifying on board presentations, you can't

10   tell me what the -- what is meant by the term

11   "dry powder target" in this presentation?

12        A    Not the specific term "dry powder

13   target."  As I said, the board had approved a

14   certain budget for DISH itself and for its

15   investment in Northstar and SNR of about

16   $10 billion as a budget.

17        Q    Okay.  And if you look at the next

18   slide, which is slide 24, it's entitled

19   "Capital Raise Sizing based on $2.0B Minimum

20   Cash Balance Pro Forma," and it states, "In

21   order to have $10.0B of dry powder for the

22   AWS-3 auction, DISH needs to raise

Page 210

1     Northstar that Northstar Wireless would be

2     included in DISH's consolidated financial

3     reports?

4          A    I mean, at some point we decided to

5     consolidate, and informed the DEs of that.  So

6     what time period are you talking about?

7          Q    When, in your view, was the decision

8     made that Northstar Wireless would be included

9     in DISH's consolidated financial reports, and

10    that information was relayed to Northstar?

11         A    I believe that was early 2015.

12         Q    And is it your testimony that there

13    was no understanding -- that DISH did not have

14    an understanding with Northstar that Northstar

15    Wireless would be included in DISH's

16    consolidated financial reports until February

17    of 2015?

18         A    Correct.

19         Q    All right.

20         A    January, February.

21         Q    Fair enough.

22         A    Early 2015.

Page 211

1        Q    Did DISH ask that Northstar Wireless

2    disclose in its short-form application that

3    Northstar Wireless would be included in DISH's

4    consolidated financial reports?

5        A    No.

6        Q    To DISH's knowledge, did Northstar

7    Wireless disclose in either its short-form

8    application or its long-form application that

9    Northstar Wireless would be included in DISH's

10   consolidated financial reports?

11       A    No.

12       Q    Did DISH ask that Northstar Wireless

13   disclose in its long-form application that

14   Northstar Wireless would be included in DISH's

15   consolidated financial reports?

16       A    Well, when DISH made an

17   accounting -- KPMG determination to do so -- I

18   don't know the date of the long form, so it

19   was -- when we made the determination, we

20   disclosed it I believe in our SEC filing in

21   February.

22            Let me look at the timeline here.

Page 212

1    So we filed -- Northstar and SNR filed their

2    long form on February 13th, and so the

3    consolidation -- it was around that time

4    frame.  So I don't know the exact timing of

5    that FCC disclosure.  It was in February 2015.

6         Q    I think my question was about

7    Northstar's disclosure in its long-form

8    application that Northstar Wireless would be

9    included in DISH's consolidated financial

10   reports.

11             To your knowledge, was that

12   disclosure made by Northstar in its long-form

13   application?

14        A    The timing -- can you refresh my

15   recollection, or do you have a representation

16   of when DISH filed its SEC filing after the

17   decision was made to consolidate?

18        Q    I don't.  If you don't know the

19   answer to the question, you can say that.

20        A    I don't -- yeah, I don't know.  I

21   don't -- I don't believe Northstar and SNR's

22   long form mentioned consolidation.

Page 213

1        Q     Okay.  Did DISH ever tell the FCC

2   that Northstar Wireless would be included in

3   DISH's consolidated financial reports?

4        A     At what time period?  I mean,

5   obviously, after -- at any time period?

6        Q     Well, yeah.  I mean, you tell --

7   tell me when you think you -- DISH told the

8   FCC that Northstar Wireless would be included

9   in DISH's consolidated financial reports.

10        A     I don't know whether we ever -- I

11   don't recall telling the FCC about our SEC

12   consolidation filings.

13        Q     Well, let me ask it this way.

14              Prior to the filing of the long-form

15   applications in February of 2015, did DISH

16   ever tell the FCC that Northstar Wireless

17   would be included in DISH's consolidated

18   financial reports?

19        A     I don't believe so, again, in terms

20   of the specific timing of when we made that

21   determination and when we made those SEC

22   disclosures.

Page 214

1              But in terms of conversations with

2      the FCC, I don't recall discussion about

3      consolidation.

4          Q     And same questions for SNR.

5              Prior to January/February 2015, did

6      DISH have an understanding with SNR that

7      SNR Wireless would be included in DISH's

8      consolidated financial reports?

9          A     No.

10         Q     Did DISH ask that SNR Wireless

11     disclose in its either short-form application

12     or its long-form application that SNR Wireless

13     would be included in DISH's consolidated

14     financial reports?

