# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *ex rel.*
VERMONT NATIONAL TELEPHONE
COMPANY,

                    *Plaintiff,*

    v.

NORTHSTAR WIRELESS, LLC, *et al.*,

                    *Defendants.*

No. 15-cv-728-CKK-MAU

## REPORT AND RECOMMENDATION[1]

This case arises out of a 2014 auction the Federal Communications Commission ("FCC") conducted for wireless spectrum licenses ("Auction 97"). Plaintiff-Relator Vermont National Telephone Company ("Vermont"), a disappointed bidder in the auction, brings this *qui tam* action pursuant to the False Claims Act ("FCA"). 31 U.S.C. §§ 3729–3733. Vermont alleges that several other telecommunications companies[2] and their affiliates conspired to defraud the United States Government out of $3.3 billion dollars in small business discounts the FCC offered for the licenses at issue in Auction 97.

---

[1] On April 7, 2025, the Court issued this Report and Recommendation under seal in light of the fact that certain materials referenced in the Parties' respective briefs were filed under seal. *See* ECF No. 219. The Parties have met and conferred and represented to the Court that no redactions to this Report and Recommendation are necessary. *See* ECF No. 221.

[2] Vermont names eighteen defendants, which are classified into three groups: 1) Northstar Wireless, LLC; Northstar Spectrum, LLC; Northstar Manager, LLC; Doyon, Limited; Miranda Wright; and Allen M. Todd (collectively "Northstar"); 2) SNR Wireless LicenseCo, LLC; SNR Wireless HoldCo, LLC; SNR Wireless Management, LLC; Atelum LLC; and John Muleta (collectively "SNR"); and 3) American AWS-3 Wireless I LLC; American AWS-3 Wireless II LLC; American AWS-3 Wireless III LLC; and DISH Wireless Holding LLC; DISH Network Corporation; Charles W. Ergen; and Cantey M. Ergen (collectively "DISH").

After nearly ten years of litigation, the United States Government ("Government") moves to dismiss this case pursuant to 31 U.S.C. § 3729(c)(2)(A). ECF No. 189. Vermont opposes the Government's Motion to Dismiss. ECF Nos. 190; 204. In the alternative, Vermont moves for a share of the payments Northstar and SNR made to the FCC in connection with their default on licenses they obtained through the auction. ECF Nos. 194; 205.

The District Court referred the motions to this Court pursuant to Local Rules of Civil Procedure 72.2 and 72.3. ECF No. 212. For the reasons set forth below, this Court recommends that the District Court: 1) **GRANT** the Government's Motion to Dismiss (ECF No. 189); and 2) **DENY** Vermont's Motion for Share of Alternate Remedy (ECF Nos. 194; 205).

## BACKGROUND AND PROCEDURAL HISTORY

The extensive facts underlying this case are set forth in detail in prior opinions from this District and the D.C. Circuit.[3] The background facts are largely undisputed as set forth in Vermont's Amended Complaint, to which both Parties cite. *See* ECF No. 76; *see, e.g.*, ECF Nos. 189 at 2; 190 at 41.[4]

### Legal Framework for Spectrum Auctions under the Communications Act

Under the Communications Act of 1934, the FCC possesses the authority to issue licenses to private companies for the use of portions of electromagnetic spectrum, a "range of electromagnetic radio frequencies used to transmit sound, data, and video across the country." *See*

---

[3]    *See United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless LLC*, 703 F. Supp. 3d 48 (D.D.C. 2023) ("*Vermont Telephone III*"); *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022) ("*Vermont Telephone II*"); *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless LLC*, 531 F. Supp. 3d 247 (D.D.C. 2021) ("*Vermont Telephone I*"), *rev'd*, 34 F.4th 29; *see also Northstar Wireless, LLC v. FCC*, 38 F.4th 190 (D.C. Cir. 2022); *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017).
[4]    Citations to docket entries are to the page numbers at the bottom of each page.

*SNR Wireless*, 868 F.3d at 1025 (noting companies use these radio frequencies for television, cell phone, and wireless internet services) (internal quotations omitted); 47 U.S.C. §§ 301, 307, 308.

To distribute these licenses, the FCC conducts competitive auctions that include a two-step application process. *See Vermont Telephone II*, 34 F.4th at 31–32; 47 U.S.C. § 309(j)(1). Bidders must first submit a short-form application, providing information and certifying their bidding eligibility. 47 C.F.R. § 1.2105(a). In this short-form application, applicants also certify their status, if applicable, as "designated entities" eligible for certain bidding credits. *Id.* § 1.2110; *see also id.* § 1.2105(a)(2)(iv). These bidding credits are "discounts used to cover part of the cost of licenses won at auction" and are available to a variety of entities, including small businesses. *Vermont Telephone II*, 34 F.4th at 32; *see* 47 C.F.R. § 1.2110(a). FCC regulations govern whether a company qualifies as a small business so that the agency ensures credits are only "used by genuine small businesses—not by small sham companies that are managed by or affiliated with big businesses." *SNR Wireless*, 868 F.3d at 1026 (citations omitted). The FCC does not conclusively determine an applicant's eligibility for bidding credits before the auction. *Northstar Wireless*, 38 F.4th at 197–98 (citations omitted). Instead, applicants agree to pay the full bid amount if they win. *Id.*; *see also* 47 C.F.R. §1.2104(g)(2).

Winning applicants submit a down payment and file a long-form application, demonstrating in further detail their eligibility for the licenses and any bidding credits they sought. 47 C.F.R. §§ 1.2107(b)–(d). The FCC publicly announces its acceptance of an applicant's long-form application and "any party in interest may file a petition to deny the application on the grounds that granting it would be inconsistent with the public interest, convenience, and necessity." *Vermont Telephone II*, 34 F.4th at 32 (citations and internal quotation marks omitted). The FCC then reviews the long-form application and any pleadings submitted to determine the

applicant's eligibility to hold a license or receive bidding credits. *See id.* (citations omitted). If the FCC concludes that an applicant does not qualify for bidding credits, that bidder must pay full price on the licenses. *Northstar Wireless*, 38 F.4th at 198 (citations omitted). If a bidder informs the FCC that it does not intend to pay for a license it won, the bidder will be subject to default penalties. 47 C.F.R. § 1.2104(g)(2). An applicant who violates the FCC's bidding rules may also be subject to sanctions proceedings. *Id.* § 1.2109(d).

### The Underlying Auction: Auction 97

In 2014, the FCC publicly announced Auction 97, a spectrum auction for 1,614 licenses pertaining to three radio frequencies. *Northstar Wireless, LLC*, 30 FCC Rcd. 8887, 8893 (2015) ("*2015 FCC Order*"); ECF No. 76 ¶ 2. In the notice for the auction, the FCC explained that small businesses could receive bidding credits equal to either a 15% or 25% discount on winning bids depending on the applicant's "attributed average annual gross revenues" over the previous three years. *Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for November 13, 2014*, 29 FCC Rcd. 8386, 8411–12 (2014) ("*Auction 97 Notice*"). These attributed average annual gross revenues included the revenue of both the small business and any entity with "de facto control" over the small business. *Id.* at 8412–13. Applicants with attributed average annual gross revenues of less than $40 million would receive a 15% discount on their winning bids, while applicants with less than $15 million would receive a 25% discount. *Id.* at 8412.

The FCC determined that seventy applicants were qualified to bid in Auction 97. *2015 FCC Order*, 30 FCC Rcd. at 8892. These applicants included Vermont, through a subsidiary, and Defendants DISH, Northstar, and SNR. *Id.* Northstar and SNR claimed to be small businesses eligible for the 25% discount. *Id.*; ECF No. 76 ¶ 3. The two businesses had "formed just in time to file short-form applications" for Auction 97. *SNR Wireless*, 868 F.3d at 1027. They disclosed

in their applications that they obtained the capital necessary to participate in the auction from DISH, a corporation ineligible for the small business bidding credits, in exchange for DISH indirectly obtaining an 85% ownership interest in each business.  *Id.*; *2015 FCC Order*, 30 FCC Rcd. at 8910–11.  The two businesses also disclosed that they had entered into "numerous" agreements with DISH.  *2015 FCC Order*, 30 FCC Rcd. at 8893; ECF No. 76 ¶¶ 87–89.  Through these agreements, DISH managed Northstar and SNR's business, invested in and credited them, had veto power over their decisionmaking, and coordinated with them in a bidding strategy for Auction 97.  *See Northstar Wireless*, 38 F.4th at 199 (citations omitted); *2015 FCC Order*, 30 FCC Rcd. at 8895–8900.  Northstar and SNR did not attribute any of DISH's revenue to themselves in their short-form applications.  ECF No. 76 ¶ 85.

