**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERMONT NATIONAL TELEPHONE COMPANY,<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>NORTHSTAR WIRELESS, LLC, *et al.*,<br><br>　　　　　　　　　Defendants. | Civil Action No. 15-00728 (CKK)<br><br>**ORAL HEARING REQUESTED** |

## RELATOR'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Stephen J. Obermeier (D.C. Bar # 979667)
Bennett L. Ross (D.C. Bar # 978122)
Bert W. Rein (D.C. Bar # 067215)
Mark B. Sweet (D.C. Bar # 490987)
Kathleen C. Cooperstein (D.C. Bar # 1017553)
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Relator Vermont
National Telephone Co.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION AND SUMMARY ................................................................................................ 1

STANDARD OF REVIEW ................................................................................................................ 6

ARGUMENT ...................................................................................................................................... 6

    I.      THE REPORT IS WRONG TO RECOMMEND GRANTING THE
           GOVERNMENT'S MOTION TO DISMISS. ........................................................... 6

           A.      The Report Misreads *Polansky.* ................................................................. 6

           B.      The Report Misconstrues the Reasonableness of the Government's
                 Arguments in Support of Dismissal. ........................................................... 13

           C.      The Report Misapplies Rule 41(a)(2). ....................................................... 22

           D.      The Report Misinterprets the Takings Clause. .......................................... 35

    II.     THE REPORT IS WRONG TO RECOMMEND DENYING RELATOR
           ITS SHARE OF THE FCC DEFAULT PAYMENTS AS AN
           ALTERNATE REMEDY. ........................................................................................ 36

           A.      The FCC and FCA Proceedings Seek to Redress the Same Harm. .......... 37

           B.      Awarding Relator a Share of the Alternate Remedy Will Advance
                 the Objectives of the FCA. ......................................................................... 39

CONCLUSION ................................................................................................................................. 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Thomas ex rel. A.T. v. District of Columbia*,
  No. 03-1791 (CKK), 2007 WL 891367 (D.D.C. Mar. 22, 2007) ...............................................6

*American Clinical Laboratory Ass'n v. Becerra*,
  40 F.4th 616 (D.C. Cir. 2022)..............................................................................................13

*United States ex rel. Barajas v. United States*,
  258 F.3d 1004 (9th Cir. 2001) .........................................................................................38, 40

*United States ex rel. Bledsoe v. Community Health Systems, Inc.*,
  342 F.3d 634 (6th Cir. 2003) .................................................................................................40

*United States ex rel. Carver v. Physicians Pain Specialists of Alabama, P.C.*,
  No. 22-13608, 2023 WL 4853328 (11th Cir. July 31, 2023)....................................................33

*Coombes v. Getz*,
  285 U.S. 434 (1932)...............................................................................................................36

*United States ex rel. Day v. Boeing*,
  No. 3:23-cv-371, 2025 WL 992708 (E.D. Va. Apr. 2, 2025)............................................12, 13

*In re Federal Election Campaign Act Litigation*,
  474 F. Supp. 1051 (D.D.C. 1979).........................................................................................34

*GAF Corp. v. Transamerica Insurance Co.*,
  665 F.2d 364 (D.C. Cir. 1981)..............................................................................................35

*Goodwin v. Syrian Arab Republic*,
  No. 23-0267, 2025 WL 1040847 (D.D.C. Apr. 8, 2025)...........................................................6

*Hubbard v. United States*,
  545 F. Supp. 2d 1 (D.D.C. 2008).........................................................................................22

*Kellmer v. Raines*,
  674 F.3d 848 (D.C. Cir. 2012)..............................................................................................33

*\*United States ex rel. Kennedy v. Novo A/S*,
  5 F.4th 47 (D.C. Cir. 2021)..............................................................................37, 38, 40, 41

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982)..............................................................................................................35

*Lopez v. Rudrakalash, LLC*,
    No. 20-cv-94 (EGS), 2022 WL 17370184 (D.D.C. Feb. 11, 2022)........................................33

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm
    Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983).................................................................................................................13

*Polansky v. Executive Health Resources, Inc.*,
    422 F. Supp. 3d 916 (E.D. Pa. 2019) .......................................................................9, 18, 23, 25

*\*United States ex rel. Polansky v. Executive Health Resources, Inc.*,
    599 U.S. 419 (2023)...................................................................................................... *passim*

*Richardson v. Sherman*,
    No. LA CV 17-07406-VBF (PLA),
    2018 WL 6112618 (C.D. Cal. Sept. 4, 2018) ...........................................................................34

*Robertson v. McCloskey*,
    No. 86-cv-2877, 1988 WL 23255 (D.D.C. Mar. 4, 1988) ........................................................33

*Sprint Communications Co. v. APCC Services, Inc.*,
    554 U.S. 269 (2008).................................................................................................................35

*United States ex rel. Stevens v. Vermont Agency of Natural Resources*,
    162 F.3d 195 (2d Cir. 1998)....................................................................................................36

*Swift v. United States*,
    318 F.3d 250 (D.C. Cir. 2003).................................................................................................20

*United States ex rel. Taylor v. Gabelli*,
    345 F. Supp. 2d 340 (S.D.N.Y. 2004)................................................................................38, 39

*United States ex rel. Touhy v. Ragen*,
    340 U.S. 462 (1951)...................................................................................................................2

*United States v. Armstrong*,
    517 U.S. 456 (1996).................................................................................................................32

*United States v. Science Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010)...............................................................................................34

*United States ex rel. USN4U, LLC v. Wolf Creek Federal Services*,
    No. 1:17-cv-0558, 2023 WL 8480085 (N.D. Ohio Dec. 7, 2023).............................................11

*United States ex rel. USN4U, LLC v. Wolf Creek Federal Services*,
    No. 24-3022, 2025 WL 1009012 (6th Cir. Mar. 31, 2025)......................................................12

*Vermont National Telephone Co. v. DOJ*,
    1:24-cv-03180 (MAU) (D.D.C. Nov. 12, 2024)........................................................32

*United States ex rel. Vermont National Telephone Co. v. Northstar Wireless, LLC*,
    34 F.4th 29 (D.C. Cir. 2023)........................................................2, 15, 16

*In re Vitamins Antitrust Litigation*,
    198 F.R.D. 296 (D.D.C. 2000)........................................................22

**Statutes**

31 U.S.C. § 3730........................................................37

**Other Authorities**

47 C.F.R. § 0.463........................................................30

DA 14-1018 (WTB July 23, 2014)........................................................16, 17

Fed. R. Civ. P. 41........................................................6

LCvR 72.2........................................................6

LCvR 72.3........................................................6

Letter from Steven Hough, Department of Justice, Office of Legislative Affairs, to
    the Honorable Charles Grassley, Chairman, Committee on the Judiciary,
    United States Senate (March 25, 2025)........................................................24

**INTRODUCTION AND SUMMARY**

Pursuant to Federal Rule of Civil Procedure 72 and Local Civil Rule 72.3, Relator Vermont National Telephone Company ("Relator") submits the following Objections to the Report and Recommendation of the Magistrate Judge (Dkt. 222) ("Report") regarding the Government's Motion to Dismiss Relator's *qui tam* action under the False Claims Act ("FCA") (Dkt. 189) and Relator's Motion for Share of Alternate Remedy (Dkt. 205).

The Court should grant Relator's objections and deny the Government's Motion to Dismiss. *First*, the Report applies the incorrect legal standard in considering the Government's Motion based on a misreading of the Supreme Court's decision in *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023). Instead of the "traditional Rule 41(a)(2) analysis" that the Supreme Court held applies in cases such as this, the Report takes snippets from *Polansky* and fashions an alternative test. This approach was erroneous and undermines the utility and function of the FCA.

*Second*, the Report compounds this error by concluding that the Government's arguments for dismissal were reasonable without offering (or requiring the Government to provide) any explanation or record evidence in support because, according to the Report, no such explanation or evidence is necessary. But that is contrary to both *Polansky* and Rule 41(a)(2), which obligate the Court to put the Government through its paces and show the reasonableness of its arguments in support of dismissal—in this case, the allegedly insufficient evidence of Defendants' fraud, the purported concern about Relator's ability to prove damages, and the claimed "significant resource drain" on the Government if this litigation were to continue. Report at 16. The Report dispenses with this showing altogether based on the erroneous conclusion that the Court has no need, no obligation, and no opportunity to delve into the reasonableness of the Government's arguments in support of dismissal. In effect, the Report would have the Court accept as

reasonable the Government's arguments regardless of whether they have any support and even when—as here—they are demonstrably untrue. This is not and cannot be the law.

As explained in detail in Relator's Opposition to the Government's Motion to Dismiss (Dkt. 204), there is ample evidence of Defendants' fraud, which the Government makes no attempt to address. In fact, despite the substantial discovery to date, the Government's Motion discusses the merits of the case *in a single paragraph* that not only omits any record citation but is contradicted by the undisputed evidence. Likewise, the Government's view of damages ignores the harms resulting from Defendants' fraud during the short-form application process, a critical phase of the Federal Communications Commission's (FCC) spectrum-auction process that the D.C. Circuit expected this Court would address "at a later stage in this litigation." *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 38 (D.C. Cir. 2023). The Report makes no attempt to grapple with these issues or reconcile the paucity of the Government's showing here as compared to *Polansky*, where the Government "*explained in detail*" why it believed that the relator's claims there "had little chance of success on the merits." 599 U.S. at 438 (emphasis added).

The Government's claim about the purported "significant resource drain" it will allegedly suffer if this litigation continues is equally meritless and simultaneously gratuitous. The Government does not enumerate or even bother to document the future discovery costs allegedly associated with continued litigation. Nor does the Government dispute that the alleged burdens of discovery would be reduced, if not eliminated, if it were to contest Defendants' discovery requests, which the Government did not bother to do, even though it has valid objections to these requests, including their inconsistency with *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). The Government's failure to take any steps to oppose Defendants' discovery requests

2

has no good-faith explanation, and it renders false the Government's claims about the burdens it purportedly faces in responding to such discovery.

