UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *ex rel.*       )
VERMONT NATIONAL TELEPHONE CO.,           )
                                          )
        Plaintiffs,                       )
                                          )   Civil Action No. 15-0728 (CKK)
            v.                            )
                                          )
NORTHSTAR WIRELESS, L.L.C. *et al.*,      )
                                          )
        Defendants.                       )
_____      )

**UNITED STATES' RESPONSE TO RELATOR'S OBJECTIONS
TO MAGISTRATE JUDGE UPADHYAYA'S REPORT AND RECOMMENDATION**

BRETT A. SHUMATE
Assistant Attorney General

JEANINE F. PIRRO
United States Attorney for the District of Columbia

DARRELL C. VALDEZ, D.C. Bar # 420232
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W., Civil Division
Washington, D.C.  20530

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

BRENNA E. JENNY
Deputy Assistant Attorney General

JAMIE A. YAVELBERG
PATRICK KLEIN
BENJAMIN C. WEI
Attorneys, Civil Division,
Commercial Litigation Branch
U.S. Department of Justice
Post Office Box 261
Washington, D.C. 20044
(202) 616-2875

Counsel for the United States of America

**TABLE OF CONTENTS**

I.  Background ...................................................................................................................3

   A.  Brief Factual Background ...................................................................................3

   B.  Magistrate Judge Upadhyaya's Report and Recommendation ...........................4

      i.  The Report Recommended Granting the Government's Motion to Dismiss.................5

      ii.  The Report Recommended Denying Relator's Motion for Share of Alternate Remedy.8

II.  Standard of Review ........................................................................................................8

III.  Argument .......................................................................................................................9

   A.  The Magistrate Correctly Recommended Granting the Government's Motion to Dismiss
       ........................................................................................................................10

      i.  The Report Correctly Reads Polansky.......................................................10

      ii.  The Report Properly Considered and Rejected Relator's Challenges to the
          Government's Reasons for Dismissal ......................................................11

      iii.  The Report Correctly Found Neither Bad Faith Nor Legal Prejudice.....................17

      iv.  The Report Correctly Rejected Relator's Takings Clause Argument.......................21

   B.  The Magistrate Correctly Recommended Denying Relator's Motion for $128.9 Million
       From the Public Fisc ........................................................................................22

      i.  The Report Correctly Concluded the "Default Payments" Were Not an "Alternate
          Remedy" to this Qui Tam Action.............................................................22

      ii.  Relator Fails to Show The Report was "Clearly Erroneous or Contrary to Law" ........25

IV.  Conclusion ...................................................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Aikens v. Shalala*,
   956 F. Supp. 14 (D.D.C. 1997) ........................................................................................9

*Avco Corp. v. U.S. Dep't of Justice*,
   884 F.2d 621 (D.C. Cir. 1989) .........................................................................................1

*Baylor v. Mitchell Rubenstein & Assocs., P.C.*,
   77 F. Supp. 3d 113 (D.D.C. 2015) ...........................................................................passim

*Graham v. Mukasey*,
   608 F. Supp. 2d 50 (D.D.C. 2009) ...................................................................................9

*Heckler v. Chaney*,
   470 U.S. 821 (1985) .......................................................................................................17

*Houlahan v. Brown*,
   979 F. Supp. 2d 86 (D.D.C. 2013) ...................................................................................9

*Shurtleff v. U.S. E.P.A.*,
   991 F. Supp. 2d 1 (D.D.C. 2013) ....................................................................................9

*United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*,
   970 F.3d 835 (7th Cir. 2020) .........................................................................................12

*United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs.*, 1:17-cv-0558,
   2023 U.S. Dist. LEXIS 217620 at *6-7 (N.D. Ohio Dec. 7, 2023) ........................................12

*United States ex rel. Folliard v. Comstor Corp.*,
   308 F. Supp. 3d 56 (D.D.C. 2018)..................................................................................24

*United States ex rel. Kennedy v. Novo A/S*,
   5 F.4th 47 (D.C. Cir. 2021)...................................................................................2, 3, 23, 26

*\*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
   599 U.S. 419 (2023) .................................................................................................passim

*\*United States ex rel. Stevens v. Vermont Agency of Nat. Res.*,
   529 U.S. 765 (2000) .................................................................................................22, 23

*\*United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless*,
   *Co.*, 34 F.4th 29 (D.C. Cir. 2022) .......................................................................15, 24, 25, 26

**Statutes**

28 U.S.C. § 636(b)(1) .......................................................................................................8

31 U.S.C. § 3730(c)(2)(c) ..............................................................................................21

31 U.S.C. § 3730(c)(5) .....................................................................................................2

31 U.S.C. § 3730(d) .......................................................................................................22

31 U.S.C. § 3730(e)(4) ...................................................................................................18

31 U.S.C. §§ 3729-3733 ...................................................................................................1

**Rules**

Fed. R. Civ. P. 41(a)(2) ............................................................................................5, 6, 7

Fed. R. Civ. P. 72(b)(2) ...................................................................................................8

Fed. R. Civ. P. 72(b)(3) ...................................................................................................8

Federal Rule of Civil Procedure 41(a) ..........................................................................10

Federal Rule of Civil Procedure 72(b) ............................................................................8

**Regulations**

47 C.F.R. § 1.2104(g)(2) ................................................................................................24

47 C.F.R. § 1.2110(j) ................................................................................................15, 16

**UNITED STATES' RESPONSE TO RELATOR'S OBJECTIONS
TO MAGISTRATE JUDGE UPADHYAYA'S REPORT AND RECOMMENDATION**

The United States submits this Response to Relator's Objections to Magistrate Judge

Upadhyaya's Report and Recommendation (Dkt. 223) ("Report") that recommended granting the

United States' Motion to Dismiss (Dkt. 189) and denying Relator's Motion for Share of

Alternate Remedy (Dkt. 194).  Since January 20, 2025, new leadership in the Department of

Justice's Civil Division have devoted significant time and attention to this case, including by

meeting with Relator's counsel, reviewing the record of this case, consulting with the Federal

Communications Commission, and carefully considering the positions articulated in the

Government's March 8, 2024, Motion to Dismiss.  After this extensive review, the Government

has concluded that the continued litigation of this matter would not vindicate the Government's

interests.  Nor would it advance new enforcement priorities of the Civil Division.  Accordingly,

the Court should accept the Magistrate Judge's Report recommending that this case be

dismissed.

This case arises under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), which is

"the government's primary litigative tool for the recovery of losses sustained as the result of

fraud against the government."  *Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 622 (D.C. Cir.

