**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, *ex rel.*
VERMONT NATIONAL TELEPHONE
COMPANY,

               Plaintiff,

    v.

NORTHSTAR WIRELESS, LLC, *et al.*,

               Defendants.

Civil Action No. 15-00728 (CKK)

**ORAL HEARING REQUESTED**

---

## RELATOR'S REPLY IN SUPPORT OF ITS OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Stephen J. Obermeier (D.C. Bar # 979667)
Bennett L. Ross (D.C. Bar # 978122)
Bert W. Rein (D.C. Bar # 067215)
Mark B. Sweet (D.C. Bar # 490987)
Kathleen C. Cooperstein (D.C. Bar # 1017553)
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Relator Vermont
National Telephone Co.*

# TABLE OF CONTENTS

RELATOR'S REPLY IN SUPPORT OF ITS OBJECTIONS ......................................................... 1

TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ............................. 1

INTRODUCTION AND SUMMARY ......................................................................................... 1

ARGUMENT ............................................................................................................................... 3

    I.      THE DOJ MISSTATES THE STANDARD OF REVIEW. ................................. 3

    II.     THE COURT SHOULD GRANT RELATOR'S OBJECTIONS AND DENY THE MOTION TO DISMISS.................................................................. 4

          A.     Both the DOJ and the Report Misread *Polansky* Regarding the Legal Standard Governing the Motion to Dismiss. .................................. 4

          B.     The Report Erroneously Accepted as Reasonable the Conclusory Assertions Offered in Support of Dismissal. .............................................. 5

               1.     *Sufficiency of evidence supporting Relator's fraud allegations* ...................................................................................... 6

               2.     *Doubt about Relator's ability to prove damages* ........................... 7

               3.     *"Significant resource drain" from continued litigation* .............. 11

          C.     The Report Contravenes *Polansky* by Effectively Giving the DOJ Unfettered Dismissal Discretion. ............................................................... 13

          D.     The DOJ and the Report Misapply Rule 41(A)(2) by Discounting the DOJ's Bad Faith and the Prejudice to Relator in Dismissing This Case.......................................................................................................... 14

               1.     *The DOJ's reasons for dismissal constitute bad faith.* ................. 15

                2.     *The inadequacy of the DOJ's investigation constitutes bad faith.* .................................................................................................. 15

               3.     *The DOJ's failure to explain its "change of heart" about Relator's case constitutes bad faith.* ............................................. 16

               4.     *The timing of the DOJ's decision to seek dismissal constitutes bad faith.* ....................................................................... 16

               5.     *The DOJ acted in bad faith by assisting Defendants in the litigation.* ...................................................................................... 17

        6.      *Dismissal would prejudice Relator.* ............................................... 17

    E.      The DOJ and the Report Misinterpret the Takings Clause. ...................... 19

III.     RELATOR IS ENTITLED TO ITS SHARE OF THE FCC DEFAULT PAYMENTS AS AN ALTERNATE REMEDY IF THIS CASE IS DISMISSED. ................................................................................................ 20

CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Barajas v. United States*,
   258 F.3d 1004 (9th Cir. 2001) ...................................................................................21, 22, 24

*Bauer v. Marmara*,
   774 F.3d 1026 (D.C. Cir. 2014) ................................................................................................20

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
   342 F.3d 634 (6th Cir. 2003) ....................................................................................................21

*United States ex rel. Compton v. Midwest Specialties, Inc.*,
   142 F.3d 296 (6th Cir. 1998) ....................................................................................................10

*Cook Cnty., Ill. v. U.S. ex rel. Chandler*,
   538 U.S. 119 (2003)...................................................................................................................18

*United States ex rel. Day v. Boeing*,
   No. 3:23-cv-371, 2025 WL 992708 (E.D. Va. Apr. 2, 2025) ...................................................13

*Guttenberg v. Emery*,
   68 F. Supp. 3d 184 (D.D.C. 2014) .............................................................................................4

*Houlahan v. Brown*,
   979 F. Supp. 2d 86 (D.D.C. 2013) .............................................................................................3

*Kellmer v. Raines*,
   674 F.3d 848 (D.C. Cir. 2012) ..................................................................................................18

*United States ex rel. Kennedy v. Novo A/S*,
   5 F.4th 47 (D.C. Cir. 2021)................................................................................................22, 24

*United States ex rel. Landis v. Tailwind Sports Corp.*,
   234 F. Supp. 3d 180 (D.D.C. 2017) ..........................................................................................10

*U.S. ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*,
   173 F.3d 870 (D.C. Cir. 1999)..................................................................................................20

*In re NextWave Pers. Commc'ns, Inc.*,
   200 F.3d 43 (2d Cir. 1999)................................................................................................11, 23

*United States ex rel. Polansky v. Executive Health Resources, Inc.*,
   17 F.4th 376 (3d Cir. 2021) .........................................................................................14, 19, 20

*Polansky v. Executive Health Resources, Inc.*,
    422 F. Supp. 3d 916 (E.D. Pa. 2019) .......................................................................16

*United States ex rel. Polansky v. Executive Health Resources, Inc.*,
    599 U.S. 419 (2023) ................................................................................... *passim*

*Shurtleff v. EPA*,
    991 F. Supp. 2d 1 (D.D.C. 2013) ..............................................................................3

*United States ex rel. Taylor v. Gabelli*,
    345 F. Supp. 2d 340 (S.D.N.Y. 2004)......................................................................21

*United States ex rel. Touhy v. Ragen*,
    340 U.S. 462 (1951)..................................................................................................12

*Tyler v. Hennepin Cnty., Minnesota*,
    598 U.S. 631 (2023)..................................................................................................20

*United States v. Ben Grunstein & Sons Co.*,
    137 F. Supp. 197 (D.N.J. 1955) ...............................................................................10

*United States v. Bornstein*,
    423 U.S. 303 (1976)..................................................................................................11

*United States v. Bourseau*,
    531 F.3d 1159 (9th Cir. 2008) .................................................................................10

*United States v. Killough*,
    848 F.2d 1523 (11th Cir. 1988) ...............................................................................10

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000)............................................................................................19, 20

*United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, Co.*,
    34 F.4th 29 (D.C. Cir. 2022)......................................................................................7

*U.S. ex rel. Wuestenhoefer v. Jefferson*,
    105 F. Supp. 3d 641 (N.D. Miss. 2015) ..................................................................10

**Statutes**

28 U.S.C § 636(b)(1)(C) ...................................................................................................3

31 U.S.C. § 3729(a)(1)(G) ..............................................................................................10

31 U.S.C. § 3730(c)(5)....................................................................................................22

**Other Authorities**

47 C.F.R. § 1.2104(g)(2)................................................................................................................9