15         A     Again, with the caveat in terms of

16     the timing of the long form, no, we did not

17     ask SNR that.

18         Q     And to your knowledge, did DISH ask

19     that SNR Wireless or Northstar Wireless --

20     I'm sorry.

21             Did DISH ask that SNR Wireless

22     disclose in either its long-form or short-form

Page 215

1     application that SNR Wireless would be

2     included in DISH's consolidated financial

3     reports?

4          A     No, but given the timing, we had not

5     made the determination of whether we would

6     consolidate until early January/February 2015,

7     which is after Northstar and SNR and

8     American I filed the short forms.

9          Q     Did DISH ever tell the FCC that

10    SNR Wireless would be included in DISH's

11    consolidated financial reports?

12         A     Again, given sort of the timing

13    thing, no, I don't recall conversations with

14    the FCC about that.

15         Q     And to DISH's knowledge, did any

16    defendant ever tell the FCC that SNR Wireless

17    would be included in DISH's consolidated

18    financial reports?

19         A     Not that I'm aware of.

20         Q     Did DISH have an understanding with

21    Northstar that Northstar Wireless would not

22    use its AWS-3 spectrum licenses to provide

Page 216

1      wireless services?

2           A    No.

3           Q    Did DISH ask that Northstar Wireless

4      disclose in its short-form application and its

5      long-form application that Northstar Wireless

6      would not use its AWS-3 spectrum licenses to

7      provide wireless services?

8           A    No.

9           Q    To DISH's knowledge, did Northstar

10     Wireless disclose in either its short-form

11     application or long-form application that

12     Northstar Wireless would not use its AWS-3

13     spectrum licenses to provide wireless

14     services?

15          A    No.

16          Q    Did DISH ever tell the FCC that

17     Northstar Wireless would not use its AWS-3

18     spectrum licenses to provide wireless

19     services?

20          A    No.

21          Q    To DISH's knowledge, did any

22     defendant ever tell the FCC that Northstar

Page 217

```
 1    Wireless would not use its AWS-3 spectrum

 2    licenses to provide wireless services?

 3          A    No.

 4          Q    Let me ask the same set of questions

 5    for SNR.

 6               Did DISH have an understanding with

 7    SNR that SNR Wireless would not use its AWS-3

 8    spectrum licenses to provide wireless

 9    services?

10          A    No.

11          Q    Did DISH ask that SNR Wireless

12    disclose in its short-form application and its

13    long-form application that SNR Wireless would

14    not use its AWS-3 spectrum licenses to provide

15    wireless services?

16          A    No.

17          Q    To DISH's knowledge, did

18    SNR Wireless disclose in its short-form

19    application and long-form application that

20    SNR Wireless would not use its AWS-3 spectrum

21    licenses to provide wireless services?

22          A    No.
```

**A-208**
**PUBLIC APPENDIX**

Page 218

1          Q    Did DISH ask that SNR Wireless --

2     I'm sorry.

3               Did DISH ever tell the FCC that

4     SNR Wireless would not use its AWS-3 spectrum

5     licenses to provide wireless services?

6          A    No.

7          Q    To DISH's knowledge, did any

8     defendant ever tell the FCC that SNR Wireless

9     would not use its AWS-3 spectrum to provide

10    wireless services?

11         A    No.

12         Q    Why don't we turn our attention to

13    Topic 8, which is DISH's strategy, plans, or

14    designs to coordinate bidding with

15    SNR Wireless and Northstar Wireless in

16    Auction 97.

17         A    Okay.

18         Q    And to get the party rolling, can I

19    ask you to look at the document behind Tab 30?

20         A    Yes.

21         Q    This document is previously marked

22    as Relator Exhibit 328, which is a Bidding

Page 309

1     opportunity to cure, that every single DE had

2     been afforded the opportunity to cure, what

3     Mr. Deller told us we would be able to do;

4     what Roger Sherman, the Chief of the Wireless

5     Bureau, right after the auction told me

6     personally, "Jeff, don't worry, you're going

7     to be treated just like every other DE, we're

8     going to give you a fair shake."

9              So, unfortunately, we did not get a

10    fair shake because the incumbents were pissed

11    that they didn't get everything they wanted.

12             And so I'm proud of the work that we

13    did, glad that Northstar and SNR acquired

14    valuable spectrum, but very disappointed, and

15    it has been damaging to DISH having to pay a

16    $500 million penalty to the US government that

17    we believe was unjustified, by being on the

18    hook to have to guarantee $3.3 billion worth

19    of spectrum for a re-auction which we believe

20    was unjustified.  So in that respect, it has

21    been harmful.