Northstar and SNR had a "remarkably successful" run in Auction 97, collectively taking home 43.5% of the available spectrum licenses.  *SNR Wireless*, 868 F.3d at 1027–28 (noting that SNR won 357 and Northstar won 345 of the 1,614 licenses available); *see Northstar Wireless, LLC*, 35 FCC Rcd. 13317, 13345 n.191 (2020) ("*2020 FCC Order*") ("The licenses that Northstar and SNR won in Auction 97, when combined, cover the entire United States.").  Neither Vermont nor DISH won any of the licenses.  ECF No. 76 ¶¶ 99–100.  In their long-form applications, Northstar and SNR again claimed eligibility for the small business bidding credits.  *SNR Wireless*, 868 F.3d at 1028; ECF No. 76 ¶ 100.  With those bidding credits, the two businesses saved approximately $3.3 billion of their $13.3 billion auction bill.  *Vermont Telephone II*, 34 F.4th at 33; ECF No. 76 ¶ 100.  "[U]pon initial review," the FCC accepted Northstar and SNR's long-form applications.  *Wireless Telecommunications Bureau Announces That Applications for Aws-3 Licenses in the 1695-1710 Mhz, & 1755-1780 Mhz & 2155-2180 Mhz Bands Are Accepted for Filing*, 30 FCC Rcd. 3795 (2015).

**The FCC Proceedings**

Once the long-form applications became public, Vermont, along with seven other parties, petitioned the FCC to deny Northstar and SNR the licenses and small business bidding credits. *2015 FCC Order*, 30 FCC Rcd. at 8890–91; ECF No. 76 ¶ 102.  Those parties claimed that Northstar and SNR did not account for DISH's de facto control over them in their attributed average annual gross revenues and had misrepresented or failed to disclose the full extent of their bidding agreements with DISH.  *2015 FCC Order*, 30 FCC Rcd. at 8891.  Vermont also claimed the two businesses "demonstrate[d] a lack of candor" and made material misrepresentations in their applications by failing to disclose DISH's controlling interest in their businesses.  *Id.* at 8940–42.

The FCC agreed that Northstar and SNR were ineligible for the bidding credits because DISH's revenue should have been attributed to the businesses as DISH exercised de facto control over them.  *Id.* at 8889–90, 8909.  The FCC disagreed, however, that the businesses had demonstrated a lack of candor or made material misrepresentations regarding their relationship with DISH.  *Id.* at 8890–91, 8940–43.  The FCC concluded that Northstar and SNR had not misled the Commission and had adequately "disclosed their ownership structures and related Agreements [with DISH] as required, and proceeded under an incorrect view about how the Commission's affiliation rules apply to these structures."  *Id.* 8940–43.  The FCC determined that, although Northstar and SNR still qualified to hold spectrum licenses, they had to pay the full $13.3 billion price for those licenses.  *Id.* at 8949–51; ECF No. 76 ¶ 103.

Following the FCC's ruling, Northstar and SNR informed the agency that, although they would pay the full amount for some of the licenses they won, they would default on their obligation to buy 197 of them, which amounted to approximately 28% of the total licenses they had won in

the auction.  *SNR Wireless*, 868 F.3d at 1028; *2020 FCC Order*, 35 FCC Rcd. at 13324; *Auction 97 Notice*, 29 FCC Rcd. at 8451; ECF No. 76 ¶ 104.  In response, the FCC ordered the two businesses to compensate the agency for "the difference between their own winning bids in Auction 97 and the amount that the FCC receives when it re-auctions the licenses," and to additionally pay 15% "of [Northstar and SNR's] own bids, or [15%] of the winning bid when their licenses are re-auctioned, whichever is less."  See *SNR Wireless*, 868 F.3d at 1029; *Auction 97 Notice*, 29 FCC Rcd. at 8451; *see also* 47 C.F.R. § 1.2104(g)(2) (outlining default payment structure).  Although the final amount Northstar and SNR owe in default payments is not yet known, the businesses have made interim payments to the FCC.  *See SNR Wireless*, 868 F.3d, at 1028 and n.3; *Northstar Wireless*, 38 F.4th at 201.

Northstar and SNR appealed the FCC's ruling to the D.C. Circuit.  *See SNR Wireless*, 868 F.3d 1029.  The D.C. Circuit affirmed the FCC's ruling that Northstar and SNR were not eligible for the small business bidding credits.  The Court, however, remanded to give the businesses an opportunity to cure their agreements with DISH because "there was considerable uncertainty at the time of Auction 97 about the degree of control [FCC] rules would tolerate."  *Id.* at 1044.  On remand, the FCC concluded that Northstar and SNR still had not sufficiently cured their relationship with DISH.  *2020 FCC Order*, 35 FCC Rcd. at 13318.  As such, the FCC sustained its original decision that the businesses were ineligible for small business bidding credits.  *Id.*  The D.C. Circuit affirmed that decision.  *Northstar Wireless*, 38 F.4th at 220–21.

### *Qui Tam* Proceedings in this Court

### Initial Proceedings

In 2015, Vermont filed this action against DISH, Northstar, and SNR.  *See* ECF No. 1. Vermont alleged Defendants violated the FCA by knowingly and falsely claiming to have

disclosed the entirety of their "instruments, agreements, and understandings" in their short- and long-form applications to obtain bidding credits. ECF No. 76 ¶¶ 1, 125–26. Vermont amended its Complaint in 2019. *See* ECF Nos. 74; 76.

The Government initially declined to intervene in this case. ECF No. 17. In 2018, however, the Government filed a statement of interest seeking to end a stay the Court had imposed pending resolution of the FCC proceedings. ECF Nos. 53; 65. The Government did so because "the outcome of the FCC proceeding [was] unlikely to shed light on the allegations in Relator's complaint" and the FCC had "a substantial interest in any discovery produced in this case" related to Defendants' alleged failures to disclose their full relationship with DISH. ECF No. 65 at 2–4. Following that stay, Defendants successfully moved to dismiss the Complaint based on the FCA's "government action bar" and materiality standard. *Vermont Telephone I*, 531 F. Supp. 3d at 264–68. On appeal, the D.C. Circuit reversed on both grounds. *Vermont Telephone II*, 34 F.4th at 36–38. The Circuit also concluded that Vermont had pled "that SNR and Northstar [allegedly] falsely certified their disclosure of all agreements related to auctioned licenses when, in fact, they failed to disclose agreements to act on DISH's behalf and transfer spectrum rights to DISH." *Id.* at 38 (citation omitted). As such, Vermont had sufficiently pled that Defendants "materially and fraudulently omitted key information from their FCC submissions." *Vermont Telephone III*, 703 F. Supp. 3d at 58 (citing *Vermont Telephone II*, 34 F.4th at 39).

<u>Proceedings on Remand</u>

On remand, Defendants answered Vermont's Complaint. ECF Nos. 104; 105; 106. Defendants then jointly filed a Motion for Judgment on the Pleadings, arguing that, under the FCA's "public disclosure" provision, the Government already knew about the facts giving rise to the alleged fraud before Vermont filed this action. ECF No. 115 at 17–18. Defendants also

asserted that Vermont failed to allege wrongdoing on the part of any Defendants other than Northstar and SNR. *Id.* at 30. The Government partially opposed Defendants' Motion, but only to the extent Vermont's claims were based on Defendants having intentionally failed "to disclose all of their instruments, agreements, and understandings" to the FCC. *See* ECF No. 164 at 1 (stressing that "[t]he United States takes no other position in this case").

The District Court denied Defendants' Motion on November 9, 2023. ECF No. 165; *Vermont Telephone III*, 703 F. Supp. 3d 48. In so doing, the District Court held that the Government's opposition to dismissal barred Defendants' public disclosure argument. *Vermont Telephone III*, 703 F. Supp. 3d at 61. The Court also concluded that Defendants' second argument failed due to the D.C. Circuit's prior holding that Vermont had alleged a plausible FCA claim as to all Defendants. *Id.* at 62 (citing *Vermont Telephone II*, 34 F.4th at 39).

Present Dispute

The Government now moves to voluntarily dismiss this case. ECF No. 189. The Government also filed a Motion to Intervene, which the Court has granted as conceded. ECF Nos. 188, 218. Vermont opposes the Government's Motion to Dismiss and moves for a Share of Alternate Remedy, seeking a portion of Northstar and SNR's interim default payments to the FCC. ECF Nos. 194; 205. The Court held oral argument on November 21, 2024. ECF Nos. 215, 217.