Yet the Report brushes aside these shortcomings, saying, in effect, that discovery always leads to some burden, which is enough to justify dismissal. But if the Government could simply claim "burden" because there is discovery, it could dismiss any case for any reason without any judicial oversight—an outcome that would contravene *Polansky* and Rule 41(a)(2). The Report also fails to explain how dismissal of this case would be consistent with *Polansky*, where the Government "*enumerated the significant costs of future discovery* in the suit, including the possible disclosure of privileged documents." 599 U.S. at 438 (emphasis added).

Under the circumstances, and in stark contrast to *Polansky*, the Government has not offered reasonable arguments for why the burdens of continued litigation of this case outweigh its benefits as required to grant the Government's Motion to Dismiss. Accordingly, the Court must reject the Report's recommendation to the contrary.

*Third*, the Report cannot cure its erroneous approach to the legal standard governing dismissal by its purported application of the requirements of Rule 41(a)(2), which obligates the Court to consider the Government's good faith in moving for dismissal and the prejudice to Relator that would result from dismissal. Here again, the Report gets it wrong.

Relator demonstrated the Government's bad faith in moving to dismiss this case. This bad faith is evidenced by the Government: (1) offering arguments for dismissal that are demonstrably untrue; (2) failing to conduct an adequate investigation of Relator's case; (3) refusing to explain its decision to seek dismissal of claims that it previously opposed dismissing just months earlier; (4) timing its dismissal decision to not only prevent Relator from uncovering the very evidence of fraud the Government was purportedly interested in Relator

3

uncovering, but also to protect Defendants Charles and Cantey Ergen from being deposed; (5) operating contrary to the Government's interests and in violation of FCC rules by materially assisting Defendants in this litigation; and (6) acting for the benefit of DISH and the Ergens, who were close political allies of the Biden Administration and generous supporters of President Biden's reelection efforts.

Incredibly, the Government does not contest Relator's evidence of bad faith. For example, the Government does not deny the shortcomings of its investigation, the timing of its dismissal decision, or the material assistance it provided to Defendants. Nor does the Government deny that it acted for the benefit of DISH and the Ergens for political purposes. And yet in considering whether the Government is seeking dismissal in good faith as required by Rule 41(a)(2), the Report largely ignores (or does not accurately characterize) this evidence.

Likewise, Relator has demonstrated clear legal prejudice from dismissal, consistent with *Polansky*'s application of Rule 41(a)(2) in FCA cases. The Report's determination to the contrary is erroneous, relying on inapposite Rule 41(a)(2) standards in non-FCA cases that fail to focus on the Relator-centric "contextual" standard required by *Polansky* "in the FCA context." *Polansky*, 599 U.S. at 436–37.

Relator acknowledges the Supreme Court's observation that "(2)(A) motions will satisfy Rule 41 in all but the most exceptional cases" and that "the Government's views are entitled to substantial deference." *Id.* at 437. But this observation does not excuse the Government from supporting its bases for dismissal and complying with Rule 41(a)(2) in seeking dismissal of an FCA case, as it has failed to even try to do here. Nor does this mean that the Court must turn a blind eye to the Government's inability to satisfy Rule 41(a)(2), as the Report does here. Were it

otherwise, the Government would have complete, unchecked discretion to dismiss *qui tam* actions—discretion the *Polansky* Court held the Government lacks.

If the Court nonetheless adopts the recommendation that the case should be dismissed, the Court should award Relator its share of the proceeds from the Government's alternate remedy obtained by the Government through default payments made by Defendants in connection with proceedings at the FCC. The Report erroneously recommends denying Relator its rightful share of the alternate remedy obtained by the Government based on the mistaken conclusion that the default payments cure a different harm than the underlying Relator's FCA claims. But this conclusion ignores the fact that the FCA's alternate remedies provision is broad and does not require that the alternate means through which the Government's interests are vindicated involve any specific mechanism or mirror the proof of fraud required in FCA cases.

The Report also erred in failing to address whether the objectives of the FCA would be served by denying Relator a share of the proceeds from the Government's alternate remedy. This failure is telling because the alternate remedy provision was intended to prevent the Government from depriving relators of their shares through formalistic technicalities, which is precisely what the Government seeks to do here. In short, neither the FCA nor relevant precedent support withholding compensation to Relator when the Government benefits from Relator's fraud allegations raised in both the administrative proceedings and this *qui tam* case, and then effectively settles with Defendants, as the Government did in accepting the default payments that Relator's allegations caused, and then claiming to have been made whole. Accordingly, the Report's recommendation to deny Relator a share of the proceeds from the Government's alternate remedy is clearly erroneous and contrary to law.

5

## STANDARD OF REVIEW

For dispositive motions, this Court "shall make a de novo determination of those portions of [the] magistrate judge's findings and recommendations to which objection is made," and may do so "based solely on the record developed before the magistrate judge, or may conduct a new hearing, receive further evidence, and recall witnesses." LCvR 72.3(c); *Goodwin v. Syrian Arab Republic*, No. 23-0267 (CKK/GMH), 2025 WL 1040847 (D.D.C. Apr. 8, 2025); *see also Thomas ex rel. A.T. v. District of Columbia*, No. 03-1791 (CKK), 2007 WL 891367, at *1–*6 (D.D.C. Mar. 22, 2007) (revising magistrate judge's recommended fee award). And for nondispositive matters (such as Relator's motion for alternate remedy), the Court is empowered to "modify or set aside any portion of a magistrate judge's order" that is "found to be clearly erroneous or contrary to law." LCvR 72.2(c).

## ARGUMENT

## I. THE REPORT IS WRONG TO RECOMMEND GRANTING THE GOVERNMENT'S MOTION TO DISMISS.

Applying the required *de novo* standard of review, the Court should grant Relator's objections to the Report and deny the Government's Motion to Dismiss. The Report's contrary recommendation is based on a misreading of the Supreme Court's decision in *Polansky* and a misapplication of Fed. R. Civ. P. 41(a)(2), which, as required by *Polansky*, controls the disposition of the Government's Motion.

### A.   The Report Misreads *Polansky.*

The Report applies the wrong legal standard in recommending dismissal of Relator's case. In its analysis of *Polansky*, the Report erroneously accepts the Government's position that "the Court must forego its traditional Rule 41(a)(2) inquiry here" and instead must ask only "two questions: 1) whether the Government has offered a 'reasonable argument' for dismissal, with

6

substantial deference granted to the Government's views; and 2) if so, whether 'extraordinary circumstances' exist to justify denying the motion." Report at 14 (citing Dkt. 199 at 1–3).

But this approach misreads *Polansky*, which held that Rule 41(a) governs the disposition of Government motions seeking the dismissal of FCA cases. This is clear from the plain language of the Supreme Court's opinion: "We [ ] hold that in handling [the Government's motion to dismiss an FCA action over a relator's objection], *district courts should apply the rule generally governing voluntary dismissal of suits: Federal Rule of Civil Procedure 41(a).*" *Polansky*, 599 U.S. at 424 (emphasis added). Indeed, the Supreme Court affirmed the Third Circuit's position "that the appropriate standard" in resolving dismissal motions by the Government "*derives from Federal Rule 41(a), which governs voluntary dismissals in ordinary civil litigation*"—a position the Supreme Court concluded "is the legally right one." *Id.* at 435 (emphasis added) (citing *Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 389–91 (3d Cir. 2021)).[1]

Because the Government moved to dismiss this case after Defendants served their Answer, dismissal is governed by Rule 41(a)(2), which "requires a 'court order, on terms that the court considers proper.'" *Polansky*, 599 U.S. at 435 (quoting Fed. R. Civ. P. 41(a)(2)). The Supreme Court directed district courts to "assess a (2)(A) motion to dismiss *using Rule 41's*

---

[1]    In addition to being inconsistent with the holding in *Polansky*, the Magistrate Judge's decision to eschew the traditional Rule 41(a)(2) analysis also overlooks the "reason" offered by the Supreme Court "for alighting on Rule 41," namely that "[t]he Federal Rules are the default rules in civil litigation, and nothing warrants a departure from them here." *Polansky*, 599 U.S. at 436. As the Supreme Court observed, "the Federal Rules apply in FCA litigation in courts across the country every day. There is no reason to make an exception for the one about voluntary dismissals." *Id.*

*standards*." *Id.* (emphasis added). However, the Report opts to forgo the "traditional Rule 41(a)(2) analysis," Report at 17, which contravenes the Supreme Court's direction.[2]

The Report compounds this error by not offering an explanation or citing any record evidence in support of the conclusion that "the Government has provided reasonable arguments for dismissal"—namely, the purported lack of "sufficient evidence" of Defendants' fraud, doubts about Relator's ability to "prove damages," and the "significant resource drain" if the litigation were to continue. Report at 16. Rather than acknowledge this gap, the Report instead claims that such explanation or evidence is unnecessary because this Court is powerless to "require specific evidence from the Government" under *Polansky*. *Id.* at 17. Here again, the Report misreads the Supreme Court's decision.

To be sure, the Supreme Court observed in *Polansky* that the Government's motion to dismiss should be granted if it "offers a reasonable argument for why the burdens of continued litigation outweigh its benefits, . . . . even if the relator presents a credible assessment to the contrary." 599 U.S. at 438. But this observation must be read in "context[ ]." Report at 15 (citing 9 C. Wright & A. Miller, Federal Practice and Procedure § 2364, p. 599 (4th ed. 2022)). It does not mean, as the Report suggests, that the Court must accept as reasonable the arguments offered by the Government in support of dismissal if they lack evidentiary support or when, as here, they are grounded in fantasy rather than reality. On the contrary, *Polansky* requires the Government to show that its arguments regarding the burdens and benefits of an FCA case it

---

[2]     As the Supreme Court noted, "application of Rule 41 in the FCA context will differ in two ways from the norm," specifically "notice and an opportunity for a hearing before a Subparagraph (2)(A) dismissal can take place," and the requirement that a district court consider the relator's interests in conducting its "proper terms" assessment when faced with a (2)(A) motion. *Polansky*, 599 U.S. at 436. While the Magistrate Judge afforded Relator with notice and an opportunity for a hearing, the Report pays mere lip service to Relator's interests under Rule 41(a)(2), as explained in greater detail below.

seeks to dismiss are reasonable and otherwise consistent with the standards in Rule 41(a)(2) and obligates the Court to scrutinize this showing.