1989).  The FCA allows a private person, known as a "relator," to bring suit alleging violations

of the FCA on behalf of the government.  *Id.* § 3730(b)(1).  Such suits, known as *qui tam* actions,

"allege[] injury to the Government **alone**."  *United States ex rel. Polansky v. Exec. Health Res.,

Inc.*, 599 U.S. 419, 437 (2023) (emphasis added).  For that reason, the FCA vests the

Government considerable control over such actions, including the right to dismiss the action

where it "offers a reasonable argument for why the burdens of continued litigation outweigh its

benefits . . . even if the relator presents a credible assessment to the contrary." *Id.* "Absent some extraordinary circumstance, that sort of showing is all that is needed for the Government to prevail on a (2)(A) motion to dismiss." *Id.* at 438.

During the prior administration, the United States offered three interrelated reasons why this *qui tam* action would not vindicate the Government's interests and should be dismissed: (1) the lack of supporting evidence; (2) the apparent lack of damages; and (3) the burden on several government agencies in responding to discovery. Report at 16. Magistrate Judge Upadhyaya concluded these reasons justified dismissal. The new administration has undertaken a thorough review of this case and has determined that the United States' Motion to Dismiss presented reasonable arguments to dismiss this case and that the continuation of the case does not align with the Government's enforcement priorities. This Court should accept the Magistrate Judge's conclusion that these reasons justify dismissal.

The FCA also gives the Government the option to pursue a fraud claim through "any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." 31 U.S.C. § 3730(c)(5). If the Government chooses to do so, the relator is awarded a share of the "proceeds of the action or settlement of the claim." *Id.* § 3730(c)(5) & (d). Critically, "the alternative remedial proceedings from which a relator can recover a share must redress the same type of falsity and fraud claims that otherwise could be pursued by a private relator's *qui tam* lawsuit under the False Claims Act." *United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47, 56 (D.C. Cir. 2021). "[I]f the alternate proceeding seeks recompense for some other type of claim that the relator could not have brought, then the proceeding is not covered by subsection 3730(c)(5) because it is not 'alternate' to the False Claims Act *qui tam* remedy. It is a different legal claim altogether, arising beyond the False

Claims Act's borders."  *Id.*  This is true even if the alternate proceeding "arose from the same underlying facts" as the *qui tam* action.  *Id.* at 57.  This is because the FCA "does not reward relators any time the government pursues any 'alternate claim or cause of action' arising from the same facts and circumstances."  *Id.* (quotation marks in original).

Here, Relator Vermont National Telephone Company ("Relator") sought (in the amount of $129 million of taxpayer money) a share of "default payments" made by Defendants DISH Network Corporation ("DISH"), Northstar Wireless, LLC ("Northstar") and SNR Wireless, LLC ("SNR") (collectively, "Defendants") following their decision to not purchase some spectrum licenses.  As Relator explained in previous briefing to the D.C. Circuit:  "Those payments are not a 'penalty' for a 'violation.'  They result from a business decision that all successful bidders at a spectrum auction (blameless or blameworthy) are permitted to make."  Relator Br. at 30 (attached as Exhibit C to Dkt. 200).  "Nor were the default payment amounts 'based on' allegations of fraud.  They were based on the winning bids for the spectrum SNR and Northstar decided to relinquish."  *Id.* at 34.  Thus, as Relator summarized, "the default payments were not based on (or assessed in a proceeding based on) the allegations and transactions undergirding the *qui tam* action."  Relator Reply Br. at 11 (attached as Exhibit D to Dkt. 200).  Consistent with this explanation, Magistrate Judge Upadhyaya concluded the "default payments" were not an "alternative" to this *qui tam* action that entitled Relator to a share, and this Court should accept that conclusion.

## I.    **Background**

### A.  Brief Factual Background

The full facts underlying this case are set forth in the Government's briefs, prior opinions from this Court and the D.C. Circuit, and the Report and are not repeated in full here. Nonetheless and for context, a few key relevant facts:

- This *qui tam* action arises from an auction for wireless spectrum licenses run by the Federal Communications Commission ("FCC" or "Commission"). Like many previous auctions of wireless spectrum, this auction included a bidding credit for small businesses (which are referred to as "designated entities" or "DEs"). Report at 4.

- DE bidding credits are awarded in a two-step process. Bidders assert eligibility at the auction's outset using a "short-form." If the bidder wins any licenses, then the bidder must submit a "long-form" that details the basis for the claimed bidding credit. The FCC evaluates the "long-form" to determine whether to award the claimed bidding credit. *Id.* at 3. In this way, the rules promote efficiency by requiring the FCC to assess bidding credit eligibility for only winning bidders where the credit would actually be used.

- SNR and Northstar claimed eligibility for bidding credits in their "short-form." They were winning bidders for 702 licenses totaling $13.3 billion in gross bid value. SNR and Northstar then submitted their "long-form." *Id.* at 5.

- After review of the "long-form," the FCC concluded that SNR and Northstar were under the *de facto* control of DISH and therefore ineligible for bidding credits. The FCC further concluded that Northstar and SNR had not misled the Commission and had adequately "disclosed their ownership structures and related Agreements [with DISH] as required, and proceeded under an incorrect view about how the Commission's affiliation rules apply to these structures." As a result, SNR and Northstar were not awarded any DE bidding credits and had to pay the full bid price to receive any of the licenses they won at auction. *Id.* at 6.

- Northstar and SNR decided they wanted most, but not all, of the licenses they won at auction. For the licenses they wanted, they paid full price and were issued the licenses. For the licenses they did not want, they paid the "default payment" specified by the auction's rules and the licenses were not issued. *Id.* at 7.

- Relator filed this *qui tam* action alleging that Defendants defrauded the Government by failing to "disclose all of their instruments, agreements, and understandings" in order to fraudulently obtain DE bidding credits. *See* Amended Complaint ¶ 128. The Government declined to intervene and, at that time, expressed concerns about the strength of the case and the amount of provable damages. Report at 21.

- Discovery began in November of 2022 and continued through January 2024. Through discovery, Relator obtained thousands of documents and conducted twenty-five depositions. Relator apprised the Government of the results of discovery on numerous occasions, both in writing and in person. *Id.* at 19.

- The Government informed Relator in January of 2024 that it had concerns about continued litigation of the *qui tam* action and was considering dismissal. The Government and Relator discussed ways to address these concerns, including potential settlement. After those discussions proved unproductive, the Government informed Relator and the Defendants that it was going to intervene and dismiss this *qui tam* action. *Id.* at 19-20.