47 C.F.R. § 1.2109(a)....................................................................................................................9

47 C.F.R. § 1.2110(j) (2014).....................................................................................................6, 9

47 C.F.R. § 1.2112(b)(1)(iii) (2014) ...........................................................................................8

65 F.R. 52323 (Aug. 29, 2000) ....................................................................................................9

DA 14-1018 (WTB July 23, 2014) ...............................................................................................8

Fed. R. Civ. P. 72(b)(2)–(3)..........................................................................................................3

Public Notice, *Auction of Advanced Wireless Services (AWS-3) Licenses Closes,*
    *Winning Bidders Announced for Auction 97* (Jan. 30, 2014) .....................................................9

v

**INTRODUCTION AND SUMMARY**

Pursuant to Federal Rule of Civil Procedure 72 and Local Civil Rule 72.3, Relator Vermont National Telephone Company ("Relator") submits the following Reply in support of its Objections to the Report and Recommendation of the Magistrate Judge (Dkt. 222) ("Report"). The Court should grant Relator's objections, notwithstanding arguments by the Department of Justice ("DOJ") and Defendants otherwise.

Try as they might, neither the DOJ nor Defendants can reconcile the Report's approach to dismissal with *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023).  That decision requires the Court to assess the DOJ's motion by applying the standards in Fed. R. Civ. P. 41(a)(2), including that rule's good faith requirement.  The Report's contrary conclusion was incorrect.

*Polansky* and Rule 41(a)(2) require more than conclusory allegations that are unsupported by any facts and inconsistent with the evidence.  But that is all the DOJ has offered here.  Unlike in *Polansky*, the DOJ failed to provide the Court with a detailed explanation about its assessment of the benefits of this case, and it also did not enumerate or document the purported burdens of continued litigation.  The DOJ did not submit a single declaration or evidence of any kind, opting instead to move for dismissal based solely *on four paragraphs in its motion*.  The Report's conclusion that this approach is sufficient to dismiss a *qui tam* case that has been pending for more than a decade was erroneous.

The Report also contravenes *Polansky* in another important respect. The DOJ continues to take the position that its authority to dismiss *qui tam* actions is unfettered and absolute, despite both the Third Circuit and the Supreme Court rejecting this position in *Polansky* as contrary to the False Claims Act ("FCA").  If the Court were to adopt the Report, it effectively would vest the DOJ with the boundless dismissal authority it currently lacks but so badly wants. That is, if

the DOJ can dismiss this case based on conclusory allegations that continued litigation "would not vindicate the Government's interests" without offering any evidence in support and without regard to the underlying facts, Dkt. 227 at 1, it could dismiss any *qui tam* action at any juncture for any reason. This likely explains why the DOJ's "new leadership" supports the Report.[1]

While endorsing the Report's purported application of Rule 41(a)(2), which requires the Court to consider the DOJ's good faith in moving for dismissal and the prejudice to Relator that would result from dismissal, the DOJ cannot cure the Report's shortcomings in applying those requirements. The record is replete with clear evidence of the DOJ's bad faith in moving to dismiss, none of which the DOJ contests. It instead asks the Court to ignore this evidence, as the Report largely did. The same is true for legal prejudice, which Relator has demonstrated and which the Report and the DOJ erroneously disregard.

Finally, if it nonetheless adopts the recommendation that the case should be dismissed, the Court should award Relator its share of the proceeds from the alternate remedy obtained by the Government through the default payments made in connection with proceedings at the FCC. The DOJ's support of the Report's erroneous recommendation to deny Relator its rightful share of the Government's alternate remedy is contradicted by numerous cases interpreting the alternate remedy provision of the FCA, which the DOJ does not address. Awarding Relator a share of the Government's alternate remedy also would be consistent with the purpose of the FCA's alternate remedy provision, which is intended to prevent the Government from using

---

[1]     When the DOJ filed its motion to dismiss last year under the prior administration, it represented that it had done so with the support of the Federal Communications Commission ("FCC"). Hr.'g Tr. 70:1–5, Dkt. 217 ("And this decision to dismiss wasn't reached unilaterally by the Department of Justice; it was in complete consultation and on -- you know, in accord with the FCC."). By contrast, the current DOJ makes no similar representation, merely stating that it "consult[ed] with" the FCC. Dkt. 277 at 1. Under the circumstances, it is unclear whether the DOJ is speaking for the current FCC when it now refers to the "Government" in its response.

information from a relator to vindicate its rights in "any alternative" proceeding without compensating that relator, as the DOJ seeks to do here. Accordingly, the Report's recommendation to deny Relator a share of the proceeds from the Government's alternate remedy is clearly erroneous and contrary to law.

**ARGUMENT**

**I.     THE DOJ MISSTATES THE STANDARD OF REVIEW.**

Notwithstanding the DOJ's claim otherwise, this Court's review of Relator's objections to the Report's recommendation to grant the DOJ's motion to dismiss must be conducted *de novo*. In insisting that the Court need only review the Report for clear error because Relator's objections raise arguments "made in its original opposition to the Government's Motion to Dismiss," Dkt. 227 at 8–10, the DOJ is wrong.

Because Relator has filed "specific written objections to the proposed findings and recommendations" related to the Government's motion to dismiss, the Court "*must determine de novo*" those parts of the Report to which Relator has "properly objected." Fed. R. Civ. P. 72(b)(2)–(3) (emphasis added); *see also* 28 U.S.C § 636(b)(1)(C) ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). Here, unlike in the cases cited by the DOJ, Relator has not raised "a series of general objections" that "can only be characterized as wholesale attacks on the Magistrate Judge's approach to the facts and the law …," *Shurtleff v. EPA*, 991 F. Supp. 2d 1, 20 (D.D.C. 2013), nor has Relator made "only conclusory or general objections" or "simply reiterate[d] [its] "original arguments." *Houlahan v. Brown*, 979 F. Supp. 2d 86, 88 (D.D.C. 2013). Accordingly, *de novo* review is required.

3

II.    **THE COURT SHOULD GRANT RELATOR'S OBJECTIONS AND DENY THE MOTION TO DISMISS.**

A.    **Both the DOJ and the Report Misread *Polansky* Regarding the Legal Standard Governing the Motion to Dismiss.**

The DOJ makes a half-hearted attempt to defend the Report's determination that Rule 41(a)(2) does not govern the disposition of its motion to dismiss. While the Report may have "identified three factors, all taken directly from *Polansky*," Dkt. 227 at 10, the DOJ brushes past the Supreme Court's directive that district courts "assess a (2)(A) motion to dismiss *using Rule 41's standards*." *Polansky*, 599 U.S. at 435 (emphasis added).  In this Circuit, Rule 41's standards require, in part, that the Court assess whether the Government has moved for dismissal in "good faith," *see Guttenberg v. Emery*, 68 F. Supp. 3d 184, 187 (D.D.C. 2014) (quoting *Conafay v. Wyeth Labs.*, 793 F.2d 350, 353 (D.C. Cir. 1986))—an assessment the DOJ is anxious to avoid given its bad faith in this case.  Indeed, if the DOJ's conduct in this case constitutes "good faith," it is hard to imagine what bad faith would look like.