22         Q    Just to clarify, the $500 million

Page 310

1    penalty that was paid, that's because SNR and

2    Northstar defaulted on their licenses, right?

3          A    Northstar and SNR had no choice but

4    to default because the FCC, we believe,

5    wrongfully denied the bidding credits; and

6    despite Northstar and SNR and DISH begging the

7    FCC to meet with us, the FCC, contrary to

8    15 years of precedent, denied what Mr. Deller

9    and Mr. Sherman told me we would get because

10   of the political pressure brought to bear by

11   Verizon, AT&T, and T-Mobile.

12         Q    They had no choice to default is

13   what I think you just testified.

14         A    That is correct.  Northstar and SNR

15   were facing the Hobson's choice of not getting

16   any licenses, defaulting on the full

17   $13.3 billion worth of licenses, and

18   Northstar, SNR, and DISH, to avoid that, were

19   able to reach an accommodation with the FCC

20   where Northstar and SNR returned $3.3 billion

21   worth of licenses.

22              But if the FCC had followed its

Page 311

1   precedent and treated us and Northstar and SNR

2   fairly, consistent with that precedent,

3   Northstar and SNR would have received the

4   bidding credit.

5            But because we were not treated

6   fairly, Northstar and SNR were put in the

7   impossible situation and defaulted on

8   $3.3 billion worth of licenses, but because we

9   were the largest non-controlling investor, we

10  paid, DISH, to the U.S. Treasury $500 million

11  in default penalties.

12       Q    But DISH had the authority -- DISH

13  had the ability and the authority to pay for

14  all $3.3 billion of the licenses rather than

15  having SNR and Northstar default, correct?

16       A    Mr. Ross, it's one thing to have

17  board authority to do it, but the reality is

18  we could not raise in that time period the

19  additional $3.3 billion.

20            And so that was communicated to the

21  FCC, and Northstar and SNR, that we had

22  $10 billion in the bank, and we did everything

Page 312

1    we could to follow FCC precedent, and we were

2    told by the FCC that if there were any issues,

3    DISH, Northstar, and SNR would be able to come

4    in and fix it, and contrary to 15 years of

5    precedent, we were deprived of that

6    opportunity and put in the position where we

7    basically had to pay a $500 million penalty,

8    or Northstar and SNR defaulting on the entire

9    amount.

10        Q    Just going back to the board

11   resolution that we talked about that's behind

12   Tab 110 (Exhibit 528) from September 29, 2015,

13   where the board authorized DISH to spend up to

14   an aggregate amount of $14 billion in the

15   auction, is that money that DISH did not have?

16            Is that your testimony?

17        A    At that time, we did not have

18   $13.3 billion.  We agreed to, so Northstar and

19   SNR could acquire $10 billion worth of

20   licenses, that DISH itself would guarantee up

21   to $3.3 billion in the re-auction.

22        Q    Can I ask you to look at -- well,

A-213
PUBLIC APPENDIX

# DISH 30(b)(6)
# Dattilo Deposition
# Transcript (excerpted)

## PUBLIC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------x

UNITED STATES OF AMERICA,        :

ex rel. VERMONT NATIONAL          :

TELEPHONE COMPANY,                :

                                  :

            Plaintiff,      : Civil Action No.

                                  :

      vs.                   :  15-00728 (CKK)

                                  :

NORTHSTAR WIRELESS, LLC,          :

et al.,                           :

            Defendants.     :

------------------------------x

      ***  C O N F I D E N T I A L   ***


   VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF

      NORTHSTAR WIRELESS, LLC, CORPORATE

         REPRESENTATIVE PETER DATTILO

         Tuesday, January 30, 2024

      9:24 a.m. Mountain Standard Time


   REPORTER:  Dawn A. Jaques, CSR, CLR


_____

         DIGITAL EVIDENCE GROUP

      1730 M Street, NW, Suite 812

         Washington, D.C. 20036

            (202) 232-0646

Page 12

```
 1                P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  We are now on the

 3    record.  This is Video No. 1 of the 30(b)(6)

 4    deposition of DISH Network Corporation, today

 5    being represented by Mr. Peter Dattilo, taken

 6    in the matter of the United States of America,

 7    ex rel. Vermont National Telephone Company v.

 8    Northstar Wireless, et al., Defendants,

 9    pending before the United States District

10    Court for the District of Columbia, Case No.

11    15-00728.

12              This deposition is being conducted

13    by Zoom Video Remote Conferencing on

14    January 30th, 2024.  The time on the video

15    screen is 9:24 a.m. Mountain Time.

16              My name is Daniel Holmstock; I am

17    the legal videographer and digital exhibit

18    technician from Digital Evidence Group.  Our

19    court reporter today is Dawn Jaques, also in

20    association with Digital Evidence Group.

21              All parties have stipulated to the

22    witness being sworn in remotely.
```