**ANALYSIS**

## I.    The Government's Motion to Dismiss

The Government argues that dismissal is proper because, for "interrelated reasons," "'this suit would not do what all *qui tam* actions are supposed to do: vindicate [the] Government's interests.'" ECF No. 189 at 16 (quoting *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 438 (2023)). Vermont contests the Government's reasons and claims dismissal is

improper.  ECF No. 190.  The Parties also dispute the appropriate standard of review for addressing the Government's Motion.  *See* ECF Nos. 190 at 16; 199 at 1–3.

### A. Standard of Review

#### 1. The False Claims Act

Congress enacted the FCA during the Civil War to address "the plundering of the public treasury" by wartime contractors' use of dishonest business practices and to protect the government's funds, property, and other assets from fraud.  *United States v. McNinch*, 356 U.S. 595, 599 (1958) (describing "a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war"); *see Rainwater v. United States*, 356 U.S. 590, 592 (1958).  Under the FCA, those seeking to defraud the United States are subject to civil liability. *See Polansky*, 599 U.S. at 424.  Moreover, the statute sets forth "a unique public-private scheme" for enforcement whereby private parties, also known as relators, may sue on behalf of the Government in *qui tam* actions.  *See id.* at 424–25; 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action . . . for the person and for the United States Government.  The action shall be brought in the name of the Government.").

The injury asserted in a *qui tam* action "is exclusively to the Government," and, as such, the Government is the "real party in interest . . . ."  *Polansky*, 599 U.S. at 425 (citing *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930 (2009)).  Accordingly, a "relator is no ordinary civil plaintiff" and faces certain restrictions.  *Id.*  One restriction is that the Government retains the right to intervene in the case and conduct the action.  31 U.S.C. §§ 3730(b)(2)–(4), (c)(3).  Another restriction is that "[t]he Government may dismiss the action" over a relator's objection so long as the relator has an opportunity to be heard on dismissal.  *Id.* § 3730(c)(2)(A).

A relator may retain certain rights, including an assignment of part of the Government's damages claim. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000); *see* 31 U.S.C. §§ 3730(d)(1)–(2) (allowing relator to obtain up to 30% of the recovery from a successful *qui tam* action as well as attorneys' fees and costs from defendants). A relator retains these rights even if the Government chooses to pursue its "claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." 31 U.S.C. § 3730(c)(5).

### 2. The Government's Dismissal Authority Under the FCA and *Polansky*

Pursuant to Section 3730(c)(2)(A) of the FCA, the "Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." *Id.* § 3730(c)(2)(A). The Supreme Court's recent holding in *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, governs this Court's analysis. 599 U.S. 419.

In *Polansky*, a relator brought a *qui tam* action against a hospital billing corporation for alleged Medicare fraud. *Id.* at 428. The Government initially declined to intervene, but after several years of discovery, moved to dismiss the action over the relator's objection because the Government concluded the "varied burdens of the suit outweighed its potential value." *Id.* Those burdens included the defendants "demanding both documents and deposition testimony from the Government," as well as "weighty privilege issues" emerging in discovery. *Id.* Over the relator's objection, the district court granted the Government's motion and found that "the Government has thoroughly investigated the costs and benefits of allowing Relator's case to proceed and has come to a valid conclusion based on the results of its investigation." *Polansky v. Exec. Health Res., Inc.*,

422 F. Supp. 3d 916, 927 (E.D. Pa. 2019), *aff'd in part, vacated in part sub nom. Polansky v. Exec. Health Res. Inc*, 17 F.4th 376 (3d Cir. 2021), *aff'd sub nom. Polansky*, 599 U.S. 419.

In evaluating the case, the Supreme Court considered the key question at issue here: "[w]hen the Government, having properly intervened, seeks to dismiss an FCA action over a relator's objection, what standard should a district court use to assess the motion?" *Polansky*, 599 U.S. at 435. The Court concluded that Federal Rule of Civil Procedure 41 applies, but that the inquiry in FCA cases will necessarily be a "contextual" one. *Id.* at 435–37. Accordingly, the Supreme Court provided clear instruction on how the lower courts should evaluate a Government's contested motion to dismiss:

> [These] motions will satisfy Rule 41 in all but the ***most exceptional cases***. This Court has never set out a grand theory of what that Rule requires, and we will not do so here. The inquiry is necessarily "contextual." And in this context, the Government's views are entitled to substantial deference. A *qui tam* suit, as we have explained, is on behalf of and in the name of the Government. The suit alleges injury to the Government alone. And the Government, once it has intervened, assumes primary responsibility for the action. Given all that*, a district court should think several times over before denying a motion to dismiss*. If the Government offers a reasonable argument for why the burdens of continued litigation outweigh its benefits, the court should grant the motion. And that is so even if the relator presents a credible assessment to the contrary.

*Id.* at 437–38 (internal citations omitted and emphasis added).

In so holding, the Supreme Court affirmed the Third Circuit's approach to this issue. *Id.* at 429. The Third Circuit had diverged from the predominate preexisting tests[5] and instead

---

[5]     Two competing approaches previously governed review of the Government's dismissal authority in the FCA context. *See Borzilleri v. Bayer Healthcare Pharms., Inc.*, 24 F.4th 32, 37–42 (1st Cir. 2022) (canvassing conflict). The Ninth Circuit set forth the rational-relation test. *See United States ex rel., Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998), *abrogated by Polansky*, 599 U.S. 419. Under that approach, the Government had to identify "a valid government purpose" for dismissal and show "a rational relation between dismissal and accomplishment of the purpose." *Sequoia Orange Co.*, 151 F.3d at 1145. If the

concluded Federal Rule of Civil Procedure 41 should govern review of dismissals in this context. *See Polansky*, 17 F.4th at 380; *United States ex rel. CIMZNHCA, LLC, v. UCB, Inc.*, 970 F.3d 835, 849 (7th Cir. 2020) (adopting the same approach).  The Third Circuit concluded that the district court did not abuse its discretion in dismissing the case as it had "exhaustively examined the interests of the parties, their conduct over the course of the litigation, and the Government's reasons for terminating the action," as well as "adequately considered the prejudice to the non-governmental parties . . . ."  *Polansky*, 17 F.4th at 393.  The Supreme Court affirmed this conclusion, finding that the case was "not a close call," and, even putting aside the usual abuse-of-discretion review, the district court reached the correct result.  *Polansky*, 599 U.S. at 438. Significantly, the Court noted that the Government provided a "reasonable view of the suit's costs and benefits," so *"[a]bsent some extraordinary circumstance*, that sort of showing [was] all that [was] needed for the Government to prevail on a [FCA] motion to dismiss" despite any competing assessment otherwise.  *Id.* (emphasis added).

### 3.  Rule 41(a)(2)

Federal Rule of Civil Procedure 41(a) governs the voluntary dismissal of civil actions.  As relevant here, Section (a)(2) states that "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper" when an opposing party has already filed an answer.  Fed. R. Civ. P. 41(a)(2).  Voluntary dismissals "are ordinarily granted" so long as they

---

Government did, the burden shifted to the relator "to demonstrate that dismissal [was] fraudulent, arbitrary and capricious, or illegal."  *Id.* (citation omitted).

    The D.C. Circuit, however, interpreted 31 U.S.C. § 3730(c)(2)(A) to mean the Government possessed a nearly "unfettered right to dismiss an action" over a relator's objection.  *See Swift v. United States*, 318 F.3d 250, 252–53 (D.C. Cir. 2003), (opining that this discretion "might be limited" if the Government tried "to have an action dismissed after the complaint had been served and the defendant answered" under Rule 41(a)(2)), *abrogated by Polansky*, 599 U.S. 419.  In the *Swift* era, the hearing required under the FCA functioned only as "a formal opportunity" for a relator to convince the Government not to dismiss.  *Id.* at 253.

are "sought in good faith," *Conafay by Conafay v. Wyeth Lab'ys, a Div. of Am. Home Prods. Corp.*, 793 F.2d 350, 353 (D.C. Cir. 1986), and no "clear legal prejudice" will be inflicted on a defendant. *Conafay by Conafay v. Wyeth Lab'ys, a Div. of Am. Home Prods. Corp.*, 841 F.2d 417, 419 (D.C. Cir. 1988); *see also Kellmer v. Raines*, 674 F.3d 848, 851 (D.C. Cir. 2012). In making these determinations, the court considers the entire record. *Guttenberg v. Emery*, 68 F. Supp. 3d 184, 186 (D.D.C. 2014).

*Polansky* directs the Court to modify this analysis in two respects. First, the Court must account for the FCA's procedural requirements, namely, providing an objecting relator with notice and an opportunity for a hearing. *Polansky*, 599 U.S. at 436. Second, because the "proper terms" assessment is more likely to involve the relator in the FCA context, part of the Court's task is to consider the relator's interests. *Id.* at 436–37.