In *Polansky*, the Supreme Court concluded that the district court was "right" to grant the Government's motion to dismiss. In reaching this conclusion, the Supreme Court pointed to the Government's motion that "*enumerated the significant costs of future discovery* in the suit, including the possible disclosure of privileged documents," and "*explained in detail* why [the Government] had come to believe that the suit had little chance of success on the merits." 599 U.S. at 438 (emphasis added). The Government's enumeration was set forth in a sworn declaration that included detailed estimates of the attorney hours and documented costs associated with continued litigation, such as "internal staff obligations," "anticipated costs related to" the Government's compliance with a Special Master's discovery recommendation that required the production of privileged documents, and "expected attorney time" for deposition preparation and litigation monitoring. *Polansky v. Exec. Health Res., Inc.*, 422 F. Supp. 3d 916, 928 (E.D. Pa. 2019). The Government's explanation about the merits included its determination that the suit was unlikely to succeed because of questions about the relator's "credibility," which the district court agreed cast doubt on the likelihood of "potential financial recovery" in the case. *Id.* at 927.[3]

---

[3]    The credibility of the relator in *Polansky* was called into question due to his: (i) belated failure to produce approximately 14,000 documents that resulted in sanctions against the relator; and (ii) "unilaterally" and "without offering any explanation" purporting to change the settled method for the selection of claims in a bellwether trial "that had been painstakingly arrived at after several pretrial conferences." 422 F. Supp. 3d at 920–21. Doubts about the relator's prospects for recovery in *Polansky* were also confirmed by the district court's decision to grant summary judgment to the defendant on certain of relator's claims for which "there can be no FCA liability" as a matter of law and for which it was unlikely the relator will "be able to establish that Defendant's alleged misconduct was material to the Government's payment decision," which, according to the district court, were "additional reasons that support dismissal of this case." *Id.* at 930, 935–39. No such reasons apply here, or to Relator.

9

Based on this "showing" by the Government, the *Polansky* Court determined that dismissal of the relator's case was "not a close call." 599 U.S. at 438. According to the Supreme Court, "[a]bsent some extraordinary circumstance, *that sort of showing*"—*i.e.*, an enumeration of the significant costs of future discovery and a detailed explanation of the unlikelihood of success on the merits—"is all that is needed for the Government to prevail on a (2)(A) motion to dismiss." *Id.* (emphasis added).

Here, the Government did not bother to make the "showing" made in *Polansky*. Specifically, the record is devoid of any enumeration by the Government of the costs of future discovery or any detailed explanation by the Government regarding the likelihood that Relator will succeed on the merits of its claims. Under the circumstances, the Court cannot find that the Government has given "good grounds for thinking that this suit would not . . . vindicate the Government's interests," 599 U.S. at 438, and thus the Government's Motion must be denied.

The Magistrate Judge seeks to excuse the Government's failure to show the reasonableness of its arguments about the burdens and benefits of this case, asserting that "the Supreme Court did not set forth such a requirement" in *Polansky*. Report at 24. But this assertion cannot be squared with the plain language of the decision cited above. It also cannot be reconciled with the Supreme Court's determination that "the Government gave good grounds" for seeking dismissal in *Polansky* and that the "competing assessment" offered by the relator in that case "could not outweigh the Government's reasonable view of the suit's costs and benefits." 599 U.S. at 438. The "good grounds" and "reasonable view" to which the Supreme Court was referring involved the Government's enumeration of the significant discovery costs and detailed explanation of the relator's likelihood of recovery set forth in a sworn declaration from the Government. *Id.*

10

The Report seeks to brush aside the Government's showing in *Polansky* that it had "sufficiently documented its investigation into the costs and benefits of continued litigation" because it was made "in the context of applying a more stringent, pre-*Polansky* approach to dismissal."  Report at 24 (citing *Polansky*, 422 F. Supp. 3d at 930).  But that is not what the Supreme Court said.  Rather, it cited to and relied upon this showing in upholding the district court's decision to grant the Government's motion to dismiss under Rule 41(a)(2).  And, of course, this makes sense—if the Court were required simply to accept the Government's conclusory explanations for dismissal, there would be no reason for judicial review at all.

In short, *Polansky* does not support the Report's refusal to require the Government to show—or the Magistrate Judge's unwillingness to inquire into—the reasonableness of the Government's arguments in support of dismissal.  Nor do the few cases in which the Government has moved to dismiss an FCA case post-*Polansky*.

For example, in *United States ex rel. USN4U, LLC v. Wolf Creek Federal Services*, No. 1:17-cv-0558, 2023 WL 8480085 (N.D. Ohio Dec. 7, 2023), *aff'd*, No. 24-3022, 2025 WL 1009012 (6th Cir. Mar. 31, 2025), the district court granted the Government's motion to dismiss the relator's claim that the defendant had fraudulently induced NASA to enter into inflated contracts based on false price proposals.  The district court concluded that the Government had "*fully explained* why it seeks dismissal of Relator's claims" and credited the Government's concerns about:  (1) the relator's "credibility" that resulted from his being subject to a motion to disqualify for breaching the FCA's seal requirements; (2) the relator's fraud theory that was "contradict[ed]" by the deposition testimony of NASA employees; and (3) the costs associating with prosecuting or even "monitoring" a case that was "unlikely to result in any significant award."  *Id.* at *2–*3 (emphasis added).

11

In affirming the district court's dismissal of the relator's case, the Sixth Circuit pointed to "the strain on [the Government's] resources should this action continue, the tenuous nature of [the relator's] claims considering the available record evidence, and the litigation challenges posed by [the relator's] credibility.  While [the relator] attempts to refute these assertions, it does little to refute the reasonableness of the government's decision to seek dismissal considering these anticipated litigation challenges."  2025 WL 1009012, at *7.

*Wolf Creek* confirms that the Government must show that its arguments in support of dismissal are reasonable and that a district court is not obligated to accept those arguments at face value.  Rather, the Court must independently assess the reasonableness of those arguments based on the "available record evidence," which the Report fails to do here.

Also instructive is the district court's recent decision in *United States ex rel. Day v. Boeing*, No. 3:23-cv-371, 2025 WL 992708 (E.D. Va. Apr. 2, 2025), which rejected the Government's position that "it need not provide any detailed discussion of its reasons to justify its dismissal motion."  *Id.* at *27 (capitalization altered).  Although the Government had moved to dismiss the relator's case before the defendants had filed an answer or motion for summary judgment, the district court found unpersuasive the Government's position that it "can simply dismiss [the relator's complaint] because it wants to.  No justification required.  That reading of *Polansky* and [the Fourth Circuit's decision in *United States ex rel. Doe v. Credit Suisse AG*, 117 F.4th 155 (4th Cir. 2024)], however, is a reach too far."  *Id.*

The district court in *Boeing* began its analysis "with *Polansky* in which the Supreme Court quite clearly held that the United States must provide '*reasonable argument[s]*' before a district court can grant its motion to dismiss."  2025 WL 992708, at *27 (emphasis in original) (quoting *Polansky*, 599 U.S. at 438).  "True, *Polansky* instructs that those reasons must be

12

afforded 'substantial deference,' but, nonetheless, *the arguments must still be given and they must be reasonable.*"  *Id.* (emphasis added).

Here, the Report recommends that the Court accept the Government's arguments for dismissal without any independent assessment of their reasonableness—a recommendation that is based on a misreading of *Polansky* and that infects everything which follows.  A correct application of the Supreme Court's decision compels rejection of the Report's recommendation.

**B.**     **The Report Misconstrues the Reasonableness of the Government's Arguments in Support of Dismissal.**

From its misreading of *Polansky*, the Report erroneously proceeds to accept as reasonable the arguments offered by the Government for dismissal.  The Report does so, even though, in stark contrast to *Polansky*, the Government's arguments are demonstrably untrue.  An argument that is untrue cannot be reasonable, as courts have held in other contexts.[4]

For example, the Government's purported assessment of the benefits of this litigation is untethered to reality.  Despite the significant discovery conducted in this case to date, Report at 19, the Government's Motion *devotes a single paragraph* to its argument that insufficient evidence exists "supporting the lynchpin" of Relator's fraud allegations.  Dkt. 189 at 16.  In this single paragraph, the Government cites to nothing in the record; it simply proclaims in conclusory fashion that Relator's evidence of Defendants' fraud is "cumulative of what the Defendants had affirmatively disclosed in their long and short form filings."  *Id.* at 17.

---

[4]     For example, under the Administrative Procedure Act, to be reasonable, an argument cannot run counter to the unrebutted evidence. *See Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).  And there must be a rational connection between the argument and the facts of the litigation. *Cf. State Farm*, 463 U.S. at 52.  Thus, the Government's arguments in support of dismissal are not reasonable simply because the Government "merely recite[s]" the magic words that the burdens of the case outweigh the benefits. *Id*.

13

That the Government does not provide evidentiary support for its "cumulative" argument is unsurprising because there is no evidence to support it, as Relator explained at length in opposing the Government's Motion. Indeed, Jeffrey Blum, DISH's Executive Vice President of External and Legislative Affairs and DISH Rule 30(b)(6) designee, testified under oath that the undisclosed understandings uncovered by Relator (the existence of which DISH denies) were never disclosed to the FCC. Dkt. 206 at A-201–209 (DISH 30(b)(6) Blum Dep. Tr. at 210:12–218:11). According to Mr. Blum, DISH never told the FCC about any of the undisclosed understandings uncovered by Relator, nor, to DISH's knowledge, did any of the Defendants. *Id*. By definition, understandings that DISH concedes were never disclosed to the FCC (and that Defendants insist do not exist) cannot be "cumulative" of whatever agreements were disclosed.