   B.  Magistrate Judge Upadhyaya's Report and Recommendation

4

The Report recommended that this Court grant the Government's Motion to Dismiss (Dkt. 189) and deny Relator's Motion for Share of Alternate Remedy (Dkt. 194).

> i.    *The Report Recommended Granting the Government's Motion to Dismiss*

1. To start, the Report concluded that the standard rule governing dismissals for cases in this procedural posture—after an answer has been served and as provided by Fed. R. Civ. P. 41(a)(2)—"must shift and take contextual factors into account" as directed by the Supreme Court in *Polansky*, 599 U.S. at 436.  Report at 15.  The Report viewed that case as instructing that the Government's Motion to Dismiss should be granted where the "Government offers a reasonable argument for why the burdens of continued litigation outweigh its benefits" and denied in only "the most exceptional cases."  *Id.* at 12 (quoting *Polansky*, 599 U.S. 437-38).

The Report then applied that standard to the reasons offered for dismissal by the Government in this case: (1) the lack of evidence supporting Relator's claim that the Defendants failed to disclose their relationship to the FCC; (2) the apparent lack of damages; and (3) the burden on several government agencies in responding to discovery.  Report at 16.  After carefully considering each reason and Relator's criticism of those reasons, the Report concluded the "Government has provided reasonable arguments for dismissal."  *Id.* at 16.

2. The Report could have ended there, but it went further and found that dismissal was warranted under even the traditional Fed. R. Civ. P. 41(a)(2) analysis because the Government was acting in "good faith" and Relator would not suffer legal prejudice.  Report at 17.  First, the Report rejected Relator's argument that the Government's concerns about the lack of evidence were made in "bad faith."  Relator argued that the Government needed to provide an in-depth explanation of why it viewed the evidence as insufficient.  *Id.* at 21.  The Report rejected that approach as essentially requiring a "mini-trial or extensive review of the evidence," which it viewed as inconsistent with the requirement in *Polansky* that the Government need only "offer a

reasonable explanation." *Id.* It was enough that the Government had explained that the evidence Relator uncovered was cumulative of what was previously disclosed by the Defendants. *Id.*

Second, the Report rejected Relator's complaints that the Government acted in "bad faith" because it did not conduct a diligent investigation, frustrated Relator's attempts to uncover evidence, and otherwise failed to consider the evidence that was uncovered by Relator. Report at 22. The Report found this argument rebutted by the fact Relator "was able to engage in robust discovery in this case, including conducting numerous depositions and collecting large tranches of documents," and presented the fruits of that discovery to Department of Justice and the FCC. *Id.* As such, the Report concluded Relator's argument on this point was "essentially that the Government has come to different conclusions than [Relator] about the strength of the case," which did not establish bad faith. *Id.* at 23.

Third, the Report rejected Relator's arguments that the Government's discovery burden was "illusory" because it was not documented and the Government had not properly contested the Defendant's discovery requests. Report at 23. The Report found that the Government had specifically identified the discovery burden in the form of "responding to Defendant's discovery demands, reviewing privileged documents, and preparing for the depositions of more government witnesses." *Id.* at 24. The Report concluded this was adequate because the Government was not required to prove and quantify its discovery costs, it needed only present a "reasonable argument" why those burdens exist. *Id.* In any event, the Report noted there was no argument the Government would incur no costs, and minimizing even a relatively small expense is a legitimate objective. *Id.* at 23-24.

Fourth, the Report rejected Relator's argument that the Government took inconsistent positions in this case. Report at 21-22. The Report disagreed, noting that the Government

expressed concerns about the strength of the case and potential for damages back when it

declined to intervene. *Id.* at 22. The Report also found the Government had not taken

inconsistent positions in this case and noted, even if it had, dismissal would still not be precluded

given the Supreme Court affirmed dismissal in *Polansky* where the Government initially told the

relator it would not dismiss. *Id.* at 22.

Fifth, the Report rejected Relator's accusation that the Government was moving to

dismiss here as part of some conspiracy with the Defendants. Report at 25. The Report found

Relator offered no meaningful evidence of such a conspiracy and found that speculation

insufficient to establish bad faith. *Id.*

Sixth, the Report found Relator failed to show clear legal prejudice. Report at 26-28. In

particular, the Report rejected Relator's claim to have a legal interest in the "FCA's deterrence

function" to stop fraud in future spectrum auctions as purely speculative. *Id.* at 26. The Report

likewise rejected the fact Relator expended significant resources litigating the case as

establishing legal prejudice given that the Supreme Court rejected that argument in *Polansky*

where, it observed that all "relators want their actions to go forward, and many of them have by

then committed substantial resources." *Id.* at 27, *quoting Polansky*, 599 U.S. at 437. The Report

also noted that Relator expended the resources to litigate knowing about the Government's

concerns about the merits, which were communicated to it when the Government declined to

intervene. *Id.* at 28. Finally, the Report found no legal prejudice in dismissing this case before

the end of discovery, observing there is no "hard and fast rule as to timing" and that dismissals

have been granted in cases at comparable stages of litigation. *Id.*

3. Lastly, the Report rejected Relator's argument that the Fifth Amendment precluded

dismissal. Report at 29-30. The Report found that any property right Relator may have in this

*qui tam* action arises only after the litigation is completed and the relator prevails. *Id.* at 30. Since Relator has not obtained a final judgment, the Report concluded there is no property interest protected by the Fifth Amendment. *Id.*

      ii.      *The Report Recommended Denying Relator's Motion for Share of Alternate Remedy*

The Report also recommended that this Court deny Relator a share (in the amount of $129 million) of the "default payments" made by Defendants as an "alternate remedy" to this *qui tam* action because the two have different bases. Report at 33. This *qui tam* action, the Report explained, is predicated on the allegation that Defendants falsely certified their applications to the FCC because they "knowingly failed to disclose all of their instruments, agreements, and understandings with" DISH. *Id.* No such showing that the Defendants "used falsity or fraud" was a predicate for the "default payments," which arose entirely from the decision by SNR and Northstar to relinquish certain licenses they had won at auction, *i.e.*, "default" on some of their winning bids. *Id.* at 34. Since Relator could not have "brought or maintained a *qui tam* action against the Defendants for defaulting," the Report concluded Relator "cannot recover a share of the default payments now." *Id.*

## II.    <u>Standard of Review</u>

Pursuant to Federal Rule of Civil Procedure 72(b), a party may file specific written objections once a magistrate judge has entered a recommended disposition. Fed. R. Civ. P. 72(b)(2). A district court "may accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3); see also 28 U.S.C. § 636(b)(1). A district court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). "If, however, the party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for

clear error." *Houlahan v. Brown*, 979 F. Supp. 2d 86, 88 (D.D.C. 2013) (internal quotation marks omitted). "[O]bjections which merely rehash an argument presented and considered by the magistrate judge are not properly objected to and are therefore not entitled to *de novo* review." *Shurtleff v. U.S. E.P.A.*, 991 F. Supp. 2d 1, 8 (D.D.C. 2013) (internal quotation marks omitted). Likewise, with respect to non-dispositive matters—here, Relator's Motion for Share of Alternate Remedy— "the report and recommendation is reviewed under the 'clearly erroneous or contrary to law' standard." *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 77 F. Supp. 3d 113, 118 (D.D.C. 2015).