The DOJ accuses Relator of relying upon a "lone sentence" from *Polansky* in arguing that Rule 41 governs the disposition of its motion to dismiss. Dkt. 227 at 10.  But this is not true, as Relator's objections quoted at length from the Supreme Court's decision holding that Rule 41 provides the appropriate standard in resolving the Government's dismissal motion. Dkt. 223 at 7–8.  The DOJ has nothing to say about this language from *Polansky*.

The DOJ also attempts to sidestep Rule 41's good faith requirement by relying upon *Polansky*'s "contextual" language quoted in the Report. Dkt. 227 at 10 (citing Report at 12). But in observing that the Rule 41 "inquiry is necessarily 'contextual,'" the Supreme Court stated that it had "*never set out a grand theory of*" the requirements of Rule 41 and "*will not do so here*." *Polansky*, 599 U.S. at 437 (emphasis added).  Yet, the Report erroneously read *Polansky* to adopt a standard divorced from the "traditional Rule 41(a)(2) analysis." Report at 17.

4

To be sure, the Supreme Court held that the Government's views regarding dismissal "are entitled to substantial deference" and determined that a motion to dismiss should be granted "[i]f the Government offers a reasonable argument for why the burdens of continued litigation outweigh its benefits …." *Polansky*, 599 U.S. at 438.[2] But nothing in *Polansky* suggests that the Court should assess the reasonableness of the DOJ's argument without regard to the good faith requirement of Rule 41(a)(2), despite the Report's contrary conclusion. Further, as the Report correctly observed, *Polansky* also did not obviate the need for the Court to consider "legal prejudice" to Relator pursuant to Rule 41(a)(2). Report at 14.

For their part, Defendants defend the Report's interpretation of *Polansky* by conflating the legal standard adopted by the Supreme Court (Rule 41) with its prediction of how that standard was likely to play out. Dkt. 226 at 1. That the Supreme Court anticipated that "(2)(a) motions will satisfy Rule 41 in all but the most exceptional cases" is not surprising, *Polansky*, 599 U.S. at 437, as the DOJ is expected to offer reasonable arguments and act in good faith in seeking dismissal of a *qui tam* case. But not so here, as explained in Relator's objections.

**B.     The Report Erroneously Accepted as Reasonable the Conclusory Assertions Offered in Support of Dismissal.**

According to the DOJ, the Report "scrutinized" and found "reasonable" each of its three arguments in support of dismissing Relator's case. Dkt. 227, at 11. But there was nothing for the Magistrate Judge to "scrutinize" because the DOJ's arguments consist of little more than conclusory assertions unsupported by any facts. And the DOJ's empty arguments are contradicted by the undisputed evidence in the record, which belie their reasonableness.

---

[2]     As noted in footnote 1 above, it is unclear whether the DOJ here is still speaking for the FCC under the new administration, and thus whether the "Government" has a unitary view about dismissal of this case.

Like a three-legged stool collapsing under its own weight, the DOJ seeks to bolster its dismissal motion by offering new contentions not presented to the Magistrate Judge. But the Court's review of the Report is "based solely on the record developed before the magistrate judge," LCvR 72.3(c), and thus these new contentions are a case of "too little, too late." And even if the Court were inclined to consider them, none have merit.

### 1.    Sufficiency of evidence supporting Relator's fraud allegations

The Report found reasonable the DOJ's argument that the evidence of fraud uncovered by Relator was insufficient because it was "cumulative" of what Defendants had disclosed to the FCC. Dkt. 227 at 12 (citing Report at 21). But this argument is a conclusory assertion unsupported by a single fact. It also is untrue, as evidenced by the DOJ's inability to point to any statement in any filing by Defendants where they disclosed to the FCC the undisclosed agreements and understandings uncovered by Relator. Indeed, as Relator has explained and the DOJ does not deny, the record conclusively establishes that the agreements and understandings at issue in this case were never disclosed to the FCC. Dkt. 223 at 13–15.[3]

The DOJ's assertion that its "cumulative" argument is reasonable "in light of the FCC proceedings" was never raised with the Magistrate Judge and is wrong in any event. Dkt. 227 at 13. That the FCC "conducted a detailed analysis" of the agreements submitted by SNR and Northstar and thus "knew DISH was exercising control over" them, *id.*, ignores that SNR and Northstar submitted these agreements ***with their long-form applications*** after the conclusion of the auction. *See* 47 C.F.R. § 1.2110(j) (2014) ("designated entities must file with their long-form applications a copy of each such agreement [that affect designated entity status]"). These

---

[3]    Because the evidence contradicts its "cumulative" argument, the DOJ's insistence that no reason exists to conclude that it "did not have an adequate basis for its view of the evidence" is nonsense. Dkt. 227 at 13. Like the Report, the DOJ simply elected to ignore this evidence.

agreements were not available to the FCC when SNR and Northstar submitted ***their short-form***

***applications***, and thus they did not provide—and could not have provided—the FCC with any

insight into the Defendants' relationship before the auction commenced.

Furthermore, what the FCC may have known about DISH's *de facto* control of SNR and

Northstar is not dispositive of Relator's claims.  Rather, Relator has alleged—and the evidence

uncovered to date confirms—that SNR and Northstar were sham designated entities that

perpetrated a fraudulent scheme to acquire spectrum for DISH at a discount to which DISH was

not entitled.  Had SNR and Northstar disclosed their actual arrangements with DISH and not

falsely certified otherwise in their short-form applications, the FCC would never have found they

were bona fide designated entities eligible to use bidding credits in the auction.  *See* Declaration

of Fred Cambell, Dkt. 191, ¶¶ 45–62 ("Campbell Decl.").  Because the DOJ does not dispute this

outcome, its "cumulative" argument is unreasonable, and the Report erred in finding otherwise.

### 2.    *Doubt about Relator's ability to prove damages*

The DOJ continues to express "doubt" about Relator's ability to prove damages because

Defendants were never awarded bidding credits.  Dkt. 227 at 13.  But here again, the DOJ's

argument, which the Report accepted without discussion, is untrue.  Dkt. 223 at 15–17.