Page 13

1          Counsel, will you please state your

2    appearances and whom you represent, followed

3    by the court reporter administering the oath?

4          MR. SCADUTO:  Good morning.  This is

5          Frank Scaduto with Wiley Rein.  With me

6          is Bennett Ross.  We represent the

7          Relator, Vermont National Telephone

8          Company.

9          MR. PAIKIN:  And my name is Jonathan

10         Paikin.  I'm here with Joey Meyer from

11         WilmerHale, representing DISH.

12         And also attending virtually is

13         Lawrence Katzin, who is in-house at DISH.

14         MR. THEIS:  Good morning, all.  This

15         is Mike Theis from Hogan Lovells US LLP,

16         representing the SNR defendants.

17         MS. FRODLE:  Good morning everyone.

18         This is Amee Frodle from

19         Covington & Burling, representing the

20         Northstar Defendants.

21         THE REPORTER:  Mr. Dattilo, if

22         you'll raise your right hand to be sworn,

Page 14

```
 1       please?

 2       (The witness was administered the oath.)

 3   Whereupon,

 4                 PETER DATTILO,

 5       was called as a witness, after having

 6       been first duly sworn by the Notary

 7       Public, was examined and testified as

 8       follows:

 9   EXAMINATION BY COUNSEL FOR THE RELATOR

10             BY MR. SCADUTO:

11       Q    Good morning, Mr. Dattilo.  Again,

12   my name is Frank Scaduto.  I'm with

13   Wiley Rein, and I represent the Relator in

14   this case.

15             I believe you're currently located

16   in Denver; is that right?

17       A    That is correct.

18       Q    Okay.  And is there anyone other

19   than Mr. Paikin and Mr. Meyer in the room

20   there with you?

21       A    No, there's not.

22       Q    Have you ever been deposed before?
```

A-218
PUBLIC APPENDIX

Page 138

1    preliminarily kind of thought out, you know,

2    we'd send it around to multiple people and

3    have everybody take a look at it to provide

4    thoughts.

5          Q    So would anyone other than yourself,

6    Mr. Maughan, and possibly Mr. Motaver, have

7    participated in the drafting of this

8    August 22nd draft?

9          A    From an internal perspective?

10         Q    Well, what do you mean by that?

11         A    From an internal perspective, I

12   would say that it would just be us; and then

13   eventually, you know, we had documentation

14   that was, on a preliminary basis, was provided

15   to KPMG.

16         Q    And why does DISH Technical

17   Accounting provide things on a preliminary

18   basis to KPMG?

19         A    Well, for one, this is incredibly

20   complex.  So if we're looking at what KPMG,

21   you know, had to do for something like this

22   and for large dollar amounts, the local office

Page 139

1    will have to get themselves familiar with the

2    transaction, have to review the documentation,

3    potentially speak with individuals.

4            And I believe that Mike Kraehnke,

5    who is the engagement partner, kind of

6    provided his end findings to the KPMG

7    Department of Professional Practice, so DPP,

8    who are the, you know, firm experts, you know,

9    as it relates to these matters, including

10   variable interest entity, ASC 810.

11       Q    Why did the process of documenting

12   the VIE analysis begin on or around

13   August 22nd, 2014?

14       A    I'm going to assume at that point

15   that there had been some conversations, you

16   know, with Legal that there was at least the

17   potential of some type of, you know, joint

18   venture being formed, and to, you know, make

19   us aware, right?  It's much better to be

20   proactive than reactionary.

21       Q    What do you mean by that?

22       A    Well, if I'm looking at it from an

A-220
PUBLIC APPENDIX

# Northstar 30(b)(6) Todd Transcript (excerpted)

## PUBLIC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------x

UNITED STATES OF AMERICA,        :

ex rel. VERMONT NATIONAL         :

TELEPHONE COMPANY,               :

                                 :

            Plaintiff,           : Civil Action No.