### B. Dismissal is Proper Under *Polansky*

#### 1. Parties' Arguments

Vermont and the Government offer competing approaches of how to apply Rule 41 in the post-*Polansky* FCA context.

According to the Government, the Court must forego its traditional Rule 41(a)(2) inquiry here. ECF No. 199 at 1–3. The Government claims the Court should instead ask two questions: 1) whether the Government has offered a "reasonable argument" for dismissal, with substantial deference granted to the Government's views; and 2) if so, whether "extraordinary circumstances" exist to justify denying the motion. *Id.*; *see Polansky*, 599 U.S. at 437–38.

Vermont disagrees and asserts that the Court should not diverge from the Circuit's more stringent Rule 41(a)(2) analysis. According to Vermont, the Court should ask under Rule 41(a)(2):

1) whether the Government has moved for dismissal in good faith; and 2) whether Vermont will face clear legal prejudice due to dismissal.  ECF No. 190 at 16; *see Polansky*, 599 U.S. at 436

### 2. Discussion

The inquiry under Rule 41(a)(2) is by its nature "discretionary and contextual."  *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2364, p. 599 (4th ed. 2022).  The Government is correct that, in the wake of *Polansky*, the Court's Rule 41(a)(2) analysis must clearly shift and take certain contextual factors into account.  First, when the Government moves for voluntary dismissal, the Court must provide the relator an opportunity to be heard, which the Court has provided to Vermont.  *Polansky*, 599 U.S. at 436; *see generally* ECF No 217 ("11/21/24 Tr.").  Second, the Court must consider whether the Government offers reasonable arguments "for why the burdens of continued litigation outweigh its benefits" in the *qui tam* action at issue.  *Polansky*, 599 U.S. at 438.  If the Government has done so, the Court must give those views "substantial deference."  *Id.* at 437; *United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs.*, No. 17-cv-558, 2023 WL 8480085, at *2–3 (N.D. Ohio Dec. 7, 2023) (granting dismissal after the Government "fully explained why it seeks dismissal of Relator's claims"), *aff'd*, No. 24-3022, 2025 WL 1009012 (6th Cir. Mar. 31, 2025).  Third, the Court must consider whether the relator's interests weigh against dismissal.  *Polansky*, 599 U.S. at 437; *see United States ex rel. Rose v. Saint Elizabeth Med. Ctr.*, No. 23-cv-123, 2025 WL 836569, at *2 (E.D. Ky. Mar. 17, 2025) (considering whether the relator had "devoted substantial time and resources to this matter" despite relator not responding to Government's motion).  In weighing the relator's interests, the Court must consider whether the *qui tam* action at issue is one of those "most exceptional cases" with "some extraordinary circumstance" that warrants against dismissal.  *Polansky*, 599 U.S. 437–38; *see also United States ex rel. Low v. Presidents and Fellows of Harvard College*, No. 23-cv-2521,

at *4 (D.D.C. July 3, 2024), ECF No. 13 (collecting cases and noting courts have suggested an exceptional case could arise when there is fraud on the court, or the Government violates a relator's equal protection rights).

The Government provides three grounds for dismissal. ECF No. 189. First, the Government asserts there is not sufficient evidence to support Vermont's allegations. ECF Nos. 189 at 16–17; 199 at 5–8, 11. Second, the Government claims there is significant doubt that Vermont "will be able prove damages . . . because the Defendants were never awarded any bidding credits." ECF Nos. 189 at 17–18; 199 at 12–14. Third, the Government argues that continued litigation of this case will impose "a significant resource drain" on the Government. ECF Nos. 189 at 19–20; 199 at 8–10. These arguments track those the Government made in *Polansky*. 599 U.S. at 438. After reviewing the record and granting the Government's views "substantial deference," the Government has provided reasonable arguments for dismissal. This is especially so in light of the fact that the purpose of this case is to "vindicate the Government's interests." *Id.* at 437; *see USN4U*, 2023 WL 8480085, at *2–3.

As discussed below,[6] after also considering Vermont's interests, this is not one of those exceptional cases which presents "extraordinary circumstance[s]" to justify denying the Government's Motion. *Polansky*, 599 U.S. at 438. Vermont makes multiple arguments to avoid dismissal, including that the Government is acting in bad faith and that Vermont will suffer clear legal prejudice. ECF No. 190 at 17–43. Even assuming these arguments amount to a credible assessment against dismissal, they fail to overcome the reasonable arguments the Government has presented in support of dismissal.

---

[6]    Many of Vermont's arguments against dismissal under *Polansky* overlap with its arguments against dismissal under a traditional Rule 41(a)(2) analysis. Accordingly, the Court addresses them in depth below.

Vermont avoids grappling with the Supreme Court's directives in *Polansky* and giving them any meaning here.  Ultimately, Vermont gives no weight to *Polansky* at all in favor of a traditional Rule 41(a)(2) analysis.  *Id.* at 16.  Vermont neglects to acknowledge that, as a relator in an FCA action, it is not a regular plaintiff.  Accordingly, although Vermont's arguments may be credible and may even carry some weight, *Polansky* requires much more from a relator than Vermont has shown here.  The inquiry that Vermont would have this Court adopt—one in which the Court must require specific evidence from the Government and weigh and make findings based on competing evidence—flies in the face of the Supreme Court's directive that the Court "think several times over before denying a motion to dismiss" after the Government presents reasonable grounds for dismissal, even when a "*relator presents a credible assessment to the contrary*." *Polansky*, 599 U.S. at 438 (emphasis added).

### C.  Dismissal is Warranted Even Under the Traditional Rule 41(a)(2) Approach

Even assuming, as Vermont argues, that notwithstanding its strong directives, *Polansky* requires that the Court go through the D.C. Circuit's Rule 41(a)(2) factors, Vermont has still failed to show that dismissal is improper.

#### 1.    The Good Faith Standard

As stated above, dismissal under Rule 41(a)(2) at this stage is proper if the movant is acting in "good faith," which is "a question of fact, assessed against a plaintiff's reasons for seeking voluntary dismissal."  *Smith v. Dep't of the Treasury*, No. 17-cv-1796, 2022 WL 4547810, at *2 (D.D.C. Mar. 8, 2022) (citing *Conafay*, 793 F.2d at 352 n.4).  These reasons need not be detailed. *See Lopez v. Rudrakalash, LLC*, No. 20-cv-94, 2022 WL 17370184, at *4 (D.D.C. Feb. 11, 2022) (granting a motion to dismiss despite "[p]laintiff's explanation of her need for dismissal" being "somewhat vague").  Voluntary dismissals sought for even strategic reasons will not necessarily

17

constitute bad faith.  For example, "it is well established that it is not a bar to a Rule 41(a)(2) dismissal that the plaintiff may obtain some tactical advantage thereby."  *See* 9 Wright & Miller § 2364, at 561–75; *Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 37 (D.D.C. 2004) ("[A]lthough the plaintiff is motivated by self-interest, this fact alone is not indicative of bad faith.").  This is especially so here, as the Court "presume[s] the Executive is acting rationally and in good faith" in exercising its discretion to decide which cases should go forward on behalf of the United States. *See Swift*, 318 F.3d at 253 (citing *Rinaldi v. United States*, 434 U.S. 22, 30 (1977) and *United States v. Armstrong*, 517 U.S. 456, 464–65 (1996)).

### 2.    Vermont Has Failed to Show the Government Acted in Bad Faith.

The Government provides three reasons for seeking dismissal: concerns about the merits of the case, doubts about available damages, and concerns about growing litigation costs and burdens moving forward.  *See supra* Section I(B)(2).  Vermont contests these reasons, arguing that the Government has acted in bad faith.  ECF No. 190 at 17–40.  Vermont's arguments boil down to three overarching complaints: 1) the Government has incorrectly assessed the case; 2) the Government's investigation of the case and discovery strategies are inadequate; and 3) the timing of the Government's motion to dismiss reflects ulterior motives.  *Id.*; 1/21/24 Tr. at 54:10–65:8. None of Vermont's complaints rise to the level of bad faith under Rule 41(a)(2).

### a.    Communications Between Vermont and the Government Regarding the Litigation.

Many of Vermont's arguments about bad faith stem from its various communications with the Government.  It is undisputed that, since the outset of the case, the Government expressed "substantial concerns" to Vermont about the merits and Vermont's ability to recover damages. ECF Nos. 199 at 3; 193 ¶¶ 6–7.  For example, the Parties agree that, due to the Government's

insistence, Vermont amended its Complaint to clarify its theory of fraud.  ECF Nos. 199 at 4; 193
¶¶ 16–25.