The Report makes no attempt to address this evidentiary discrepancy. Nor does the Report bother to explain the undisputed evidence discovered by Relator which confirms that Defendants were parties to a "joint venture" arrangement. *See, e.g.*, Dkt. 206 at A-54 (stating in its annual report that Doyon "is the managing member" of a "joint venture" with DISH "to acquire and develop wireless spectrum licenses" in Auction 97); *id.* at A-189–190 (Wright Dep. Tr. at 24:22–25:1) ("We had a joint venture with DISH."); *id.* at A-191 (Wright Dep. Tr. at 144:15–144:17) ("[I]t was more of a joint venture type of arrangement than a partnership."); *id.* at A-219–220 (DISH 30(b)(6) Dattilo Dep. Tr. at 138–139) (testifying that DISH's accounting team prepared a preliminary analysis of the consolidation issue in August 2014 after learning of a "joint venture being formed"). The Government does not contest that Defendants' joint

14

venture was never disclosed to the FCC or that its disclosure would have rendered Defendants ineligible for bidding credits before the auction had even started.[5]

Likewise, in expressing "significant doubt" about Relator's ability to prove damages under the FCA "because the Defendants were never awarded any bidding credits," the Government's motion *devotes a mere two paragraphs* to this subject.  Dkt. 189 at 17–18.  The Government's argument boils down to its position that, had Defendants disclosed the undisclosed understandings uncovered by Relator, "the result would be the same:  the FCC would have denied SNR and Northstar bidding credits."  *Id.* at 18.

But here again, the Government's argument is untrue.  Predicated on the FCC's denial of bidding credits after review of SNR's and Northstar's ***long-form applications***, the Government's argument is the flip side of Defendants' argument that their fraud was not material under the FCA because "the alleged undisclosed agreements would not have changed the Commission's ultimate decision to deny bidding credits"—an argument the D.C. Circuit expressly rejected. *Northstar Wireless, LLC*, 34 F.4th at 37.

In assessing the materiality of Defendants' fraud, the D.C. Circuit pointed to SNR's and Northstar's failure to disclose agreements and the false certifications on their ***short-form applications***, which the D.C. Circuit concluded "had the potential to affect the Commission's eligibility determinations regarding such bidding credits."  *Id.*  The D.C. Circuit expected that the

---

[5]    For their part, Defendants argue that these admissions of an undisclosed joint venture were for unrelated accounting standards or just colloquialisms.  *See* Dkt. 198-1 at 7–8.  But DISH's 30(b)(6) witness on the topic was clear that the accounting standards were only considered because of the "joint venture being formed"—not the other way around.  Dkt. 206 at A-220 (DISH 30(b)(6) Dattilo Dep. Tr. at 139:11–139:20).  And DISH's 30(b)(6) witness on its FCC disclosures was equally clear that the joint venture was not disclosed.  *Id.* at A-201–206 (DISH 30(b)(6) Blum Dep. Tr. at 210–215).

degree to which the FCC "substantially reviews short-form applications" would "be addressed at a later stage in this litigation." *Id.* at 38.

The D.C. Circuit's analysis applies equally to damages and requires the Court to consider harms to the Government resulting from Defendants' fraud at the ***short-form application stage***. For this reason, Relator filed an expert declaration from the former chief of the FCC's Wireless Telecommunications Bureau explaining the substantial review of short-form applications conducted by the agency. *See* Declaration of Fred Cambell, Dkt. 191, ¶¶ 35–44 ("Campbell Decl."). As explained in this declaration, FCC staff conducted a substantive review of the short-form applications of applicants seeking bidding credits in every spectrum auction held to date, which review was intended to prevent an applicant that is not a bona fide designated entity from using bidding credits in a spectrum auction. *Id.* ¶ 32. Indeed, the public notice setting forth the procedures governing Auction 97 expressly put applicants on notice that such a review would take place at the short-form application stage. DA 14-1018, ¶ 64 (WTB July 23, 2014) ("If an applicant claims eligibility for a bidding credit, the information provided in its FCC Form 175 *[short-form application] will be used to determine whether the applicant is eligible for the claimed bidding credit.*") (emphasis added). And as noted by Relator in opposing the Government's Motion, there are multiple examples in numerous spectrum auctions of FCC staff assessing an applicant's claim for bidding credits and finding that claim wanting based on the information in that applicant's short-form application. Campbell Decl. ¶¶ 39–41. This record evidence is undisputed and is fatal to the Government's damages argument.

Despite the importance of the short-form applications to an assessment of the damages resulting from Defendants' fraud, the Government ignores the issue in its Motion. And the Report overlooks the issue as well.

16

Further, while the Government expresses "doubt" about Relator's ability to prove damages because Defendants were never awarded bidding credits *after the auction*, neither the Government nor the Report address the harms to the Government and the public resulting from Defendants' improper use of bidding credits *during the auction*.  By improperly using bidding credits in Auction 97, Defendants prevented rival service providers from obtaining AWS-3 spectrum they needed to compete; artificially increased the amounts that competitors paid for the AWS-3 spectrum they were able to win; and artificially increased the value of DISH's spectrum holdings.  Campbell Decl. ¶¶ 64–69.  These harms exist independent of—and are not remedied by—the denial of bidding credits.  *Id.* ¶¶ 63–64.

In assessing the Government's argument regarding damages, the Report also disregards the undisputed evidence that the Government still has not been paid the $3.3 billion it was owed in 2015, on which the interest alone is approximately $1 billion, and the spectrum on which Northstar and SNR defaulted has remained fallow for nearly a decade—harms that are not remedied by denial of bidding credits.  That Defendants ultimately did not enjoy the financial benefit of bidding credits because they got caught also flouts the deterrent purpose that damages under the FCA are intended to serve, another issue the Report fails to acknowledge let alone address.

The Government's final argument in support of dismissal—that the Government will incur a "significant resource drain" if this case were to continue—fares no better.[6]  In contrast to the Government's showing in *Polansky*, the Government does not enumerate or even bother to

---

[6]    When the Government first threatened to seek dismissal of Relator's case, the only explanation given at that time was the Government's belief that Relator had not adequately established fraud or damages.  No mention was made of any burdens on the Government in responding to Defendants' discovery requests as a purported justification for dismissal of Relator's claims.  Declaration of Stephen J. Obermeier, Dkt. 193, ¶ 55 ("Obermeier Decl.").

17

document the future discovery costs it will allegedly incur if this case were to continue. The Magistrate Judge's conclusion that the Government is not required to "submit evidence of its discovery burdens," Report at 24, cannot be reconciled with *Polansky*, in which the Supreme Court agreed that the Government had reasonable grounds for seeking dismissal of the relator's case because it had "*enumerated the significant costs of future discovery* in the suit, including the possible disclosure of privileged documents." 599 U.S. at 438 (emphasis added); *see also Polansky*, 422 F. Supp. 3d at 928 (noting "abundant case law granting dismissal to the government because of *documented* litigation costs") (emphasis added).

The discovery burdens the Government claims to face here also are illusory, notwithstanding the Report's acceptance of them without scrutiny. While Defendants have inundated the Government with numerous discovery requests, the Government acknowledges that the scope of permissible discovery is narrow and that many of Defendants' discovery requests exceed that scope or are otherwise objectionable. Dkt. 189 at 20; Obermeier Decl., Ex. SO-7, Dkt. 193-7. And yet, the Government has not made any effort to assert these objections or otherwise contest Defendants' discovery demands, which, were it to do so, the Government's burdens in responding to those demands would be reduced, if not eliminated.

Likewise, Defendants' discovery requests also fail the standards for seeking third-party discovery from the Government under *Touhy*. And yet, the Government also has not exercised its substantial discretion to oppose Defendants' discovery under *Touhy*. While the Government's failure to do so has no good-faith explanation, it renders false the Government's claims about the

18

burdens it purportedly faces in responding to discovery to which it has valid grounds for not responding.[7]

The Report does not address the Government's failures to minimize (if not eliminate) the burdens of discovery, except to assert that the Court is not "required under *Polansky* to go behind the Government's reasonable arguments about continued discovery burdens." Report at 24. But this assertion only confirms the Report's error, which is to presuppose that the Government's arguments are "reasonable" rather than requiring the Government to show their reasonableness.

The Report compounds that error by claiming that "[t]he Government has detailed the costs for continuing this case in its briefing, including responding to Defendants' discovery demands, reviewing privileged documents, and preparing for the depositions of more government witnesses." *Id.* These "detailed costs," however, consist of nothing more than a recitation of discovery activities that are present in every *qui tam* case and nearly none of which would be required here if the Government bothered to contest Defendants' discovery demands.[8]

While the Report posits that the Government will have some discovery "costs moving forward," Report at 24, that is beside the point. To warrant dismissal under Rule 41(a)(2), the Government must offer "a reasonable argument for why the burdens of continued litigation

---

[7]    The Report accepts the Government's claim that it "reached an impasse on major issues concerning scope and applicable privileges." Report at 20 (quoting Dkt. 199 at 9). But this claim is false and further evidences the Government's bad faith. Based on documents Relator has obtained from the FCC under the Freedom of Information Act ("FOIA"), the Government had a least 20 conference calls with Defendants in the 13-month period from January 2023 through February 2024, many of which involved the DOJ. None of these discussions reflect any substantive negotiations with Defendants about the scope of their discovery demands, except for two narrow categories of document requests. Supplemental Declaration of Stephen J. Obermeier, Dkt. 216-1, ¶ 26 ("Obermeier Supp. Decl.").

[8]    Even counsel for the Government acknowledged that it did not provide "specific information" about the alleged burden of discovery, insisting that such information was unnecessary because "the burden is manifest from the existence of the [Defendants'] subpoenas." Nov. 21, 2024 Mot. Hearing Tr., Dkt. 217-1, at 66:18–66:25 ("11/21/24 Tr.").

outweigh its benefits," *Polansky*, 599 U.S. at 438, which the Government cannot do if such burdens are unknown or speculative.  Indeed, in *Polansky* the Supreme Court found that "*significant*" discovery costs constituted reasonable grounds for dismissal under Rule 41(a)(2), *id.* (emphasis added), not *any* discovery costs.