Under the clearly erroneous standard, the "magistrate judge's decision is entitled to great deference" and is clearly erroneous only "if on the entire evidence the court is left with the definite and firm conviction that a mistake has been committed." *Graham v. Mukasey*, 608 F. Supp. 2d 50, 52 (D.D.C. 2009).

In addition, the "court will not consider an argument which could have been, but inexplicably was not, presented to the Magistrate Judge in the first instance." *Aikens v. Shalala*, 956 F. Supp. 14, 23 (D.D.C. 1997) (internal quotation marks omitted). This is because "[p]arties must take before the Magistrate Judge, not only their best shot but all of their shots." *Id.* Thus, a failure to make an argument to the Magistrate Judge "constitutes a waiver of that argument." *Id.*

### III.    Argument

The Report recommended that this Court grant the Government's Motion to Dismiss (Dkt. 189) and deny Relator's Motion for Share of Alternate Remedy (Dkt. 194). The Government continues to believe that this *qui tam* case should be dismissed because the United States' Motion to Dismiss offered reasonable arguments in support of dismissal, the case does not vindicate the Government's interests, and investing additional resources in this case would not advance its enforcement priorities. Relator's ostensible "objections" to the Report are

repackaged arguments that were already rejected by Magistrate Judge Upadhyaya.  This Court

should do the same and accept the Report in its entirety.

A. <u>The Magistrate Correctly Recommended Granting the Government's Motion to Dismiss</u>

      *i.*    *The Report Correctly Reads Polansky*

Relator's principal objection to the Report is that it misapplied *Polansky* by not applying

the "traditional Rule 41(a)(2) analysis."  Objections at 7.  This was an argument Relator made in

its original opposition to the Government's Motion to Dismiss, (Dkt. 190 at 16), that the Report

expressly rejected, Report 16.  As such, this argument should be evaluated under the "clearly

erroneous or contrary to law" standard.  *Baylor*, 77 F. Supp. 3d at 118.  But under any standard

of review, the Report was correct.

Relator entirely relies upon a snippet of *Polansky* that stated: "district courts should apply

the rule generally governing voluntary dismissal of suits: Federal Rule of Civil Procedure 41(a)."

Objections at 7.  But that lone sentence was not the entirety of the opinion.  The full context of

that quote, which the Report quoted in full, went on to explain:

> This Court has never set out a grand theory of what that Rule requires, and we
> will not do so here.  The inquiry is necessarily "contextual."  And in this context,
> the Government's views are entitled to substantial deference.  A *qui tam* suit, as
> we have explained, is on behalf of and in the name of the Government.  The suit
> alleges injury to the Government alone.  And the Government, once it has
> intervened, assumes primary responsibility for the action.  Given all that, a district
> court should think several times over before denying a motion to dismiss.  If the
> Government offers a reasonable argument for why the burdens of continued
> litigation outweigh its benefits, the court should grant the motion.  And that is so
> even if the relator presents a credible assessment to the contrary.

Report at 12, quoting *Polansky*, 599 U.S. at 437.

The Report applied this "contextual" standard, finding that its "Rule 41(a)(2) analysis

must clearly shift and take certain contextual factors into account."  Report at 15.  The Report

identified three factors, all taken directly from *Polansky*.  The first was to give Relator an

opportunity to be heard, which was provided. *Id.* The second was to consider "whether the Government offers reasonable arguments 'for why the burdens of continued litigation outweigh its benefits' in the *qui tam* action at issue." *Id.*, *quoting Polansky*, 599 U.S. at 438. The last was to "consider whether the relator's interests weigh against dismissal," while recognizing that in the FCA context, the Government's views must be given "substantial deference" as compared to relator's asserted interests. *Id.*, *quoting Polansky*, 599 U.S. at 437. This standard, and not the "traditional Rule 41(a)(2) analysis" advocated by Relator, was the correct one and the Report did not err in using it.

> ii. *The Report Properly Considered and Rejected Relator's Challenges to the Government's Reasons for Dismissal*

Relator argues that the Report further erred by not scrutinizing the Government's offered reasons for dismissal, which Relator characterizes as "grounded in fantasy rather than reality." Objections at 8-9. This too was an argument Relator made in its original opposition to the Government's Motion to Dismiss, where it exhaustively contested each of the Government's offered reasons for dismissal. Dkt. 190 at 22-32. As such, this argument should also be evaluated under the "clearly erroneous or contrary to law" standard. *Baylor*, 77 F. Supp. 3d at 118. But under any standard of review, this objection fails.

Here, the Government offered three interrelated reasons why this *qui tam* action will not vindicate the Government's interests: (1) the lack of evidence supporting Relator's claim that the Defendants failed to disclose their relationship to the FCC; (2) the apparent lack of damages; and (3) the burden on several government agencies in responding to discovery. Each of these reasons were scrutinized by the Report and found to be a reasonable reason for the Government to seek dismissal.

1.  First, the Government did not believe Relator had uncovered sufficient evidence supporting its allegation that the Defendants failed "to disclose all of their instruments, agreements, and understandings with the DISH-Controlling Defendants" in their filings with the FCC.  *See* Amended Complaint ¶ 128.  Specifically, the Government viewed the "undisclosed understandings" that Relator purportedly uncovered were cumulative of what the Defendants disclosed to the FCC during the auction.  The Government reached this conclusion only after review of the evidence in this case, including evidence Relator uncovered during discovery that it presented to the Department of Justice and FCC on multiple occasions.  The Report found this to be a reasonable argument for dismissal.  Report at 21.