Consistent with the D.C. Circuit's analysis of materiality, the question before the Court—

a question the DOJ is anxious to avoid and the Report does not address—is whether SNR's and

Northstar's failure to disclose their actual agreements and understandings with DISH as well as

the false certifications in their ***short-form applications*** affected the FCC's bidding credit

eligibility determination.  *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, Co.*, 34

F.4th 29, 37 (D.C. Cir. 2022).  Relator's expert declaration from the former chief of the FCC's

Wireless Telecommunications Bureau establishes beyond doubt that the answer to this question

is "yes." *See* Campbell Decl., Dkt. 191, ¶¶ 35–44. There is no contrary evidence in the record, which is fatal to the purported reasonableness of the DOJ's damages argument.

The DOJ concedes that "now" is the time for the Court to consider the importance of the short-form application to the FCC's bidding credit eligibility determination. Dkt. 227 at 15. But the DOJ then proceeds to duck the issue. Pointing to the Malmud Declaration, the DOJ insists that the FCC only assesses bidding credit eligibility using the long-form application. *Id.* However, Mr. Malmud has never reviewed a short-form application and thus was "not certain" about the FCC's short-form review process. Declaration of Stephen J. Obermeier, Dkt. 193, ¶ 50 ("Obermeier Decl."). Furthermore, the DOJ's position cannot be reconciled with the FCC's public notice setting forth the procedures governing Auction 97, which explicitly states that "the information provided in its FCC Form 175 [short-form application] *will be used to determine whether the applicant is eligible for the claimed bidding credit*." DA 14-1018, ¶ 64 (WTB July 23, 2014) (emphasis added).

Unable to square its damages argument with the critical role the short-form application plays in the FCC's determination of bidding credit eligibility, the DOJ asserts for the first time that "Relator cites to nothing that requires Defendants to disclose their agreements, *i.e.*, their basis for bidding credit eligibility in their short-form applications." Dkt. 227 at 14. But this assertion reflects an astonishing lack of familiarity with FCC rules, which expressly require that an applicant include in its short-form application a complete list and summary of "all agreements or instruments (with appropriate references to specific provisions in the text of such agreements and instruments) that support the applicant's eligibility as a small business under the applicable designated entity provisions, including the establishment of *de facto* or *de jure* control or the presence or absence of attributable material relationships." 47 C.F.R. § 1.2112(b)(1)(iii) (2014).

8

Indeed, pursuant to this rule, SNR and Northstar included with their short-form applications a 68-page exhibit listing and summarizing various agreements between themselves and DISH, although these exhibits fraudulently omitted the undisclosed agreements and understandings uncovered by Relator.[4]

The DOJ also overlooks the FCC rule which requires that an applicant submitting a short-form application as a designated entity must provide a "statement to that effect and a declaration, under penalty of perjury, that the applicant is qualified as a designated entity …." 47 C.F.R. § 1.2110(j) (2014). The undisclosed agreements and understandings uncovered by Relator confirm that SNR's and Northstar's declarations pursuant to this rule were fraudulent. Dkt. 204 at 10–14.

The DOJ's suggestion that the Government was not damaged by Defendants' fraud because the FCC was not "owed" the $3.3 billion that Defendants failed to pay at the conclusion of Auction 97 is without merit. Dkt. 227 at 15. First, FCC rules provide that a winning bidder has an actionable "obligation to pay" the full amount of its winning bids at the close of the auction.[5] As the FCC explained when promulgating those regulations, "the close of the auction creates a binding contractual obligation by the high bidder to pay the auction price for the license," and that obligation persists regardless "[w]hether the obligation is thereafter breached by a default of payment or by a failure to qualify to receive the license for which the bid was placed." 65 F.R. 52323, 52334 (Aug. 29, 2000).

---

[4]   Northstar Wireless LLC, Auction File No. 0006458325, FCC Form 175, Ex. C; SNR Wireless Licenseco, LLC, Auction File No. 0006458318, FCC Form 175, Ex. E.

[5]   47 C.F.R. § 1.2104(g)(2); *see also* 47 C.F.R. § 1.2109(a) ("auction winners are required to pay the balance of their winning bids in a lump sum within ten (10) business days following the release of a public notice establishing the payment deadline"); Public Notice, *Auction of Advanced Wireless Services (AWS-3) Licenses Closes, Winning Bidders Announced for Auction 97*, ¶ 8 (Jan. 30, 2014) (setting March 2, 2015 as the payment due date).

9

Here, based on the full amount of their winning bids, SNR and Northstar were obligated to pay approximately $13.3 billion to the FCC, with full payment of this amount due on March 2, 2015.  But because of the fraudulent disclosures and false certifications in their short-form applications, SNR and Northstar only paid the FCC approximately $10 billion by the March 2, 2015 due date, resulting in an underpayment of approximately $3.3 billion—an amount that remains unpaid more than a decade later.  Am. Compl., Dkt. 76 at ¶¶ 132–135.  By "knowingly" decreasing "an obligation to pay or transmit money . . . to the Government," Defendants are liable for treble damages and statutory penalties under the FCA.  31 U.S.C. § 3729(a)(1)(G).

Second, the DOJ ignores that damages under the FCA are "liberally calculated."  *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998); *see also United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) ("the United States' damages should be liberally measured to effectuate the remedial purposes of the Act, and that the United States should be afforded a full and complete recovery of all its damages") (quoting S. Rep. 615, 96th Cong., 2d Sess. at 4 (1981)).  The measure of single damages under the FCA is determined by a "benefit-of-the-bargain" test*, see, e.g.*, *United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 199 (D.D.C. 2017), although the appropriate methodology for calculating such damages "necessarily varies with the facts of the particular case."  *United States v. Ben Grunstein & Sons Co.*, 137 F. Supp. 197, 209 (D.N.J. 1955).