                                 :

      vs.                        :  15-00728 (CKK)

                                 :

NORTHSTAR WIRELESS, LLC,         :

et al.,                          :

            Defendants.          :

------------------------------x

      ***  C O N F I D E N T I A L   ***

   VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF

     NORTHSTAR CORPORATE REPRESENTATIVE

          ALLEN MICHAEL TODD

        Monday, January 22, 2024

       8:06 a.m. Alaska Standard Time


REPORTER:  Dawn A. Jaques, CSR, CLR


_____

            DIGITAL EVIDENCE GROUP

        1730 M Street, NW, Suite 812

          Washington, D.C. 20036

            (202) 232-0646

**A-222**
**PUBLIC APPENDIX**

Page 10

```
 1                    P R O C E E D I N G S

 2                    THE VIDEOGRAPHER:  We are now on the

 3      record.  This is Video No. 1 in the 30(b)(6)

 4      deposition of the Northstar corporate

 5      defendants, who will be represented today by

 6      Mr. Allen M. Todd.

 7                    This is taken in the matter of USA,

 8      ex rel. Vermont National Telephone Company v.

 9      Northstar Wireless, LLC, et al.  The case is

10      pending before the United States District

11      Court for the District of Columbia, Case No.

12      15-00728.

13                    This deposition is being conducted

14      by Zoom Video Remote Conferencing on

15      January 22nd, 2024.  The time on the video

16      screen is 8:06 a.m., local time for the

17      witness in Alaska.

18                    My name is Daniel Holmstock; I am

19      the legal videographer and digital exhibit

20      technician from Digital Evidence Group.  Our

21      court reporter today is Dawn Jaques, also in

22      association with Digital Evidence Group.
```

A-223
PUBLIC APPENDIX

Page 11

```
 1                All parties have stipulated to the

 2        witness being sworn in remotely.

 3                Counsel, will you please state your

 4        appearances and whom you represent, followed

 5        by the court reporter administering the oath.

 6                MR. SWEET:  Hi, I'm Mark Sweet from

 7             the law firm of Wiley Rein on behalf of

 8             Vermont National Telephone Company, and

 9             joining me today is my colleague,

10             Spencer Brooks.

11                MR. BLOCK:  Good morning, Benjamin

12             Block, Covington & Burling LLP, on behalf

13             of the Northstar Defendants, including

14             Mr. Todd.

15                MR. THEIS:  I'm Mike Theis from

16             Hogan Lovells (US) LLP on behalf of

17             SNR Wireless.

18                MR. VOLCHOK:  Daniel Volchok from

19             Wilmer, Cutler, Pickering, Hale & Dorr

20             for the DISH defendants.

21                THE REPORTER:  Mr. Todd, will you

22             raise your right hand to be sworn, sir?
```

A-224
PUBLIC APPENDIX

Page 12

1       (The witness was administered the oath.)

2    Whereupon,

3            ALLEN MICHAEL TODD,

4        was called as a witness, after having

5        been first duly sworn by the Notary

6        Public, was examined and testified as

7        follows:

8     EXAMINATION BY COUNSEL FOR THE RELATOR

9            BY MR. SWEET:

10       Q    Good morning, Mr. Todd.  Thank you

11    for joining us.  As I mentioned, my name is

12    Mark Sweet, and I represent Vermont National

13    Telephone Company.

14            I know that you have been listening

15    in to some of the depositions that we've been

16    doing in this case, but have you ever

17    personally been deposed before?

18       A    I have.

19       Q    And what was the nature of the case

20    in which you were deposed?

21       A    It's been a few years ago.  I was

22    a -- we were a third party that was subpoenaed

Page 325

```
1    price all of the licenses that we had won as

2    the apparent winner in Auction 97.

3            We had -- I believe from the date of

4    that notice, we had 30 days to come up with

5    $2.1 billion, as I recall.  And they didn't

6    require that we default, but without

7    sufficient funds to pay for all of the

8    licenses in our capital structure, it was a

9    forgone conclusion, in our view.

10        Q    Did Northstar try to raise

11   additional funds to pay for the licenses at

12   full price?

13        A    We did have discussions with parties

14   at the time.  I know we had some discussion

15   with DISH about whether or not we could

16   receive that amount under our credit

17   agreement.

18        Q    You should ask Ben for the money.

19   He probably has that in his bank account.

20            MR. BLOCK:  I don't think you know

21        me as well as you think you know me,

22        Mark.
```