Discovery began in November 2022 and was set to close by June 2024.  ECF Nos. 113;
160.  Through discovery, Vermont obtained thousands of documents and conducted twenty-five
depositions.  ECF Nos. 189 at 11; 193 ¶¶ 11–15; 193-4.  Vermont claims that it frequently
contacted the Government during discovery to brief it about the progress of the case.  ECF No.
190 at 20–21.  This includes sending the Government multiple documents Vermont obtained
through discovery and requesting several meetings.  *Id.*  As Vermont argues, the Government
essentially "abdicated its investigatory responsibilities."  ECF No. 190 at 21.  For example,
according to Vermont, the Government did not always agree to meet Vermont and showed a "lack
of interest" in reviewing documents Vermont sent.  ECF Nos. 190 at 20.

The Government argues that Vermont "had abundant opportunity to communicate its view
of the evidence and damages to the Government."  ECF No. 199 at 7–8.  The Government notes
that Vermont met with the FCC and senior leadership at the Department of Justice to discuss the
case.  *Id.*  Additionally, Vermont sent the Government numerous written submissions outlining
Vermont's view of the case.  *Id.*

The Government also asserts it "has expended significant resources to date responding to
discovery requests by the parties," including a thirteen-topic subpoena in which Defendants sought
documents from more than sixty FCC custodians.  ECF Nos. 189 at 13; 193 ¶ 26.  The Government
notes that, in response to subpoenas or FOIA requests, six agencies have or are in the process of
producing documents.  *See* ECF No. 189 at 13–14.  Defendants are also seeking to depose "three
senior FCC witnesses."  *Id.*  Vermont does not contest these asserted discovery burdens, but rather
contends that the Government has not adequately objected to or contested Defendants' discovery

requests.  ECF No. 190 at 22.  *But see* ECF No. 193-7 at 1 (letter from the Government "reiterat[ing] our objections that [Defendant's] subpoena is contrary" to Federal Rule of Civil Procedure 45(d)).  Vermont further takes issue with the Government providing Defendants a declaration from a high-ranking FCC official without seeking Vermont's input.  ECF No. 193 ¶¶ 30–31.  The Government counters that it "has raised numerous objections with the Defendants," but has now "reached an impasse on major issues concerning scope and applicable privileges." ECF No. 199 at 9.  The Government has also faced discovery issues with Vermont.  ECF Nos. 193-1; 193-2.

On January 12, 2024, the Government informed Vermont that it did not believe this case should go forward based on internal communications with the FCC and the Government's review of the evidence.  ECF Nos. 190 at 14; 193 ¶ 55.  The Government offered Vermont time to settle the case.  ECF Nos. 190 at 15; 193 ¶¶ 56, 60.  On January 16, 2024, Vermont sent a letter to the Government expressing "disbelief and disappointment" with the Government for not wishing to proceed, requesting that the Government allow Vermont to complete discovery, and agreeing to discuss a potential settlement with Defendants.  ECF No. 211-2 at 1, 7–8.  The Government and Vermont thereafter exchanged communications on the status of settlement.  ECF No. 193 ¶¶ 63, 67–72.  Vermont also met with the Government on January 25, 2024, at which time the Parties further discussed the issues in Vermont's letter, damages, and methods "to relieve the burdens on the FCC associated with Defendants' discovery demands."  *Id.* ¶ 65.  Vermont made a settlement offer to Defendants on February 7, 2024, which Defendants rejected the same day.  *Id.* ¶ 73.  The next day, the Government informed Defendants it intended to intervene and dismiss this case.  *Id.* ¶ 78.

#### b. Vermont's Disagreements with the Government's Assessment of the Case.

Vermont disagrees with the Government's assessment of this case, arguing that the Government's "mischaracterization" of the evidence of fraud and damages constitutes bad faith. ECF No. 190 at 25–32. At oral argument, Vermont focused on this evidence as being "critically important" to this case and claiming that the Government "should be required at least to say or point to something" refuting Vermont's view of the evidence. *See* 11/21/24 Tr. at 55:4–58:15.

Vermont's approach would require this Court to engage in a mini-trial or extensive review of the evidence, weighing and making judgments about the competing views of the case. The Supreme Court's decision in *Polansky*, however, forecloses this approach. The Government only needs to present "reasonable argument[s]" for dismissal. *Polansky*, 599 U.S. at 437–38. Here, the Government has explained why the evidence upon which Vermont relies is insufficient and why Vermont is likely to fail in vindicating the Government's interests. *See* ECF No. 189 at 16–20; 11/21/24 Tr. at 30:11–30:25 (stating, among other things, that Vermont's evidence is cumulative of agreements that Defendants already disclosed in their applications to the FCC and that Vermont will be unable to prove significant damages because no party received any bidding credits). Because the Government's views are entitled to substantial deference, the Court need not engage in the type of mini-trial Vermont seeks.

Vermont also claims that the Government has taken inconsistent positions in this case. Specifically, despite the Government's current position, the Government previously opposed the Defendants' Motion for Judgment on the Pleadings and requested that the Court lift the stay it had previously imposed. ECF No. 190 at 17–18. Vermont makes this argument despite conceding that the Government initially expressed concerns about the strength of the case and potential for damages. ECF No. 193 at ¶¶ 5–7. In the Government's 2018 statement of interest requesting that

the Court lift the stay, the Government stated that, although Defendants' FCC proceeding was concerned with issues distinct from Vermont's *qui tam* action, the FCC had "a substantial interest in any discovery produced in this case that relates to Defendants' alleged failure to disclose material facts to" the FCC.  ECF No. 65 at 2–3.  As the Government points out, however, those FCC proceedings have now concluded.  ECF No. 189 at 7 (citing *Northstar Wireless, LLC v. FCC*, 143 S. Ct. 2693, 2694 (2023) (denial of certiorari)); *see also Polansky*, 17 F.4th at 393 (chronicling "events that took place in the run-up to the Government's motion that justified its interest in discontinuing").  This is neither inconsistency nor bad faith on the Government's part.  Even if the Government had undergone a change of heart about moving forward with this case, such a change would not preclude dismissal.  *See Polansky*, 422 F. Supp. 3d 916 at 921–22 (observing that the Government went back and forth with the relator on seeking dismissal).

### c.    Vermont's Critiques of the Government's Diligence in Investigation and Discovery.

Vermont next argues that the Government has displayed bad faith by "frustrat[ing] Relator's ability to obtain evidence of Defendants' fraud," seeking dismissal before the end of discovery, "and fail[ing] to consider evidence that Relator had uncovered."  ECF No. 190 at 17–21.  Vermont criticizes the Government's investigation, alleging that the Government did not adequately consider certain evidence, attend depositions, issue subpoenas, or agree to meet with Vermont every time Vermont requested.  *Id.*

The purpose of a *qui tam* action is to vindicate the Government's interests, "not to encourage fishing expeditions" through discovery.  *USN4U*, 2023 WL 8480085, at *3.  As a relator, Vermont was not entitled to engage in *any* discovery.  In any event, the evidence upon which Vermont relies reflects that it *was* able to engage in robust discovery in this case, including conducting numerous depositions and collecting large tranches of documents.  *See, e.g.*, ECF Nos.

193 at ¶¶ 11–15; 193-4, 195.  Although the Government did not meet with Vermont as much as Vermont would have preferred, Vermont met with the Department of Justice and the FCC to present its case.  ECF No. 190 at 21.  Nor does Vermont allege it was stonewalled from providing the Government with any newly-discovered evidence or argument.  Indeed, the Government states it considered Vermont's evidence in reaching its conclusion.  ECF Nos. 189 at 17; 199 at 7. Vermont's arguments are essentially that the Government has come to different conclusions than Vermont about the strength of the case.  Even assuming Vermont's arguments are credible, this is insufficient to show bad faith and overcome the Government's right to dismiss.  *Polansky*, 599 U.S. at 438.

Vermont's arguments about the Government's alleged lack of diligence in discovery fare no better.  Vermont argues that the Government has failed to object or otherwise contest Defendants' discovery requests.  ECF No. 190 at 22–25.  According to Vermont, the Government's arguments about the burdens of discovery are "illusory" because "the scope of permissible discovery from the government is narrow."  *Id.* at 22.  Vermont believes the actual costs to the Government are minimal, and that the Government must provide documentation of these discovery burdens to justify dismissal.  *Id.*; 11/21/24 Tr. 41:2–41:11, 43:18–44:14; *See Polansky*, 422 F. Supp. 3d at 928 n.15 (noting a declaration the Government provided "help[ed] to quantify" the Government's asserted discovery burdens and litigation costs).