The Report cites *Swift v. United States*, 318 F.3d 250 (D.C. Cir. 2003), for the proposition that "'the government's goal of minimizing its expenses is still a legitimate objective' for the Government to pursue through dismissal," even when those "costs would be relatively small." Report at 23 (quoting *Swift*, 318 F.3d at 254).  But *Swift* is a slender reed on which to grasp because it was effectively overruled by *Polansky*.  Furthermore, the D.C. Circuit's discussion of discovery costs in *Swift* was dicta, as it was offered in connection with a standard for dismissal that the *Swift* court concluded was not supported by the language of the FCA, its legislative history, or constitutional law.

Furthermore, parties routinely seek discovery from the Government in FCA cases, and the Government necessarily must incur "some amount of cost and burdens in addressing these discovery demands."  Report at 24 (citing *Swift*, 318 F.3d at 254).  If any amount of future discovery costs was sufficient to satisfy Rule 41(a)(2), every FCA case would be subject to dismissal by the Government, whether for meritorious reasons or for unsavory motives.  In fact, the Government's position here, which the Report erroneously accepts, will encourage FCA defendants to overwhelm the Government with discovery demands in the hope that the Government would seek dismissal because of the burdens of complying with those demands—an outcome the Court should not countenance.

If the Government's arguments were reasonable (and if its Motion to Dismiss were brought in good faith), it would have been easy enough for the Government to provide record

evidence in support of those arguments. Doing so would not require that the Court "engage in a mini-trial or extensive review of the evidence, weighing and making judgments about the competing views of the case," as the Report erroneously asserts. Report at 21. It simply would have required the Government to show the reasonableness of its arguments so that the Court could independently conclude that the Government was seeking dismissal in good faith consistent with the approach in *Polansky* and Rule 41(a)(2).[9]

Nor is this Court being asked to "make findings based on competing evidence," as the Report erroneously concludes. Report at 17. To the contrary, there is no "competing evidence" with which the Court must contend because the Government's arguments in support of dismissal are not based on evidence. Rather, they are simply conclusory statements in a pleading designed to "track" the arguments made in *Polansky*. *Id.* at 16. The Government's reliance upon language from *Polansky* in couching its arguments does not magically make them reasonable here. Were it otherwise, the Government could dismiss any FCA action simply by regurgitating the language from *Polansky* even when unsupported and contradicted by the underlying facts, as in this case. This would effectively give the Government an unfettered dismissal right, which the Supreme Court held in *Polansky* the Government does not enjoy.

At bottom, the Report treats the Government's arguments as if they are imbued with a talismanic quality and accepts them as true despite their being completely divorced from reality. Such treatment is not "substantial deference," as the Report contends. Rather, it represents an

---

[9]     The Report gets it wrong in asserting that Relator insisted "that the Government 'should be required at least to say or point to something' *refuting Vermont's view of the evidence*." Report at 21 (emphasis added) (citing 11/21/24 Tr. at 55:4–58:15). On the contrary, Relator's position is that the Government must show the reasonableness of its own arguments—a showing that obligates the Government to provide some evidentiary support. 11/21/24 Tr. at 56:16–56:18.

abdication of the judicial scrutiny required under both *Polansky* and Rule 41(a)(2), and thus the Court should decline to adopt the recommendation to grant the Government's Motion to Dismiss.

### C.    The Report Misapplies Rule 41(a)(2).

The Report attempts to cure its erroneous approach to the legal standard governing dismissal of this case by purporting to apply the requirements of Rule 41(a)(2). But here again, the Report misses the mark. Relator demonstrated the Government's bad faith in moving to dismiss this case and established legal prejudice if the case were dismissed, which requires that the Government's Motion be denied.

### 1.    The Government's reasons for dismissal constitute bad faith.

At the outset, the Report does not accurately characterize Relator's position about the Government's bad faith in seeking dismissal under Rule 41(a)(2). According to the Report, in contesting the Government's reasons for dismissal, Relator complains that "the Government has incorrectly assessed the case." Report at 18. But Relator's opposition to dismissal goes well beyond the Government's assessment of this case. Rather, as discussed above, and as explained at length in its Opposition to the Government's Motion and as supported by a detailed and undisputed declaration from counsel, Relator contends that the reasons for dismissal offered by the Government are demonstrably untrue, which necessarily constitutes bad faith under Rule 41(a)(2). Dkt. 204 at 22–31; *Hubbard v. United States*, 545 F. Supp. 2d 1, 7–8 (D.D.C. 2008) (rejecting movant's reasons for Rule 41(a)(2) dismissal as "unpersuasive"); *see also In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 304 (D.D.C. 2000) (finding good faith "highly questionable" where movant's reasons were suspect and movant failed to set forth any "new circumstances" at advanced stage of litigation). The Report never grapples with the substance of this contention.

22

The same is true for the other evidence of the Government's bad faith asserted by Relator that is summarized below.  In addressing this evidence, the Report gets basic facts wrong and ignores other facts that bear directly on the Government's bad faith.

### 2. The inadequacy of the Government's investigation of Relator's case constitutes bad faith.

The notion that the good-faith standard under Rule 41(a)(2) requires the Government to conduct an adequate investigation of the *qui tam* case it seeks to dismiss should be noncontroversial.  *See Polansky*, 422 F. Supp. 3d at 927 ("In this case, the Court is satisfied that the Government has thoroughly investigated the costs and benefits of allowing Relator's case to proceed and has come to a valid conclusion based on the results of its investigation.").  Absent an adequate investigation, a court would be unable to find reasonable the Government's arguments "for why the burdens of continued litigation outweigh its benefits." *Polansky*, 599 U.S. at 438.

Here, Relator outlined numerous deficiencies in the Government's investigation, which include the Government's failure to:

- read the vast majority of documents provided by Relator in support of its claims (Obermeier Decl. ¶ 15 & Dkt. 189 at 12);

- attend a single deposition of Defendants or their affiliated third parties (Obermeier Decl. ¶ 57);

- review any deposition transcripts prior to threatening dismissal of Relator's case (*id.*);

- consider letters and memoranda prepared by Relator summarizing the evidence confirming Defendants' fraud and outlining Relator's damages theories (*id.* ¶ 44); or

- confer with Relator's counsel about the case prior to making its dismissal threat (*id.* ¶¶ 9–11, 14).[10]

***The Government does not dispute any of these investigatory shortcomings***.  And yet, they are not addressed, let alone even acknowledged, in the Report.

While it is true that Relator "met with the Department of Justice and the FCC to present its case," Report at 23, the single Department of Justice (DOJ) meeting to which the Report is referring occurred on January 25, 2024, *13 days after* the DOJ had threatened dismissal of Relator's case.  Dkt. 189 at 13; Obermeier Decl. ¶¶ 63–65.  And all Relator's meetings with the FCC took place before a single Defendant had been deposed and before the conclusion of written discovery.  Obermeier Decl. ¶¶ 46, 57.  Furthermore, the DOJ is the decision-maker here, not the FCC.[11]  As such, the DOJ's refusal to meet with Relator to discuss the case prior to threatening dismissal is even more inexplicable, especially considering that "[t]he purpose of a *qui tam* action is to vindicate the Government's interests."  Report at 22.

The Report contends that the Government "considered Vermont's evidence in reaching its conclusion," *id.* at 23, but the Report fails to identify what "evidence" the Government purportedly considered.  This failure is unsurprising given that the Government's Motion is devoid of any discussion of the evidentiary record.  Indeed, it is impossible for the Court to glean

---

[10]    On this last point, the Report characterizes Relator's criticism of the Government for failing to "agree to meet with Vermont every time Vermont requested," Report at 22, a characterization that is neither fair nor accurate.  On the contrary, the DOJ *never met with Relator* about the case between the commencement of discovery in late 2022 and when the Government first threatened dismissal on January 12, 2024, despite multiple meeting requests by Relator.  Dkt. 189 at 13; Obermeier Decl. ¶¶ 63–65.

[11]    Letter from Steven Hough, Department of Justice, Office of Legislative Affairs, to the Honorable Charles Grassley, Chairman, Committee on the Judiciary, United States Senate, at 2 (March 25, 2025) (noting that the DOJ "ultimately decides whether to dismiss a *qui tam* action"), *available at* https://tinyurl.com/2sa96man.

24

the "evidence" upon which the Government purportedly relied in reaching its conclusions about the merits of Relator's case because the Government has never provided this information. Furthermore, and in contrast to *Polansky*, the Government's investigation of Relator's case was the opposite of "thorough," which undermines any good-faith basis for the conclusions reached by the Government about Relator's case.

> **3.      The Government's failure to explain its "change of heart" about Relator's case constitutes bad faith.**

Another issue that is given short shrift in the Report involves the Government's change of heart about this case. Not once, but twice the Government opposed dismissal of Relator's claims. Yet the Government has never bothered to explain why it now seeks to dismiss claims it previously opposed dismissing.

The Magistrate Judge questions whether the Government's position on Relator's case has really changed. But, according to the Magistrate Judge, even assuming "the Government had undergone a change of heart about moving forward with this case," it "would not preclude dismissal," citing the district court's decision in *Polansky*. Report at 22.

*Polansky* only makes Relator's point. In that case the Government represented to the district court that it would not seek dismissal of the relator's case, only to move for dismissal three months later, which the court acknowledged was "unusual." *Polansky*, 422 F. Supp. 3d at 930. However, the district court rejected the relator's challenge to the Government's change in position "because it ignores the significant, and important, developments that occurred" during this three-month period, which the Government explained in a "well-reasoned and supported" manner. *Id.* at 929–30.