Relator objects to the lack of "evidentiary support" for the Government's view of the evidence, (Objections at 14), just as it did in its original opposition,  Dkt. 190 at 25-27.  But, as the Report recognized, such evidence would be useful only in a "mini-trial" where the court would effectively be deciding the merits of the case.  Report at 21.  This is something even Relator concedes is inapposite.  Dkt. 190 at 27 ("[T]his Court is not tasked here with deciding the merits of the cases [sic] . . . .").  In any event, the Government need not disprove Relator's case before it can dismiss.  *United States ex rel. CIMZNHCA, LLC v. UCB, Inc*., 970 F.3d 835, 852 (7th Cir. 2020) ("The government is not required to justify its litigation decisions in this way, as though it had to show 'reasoned decisionmaking' as a matter of administrative law") (quotation marks in original).  It is enough that the relator "has not been able to uncover enough evidence to **convince the Government** that any significant violations of the FCA actually took place."  *United States. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs*., No. 1:17-cv-0558, 2023 U.S. Dist. LEXIS 217620 at *6-7 (N.D. Ohio Dec. 7, 2023) (emphasis added).

Nor is there any reason to conclude the Government did not have an adequate basis for its view of the evidence. As the Report noted, Relator was able to "engage in robust discovery in this case, including conducting numerous depositions and collecting large tranches of documents." Report at 22. Relator was then able to present this evidence to the Department of Justice and the FCC, which was considered by the Government before reaching its conclusion. *Id*. And, Relator does not "allege it was stonewalled from providing the Government with any newly-discovered evidence or argument." *Id.* at 23. Thus, Relator's actual complaint, as the Report recognized, was that the Government had come to a different conclusion about the evidence. *Id.* But that is not a reason to find the Government's view was unreasonable.

Finally, the Government's view that the evidence uncovered by Relator is cumulative of what was previously disclosed is reasonable in light of the FCC proceedings. There, "[p]ursuant to [FCC] rules requiring that applicants support their claims of DE eligibility, SNR and Northstar submitted Applications that included copies of their respective agreements between and among themselves and DISH, their other investors and principals, and each other." *Northstar Wireless, LLC*, 30 FCC Rcd. 8887, 8892 ¶ 51 (2015), attached as Exhibit A to Dkt. 189 (hereinafter "SNR/Northstar Order"). The FCC conducted a detailed analysis of these documents, and found they disclosed multiple ways that suggest DISH had control over SNR and Northstar. *Id.* at ¶¶ 49-117, 122-128. Given the multitude of ways the FCC knew DISH was exercising control over SNR and Northstar, it is not unreasonable for the Government to conclude that what evidence Relator claims to have uncovered was cumulative of what the Government already knew.

2. Second, the Government believed that even if Relator were able to prove liability, there was significant doubt it would be able prove damages because the Defendants were never awarded any bidding credits. SNR/Northstar Order ¶¶ 152, 154. As explained above, Auction

97 used a two-part process to award small business bidding credits. First, applicants seeking

small business bidding credits assert eligibility on a "short-form" application. The FCC's

acceptance of a "short-form" application, which allows the applicant to participate in the auction,

is not an award of any small business bidding credit. Public Notice, 29 FCC Rcd 11606 (WTB

2014) ¶ 4 ("Thus, a determination that a short-form application is complete and complies with

the Commission's competitive bidding rules and policies is not determinative of an applicant's

qualifications to hold a license or of entitlement to a bidding credit."). Second and after the

auction, bidders that submitted the highest bid for any license must submit a "long-form"

application. The "long-form" application is the document that the FCC evaluates to actually

award the licenses, along with any claimed small business bidding credits. *See* Public Notice, 29

FCC Rcd 8386 ¶ 231 (WTB 2014).

Here, the FCC denied both SNR and Northstar bidding credits after review of their "long-

form" applications. SNR/Northstar Order ¶¶ 152, 154. Thus, neither SNR nor Northstar

received any bidding credits and, for every license they were issued, paid full price. Given these

facts, the Government had reasonable doubts about Relator's ability to prove meaningful FCA

damages.

Perhaps recognizing the challenges posed to their theory by the FCC's considered

conclusion that Defendants' long-form applications fully disclosed all information necessary to

assess Defendants' eligibility for small business bidding credits, Relator focuses on supposed

shortcomings in Defendants' short-form applications. Objections at 15. However, Relator cites

to nothing that requires Defendants to disclose their agreements, *i.e.*, their basis for bidding

credit eligibility, in their short-form applications. Instead, Relator suggests the D.C. Circuit

concluded the short-form applications "had the potential to affect the Commission's eligibility

determinations regarding such bidding credits," and this conclusion must carry the day now. *Id.* But the D.C. Circuit never ruled that the short-form applications were material, only that their materiality would be "addressed at a later stage in this litigation." *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless Co.,* 34 F.4th 29, 38 (D.C. Cir. 2022). That later stage is now, and the fact is that the "long form" applications were what the FCC used to evaluate bidding credit eligibility. 47 C.F.R. § 1.2110(j); Malmud Decl. ¶ 5 ("The "long-form" application is the document that the FCC evaluates in order to actually award the licenses, along with any claimed small business bidding credits.").

Relator further objects to the Report crediting this basis for dismissal by arguing that it ignored potential harm during the auction, Objections at 17, repeating an argument it made in its original opposition. Dkt. 190 at 27-32. But harm does not necessarily equate to FCA damages. Indeed, one "harm" Relator cites to is the fact the Defendants "artificially increased the amounts that competitors paid for the AWS-3 spectrum they were able to win." Objections at 17. But this means the Defendants' alleged conduct had the effect of increasing the amount the Government received in the auction, making it even more difficult to establish how the Government was damaged. Relator also alleges that the Government "still has not been paid the $3.3 billion it was owed in 2015," presumably referring to the amount of the winning bids for licenses that SNR and Northstar chose to default on. *Id.* But it is unclear how Government is "owed" that money because it was for licenses that were never issued to SNR or Northstar. None of these reasons shows the Government's concern about Relator's ability to prove damages are "grounded in fantasy rather than reality." *Id.* at 8-9.

3. Lastly, the Government cited the costs of continued litigation of this *qui tam* action as a reason justifying dismissal. In particular, the Government identified the burden created by the

need for the FCC and five other government agencies (Department of Interior, Department of Commerce, Department of the Army, Department of the Navy, and Department of the Air Force) to respond to discovery requests and to prepare government witnesses for depositions. The Government concluded it would not be a useful expenditure of scarce public resources to incur these costs to advance this *qui tam* action which, as noted above, has serious deficiencies. The Report agreed this cost-benefit analysis was reasonable and supported dismissal. Report at 24.