Here, the Government's damages can be calculated based upon the Defendants' $3.3 billion underpayment—*i.e.*, "the difference between what the defendant should have paid the government and what the defendant actually paid the government." *United States v. Bourseau*, 531 F.3d 1159, 1172 (9th Cir. 2008) (citation omitted); *see also U.S. ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 673–74 (N.D. Miss. 2015) (same); Declaration of Dr. Robert

10

Kulik, Dkt. 192, ¶ 23 ("Kulik Decl."). Alternatively, the Government's damages represent the approximately $516 million in default payments made by SNR and Northstar, which are "the functional analog of expectation damages." *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 58 (2d Cir. 1999); *see also* Kulik Decl. Dkt. 192, ¶ 24.[6]

The DOJ offers no substantive analysis of or response to Relator's damages theories. And it did not bother to wait until the end of discovery or for the issue to be briefed on summary judgment before assessing Relator's ability to recover damages for Defendants' fraud. Indeed, taken to its illogical extreme, the DOJ's position would mean that an applicant can lie in its short-form application with immunity from FCA liability as long as the applicant is ultimately denied bidding credits—a position the FCC understandably does not endorse. Obermeier Decl., Dkt. 193, ¶ 32. At bottom, the DOJ was obligated to explain in detail to the Court why it believes Relator is precluded from recovering damages under the FCA. The Report erred in finding reasonable the Government's damages argument in the absence of any such explanation.[7]

> 3.    *"Significant resource drain" from continued litigation*

The DOJ makes no apology for its failure to enumerate or document the future discovery costs the Government allegedly will incur if this case were to continue, claiming that such information "would not add anything to the analysis." Dkt. 227 at 16. But, as *Polansky* makes clear, such information is critical to the Court's assessment of the reasonableness of the DOJ's

---

[6]    That Defendants' fraudulent scheme was ultimately unsuccessful and the licenses to which the $3.3 billion underpayment relates "were never issued to SNR or Northstar," Dkt. 227 at 15, does not insulate Defendants from liability under the FCA. *See United States v. Bornstein*, 423 U.S. 303, 315–16 (1976).

[7]    That the DOJ only now professes uncertainty about Relator's damages theories when this case has been pending for a decade only underscores its investigatory shortcomings and confirms its bad faith. Dkt. 227 at 15. Despite multiple opportunities, the DOJ never discussed damages with Relator during the eight years between the time it declined to intervene in 2016 until after it threatened to seek dismissal in January 2024. Obermeier Decl. ¶ 7.

burden argument and its good faith in seeking dismissal. In *Polansky*, the Supreme Court affirmed dismissal based in part upon a detailed declaration from the Government that "*enumerated the significant costs of future discovery* in the suit," which included the "disclosure of privileged documents" the Government had been ordered to produce. 599 U.S. at 438 (emphasis added). The DOJ does not explain why a declaration enumerating and documenting its discovery burdens was important in *Polansky* but is unnecessary here.[8]

That the Government may incur some unspecified "costs moving forward" is contrary to *Polansky*, Dkt. 227 at 16 (quoting Report at 24), where "*significant*" discovery costs, not *any* discovery costs, constituted reasonable grounds for dismissal. The DOJ also does not explain how it could reasonably show that "the burdens of continued litigation outweigh its benefits" when such burdens are unknown or speculative. *See Polansky*, 599 U.S. at 438. A conclusory assertion of unspecified "costs" would not satisfy this Court when a party resists a motion to compel, and it should not satisfy the Court when evaluating whether to dismiss this case.

The DOJ does not dispute that it could reduce, if not eliminate, the purported burdens of continued litigation by objecting to Defendants' discovery requests and exercising its substantial discretion to oppose Defendants' discovery under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). While it may be a "judgment call" on the DOJ's part whether to do so, Dkt. 227 at

---

[8]   In *Polansky*, the Government also "*explained in detail*" why it had come to believe that Relator "had little chance of success on the merits," 599 U.S. at 438 (emphasis added), whereas here the DOJ's motion devoted only a *single paragraph* to the merits of this case that is devoid of any details. Dkt. 188 at 16–20. And, unlike the district court's decision in *Polansky*, the Report failed to explain why the arguments offered by the DOJ to justify dismissal were reasonable or to cite any record evidence in support of that conclusion. Under the circumstances, the DOJ's contention that "this case is identical to *Polansky* in almost every salient respect" is wishful thinking. Dkt. 227 at 17.

17, the Government cannot reasonably complain about the burdens it purportedly faces in responding to discovery when the DOJ has decided not to take steps to avoid such burdens.

Moreover, the DOJ cannot demonstrate burden based on a recitation of general discovery activities that exist in every *qui tam* case—"responding to Defendants' discovery demands, reviewing privileged documents, and preparing for the depositions of more government witnesses." Dkt. 227 at 16 (quoting Report at 16). How many of Defendants' discovery demands are unobjectionable and thus even require a response? Do any of Defendants' unobjectionable discovery demands even call for privileged documents that must be reviewed? How many Government witnesses possess relevant information and thus are even subject to being deposed? The DOJ never says, and the Report erred in finding the DOJ's burden argument reasonable in the absence of such basic information.

**C.      The Report Contravenes *Polansky* by Effectively Giving the DOJ Unfettered Dismissal Discretion.**

Even though the *Polansky* Court rejected the Government's position that it has "essentially unfettered discretion to dismiss," *Polansky*, 599 U.S. at 435, the DOJ apparently cannot abide that decision.[9] Here, the DOJ seeks to achieve indirectly what it was unable to accomplish directly by seeking dismissal of a *qui tam* action based solely on conclusory arguments that "track" language in *Polansky* but lack any evidentiary support and cannot be reconciled with the underlying facts. Report at 16–17.[10]

---

[9]      *See, e.g., United States ex rel. Day v. Boeing*, No. 3:23-cv-371, 2025 WL 992708, at *27 (E.D. Va. Apr. 2, 2025) (rejecting the DOJ's position that it "can simply dismiss [the relator's complaint] because it wants to. No justification required.").

[10]      Although the DOJ and Defendants seek to characterize Relator's objections to the Report as nothing more than a disagreement about the evidence, they are wrong. Dkt. 227 at 13; Dkt 226 at 2. This case does not present the Court with competing versions of the evidence because the DOJ's motion contains nothing more that conclusory arguments unsupported by evidence.

13

This approach, which the Report accepted, would effectively vest the DOJ with unfettered dismissal discretion.  If all that is required to dismiss a *qui tam* case are vague conclusions and unsupported allegations by the DOJ that continued litigation of the case "would not vindicate the Government's interests," Dkt. 227 at 1, every *qui tam* action would be subject to dismissal at any time at the whim of the DOJ.

But *Polansky* and Rule 41 require more. Specifically, the DOJ's arguments to justify dismissal must be supported by facts and be consistent with the evidence, which is not the case here.  *Cf. United States ex rel. Polansky v. Executive Health Resources, Inc.*, 17 F.4th 376, 393 (3d Cir. 2021) (district court did not abuse its discretion in granting the Government's motion to dismiss when it "exhaustively examined the interests of the parties, their conduct over the course of the litigation, and the Government's reasons for terminating the action").  Demanding such support would not require the Court to conduct a "mini-trial" or obligate the DOJ to "disprove Relator's case," as the DOJ asserts and the Report erroneously concluded.  Dkt. 227 at 12. Indeed, in *Polansky*, the Government made a detailed showing to demonstrate the reasonableness of its assessment of the relative burdens and benefits of the case, and the district court "exhaustively" scrutinized this showing as reflected in its opinion granting the motion; no "mini-trial" was conducted, and it was only necessary for the Government to show that its arguments were reasonable, not to disapprove the relator's case.