Although Vermont "believes that the costs would be relatively small, the government's goal of minimizing its expenses is still a legitimate objective" for the Government to pursue through dismissal.  *Swift*, 318 F.3d at 254 (citation omitted).  The Government has the right to determine "the dollar recovery [is] not large enough to warrant expending resources monitoring the case, complying with discovery requests, and so forth, and that spending time and effort on

this case w[ill] divert scarce resources from more significant cases." *Id.* The Government has detailed the costs for continuing this case in its briefing, including responding to Defendants' discovery demands, reviewing privileged documents, and preparing for the depositions of more government witnesses. ECF Nos. 189 at 13–14; 199 at 8–9; *see Polansky*, 599 U.S. at 438; *see also CIMZNHCA*, 970 F.3d at 852 (noting that the Government is "not required to make a particularized dollar-figure estimate of the potential costs and benefits of [a relator's] lawsuit" in deciding whether to dismiss).

The Government is not required to submit evidence of its discovery burdens. Nor is this Court required under *Polansky* to go behind the Government's reasonable arguments about continued discovery burdens and conduct an evidentiary hearing, determine who has the better case, or further weigh the evidence. True, the district court in *Polansky* found the Government had "sufficiently documented its investigation into the costs and benefits of continued litigation" through a declaration. *See Polansky*, 422 F. Supp. 3d at 930. The court did so, however, in the context of applying a more stringent, pre-*Polansky* approach to dismissal. *See id.* (applying the rational-relation test). On appeal, the Supreme Court did not set forth such a requirement.

In any event, Vermont does not argue, nor could it, that the Government has *no* costs moving forward. As the relator in this case, Vermont itself has complained about the costs of prosecuting this case. ECF No. 190 at 42–43. Vermont's real complaint is that the Government has not addressed these discovery issues in the way Vermont would. But the Government would still need to shoulder some amount of cost and burdens in addressing these discovery demands no matter the strategy, and these costs and burdens will only increase if litigation goes forward. *Swift*, 318 F.3d at 254 (citation omitted). The fact that the Government evaluates these burdens differently than Vermont does not mean that the Government is acting in bad faith. *See Indep.*

*Fed. Sav. Bank v. Bender*, 230 F.R.D. 11, 14 (D.D.C. 2005) (party does not display bad faith by seeking dismissal due the "costs and risks" of litigation).

**d.      Vermont's Other Arguments Amount to Speculation.**

None of Vermont's remaining claims reflect bad faith on the Government's part.  Vermont alleges the Government has moved for voluntary dismissal in bad faith because "this case [is] unlike any other *qui tam* action in which the [Government] has sought dismissal over the relator's objection."  ECF No. 190 at 32.  Vermont does not meaningfully explain, however, why the Government's decision to dismiss in this case must be identical or similar to past *qui tam* actions in which the Government sought dismissal.

Vermont also suspects, though "it cannot know for certain," that the Government is seeking dismissal to protect the FCC from institutional embarrassment or that the Government is conspiring with Defendants to end this case.  ECF No. 190 at 35–40.  Vermont provides no evidence for these allegations, only theorizing and concluding that "[t]he government's conduct in this case cannot be explained by any good faith reason."  *Id*. at 40.  Indeed, at oral argument, Vermont reiterated it wasn't "accusing anybody of anything."  11/21/24 Tr. 63:24–65:4.

An assertion of bad faith cannot be speculative or bare.  *Lopez*, 2022 WL 17370184, at *3 (citing *FMC Corp. v. EPA*, 279 F.R.D. 14, 17 (D.D.C. 2011).  "[G]eneral accusations of unfairness are insufficient to demonstrate bad faith."  *Id.* at *3 (citations omitted).  Vermont offers no evidence of any alleged conspiracy between the Government and Defendants or any meaningful support for its remaining arguments.  None of these conclusory arguments demonstrate bad faith. *Lopez*, 2022 WL 17370184, at *3.

**3.      The Legal Prejudice Standard**

"[T]he parameters of legal prejudice are not absolutely clear," and courts take a variety of approaches in considering this factor.  *Conafay*, F.2d at 419 (quotations omitted); *N.S. by &*

25

*through S.S. v. District of Columbia*, 272 F. Supp. 3d 192, 197–98 (D.D.C. 2017) (collecting cases).  Generally, courts weigh various factors, including: 1) the expenses a nonmoving party has incurred in preparing for trial; 2) a moving party's excessive delays or lack of diligence in conducting the action; 3) the adequacy of the moving party's reasons for dismissal; and 4) the stage of litigation at the time the motion is made.  *Mitchell v. U.S. Bank N.A.*, 293 F. Supp. 3d 209, 213–14 (D.D.C. 2018) (citations omitted); *see also Olaniyi v. District of Columbia*, 763 F. Supp. 2d 70, 96 n.22 (D.D.C. 2011) (permitting voluntary dismissal "in the interest of justice").  Voluntary dismissal must, at minimum, inflict clear legal prejudice on nonmoving parties in this context.  *Kellmer*, 674 F.3d at 851 (citation omitted).

### 4.    Vermont Has Failed to Show Clear Legal Prejudice.

Vermont contends that it will suffer prejudice by dismissal because: 1) it will defeat Vermont's goal of holding Defendants accountable and deterring fraud in future spectrum auctions; 2) Vermont has put in significant money and time into this case; and 3) this case has progressed to discovery.  ECF No. 190 at 40–43.  The Government contends that Vermont has not suffered any cognizable prejudice and certainly not enough to overcome the Government's Motion.  ECF No. 199 at 19–20

### a.    Vermont's Loss of a Dispositive Legal Ruling is Not Clear Legal Prejudice.

Vermont claims it will be clearly prejudiced by dismissal because "[d]ismissal of this case would undermine [Vermont's] interest in the FCA's deterrence function" to stop fraud in future spectrum auctions.  ECF No. 190 at 40–42.  Vermont maintains that dismissal would make it impossible for Vermont to hold Defendants accountable for their alleged fraud and the harm caused to actual small businesses seeking spectrum in Auction 97.  *Id.*

"[T]he law is clear that a mere missed opportunity for a legal ruling is not sufficient prejudice to warrant the denial of a motion for voluntary dismissal." *In re Fed. Election Campaign Act Litig.*, 474 F. Supp. 1051, 1052 (D.D.C. 1979) (citation omitted).  Because Vermont provides no specific evidence or argument regarding how this case will impact the future of bidding auctions or why the FCC proceedings were not the proper avenue for its concerns, Vermont's claim is "only speculative at this time." *WildEarth Guardians v. Haaland*, No. 16-cv-1724, 2022 WL 1773474, at *7 (D.D.C. June 1, 2022) (citation omitted); *see also Pharm. Care Mgmt. Ass'n v. D.C.*, 796 F. Supp. 2d 93, 97 (D.D.C. 2011) (finding no legal prejudice despite the defendants' argument that the constitutionality of a statute would remain "uncertain and that enforcement of the law would be stymied" (internal quotations omitted)).

> **b.**     **The Expenses Vermont Has Incurred in This Case Do Not Constitute Clear Legal Prejudice.**

Vermont next contends it will suffer clear legal prejudice because it "has invested substantial time and money" into this case and "nearly 15,000 hours" of attorney time.  ECF No. 190 at 42–43.  Vermont reiterated at oral argument that "[t]his case has been pending for nine years," and "has survived a motion to dismiss for failure to state a claim," as well as "a motion for judgment on the pleadings."  11/21/24 Tr. 37:20–37:24.  Vermont argues that its expense "will be for naught" if it is not able to bring this case before an impartial factfinder.  ECF No. 190 at 42–43.

There is no doubt that Vermont has expended significant time and expense in this case. The law is clear, however, that the "fact that the [relator] may have incurred substantial expense prior to dismissal does not amount to legal prejudice." *Johnson v. Wynne*, 239 F.R.D. 283, 287 (D.D.C. 2006) (citation omitted).  As the Court noted in *Polansky*, all "relators want their actions to go forward, and many of them have by then committed substantial resources."  599 U.S. at 437.

As the Government points out, the relator in *Polansky*, unlike Vermont, had taken the case to the eve of trial. ECF No. 199 at 20. Although Vermont has spent significant money to litigate this case, Vermont did so knowing of the Government's concerns about the merits. Moreover, although the case has been pending for some time, no summary judgment motions have been filed. As such, without more, the fact that Vermont has expended resources does not amount to clear legal prejudice. *WildEarth Guardians*, 2022 WL 1773474, at *5.[7]

> ### c.    Dismissal at This Stage Will Not Inflict Clear Legal Prejudice.