In this case, by contrast, the Government has never even acknowledged—let alone explained—its change of heart in threatening Relator in January 2024 with dismissal of claims

25

that it had opposed dismissing two months earlier. In contrast to *Polansky*, there were no "significant or important developments" in the case during this two-month period that would warrant a change in the Government's position regarding this case, and the Government has never contended otherwise. That the Government cannot or will not explain its change in position in this case underscores the Government's bad faith.

### 4. The timing of the Government's decision to seek dismissal of Relator's case constitutes bad faith.

In opposing Defendants' Motion for Judgment on the Pleadings, the Government confirmed in December 2022 (Dkt. 118) and again in November 2023 (Dkt. 164) its stated interest in giving Relator the opportunity to uncover evidence of Defendants' fraud. Dkt. 189 at 10 ("The United States' objection gave VTel a chance, in discovery, to uncover evidence supporting its core allegation that the Defendants failed to disclose material information."). However, the Government acted contrary to this interest—and in bad faith—when, on January 12, 2024, the Government threatened to seek dismissal of this case.

As of January 12, 2024, Relator had deposed just 12 fact witnesses, only one of whom was a Defendant (Miranda Wright). Relator had scheduled 11 depositions for the last two weeks in January 2024 and 12 depositions for February 2024. Among the depositions scheduled for February included Defendant Charles Ergen (February 16), Defendant Cantey Ergen (February 14), Defendant John Muleta (February 21), and two senior DISH executives (February 9 and February 13), among others. Relator's fact discovery was scheduled to conclude on February 23, 2024, and Relator's expert reports were due on February 28, 2024. Obermeier Decl. ¶¶ 57, 62.

Why did the Government threaten on January 12, 2024 to seek dismissal of Relator's case, when Relator was knee deep in depositions and just weeks away from concluding its discovery? Why did the Government not wait until the close of Relator's fact discovery and

26

submission of Relator's expert reports, which would have allowed the Government to make an informed decision about the merits of Relator's case based on all the evidence Relator had uncovered?  The Government never says.

The Government also does not deny that it timed its dismissal decision during discovery to prevent Relator from uncovering the very evidence the Government was purportedly interested in Relator uncovering.  Specifically, the Government stated its intention to move for dismissal, just days before the depositions of key actors involved in the fraud, including Charles Ergen, knowing full well that Defendants would cancel (or otherwise refuse to appear for) the remaining depositions, which is precisely what happened.  Obermeier Decl. ¶¶ 60, 78.  The timing of the Government's dismissal decision is evidence of bad faith and cannot be reconciled with the Government's representation that it made its decision only after "careful consideration of the evidence." Dkt. 189 at 1.

Nor does the Government deny that it timed the announcement of its dismissal decision to protect Mr. Ergen from having to testify under oath.  Mr. Ergen was a key player in Defendants' fraud given his involvement in developing DISH's "strategy" in Auction 97.[12]  That the Government acted in the interests of Mr. Ergen, a generous contributor to and supporter of President Biden, and contrary to its stated interest in giving Relator the opportunity to uncover evidence of Defendants' fraud, only confirms the Government's bad faith.

The Report does not address any of these issues, even though they bear directly on the Government's bad faith.  It avoids doing so by suggesting that Relator was engaged in a "fishing

---

[12]    Dkt. 206 at A-104, A-105 (Dravenstott Dep. Tr. at 179, 268:5–268:9); *id.* at A-111–116 (Dunn Dep. Tr. at 348–53).  As described by one DISH employee, Ergen was "very engaged and stated that this auction project was 'the most intellectually interesting/challenging thing that he has done in his entire career.'"  Dkt. 207 at A-33 (Rel. Ex. 170D).

expedition[ ]," Report at 22 (quoting *USN4U*, 2023 WL 8480085, at *3), which is hard to fathom when Relator was seeking to depose Defendants and third parties with first-hand knowledge of—and who were active participants in—the fraudulent scheme at issue.

The Report's assertion that "[a]s a relator, Vermont was not entitled to engage in any discovery" is mystifying. Report at 22. As the Supreme Court explained in *Polansky*, a *qui tam* action "alleges both an 'injury to the [Government's] sovereignty arising from violation of its laws' and an injury to its 'proprietary [interests] resulting from [a] fraud.'" 599 U.S. at 425 (alterations in original) (quoting *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)). But a *qui tam* suit is "for" both the relator and the Government. *Id.* (quoting 31 U.S.C. § 3730(b)(1)) (describing the action as "for the person and for the United States"). Thus, while a *qui tam* action "is on behalf of and in the name of the Government," the relator has "primary responsibility for the action" unless and until the Government has intervened. *Id.* at 437. Consistent with that responsibility, Relator had the right—if not the obligation—to pursue discovery that would aid in its efforts to remedy the harms to the Government resulting from Defendants' fraud.

Equally mystifying is the Report's claim that Relator was not "stonewalled from providing the Government with any newly-discovered evidence or argument." Report at 23. On the contrary, it is undisputed that the Government timed its dismissal decision to prevent Relator from deposing key actors involved in Defendants' fraud, including Mr. Ergen. Had Relator been able to complete these depositions, it could have presented the Government with a more complete picture of Defendants' fraudulent scheme. But Relator was prevented from doing so by the Government, which is further evidence of its bad faith.

28

**5.    The Government acted in bad faith by assisting Defendants in the litigation.**

The record is replete with evidence of the material assistance that the Government provided to Defendants in this case and the lengths to which both the DOJ and the FCC were willing to go to aid Defendants, even though doing so was contrary to the Government's interests and violated FCC rules.  This assistance included:  (1) providing Defendants with a declaration from an FCC staffer that the Government knew Defendants would use to seek dismissal of the case based on their theory that the Government has not been harmed by Defendants' fraud; (2) attempting to coerce Relator into accepting a settlement that was unethical and that stood to benefit only Defendants, not the Government; and (3) arranging to seek dismissal of this case pursuant to its authority under 31 U.S.C. § 3729(c)(2)(A) when schemes (1) and (2) failed.

The Government's assistance in providing Defendants with a declaration from Paul Malmud, Associate Division Chief, Broadband Division of the FCC's Wireless Telecommunications Bureau (Dkt. 161-1) ("Malmud Declaration"), is especially egregious. Although the Government represented previously that the Malmud Declaration was intended to address FCC concerns about the volume of potential documents responsive to three discovery requests from Defendants and the related burden on the agency, documents Relator obtained from the FCC pursuant to FOIA reflect otherwise.  Obermeier Supp. Decl. ¶ 29.  In fact, attorneys in the FCC's Office of General Counsel ("OGC") offered to provide Defendants with a declaration "***attesting to whether the FCC sustained any pecuniary loss as a result of the actions or omissions of the Defendants in connection with Auction 97***."  Obermeier Supp. Decl. ¶ 30 (emphasis added) (quoting Obermeier Supp. Decl., Ex. SO-13 at 2 (Dkt. 216-6)).  The OGC made this offer knowing that Defendants would use the declaration to support their "theory

29

that there are **no** cognizable False Claims Act damages in the case." Obermeier Supp. Decl. ¶ 32 (emphasis added) (quoting Obermeier Supp. Decl., Ex. SO-14 at 1 (Dkt. 216-7)).

In short, the Government intended to assist Defendants' case by providing the Malmud Declaration. Obermeier Supp. Decl. ¶ 32. This intention is underscored by the back and forth between OGC and Defendants' counsel about its contents. OGC verbally shared the language in the Malmud Declaration with Defendants' counsel to give them the opportunity to "confirm" that the Malmud Declaration was "sufficient to meet [Defendants'] needs." Obermeier Supp. Decl. ¶ 36; *id.*, Ex. SO-15, Dkt. 216-8 & Ex. SO-16, Dkt. 216-9. Defendants relied upon the Malmud Declaration to twice move for partial summary judgment on damages, albeit unsuccessfully. Obermeier Supp. Decl. ¶ 38.

Not only did the Government try to assist Defendants by providing the Malmud Declaration, but it violated the FCC's *Touhy* rules in the process. Specifically, those rules require a party in proceedings in which the FCC "is a non-party who wishes to obtain records or testimony from the Commission" to "submit a written request to the General Counsel" containing specified information, which the agency considers in deciding whether to provide the requested records or testimony based on specific factors set forth in those rules. 47 C.F.R. § 0.463(c), (d). The FCC's rules also only authorize the General Counsel to "approve non-privileged testimony by a present or former employee of the Commission" after "consultation with the Managing Director and any relevant Commission Bureau or Office" and subject to any "governmental privileges" the General Counsel may assert in connection with such testimony. *Id.* § 0.463(f).

Here, there is no indication that the OGC complied with these rules prior to preparing the Malmud Declaration or providing it to Defendants. Specifically, no *Touhy* letter was issued, and

30

none of the documents produced by the FCC in response to Relator's FOIA request reflect that the General Counsel considered the factors specified in Section 0.463(d) of the FCC's rules or consulted with the FCC's Managing Director in deciding whether to permit Mr. Malmud to testify by means of a declaration.  Obermeier Supp. Decl. ¶ 41.

When Defendants' efforts to secure partial summary judgment based on the Malmud Declaration were unsuccessful (Dkt. 165), the Government pivoted to Plan B, which involved trying to coerce Relator into settling the case on terms favorable to Defendants.  This coercion commenced with the January 12, 2024 call, during which the Government threatened Relator with dismissal of this case unless Relator agreed to a settlement that consisted of a "nominal amount" of damages and the recovery of Relator's attorney's fees.  Obermeier Decl. ¶¶ 55–56. The Government's proposed settlement only benefitted Defendants and was unethical in any event.  And rather than attempting to broker a reasonable and ethical settlement that provided some benefit to the Government, the DOJ undermined the settlement negotiations by coordinating with Defendants about settlement strategy and the Government's dismissal plans. *Id.* ¶¶ 66–71.