Relator's objection on this score is that the Government's burdens are "illusory," because the Government could reduce its burden if it contested the Defendants' discovery requests in the manner Relator would prefer and not supported with specific evidence, such as in a declaration. Objections at 18-19. Both arguments were raised by Relator in its original opposition (Dkt. 190 at 22-25, 33) and miss the point. As the Report recognized, Relator "does not argue, nor could it, that the Government has *no* costs moving forward." Report at 24. (emphasis in original). Thus, the Government would unavoidably "shoulder some amount of costs and burdens in addressing these discovery requests." *Id.* That Relator believes the Government could take steps to reduce these costs does not make them any less real.

Similarly, a declaration providing additional granularity on the Government's litigation costs would not add anything to the analysis. As the Report found, the Government did not just vaguely allude to "burdens," but rather "detailed the costs for continuing this case in its briefing, including responding to Defendant's discovery demands, reviewing privileged documents, and preparing for the depositions of more government witnesses." Report at 24. Relator does not contest that continued litigation would require the Government to perform these tasks, so no value would be added by repeating them in a declaration. Nor would any point be served by quantifying the effort involved. This is not an award of attorneys' fees and costs, and there is no

quantitative threshold the Government's burden must exceed before it may move to dismiss. Rather, it is a judgment call on how best to allocate Government resources that Relator is not entitled to overrule simply because it disagrees with the calculus. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

4. In sum, as the Report recognized, this case is identical to *Polansky* in almost every salient respect. In both cases, the relator aggressively litigated the *qui tam* action for several years following the United States' declination, in the process investing "considerable time and resources in the case." *Polansky*, 17 F.4th at 381. Also in both cases, the Government "enumerated the significant costs of future discovery in the suit," and "explained in detail why it had come to believe that the suit had little chance of success on the merits." *Polansky*, 599 U.S. at 438. And like Relator here, the relator in *Polansky* "vigorously disputed the latter point, claiming that the Government was leaving billions of dollars of potential recovery on the table." *Id.* (internal quotation marks omitted). The Supreme Court held that it was "not a close call" to grant the Government's motion to intervene and dismiss in *Polansky*. *Id.* After a thorough review by the new administration, the Government agrees with the Report's recommendation that this case should also be dismissed.

        *iii.*       *The Report Correctly Found Neither Bad Faith Nor Legal Prejudice*

Relator also repeats the very same arguments it made in its initial opposition to the Government's Motion to Dismiss that the Government was acting in bad faith and that the dismissal would cause Relator legal prejudice. Objections at 22-35. These arguments were considered and rejected by the Report. These are yet more arguments that should also be evaluated under the "clearly erroneous or contrary to law" standard but fail under any standard. *Baylor*, 77 F. Supp. 3d at 118.

1.  Relator first repeats its argument that the inadequacy of the Government's investigation demonstrates bad faith.  Objections at 23-24; Dkt. 190 at 17-21.  In particular, Relator claims the Government failed to consider some of the evidence that it uncovered before moving to dismiss.  But Relator acknowledges it was able to meet with the Department of Justice and FCC to present its case on several occasions before the Government decided to exercise its dismissal authority.  Objections at 24.  As the Report observed, Relator does not "allege it was stonewalled from providing the Government with any newly-discovered evidence or argument." Report at 23.  Thus, there is no dispute that the Government had before it every piece of evidence and argument Relator saw fit to present.  That the Government simply came to a different conclusion about that evidence and those arguments is not bad faith.

2.  Relator repeats its argument that the Government failed to explain its "change of heart" about this case given its prior objections to the dismissal of this case.  Objections at 25-26; Dkt. 190 at 17-21.  Even were this true, as the Report recognized, it would not represent "bad faith" because the Government is entitled to change its mind as it did in *Polansky*, where the Government initially told the relator it would not move to dismiss.  422 F. Supp. 3d at 921-22. But the Government has never had a change of heart on the merits of this case.  As the Report noted:  "It is undisputed that, since the outset of the case, the Government expressed 'substantial concerns' to Vermont about the merits and Vermont's ability to recover damages."  Report at 18. This is not inconsistency.

Likewise, the Government objection to dismissal of this case was not on the merits, but rather in relation to the FCA's "public disclosure bar," which is hinges on whether "substantially the same allegations or transactions" alleged in the *qui tam* action "were publicly disclosed."  31 U.S.C. § 3730(e)(4).  Here, the alleged "public disclosure" was the prior FCC proceeding.  And

because Relator agreed to amend its complaint to make clear this *qui tam* action was only about agreements not disclosed to the FCC, something the prior FCC proceeding could not have considered, the Government agreed that the prior FCC proceedings should not serve as procedural bar to this *qui tam* action. It is not inconsistent for Government to now believe, after Relator has conducted "robust discovery" and presented that evidence to the Government, Report at 22, that the continued litigation of this *qui tam* action would not serve its interests and should be dismissed. Indeed, the new administration has reviewed this case and agrees it should be dismissed.

3. Relator repeats its argument that the Government's dismissal was in bad faith because it prevented Relator from taking several depositions. Objections at 26-28; Dkt. 190 at 18-21. The Report rightly rejected this argument as belied by the fact Relator was able to "engage in robust discovery in this case, including conducting numerous depositions and collecting large tranches of documents." Report at 22. It was not unreasonable, let alone bad faith, for the Government to conclude this volume of evidence was enough for it to make an evaluation of the case. This is particularly true given that Relator's counsel told the Government that he expected the remaining depositions to uncover additional support for the fraud they already identified. The new administration agrees that additional depositions would not change the Government's assessment of this case.

4. Relator repeats its claim that the Government conspired with the Defendants to improperly assist them in the litigation by providing a declaration and encouraging Relator to settle. Objections at 29; Dkt. 190 at 38-40. The Report correctly dismissed this allegation as speculation, and this Court should do the same. Report at 25. But these allegations fail even the lightest degree of scrutiny. The Government did provide Defendants with a declaration in

response to certain discovery requests, but this was so that the Government would not have to produce documents and offer witnesses for depositions. This is the very sort of effort to minimize the discovery burden of this *qui tam* action that, ironically, Relator faults the Government for not making. Likewise, the fact the Government indicated it was open to a settlement of this *qui tam* action for a modest amount was perfectly consistent with its view of Relator's questionable ability to prove damages. Neither reflects some sort of conspiracy as Relator speculates, and the Report was correct to summarily dismiss them.