### D.    The DOJ and the Report Misapply Rule 41(A)(2) by Discounting the DOJ's Bad Faith and the Prejudice to Relator in Dismissing This Case.

The DOJ attempts to justify the Report's approach in applying Rule 41(a)(2).  But the DOJ does so by largely ignoring or mischaracterizing its bad faith in moving to dismiss this case and the legal prejudice to Relator if this case were dismissed.  Because the Report erred in

14

finding that the DOJ satisfied the requirements of Rule 41(a)(2), the Court should grant Relator's objections and deny the Government's motion.

### 1. The DOJ's reasons for dismissal constitute bad faith.

As explained in Relator's objections, the DOJ moved to dismiss this case based on arguments that are simply untrue. Dkt. 223 at 13-22. Like the Report, the DOJ does not address Relator's contention that the DOJ acted in bad faith by doing so.

### 2. The inadequacy of the DOJ's investigation constitutes bad faith.

The DOJ does not contest that Rule 41(a)(2)'s good faith standard requires it to conduct an adequate investigation of Relator's case before seeking dismissal. But the DOJ makes no attempt to demonstrate the adequacy of that investigation, which is understandable given the undisputed deficiencies identified by Relator, including the DOJ's failure to read the vast majority of documents provided by Relator in support of its claims, attend a single deposition of witnesses with knowledge of Defendants' fraud, or review any transcripts from such depositions. Obermeier Decl., Dkt. 193, ¶¶ 15 & 57. None of these deficiencies are addressed in the Report.

Instead, the DOJ attempts to dodge entirely its investigatory shortcomings by insisting "that the Government had before it every piece of evidence and argument Relator saw fit to present." Dkt. 227 at 18. However, the DOJ does not deny that Relator was unable to "present" evidence to the DOJ because prior to threatening dismissal on January 12, 2024: (1) the DOJ refused to meet with Relator about the case; and (2) only a single Defendant had even been deposed. Dkt. 189 at 13; Obermeier Decl., Dkt. 193, ¶¶ 9–11 & 57. And whatever the evidence "before it," the DOJ does not represent that it considered such evidence, which is not surprising when its senior attorney responsible for the case never bothered to read most of the documents Relator was able to present to the agency. Dkt. 189 at 12; Obermeier Decl., Dkt. 193, ¶ 15.

15

>    3.    *The DOJ's failure to explain its "change of heart" about Relator's case constitutes bad faith.*

Relator acknowledges that the DOJ "is entitled to change its mind" about a *qui tam* case. Dkt. 227 at 18.  But as in *Polansky*, when it moves to dismiss a case it had previously opposed dismissing, the DOJ owes the Court an explanation, which it has failed to provide here.  *See Polansky v. Executive Health Resources, Inc.*, 422 F. Supp. 3d 916, 929–30 (E.D. Pa. 2019) (noting the "developments" that warranted a change in the Government's position).

That the Government initially opposed dismissal of Relator's case based on the public disclosure bar rather than "on the merits" is a distinction without a difference.  Dkt. 227 at 18. The Government's opposition was intended to give Relator the opportunity to uncover evidence of Defendants' fraud.  Dkt. 189 at 10.  And yet, just two months after reiterating its opposition to the dismissal of Relator's case to provide Relator that opportunity, the DOJ threatened to dismiss the case.  Dkt. 223 at 25-26.  The DOJ has never bothered to explain what changed.

>    4.    *The timing of the DOJ's decision to seek dismissal constitutes bad faith.*

The DOJ's claim that it acted in good faith by timing its dismissal decision to prevent Relator from deposing key actors involved in Defendants' fraud is impossible to take seriously. Dkt. 227 at 19.  The DOJ's position that these depositions "would not change [its] assessment of this case" is telling.  *Id.*  If no evidence could change the DOJ's mind—say, for example, a deponent admitting to Defendants' scheme and their intent to defraud the Government—it renders false the DOJ's representation that its decision to seek dismissal was based on "careful consideration of the evidence" and confirms the DOJ's bad faith.  Dkt. 189 at 1.[11]

---

11    The DOJ's claim that it was told by Relator's counsel "that he expected the remaining depositions to uncover additional support for the fraud they already identified" is not accurate as counsel made clear that he could not predict the future.  Dkt. 227 at 19. Furthermore, this

5.      *The DOJ acted in bad faith by assisting Defendants in the litigation.*

While conceding it assisted Defendants in this litigation, the DOJ's attempt to rationalize such assistance is unconvincing.  In its objections, Relator thoroughly refuted the claim that the Government provided the Malmud Declaration to "minimize the discovery burden" associated with this case.  Dkt. 223 at 29–30.  But rather than address the substance of Relator's arguments, the DOJ just repeats the same claim, which does not make it true.  Dkt. 227 at 20.

The DOJ's assertion that "it was open to a settlement of this *qui tam* action for a modest amount" is a gross mischaracterization of the agency's misconduct, Dkt 227 at 20, which involved threatening Relator with dismissal unless it accepted an unethical settlement on terms that only benefitted the Defendants, not the Government. Obermeier Decl., Dkt. 193, ¶¶ 55–56. And the DOJ undermined the settlement negotiations by coordinating with Defendants about settlement strategy and revealing to Defendants its plans to seek dismissal, *id.* ¶¶ 66–71, actions that confirm its bad faith and that the DOJ makes no attempt to justify.  Indeed, how could the DOJ reasonably expect that Defendants would be amenable to any plausible settlement after the DOJ informed them of its plan to dismiss the case?

6.      *Dismissal would prejudice Relator.*

The DOJ's assertion that the Court should overlook the prejudice to Relator resulting from dismissal of this case because the DOJ has purportedly offered a reasonable argument for why the burdens of continued litigation outweigh its benefits cannot be reconciled with *Polansky*. Dkt. 227 at 20.  In holding that the Rule 41(a)(2) standard applies to the Government's dismissal motion, the *Polansky* Court observed that the rule's "'proper terms' analysis focuses on

---

conversation occurred *after* the DOJ threatened to dismiss Relator's case and thus could not have impacted the DOJ's dismissal threat.

the defendant's interests" in non-FCA cases, while "in the FCA context, the 'proper terms' assessment is more likely to involve the relator" and consideration of the relator's "interests." *Polansky*, 599 U.S. at 436–38; *see also* Report at 14.  In this Circuit, consideration of the Relator's interests pursuant to Rule 41(a)(2) requires the Court to assess whether "dismissal will inflict clear legal prejudice on" Relator.  *Kellmer v. Raines*, 674 F.3d 848, 851 (D.C. Cir. 2012).