Vermont argues it will be clearly prejudiced if this case is dismissed mid-discovery. ECF No. 190 at 43.[8] Vermont maintains that not allowing the case to go forward will halt key depositions and bury important expert reports. *Id.*

There is "no hard and fast rule as to timing" when it comes to a motion for voluntary dismissal. *See* 9 Wright & Miller § 2364, at 584. Courts have granted such motions for cases at far later stages of litigation. *See, e.g., Lopez*, 2022 WL 17370184, at *3 (granting motion for voluntary dismissal when case was at the "closing stages of discovery"); *Gossard v. Washington Gas Light Co.,* 217 F.R.D. 38, 41 (D.D.C. 2003) ("[T]he pendency of a motion for summary judgment is not sufficient reason, standing alone, to deny a plaintiff's motion for voluntary dismissal." (citations omitted)); *Robertson v. McCloskey*, No. 86-cv-2877, 1988 WL 23255, at *2 (D.D.C. Mar. 4, 1988) (granting motion for voluntary dismissal on the "eve of trial").

In this case, discovery is not yet complete, and no dispositive motions have been filed. Nor has this case been scheduled for or proceeded to trial. *Conafay*, 793 F.2d at 352 (internal citations

---

[7]    At oral argument, Vermont confirmed to the Court that it was not requesting any conditions be imposed if the Court granted dismissal. 11/21/24 Tr. 77:6–77:21. This would include any conditions to account for the resources Vermont had devoted to this case.

[8]    Vermont moved for the Court to hold all remaining discovery deadlines in abeyance on February 27, 2024, which the Court granted. *See* ECF No. 184; Minute Order (2/27/2024).

omitted).  Other than its complaint that it will not be able to discover facts it wishes to discover, Vermont has not articulated any cognizable legal prejudice by virtue of the fact that this case is in discovery.

### D.  Dismissal Does Not Constitute an Unconstitutional Taking

#### 1.  Parties' Arguments

In a final effort to avoid dismissal, Vermont makes a cursory argument that granting dismissal would constitute a regulatory taking under the Fifth Amendment.  ECF No. 190 at 44–45.  Vermont contends it possesses a property right in this case and reasonably relied on the Government's alleged past policy of not seeking dismissal of *qui tam* actions and lack of intervention over the course of years.  *Id.*  The Government responds that dismissal would not violate Vermont's Fifth Amendment rights because Vermont is not the real party in interest and only possesses a right to the "proceeds of the action or settlement of the claim," which do not materialize until after success on the merits.  ECF No. 199 at 20–21.

#### 2.  Legal Standard

Under the Fifth Amendment, the Government cannot take private property for public use without just compensation.  U.S. CONST. amend. V.  Generally, a regulatory taking occurs when the Government regulates private property in a way so onerous that it amounts "to a direct appropriation or ouster" of that property.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Analyzing these claims usually requires "an ad hoc inquiry for a given case."  *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 515 (D.C. Cir. 2020).

Causes of action usually only become actionable property interests that vest upon the entry of final judgment.  *See Jung v. Ass'n of Am. Med. Colleges*, 339 F. Supp. 2d 26, 43 (D.D.C. 2004) (citations omitted), *aff'd*, 184 F. App'x 9 (D.C. Cir. 2006) (unpublished); *Ileto v. Glock, Inc.*, 565

F.3d 1126, 1141 (9th Cir. 2009) (observing that "although a cause of action is a species of property, a party's property right in any cause of action does not vest until a final unreviewable judgment is obtained" (citation omitted)).

### 3. Discussion

The Court need not engage in an ad hoc inquiry here. Although the FCA "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" to the relator, the relator's rights under that claim do "not even fully materialize until the litigation is completed and the relator prevails." *Vermont Agency of Nat. Res.*, 529 U.S. at 773 and n.3; 31 U.S.C. § 3730(d). "Dismissal [of the action] ends the assignment." *Swift*, 318 F.3d at 254 n.*. Indeed, in the context of the FCA, "courts long ago rejected the argument that a constitutional protected property right vests upon initiating suit." *Rogers v. Tristar Prod., Inc.*, 559 F. App'x 1042, 1045 (Fed. Cir. 2012) (unpublished) (collecting cases).

Vermont has not prevailed here, nor has it obtained a final judgment such that it has an actionable property interest. As such, Vermont will not suffer an unconstitutional taking through dismissal of this case. *See Nasuti v. United States*, No. 14-398C, 2014 WL 12543799, at *4 (Fed. Cl. Sept. 4, 2014) (finding that any potential property interests a relator "may have obtained under the FCA is subject to the Government's authority to dismiss the action since it is the real party in interest"), *aff'd,* 581 F. App'x 904 (Fed. Cir. 2014) (unpublished).

## II.    Vermont's Motion for Share of Alternate Remedy

As an alternative to dismissal, Vermont seeks a 25% share of Northstar and SNR's interim default payments to the FCC (totaling $128,888,798) as well as costs and attorneys' fees for its work on this case. ECF No. 194-1 at 1. Under Section 31 U.S.C. § 3730(c)(5) of the FCA, "the Government may elect to pursue its claim through any alternate remedy available" instead of

conducting the action in court, such as "any administrative proceeding to determine a civil money

penalty." If the Government does so, a relator "shall have the same rights in such proceeding as

such person would have had if the action had continued" in litigation. *Id.* Those rights include

collecting a share of the proceeds from the money awarded, "depending upon the extent to which

the [relator] substantially contributed" to the FCA claim, as well as "an amount for reasonable

expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees

and costs." *Id.* §§ 3730(d)(1)–(2). A relator's "expenses, fees, and costs" in this context are

generally paid for by the defendants. *Id.* §§ 3730(d)(1)–(2). The Government contends Vermont

is not entitled to any share of the default payments. ECF No. 200. The Government is correct.

### A. Standard of Review

The relator can recover shares from an alternative remedial proceeding if that proceeding,

"redress[es] the same type of falsity and fraud claims that otherwise could be pursued by a private

relator's *qui tam* lawsuit under the [FCA]." *United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47,

56 (D.C. Cir. 2021). This can include "an administrative proceeding for the remediation of false

or fraudulent money claims." *Id.* In other words, "if the alternate proceeding seeks recompense

for some other type of claim that the relator could not have brought," the relator cannot obtain a

share of any remedy obtained in that proceeding. *Id.* at 56.

### B. The FCC Default Payments Are Not an Alternative Remedy in This Case.

#### 1. Parties' Arguments

Vermont argues that Northstar and SNR's default payments are an "alternate remedy"

under the FCA because those payments are tied to the 2015 FFC licensing proceedings and the

FCC's denial of bidding credits. ECF No. 194-1 at 8–14. According to Vermont, the licensing

proceedings involved the same allegations of fraud as Vermont made in this *qui tam* action. *Id.*

Vermont also contends the default payments serve the same function as damages under the FCA because they arose from the FCC's denial of bidding credits to Northstar and SNR. *Id.* at 14–16. At oral argument, Vermont further argued the Government had "expressly linked" the default payments to this *qui tam* action in certain pleadings and documents, such as the Government's 2018 statement of interest. 11/21/24 Tr. at 81:13–82:5. The Government contends the payments are factually and legally distinct from this case and the FCC did not find any fraud in the licensing proceedings. ECF No. 200 at 9–18.

Vermont's Motion fails for two reasons. First, under the D.C. Circuit's type-of-claim analysis, the FCC's default payments did not resolve the same type of legal claim that was brought in this case. Second, the factual overlap underlying the FCC licensing proceedings and this case is insufficient to establish a right to a share of an alternate remedy.

### 2. Discussion

#### a. The Default Payments Do Not Redress the Same Type of Falsity and Fraud that Vermont Pursued in this Action.

Vermont's FCA claims stem from subparagraphs (A), (B), (C), and (G) of 31 U.S.C. § 3729(a)(1). ECF No. 76 ¶¶ 143–55. Those subparagraphs state that an individual is liable if they:

> (A) knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim;
> (C) conspire[] to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
> . . .
> (G) knowingly make[], use[], or cause[] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[] or knowingly and improperly avoid[] or decrease[] an obligation to pay or transmit money or property to the Government . . . .

31 U.S.C. § 3729(a)(1)(A)–(C), (G).  Vermont's theory of the case was that Northstar and SNR

falsely certified their FCC applications "because they knowingly failed to disclose all of their

instruments, agreements, and understandings with" DISH.  ECF No. 76 ¶ 128.