The Report does not address the Government's misconduct, mentioning the Malmud Declaration only once in passing.  Report at 20.  Instead, the Report accuses Relator of not providing "evidence for these allegations, only theorizing and concluding that '[t]he government's conduct in this case cannot be explained by any good faith reason.'"  *Id.* at 25 (alteration in original) (citation omitted).  But this accusation is belied by the fact that Relator provided a sworn declaration and documents in support of its allegations.  Relator's evidence, *which is unrefuted in the record*, also contradicts the Report's claim that the allegations about the Government's bad faith are "conclusory," "speculative," and "bare."  *Id.*

The Report also fails to address Relator's evidence that the Government assisted Defendants' case for political purposes. As outlined in detail in Relator's Opposition to the Government's Motion, DISH and the Ergens were closely allied politically with the Biden Administration. For example, the Biden Administration awarded DISH a $50 million grant to facilitate its network deployment—an award that was publicly announced just two days before DOJ first threatened Relator with dismissal of this case. And both Charles and Cantey Ergen were generous supporters of President Biden's reelection efforts, making sizeable contributions to the former President's campaign less than a month before the DOJ threatened Relator with dismissal of this case. Obermeier Decl. ¶¶ 103–107.

Importantly, the DOJ does not deny that politics played a factor in its efforts to assist Defendants' case. Instead, the DOJ claims Relator cannot prove it. Dkt. 199 at 18 ("None of these facts even remotely suggest that DISH or any Defendant has had any influence on the Government's handling of the case."). But had politics played no role in its handling of this case, the Government could easily have said so.[13]

While this Court may presume that "'the Executive is acting rationally and in good faith' in exercising its discretion to decide which cases should go forward on behalf of the United States," Report at 18 (quoting *Swift*, 318 F.3d at 253), that presumption is not absolute and can be overcome by "clear evidence to the contrary." *See, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted). As explained above, Relator has presented ample evidence of the Government's bad faith to which the Report turns a blind eye.

---

[13]    Of course, Relator has attempted to obtain proof of the Government's political favoritism by submitting FOIA requests to the DOJ. But the DOJ failed to produce the requested records in violation of its statutory obligations, which necessitated that Relator file suit against the DOJ under FOIA. Obermeier Supp. Decl. ¶¶ 6–16. This suit remains pending before this Court. *See Vermont Nat'l Tel. Co. v. DOJ*, 1:24-cv-03180 (MAU) (D.D.C. Nov. 12, 2024).

### 6.    Dismissal would prejudice Relator.

Relator also established the "clear legal prejudice" it will suffer from dismissal. *Kellmer v. Raines*, 674 F.3d 848, 851 (D.C. Cir. 2012) (citation omitted). The Report's determination to the contrary is wrong. Report at 26–29. It is based on inapposite Rule 41(a)(2) standards "in non-FCA cases" that "focus[ ] on the defendant's interests" rather than the Relator-centric "contextual" standard required by *Polansky* "in the FCA context." *Polansky*, 599 U.S. at 437.

*First*, the Report erroneously finds no prejudice from the timing of the Government's dismissal decision. According to the Report, non-FCA cases have been dismissed at "far later stages of litigation." Report at 28.[14] That may well be true, but it ignores the "contextual" Rule 41 analysis necessary to ensure a relator is "not denied a fair opportunity to prove her case." *United States ex rel. Carver v. Physicians Pain Specialists of Ala., P.C.*, No. 22-13608, 2023 WL 4853328, at *7 (11th Cir. July 31, 2023). Here, the Government stepped in after *nine years* of litigation, just before the key architects of Defendants' fraud were to be deposed. Expert reports were imminent, and summary judgment briefing was mere months away. The impact of dismissal on a relator under these circumstances is not comparable to defendants who, by virtue of a plaintiff's voluntary dismissal, accomplish the aim of any successful defense, namely the avoidance of liability. Here, by contrast, Relator was denied a fair opportunity to present its case.[15]

---

[14]    In one of the decisions cited for this proposition, the Court found no prejudice "because this case is still at a relatively early stage overall." *Lopez v. Rudrakalash, LLC*, No. 20-cv-94 (EGS), 2022 WL 17370184, at *3 (D.D.C. Feb. 11, 2022). Another cited case took only 18 months to get to trial and imposed costs as a condition to dismissal. *See Robertson v. McCloskey*, No. 86-cv-2877, 1988 WL 23255, at *1, *5–*6 (D.D.C. Mar. 4, 1988).

[15]    The Report (at 28 n.8) suggests that Relator is partly responsible for discovery not moving forward because it sought to hold deadlines in abeyance while the Government filed its motion to dismiss. But Relator's abeyance motion clearly lays out the limbo in which it had been placed. *See* Dkt. 184. It is simply not credible to claim that discovery would have moved

33

*Second*, the Report brushes aside Relator's important interest in the deterrence function of the FCA.  That interest distinguishes this situation from those cases that involve a "mere missed opportunity for a legal ruling" to prevent speculative future litigation against defendants.  *See, e.g.*, *In re Fed. Election Campaign Act Litig.*, 474 F. Supp. 1051, 1052 (D.D.C. 1979).  That kind of legal uncertainty is materially different from the policy aim Congress built into the FCA—"to punish and deter fraud."  *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010); *cf. Richardson v. Sherman*, No. LA CV 17-07406-VBF (PLA), 2018 WL 6112618, at *3 (C.D. Cal. Sept. 4, 2018) (denying voluntary dismissal where it "would frustrate Congress's aim of deterring prisoners from filing baseless lawsuits").  By cutting short Relator's ability to pursue the FCA's deterrence function, dismissal prejudices Relator.

*Third*, the Report fails to credit Relator's significant commitment of time and money toward this FCA case.  The Magistrate Judge relies on non-FCA authority to hold that substantial expenses do not qualify as prejudice and then misreads *Polansky* to suggest that every relator will have this problem.  But *Polansky* says quite the opposite, expressly tasking district courts to consider relators' commitment of resources as part of the Rule 41(a)(2) "contextual" inquiry.  *Polansky*, 599 U.S. at 437.  The Report does not meaningfully grapple with the context favoring Relator.  It says nothing, for instance, about the ten years Relator has been litigating this case, including three rounds of Rule 12 motion briefing and an appeal on which Relator prevailed.  Nor does it address the undisputed facts that counsel operated efficiently and diligently and, in DOJ's own words, has "done a good job."  Obermeier Decl. ¶¶ 56, 110.

---

forward when Defendants were demanding a pause pending the motion.  Most egregiously, as Relator's filing underscored, depositions would have been completed by the time the Government finally made good on its promise to file its motion to dismiss.  *Id.* ¶ 4.

Nevertheless, the Report concludes that Relator's efforts are for naught because it proceeded "knowing of the Government's concerns about the merits." Report at 28. Here again, context matters. The only evidence in the record of such concerns comes from Relator, and the undisputed evidence establishes that dismissal was not on the table until 2024—nearly nine years into the case. Obermeier Decl. ¶ 55; *see also id.* ¶¶ 5, 7. Before then, the Government *opposed* dismissal of the case. *Id.* ¶¶ 17–25. Relator undertook significant document discovery and depositions because of the Government's actions, not in spite of them.

Relator has demonstrated clear legal prejudice from dismissal, consistent with *Polansky*'s application of Rule 41(a)(2) in FCA cases.[16]

### D.    The Report Misinterprets the Takings Clause.

The Report wrongly rejected Relator's constitutional challenge to dismissal. The Report declined to undertake the required analysis of whether dismissal constitutes a taking because it concluded that there is no property interest at stake. Report at 29–30. In doing so, the Report relied on non-binding dicta about standing and wrongly decided cases from outside the Circuit.

To be sure, there is no controlling case that neatly addresses this issue. However, the Supreme Court has clearly held that a party's interest in a lawsuit or cause of action is "a species of property protected" by the Constitution. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 275–76 (2008) (a

---

[16]    The Report ends its prejudice analysis by remarking, in a footnote, that Relator "confirmed to the Court that it was not requesting any conditions be imposed if the Court granted dismissal." Report at 28 n.7 (citing 11/21/24 Tr. at 77:6–77:21). Counsel for Relator understood the Court to be asking about any Rule 41 conditions separate and apart from Relator's Motion for Share of Alternate Remedy, which seeks expenses, attorney's fees, and costs. Dkt. 205 at 2. To the extent this Court is inclined to dismiss the case and not grant Relator's motion for a share of alternate remedy, Relator respectfully requests any such expenses, attorney's fees, and costs be awarded as a condition to Rule 41 dismissal. *See GAF Corp. v. Transamerica Ins. Co.*, 665 F.2d 364 (D.C. Cir. 1981).

35

cause of action is a form of property known as a "chose in action").  And the Supreme Court has held that that interest becomes constitutionally protected as soon as the lawsuit is filed and not just after a final judgment is rendered.  *See Coombes v. Getz*, 285 U.S. 434, 442 (1932).  Consequently, as Judge Jack Weinstein, sitting by designation, observed, the Constitution "confers on the *qui tam* relator a vested interest in the nature of a property right once the suit is commenced."  *United States ex rel. Stevens v. Vermont Agency of Nat. Res.*, 162 F.3d 195, 224 (2d Cir. 1998) (Weinstein, J., dissenting), *rev'd sub nom.*, *Stevens*, 529 U.S. 765.[17]

Once that proposition is accepted, the taking analysis follows in favor of Relator.  *See* Dkt. 204 at 48.  Indeed, the Report did not attempt to show otherwise.  The Government's bid to dismiss this case must therefore be denied as unconstitutional.

## II.    THE REPORT IS WRONG TO RECOMMEND DENYING RELATOR ITS SHARE OF THE FCC DEFAULT PAYMENTS AS AN ALTERNATE REMEDY.

If the Court accepts the recommendation to dismiss this case, the Court should award Relator its share of the proceeds from the Government's alternate remedy obtained through default proceedings at the FCC.  The Report errs in recommending that Relator be denied its rightful share of the alternate remedy obtained by the Government—an error that springs from a mistaken conclusion in the Report that the default payments paid by Defendants cure a different harm than that underlying Relator's FCA claims.  *See* Report 32–37.  Furthermore, the Report errs in refusing to consider how best to serve the *purpose* of the alternate remedies provision, which is to incent whistleblowers to exert their own efforts to remedy fraud while deterring the Government from gaming the system and thereby remove such incentives.