5. Finally, Relator repeats its claim that dismissal will cause it legal prejudice. Objections at 33-35; Dkt. 190 at 40-43. As a threshold matter, prejudice to the relator is not an independent ground to deny the Government's motion to dismiss. Indeed, every relator that has their *qui tam* action dismissed over their objection suffers a form of "prejudice." Rather, prejudice to relator is only one "set of interests the court should consider," with the focus on the Government's views, which "are entitled to substantial deference." *Polansky*, 599 U.S. at 436. Thus, where, as here, the Government "offers a reasonable argument for why the burdens of continued litigation outweigh its benefits," the Government's motion should be granted even if it results in prejudice to the relator. *Id.*

In any event, Relator does not identify any particular reason why it would be so uniquely prejudiced as to justify denying the Government's motion to dismiss. First, Relator claims it would suffer prejudice because the Government's dismissal would prevent it from having "a fair opportunity to present its case." Objections at 33; Dkt. 190 at 18-21. But, as noted above, Relator was able present its case to the Government after "engag[ing] in robust discovery in this case, including conducting numerous depositions and collecting large tranches of documents." Report at 22. More fundamentally, this argument overlooks the fact this case does not belong to

Relator, it is filed "on behalf of and in the name of the Government" and "alleges injury to the Government alone." *Polansky*, 143 S. Ct. at 1734. So the ultimate right to present this case lies with the Government, not Relator. *See* 31 U.S.C. § 3730(c)(2)(c) (giving the Government the right to limit the participation of a relator in the litigation).

Second, Relator claims it would suffer prejudice because its interest in the "deterrence function of the FCA" would be frustrated. Objections at 34; Dkt. 190 at 40-42. But, as the Report noted, the missed opportunity for a legal ruling is not sufficient prejudice. Report at 27. Moreover, that is a claim common to every *qui tam* relator and premised upon the assumption that Defendants are guilty of what Relator alleges. That assumption is particularly shaky here given the Government's significant doubts about the evidence.

Finally, Relator claims it will suffer prejudice because it will have lost the resources it expended in litigating the case. Objections at 34-35; Dkt. 190 at 42-43. But that would have also happened if Relator failed to prove liability, which is not an inconceivable outcome given the Government's concerns about the evidence. Moreover, that is not a unique concern. As Supreme Court noted, "all relators faced with a (2)(A) motion want their actions to go forward, and many have by then committed substantial resources." *Polansky*, 599 U.S. at 535. Indeed, the relator in *Polansky* committed even more resources, having litigated the case for several years to the eve of trial. *Polansky*, 17 F.4th at 381, 393 ("[T]he litigation was at an advanced stage and significant resources had been expended on it by both the parties and the Court...."). And still, granting the Government's motion to dismiss was "not a close call." *Polansky*, 599 U.S. at 536. Indeed, the Government's statutory authority to dismiss *qui tam* actions would be ineffectual if it could be neutralized by a relator's mere expenditure of resources.

    *iv.*   *The Report Correctly Rejected Relator's Takings Clause Argument*

Relator objects to the Report not accepting its argument that Relator has a property interest protected by the Fifth Amendment in the filing of this *qui tam* action.  Objection at 35; Dkt. 190 at 44-45.  But relators file *qui tam* suits "on behalf of and in the name of the Government" that "allege[] injury to the Government alone."  *Polansky*, 143 S. Ct. at 1734.  Thus, while the FCA "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" to the relator, it does not convert the relator into the real party in interest, nor does it give the relator exclusive control of the litigation.  *United States ex rel. Stevens v. Vermont Agency of Nat. Res.*, 529 U.S. 765, 773 (2000).  Relator only has a right to the "proceeds of the action or settlement of the claim," 31 U.S.C. § 3730(d), which does not materialize until after success on the merits, *see Stevens*, 529 U.S. at 773 n.3 ("Blackstone noted, with regard to English qui tam actions, that 'no particular person, A or B, has any right, claim or demand, in or upon [the bounty], till after action brought,' and that the bounty constituted an 'inchoate imperfect degree of property . . . [which] is not consummated till judgment.'") (quotation marks and alterations in original).  For that reason, the Report was correct to conclude Relator has no protected property interest in merely filing this *qui tam* action.  Report at 30.  Indeed, the relator in *Polansky* also argued the dismissal deprived him of a property interest, but the Supreme Court did not even mention the Fifth Amendment as part of the standard to evaluate the Government's motion to dismiss under Section 3730(c)(2)(A).

B.  The Magistrate Correctly Recommended Denying Relator's Motion for $128.9 Million From the Public Fisc

i.    *The Report Correctly Concluded the "Default Payments" Were Not an "Alternate Remedy" to this Qui Tam Action*

When a *qui tam* action is filed, Section 3730(c)(5) of the FCA permits the Government to elect to pursue an FCA violation "through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty."  The purpose of

this provision is to provide the government with flexibility to redress the defendants' fraud. Where the Government elects to proceed with a different fraud remedy, the FCA protects the relator by putting the relator in the same position it would have been if the government had pursued the fraud scheme under the FCA. *Id.* ("[I]f any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section."). Thus, a relator is entitled to a share of any recovery that results from the Government's pursuit of an "alternate remedy" for fraud.

The alternate remedy provision does not, however, allow a realtor to receive a share of recoveries that would not be actionable under the FCA. As the D.C. Circuit made clear, "the alternative remedial proceedings from which a relator can recover a share must redress the same type of falsity and fraud claims that otherwise could be pursued by a private relator's *qui tam* lawsuit under the False Claims Act." *Kennedy*, 5 F. 4th at 56. In other words, the "claim pursued in the alternate remedy is of the type that could have been pressed under the False Claims Act." *Id.* at 47. Thus, "if the alternate proceeding seeks recompense for some other type of claim that the relator could not have brought, then the proceeding is not covered by subsection 3730(c)(5) because it is not 'alternate' to the False Claims Act *qui tam* remedy. It is a different legal claim altogether, arising beyond the False Claims Act's borders." *Id.* at 56. This is true even if the alternate proceeding "arose from the same underlying facts" as the *qui tam* action. *Id.* at 57. This is because the FCA "does not reward relators any time the government pursues any 'alternate claim or cause of action' arising from the same facts and circumstances." *Id.* (quotation marks in original).