The DOJ's efforts to discount the prejudice to Relator if this case were dismissed are without merit.  First, regarding the timing of its dismissal decision, the DOJ disputes that Relator was denied a fair opportunity to present its case, Dkt. 227 at 20, but it does not deny that it stepped in just weeks before the depositions of the key architects of Defendants' fraud.  This had the predictable effect, if not the purpose, of preventing these depositions from taking place.  The DOJ has never explained why it threatened dismissal of Relator's case after only a single Defendant had been deposed, and it fails to do so again here.  The DOJ's assertion that "this case does not belong to Relator" is not only beside the point but also ignores that "a *qui tam* suit is, as the statute puts it, 'for' both the relator and the Government," in that the FCA "'effect[s] a partial assignment of the Government's' own damages claim."  *Polansky*, 599 U.S. at 425.

Second, the DOJ offers no substantive response to Relator's argument that it would be prejudiced by cutting short its ability to pursue the FCA's deterrence function.  Instead, the DOJ ignores the crucial difference between missed opportunities for legal rulings that might deter future litigation (which is not sufficient prejudice) and those that frustrate Congressional policy objectives conferred on private litigants like relators (which is sufficient prejudice).  Dkt. 223 at 34 (citing authorities).  Indeed, the FCA was specifically amended to "enhance[] the incentives for relators to bring suit" so as "to make the FCA a 'more useful tool against fraud in modern times.'"  *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 133 (2003) (citation omitted).

18

Relator's interest in carrying out that deterrence function is undermined when the DOJ seeks to dismiss an FCA suit based on nebulous "doubts about the evidence," Dkt. 227 at 21, particularly when discovery was ongoing and the Government's "doubts" are predicated on a theory that is objectively unreasonable.  Dkt. 223 at 13–15.

Third, the DOJ mischaracterizes Relator's argument about the prejudice associated with the significant commitment of time and money it has expended on this case, insisting that its "statutory authority to dismiss *qui tam* actions would be ineffectual if it could be neutralized by a relator's mere expenditure of resources." Dkt. 227 at 21.  But this case is not just any *qui tam* case.  Over the past decade, Relator fended off Defendants' Rule 12(b)(6) and Rule 12(c) motions and, even though discovery was cut short by the DOJ, uncovered evidence to establish each element of its FCA claims. That Relator "will have lost the resources it expended in litigating the case" if it ultimately is unable "to prove liability" is a non sequitur, *id.*, because the Rule 41(a)(2) inquiry is necessarily focused on the loss of the opportunity to present the case to the trier of fact, as the DOJ seeks to do here.  And while "the relator in *Polansky*" may have "committed even more resources," *id.*, the relator there—unlike Relator here—"had engaged in potentially sanctionable conduct during the course of discovery," which significantly informed the prejudice analysis.  *Polansky*, 17 F.4th at 393.

Notwithstanding the DOJ's arguments to the contrary, the Report erred in finding that Relator would not suffer clear legal prejudice from dismissal of this case.

### E.    The DOJ and the Report Misinterpret the Takings Clause.

The DOJ's Fifth Amendment analysis underscores the flaws in the Report's treatment of the Takings Clause.  As Relator explained, Dkt. 190 at 44–45, Dkt. 223 at 35–36, its property interest flows from the Supreme Court's teaching that the FCA "gives the relator himself an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery."  *Vermont*

*Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772–73 (2000); *see also Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 638 (2023) ("this Court's precedents" "define property"). In holding otherwise, the Report wrongly conflated Relator's interest in "the lawsuit" with its interest in "the bounty." *See Stevens*, 529 U.S. at 772–73 (emphasis removed).

The DOJ makes the same error, contending that Relator has no interest in this "action." Dkt. 227 at 22. To be sure, a relator's interest in *the bounty* does not "fully materialize until the litigation is completed and the relator prevails." *Stevens*, 529 U.S. at 773. But its interest in *the lawsuit* is perfected by the FCA's "partial assignment of the Government's damages *claim*." *Id.* (emphasis added); *accord U.S. ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 870, 884–85 (D.C. Cir. 1999) (the FCA gives the relator a "right" to enforce the statute). That insight was key to the *Stevens* Court's explanation why a relator has both the requisite privity to assert the Government's injury *and* the requisite adversity to challenge its dismissals. 529 U.S. at 772–74; *cf. Bauer v. Marmara*, 774 F.3d 1026, 1030–31 (D.C. Cir. 2014) (holding that a private party lacked a justiciable interest under "a 'bounty only' statute"). The DOJ is wrong in treating the same what the Supreme Court recognized are distinct and cognizable property interests.[12]

## III. RELATOR IS ENTITLED TO ITS SHARE OF THE FCC DEFAULT PAYMENTS AS AN ALTERNATE REMEDY IF THIS CASE IS DISMISSED.

If the Court grants the motion to dismiss, it should rule Relator its statutory share of the proceeds from the Government's alternate remedy. The arguments advanced by the DOJ in

---

[12]   The DOJ also is wrong when it contends that *Polansky* forecloses Relator's Fifth Amendment objections. Dkt. 227 at 22. To the contrary, the *Polansky* Court expressly did "not consider the circumstances in which … a court should find the Constitution to prevent the Government from dismissing a *qui tam* action" "because Polansky ha[d] not raised a claim of that sort." 599 U.S. at 437 n.4. The court also deemed the unconstitutional takings argument to be waived by the parties. *See Polansky*, 17 F.4th at 382 n.5. The DOJ does not explain how the Supreme Court purportedly resolved an issue that was neither preserved by the parties nor passed upon by the Third Circuit. Dkt. 227 at 22.

support of the Report's contrary conclusion are without merit.  The DOJ's claim that Relator seeks some undeserved "windfall" is false.  Dkt. 227 at 27.  Rather, Relator seeks to fulfill the purpose of the FCA's alternate remedy provision, which Congress enacted to foreclose the Government from using information from a relator to vindicate its rights in "any alternative" proceeding without compensating the relator, as the DOJ seeks to do here. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 648–49 (6th Cir. 2003) (quoting 31 U.S.C. § 3730(c)(5)).  Both the Report and the DOJ ask the Court to contravene that purpose by denying Relator its statutorily mandated share of the FCC default payments.[13]

The DOJ's argument that the FCA's alternate remedy provision does not "allow a realtor [sic] to receive a share of recoveries that would not be actionable under the FCA" is contrary to both *United States ex rel. Barajas v. United States*, 258 F.3d 1004 (9th Cir. 2001), and *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 340 (S.D.N.Y. 2004).  Dkt. 227 at 23. In *Barajas*, the alternate remedy provision was triggered by suspension and debarment proceedings premised on the delivery of non-confirming goods. *Barajas*, 258 F.3d at 1006.  In *Gabelli*, the court noted that FCC proceedings concerning eligibility for bidding credits could serve as an "alternative" to the FCA action. *Gabelli*, 345 F. Supp. 2d at 353.  The alternate remedy proceedings at issue in *Barajas* and *Gabelli* did not involve recoveries that would "be actionable under the FCA," nor did they "mirror[] a *qui tam* action." Dkt. 227 at 23 & 26. That the DOJ's position cannot be reconciled with these cases may explain why the DOJ elected to ignore them.