The FCC imposed a payment on Northstar and SNR after the businesses disclosed their

plan to default on their obligations to purchase certain spectrum licenses following their loss of

bidding credits.  The legal basis for these default payments stems from 47 C.F.R. § 1.2104(g)(2):

> (2) Default or disqualification after close of auction.  A bidder assumes a binding
> obligation to pay its full bid amount upon acceptance of the winning bid at the close
> of an auction.  If a bidder defaults . . . after the close of such an auction, the
> defaulting bidder will be subject to a default payment consisting of a deficiency
> payment . . . and an additional payment . . . .

*Id.*

Comparing the two provisions, it is clear that the basis for imposition of an FCC default

payment is different from the basis of Vermont's FCA claims.  Default payments are not designed

to seek recovery for any perpetration of fraud, "the hallmark of a claim litigable under the [FCA]."

*Kennedy*, 5 F.4th at 56.  In fact, Section 1.2104(g)(2) does not even mention fraud or use of false

statements.

In *Kennedy*, the D.C. Circuit considered whether an alternate proceeding arose from the

same type of claim as a relator's FCA claim.  5 F.4th at 56.  The court looked to the nature of

claims at issue in the alternate proceeding, who was harmed by the alleged falsity or fraud, and the

nature of the remedies available in the alternate proceeding.  *Id.*  The court concluded that the

alternate claim at issue, a Federal Food, Drug, and Cosmetic Act misbranding claim, was not the

same type of claim as the *qui tam* action because "misbranding bears little resemblance to the types

of fraudulent behavior that the [FCA] identifies and proscribes"; a misbranding claim seeks to

protect the public while a *qui tam* action seeks to protect the government; and the remedies

available under a misbranding claim are "equitable relief and penalties or fines" as opposed to legal damages for fraud. *Id.*

Here, Section 1.2104(g)(2) does seek to protect the Government. Because a winning bidder has an obligation to pay their full bid amount after the spectrum auction closes, the failure to do so would harm the FCC. 47 C.F.R. § 1.2104(g)(2); *see also Auction 97 Notice*, 29 FCC Rcd. at 8451 (noting "defaults weaken the integrity of the auction process and may impede the deployment of service to the public"). The FCC default payments, however, are not the same type of claim as Vermont pursues in this action because Section 1.2104(g)(2) does not require the FCC to find that the bidder used falsity or fraud to deprive the government. *See Kennedy*, 5 F.4th at 56. Thus, Northstar and SNR were not liable for these payments because of allegedly fraudulent behavior, but because they chose to default on their bidding obligations after they won the licenses. It is this fact alone that gives the FCC a legal basis to impose a default payment. *See* 47 C.F.R. § 1.2104(g). Because Vermont could not have brought or maintained its *qui tam* action against Defendants for defaulting, it cannot recover a share of the default payments now. *Kennedy*, 5 F.4th at 56–57 (observing how the relator admitted it "would never have been able to bring a *qui tam* lawsuit against [the defendants] for misbranding" and how the misbranding claim was not "the type of action that could have been initiated by a *qui tam* relator, let alone 'continued[,]'" under the FCA (alterations in original, citation omitted)).

Vermont relies on two out-of-circuit cases. Neither is availing. In *United States ex rel. Barajas v. United States*, the Ninth Circuit held that an agreement reached in a debarment and suspension proceeding stemming from a contractor's criminal and fraudulent conduct was an alternate remedy under the FCA. 258 F.3d 1004, 1006–13 (9th Cir. 2001). *Barajas* is different than this case, however, because a suspension and debarment proceeding *can* be brought based on

a contractor having engaged in fraud. *See* 48 C.F.R. §§ 9.406-2(a), 9.407-2(a). No such ground

exists under the FCC's default regulation. Meanwhile, in *United States ex rel. Bledsoe v. Cmty.*

*Health Sys., Inc.*, the Sixth Circuit held that a relator was potentially entitled to a share of

settlement proceeds reached between the Government and the defendant in a Medicare fraud case,

so long as the fraudulent conduct alleged in the relator's *qui tam* "overlap[ped]" with the covered

conduct. 342 F.3d 634, 637–40, 647–51 (6th Cir. 2003). *Bledsoe* is inapposite given that the

Government's settlement in that case centered on defendant's alleged fraudulent conduct over

which a party could have, and did, initiate a *qui tam* action. *See id.* at 638–39 (noting the

investigation concerned "whether a FCA violation might have occurred").

### b. Any Factual Overlap is Insufficient to Show the Default Payments Addressed the Same Fraud Alleged in Vermont's Complaint.

Vermont argues that the FCC's determination of Northstar and SNR's ineligibility for

bidding credits triggered their default obligations. ECF No. 194-1 at 14. In so doing, Vermont

points to evidence supporting its position that Northstar and SNR did not have the financial

resources to pay full price for all spectrum licenses they won. *See generally* ECF No. 195.

The reason for defaulting, however, is irrelevant under the text of the regulation. The only

ground for imposition of a default payment is whether, not why, a bidder has decided not to make

their bid payments. *See* 47 C.F.R. § 1.2104(g) ("[T]he Commission will impose payments on

bidders . . . who default on payments due after an auction closes."). Indeed, if Northstar and SNR

decided to purchase all spectrum licenses they won after the FCC determined they were ineligible

for bidding credits, the regulation would not have barred them. *See Vermont Telephone II*, 34

F.4th at 35 (concluding that the default payments did not connect directly to the licensing

proceedings because "an intervening event" "occurred before the Commission assessed default

payments against these companies"). Vermont attempts to link the facts of the FCC's licensing

proceeding, in which Vermont raised Northstar and SNR's alleged fraud, to the FCC's decision to impose the default payments. Vermont is wrong. It is not enough that the default payments arise from the same underlying set of facts as the *qui tam* action. The payment must be legally connected to alleged fraud. *Kennedy*, 5 F.4th at 57–58 ("[I]t is the nature of the legal claim—the fraudulent or false deprivation of a monetary or property interest—and not the commonality of facts that determines a relator's right to share in an alternative recovery.").

Moreover, even considering the underlying facts of the FCC's licensing proceeding, the result would not be different. The FCC disagreed with Vermont that Northstar and SNR made material misrepresentations or demonstrated a lack of candor in their applications. *2015 FCC Order*, 30 FCC Rcd. at 8940–43. Thus, no finding of falsity or fraud played a factual role in the FCC's decision to deny Northstar and SNR bidding credits. *See id.*; *Kennedy*, 5 F.4th at 57. Vermont conflates Northstar and SNR's ineligibility for bidding credits with its allegations that Defendants defrauded the government. The latter is the essence of Vermont's FCA claim; the former is not.[9]

Finally, contrary to Vermont's arguments, the Government's position in this case has not been that it was compensated for any alleged fraud by Northstar and SNR's interim default payments. 11/21/24 Tr. at 91:8–92:18 ("I want to be clear about the Government's position that it didn't suffer economic loss here. It didn't suffer economic loss because of the Defendants' claim of bidding credits that it was not ultimately awarded because those claims weren't ultimately awarded."). Indeed, because Northstar and SNR never obtained bidding credits, the Government

---

[9]    Vermont claims that the FCC made its findings without the alleged evidence of fraud now uncovered in this *qui tam* action. ECF No. 210 at 10–11. This argument misses the point. The fact that Vermont allegedly uncovered new fraud evidence unavailable at the time of the FCC licensing proceedings shows the FCC's decisionmaking regarding bidding credits or default payments was not based on any showing of alleged fraud.

has held misgivings about the damages available since Vermont filed its Complaint.  ECF No. 193 ¶ 7.  Although the Government explained in its 2018 statement of interest that potential evidence Vermont uncovered in this *qui tam* action could have been relevant to the FCC licensing proceedings, the Government also stated those proceedings focused on distinct issues and would "likely not consider whether Defendants violated their disclosure obligations to the FCC."  ECF No. 62 at 2–4 (noting "the United States submits that the outcome of the FCC proceeding is unlikely to shed light on the allegations in the Relator's complaint").

<u>**CONCLUSION**</u>

For the reasons set forth above, the Court recommends that the Government's Motion to Dismiss be **GRANTED** without prejudice, ECF No. 189, and Vermont's Motion for Share of Alternate Remedy be **DENIED**.  ECF Nos. 194; 205.

Date: April 7, 2025

_____

MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

### Local Civil Rule 72.3(b) Notice

The parties are advised that under the provisions of Local Rule 72.3(b), any party who objects to a Report and Recommendation must file a written objection with the Clerk of Court within fourteen days of the party's receipt of the Report and Recommendation.  The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections.  Failure to file timely objections to the findings and recommendations set forth in this Report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

* * *