---

[17]    This issue almost reached the Supreme Court in *Polanksy*.  Noted constitutional scholar Dean Erwin Chemerinsky submitted an amicus brief to the Third Circuit arguing that dismissal was an unconstitutional taking, but the Third Circuit deemed the issue waived by the parties.  *See Polanksy v. Exec. Health Resources Inc.*, No. 19-3810, Dkt. 38 (3d Cir.) (filed May 22, 2020).

A.      **The FCC and FCA Proceedings Seek to Redress the Same Harm.**

While acknowledging that both proceedings seek the same *objective*—to protect the Government—the Report then veers away from the correct result by insisting that the *mechanisms* are different.  Namely, the Report focuses on the fact that the FCC default process does not require a finding that the bidder used falsity or fraud in order to impose financial penalties, whereas the FCA does.

In so doing, the Report misses the thrust of the FCA's alternate remedies provision.  That provision is designed to provide recovery for a whistleblower when the Government vindicates the interests implicated in the FCA suit through "any" alternate means.  31 U.S.C. § 3730(c)(5).  The FCA does not require that this alternate means must be vindicated through any specific mechanism or must mirror the proof of fraud required in FCA cases.  After all, if the two proceedings both required identical findings to impose the same type of redress, one or the other would be superfluous.  But the expansive words of the FCA should not and cannot be read so narrowly as to require that an alternative means must mirror a *qui tam* action under the FCA.

The Report analyzes whether the FCC default proceedings and the FCA proceedings involve "the same type of falsity and fraud."  Report at 32 (capitalization altered).  But under *United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47, 55 (D.C. Cir. 2021), this is not the correct analysis.  The FCA alternate remedies provision is properly interpreted not as an inquiry into whether the proceedings both prove the lie itself but, rather, whether the two proceedings address the same **harm arising from** that lie.  This is why, in *Kennedy*, the court denied alternate recovery from a lawsuit brought under the Federal Food, Drug, and Cosmetic Act ("FDCA") to vindicate the rights of consumers.  *Id.*  Although the deceit underlying both FCA and FDCA claims was identical, the harms redressed by the two proceedings were dissimilar; harm to a consumer is fundamentally different from harm to the Government, which is the "hallmark" of

37

the FCA. *Id.* at 56–57 (factual overlap existed and is necessary but is not sufficient). This distinction was the reason the D.C. Circuit concluded that a suit under the FDCA does not qualify as an alternate remedy to the FCA. *Id.* Indeed, the *Kennedy* language quoted in the Report makes this clear: "The relator can recover shares from an alternative remedial proceeding if that proceeding, '***redress[es]*** the same type of falsity and fraud claims that otherwise could be pursued by a private relator's *qui tam* lawsuit under the [FCA].'" Report at 31 (emphasis added) (quoting *Kennedy*, 5 F.4th at 56).

This case does not suffer from the same fatal defect present in *Kennedy*, contrary to the Report's erroneous view, because, unlike in *Kennedy*, there is no mismatch between the victims of the harm alleged. This case is much more analogous to *United States ex rel. Barajas v. United States*, 258 F.3d 1004 (9th Cir. 2001), where suspension and debarment proceedings were deemed an alternate recovery. In distinguishing between this case and *Barajas*, the Report observes that suspension and debarment proceedings are different because they "*can* be brought based on a contractor having engaged in fraud." Report at 34–35 (emphasis in original). What the Report elides is the fact that, in *Barajas*, fraud was not the basis for the suspension and debarment proceedings, which rather were initiated based on the delivery of non-conforming goods. *Barajas*, 258 F.3d at 1006. Yet the court nevertheless awarded an alternate recovery because, just as here, the sequence of events leading up to the suspension and debarment proceedings involved a revelation of fraud and deceit that the Ninth Circuit determined sufficiently informed the outcome to render it an alternate recovery. *Id*. at 1012–13.

The Report also ignores an almost perfect analog in *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 340 (S.D.N.Y. 2004), which involved a relator's allegations that the defendants had withheld crucial information from the FCC that would have disqualified them

38

from receiving bidding credits.  When the Government declined to intervene, the defendants moved for a stay of the *qui tam* action pending referral to the FCC, arguing that the FCC was better suited to resolve the salient issues relating to qualification for bidding credits—notably, **not** because the fraud allegations would be resolved there.  *Id.* at 344.  The district court noted that applicants such as the defendants there (and Defendants here) owe the FCC a "duty of candor" when applying for credits, which rendered the qualification for credits and the questions of fraud raised in the FCA action "interdependen[t]."  *Id.* at 350–53.  The *Gabelli* court observed that the Government might choose to remediate its injury at the FCC in the "alternative" to the FCA action.  *Id.* at 353.

The Government in this case previously conceded the overlapping nature of the two proceedings when it opposed staying this case because it might uncover evidence relevant to the FCC administrative proceedings that were then-ongoing.  Dkt. 65 at 3.  And this Court as well confirmed that findings at the FCC may affect the quantity of damages available in this case.  Dkt. 68 at 2.  The Report erred in failing to examine *Gabelli* and overlooking prior statements by the Government and this Court demonstrating that the FCC and FCA actions are indeed inextricably intertwined.

## B.    Awarding Relator a Share of the Alternate Remedy Will Advance the Objectives of the FCA.

Noticeably absent from the Report is any discussion of the Government's gamesmanship in this case.  The Report does not address whether the objectives of the FCA would be served by robbing Relator of its due on a technicality.  As just one example, the Report's analysis of *Bledsoe* completely sidesteps the proposition for which Relator cites that case.  Report at 35.  It is true, as the Report notes, that the settlement deemed an alternate recovery in *Bledsoe* was explicitly premised on the fraudulent conduct over which Relator had filed its FCA suit.  But the

39

more relevant portion of the Sixth Circuit's decision—which is nowhere mentioned in the Report—is its discussion of the impetus behind Congress's enactment of the alternate remedy provision.

The context explored in *Bledsoe* is critical to an accurate analysis of Relator's claims here. As described by the *Bledsoe* court, in implementing the alternate remedy provision, Congress sought to eliminate any "incentive" by the Government "to decline to intervene in an action and, having been apprised of possible FCA violations by a private citizen, to independently pursue an investigation of the alleged FCA violator(s)." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 648–49 (6th Cir. 2003). Instead, it would incentivize "the government and private citizens collaborat[ing]" to protect the Government's interests. In short, Congress sought to prevent the Government from depriving relators of their shares through formalistic technicalities, which is precisely what the Government seeks to do here.

This observation by the Sixth Circuit is echoed by *Barajas*, in which the Ninth Circuit stated that "[i]t would be inconsistent not only with the plain meaning of the broad language employed in the statute, but also with the purpose of the statute, to allow the government to obtain from a qui tam defendant a remedy that could have been obtained in an already-filed FCA action, and then to argue that the proceeds of that remedy need not be shared with the whistleblower because the remedy was not an 'alternate remedy' within the meaning of the FCA." 258 F.3d at 1012. Likewise, in *Kennedy*, the D.C. Circuit acknowledged that "governmental manipulation" that unfairly deprived a relator of its due might have dictated a different outcome in that case. 5 F.4th at 58. Indeed, the fact that the relator in question had already received a share of an earlier FCA settlement stemming from the same series of events

40

played heavily in the court's determination that no "abuse" had been perpetrated by the Government there. *Id.* The Report dodges the question of governmental manipulation in the alternate remedy context, opting instead to rely on a narrow and overly technical reading of the statute to determine erroneously that the FCC default proceedings do not constitute an alternate remedy.

Indeed, even if the Report were correct that the FCC's default proceedings cannot lead to an alternate remedy despite compensating the Government for the exact same harm alleged in the *qui tam* action, Relator is still entitled to an alternate remedy. That is, if the Report is correct, the relevant proceeding would be the licensing proceeding in which Relator alleged the same fraud alleged here. According to the Report, as a result of that proceeding, the Government found that Defendants were not entitled to bidding credits, which resulted in SNR and Northstar returning approximately $3.44 billion in spectrum licenses on which they defaulted. Report at 36–37.[18] Thus, it is the $3.44 billion amount—rather than the approximately $516 million in default payments—that would constitute the alternate remedy for Defendants' fraud as raised in Relator's petition to deny the bidding credits. And Relator would be entitled to 25 percent of that amount, or approximately $859 million, which is considerably larger than the approximately $129 million Relator requested in its Motion.

In other words, no matter how the relevant administrative remedies are characterized, it cannot be the case that Relator is not entitled to compensation when the Government benefits from Relator's fraud allegations raised in both the administrative proceedings and the *qui tam*

---

[18]    The Government's position, echoed in the Report, that it "didn't suffer economic loss" is not credible. Report at 36 (citing 11/21/24 Tr. at 91:8–92:18). This is akin to claiming that no loss occurs from a robbery if the robber is captured on the way out the door with a duffel bag full of cash. Although the loss can be swiftly remedied by snatching back the duffel bag, it is incorrect to claim that the loss **never occurred at all**.

case, and then effectively settles with Defendants. *Kennedy* does not support such a result, and *Barajas* and *Bledsoe* make clear that such an outcome is improper. Thus, the Court should reject the Report's recommendation to deny Relator's Motion for its share of the Government's alternate remedy.

## CONCLUSION

For the foregoing reasons, the Court should grant Relator's objections to the Report.


Dated: May 15, 2025

/s/ *Stephen J. Obermeier*
Stephen J. Obermeier (D.C. Bar # 979667)
Bennett L. Ross (D.C. Bar # 978122)
Bert W. Rein (D.C. Bar # 067215)
Mark B. Sweet (D.C. Bar # 490987)
Kathleen C. Cooperstein (D.C. Bar # 1017553)
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000
sobermeier@wiley.law

*Counsel for Relator Vermont*
*National Telephone Co.*

42