Here, Relator claims that the "default payments" by SNR and Northstar resulted from the Government's pursuit of this *qui tam* action through an "alternate remedy." As the Report recognized, this is fundamentally incorrect because the "default payments," unlike every action under the FCA, were not predicated on any fraudulent behavior. Report at 34. Specifically, "default payments" are imposed on any "bidders who withdraw high bids during the course of an auction, or who default on payments due after an auction closes or who are disqualified." 47 C.F.R. § 1.2104(g)(2). There is no need to prove the defaulting bidder made a false statement to the FCC, let alone had knowledge that statement was false, both of which are core elements to any claim under the FCA. *See United States ex rel. Folliard v. Comstor Corp.*, 308 F. Supp. 3d 56, 79 (D.D.C. 2018) (A violation of the FCA requires showing "the defendant submitted [1] a claim to the government, [2] that the claim was false, and [3] that the defendant knew that the claim was false."). Instead, all that the FCC had to show to impose a default payment on SNR and Northstar was that they "default[ed] on payments due after an auction closes." 47 C.F.R. § 1.2104(g)(2). Thus, the Report concluded, "[b]ecause [Relator] could not have brought or maintained its *qui tam* action against Defendants for defaulting, it cannot recover a share of the default payments now." Report at 34.

At one time, Relator fully agreed with this conclusion. In prior briefing to the D.C. Circuit, Relator explained: "By contrast, 'default payments' are just that: 'payments' that are a consequence of a default, not 'civil money penalties' for misconduct." Relator Br. at 30 (attached as Exhibit C to Dkt. 200). "Those payments are not a 'penalty' for a 'violation.' They result from a business decision that all successful bidders at a spectrum auction (blameless or blameworthy) are permitted to make." *Id.* at 31 (quotation marks in original). "Nor were the default payment amounts 'based on' allegations of fraud. They were based on the winning bids

for the spectrum SNR and Northstar decided to relinquish." *Id.* at 34 (quotation marks in original). "Indeed, the selective defaults that triggered SNR and Northstar's default payment obligations here were permitted by Commission rules." *Id.* at 31. Thus, as Relator summarized, "the default payments were not based on (or assessed in a proceeding based on) the allegations and transactions undergirding the *qui tam* action." Relator Reply Br. at 11 (attached as Exhibit D to Dkt. 200). Relator was correct then just as the Report is correct now.

> ii.     *Relator Fails to Show The Report was "Clearly Erroneous or Contrary to Law"*

Relator raises two objections to the Report's recommendation to deny Relator a share of the "default payments," neither of which have merit, let alone establish the Report was "clearly erroneous or contrary to law" such that this Court should not accept it. *Baylor*, 77 F. Supp. 3d at 118. First, Relator claims it is enough that the "default payments" and this *qui tam* action are intended to address the "same harm." Opposition at 37. After all, Relator posits, if the "alternate remedy" provision applied only to proceedings that "mirror the proof of fraud required in FCA cases," that would render "one or the other . . . superfluous." *Id.* at 37. This has it precisely backwards.

As the D.C. Circuit explained:

The alternate remedy must be used to pursue the government's 'claim.'

. . .

But subsection 3730(c)(5) does not refer to just any legal claim or cause of action that the government has. The statute does not, for example, say that the relator can recover if the government pursues any alternate cause of action. Instead, the remedy is tied to the single referenced 'claim.' That claim is only the one that otherwise could be prosecuted through a *qui tam* suit under subsection 3730(b) of the False Claims Act. It is for those specified claims of falsity or fraud that Congress felt a need to give express permission for the government to pursue alternative recourse 'notwithstanding' a relator's initiation of a *qui tam* lawsuit under 'subsection (b).'

*Kennedy*, 5 F.4th at 55 (quotation marks in original) (internal citations omitted).  Thus, the fact an "alternate remedy" mirrors a *qui tam* action is what makes the administrative proceeding an "alternate remedy" in the first instance.  *Id.* at 58 ("Subsection 3730(c)(5) limits a relator's recovery from an alternate remedy pursued by the government to those types of false or fraudulent claims that the False Claims Act recognizes and for which a *qui tam* action could have been litigated.")

Moreover, this objection even fails on its own terms as the "default payment" and this *qui tam* action address different harms.  As the Report recognized, the "default payments" were intended to redress the harm caused by the failure of a winning bidder to "pay their full bid amount after the spectrum auction closes."  Report at 34.  In contrast, the harm claimed by this *qui tam* action is predicated on the allegation that Defendants falsely certified their applications to the FCC because they "knowingly failed to disclose all of their instruments, agreements, and understandings with" DISH, *i.e.*, fraud.  *Id.* 33.  Thus, the harms addressed by the "default payments" and this *qui tam* action are separate:  Bidders who fraudulently claim DE credits but pay all of their full winning bids are not subject to "default payments."  Conversely, bidders who choose to not pay some of their full winning bids are subject to "default payments," even if they did not seek DE credits at all.  The Report was correct to recognize this distinction.  *Id.* at 35.

Second, Relator argues that the Report erred because awarding Relator a share of the "default payments" would "advance the objectives of the FCA."  Objections at 39.  Even were that true, "[t]he problem is that Congress wrote a different statute than the one that [Relator] envisions."  *Kennedy*, 5 F. 4th at 57.  Rather and as noted above, the FCA provides Relators a share only for "those types of false or fraudulent claims that the False Claims Act recognizes and for which a qui tam action could have been litigated."  *Id.* at 58.

In any event, the purpose of the FCA would not be served by paying Relator here. Relator is not entitled to compensation for merely litigating a (non-meritorious) *qui tam* action, particularly given the Government's view that "this suit would not do what all *qui tam* actions are supposed to do: vindicate Government's interests."  599 U.S. at 536.  This Court should accept the Report's recommendation to deny Relator's request for a $128.9 million windfall as a result of payments Relator itself acknowledges "were not in any sense 'based upon' the same allegations or transactions as the qui tam complaint."  Relator Br. at 32.

### IV.    Conclusion

For the foregoing reasons, this Court should accept the Report in full to grant the Government's Motion to Dismiss (Dkt. 189) and deny Relator's Motion for Share of Alternate Remedy (Dkt. 194).

*    *    *

Date: June 26, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JEANINE F. PIRRO
United States Attorney for the District of Columbia


_/s/ Darrell C. Valdez_
DARRELL C. VALDEZ, D.C. Bar # 420232
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W., Civil Division
Washington, D.C.  20530
(202) 252-2507

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

BRENNA E. JENNY
Deputy Assistant Attorney General

JAMIE A. YAVELBERG
PATRICK KLEIN
BENJAMIN C. WEI
Attorneys, Civil Division,
Commercial Litigation Branch
U.S. Department of Justice
Post Office Box 261
Washington, D.C. 20044
(202) 616-2875

Attorneys for the United States of America