---

[13]    The DOJ's claim that Relator's share would come "from the public fisc" ignores that the default payments were paid to the FCC by SNR and Northstar, not taxpayers.  Dkt. 227 at 22. Furthermore, by moving to dismiss Relator's FCA case, the DOJ elected to prevent Relator from recovering directly from Defendants, leaving Relator with no option but to obtain recovery indirectly by sharing in the proceeds of their default payments.

*United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47 (D.C. Cir. 2021), does not compel a different result. In *Kennedy* the D.C. Circuit considered whether an alternate remedy (the Government's recovery in a misbranding claim under the Food, Drug, and Cosmetic Act) addressed the ***harm*** that would be remedied in an FCA action, a question that the Court of Appeals answered in the negative. *Kennedy* does not hold, as the DOJ would have it, that the alternate remedy proceeding must determine the same ***issues*** that an FCA case would resolve (*i.e.*, fraud). Indeed, alternate remedies may result from proceedings that are "significantly different from an FCA action." *Barajas*, 258 F.3d at 1011. Thus, it matters not—as the DOJ mistakenly argues and the Report erroneously concluded—that FCC default payments are "not predicated on any fraudulent behavior." Dkt. 227 at 24 (citing Report at 34).

Furthermore, in this specific case, the default payments made by SNR and Northstar "redress the same type of falsity and fraud claims" as Relator pursued in its *qui tam* action, notwithstanding the DOJ's arguments otherwise. *See Kennedy*, 5 F.4th at 56. That is, the claims asserted before the FCC sought relief based on the type of fraud covered by the FCA, and the default payments remedied (at least in part) the Government's loss, which is all that matters for alternate remedy purposes. *See id.* at 49; 31 U.S.C. § 3730(c)(5). This is true for three reasons.

First, the default payments were the direct result of fraud allegations made by Relator's wholly owned subsidiary—VTel Wireless ("VTel")—in proceedings before the FCC, which were essentially the same fraud allegations in Relator's Amended Complaint. Dkt. 205-1 at 4–6. The DOJ has conceded as much. Dkt. 188 at 7.[14]

---

[14]    This concession eviscerates the DOJ's assertion that the FCC proceedings do not constitute an alternate remedy proceeding because they did not involve "those types of false or fraudulent claims that the False Claims Act recognizes and for which a *qui tam* action could have been litigated." Dkt. 227 at 26 (quoting *Kennedy*, 5 F.4th at 58).

Second, in the FCC proceedings, VTel requested that the FCC impose the same default payments on SNR and Northstar that they ultimately were required to pay. Dkt. 205-1 at 6 (urging the FCC to impose default payments to "ensure that Northstar and SNR are held accountable for their misconduct and that the federal government is made whole") (citation omitted). The DOJ does not dispute these facts.

Third, the default payments paid by SNR and Northstar were triggered by and serve to remedy, in part, Defendants' fraud. In contending otherwise, the DOJ relies upon Relator's arguments to the D.C. Circuit that such payments do not constitute "civil money penalties." Dkt. 227 at 24-25. But that is a question entirely different from whether Relator is entitled to a share of the Government's alternate remedy under the circumstances of this case, as Relator has explained previously. Dkt. 210 at 5-6. The DOJ does not dispute that neither SNR nor Northstar had any intention or ability to pay the full amount of their gross winning bids in violation of FCC rules; thus, their default was the inevitable result once Defendants' fraudulent scheme proved unsuccessful and SNR and Northstar were denied bidding credits. Dkt. 205-1 at 10.[15] Nor does the DOJ dispute that SNR's and Northstar's default payments serve as both a recognition and measure of a portion of the Government's damages from Defendants' fraud that resulted in their defaulting. *See, e.g, NextWave*, 200 F.3d at 58.

While contending that the Report correctly recognized that "the harms addressed by the 'default payments' and this *qui tam* action are separate," Dkt. 227 at 26, the DOJ represented otherwise in its motion to dismiss. There, the DOJ noted the "the FCC's official position" that

---

[15]     The DOJ's claim that SNR's and Northstar's default was the result of their determination that "they wanted most, but not all, of the licenses they won at auction" is not true. Dkt. 227 at 4. Because DISH had only $10 billion to spend in Auction 97, Northstar and SNR lacked the financial wherewithal to pay the full amount of their gross winning bids (approximately $13.3 billion). Dkt. 205-1 at 10. Thus, default was inevitable, not optional.

"SNR and Northstar [] have fully and timely satisfied their obligation to pay money to the Government arising from Auction 97 given their [default] payments to the FCC." Dkt. 199 at 16 (internal quotation omitted). Now, with approximately $516 million in default payments in hand that SNR and Northstar paid as a direct result of VTel's perseverance, the Government has obtained "from a *qui tam* defendant a remedy" and is arguing "that the proceeds of that remedy need not be shared with the whistleblower," *Barajas*, 258 F.3d at 1012—the very circumstances the FCA's alternate remedy provision is intended to protect relators against.[16]

Under the circumstances, if the Court accepts the Report's recommendation to dismiss this case, the Court should award Relator its share of the default payments that the Government received as an alternate remedy.

## CONCLUSION

Accordingly, the Court should grant Relator's objections to the Report.

Dated: July 8, 2025

*/s/ Stephen J. Obermeier*

Stephen J. Obermeier (D.C. Bar # 979667)
Bennett L. Ross (D.C. Bar # 978122)
Bert W. Rein (D.C. Bar # 067215)
Mark B. Sweet (D.C. Bar # 490987)
Kathleen C. Cooperstein (D.C. Bar # 1017553)
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Relator Vermont
National Telephone Co.*

---

[16] In *Kennedy*, the D.C. Circuit had "no occasion to decide" the circumstances presented here—namely, "what the consequences (if any) would be were the government to use a relator's information in a separate proceeding without fairly compensating the relator in the *qui tam* litigation" or if a claim of "governmental manipulation" has been raised. *Kennedy*, 5 F.4th at 58. This is yet another reason that the case does not foreclose Relator from sharing in the proceeds of the Government's alternate remedy, despite the DOJ's contention otherwise.